## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Blackjewel, L.L.C., *et al.*, | : | Case No. 19-30289 |
| Debtors,[1] | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03008 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CLEARWATER INVESTMENT | : | |
| HOLDINGS, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03012 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LEXINGTON COAL COMPANY, | : | |
| LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03015 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRIPLE H REAL ESTATE, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

[1] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Jeffery A. Hoops, Sr. ("Hoops"), Clearwater Investment Holdings, LLC ("Clearwater"), Lexington Coal Company, LLC ("Lexington"), Triple H Real Estate, LLC ("Triple H"), Construction & Reclamation Services, LLC ("CRS"), and Lexington Coal Royalty Company, LLC ("LCRC" and together with Hoops, Clearwater, Lexington, Triple H, and CRS, the "Defendants"), in accordance with the Order Regarding Consolidation and Scheduling, Adv. No. 20-03008, Docket No. 103 (the "Consolidation Order"), hereby file this Motion for Partial Summary Judgment, which is supported by the attached memorandum in support (including a numbered Statement of Material Facts) and the attached Appendix of deposition excerpts, exhibits, and other materials of record referred to in the Statement of Material Facts (the "Appendix").

Dated:  April 18, 2022

**McGUIREWOODS LLP**

/s/ *K. Elizabeth Sieg*
Mark E. Freedlander (admitted *pro hac vice*)
Frank J. Guadagnino (admitted *pro hac vice*)
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile:  (412) 667-6050
mfreedlander@mcguirewoods.com
fguadagnino@mcguirewoods.com

K. Elizabeth Sieg, Esq. (admitted *pro hac vice*)
Gateway Plaza, 800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
bsieg@mcguirewoods.com

A. Wolfgang McGavran (admitted *pro hac vice*)
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington D.C. 20006
Telephone: (202) 857-2471
wmcgavran@mcguirewoods.com

*Counsel to Defendants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Blackjewel, L.L.C., *et al.*, | : | Case No. 19-30289 |
| Debtors,[2] | : | (Jointly Administered) |
| | : | |

---

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03008 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CLEARWATER INVESTMENT | : | |
| HOLDINGS, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03012 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LEXINGTON COAL COMPANY, | : | |
| LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03015 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRIPLE H REAL ESTATE, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

---

[2] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Jeffery A. Hoops, Sr. ("Hoops"), Clearwater Investment Holdings, LLC ("Clearwater"), Lexington Coal Company, LLC ("Lexington"), Triple H Real Estate, LLC ("Triple H"), Construction & Reclamation Services, LLC ("CRS"), and Lexington Coal Royalty Company, LLC ("LCRC," and together with Hoops, Clearwater, Lexington, Triple H, and CRS, the "Defendants") hereby submit this Memorandum In Support of its Motion for Partial Summary Judgment, which respectfully states as follows:

## I.   DEFENDANTS' STATEMENT OF MATERIAL FACTS[3]

1.   Revelation Energy, LLC ("Revelation") was, prior to the formation of Blackjewel L.L.C. ("Blackjewel"), the principal operating company of the Debtors and wholly owned by Revelation Energy Holdings, LLC.  [App 1 – J. Reynolds Tr. 16:2-7].

2.   LR-Revelation Holdings, L.P., an affiliate of Lime Rock Partners (collectively, "Lime Rock") invested in Revelation Holdings in 2009.  [App. 2 – Revelation Holdings LLC Agreement at DEBTORSCL_009609].

3.   At all relevant times, Lime Rock was the majority owner of Revelation Holdings.  [App. 1 – J. Reynolds 25:15-26:4].

4.   Revelation Holdings was, at all relevant times, managed by a three-seat board of directors, which consisted of John Reynolds ("Reynolds") and Jeff Scofield ("Scofield") from Lime Rock, and Hoops.  [App. 1 – J. Reynolds Tr. 23:16-24:2].

5.   Revelation was initially formed to be a largely thermal coal mining business, but as a result of a downturn in the coal market beginning in approximately 2015, Revelation was able to acquire

---

[3] References in this Motion to the Defendants' Statement of Material Facts are styled as "DEF SMF ¶" followed by the applicable paragraph number.  References to the Appendix are styled as "App." Followed by the applicable exhibit number and a brief description of the exhibit.

a number of metallurgical coal mining operations and also convert some of its thermal coal mining

operations to metallurgical coal.  [App. 3 – J. Scofield Tr. 252:10-25].

6.      Meanwhile, by 2017, the global market for metallurgical coal was improving while the

market for thermal coal began to face more challenges and competition from natural gas and

renewable energy sources.  [App. 3 – J. Scofield Tr. 252:14-25].

7.      As a result, in 2017, Lime Rock and Hoops determined to restructure the business whereby

Blackjewel would be formed, Blackjewel would acquire Revelation's metallurgical coal assets,

Revelation's thermal coal assets (and associated reclamation liability) would be left behind to be

sold or reclaimed, and the company would then seek financing for Blackjewel (the

"Restructuring").  [App. 3 – Scofield Tr. 253:2-12].

8.      Thus, upon Blackjewel's formation in 2017, Blackjewel became the Debtors' primary

operating company and, at all relevant times, was wholly owned by Blackjewel Holdings L.L.C.

("Blackjewel Holdings").   [App. 4 – Blackjewel LLC Agreement at DEBTORSCL_009312;

*Declaration of Jeff A. Hoops, Sr. In Support of Chapter 11 Filings and First Day Motions*, Case

No. 19-30289, Docket No. 14, at ¶¶ 6, 9 (the "First Day Affidavit")].

9.      Lime Rock was at all relevant times the majority owner of Blackjewel Holdings. [App. 5

– Blackjewel Holdings LLC Agreement, at DEBTORSCL_009392; First Day Affidavit, at ¶ 41].

10.     Like Revelation Holdings, Blackjewel Holdings was, at all relevant times, managed by a

three-seat board of directors consisting of Reynolds, Scofield, and Hoops.  [App 1 – J. Reynolds

Tr. 24:22-25:14].[4]

---

[4] The Blackjewel Holdings board of directors and the Revelation Holdings Board of Directors will be collectively
referred to hereafter as the "Board of Directors" unless the context requires greater specificity.

11.     Scofield led the Lime Rock team in respect of Lime Rock's investment in the Debtors, and "was considerably closer to the day-to-day at Revelation and Blackjewel than John Reynolds." [App. 1 – J. Reynolds Tr., 88:21-24; 90:6-8].

12.     It was typical for the Board of Directors to approve company actions verbally, either over the telephone or during an in-person board meeting, or by email.  [App. 3 – J. Scofield Tr. 26:15-17].

13.     Scofield testified that there would be "weekly dialogue" between Lime Rock and the Debtors' management along with regular board meetings.  [*Id.* at 25:2-15].

14.     However, changes to the Debtors' equity structure required an amendment to the applicable operating agreement to reflect the updated allocation of equity, and Scofield testified that no changes to the equity structure were ever made without this being done [App. 3 – J. Scofield Tr. 27:13-23; 30:19-31:4].

15.     As an example, in August 2017, Hoops and a trust entity associated with Reynolds each contributed $2 million to Blackjewel Holdings in exchange for 20,000 Senior Preferred Units (collectively, the "2017 Equity Contributions").  [First Day Affidavit, at ¶ 40].

16.     Each of the 2017 Equity Contributions was formalized with a Contribution, Adoption, and Waiver Agreement dated as of August 15, 2017 (each a "Contribution Agreement").  [App. 6 – John Reynolds Revocable Trust Contribution Agreement, LR_REV_00000080; App. 7 – Hoops Contribution Agreement, LR_REV_00000007; App. 1 - J. Reynolds Tr. 73:6-11; 74:14-19].

17.     Earlier in 2017, in connection with the Restructuring, the Debtors engaged in discussions with Riverstone Credit Partners – Direct, L.P. ("Riverstone") regarding potential financing for Blackjewel.  [App. 3 – J. Scofield Tr. 252:10-253:12; 31:13-25].

18.     In discussing the potential Riverstone financing, Scofield told Lime Rock's investment committee in an email dated June 26, 2017, that "Hoops has covered nearly $9mm of liquidity shortfall so far this year" through what Scofield described as a "personal loan" (the "Pre-Riverstone Hoops Indebtedness"). [App. 8 – 6/26/2017 Email to Lime Rock Investment Committee, at LR_REV_00005936; App. 3 - J. Scofield Tr. 38:20-42:3].

19.     Scofield told the Lime Rock investment committee that approximately $5 million of proceeds from the contemplated loan from Riverstone would be used to partially repay the Pre-Riverstone Hoops Indebtedness and that Hoops would be "rolling the balance."  [*Id.*].

20.     Scofield also told the Lime Rock investment committee that Riverstone's willingness to lend was contingent upon "Lime Rock putting in a 'like amount' into the Term Loan alongside them, which is currently contemplated to be $3mm," but that to ensure that the Debtors had sufficient liquidity to allow for the Riverstone loan to close, $1 million of the contemplated $3 million loan from Lime Rock would need to be advanced to the company as a bridge loan prior to the closing of the contemplated Riverstone financing (the "Lime Rock Bridge Loan").  [*Id.*].

21.     Scofield also told Daniel Flannery ("Flannery"), who was the primary person at Riverstone dealing with the Debtors [App. 9 – D. Flannery Tr. 33:14-18], that "we want to use $5mm of the proceeds to pay down a note Hoops has made to the company (he'll roll $3mm)."  [App. 10 – 6/13/17 Email from Scofield to Flannery; App. 9 - D. Flannery Tr. 59:3-16].

22.     The Pre-Riverstone Hoops Indebtedness referenced in Scofield's emails to Flannery and the Lime Rock investment committee was secured by a mortgage dated December 1, 2016 (the "Hoops Mortgage").  [App. 28 – Hoops Mortgage; App. 3 - J. Scofield Tr. 299:25-300-6; App. 11-3/3/22 Hoops Tr. 56:22-57:10].

23.     On June 29, 2017, Scofield emailed Helena Jackson ("Jackson"), who at that time was the Debtors' General Counsel [App. 11 – 3/3/22 Hoops Tr. 28:6-9], and told Jackson that "our plan here is to just match our note to the same form Jeff H has (is this it?), and secure [t]he same collateral (parri with his note)."  [App. 12 - 6/29/17 Email from Scofield to Jackson].

24.     Pursuant to Scofield's direction, the Hoops Mortgage was amended and restated on July 10, 2017 to, among other things, add Lime Rock as a mortgagee (the "A&R Mortgage").  [App. 13 – A&R Mortgage; App. 3 - J. Scofield Tr. 297:22-299:20].

25.     On July 10, 2017, Lime Rock and Hoops also entered into a Letter Agreement which provides, among other things, for Lime Rock and Hoops to be treated *pari passu* and of equal priority with respect to each other as lenders under the "Bridge Loan Documents," which is defined therein as including the Hoops Mortgage (as amended on July 10, 2017) and a related amended and restated promissory note in favor of both Lime Rock and Hoops evidencing a $9,000,000 obligation owed to Hoops and a $3,000,000 obligation owed to Lime Rock (the "Letter Agreement").  [App. 14 – Letter Agreement].

26.     The Letter Agreement was drafted by Anu Mehta, Lime Rock's in-house counsel. [App. 15 – 7/5/17 Email from Mehta to Jackson].

27.     On July 17, 2017, the Debtors entered into a $34 million credit agreement with Riverstone (the "Riverstone Facility"), which consisted of $28 million lent by Riverstone, $3 million lent by Lime Rock ($1m of which was prefunded and rolled into the Riverstone Facility), and $3 million lent by Hoops (all of which was prefunded and rolled into the Riverstone Facility) (the "Hoops-Riverstone Participation").  [App. 16 – Riverstone Credit Agreement; App. 8 - 6/26/2017 Email to Lime Rock Investment Committee, at LR_REV_00005936; App. 3 – J. Scofield Tr. 217:5-14].

8

28.    Hoops received $4,956,798.93 from the proceeds of the Riverstone Facility (the "Hoops-Riverstone Payment") as contemplated by Scofield's emails to Flannery and the Lime Rock investment committee.  [App. 17 – Flow of Funds; App. 9 - D. Flannery Tr. 73:2-74:12].

29.    In connection with the closing on the Riverstone Facility, Hoops and Lime Rock, in connection with rolling their respective indebtedness into the Riverstone Facility and the partial repayment to Hoops of $4,956,798.93, were required to terminate the A&R Mortgage.  [App. 18 - Mortgage Termination; App. 3 - J. Scofield Tr. 295:25-299:24].

30.    Following the closing on the Riverstone Facility, Hoops presented the Debtors with an opportunity to acquire certain coal assets from various affiliates of Contura Energy (collectively, "Contura") located in the Powder River Basin in Wyoming, which transaction would include the Debtors receiving millions from Contura in consideration for the Debtors' assumption of the reclamation liabilities associated with the coal assets being acquired (the "Contura Transaction"). [App. 3 – J. Scofield Tr. 127:13-22; 131:22-132:3; 135:10-21; 212:3-6; 212:16-23].

31.    During the course of those discussions with Contura, the Debtors' underground workers' compensation insurance rate increased from 24% to 48% effective October 25, 2017 as a result of a change in Kentucky state law, resulting in a cost increase to the Debtors of $24 million per year. [App. 19 – 11/7/2017 Email from Hoops to Flannery, at DEBTORSUB_093859-60; App. 9 - D. Flannery Tr. 159:17-160:8].

32.    Likewise, on or around November 6, 2017, a roof collapsed at Blackjewel's Lone Mountain facility which temporarily reduced production at Lone Mountain by a significant degree.  [App. 19 – 11/7/2017 Email from Hoops to Flannery, at DEBTORSUB_093859-60; App. 9 - D. Flannery Tr. 162:7-16].

33.     Given the liquidity issues caused by the increase in workers' compensation costs and the roof collapse at Lone Mountain, the Debtors required additional liquidity to allow them to bridge to a closing on the Contura Transaction.  [App. 19 – 11/7/2017 Email from Hoops to Flannery, at DEBTORSUB_093859-60; App. 9 - D. Flannery Tr. 160:19-22].

34.     On November 13, 2017, Hoops proposed to Scofield that Hoops would loan $5 million to the Debtors to allow them sufficient liquidity pending the closing on the Contura Transaction. [App. 20 – 11/13/17 Email from Hoops to Scofield].

35.     As part of the consideration for bringing the Contura Transaction to the Debtors and agreeing to extend the Debtors a $5 million bridge loan, Hoops asked that two ranches located in Wyoming, which Contura was including as part of the Contura Transaction, be conveyed to Triple H (the "Ranches").  [Id.].

36.     On the same day, Oliver Phillips of Lime Rock emailed Flannery a summary of a proposal from Hoops to "invest $5mm into the existing loan structure, pari-passu with existing creditors" in exchange for, in part, the conveyance of the Ranches to Triple H.  [App. 21 – 11/13/17 Email from Phillips to Flannery; App. 3 - J. Scofield Tr. 134:8-135:3].

37.     Following discussion between Lime Rock, Riverstone, and Hoops, Flannery consented to Hoops lending $5 million to Blackjewel (the "2017 Loan").  [App. 22 – 11/14/17 Email from Flannery to Hoops; App. 9 - D. Flannery Tr. 82:8-83:20].

38.     The 2017 Loan was memorialized in a promissory note. [App. 23 - $5 million note; App. 9 - D. Flannery Tr. 82:8-83:20].

39.     On December 29, 2017, Phillips provided Flannery with a Secretary's Certificate indicating the dates and amounts of the draws and repayment of the 2017 Loan.  [App. 24 – 12/29/17 Email from Phillips to Flannery].

40.     Scofield testified that Lime Rock approved the 2017 Loan "because we thought it was in the best interest of Blackjewel" and that he still "believe[s] the purchase of the Contura assets in the [Powder River Basin] were in the best interest of Blackjewel." [App. 3 – J. Scofield Tr. 132:25-133:9].

41.     The Ranches were ultimately never conveyed to Hoops or Triple H. [App. 11 – Hoops Tr. 294:8-24].

42.     Throughout 2018 and 2019, Hoops continued to support Blackjewel's liquidity needs as they arose in the ordinary course of business.  [First Day Affidavit, ¶ 21; App. 25 – D. Kesler Tr. 56:7-13; 44:14-45:5; 48:3-23].

43.     Specifically, Hoops held a personal revolving line of credit with United Bank (the "Hoops LOC") and, in instances where Blackjewel needed to bridge a short-term liquidity gap, Hoops would allow United Bank to transfer funds from the Hoops LOC to Blackjewel's line of credit with United Bank for purposes of affording Blackjewel bridge liquidity (the "Hoops Revolving Loans") [App. 25 – D. Kesler Tr. 64:6-65:17].

44.     Once the temporary liquidity issue necessitating the funds from the Hoops LOC was resolved, those funds would typically be transferred back to the Hoops LOC by Blackjewel.  [App. 11 – 3/3/22 Hoops Tr. 154:3-155:12; App. 3 – J. Scofield Tr. 34:14-23].  The Hoops LOC was made available to Blackjewel on what amounted to a revolving basis.  [App. 11 – 3/3/22 Hoops Tr. at 157:20-157:9].

45.     Drew Kesler, Debtors' former Chief Financial Officer ("CFO"), testified that amounts owed to Hoops on account of the Hoops Revolving Loans were recorded on the Debtors' monthly financials and that monthly financials were shared with Lime Rock.  [App. 25 – D. Kesler Tr. 69:9-22].

46.     On or about April 24, 2019, Hoops assigned the indebtedness owed to him by Blackjewel on account of the Hoops Revolving Loans to Clearwater [App. 26 – Hoops-Clearwater Assignment Agreement; P. Hoops Tr. 52:6-19], which began making similar short-term bridge loans to Blackjewel to allow it to bridge liquidity gaps and prevent checks from being returned (the "Clearwater Revolving Loans").  [App. 27 – B. Walls Tr. 165:22-166:23].

47.     Clearwater is owned by an entity called the Clearwater Trust, which held 99%, and Hoops wife, Patricia Hoops, who owns the remaining 1%.  [App. 29 – Clearwater Operating Agreement, at DEBTORSUB_105010; App. 30 - P. Hoops Tr. 48:13-21].

48.     Hoops' sons are the beneficiaries of the Clearwater Trust.  [App. 30 – P. Hoops Tr. 48:22-24].

49.     Clearwater's manager, Patricia Hoops, has sole authority to manage Clearwater.  [App. 29 – Clearwater Operating Agreement, §§ 3.1, 3.2, at DEBTORSUB_104997].

50.     Clearwater made the Clearwater Revolving Loans to Blackjewel pursuant to a revolving line of credit established between Clearwater and United Bank.  [App. 31 – Clearwater RLOC Note; App. 30 - P. Hoops Tr. 51:19-52:5].

51.     Clearwater charged interest on the Clearwater Revolving Loans at the same rate that it was being charged by United Bank, such that Clearwater's interest expense at United Bank was passed through to Blackjewel.  [App. 27 – B. Walls Tr. 212:8-19].

52.     Kesler testified that the Hoops Revolving Loans and Clearwater Revolving Loans used to cover "ordinary course operating expenses" including "payroll, royalties, taxes" and "other various things in the normal course of operating the business."  [App. 25 – D. Kesler Tr. 47:25-48:9].

53.     Lime Rock was aware that Hoops and Clearwater were making these loans to Blackjewel and that they were "largely made to cover working capital-related needs of the business that

exceeded the availability under the company's line with United Bank or cash on hand." [App. 3 – J. Scofield Tr. 32:23-33:12].

54.     Scofield viewed these loans as "providing unsecured credit support to the business.  We viewed it as debt, you know, to provide working capital shortfalls over time to a business that had ongoing projections to be out of the liquidity crisis."  [*Id.* at 230:7-12].

55.     Scofield testified that these loans were typically made "based upon a cash flow forecast that Jeff Hoops kept, and he would show us the cash flow forecast sometimes as part of our reporting."  [*Id.* at 33:21-24].

56.     Lime Rock knew that the Hoops Revolving Loans and the Clearwater Revolving Loans were used when the company "had liquidity pinches in between bills that needed to be paid and receivables that came in" [*Id.* at 47:24-48:8] and needed "a bridge on working capital."  [*Id.* at 74:3-8].

57.     Lime Rock supported and approved Hoops and Clearwater providing liquidity support to Blackjewel because it helped Blackjewel pay accounts payable as they came due.  [*Id.* at 48:10-16].

58.     Scofield testified that Hoops "was the closest to the business cash flows as you've seen from the models and the e-mails.  He ran the business on a day-to-day basis, and he was making those decisions real time on discrete data that we relied on and which . . . I believed to be . . . based upon the best facts at the time.  He had a very good handle on the day-to-day running of the business."  [*Id.* at 74:9-17].

59.     Lime Rock also supported and approved the Hoops and Clearwater providing liquidity support to Blackjewel because it understood it was not being asked to dilute its equity interests in exchange.  [App. 1 - J. Reynolds Tr. 66:3-19].

60.     Scofield testified that Lime Rock was aware that the Hoops Revolving Loans and the Clearwater Revolving Loans were "something that needed to be addressed over time, which it had been addressed over time like when we got the Riverstone deal done and you had permanent financing come in, and some of it was turned into permanent financing and refunded back." [App. 3 – J. Scofield Tr. 229:20-230:2].

61.     Lime Rock did not understand Hoops' liquidity support of Blackjewel to be equity contributions, nor did Lime Rock intend for this liquidity support to be treated as equity. [App. 1 – J. Reynolds Tr. 66:3-19; App. 3 – J. Scofield Tr. 230:7-12].

62.     Both Reynolds and Scofield confirmed that no changes to the equity structure occurred in 2018, and that no changes to the equity structure occurred in 2019.  [App. 3 – J. Scofield Tr. 68:12-69:2; App. 1 – J. Reynolds Tr. 79:13-80:8].

63.     On June 24, 2019, Kesler emailed Riverstone a spreadsheet indicating the amounts and dates of various Hoops Revolving Loans and Clearwater Revolving Loans that occurred in 2019. [App. 38A – 6/24/2019 Email from Kesler to Flannery; App. 9 - D. Flannery Tr. 48:2-49:2], which spreadsheet indicated that Hoops and Clearwater had, in the aggregate, lent $45,126,179.74 and had been repaid $34,672,699.35 in the aggregate.  [App. 38B – Revolving Loans Spreadsheet].

64.     Scofield stated that the economics of the coal mining business largely relates to logistics, such as whether a particular mine is located near a load-out and preparation plant, and that it was quite common in the coal space for properties to change hands to take advantage of certain logistical benefits.  [App. 3 – J. Scofield Tr. at 171:16-172:17].

65.     In respect of Defendant Lexington, Scofield testified that the "board approved several transactions" between the Debtors and Lexington where properties were sold by the Debtors to

Lexington for purposes of removing reclamation liability from the Debtors' books. [App. 3 – J. Scofield Tr. 80:15-81:25; 84:2-9].

66.     Revelation, Blackjewel, and Lexington entered into a certain Asset Purchase Agreement dated effective as of November 30, 2017 (the "APA"), along with an accompanying Permit Transfer Agreement also dated effective as of November 30, 2017 (the "PTA"). [App. 32 – APA & PTA; App. 33 - S. Poe Tr. 79:13-20; 83:13-22].

67.     Scofield testified that he believed the APA and PTA were "part of the transaction where we separated Blackjewel and Revelation, leaving . . . largely thermal assets in Revelation and putting metallurgical assets into Blackjewel. And as part of that, a portion of assets that were more valuable to Lexington than either Revelation or Blackjewel were sold in exchange for reclamation liability. It was a three-way deal." [App. 3 – J. Scofield Tr. 90:20-91:7].

68.     Scofield testified that the Debtors owned "shut-in mining complexes" that were not currently in operation and "not part of Blackjewel's . . . current or go-forward operating plan, but which involved future reclamation obligations," and that the purpose of the APA and PTA was to transfer those properties to Lexington because Lexington could fit those properties within its own mining plan and was therefore willing to purchase the properties and assume the associated reclamation liability. [*Id.* at 83:3-84:9].

69.     Sixty-one (61) permits held by Revelation were to be transferred to Lexington pursuant to the APA and PTA (the "Permits") [App. 32 – APA & PTA at DEBTORSUB_042910-11; App. 33 - S. Poe Tr. 84:13-86:3].

70.     Steven Poe ("Poe") was Lexington's C.E.O. at the time the parties entered into the APA and PTA and remained Lexington's C.E.O. until January 2019 [App. 33 – S. Poe Tr. 23:19-23; 46:20-21].

71.    Poe testified in his deposition that "[t]hese permits were obviously strained so much that they could have been taken away from Revelation if actions weren't taken properly." [*Id.* at 67:23-68:2].

72.    Poe testified that the state of the Permits was such that Hoops "needed to move on this fast because he truly did not have any equipment that could go do the [reclamation] work.   Their equipment was all basically ran into the ground.  The equipment they had and the assets they had couldn't even physically do work." [*Id*. at 72:13-17].

73.    Poe testified that, on the other hand, "Lexington did have assets.  We did have operators. We did have equipment that could function and do the work.  So that's why [Hoops] was initially wanting to put Lexington on these permits as an operator initially" pending transfer of the Permits. [*Id.* at 72:21-25].

74.    Each of the Permits could only be transferred to Lexington if the Commonwealth of Kentucky (the "Commonwealth") authorized and approved such transfer in its sole discretion [*Id.* at 223:20-24].

75.    On or about April 23, 2018, permit transfer applications for each Permit were submitted to the Commonwealth (the "Permit Transfer Applications").  [*Id.* at 220:25-221:4].

76.    Lexington provided the required bonding for all Permits.  [*Id.* at 221:22-24].

77.    Poe testified that permit transfers in connection with coal company acquisitions "take months to get done."  [*Id.* at 122:17-25].

78.    Poe testified that he was not aware of anything Lexington could have done that it did not do in order to effectuate the transfer of the Permits [*Id*. at 223:5-8] and that, during his time as C.E.O., Lexington performed all of its obligations under the APA and PTA.  [*Id.* at 232:7-11].

79.    Poe testified that no one at Revelation or Blackjewel ever suggested to him that Lexington was in breach of either the APA or the PTA.  [*Id.* at 231:18-232:6].

80.    At his deposition, Scofield testified that "[s]pecific to that deal, I still think that was a fair deal that we approved, you know, as a board for the company."  [*Id.* at 91:8-16].

[remainder of page intentionally blank]

## II.     <u>INTRODUCTION</u>

When considering Defendants' Motion, it is important to contextualize the underlying Complaints.  For more than a decade prior to the Debtors' bankruptcy filings, a sophisticated multi-billion dollar investment fund, Lime Rock, was the majority owner of the Debtors and maintained two of three seats on the Board of Directors.  During this entire period, Lime Rock worked closely with its investment partner, Jeff Hoops and entities associated with him.  Hoops served as the Debtors' C.E.O. for the entirety of this working relationship with Lime Rock until the Debtors sought bankruptcy protection.  Information obtained via discovery demonstrates that Hoops regularly and consistently conferred with and informed Lime Rock regarding various matters involving the Debtors as they transpired over the course of time.   The parties did business largely on an informal basis—a common business practice for non-public companies—but one that has afforded the Plaintiff great liberties in the crafting of the pending Complaints.

The Complaints filed in this matter attempt to recreate circumstances underlying a series of historical transactions in a manner that implicates self-dealing or worse at practically every turn.  However, in several important instances, the allegations contained in the Complaints do not reconcile with what actually transpired and, as a result, several significant Counts in the underlying litigation cannot survive summary judgment.

Chief among these are those Counts related to the revolving advances extended by and repaid to Hoops and Clearwater.  These revolving advances were without question intended by Lime Rock, Hoops, Clearwater, and Blackjewel to be short-term extensions of bridge credit and were made with Lime Rock's full support, yet Plaintiff—hoping to take advantage of the informal manner in which Lime Rock and Hoops conducted business—nevertheless seeks to recharacterize them as equity contributions.  As explained more fully below, Plaintiff does so not for purposes of effectuating the original intent of the parties, but instead to create fraudulent conveyance claims

18

and breach of fiduciary duty claims that otherwise would not be viable.   Plaintiff's use of recharacterization to revise history in accordance with its own wishful thinking is not appropriate and should not be permitted here.

### III.   LEGAL STANDARD

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  Once the moving party meets its "initial burden of pointing to the absence of a genuine issue of material fact," the burden "then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991).   "Mere speculation by the non-moving party 'cannot create a genuine issue of material fact.'"  *Tsai v. Md. Aviation*, 306 Fed. Appx. 1, 4 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).  The nonmoving party must "produce evidence that goes beyond '[c]onclusory or speculative allegations' and relies on more than 'a mere scintilla of evidence' to withstand summary judgment."  *Id.* (quoting *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).  As stated by the United States Supreme Court:

> "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV.    ARGUMENT

**A. Defendant Hoops is Entitled to Summary Judgment on Counts Two, Three, and Five of the Clearwater Complaint Related to the Hoops-Riverstone Payment, the Hoops-Riverstone Participation, and the Security Interests Granted in Connection Therewith.**

Counts Two, Three and Five of the Clearwater Complaint[5] seek to avoid and recover the Hoops-Riverstone Payment, the Hoops-Riverstone Participation, and the security interests granted in connection with the Hoops-Riverstone Participation as constructively fraudulent transfers.[6] As demonstrated below, Hoops is entitled to summary judgment on Counts Two, Three, and Five because Plaintiff cannot demonstrate that the Debtors did not receive reasonably equivalent value in connection with those transactions.

> i.    *Lime Rock was aware of the Pre-Riverstone Hoops Indebtedness and wanted to utilize proceeds from the Riverstone Facility to make the Hoops-Riverstone Payment.*

Plaintiff suggests that Hoops "caused" Blackjewel to pay him the Hoops-Riverstone Payment related to amounts Hoops "claimed to be owed," which had the effect of granting "Hoops a security interest under the Riverstone Facility securing $3 million of alleged obligations to Hoops that were not previously secured . . . ." *See* Clearwater Complaint, ¶¶ 21-22.  These allegations are false and not supported by any evidence.  First, though the Clearwater Complaint implies that the Pre-Riverstone Hoops Indebtedness was somehow fabricated by Hoops, Lime Rock was well aware of this indebtedness and of the need to repay it [DEF SMF ¶¶ 18-19].  Secondly, Hoops did not "cause" Blackjewel to pay the Hoops-Riverstone Payment.  Lime Rock at all times controlled the Board of Directors and was the Debtors' majority owner [DEF SMF ¶¶ 3-4, 9-10], and thus

---

[5] *See* First Amended Adversary Complaint, Adv. No. 20-03008, Docket No. 37 (the "Clearwater Complaint").

[6] It is not clear whether Plaintiff seeks to avoid the Hoops-Riverstone Payment along with the Hoops-Riverstone Participation and associated security interests.  For purposes of this Motion, Hoops assumes that Plaintiff does intend to avoid the Hoops-Riverstone Payment, which he submits is not avoidable for the reasons stated herein.

Lime Rock—not Hoops—ultimately determined how the Riverstone Facility would be structured and how proceeds of the Riverstone Facility would be utilized.  This is evidenced by Scofield's email to Flannery on June 13, 2017, in which he stated that "we want to use $5mm of the proceeds to pay down a note Hoops has made to the company (he'll roll $3mm)."  [DEF MSF ¶ 21].  All of the foregoing was confirmed by Scofield in his deposition.[7]  Accordingly, any suggestions that the Pre-Riverstone Hoops Indebtedness was undisclosed or illegitimate, or that Hoops compelled the Debtors to make the Riverstone Payment or grant him the Hoops-Riverstone participation, are false and unsupported.

> ii.     *The Pre-Riverstone Hoops Indebtedness was a secured obligation of the Debtors at the time it was rolled into the Riverstone Facility.*

Plaintiff's suggestion that Pre-Riverstone Hoops Indebtedness was previously unsecured is also false.  The Pre-Riverstone Hoops Indebtedness was originally secured by the Hoops Mortgage.  [DEF MSF ¶ 22].  Lime Rock clearly knew this, because when Lime Rock sought to extend its own $1 million bridge loan to the Debtors in advance of closing on the Riverstone Financing (the "Lime Rock Bridge Loan") [DEF SMF ¶ 20], which was rolled into the Riverstone Facility along with the Pre-Riverstone Hoops Indebtedness, Scofield directed Helena Jackson (then the Debtors' General Counsel) to amend the Hoops Mortgage and related promissory note to add Lime Rock as a mortgagee and noteholder.  [DEF MSF ¶ 23].  Accordingly, on July 10, 2017, the parties executed the A&R Mortgage [DEF MSF ¶ 24] and the Letter Agreement [DEF MSF ¶ 25].  The Letter Agreement provides that "Hoops and Lime Rock hereby agree that they shall be treated *pari passu* and of equal priority with respect to each other as lenders . . . ." [DEF MSF ¶ 25].[8]

---

[7] *See* App. 3 – J. Scofield Tr. 220:11-25.
[8] Notwithstanding the fact that Hoops and Lime Rock each rolled pre-existing bridge loan indebtedness into the Riverstone facility and executed the Letter Agreement, the Debtors repaid the Lime Rock Bridge Loan without challenge, while the money that should have been paid to Hoops on account of the Pre-Riverstone Hoops

Accordingly, Lime Rock and Hoops were each secured by the A&R Mortgage on the Lime Rock Bridge Loan and the Pre-Riverstone Hoops Indebtedness, respectively. On July 17, 2017, the parties closed on the Riverstone Facility, and Lime Rock and Hoops executed the Mortgage Termination. [DEF MSF ¶¶ 27-29]. As explained below, because the Pre-Riverstone Hoops Indebtedness constituted bona fide secured indebtedness of the Debtors to Hoops as of the closing of the Riverstone Facility, Plaintiff's claims for fraudulent transfer fail as a matter of law.

>    iii.    *The Debtors received reasonably equivalent value in exchange for the Hoops-Riverstone Payment, the Hoops-Riverstone Participation, and the security interests granted in connection therewith, and therefore the Trust cannot avoid them as fraudulent transfers.*

Count Two and Count Three of the Clearwater Complaint seek to avoid (and Count Five seeks to recover), among other transfers, the Hoops-Riverstone Payment, the Hoops-Riverstone Participation, and any associated security interests granted to Hoops in connection therewith as constructively fraudulent transfers under 11 U.S.C. 548 and the West Virginia Uniform Fraudulent Transfers Act (the "UFTA"), respectively. Section 548 of the Bankruptcy Code provides in relevant part that:

> (a)(1) The Trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured;"
> . . . .

---

Indebtedness was instead deposited into the Court's registry where it remains to this day. Clearwater Complaint, ¶ 23.

11 U.S.C. § 548(a)(1)(B).[9]  As stated in Count Five, section 550 of the Bankruptcy Code allows

for the recovery of any transfers that are successfully avoided (or the value thereof). 11 U.S.C. §

550.

Thus, to succeed on a constructively fraudulent transfer claim, Plaintiff must demonstrate

that the Debtors did not receive reasonably equivalent value in exchange for the Hoops-Riverstone

Payment, the Hoops-Riverstone Participation, and the security interests granted in connection with

the Hoops-Riverstone Participation.  It cannot do so here and Hoops is therefore entitled to

summary judgment as a matter of law.  "Value," is defined in section 548 to include the

"satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. ¶ 548(d)(2)(A).

As demonstrated above, Hoops personally loaned approximately $9 million to the Debtors which

was secured by the Hoops Mortgage.  [DEF MSF ¶¶ 18, 22]. The Pre-Riverstone Hoops

Indebtedness was contemporaneously acknowledged by Lime Rock in its communications to its

own investment committee, Riverstone, and the Debtors' General Counsel, as well as in the A&R

Mortgage, the Letter Agreement, the Mortgage Termination, and all other documents related

thereto.  [DEF MSF ¶¶ 18, 21, 23-25, 29].  Thus, the Hoops-Riverstone Payment constituted a

dollar-for-dollar reduction of the Pre-Riverstone Hoops Indebtedness.  "Typically, a dollar-for-

dollar reduction in debt constitutes—as a matter of law—reasonably equivalent value for purposes

of the fraudulent-transfer statutes."[10]  Likewise, the senior liens granted to Hoops and Lime Rock,

in connection with the Riverstone Facility to secure the Hoops-Riverstone Participation as well as

Lime Rock's $3 million loan, replaced the A&R Mortgage previously securing the Pre-Riverstone

---

[9] The UFTA contains nearly identical language across W. Va. Code sections 40-1A-4(a)(2) and 40-1A-5(a), and also requires a showing of lack of reasonably equivalent value for the transfer or obligation in question.

[10] *Southeast Waffles, LLC v. United States Dept. of Treasury (In re Southeast Waffles, LLC)*, 702 F.3d 850, 857 (6th Cir. 2012) (citing cases); *see also Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1145-46 (9th Cir. 2013) ("Therefore, to the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not constructively fraudulent.").

Hoops Indebtedness and the Lime Rock Bridge Loan. The Debtors therefore received reasonably equivalent value in exchange for the Hoops-Riverstone Participation and the associated liens granted to Hoops.

Consequently, Hoops is entitled to judgment as a matter of law on Count Two, Count Three, and Count Five of the Clearwater Complaint as those counts relate to the Hoops-Riverstone Payment, the Hoops-Riverstone Participation, and any liens granted to Hoops in connection with the Hoops-Riverstone Participation.

**B. Plaintiff Cannot Demonstrate that the Parties Intended the Hoops Revolving Loans or the Clearwater Revolving Loans to be Equity Contributions and Therefore Such Loans Should Not Be Recharacterized.**

Plaintiff seeks in Count One of the Clearwater Complaint to recharacterize the Hoops Revolving Loans and the Clearwater Revolving Loans, which is appropriate "where the circumstances show that a debt transaction was 'actually [an] equity contribution *ab initio*.'"[11] The "paradigmatic situation for recharacterization" is where an insider advances funds into an enterprise "*with little or no expectation that they would be paid back along with other creditor claims.*" *Adelphia Comms. Corp. v. Bank of America, N.A. (In re Adelphia Comms. Corp.)*, 365 B.R. 24, 74-75 (Bankr. S.D.N.Y. 2007) (emphasis added). The burden of proof rests with the party seeking recharacterization.[12]

    *i.    Recharacterization would produce an irrational result under the actual circumstances of the advances made to Blackjewel by Hoops and Clearwater.*

"The doctrine of recharacterization, as it has evolved across United States jurisdictions, unfortunately imposes inconsistent and, arguably, sometimes **_irrational_** results (particularly for insiders or other nontraditional lenders of last resort) who provide financial support to a business

---

[11] *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001) (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)) (emphasis in original).

[12] *In re Estill Med. Techs.*, No. 01-48064, 2003 Bankr. LEXIS 2310 at *10 (N.D. Tex. Sept. 12, 2003) (citing *Herzog v. Leighton Holdings (In re Kids Creek Partners, L.P.)*, 212 B.R. 898, 933 (Bankr. N.D. Ill. 1997)).

in financial distress." *Gernsbacher v. Campbell (In re Equip. Equity Holdings, Inc.*), 491 B.R. 792, 848 (Bankr. N.D. Tex. 2013) (emphasis in original). The instant case is a perfect example of where recharacterization would produce completely irrational results. Consider, for instance, the allegation leveled against Clearwater. Once it took assignment of the indebtedness Hoops was owed by Blackjewel, Clearwater began to allow Blackjewel to use the Clearwater LOC in the same manner and for the same purposes that Hoops had allowed Blackjewel to utilize the Hoops LOC— as a form of short-term bridge liquidity to allow Blackjewel to avoid overdrafts and clear checks to creditors in the ordinary course of business. Importantly, the Clearwater LOC was a revolving facility with a maximum availability of $11 million, and so in effect the same $11 million of credit at United Bank was being borrowed, repaid, and re-borrowed numerous times over. [App. 31 - Clearwater RLOC Note]. As of the bankruptcy filing, Blackjewel owed Clearwater $7,280,577.99 on account of the Clearwater Revolving Loans. [App. 34 – Clearwater Proof of Claim]. Yet Plaintiff suggests that not only should Clearwater recover nothing on its Proof of Claim, Clearwater should also repay *$34 million* to the estate. The Plaintiff came up with this figure by simply adding up the individual repayments made to the Clearwater LOC in the aggregate, which, without factoring in subsequent reborrowing of those funds, is a meaningless and completely misleading number.[13] The $34 million is a fiction—Clearwater quite obviously did not recover $34 million on an $11 million loan. In reality, those repayments revolved back into the Debtors to help facilitate payment to the Debtors' other creditors, and when the proverbial music stopped, Clearwater was left holding the bag and it is highly unlikely that it will ever recover anything on its Proof of Claim, regardless of what happens in this litigation.

---

[13] Similarly, Plaintiff seeks to recover $7.7 million of loan repayments to Hoops without factoring in any subsequent reborrowing of those loan payments, even though Hoops—like Clearwater—lent money to Blackjewel via a revolving line of credit and even though as of the bankruptcy filing Hoops was owed $3,604,267.71 on account of the Hoops Revolving Loans. [App. 35 – Hoops Proof of Claim].

Plaintiff's conclusion that these loan repayments "harmed the Debtors and their ability to satisfy obligations to creditors"[14] is likewise incorrect because, again, Plaintiff failed to consider that every penny of that "$34 million" was subsequently reborrowed by Blackjewel. When reborrowing is taken into account, Plaintiff's conclusion makes no sense, and indeed Lime Rock, Drew Kesler, and Hoops all testified to the exact opposite. Specifically, they testified that the additional liquidity from Clearwater (and earlier, from Hoops personally) was a benefit to Blackjewel, as it allowed Blackjewel to avoid overdrafts and enhanced (rather than harmed) Blackjewel's ability to satisfy obligations to other creditors. [DEF MSF ¶¶ 52-58].

    ii.    *Recharacterization is not appropriate for either the Hoops Revolving Loans or Clearwater Revolving Loans because the parties did not intend for the advances to be treated as equity contributions.*

The "overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a transaction . . . ." *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (emphasis in original). Accordingly, this Court should look to the parties' intent as a key component of its recharacterization analysis.[15] It is not appropriate to "use recharacterization arguments to try to change the relationships between the parties." *In re Yoga Smoga, Inc.*, 2016 Bankr. LEXIS 4481, *8 (Bankr. S.D.N.Y. Dec. 19, 2016) (agreeing "with the Third Circuit Court of Appeals in the <u>SubMicron</u> decision that it is wrong to try to use recharacterization arguments in this way"). As stated by Judge Wiles in *Yoga Smoga, Inc.*:

---

[14] Clearwater Complaint, ¶ 19.
[15] *See In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.*, 453 F.3d 225, 235 (4th Cir. 2006) ("<u>Dornier Aviation</u>"); *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (identifying "the intent of the parties" as factor in recharacterization analysis) (citations omitted) (cited with approval in *Dornier Aviation*, 453 F.3d at 234, n.6).

"[i]t is one thing to examine the terms of a relationship, and the intents of the parties, to identify whether an advance of money actually was a loan or an equity investment at the time it occurred.  It is quite different to suggest that the court, after the fact, can apply a new characterization based on the court's idea of how the arrangement could or should have been structured, or based on the court's idea of what would be fair to other creditors."

*Id.*

The latter is exactly what Plaintiff would have this Court do, because Plaintiff cannot demonstrate that any of the Debtors' directors or officers understood or intended the Hoops Revolving Loans or Clearwater Revolving Loans to be equity contributions *ab initio*.  Scofield testified that Hoops "was providing unsecured credit support to the business. ***We viewed it as debt***, you know, to provide working capital shortfalls over time to a business that had ongoing projections to be out of the liquidity crisis."  [App. 3 – J. Scofield Tr. 230:7-12 (emphasis added)]. Scofield also testified that the Board of Directors viewed the Hoops Revolving Loans and Clearwater Revolving Loans the same way as they did the Pre-Riverstone Hoops Indebtedness, stating that "[w]e were also aware that it was something that needed to be addressed over time, which it had been addressed over time like when we got the Riverstone deal done and you had permanent financing come in, and some of it was turned into permanent financing and refunded back."  [*Id.* at 229:20-230:2].  With respect to equity, Scofield testified that "if we made a change to the equity structure with a funding, we would memorialize it with an amendment to the LLC agreement," [*Id.* at 27:21-23] and that there were never any equity infusions by any party that were not reflected in an operating agreement amendment.  [*Id.* at 30:19-31:4].

Reynolds, though much farther removed from the day-to-day at the Debtors than Scofield [App. 1 – J. Reynolds Tr. 90:6-8], likewise testified that the Board of Directors was supportive of the liquidity support being provided by Hoops because Hoops knew the business the best, the alternative was to run out of liquidity, and because he was not being asked to dilute his equity

interests. [*Id*. at 66:3-19]. Reynolds likewise confirmed that there were no changes in the Debtors' equity structure in either 2018 or 2019. [*Id.* at 79:2-80:8].

Hoops, Blackjewel's former C.E.O. and the former remaining director on the Board of Directors, has consistently stated that the support Blackjewel received were loans and not equity. *See* First Day Affidavit, at ¶ 38 (stating that Hoops and Clearwater made "several revolving credit advances and other unsecured loans or extensions of credit . . . which were advanced and repaid on a revolving basis and were not documented, [which] were made to . . . enable the Debtors to pay ordinary course costs and expenses").

Further, Drew Kesler, the Debtors' Chief Financial Officer ("CFO"), testified that the Hoops Revolving Loans and Clearwater Revolving Loans were one of the sources of credit available to Blackjewel, that he was aware of those loans, and that he was involved in administering them when the need for credit arose. [App. 25 – D. Kesler Tr. 44:14-17; 46:6-12; 48:24-49:15]. Kesler—who remained an employee of Blackjewel after the bankruptcy filing and continues to be paid by the Liquidation Trust as a consultant—further testified that, as C.F.O., he tracked members' equity and that there were no changes to equity in 2019. [*Id.* at 24:19-25:7; 40:24-41:9; 43:20-23]. Consistent with the testimony of its officers and directors, Blackjewel's records reflected that the transactions at issue were debt, not equity. [*Id.* at 47:14-24].

Finally, it is uncontroverted that Clearwater understood that the Clearwater Revolving Loans were to be used as bridge loans that were to be repaid as soon as possible. [App. 27 – B. Walls Tr. 226:14-227:4].

Even Plaintiff's own characterizations of record appear to acknowledge that the Hoops Revolving Loans and the Clearwater Revolving Loans were not intended to be equity contributions. For instance, in the Plaintiff's adversary proceeding against United Bank, Plaintiff

28

has stated that "[o]n other occasions prior to the Petition Date, United Bank allowed Clearwater and/or Hoops to **loan money** to the Plaintiffs, including for the purpose of covering payroll obligations to employees."). *See* Adv. No. 20-03007, Docket No. 28, ¶ 16. Likewise, one email from David Beckman, the Plaintiff's appointed trustee, is particularly telling. By way of background, after United Bank thwarted the Clearwater DIP loan at the commencement of the bankruptcy cases, and after Hoops' resignation from the Debtors, Hoops made a separate DIP financing proposal to the Debtors. As part of that proposal, Hoops wanted to seek a judicial determination that the Hoops Revolving Loans and the Clearwater Revolving Loans were loans and not equity. In discussing this proposal, Mr. Beckman suggested that "we can say that the debtor has looked at the ins/outs and Hoops contributed a net $11m and under a strict preference *we believe that and debtor does owe the $11m. I think we can get the UCC to support that analysis and conclusion"* (emphasis added) [App. 36 – D. Beckman Email, at DEBTORSUB_205708; D. Beckman Tr. 163:8-164:24]. This email underscores the reality that Plaintiff is not seeking recharacterization based on a genuine belief that the parties intended the Hoops Revolving Loans or the Clearwater Revolving Loans to be equity (i.e., the only instance in which recharacterization is appropriate). Rather, recharacterization is being sought, despite the clear intent of the parties, to create fraudulent transfer claims that would not otherwise exist.[16] This is not an appropriate use of recharacterization and should not be permitted here. *In re Yoga Smoga, Inc.*, 2016 Bankr. LEXIS 4481, at *8.

> iii.  *The Autostyle Factors, viewed in light of the totality of the circumstances, do not weigh heavily enough toward recharacterization to outweigh the clear intent of the parties as expressed through their deposition testimony.*

---

[16] As discussed in Section IV(E) herein, if the Hoops Revolving Loans and the Clearwater Revolving Loans are determined to be debt rather than equity, there is no statutory basis upon which the Trust's fraudulent transfer claims can be premised.

The Fourth Circuit Court of Appeals, in *Dornier Aviation*, endorsed review of eleven factors to help determine the original intent of the parties and thus whether recharacterization is appropriate.[17]   None of the factors are dispositive, and the significance of each factor depends on the unique circumstances of each case.   *Id.* at 234.   "As the court noted in *SubMicron Systems*, '[n]o mechanistic scorecard suffices.   And none should, for Kabuki outcomes elude difficult fact patterns.'"   *Dornier Aviation*, 453 F.3d at 234 (quoting *In re SubMicron Systems Corp.*, 432 F.3d 448, 456 (3d Cir. 2006)).   A review of these factors indicates that Plaintiff cannot demonstrate that a meaningful number weigh in favor of recharacterization, particularly given the clear stated intent of the parties that the Hoops Revolving Loans and Clearwater Revolving Loans were not intended or understood to be equity.

***Names Given to the Instruments.***   While no promissory note or loan agreement exists in respect of the Hoops Revolving Loans or the Clearwater Revolving Loans, the parties' course of conduct must be taken into account as part of the totality of the circumstances.   *Dornier Aviation*, 453 F.3d at 234 (stating that the significance of each *Autostyle* Factor depends on the facts and circumstances of each case).   First, Lime Rock and Hoops had been partners together in the coal mining business since 2009.   [DEF MSF ¶ 2].   The Board of Directors conducted itself in a relatively informal fashion.   It was typical, for instance, for the Board of Directors to approve company actions verbally—either over a conference call or in an in-person meeting, or to approve

---

[17] The factors (the "*Autostyle* Factors") are:  (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.   *Dornier Aviation*, 453 F.3d at 233-34 (citing *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749 (6th Cir. 2001).

actions over email.  [DEF MSF ¶ 12].  There would not often be formal corporate resolutions executed by the Board of Directors.  [App. 3 – J. Scofield Tr. 26:18-27:5].  Ironically, the one thing Lime Rock always made sure was formalized was changes to the equity structure, which definitively did not occur in connection with any of the Hoops Revolving Loans or the Clearwater Revolving Loans.  [DEF MSF ¶ 14].  Lime Rock, by virtue of its majority ownership and its holding two seats on the Board of Directors, could have conducted the Debtors' operations as formally or informally as they saw fit.  Neither Hoops nor Clearwater should be penalized for a lack of loan documentation when Lime Rock knew that Hoops and Clearwater were providing necessary credit support to Blackjewel and could have, at any time, requested or insisted that loan documentation be prepared and executed.

Even without formal loan documentation, the sheer amount of loan advances and repayments over the course of a several-year period firmly establishes the parties' lending relationship.  From September 2017 through approximately April 24, 2019, Blackjewel regularly and routinely utilized the Hoops LOC as, in essence, an additional working capital revolving line of credit. [DEF MSF ¶¶ 42-44].  The purpose of utilizing the Hoops LOC was to ensure that Blackjewel could clear its checks to vendors, suppliers, and other creditors in the event that its accounts at United Bank would otherwise be overdrawn on account of delays in Blackjewel's receipt of cash proceeds from its sales of coal.  [DEF MSF ¶ 56].  Because the Hoops LOC was intended to serve, and did serve, as overdraft protection for Blackjewel, amounts required to be swept from the Hoops LOC to the Blackjewel LOC were not precisely known in advance.  Dozens of loan advances and repayments were made over this three-year period [DEF MSF ¶¶ 52, 63], and the number of repayments and speed with which they occurred strongly indicates that the parties' expectation was that advances from the Hoops LOC or Clearwater LOC would be

outstanding for a very short period of time before being repaid.  Accordingly, given the established

course of lending between the parties, Hoops and Clearwater submit that the lack of a formal

promissory note or loan agreement should be given very little weight, if any.

*Maturity Date and Schedule of Payments.*  Because the Hoops LOC and Clearwater LOC

were used by Blackjewel as a revolving line of credit, it makes perfect sense that there would not

be a schedule of payments associated with the 2019 loans.[18]  Likewise, there was no need for (or

even an ability to determine) precise maturity dates for the advances because the intent of the

parties was that loans would only be advanced as needed for a very short period of time to cover

"liquidity pinches in between bills that needed to be paid and receivables that came in."  [App. 3

– J. Scofield Tr. 48:5-8].  Hoops and Clearwater submit that this factor is not relevant given the

revolving nature of the borrowing and the quickness with which loans were typically repaid.

*Fixed Interest Rates.*  This factor weighs against recharacterization because Hoops and

Clearwater did charge interest to Blackjewel for use of the Hoops LOC and Clearwater LOC.

[DEF MSF ¶ 51].  Specifically, United Bank charged Clearwater interest on amounts drawn from

the Clearwater LOC.  [App. 27 – B. Walls Tr. 215:1-9].  The intent was for Clearwater to pass that

cost through to Blackjewel so that Clearwater could be made whole.   [*Id.*].   Brent Walls,

Clearwater's C.F.O., testified that interest payments due to United Bank from Clearwater were due

monthly.  [*Id.*].  Clearwater would pay those invoices and then invoice Blackjewel for that interest

expense.  [*Id.*].

*Source of Repayments.*  This factor weighs strongly against recharacterization because the

record is clear that over the course of several years Hoops (and later Clearwater) were repaid as

---

[18] *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 95 (Bankr. S.D.N.Y. 2016) (reviewing the
*Autostyle* Factors and concluding that the lack of fixed payment schedule was irrelevant because the loans in
question were made pursuant to a revolving loan agreement).

soon as Blackjewel received the proceeds from its coal sales (i.e. as soon as the "liquidity pinch" had been bridged).[19]  There is no evidence whatsoever that Blackjewel's duty to repay the Hoops Revolving Loans or the Clearwater Revolving Loans was conditioned upon it achieving "financial success."  Rather, in most instances the loans were repaid within a matter of days, or sometimes even the same day.  [App. 11 – Hoops Tr. 153:11-23].  In other words, this was truly overdraft protection being provided and was not at all the "paradigmatic situation for recharacterization where . . . inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims." *Adelphia Comms. Corp.*, 365 B.R. at 74.

*Adequacy of Capitalization.*  This factor should be given very little weight, as even if Blackjewel was inadequately capitalized (which the Defendants dispute), it is illogical to presume that this in any way dictates that the Hoops Revolving Loans or Clearwater Revolving Loans were intended to be equity contributions.  As explained by the Bankruptcy Court for the Southern District of New York, where a company is inadequately capitalized, "common sense says that a person who provides additional money is ***more likely to want it to be considered debt***, not equity, because even if the debt may not be repaid in full, at least it will stand higher in the capital structure." *In re Yoga Smoga, Inc.*, 2016 Bankr. LEXIS 4481, *10 (emphasis added).  Likewise, "[c]ourts should not put too much emphasis on this factor . . . because all companies in bankruptcy are in some sense undercapitalized." *BH S&B Holdings*, 420 B.R. at 159; *see also Dornier Aviation*, 453 F.3d at 234 ("We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization

---

[19] Importantly, the repayments of the Hoops Revolving Loans and Clearwater Revolving Loans did not harm Blackjewel or any of its creditors because every repayment could simply be reborrowed by Blackjewel in the future whenever the need arose.  [App. 11 – Hoops Tr. 157:18-158:3].

of a claim."); *In re Alternate Fuels, Inc.,* 789 F.3d 1139, 1152 (10th Cir. 2015) ("[W]e have held that placing too heavy an emphasis on undercapitalization in our recharacterization analysis would create an 'unhealthy deterrent effect,' causing business owners to fear that, should their 'rescue efforts' fail, a court will 'give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.'").

*Identity of Interest Between Creditor and Stockholder.*   This factor weighs strongly against recharacterization.  As a starting point, neither Hoops nor Clearwater are equity owners in Blackjewel.  [App. 5 – Blackjewel Holdings LLC Agreement].  Even if the equity held by the Blackjewel Investment L.L.C. in Blackjewel Holdings is attributable to Hoops for the sake of argument, Hoops advanced 100% of the Hoops Revolving Loans despite only owning approximately 37.50% of the enterprise (and despite his also contributing all of the "sweat equity"), and thus was not advancing loans in proportion to his equity interest.  "A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is . . . strongly indicative that the debt is bona fide." *Estate of Mixon v. United States*, 464 F.2d 394, 409 (5th Cir. 1972).

*Security for the Loans.*   The Hoops Revolving Loans and Clearwater Revolving Loans were unsecured, but given the nature of the revolving loans as a form of overdraft protection (and in particular given that the loans were routinely paid back within a day or two) [DEF MSF ¶ 63], it is not unreasonable for these emergency bridge loans to have been extended on an unsecured basis.  Hoops and Clearwater therefore submit that this factor should be given very little weight under the circumstances.

*Ability to Obtain Financing From Outside Lenders.*   "When existing [equity holders] make loans to a distressed company, they are trying to protect their [investment] and traditional

factors that lenders consider . . . do not apply as they would when lending to a financially healthy company." *Lyondell*, 544 B.R. at 99.  Moreover, Clearwater in fact was an outside lender with no equity interest in Blackjewel notwithstanding its connection to the Hoops family.  *See Autostyle*, 269 F.3d at 752 (noting that with respect to this factor, "[t]here is no requirement that outside financing come without any involvement of 'interested parties'").  Hoops had no ability to compel Clearwater to provide the Clearwater Revolving Loans to Blackjewel [DEF MSF ¶ 49].

**Subordination of Advances to Claims of Outside Creditors.**  *Autostyle* indicates that "[s]ubordination of advances to claims of **all other creditors** indicates that the advances were capital contributions and not loans."  *Autostyle*, 269 F.3d at 752 (emphasis added).  Here, this factor weighs heavily against recharacterization as the evidence shows that over a period of several years, Hoops and Clearwater were routinely repaid on their revolving loan advances within a matter of days.  [DEF MSF ¶ 63].  There is no evidence that the loans were subordinated to claims of all other creditors.

**Advances Used to Acquire Capital Assets.**  This factor strongly weighs against recharacterization.  It is undisputed that the loans from Hoops and Clearwater were made to cover overdrafts and thus to support Blackjewel's ordinary course working capital requirements, not to acquire capital assets.  [DEF MSF ¶¶ 52-54].

**Presence of a Sinking Fund.**  Sinking funds are typically used to create a reservoir from which money can be drawn to pay fully funded, long-term indebtedness.[20]  In contrast, with a revolving credit facility, such as the Hoops LOC and the Clearwater LOC utilized by Blackjewel, the borrower can draw, repay, and reborrow selectively and at any time, and interest only accrues

---

[20] *See* 19 C.J.S. Corporations § 756; Black's Law Dictionary 559 (8th ed. 2005) ("[a] sinking fund is a fund 'consisting of regular deposits that are accumulated with interest to pay off a *long-term* corporate or *public* debt.'" (emphasis added)).

on borrowings while they are drawn.  In this type of fluid, short-term borrowing arrangement, a sinking fund would not make sense because a borrower would never choose to encumber its cash in a sinking fund (while allowing interest to accrue on outstanding borrowings) rather than simply paying down the revolving credit facility and borrowing again as needed.  Thus, the absence of a sinking fund under these circumstances is irrelevant and should not be given any weight.

Plaintiff cannot demonstrate that the foregoing *Autostyle* Factors, applied in light of all relevant facts and circumstances, weigh meaningfully in favor of recharacterization, particularly given Scofield's and Reynolds' testimony that they did not view the Hoops Revolving Loans or the Clearwater Revolving Loans as equity contributions.  [DEF MSF ¶¶ 59-60].  Therefore, Hoops and Clearwater are entitled to judgment as a matter of law on Count One of the Clearwater Complaint as it relates to the Hoops Revolving Loans and the Clearwater Revolving Loans.

**D. There is Likewise No Basis to Recharacterize the $5 Million Loan Repayment Made to Hoops in December 2017.**

The Clearwater complaint alleges that, separate and apart from the Hoops Revolving Loans and Clearwater Revolving Loans, Hoops received a $5.7 million payment in December 2017 "purportedly on account of a 2012 line of credit."  *See* Amended Complaint, at ¶ 29.  This is incorrect.  In fact, Hoops made a $5 million loan to Blackjewel (the "2017 Loan"), not pursuant to any "2012 line of credit" but instead, in response to a liquidity crisis that arose in November 2017.  Specifically, a roof collapsed at Blackjewel's Lone Mountain complex on or about November 6, 2017, temporarily shutting down production at that location.  [DEF MSF ¶¶ 31-32].  In addition, due to a change in Kentucky state law, the Debtors' costs related to underground workers' compensation insurance rate increased from 24% to 48% effective October 25, 2017, resulting in an increase of $24 million per year in additional costs to the Debtors related to workers' compensation insurance.  [*Id.*].

36

Meanwhile, the Debtors were in discussions with Contura in respect of the Contura Transaction. [DEF MSF ¶¶ 30-31]. The confluence of the increase in workers' compensation premiums and the roof collapse at Lone Mountain created a significant, short-term liquidity issue for Blackjewel that threatened the ability of Blackjewel to continue operations long enough to close on the Contura Transaction. [DEF MSF ¶ 33].

To solve this short-term liquidity issue, Hoops sent an email to Scofield and offered to lend $5 million to Blackjewel as a bridge loan to ensure that Blackjewel could close on the Contura Transaction. [DEF MSF ¶ 34]. Part of what Hoops requested in return was to have two ranches in Wyoming (the "Ranches"), which were owned by Contura and were to be included in the Contura Transaction, transferred to Triple H. [DEF MSF ¶ 35]. On the same day, Oliver Phillips of Lime Rock emailed Flannery at Riverstone and conveyed the offer from Hoops to "invest $5mm into the existing loan structure, pari-passu with existing creditors." [DEF MSF ¶ 36]. Like in Hoops' email to Scofield, Phillips' email to Flannery stated that in return for lending $5 million to Blackjewel, the Ranches would be conveyed to Triple H. [*Id.*].

On November 14, 2017, Flannery emailed Hoops and Scofield and suggested that the $5 million come instead in the form of "new preferred equity from Jeff Hoops." [App. 22 at DEBTORSLCC_101132]. Hoops pushed back on the concept of putting in the $5 million as preferred equity rather than a loan, following which Flannery sent an updated proposal to Hoops and Scofield which said that "Jeff Hoops can invest $5mm in the term loan pari-passu," but that Hoops could not be repaid if there was an event of default on the Riverstone Facility and could not be repaid unless the Contura Transaction closed and $15 million to $20 million in cash was received by Blackjewel in connection with the Contura Transaction. [*Id.* at DEBTORSLCC_101131]. Hoops responded that he "just cannot take the risk of these funds being

tied up long term and so my offer is this simple . . . I will loan $5mm @ no interest to Blackjewel and when $10mm comes in from any source other than ordinary revenue, the $5mm will be returned to me." [*Id.* at DEBTORSLCC_101130-31]. Flannery ultimately agreed with this proposal on behalf of Riverstone. [DEF MSF ¶ 37]. As a result, Hoops extended the 2017 Loan, which was memorialized in a promissory note dated November 10, 2017. [DEF MSF ¶ 38]. On December 29, 2017, Phillips sent Flannery a Secretary's letter indicating the repayment of the 2017 Loan. [DEF MSF ¶ 39].

Based on the foregoing, there is no basis whatsoever to contend that the 2017 Loan was somehow intended by the parties to be an equity contribution. That much is obvious given that Riverstone specifically proposed in its negotiations with Hoops that the $5 million be contributed to Blackjewel as preferred equity, and Hoops refused to advance funds on that basis. [App. 22 at DEBTORSLCC_101130-32].

Further, to the extent the intent is not perfectly clear from the email correspondence between the parties, several *Autostyle* Factors lean heavily toward a finding that confirms the parties' stated intentions with respect to the 2017 Loan, including that: (i) the loan was memorialized by a promissory note (Factor 1) [DEF MSF ¶ 38]; (ii) repayment was not conditioned upon Blackjewel's financial success (Factor 4) [App. 22 at DEBTORSLCC_101131]; (iii) there was no identity of interest between creditor and stockholder for purposes of *Autostyle* given that Hoops loaned 100% of the $5 million despite Lime Rock owning approximately 62.5% of the equity (Factor 6) [DEF MSF ¶ 9]; (iv) the obligation to repay Hoops was not subordinated to the claims of other creditors (Factor 9) [App. 22 at DEBTORSLCC_101131]; and (v) the $5 million was not used to acquire capital assets but instead to cover ordinary course working capital expenses to ensure the Contura Transaction could close (Factor 10) [DEF MSF ¶ 33]. Several other factors

are not meaningful in the context of the 2017 Loan.  For instance, there was no need for a payment schedule where the arrangement was for the $5 million to be interest free and paid back in one lump sum.  [App. 22 at DEBTORSLCC_101131].  Likewise, though no interest was charged on the $5 million, Hoops was to receive other consideration (including the Ranches) in lieu of interest. [DEF MSF ¶ 36].  Similarly, the short-term nature of the $5 million would have made it impractical and pointless to establish a sinking fund to repay it.  [DEF MSF ¶ 39].

Accordingly, Count One of the Clearwater Complaint fails with respect to the 2017 Loan and Hoops is entitled to summary judgment as a matter of law.

**E.  If the Hoops Revolving Loans, the Clearwater Revolving Loans, and the 2017 Loan Cannot Be Recharacterized, Plaintiff's Fraudulent Transfer Claims in Respect of These Loans Fail as a Matter of Law.**

Plaintiff has no ability to avoid and recover any repayments on the Hoops Revolving Loans, the Clearwater Revolving Loan, or the 2017 Loan as constructively fraudulent transfers without first recharacterizing those loans as equity.  This is because, as noted in Section IV(A)(iii) herein, a claim for constructive fraud, whether under section 548(a)(1)(B) of the Bankruptcy Code, or the UFTA, cannot succeed unless the Plaintiff shows that reasonably equivalent value was not received in exchange for making the transfer or incurring the obligation.  As further noted in Section IV(A)(iii) herein, dollar-for-dollar reductions in antecedent debt constitute reasonably equivalent value as a matter of law.[21]  Accordingly, if the Hoops Revolving Loans, Clearwater Revolving Loans and/or the 2017 Loan cannot be recharacterized as a matter of law, that will necessarily mean that those loans constitute bona fide indebtedness of Blackjewel, which was

---

[21] *Southeast Waffles, LLC,* 702 F.3d at 857 (citing cases); *see also In re Fitness Holdings Int'l, Inc.,* 714 F.3d at 1145-46 ("Therefore, to the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not constructively fraudulent.").

satisfied dollar-for-dollar with each loan repayment made, meaning that as a matter of law Blackjewel would have received reasonably equivalent value for each loan repayment.

Therefore, to the extent that Hoops and Clearwater are entitled to summary judgment on Count One of the Clearwater Complaint (related to recharacterization) in respect of the Hoops Revolving Loans, Clearwater Revolving Loans, or the 2017 Loan, it is entitled to summary judgment as a matter of law on Counts Two, Three, and Five of the Clearwater Complaint as well (related to avoidance and recovery of constructively fraudulent transfers) in respect of those loans.

### F.   Count Four of the Clearwater Complaint fails because Clearwater is not an "insider" of Blackjewel and because Hoops has valid defenses to avoidance.

Count Four seeks to avoid the payments made in 2019 on the Hoops Revolving Loans and Clearwater Revolving Loans under West Virginia Code § 40-1A-5(b), which allows a debtor to avoid a transfer to "an insider" for an antecedent debt.  Clearwater is clearly not an "insider" of Blackjewel, which under the statute means, if the debtor is a corporation, a "director," "officer," "person in control," a "partnership in which the debtor is a general partner," a "general partner in a partnership" in which the debtor is a general partner, or a "relative."  W. Va. Code § 40-1A-1(h)(2).  Likewise, Clearwater is not an "affiliate" of Blackjewel, or an "insider of an affiliate" of Blackjewel, nor is it a "managing agent of the debtor."  *Id.* at § 40-1A-§§a(h)(4),(5).  Plaintiff, of course, knows that Clearwater is not an insider of the Debtors, as it is currently arguing in its suit against United Bank that Clearwater and Blackjewel are not even affiliates of each other.[22] Accordingly, Count Four must be dismissed against Clearwater.

---

[22] *See* Adv. No. 20-03007, Docket No. 138., p. 21 ("Because United Bank cannot establish that Hoops either owned or controlled Clearwater, and because United Bank's own records establish that Lime Rock controlled the Debtors, United Bank cannot unilaterally deem the Debtors to be 'affiliates' of Clearwater.  No legal or factual basis supports this attempt.").

With respect to Hoops, West Virginia Code § 40-1A-8(f) provides him with complete defenses to avoidance.[23]  First, section 40-1A-(8)(f)(2) states that if the transfers were made in the ordinary course of business or financial affairs of the debtor and the insider, the transfers are not voidable.  Here, Blackjewel was routinely relying on the Hoops LOC for overdraft protection in the ordinary course of its business for essentially its entire corporate existence.  [DEF MSF ¶ 42].  Each of the 2019 Hoops Revolving Loans and the repayments thereof are therefore no different than the Hoops Revolving Loans and repayments to Hoops that occurred in 2017 and 2018.  Secondly, section 40-1A-(8)(f)(3) states that transfers are not voidable where "made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."  That is exactly what was occurring with the Hoops Revolving Loans.  Each was made to rehabilitate Blackjewel (by fixing a short-term liquidity issue to ensure Blackjewel's checks could clear) [DEF MSF ¶ 56] and each repayment not only repaid an antecedent debt but, given that the Hoops LOC was a revolving facility, each repayment secured the ability of Blackjewel to reborrow those same funds again the next time it needed additional liquidity in a pinch [DEF MSF ¶ 44].  Accordingly, Count Four should also be dismissed in its entirety as against Hoops.

However, even if the Court is not inclined to dismiss the entirety of Count Four, section 40-1A-(8)(f)(1) also provides that transfers are not avoidable "to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien."  Here, because of the revolving nature of the Hoops Revolving Loans, Hoops extended significant new value in between repayments throughout the course of 2019 [DEF MSF ¶ 63], all of which was extended on an unsecured basis [DEF MSF ¶ 54], and which

---

[23] Each of the following defenses applies with equal force to Clearwater as well to the extent the Court does not agree that Clearwater is not an insider of the Debtors for purposes of the UFTA.

significantly reduces Hoops' total exposure even before considering any other defenses. Accordingly, at minimum, Hoops should receive new value credit for all amounts advanced by him subsequent to his receipt of each repayment at issue.

### G. Based On the Foregoing, Hoops is Entitled to Summary Judgment as a Matter of Law on Count 7 of the Clearwater Complaint as None of the Transactions at Issue Breached His Fiduciary Duties to the Debtors.

Hoops is also entitled to judgment as a matter of law on Count Seven of the Clearwater Complaint, which alleges in conclusory fashion that Hoops breached his fiduciary duties in respect of the Hoops-Riverstone Payment, Hoops-Riverstone Participation, the Hoops Revolving Loans, the Clearwater Revolving Loans, and the 2017 Loan, because the Plaintiff has no evidence that demonstrates that any of these transactions were not undertaken in the Debtors' best interests or that there was any lack of disclosure.  Rather, the claims appear to be based purely on Hoops' insider status, but it is not an inherent breach of fiduciary duty for an insider to loan money to a company. *See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics)*, 1999 U.S. Dist. LEXIS 14369, at *34 (W.D. Mich. May 25, 1999).  Lime Rock knew about the Pre-Riverstone Hoops Indebtedness and was supportive of it, as Lime Rock knew that it was being incurred for purposes of covering liquidity shortfalls at Blackjewel and ensuring that checks could clear.  [DEF MSF ¶ 18].  Lime Rock also clearly knew that the Pre-Riverstone Hoops Indebtedness was secured.  [DEF MSF ¶¶ 23-24].  Lime Rock, not Hoops, proposed to Riverstone that a portion of the proceeds from the Riverstone Facility be used to make the Hoops-Riverstone Payment, with Scofield telling Flannery and Jamie Brodsky at Riverstone, "we want him to be laser focused on execution and delivering the 2017 plan and Arch deal, and think getting him some of the float he's put in the company in the last year back probably takes a bit of the pressure off on that side of the coin, which I'm sure you two can appreciate (I can…)."  [DEF MSF ¶ 21; App. 10 at RCP017092].

Likewise, in respect of the 2017 Loan, Scofield confirmed in his deposition that it was made "to get to the closing of the Contura transaction, which in and of itself, came with a significant amount of liquidity." [App. 3 – J. Scofield Tr. 131:24-132:3]. Scofield testified that Lime Rock approved the 2017 Loan "because we thought it was in the best interest of Blackjewel" and, even with the benefit of hindsight, testified that "I believe the purchase of the Contura assets in the PRB were in the best interest of Blackjewel." [*Id.* at 132:25-133:9].

Finally, in respect of the Hoops Revolving Loans and the Clearwater Revolving Loans, the evidence is unequivocal that Lime Rock supported those transactions as in the best interests of the Debtors, as they were specifically designed for purposes of making sure that checks for Debtors' other creditors would not be returned. [DEF MSF ¶¶ 53-58]. In light of this unalloyed benefit to Debtors, it is not surprising that David Beckman, testifying on behalf of Plaintiff, admitted at his Rule 30(b)(6) deposition that the claims for breach of fiduciary duty do not apply to the Hoops Revolving Loans or Clearwater Revolving Loans. [App. 37 – D. Beckman Tr. 90:5-8] ("No, the 2019 advances, and I think I already testified to this, the 2019 recovery of the 2019 disbursements to Clearwater and Hoops is not based on a breach of fiduciary duty."). According, to the extent such claims were ever asserted, they should be dismissed.

Accordingly, there is no basis to find that Hoops breached his fiduciary duty in respect to any of these transactions.

## H. Plaintiff has no evidence that Lexington breached the November 30, 2017 Asset Purchase Agreement or Permit Transfer Agreement with the Debtors.

Count One of the Lexington Complaint seeks recovery against Lexington for alleged breaches of the APA and PTA.[24] Plaintiff suggests that because the Commonwealth ultimately did not authorize the transfer to Lexington of a subset of the Permits, this somehow equates to a

---

[24] *See* First Amended Adversary Complaint, Adv. No. 20-03012, Docket No. 25 (the "Lexington Complaint").

breach of contract by Lexington.  *See* Lexington Complaint, ¶¶ 36-47.  This is wrong and not supported by any evidence.  While the APA contemplated the transfer of the sixty-one (61) Permits to Lexington, the parties clearly understood that no Permits could transfer without approval from the Commonwealth.  Indeed, section 5.3(c) of the APA expressly contemplates this possibility and provides that "*if any permit cannot be transferred for any reason beyond the control of Buyer*, Buyer shall be entitled to utilize the permit as a designated operator or pursuant to another mutually acceptable arrangement."  [App. 32 – APA § 5.3(c), at DEBTORSLCC_001132].

Accordingly, Lexington made no representations in the APA or in the PTA that any permits would actually transfer.  Plaintiff's suggestion that Lexington "falsely represent[ed] and warrant[ed] that it had the power and ability to perform its obligations under the APA" is a mischaracterization of Section 4.1 of the APA.[25]  Section 4.1(b) states that Lexington had "all requisite *organizational* power and authority" to perform its obligations under the APA, which it did [App. 32 – APA § 4.1(b), at DEBTORSLCC_001131 (emphasis added)].  This is a standard representation in a purchase agreement related to requisite *internal* approvals to enter into and perform under a transaction.  This is clearly not a representation that Lexington had all power and authority to cause all permits to transfer.

Instead, Lexington's obligations with respect to the permits are as set forth in Section 5.3(a) of the APA, and they are as follows:  (i) to use "commercially reasonable efforts to diligently and in good faith pursue the transfer of each Permit to Buyer and the approval of each such transfer by each Governmental Authority"; (ii) to "[a]fter the Closing Date . . . submit and file with the applicable Governmental Authority a complete and correct successor operator permit application and any other application or document necessary to cause or allow the transfer of each Permit to

---

[25] *See* Lexington Complaint, ¶ 43.

Buyer and the related thereto"; and (iii) to "[s]imultaneously with the submission of the successor operator permit application . . . file and post with such Governmental Authority new bonds with adequate surety to allow transfer of each Permit and cause a full and complete release of Seller's bonds upon final transfer of each Permit." [*Id.* at § 5.3(a), DEBTORSLCC_001131].

Lexington complied fully with section 5.3(a) of the APA. Lexington submitted all 61 permit transfer applications to the Commonwealth of Kentucky on April 23, 2018. [DEF MSF ¶ 75]. All required bonds were posted. [DEF MSF ¶ 76]. Steven Poe testified that he is not aware of anything more that Lexington could have done to effectuate the transfer of these permits, and Plaintiff cannot present any evidence of any act or omission by Lexington that would rise to the level of a breach of the APA or PTA [DEF MSF ¶ 78].[26] Lexington is therefore entitled to summary judgment as a matter of law with respect to Count One of the Lexington Complaint.

**I. Plaintiff Lacks Evidence That Lexington, Triple H, LCRC, and/or CRS Substantially Assisted Hoops' Alleged Breaches of Fiduciary Duty**

Plaintiff asserts that Lexington, Triple H, LCRC, and CRS are liable for "aiding and abetting" Hoops' alleged breaches of fiduciary duty. *See* Lexington Complaint, at 13-14 (asserting claim against Lexington in Count Four); Complaint in Cause No. 3:20-ap-03015 (the "Triple H Complaint") at 13-14 (asserting claim against other listed defendants in Count Two).[27] Although few West Virginia cases discuss this claim, the key elements of aiding and abetting a breach of

---

[26] For this reason, Lexington likewise did not breach Section 5.1 of the APA (requiring it to take all further actions necessary to carry out the purposes of the APA), Section 7(a) of the PTA (essentially mirroring the obligations under Section 5.3(a) of the APA and requiring Lexington to apply for, diligently pursue, and use commercially reasonable efforts to obtain transfer of the permits), and did not breach any implied covenant of good faith and fair dealing as a result of any failure to employ good faith efforts to have the permits transferred.

[27] More specifically, Plaintiff alleges that Lexington aided and abetted Hoops' supposed breaches of fiduciary duty by entering into agreements with respect to the HWMs and associated Lease Agreement along with the PTA, the APA, and "transfers of assets and equipment by Plaintiffs to LCC." *See* Lexington Complaint at pp. 3-8. Triple H allegedly aided and abetted Hoops' supposed breaches of fiduciary duty by being a party to assignments related to certain ranches and Overriding Royalty Interest deeds. *See* Triple H Complaint, at pp. 3-4. LCRC is allegedly liable for aiding and abetting based solely on being assigned a royalty. *See id.* at pp. 6-8. Finally, CRS allegedly aided and abetted Hoops' breach of fiduciary duty by contracting with Blackjewel, hiring its employees, and using its equipment. *Id.* at pp. 5-6. Plaintiff did not assert and aiding and abetting claim against Clearwater. *See* Clearwater Complaint.

fiduciary duty are, at a minimum, damages caused by the breach, that a defendant had actual knowledge of that breach, and that the defendant provided substantial assistance or encouragement to the party breaching the duty. *See Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.*, 854 S.E.2d 870, 893, n. 11 (2020) ("[O]ne is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.") (quotation and citation omitted). The central element of an aiding and abetting claim is therefore active participation in the breach of fiduciary duty. *See, e.g., In re Infinity Bus. Grp., Inc.*, 628 B.R. 213, 239 (D.S.C. 2021) (affirming bankruptcy court's judgment that defendants did not "substantially participate" in debtor's managers' breaches of fiduciary duty, where evidence revealed that debtor and employee did not "cause" fiduciary to implement questionable accounting practice nor did they create "informational vacuum" around the practice").

Importantly, Courts regularly reject attempts to hold contractual counterparties liable for aiding and abetting a breach of fiduciary duty where that liability is predicated on nothing more than business dealings related to the alleged breach of duty. *See, e.g., M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 881 N.Y.S.2d 364 (Sup. Ct. 2009), *aff'd as modified*, 68 A.D.3d 1747, 891 N.Y.S.2d 578 (4th Dep't 2009) ("Service as a counterparty to a credit default swap cannot, in itself, be deemed sufficient to substantiate an allegation that the counterparty has 'substantially assisted' a breach of fiduciary duty."); *77 Charters, Inc. v. Gould*, No. CV 2019-0127-JRS, 2020 WL 2520272, at *21 (Del. Ch. May 18, 2020) ("By itself, being a counterparty to a transaction with a fiduciary does not an aiding and abetting claim make."). In other words, a party's mere status as a counterparty to a contract is not evidence that it aided and abetted a breach of fiduciary duty.

In this case, even assuming—for the purposes of this argument section only—that Plaintiff has more than a scintilla of evidence of an underlying breach of fiduciary duty against Hoops, Plaintiff lacks sufficient evidence of the other elements with respect to its aiding and abetting claims.  In particular, Plaintiff has no evidence that the Lexington, Triple H, LCRC, and CRS were aware of the underlying breaches of fiduciary duty.  Further, Plaintiff has no evidence that these Defendants substantially assisted or encouraged any breach of fiduciary duty.  Accordingly, this Court should grant summary judgment against Plaintiff's "aiding and abetting" claims.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment:  (i) in favor of Hoops and Clearwater on all Counts of the Clearwater Complaint; (ii) in favor of Lexington on Count One and Count Four of the Lexington Complaint; and (iii) in favor of CRS, Triple H, and LCRC on Count Two of the Triple H Complaint.

Dated:  April 18, 2022

**McGUIREWOODS LLP**

/s/ *K. Elizabeth Sieg*
Mark E. Freedlander (admitted *pro hac vice*)
Frank J. Guadagnino (admitted *pro hac vice*)
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile:  (412) 667-6050
mfreedlander@mcguirewoods.com
fguadagnino@mcguirewoods.com

K. Elizabeth Sieg, Esq. (admitted *pro hac vice*)
Gateway Plaza, 800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
bsieg@mcguirewoods.com

A. Wolfgang McGavran (admitted *pro hac vice*)
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington D.C. 20006
Telephone: (202) 857-2471
wmcgavran@mcguirewoods.com
*Counsel to Defendants*