**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Blackjewel, L.L.C., *et al.*, | : | Case No. 19-30289 |
| Debtors,[1] | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03008 |
| | : | (Consolidated) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CLEARWATER INVESTMENT HOLDINGS, LLC, et al., | : | |
| | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03012 |
| | : | (Consolidated) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LEXINGTON COAL COMPANY, LLC, et al., | : | |
| | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03012 |
| | : | (Consolidated) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRIPLE H REAL ESTATE, LLC, et al | : | |
| | | |
|     Defendants. | | |

**APPENDIX TO MEMORANDUM IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

[1] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

**<u>TABLE OF CONTENTS</u>**

**APP. No.**                                                                                                                        **PDF Page No.**

1.   John Reynolds Transcript ................................................................................ 4

2.   Revelation Holdings Operating Agreement ................................................. 16

3.   Jeff Scofield Transcript .................................................................................. 95

4.   Blackjewel L.L.C. Operating Agreement ................................................... 143

5.   Blackjewel Holdings Operating Agreement ............................................... 173

6.   Contribution Agreement (Reynolds) ........................................................... 236

7.   Contribution Agreement (Hoops) ................................................................ 309

8.   2017.06.27 Email - Scofield to Lime Rock Investment Committee ........... 382

9.   Daniel Flannery Transcript .......................................................................... 385

10.  2017.06.13 Email - Scofield to Flannery ................................................... 396

11.  Jeffery Hoops Transcript (3.3.22) ............................................................... 397

12.  2017.06.29 Email – Scofield to Helena Jackson ....................................... 406

13.  2017.07.10 Amended Mortgage ................................................................... 409

14.  2017.07.10 Letter Agreement ...................................................................... 427

15.  2017.07.05 Email – Anu Mehta to H. Jackson ......................................... 430

16.  2017.07.17 Riverstone Credit Agreement .................................................. 442

17.  2017.07.17 Flow of Funds ............................................................................ 850

18.  2017.07.17 Mortgage Termination .............................................................. 853

19.  2017.11.07 Email - Hoops to Flannery ....................................................... 867

20.  2017.11.13 Email - Hoops to Scofield ........................................................ 869

21.  2017.11.13 Email - Oliver Phillips to Flannery ......................................... 870

22.  2017.11.14 Email - Flannery to Hoops ....................................................... 872

23.  2017.11.10 Hoops Promissory Note ............................................................ 875

24.  2017.12.29 Email - Phillips to Flannery .................................................... 877

25.  Drew Kesler Transcript ................................................................................ 881

26. Hoops and Clearwater Assignment Agreement ............................................................. 897

27. Brent Walls Transcript .................................................................................................. 898

28. 2016.12.01 Hoops Mortgage .......................................................................................... 903

29. Clearwater Operating Agreement................................................................................... 916

30. Patricia Hoops Transcript.............................................................................................. 935

31. 2019.04.01 Clearwater - United Bank Promissory Note ................................................ 937

32. 2017.11.30 APA and PTA............................................................................................... 943

33. Steven Poe Transcript.................................................................................................... 997

34. Clearwater Proof of Claim .......................................................................................... 1015

35. Hoops Proof of Claim .................................................................................................. 1023

36. 2019.07.18 David Beckman Email ............................................................................... 1031

37. David Beckman Transcript........................................................................................... 1034

38. 2019.06.24 Email – Kesler to Flannery ....................................................................... 1037

        a.   Email ............................................................................................................... 1037

        b.   Attachment (Revolving Loans Detail) ............................................................ 1044

39. Declaration of Patricia Hoops ..................................................................................... 1048

40. Declaration of Jeff Hoops ........................................................................................... 1051

41. Declaration of Helena Jackson .................................................................................... 1055

1                    John Reynolds

2   was a lot of occasions where assets were available

3   in the coal market with not a large list of obvious

4   buyers of those assets.  If you could make the two,

5   good value on the purchase price and efficient

6   low-cost operations on the operating side, there was

7   a recipe for financial success.

8        Q.    Was Revelation mostly focused on

9   thermal or met coal-dependent?

10       A.    I don't recall us having any

11   prohibition against either.  Initially I think the

12   opportunity set was more thermal in nature.  It

13   evolved differently over time, but the market I

14   think out of the gates, if my memory is right, was

15   more on the thermal end of the spectrum.

16       Q.    So after Lime Rock invested in

17   Revelation, who sat on the Revelation board of

18   directors, if you can recall?

19       A.    The board consisted of just three

20   people, myself and Jeff Scofield from Lime Rock and

21   Jeff Hoops.  I believe it was a three-person board.

22       Q.    Did the members of the Revelation

23   board of directors ever change?

24       A.    I -- I don't believe it ever changed

25   while Lime Rock was still an entity that had

1                          John Reynolds

2    investment exposure to Revelation.

3          Q.      So is it fair to say --

4          A.      Subsequent to that, yes, I assume

5    we -- "we" being Jeff Scofield and John Reynolds,

6    resigned from the Revelation board.  I believe we

7    did.

8          Q.      Was that following the bankruptcy?

9          A.      I believe we left the Revelation board

10   upon the disposition of Revelation and the

11   separation, I should say, of Revelation from

12   Blackjewel.

13         Q.      To join the board of Blackjewel

14   Holdings?

15         A.      Yes.

16         Q.      So is it fair to say that from the

17   time of Lime Rock's initial investment through to

18   that time when Lime Rock resigned its positions from

19   the Revelation board of directors, that Lime Rock

20   controlled two of the three Revelation board seats?

21         A.      Yes.

22         Q.      I believe you may have already

23   answered this, but after Blackjewel was formed,

24   Blackjewel's board of directors also consisted of

25   yourself and Mr. Scofield and Mr. Hoops?

1                        John Reynolds

2          A.     Yes.

3          Q.     And from the time that Lime Rock took

4   their seats on the Blackjewel board of directors

5   through the bankruptcy filing of Blackjewel, did the

6   members of the Blackjewel board of directors ever

7   change?

8          A.     I do not believe the Blackjewel board

9   ever changed, no.

10         Q.     So from the time of Blackjewel's

11  formation through the time of its bankruptcy filing,

12  would it be accurate to state that Lime Rock

13  controlled two of the three board seats?

14         A.     Yes.

15         Q.     What percentage of the equity in

16  Revelation did Lime Rock hold when Lime Rock first

17  invested in Revelation, if you can recall?

18         A.     I don't recall specifically.  I have a

19  number in my mind that we were roughly 65 percent to

20  Lime Rock and 35 percent to Jeff Hoops through most

21  of the investment.  Some -- some number around that

22  split.

23         Q.     Did Lime Rock's percentage of equity

24  in Revelation ever change I guess as of the time

25  that Blackjewel was formed -- or up until the time,

1                      John Reynolds

2   I should say, that Blackjewel was formed?

3          A.     It may have, but I don't recall it

4   changing materially.

5          Q.     Mr. Reynolds, do you recall that in

6   2016 and 2017 -- I'm referring to the period now

7   before Blackjewel was formed -- Jeff Hoops made

8   various loans to Revelation?

9          A.     I recall credit being extended from

10  Jeff Hoops to Revelation, yes.

11         Q.     I'm going to -- this will be my test

12  run.  I'm going to try to drop Exhibit 1 into the

13  chat here.  Please ignore the other exhibit in the

14  chat.  That was a test.

15         A.     Okay.

16         Q.     But if you wouldn't mind opening

17  Exhibit 1.  And I learned yesterday that I think you

18  have to download this, and then you're able to open

19  it up.

20                (Exhibit 1, Bates Nos.

21                DEBTORSUB_061034-37, Factoring and Security

22                Letter Agreement, received and marked.)

23  BY MR. GAUDAGNINO:

24         Q.     Let me know when you have it open.

25         A.     I'm having an issue here, but bear

Page 66

1              John Reynolds

2  BY MR. GAUDAGNINO:

3        Q.    And would you agree, Mr. Reynolds,

4  that the board of directors at Blackjewel was

5  supportive of this liquidity support being provided

6  by Jeff Hoops?

7        A.    Yes.

8        Q.    And why was that?

9        A.    Two reasons.  First, the alternative

10 in running out of liquidity was -- was not going to

11 be pleasant insofar as not having cash to run the

12 business.  Second, as a director of the business,

13 our -- my assessment as a director was that we had

14 sufficient liquidity by the person who knew the

15 business best, the CEO of the business who was

16 providing that liquidity, and that provided comfort

17 to me as a director.  And I would say third, as an

18 investor, I was not, until June of 2019, being asked

19 to dilute my interest in the business.

20       Q.    Right.

21             So until -- so until June of 2019, you

22 had no expectation of being diluted as a result of

23 this credit support or liquidity support; correct?

24       A.    Until June 4th/5th of 2019, yes.

25       Q.    I didn't catch the date.  Did you say

1                    John Reynolds

2        A.      Okay.

3        Q.      You've got Exhibit 16 in front of you,

4   Mr. Reynolds?  It's arrived?

5        A.      Yes.  I have it open, yes.

6        Q.      Do you recognize this document, sir?

7        A.      I do.

8        Q.      This is -- this is the document by

9   which you contributed that $2 million preferred

10  equity into Blackjewel Holdings; correct?

11       A.      Yes, correct.

12       Q.      And you can see that if you scroll

13  down to paragraph 7 --

14       A.      Yep.

15       Q.      -- the parties appear to be agreeing

16  here that the LLC agreement will be amended

17  accordingly; is that fair?

18       A.      Yes.

19       Q.      As we discussed, that's something that

20  was required whenever equity was contributed to

21  Blackjewel Holdings; correct?

22       A.      Correct.

23       Q.      I can't remember if I asked you this

24  before we took a break, but do you recall that Jeff

25  Hoops also put in 2 million at the same time

Page 74

1                    John Reynolds

2   alongside you -- or alongside your trust entity?

3   I'm sorry.

4        A.    I believe he did, yes.

5        Q.    If you've got Exhibit 17, let's go

6   ahead and open that as well.

7              (Exhibit 17, Bates Nos.

8        LR_REV_00000007-79, Contribution, Adoption

9        and Waiver Agreement, received and marked.)

10  BY MR. GAUDAGNINO:

11       Q.    Just let me know when you have it,

12  Mr. Reynolds.

13       A.    Yes, it's opening.  Yes, it's open.

14       Q.    This is what appears to be a very

15  similar-looking agreement by which Jeff Hoops

16  contributed his 2 million of preferred equity into

17  Blackjewel Holdings.

18             Does that appear accurate to you?

19       A.    Yes.

20       Q.    Once again, you have paragraph 7,

21  which I believe says the same thing, which is that

22  the parties agree that the LLC agreement for

23  Blackjewel Holdings would be amended accordingly to

24  reflect Jeff Hoops' preferred equity contribution;

25  correct?

1                      John Reynolds

2          Q.     And so to the extent that Jeff Hoops

3    was providing credit support or liquidity support to

4    Blackjewel in 2018 -- if we assume that's the case,

5    one way or the other, the equity structure of

6    Blackjewel didn't change in calendar year 2018; is

7    that fair?

8                   MR. KANE:  Object to the form of the

9          question.

10                  THE WITNESS:  Yeah, as I noted

11         earlier, I'm not familiar -- I don't recall

12         the funds flows in relation to what we

13         discussed in the prior two hours, but as far

14         as the equity account being unchanged in the

15         calendar year 2018, I believe that statement

16         that is in the audit is correct.

17   BY MR. GAUDAGNINO:

18         Q.     Was that true for the year -- was it

19   true for 2019 as well, that there were no equity

20   structure changes?

21                  MR. KANE:  Object to the form of the

22         question.

23                  THE WITNESS:  I -- I don't -- prior to

24         bankruptcy, I don't believe there were any

25         changes to the equity account that involved

1              John Reynolds

2         any amendment to the LLC agreement.

3    BY MR. GAUDAGNINO:

4         Q.    Okay.  So no -- you're not aware of

5    any changes in the equity structure of Blackjewel

6    Holdings that occurred in calendar year 2019?

7         A.    I don't recall any changes in 2019,

8    no.

9         Q.    And you were aware that Jeff Hoops'

10   liquidity support and/or credit support, however you

11   want to describe it, occurred in calendar year 2019;

12   correct?

13        A.    Yes.

14        Q.    Then I want to go back to something

15   that you testified to earlier, which is -- I don't

16   want to mischaracterize what you said, but in early

17   June of 2019, there was a suggestion that Lime Rock

18   should or could be diluted?

19        A.    Yes.

20        Q.    Bear with me one second, please.

21             MR. GAUDAGNINO:  I'm dropping

22        Exhibit 19 into the chat.

23             (Exhibit 19, Bates Nos.

24        DEBTORSCL_002277-78, E-mail Chain, received

25        and marked.)

1                    John Reynolds

2   three parties.  Specifics of this event, I don't

3   have recollection.

4          Q.    But you do recall that there was a

5   transaction as between those three parties by which

6   Revelation did transfer some assets and obligations

7   to Lexington Coal?

8          A.    Yes.

9                MR. KANE:  Object to the form.

10  BY MR. GAUDAGNINO:

11         Q.    In terms of transactions and similar

12  matters that Blackjewel and Revelation would enter

13  into, would you consider yourself to be the closest

14  among the folks on the Lime Rock side to the details

15  of those transactions?

16               MR. KANE:  Object to the form

17          including lack of foundation.

18               MR. GAUDAGNINO:  That was a bad

19          question.  Let me start over.

20  BY MR. GAUDAGNINO:

21         Q.    Would you consider -- was there -- was

22  there a team lead on the Lime Rock side in respect

23  of the Blackjewel investment?

24         A.    Yes, most certainly Jeff Scofield.

25         Q.    Jeff Scofield led the team in respect

Page 89

1              John Reynolds

2  of Lime Rock and, therefore, likely has the most

3  knowledge with respect to details of specific asset

4  transactions that occurred between Revelation and

5  Blackjewel and other third parties?

6              MR. KANE:  Object to the form,

7         foundation, counsel's characterization.

8              THE WITNESS:  Yes, Jeff was squarely

9         the point person, I'd say, inside Lime Rock

10        as it related to the investment.

11 BY MR. GAUDAGNINO:

12      Q.    Whenever -- when you needed

13 information about dealings at Blackjewel or

14 Revelation, would you generally look to Jeff

15 Scofield to provide those details or information?

16      A.    I think there were -- there was a

17 regular -- a more regular dialogue between Jeff

18 Scofield and Jeff Hoops than there was between

19 myself and Jeff Hoops during the course of the

20 investment.

21      Q.    Understood.

22            And would you rely on Jeff Scofield to

23 keep you informed as to the more granular detail,

24 I'll say, in respect of Blackjewel and Revelation?

25            MR. KANE:  Object to the form of the

1           John Reynolds

2    question.

3              THE WITNESS:  I think every private

4    equity deal is going to have an individual or

5    individuals that are closer to an investment

6    than others.  And in this case, Jeff Scofield

7    was considerably closer to the day-to-day at

8    Revelation and Blackjewel than John Reynolds.

9  BY MR. GAUDAGNINO:

10        Q.    Would that be consistent with Lime

11  Rock's other investments?  In other words, would

12  Lime Rock have sort of a deal team with someone

13  leading the team that was sort of in charge?

14              MR. KANE:  Object to the form of the

15    question.

16              THE WITNESS:  Every deal has its own

17    cadence and structure.  It would not be

18    unusual, with two managing directors at Lime

19    Rock and a junior individual or individuals,

20    that one of the two senior people had more

21    direct day-to-day involvement in an

22    investment than another.

23  BY MR. GAUDAGNINO:

24        Q.    I think we can -- why don't we go to

25  Exhibit 21, if you have that.  Wolf may have already

LIMITED LIABILITY COMPANY AGREEMENT

OF

REVELATION ENERGY HOLDINGS, LLC

A DELAWARE LIMITED LIABILITY COMPANY

MARCH 26, 2009

THE MEMBERSHIP INTERESTS (AS DEFINED HEREIN) GOVERNED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN AND IN THE OTHER INVESTMENT DOCUMENTS (AS DEFINED HEREIN).

4684535.12

# TABLE OF CONTENTS

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Construction | 1 |

## ARTICLE 2

## ORGANIZATION

| | | |
|---|---|---|
| Section 2.1 | Formation | 2 |
| Section 2.2 | Name | 2 |
| Section 2.3 | Offices | 2 |
| Section 2.4 | Purposes | 2 |
| Section 2.5 | Foreign Qualification | 2 |
| Section 2.6 | Term | 3 |
| Section 2.7 | No State Law Partnership | 3 |
| Section 2.8 | Title to Company Assets | 3 |

## ARTICLE 3

## REPRESENTATIONS, WARRANTIES AND COVENANTS

| | | |
|---|---|---|
| Section 3.1 | Representations and Warranties of Each Member | 3 |
| Section 3.2 | Representations and Warranties of the Company | 5 |

## ARTICLE 4

## MEMBERS; UNITS

| | | |
|---|---|---|
| Section 4.1 | Members | 5 |
| Section 4.2 | Units | 6 |
| Section 4.3 | Preemptive Rights | 8 |
| Section 4.4 | Transfers of Units | 10 |
| Section 4.5 | Registration Rights | 10 |
| Section 4.6 | Additional Terms Relating to Members | 10 |
| Section 4.7 | Liability to Third Parties | 11 |

DEBTORSCL_009558

## ARTICLE 5

### CAPITAL CONTRIBUTIONS

Section 5.1    Capital Contributions.................................................................11
Section 5.2    Return of Capital Contributions...............................................11
Section 5.3    Advances by Members...............................................................11
Section 5.4    Capital Accounts.......................................................................12

## ARTICLE 6

### DISTRIBUTIONS; ALLOCATIONS

Section 6.1    Distributions.............................................................................12
Section 6.2    Tax Distributions .....................................................................14
Section 6.3    Allocations of Net Profits and Net Losses................................14
Section 6.4    Regulatory Allocations. ............................................................15
Section 6.5    Curative Allocations .................................................................17
Section 6.6    Income Tax Allocations.............................................................17
Section 6.7    Other Allocation Rules. ............................................................17
Section 6.8    Limitation Upon Distributions .................................................18
Section 6.9    Withholding Authorized ...........................................................18

## ARTICLE 7

### MANAGEMENT

Section 7.1    Management by Directors...........................................................18
Section 7.2    Board of Directors.....................................................................18
Section 7.3    Meetings of the Members. .........................................................21
Section 7.4    Provisions Applicable to All Meetings.....................................22
Section 7.5    Officers .....................................................................................23
Section 7.6    Duties of Directors and Members. ............................................24

## ARTICLE 8

### ADDITIONAL COVENANTS

Section 8.1    Reports .....................................................................................25
Section 8.2    Inspection Rights .....................................................................26
Section 8.3    Internal Restructure...................................................................26
Section 8.4    Confidentiality .........................................................................28
Section 8.5    Business Opportunities. ............................................................29
Section 8.6    VCOC Related Rights...............................................................29

4684535.12

DEBTORSCL_009559

## ARTICLE 9

### EXCULPATION AND INDEMNIFICATION

| | | |
|---|---|---|
| Section 9.1 | Exculpation | 30 |
| Section 9.2 | Indemnification | 30 |
| Section 9.3 | Advance Payment | 31 |
| Section 9.4 | Indemnification of Officers, Employees and Agents | 31 |
| Section 9.5 | Appearance as a Witness | 31 |
| Section 9.6 | Nonexclusivity of Rights | 32 |
| Section 9.7 | Insurance | 32 |

## ARTICLE 10

### TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

| | | |
|---|---|---|
| Section 10.1 | Tax Returns | 32 |
| Section 10.2 | Tax Partnership | 33 |
| Section 10.3 | Tax Elections | 33 |
| Section 10.4 | Tax Matters Member | 33 |
| Section 10.5 | Bank Accounts | 34 |
| Section 10.6 | Fiscal Year | 35 |

## ARTICLE 11

### DISSOLUTION, WINDING-UP AND TERMINATION

| | | |
|---|---|---|
| Section 11.1 | Dissolution | 35 |
| Section 11.2 | Winding-Up and Termination | 35 |
| Section 11.3 | Deficit Capital Accounts | 36 |
| Section 11.4 | Certificate of Cancellation | 36 |

## ARTICLE 12

### GENERAL PROVISIONS

| | | |
|---|---|---|
| Section 12.1 | Books | 37 |
| Section 12.2 | Offset | 37 |
| Section 12.3 | Advances | 37 |
| Section 12.4 | Notices | 37 |
| Section 12.5 | Entire Agreement; Supersedure | 38 |
| Section 12.6 | Effect of Waiver or Consent | 38 |
| Section 12.7 | Amendment or Restatement | 38 |
| Section 12.8 | Binding Effect | 38 |
| Section 12.9 | Governing Law; Venue | 39 |

DEBTORSCL_009560

Section 12.10   Severability ....................................................................................... 39
Section 12.11   Further Assurances ............................................................................ 39
Section 12.12   Waiver of Certain Rights ................................................................. 39
Section 12.13   Directly or Indirectly ....................................................................... 39
Section 12.14   Counterparts ....................................................................................... 39

**SCHEDULES:**

Schedule 1            Members and Information Related Thereto

**EXHIBITS:**

Exhibit A            Defined Terms
Exhibit B            Provisions Relating To Transfers
Exhibit C            Registration Rights
Exhibit D            Joinder Agreement

DEBTORSCL_009561

# GLOSSARY OF DEFINED TERMS

The location of the definition of each capitalized term used in this Agreement is set forth in this Glossary:

10% Member.............................................. A-1
Accepting Person .................................... B-5
Accepting Persons' Notice.................... B-5
Accounting Firm .................................... A-1
Act............................................................. A-1
Adjusted Capital Account ..................... A-1
Affiliate.................................................... A-1
Agreement................................................ A-1
Available Cash........................................ A-1
Board........................................................ 19
Book Liability Value............................. A-1
Book Value ............................................. A-1
Business Day........................................... A-2
Business Line ......................................... 2
Capital Account ...................................... 12
Capital Contribution.............................. A-2
Capital Stock........................................... A-3
Cause........................................................ A-3
Certificate................................................ 1
Code......................................................... A-3
Company.................................................. 1
Company ROFO Election Period........... B-2
Contribution Agreement ....................... A-3
Control..................................................... A-3
Co-Sale Buyer ........................................ B-3
Co-Sale Notice ....................................... B-3
Co-Sale Offer.......................................... B-3
Co-Sale Percentage ................................ A-3
Co-Sale Seller ........................................ B-3
Co-Sale Units.......................................... B-4
Curative Allocations ............................. A-3
Depreciation............................................ A-3
Disposing Member.................................. B-2
Disposition Notice ................................. B-2
Disposition Offer ................................... B-2
Dissolution Event................................... 35
Drag-Along Person ................................ B-5
Economic Risk of Loss .......................... A-4

Effective Date ........................................ 1
Electing Member..................................... B-4
Election Period........................................ 9
Eligible Incentive Unit........................... A-4
Eligible Investor..................................... 9
Eligible Purchaser ................................. 9
Entity....................................................... A-4
Exchange Act.......................................... A-4
Exempted Units....................................... A-4
Expel, Expelled or Expulsion ................ A-5
First Notice............................................. 9
Fiscal Year.............................................. 35
Formation Date ...................................... 1
Former Director ..................................... 20
Founder Notes........................................ A-5
Founders.................................................. A-5
Fund Group ............................................ 29
Fund Group Member.............................. 29
Fund Indemnitors ................................... 32
Fund Renounced Business Opportunity.... 30
GAAP....................................................... A-5
Hoops....................................................... 7
Hoops Designee ...................................... 19
Hoops Related Parties............................ A-5
HSR Act .................................................. A-5
Incentive Units ....................................... 8
Indemnified Party................................... C-6
Indemnifying Party ................................ C-6
Initial Notice Period .............................. 9
Internal Restructure................................ A-5
Involuntary Transfer .............................. A-5
Joinder Agreement ................................. A-5
Lime Rock............................................... A-5
Lime Rock Designee............................... 19
Lime Rock Investors .............................. A-5
LLC Agreement ...................................... D-1
Losses...................................................... A-7
Maximum Tax Liability ......................... A-6

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
v

DEBTORSCL_009562

Member ................................................. A-6
Member Nonrecourse Debt ..................... A-6
Member Nonrecourse Debt Minimum
    Gain ............................................... A-6
Member Nonrecourse Deduction ........... A-6
Membership Interest ............................... A-6
Minimum Gain ....................................... A-6
Nonrecourse Deduction ......................... A-7
Offered Units ............................................ 8
Officers ................................................... 23
Over-Allotment Amount ........................... 9
Payment Notice ....................................... 11
Per Unit Price ........................................ B-3
Percentage Interest ............................... A-7
Permitted Transfer ................................ A-7
Person ..................................................... A-7
Proceeding ............................................... 31
Profits ..................................................... A-7
Proposed Co-Sale Transfer ................... B-3
Proposed Purchaser .................................. 8
Registration Expenses .......................... A-8
Regulatory Allocations .......................... A-9
Requesting Investor ................................. 9
Resign, Resigning or Resignation ........... A-9
Restricted Unit Agreement ................... A-9
Return of Capital .................................... A-9
ROFO Member Election Period ............. B-2
ROFO Members .................................... B-2

Safe Harbor Election ................................. 8
Sale of the Company Offer ................... B-5
Sale Price ............................................... B-2
Sale Transaction ..................................... A-9
Sale Units ............................................... B-2
SEC ...................................................... A-10
Securities Act ................................. 7, A-10
Series A Percentage Ownership ........... A-10
Series A Preferred Return Amount ....... A-10
Series A Units .......................................... 7
Series B Preferred Return Amount ....... A-10
Series B Units .......................................... 7
Severance Amounts ................................. 37
Sharing Ratio ....................................... A-10
Subsidiary ............................................. A-10
Supplemental Notice ................................ 9
Tax Matters Member ............................... 34
Third-Party Buyer ................................ B-5
Threshold Amount .................................... 8
Transfer ................................................ A-10
Transferee ............................................. D-1
Treasury Regulations ........................... A-11
True-Up Amount ...................................... 13
Unit .......................................................... 6
Vested Incentive Unit ......................... A-11
Voting Interest ..................................... A-11
Voting Units ......................................... A-11

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## REVELATION ENERGY HOLDINGS, LLC
### A Delaware Limited Liability Company

This **LIMITED LIABILITY COMPANY AGREEMENT** of **REVELATION ENERGY HOLDINGS, LLC**, a Delaware limited liability company (the "*Company*"), dated as of March 26, 2009 (the "*Effective Date*"), is adopted, executed and agreed to, for good and valuable consideration, by the Company and the Members (as defined below).

### RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on February 27, 2009 (the "*Formation Date*"), of a Certificate of Formation under and pursuant to the Act (such Certificate of Formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "*Certificate*"); and

**WHEREAS**, the parties hereto desire to enter into this Agreement in order to set forth their rights and obligations as Members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Act.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

### AGREEMENTS

### ARTICLE 1

### DEFINITIONS AND CONSTRUCTION

**Section 1.1**   *Definitions*.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them in Exhibit A.  The Glossary of Defined Terms, which follows the Table of Contents, sets forth the location in this Agreement of the definition for each capitalized term used herein.

**Section 1.2**   *Construction*.  Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America; (e) the word "including" means "including without limitation;" and (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto.

DEBTORSCL_009564

## ARTICLE 2

## ORGANIZATION

**Section 2.1**    *Formation*.  The Company was organized as a limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware, in accordance with and pursuant to the Act.  All actions by any Member in making such filing are hereby ratified, adopted and approved.  The rights and liabilities of the Members will be determined pursuant to the Act and this Agreement.  To the extent that there is any conflict or inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement control and take precedence.

**Section 2.2**    *Name*.  The name of the Company is "Revelation Energy Holdings, LLC" and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select.

**Section 2.3**    *Offices*.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States shall be at 104 Brent Way, Hurricane, West Virginia 25526 or such other place as the Board may designate, which need not be in the State of Delaware.  The Company may have such other offices as the Board may designate.

**Section 2.4**    *Purposes*.  The purpose of the Company shall be the leasing, acquisition, exploration, mining and development of coal properties in the United States (the "*Business Line*") and any business activity reasonably related thereto, to the extent not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity.  In furtherance of such purpose, the Company may (a) acquire (i) coal leasehold interests, mineral interests and royalty interests, (ii) mines, plants, railways, facilities, equipment and other assets relating to such activities or properties and (iii) contracts, easements, servitudes, permits, licenses and other rights relating to the foregoing; (b) explore for, mine, develop, produce, store, treat, process, gather, transport, purchase and market synfuel, coal and coal byproducts and related hydrocarbons and minerals; (c) farmout, sell, abandon and otherwise dispose of Company assets; (d) effectuate commodity hedging transactions in order to minimize the risks associated with the fluctuation of prices to be received by the Company from the sale of synfuel, coal and coal byproducts and related hydrocarbons and minerals from Company properties; and (e) take all such other actions incidental or ancillary to any of the foregoing as the Board may determine to be necessary or desirable.

**Section 2.5**    *Foreign Qualification*.  Prior to the Company's conducting business in any jurisdiction other than Delaware, to the extent that the nature of the business conducted requires the Company to qualify as a foreign limited liability company under the Law of that jurisdiction, the Company shall satisfy all requirements necessary to so qualify.  At the request of

4684535.12

2

DEBTORSCL_009565

the Company, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Section 2.6   *Term*.  The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 11.

Section 2.7   *No State Law Partnership*.  The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member shall be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and state income tax purposes, and this Agreement shall not be interpreted to provide otherwise.  The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

Section 2.8   *Title to Company Assets*.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.  Each of the Members hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the Company's assets partitioned.

## ARTICLE 3

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.1   *Representations and Warranties of Each Member*.  Each Member (as to itself only) represents and warrants to the Company and the other Members (including other Members admitted after the date hereof) as follows:

(a)    Organization; Existence.  Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)    Power; Qualification.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)    Authority; Enforceability.  This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this

4684535.12

3

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009566

Agreement by the other parties hereto, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)     No Conflicts.  The execution, delivery, and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment, or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)     Investment Matters.  Such Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities laws.  Such Member is an "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.  Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities."  Such Member has knowledge of finance, securities and investments generally, experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company.

(f)     LLC Agreement.  Such Member understands that the Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement.

(g)     No Brokers.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company or any other Member; and such Member shall indemnify and hold harmless the Company and the other Members from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Members in connection with the Company or this Agreement.

(h)     Survival of Representations and Warranties.  All representations and warranties made by each of the Members in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

4684535.12

<div align="center">

4

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

</div>

**Section 3.2**   *Representations and Warranties of the Company*.   The Company represents and warrants to the Members that:

(a)   It was formed in the State of Delaware on the Formation Date.

(b)   The Company is duly organized, validly existing and in good standing under the laws of Delaware and has all requisite power and authority to enter into this Agreement.

(c)   There are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the officers and managers of the Company, threatened against or affecting the Company.

(d)   Prior to the Effective Date, the Company has not conducted any business operations other than in connection (i) with its formation and capitalization, (ii) any transactions described in the Contribution Agreement, and (iii) matters relating to the foregoing.

(e)   The Company has not owned any property or assets before the Effective Date.

## ARTICLE 4

## MEMBERS; UNITS

**Section 4.1**   *Members*.

(a)   Existing Members.   Each of the Persons listed on Schedule 1 hereto is hereby admitted as a Member as of the Effective Date.

(b)   Additional Members.   In addition to the Persons listed on Schedule 1, the following Persons shall be deemed to be Members and shall be admitted as Members without any further action by the Company, the Board or any Member: (i) any Person to whom Units are Transferred by a Member so long as such Transfer is made in compliance with this Agreement, including Exhibit B and (ii) any Person to whom the Company issues Units after the Effective Date in compliance with this Agreement so long as the Board designates such Person as a "Member", which designation must be evidenced by an adoption of this Agreement and any other agreement reasonably specified by the Board.

(c)   Cessation of Members.   Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Section 9.2, which rights shall not cease), but such Person shall remain bound by Section 8.4.

4684535.12

5

DEBTORSCL_009568

**Section 4.2**    *Units.*

(a)    Units; Class and Series.  The Membership Interests of the Company shall be issued in unit increments (each, a "*Unit*").  The Company may also issue Membership Interests in fractional Unit increments.  From time to time, the Company may, subject to the terms of this Agreement, including Section 4.3, issue such Units as the Board reasonably determines to be in the best interests of the Company; provided, however, that, following the Effective Date, the Company may not issue any Units without the unanimous consent of the Board.  Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in Section 4.2(c) or otherwise as shall be fixed by the Board by resolution thereof.  The Board, in so fixing the designations, rights and preferences of any class or series of Units, may, subject to the terms of this Agreement, designate such Units as "Preferred Units", "Common Units", "Incentive Units" or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units.  The Board may increase the number of authorized Units in any then existing class or series.  Upon due authorization of such issuances, the Board is hereby authorized, subject to this Agreement, to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations, preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units.  Each Member acknowledges and agrees that (i) any actions taken by the Company or the Board pursuant to this Section 4.2(a) (including the issuance of one or more classes or series of Units) shall not be deemed to materially adversely affect such Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director and (ii) any such amendment in connection with a duly authorized issuance of Units that is recommended by the Board may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution and tax allocation provisions of this Agreement to the extent approved by the Board.

(b)    Unit Certificates.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates.  As of the date hereof, Units are uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof.  In such event, the Board shall prescribe the forms of certificates to be issued by the Company including the forms of legends to be affixed thereto.  Any such certificate shall be delivered by the Company to the applicable record owner of the Units represented by such certificate.  Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code.  Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who shall certify the Units represented by such certificate.  Books and records reflecting the record ownership of the Units shall be kept by the Secretary.  In the event any Officer who shall have signed, or whose facsimile signature or signatures shall have been placed upon, any such certificate or certificates shall have ceased to be such Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such Officer at the date of issue.  The

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009569

Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed. Each certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

> **THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY MAY BE REQUESTED BY THE COMPANY TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT).**

> **THIS SECURITY MAY BE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF MARCH 26, 2009 (AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.**

   (c)    Initial Unit Designations; Effective Date Issuances.

          (i)    A class of Units designated as "*Series A Units*" is hereby created and a class of Units designated as "*Series B Units*" is hereby created. The Company is authorized to issue as many Series A Units and Series B Units as the Board approves from time to time. As of the Effective Date, the Company shall issue (A) to Lime Rock, 150,000 Series A Units in exchange for Lime Rock's cash contribution to the Company in the amount of $15,000,000, (B) to Jeffrey A. Hoops, Sr. ("*Hoops*") pursuant to the Contribution Agreement, 35,000 Series A Units and (C) to the Founders pursuant to the Contribution Agreement, an aggregate of 315,000 Series B Units, of which Triple H Family Limited Partnership shall receive 239,400 Series B Units, Jimmy D. Branham shall receive 37,800 Series B Units and Barry C. Tackett shall receive 37,800 Series B Units. Schedule 1 lists the Members and the number of Series A Units and/or Series B Units issued to each of them as of the Effective Date. The Board, without any action by any Member or any other Person, is authorized to amend and restate Schedule 1 from time to time to reflect the admission of new Members, the cessation of any Person as a

4684535.12

7

DEBTORSCL_009570

Member and transfers and issuances of Units made, in each case, in accordance with this Agreement.

(ii)   A class of Units designated as "*Incentive Units*" is hereby created and the Company is authorized to issue up to such number of Incentive Units as the Board approves from time to time. Incentive Units issued from time to time (including those issued on the Effective Date) will be issued for no consideration or de minimis consideration as such interests are intended to constitute "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43. Incentive Units shall be issued pursuant to separate Restricted Unit Agreements between the Company and each grantee thereof. Incentive Units shall be subject to forfeiture without consideration on the terms set forth in each Restricted Unit Agreement. Each Incentive Unit shall have a threshold amount assigned to it by the Board at the time of issuance of such Incentive Unit (as to each Incentive Unit, its *"Threshold Amount"*). The Incentive Units shall be non-voting except with respect to such matters, if any, on which the Incentive Units are entitled to vote as a matter of law and, in such cases, the Incentive Units shall entitle the holders thereof to one vote per Incentive Unit and such votes shall be cast on a combined basis (and not as a separate class) with all other Units.

(iii)   Without any further action by the Board or any Member, the Company may make an election to value any Incentive Units at liquidation value (the "*Safe Harbor Election*"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(1) and IRS Notice 2005-43. The Board shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations under Proposed Regulations Section 1.704-1(b)(4)(xii)(c) and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

(d)   Voting Rights.   Unless otherwise specified in this Agreement or the resolution of the Board creating any class or series of Voting Units, all classes and series of Voting Units shall vote together as a single class on all matters.

**Section 4.3   *Preemptive Rights*.**

(a)   Except for Exempted Units, prior to the Company issuing, after the date hereof, any Units or any equity security having rights, preferences or priority as to distributions senior to or on parity with any then existing Units, whether on a stand-alone basis or in tandem with notes, warrants, loans or other financial accommodations (collectively, the "*Offered Units*") to a proposed purchaser (the "*Proposed Purchaser*"), each of Lime Rock and each Founder, so long as (i) in the case of the Hoops Related Parties, the Hoops Related Parties continue to collectively own of record at least 33-1/3% of the number of Series A Units and Series B Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations) or, in the case of the other Founders, such Founder and its Permitted Transferees collectively own of record at least 33-1/3% of the number of Units owned of record by such Founder on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations) and (ii) such Founder remains an Eligible

8

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009571

Investor (each, an "*Eligible Purchaser*"), shall have the right to purchase the number of Offered Units as provided below in this Section 4.3. "*Eligible Investor*" means any Person that is an "accredited investor" under Rule 501 of Regulation D of the Securities Act and who is not in default under this Agreement. In order to confirm that a Person is an "Eligible Investor" for the foregoing purposes, the Company may require such Person to deliver customary investor eligibility certificates and documentation supporting the financial or other representations made therein.

(b)     The Company shall give each Eligible Purchaser written notice of any proposed issuance of Offered Units to which the preemptive rights provisions of Section 4.3(a) apply (the "*First Notice*") not less than 15 days prior to any such issuance (the "*Initial Notice Period*"). The First Notice shall include (i) the proposed number and class of the Offered Units and a description of the rights and preferences of such class if such class is other than Series A Units or Series B Units; (ii) the prospective sale price per Unit; and (iii) any other proposed terms and conditions of such issuance and shall offer to each Eligible Purchaser the opportunity to purchase its Percentage Interest (which Percentage Interest shall be calculated as of the date of such notice) of the Offered Units at the same price, on the same terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company. If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company shall furnish a supplemental notice (a "*Supplemental Notice*") describing the revised terms; provided, the Supplemental Notice shall not restart the Initial Notice Period, but the Company shall give each Eligible Purchaser a reasonable period of time (no fewer than five Business Days after the Eligible Purchaser receives such Supplemental Notice, which shall, to the extent necessary, extend the Initial Notice Period) (such Initial Notice Period, as extended if applicable, being referred to as the "*Election Period*") to consider the revised terms. If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering written notice thereof to the Company prior to the expiration of the Election Period or such later date determined by the Company because of material changes in the terms of the issuance or for any other reason. Each Eligible Purchaser's notice shall state the dollar amount of Offered Units such Eligible Purchaser (each a "*Requesting Investor*") would like to purchase up to a maximum amount equal to such holder's Percentage Interest of the total offering amount plus the additional dollar amount of Offered Units such Requesting Investor would like to purchase in excess of its Percentage Interest (the "*Over-Allotment Amount*"), if any, if other Eligible Purchasers do not elect to purchase their full Percentage Interest of the Offered Units. The rights of each Requesting Investor to purchase a dollar amount of Offered Units in excess of each such Requesting Investor's Percentage Interest of the Offered Units shall be based on the Requesting Investors' relative Percentage Interests of the excess Offered Units.

(c)     If all of the Offered Units are not fully subscribed by the Eligible Purchasers pursuant to the foregoing, the Company shall have the right to either (i) accept the partial subscriptions from the Eligible Purchasers and issue and sell the unsubscribed for portion of the Offered Units to the Proposed Purchaser (only on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable) at any time during the 90 days following the termination of the Election Period or (ii) cancel the entire offering (in which case any new offering will again be subject to the terms of this Section 4.3). The Board may, acting

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009572

unanimously, impose such other reasonable and customary terms and procedures such as setting a closing date (no fewer than five Business Days after the expiration of the Election Period), rounding the number of Units covered by this Section 4.3 to the nearest whole Unit and requiring customary closing deliveries such as accredited investor certificates, unit powers, representations of ownership and absence of encumbrances in connection with any preemptive rights offering. Except in the case of an Eligible Purchaser which withdraws its election to exercise its preemptive rights in any offering due to a material change in the terms and conditions of the offering occurring after its election, if any Eligible Purchaser refuses to purchase Offered Units for which it subscribed pursuant to the exercise of preemptive rights granted thereto under this Section 4.3, in addition to any other rights the Company may be permitted to enforce at law or in equity, the Board may require such Member and any Permitted Transferee thereof, in connection with exercising any future pre-emptive rights granted under Section 4.3  in connection with a future offering, to deposit with the Company, along with written notice of its election to exercise its rights hereunder, such funds as may be necessary to purchase the Offered Units subscribed for by such Person (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all) (any such deposit to be fully refundable if the offering is cancelled or if the Member is permitted to withdraw its subscription due to a material change in the terms and conditions of the offering occurring after its election, or partially refundable to the extent that the amount deposited exceeds the ultimate purchase price of the Units such Eligible Person is permitted purchase under this Section 4.3 for the applicable offering).

(d)      The rights granted to the Lime Rock Investors under this Section 4.3  may be transferred to any private equity fund that is an Affiliate of Lime Rock.  The rights granted to each Founder in this Section 4.3 are personal to it and cannot be transferred including by Involuntary Transfer; provided, however, to the extent that a Founder makes a Permitted Transfer of its Units, such transferee may, if so permitted by such Founder, exercise its rights hereunder.

**Section 4.4**   *Transfers of Units*.  The Units shall be bound by, and the Members shall comply with, the terms set forth on Exhibit B hereto governing, among other matters, the Transfer of Units.  Incentive Units may be subject to additional or different transfer restrictions, as set forth in the Restricted Unit Agreement pursuant to which such Incentive Units were first issued by the Company.

**Section 4.5**   *Registration Rights*.  Each Member understands and agrees that the Units issued on or prior to the date hereof have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act.  The Company shall comply with, and the Members shall comply with and be entitled to the benefits of, the provisions set forth on Exhibit C governing and providing for, among other matters, registration rights with respect to the registrable securities.

**Section 4.6**   *Additional Terms Relating to Members*.  No Member (a) has the right or power to Resign or (b) may be Expelled from the Company (other than in the event that such Member ceases to hold Units).

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009573

**Section 4.7**   *Liability to Third Parties*.   No Member shall be liable for the debts, obligations or liabilities of the Company, nor shall any Member be obligated to guaranty any debt, obligation or liability of the Company.

## ARTICLE 5

## CAPITAL CONTRIBUTIONS

**Section 5.1**   *Capital Contributions.*

(a)   *Initial Contributions*.   As of the Effective Date, each Member has made Capital Contributions to the Company equal to the amount set forth opposite such Member's name on Schedule 1 hereto in the column entitled "Capital Contributions" in exchange for the number and type of Units set forth opposite such Member's name in Schedule 1.   No Member shall have any obligation to make any Capital Contribution after the Effective Date.

(b)   Subsequent Contributions.

(i)   Lime Rock shall have the right to make additional Capital Contributions in cash to the Company, at such time, in such amounts, for such purposes and on such other terms, in each case, as are unanimously approved and determined by the Board and as are consistent with the remaining terms of this Section 5.1(b).   The Company shall issue Lime Rock one fully paid and non-assessable Series A Unit for each $100 contributed pursuant to this Section 5.1(b).

(ii)   The amount Lime Rock has the right contribute on any contribution date shall be specified by the Board by notice to Lime Rock (each, a "*Payment Notice*"); provided, notwithstanding anything to the contrary in this Section 5.1 or anywhere else in this Agreement, Lime Rock shall not be required to make any Capital Contributions unless it elects, in its sole discretion, to do so after receipt of a Payment Notice.   Capital Contributions shall be made by wire transfer of immediately available funds to the account specified in the related Payment Notice.   The Company shall not issue any Units or Membership Interests, other than Exempted Units, or accept any Capital Contributions in cash from any Person, other than in respect of Exempted Units, until Lime Rock has first made additional Capital Contributions under this Section 5.1(b) equal to $35 million unless unanimously approved by the Board.

**Section 5.2**   *Return of Capital Contributions*.   A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.   An unrepaid Capital Contribution is not a liability of the Company or of any Member.   A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 5.3**   *Advances by Members*.   Any Member may, with the consent of the Board, advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company on such terms as the Board and such Member mutually agree.

4684535.12

DEBTORSCL_009574

**Section 5.4**    *Capital Accounts.*

(a)    A separate capital account (a "*Capital Account*") will be maintained for each Member. Each Member's Capital Account will be increased by: (i) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Profits and other items of income and gain pursuant to Section 6.3 and Section 6.4. Each Member's Capital Account will be decreased by: (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Losses and other items of deduction and loss pursuant to Section 6.3 and Section 6.4.

(b)    In the event of a permitted sale or exchange of an interest the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.4(c) is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.4(c) should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.4(c), the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

## ARTICLE 6

## DISTRIBUTIONS; ALLOCATIONS

**Section 6.1**    *Distributions.*

(a)    *Regular Distributions.* Available Cash and other property shall be distributed to the Members solely at such times and in such amounts as the Board shall determine and approve. Subject to the remaining provisions of this Article 6, at any such time, distributions shall be made according to the following methodology and the following order of priority:

(i)    First, 100% to the holders of Series A Units in respect of each Series A Unit held of record thereby until there has been distributed under this Section 6.1(a)(i) an amount equal to $100 in respect of each Series A Unit held of record by all holders of Series A Units. Distributions under this Section 6.1(a)(i) shall be made in

4684535.12

DEBTORSCL_009575

respect of each Series A Unit pro rata in accordance with each Series A Unit's Return of Capital Amount.

(ii)     Second, 100% to the holders of Series A Units in respect of each Series A Unit held of record thereby (in proportion to each Series A Unit's Series A Preferred Return Amount determined immediately before such distribution is made) until there has been distributed under this Section 6.1(a)(ii) in respect of each Series A Unit an amount sufficient to reduce such Series A Unit's Series A Preferred Return Amount to $0.

(iii)     Third, 100% to the holders of Series B Units (pro rata in accordance with the number of Series B Units held) until there has been distributed under this Section 6.1(a)(iii) an aggregate amount equal to $100 in respect of each Series B Unit held.

(iv)     Fourth, 100% to the holders of Series B Units in respect of each Series B Unit held of record thereby (pro rata in accordance with the number of Series B Units then outstanding) until there has been distributed under this Section 6.1(a)(iv) an aggregate amount equal to the Series B Preferred Return Amount.

(v)     Fifth, 100% to the holders of Series A Units, Series B Units and Eligible Incentive Units (pro rata in accordance with the number of Series A Units, Series B Units and Eligible Incentive Units held by each, treated as single class for these purposes).

(b)     *True-Up Distributions.*   If any Series A Unit is issued after any distribution is made under Section 6.1(a), on each date the Company has Available Cash for distribution under Section 6.1(a), the Board shall determine the dollar amount that should be distributed under Sections 6.1(a)(i) and (ii) so that, taking all Series A Units into account, the proper cumulative amount has been distributed under Sections 6.1(a)(i) and (ii) (such amount, as of such date of determination, is referred to herein as the "***True-Up Amount***").   At any time a True-Up Amount exists, distributions equal to the True-Up Amount shall be made under Section 6.1(a)(i) and Section 6.1(a)(ii), instead of any other clause of Section 6.1(a), until the True-Up Amount has been reduced to $0 at which point distribution shall next be made under clause (iii), (iv) or (v), as applicable at such time.

(c)     *True-Up Contributions and Distributions following Liquidation.*   If a True-Up Amount exists after all distributions on liquidation under Section 11.2(c)(iii) have been made, then each person that received distributions under Section 6.1(v) shall promptly return, and pay, to the Company in cash the lesser of (x) its pro rata share of the True-Up Amount and (y) the total amount distributed to such person under Section 6.1(a)(v).   "***Pro rata share,***" as used in clause (x) preceding, means, with respect to any Person, the relative amount received by such Person under Section 6.1(a)(v) compared to the total amount distributed under Section 6.1(a)(v).   Amounts returned and paid to the Company pursuant to the preceding provisions of this Section 6.1(c) shall be distributed under Section 6.1(a)(i) and (ii), as applicable.   If, after making such distributions described in the preceding sentence, a True-Up Amount still exists, the holders of Series B Units shall promptly return, and pay, to the Company in cash its pro rata

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009576

share (based on the number of Series B Units held by each such holder compared to all Series B Units then outstanding) of the remaining True-Up Amount. Amounts returned and paid to the Company pursuant to the preceding sentence shall be distributed under Section 6.1(a)(i) and (ii), as applicable.

(d)     For the avoidance of doubt, no Member shall be required to return cash to the Company pursuant to this Section 6.1(b) in respect of any Class of Units in excess of the total distributions made to such Member in respect of such class of Units reduced by the Maximum Tax Liability attributable to such Member.

(e)     Notwithstanding the foregoing, amounts otherwise distributable in respect of an unvested Incentive Unit pursuant to this Section 6.1 shall not be distributed until such time as such Unit has vested in accordance with the terms hereof and the applicable Restricted Unit Agreement, and if such Unit is forfeited without vesting, the amounts not so distributed with respect thereto shall revert to the Company.

(f)     Notwithstanding the foregoing, other than upon the occurrence of a Dissolution Event, Internal Restructure or Sale Transaction, distributions shall not be made pursuant to Section 6.1(a)(ii), (iv) and (v), to the extent such distributions would cause such holder's Capital Account (reduced by any tax distributions required to be made to such holder pursuant to Section 6.2) to be less than zero.

Section 6.2   *Tax Distributions*.   Notwithstanding anything to the contrary in Section 6.1, unless prohibited by applicable law or by any contract binding on the Company, prior to making any distribution under Section 6.1, the Company shall distribute cash to the Members at least five Business Days before estimated quarterly tax payments are due in respect of each of the quarters of each Fiscal Year on a pro rata basis based on the Board's good faith estimate of the projected Maximum Tax Liability of each Member, assuming a reasonable projection of the Company's annual Net Profit for the Fiscal Year. The Company shall not have any liability to a Member for penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments. Any distributions made pursuant to this Section 6.2 shall not be treated as an advance payment of, nor shall they reduce by a like amount, the amounts otherwise distributable to such Member pursuant to Section 6.1(a).

Section 6.3   *Allocations of Net Profits and Net Losses*.   Subject to Section 11.2(d), Net Profits and Net Losses for each Fiscal Year or other periods shall be allocated among the Members, after giving effect to the allocations pursuant to Section 6.5 and Section 6.6 for such Fiscal Year or other period as follows:

(a)     Net Profits shall be allocated,

(i)     First, pro rata to Members with negative Capital Accounts until all Capital Accounts have been increased to zero;

(ii)     Second, 100% to the holders Series A Units, pro rata to the extent their Capital Accounts are less than the sum of the amount such holders are entitled to receive pursuant to (A) Section 6.1(a)(i), (B) Section 6.1(a)(ii) and (C) Section 6.2 (to the

4684535.12

14

DEBTORSCL_009577

extent such tax distributions are in respect of allocations made to support the distributions to be made pursuant to Section 6.1(a)(i) and (ii));

(iii)    Third, 100% to the holders of Series B Units, pro rata to the extent their Capital Accounts are less than the sum of the amount such holders are entitled to receive pursuant to (A) Section 6.1(a)(iii), (B) Section 6.1(a)(iv) and (C) Section 6.2 (to the extent such tax distributions are in respect of allocations made to support the distributions to be made pursuant to Section 6.1(a)(iii) and (iv)); and

(iv)    Fourth, 100% to the holders of Series A Units, Series B Units and Incentive Units (pro rata in accordance with the number of Series A Units, Series B Units, and Incentive Units held by each, treated as a single class for these purposes).

(b)    Net Losses shall be allocated,

(i)    First, to all holders of Series A Units, Series B Units, and Incentive Units (pro-rata in accordance with the number of Series A Units, Series B Units and Incentive Units held be each, treated as a single class for these purposes) to reverse Profits that have been allocated pursuant to Section 6.3(a)(iv) (limited to each holder's positive Capital Accounts);

(ii)    Second, 100% to the holders of Series B Units pro rata to the extent of positive Capital Account balance until such holders' Capital Accounts in respect of their Series B Units have been reduced to zero;

(iii)    Third, 100% to the holders of Series A Units pro rata to the extent of positive Capital Account balance until such holders' Capital Accounts have been reduced to zero; and

(iv)    Fourth, pro rata in accordance with the number of Series A and Series B Units held by each among all the holders of Series A and Series B Units.

**Section 6.4    *Regulatory Allocations*.**

The following allocations shall be made in the following order:

(a)    Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Sharing Ratios.

(b)    Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4).  If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss.  This Section 6.4(b) is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

4684535.12

DEBTORSCL_009578

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(c)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)).  This Section 6.4(c) is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except Section 6.4(c) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(d), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).  This Section 6.4(d) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except Section 6.4(c) and Section 6.4(d) (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible.  This Section 6.4(e) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)     In the event that any Member has a negative Adjusted Capital Account at the end of any Fiscal Year, such Member shall be allocated items of Company income and gain in the amount of such deficit as quickly as possible; provided that an allocation pursuant to this Section 6.4(f) shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 6.4 have been tentatively made as if this Section 6.4(f) were not in this Agreement.

(g)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) if such

4684535.12

DEBTORSCL_009579

Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

**Section 6.5    *Curative Allocations*.** The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Board is authorized to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero. The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

**Section 6.6    *Income Tax Allocations*.**

(a)    All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as otherwise provided in this Section 6.6.

(b)    In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using the "traditional method" with no curative or remedial allocations. In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Regulations thereunder.

(c)    Any (i) recapture of depreciation, depletion, "section 1254" costs or any other item of deduction shall be allocated, in accordance with Treasury Regulations Sections 1.1245-1(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of remedial allocations), and (ii) recapture of credits shall be allocated to the Members in accordance with applicable law.

(d)    Allocations pursuant to this Section 6.6 are solely for purposes of federal, state, and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**Section 6.7    *Other Allocation Rules*.**

(a)    All items of income, gain, loss, deduction and credit allocable to a Membership Interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as the owner of such Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash

4684535.12

DEBTORSCL_009580

distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Code Section 706 and the regulations thereunder.

(b)     The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be determined in accordance with their Sharing Ratios (relating solely to the Series A Units, Series B Units and Incentive Units held thereby).

**Section 6.8     *Limitation Upon Distributions.*** No distribution shall be declared and paid unless, after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities or if the declaration or payment would cause the Company or any of its Subsidiaries to breach any material agreement.

**Section 6.9     *Withholding Authorized.*** The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign law. All amounts required to be withheld pursuant to federal, state, local or foreign tax laws shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

## ARTICLE 7

## MANAGEMENT

**Section 7.1     *Management by Directors.*** The Company shall be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7, except with respect to certain consent or approval requirements provided in this Agreement, no Member by virtue of having the status of a Member shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company. The "managers" are referred to as "Directors" throughout this Agreement. The business and affairs of the Company shall be managed by the Board of Directors of the Company (the ***"Board"***) in accordance with this Agreement. Under the direction of the Board, to the extent that the Board designates Officers pursuant to Section 7.5, the day-to-day activities of the Company shall be conducted on the Company's behalf by the Officers, who shall be agents of the Company. In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, the Board shall have full power and authority to do all things on such terms as they may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company.

**Section 7.2     *Board of Directors.*** Each Member agrees that it will cast all votes ascribed to its Units, if any, or execute consents, as the case may be, and take all other necessary action (including causing the Company to call a special meeting of Members) in order to elect individuals, who have been nominated in accordance with the remaining provisions of this

4684535.12

18

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

Section 7.2, to serve as Directors of the Board and otherwise to ensure that the composition of the Board is at all times consistent with the following:

      (a)    <u>Composition; Initial Directors; Observation Rights</u>.

      (i)    The Board shall consist of natural persons who need not be Members or residents of the State of Delaware.  Subject to the remaining provisions of this Section 7.2, the Board shall consist of three Directors, and the nominees to stand for election to serve as Directors shall be designated as follows:   (A) one individual nominated by Hoops (the "***Hoops Designee***"), so long as (x) Hoops remains employed with the Company and (y) the Hoops Related Parties continue to collectively own of record at least 33-1/3% of the number of Series A Units and Series B Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations); and (B) two individuals nominated by the Lime Rock Investors (each, a "***Lime Rock Designee***").  The initial Lime Rock Designees are John T. Reynolds and Jeffrey B. Scofield.  The Hoops Designee shall be Hoops or another full-time employee of the Company or subsidiary thereof and shall initially be Jeffrey A. Hoops, Sr.  In the event that Hoops' right to nominate the Hoops Designee terminates as provided above, the Lime Rock Designees, acting jointly, shall have the right to require the Hoops Designee's resignation from the Board.  Thereafter, the Lime Rock Designees can either elect to fill the vacancy on the Board created by the removal or reduce the size of the Board to eliminate the vacancy on the Board created by such removal.  In the event any Hoops Designee ceases to be employed by the Company or any subsidiary thereof on a full-time basis, the Lime Rock Designees may request such Hoops Designee to resign from the Board in which case such Hoops Designee shall resign (or be removed by the Lime Rock Designees) and such vacancy shall be filled by Hoops so long as he remains entitled to designate a nominee.  The Company shall allow up to two representatives designated by the Lime Rock Investors and, so long as the Hoops Related Parties continue to collectively own of record at least 33-1/3% of the number of Series A Units and Series B Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations), up to two representatives designated by Hoops to attend all meetings of the Board in a nonvoting capacity, and in connection therewith, the Company shall give such representative copies of all notices, minutes, consents and other materials, financial or otherwise, which the Company provides to the Board; provided, however, that such representative shall agree to hold in confidence and trust all such information pursuant to a confidentiality agreement satisfactory to the Company; provided further, however, that the Company reserves the right to exclude such representatives from access to any material or meeting or portion thereof if the Company believes that (i) such exclusion may be helpful or necessary to preserve the attorney-client privilege or (ii) the presence of such representative could materially impair due consideration of the Board with respect to certain competitively sensitive matters, proprietary information and other similar matters (and the Company shall not be obligated to provide the representative with any related materials provided to the Board).

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009582

(ii)     The Members hereby elect, effective as of the Effective Date, Hoops (the Hoops Designee); John T. Reynolds (a Lime Rock Designee) and Jeffrey B. Scofield (a Lime Rock Designee) to serve as the initial Directors.

(iii)     Except as otherwise provided herein and for so long as such Person has the right to designate any Director, the Lime Rock Investors shall have the right to designate alternate or successor Directors (in lieu of the Lime Rock Designees), who may replace any absent or disqualified Director who was designated thereby; and Hoops shall have the right to designate alternate or successor Directors (in lieu of any Hoops Designee), who may replace any absent or disqualified Director who was designated thereby.

(iv)     Each individual elected to serve on the Board in accordance with this Section 7.2 shall serve until a successor is duly nominated and elected to serve in his stead, or until his removal in accordance with Section 7.2(c), voluntary resignation, death or disability, as applicable.

(v)     The chairperson of the Board, if any, shall be designated by the majority vote of all the Directors.

(b)     Vacancies.  Any vacancy created by the death, disability, retirement, resignation or proper removal (i.e., removal in accordance with Section 7.2(c)) of any individual designated under Section 7.2(a) (a "*Former Director*") shall be filled by a nominee designated by the Person that designated the applicable Former Director under Section 7.2(a) unless such Person no longer has the right to designate a nominee to serve as a Director.

(c)     Removal.  Except as provided in Section 7.2(a)(i), a Director nominated in accordance with Section 7.2(a) may not be removed from the Board during his or her term of office except by the Person or Persons authorized to nominate such Director or for Cause (it being understood and agreed that such Person authorized to nominate a successor to the removed Director shall be permitted to designate a different natural person as successor to the removed Director).

(d)     Quorum; Required Vote for Board Action.  Each Director shall be entitled to cast one vote, in person or by proxy, with respect to each matter submitted for the vote or consent of the Board.  If only one Lime Rock Designee attends any meeting of the Board, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that is absent from such meeting.  If there is one or more vacancy on the Board because Lime Rock has yet to nominate both of the Lime Rock Designees, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that has yet to be nominated. Directors then serving on the Board (i.e., excluding any vacancies on the Board) that are entitled to cast a majority of the votes that may be cast by all of the Directors then serving on the Board must be present in order to constitute a quorum for the transaction of business of the Board.  The act of a majority of the Directors present, in person or by proxy, at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by the Act, the Certificate of Formation or by this Agreement (including Section 7.2 hereof).  A Director who is present at a meeting of the Board at which action on any

4684535.12

20

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009583

matter is taken shall be presumed to have assented to the action unless his dissent shall be entered into the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

(e)     Location; Order of Business.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution. At all meetings of the Board business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)     Meetings of the Board; Notices.  The Board shall meet at least quarterly. Regular meetings of the Board shall be held at such places as shall be designated from time to time by resolution of the Board. Special meetings of the Board may be called by the Lime Rock Investors or any Founder on at least five days personal, written, telegraphic or wireless notice (e.g. e-mail) to each Director, with such notice containing a statement of the purposes for such special meeting. If a Hoops Designee is not able to attend a special meeting, such Director shall promptly send personal, written, telegraphic or wireless notice (e.g. e-mail) to each other Director of such Director's inability to attend the special meeting and, unless otherwise agreed, the special meeting shall be rescheduled to a date not later than ten Business Days from the original date of such special meeting.

(g)     Reimbursement; Compensation.  All Directors shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including travel expenses in accordance with the Company's travel reimbursement policies.

**Section 7.3**    *Meetings of the Members.*

(a)     Place of Meetings.  All meetings of the Members shall be held at the principal office of the Company, or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice) thereof.

(b)     Quorum; Required Vote for Member Action; Adjournment of Meetings. Except as expressly provided otherwise by this Agreement, the holders of a majority of the Voting Units then outstanding, voting together as a single class, and entitled to vote at any meeting of Members, present in person or represented by proxy thereat, shall constitute a quorum at any such meeting for the transaction of business, and the affirmative vote of the holders of a majority of the Units so present or represented at such meeting, voting together as a single class, at which a quorum is present shall constitute the act of the Members. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c)     Annual Meetings.  An annual meeting of the Members for the election of Directors to succeed those Directors serving on the Board whose terms expire and for the transaction of such other business as may properly be considered at the meeting may be held at

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009584

such place, within or without the State of Delaware, on such date, and at such time as the Board shall fix and set forth in the notice of the meeting; provided, until such time as a meeting of Members shall be called in accordance with this Section 7.3, the Directors shall continue to serve until their resignation or removal in accordance with Section 7.2. In lieu of annual meetings, which are not a requirement for any purpose, the Members may elect Directors by written consent.

(d)     Record Date.

(i)     The Board shall give at least 10 days personal, written or wireless notice (*e.g.*, e-mail) of any meetings of the Members of the Company. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days prior to the date of such meeting. If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held. Holders of Incentive Units shall not be entitled to notice of or to vote at any meeting of the Members of the Company, except as required by law.

(ii)     If, in accordance with this Agreement, action without a meeting of Members is permitted to be taken, the Board may fix a record date for determining Members entitled to consent in writing to such action, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or to an Officer of the Company having custody of the book in which proceedings of meetings of Members are recorded.

(iii)     A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

**Section 7.4     *Provisions Applicable to All Meetings*.** In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions shall apply:

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009585

(a)     Waiver of Notice Through Attendance.  Attendance of a Person at such meeting (including attendance by telephone pursuant to Section 7.4(d)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)     Proxies.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a Members meeting may vote at a Members meeting by a written proxy executed by that Person and delivered to the Secretary.  A proxy shall be revocable unless it is stated to be irrevocable.

(c)     Action by Written Consent.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by all of the Directors or members of a committee of the Board or the Members, as applicable.

(d)     Meetings by Telephone.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment shall be given full effect.

**Section 7.5    *Officers*.**  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company (*"Officers"*) and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described by resolution of the Board or as is customary for each such position.  In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person." An employee or other agent of the Company shall not be an authorized person unless specifically appointed as such by the Board.  Duly elected and designated Officers shall have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board; provided, notwithstanding anything to the contrary herein, unless such acts have been approved by the Board, the Officers shall not have the power or authority to cause or permit the Company to do or perform any of the following:

(a)     Incur any indebtedness or make any loan other than trade payables incurred in the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(b)     Sell, assign, convey or otherwise dispose of assets or properties of the Company outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

4684535.12

23

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

(c)    Make any capital expenditure outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(d)    Approve or amend any capital or operating budget;

(e)    Mortgage, pledge, assign in trust or otherwise encumber or permit to be encumbered any of the Company assets outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board; or

(f)    Enter into any transaction with a Member or an Officer or an Affiliate of a Member or an Officer.

**Section 7.6**    *Duties of Directors and Members.*

(a)    To the fullest extent permitted by the Act, a person, in performing his duties and obligations as a Director under this Agreement, shall be entitled to act or omit to act at the direction of the Members that designated such person to serve on the Board, considering only such factors, including the separate interests of the designating Members, as such Director or Members choose to consider, and any action of a Director or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Director or Members designating such Director, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Director or Members of the Company or any other Director or Member.

(b)    The Members (in their own names and in the name and on behalf of the Company) hereby:

(i)    agree that (A) the terms of this Section 7.6, to the extent that they modify or limit a duty or other obligation, if any, that a Director may have to the Company or any another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this Section 7.6 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

(ii)    waive to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.6.

(c)    The Members (in their own names and in the name and on behalf of the Company), acknowledge, affirm and agree that (i) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 7.6, and (ii) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

4684535.12

DEBTORSCL_009587

# ARTICLE 8

## ADDITIONAL COVENANTS

**Section 8.1**    *Reports*.  Except as expressly stated otherwise, the Company shall deliver the following reports and information to Lime Rock, the Founders and any other 10% Member:

(a)    Annual Reports.

(i)    As soon as available and in any event within 90 days after the end of each Fiscal Year, a consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related consolidated and consolidating statements of operations, members' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified without qualification to the Board by an Accounting Firm as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

(ii)    As soon as available and in any event within 90 days after the end of each Fiscal Year, the Company shall deliver a reserve report prepared in accordance with applicable SEC guidelines by an independent engineer approved by the Board with respect to the coal reserves of the Company and the Subsidiaries.

(iii)    Prior to year end, an annual capital and operating budget for the coming year, that shall be approved by the Board (as the same may be modified as approved by the Board on a month-to-month basis).

(b)    Monthly Reports.  As soon as practicable and in any event within 30 days after the end of each calendar month (including the last calendar month of the Company's Fiscal Year), a management report discussing the financial condition and operations of the Company and its Subsidiaries for the most recent period ended for which information is available, all in reasonable detail and certified by an officer of the Company as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP, as applied consistently with the Company's practices, and with the audited financial statements of the Company, excluding customary footnotes and year-end adjustments.

(c)    Weekly Reports.  Upon the request of Lime Rock, the Chief Executive Officer shall hold a weekly conference call during which management shall describe significant issues and events which have occurred during the previous week or which are expected to occur during the coming week (or such other reasonably relevant time frame as requested by Lime Rock).  Lime Rock shall be afforded the opportunity to ask questions regarding the information presented.  Notice of such conference call and the call-in number therefore shall be made available to Lime Rock and the Chief Executive Officer not less than 48 hours prior to the commencement of such conference call.

4684535.12

DEBTORSCL_009588

(d)    Other Information.

(i)    The Company shall promptly (but in any event within five Business Days) provide Lime Rock notice of: (A) any default in any material respect under any material agreement to which the Company or any Subsidiary is a party; (B) any material lawsuit or proceeding against the Company or any Subsidiary or executive officers, in their capacities as such executive officer; and (C) any other material change, event or circumstance affecting the Company, any Subsidiary or any executive officer, in their capacity as such executive officer, thereof.

(ii)    The Company shall promptly (but in any event within five Business Days) provide Lime Rock with copies of all material communications relating to any interest expressed by third-parties to engage in a Sale Transaction and all reasonable terms and other detail expressed in connection with such interest.

(iii)    Within five Business Days of the Company's receipt thereof, the Company shall provide Lime Rock with copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Company or any of its Subsidiaries to its Members, (B) all regular and periodic reports and all registration statements and prospectuses filed by the Company or any of its Subsidiaries with any securities exchange quotation system or service or with the SEC or any successor, (C) all press releases and other statements made available generally by the Company or any Subsidiaries concerning material developments in the business of the Company or its Subsidiaries and (D) all material communications with and from Federal, state or major municipal regulatory agencies or other governmental authorities, excluding any communications that are usual, customary, and in the ordinary course of the business of the Company and its Subsidiaries.

(iv)    The Company shall promptly (but in any event within five Business Days) provide to a Member any other information reasonably requested by such Member.

(v)    To each Member, as soon as available, but in no event more than 90 days after the end of each year, a copy of all tax information required to be provided to members, including but not limited to Schedules K-1.

**Section 8.2    *Inspection Rights*.** Lime Rock, each Founder and each 10% Member and its duly authorized representatives shall be permitted, during normal business hours and upon reasonable advance notice to the Company, to (a) inspect the books, records, contracts and agreements of the Company and the Subsidiaries for any proper purpose and make copies thereof and (b) obtain any information reasonably requested by such Member relating to the Company and the Subsidiaries. All costs incurred in such inspection will be borne by the requesting Member; provided, that if it is determined that the Company or its Subsidiaries is in breach of this Agreement, then such costs will be borne by the Company.

**Section 8.3    *Internal Restructure*.**

4684535.12

DEBTORSCL_009589

(a)      The Company, upon the unanimous approval of the Board, may effect an Internal Restructure on such terms as the Board in good faith deems advisable; provided that each Member (and if applicable, the stockholders, members, partners, trustees or other equity owners of an entity or trust Member, as applicable) is treated equitably and incurs no personal liability with respect to such Internal Restructure. Each Member agrees that it will consent to and raise no objections to such an Internal Restructure, in accordance with this Section 8.3, that has been unanimously approved by the Board. Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this Section 8.3) to be executed by such Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement, including, without limitation, relative equity ownership percentages among the holders of a series or class of Units, relative pro rata distribution rights among the holders of a series or class of Units, pre-emptive rights (except in connection with a public offering of the Company), those provisions granting the Board authority to manage the affairs of the Company, and granting certain Persons the right to nominate and cause the election of Directors, governing Transfers of Units or other equity securities and indemnification.

(b)      The Members acknowledge that an Internal Restructure may be undertaken in connection with a public offering of the Company, an acquisition of another business or entity or the sale of equity in the surviving entity to other Persons.

(c)      Upon the consummation of an Internal Restructure, the surviving entity or entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company.  The governing instruments of the surviving entity shall incorporate the governance provisions of this Agreement as closely as practicable.  All Members shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Company in connection with consummating an Internal Restructure (in accordance with this Section 8.3) including voting for or consenting thereto.

(d)      Notwithstanding anything to the contrary in this Section 8.3, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a public offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby and such Member is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a Purchaser Representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.  No Member shall have any dissenters' or appraisal rights in connection with any Internal Restructure, and each Member hereby votes in favor of such Internal Restructure and agrees to execute such further instruments as the Company reasonably requests to further evidence the waiver of any such dissenters' or appraisal rights.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009590

(e)    Each Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions of this Section 8.3.

Section 8.4    *Confidentiality.*    The Members acknowledge that they may receive information from or regarding the Company, any of its Subsidiaries, the other Members, or Affiliates of any of the foregoing in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing.    Each Member shall hold in confidence and not disclose any confidential or proprietary information it receives regarding the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing that is identified as confidential and may not disclose it to any Person other than another Member except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) to Affiliates, advisers or representatives of the Member (provided that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Affiliates, advisors and/or representatives to whom it discloses such information), (c) of information that the Member also has received from a source independent of the Company, any of its Subsidiaries, other Member, or Affiliates of any of the foregoing, as applicable, that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (d) to any Person to which such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and shall disclose only that portion of such information required to be disclosed), (f) permitted by the Company or Member affected by such disclosure, as applicable, (g) by any Member that is a private equity fund, hedge fund or institutional investor to its investors, partners or Affiliates (exclusive, however, of any portfolio company or any of their officers, directors, employees or owners, other than such Member); provided, that such Member remains liable for any breach of this provision by its investors, partners and Affiliates to whom it discloses such information, or (h) by any private equity fund, hedge fund or institutional investor of confidential information to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Person reasonably deems necessary or appropriate in connection with such Person obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information and that the information permitted to be so disclosed shall in no event include the identity of any direct or indirect owner of any Member or any information regarding such Person's direct or indirect ownership in any Member.    The Members agree that breach of the provisions of this Section 8.4 may cause irreparable injury to the Company or the

4684535.12

DEBTORSCL_009591

other Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this Section 8.4. Accordingly, the Members agree that the provisions of this Section 8.4 may be enforced by specific performance.

### Section 8.5    *Business Opportunities.*

(a)    <u>Company Opportunities</u>.  The Company and each Member recognize Lime Rock and its Affiliates are private equity funds, hedge funds and institutional investors and that they, their partners or investors (such persons, together with the operating companies described in this sentence, are collectively referred to as the "*Fund Group*" and individually as a "*Fund Group Member*") invest in, serve on the board of directors and other governing boards of, serve as officers of, provide services to and have minority and controlling ownership interests in existing and future operating companies. Except for the confidentiality obligations contained in Section 8.4, nothing in this Agreement or the nature of the existing or any future relationship between any Fund Group Member, on the one hand, and the Company or any Member, on the other (whether such relationship is by reason of any Fund Group Member acting as a lender, owner of equity interests or warrants, landlord, service provider or otherwise), will prohibit any Fund Group Member from engaging in any activity or business opportunity whatsoever for its own account or will require any Fund Group Member to make any business opportunity available to the Company, in each case, even if such activity or business opportunity competes with the Business Line or any other business conducted by the Company.

(b)    <u>Renunciation of Company Opportunities</u>.  The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Fund Group Member participates in or desires to participate in including those that may involve any aspect related to the Business Line or any other business conducted by the Company (each such business opportunity is referred to as a "*Fund Renounced Business Opportunity*"). No Fund Group Member shall have any obligation to communicate or offer any Fund Renounced Business Opportunity to the Company, and any Fund Group Member may pursue any Fund Renounced Business Opportunity solely for its own account.

Section 8.6    *VCOC Related Rights*. So long as any Lime Rock Investor is a Member or owns, directly or indirectly, any ownership interest in the Company, such Lime Rock Investor shall have the right under this Agreement to consult with and advise the management of the Company and any of its subsidiaries (including the right to meet with management personnel at least quarterly at the request of such Lime Rock Investor) on matters relating to the business and financial affairs of the Company and any of its subsidiaries. The rights granted to each Lime Rock Investor under this Section 8.6 are intended to constitute "management rights" within the meaning of U.S. Department of Labor Regulation § 2510.3-101(d)(3)(ii), and the Company and its subsidiaries will be operated consistent with the status of the Company as a "venture capital investment" of the Lime Rock Investors. The involvement of any Lime Rock Investor as contemplated in this Section 8.6 is for the purpose of informing such Lime Rock Investor with respect to various Company and subsidiary matters and receiving any ideas and suggestions that

4684535.12

DEBTORSCL_009592

such Lime Rock Investor may have with respect to Company and subsidiary matters but is not otherwise intended to change the governance of the Company or any of its subsidiaries as more particularly set forth in this Agreement. Notwithstanding anything to the contrary contained in this Section 8.6, the Board shall have full and exclusive power and authority on behalf of the Company and its subsidiaries to acquire, manage, control, administer and operate the property, business and affairs of the Company and its subsidiaries in accordance with Article 7 and the other applicable provisions of this Agreement.

## ARTICLE 9

## EXCULPATION AND INDEMNIFICATION

**Section 9.1    *Exculpation*.**  No Director or Officer in his capacity as such and no Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (a) liability for acts that involve fraud, willful misconduct or gross negligence and (b) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (a) and (b) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator. Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Director, Affiliate or Officer thereof breached the standard of care set forth above in this Section 9.1. In addition, by resolution of the Board, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Director or Officer is exculpated under this Section 9.1.

**Section 9.2    *Indemnification*.**  Subject to the limitations set forth in this Article 9, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a ***"Proceeding"***), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was a Director or while a Director is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this Section 9.2, indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in

4684535.12

Limited Liability Company Agreement
of
Revelation Energy Holdings, LLC

DEBTORSCL_009593

connection with such Proceeding, and indemnification under this Article 9 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. Notwithstanding anything to the contrary in this Section 9.2, a person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such person seeks indemnification, such person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company or that such person's actions constituted fraud, willful misconduct or gross negligence. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

**Section 9.3    *Advance Payment*.** The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

**Section 9.4    *Indemnification of Officers, Employees and Agents*.** The Company, by adoption of a resolution of the Board, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company who is not a Director to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Directors under this Article 9; and, the Company may, but shall not be obligated to, indemnify and advance expenses to persons who are not or were not Directors of the Company but who are or were serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against such Person and incurred by such Person in such a capacity or arising out of its status as such an aforementioned functionary to the same extent that the Company may indemnify and advance expenses to Directors under this Article 9.

**Section 9.5    *Appearance as a Witness*.** Notwithstanding any other provision of this Article 9, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by a Director or Member in connection with its appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

4684535.12

31

DEBTORSCL_009594

**Section 9.6** *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right that a Director or other Person indemnified pursuant to this Article 9 may have or hereafter acquire by vote of the Board. The Company hereby acknowledges that the Lime Rock Designees have certain rights to indemnification, advancement of expenses and/or insurance provided by Lime Rock and certain of its Affiliates (collectively, the *"Fund Indemnitors"*). The Company hereby agrees (i) that it is the indemnitor of first resort with respect to the Lime Rock Designees (i.e., its obligations to the Lime Rock Designees are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Lime Rock Designees are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Lime Rock Designees and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights a Lime Rock Designee may have against the Fund Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of a Lime Rock Designee with respect to any claim for which such Lime Rock Designee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Lime Rock Designee against the Company. The Company and each of the Members acknowledges that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 9.6).

**Section 9.7** *Insurance.* Without limiting the Company's other obligations under this Article 9 and as soon as practicable, the Company shall procure and at all times maintain directors liability insurance policies on customary terms, and all of the Directors, current and former, shall be included as insureds under such policies. Without limiting the Company's other obligations under this Article 9, the Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as an Officer, authorized person, authorized signatory, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

# ARTICLE 10

# TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

**Section 10.1** *Tax Returns.* The Company shall prepare and timely file all tax returns and reports required to be filed by the Company. Unless otherwise agreed by the Directors, any income tax return of the Company shall be prepared by the Accounting Firm. Each Member shall furnish to the Company all pertinent information in its possession relating to the

4684535.12

DEBTORSCL_009595

Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a Schedule K-1 to each of the Members as soon as practicable after the close of each taxable year, but in no event later than 90 days after the end of each year, together with such additional information as may be required by the Members in order for the Members to file their individual returns reflecting the Company's operations. The Company shall bear the costs of the preparation and filing of its tax returns and reports.

Section 10.2  *Tax Partnership*. The Members acknowledge that, subject to Section 8.3 and the impact of an Internal Restructure, the Company shall be treated as a partnership for Federal income tax purposes and will not otherwise characterize the Company for purposes of any Federal tax returns, statements or reports filed by them or their Affiliates.

Section 10.3  *Tax Elections*. The Company shall make the following elections on the appropriate tax returns:

(a)     to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Tax Matters Member designates;

(b)     to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method unless the cash method of accounting is available and the Tax Matters Member designates the cash method of accounting for use by the Company;

(c)     if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Tax Matters Member determines that the Code Section 754 election is in the best interests of the Company and the other Members, and so long as the Board consents to such election;

(d)     to elect to amortize the organizational expenses of the Company ratably over a period of 180 months as permitted by Code Section 709(b);

(e)     any election that would ensure that the Company will be treated as a partnership for Federal income tax purposes; and

(f)     any other election the Board may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

Section 10.4  *Tax Matters Member*.

(a)     <u>Designation by the Board</u>. The "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code shall be Lime Rock, or such other Member

DEBTORSCL_009596

designated as such by the Board from time to time. Any Member who is designated as the "tax matters partner" is referred to herein as the *"Tax Matters Member."* The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

(b)    <u>Duties and Obligations</u>. The Tax Matters Member shall take no action without the authorization of the Board, other than such action as may be required by Law. Any cost or expense incurred by the Tax Matters Member in connection with its duties as such, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company. The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board. The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the written consent of such Member. Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3)) shall notify the other Members of such settlement agreement and its terms within 30 days from the date of the settlement.

(c)    <u>Requests for Administrative Adjustments by Members</u>. No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members. If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within 30 days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf. Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(d)    <u>Notice of Inconsistent Treatment</u>. If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

**Section 10.5   *Bank Accounts*.** The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Board may determine. The Company shall not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009597

**Section 10.6** *Fiscal Year.* The fiscal year of the Company (the *"Fiscal Year"*) shall end on December 31 of each calendar year unless, for United States Federal income tax purposes, another fiscal year is required. The Company shall have the same fiscal year for United States Federal income tax purposes and for accounting purposes.

## ARTICLE 11

## DISSOLUTION, WINDING-UP AND TERMINATION

**Section 11.1** *Dissolution.*

(a)    General. Subject to Section 11.1(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a *"Dissolution Event"*), and no other event shall cause the Company's dissolution:

(i)    the approval of the Board; and

(ii)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    Continuance of the Company. To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

**Section 11.2** *Winding-Up and Termination.* On the occurrence of a Dissolution Event, the Board may, acting unanimously, select one or more Persons to act as liquidator or may itself act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board. The steps to be accomplished by the liquidator are as follows:

(a)    Accounting. As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    Satisfaction of Obligations. The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 5.3); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    Distribution of Assets. All remaining assets of the Company shall be distributed to the Members as follows:

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009598

(i)      the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the provisions of Sections 6.3, 6.4, and 6.5;

(ii)      with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)      the property of the Company shall be distributed in accordance with Section 6.1 (with no part distributed under Section 6.2).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 11.2; provided, however, that no Member shall be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act; provided, however, that no Member shall be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)      Final Capital Account Balances. The Members intend that the allocations provided under Sections 6.3, 6.4, and 6.5 will produce final Capital Account balances for the Members that permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made in the order and priorities set forth in Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1). If the allocations otherwise made under Sections 6.3, 6.4, and 6.5 would fail to produce such final Capital Account balances, the Board shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

**Section 11.3 *Deficit Capital Accounts*.**  No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**Section 11.4 *Certificate of Cancellation*.**  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009599

any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company. Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE 12

## GENERAL PROVISIONS

**Section 12.1** *Books.* To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**Section 12.2** *Offset.* Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset. For the avoidance of doubt, any amounts owed to the Company pursuant to the Founder Notes shall not be subject to this Section 12.2.

**Section 12.3** *Advances.* Any and all amounts paid to a holder of Series B Units (such amounts, "*Severance Amounts*") pursuant to Section 6 of the Employment Letter Agreement (as such term is defined in the Contribution Agreement) to which such holder of Series B Units is a party, other than Severance Amounts paid after a termination by such holder for Good Reason (as such term is defined in the Employment Letter Agreement), shall be deemed an advance of distributions to be made to such holder of Series B Units pursuant to Section 6.1, and the Company is hereby authorized to withhold from any distribution made to such holder of Series B Units pursuant to Section 6.1 an amount equal to the aggregate of such Severance Amounts and all such amounts withheld shall be treated as amounts actually distributed to the affected holder of Series B Units for all purposes under this Agreement.

**Section 12.4** *Notices.* Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it. Notices given by telecopy shall be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day. All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the other Members. Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

4684535.12

DEBTORSCL_009600

**Section 12.5** *Entire Agreement; Supersedure.* This Agreement and any other agreements expressly mentioned herein (including the Founder Notes) constitute the entire agreement of the Members, and their respective Affiliates relating to the formation and operation of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written. For avoidance of doubt, the Contribution Agreement and related transaction documents are not superseded by this Agreement.

**Section 12.6** *Effect of Waiver or Consent.* A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 12.7** *Amendment or Restatement.* Except as expressly set forth herein, this Agreement (including the Exhibits and Schedules) may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon unanimous Board approval); provided, (a) any amendment to this Agreement that would (i) obligate a Member to make a Capital Contribution to the Company (other than as provided by the terms of this Agreement in effect as of the Effective Date), (ii) cause a Member to have personal liability for Company obligations, (iii) materially adversely affect any Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director (other than any amendment related to an Internal Restructure in connection with an initial public offering) unless, with respect to each of the matters described in this clause (iii), such amendment (A) similarly affects all holders of a particular class of Units AND is approved by the holders of a majority of such class of Units or (B) similarly affects all holders of Series A Units and Series B Units AND is approved by the holders of a majority of all Series A Units and Series B Units voting as a single class, or (iv) adversely affect any Member's consent rights under this Section 12.7, shall be effective only with the consent of such Member, (b) to the extent that a provision of this Agreement requires a specified vote of the Members, or the vote of some or all of the holders of a specified class or series of Units, then any amendment of that provision will also require the consent of such specified vote of the Members or the vote of the requisite holders of such specified class or series of Units, as applicable, and (c) the Company (upon Board approval) may amend Schedule 1 without the consent of any Person to reflect new Members admitted in accordance with this Agreement, changes to the notice addresses and other similar relevant information. The Certificate may be amended or restated only with the approval of the Company (upon Board approval), provided, however, that no such amendment or restatement of the Certificate may effect any change described in Section 12.7(a) or (b) above without the consent of the Member or Members whose consent would be required under such clauses if such change were being effected through an amendment or restatement of this Agreement.

**Section 12.8** *Binding Effect.* This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

DEBTORSCL_009601

**Section 12.9  *Governing Law; Venue*.**  This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware.  The Members covenant and agree that the state courts located in Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in Delaware shall have exclusive jurisdiction of any action or proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

**Section 12.10  *Severability*.**  If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

**Section 12.11  *Further Assurances*.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.12  *Waiver of Certain Rights*.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

**Section 12.13  *Directly or Indirectly*.**  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**Section 12.14  *Counterparts*.**  This Agreement may be executed in any number of counterparts, including facsimile counterparts, with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

## [SIGNATURES CONTAINED ON FOLLOWING PAGE]

4684535.12

39

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the Effective Date.

COMPANY:

**REVELATION ENERGY HOLDINGS, LLC**

By: _____
Name: Jeffrey B. Scofield
Title: Director

MEMBERS:

LIME ROCK:

**LR-REVELATION HOLDINGS, L.P.**

By: LIME ROCK PARTNERS GP V, L.P.,
    its general partner

By: LRP GP V, Inc.,
    its general partner

By: _____
Name: Mark A. McCall
Title:  Chief Financial Officer

FOUNDERS:

_____
Jeffrey A. Hoops, Sr.

_____
Jimmy D. Branham

DEBTORSCL_009603

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the Effective Date.

COMPANY:

REVELATION ENERGY HOLDINGS, LLC

By: _____
Name:
Title:

MEMBERS:

LIME ROCK:

LR-REVELATION HOLDINGS, L.P.

By: LIME ROCK PARTNERS GP V, L.P.,
       its general partner

By: LRP GP V, Inc.,
       its general partner

By: _____
Name: Mark A. McCall
Title:  Chief Financial Officer

FOUNDERS:

_____
Jeffrey A. Hoops, Sr.

_____
Jimmy D. Branham

DEBTORSCL_009604

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the Effective Date.

COMPANY:

REVELATION ENERGY HOLDINGS, LLC

By: _____
Name:
Title:

MEMBERS:

LIME ROCK:

LR-REVELATION HOLDINGS, L.P.

By: LIME ROCK PARTNERS GP V, L.P.,
    its general partner

By: LRP GP V, Inc.,
    its general partner

By: _____
Name: Mark A. McCall
Title: Chief Financial Officer

FOUNDERS:

Jeffrey A. Hoops, Sr.

_____
Jimmy D. Branham

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

COMPANY:

**REVELATION ENERGY HOLDINGS, LLC**

By: _____

Name:

Title:

MEMBERS:

LIME ROCK:

**LR-REVELATION HOLDINGS, L.P.**

By: LIME ROCK PARTNERS GP V, L.P.,
    its general partner

By: LRP GP V, Inc.,
    its general partner

By: _____

Name: Mark A. McCall

Title:   Chief Financial Officer

FOUNDERS:

_____

Jeffrey A. Hoops, Sr.

_____

Jimmy D. Branham

Barry C. Tackett

**Triple H Family Limited Partnership**

By:
Name:
Title:

DEBTORSCL_009607

_____
Barry C. Tackett

**Triple H Family Limited Partnership**

By: _____

Name: _____

Title: _____

## SCHEDULE 1

## MEMBERS, UNITS AND INFORMATION RELATED THERETO

| Members | Number of Series A Units | Number of Series B Units | Capital Contributions as of the Effective Date |
|---|---|---|---|
| **LR-Revelation Holdings, L.P.** c/o Lime Rock Partners 274 Riverside Ave., 3rd Floor Westport, CT 06880 Attention: Jeffrey B. Scofield Kris Agarwal | 150,000 | N/A | $15,000,000 |
| **Jeffrey A. Hoops, Sr.** 1149 Newmans Branch Road Milton, WV 25541 | 35,000 | N/A | $3,500,000 |
| **Jimmy D. Branham** 475 Cedar Creek Road Pikeville, KY 41501 | N/A | 37,800 | $3,780,000 |
| **Barry C. Tackett** 400 Pine Grove Road Sumerco, WV 25567 | N/A | 37,800 | $3,780,000 |
| **Triple H Family Limited Partnership** 1149 Newmans Branch Road Milton, WV 25541 | N/A | 239,400 | $23,940,000 |

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
SCHEDULE 3

PAGE 1 OF 1

DEBTORSCL_009609

# EXHIBIT A

## DEFINED TERMS

"*10% Member*" means each Member that is the record holder of more than 10% of the then outstanding Voting Units (including, for purposes hereof, Voting Units held by such Member's Affiliates).

"*Accounting Firm*" means such accounting firm as the Board shall from time to time determine. The initial Accounting Firm shall be Dixon Hughes PLLC.

"*Act*" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"*Adjusted Capital Account*" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"*Affiliate*" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person.

"*Agreement*" means this Limited Liability Company Agreement of Revelation Energy Holdings, LLC, as amended and restated from time to time, including the Exhibits and Schedules hereto.

"*Available Cash*" means all cash, revenues and funds received by the Company from Company operations and proceeds from a Sale Transaction, less the sum of the following, to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the operation of the Company's business; and (c) such reserves as the Board deems reasonably necessary for the proper operation of the Company's business.

"*Book Liability Value*" means with respect to any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's-length transaction. The Book Liability Value of each liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values.

"*Book Value*" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

DEBTORSCL_009610

(a)     The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

(b)     The Book Values of all properties shall be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by all Members in proportion to their respective Sharing Ratios) to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property (other than a distribution made to all Members in proportion to their respective Sharing Ratios) as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Code); provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Book Value of property distributed to a Member shall be the fair market value of such property as of the date of such distribution as reasonably determined by the Board;

(d)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses; and

If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Section 6.4.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the States of New York or West Virginia are authorized by Law to close.

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT A – DEFINED TERMS
PAGE A-2

DEBTORSCL_009611

*"Capital Stock"* means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

*"Cause"* means, with respect to any Person, that such Person (a) has committed willful misconduct or gross negligence in a manner that materially impairs the Company's financial condition or prospects, (b) has continually refused or intentionally failed to perform his duties and obligations in some material respect after reasonable written notice (and reasonable time to cure) of any such refusal or failure to perform such duties or obligations or (c) has been convicted of a felony or crime involving moral turpitude.

*"Code"* means the United States Internal Revenue Code of 1986, as amended from time to time. All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

*"Contribution Agreement"* means that certain Contribution Agreement of even date herewith among Revelation Energy Holdings, LLC, Lime Rock, the Founders and the other persons named therein.

*"Control,"* including the correlative terms *"Controlling," "Controlled by"* and *"Under Common Control with"* means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

*"Co-Sale Percentage"* means, for each Electing Member, a fraction (expressed as a percentage), the numerator of which is the number of Series A Units held of record by such Electing Member and the denominator of which is the sum of the number of Series A Units held of record by all Electing Members and the Co-Sale Seller.

*"Curative Allocations"* means the allocations pursuant to Section 6.5 of this Agreement.

*"Depreciation"* means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income

4684535.12

DEBTORSCL_009612

tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

*"Economic Risk of Loss"* has the meaning set forth in Treasury Regulation Section 1.752-2(a).

*"Eligible Incentive Unit"* means, as of any time of determination, each Incentive Unit then outstanding, the Threshold Value of which is equal to or less than the cumulative amount distributed in respect of any Series B Unit under Section 6.1 after the date such Incentive Unit was first issued to such time of determination. Whether an Incentive Unit constitutes an Eligible Incentive Unit shall be determined before and after each dollar is distributed under Section 6.1(a).

*"Entity"* means any Person other than a natural person.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

*"Exempted Units"* means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) any Units distributed or set aside ratably to all Members pro rata based on their respective Units, including any distribution issued for no consideration to all Unit holders or any split of Units, (c) any Units issued, sold or otherwise transferred to sellers as consideration in connection with the Company's or any Subsidiary's acquisition of all or substantially all of another Person or another Person's line of business or division, or all or substantially all of a Person's assets, in any case, by merger, consolidation, stock purchase, asset purchase, recapitalization, or other reorganization, (d) Incentive Units issued, sold or otherwise Transferred to or on behalf of the managers, Directors, officers or other key employees of the Company or any of its Subsidiaries pursuant to any employment agreement or arrangement, unit option plan, restricted unit agreement, incentive compensation plan or program or similar incentive compensation program approved by the Board, (e) any Units issued, sold or otherwise Transferred to any third-party unaffiliated investor if the Board determines that there are strategic reasons to exempt such issuance, sale or Transfer from the preemptive rights terms of Article 4, (f) any Units issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates) in connection with any loan or commitment to loan made by such lender to the Company or any Subsidiary thereof and (g) any Series A Units issued pursuant to Section 5.1(b).

*"Expel, Expelled or Expulsion"* means the expulsion or removal of a Member from the Company as a member.

*"Founder Notes"* means those certain two Secured Nonrecourse Promissory Notes and Pledge Agreements, each dated as of the date hereof, by and between the

4684535.12

DEBTORSCL_009613

Company, on the one hand, and Jimmy D. Branham and Barry C. Tackett, respectively, on the other hand.

*"Founders "* means Jeffrey A. Hoops, Sr., Triple H Family Limited Partnership, a West Virginia limited partnership, Jimmy D. Branham and Barry C. Tackett and their respective Permitted Transferees that hold all or any portion of the Units issued by the Company to such Person from time to time.

*"GAAP"* means United States generally accepted accounting principles and policies as in effect from time to time.

*"Hoops Related Parties"* means, collectively, Hoops, Triple H Family Limited Partnership and the respective Permitted Transferees.

*"HSR Act"* means the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

*"Internal Restructure"* means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Members or their Affiliates continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Members or their Affiliates in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to any Member.

*"Involuntary Transfer"* means a Transfer resulting from the death of a Person or another involuntary Transfer occurring by operation of law.

*"Joinder Agreement"* means an agreement substantially in the form of <u>Exhibit D</u> hereto pursuant to which a Person agrees to be bound by the terms of this Agreement and agrees that any Units held thereby shall be bound by the terms of this Agreement or such other form as the Board reasonably required in connection with a Transfer.

*"Lime Rock"* means LR-Revelation Holdings, L.P., a Delaware limited partnership.

*"Lime Rock Investors"* means Lime Rock and its Affiliates and any direct or indirect transferee of all or any portion of the Units issued by the Company to Lime Rock from time to time.

*"Maximum Tax Liability"* means, for any Member, the product of (a) an amount determined by the Company (on an actual or estimated basis) for each Member for a completed fiscal quarter, as the case may be, equal to the sum of the portion of the Company's Net Profit allocated or to be allocated and guaranteed payments made or to be made pursuant to Article 6 to such Member for federal, state or local income tax purposes

4684535.12

DEBTORSCL_009614

for such fiscal quarter multiplied by (b) the highest combined marginal federal, state and local income tax rates that apply to an individual residing in New York County, New York taking into account rate differences that may apply to the character of the income so allocated.  In determining cumulative Maximum Tax Liability for each Member, Net Losses allocated to a Member for a Fiscal Year that are allowed to be carried forward under applicable tax laws to a later Fiscal Year shall be deducted from Net Profit in that later year.

*"Member"* means any Person executing this Agreement as of the Effective Date, that executes a Restricted Unit Agreement and agrees to be bound by this Agreement or is hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

*"Member Nonrecourse Debt"* has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

*"Member Nonrecourse Debt Minimum Gain"* has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulation Section 1.704-2(i)(2).

*"Member Nonrecourse Deduction"* has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(1).

*"Membership Interest"* means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

*"Minimum Gain"* has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

*"Net Loss"* means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

*"Net Profit"* means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

*"Nonrecourse Deduction"* has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(1).

*"Percentage Interest"* means, as to any Eligible Purchaser, a fraction (expressed as a percentage), the numerator of which equals the number of Voting Units held of

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT A – DEFINED TERMS
PAGE A-6

DEBTORSCL_009615

record thereby and the denominator of which equals the number of Voting Units held of record by all of the Eligible Purchasers.

"*Permitted Transfer*" means any Involuntary Transfer or, with respect to any Member, any Transfer to (a) any parent, sibling, child or grandchild of such Member, (b) any trust, limited liability company, limited partnership or other entity having as its sole beneficiaries or owners such Member, any Persons described in clause (a) above or any combination of the foregoing, (c) the shareholders, members, partners or other equity owners of a Member that is an entity, or (d) an Affiliate of a Member if such Member (or the sole shareholder(s)/member(s) of the Member) own(s) one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, (e) solely with respect to Lime Rock, any private equity fund that is an Affiliate of Lime Rock Management, L.P. and any direct or indirect, wholly-owned (together with any general partner) subsidiary of any such fund, and (f) any Person designated by the Board as a "Permitted Transferee" for purposes of such Transfer.

"*Person*" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"*Profits*" or "*Losses*" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(c)     In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

DEBTORSCL_009616

(d)     In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(e)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(g)     To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)     Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

*"Registration Expenses"* means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties and costs and expenses relating to analyst or investor presentations, if any, or any "road show" undertaken in connection with the registration and/or marketing of the Units other than as provided in any underwriting agreement entered into in connection with such offering), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters), (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Units of all participating Members, (h) fees and expenses in connection with any review of underwriting

4684535.12

DEBTORSCL_009617

arrangements by the National Association of Securities Dealers, Inc. including fees and expenses of any "qualified independent underwriter", (i) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (j) fees and disbursements of underwriters customarily paid by issuers or sellers of Units, but shall not include any underwriting discounts attributable to the sale of secondary Units, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members or any fees and expenses of underwriter's counsel, and (k) the expenses and fees for listing the Units to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system.

*"Regulatory Allocations"* means the allocations pursuant to Section 6.4 of this Agreement.

*"Resign, Resigning or Resignation"* means the resignation, withdrawal or retirement of a Member from the Company. Such terms shall not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

*"Restricted Unit Agreement"* means with respect to each Member holding Incentive Units, that certain agreement dated as of the date of issuance of such Member's Incentive Units between the Company and such Member.

*"Return of Capital Amount"* means, with respect to each Series A Unit, $100 less all distributions made to the holder of such Series A Unit pursuant to Section 6.1(a)(i).

*"Sale Transaction"* means any transaction or series of related transactions (whether such transaction occurs by a sale of assets, sale of Units or other Company interests, merger, conversion, recapitalization or other business combination) that, after giving effect thereto, results in (a) all or substantially all of the assets of the Company being held by an entity that is less than 50% owned by the record holders of Units immediately prior to such transaction and their Affiliates or (b) the record holders of the Units prior to such transaction and their Affiliates having record ownership, directly or indirectly after the consummation of such transaction, of 50% or less (determined by the percentage of liquidating distributions the record holders of Units would receive upon a liquidation of the Company or other surviving entity immediately after consummation of such transaction) of the equity securities of the surviving company.

*"SEC"* means the United States Securities and Exchange Commission.

*"Securities Act"* means the Securities Act of 1933, as amended from time to time.

*"Series A Percentage Ownership"* means a fraction, expressed as a percentage, the numerator of which equals the number of Series A Units then outstanding and the denominator of which equals the sum of the number of Series A Units and Series B Units then outstanding.

4684535.12

DEBTORSCL_009618

*"Series A Preferred Return Amount"* means, with respect to any Series A Unit and as of any date of determination, the hypothetical interest amount that would have accrued and that would remain unpaid as of such date of determination on a promissory note in the original principal amount of $100 that accrues interest at a rate of 8% per annum, compounded annually beginning on the date such Series A Unit was issued by the Company and treating distributions in respect of such Series A Unit under Section 6.1(a)(i) and Section 6.1(a)(ii) to first be repayments of the principal amount of such promissory note and then to be repayments of accrued interest.

*"Series B Preferred Return Amount"* means, as of any date of determination, (a) the total amount that has distributed prior to and on such date of determination under Section 6.1(a)(ii) divided by the Series A Percentage Ownership minus (b) the total amount that has distributed prior to and on such date of determination under Section 6.1(a)(ii).

*"Sharing Ratio"* means, with respect to any Member, the ratio which the number of Units (or Units of a specified class or specified classes) held by that Member bears to the total number of Units (or Units of the specified class or specified classes) held by all Members.

*"Subsidiary"* means (a) any corporation or other entity (including a limited liability company) a majority of the Capital Stock of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect Subsidiary of the Company or (b) a partnership in which the Company or any direct or indirect Subsidiary is a general partner.

*"Transfer,"* including the correlative terms *"Transferring"* or *"Transferred"*, means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided, however, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

*"Treasury Regulations"* means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

*"Vested Incentive Unit"* means, as of any date of determination, each Incentive Unit that is no longer subject to forfeiture pursuant to the terms of the Restricted Unit Agreement by which such Incentive Unit was issued.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT A – DEFINED TERMS
PAGE A-10

DEBTORSCL_009619

*"Voting Units"* means all Units other than (a) the Incentive Units and (b) any class or series of Units that is designated by the Board as non-voting.

*"Voting Interest"* means, with respect to each Member and any Person that acquires all or any portion of the Voting Units initially issued to and held by such Member, the percentage derived by dividing (a) the number of Voting Units (or Voting Units of a specific class) held by such Member by (b) the number of all Voting Units (or Voting Units of a specific class) held by all Members (and such percentage shall be allocated among such original Member and any such acquiring Person or Persons according to the transfer documentation pursuant to which all or any portion of such Voting Units are Transferred from time to time).

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT A – DEFINED TERMS
PAGE A-11

DEBTORSCL_009620

**EXHIBIT B**

**PROVISIONS RELATING TO TRANSFERS**

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in the Limited Liability Company Agreement to which this Exhibit is attached. Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

1.    General Rules.

(a)    No Member may Transfer all or any portion of its Units other than in accordance with the terms of this Exhibit B, and any attempted Transfer that is not in accordance with this Exhibit B shall be, and is hereby declared, null and void ab initio.

(b)    No Member may Transfer all or any portion of its Incentive Units except in accordance with the Restricted Unit Agreement to which such Member is a party and pursuant to Section 5 of this Exhibit B.

(c)    No Founder may Transfer all or any portion of its Series B Units except (i) in a Sale Transaction or (ii) in a Permitted Transfer; provided that, notwithstanding the foregoing, Triple H Family Limited Partnership may transfer Series B Units to members of the management of the Company (other than individuals who are Members as of the Effective Date), as approved by the Board.

(d)    Prior to the third anniversary of the Effective Date, no Founder may Transfer all or any portion of its Series A Units except (i) in a Sale Transaction, (ii) in a Permitted Transfer, (iii) to Lime Rock Investors and the Hoops Related Parties ratably in accordance with ownership of Series A Units or the Company, or (iv) pursuant to the co-sale rights in Section 4 of this Exhibit B.

(e)    No Member shall Transfer all or any of his or its Units (i) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (ii) if such Transfer would cause the Company to lose its status as a partnership for Federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704 or (iii) if the nature of the Transfer is reasonably likely to adversely affect the ability of the Company or any of its Subsidiaries to conduct its business in the manner conducted as of the time of a proposed Transfer.

(f)    The Members agree that a breach of the provisions of this Exhibit B may cause irreparable injury to the Company and the Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Person to comply with such provisions and (ii) the uniqueness of the Company's business and the relationship among the Members. Accordingly, the Members agree that the provisions of this Exhibit B may be enforced by specific performance.

4684535.12

DEBTORSCL_009621

2.      <u>Permitted Transfers</u>.  A Member may make a Permitted Transfer of all or a portion of its Units (other than Incentive Units) subject to compliance with Section 6 of this <u>Exhibit B</u>.

3.      <u>Right of First Offer</u>.

(a)      The provisions of this Section 3 shall not apply to (i) a Permitted Transfer, (ii) a Transfer pursuant to the exercise of co-sale (tag-along) rights under Section 4 of this <u>Exhibit B</u>, (iii) a Transfer in connection with a Sale Transaction or (iv) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)      If a Founder (or its Affiliate) desires to Transfer all or a portion of its Series A Units to any Person (including another Member), other than a Transfer described in Section 3(a) of this <u>Exhibit B</u>, such Founder (or its Affiliate) (the "*Disposing Member*") shall promptly give written notice (a "*Disposition Notice*") to the Company and the Lime Rock Investors (the "*ROFO Members*") that such Disposing Member desires to effect such a Transfer and setting forth the portion (by reference to the Voting Interest percentage of the portion of the Series A Units the Disposing Member desires to dispose of) of the Series A Units proposed to be transferred by the Disposing Member (the "*Sale Units*"), the consideration that such Disposing Member proposes to be paid for such Sale Units (the "*Sale Price*") and any other material terms sought by the Disposing Member.

(c)      The giving of a Disposition Notice shall constitute an offer (the "*Disposition Offer*") by the Disposing Member to sell to the ROFO Members and the Company all of the Sale Units at the Sale Price.  The ROFO Members (and the Company, as hereafter set forth) shall have the option, but not the obligation, to acquire all, but not less than all, of the Sale Units on the terms set forth in the Disposition Notice, and such option shall be exercisable by the ROFO Members giving notice to the Disposing Member and the Company before the expiration of the 30-day period following the receipt by the ROFO Members of the Disposition Notice (the "*ROFO Member Election Period*").  If more than one of the ROFO Members exercise the option granted in this Section 3(c), the Sale Units will be allocated among them based on the relative Voting Interests of the Series A Units held of record by them or on such other basis as the ROFO Members unanimously agree.  Any ROFO Member that fails to notify the Disposing Member prior to the expiration of the ROFO Member Election Period will be deemed to have rejected the Disposition Offer.  If the ROFO Members do not exercise the purchase option with respect to all the Sale Units, the Disposing Member shall immediately notify the Company thereof and the Company may, upon receipt of such notice, following the expiration of the ROFO Member Election Period, by giving notice to such Disposing Member and the ROFO Members within 10 days after the expiration of the ROFO Member Election Period (such 10-day period being referred to herein as the "*Company ROFO Election Period*"), exercise the right of first offer with respect to a portion of Sale Units that the ROFO Members declined pursuant to the Disposition Offer.  If the ROFO Members and the Company do not elect to purchase all of the Sale Units, the ROFO Members and the Company shall be deemed to have rejected the Disposition Offer.  The closing of the purchase and sale of the Sale Units to the ROFO Members or the Company, as applicable, shall be at 9:00 a.m. on the 20th Business Day following the end

4684535.12

<div align="center">
LIMITED LIABILITY COMPANY AGREEMENT<br>
OF<br>
REVELATION ENERGY HOLDINGS, LLC<br>
EXHIBIT B – PROVISIONS RELATING TO TRANSFERS<br>
PAGE B-2
</div>

DEBTORSCL_009622

of the ROFO Member Election Period or the Company ROFO Election Period, as applicable, unless the ROFO Members and/or the Company, as applicable, and the Disposing Member otherwise agree.  At the closing, the ROFO Members or the Company, as applicable, shall deliver to the Disposing Member cash in the amount of the consideration applicable to the Sale Units to be purchased, and the Disposing Member shall represent and warrant to the ROFO Members and the Company, as applicable, that the Disposing Member owns such Sale Units free and clear of all liens, encumbrances and to the knowledge of such Disposing Member adverse claims, and shall deliver to the ROFO Members or the Company executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company.  The Disposing Member, the Company and the ROFO Members shall cooperate in good faith in obtaining all necessary governmental and other third Person approvals, waivers and consents required for the closing. Notwithstanding the foregoing, any such closing shall be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the HSR Act.

(d)      The Disposing Member shall be free to sell the portion of the Sale Units not purchased by the ROFO Members or the Company pursuant to Section 3(c) of this Exhibit B to any Person during the 90-day period following the expiration of the Company ROFO Election Period; provided (i) any such sale shall be subject to Section 6 of this Exhibit B and (ii) the consideration and other terms offered by the Disposing Member shall be no more favorable to the transferee than those offered to the ROFO Members in the Disposition Notice.  Any Sale Unit not sold during the 90-day period described in this Section 3(d) shall be subject again to right of first offer set forth in Section 3(b) of this Exhibit B.

4.      Co-Sale (Tag-Along) Rights.

(a)      The remaining provisions of this Section 4 shall not apply to (i) a Permitted Transfer, (ii) a Transfer in connection with a Sale Transaction, or (iii) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)      If any of the Lime Rock Investors or any Founder (each, a "*Co-Sale Seller*") desires to Transfer, in a transaction or series of related transactions, Series A Units then outstanding (a "*Proposed Co-Sale Transfer*"), then such Co-Sale Seller shall offer (the "*Co-Sale Offer*") to include in such Transfer a number of Series A Units owned of record by the other Lime Rock Investors and Founders (and its Affiliates) according to the remaining terms of this Section 4.

(c)      The Co-Sale Seller shall notify the other Lime Rock Investors and Founders (the "*Co-Sale Notice*") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer.  The Co-Sale Notice shall specify the proposed Transferee (the "*Co-Sale Buyer*"), the number of Series A Units proposed to be Transferred as part of the Proposed Co-Sale Transfer, the amount and type of consideration to be received therefor, the consideration offered to be paid for each Series A Unit (the "*Per Unit Price*") and the place and date on which the Transfer is to be consummated.  If a Lime Rock Investor or Founder (and any Affiliate) wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer such Person

4684535.12

DEBTORSCL_009623

must notify the Co-Sale Seller prior to 12:00 pm, New York time 10 calendar days following the date the Co-Sale Seller gave the Co-Sale Notice.  If a Lime Rock Investor or Founder (or any Affiliate) elects to participate in such Proposed Co-Sale Transfer (the "*Electing Member*"), then such Person shall have the right to include Series A Units in such Transfer as follows:

> (i)    Unless unanimously agreed to otherwise by the Electing Member and the Co-Sale Seller, the Electing Member may elect, by notice delivered to the Co-Sale Seller within 10 days after the Co-Sale Notice is given, to include up to a number of Series A Units in the Proposed Co-Sale Transfer equal to its Co-Sale Percentage of the total number of Series A Units proposed to be purchased by the Co-Sale Buyer pursuant to the Proposed Co-Sale Transfer.  The number of Series A Units the Electing Member elects to sell in accordance with the foregoing is referred to as such Electing Member's "*Co-Sale Units*."  The Co-Sale Seller will reduce the number of Series A Units to be included in the Proposed Co-Sale Transfer by the Electing Member's Co-Sale Units or, if the Co-Sale Buyer refuses to purchase Series A Units from the Electing Member, the Co-Sale Seller shall purchase the Co-Sale Units from the Electing Member on the same terms as apply to the Proposed Co-Sale Transfer.

> (ii)    All of the consideration payable to the Members in the Proposed Co-Sale Transfer shall be distributed to such Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement.  If the consideration in the Proposed Co-Sale Transfer involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then Lime Rock may require each Member, at the option of the Member, that is not an accredited investor (A) to receive solely cash in such transaction, or (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

> (iii)    The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(d)    In connection with a Proposed Co-Sale Transfer, the Electing Member shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Series A Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms (other than non-compete and non-

4684535.12

DEBTORSCL_009624

solicitation terms) as the Co-Sale Seller and (iv) be required to deliver customary transfer instruments.

5.    Sale Transaction; Drag-Along Provisions.

(a)    If (i) any Person that is not a Member or an Affiliate thereof (a *"Third-Party Buyer"*) submits a bona fide written offer to any Lime Rock Investor to effect a Sale Transaction (a *"Sale of the Company Offer"*) and (ii) Lime Rock desires to accept such offer (the *"Accepting Person"*), then the Lime Rock Investors shall have the right to require each other Member (each, a *"Drag-Along Person"*) to Transfer to such Third-Party Buyer all of the Units held thereby (or if less than all of the Members' Units are to be Transferred to the Third Party Buyer in such Sale Transaction, each Member's pro rata share of the Units to be Transferred in such Sale Transaction).

(b)    In connection with such Transfer, each Drag-Along Person shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms as the Lime Rock Investors, (iv) be required to deliver customary stock powers, letters of transmittal or other similar transfer documentation and (v) be obligated to pay no more than its pro rata share (based upon the amount of consideration received) of the costs of any Sale Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.

(c)    The Company shall give written notice to each Drag-Along Person of the Sale of the Company Offer approved by the Accepting Person (the *"Accepting Persons' Notice"*) at least 20 calendar days before the scheduled closing of the Sale Transaction. The Accepting Persons' Notice shall specify the Third-Party Buyer, the amount and type of consideration to be received by the Members in connection with the Sale Transaction, the terms and conditions of payment of the consideration offered by the acquiring party and the place and date on which the Transfer is to be consummated. Subject to Section 5(d) of this Exhibit B, if any holder of a particular class of Units is given an option as to the form and amount of consideration to be received, all holders of such class of Units shall be given the same option with respect to such consideration. If the Accepting Persons elect to exercise their rights under this Section 5, the Drag-Along Persons shall take such other actions as may be reasonably required and otherwise cooperate in good faith with the Company and the Accepting Persons in connection with consummating the proposed Transfer.

(d)    All of the consideration payable to the Members in a Sale Transaction first shall be aggregated by the Company, as disbursing agent, before distributing any such consideration to any of the Members. The Company, acting solely as the disbursing agent of the Members, shall then distribute the aggregate consideration to the Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement. If the Sale Transaction involves the issuance of any stock or other

4684535.12

DEBTORSCL_009625

equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then Lime Rock may require each Member that is not an accredited investor (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction and/or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(e)     No Member shall have any dissenters' or appraisal rights in connection with a Sale Transaction, and each Member hereby releases, votes in favor of, consents to and will execute such further instruments as the Company reasonably requests (in accordance with this Section 5) to further evidence the waiver of, such rights and the approval of the Sale Transaction. No Member shall institute any action or proceeding with respect to the adequacy of the consideration given in a Sale Transaction.

(f)     Each Member hereby makes, constitutes and appoints the secretary or other officer of the Company, in its official Company capacity, as its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member in this Section 5 in the event that such Member is or becomes a Drag-Along Person pursuant to this Section 5. Each Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as a Drag-Along Person pursuant to this Section 5 as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall lawfully do or cause to be done by virtue of the power of attorney granted hereby. The power of attorney granted pursuant to this Section 5(f) is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

6.     Conditions to Transfers; Continued Applicability of Agreement.

(a)     As a condition to any Transfer permitted under this Exhibit B (including Permitted Transfers), any transferee of Units shall be required to become a party to this Agreement, by executing (together with such Person's spouse, if applicable) a Joinder Agreement. If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (whether such Transfer resulted by operation of law or otherwise), such Person and such Units shall be subject to this Agreement as if such Units were still held by the transferor.

DEBTORSCL_009626

(b)    No Units may be Transferred by a Person unless the transferee first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Company, with the approval of the Board, may waive any requirement to deliver a legal opinion under this Section 6.

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT B – PROVISIONS RELATING TO TRANSFERS
PAGE B-7

DEBTORSCL_009627

## EXHIBIT C

## REGISTRATION RIGHTS

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

1.    Registration.

(a)    *Piggyback Registration Rights.*  If the Company (which term, for purposes of this Exhibit, includes any successor entity such as a Delaware corporation formed through an Internal Restructure or otherwise) proposes to register any of its Units (the term Units, as used in this Exhibit, shall be read broadly to include common stock if the issuer is a corporation rather than a limited liability company and if the Units have been, are to be, exchanged or converted into common stock in connection with a public offering) under the Securities Act (other than a registration (i) on Form S-8 or S-4 or any successor or similar forms, (ii) relating to Units issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company, (iii) in connection with a direct or indirect merger, acquisition or other similar transaction or (iv) on such other forms not permitting the registration of Units for resale by the Members), for its own account, it will at such time, subject to the provisions of Section 1(c), give notice to each Member at least 20 days prior to the filing of the registration statement relating to such registration with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1 and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 20 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the Company's registration must sell their Units to the underwriters selected by the Company on substantially the same terms and conditions as apply to the Company, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such Units or the transfer thereof, the Company shall give written notice to all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Company may (x) adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering or (y) exclude any Units from any

DEBTORSCL_009628

offering to the extent the Board reasonably determines that the inclusion of such Units would be unduly burdensome on the Company and the Members. The Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

(b) *Requests for Registration Rights.* Following an initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 for secondary sales. At any time after an initial public offering, the Lime Rock Investors shall have the right to request registrations with respect to all or a part of the Units held by the Lime Rock Investors (such requests shall be in writing and shall state the number of Units to be disposed of and the intended method of disposition of shares by such holders); provided that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 1(b) (i) unless the Lime Rock Investors propose to dispose of securities having an aggregate price to the public of more than $15,000,000 (or $5,000,000 in the case of a registration on Form S-3) or (ii) within 180 days of the effective date of the most recent registration pursuant to this Section 1(b). The Company shall give notice to each Member at least 15 days prior to the anticipated date the registration statement relating to such registration shall be filed with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1(b) and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1. Upon the written request of any such Member made within 10 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the registration must sell their Units to the underwriters selected by the Lime Rock Investors on substantially the same terms and conditions as apply to the Lime Rock Investors, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Lime Rock Investors shall determine for any reason not to register such Units or the transfer thereof, the Lime Rock Investor shall give written notice to the Company and all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Lime Rock Investors and the Company may adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering. The Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

(c) *Allocations.* If a registration pursuant to this Section 1 involves an underwritten public offering and the managing underwriter advises the Company that, in its view, the number of Units that the Company and the Members exercising their rights under this Section 1 intend to include in such registration exceeds the maximum offering size, including the

4684535.12

LIMITED LIABILITY COMPANY AGREEMENT
OF
REVELATION ENERGY HOLDINGS, LLC
EXHIBIT C – REGISTRATION RIGHTS
PAGE C-2

DEBTORSCL_009629

price at which such Units can be sold, the Company will include in such registration the following Units, in the following priority, up to the maximum offering size:

        (i)     first, so much of the Units proposed to be registered for the account of the Company as would not cause the offering to exceed the maximum offering size;

        (ii)    second, all Units requested to be included in such registration by any Member pursuant to this Section 1 allocated, if necessary for the offering not to exceed the maximum offering size, pro rata among such Members on the basis of the relative number of Units owned by each requesting Member.

    2.    <u>Standstill Agreements</u>.  With respect to an initial public offering or any underwritten public offering, notwithstanding anything to the contrary in this <u>Exhibit C</u>, each Member agrees not to effect any public sale or distribution, including any sale pursuant to Rule 144, or any successor provision, under the Securities Act, of any Units, and not to effect any such public sale or distribution of any other security of the Company that is convertible into or exchangeable or exercisable for any Unit and that would be a Unit (in each case, other than as part of such underwritten public offering) during the 14 days prior to the anticipated effective date of the applicable registration statement or during the period after such effective date that the managing underwriter and the Company shall agree; provided, (a) such post-effective date standstill period shall not exceed 180 days or be less than 90 days and (b) notwithstanding clause (a) preceding, the Company may waive the 90-day minimum standstill period with respect to some or all of the Members if the managing underwriter does not require such Members to be bound by a standstill arrangement for any period of time and the Company determines that the absence of such standstill period for such Members will not adversely affect such offering.

    3.    <u>Registration Procedures</u>.  Whenever Members request that any Units be registered pursuant to Section 1, the Company will, subject to the provisions of such Sections, use commercially reasonable efforts to effect the registration and the sale of such Units in accordance with the intended method of disposition thereof and, in connection with any such request:

        (a)    The Company will as soon as reasonably practicable prepare and file with the Securities and Exchange Commission a registration statement on any form selected by counsel for the Company and which form shall be available for the sale of the Units to be registered thereunder in accordance with the intended method of distribution thereof, and use all reasonable efforts to cause such filed registration statement to become and remain effective for a period of not less than 180 days (or such shorter period in which all of the Units of any Person included in such registration statement shall have actually been sold thereunder).

        (b)    The Company will furnish to each Member and each underwriter, if any, of the Units covered by such registration statement copies of such registration statement as filed or proposed to be filed, and thereafter the Company will furnish to such Members and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto (and, if requested by such Members, all exhibits thereto and documents

4684535.12

DEBTORSCL_009630

incorporated by reference therein), the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as such Members or underwriters may reasonably request in order to facilitate the disposition of the Units owned by such Members. Each such Member shall have the right to request that the Company modify any information contained in such registration statement, amendment and supplement thereto pertaining to such Member and the Company shall use commercially reasonable efforts to comply with such request; provided, the Company shall not have any obligation to so modify any information if so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

(c)     After the filing of the registration statement, the Company will promptly notify each Member holding Units covered by such registration statement of any stop order issued or threatened by the SEC or any state Units commission under state blue sky laws and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered.

(d)     The Company will use commercially reasonable efforts to (i) register or qualify the Units covered by such registration statement under such other Units or blue sky laws of such jurisdictions in the United States as any Member holding such Units reasonably (in light of such Member's intended plan of distribution) requests, (ii) cause such Units to be listed on any Units exchange or market or included for trading on any automated quotation system on which its Units are then listed or included for trading and (iii) cause such Units to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Member to consummate the disposition of the Units owned by such Member; provided, the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

(e)     The Company will immediately notify each Member holding such Units covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Units, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and promptly prepare and make available to each such Member and file with the SEC any such supplement or amendment.

(f)     Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, the Company will make available for inspection by any Member and any underwriter participating in any disposition pursuant to a registration statement being filed by the Company pursuant to this Section 3 and any attorney, accountant or other professional retained by any such Member or underwriter, financial and other records, pertinent

4684535.12

DEBTORSCL_009631

corporate documents and properties of the Company as shall be reasonably requested by any such Person, and cause the Company's officers, Directors and employees to supply all information reasonably requested by any such attorney, accountant or other professional in connection with such registration statement.

(g)    The Company will furnish to each Selling Member and to each underwriter, if any, a signed counterpart, addressed to such underwriters and such Members, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as a majority of such Members or the managing underwriter therefore reasonably requests.

(h)    The Company will comply with all applicable rules and regulations of the SEC, and make available to the Members, as soon as substantially practicable, an earnings statement covering a period of 12 months, beginning within three months after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act.

(i)    The Company may require each Member to promptly furnish in writing to the Company information regarding the distribution of the Units as the Company may from time to time reasonably request and such other information as may be legally required in connection with such registration.

(j)    Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(e), such Member will forthwith discontinue disposition of Units pursuant to the registration statement covering such Units until such Member's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(e), and, if so directed by the Company, such Member will deliver to the Company all copies, other than any permanent file copies then in such Member's possession, of the most recent prospectus covering such Units at the time of receipt of such notice. In the event that the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 3(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 3(e) to the date when the Company shall make available to such Member a prospectus supplemented or amended to conform with the requirements of Section 3(e).

(k)    The Company will provide a transfer agent and registrar for all such Units not later than the effective date of the first registration statement relating to Units.

4.    <u>Indemnification by the Company</u>.  The Company shall indemnify, defend and hold harmless to the full extent permitted by law each Member holding Units covered by a registration statement, its managers, members, officers, Directors, employees, partners and agents, and each Person, if any, who controls such Member within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages, expenses (including reasonable cost of investigation and, subject to Section 7 of this <u>Exhibit C</u>, reasonable fees, disbursements and other charges of legal counsel) and liabilities

4684535.12

DEBTORSCL_009632

Indemnified Party unless (a) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel (at the expense of the Indemnifying Party), or (b) in the reasonable judgment of such Indemnified Party representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties, and in the event the Indemnified Parties are not able to agree as to such firm, the Indemnified Party that has the largest potential risk of loss covered by the Indemnifying Party's indemnity hereunder shall select such firm, subject to the consent of the other Indemnified Parties, which consent shall not be unreasonably withheld, which selection shall then be binding for purposes of this Section 6. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any and all losses, claims, damages, liabilities and expenses or liability (to the extent stated above) by reason of such settlement or judgment. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

7.      Contribution.  If the indemnification provided for in this Exhibit C is unavailable to an Indemnified Party in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Company and the Members holding Units covered by a registration statement and the underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities. The relative fault of the Company and such Members and the underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Members agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 7, in

4684535.12

DEBTORSCL_009633

## EXHIBIT D

## JOINDER AGREEMENT

This Joinder Agreement (this *"Joinder Agreement"*) is executed as of [•] pursuant to the terms of the Limited Liability Agreement of Revelation Energy Holdings, LLC dated as of March 26, 2009, and the Schedules and Exhibits thereto, as amended or restated from time to time, a copy of which is attached hereto (the *"LLC Agreement"*), by the transferee (*"Transferee"*) executing this Joinder Agreement. By the execution of this Joinder Agreement, the Transferee agrees as follows:

1.      Acknowledgment. Transferee acknowledges that Transferee is acquiring certain **[describe Units acquired]** subject to the terms and conditions of the LLC Agreement. Capitalized terms used herein without definition are defined in the LLC Agreement and are used herein with the same meanings set forth therein.

2.      Agreement. Transferee (a) agrees that **[describe Units]** acquired by Transferee shall be bound by and subject to the terms of the LLC Agreement and (b) hereby joins in, and agrees to be bound by, the LLC Agreement (including the Exhibits) with the same force and effect as if the Transferee were originally a party thereto.

3.      Representations. Transferee hereby makes each of the representations and warranties set forth in Section 3.1 of the LLC Agreement to the Company and each other Member with the same force and effect as if the Transferee were originally a party thereto.

4.      Notice. Any notice required by the LLC Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

5.      Joinder. The spouse of the undersigned Transferee, if applicable, executes this Joinder Agreement to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's community interest, if any, in the **[describe Units]** to the terms of the LLC Agreement.

4684535.12

DEBTORSCL_009634

TRANSFEREE:


By: _____

Information for Notices:

_____
_____

Telecopy: _____

SPOUSE:

By: _____

4684535.12

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**REVELATION ENERGY HOLDINGS, LLC**
**EXHIBIT D – JOINDER AGREEMENT**

**PAGE D-2**

DEBTORSCL_009635

1

2   REMOTE APPEARANCES:

3   ON BEHALF OF PLAINTIFF BLACKJEWEL LIQUIDATION TRUST:

4       Scott Kane, Esq.

5       Jennifer Dollard-Smith, Esq.

6       Squire Patton Boggs

7       201 East Fourth Street

8       Cincinnati, OH 45202

9

10  ON BEHALF OF THE WITNESS:

11      James Dugan, Esq.

12      Jennifer Hardy, Esq.

13      Willkie Farr & Gallagher

14      787 Seventh Avenue

15      New York, NY 10019

16      (present with The Witness)

17

18

19

20

21

22

23

24

25

1               J. SCOFIELD

2        A.   We had a very standard what I would

3   call private equity-style structure.  We had

4   weekly or biweekly -- or weekly or every other

5   week -- they often get moved around due to

6   scheduling conflicts and things ongoing either at

7   the company or Lime Rock -- calls with management

8   and the Lime Rock deal team.

9            We had regular board meetings.  I

10  think the LLC agreement called for those to be

11  held quarterly.  Given that we had a weekly

12  dialogue, it's not uncommon for those board

13  meetings to get moved around with a little bit of

14  grace period around them actually being

15  quarterly.

16       Q.   Was it Lime Rock's -- I'll just say

17  the board's practice to, you know, do formal

18  resolutions on things or was it more likely that

19  approval for the company's action would be given

20  verbally or maybe over e-mail?

21            MR. KANE:  Object to the form of the

22  question.

23            MR. McGAVRAN:  Mr. Scofield, from

24  time to time you might hear an objection to form

25  from either Mr. Kane or Mr. Dugan.  Unless either

1            J. SCOFIELD

2   of them instruct you not to answer, it's okay to

3   try to answer my question as you best understand

4   it.

5            THE WITNESS:  Jim, am I good to

6   answer?

7            MR. DUGAN:  What I would say is if

8   you understand the question, you may answer it.

9            THE WITNESS:  Sorry, could you repeat

10   the question?

11   BY MR. McGAVRAN:

12       Q.  When the board of Blackjewel or

13   Revelation was approving something, how would

14   that approval take place?

15       A.  It was typical for those approvals to

16   be verbal over a conference call or if it was as

17   part of an in-person board meeting or by e-mail.

18       Q.  And there weren't really formal

19   resolutions papering every approval, correct?

20            MR. DUGAN:  Objection to form.

21       A.  We had -- we formalized most items --

22   we formalized items that related largely to

23   the LLC agreement and adjustments to that, but

24   operating decisions around -- I shouldn't say

25   operating decisions because we didn't make

1            J. SCOFIELD

2   operating decisions -- but decisions around

3   budgets presented by management, as an example,

4   to the board would be approved verbally or by

5   e-mail.

6   BY MR. McGAVRAN:

7        Q.  And you mentioned that there was

8   an LLC agreement in place, correct?

9        A.  Correct.

10       Q.  And that LLC agreement would have set

11  out the different members' equity, correct?

12       A.  Correct.

13       Q.  And the board -- in order to change

14  the members' respective equity in Revelation or

15  Blackjewel, there would need to be a written

16  amendment to the LLC agreement, correct?

17       A.  Correct.

18       Q.  And certainly Lime Rock wouldn't let

19  its position be diluted without such a written

20  agreement, correct?

21       A.  If we made a change to the equity

22  structure with a funding, we would memorialize it

23  with an amendment to the LLC agreement.

24       Q.  And that was to prevent dilution,

25  correct, so that nothing could have been mistaken

Page 30

1                    J. SCOFIELD

2   that, well, Lime Rock never did that.  I'm trying

3   to get at, was there anybody else that did do

4   that.  So let me try to -- that's just to give

5   you some background.

6            The question I'm asking is:  Were

7   there ever any equity infusions by any party that

8   were not reflected in an amendment to the LLC

9   agreement of Revelation or Blackjewel?

10           MR. KANE:  Object to the form.

11           You can answer.

12      A.  There was no injections into the

13  business by parties other than Lime Rock that we

14  viewed as needing an adjustment to the LLC

15  agreement for the equity splits at that time.

16  BY MR. McGAVRAN:

17      Q.  So is that a no to my question?

18      A.  Say the question again.

19      Q.  Were there ever any equity infusions

20  by any party that were not reflected in an

21  amendment to the LLC agreement of Revelation or

22  Blackjewel?

23           MR. KANE:  Wolf, will you just give

24  me a continuing objection as to equity infusions

25  so I don't have to object to every question?

1                          J. SCOFIELD

2                MR. McGAVRAN:   Sure.

3                MR. KANE:   Okay.

4          A.   No.

5    BY MR. McGAVRAN:

6          Q.   Mr. Scofield, I'd like to switch

7    gears a little bit here.

8                Can you give me some context as far

9    as why Riverstone was approached by Revelation?

10         A.   With regards to what?   Their initial

11   funding?

12         Q.   Yes, sir.

13         A.   The company had secured or was

14   negotiating an acquisition of some additional

15   metallurgical coal properties -- I can't remember

16   the date -- that had an up-front purchase price

17   in addition to needing working capital from an

18   ongoing perspective, and the company, you know,

19   as approved by the board approached a range of

20   lenders in order to fund that acquisition.

21   Riverstone was on the list of the range of

22   lenders that were contacted.

23         Q.   And eventually a deal was struck with

24   Riverstone, correct?

25         A.   Correct.

Confidential

1                    J. SCOFIELD

2          Q.  And would it be fair to say as kind

3    of a general outline that Riverstone supplied

4    28 million, Lime Rock provided another 3 million,

5    and Mr. Hoops provided 3 million as part of that

6    transaction?

7          A.  Correct, although not all of the

8    Riverstone funding was in the initial closing.  I

9    think there was a second closing that upsized the

10   deal.

11         Q.  And after the Riverstone transaction,

12   Lime Rock still controlled the board of then

13   Blackjewel, correct?

14         A.  After the river -- nothing changed in

15   the LLC agreement governance due to the closing

16   of the Riverstone transaction.

17         Q.  It was still you, Mr. Reynolds and

18   Mr. Hoops on the board?

19         A.  Correct.

20         Q.  And that was the case all the way up

21   until the bankruptcy, correct?

22         A.  Correct.

23         Q.  Mr. Scofield, you're aware that loans

24   were made to Revelation and then Blackjewel by

25   Mr. Hoops or entities related to him or his

Page 33

1                  J. SCOFIELD

2  family, correct?

3         A.  Correct.

4         Q.  And you were aware of those loans

5  prior to the bankruptcy, correct?

6         A.  Correct.

7         Q.  What is your understanding for why

8  those loans were necessary?

9         A.  They were largely made to cover

10  working capital-related needs of the business

11  that exceeded the availability under the

12  company's line with United Bank or cash on hand.

13         Q.  So loans were made when Revelation or

14  Blackjewel could not pay its bills, basically,

15  right?

16         A.  I wouldn't say it that way.

17         Q.  Why not?

18         A.  The loans were made typically in

19  anticipation of checks clearing -- checks needing

20  to be cleared or fundings that needed to be

21  happen -- or that needed to happen based on a

22  cash flow forecast that Jeff Hoops kept, and he

23  would show us the cash flow forecast sometimes as

24  part of our reporting.

25         Q.  So is it fair to say that if

Page 34

1                    J. SCOFIELD

2    Blackjewel, for instance, knew that it was

3    getting a $4 million receivable Tuesday, let's

4    say, and some payments needed to go out on

5    Monday, Mr. Hoops might loan the company the

6    money it needed just until that receivable came

7    in?

8                    MR. KANE:  Object to the form of the

9    question.

10                   You can answer.

11        A.  That could be one scenario where the

12   structure was used, yes.

13   BY MR. McGAVRAN:

14        Q.  And then once that receivable came

15   in, Mr. Hoops would be repaid for that advance,

16   correct?

17                   MR. KANE:  Object to the form of the

18   question.

19                   You can answer.

20        A.  Yeah, once the company's liquidity

21   situation improved through receivables or

22   generation of cash, the need for those interim

23   fundings would go away, correct.

24   BY MR. McGAVRAN:

25        Q.  And the amount that Mr. Hoops or

1                    J. SCOFIELD

2    record.

3              THE VIDEOGRAPHER:  The time is

4    10:13 a.m., and we are going off the record.

5              (Recess taken, 10:13 a.m. to

6    10:24 a.m. CST)

7              THE VIDEOGRAPHER:  The time is

8    10:24 a.m., and we are back on the record.

9    BY MR. McGAVRAN:

10        Q.  Mr. Scofield, we're back from a quick

11   break.  I think I did forget to mention kind of

12   in my opening remarks that if you ever need a

13   break today, just let us know just like Mike did,

14   and we'll do so, okay?

15             Were you able to open Exhibit 2?

16        A.  I am.  I only have one screen, so I'm

17   not able to see you when I'm looking at it, just

18   so you know.

19        Q.  You're not missing much.

20             Exhibit 2 is an e-mail from you to --

21   it says IC Members.  Does that mean Lime Rock's

22   investment committee?

23        A.  Yes.

24        Q.  And it was sent on June 26th, 2017,

25   correct?

1                        J. SCOFIELD

2          A.   Yeah.   Yes.

3          Q.   And do you recall what the purpose of

4    this e-mail was?

5          A.   I have not read this e-mail fully.

6    I'm happy to if you would like me to right now to

7    answer that question.

8          Q.   Why don't you jump down to the second

9    full paragraph of your e-mail to the Lime Rock

10   investment committee, and I'll read it to you,

11   okay?

12         A.   Sure.

13         Q.   The RCP term loan is a 34 million,

14   18-month, NC minus six, L plus 1400 bps,

15   parentheses, 100 bps floor, facility.  Use of

16   proceeds includes working capital necessary to

17   comfortably fund the 2017 plan, 8 million to

18   acquire a property immediately adjacent to

19   Revelation's highest quality, most profitable

20   operating mine, and 5 million to repay Jeff

21   Hoops, who has been funding liquidity shortfalls

22   year to date.

23              Did I read that correctly so far?

24         A.   Yes.

25         Q.   Hoops has covered nearly 9 million of

Confidential

1                    J. SCOFIELD

2    liquidity shortfall so far this year, and will be

3    rolling the balance, less the 5 million, into

4    this new note.

5               Did I read that second part

6    correctly?

7          A.  Yes.

8          Q.  And was that all accurate at the time

9    you wrote this e-mail?

10         A.  To the best of my knowledge, yes.

11         Q.  And it says that Jeff Hoops has been

12   covering that, correct?

13         A.  It says Jeff Hoops has covered nearly

14   9 million of liquidity shortfall this year,

15   correct.

16         Q.  And there's no reference to a United

17   Bank accordion facility, correct?

18         A.  Correct.

19         Q.  Would you please turn to the second

20   page of the PDF.

21         A.  I'm there.

22         Q.  And in the second full paragraph,

23   about two-thirds of the way down that paragraph,

24   it says:  The 8 million swing.

25               Do you see that -- the start of that

1                    J. SCOFIELD

2    sentence?

3         A.  Let me find it.  Hold on.  Are you in

4    the paragraph that says "As discussed"?

5         Q.  Yes, sir.

6         A.  Where is it in the paragraph?

7         Q.  It's about two-thirds down.  The line

8    starts "tomorrow," and then it says:  The

9    8 million swing.

10        A.  Okay.  Yeah, I got it.  Yeah.

11        Q.  Yeah.  So here you write:  The

12   8 million swing has hamstrung liquidity and Hoops

13   has effectively personally stood up to support

14   the company through the shortfall.  This is the

15   largest portion of his personal loan referenced

16   earlier.

17            Did I read that correctly?

18        A.  You did.

19        Q.  And was that correct to the best of

20   your knowledge when you wrote this e-mail?

21        A.  It was.

22        Q.  And it states that Jeff Hoops is

23   doing that personally, correct?

24        A.  Correct.

25        Q.  And again, there's no reference of a

1                    J. SCOFIELD

2    United Bank accordion facility, correct?

3         A.  Correct.

4         Q.  I'd like to drag into the chat

5    Exhibit 3.  Let me know when you have that open,

6    Mr. Scofield.

7              (Scofield Deposition Exhibit 3

8    marked.)

9         A.  I have it open.

10   BY MR. McGAVRAN:

11        Q.  Exhibit 3 is a message from Oliver

12   Phillips -- he was one of the Lime Rock

13   associates we talked about earlier, right?

14        A.  Correct.

15        Q.  And it's a message to you, subject,

16   Revelation.  Right?

17        A.  I think it's a forward, but yeah.

18        Q.  Subject, Forward, Revelation,

19   correct?

20        A.  Correct.

21        Q.  And if you look towards the end of

22   Oliver's message, he writes:  Hoops has not been

23   paying himself cash interest on his loans over

24   the same period.

25              Correct?

1                    J. SCOFIELD

2    the examples where this issue would be brought to

3    Lime Rock's attention over an e-mail that an

4    infusion might be necessary?

5              MR. KANE:  Object to the form of the

6    question.

7              You can answer.

8    BY MR. McGAVRAN:

9         Q.  That a loan might be necessary?

10        A.  It would, yes.

11        Q.  And he's stating that he's going to

12   put that money in personally, correct?

13        A.  He says I will -- I may -- I have to

14   advance money personally, yes.

15        Q.  There's no reference of a United Bank

16   accordion, correct?

17        A.  Correct.

18        Q.  And would this be the kind of advance

19   of money from Mr. Hoops that would have been

20   approved by Lime Rock?

21             MR. KANE:  Object to the form of the

22   question.

23             You can answer.

24        A.  This would be the type of e-mail that

25   outlines the liquidity support that Jeff was

1                        J. SCOFIELD

2   providing to the business.  As I'm sure you can

3   see in the e-mails, there's not sort of an ask

4   for formal approval by the board relative to

5   that.  It's -- you know, it's a notice that he

6   was continuing to support the business when it

7   had liquidity pinches in between bills that

8   needed to be paid and receivables that came in.

9   BY MR. McGAVRAN:

10          Q.  And Lime Rock was supportive of

11  Mr. Hoops doing this, correct?

12          A.  Correct.

13          Q.  Because Revelation and Blackjewel

14  benefited by being able to pay those accounts as

15  that came due, right?

16          A.  Correct.

17          Q.  You can close that, Mr. Scofield.

18          A.  Sorry, I can what?

19          Q.  You can close that PDF.

20          A.  Do I need to open 5b?

21          Q.  No, you don't need that.

22              I'm going to send Exhibit 6.  Let me

23  know when you're able to open it, Mr. Scofield.

24              (Scofield Deposition Exhibit 6

25  marked.)

Page 66

1                          J. SCOFIELD

2              Did I read that correctly?

3         A.   You did.

4         Q.   And was that accurate?

5         A.   Yeah, my assumption would be that at

6    the end of the year, everything had been repaid

7    based on this note.

8         Q.   And the member that's being disclosed

9    here is Jeff Hoops.  Would you agree with me

10   there?

11        A.   That's my understanding, yeah.

12        Q.   And it's stating that he's provided

13   cash advances, correct?

14        A.   Correct.

15        Q.   And those advances are payable on

16   demand back to Mr. Hoops according to this audit

17   which Lime Rock received, correct?

18        A.   Correct.

19        Q.   I want to come back to this later,

20   but you can close Exhibit 22 for now.

21              I'm sending you Exhibit 23.  If you

22   would please let me know when you've opened that.

23              (Scofield Deposition Exhibit 23

24   marked.)

25        A.   I have it open.

1                    J. SCOFIELD

2              Do you see that?

3        A.   Yes.

4        Q.   This audit states that:  As of and

5   for the year ended December 31st, 2018, there

6   were no contributions, distributions or transfers

7   among the unit holders, and the company had

8   323,966 preferred units and 1,000 Series A units

9   outstanding.

10             Did I read that correctly?

11       A.   You did.

12       Q.   And is that basically saying that in

13  the calendar year ending December 31st, 2018,

14  there were no changes in the equity of

15  Blackjewel?

16       A.   Correct.

17       Q.   And is that true to your

18  understanding?

19       A.   It is, yeah.

20       Q.   You can close Exhibit 23.

21             Was the same thing true in 2019?

22       A.   I don't know off the top of my head

23  if we made any equity fundings in 2019.  I'd have

24  to go look.

25       Q.   Sitting here today, you can't recall

1                     J. SCOFIELD

2    any equity fundings in 2019, correct?

3         A.  Not today or not as of right now, no.

4         Q.  And -- actually, I meant to do this

5    later, but let's go back to --

6         A.  Are we going back to -- are we on 23

7    or can I go back into the Zoom?

8         Q.  You can close 23.  And would you open

9    22 again, please.

10        A.  Give me a second.  Yep, I'm in it.

11   Where do you want me to go?

12        Q.  Just back to where we were on page 22

13   of the document.

14             MR. KANE:  What page, Wolf?  22 did

15   you say?

16             MR. McGAVRAN:  Yeah, page 22, Related

17   Party Transactions.

18        A.  I'm there.

19   BY MR. McGAVRAN:

20        Q.  The part we read earlier where it

21   starts "Throughout 2017, a member of the company

22   provided cash advances" --

23        A.  Yes.

24        Q.  -- was the same thing true in 2018

25   and 2019?

1               J. SCOFIELD

2   documented feature of this loan agreement.

3           I mean, I viewed the support that

4   Jeff was providing to cover liquidity as credit.

5   I viewed it as -- or as I should say, his debt

6   that he extended to the business to provide a

7   bridge on working capital to support the

8   business.

9           He was the closest to the business

10  cash flows as you've seen from the models and the

11  e-mails.  He ran the business on a day-to-day

12  basis, and he was making those decisions real

13  time on discrete data that we relied on and

14  which, you know, I believed to be, you know,

15  based upon the best facts at the time.  He had a

16  very good handle on the day-to-day running of the

17  business.

18          My understanding of how that credit

19  was provided was that he was -- he had a line at

20  United Bank, the same bank that provided the

21  company's credit facility, and to the extent we

22  could not clear checks or there was checks that

23  were coming in that needed to be cleared, he

24  provided his personal credit support at United

25  Bank for those to get cleared, and effectively

Page 79

1                    J. SCOFIELD

2    the building from an entity owned by Hoops.

3            As part of his role as the CEO, there

4    was business travel involved to go see customers

5    and banks, work on deals, and I believe the

6    aircraft was held in a separate company, so there

7    was a related party kind of relationship between

8    the company paying for the aircraft time that it

9    used.

10           Sorry, what was the third one?  Oh,

11   testing.  Yes, and I was aware that he owned -- I

12   don't know if he owned all or a piece of a water

13   testing business that did do -- did do work with

14   Revelation and Blackjewel.

15   BY MR. McGAVRAN:

16       Q.  And the board was aware of that and

17   had no issues with those transactions; is that

18   fair?

19           MR. KANE:  Object to the form of the

20   question.

21           You can answer.

22       A.  The board was -- specific to those

23   three, yes, the board was aware of them and had

24   no issues with those, and reviewed them as part

25   of the audit.

Page 80

1                          J. SCOFIELD

2    BY MR. McGAVRAN:

3          Q.  And would you look at Exhibit 25,

4    please.

5          A.  Yes, I'm in it.

6          Q.  Have you seen this document before?

7          A.  What document is it?

8          Q.  Exhibit 25.

9          A.  No, no, I know, but what -- I just

10   opened it.  I haven't seen it.  What is it?

11         Q.  That's what I'm asking you.  Do you

12   recognize this document?

13         A.  Let me read it.  Hold on.

14              (Document review.)

15         A.  I mean, it's a purchase agreement

16   between Blackjewel and -- or between Revelation,

17   Blackjewel and Lexington, but I'm not sure which

18   assets it covers without reviewing it.  But I'm

19   happy to go through it, if you'd like.

20   BY MR. McGAVRAN:

21         Q.  Well, do you recall any transaction

22   involving those companies in 2017?

23         A.  Yeah, there was numerous transactions

24   from the formation of Lexington, which I think

25   was in 2017, amongst Revelation and Blackjewel

1                    J. SCOFIELD

2   and Lexington related to various different assets

3   over time.  That's why -- I'm not trying to be

4   obtuse.  I just don't know which specific one

5   this might be referencing without -- I mean, it's

6   a 31-page document, so...

7            Q.  Sure.

8                Well, was one of the transactions

9   during that time period a transaction wherein

10  Lexington Coal Company -- I might just refer to

11  them as Lexington, if that's okay -- purchased a

12  series of assets from Revelation, including real

13  property, mining permits and equipment?

14           A.  Yeah, I believe there was more than

15  one transaction like that, although maybe it was

16  just one.  But certainly in that time frame there

17  was a transaction between Lexington and

18  Blackjewel/Revelation.

19           Q.  And the board approved those

20  transactions, correct?

21           A.  The board approved several

22  transactions.  Whether it approved this one in

23  front of me or not, I don't know.  But my

24  assumption is that this is something we

25  discussed.

1           J. SCOFIELD

2   BY MR. McGAVRAN:

3        Q.   And what was the purpose behind that

4   deal from Revelation's perspective?

5        A.   Typically these were transactions

6   relating to shut-in mining complexes that --

7   meaning -- by shut-in I mean like not currently

8   under operation -- that were not part of

9   Blackjewel's, you know, current or go-forward

10  operating plan, but which involved future

11  reclamation obligations that the company would

12  have to, you know, expend cash to complete.

13           And given the breadth and scale of

14  Lexington's position, there were certain

15  properties that were not in the Revelation --

16  sorry, in the Blackjewel plan that if within

17  Lexington could be combined with other properties

18  Lexington had and be part of that mining plan,

19  which, you know, therefore made the reclamation

20  liability something that would be in the future.

21           So it's, you know, simplistically I

22  would say an ongoing and potential liability at

23  Blackjewel, and it's something that could be an

24  operating opportunity at Lexington in their

25  current mining plan.

1              J. SCOFIELD

2            So there were certain transactions

3   between Blackjewel and Lexington where we

4   effectively sold properties to Lexington for the

5   assumption of that reclamation liability, because

6   that removed the liability from Blackjewel's

7   balance sheet, and it was something that

8   Lexington was willing to purchase because it

9   could fit into their mining plan.

10       Q.  You can close that exhibit for now.

11            I'm dropping Exhibit 26.  Let me know

12   when you're able to view it, Mr. Scofield.

13            (Scofield Deposition Exhibit 26

14   marked.)

15            THE WITNESS:  Are we going to be on

16   this for a little bit?  Like is there a natural

17   point for a break coming up or now?

18            MR. McGAVRAN:  I'm open to whatever

19   the group wants to do.  If you want to take a

20   break for lunch now, we can.  I'm not really at a

21   natural breaking point, but that doesn't mean we

22   can't take a break.

23            THE WITNESS:  I was less thinking

24   about lunch and just going to hit the head, but

25   we can do a couple more.

1                        J. SCOFIELD

2          A.   I believe that this is the form- --

3   this deal was -- that's noted -- and maybe you

4   can tell me, in 2017 was effectively the split of

5   Blackjewel and Revelation.  Is this the deal that

6   we're talking about, or is this post that split?

7          Q.   It's dangerous when lawyers start to

8   answer questions during these, so I'm going to

9   avoid doing so, and I'll do it this way.

10          Do you know what deal between LCC and

11   Revelation or Blackjewel is being discussed in

12   the first paragraph here that starts "During

13   November 2017"?

14          A.   I don't know which specific deal it

15   is, to be frank.  I believe I know what it is,

16   but I don't want to assume.

17          Q.   Understanding that it's not a -- that

18   you're not a hundred percent, which deal do you

19   think it might be?

20          A.   I believe this was part of the

21   transaction where we separated Blackjewel and

22   Revelation, leaving certain assets in Blackjewel

23   and moving other largely metallurgical coal

24   assets -- sorry, leaving largely thermal assets

25   in Revelation and putting metallurgical assets

1                     J. SCOFIELD

2    into Blackjewel.

3              And as part of that, a portion of

4    assets that were more valuable to Lexington than

5    either Revelation or Blackjewel were sold in

6    exchange for reclamation liability.  It was a

7    three-way deal.

8         Q.  And do you think that adequate

9    consideration was exchanged as part of that deal?

10        A.  Based on the facts we knew about the

11   deal, we did.

12        Q.  And has that opinion changed today in

13   some way or is it --

14        A.  Specific to that deal, I still think

15   that was a fair deal that we approved, you know,

16   as a board for the company.

17        Q.  You can go ahead and close that 22

18   once again.

19              And as part of the transaction

20   involving LCC -- and you understand LCC to be

21   Lexington Coal Company, right?

22        A.  I do.

23        Q.  As part of that transaction, were

24   mining permits transferred?

25              MR. KANE:  Can you specify which

1                    J. SCOFIELD

2        A.   Revelation didn't own any Denmark

3   royalty.   Jeff Hoops owned the Denmark royalty.

4        Q.   You can close out of Exhibit 35.

5             Before I show you an exhibit on the

6   next topic, Mr. Scofield, do you recall a

7   transaction in roughly December of 2017 pursuant

8   to which Blackjewel purchased some mines in

9   Wyoming belonging to Contura Energy?

10       A.   Yes.

11       Q.   Can you describe the outlines of that

12   transaction for me?

13       A.   Contura was selling a package of

14   mines it owned in the Powder River Basin of

15   Wyoming to focus exclusively on their central

16   Appalachian operations, which were more

17   metallurgical coal focused.   Powder River Basin

18   is all thermal coal.

19             And Jeff had been in negotiations

20   with them on a number of deals over time, and

21   negotiated a deal for Blackjewel to purchase

22   those mines from them.

23       Q.   I actually want to -- I hope it's not

24   too confusing.   I want to go back to the Arch

25   settlements for a moment.

1              J. SCOFIELD

2          Number 3, in return, the cost would

3    be:  Bullet point (a):  Contura is including two

4    ranches in Wyoming that are not near the mines

5    and are just law land, not working, but could

6    have some value.  I would like those conveyed to

7    Triple H Real Estate.

8          Did I read that correctly so far?

9          A.  Yes.

10         Q.  What was your understanding of what

11   Triple H Real Estate was?

12         A.  It's a holding company controlled by

13   Jeff and/or members of his family.  I really have

14   no idea who actually controls it, but it's an

15   affiliated family vehicle.

16         Q.  Okay.  And in this e-mail Jeff is

17   proposing that these two ranches be transferred

18   to that company, correct?

19         A.  Correct.

20         Q.  And do you recall any discussions

21   surrounding this about why that was to be done?

22         A.  Yeah, I remember this transaction,

23   and this is effectively Hoops proposing putting

24   funding into the business to get to the closing

25   of the Contura transaction, which in and of

1                        J. SCOFIELD

2    itself, came with a significant amount of

3    liquidity at closing.

4              And then point 2 and 3 is his

5    proposal for what he wanted in exchange for that,

6    which included the two ranches he noted; and I do

7    remember us having this discussion and ultimately

8    approving a deal that included that.

9         Q.  And, in fact, did Mr. Hoops extend

10   that loan that's discussed in this?

11        A.  He did, although I don't remember if

12   it was the exact same quantum in here or not.

13        Q.  Okay.  And do you recall whether

14   there were any grazing rights associated with

15   these ranches?

16        A.  Only thing I know about these ranches

17   is what I've read in this and the other e-mails.

18        Q.  Okay.  And why did you -- I assume

19   since you approved this, you thought it was a

20   good deal from the company's standpoint?

21             MR. KANE:  Object to the form of the

22   question.

23             You can answer.

24        A.  We did approve a deal that included

25   some of these concepts, yes, because we thought

Confidential

1                          J. SCOFIELD

2    it was in the best interest of Blackjewel.

3    BY MR. McGAVRAN:

4          Q.  And do you have any reason sitting

5    here today to think that it was not in the best

6    interest of Blackjewel?

7          A.  I believe the purchase of the Contura

8    assets in the PRB were in the best interest of

9    Blackjewel.

10         Q.  Even though it involved the

11   assignment of these two ranches to Triple H?

12         A.  Yes, part of the financing package

13   that was part of what we agreed.  You know,

14   whether those ranches have value that I don't

15   understand or not, I have no idea.

16         Q.  Sitting here today --

17         A.  My knowledge -- my knowledge then is

18   limited to what's in this e-mail.

19         Q.  Okay.

20         A.  And probably one or two others.

21         Q.  So sitting here today, you have no

22   reason to think that this transaction was unfair

23   to Blackjewel, correct?

24         A.  I don't.

25         Q.  You can close that e-mail, sir.

1                    J. SCOFIELD

2            I've dropped Exhibit 37 into the

3    chat.  Just let me know when you've opened it.

4                 (Scofield Deposition Exhibit 37

5    marked.)

6            A.  I have it open.

7    BY MR. McGAVRAN:

8            Q.  All right.  The Exhibit 37 is a chain

9    of e-mails.  I'm looking at the second e-mail

10   down.  It's an e-mail from Oliver Phillips at

11   Lime Rock to Daniel Flannery at Riverstone, and

12   you are copied along with a couple others,

13   correct?

14           A.  Yes.

15           Q.  And the subject line is Blackjewel

16   proposal, and that e-mail was sent on

17   November 13th, 2017, correct?

18           A.  Yes, that's correct.

19           Q.  Okay.  And you wrote -- excuse me --

20   Mr. Phillips wrote that -- under bullet point 3:

21   Contura is including two ranches in Wyoming that

22   are not near the mines and are just raw surface

23   land, not working, but could have some value.

24   Jeff would like those conveyed to his Triple H

25   Real Estate vehicle.

1                    J. SCOFIELD

2            Correct?

3      A.   Correct.

4      Q.   And that's the same sort of

5  description we saw in the last exhibit, right?

6      A.   Correct.

7      Q.   And if you don't know, that's fine,

8  but do you know why Mr. Phillips was sharing this

9  with Riverstone?

10     A.   Yeah, because the investment --

11  Riverstone was a creditor, and the investment

12  was -- involved -- involved the item number 1 and

13  number 2 in here, where he was putting the

14  $5 million in pari passu with the existing

15  creditors, which they would need to sign off on,

16  and outlining that it would be repaid when funds

17  were available from the closing of, I believe, a

18  financing we were looking at with Uniper or the

19  Contura acquisition, which, as I said, came with

20  a significant amount of cash liquidity, and then

21  the other items in the deal.

22            We were explaining the financing that

23  we had agreed -- ultimately agreed to with -- as

24  a board and with Jeff as a related party, you

25  know, to our lender.

1                    J. SCOFIELD

2    in this case, Lexington; and as I talked about

3    earlier, who, you know -- given the nature of

4    either their business model or their other

5    property suite that, you know, the purchased

6    properties would go into could have a different

7    economic equation to them than what Blackjewel

8    had.

9              But largely the valuation for things

10   that we transferred out of Blackjewel related to

11   properties that did not have a positive -- a

12   positive NPV or ongoing cash flow; they largely

13   related reclamation -- related to reclamation

14   liability that we were able to sell.

15        Q.   What was LCC going to do with them?

16        A.   Again, you know, the coal mining

17   business is a physical commodity-moving business,

18   and a large measure of the economics relates to

19   logistics.

20              And so you could have a mine -- you

21   could own a mining property as one company that

22   had excellent reserves but which did not have,

23   say, a load-out facility or a preparation plant,

24   and you would have to truck those reserves after

25   you mined them many miles to another facility to

Page 172

1                    J. SCOFIELD

2    get them processed and sold.  That goes into your

3    economics, and that mine may have very marginal

4    economics.

5                If your neighbor owns the mine next

6    door and they have a load-out and preparation

7    facility, they could mine your property for a

8    much lower cost because there's no trucking.

9    They could take that product out of the ground

10   and put it in their load-out facility.

11               So you see lots of properties change

12   hands in the coal space because of those

13   logistics issues, and, you know, frankly, we,

14   over the years, purchased properties based on the

15   benefit of those logistics issues, and we sold

16   properties based on the detriment of those

17   logistics issues.  So quite common.

18         Q.  So what you just described, was that

19   the case with respect to the properties that were

20   transferred as part of this agreement in

21   Exhibit 25?

22         A.  Whether it's the specific agreement

23   in 25, again, I don't know exactly which

24   Lexington deal that relates to, but in general,

25   the deals between -- that the board approved

                        J. SCOFIELD

1

2   giving those ranches to Hoops?

3        A.   The capital to bridge the business to

4   the Contura deal, which came with a large slug of

5   cash, in addition to operating properties that

6   were currently making money.

7        Q.   All right.  And that cash came in

8   pari passu with Riverstone, right?

9        A.   No, it was cash.  It was very typical

10  at that point in the coal cycle, people were

11  selling mines, and we -- we at Revelation bought

12  mines where the profitability under the incumbent

13  owner would be marginal or low.  Under our cost

14  structure, we generally felt like we could lower

15  the cost and make the mines more profitable.

16          From a seller's perspective, because

17  the mines were marginally profitable but they had

18  a reconciliation liability, you were seeing deals

19  transact in the marketplace, some of which we

20  did, some of which others did, where the

21  purchaser would get properties and cash in

22  exchange for -- for the assumption of the

23  ultimate liability.

24          So the Contura deal was -- I believe

25  it was two operating mines in the Powder River

1                    J. SCOFIELD

2          A.   It would be in -- it would be front

3    and center on whatever -- on the credit agreement

4    with Riverstone, so I can't remember.

5          Q.   The Riverstone facility was for

6    34 million but only 28 million of it was new

7    money; is that right?

8          A.   28 million of it was their money.

9    6 million of it was provided by Lime Rock, and

10   Hoops -- the Hoops piece, the conversion of money

11   that -- I think both of us ended up prefunding

12   prior to close and then having that included in

13   the $34 million facility when the Riverstone term

14   loan closed.

15         Q.   All right.  Lime Rock put in

16   3 million of new money, right?

17         A.   Correct.

18         Q.   And Riverstone requested that, right?

19         A.   I'm not sure I would say it that way.

20   I'm not sure if they requested it or if we

21   offered it as part of the negotiation.  I can't

22   recall.

23         Q.   Look at the second paragraph here in

24   Exhibit 2.  I think it's the second-to-last

25   sentence says:  RCP has made its funding

1               J. SCOFIELD

2    claiming at the time, right?

3         A.  I don't believe so, no.  Or I'm not

4    aware of any, no.

5         Q.  Are you aware of any -- you said it

6    was undocumented, so I think I know the answer,

7    but I just want the record to be clear.

8              As of June 26th, 2017, was Lime Rock

9    aware of any written instruments or documents

10   governing those amounts claimed by Hoops?

11        A.  My recollection is that those --

12   those advances were similar credit support that

13   he was providing to the business that we talked

14   about a lot earlier today in sort of the 2019

15   time frame.

16              So it was -- it was covering

17   liquidity shortfalls and -- you know, at that

18   moment in time, he had -- he had extended credit

19   to the business to cover, you know, $8 million of

20   shortfalls.

21              We then did this financing, and

22   $3 million of that extension became permanent

23   capital in the business in the Riverstone

24   facility, alongside our 3, and the remainder was

25   released for payback.

1                   J. SCOFIELD

2              I thought of it, again, more as a

3    credit support or an accordion mechanism, which

4    obviously in hindsight was not exactly how it

5    worked.

6         Q.  And was this, the arrangement you're

7    describing, ever formally presented to the board

8    for approval?

9              MR. McGAVRAN:  Objection, form.

10        A.  I'm sorry, could you say that again?

11   Because there's some noise outside.

12   BY MR. KANE:

13        Q.  The circumstances under which Hoops

14   would advance funds as you just described it, was

15   that ever presented to the board formally for

16   approval?

17             MR. McGAVRAN:  Same objection.

18             You can answer.

19        A.  It wasn't presented for approval.  It

20   was sort of we were made aware of it.  We were

21   also aware that it was something that needed to

22   be addressed over time, which it had been

23   addressed over time like when we got the

24   Riverstone deal done and you had permanent

25   financing come in, and some of it was turned into

1              J. SCOFIELD

2    permanent financing and refunded back.

3              So there were examples of that

4    funding mechanism over time getting formalized,

5    but it wasn't -- we had an entrepreneur who was

6    our partner, we had equity splits, we had credit.

7              And he was providing, you know,

8    unsecured credit support to the business.  We

9    viewed it as debt, you know, to provide working

10   capital shortfalls over time to a business that

11   had ongoing projections to be out of the

12   liquidity crisis.

13             And it would be a problem solved or

14   it would be something that he would come to us

15   and say I have this in, I want to leave it in and

16   I want to adjust the permanent capital deal as a

17   result of that, which was another e-mail that we

18   reviewed earlier today relative to additional

19   funding and changes to splits.

20             So I think it was a -- it was an

21   undocumented level of credit support provided to

22   the business less under sort of formal board

23   approval but certainly under board knowledge.

24   BY MR. KANE:

25        Q.  Board knowledge after it had

1                    J. SCOFIELD

2        A.   Yeah, Blackjewel didn't exist, yes.

3        Q.   And in broad strokes as a description

4   of the transaction, Blackjewel was created and

5   new assets by and large were put into Blackjewel,

6   and Revelation was left with mostly nonoperating

7   assets.

8            Is that your general understanding?

9        A.   I'd describe it a little differently.

10  The -- Revelation was formed, as I said before,

11  with an initial thesis to build a largely thermal

12  coal mining business.  Thermal coal is used to

13  generate power.

14           The market for metallurgical coal

15  began to move later in our investment cycle to be

16  considered a shorter commodity globally and have

17  higher prices, whereas the thermal coal business

18  became more challenged by competition from gas

19  and renewables.

20           Given the second -- given the coal

21  downturn in '15, '16, '17, '18, Revelation was

22  able to acquire a number of metallurgical coal

23  mining operations and also convert some of its

24  thermal coal mining operations to metallurgical

25  coal.

1                    J. SCOFIELD

2            So the split was really premised on

3   putting the metallurgical assets into Blackjewel

4   and raising financing around them and using that

5   financing to grow that business and satisfy the

6   obligations of reclamation for the Revelation

7   assets, which were left in a separate entity

8   outside of that financing.

9            And that was effectively the

10  structure we used to pull the business apart and

11  raise the Riverstone financing at the Blackjewel

12  level.

13           And then there was a credit

14  support -- or an agreement where a specific

15  amount of cash was transferred each month from

16  Blackjewel to Revelation to satisfy those legacy

17  obligations.

18       Q.   Okay.  And I appreciate that.  I

19  understand the distinction between metallurgical

20  coal and thermal coal.

21           But post formation, Blackjewel, as

22  opposed to Revelation, had assets in locations

23  producing thermal coal, right?

24       A.   Some.  There's very few mines that

25  are 100% a specific grade of coal.

Page 295

1                      J. SCOFIELD

2          A.  I believe I said I don't remember if

3     it -- I don't remember if it was documented or

4     not.

5          Q.  Okay.  Thanks for the clarification.

6               Let me show you Exhibit 43.  Let me

7     know when you're able to open it.

8               (Scofield Deposition Exhibit 43

9     marked.)

10         A.  I have it open.

11    BY MR. McGAVRAN:

12         Q.  Mr. Scofield, could you take a minute

13    to review Exhibit 43, and I'd like to ask you a

14    couple of questions about it after you've had a

15    chance to skim it.

16              (Document review.)

17         A.  I've skimmed it.  You want me to read

18    it in full?

19    BY MR. McGAVRAN:

20         Q.  Skimming is good for now.  If I ask

21    you a question that you don't know the answer to,

22    if you need to read it more, just let me know,

23    all right?

24         A.  Yep.

25         Q.  Is Exhibit 43 a mortgage termination

Page 296

1                          J. SCOFIELD

2    dated July 17th, 2017 that you signed?

3          A.  I didn't see the signature block.

4    Hold on.

5              It doesn't have my signature on it.

6    Oh, there it is, sorry, down below.  Yeah, yeah,

7    it is.

8          Q.  That's your signature on page 5,

9    correct?

10         A.  That is my signature on page 5.

11         Q.  Does this refresh your memory about

12   whether the loan Mr. Hoops made that then became

13   part of the Riverstone financing was documented

14   or secured?

15         A.  I need to read it again, because it

16   also has Lime Rock with a payoff amount on it, so

17   I'm not sure if this was related to

18   memorializing -- this looks like it's dated as of

19   around the closing of the Riverstone transaction

20   whereas they would probably want a payoff letter

21   memorializing the prefunding by Lime Rock and

22   Mr. Hoops into their deal.

23             I would need to study this as to

24   whether it's -- relates to sort of a prior

25   agreement or something we put in place before the

1                        J. SCOFIELD

2    Riverstone financing.

3           Q.  Let me see if I can shortcut this.

4    I'm going to drop another exhibit into the chat.

5              (Scofield Deposition Exhibit 44

6    marked.)

7           A.  44?

8    BY MR. McGAVRAN:

9           Q.  Yes, sir.

10          A.  Yep, I got it.

11          Q.  Same thing here.  I'll ask you to

12   take a couple of minutes if you need it to skim,

13   and then I'll ask you some questions about it.

14   And if you need to look at it more carefully

15   afterwards, we can.

16          A.  I mean, it's a 21-page document, so

17   it's going to take me a while to read it.

18             (Document review.)

19          A.  Go ahead and ask me a question.  What

20   do you want?  What have you got?

21   BY MR. McGAVRAN:

22          Q.  Sure.  Why don't you go to page 19

23   for starters.

24          A.  In the PDF or the -- 19 of 21?

25          Q.  Yes, sir.  The Bates at the bottom is

Page 298

1               J. SCOFIELD

2    DEBTORS_095284, if that's helpful.

3          A.  Yep, I'm there.

4          Q.  This references a promissory note

5    made by Mr. Hoops, correct?

6          A.  This references a promissory note for

7    9 million for Mr. Hoops and 1 million from Lime

8    Rock dated as of June 27th, which is shortly

9    before the closing of the Riverstone financing.

10          And those dollar amounts represent

11   the dollar amount in the e-mails you showed me

12   earlier that Jeff had extended to the business

13   and the 1 million that Lime Rock prefunded ahead

14   of the Riverstone closing.

15          I think this document -- without

16   reviewing it fully, I believe this document

17   memorializes the amounts that were in the company

18   that were then going to later get converted to

19   $3 million for Hoops and the 1 million here plus

20   2 of new capital for Lime Rock into the

21   Riverstone deal.

22          Q.  And what about in paragraph A of this

23   page that we're looking at:  Hoops hereby agrees

24   and represents that the promissory note between

25   borrowers and Hoops dated December 1st, 2016 in

1             J. SCOFIELD

2    the principal amount of $6 million, parentheses,

3    the original note, will be amended and restated

4    by the amended and restated promissory note dated

5    as the date hereof.

6        A.   Yeah.

7        Q.   What does that mean to you?

8        A.   That leads me to believe that on

9    December 1st we memorialized a portion of that

10   $9 million in the $6 million original note.

11       Q.   And if you go back to the very first

12   page of this document.

13       A.   Yep.

14       Q.   It's called -- at least the title

15   states that it's an Amended and Restated Mortgage

16   and Security Agreement, correct?

17       A.   Yep.

18       Q.   And would this be securing the notes

19   that we've discussed?

20       A.   That would be my assumption.

21       Q.   And did you, in fact, sign this

22   agreement?  In other words, is it your signature

23   that appears on page 13 of the PDF?

24       A.   Yep.

25       Q.   So does this -- do Exhibit 43 and

Page 300

1                       J. SCOFIELD

2    Exhibit 44 indicate to you that the Hoops loan

3    was, in fact, documented and that there was

4    security for it?

5           A.  For that $9 million that was in prior

6    to the Riverstone financing, yes.  So...

7           Q.  Okay.  I didn't mean to cut you off.

8    Did you have anything else to add?

9           A.  No.

10             MR. McGAVRAN:  You can close that

11   document.  And once again, Mr. Scofield, thank

12   you for your time today.

13             MR. KANE:  I have no further

14   questions for you, Mr. Scofield.  Thanks.

15             THE STENOGRAPHER:  Are we off?

16             THE VIDEOGRAPHER:  Is that it?  Are

17   we done?

18             The time is 5:56 p.m., and this ends

19   the deposition of Jeff Scofield.

20             (Time noted: 5:56 p.m. CST)

21

22

23

24

25

## LIMITED LIABILITY COMPANY AGREEMENT OF
## BLACKJEWEL L.L.C.
A Delaware Limited Liability Company

This **LIMITED LIABILITY COMPANY AGREEMENT** of **BLACKJEWEL L.L.C.,** a Delaware limited liability company (the "***Company***"), dated as of March 24, 2017 (the "***Effective Date***"), is adopted, executed and agreed to, for good and valuable consideration, by the Company and the Member (as defined below).

### RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on March 24, 2017 (the "***Formation Date***"), of a Certificate of Formation under and pursuant to the Act (such Certificate of Formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "***Certificate***");

**WHEREAS**, the party hereto desires to enter into this Agreement in order to set forth its rights and obligations as Member, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Act.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Member and the Company hereby agree as follows:

### AGREEMENTS

### ARTICLE 1
### DEFINITIONS AND CONSTRUCTION

**Section 1.1**   ***Definitions***.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them below:

"***Accounting Firm***" means such accounting firm as the Member shall from time to time determine.  The initial Accounting Firm shall be Dixon Hughes PLLC.

"***Act***" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"***Adjusted Capital Account***" means the Capital Account maintained for the Member, (a) increased by any amounts that the Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to the Member.

"***Affiliate***" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person.

DEBTORSCL_009302

"*Agreement*" means this Limited Liability Company Agreement of Blackjewel LLC, as amended and restated from time to time.

"*Available Cash*" means all cash, revenues and funds received by the Company from Company operations and proceeds from a Sale Transaction, less the sum of the following, to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the operation of the Company's business; and (c) such reserves as the Member deems reasonably necessary for the proper operation of the Company's business.

"*Book Value*" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

(a) The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as of the date of such contribution as reasonably determined by the Member;

(b) The Book Values of all properties shall be adjusted to equal their respective fair market values as reasonably determined by the Member in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by the Member or in exchange for the performance of services to or for the benefit of the Company), (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Code); provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Member in the Company;

(c) The Book Value of property distributed to a Member shall be the fair market value of such property as of the date of such distribution as reasonably determined by the Member;

(d) The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account while determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses; and

(e) If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to this Agreement.

DEBTORSCL_009303

*"Business Day"* means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the States of New York or West Virginia are authorized by Law to close.

*"Capital Contribution"* means with respect to the Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member.

*"Code"* means the United States Internal Revenue Code of 1986, as amended from time to time. All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

*"Control,"* including the correlative terms *"Controlling," "Controlled by"* and *"Under Common Control with"* means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

*"Depreciation"* means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Member.

*"Entity"* means any Person other than a natural person.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

*"Expel, Expelled or Expulsion"* means the expulsion or removal of a Member from the Company as a member.

*"GAAP"* means United States generally accepted accounting principles and policies as in effect from time to time.

DEBTORSCL_009304

*"HSR Act"* means the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

*"Internal Restructure"* means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Member of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Member continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Member in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to the Member.

*"Involuntary Transfer"* means a Transfer resulting from the death of a Person or another involuntary Transfer occurring by operation of law.

*"Maximum Tax Liability"* means, for the Member, the product of (a) an amount determined by the Company (on an actual or estimated basis) for the Member for a completed fiscal quarter, as the case may be, equal to the sum of the portion of the Company's Net Profit allocated or to be allocated and guaranteed payments made or to be made pursuant to this Agreement to the Member for federal, state or local income tax purposes for such fiscal quarter multiplied by (b) the highest combined marginal federal, state and local income tax rates that apply to an individual residing in New York County, New York taking into account rate differences that may apply to the character of the income so allocated. In determining cumulative Maximum Tax Liability for the Member, Net Losses allocated to a Member for a Fiscal Year that are allowed to be carried forward under applicable tax laws to a later Fiscal Year shall be deducted from Net Profit in that later year.

*"Member"* means any Person executing this Agreement as of the Effective Date, that agrees to be bound by this Agreement or is hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

*"Membership Interest"* means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

*"Net Loss"* means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

*"Net Profit"* means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

*"Nonrecourse Deduction"* has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(1).

*"Permitted Transfer"* means any Involuntary Transfer or, with respect to the Member, any Transfer to (a) any parent, sibling, child or grandchild of the Member, (b) any trust, limited liability company, limited partnership or other entity having as its sole beneficiaries or owners the Member, any Persons described in clause (a) above or any combination of the foregoing (c) the shareholders, Member, partners or other equity owners of the Member that is an entity, or (d) an Affiliate of the Member if the Member (or the sole shareholder(s)/member(s) of the Member) own(s) one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, and (e) any Person designated by the Member as a "Permitted Transferee" for purposes of such Transfer.

*"Person"* means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

*"Profits"* or *"Losses"* means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

    (a) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

    (b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

    (c) In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

    (d) Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

DEBTORSCL_009306

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(f) To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

*"Registration Expenses"* means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties and costs and expenses relating to analyst or investor presentations, if any, or any "road show" undertaken in connection with the registration and/or marketing of the Units other than as provided in any underwriting agreement entered into in connection with such offering), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters), (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Member participating in the offering chosen by the participating Member holding a majority and/or marketing of the Units of the Member, (h) fees and expenses in connection with any review of underwriting arrangements by the National Association of Securities Dealers, Inc. including fees and expenses of any "qualified independent underwriter", (i) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (j) fees and disbursements of underwriters customarily paid by issuers or sellers of Units, but shall not include any underwriting discounts attributable to the sale of secondary Units, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Member or any fees and expenses of underwriter's counsel, and (k) the expenses and fees for listing the Units to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system.

*"Regulatory Allocations"* means the allocations pursuant to Section 6.4 of this Agreement.

*"Resign, Resigning or Resignation"* means the resignation, withdrawal or retirement of a Member from the Company.  Such terms shall not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

*"Restricted Unit Agreement"* means with respect to the Member holding Incentive Units, that certain agreement dated as of the date of issuance of the Member's Incentive Units between the Company and the Member.

*"Sale Transaction"* means any transaction or series of related transactions (whether such transaction occurs by a sale of assets, sale of Units or other Company interests, merger, conversion, recapitalization or other business combination) that, after giving effect thereto, results in (a) all or substantially all of the assets of the Company being held by an entity that is less than 50% owned by the record holders of Units immediately prior to such transaction and their Affiliates or (b) the record holders of the Units prior to such transaction and their Affiliates having record ownership, directly or indirectly after the consummation of such transaction, of 50% or less (determined by the percentage of liquidating distributions the record holders of Units would receive upon a liquidation of the Company or other surviving entity immediately after consummation of such transaction) of the equity securities of the surviving company.

*"SEC"* means the United States Securities and Exchange Commission.

*"Securities Act"* means the Securities Act of 1933, as amended from time to time.

*"Transfer,"* including the correlative terms *"Transferring"* or *"Transferred"*, means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided, however, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

*"Treasury Regulations"* means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.   All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

**Section 1.2     *Construction*.** Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to money refer to legal currency of the United States of America; (d) the word "including" means "including without limitation;" and (e) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean

DEBTORSCL_009308

such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto.

<div align="center">

**ARTICLE 2**
**ORGANIZATION**

</div>

**Section 2.1**    *Formation*.    The Company was organized as a limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware, in accordance with and pursuant to the Act.    All actions by the Member while making such filing are hereby ratified, adopted and approved.    The rights and liabilities of the Member will be determined pursuant to the Act and this Agreement.    To the extent that there is any conflict or inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement control and take precedence.

**Section 2.2**    *Name*.    The name of the Company is "**Blackjewel L.L.C.**" and all Company business must be conducted in that name or such other names that comply with Law and as the Member may select.

**Section 2.3**    *Offices*.    The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Member may designate in the manner provided by Law.    The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Member may designate in the manner provided by Law.    The principal office of the Company in the United States shall be at 1051 Main Street, Milton, West Virginia 25541 or such other place as the Member may designate, which need not be in the State of Delaware.    The Company may have such other offices as the Member may designate.

**Section 2.4**    *Purpose*.    The purpose of the Company shall be the leasing, acquisition, exploration, mining and development of coal properties in the United States (the "*Business Line*") and any business activity reasonably related thereto, to the extent not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity.    In furtherance of such purpose, the Company may (a) acquire (i) coal leasehold interests, mineral interests and royalty interests, (ii) mines, plants, railways, facilities, equipment and other assets relating to such activities or properties and (iii) contracts, easements, servitudes, permits, licenses and other rights relating to the foregoing; (b) explore for, mine, develop, produce, store, treat, process, gather, transport, purchase and market synfuel, coal and coal byproducts and related hydrocarbons and minerals; (c) farm out, sell, abandon and otherwise dispose of Company assets; (d) effectuate commodity hedging transactions in order to minimize the risks associated with the fluctuation of prices to be received by the Company from the sale of synfuel, coal and coal byproducts and related hydrocarbons and minerals from Company properties; and (e) take all such other actions incidental or ancillary to any of the foregoing as the Member may determine to be necessary or desirable.

DEBTORSCL_009309

**Section 2.5**   *Foreign Qualification*. Prior to the Company's conducting business in any jurisdiction other than Delaware, to the extent that the nature of the business conducted requires the Company to qualify as a foreign limited liability company under the Law of that jurisdiction, the Company shall satisfy all requirements necessary to so qualify.  At the request of the Company, the Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**Section 2.6**   *Term*.  The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 11.

**Section 2.7**   *No State Law Partnership*.   The Member does not intend for the Company to be a partnership (including a limited partnership) or joint venture, and the Member shall not be a partner or joint venturer by reason of this Agreement for any purpose other than federal and state income tax purposes, and this Agreement shall not be interpreted to provide otherwise.   The Member intends that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and the Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.    The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Member.

**Section 2.8**   *Title to Company Assets*.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and neither the Member, nor any Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.  The Member hereby waives any right it may at any time have to cause the Company's assets to be partitioned or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the Company's assets partitioned.

### ARTICLE 3
### REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.1**   *Representations and Warranties of The Member*.   The Member (as to itself only) represents and warrants to the Company as follows:

(a)   Organization; Existence.  The Member is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)   Power; Qualification.   The Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by the Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

DEBTORSCL_009310

(c)     <u>Authority; Enforceability</u>.  This Agreement has been duly and validly executed and delivered by the Member and constitutes the binding obligation of the Member enforceable against the Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)     <u>No Conflicts</u>.  The execution, delivery, and performance by the Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which the Member is subject, (ii) violate any order, judgment, or decree applicable to the Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which the Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by the Member of this Agreement.

(e)     <u>Investment Matters</u>.  The Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities laws.  The Member is an "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.  The Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities."  Such Member has knowledge of finance, securities and investments generally, experience and skill in investments based on actual participation, and has the ability to bear the economic risks of the Member's investment in the Company.

(f)     <u>LLC Agreement</u>.  The Member understands that the Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement.

(g)     <u>No Brokers</u>.  Neither the Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company or any other Member; and the Member shall indemnify and hold harmless the Company from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by the Member in connection with the Company or this Agreement.

(h)     <u>Survival of Representations and Warranties</u>.  All representations and warranties made by the Member in this Agreement shall be considered to have been relied upon

and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

Section 3.2   ***Representations and Warranties of the Company***.   The Company represents and warrants to the Member that:

(a)     It was formed in the State of Delaware on the Formation Date.

(b)     The Company is duly organized, validly existing and in good standing pursuant to the laws of Delaware and has all requisite power and authority to enter into this Agreement.

(c)     There are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the officers and managers of the Company, threatened against or affecting the Company.

(d)     Prior to the execution date of this Agreement, the Company did not conduct any business operations other than in connection with its formation and capitalization.

(e)     Prior to the execution date of this Agreement, the Company did not own any property or assets.

<div align="center">

**ARTICLE 4**
**MEMBER; UNITS**

</div>

Section 4.1   *Member*.

(a)     <u>Member</u>.  Blackjewel Holdings L.L.C. is the Company's sole Member.

(b)     <u>Additional Members</u>.   In addition to Blackjewel Holdings L.L.C., the following Persons shall be deemed to be a Member and shall be admitted as a Member without any further action by the Company or the Member: (i) any Person to whom Units are Transferred by the Member so long as such Transfer is made in compliance with this Agreement and (ii) any Person to whom the Company issues Units after the Effective Date in compliance with this Agreement so long as the Member designates such Person as a "Member", which designation must be evidenced by an adoption of this Agreement and any other agreement reasonably specified by the Member.

(c)     <u>Cessation of Member</u>.  Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units, but such Person shall remain bound by Section 8.4.

Section 4.2   *Units*.

(a)    <u>Units; Class and Series</u>.  The Membership Interests of the Company shall be issued in unit increments (each, a "***Unit***").  The Company may also issue Membership Interests in fractional Unit increments.  From time to time, the Company may, subject to the terms of this Agreement, issue such Units as the Member reasonably determines to be in the best interests of the Company; provided, however, that, following the Effective Date, the Company may not issue any Units without the unanimous consent of the Member.  Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in Section 4.2(c) or otherwise as shall be fixed by the Member by resolution thereof.  The Member, in so fixing the designations, rights and preferences of any class or series of Units, may designate such Units as "Preferred Units", "Common Units", "Priority Units", "Incentive Units" or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units.  The Member may increase the number of authorized Units in any then existing class or series.  Upon due authorization of such issuances, the Member is hereby authorized, subject to this Agreement, to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations, preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units.  The Member acknowledges and agrees that (i) any actions taken by the Company or the Member pursuant to this Section (including the issuance of one or more classes or series of Units) shall not be deemed to materially adversely affect the Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights or rights governing Transfer of Units and (ii) any such amendment in connection with a duly authorized issuance of Units that is recommended by the Member may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution and tax allocation provisions of this Agreement to the extent approved by the Member.

(b)    <u>Unit Certificates</u>.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates.  As of the date hereof, Units are uncertificated, but the Member may determine to certificate all or any Units at any time by resolution thereof.  In such event, the Member shall prescribe the forms of certificates to be issued by the Company including the forms of legends to be affixed thereto.  Any such certificate shall be delivered by the Company to the applicable record owner of the Units represented by such certificate.  Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code.  Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Member to sign such certificates who shall certify the Units represented by such certificate. Books and records reflecting the record ownership of the Units shall be kept by the Secretary.  In the event any Officer who shall have signed, or whose facsimile signature or signatures shall have been placed upon, any such certificate or certificates shall have ceased to be such Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such Officer at the date of issue.  The Member may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal

DEBTORSCL_009313

representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed. Each certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY MAY BE REQUESTED BY THE COMPANY TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT).**

**THIS SECURITY MAY BE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF MARCH 24, 2017 (AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.**

Section 4.3   *Registration Rights*. The Member understands and agrees that the Units issued on or prior to the date hereof have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act.

Section 4.4   *Liability to Third Parties*. The Member shall not be liable for the debts, obligations or liabilities of the Company, nor shall the Member be obligated to guaranty any debt, obligation or liability of the Company.

## ARTICLE 5
## CAPITAL CONTRIBUTIONS

Section 5.1   *Capital Contributions*.

(a)   Initial Contributions. As of the Effective Date, the Member has made Capital Contributions to the Company equal to the amount set forth on Schedule 1 hereto in the column entitled "Capital Contributions" in exchange for the number and type of Units set forth opposite the Member's name in Schedule 1. The Member shall not have any obligation to make any Capital Contributions after the Effective Date.

(b)   Subsequent Contributions.

(i)   The Member shall have the right to make additional Capital Contributions in cash to the Company, at such time, in such amounts, for such purposes and on such other terms, in

each case, as are unanimously approved and determined by the Member and as are consistent with the remaining terms of this Section.

(ii)     Capital Contributions shall be made by wire transfer of immediately available funds to the account specified in the related Payment Notice.  The Company shall not issue any Units or Membership Interests or accept any Capital Contributions in cash from any Person unless approved by the Member.

**Section 5.2    *Return of Capital Contributions*.**  The Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or of the Member.  The Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return the Member's Capital Contributions.

**Section 5.3    *Advances by Member*.**  The Member may advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company.

**Section 5.4    *Capital Account*.**

(a)     A separate capital account (a "***Capital Account***") will be maintained for the Member.  The Member's Capital Account will be increased by:  (i) the amount of money contributed by the Member to the Company; (ii) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to the Member of Profits and other items of income and gain pursuant to this Agreement.  The Member's Capital Account will be decreased by:  (i) the amount of money distributed to the Member by the Company; (ii) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to the Member of Losses and other items of deduction and loss pursuant to this Agreement.

(b)     In the event of a permitted sale or exchange of an interest the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Member determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section, the method in which Capital Accounts are maintained shall be so modified; provided,

however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Member as set forth in this Agreement.

## ARTICLE 6
## DISTRIBUTIONS; ALLOCATIONS

**Section 6.1**    *Distributions.*

(a)    Available Cash and other property shall be distributed to the Member solely at such times and in such amounts as the Member shall determine and approve.  Such distributions shall be made at such time or times as shall be agreed by the Member, but no later than 75 days after the conclusion of the taxable year.

(b)    No Member shall be required to return cash to the Company pursuant to this Section in excess of the total distributions made to the Member in respect of such class of Units reduced by the Maximum Tax Liability attributable to such Units.

(c)    Other than upon the occurrence of a Dissolution Event, Internal Restructure or Sale Transaction, distributions shall not be made pursuant to this Section to the extent such distributions would cause such holder's Capital Account (reduced by any tax distributions required to be made to such holder) to be less than zero.

**Section 6.2**    *Tax Distributions.*

Notwithstanding anything to the contrary in this Agreement, unless prohibited by applicable law or by any contract binding on the Company, prior to making any distribution as listed above, the Company shall distribute cash to the Member at least five Business Days before estimated quarterly tax payments are due with respect to each of the quarters of each Fiscal Year on a pro rata basis based on the Member's good faith estimate of the projected Maximum Tax Liability of the Member, assuming a reasonable projection of the Company's annual Net Profit for the Fiscal Year.  The Company shall not have any liability to the Member for penalties arising from non-payment or incorrect estimates of the Member's estimated tax payments.  Any distributions made pursuant to this Section shall not be treated as an advance payment of, nor shall they reduce by a like amount, the amounts otherwise distributable to the Member.

**Section 6.3**    *Allocations of Net Profits and Net Losses.*

For any taxable year of the Company, Net Profits and Net Losses shall be allocated 100% to the Member for such Fiscal Year.

**Section 6.4**    *Regulatory and Income Tax Allocations.*

(a)    The Member shall not be allocated Losses or deductions if the allocation causes the Member to have an Adjusted Capital Account Deficit.  To the extent Losses or deductions are allocated to the Member by virtue of this Section, the Profit of the Company thereafter

DEBTORSCL_009316

recognized shall be allocated to such Member until such time as the Profit allocated to them pursuant to this sentence equals the Losses or deductions allocated to them pursuant to this Section.

(b)     If the Member has an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company for that taxable year shall be allocated to the Member before any other allocation is made of Company items for that taxable year, in the amount and manner required to eliminate the Adjusted Capital Account Deficit as quickly as possible. This Section is intended to comply with, and shall be interpreted consistently with the "qualified income offset" provisions of Tax Code.

(c)     The Company's partner nonrecourse deductions shall be allocated solely to the Member with respect to the partner nonrecourse liability related thereto.

(d)     In accordance with the Tax Code and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for income tax purposes, be allocated to the Member so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution) using the traditional method with curative allocations. If the book value of any Company asset is adjusted for federal income tax purposes, subsequent allocations of income, gain, loss, and deduction with respect to the revalued asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value using the traditional method with curative allocations.

(e)     In the event of the transfer of all or any part of the Member's Units at any time other than at the end of the Company's taxable year, the admission of a new Member, or disproportionate Capital Contributions, the transferring Member's or new Member's shares of the Company's Profit, gain, loss, deductions, and credits allocable, as computed both for accounting purposes and for federal income tax purposes, shall be allocated between the transferor Member and the transferee Member (or Members), the new Member and the other Members, or among the Members, as the case may be, in the same ratio as the number of days in such Fiscal Year before and after the date of such transfer, admission, or disproportionate Capital Contributions; provided, however, that the Member shall have the option to treat the periods before and after the date of such transfer, admission, or disproportionate Capital Contributions as separate taxable years and allocate the Company's Profit, gain, loss, deductions, and credits for each of such deemed separate taxable years in accordance with the Member's respective interest in the Company for such deemed separate taxable years. Notwithstanding the foregoing, if the Company uses the cash receipts and disbursements method of accounting, the Company's "allocable cash basis items," as that term is used, shall be allocated as required.

(f)     The excess nonrecourse liabilities of the Company, if any, shall be allocated to the Member(s) in accordance with their respective Percentages.

**Section 6.5     *Limitation Upon Distributions*.** No distribution shall be declared and paid unless, after the distribution is made, the fair value of the Company's assets is at least equal to all

DEBTORSCL_009317

of the Company's liabilities or if the declaration or payment would cause the Company to breach any material agreement.

**Section 6.6** *Withholding Authorized*. The Company is hereby authorized to withhold from any distribution to the Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign law. All amounts required to be withheld pursuant to federal, state, local or foreign tax laws shall be treated as amounts actually distributed to the affected Member for all purposes under this Agreement.

## ARTICLE 7
## MANAGEMENT

**Section 7.1** The Company shall be managed by the Member. Except as otherwise provided in this Agreement, the Member shall have the right to act for and bind the Company in the ordinary course of its business.

**Section 7.2 Meetings of, and Duties of the Member.**

(a)     A meeting of the Member may be called at any time by the Member. Meetings of the Member shall be held at the Company's principal place of business or at any other location designated by the Member. Not less than ten days before each meeting, the Member shall give written notice of the meeting to each participant. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, the Member waives notice if before or after the meeting the participant signs a waiver of the notice to be filed with the records of Member's meetings, or is present at the meeting in person or by proxy.

(b)     In lieu of holding a meeting, the Member may vote or otherwise take action by a written instrument indicating the consent of the Member.

(c)     The Member shall not be liable, responsible, or accountable in damages or otherwise to the Company for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Member by this Agreement or by law, unless the action taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

(d)     Except as otherwise expressly provided, nothing in this Agreement shall be deemed to restrict in any way the rights of the Member, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of its respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.

DEBTORSCL_009318

(e)     To the fullest extent permitted by the Act, the Company shall indemnify the Member for, and hold the Member harmless from, any loss or damage incurred by the Member by reason of any act or omission so performed or omitted by the Member (and not involving fraud, bad faith or gross negligence). To the full extent authorized or permitted by the Act, the Company shall pay or reimburse reasonable expenses (including reasonable attorneys' fees) incurred by the Member if a party to a proceeding, in advance of final disposition of such proceeding. The Company may purchase and maintain insurance on behalf of the Member against any liability asserted against or incurred by the Member as a result of being the Member, regardless of whether the Company would have the power to indemnify such person against the same liability under the provisions of this Section or the Act.

**Section 7.3** *Provisions Applicable to All Meetings*. In connection with any meeting of the Member, the following provisions shall apply:

(a)     Waiver of Notice Through Attendance. Attendance of a Person at such meeting (including attendance by telephone) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)     Proxies. A Member may vote at a Member meeting by a written proxy executed by that Person and delivered to the Secretary. A proxy shall be revocable unless it is stated to be irrevocable.

(c)     Action by Written Consent. Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by the Member.

(d)     Meetings by Telephone. The Member may hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of the Member participating by conference telephone, video conference or similar communications equipment shall be given full effect.

(e)     Reimbursement; Compensation. The Member and any and all Officers shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including travel expenses in accordance with the Company's travel reimbursement policies.

**Section 7.4** *Officers*.

The Member may appoint certain agents of the Company to be referred to as "officers" of the Company (*"Officers"*) and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) that are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described by resolution of the Member or as is customary for each such position. In addition to or in lieu of Officers, the Member may authorize any person to take any action or perform any duties on

DEBTORSCL_009319

behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person." An employee or other agent of the Company shall not be an authorized person unless specifically appointed as such by the Member. Duly elected and designated Officers shall have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Member; provided, notwithstanding anything to the contrary herein, unless such acts have been approved by the Member, the Officers shall not have the power or authority to cause or permit the Company to do or perform any of the following:

(a)     Incur indebtedness or make any loan other than trade payables incurred in the ordinary course of the operations of the Company consistent with a budget approved by the Member;

(b)     Sell, assign, convey or otherwise dispose of assets or properties of the Company outside of the ordinary course of the operations of the Company consistent with a budget approved by the Member;

(c)     Make any capital expenditure outside the ordinary course of the operations of the Company consistent with a budget approved by the Member;

(d)     Approve or amend any capital or operating budget; or

(e)     Mortgage, pledge, assign in trust or otherwise encumber or permit to be encumbered any of the Company assets outside of the ordinary course of the operations of the Company consistent with a budget approved by the Member.

## ARTICLE 8
## ADDITIONAL COVENANTS

**Section 8.1     *Reports*.** Except as expressly stated otherwise, the Company shall deliver the following reports and information to the Member:

(a)     As soon as available and in any event within 90 days after the end of each Fiscal Year, a consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related consolidated and consolidating statements of operations, Member's equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified without qualification to the Member by an Accounting Firm as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

(b)     As soon as available and in any event within 90 days after the end of each Fiscal Year, the Company shall deliver a reserve report prepared in accordance with applicable SEC guidelines by an independent engineer approved by the Member with respect to the coal reserves of the Company.

(c)　　Prior to year-end, an annual capital and operating budget for the coming year, that shall be approved by the Member (as the same may be modified as approved by the Member on a month-to-month basis).

(d)　　As soon as practicable and in any event within 30 days after the end of each calendar month (including the last calendar month of the Company's Fiscal Year), a management report discussing the financial condition and operations of the Company for the most recent period ended for which information is available, all in reasonable detail and certified by an officer of the Company as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP, as applied consistently with the Company's practices, and with the audited financial statements of the Company, excluding customary footnotes and year-end adjustments.

(e)　　The Company shall promptly (but in any event within five Business Days) provide to the Member notice of: (i) any default in any material respect under any material agreement to which the Company is a party; (ii) any material lawsuit or proceeding against the Company or Officers, in their capacities as such Officer; and (iii) any other material change, event or circumstance affecting the Company or any Officer, in their capacity as such Officer.

(f)　　The Company shall promptly (but in any event within five Business Days) provide the Member with copies of all material communications relating to any interest expressed by third-parties to engage in a Sale Transaction and all reasonable terms and other detail expressed in connection with such interest.

(g)　　The Company shall promptly (but in any event within five Business Days) provide to a Member any other information reasonably requested by the Member.

### Section 8.2　*Internal Restructure*.

(a)　　The Company, upon the approval of the Member, may effect an Internal Restructure on such terms as the Member in good faith deems advisable; provided that the Member is treated equitably and incurs no liability with respect to such Internal Restructure. The Member agrees that it will consent to and raise no objections to such an Internal Restructure, in accordance with this Section that has been unanimously approved by the Member. The Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Member (and not in conflict with this Section to be executed by the Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement, including, without limitation, relative equity ownership percentages among the holders of a series or class of Units, relative pro rata distribution rights among the holders of a series or class of Units, pre-emptive rights (except in connection with a public offering of the Company), those provisions granting the Member authority to manage the affairs of the Company, and granting certain Persons the right to govern the Transfers of Units or other equity securities and indemnification.

(b)      The Member acknowledges that an Internal Restructure may be undertaken in connection with a public offering of the Company, an acquisition of another business or entity or the sale of equity in the surviving entity to other Persons.

(c)      Upon the consummation of an Internal Restructure, the surviving entity or entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company.  The governing instruments of the surviving entity shall incorporate the governance provisions of this Agreement as closely as practicable.  The Member shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Company in connection with consummating an Internal Restructure (in accordance with this Section) including voting for or consenting thereto.

(d)      The Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions of this Section.

### Section 8.3      *Confidentiality*.

The Member acknowledges that it may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company (including Persons with whom it may conduct business). The Member shall hold in confidence and not disclose any confidential or proprietary information it receives regarding the Company (including Persons with whom they may conduct business), that is identified as confidential and may not disclose it to any Person except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company promptly of any request for that information before disclosing it if practicable), (b) to advisors or representatives of the Member (provided that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the Member remains liable for any breach of this provision by its advisors and/or representatives to whom it discloses such information), (c) to any Person to which the Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (d) of information in connection with litigation against the Company or the Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and shall disclose only that portion of such information required to be disclosed), (e) permitted by the Company or Member affected by such disclosure, as applicable, or (f) by any private equity fund, hedge fund or institutional investor of confidential information to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Person reasonably deems necessary or appropriate in connection with such Person obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information and that the information permitted to be so disclosed shall in no event include the identity of any direct or

DEBTORSCL_009322

indirect owner of the Member or any information regarding such Person's direct or indirect ownership in the Member.  The Member agrees that breach of the provisions of this Section may cause irreparable injury to the Company for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of the Member to comply with such provisions and (ii) the uniqueness of the Company's and the Member's business and the confidential nature of the information described in this Section.   Accordingly, the Member agrees that the provisions of this Section may be enforced by specific performance.

## ARTICLE 9
## EXCULPATION AND INDEMNIFICATION

**Section 9.1**    *Exculpation*.   No Officer in his or her capacity as such and no Officer who is or was serving at the request of the Company as a member, manager, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or the Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (a) liability for acts that involve fraud, willful misconduct or gross negligence and (b) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (a) and (b) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator.   Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or the Member, as applicable, shall bear the burden of establishing a prima facie case that a Officer thereof breached the standard of care set forth above in this Section.  In addition, by resolution of the Member, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Officer is exculpated under this Section.

**Section 9.2**    [Reserved]

**Section 9.3**    *Indemnification of Officers, Employees and Agents*.   The Company, by adoption of a resolution of the Member, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company; and, the Company may, but shall not be obligated to, indemnify and advance expenses to persons who are or were serving at the request of the Company as a member, manager, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against such Person and incurred by such Person in such a capacity or arising out of its status as such an aforementioned functionary to the same extent that the Company may indemnify and advance expenses to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but in the case of any such amendments, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees)

DEBTORSCL_009323

actually incurred by such Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding. Notwithstanding anything to the contrary in this Section, a person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such person seeks indemnification, such person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company or that such person's actions constituted fraud, willful misconduct or gross negligence.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

**Section 9.4**     *Advance Payment*.  The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person indemnified under Section 9.3 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

**Section 9.5**     *Nonexclusivity of Rights*.    The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right that a Person indemnified pursuant to this Article 9 may have or hereafter acquire by vote of the Member.

**Section 9.6**     *Insurance*.   Without limiting the Company's other obligations under this Article 9, the Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as an Officer, authorized person, authorized signatory, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

## ARTICLE 10
## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

DEBTORSCL_009324

**Section 10.1   *Tax Returns***.  The Company shall prepare and timely file all tax returns and reports required to be filed by the Company.  Unless otherwise agreed by the Member, any income tax return of the Company shall be prepared by the Accounting Firm.  The Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company shall deliver a Schedule K-1 to the Member as soon as practicable after the close of each taxable year, but in no event later than 90 days after the end of each year, together with such additional information as may be required by the Member in order for the Member to file its returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filing of its tax returns and reports.

**Section 10.2   *Tax Elections***.  The Company shall make the following elections on the appropriate tax returns:

(a)   to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Tax Matters Member designates;

(b)   to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method unless the cash method of accounting is available and the Member designates the cash method of accounting for use by the Company;

(c)   if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, on request by notice from the Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Member determines that the Code Section 754 election is in the best interest of the Company and so long as the Member consents to such election;

(d)   to elect to amortize the organizational expenses of the Company ratably over a period of 180 months as permitted by Code Section 709(b);

(e)   any other election the Member may deem appropriate and in the best interests of the Member.

**Section 10.3   *Bank Accounts***.  The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Member may determine.  The Company shall not commingle the Company's funds with the funds of the Member or any Affiliate.

**Section 10.4   *Fiscal Year***.   The fiscal year of the Company (the ***"Fiscal Year"***) shall end on December 31 of each calendar year unless, for United States Federal income tax purposes, another fiscal year is required.  The Company shall have the same fiscal year for United States Federal income tax purposes and for accounting purposes.

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

**Section 11.1** *Dissolution*.

(a)    <u>General</u>.  Subject to Section 11.1(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "*Dissolution Event*"), and no other event shall cause the Company's dissolution:

(i)    the approval of the Member; and

(ii)   the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    <u>Continuance of the Company</u>.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of the Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

**Section 11.2** *Winding-Up and Termination*.  On the occurrence of a Dissolution Event, the Member may, acting unanimously, select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Member.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Member.  The steps to be accomplished by the liquidator are as follows:

(a)    <u>Accounting</u>.  As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    <u>Satisfaction of Obligations</u>.  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in this Agreement); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    <u>Distribution of Assets</u>.  All remaining assets of the Company shall be distributed to the Member as follows:

(i)    the liquidator may sell any or all Company property, including to the Member, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Member in accordance with the provisions of this Agreement;

DEBTORSCL_009326

(ii)    with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Member shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)   the property of the Company shall be distributed in accordance with this Agreement.

All distributions in kind to the Member shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section; provided, however, that the Member shall not be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to the Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Member have consented within the meaning of Section 18-502(b) of the Act; provided, however, that the Member shall not be deemed, under this Section, to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to the Member.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)    Final Capital Account Balances.  The Member intends that the allocations provided under this Agreement will produce final Capital Account balances for the Member that permit liquidating distributions to be made in the order and priorities set forth in this Agreement. If the allocations otherwise made would fail to produce such final Capital Account balances, the Member shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments, to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

**Section 11.3** *Deficit Capital Accounts*.  No Member will be required to pay to the Company, to any other Member, or to any third party any deficit balance that may exist from time to time in the Member's Capital Account.

**Section 11.4** *Certificate of Cancellation*.  Upon completion of the distribution of Company assets as provided herein, the Member (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement, and take such other actions as may be necessary to terminate the existence of the Company.  Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE 12
## GENERAL PROVISIONS

DEBTORSCL_009327

**Section 12.1   *Books*.**  To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**Section 12.2   *Offset*.**  Whenever the Company is to pay any sum to the Member, any amounts that the Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset.

**Section 12.3   *Notices*.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by telecopy shall be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the other Member.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 12.4   *Entire Agreement*.**  This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Member relating to the formation and operation of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

**Section 12.5   *Effect of Waiver or Consent*.**  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 12.6   *Amendment or Restatement*.**  Except as expressly set forth herein, this Agreement may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon Member approval).

**Section 12.7   *Binding Effect*.**  This Agreement is binding on and inures to the benefit of the Member and its respective heirs, legal representatives, successors, and permitted assigns.

DEBTORSCL_009328

**Section 12.8   *Governing Law; Venue*.**  This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware.  The Member covenants and agrees that the state courts located in Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in Delaware shall have exclusive jurisdiction of any action or proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

**Section 12.9   *Severability*.**  If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the Member or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of  this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

**Section 12.10 *Further Assurances*.**   In connection with this Agreement and the transactions contemplated hereby, the Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.11 *Waiver of Certain Rights*.**  The Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

**Section 12.12 *Directly or Indirectly*.**  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**Section 12.13 *Counterparts*.**  This Agreement may be executed in any number of counterparts, including facsimile counterparts, with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

DEBTORSCL_009329

**IN WITNESS WHEREOF,** this Agreement has been executed as of the date set forth hereinabove.

**Blackjewel Holdings LLC**
**BY:** _____
**ITS:** _____

DEBTORSCL_009330

**SCHEDULE I**

**Blackjewel Holdings L.L.C.**                    **$10,000 Contribution**

DEBTORSCL_009331

Execution Version

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BLACKJEWEL HOLDINGS L.L.C.**

**A DELAWARE LIMITED LIABILITY COMPANY**

**JULY 14, 2017**

THE MEMBERSHIP INTERESTS (AS DEFINED HEREIN) GOVERNED BY THIS LIMITED
LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE
UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER
APPLICABLE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE
SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT
EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION
THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS
ON TRANSFERABILITY SET FORTH HEREIN AND IN THE OTHER INVESTMENT
DOCUMENTS (AS DEFINED HEREIN).

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BLACKJEWEL HOLDINGS L.L.C.
### A Delaware Limited Liability Company

This Limited Liability Company Agreement of Blackjewel Holdings L.L.C., a Delaware limited liability company (the "*Company*"), dated as of July 14, 2017 (the "*Effective Date*") is adopted, executed and agreed to, for good and valuable consideration, by the Company and the Members (both as defined below).

## RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on March 30, 2017 (the "*Formation Date*"), of a Certificate of Formation under and pursuant to the Act (such Certificate of Formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "*Certificate*"); and

**WHEREAS**, the parties hereto desire to enter into this Agreement in order to set forth their rights and obligations as Members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Act.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

## AGREEMENTS

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

**Section 1.1**    *Definitions*.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them in Exhibit A.  The Glossary of Defined Terms, which follows the Table of Contents, sets forth the location in this Agreement of the definition for each capitalized term used herein.

**Section 1.2**    *Construction*.  Unless the context requires otherwise:  (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America; (e) the word "including" means "including without limitation;" and (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto.

## ARTICLE 2

## ORGANIZATION

**Section 2.1** *Formation.* The Company was organized as a limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware, in accordance with and pursuant to the Act. All actions by any Member while making such filing are hereby ratified, adopted and approved. The rights and liabilities of the Members will be determined pursuant to the Act and this Agreement. To the extent that there is any conflict or inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement control and take precedence.

**Section 2.2** *Name.* The name of the Company is "Blackjewel Holdings L.L.C." and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select.

**Section 2.3** *Offices.* The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law. The principal office of the Company in the United States shall be at 1051 Main Street, Milton, West Virginia 25541 or such other place as the Board may designate, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate.

**Section 2.4** *Purposes.* The purpose of the Company shall be the leasing, acquisition, exploration, mining and development of coal properties in the United States (the "**Business Line**") and any business activity reasonably related thereto, to the extent not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity. In furtherance of such purpose, the Company may (a) acquire (i) coal leasehold interests, mineral interests and royalty interests, (ii) mines, plants, railways, facilities, equipment and other assets relating to such activities or properties and (iii) contracts, easements, servitudes, permits, licenses and other rights relating to the foregoing; (b) explore for, mine, develop, produce, store, treat, process, gather, transport, purchase and market synfuel, coal and coal byproducts and related hydrocarbons and minerals; (c) farm out, sell, abandon and otherwise dispose of Company assets; effectuate commodity hedging transactions in order to minimize the risks associated with the fluctuation of prices to be received by the Company from the sale of synfuel, coal and coal byproducts and related hydrocarbons and minerals from Company properties; and (d) take all such other actions incidental or ancillary to any of the foregoing as the Board may determine to be necessary or desirable.

**Section 2.5** *Foreign Qualification.* Prior to the Company's conducting business in any jurisdiction other than Delaware, to the extent that the nature of the business conducted requires the Company to qualify as a foreign limited liability company under the Law of that jurisdiction, the Company shall satisfy all requirements necessary to so qualify. At the request of the Company, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue,

2

DEBTORSCL_009357

and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**Section 2.6**   *Term.*  The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 11.

**Section 2.7**   *No State Law Partnership.*  The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member shall be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and state income tax purposes, and this Agreement shall not be interpreted to provide otherwise.  The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

**Section 2.8**   *Title to Company Assets.*  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.  Each of the Members hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the Company's assets partitioned.

## ARTICLE 3

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.1**   *Representations and Warranties of Each Member.*  Each Member (as to itself only) represents and warrants to the Company and the other Members (including other Members admitted after the date hereof) as follows:

(a)   <u>Organization; Existence</u>.  Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)   <u>Power; Qualification</u>.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)   <u>Authority; Enforceability</u>.  This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the other parties hereto, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally and by principles of equity.

3

DEBTORSCL_009358

(d)   <u>No Conflicts</u>.  The execution, delivery, and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment, or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)   <u>Investment Matters</u>.  Such Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities laws.  Such Member is an "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.  Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities." Such Member has knowledge of finance, securities and investments generally, experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company.

(f)   <u>LLC Agreement</u>.  Such Member understands that the Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement.

(g)   <u>No Brokers</u>.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company or any other Member; and such Member shall indemnify and hold harmless the Company and the other Members from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Members in connection with the Company or this Agreement.

(h)   <u>Survival of Representations and Warranties</u>.  All representations and warranties made by each of the Members in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

   **Section 3.2**   ***Representations and Warranties of the Company***.  The Company represents and warrants to the Members that:

(a)   It was formed in the State of Delaware on the Formation Date.

4

(b)    The Company is duly organized, validly existing and in good standing under the laws of Delaware and has all requisite power and authority to enter into this Agreement.

(c)    There are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the officers and managers of the Company, threatened against or affecting the Company.

(d)    Prior to the Effective Date, the Company has not conducted any business operations other than in connection (i) with its formation and capitalization and (ii) matters relating to the foregoing.

(e)    The Company has not owned any property or assets before the Effective Date.

<div align="center">

**ARTICLE 4**

**MEMBERS; UNITS**

</div>

**Section 4.1**    *Members.*

(a)    <u>Existing Members</u>.  Each of the Persons listed on <u>Schedule 1</u> hereto is hereby admitted as a Member as of the Effective Date.

(b)    <u>Additional Members</u>.  In addition to the Persons listed on <u>Schedule 1</u>, the following Persons shall be deemed to be Members and shall be admitted as Members without any further action by the Company, the Board or any Member:  (i) any Person to whom Units are Transferred by a Member so long as such Transfer is made in compliance with this Agreement, including <u>Exhibit B</u> and (ii) any Person to whom the Company issues Units after the Effective Date in compliance with this Agreement so long as the Board designates such Person as a "Member", which designation must be evidenced by an adoption of this Agreement and any other agreement reasonably specified by the Board.

(c)    <u>Cessation of Members</u>.  Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Section 9.2, which rights shall not cease), but such Person shall remain bound by Section 8.4.

**Section 4.2**    *Units.*

(a)    <u>Units; Class and Series</u>.  The Membership Interests of the Company shall be issued in unit increments (each, a "***Unit***").  The Company may also issue Membership Interests in fractional Unit increments.  From time to time, the Company may, subject to the terms of this Agreement, including Section 4.3, issue such Units as the Board reasonably determines to be in the best interests of the Company; provided, however, that, following the Effective Date, the Company may not issue any Units without the unanimous consent of the Board.  Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in Section 4.2(c) or otherwise as shall be fixed by the Board by resolution

<div align="center">5</div>

DEBTORSCL_009360

thereof.  The Board, in so fixing the designations, rights and preferences of any class or series of Units, may, subject to the terms of this Agreement, designate such Units as "Preferred Units", "Common Units", or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units.  The Board may increase the number of authorized Units in any then existing class or series. Upon due authorization of such issuances, the Board is hereby authorized, subject to this Agreement, to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations, preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units.  Each Member acknowledges and agrees that (i) any actions taken by the Company or the Board pursuant to this Section 4.2(a) (including the issuance of one or more classes or series of Units) shall not be deemed to materially adversely affect such Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director and (ii) any such amendment in connection with a duly authorized issuance of Units that is recommended by the Board may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution and tax allocation provisions of this Agreement to the extent approved by the Board.

(b)      Unit Certificates.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates.  As of the date hereof, Units are uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof.  In such event, the Board shall prescribe the forms of certificates to be issued by the Company including the forms of legends to be affixed thereto.  Any such certificate shall be delivered by the Company to the applicable record owner of the Units represented by such certificate.  Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code.  Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who shall certify the Units represented by such certificate.  Books and records reflecting the record ownership of the Units shall be kept by the Secretary.  In the event any Officer who shall have signed, or whose facsimile signature or signatures shall have been placed upon, any such certificate or certificates shall have ceased to be such Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such Officer at the date of issue.  The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed.  Each certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE**

6

DEBTORSCL_009361

SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY MAY BE REQUESTED BY THE COMPANY TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT).

THIS SECURITY MAY BE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JULY 14, 2017 (AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

(c)      Initial Unit Designations; Effective Date Issuances.

(i)      A class of Units designated as "*Senior Preferred Units*" is hereby created and a class of Units designated as "*Series A Units*" is hereby created.  The Company is authorized to issue as many Senior Preferred Units and Series A Units as the Board approves from time to time.  Schedule 1 lists the Members and the number of Senior Preferred Units and/or Series A Units issued to each of them as of the Effective Date.  The Board, without any action by any Member or any other Person, is authorized to amend and restate Schedule 1 from time to time to reflect the admission of new Members, the cessation of any Person as a Member and transfers and issuances of Units made, in each case, in accordance with this Agreement.

(d)      Voting Rights.  Unless otherwise specified in this Agreement or the resolution of the Board creating any class or series of Voting Units, all classes and series of Voting Units shall vote together as a single class on all matters.

**Section 4.3    *Preemptive Rights*.**

(a)      Except for Exempted Units, prior to the Company issuing, after the date hereof, any Units or any equity security having rights, preferences or priority as to distributions senior to or on parity with any then existing Units, whether on a stand-alone basis or in tandem with notes, warrants, loans or other financial accommodations (collectively, the "*Offered Units*") to a proposed purchaser (the "*Proposed Purchaser*"), each Investor, so long as (i) in the case of an Investor that is one of the Hoops Related Parties, the Hoops Related Parties continue to collectively own of record at least 20% of the number of Series A Units owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations) and (ii) such Hoops Related Party remains an Eligible Investor (each, an "*Eligible Purchaser*"), shall have the right to purchase the number of Offered Units as provided below in this Section 4.3.  "*Eligible Investor*" means any Person that is an "accredited investor" under Rule 501 of Regulation D of the Securities Act and who is not in default under this

7

Agreement. In order to confirm that a Person is an "Eligible Investor" for the foregoing purposes, the Company may require such Person to deliver customary investor eligibility certificates and documentation supporting the financial or other representations made therein.

(b) The Company shall give each Eligible Purchaser written notice of any proposed issuance of Offered Units to which the preemptive rights provisions of Section 4.3(a) apply (the "*First Notice*") not less than 15 days prior to any such issuance (the "*Initial Notice Period*"). The First Notice shall include (i) the proposed number and class of the Offered Units and a description of the rights and preferences of such class if such class is other than Senior Preferred Units or Series A Units; (ii) the prospective sale price per Unit; and (iii) any other proposed terms and conditions of such issuance and shall offer to each Eligible Purchaser the opportunity to purchase its Percentage Interest (which Percentage Interest shall be calculated as of the date of such notice) of the Offered Units at the same price, on the same terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company. If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company shall furnish a supplemental notice (a "*Supplemental Notice*") describing the revised terms; provided, the Supplemental Notice shall not restart the Initial Notice Period, but the Company shall give each Eligible Purchaser a reasonable period of time (no fewer than five Business Days after the Eligible Purchaser receives such Supplemental Notice, which shall, to the extent necessary, extend the Initial Notice Period) (such Initial Notice Period, as extended if applicable, being referred to as the "*Election Period*") to consider the revised terms. If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering written notice thereof to the Company prior to the expiration of the Election Period or such later date determined by the Company because of material changes in the terms of the issuance or for any other reason. Each Eligible Purchaser's notice shall state the dollar amount of Offered Units such Eligible Purchaser (each a "*Requesting Investor*") would like to purchase up to a maximum amount equal to such holder's Percentage Interest of the total offering amount plus the additional dollar amount of Offered Units such Requesting Investor would like to purchase in excess of its Percentage Interest (the "*Over-Allotment Amount*"), if any, if other Eligible Purchasers do not elect to purchase their full Percentage Interest of the Offered Units. The rights of each Requesting Investor to purchase a dollar amount of Offered Units in excess of each such Requesting Investor's Percentage Interest of the Offered Units shall be based on the Requesting Investors' relative Percentage Interests of the excess Offered Units.

(c) If all of the Offered Units are not fully subscribed by the Eligible Purchasers pursuant to the foregoing, the Company shall have the right to either (i) accept the partial subscriptions from the Eligible Purchasers and issue and sell the unsubscribed for portion of the Offered Units to the Proposed Purchaser (only on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable) at any time during the 90 days following the termination of the Election Period or (ii) cancel the entire offering (in which case any new offering will again be subject to the terms of this Section 4.3). The Board may, acting unanimously, impose such other reasonable and customary terms and procedures such as setting a closing date (no fewer than five Business Days after the expiration of the Election Period), rounding the number of Units covered by this Section 4.3 to the nearest whole Unit and requiring customary closing deliveries such as accredited investor certificates, unit powers, representations of ownership and absence of encumbrances in connection with any preemptive rights offering.

8

DEBTORSCL_009363

Except in the case of an Eligible Purchaser which withdraws its election to exercise its preemptive rights in any offering due to a material change in the terms and conditions of the offering occurring after its election, if any Eligible Purchaser refuses to purchase Offered Units for which it subscribed pursuant to the exercise of preemptive rights granted thereto under this Section 4.3, in addition to any other rights the Company may be permitted to enforce at law or in equity, the Board may require such Member and any Permitted Transferee thereof, in connection with exercising any future pre-emptive rights granted under Section 4.3 in connection with a future offering, to deposit with the Company, along with written notice of its election to exercise its rights hereunder, such funds as may be necessary to purchase the Offered Units subscribed for by such Person (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all) (any such deposit to be fully refundable if the offering is cancelled or if the Member is permitted to withdraw its subscription due to a material change in the terms and conditions of the offering occurring after its election, or partially refundable to the extent that the amount deposited exceeds the ultimate purchase price of the Units such Eligible Person is permitted purchase under this Section 4.3 for the applicable offering).

(d)     The rights granted to the Lime Rock Investors under this Section 4.3 may be transferred to any private equity fund that is an Affiliate of Lime Rock.  The rights granted to each Hoops Related Party in this Section 4.3 are personal to it and cannot be transferred including by Involuntary Transfer; provided, however, to the extent that a Hoops Related Party makes a Permitted Transfer of its Units, such transferee may, if so permitted by such Hoops Related Party, exercise its rights hereunder.

**Section 4.4     *Transfers of Units*.**  The Units shall be bound by, and the Members shall comply with, the terms set forth on Exhibit B hereto governing, among other matters, the Transfer of Units.

**Section 4.5     *Registration Rights*.**  Each Member understands and agrees that the Units issued on or prior to the date hereof have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act.  The Company shall comply with, and the Members shall comply with and be entitled to the benefits of, the provisions set forth on Exhibit C governing and providing for, among other matters, registration rights with respect to the registrable securities.

**Section 4.6     *Additional Terms Relating to Members*.**  No Member (a) has the right or power to Resign or (b) may be Expelled from the Company (other than in the event that such Member ceases to hold Units).

**Section 4.7     *Liability to Third Parties*.**  No Member shall be liable for the debts, obligations or liabilities of the Company, nor shall any Member be obligated to guaranty any debt, obligation or liability of the Company.

9

DEBTORSCL_009364

# ARTICLE 5

## CAPITAL CONTRIBUTIONS

**Section 5.1**    *Capital Contributions*.

(a)    *Initial Contributions*.  As of the Effective Date, each Member has made Capital Contributions to the Company equal to the amount set forth opposite such Member's name on Schedule 1 hereto in the column entitled "Capital Contributions" in exchange for the number and type of Units set forth opposite such Member's name in Schedule 1.  No Member shall have any obligation to make any Capital Contribution after the Effective Date.

**Section 5.2**    *Return of Capital Contributions*.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest with respect to either its Capital Account or its Capital Contributions.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 5.3**    *Advances by Members*.  Any Member may, with the consent of the Board, advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company on such terms as the Board and such Member mutually agree.

**Section 5.4**    *Capital Accounts*.

(a)    A separate capital account (a "*Capital Account*") will be maintained for each Member.  Each Member's Capital Account will be increased by:  (i) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Profits and other items of income and gain pursuant to Section 6.3 and Section 6.4.  Each Member's Capital Account will be decreased by:  (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Losses and other items of deduction and loss pursuant to Section 6.3 and Section 6.4.

(b)    In the event of a permitted sale or exchange of an interest the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred interest in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.4 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.4 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.4,

DEBTORSCL_009365

the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

## ARTICLE 6

## DISTRIBUTIONS; ALLOCATIONS

**Section 6.1**   *Distributions.*

(a)   *Regular Distributions.*   Available Cash and other property shall be distributed to the Members solely at such times and in such amounts as the Board shall determine and approve.  Subject to the remaining provisions of this Article 6, at any such time, distributions shall be made according to the following methodology and the following order of priority:

(i)   First, 100% to the holders of Senior Preferred Units in respect of each Senior Preferred Unit held of record thereby until there has been distributed under this Section 6.1(a)(i) an amount equal to the sum of (A) $100 and (B) an amount sufficient to reduce such Senior Preferred Unit's Senior Preferred Return Amount to $0, in respect of each Senior Preferred Unit held of record by all holders of Senior Preferred Units; and

(ii)   Second, 100% to the holders of Series A Units (pro rata in accordance with the number of Series A Units held by each).

(b)   [RESERVED]

(c)   [RESERVED]

(d)   For the avoidance of doubt, no Member shall be required to return cash to the Company pursuant to this Section 6.1(b) with respect to any class of Units in excess of the total distributions made to such Member in respect of such class of Units reduced by the Maximum Tax Liability attributable to such Units.

(e)   [RESERVED]

(f)   Notwithstanding the foregoing, other than upon the occurrence of a Dissolution Event, Internal Restructure or Sale Transaction, distributions shall not be made pursuant to Section 6. 1(a)(ii) and 6.1(a)(iii) to the extent such distributions would cause such holder's Capital Account (reduced by any tax distributions required to be made to such holder pursuant to Section 6.2) to be less than zero.

**Section 6.2**   *Tax Distributions.*  Notwithstanding anything to the contrary in Section 6.1, unless prohibited by applicable law or by any contract binding on the Company, prior to making any distribution under Section 6.1, the Company shall distribute cash to the Members at least five Business Days before estimated quarterly tax payments are due in respect of each of the quarters of each Fiscal Year on a pro rata basis based on the Board's good faith estimate of the projected Maximum Tax Liability of each Member, assuming a reasonable projection of the Company's annual Net Profit for the Fiscal Year.  The Company shall not have any liability to a Member for

11

DEBTORSCL_009366

penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments. Any distributions made pursuant to this Section 6.2 shall be treated as an advance payment of, and shall reduce by a like amount, the amounts otherwise distributable to such Member pursuant to Section 6.1.

**Section 6.3** *Allocations of Net Profits and Net Losses*. After giving effect to the allocations under Section 6.4, except as otherwise provided herein, for purposes of maintaining the Capital Accounts, Net Profit and Net Loss for each Fiscal Year or other period shall be allocated among the Members in such a manner as shall cause the Capital Accounts of the Members (as adjusted to reflect all allocations under Section 6.4 and all distributions through the end of such period) to equal, as nearly as possible, (a) the amount such Members would receive if all assets of the Company on hand at the end of such period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of Nonrecourse Liabilities to the Book Value of the property securing such liabilities) and all remaining cash were distributed to the Members under Section 11.02(c) minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount any such Member is treated as obligated to contribute to the Company, computed immediately after the hypothetical sale of assets.

**Section 6.4** *Regulatory Allocations*.

The following allocations shall be made in the following order:

(a)  Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Sharing Ratios.

(b)  Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4). If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss. This Section 6.4(b) is intended to comply with the provisions of Treasury Regulation Section 1.704- 2(i) and shall be interpreted consistently therewith.

(c)  Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(c)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)). This Section 6.4(c) is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(d)  Notwithstanding any provision hereof to the contrary except Section 6.4(c) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum

DEBTORSCL_009367

Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year) and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(d), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).   This Section 6.4(d) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)    Notwithstanding any provision hereof to the contrary except Section 6.4(c) and Section 6.4(d) (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible.   This Section 6.4(e) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)    In the event that any Member has a negative Capital Account at the end of any Fiscal Year, such Member shall be allocated items of Company gross income and gain in the amount of such deficit as quickly as possible; provided that an allocation pursuant to this Section 6.4(f) shall be made only if and to the extent that such Member would have a negative Capital Account after all other allocations provided for in this Section 6.4 have been tentatively made as if this Section 6.4(f) were not in this Agreement.

(g)    To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) or 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

**Section 6.5    *Curative Allocations*.**  The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.   The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Board is authorized to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero.  The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

DEBTORSCL_009368

**Section 6.6**     *Income Tax Allocations*.

(a)     All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as otherwise provided in this Section 6.6.

(b)     In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using the "traditional method" with no curative or remedial allocations.  In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Regulations thereunder.

(c)     Any (i) recapture of depreciation, depletion, "section 1254" costs or any other item of deduction shall be allocated, in accordance with Treasury Regulations Sections 1.1245-l(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of remedial allocations), and (ii) recapture of credits shall be allocated to the Members in accordance with applicable law.

(d)     Allocations pursuant to this Section 6.6 are solely for purposes of federal, state, and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**Section 6.7**     *Other Allocation Rules*.

(a)     All items of income, gain, loss, deduction and credit allocable to a Membership Interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as the owner of such Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Code Section 706 and the regulations thereunder.

(b)     The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be determined in accordance with their Sharing Ratios (relating solely to the Senior Preferred Units and Series A Units).

**Section 6.8**     *Limitation Upon Distributions*.  No distribution shall be declared and paid unless, after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities or if the declaration or payment would cause the Company or any of its Subsidiaries to breach any material agreement.

14

DEBTORSCL_009369

**Section 6.9**      ***Withholding Authorized.*** The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign law. All amounts required to be withheld pursuant to federal, state, local or foreign tax laws shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

## ARTICLE 7

## MANAGEMENT

**Section 7.1**      ***Management by Directors.*** The Company shall be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7, except with respect to certain consent or approval requirements provided in this Agreement, no Member by virtue of having the status of a Member shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company. The "managers" are referred to as "Directors" throughout this Agreement. The business and affairs of the Company shall be managed by the Board of Directors of the Company (the "***Board***", in accordance with this Agreement. Under the direction of the Board, to the extent that the Board designates Officers pursuant to Section 7.5, the day-to-day activities of the Company shall be conducted on the Company's behalf by the Officers, who shall be agents of the Company. In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, the Board shall have full power and authority to do all things on such terms as they may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company.

**Section 7.2**      ***Board of Directors.*** Each Member agrees that it will cast all votes ascribed to its Units, if any, or execute consents, as the case may be, and take all other necessary action (including causing the Company to call a special meeting of Members) in order to elect individuals, who have been nominated in accordance with the remaining provisions of this Section 7.2, to serve as Directors of the Board and otherwise to ensure that the composition of the Board is at all times consistent with the following:

      (a)     <u>Composition; Initial Directors; Observation Rights</u>.

          (i)     The Board shall consist of natural persons who need not be Members or residents of the State of Delaware. Subject to the remaining provisions of this Section 7.2, the Board shall consist of three Directors, and the nominees to stand for election to serve as Directors shall be designated as follows: (A) one individual nominated by Hoops (the "***Hoops Designee***"), so long as (x) Jeffrey A. Hoops, Sr., remains employed with the Company and (y) the Hoops Related Parties continue to collectively own of record at least 20% of the number of Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations); and (B) two individuals nominated by the Lime Rock Investors (each, a "Lime Rock Designee"). The initial Lime Rock Designees are John T. Reynolds and Jeffrey B. Scofield. The Hoops Designee shall be Jeffrey A. Hoops, Sr., Patricia A.

<div align="center">15</div>

DEBTORSCL_009370

Hoops, or any of their descendants and shall initially be Jeffrey A. Hoops, Sr. In the event that Hoops' right to nominate the Hoops Designee terminates as provided above, the Lime Rock Designees, acting jointly, shall have the right to require the Hoops Designee's resignation from the Board. Thereafter, the Lime Rock Designees can either elect to fill the vacancy on the Board created by the removal or reduce the size of the Board to eliminate the vacancy on the Board created by such removal. The Company shall allow up to two representatives designated by the Lime Rock Investors and, so long as the Hoops Related Parties continue to collectively own of record at least 20% of the Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations), up to two representatives designated by Hoops to attend all meetings of the Board in a nonvoting capacity, and in connection therewith, the Company shall give such representative copies of all notices, minutes, consents and other materials, financial or otherwise, which the Company provides to the Board; provided, however, that such representative shall agree to hold in confidence and trust all such information pursuant to a confidentiality agreement satisfactory to the Company; provided further, however, that the Company reserves the right to exclude such representatives from access to any material or meeting or portion thereof if the Company believes that (i) such exclusion may be helpful or necessary to preserve the attorney- client privilege or (ii) the presence of such representative could materially impair due consideration of the Board with respect to certain competitively sensitive matters, proprietary information and other similar matters (and the Company shall not be obligated to provide the representative with any related materials provided to the Board).

(ii)     [RESERVED]

(iii)     Except as otherwise provided herein and for so long as such Person has the right to designate any Director, the Lime Rock Investors shall have the right to designate alternate or successor Directors (in lieu of the Lime Rock Designees), who may replace any absent or disqualified Director who was designated thereby; and Hoops shall have the right to designate alternate or successor Directors (in lieu of any Hoops Designee), who may replace any absent or disqualified Director who was designated thereby.

(iv)     Each individual elected to serve on the Board in accordance with this Section 7.2 shall serve until a successor is duly nominated and elected to serve in his stead, or until his removal in accordance with Section 7.2(c), voluntary resignation, death or disability, as applicable.

(v)     The chairperson of the Board, if any, shall be designated by the majority vote of all the Directors.

(b)     <u>Vacancies</u>.  Any vacancy created by the death, disability, retirement, resignation or proper removal (*i.e.*, removal in accordance with Section 7.2(c)) of any individual designated under Section 7.2(a) (a "***Former Director***") shall be filled by a nominee designated by the Person that designated the applicable Former Director under Section 7.2(a) unless such Person no longer has the right to designate a nominee to serve as a Director.

16

DEBTORSCL_009371

(c) <u>Removal</u>.  Except as provided in Section 7.2(a)(i), a Director nominated in accordance with Section 7.2(a) may not be removed from the Board during his or her term of office except by the Person or Persons authorized to nominate such Director or for Cause (it being understood and agreed that such Person authorized to nominate a successor to the removed Director shall be permitted to designate a different natural person as successor to the removed Director).

(d) <u>Quorum; Required Vote for Board Action</u>.  Each Director shall be entitled to cast one vote, in person or by proxy, with respect to each matter submitted for the vote or consent of the Board.  If only one Lime Rock Designee attends any meeting of the Board, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that is absent from such meeting.  If there is one or more vacancy on the Board because the Lime Rock Investors have yet to nominate both of the Lime Rock Designees, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that has yet to be nominated.  Directors then serving on the Board *(i.e.,* excluding any vacancies on the Board) that are entitled to cast a majority of the votes that may be cast by all of the Directors then serving on the Board must be present in order to constitute a quorum for the transaction of business of the Board.  The act of a majority of the Directors present, in person or by proxy, at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by the Act, the Certificate of Formation or by this Agreement (including Section 7.2 hereof).  A Director who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered into the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favor of such action.

(e) <u>Location; Order of Business</u>.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f) <u>Meetings of the Board; Notices</u>.  The Board shall meet at least quarterly. Regular meetings of the Board shall be held at such places as shall be designated from time to time by resolution of the Board.  Special meetings of the Board may be called by any Investor on at least five days personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each Director, with such notice containing a statement of the purposes for such special meeting.  If a Hoops Designee is not able to attend a special meeting, such Director shall promptly send personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each other Director of such Director's inability to attend the special meeting and, unless otherwise agreed, the special meeting shall be rescheduled to a date not later than ten Business Days from the original date of such special meeting.

(g) <u>Reimbursement; Compensation</u>.  All Directors shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including travel expenses in accordance with the Company's travel reimbursement policies.

17

**Section 7.3** *Meetings of the Members*.

      (a)    <u>Place of Meetings</u>.  All meetings of the Members shall be held at the principal office of the Company, or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice) thereof.

      (b)    <u>Quorum; Required Vote for Member Action; Adjournment of Meetings</u>. Except as expressly provided otherwise by this Agreement, the holders of a majority of the Voting Units then outstanding, voting together as a single class, and entitled to vote at any meeting of Members, present in person or represented by proxy thereat, shall constitute a quorum at any such meeting for the transaction of business, and the affirmative vote of the holders of a majority of the Units so present or represented at such meeting, voting together as a single class, at which a quorum is present shall constitute the act of the Members.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

      (c)    <u>Annual Meetings</u>.  An annual meeting of the Members for the election of Directors to succeed those Directors serving on the Board whose terms expire and for the transaction of such other business as may properly be considered at the meeting may be held at such place, within or without the State of Delaware, on such date, and at such time as the Board shall fix and set forth in the notice of the meeting; provided, until such time as a meeting of Members shall be called in accordance with this Section 7.3, the Directors shall continue to serve until their resignation or removal in accordance with Section 7.2.  In lieu of annual meetings, which are not a requirement for any purpose, the Members may elect Directors by written consent.

      (d)    <u>Record Date</u>.

          (i)    The Board shall give at least 10 days personal, written or wireless notice *(e.g.,* e-mail) of any meetings of the Members of the Company.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.

          (ii)    If, in accordance with this Agreement, action without a meeting of Members is permitted to be taken, the Board may fix a record date for determining Members entitled to consent in writing to such action, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed

18

by the Board, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or to an Officer of the Company having custody of the book in which proceedings of meetings of Members are recorded.

(iii)    A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

**Section 7.4    *Provisions Applicable to All Meetings*.**  In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions shall apply:

(a)    <u>Waiver of Notice Through Attendance</u>.  Attendance of a Person at such meeting (including attendance by telephone pursuant to Section 7.4(d)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)    <u>Proxies</u>.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a Members meeting may vote at a Members meeting by a written proxy executed by that Person and delivered to the Secretary.  A proxy shall be revocable unless it is stated to be irrevocable.

(c)    <u>Action by Written Consent</u>.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by all of the Directors or members of a committee of the Board or the Members, as applicable.

(d)    <u>Meetings by Telephone</u>.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment shall be given full effect.

**Section 7.5    *Officers*.**  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company (*"Officers"*), and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described by resolution of the Board or as is customary for each such position.  In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person." An employee or other agent of the

19

DEBTORSCL_009374

Company shall not be an authorized person unless specifically appointed as such by the Board. Duly elected and designated Officers shall have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board; provided, notwithstanding anything to the contrary herein, unless such acts have been approved by the Board, the Officers shall not have the power or authority to cause or permit the Company to do or perform any of the following:

(a)     Incur any indebtedness or make any loan other than trade payables incurred in the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(b)     Sell, assign, convey or otherwise dispose of assets or properties of the Company outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(c)     Make any capital expenditure outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(d)     Approve or amend any capital or operating budget;

(e)     Mortgage, pledge, assign in trust or otherwise encumber or permit to be encumbered any of the Company assets outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board; or

(f)     Enter into any transaction with a Member or an Officer or an Affiliate of a Member or an Officer.

**Section 7.6     *Duties of Directors and Members*.**

(a)     To the fullest extent permitted by the Act, a person, in performing his duties and obligations as a Director under this Agreement, shall be entitled to act or omit to act at the direction of the Members that designated such person to serve on the Board, considering only such factors, including the separate interests of the designating Members, as such Director or Members choose to consider, and any action of a Director or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Director or Members designating such Director, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Director or Members of the Company or any other Director or Member.

(b)     The Members (in their own names and in the name and on behalf of the Company) hereby:

(i)     agree that (A) the terms of this Section 7.6, to the extent that they modify or limit a duty or other obligation, if any, that a Director may have to the Company or any another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this Section 7.6 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have

20

DEBTORSCL_009375

to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

(ii) waive to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.6.

(c) The Members (in their own names and in the name and on behalf of the Company), acknowledge, affirm and agree that (i) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 7.6, and (ii) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

## ARTICLE 8

## ADDITIONAL COVENANTS

**Section 8.1**    *Reports*.   Except as expressly stated otherwise, the Company shall deliver the following reports and information to the Investors:

(a)    Annual Reports.

(i) As soon as available and in any event within 90 days after the end of each Fiscal Year, a consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related consolidated and consolidating statements of operations, members' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified without qualification to the Board by an Accounting Firm as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

(ii) As soon as available and in any event within 90 days after the end of each Fiscal Year, the Company shall deliver a reserve report prepared in accordance with applicable SEC guidelines by an independent engineer approved by the Board with respect to the coal reserves of the Company and the Subsidiaries.

(iii) Prior to year-end, an annual capital and operating budget for the coming year, that shall be approved by the Board (as the same may be modified as approved by the Board on a month-to-month basis).

(b)    Monthly Reports.   As soon as practicable and in any event within 30 days after the end of each calendar month (including the last calendar month of the Company's Fiscal Year), a management report discussing the financial condition and operations of the Company and its Subsidiaries for the most recent period ended for which information is available, all in reasonable detail and certified by an officer of the Company as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance

21

with GAAP, as applied consistently with the Company's practices, and with the audited financial statements of the Company, excluding customary footnotes and year-end adjustments.

(c)     Weekly Reports.  Upon the request of the Lime Rock Investors, the Chief Executive Officer shall hold a weekly conference call during which management shall describe significant issues and events which have occurred during the previous week or which are expected to occur during the coming week (or such other reasonably relevant time frame as requested by the Lime Rock Investors).  The Lime Rock Investors shall be afforded the opportunity to ask questions regarding the information presented.  Notice of such conference call and the call-in number therefore shall be made available to the Lime Rock Investors and the Chief Executive Officer not less than 48 hours prior to the commencement of such conference call.

(d)     Other Information.

(i)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors notice of:  (A) any default in any material respect under any material agreement to which the Company or any Subsidiary is a party; (B) any material lawsuit or proceeding against the Company or any Subsidiary or executive officers, in their capacities as such executive officer; and (C) any other material change, event or circumstance affecting the Company, any Subsidiary or any executive officer, in their capacity as such executive officer, thereof.

(ii)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors with copies of all material communications relating to any interest expressed by third-parties to engage in a Sale Transaction and all reasonable terms and other detail expressed in connection with such interest.

(iii)     Within five Business Days of the Company's receipt thereof, the Company shall provide the Lime Rock Investors with copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Company or any of its Subsidiaries to its Members, (B) all regular and periodic reports and all registration statements and prospectuses filed by the Company or any of its Subsidiaries with any securities exchange quotation system or service or with the SEC or any successor, (C) all press releases and other statements made available generally by the Company or any Subsidiaries concerning material developments in the business of the Company or its Subsidiaries and (D) all material communications with and from Federal, state or major municipal regulatory agencies or other governmental authorities, excluding any communications that are usual, customary, and in the ordinary course of the business of the Company and its Subsidiaries.

(iv)     The Company shall promptly (but in any event within five Business Days) provide to a Member any other information reasonably requested by such Member.

(v)     To each Member, as soon as available, but in no event more than 90 days after the end of each year, a copy of all tax information required to be provided to members, including but not limited to Schedules K-1.

22

**Section 8.2** *Inspection Rights.* Each Investor and its duly authorized representatives shall be permitted, during normal business hours and upon reasonable advance notice to the Company, to (a) inspect the books, records, contracts and agreements of the Company and the Subsidiaries for any proper purpose and make copies thereof and (b) obtain any information reasonably requested by such Member relating to the Company and the Subsidiaries. All costs incurred in such inspection will be borne by the requesting Member; provided, that if it is determined that the Company or its Subsidiaries is in breach of this Agreement, then such costs will be borne by the Company.

**Section 8.3** *Internal Restructure.*

(a)     The Company, upon the unanimous approval of the Board, may affect an Internal Restructure on such terms as the Board in good faith deems advisable; provided that each Member (and if applicable, the stockholders, members, partners, trustees or other equity owners of an entity or trust Member, as applicable) is treated equitably and incurs no personal liability with respect to such Internal Restructure. Each Member agrees that it will consent to and raise no objections to such an Internal Restructure, in accordance with this Section 8.3, that has been unanimously approved by the Board. Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this Section 8.3) to be executed by such Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement, including, without limitation, relative equity ownership percentages among the holders of a series or class of Units, relative pro rata distribution rights among the holders of a series or class of Units, pre-emptive rights (except in connection with a public offering of the Company), those provisions granting the Board authority to manage the affairs of the Company, and granting certain Persons the right to nominate and cause the election of Directors, governing Transfers of Units or other equity securities and indemnification.

(b)     The Members acknowledge that an Internal Restructure may be undertaken in connection with a public offering of the Company, an acquisition of another business or entity or the sale of equity in the surviving entity to other Persons.

(c)     Upon the consummation of an Internal Restructure, the surviving entity or entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company. The governing instruments of the surviving entity shall incorporate the governance provisions of this Agreement as closely as practicable. All Members shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Company in connection with consummating an Internal Restructure (in accordance with this Section 8.3) including voting for or consenting thereto.

(d)     Notwithstanding anything to the contrary in this Section 8.3, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a public offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby and such Member is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to

23

DEBTORSCL_009378

otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a Purchaser Representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.  No Member shall have any dissenters' or appraisal rights in connection with any Internal Restructure, and each Member hereby votes in favor of such Internal Restructure and agrees to execute such further instruments as the Company reasonably requests to further evidence the waiver of any such dissenters' or appraisal rights.

(e)    Each Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions of this Section 8.3.

**Section 8.4** *Confidentiality*.    The Members acknowledge that they may receive information from or regarding the Company, any of its Subsidiaries, the other Members, or Affiliates of any of the foregoing in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing.  Each Member shall hold in confidence and not disclose any confidential or proprietary information it receives regarding the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing that is identified as confidential and may not disclose it to any Person other than another Member except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) to Affiliates, advisers or representatives of the Member (provided that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Affiliates, advisors and/or representatives to whom it discloses such information), (c) of information that the Member also has received from a source independent of the Company, any of its Subsidiaries, other Member, or Affiliates of any of the foregoing, as applicable, that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (d) to any Person to which such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and shall disclose only that portion of such information required to be disclosed), (f) permitted by the Company or Member affected by such disclosure, as applicable, (g) by any Member that is a private equity fund, hedge fund or institutional investor to its investors, partners or Affiliates (exclusive, however, of any portfolio company or any of their officers, directors, employees or owners, other than such Member); provided, that such Member remains liable for any breach of this provision by its investors, partners and Affiliates to whom it discloses

24

DEBTORSCL_009379

such information, or (h) by any private equity fund, hedge fund or institutional investor of confidential information to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Person reasonably deems necessary or appropriate in connection with such Person obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information and that the information permitted to be so disclosed shall in no event include the identity of any direct or indirect owner of any Member or any information regarding such Person's direct or indirect ownership in any Member.  The Members agree that breach of the provisions of this Section 8.4 may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this Section 8.4.  Accordingly, the Members agree that the provisions of this Section 8.4 may be enforced by specific performance.

Section 8.5    *Business Opportunities.*

(a)    Company Opportunities.  The Company and each Member recognize Lime Rock and its Affiliates are private equity funds, hedge funds and institutional investors and that they, their partners or investors (such persons, together with the operating companies described in this sentence, are collectively referred to as the "*Fund Group*" and individually as a "*Fund Group Member*") invest in, serve on the board of directors and other governing boards of, serve as officers of, provide services to and have minority and controlling ownership interests in existing and future operating companies.  Except for the confidentiality obligations contained in Section 8.4, nothing in this Agreement or the nature of the existing or any future relationship between any Fund Group Member, on the one hand, and the Company or any Member, on the other (whether such relationship is by reason of any Fund Group Member acting as a lender, owner of equity interests or warrants, landlord, service provider or otherwise), will prohibit any Fund Group Member from engaging in any activity or business opportunity whatsoever for its own account or will require any Fund Group Member to make any business opportunity available to the Company, in each case, even if such activity or business opportunity competes with the Business Line or any other business conducted by the Company.

(b)    Renunciation of Company Opportunities.  The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Fund Group Member participates in or desires to participate in including those that may involve any aspect related to the Business Line or any other business conducted by the Company (each such business opportunity is referred to as a "*Fund Renounced Business Opportunity*").  No Fund Group Member shall have any obligation to communicate or offer any Fund Renounced Business Opportunity to the Company, and any Fund Group Member may pursue any Fund Renounced Business Opportunity solely for its own account.

Section 8.6    *VCOC Related Rights.*  So long as any Lime Rock Investor is a Member or owns, directly or indirectly, any ownership interest in the Company, such Lime Rock Investor shall have the right under this Agreement to consult with and advise the management of the Company and any of its subsidiaries (including the right to meet with management personnel at least quarterly at the request of such Lime Rock Investor) on matters relating to the business and

DEBTORSCL_009380

financial affairs of the Company and any of its subsidiaries. The rights granted to each Lime Rock Investor under this Section 8.6 are intended to constitute "management rights" within the meaning of U.S. Department of Labor Regulation § 2510.3-101 (d)(3)(ii), and the Company and its subsidiaries will be operated consistent with the status of the Company as a "venture capital investment" of the Lime Rock Investors. The involvement of any Lime Rock Investor as contemplated in this Section 8.6 is for the purpose of informing such Lime Rock Investor with respect to various Company and subsidiary matters and receiving any ideas and suggestions that such Lime Rock Investor may have with respect to Company and subsidiary matters but is not otherwise intended to change the governance of the Company or any of its subsidiaries as more particularly set forth in this Agreement. Notwithstanding anything to the contrary contained in this Section 8.6, the Board shall have full and exclusive power and authority on behalf of the Company and its subsidiaries to acquire, manage, control, administer and operate the property, business and affairs of the Company and its subsidiaries in accordance with Article 7 and the other applicable provisions of this Agreement.

<div align="center">

**ARTICLE 9**

**EXCULPATION AND INDEMNIFICATION**

</div>

**Section 9.1** *Exculpation.* No Director or Officer in his capacity as such and no Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (a) liability for acts that involve fraud, willful misconduct or gross negligence and (b) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (a) and (b) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator. Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Director, Affiliate or Officer thereof breached the standard of care set forth above in this Section 9.I. In addition, by resolution of the Board, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Director or Officer is exculpated under this Section 9.1.

**Section 9.2** *Indemnification.* Subject to the limitations set forth in this Article 9, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "***Proceeding***"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was an Officer or Director or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this Section 9.2, indemnified by the Company to the fullest extent permitted by the Act, as the

DEBTORSCL_009381

same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 9 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. Notwithstanding anything to the contrary in this Section 9.2, a person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such person seeks indemnification, such person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company or that such person's actions constituted fraud, willful misconduct or gross negligence. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

**Section 9.3** *Advance Payment.* The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

**Section 9.4** *Indemnification of Employees and Agents.* The Company, by adoption of a resolution of the Board, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company who is not an Officer or Director to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Directors under this Article 9.

**Section 9.5** *Appearance as a Witness.* Notwithstanding any other provision of this Article 9, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by an Officer or Director or Member in connection with its appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

**Section 9.6** *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right that an Officer or Director or other Person indemnified pursuant to this Article 9 may have or hereafter acquire by vote of the Board. The Company hereby acknowledges that the Lime

DEBTORSCL_009382

Rock Designees have certain rights to indemnification, advancement of expenses and/or insurance provided by Lime Rock and certain of its Affiliates (collectively, the "*Fund Indemnitors*"). The Company hereby agrees (i) that it is the indemnitor of first resort with respect to the Lime Rock Designees (*i.e.*, its obligations to the Lime Rock Designees are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Lime Rock Designees are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Lime Rock Designees and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights a Lime Rock Designee may have against the Fund Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of a Lime Rock Designee with respect to any claim for which such Lime Rock Designee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Lime Rock Designee against the Company. The Company and each of the Members acknowledges that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 9.6).

**Section 9.7    *Insurance*.** Without limiting the Company's other obligations under this Article 9 and as soon as practicable, the Company shall procure and at all times maintain directors and officers liability insurance policies on customary terms, and all of the Officers and Directors, current and former, shall be included as insureds under such policies. Without limiting the Company's other obligations under this Article 9, the Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as an authorized person, authorized signatory, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

## ARTICLE 10

## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

**Section 10.1    *Tax Returns*.** The Company shall prepare and timely file all tax returns and reports required to be filed by the Company. Unless otherwise agreed by the Directors, any income tax return of the Company shall be prepared by the Accounting Firm. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a Schedule K-1 to each of the Members as soon as practicable after the close of each taxable year, but in no event later than 90 days after the end of each year, together with such additional information as may be required by the Members in order for the Members to

DEBTORSCL_009383

file their individual returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filing of its tax returns and reports.

Section 10.2  *Tax Partnership*.  The Members acknowledge that, subject to Section 8.3 and the impact of an Internal Restructure, the Company shall be treated as a partnership for Federal income tax purposes and will not otherwise characterize the Company for purposes of any Federal tax returns, statements or reports filed by them or their Affiliates.

Section 10.3  *Tax Elections*.  The Company shall make the following elections on the appropriate tax returns:

(a)    to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Tax Matters Member designates;

(b)    to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method unless the cash method of accounting is available and the Tax Matters Member designates the cash method of accounting for use by the Company;

(c)    if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Tax Matters Member determines that the Code Section 754 election is in the best interests of the Company and the other Members, and so long as the Board consents to such election;

(d)    to elect to amortize the organizational expenses of the Company ratably over a period of 180 months as permitted by Code Section 709(b);

(e)    any election that would ensure that the Company will be treated as a partnership for Federal income tax purposes; and

(f)    any other election the Board may deem appropriate and m the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

Section 10.4  *Tax Matters Member*.

(a)    <u>Designation by the Board</u>.  The "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code shall be Lime Rock, or such other Member designated as such by the Board from time to time.  Any Member who is designated as the "tax matters partner" is referred to herein as the "***Tax Matters Member***."  The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.  The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its

29

DEBTORSCL_009384

capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

       (b)    <u>Duties and Obligations</u>. The Tax Matters Member shall take no action without the authorization of the Board, other than such action as may be required by Law. Any cost or expense incurred by the Tax Matters Member in connection with its duties as such, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company. The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board. The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the written consent of such Member. Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 623 I (a)(3)) shall notify the other Members of such settlement agreement and its terms within 30 days from the date of the settlement.

       (c)    <u>Requests for Administrative Adjustments by Members</u>. No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members. If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within 30 days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf. Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

       (d)    <u>Notice of Inconsistent Treatment</u>. If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

       (e)    For any taxable year for which the Bipartisan Budget Act is applicable, Lime Rock shall be the "Partnership Representative" as that term is defined in Section 6223(a) of the Amended Code and each Member shall take all actions necessary to cause Lime Rock to be so designated in accordance with any procedures prescribed therefor. Unless determined otherwise by the Board and unless prohibited by applicable Law, the Company shall elect the alternative method of paying any imputed underpayment resulting from any Company adjustment as provided by Section 6226 of the Amended Code and each Member shall take any and all actions necessary to effect such election, including but not limited to the filing by each Member of amended returns and the payment of any tax, including any interest, penalties, or additions to such tax, resulting from the "imputed underpayment". If such election is not made, the Company shall take commercially reasonable actions to minimize the financial burden of any imputed underpayment

DEBTORSCL_009385

to the Company and the Members through the procedures established pursuant to Section 6225 of the Amended Code, including, to the extent permissible under this Agreement, taking any commercially reasonable actions to allocate the financial burden of any imputed underpayment to the Member(s) to whom such amounts are specifically attributable (whether as a result of their tax status, actions, inactions, or otherwise), unless taking such actions would preclude judicial review of an adjustment arising out of such audit, as determined by the Partnership Representative. The Company shall not elect to apply the partnership audit rules, as added by the Bipartisan Budget Act, to taxable years of the Company earlier than is required (without such election). The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Treasury Regulations issued thereunder. The Partnership Representative shall have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The provisions contained in this Section 10.4(e) shall survive the termination of the Company and the withdrawal of any Member.

**Section 10.5   *Bank Accounts*.** The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Board may determine. The Company shall not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

**Section 10.6   *Fiscal Year*.** The fiscal year of the Company (the "*Fiscal Year*") shall end on December 31 of each calendar year unless, for United States Federal income tax purposes, another fiscal year is required. The Company shall have the same fiscal year for United States Federal income tax purposes and for accounting purposes.

## ARTICLE 11

## DISSOLUTION, WINDING-UP AND TERMINATION

**Section 11.1   *Dissolution*.**

(a)      General.   Subject to Section 11.l(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "*Dissolution Event*"), and no other event shall cause the Company's dissolution:

(i)       the approval of the Board; and

(ii)      the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)      Continuance of the Company.   To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

DEBTORSCL_009386

**Section 11.2   *Winding-Up and Termination*.**   On the occurrence of a Dissolution Event, the Board may, acting unanimously, select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind-up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)     Accounting.  As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)     Satisfaction of Obligations.  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 5.3); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)     Distribution of Assets.  All remaining assets of the Company shall be distributed to the Members as follows:

(i)     the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the provisions of Sections 6.3, 6.4, and 6.5;

(ii)     with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)     the property of the Company shall be distributed in accordance with Section 6.1 (with no part distributed under Section 6.2).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 11.2; provided, however, that no Member shall be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act;

32

DEBTORSCL_009387

provided, however, that no Member shall be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)     Final Capital Account Balances. The Members intend that the allocations provided under Sections 6.3, 6.4, and 6.5 will produce final Capital Account balances for the Members that permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made in the order and priorities set forth in Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1). If the allocations otherwise made under Sections 6.3, 6.4, and 6.5 would fail to produce such final Capital Account balances, the Board shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

**Section 11.3** *Deficit Capital Accounts*. No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**Section 11.4** *Certificate of Cancellation*. On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company. Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE 12

## GENERAL PROVISIONS

**Section 12.1** *Books*. To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**Section 12.2** *Offset*. Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset.

**Section 12.3** *Notices*. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it. Notices given by telecopy shall be deemed to have been received (a) on the day on which the sender receives return confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business

DEBTORSCL_009388

Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on <u>Schedule 1</u> or such other address as that Member may specify by notice to the other Members.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

      **Section 12.4   *Entire Agreement; Supersedure*.**   This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Members, and their respective Affiliates relating to the formation and operation of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

      **Section 12.5   *Effect of Waiver or Consent*.**   A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

      **Section 12.6   *Amendment or Restatement*.**   Except as expressly set forth herein, this Agreement (including the Exhibits and Schedules) may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon unanimous Board approval); provided, (a) any amendment to this Agreement that would (i) obligate a Member to make a Capital Contribution to the Company (other than as provided by the terms of this Agreement in effect as of the Effective Date), (ii) cause a Member to have personal liability for Company obligations, (iii) materially adversely affect any Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director (other than any amendment related to an Internal Restructure in connection with an initial public offering) unless, with respect to each of the matters described in this clause (iii), such amendment (A) similarly affects all holders of a particular class of Units <u>AND</u> is approved by the holders of a majority of such class of Units or(B) similarly affects all holders of Senior Preferred Units and Series A Units <u>AND</u> is approved by the holders of a majority of all Senior Preferred Units and Series A Units voting as a single class, or (iv) adversely affect any Member's consent rights under this Section 12.7, shall be effective only with the consent of such Member, (b) to the extent that a provision of this Agreement requires a specified vote of the Members, or the vote of some or all of the holders of a specified class or series of Units, then any amendment of that provision will also require the consent of such specified vote of the Members or the vote of the requisite holders of such specified class or series of Units, as applicable, and (c) the Company (upon Board approval) may amend <u>Schedule 1</u> without the consent of any Person to reflect new Members admitted in accordance with this Agreement, changes to the notice addresses and other similar relevant information.  The Certificate may be amended or restated only with the approval of the Company (upon Board approval), provided, however, that no such amendment or restatement of the Certificate may effect any change described in Section 12.7(a) or (b) above without the consent of the Member or Members whose consent would be required

34

DEBTORSCL_009389

under such clauses if such change were being effected through an amendment or restatement of this Agreement.

**Section 12.7** *Binding Effect*. This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

**Section 12.8** *Governing Law; Venue*. This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware. The Members covenant and agree that the state courts located in Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in Delaware shall have exclusive jurisdiction of any action or proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

**Section 12.9** *Severability*. If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control. If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

**Section 12.10** *Further Assurances*. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.11** *Waiver of Certain Rights*. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

**Section 12.12** *Directly or Indirectly*. Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**Section 12.13** *Counterparts*. This Agreement may be executed in any number of counterparts, including facsimile counterparts, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**[SIGNATURES CONTAINED ON FOLLOWING PAGE]**

35

DEBTORSCL_009390

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

<div align="center">

**COMPANY**:

</div>

**BLACKJEWEL HOLDINGS L.L.C.**

By: _____
Name: Jeffery A. Hoops, Sr.
Title: President and Chief Executive Officer

**MEMBERS**:

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P.,
its general partner

By:  LRP GP V, Inc.,
its general partner

By:_____
Name: Jeffrey B. Scofield
Title: Managing Partner

**BLACKJEWEL INVESTMENT L.L.C.**

BLACKJEWEL INVESTMENT L.L.C.

By: _____
Name: Jeffrey A. Hoops, Sr.
Title: President and Chief Executive Officer

<div align="center">

*[Signature page to Blackjewel Holdings LLC Agreement]*

</div>

SCHEDULE 1

MEMBERS, UNITS AND INFORMATION RELATED THERETO

| Members | Number of Senior Preferred Units | Number of Series A Units | Capital Contributions as of the Effective Date |
|---|---|---|---|
| **LR-REVELATION HOLDINGS L.P.** <br> 274 Riverside Ave., 3rd Floor <br> Westport, CT 06880 <br> Attention: Jeffrey B. Scofield | **292,354** | **625** | **$29.24** |
| **BLACKJEWEL INVESTMENT L.L.C.** <br> 1149 Newmans Branch Road <br> Milton, WV 25541 | **31,612** | **375** | **$3.16** |

DEBTORSCL_009392

## EXHIBIT A

## DEFINED TERMS

"*Accounting Firm*" means such accounting firm as the Board shall from time to time determine. The initial Accounting Firm shall be Dixon Hughes Goodman PLLC.

"*Act*" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"*Adjusted Capital Account*" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections l. 704-1(b)(2)(ii)(c), l.704-2(g)(l) and l.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section l.704-l(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"*Affiliate*" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person.

"*Agreement*" means this Limited Liability Company Agreement of Blackjewel Holdings L.L.C., as amended and restated from time to time, including the Exhibits and Schedules hereto.

"*Amended Code*" means the Code (as amended by the Bipartisan Budget Act).

"*Available Cash*" means all cash, revenues and funds received by the Company from Company operations and proceeds from a Sale Transaction, less the sum of the following, to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the operation of the Company's business; and (c) such reserves as the Board deems reasonably necessary for the proper operation of the Company's business.

"*Bipartisan Budget Act*" means Title XI of the Bipartisan Budget Act of 2015 and any related provisions of law, court decisions, regulations, rules, and administrative guidance.

"*Book Liability Value*" means with respect to any liability of the Company described in Treasury Regulation Section l.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's- length transaction. The Book Liability Value of each liability of the Company described in Treasury Regulation Section l.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values.

"*Book Value*" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

> (a)     The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

A-1

(b)     The Book Values of all properties shall be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by all Members in proportion to their respective Sharing Ratios) to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property (other than a distribution made to all Members in proportion to their respective Sharing Ratios) as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-l(b)(2)(ii)(g)(l) (other than pursuant to Section 708(b)(l)(B) of the Code); provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Book Value of property distributed to a Member shall be the fair market value of such property as of the date of such distribution as reasonably determined by the Board;

(d)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses; and

If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Section 6.4.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the States of New York or West Virginia are authorized by Law to close.

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

"*Capital Stock*" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"*Cause*" means, with respect to any Person, that such Person (a) has committed willful misconduct or gross negligence in a manner that materially impairs the Company's financial condition or prospects, (b) has continually refused or intentionally failed to perform his duties and

A-2

DEBTORSCL_009394

obligations in some material respect after reasonable written notice (and reasonable time to cure) of any such refusal or failure to perform such duties or obligations or (c) has been convicted of a felony or crime involving moral turpitude.

"*Code*" means the United States Internal Revenue Code of 1986, as amended from time to time.  All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"*Co-Sale Percentage*" means, for each Electing Member, a fraction (expressed as a percentage), the numerator of which is the number of Senior Preferred Units held of record by such Electing Member and the denominator of which is the sum of the number of Senior Preferred Units held of record by all Electing Members and the Co-Sale Seller.

"*Control*," including the correlative terms "*Controlling*," "*Controlled by*" and "*Under Common Control with*" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.  For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

"*Curative Allocations*" means the allocations pursuant to Section 6.5 of this Agreement.

"*Depreciation*" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"*Economic Risk of Loss*" has the meaning set forth in Treasury Regulation Section 1.752-2(a).

"*Entity*" means any Person other than a natural person.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"*Exempted Units*" means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) any Units distributed or set aside ratably to all Members pro rata based on their respective Units, including any distribution issued for no

A-3

DEBTORSCL_009395

consideration to all Unit holders or any split of Units, (c) any Units issued, sold or otherwise transferred to sellers as consideration in connection with the Company's or any Subsidiary's acquisition of all or substantially all of another Person or another Person's line of business or division, or all or substantially all of a Person's assets, in any case, by merger, consolidation, stock purchase, asset purchase, recapitalization, or other reorganization, (d) [RESERVED], (e) any Units issued, sold or otherwise Transferred to any third-party unaffiliated investor if the Board determines that there are strategic reasons to exempt such issuance, sale or Transfer from the preemptive rights terms of Article 4, (f) any Units issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates) in connection with any loan or commitment to loan made by such lender to the Company or any Subsidiary thereof and (g) any Senior Preferred Units issued pursuant to Section 5.1(b).

"*Expel, Expelled or Expulsion*" means the expulsion or removal of a Member from the Company as a member.

"*GAAP*" means United States generally accepted accounting principles and policies as in effect from time to time.

"*Hoops*" means Blackjewel Investment L.L.C., a Delaware limited liability company.

"*Hoops Related Parties*" means, collectively, Hoops and its respective Permitted Transferees.

"*HSR Act*" means the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

"*Internal Restructure*" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Members or their Affiliates continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Members or their Affiliates in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to any Member.

"*Investors*" means Hoops, LR-Revelation Holdings, L.P., and their respective Permitted Transferees that hold all or any portion of the Units issued by the Company to such Person from time to time.

"*Involuntary Transfer*" means a Transfer resulting from the death of a Person or another involuntary Transfer occurring by operation of law.

"*Joinder Agreement*" means an agreement substantially in the form of Exhibit D hereto pursuant to which a Person agrees to be bound by the terms of this Agreement and agrees that any Units held thereby shall be bound by the terms of this Agreement or such other form as the Board reasonably required in connection with a Transfer.

"*Lime Rock*" means LR-Revelation Holdings, L.P., a Delaware limited partnership.

A-4

DEBTORSCL_009396

"*Lime Rock Investors*" means Lime Rock and its Affiliates and any direct or indirect transferee of all or any portion of the Units issued by the Company to Lime Rock or its Affiliates from time to time.

"*Maximum Tax Liability*" means, for any Member, the product of (a) an amount determined by the Company (on an actual or estimated basis) for each Member for a completed fiscal quarter, as the case may be, equal to the sum of the portion of the Company's Net Profit allocated or to be allocated and guaranteed payments made or to be made pursuant to Article 6 to such Member for federal, state or local income tax purposes for such fiscal quarter multiplied by (b) the highest combined marginal federal, state and local income tax rates that apply to an individual residing in New York County, New York taking into account rate differences that may apply to the character of the income so allocated. In determining cumulative Maximum Tax Liability for each Member, Net Losses allocated to a Member for a Fiscal Year that are allowed to be carried forward under applicable tax laws to a later Fiscal Year shall be deducted from Net Profit in that later year.

"*Member*" means any Person executing this Agreement as of the Effective Date, that executes a Restricted Unit Agreement and agrees to be bound by this Agreement or is hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

"*Member Nonrecourse Debt*" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"*Member Nonrecourse Debt Minimum Gain*" has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulation Section 1.704-2(i)(2).

"*Member Nonrecourse Deduction*" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(l).

"*Membership Interest*" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"*Minimum Gain*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

"*Net Loss*" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"*Net Profit*" means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

"*Nonrecourse Deduction*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(l).

A-5

DEBTORSCL_009397

"*Nonrecourse Liabilities*" means nonrecourse liabilities (or portions thereof) of the Company for which no Member bears the Economic Risk Of Loss.

"*Percentage Interest*" means, as to any Eligible Purchaser, a fraction (expressed as a percentage), the numerator of which equals the number of Voting Units held of record thereby and the denominator of which equals the number of Voting Units held of record by all of the Eligible Purchasers.

"*Permitted Transfer*" means any Involuntary Transfer or, with respect to any Member, any Transfer to (a) any parent, sibling, child or grandchild of such Member, (b) any trust, limited liability company, limited partnership or other Entity having as its sole beneficiaries or owners such Member, any Persons described in clause (a) above or any combination of the foregoing, (c) the shareholders, members, partners, beneficiaries or other equity owners of a Member that is an Entity, or (d) an Affiliate of a Member if such Member (or the sole shareholder(s)/member(s) of the Member) own(s) one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, (e) solely with respect to a Lime Rock Investor, any private equity fund that is an Affiliate of Lime Rock Management, L.P. and any direct or indirect, wholly-owned (together with any general partner) subsidiary of any such fund, and (f) any Person designated by the Board as a "Permitted Transferee" for purposes of such Transfer.

"*Person*" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"*Profits*" or "*Losses*" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(l) shall be included in taxable income or loss), with the following adjustments (without duplication):

      (a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

      (b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

      (c)     In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

A-6

DEBTORSCL_009398

(d)     In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(e)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(g)     To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)     Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

"*Registration Expenses*" means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties and costs and expenses relating to analyst or investor presentations, if any, or any "road show" undertaken in connection with the registration and/or marketing of the Units other than as provided in any underwriting agreement entered into in connection with such offering), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters), (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Units of all participating Members, (h) fees and expenses in connection with any review of underwriting arrangements by the National Association of Securities Dealers, Inc. including fees and expenses of any "qualified independent underwriter", (i) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (j) fees and disbursements of underwriters

A-7

DEBTORSCL_009399

customarily paid by issuers or sellers of Units, but shall not include any underwriting discounts attributable to the sale of secondary Units, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members or any fees and expenses of underwriter's counsel, and (k) the expenses and fees for listing the Units to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system.

"*Regulatory Allocations*" means the allocations pursuant to Section 6.4 of this Agreement.

"*Resign*, *Resigning or Resignation*" means the resignation, withdrawal or retirement of a Member from the Company. Such terms shall not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

"*Sale Transaction*" means any transaction or series of related transactions (whether such transaction occurs by a sale of assets, sale of Units or other Company interests, merger, conversion, recapitalization or other business combination) that, after giving effect thereto, results in (a) all or substantially all of the assets of the Company being held by an entity that is less than 50% owned by the record holders of Units immediately prior to such transaction and their Affiliates or (b) the record holders of the Units prior to such transaction and their Affiliates having record ownership, directly or indirectly after the consummation of such transaction, of 50% or less (determined by the percentage of liquidating distributions the record holders of Units would receive upon a liquidation of the Company or other surviving entity immediately after consummation of such transaction) of the equity securities of the surviving company.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Senior Preferred Return Amount*" means, with respect to any Senior Preferred Unit and as of any date of determination, the hypothetical interest amount that would have accrued and that would remain unpaid as of such date of determination on a promissory note in the original principal amount of $100 that accrues interest at a rate of 15% per annum, compounded annually beginning on the date such Senior Preferred Unit was issued by the Company and treating distributions in respect of such Senior Preferred Unit under Section 6.1(a)(i) to first be repayments of the principal amount of such promissory note and then to be repayments of accrued interest.

"*Sharing Ratio*" means, with respect to any Member, the ratio which the number of Units (or Units of a specified class or specified classes) held by that Member bears to the total number of Units (or Units of the specified class or specified classes) held by all Members.

"*Subsidiary*" means (a) any corporation or other entity (including a limited liability company) a majority of the Capital Stock of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect Subsidiary of the Company or (b) a partnership in which the Company or any direct or indirect Subsidiary is a general partner.

A-8

DEBTORSCL_009400

"***Transfer***," including the correlative terms "***Transferring***" or "***Transferred***", means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided, however, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

"***Treasury Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.  All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

"***Voting Interest***" means, with respect to each Member and any Person that acquires all or any portion of the Voting Units initially issued to and held by such Member, the percentage derived by dividing (a) the number of Voting Units (or Voting Units of a specific class) held by such Member by (b) the number of all Voting Units (or Voting Units of a specific class) held by all Members (and such percentage shall be allocated among such original Member and any such acquiring Person or Persons according to the transfer documentation pursuant to which all or any portion of such Voting Units are Transferred from time to time).

"***Voting Units***" means all Units other than any class or series of Units that is designated by the Board as non-voting.

A-9

DEBTORSCL_009401

**EXHIBIT B**

**PROVISIONS RELATING TO TRANSFERS**

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in the Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

1.    General Rules.

(a)    No Member may Transfer all or any portion of its Units other than in accordance with the terms of this Exhibit B, and any attempted Transfer that is not in accordance with this Exhibit B shall be, and is hereby declared, null and void ab initio.

(b)    [RESERVED]

(c)    No Member shall Transfer all or any of his or its Units (i) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (ii) if such Transfer would cause the Company to lose its status as a partnership for Federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704 or (iii) if the nature of the Transfer is reasonably likely to adversely affect the ability of the Company or any of its Subsidiaries to conduct its business in the manner conducted as of the time of a proposed Transfer.

(d)    The Members agree that a breach of the provisions of this Exhibit B may cause irreparable injury to the Company and the Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Person to comply with such provisions and (ii) the uniqueness of the Company's business and the relationship among the Members.  Accordingly, the Members agree that the provisions of this Exhibit B may be enforced by specific performance.

2.    Permitted Transfers.  A Member may make a Permitted Transfer of all or a portion of its Units subject to compliance with Section 6 of this Exhibit B.

3.    Right of First Offer.

(a)    The provisions of this Section 3 shall not apply to (i) a Permitted Transfer, (ii) a Transfer pursuant to the exercise of co-sale (tag-along) rights under Section 4 of this Exhibit B, (iii) a Transfer in connection with a Sale Transaction or (iv) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)    If an Investor (or its Affiliate) desires to Transfer all or a portion of its Units to any Person (including another Member), other than a Transfer described in Section 3(a) of this Exhibit B, such Investor (or its Affiliate) (the "***Disposing Member***") shall promptly give written notice (a "***Disposition Notice***") to the Company and the Lime Rock Investors (the "***ROFO Members***") that such Disposing Member desires to effect such a Transfer and setting forth the

B-1

DEBTORSCL_009402

portion (by reference to the Voting Interest percentage of the portion of the Units the Disposing Member desires to dispose of) of the Units proposed to be transferred by the Disposing Member (the "*Sale Units*"), the consideration that such Disposing Member proposes to be paid for such Sale Units (the "*Sale Price*") and any other material terms sought by the Disposing Member.

        (c)     The giving of a Disposition Notice shall constitute an offer (the "*Disposition Offer*") by the Disposing Member to sell to the ROFO Members and the Company all of the Sale Units at the Sale Price. The ROFO Members (and the Company, as hereafter set forth) shall have the option, but not the obligation, to acquire all, but not less than all, of the Sale Units on the terms set forth in the Disposition Notice, and such option shall be exercisable by the ROFO Members giving notice to the Disposing Member and the Company before the expiration of the 30-day period following the receipt by the ROFO Members of the Disposition Notice (the "*ROFO Member Election Period*"). If more than one of the ROFO Members exercise the option granted in this Section 3(c), the Sale Units will be allocated among them based on the relative Voting Interests of the Units held of record by them or on such other basis as the ROFO Members unanimously agree. Any ROFO Member that fails to notify the Disposing Member prior to the expiration of the ROFO Member Election Period will be deemed to have rejected the Disposition Offer. If the ROFO Members do not exercise the purchase option with respect to all the Sale Units, the Disposing Member shall immediately notify the Company thereof and the Company may, upon receipt of such notice, following the expiration of the ROFO Member Election Period, by giving notice to such Disposing Member and the ROFO Members within 10 days after the expiration of the ROFO Member Election Period (such 10-day period being referred to herein as the "*Company ROFO Election Period*"), exercise the right of first offer with respect to a portion of Sale Units that the ROFO Members declined pursuant to the Disposition Offer. If the ROFO Members and the Company do not elect to purchase all of the Sale Units, the ROFO Members and the Company shall be deemed to have rejected the Disposition Offer. The closing of the purchase and sale of the Sale Units to the ROFO Members or the Company, as applicable, shall be at 9:00 a.m. on the 20th Business Day following the end of the ROFO Member Election Period or the Company ROFO Election Period, as applicable, unless the ROFO Members and/or the Company, as applicable, and the Disposing Member otherwise agree. At the closing, the ROFO Members or the Company, as applicable, shall deliver to the Disposing Member cash in the amount of the consideration applicable to the Sale Units to be purchased, and the Disposing Member shall represent and warrant to the ROFO Members and the Company, as applicable, that the Disposing Member owns such Sale Units free and clear of all liens, encumbrances and to the knowledge of such Disposing Member adverse claims, and shall deliver to the ROFO Members or the Company executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company. The Disposing Member, the Company and the ROFO Members shall cooperate in good faith in obtaining all necessary governmental and other third Person approvals, waivers and consents required for the closing. Notwithstanding the foregoing, any such closing shall be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the HSR Act.

        (d)     The Disposing Member shall be free to sell the portion of the Sale Units not purchased by the ROFO Members or the Company pursuant to Section 3(c) of this Exhibit B to any Person during the 90-day period following the expiration of the Company ROFO Election Period; provided (i) any such sale shall be subject to Section 6 of this Exhibit B and (ii) the

DEBTORSCL_009403

consideration and other terms offered by the Disposing Member shall be no more favorable to the transferee than those offered to the ROFO Members in the Disposition Notice. Any Sale Unit not sold during the 90-day period described in this Section 3(d) shall be subject again to right of first offer set forth in Section 3(b) of this <u>Exhibit B</u>.

4.    <u>Co-Sale (Tag-Along) Rights</u>.

(a)    The remaining provisions of this Section 4 shall not apply to (i) a Permitted Transfer, (ii) a Transfer in connection with a Sale Transaction, or (iii) a Transfer in connection with the exercise of the registration rights described in <u>Exhibit C</u>.

(b)    If any of the Investors (each, a "*Co-Sale Seller*") desires to Transfer, in a transaction or series of related transactions, Units then outstanding (a "***Proposed Co-Sale Transfer***"), then such Co-Sale Seller shall offer (the "*Co-Sale Offer*") to include in such Transfer a number of Units owned of record by the other Investors (and its Affiliates) according to the remaining terms of this Section 4.

(c)    The Co-Sale Seller shall notify the other Investors (the "*Co-Sale Notice*") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer. The Co-Sale Notice shall specify the proposed Transferee (the "*Co-Sale Buyer*"), the number of Units proposed to be Transferred as part of the Proposed Co-Sale Transfer, the amount and type of consideration to be received therefor, the consideration offered to be paid for each Unit (the "***Per Unit Price***") and the place and date on which the Transfer is to be consummated. If an Investor (and any Affiliate) wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer such Person must notify the Co-Sale Seller prior to 12:00 pm, New York time 10 calendar days following the date the Co-Sale Seller gave the Co-Sale Notice. If an Investor (or any Affiliate) elects to participate in such Proposed Co-Sale Transfer (the "***Electing Member***"), then such Person shall have the right to include Units in such Transfer as follows:

(i)    Unless unanimously agreed to otherwise by the Electing Member and the Co-Sale Seller, the Electing Member may elect, by notice delivered to the Co-Sale Seller within 10 days after the Co-Sale Notice is given, to include up to a number of Units in the Proposed Co-Sale Transfer equal to its Co-Sale Percentage of the total number of Units proposed to be purchased by the Co-Sale Buyer pursuant to the Proposed Co-Sale Transfer. The number of Units the Electing Member elects to sell in accordance with the foregoing is referred to as such Electing Member's "*Co-Sale Units.*" The Co-Sale Seller will reduce the number of Units to be included in the Proposed Co-Sale Transfer by the Electing Member's Co-Sale Units or, if the Co-Sale Buyer refuses to purchase Units from the Electing Member, the Co-Sale Seller shall purchase the Co-Sale Units from the Electing Member on the same terms as apply to the Proposed Co-Sale Transfer.

(ii)    All of the consideration payable to the Members in the Proposed Co-Sale Transfer shall be distributed to such Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement. If the consideration in the Proposed Co-Sale Transfer involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an

DEBTORSCL_009404

accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Lime Rock Investor may require each Member, at the option of the Member, that is not an accredited investor (A) to receive solely cash in such transaction, or (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(iii)    The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(d)    In connection with a Proposed Co-Sale Transfer, the Electing Member shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms (other than non-compete and non-solicitation terms) as the Co-Sale Seller and (iv) be required to deliver customary transfer instruments.

5.    Sale Transaction; Drag-Along Provisions.

(a)    If (i) any Person that is not a Member or an Affiliate thereof (a "*Third-Party Buyer*") submits a bona fide written offer to any Lime Rock Investor to effect a Sale Transaction (a "*Sale of the Company Offer*") and (ii) such Lime Rock Investor desires to accept such offer (the "*Accepting Person*"), then the Lime Rock Investors shall have the right to require each other Member (each, a "*Drag-Along Person*") to Transfer to such Third-Party Buyer all of the Units held thereby (or if less than all of the Members' Units are to be Transferred to the Third Party Buyer in such Sale Transaction, each Member's pro rata share of the Units to be Transferred in such Sale Transaction).

(b)    In connection with such Transfer, each Drag-Along Person shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms as the Lime Rock Investors, (iv) be required to deliver customary stock powers, letters of transmittal or other similar transfer documentation and (v) be obligated to pay no more than its pro rata share (based upon the amount of consideration received) of the costs of any Sale Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.

(c)    The Company shall give written notice to each Drag-Along Person of the Sale of the Company Offer approved by the Accepting Person (the "*Accepting Persons' Notice*")

B-4

DEBTORSCL_009405

at least 20 calendar days before the scheduled closing of the Sale Transaction.  The Accepting Persons' Notice shall specify the Third-Party Buyer, the amount and type of consideration to be received by the Members in connection with the Sale Transaction, the terms and conditions of payment of the consideration offered by the acquiring party and the place and date on which the Transfer is to be consummated.  Subject to Section 5(d) of this Exhibit B, if any holder of a particular class of Units is given an option as to the form and amount of consideration to be received, all holders of such class of Units shall be given the same option with respect to such consideration.  If the Accepting Persons elect to exercise their rights under this Section 5, the Drag-Along Persons shall take such other actions as may be reasonably required and otherwise cooperate in good faith with the Company and the Accepting Persons in connection with consummating the proposed Transfer.

(d)     All of the consideration payable to the Members in a Sale Transaction first shall be aggregated by the Company, as disbursing agent, before distributing any such consideration to any of the Members.  The Company, acting solely as the disbursing agent of the Members, shall then distribute the aggregate consideration to the Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement. If the Sale Transaction involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then Lime Rock may require each Member that is not an accredited investor (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction and/or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(e)     No Member shall have any dissenters' or appraisal rights in connection with a Sale Transaction, and each Member hereby releases, votes in favor of, consents to and will execute such further instruments as the Company reasonably requests (in accordance with this Section 5) to further evidence the waiver of, such rights and the approval of the Sale Transaction. No Member shall institute any action or proceeding with respect to the adequacy of the consideration given in a Sale Transaction.

(f)     Each Member hereby makes, constitutes and appoints the secretary or other officer of the Company, in its official Company capacity, as its true and lawful attorney-in- fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member in this Section 5 in the event that such Member is or becomes a Drag-Along Person pursuant to this Section 5.  Each Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as a Drag-Along Person pursuant to this Section 5 as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall

B-5

DEBTORSCL_009406

lawfully do or cause to be done by virtue of the power of attorney granted hereby.  The power of attorney granted pursuant to this Section 5(f) is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

6.      Conditions to Transfers; Continued Applicability of Agreement.

(a)      As a condition to any Transfer permitted under this Exhibit B (including Permitted Transfers), any transferee of Units shall be required to become a party to this Agreement, by executing (together with such Person's spouse, if applicable) a Joinder Agreement.  If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (whether such Transfer resulted by operation of law or otherwise), such Person and such Units shall be subject to this Agreement as if such Units were still held by the transferor.

(b)      No Units may be Transferred by a Person unless the transferee first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Company, with the approval of the Board, may waive any requirement to deliver a legal opinion under this Section 6.

B-6

DEBTORSCL_009407

# EXHIBIT C

## REGISTRATION RIGHTS

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

<u>Registration</u>.

*Piggyback Registration Rights*.  If the Company (which term, for purposes of this Exhibit, includes any successor entity such as a Delaware corporation formed through an Internal Restructure or otherwise) proposes to register any of its Units (the term Units, as used in this Exhibit, shall be read broadly to include common stock if the issuer is a corporation rather than a limited liability company and if the Units have been, are to be, exchanged or converted into common stock in connection with a public offering) under the Securities Act (other than a registration (i) on Form S-8 or S-4 or any successor or similar forms, (ii) relating to Units issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company, (iii) in connection with a direct or indirect merger, acquisition or other similar transaction or (iv) on such other forms not permitting the registration of Units for resale by the Members), for its own account, it will at such time, subject to the provisions of Section 1(c), give notice to each Member at least 20 days prior to the filing of the registration statement relating to such registration with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1 and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 20 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the Company's registration must sell their Units to the underwriters selected by the Company on substantially the same terms and conditions as apply to the Company, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such Units or the transfer thereof, the Company shall give written notice to all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Company may (x) adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering or (y) exclude any Units from any offering to the extent the Board reasonably determines that the inclusion of such Units would be unduly burdensome on the Company and the Members.  The

C-1

DEBTORSCL_009408

Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Requests for Registration Rights.*  Following an initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 for secondary sales.  At any time after an initial public offering, the Lime Rock Investors shall have the right to request registrations with respect to all or a part of the Units held by the Lime Rock Investors (such requests shall be in writing and shall state the number of Units to be disposed of and the intended method of disposition of shares by such holders); provided that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 1(b) (i) unless the Lime Rock Investors propose to dispose of securities having an aggregate price to the public of more than $15,000,000 (or $5,000,000 in the case of a registration on Form S-3) or (ii) within 180 days of the effective date of the most recent registration pursuant to this Section 1(b).  The Company shall give notice to each Member at least 15 days prior to the anticipated date the registration statement relating to such registration shall be filed with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1(b) and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 10 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the registration must sell their Units to the underwriters selected by the Lime Rock Investors on substantially the same terms and conditions as apply to the Lime Rock Investors, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Lime Rock Investors shall determine for any reason not to register such Units or the transfer thereof, the Lime Rock Investor shall give written notice to the Company and all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Lime Rock Investors and the Company may adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering.  The Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Allocations.*  If a registration pursuant to this Section 1 involves an underwritten public offering and the managing underwriter advises the Company that, in its view, the number of Units that the Company and the Members exercising their rights under this Section 1 intend to include in such registration exceeds the maximum offering size, including the price at which such Units can be sold, the Company will include in such registration the following Units, in the following priority, up to the maximum offering size:

C-2

DEBTORSCL_009409

first, so much of the Units proposed to be registered for the account of the Company as would not cause the offering to exceed the maximum offering size;

second, all Units requested to be included in such registration by any Member pursuant to this Section 1 allocated, if necessary for the offering not to exceed the maximum offering size, pro rata among such Members on the basis of the relative number of Units owned by each requesting Member.

Standstill Agreements.  With respect to an initial public offering or any underwritten public offering, notwithstanding anything to the contrary in this Exhibit C, each Member agrees not to effect any public sale or distribution, including any sale pursuant to Rule 144, or any successor provision, under the Securities Act, of any Units, and not to effect any such public sale or distribution of any other security of the Company that is convertible into or exchangeable or exercisable for any Unit and that would be a Unit (in each case, other than as part of such underwritten public offering) during the 14 days prior to the anticipated effective date of the applicable registration statement or during the period after such effective date that the managing underwriter and the Company shall agree; provided, (a) such post-effective date standstill period shall not exceed 180 days or be less than 90 days and (b) notwithstanding clause (a) preceding, the Company may waive the 90-day minimum standstill period with respect to some or all of the Members if the managing underwriter does not require such Members to be bound by a standstill arrangement for any period of time and the Company determines that the absence of such standstill period for such Members will not adversely affect such offering.

Registration Procedures.  Whenever Members request that any Units be registered pursuant to Section 1, the Company will, subject to the provisions of such Sections, use commercially reasonable efforts to effect the registration and the sale of such Units in accordance with the intended method of disposition thereof and, in connection with any such request:

The Company will as soon as reasonably practicable prepare and file with the Securities and Exchange Commission a registration statement on any form selected by counsel for the Company and which form shall be available for the sale of the Units to be registered thereunder in accordance with the intended method of distribution thereof, and use all reasonable efforts to cause such filed registration statement to become and remain effective for a period of not less than 180 days (or such shorter period in which all of the Units of any Person included in such registration statement shall have actually been sold thereunder).

The Company will furnish to each Member and each underwriter, if any, of the Units covered by such registration statement copies of such registration statement as filed or proposed to be filed, and thereafter the Company will furnish to such Members and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto (and, if requested by such Members, all exhibits thereto and documents incorporated by reference therein), the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as such Members or underwriters may reasonably request in order to facilitate the disposition of the Units owned by such Members.  Each such Member shall have the right to request that the Company modify any information contained in such registration statement, amendment and supplement thereto pertaining to such Member and the Company shall use commercially reasonable efforts to comply with such request; provided, the Company shall not

C-3

DEBTORSCL_009410

have any obligation to so modify any information if so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

After the filing of the registration statement, the Company will promptly notify each Member holding Units covered by such registration statement of any stop order issued or threatened by the SEC or any state Units commission under state blue sky laws and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered.

The Company will use commercially reasonable efforts to (i) register or qualify the Units covered by such registration statement under such other Units or blue sky laws of such jurisdictions in the United States as any Member holding such Units reasonably (in light of such Member's intended plan of distribution) requests, (ii) cause such Units to be listed on any Units exchange or market or included for trading on any automated quotation system on which its Units are then listed or included for trading and (iii) cause such Units to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Member to consummate the disposition of the Units owned by such Member; provided, the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

The Company will immediately notify each Member holding such Units covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Units, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and promptly prepare and make available to each such Member and file with the SEC any such supplement or amendment.

Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, the Company will make available for inspection by any Member and any underwriter participating in any disposition pursuant to a registration statement being filed by the Company pursuant to this Section 3 and any attorney, accountant or other professional retained by any such Member or underwriter, financial and other records, pertinent corporate documents and properties of the Company as shall be reasonably requested by any such Person, and cause the Company's officers, Directors and employees to supply all information reasonably requested by any such attorney, accountant or other professional in connection with such registration statement.

The Company will furnish to each Selling Member and to each underwriter, if any, a signed counterpart, addressed to such underwriters and such Members, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as a majority of such Members or the managing underwriter therefore reasonably requests.

C-4

DEBTORSCL_009411

The Company will comply with all applicable rules and regulations of the SEC, and make available to the Members, as soon as substantially practicable, an earnings statement covering a period of 12 months, beginning within three months after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act.

The Company may require each Member to promptly furnish in writing to the Company information regarding the distribution of the Units as the Company may from time to time reasonably request and such other information as may be legally required in connection with such registration.

Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(e), such Member will forthwith discontinue disposition of Units pursuant to the registration statement covering such Units until such Member's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(e), and, if so directed by the Company, such Member will deliver to the Company all copies, other than any permanent file copies then in such Member's possession, of the most recent prospectus covering such Units at the time of receipt of such notice.  In the event that the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 3(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 3(e) to the date when the Company shall make available to such Member a prospectus supplemented or amended to conform with the requirements of Section 3(e).

The Company will provide a transfer agent and registrar for all such Units not later than the effective date of the first registration statement relating to Units.

Indemnification by the Company.  The Company shall indemnify, defend and hold harmless to the full extent permitted by law each Member holding Units covered by a registration statement, its managers, members, officers, Directors, employees, partners and agents, and each Person, if any, who controls such Member within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages, expenses (including reasonable cost of investigation and, subject to Section 7 of this Exhibit C, reasonable fees, disbursements and other charges of legal counsel) and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Units (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or any preliminary prospectus, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, expenses or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission so made in conformity with information furnished in writing to the Company by such Member or on such Member's behalf expressly for use therein.  The Company shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and directors and each person who controls such underwriter on substantially the same basis as that provided in this Section 4.

Indemnification by Participating Investors.  Each Member holding Units included in any registration statement shall, severally but not jointly, indemnify, defend and hold harmless the

C-5

DEBTORSCL_009412

Company, its officers, Directors and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to such Member, but only with respect to information furnished in writing by such Member or on such Member's behalf expressly for use in any registration statement or prospectus relating to the Units, or any amendment or supplement thereto, or any preliminary prospectus. Each such Member shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and Directors and each person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 5. Notwithstanding the provisions of this Section 5, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to indemnify the Company or any underwriter pursuant to this Section 5, such Member shall not be required to pay any amount, including pursuant to Sections 6 or 7 of this <u>Exhibit C</u>, in excess of the net proceeds received by such Member in the offering to which such registration statement relates. As a condition to including Units in any registration statement filed in accordance with this <u>Exhibit C</u>, the Company may require that it shall have received an undertaking reasonably satisfactory to it from any underwriter to indemnify and hold it harmless to the extent customarily provided by underwriters with respect to similar Units.

<u>Conduct of Indemnification Proceedings</u>. In case any proceeding (including any governmental investigation) shall be instituted involving any Person in respect of which such Person is entitled to indemnity pursuant to this <u>Exhibit C</u>, such Person (an "***Indemnified Party***") shall promptly notify the Person against whom such indemnity may be sought (the "***Indemnifying Party***") in writing and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnified Party, and the Indemnifying Party shall assume the payment of all fees and expenses; provided, that the failure of any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that the Indemnifying Party is prejudiced by such failure to notify. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel (at the expense of the Indemnifying Party), or (b) in the reasonable judgment of such Indemnified Party representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties, and in the event the Indemnified Parties are not able to agree as to such firm, the Indemnified Party that has the largest potential risk of loss covered by the Indemnifying Party's indemnity hereunder shall select such firm, subject to the consent of the other Indemnified Parties, which consent shall not be unreasonably withheld, which selection shall then be binding for purposes of this Section 6. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any and all losses, claims, damages, liabilities and expenses or liability (to the extent stated above) by reason of such settlement or

C-6

DEBTORSCL_009413

judgment. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

Contribution.  If the indemnification provided for in this Exhibit C is unavailable to an Indemnified Party in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Company and the Members holding Units covered by a registration statement and the underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities.  The relative fault of the Company and such Members and the underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Members agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 7, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to make any contribution pursuant to this Section 7, such Member shall not be required to contribute any amount in excess of the net proceeds received by such Member in the offering to which such registration statement relates.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Participation in Underwritten Public Offering.  No Person may participate in any Underwritten Public Offering unless such Person (a) agrees to sell such Person's Units on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, custody agreements, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and the provisions of this Exhibit C in respect of registration rights.

Rule 144.  So long as the Company is subject to Section 13 or Section 15(d) of the Exchange Act, the Company covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act and that it will take such commercially reasonable further action as any Member may reasonably request to the extent required from time to time to enable such Member to sell Units without registration under the Securities Act within the limitations of the exemptions

C-7

provided by Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC. Upon the request of any Member, the Company will deliver to such Member a written statement as to whether it has complied with such reporting requirements. The registration rights set forth in this Exhibit C shall not be available to any Member if, in the opinion of counsel to the Company (delivered to the transfer agent), all of the Units then owned by such Member could be sold without restriction or limitation pursuant to Rule 144.

Other Registration Rights Agreements.  Without the approval of holders of a majority of the outstanding Units, the Company will neither enter into any new registration rights agreements that grant registration rights senior to those granted in this Exhibit C or otherwise conflict with the terms of this Exhibit C nor permit the exercise of any other registration rights in a manner that conflicts with the terms of the registration rights granted under this Exhibit C.  Notwithstanding the foregoing, the Company is authorized to grant piggyback registration rights with respect to incentive units or other equity-based awards, and such registration rights will be pari passu with the piggyback registration rights granted in this Exhibit C.

Transfer of Registration Rights.  The rights of the Lime Rock Investors (including the rights of any of their respective Permitted Transferees) under this Exhibit C may be assigned by any of them to any of their respective Permitted Transferees.

No Inconsistent Agreements.  The Company will not enter into any agreement with respect to its Units (excluding registration rights agreements described in Section 10 above) which is inconsistent with or violates the rights granted to the holders of Units in this Exhibit C.

C-8

DEBTORSCL_009415

## EXHIBIT D

## JOINDER AGREEMENT

This Joinder Agreement (this "***Joinder Agreement***") is executed as of _____ pursuant to the terms of the Limited Liability Agreement of Blackjewel Holdings L.L.C. dated as of July __, 2017, and the Schedules and Exhibits thereto, as amended or restated from time to time, a copy of which is attached hereto (the "***LLC Agreement***"), by the transferee (***"Transferee"***) executing this Joinder Agreement.  By the execution of this Joinder Agreement, the Transferee agrees as follows:

1.    <u>Acknowledgment</u>.  Transferee acknowledges that Transferee is acquiring certain [_____] subject to the terms and conditions of the LLC Agreement.  Capitalized terms used herein without definition are defined in the LLC Agreement and are used herein with the same meanings set forth therein.

2.    <u>Agreement</u>.  Transferee (a) agrees that [_____] acquired by Transferee shall be bound by and subject to the terms of the LLC Agreement and (b) hereby joins in, and agrees to be bound by, the LLC Agreement (including the Exhibits) with the same force and effect as if the Transferee were originally a party thereto.

3.    <u>Representations</u>.  Transferee hereby makes each of the representations and warranties set forth in Section 3.1 of the LLC Agreement to the Company and each other Member with the same force and effect as if the Transferee were originally a party thereto.

4.    <u>Notice</u>.  Any notice required by the LLC Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

5.    <u>Joinder</u>.  The spouse of the undersigned Transferee, if applicable, executes this Joinder Agreement to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's community interest, if any, in the [_____] to the terms of the LLC Agreement.

D-1

DEBTORSCL_009416

TRANSFEREE:

By:_____

Information for Notices:

_____

_____

Telecopy:_____

SPOUSE:

By:_____

D-2

DEBTORSCL_009417

*Execution*

## CONTRIBUTION, ADOPTION AND WAIVER AGREEMENT

## BLACKJEWEL HOLDINGS L.L.C.

THIS CONTRIBUTION, ADOPTION AND WAIVER AGREEMENT, dated as of August 15, 2017 (this "*Agreement*"), is by and among Blackjewel Holdings L.L.C. a Delaware limited liability company (the "*Company*"), ("*Contributor*"); LR-Revelation Holdings L.P ("*LRRH*") and Blackjewel Investment L.L.C. (together with LRRH, the "*Existing Members*").

## RECITALS

**WHEREAS**, the Company is offering 20,000 Senior Preferred Units to Contributor and Contributor desires to participate in such offering and purchase such 20,000 Senior Preferred Units in exchange for a cash capital contribution of $2,000,000 to the Company;

**WHEREAS**, Contributor desires to adopt the Limited Liability Company Agreement of the Company, dated as of July 14, 2017, set forth on Exhibit A hereto (the "*LLC Agreement*"). Capitalized terms used and not defined herein shall have the meanings ascribed in such terms in the LLC Agreement;

**WHEREAS**, Section 4.3 of the LLC Agreement sets forth (a) certain preemptive rights of Eligible Purchasers to receive notice of proposed issuances of, and purchase, Offered Units and (b) certain obligations of the Company to give written notices of such proposed issuances to Eligible Purchasers, which rights and obligations the parties hereto desire to waive; and

**WHEREAS**, Section 4.4 and Exhibit B of the LLC Agreement set forth certain restrictions on the Transfer of Units, which restrictions the parties hereto desire to waive in respect of any future Transfer of Senior Preferred Units purchased by John Reynolds on the date hereof, by John Reynolds to a Lime Rock Investor (a "*Reynolds-Lime Rock Transfer*").

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENTS

1. Purchase of Senior Preferred Units. The Company agrees to issue, and hereby sells, to Contributor, and Contributor hereby purchases from the Company, Twenty Thousand (20,000) Senior Preferred Units, at $100 per such Senior Preferred Unit, for a total purchase price of Two Million Dollars ($2,000,000) and Contributor acknowledges and agrees that such Senior Preferred Units will be subject to, and governed by, the LLC Agreement.

2. Contribution. On the terms and subject to the conditions set forth in this Agreement, in consideration for the Company's agreement to issue to Contributor, and the sale of, Twenty Thousand (20,000) Senior Preferred Units, Contributor agrees to make a capital contribution of Two Million Dollars ($2,000,000) to the Company. The capital contribution shall be payable to

CONFIDENTIAL

the Company by Contributor in cash or wire transfer of immediately available funds on the date hereof.

3.      Accession to LLC Agreement. As required by Section 4.2(c) of the LLC Agreement, Contributor hereby agrees to each term of the LLC Agreement and agrees to be bound by, adopt and accede to the terms of the LLC Agreement, as a Member.

4.      Representations and Warranties of Contributor. In connection with the issuance of the Senior Preferred Units pursuant to this Agreement, Contributor represents and warrants to the Company and each Member as follows:

      a.     Organization; Existence. Such Person, if such Person is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

      b.     Power; Qualification. Such Person has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Person of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

      c.     Authority; Enforceability. This Agreement has been duly and validly executed and delivered by such Person and constitutes the binding obligation of such Person enforceable against such Person in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

      d.     No Conflicts. The execution, delivery, and performance by such Person of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Person is subject, (ii) violate any order, judgment, or decree applicable to such Person or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Person is a party. No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Person of this Agreement..

5.      Representations and Warranties of the Company. In connection with the issuance of the Senior Preferred Units pursuant to this Agreement, the Company represents and warrants to Contributor the representations and warranties set forth in Section 4 hereof.

6.      Waivers and Consents.

      a.     Waiver of Preemptive Rights by Existing Members. Notwithstanding anything to the contrary contained in Section 4.3 of the LLC Agreement, each Existing

- 2 -

LR_REV_00000081

Member hereby consents to the Company offering 20,000 Senior Preferred Units to Contributor and waives its rights to receive any First Notice and Supplemental Notice, and its opportunity to exercise its preemptive rights to subscribe for the Senior Preferred Units offered to, and purchased by, Contributor pursuant to this Agreement.

      b.    <u>Waiver of Transfer Restrictions for Reynolds-Lime Rock Transfer</u>. Notwithstanding anything to the contrary contained in Exhibit B of the LLC Agreement, each of the parties hereto agrees and acknowledges that any Reynolds-Lime Rock Transfer shall be deemed a Permitted Transfer for all purposes pursuant to, and under, the LLC Agreement.

7.    <u>Amendment and Restatement of LLC Agreement</u>. The parties to this Agreement acknowledge that the Board, without any action by any Member or any other Person, is authorized to, and shall, amend and restate <u>Schedule 1</u> of the LLC Agreement to reflect the admission of Contributor as a Member.

8.    <u>Further Assurances</u>. Each party agrees to execute any and all documents and instruments of transfer, assignment, assumption or novation and to perform such other acts as may be reasonably necessary or expedient to further the purposes of this Agreement and the transactions contemplated by this Agreement.

9.    <u>Agreement</u>. This Agreement and the LLC Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, representations and warranties and agreement, both written and oral, with respect to such subject matter.

10.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

12.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

13.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

- 3 -

CONFIDENTIAL

14.     <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Kentucky in each case located in the city of Lexington and County of Fayette, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

<p align="center">[Remainder of Page Intentionally Left Blank]</p>

<p align="center">- 4 -</p>

LR_REV_00000083

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date set forth above.

**COMPANY**:

**BLACKJEWEL HOLDINGS, L.L.C.**

By: _____
Name: Jeffery A. Hoops, Sr.
Title: President and Chief Executive Officer

CONFIDENTIAL

LR_REV_00000084

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date set forth above.

**CONTRIBUTOR:**

By: _____

Name: John T. Reynolds

Title:

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of
the date set forth above.

> Solely for purposes of the waiver set forth in
> Section 6 above:
>
> EXISTING MEMBERS:
>
> BLACKJEWEL INVESTMENT L.L.C.
>
> By: _____
> Jeffery A. Hoops, Sr.
> Its:  President and Chief Executive Officer

CONFIDENTIAL

LR_REV_00000086

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date set forth above.

<u>**Solely for purposes of the waiver set forth in Section 6 above:**</u>

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P., its general partner

By: LRP GP V, Inc., its general partner

By:_____
      Jeffery B. Scofield
Its: Authorized Person

[SIGNATURE PAGE TO BLACKJEWEL CONTRIBUTION AGREEMENT – REYNOLDS]

CONFIDENTIAL

EXHIBIT A

LLC Agreement

ACTIVE 224089388v.4

CONFIDENTIAL

Execution Version

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BLACKJEWEL HOLDINGS L.L.C.**

**A DELAWARE LIMITED LIABILITY COMPANY**

**JULY 14, 2017**

THE MEMBERSHIP INTERESTS (AS DEFINED HEREIN) GOVERNED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN AND IN THE OTHER INVESTMENT DOCUMENTS (AS DEFINED HEREIN).

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BLACKJEWEL HOLDINGS L.L.C.
A Delaware Limited Liability Company

This Limited Liability Company Agreement of Blackjewel Holdings L.L.C., a Delaware limited liability company (the "*Company*"), dated as of July 14, 2017 (the "*Effective Date*") is adopted, executed and agreed to, for good and valuable consideration, by the Company and the Members (both as defined below).

## RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on March 30, 2017 (the "*Formation Date*"), of a Certificate of Formation under and pursuant to the Act (such Certificate of Formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "*Certificate*"); and

**WHEREAS**, the parties hereto desire to enter into this Agreement in order to set forth their rights and obligations as Members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Act.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

## AGREEMENTS

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

**Section 1.1** *Definitions*.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them in <u>Exhibit A</u>.  The Glossary of Defined Terms, which follows the Table of Contents, sets forth the location in this Agreement of the definition for each capitalized term used herein.

**Section 1.2** *Construction*.  Unless the context requires otherwise:  (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America; (e) the word "including" means "including without limitation;" and (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto.

CONFIDENTIAL

# ARTICLE 2

## ORGANIZATION

**Section 2.1**    *Formation*.  The Company was organized as a limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware, in accordance with and pursuant to the Act.  All actions by any Member while making such filing are hereby ratified, adopted and approved.  The rights and liabilities of the Members will be determined pursuant to the Act and this Agreement.  To the extent that there is any conflict or inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement control and take precedence.

**Section 2.2**    *Name*.  The name of the Company is "Blackjewel Holdings L.L.C." and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select.

**Section 2.3**    *Offices*.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States shall be at 1051 Main Street, Milton, West Virginia 25541 or such other place as the Board may designate, which need not be in the State of Delaware.  The Company may have such other offices as the Board may designate.

**Section 2.4**    *Purposes*.  The purpose of the Company shall be the leasing, acquisition, exploration, mining and development of coal properties in the United States (the "*Business Line*") and any business activity reasonably related thereto, to the extent not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity.  In furtherance of such purpose, the Company may (a) acquire (i) coal leasehold interests, mineral interests and royalty interests, (ii) mines, plants, railways, facilities, equipment and other assets relating to such activities or properties and (iii) contracts, easements, servitudes, permits, licenses and other rights relating to the foregoing; (b) explore for, mine, develop, produce, store, treat, process, gather, transport, purchase and market synfuel, coal and coal byproducts and related hydrocarbons and minerals; (c) farm out, sell, abandon and otherwise dispose of Company assets; effectuate commodity hedging transactions in order to minimize the risks associated with the fluctuation of prices to be received by the Company from the sale of synfuel, coal and coal byproducts and related hydrocarbons and minerals from Company properties; and (d) take all such other actions incidental or ancillary to any of the foregoing as the Board may determine to be necessary or desirable.

**Section 2.5**    *Foreign Qualification*.  Prior to the Company's conducting business in any jurisdiction other than Delaware, to the extent that the nature of the business conducted requires the Company to qualify as a foreign limited liability company under the Law of that jurisdiction, the Company shall satisfy all requirements necessary to so qualify.  At the request of the Company, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue,

2

and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**Section 2.6**    *Term*.  The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 11.

**Section 2.7**    *No State Law Partnership*.  The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member shall be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and state income tax purposes, and this Agreement shall not be interpreted to provide otherwise.  The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

**Section 2.8**    *Title to Company Assets*.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.  Each of the Members hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the Company's assets partitioned.

## ARTICLE 3

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.1**    *Representations and Warranties of Each Member*.  Each Member (as to itself only) represents and warrants to the Company and the other Members (including other Members admitted after the date hereof) as follows:

(a)    Organization; Existence.  Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)    Power; Qualification.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)    Authority; Enforceability.  This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the other parties hereto, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally and by principles of equity.

3

CONFIDENTIAL

(d)    <u>No Conflicts</u>.  The execution, delivery, and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment, or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)    <u>Investment Matters</u>.  Such Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities laws.  Such Member is an "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.  Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities." Such Member has knowledge of finance, securities and investments generally, experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company.

(f)    <u>LLC Agreement</u>.  Such Member understands that the Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement.

(g)    <u>No Brokers</u>.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company or any other Member; and such Member shall indemnify and hold harmless the Company and the other Members from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Members in connection with the Company or this Agreement.

(h)    <u>Survival of Representations and Warranties</u>.  All representations and warranties made by each of the Members in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

**Section 3.2**    *Representations and Warranties of the Company*.  The Company represents and warrants to the Members that:

(a)    It was formed in the State of Delaware on the Formation Date.

4

(b)     The Company is duly organized, validly existing and in good standing under the laws of Delaware and has all requisite power and authority to enter into this Agreement.

(c)     There are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the officers and managers of the Company, threatened against or affecting the Company.

(d)     Prior to the Effective Date, the Company has not conducted any business operations other than in connection (i) with its formation and capitalization and (ii) matters relating to the foregoing.

(e)     The Company has not owned any property or assets before the Effective Date.

## ARTICLE 4

## MEMBERS; UNITS

### Section 4.1     *Members.*

(a)     Existing Members.   Each of the Persons listed on Schedule 1 hereto is hereby admitted as a Member as of the Effective Date.

(b)     Additional Members.   In addition to the Persons listed on Schedule 1, the following Persons shall be deemed to be Members and shall be admitted as Members without any further action by the Company, the Board or any Member:   (i) any Person to whom Units are Transferred by a Member so long as such Transfer is made in compliance with this Agreement, including Exhibit B and (ii) any Person to whom the Company issues Units after the Effective Date in compliance with this Agreement so long as the Board designates such Person as a "Member", which designation must be evidenced by an adoption of this Agreement and any other agreement reasonably specified by the Board.

(c)     Cessation of Members.   Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Section 9.2, which rights shall not cease), but such Person shall remain bound by Section 8.4.

### Section 4.2     *Units.*

(a)     Units; Class and Series.   The Membership Interests of the Company shall be issued in unit increments (each, a "***Unit***").   The Company may also issue Membership Interests in fractional Unit increments.   From time to time, the Company may, subject to the terms of this Agreement, including Section 4.3, issue such Units as the Board reasonably determines to be in the best interests of the Company; provided, however, that, following the Effective Date, the Company may not issue any Units without the unanimous consent of the Board.   Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in Section 4.2(c) or otherwise as shall be fixed by the Board by resolution

5

LR_REV_00000094

thereof. The Board, in so fixing the designations, rights and preferences of any class or series of Units, may, subject to the terms of this Agreement, designate such Units as "Preferred Units", "Common Units", or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units. The Board may increase the number of authorized Units in any then existing class or series. Upon due authorization of such issuances, the Board is hereby authorized, subject to this Agreement, to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations, preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units. Each Member acknowledges and agrees that (i) any actions taken by the Company or the Board pursuant to this Section 4.2(a) (including the issuance of one or more classes or series of Units) shall not be deemed to materially adversely affect such Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director and (ii) any such amendment in connection with a duly authorized issuance of Units that is recommended by the Board may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution and tax allocation provisions of this Agreement to the extent approved by the Board.

(b)     Unit Certificates.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates. As of the date hereof, Units are uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof. In such event, the Board shall prescribe the forms of certificates to be issued by the Company including the forms of legends to be affixed thereto. Any such certificate shall be delivered by the Company to the applicable record owner of the Units represented by such certificate. Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code. Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who shall certify the Units represented by such certificate. Books and records reflecting the record ownership of the Units shall be kept by the Secretary. In the event any Officer who shall have signed, or whose facsimile signature or signatures shall have been placed upon, any such certificate or certificates shall have ceased to be such Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such Officer at the date of issue. The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed. Each certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE**

6

SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY MAY BE REQUESTED BY THE COMPANY TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT).

THIS SECURITY MAY BE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JULY 14, 2017 (AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

(c)     Initial Unit Designations; Effective Date Issuances.

(i)     A class of Units designated as "*Senior Preferred Units*" is hereby created and a class of Units designated as "*Series A Units*" is hereby created. The Company is authorized to issue as many Senior Preferred Units and Series A Units as the Board approves from time to time. Schedule 1 lists the Members and the number of Senior Preferred Units and/or Series A Units issued to each of them as of the Effective Date. The Board, without any action by any Member or any other Person, is authorized to amend and restate Schedule 1 from time to time to reflect the admission of new Members, the cessation of any Person as a Member and transfers and issuances of Units made, in each case, in accordance with this Agreement.

(d)     Voting Rights. Unless otherwise specified in this Agreement or the resolution of the Board creating any class or series of Voting Units, all classes and series of Voting Units shall vote together as a single class on all matters.

**Section 4.3     *Preemptive Rights*.**

(a)     Except for Exempted Units, prior to the Company issuing, after the date hereof, any Units or any equity security having rights, preferences or priority as to distributions senior to or on parity with any then existing Units, whether on a stand-alone basis or in tandem with notes, warrants, loans or other financial accommodations (collectively, the "*Offered Units*") to a proposed purchaser (the "*Proposed Purchaser*"), each Investor, so long as (i) in the case of an Investor that is one of the Hoops Related Parties, the Hoops Related Parties continue to collectively own of record at least 20% of the number of Series A Units owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations) and (ii) such Hoops Related Party remains an Eligible Investor (each, an "*Eligible Purchaser*"), shall have the right to purchase the number of Offered Units as provided below in this Section 4.3. "*Eligible Investor*" means any Person that is an "accredited investor" under Rule 501 of Regulation D of the Securities Act and who is not in default under this

7

LR_REV_00000096

Agreement.  In order to confirm that a Person is an "Eligible Investor" for the foregoing purposes, the Company may require such Person to deliver customary investor eligibility certificates and documentation supporting the financial or other representations made therein.

(b)     The Company shall give each Eligible Purchaser written notice of any proposed issuance of Offered Units to which the preemptive rights provisions of Section 4.3(a) apply (the "*First Notice*") not less than 15 days prior to any such issuance (the "*Initial Notice Period*").  The First Notice shall include (i) the proposed number and class of the Offered Units and a description of the rights and preferences of such class if such class is other than Senior Preferred Units or Series A Units; (ii) the prospective sale price per Unit; and (iii) any other proposed terms and conditions of such issuance and shall offer to each Eligible Purchaser the opportunity to purchase its Percentage Interest (which Percentage Interest shall be calculated as of the date of such notice) of the Offered Units at the same price, on the same terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company.  If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company shall furnish a supplemental notice (a "*Supplemental Notice*") describing the revised terms; provided, the Supplemental Notice shall not restart the Initial Notice Period, but the Company shall give each Eligible Purchaser a reasonable period of time (no fewer than five Business Days after the Eligible Purchaser receives such Supplemental Notice, which shall, to the extent necessary, extend the Initial Notice Period) (such Initial Notice Period, as extended if applicable, being referred to as the "*Election Period*") to consider the revised terms.  If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering written notice thereof to the Company prior to the expiration of the Election Period or such later date determined by the Company because of material changes in the terms of the issuance or for any other reason.  Each Eligible Purchaser's notice shall state the dollar amount of Offered Units such Eligible Purchaser (each a "*Requesting Investor*") would like to purchase up to a maximum amount equal to such holder's Percentage Interest of the total offering amount plus the additional dollar amount of Offered Units such Requesting Investor would like to purchase in excess of its Percentage Interest (the "*Over-Allotment Amount*"), if any, if other Eligible Purchasers do not elect to purchase their full Percentage Interest of the Offered Units.  The rights of each Requesting Investor to purchase a dollar amount of Offered Units in excess of each such Requesting Investor's Percentage Interest of the Offered Units shall be based on the Requesting Investors' relative Percentage Interests of the excess Offered Units.

(c)     If all of the Offered Units are not fully subscribed by the Eligible Purchasers pursuant to the foregoing, the Company shall have the right to either (i) accept the partial subscriptions from the Eligible Purchasers and issue and sell the unsubscribed for portion of the Offered Units to the Proposed Purchaser (only on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable) at any time during the 90 days following the termination of the Election Period or (ii) cancel the entire offering (in which case any new offering will again be subject to the terms of this Section 4.3).  The Board may, acting unanimously, impose such other reasonable and customary terms and procedures such as setting a closing date (no fewer than five Business Days after the expiration of the Election Period), rounding the number of Units covered by this Section 4.3 to the nearest whole Unit and requiring customary closing deliveries such as accredited investor certificates, unit powers, representations of ownership and absence of encumbrances in connection with any preemptive rights offering.

8

Except in the case of an Eligible Purchaser which withdraws its election to exercise its preemptive rights in any offering due to a material change in the terms and conditions of the offering occurring after its election, if any Eligible Purchaser refuses to purchase Offered Units for which it subscribed pursuant to the exercise of preemptive rights granted thereto under this Section 4.3, in addition to any other rights the Company may be permitted to enforce at law or in equity, the Board may require such Member and any Permitted Transferee thereof, in connection with exercising any future pre-emptive rights granted under Section 4.3 in connection with a future offering, to deposit with the Company, along with written notice of its election to exercise its rights hereunder, such funds as may be necessary to purchase the Offered Units subscribed for by such Person (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all) (any such deposit to be fully refundable if the offering is cancelled or if the Member is permitted to withdraw its subscription due to a material change in the terms and conditions of the offering occurring after its election, or partially refundable to the extent that the amount deposited exceeds the ultimate purchase price of the Units such Eligible Person is permitted purchase under this Section 4.3 for the applicable offering).

(d)     The rights granted to the Lime Rock Investors under this Section 4.3 may be transferred to any private equity fund that is an Affiliate of Lime Rock.  The rights granted to each Hoops Related Party in this Section 4.3 are personal to it and cannot be transferred including by Involuntary Transfer; provided, however, to the extent that a Hoops Related Party makes a Permitted Transfer of its Units, such transferee may, if so permitted by such Hoops Related Party, exercise its rights hereunder.

**Section 4.4**    *Transfers of Units*.  The Units shall be bound by, and the Members shall comply with, the terms set forth on Exhibit B hereto governing, among other matters, the Transfer of Units.

**Section 4.5**    *Registration Rights*.  Each Member understands and agrees that the Units issued on or prior to the date hereof have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act.  The Company shall comply with, and the Members shall comply with and be entitled to the benefits of, the provisions set forth on Exhibit C governing and providing for, among other matters, registration rights with respect to the registrable securities.

**Section 4.6**    *Additional Terms Relating to Members*.  No Member (a) has the right or power to Resign or (b) may be Expelled from the Company (other than in the event that such Member ceases to hold Units).

**Section 4.7**    *Liability to Third Parties*.  No Member shall be liable for the debts, obligations or liabilities of the Company, nor shall any Member be obligated to guaranty any debt, obligation or liability of the Company.

9

CONFIDENTIAL                                                     LR_REV_00000098

## ARTICLE 5

## CAPITAL CONTRIBUTIONS

**Section 5.1**   *Capital Contributions*.

(a)   *Initial Contributions*.  As of the Effective Date, each Member has made Capital Contributions to the Company equal to the amount set forth opposite such Member's name on <u>Schedule 1</u> hereto in the column entitled "Capital Contributions" in exchange for the number and type of Units set forth opposite such Member's name in <u>Schedule 1</u>.  No Member shall have any obligation to make any Capital Contribution after the Effective Date.

**Section 5.2**   *Return of Capital Contributions*.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest with respect to either its Capital Account or its Capital Contributions.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 5.3**   *Advances by Members*.  Any Member may, with the consent of the Board, advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company on such terms as the Board and such Member mutually agree.

**Section 5.4**   *Capital Accounts*.

(a)   A separate capital account (a "*Capital Account*") will be maintained for each Member.  Each Member's Capital Account will be increased by:  (i) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Profits and other items of income and gain pursuant to Section 6.3 and Section 6.4.  Each Member's Capital Account will be decreased by:  (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Losses and other items of deduction and loss pursuant to Section 6.3 and Section 6.4.

(b)   In the event of a permitted sale or exchange of an interest the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred interest in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)   The manner in which Capital Accounts are to be maintained pursuant to this Section 5.4 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.4 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.4,

10

LR_REV_00000099

the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

## ARTICLE 6

## DISTRIBUTIONS; ALLOCATIONS

**Section 6.1**    *Distributions*.

(a)    *Regular Distributions.*    Available Cash and other property shall be distributed to the Members solely at such times and in such amounts as the Board shall determine and approve.  Subject to the remaining provisions of this Article 6, at any such time, distributions shall be made according to the following methodology and the following order of priority:

(i)    First, 100% to the holders of Senior Preferred Units in respect of each Senior Preferred Unit held of record thereby until there has been distributed under this Section 6.1(a)(i) an amount equal to the sum of (A) $100 and (B) an amount sufficient to reduce such Senior Preferred Unit's Senior Preferred Return Amount to $0, in respect of each Senior Preferred Unit held of record by all holders of Senior Preferred Units; and

(ii)    Second, 100% to the holders of Series A Units (pro rata in accordance with the number of Series A Units held by each).

(b)    [RESERVED]

(c)    [RESERVED]

(d)    For the avoidance of doubt, no Member shall be required to return cash to the Company pursuant to this Section 6.1(b) with respect to any class of Units in excess of the total distributions made to such Member in respect of such class of Units reduced by the Maximum Tax Liability attributable to such Units.

(e)    [RESERVED]

(f)    Notwithstanding the foregoing, other than upon the occurrence of a Dissolution Event, Internal Restructure or Sale Transaction, distributions shall not be made pursuant to Section 6. l(a)(ii) and 6.1(a)(iii) to the extent such distributions would cause such holder's Capital Account (reduced by any tax distributions required to be made to such holder pursuant to Section 6.2) to be less than zero.

**Section 6.2**    *Tax Distributions*.  Notwithstanding anything to the contrary in Section 6.1, unless prohibited by applicable law or by any contract binding on the Company, prior to making any distribution under Section 6.1, the Company shall distribute cash to the Members at least five Business Days before estimated quarterly tax payments are due in respect of each of the quarters of each Fiscal Year on a pro rata basis based on the Board's good faith estimate of the projected Maximum Tax Liability of each Member, assuming a reasonable projection of the Company's annual Net Profit for the Fiscal Year.  The Company shall not have any liability to a Member for

11

LR_REV_00000100

penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments. Any distributions made pursuant to this Section 6.2 shall be treated as an advance payment of, and shall reduce by a like amount, the amounts otherwise distributable to such Member pursuant to Section 6.1.

**Section 6.3** *Allocations of Net Profits and Net Losses*. After giving effect to the allocations under Section 6.4, except as otherwise provided herein, for purposes of maintaining the Capital Accounts, Net Profit and Net Loss for each Fiscal Year or other period shall be allocated among the Members in such a manner as shall cause the Capital Accounts of the Members (as adjusted to reflect all allocations under Section 6.4 and all distributions through the end of such period) to equal, as nearly as possible, (a) the amount such Members would receive if all assets of the Company on hand at the end of such period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of Nonrecourse Liabilities to the Book Value of the property securing such liabilities) and all remaining cash were distributed to the Members under Section 11.02(c) minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount any such Member is treated as obligated to contribute to the Company, computed immediately after the hypothetical sale of assets.

**Section 6.4** *Regulatory Allocations*.

The following allocations shall be made in the following order:

(a)     Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Sharing Ratios.

(b)     Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4). If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss. This Section 6.4(b) is intended to comply with the provisions of Treasury Regulation Section 1.704- 2(i) and shall be interpreted consistently therewith.

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(c)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)). This Section 6.4(c) is intended to constitute a minimum gain chargeback under Treasury Regulation Section l.704-2(f) and shall be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except Section 6.4(c) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum

CONFIDENTIAL                                                                    LR_REV_00000101

Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year) and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(d), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).   This Section 6.4(d) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except Section 6.4(c) and Section 6.4(d) (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible.  This Section 6.4(e) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704- 1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)     In the event that any Member has a negative Capital Account at the end of any Fiscal Year, such Member shall be allocated items of Company gross income and gain in the amount of such deficit as quickly as possible; provided that an allocation pursuant to this Section 6.4(f) shall be made only if and to the extent that such Member would have a negative Capital Account after all other allocations provided for in this Section 6.4 have been tentatively made as if this Section 6.4(f) were not in this Agreement.

(g)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) or 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

**Section 6.5**     *Curative Allocations*.  The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.   The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Board is authorized to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero.  The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

CONFIDENTIAL

**Section 6.6**   *Income Tax Allocations.*

(a)      All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as otherwise provided in this Section 6.6.

(b)      In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using the "traditional method" with no curative or remedial allocations.  In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Regulations thereunder.

(c)      Any (i) recapture of depreciation, depletion, "section 1254" costs or any other item of deduction shall be allocated, in accordance with Treasury Regulations Sections 1.1245-l(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of remedial allocations), and (ii) recapture of credits shall be allocated to the Members in accordance with applicable law.

(d)      Allocations pursuant to this Section 6.6 are solely for purposes of federal, state, and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**Section 6.7**   *Other Allocation Rules.*

(a)      All items of income, gain, loss, deduction and credit allocable to a Membership Interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as the owner of such Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Code Section 706 and the regulations thereunder.

(b)      The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be determined in accordance with their Sharing Ratios (relating solely to the Senior Preferred Units and Series A Units).

**Section 6.8**   *Limitation Upon Distributions.*   No distribution shall be declared and paid unless, after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities or if the declaration or payment would cause the Company or any of its Subsidiaries to breach any material agreement.

14

CONFIDENTIAL

**Section 6.9     *Withholding Authorized.*** The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign law. All amounts required to be withheld pursuant to federal, state, local or foreign tax laws shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

## ARTICLE 7

## MANAGEMENT

**Section 7.1     *Management by Directors.*** The Company shall be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7, except with respect to certain consent or approval requirements provided in this Agreement, no Member by virtue of having the status of a Member shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company. The "managers" are referred to as "Directors" throughout this Agreement. The business and affairs of the Company shall be managed by the Board of Directors of the Company (the "***Board***", in accordance with this Agreement. Under the direction of the Board, to the extent that the Board designates Officers pursuant to Section 7.5, the day-to-day activities of the Company shall be conducted on the Company's behalf by the Officers, who shall be agents of the Company. In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, the Board shall have full power and authority to do all things on such terms as they may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company.

**Section 7.2     *Board of Directors.*** Each Member agrees that it will cast all votes ascribed to its Units, if any, or execute consents, as the case may be, and take all other necessary action (including causing the Company to call a special meeting of Members) in order to elect individuals, who have been nominated in accordance with the remaining provisions of this Section 7.2, to serve as Directors of the Board and otherwise to ensure that the composition of the Board is at all times consistent with the following:

(a)     Composition; Initial Directors; Observation Rights.

(i)     The Board shall consist of natural persons who need not be Members or residents of the State of Delaware. Subject to the remaining provisions of this Section 7.2, the Board shall consist of three Directors, and the nominees to stand for election to serve as Directors shall be designated as follows: (A) one individual nominated by Hoops (the "***Hoops Designee***"), so long as (x) Jeffrey A. Hoops, Sr., remains employed with the Company and (y) the Hoops Related Parties continue to collectively own of record at least 20% of the number of Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations); and (B) two individuals nominated by the Lime Rock Investors (each, a "Lime Rock Designee"). The initial Lime Rock Designees are John T. Reynolds and Jeffrey B. Scofield. The Hoops Designee shall be Jeffrey A. Hoops, Sr., Patricia A.

15

Hoops, or any of their descendants and shall initially be Jeffrey A. Hoops, Sr. In the event that Hoops' right to nominate the Hoops Designee terminates as provided above, the Lime Rock Designees, acting jointly, shall have the right to require the Hoops Designee's resignation from the Board. Thereafter, the Lime Rock Designees can either elect to fill the vacancy on the Board created by the removal or reduce the size of the Board to eliminate the vacancy on the Board created by such removal. The Company shall allow up to two representatives designated by the Lime Rock Investors and, so long as the Hoops Related Parties continue to collectively own of record at least 20% of the Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations), up to two representatives designated by Hoops to attend all meetings of the Board in a nonvoting capacity, and in connection therewith, the Company shall give such representative copies of all notices, minutes, consents and other materials, financial or otherwise, which the Company provides to the Board; provided, however, that such representative shall agree to hold in confidence and trust all such information pursuant to a confidentiality agreement satisfactory to the Company; provided further, however, that the Company reserves the right to exclude such representatives from access to any material or meeting or portion thereof if the Company believes that (i) such exclusion may be helpful or necessary to preserve the attorney- client privilege or (ii) the presence of such representative could materially impair due consideration of the Board with respect to certain competitively sensitive matters, proprietary information and other similar matters (and the Company shall not be obligated to provide the representative with any related materials provided to the Board).

(ii)    [RESERVED]

(iii)    Except as otherwise provided herein and for so long as such Person has the right to designate any Director, the Lime Rock Investors shall have the right to designate alternate or successor Directors (in lieu of the Lime Rock Designees), who may replace any absent or disqualified Director who was designated thereby; and Hoops shall have the right to designate alternate or successor Directors (in lieu of any Hoops Designee), who may replace any absent or disqualified Director who was designated thereby.

(iv)    Each individual elected to serve on the Board in accordance with this Section 7.2 shall serve until a successor is duly nominated and elected to serve in his stead, or until his removal in accordance with Section 7.2(c), voluntary resignation, death or disability, as applicable.

(v)    The chairperson of the Board, if any, shall be designated by the majority vote of all the Directors.

(b)    _Vacancies_.  Any vacancy created by the death, disability, retirement, resignation or proper removal (*i.e.*, removal in accordance with Section 7.2(c)) of any individual designated under Section 7.2(a) (a "***Former Director***") shall be filled by a nominee designated by the Person that designated the applicable Former Director under Section 7.2(a) unless such Person no longer has the right to designate a nominee to serve as a Director.

16

(c)     Removal.  Except as provided in Section 7.2(a)(i), a Director nominated in accordance with Section 7.2(a) may not be removed from the Board during his or her term of office except by the Person or Persons authorized to nominate such Director or for Cause (it being understood and agreed that such Person authorized to nominate a successor to the removed Director shall be permitted to designate a different natural person as successor to the removed Director).

(d)     Quorum; Required Vote for Board Action.  Each Director shall be entitled to cast one vote, in person or by proxy, with respect to each matter submitted for the vote or consent of the Board.  If only one Lime Rock Designee attends any meeting of the Board, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that is absent from such meeting.  If there is one or more vacancy on the Board because the Lime Rock Investors have yet to nominate both of the Lime Rock Designees, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that has yet to be nominated.  Directors then serving on the Board (*i.e.*, excluding any vacancies on the Board) that are entitled to cast a majority of the votes that may be cast by all of the Directors then serving on the Board must be present in order to constitute a quorum for the transaction of business of the Board.  The act of a majority of the Directors present, in person or by proxy, at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by the Act, the Certificate of Formation or by this Agreement (including Section 7.2 hereof).  A Director who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered into the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favor of such action.

(e)     Location; Order of Business.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)     Meetings of the Board; Notices.  The Board shall meet at least quarterly. Regular meetings of the Board shall be held at such places as shall be designated from time to time by resolution of the Board.  Special meetings of the Board may be called by any Investor on at least five days personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each Director, with such notice containing a statement of the purposes for such special meeting.  If a Hoops Designee is not able to attend a special meeting, such Director shall promptly send personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each other Director of such Director's inability to attend the special meeting and, unless otherwise agreed, the special meeting shall be rescheduled to a date not later than ten Business Days from the original date of such special meeting.

(g)     Reimbursement; Compensation.  All Directors shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including travel expenses in accordance with the Company's travel reimbursement policies.

17

LR_REV_00000106

**Section 7.3**     *Meetings of the Members*.

(a)     <u>Place of Meetings</u>.  All meetings of the Members shall be held at the principal office of the Company, or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice) thereof.

(b)     <u>Quorum; Required Vote for Member Action; Adjournment of Meetings</u>. Except as expressly provided otherwise by this Agreement, the holders of a majority of the Voting Units then outstanding, voting together as a single class, and entitled to vote at any meeting of Members, present in person or represented by proxy thereat, shall constitute a quorum at any such meeting for the transaction of business, and the affirmative vote of the holders of a majority of the Units so present or represented at such meeting, voting together as a single class, at which a quorum is present shall constitute the act of the Members.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c)     <u>Annual Meetings</u>.  An annual meeting of the Members for the election of Directors to succeed those Directors serving on the Board whose terms expire and for the transaction of such other business as may properly be considered at the meeting may be held at such place, within or without the State of Delaware, on such date, and at such time as the Board shall fix and set forth in the notice of the meeting; provided, until such time as a meeting of Members shall be called in accordance with this Section 7.3, the Directors shall continue to serve until their resignation or removal in accordance with Section 7.2.  In lieu of annual meetings, which are not a requirement for any purpose, the Members may elect Directors by written consent.

(d)     <u>Record Date</u>.

(i)     The Board shall give at least 10 days personal, written or wireless notice *(e.g.*, e-mail) of any meetings of the Members of the Company.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.

(ii)     If, in accordance with this Agreement, action without a meeting of Members is permitted to be taken, the Board may fix a record date for determining Members entitled to consent in writing to such action, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed

18

CONFIDENTIAL

by the Board, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or to an Officer of the Company having custody of the book in which proceedings of meetings of Members are recorded.

(iii)    A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

**Section 7.4    *Provisions Applicable to All Meetings*.**  In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions shall apply:

(a)    <u>Waiver of Notice Through Attendance</u>.  Attendance of a Person at such meeting (including attendance by telephone pursuant to Section 7.4(d)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)    <u>Proxies</u>.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a Members meeting may vote at a Members meeting by a written proxy executed by that Person and delivered to the Secretary.  A proxy shall be revocable unless it is stated to be irrevocable.

(c)    <u>Action by Written Consent</u>.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by all of the Directors or members of a committee of the Board or the Members, as applicable.

(d)    <u>Meetings by Telephone</u>.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment shall be given full effect.

**Section 7.5    *Officers*.**  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company (*"Officers"*), and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described by resolution of the Board or as is customary for each such position.  In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person."  An employee or other agent of the

19

LR_REV_00000108

Company shall not be an authorized person unless specifically appointed as such by the Board. Duly elected and designated Officers shall have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board; provided, notwithstanding anything to the contrary herein, unless such acts have been approved by the Board, the Officers shall not have the power or authority to cause or permit the Company to do or perform any of the following:

(a) Incur any indebtedness or make any loan other than trade payables incurred in the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(b) Sell, assign, convey or otherwise dispose of assets or properties of the Company outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(c) Make any capital expenditure outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(d) Approve or amend any capital or operating budget;

(e) Mortgage, pledge, assign in trust or otherwise encumber or permit to be encumbered any of the Company assets outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board; or

(f) Enter into any transaction with a Member or an Officer or an Affiliate of a Member or an Officer.

**Section 7.6** *Duties of Directors and Members.*

(a) To the fullest extent permitted by the Act, a person, in performing his duties and obligations as a Director under this Agreement, shall be entitled to act or omit to act at the direction of the Members that designated such person to serve on the Board, considering only such factors, including the separate interests of the designating Members, as such Director or Members choose to consider, and any action of a Director or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Director or Members designating such Director, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Director or Members of the Company or any other Director or Member.

(b) The Members (in their own names and in the name and on behalf of the Company) hereby:

(i) agree that (A) the terms of this Section 7.6, to the extent that they modify or limit a duty or other obligation, if any, that a Director may have to the Company or any another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this Section 7.6 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have

20

LR_REV_00000109

to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

           (ii)      waive to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.6.

        (c)      The Members (in their own names and in the name and on behalf of the Company), acknowledge, affirm and agree that (i) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 7.6, and (ii) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

## ARTICLE 8

## ADDITIONAL COVENANTS

**Section 8.1**    *Reports*.  Except as expressly stated otherwise, the Company shall deliver the following reports and information to the Investors:

        (a)      <u>Annual Reports</u>.

           (i)      As soon as available and in any event within 90 days after the end of each Fiscal Year, a consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related consolidated and consolidating statements of operations, members' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified without qualification to the Board by an Accounting Firm as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

           (ii)      As soon as available and in any event within 90 days after the end of each Fiscal Year, the Company shall deliver a reserve report prepared in accordance with applicable SEC guidelines by an independent engineer approved by the Board with respect to the coal reserves of the Company and the Subsidiaries.

           (iii)      Prior to year-end, an annual capital and operating budget for the coming year, that shall be approved by the Board (as the same may be modified as approved by the Board on a month-to-month basis).

        (b)      <u>Monthly Reports</u>. As soon as practicable and in any event within 30 days after the end of each calendar month (including the last calendar month of the Company's Fiscal Year), a management report discussing the financial condition and operations of the Company and its Subsidiaries for the most recent period ended for which information is available, all in reasonable detail and certified by an officer of the Company as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance

CONFIDENTIAL

with GAAP, as applied consistently with the Company's practices, and with the audited financial statements of the Company, excluding customary footnotes and year-end adjustments.

(c)     Weekly Reports.  Upon the request of the Lime Rock Investors, the Chief Executive Officer shall hold a weekly conference call during which management shall describe significant issues and events which have occurred during the previous week or which are expected to occur during the coming week (or such other reasonably relevant time frame as requested by the Lime Rock Investors).  The Lime Rock Investors shall be afforded the opportunity to ask questions regarding the information presented.  Notice of such conference call and the call-in number therefore shall be made available to the Lime Rock Investors and the Chief Executive Officer not less than 48 hours prior to the commencement of such conference call.

(d)     Other Information.

(i)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors notice of:  (A) any default in any material respect under any material agreement to which the Company or any Subsidiary is a party; (B) any material lawsuit or proceeding against the Company or any Subsidiary or executive officers, in their capacities as such executive officer; and (C) any other material change, event or circumstance affecting the Company, any Subsidiary or any executive officer, in their capacity as such executive officer, thereof.

(ii)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors with copies of all material communications relating to any interest expressed by third-parties to engage in a Sale Transaction and all reasonable terms and other detail expressed in connection with such interest.

(iii)     Within five Business Days of the Company's receipt thereof, the Company shall provide the Lime Rock Investors with copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Company or any of its Subsidiaries to its Members, (B) all regular and periodic reports and all registration statements and prospectuses filed by the Company or any of its Subsidiaries with any securities exchange quotation system or service or with the SEC or any successor, (C) all press releases and other statements made available generally by the Company or any Subsidiaries concerning material developments in the business of the Company or its Subsidiaries and (D) all material communications with and from Federal, state or major municipal regulatory agencies or other governmental authorities, excluding any communications that are usual, customary, and in the ordinary course of the business of the Company and its Subsidiaries.

(iv)     The Company shall promptly (but in any event within five Business Days) provide to a Member any other information reasonably requested by such Member.

(v)     To each Member, as soon as available, but in no event more than 90 days after the end of each year, a copy of all tax information required to be provided to members, including but not limited to Schedules K-1.

22

**Section 8.2     *Inspection Rights*.**  Each Investor and its duly authorized representatives shall be permitted, during normal business hours and upon reasonable advance notice to the Company, to (a) inspect the books, records, contracts and agreements of the Company and the Subsidiaries for any proper purpose and make copies thereof and (b) obtain any information reasonably requested by such Member relating to the Company and the Subsidiaries.  All costs incurred in such inspection will be borne by the requesting Member; provided, that if it is determined that the Company or its Subsidiaries is in breach of this Agreement, then such costs will be borne by the Company.

**Section 8.3     *Internal Restructure*.**

(a)     The Company, upon the unanimous approval of the Board, may affect an Internal Restructure on such terms as the Board in good faith deems advisable; provided that each Member (and if applicable, the stockholders, members, partners, trustees or other equity owners of an entity or trust Member, as applicable) is treated equitably and incurs no personal liability with respect to such Internal Restructure.  Each Member agrees that it will consent to and raise no objections to such an Internal Restructure, in accordance with this Section 8.3, that has been unanimously approved by the Board.  Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this Section 8.3) to be executed by such Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement, including, without limitation, relative equity ownership percentages among the holders of a series or class of Units, relative pro rata distribution rights among the holders of a series or class of Units, pre-emptive rights (except in connection with a public offering of the Company), those provisions granting the Board authority to manage the affairs of the Company, and granting certain Persons the right to nominate and cause the election of Directors, governing Transfers of Units or other equity securities and indemnification.

(b)     The Members acknowledge that an Internal Restructure may be undertaken in connection with a public offering of the Company, an acquisition of another business or entity or the sale of equity in the surviving entity to other Persons.

(c)     Upon the consummation of an Internal Restructure, the surviving entity or entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company.  The governing instruments of the surviving entity shall incorporate the governance provisions of this Agreement as closely as practicable.  All Members shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Company in connection with consummating an Internal Restructure (in accordance with this Section 8.3) including voting for or consenting thereto.

(d)     Notwithstanding anything to the contrary in this Section 8.3, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a public offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby and such Member is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to

23

                                                           LR_REV_00000112

otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a Purchaser Representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.  No Member shall have any dissenters' or appraisal rights in connection with any Internal Restructure, and each Member hereby votes in favor of such Internal Restructure and agrees to execute such further instruments as the Company reasonably requests to further evidence the waiver of any such dissenters' or appraisal rights.

(e)    Each Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions of this Section 8.3.

**Section 8.4** *Confidentiality*.    The Members acknowledge that they may receive information from or regarding the Company, any of its Subsidiaries, the other Members, or Affiliates of any of the foregoing in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing.  Each Member shall hold in confidence and not disclose any confidential or proprietary information it receives regarding the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing that is identified as confidential and may not disclose it to any Person other than another Member except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) to Affiliates, advisers or representatives of the Member (provided that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Affiliates, advisors and/or representatives to whom it discloses such information), (c) of information that the Member also has received from a source independent of the Company, any of its Subsidiaries, other Member, or Affiliates of any of the foregoing, as applicable, that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (d) to any Person to which such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and shall disclose only that portion of such information required to be disclosed), (f) permitted by the Company or Member affected by such disclosure, as applicable, (g) by any Member that is a private equity fund, hedge fund or institutional investor to its investors, partners or Affiliates (exclusive, however, of any portfolio company or any of their officers, directors, employees or owners, other than such Member); provided, that such Member remains liable for any breach of this provision by its investors, partners and Affiliates to whom it discloses

24

                                                                              LR_REV_00000113

such information, or (h) by any private equity fund, hedge fund or institutional investor of confidential information to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Person reasonably deems necessary or appropriate in connection with such Person obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information and that the information permitted to be so disclosed shall in no event include the identity of any direct or indirect owner of any Member or any information regarding such Person's direct or indirect ownership in any Member.  The Members agree that breach of the provisions of this Section 8.4 may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this Section 8.4.  Accordingly, the Members agree that the provisions of this Section 8.4 may be enforced by specific performance.

Section 8.5     *Business Opportunities*.

(a)     Company Opportunities.  The Company and each Member recognize Lime Rock and its Affiliates are private equity funds, hedge funds and institutional investors and that they, their partners or investors (such persons, together with the operating companies described in this sentence, are collectively referred to as the "***Fund Group***" and individually as a "***Fund Group Member***") invest in, serve on the board of directors and other governing boards of, serve as officers of, provide services to and have minority and controlling ownership interests in existing and future operating companies.  Except for the confidentiality obligations contained in Section 8.4, nothing in this Agreement or the nature of the existing or any future relationship between any Fund Group Member, on the one hand, and the Company or any Member, on the other (whether such relationship is by reason of any Fund Group Member acting as a lender, owner of equity interests or warrants, landlord, service provider or otherwise), will prohibit any Fund Group Member from engaging in any activity or business opportunity whatsoever for its own account or will require any Fund Group Member to make any business opportunity available to the Company, in each case, even if such activity or business opportunity competes with the Business Line or any other business conducted by the Company.

(b)     Renunciation of Company Opportunities.  The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Fund Group Member participates in or desires to participate in including those that may involve any aspect related to the Business Line or any other business conducted by the Company (each such business opportunity is referred to as a "***Fund Renounced Business Opportunity***").  No Fund Group Member shall have any obligation to communicate or offer any Fund Renounced Business Opportunity to the Company, and any Fund Group Member may pursue any Fund Renounced Business Opportunity solely for its own account.

Section 8.6     *VCOC Related Rights*.  So long as any Lime Rock Investor is a Member or owns, directly or indirectly, any ownership interest in the Company, such Lime Rock Investor shall have the right under this Agreement to consult with and advise the management of the Company and any of its subsidiaries (including the right to meet with management personnel at least quarterly at the request of such Lime Rock Investor) on matters relating to the business and

25

financial affairs of the Company and any of its subsidiaries.  The rights granted to each Lime Rock Investor under this Section 8.6 are intended to constitute "management rights" within the meaning of U.S.  Department of Labor Regulation § 2510.3-101 (d)(3)(ii), and the Company and its subsidiaries will be operated consistent with the status of the Company as a "venture capital investment" of the Lime Rock Investors.  The involvement of any Lime Rock Investor as contemplated in this Section 8.6 is for the purpose of informing such Lime Rock Investor with respect to various Company and subsidiary matters and receiving any ideas and suggestions that such Lime Rock Investor may have with respect to Company and subsidiary matters but is not otherwise intended to change the governance of the Company or any of its subsidiaries as more particularly set forth in this Agreement.  Notwithstanding anything to the contrary contained in this Section 8.6, the Board shall have full and exclusive power and authority on behalf of the Company and its subsidiaries to acquire, manage, control, administer and operate the property, business and affairs of the Company and its subsidiaries in accordance with Article 7 and the other applicable provisions of this Agreement.

## ARTICLE 9

## EXCULPATION AND INDEMNIFICATION

**Section 9.1    *Exculpation*.**  No Director or Officer in his capacity as such and no Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for ( a) liability for acts that involve fraud, willful misconduct or gross negligence and (b) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (a) and (b) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator.  Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Director, Affiliate or Officer thereof breached the standard of care set forth above in this Section 9.I.  In addition, by resolution of the Board, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Director or Officer is exculpated under this Section 9.1.

**Section 9.2    *Indemnification*.**  Subject to the limitations set forth in this Article 9, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "***Proceeding***"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was an Officer or Director or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this Section 9.2, indemnified by the Company to the fullest extent permitted by the Act, as the

26

LR_REV_00000115

same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 9 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. Notwithstanding anything to the contrary in this Section 9.2, a person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such person seeks indemnification, such person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company or that such person's actions constituted fraud, willful misconduct or gross negligence.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 9.3     *Advance Payment*.  The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

Section 9.4     *Indemnification of Employees and Agents*.  The Company, by adoption of a resolution of the Board, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company who is not an Officer or Director to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Directors under this Article 9.

Section 9.5     *Appearance as a Witness*.  Notwithstanding any other provision of this Article 9, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by an Officer or Director or Member in connection with its appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

Section 9.6     *Nonexclusivity of Rights*.   The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right that an Officer or Director or other Person indemnified pursuant to this Article 9 may have or hereafter acquire by vote of the Board.  The Company hereby acknowledges that the Lime

27

Rock Designees have certain rights to indemnification, advancement of expenses and/or insurance provided by Lime Rock and certain of its Affiliates (collectively, the "**Fund Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort with respect to the Lime Rock Designees (*i.e.*, its obligations to the Lime Rock Designees are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Lime Rock Designees are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Lime Rock Designees and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights a Lime Rock Designee may have against the Fund Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of a Lime Rock Designee with respect to any claim for which such Lime Rock Designee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Lime Rock Designee against the Company. The Company and each of the Members acknowledges that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 9.6).

**Section 9.7   *Insurance*.** Without limiting the Company's other obligations under this Article 9 and as soon as practicable, the Company shall procure and at all times maintain directors and officers liability insurance policies on customary terms, and all of the Officers and Directors, current and former, shall be included as insureds under such policies. Without limiting the Company's other obligations under this Article 9, the Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as an authorized person, authorized signatory, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

## ARTICLE 10

## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

**Section 10.1   *Tax Returns*.** The Company shall prepare and timely file all tax returns and reports required to be filed by the Company. Unless otherwise agreed by the Directors, any income tax return of the Company shall be prepared by the Accounting Firm. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a Schedule K-1 to each of the Members as soon as practicable after the close of each taxable year, but in no event later than 90 days after the end of each year, together with such additional information as may be required by the Members in order for the Members to

28

file their individual returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filing of its tax returns and reports.

Section 10.2   *Tax Partnership*.  The Members acknowledge that, subject to Section 8.3 and the impact of an Internal Restructure, the Company shall be treated as a partnership for Federal income tax purposes and will not otherwise characterize the Company for purposes of any Federal tax returns, statements or reports filed by them or their Affiliates.

Section 10.3   *Tax Elections*.  The Company shall make the following elections on the appropriate tax returns:

(a)   to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Tax Matters Member designates;

(b)   to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method unless the cash method of accounting is available and the Tax Matters Member designates the cash method of accounting for use by the Company;

(c)   if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Tax Matters Member determines that the Code Section 754 election is in the best interests of the Company and the other Members, and so long as the Board consents to such election;

(d)   to elect to amortize the organizational expenses of the Company ratably over a period of 180 months as permitted by Code Section 709(b);

(e)   any election that would ensure that the Company will be treated as a partnership for Federal income tax purposes; and

(f)   any other election the Board may deem appropriate and m the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

Section 10.4   *Tax Matters Member*.

(a)   Designation by the Board.  The "tax matters partner" of the Company pursuant to Section  6231(a)(7) of the Code shall be Lime Rock, or such other Member designated as such by the Board from time to time.  Any Member who is designated as the "tax matters partner" is referred to herein as the "*Tax Matters Member*."  The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its

29

LR_REV_00000118

capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

(b)    Duties and Obligations.    The Tax Matters Member shall take no action without the authorization of the Board, other than such action as may be required by Law.  Any cost or expense incurred by the Tax Matters Member in connection with its duties as such, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board.  The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the written consent of such Member.  Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 623 I (a)(3)) shall notify the other Members of such settlement agreement and its terms within 30 days from the date of the settlement.

(c)    Requests for Administrative Adjustments by Members.    No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members.  If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members.  If such consent is not obtained within 30 days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf.  Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding.  In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(d)    Notice of Inconsistent Treatment.    If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

(e)    For any taxable year for which the Bipartisan Budget Act is applicable, Lime Rock shall be the "Partnership Representative" as that term is defined in Section 6223(a) of the Amended Code and each Member shall take all actions necessary to cause Lime Rock to be so designated in accordance with any procedures prescribed therefor.  Unless determined otherwise by the Board and unless prohibited by applicable Law, the Company shall elect the alternative method of paying any imputed underpayment resulting from any Company adjustment as provided by Section 6226 of the Amended Code and each Member shall take any and all actions necessary to effect such election, including but not limited to the filing by each Member of amended returns and the payment of any tax, including any interest, penalties, or additions to such tax, resulting from the "imputed underpayment".  If such election is not made, the Company shall take commercially reasonable actions to minimize the financial burden of any imputed underpayment

30

    LR_REV_00000119

to the Company and the Members through the procedures established pursuant to Section 6225 of the Amended Code, including, to the extent permissible under this Agreement, taking any commercially reasonable actions to allocate the financial burden of any imputed underpayment to the Member(s) to whom such amounts are specifically attributable (whether as a result of their tax status, actions, inactions, or otherwise), unless taking such actions would preclude judicial review of an adjustment arising out of such audit, as determined by the Partnership Representative. The Company shall not elect to apply the partnership audit rules, as added by the Bipartisan Budget Act, to taxable years of the Company earlier than is required (without such election). The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Treasury Regulations issued thereunder. The Partnership Representative shall have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The provisions contained in this Section 10.4(e) shall survive the termination of the Company and the withdrawal of any Member.

**Section 10.5   *Bank Accounts*.**  The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Board may determine. The Company shall not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

**Section 10.6   *Fiscal Year*.**  The fiscal year of the Company (the "***Fiscal Year***") shall end on December 31 of each calendar year unless, for United States Federal income tax purposes, another fiscal year is required. The Company shall have the same fiscal year for United States Federal income tax purposes and for accounting purposes.

## ARTICLE 11

## DISSOLUTION, WINDING-UP AND TERMINATION

**Section 11.1   *Dissolution*.**

(a)   <u>General</u>.   Subject to Section 11.l(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "***Dissolution Event***"), and no other event shall cause the Company's dissolution:

(i)   the approval of the Board; and

(ii)   the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)   <u>Continuance of the Company</u>.   To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

31

LR_REV_00000120

**Section 11.2    *Winding-Up and Termination*.**  On the occurrence of a Dissolution Event, the Board may, acting unanimously, select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind-up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)    Accounting.  As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    Satisfaction of Obligations.  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 5.3); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    Distribution of Assets.  All remaining assets of the Company shall be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the provisions of Sections 6.3, 6.4, and 6.5;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    the property of the Company shall be distributed in accordance with Section 6.1 (with no part distributed under Section 6.2).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 11.2; provided, however, that no Member shall be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act;

32

provided, however, that no Member shall be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)     Final Capital Account Balances.  The Members intend that the allocations provided under Sections 6.3, 6.4, and 6.5 will produce final Capital Account balances for the Members that permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made in the order and priorities set forth in Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1).   If the allocations otherwise made under Sections 6.3, 6.4, and 6.5 would fail to produce such final Capital Account balances, the Board shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

Section 11.3   *Deficit Capital Accounts*.   No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 11.4   *Certificate of Cancellation*.  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company.  Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE 12

## GENERAL PROVISIONS

Section 12.1   *Books*.  To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

Section 12.2   *Offset*.  Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset.

Section 12.3   *Notices*.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by telecopy shall be deemed to have been received (a) on the day on which the sender receives return confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business

CONFIDENTIAL                                                                          LR_REV_00000122

Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the other Members.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 12.4**  *Entire Agreement; Supersedure.*     This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Members, and their respective Affiliates relating to the formation and operation of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

**Section 12.5**  *Effect of Waiver or Consent.*  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 12.6**  *Amendment or Restatement.*  Except as expressly set forth herein, this Agreement (including the Exhibits and Schedules) may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon unanimous Board approval); provided, (a) any amendment to this Agreement that would (i) obligate a Member to make a Capital Contribution to the Company (other than as provided by the terms of this Agreement in effect as of the Effective Date), (ii) cause a Member to have personal liability for Company obligations, (iii) materially adversely affect any Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director (other than any amendment related to an Internal Restructure in connection with an initial public offering) unless, with respect to each of the matters described in this clause (iii), such amendment (A) similarly affects all holders of a particular class of Units AND is approved by the holders of a majority of such class of Units or(B) similarly affects all holders of Senior Preferred Units and Series A Units AND is approved by the holders of a majority of all Senior Preferred Units and Series A Units voting as a single class, or (iv) adversely affect any Member's consent rights under this Section 12.7, shall be effective only with the consent of such Member, (b) to the extent that a provision of this Agreement requires a specified vote of the Members, or the vote of some or all of the holders of a specified class or series of Units, then any amendment of that provision will also require the consent of such specified vote of the Members or the vote of the requisite holders of such specified class or series of Units, as applicable, and (c) the Company (upon Board approval) may amend Schedule 1 without the consent of any Person to reflect new Members admitted in accordance with this Agreement, changes to the notice addresses and other similar relevant information.  The Certificate may be amended or restated only with the approval of the Company (upon Board approval), provided, however, that no such amendment or restatement of the Certificate may effect any change described in Section 12.7(a) or (b) above without the consent of the Member or Members whose consent would be required

34

under such clauses if such change were being effected through an amendment or restatement of this Agreement.

Section 12.7 *Binding Effect*. This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

Section 12.8 *Governing Law; Venue*. This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware. The Members covenant and agree that the state courts located in Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in Delaware shall have exclusive jurisdiction of any action or proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

Section 12.9 *Severability*. If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control. If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

Section 12.10 *Further Assurances*. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 12.11 *Waiver of Certain Rights*. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

Section 12.12 *Directly or Indirectly*. Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

Section 12.13 *Counterparts*. This Agreement may be executed in any number of counterparts, including facsimile counterparts, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**[SIGNATURES CONTAINED ON FOLLOWING PAGE]**

35

CONFIDENTIAL

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

**COMPANY:**

**BLACKJEWEL HOLDINGS L.L.C.**

By:_____

Name: Jeffery A. Hoops, Sr.

Title: President and Chief Executive Officer

**MEMBERS:**

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P.,
its general partner

By:  LRP GP V, Inc.,
its general partner

By:_____

Name: Jeffrey B. Scofield

Title: Managing Partner

**BLACKJEWEL INVESTMENT L.L.C.**

BLACKJEWEL INVESTMENT L.L.C.

By:_____

Name: Jeffrey A. Hoops, Sr.

Title: President and Chief Executive Officer

[*Signature page to Blackjewel Holdings LLC Agreement*]

LR_REV_00000125

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

<div align="center">

**COMPANY:**

**BLACKJEWEL HOLDINGS L.L.C.**

By:_____
Name: Jeffery A. Hoops, Sr.
Title: President and Chief Executive Officer

**MEMBERS:**

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P.,
its general partner

By:  LRP GP V, Inc.,
its general partner

By:_____
Name: Jeffrey B. Scofield
Title: Managing Partner

**BLACKJEWEL INVESTMENT L.L.C.**

BLACKJEWEL INVESTMENT L.L.C.

By:_____
Name: Jeffrey A. Hoops, Sr.
Title: President and Chief Executive Officer

</div>

*[Signature page to Blackjewel Holdings LLC Agreement]*

SCHEDULE 1

MEMBERS, UNITS AND INFORMATION RELATED THERETO

| Members | Number of Senior Preferred Units | Number of Series A Units | Capital Contributions as of the Effective Date |
|---|---|---|---|
| **LR-REVELATION HOLDINGS L.P.** 274 Riverside Ave., 3rd Floor Westport, CT 06880 Attention: Jeffrey B. Scofield | **292,354** | **625** | **$29.24** |
| **BLACKJEWEL INVESTMENT L.L.C.** 1149 Newmans Branch Road Milton, WV 25541 | **31,612** | **375** | **$3.16** |

Sch. 1-1

CONFIDENTIAL

## EXHIBIT A

## DEFINED TERMS

"***Accounting Firm***" means such accounting firm as the Board shall from time to time determine.  The initial Accounting Firm shall be Dixon Hughes Goodman PLLC.

"***Act***" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"***Adjusted Capital Account***" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections I. 704-1(b)(2)(ii)(c), l.704-2(g)(l) and l.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section l.704-l(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"***Affiliate***" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person.

"***Agreement***" means this Limited Liability Company Agreement of Blackjewel Holdings L.L.C., as amended and restated from time to time, including the Exhibits and Schedules hereto.

"***Amended Code***" means the Code (as amended by the Bipartisan Budget Act).

"***Available Cash***" means all cash, revenues and funds received by the Company from Company operations and proceeds from a Sale Transaction, less the sum of the following, to the extent paid or set aside by the Company:  (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the operation of the Company's business; and (c) such reserves as the Board deems reasonably necessary for the proper operation of the Company's business.

"***Bipartisan Budget Act***" means Title XI of the Bipartisan Budget Act of 2015 and any related provisions of law, court decisions, regulations, rules, and administrative guidance.

"***Book Liability Value***" means with respect to any liability of the Company described in Treasury Regulation Section I.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's- length transaction.  The Book Liability Value of each liability of the Company described in Treasury Regulation Section l.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values.

"***Book Value***" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

> (a)     The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

A-1

CONFIDENTIAL                                                          LR_REV_00000128

(b)      The Book Values of all properties shall be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by all Members in proportion to their respective Sharing Ratios) to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property (other than a distribution made to all Members in proportion to their respective Sharing Ratios) as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-l(b)(2)(ii)(g)(l) (other than pursuant to Section 708(b)(l)(B) of the Code); provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)      The Book Value of property distributed to a Member shall be the fair market value of such property as of the date of such distribution as reasonably determined by the Board;

(d)      The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses; and

If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Section 6.4.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the States of New York or West Virginia are authorized by Law to close.

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

"*Capital Stock*" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"*Cause*" means, with respect to any Person, that such Person (a) has committed willful misconduct or gross negligence in a manner that materially impairs the Company's financial condition or prospects, (b) has continually refused or intentionally failed to perform his duties and

A-2

obligations in some material respect after reasonable written notice (and reasonable time to cure) of any such refusal or failure to perform such duties or obligations or (c) has been convicted of a felony or crime involving moral turpitude.

"*Code*" means the United States Internal Revenue Code of 1986, as amended from time to time. All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"*Co-Sale Percentage*" means, for each Electing Member, a fraction (expressed as a percentage), the numerator of which is the number of Senior Preferred Units held of record by such Electing Member and the denominator of which is the sum of the number of Senior Preferred Units held of record by all Electing Members and the Co-Sale Seller.

"*Control*," including the correlative terms "*Controlling*," "*Controlled by*" and "*Under Common Control with*" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

"*Curative Allocations*" means the allocations pursuant to Section 6.5 of this Agreement.

"*Depreciation*" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"*Economic Risk of Loss*" has the meaning set forth in Treasury Regulation Section l.752-2(a).

"*Entity*" means any Person other than a natural person.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"*Exempted Units*" means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) any Units distributed or set aside ratably to all Members pro rata based on their respective Units, including any distribution issued for no

CONFIDENTIAL

consideration to all Unit holders or any split of Units, (c) any Units issued, sold or otherwise transferred to sellers as consideration in connection with the Company's or any Subsidiary's acquisition of all or substantially all of another Person or another Person's line of business or division, or all or substantially all of a Person's assets, in any case, by merger, consolidation, stock purchase, asset purchase, recapitalization, or other reorganization, (d) [RESERVED], (e) any Units issued, sold or otherwise Transferred to any third-party unaffiliated investor if the Board determines that there are strategic reasons to exempt such issuance, sale or Transfer from the preemptive rights terms of Article 4, (f) any Units issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates) in connection with any loan or commitment to loan made by such lender to the Company or any Subsidiary thereof and (g) any Senior Preferred Units issued pursuant to Section 5.1(b).

"***Expel, Expelled or Expulsion***" means the expulsion or removal of a Member from the Company as a member.

"***GAAP***" means United States generally accepted accounting principles and policies as in effect from time to time.

"***Hoops***" means Blackjewel Investment L.L.C., a Delaware limited liability company.

"***Hoops Related Parties***" means, collectively, Hoops and its respective Permitted Transferees.

"***HSR Act***" means the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

"***Internal Restructure***" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Members or their Affiliates continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Members or their Affiliates in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to any Member.

"***Investors***" means Hoops, LR-Revelation Holdings, L.P., and their respective Permitted Transferees that hold all or any portion of the Units issued by the Company to such Person from time to time.

"***Involuntary Transfer***" means a Transfer resulting from the death of a Person or another involuntary Transfer occurring by operation of law.

"***Joinder Agreement***" means an agreement substantially in the form of <u>Exhibit D</u> hereto pursuant to which a Person agrees to be bound by the terms of this Agreement and agrees that any Units held thereby shall be bound by the terms of this Agreement or such other form as the Board reasonably required in connection with a Transfer.

"***Lime Rock***" means LR-Revelation Holdings, L.P., a Delaware limited partnership.

A-4

"*Lime Rock Investors*" means Lime Rock and its Affiliates and any direct or indirect transferee of all or any portion of the Units issued by the Company to Lime Rock or its Affiliates from time to time.

"*Maximum Tax Liability*" means, for any Member, the product of (a) an amount determined by the Company (on an actual or estimated basis) for each Member for a completed fiscal quarter, as the case may be, equal to the sum of the portion of the Company's Net Profit allocated or to be allocated and guaranteed payments made or to be made pursuant to Article 6 to such Member for federal, state or local income tax purposes for such fiscal quarter multiplied by (b) the highest combined marginal federal, state and local income tax rates that apply to an individual residing in New York County, New York taking into account rate differences that may apply to the character of the income so allocated.  In determining cumulative Maximum Tax Liability for each Member, Net Losses allocated to a Member for a Fiscal Year that are allowed to be carried forward under applicable tax laws to a later Fiscal Year shall be deducted from Net Profit in that later year.

"*Member*" means any Person executing this Agreement as of the Effective Date, that executes a Restricted Unit Agreement and agrees to be bound by this Agreement or is hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

"*Member Nonrecourse Debt*" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"*Member Nonrecourse Debt Minimum Gain*" has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulation Section 1.704-2(i)(2).

"*Member Nonrecourse Deduction*" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(l).

"*Membership Interest*" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"*Minimum Gain*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

"*Net Loss*" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"*Net Profit*" means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

"*Nonrecourse Deduction*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(l).

A-5

"***Nonrecourse Liabilities***" means nonrecourse liabilities (or portions thereof) of the Company for which no Member bears the Economic Risk Of Loss.

"***Percentage Interest***" means, as to any Eligible Purchaser, a fraction (expressed as a percentage), the numerator of which equals the number of Voting Units held of record thereby and the denominator of which equals the number of Voting Units held of record by all of the Eligible Purchasers.

"***Permitted Transfer***" means any Involuntary Transfer or, with respect to any Member, any Transfer to (a) any parent, sibling, child or grandchild of such Member, (b) any trust, limited liability company, limited partnership or other Entity having as its sole beneficiaries or owners such Member, any Persons described in clause (a) above or any combination of the foregoing, (c) the shareholders, members, partners, beneficiaries or other equity owners of a Member that is an Entity, or (d) an Affiliate of a Member if such Member (or the sole shareholder(s)/member(s) of the Member) own(s) one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, (e) solely with respect to a Lime Rock Investor, any private equity fund that is an Affiliate of Lime Rock Management, L.P. and any direct or indirect, wholly-owned (together with any general partner) subsidiary of any such fund, and (f) any Person designated by the Board as a "Permitted Transferee" for purposes of such Transfer.

"***Person***" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"***Profits***" or "***Losses***" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(l) shall be included in taxable income or loss), with the following adjustments (without duplication):

      (a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

      (b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

      (c)     In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

CONFIDENTIAL

LR_REV_00000133

(d)      In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(e)      Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(g)      To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)      Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

"**_Registration Expenses_**" means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties and costs and expenses relating to analyst or investor presentations, if any, or any "road show" undertaken in connection with the registration and/or marketing of the Units other than as provided in any underwriting agreement entered into in connection with such offering), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters), (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Units of all participating Members, (h) fees and expenses in connection with any review of underwriting arrangements by the National Association of Securities Dealers, Inc. including fees and expenses of any "qualified independent underwriter", (i) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (j) fees and disbursements of underwriters

A-7

customarily paid by issuers or sellers of Units, but shall not include any underwriting discounts attributable to the sale of secondary Units, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members or any fees and expenses of underwriter's counsel, and (k) the expenses and fees for listing the Units to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system.

"**Regulatory Allocations**" means the allocations pursuant to Section 6.4 of this Agreement.

"**Resign**, **Resigning or Resignation**" means the resignation, withdrawal or retirement of a Member from the Company.  Such terms shall not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

"**Sale Transaction**" means any transaction or series of related transactions (whether such transaction occurs by a sale of assets, sale of Units or other Company interests, merger, conversion, recapitalization or other business combination) that, after giving effect thereto, results in (a) all or substantially all of the assets of the Company being held by an entity that is less than 50% owned by the record holders of Units immediately prior to such transaction and their Affiliates or (b) the record holders of the Units prior to such transaction and their Affiliates having record ownership, directly or indirectly after the consummation of such transaction, of 50% or less (determined by the percentage of liquidating distributions the record holders of Units would receive upon a liquidation of the Company or other surviving entity immediately after consummation of such transaction) of the equity securities of the surviving company.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Senior Preferred Return Amount**" means, with respect to any Senior Preferred Unit and as of any date of determination, the hypothetical interest amount that would have accrued and that would remain unpaid as of such date of determination on a promissory note in the original principal amount of $100 that accrues interest at a rate of 15% per annum, compounded annually beginning on the date such Senior Preferred Unit was issued by the Company and treating distributions in respect of such Senior Preferred Unit under Section 6.1(a)(i) to first be repayments of the principal amount of such promissory note and then to be repayments of accrued interest.

"**Sharing Ratio**" means, with respect to any Member, the ratio which the number of Units (or Units of a specified class or specified classes) held by that Member bears to the total number of Units (or Units of the specified class or specified classes) held by all Members.

"**Subsidiary**" means (a) any corporation or other entity (including a limited liability company) a majority of the Capital Stock of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect Subsidiary of the Company or (b) a partnership in which the Company or any direct or indirect Subsidiary is a general partner.

A-8

CONFIDENTIAL

"**_Transfer_**," including the correlative terms "**_Transferring_**" or "**_Transferred_**", means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided, however, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

"**_Treasury Regulations_**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.  All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

 "**_Voting Interest_**" means, with respect to each Member and any Person that acquires all or any portion of the Voting Units initially issued to and held by such Member, the percentage derived by dividing (a) the number of Voting Units (or Voting Units of a specific class) held by such Member by (b) the number of all Voting Units (or Voting Units of a specific class) held by all Members (and such percentage shall be allocated among such original Member and any such acquiring Person or Persons according to the transfer documentation pursuant to which all or any portion of such Voting Units are Transferred from time to time).

"**_Voting Units_**" means all Units other than any class or series of Units that is designated by the Board as non-voting.

A-9

LR_REV_00000136

## EXHIBIT B

## PROVISIONS RELATING TO TRANSFERS

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in the Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

1.      General Rules.

(a)     No Member may Transfer all or any portion of its Units other than in accordance with the terms of this Exhibit B, and any attempted Transfer that is not in accordance with this Exhibit B shall be, and is hereby declared, null and void ab initio.

(b)     [RESERVED]

(c)     No Member shall Transfer all or any of his or its Units (i) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (ii) if such Transfer would cause the Company to lose its status as a partnership for Federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704 or (iii) if the nature of the Transfer is reasonably likely to adversely affect the ability of the Company or any of its Subsidiaries to conduct its business in the manner conducted as of the time of a proposed Transfer.

(d)     The Members agree that a breach of the provisions of this Exhibit B may cause irreparable injury to the Company and the Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Person to comply with such provisions and (ii) the uniqueness of the Company's business and the relationship among the Members.  Accordingly, the Members agree that the provisions of this Exhibit B may be enforced by specific performance.

2.      Permitted Transfers.  A Member may make a Permitted Transfer of all or a portion of its Units subject to compliance with Section 6 of this Exhibit B.

3.      Right of First Offer.

(a)     The provisions of this Section 3 shall not apply to (i) a Permitted Transfer, (ii) a Transfer pursuant to the exercise of co-sale (tag-along) rights under Section 4 of this Exhibit B, (iii) a Transfer in connection with a Sale Transaction or (iv) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)     If an Investor (or its Affiliate) desires to Transfer all or a portion of its Units to any Person (including another Member), other than a Transfer described in Section 3(a) of this Exhibit B, such Investor (or its Affiliate) (the "***Disposing Member***") shall promptly give written notice (a "***Disposition Notice***") to the Company and the Lime Rock Investors (the "***ROFO Members***") that such Disposing Member desires to effect such a Transfer and setting forth the

B-1

CONFIDENTIAL                                                          LR_REV_00000137

portion (by reference to the Voting Interest percentage of the portion of the Units the Disposing Member desires to dispose of) of the Units proposed to be transferred by the Disposing Member (the "***Sale Units***"), the consideration that such Disposing Member proposes to be paid for such Sale Units (the "***Sale Price***") and any other material terms sought by the Disposing Member.

(c)     The giving of a Disposition Notice shall constitute an offer (the "***Disposition Offer***") by the Disposing Member to sell to the ROFO Members and the Company all of the Sale Units at the Sale Price.  The ROFO Members (and the Company, as hereafter set forth) shall have the option, but not the obligation, to acquire all, but not less than all, of the Sale Units on the terms set forth in the Disposition Notice, and such option shall be exercisable by the ROFO Members giving notice to the Disposing Member and the Company before the expiration of the 30-day period following the receipt by the ROFO Members of the Disposition Notice (the "***ROFO Member Election Period***").  If more than one of the ROFO Members exercise the option granted in this Section 3(c), the Sale Units will be allocated among them based on the relative Voting Interests of the Units held of record by them or on such other basis as the ROFO Members unanimously agree.  Any ROFO Member that fails to notify the Disposing Member prior to the expiration of the ROFO Member Election Period will be deemed to have rejected the Disposition Offer.  If the ROFO Members do not exercise the purchase option with respect to all the Sale Units, the Disposing Member shall immediately notify the Company thereof and the Company may, upon receipt of such notice, following the expiration of the ROFO Member Election Period, by giving notice to such Disposing Member and the ROFO Members within 10 days after the expiration of the ROFO Member Election Period (such 10-day period being referred to herein as the "***Company ROFO Election Period***"), exercise the right of first offer with respect to a portion of Sale Units that the ROFO Members declined pursuant to the Disposition Offer.  If the ROFO Members and the Company do not elect to purchase all of the Sale Units, the ROFO Members and the Company shall be deemed to have rejected the Disposition Offer.  The closing of the purchase and sale of the Sale Units to the ROFO Members or the Company, as applicable, shall be at 9:00 a.m.  on the 20th Business Day following the end of the ROFO Member Election Period or the Company ROFO Election Period, as applicable, unless the ROFO Members and/or the Company, as applicable, and the Disposing Member otherwise agree.  At the closing, the ROFO Members or the Company, as applicable, shall deliver to the Disposing Member cash in the amount of the consideration applicable to the Sale Units to be purchased, and the Disposing Member shall represent and warrant to the ROFO Members and the Company, as applicable, that the Disposing Member owns such Sale Units free and clear of all liens, encumbrances and to the knowledge of such Disposing Member adverse claims, and shall deliver to the ROFO Members or the Company executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company.  The Disposing Member, the Company and the ROFO Members shall cooperate in good faith in obtaining all necessary governmental and other third Person approvals, waivers and consents required for the closing.  Notwithstanding the foregoing, any such closing shall be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the HSR Act.

(d)     The Disposing Member shall be free to sell the portion of the Sale Units not purchased by the ROFO Members or the Company pursuant to Section 3(c) of this Exhibit B to any Person during the 90-day period following the expiration of the Company ROFO Election Period; provided (i) any such sale shall be subject to Section 6 of this Exhibit B and (ii) the

B-2

consideration and other terms offered by the Disposing Member shall be no more favorable to the transferee than those offered to the ROFO Members in the Disposition Notice. Any Sale Unit not sold during the 90-day period described in this Section 3(d) shall be subject again to right of first offer set forth in Section 3(b) of this Exhibit B.

4.      Co-Sale (Tag-Along) Rights.

(a)      The remaining provisions of this Section 4 shall not apply to (i) a Permitted Transfer, (ii) a Transfer in connection with a Sale Transaction, or (iii) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)      If any of the Investors (each, a "*Co-Sale Seller*") desires to Transfer, in a transaction or series of related transactions, Units then outstanding (a "*Proposed Co-Sale Transfer*"), then such Co-Sale Seller shall offer (the "*Co-Sale Offer*") to include in such Transfer a number of Units owned of record by the other Investors (and its Affiliates) according to the remaining terms of this Section 4.

(c)      The Co-Sale Seller shall notify the other Investors (the "*Co-Sale Notice*") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer. The Co-Sale Notice shall specify the proposed Transferee (the "*Co-Sale Buyer*"), the number of Units proposed to be Transferred as part of the Proposed Co-Sale Transfer, the amount and type of consideration to be received therefor, the consideration offered to be paid for each Unit (the "*Per Unit Price*") and the place and date on which the Transfer is to be consummated. If an Investor (and any Affiliate) wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer such Person must notify the Co-Sale Seller prior to 12:00 pm, New York time 10 calendar days following the date the Co-Sale Seller gave the Co-Sale Notice. If an Investor (or any Affiliate) elects to participate in such Proposed Co-Sale Transfer (the "*Electing Member*"), then such Person shall have the right to include Units in such Transfer as follows:

(i)      Unless unanimously agreed to otherwise by the Electing Member and the Co-Sale Seller, the Electing Member may elect, by notice delivered to the Co-Sale Seller within 10 days after the Co-Sale Notice is given, to include up to a number of Units in the Proposed Co-Sale Transfer equal to its Co-Sale Percentage of the total number of Units proposed to be purchased by the Co-Sale Buyer pursuant to the Proposed Co-Sale Transfer. The number of Units the Electing Member elects to sell in accordance with the foregoing is referred to as such Electing Member's "*Co-Sale Units.*" The Co-Sale Seller will reduce the number of Units to be included in the Proposed Co-Sale Transfer by the Electing Member's Co-Sale Units or, if the Co-Sale Buyer refuses to purchase Units from the Electing Member, the Co-Sale Seller shall purchase the Co-Sale Units from the Electing Member on the same terms as apply to the Proposed Co-Sale Transfer.

(ii)      All of the consideration payable to the Members in the Proposed Co-Sale Transfer shall be distributed to such Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement. If the consideration in the Proposed Co-Sale Transfer involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an

B-3

accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Lime Rock Investor may require each Member, at the option of the Member, that is not an accredited investor (A) to receive solely cash in such transaction, or (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(iii)    The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(d)    In connection with a Proposed Co-Sale Transfer, the Electing Member shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms (other than non-compete and non-solicitation terms) as the Co-Sale Seller and (iv) be required to deliver customary transfer instruments.

5.    Sale Transaction; Drag-Along Provisions.

(a)    If (i) any Person that is not a Member or an Affiliate thereof (a "***Third-Party Buyer***") submits a bona fide written offer to any Lime Rock Investor to effect a Sale Transaction (a "***Sale of the Company Offer***") and (ii) such Lime Rock Investor desires to accept such offer (the "***Accepting Person***"), then the Lime Rock Investors shall have the right to require each other Member (each, a "***Drag-Along Person***") to Transfer to such Third-Party Buyer all of the Units held thereby (or if less than all of the Members' Units are to be Transferred to the Third Party Buyer in such Sale Transaction, each Member's pro rata share of the Units to be Transferred in such Sale Transaction).

(b)    In connection with such Transfer, each Drag-Along Person shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms as the Lime Rock Investors, (iv) be required to deliver customary stock powers, letters of transmittal or other similar transfer documentation and (v) be obligated to pay no more than its pro rata share (based upon the amount of consideration received) of the costs of any Sale Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.

(c)    The Company shall give written notice to each Drag-Along Person of the Sale of the Company Offer approved by the Accepting Person (the "***Accepting Persons' Notice***")

B-4

LR_REV_00000140

at least 20 calendar days before the scheduled closing of the Sale Transaction.  The Accepting Persons' Notice shall specify the Third-Party Buyer, the amount and type of consideration to be received by the Members in connection with the Sale Transaction, the terms and conditions of payment of the consideration offered by the acquiring party and the place and date on which the Transfer is to be consummated.  Subject to Section 5(d) of this Exhibit B, if any holder of a particular class of Units is given an option as to the form and amount of consideration to be received, all holders of such class of Units shall be given the same option with respect to such consideration.  If the Accepting Persons elect to exercise their rights under this Section 5, the Drag-Along Persons shall take such other actions as may be reasonably required and otherwise cooperate in good faith with the Company and the Accepting Persons in connection with consummating the proposed Transfer.

(d)      All of the consideration payable to the Members in a Sale Transaction first shall be aggregated by the Company, as disbursing agent, before distributing any such consideration to any of the Members.  The Company, acting solely as the disbursing agent of the Members, shall then distribute the aggregate consideration to the Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement.  If the Sale Transaction involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then Lime Rock may require each Member that is not an accredited investor (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction and/or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(e)      No Member shall have any dissenters' or appraisal rights in connection with a Sale Transaction, and each Member hereby releases, votes in favor of, consents to and will execute such further instruments as the Company reasonably requests (in accordance with this Section 5) to further evidence the waiver of, such rights and the approval of the Sale Transaction.  No Member shall institute any action or proceeding with respect to the adequacy of the consideration given in a Sale Transaction.

(f)      Each Member hereby makes, constitutes and appoints the secretary or other officer of the Company, in its official Company capacity, as its true and lawful attorney-in- fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member in this Section 5 in the event that such Member is or becomes a Drag-Along Person pursuant to this Section 5.  Each Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as a Drag-Along Person pursuant to this Section 5 as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall

B-5

lawfully do or cause to be done by virtue of the power of attorney granted hereby.  The power of attorney granted pursuant to this Section 5(f) is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

6.    Conditions to Transfers; Continued Applicability of Agreement.

(a)    As a condition to any Transfer permitted under this Exhibit B (including Permitted Transfers), any transferee of Units shall be required to become a party to this Agreement, by executing (together with such Person's spouse, if applicable) a Joinder Agreement.  If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (whether such Transfer resulted by operation of law or otherwise), such Person and such Units shall be subject to this Agreement as if such Units were still held by the transferor.

(b)    No Units may be Transferred by a Person unless the transferee first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Company, with the approval of the Board, may waive any requirement to deliver a legal opinion under this Section 6.

B-6

CONFIDENTIAL

## EXHIBIT C

## REGISTRATION RIGHTS

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in Limited Liability Company Agreement to which this Exhibit is attached. Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

Registration.

*Piggyback Registration Rights.* If the Company (which term, for purposes of this Exhibit, includes any successor entity such as a Delaware corporation formed through an Internal Restructure or otherwise) proposes to register any of its Units (the term Units, as used in this Exhibit, shall be read broadly to include common stock if the issuer is a corporation rather than a limited liability company and if the Units have been, are to be, exchanged or converted into common stock in connection with a public offering) under the Securities Act (other than a registration (i) on Form S-8 or S-4 or any successor or similar forms, (ii) relating to Units issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company, (iii) in connection with a direct or indirect merger, acquisition or other similar transaction or (iv) on such other forms not permitting the registration of Units for resale by the Members), for its own account, it will at such time, subject to the provisions of Section 1(c), give notice to each Member at least 20 days prior to the filing of the registration statement relating to such registration with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1 and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1. Upon the written request of any such Member made within 20 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the Company's registration must sell their Units to the underwriters selected by the Company on substantially the same terms and conditions as apply to the Company, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such Units or the transfer thereof, the Company shall give written notice to all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Company may (x) adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering or (y) exclude any Units from any offering to the extent the Board reasonably determines that the inclusion of such Units would be unduly burdensome on the Company and the Members. The

C-1

LR_REV_00000143

Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Requests for Registration Rights.*  Following an initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 for secondary sales.  At any time after an initial public offering, the Lime Rock Investors shall have the right to request registrations with respect to all or a part of the Units held by the Lime Rock Investors (such requests shall be in writing and shall state the number of Units to be disposed of and the intended method of disposition of shares by such holders); provided that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 1(b) (i) unless the Lime Rock Investors propose to dispose of securities having an aggregate price to the public of more than $15,000,000 (or $5,000,000 in the case of a registration on Form S-3) or (ii) within 180 days of the effective date of the most recent registration pursuant to this Section 1(b).  The Company shall give notice to each Member at least 15 days prior to the anticipated date t he registration statement relating to such registration shall be filed with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1(b) and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 10 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the registration must sell their Units to the underwriters selected by the Lime Rock Investors on substantially the same terms and conditions as apply to the Lime Rock Investors, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Lime Rock Investors shall determine for any reason not to register such Units or the transfer thereof, the Lime Rock Investor shall give written notice to the Company and all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Lime Rock Investors and the Company may adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering.  The Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Allocations.*  If a registration pursuant to this Section 1 involves an underwritten public offering and the managing underwriter advises the Company that, in its view, the number of Units that the Company and the Members exercising their rights under this Section 1 intend to include in such registration exceeds the maximum offering size, including the price at which such Units can be sold, the Company will include in such registration the followi ng Units, in the following priority, up to the maximum offering size:

C-2

LR_REV_00000144

first, so much of the Units proposed to be registered for the account of the Company as would not cause the offering to exceed the maximum offering size;

second, all Units requested to be included in such registration by any Member pursuant to this Section 1 allocated, if necessary for the offering not to exceed the maximum offering size, pro rata among such Members on the basis of the relative number of Units owned by each requesting Member.

Standstill Agreements.  With respect to an initial public offering or any underwritten public offering, notwithstanding anything to the contrary in this Exhibit C, each Member agrees not to effect any public sale or distribution, including any sale pursuant to Rule 144, or any successor provision, under the Securities Act, of any Units, and not to effect any such public sale or distribution of any other security of the Company that is convertible into or exchangeable or exercisable for any Unit and that would be a Unit (in each case, other than as part of such underwritten public offering) during the 14 days prior to the anticipated effective date of the applicable registration statement or during the period after such effective date that the managing underwriter and the Company shall agree; provided, (a) such post-effective date standstill period shall not exceed 180 days or be less than 90 days and (b) notwithstanding clause (a) preceding, the Company may waive the 90-day minimum standstill period with respect to some or all of the Members if the managing underwriter does not require such Members to be bound by a standstill arrangement for any period of time and the Company determines that the absence of such standstill period for such Members will not adversely affect such offering.

Registration Procedures.  Whenever Members request that any Units be registered pursuant to Section 1, the Company will, subject to the provisions of such Sections, use commercially reasonable efforts to effect the registration and the sale of such Units in accordance with the intended method of disposition thereof and, in connection with any such request:

The Company will as soon as reasonably practicable prepare and file with the Securities and Exchange Commission a registration statement on any form selected by counsel for the Company and which form shall be available for the sale of the Units to be registered thereunder in accordance with the intended method of distribution thereof, and use all reasonable efforts to cause such filed registration statement to become and remain effective for a period of not less than 180 days (or such shorter period in which all of the Units of any Person included in such registration statement shall have actually been sold thereunder).

The Company will furnish to each Member and each underwriter, if any, of the Units covered by such registration statement copies of such registration statement as filed or proposed to be filed, and thereafter the Company will furnish to such Members and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto (and, if requested by such Members, all exhibits thereto and documents incorporated by reference therein), the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as such Members or underwriters may reasonably request in order to facilitate the disposition of the Units owned by such Members. Each such Member shall have the right to request that the Company modify any information contained in such registration statement, amendment and supplement thereto pertaining to such Member and the Company shall use commercially reasonable efforts to comply with such request; provided, the Company shall not

C-3

have any obligation to so modify any information if so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

After the filing of the registration statement, the Company will promptly notify each Member holding Units covered by such registration statement of any stop order issued or threatened by the SEC or any state Units commission under state blue sky laws and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered.

The Company will use commercially reasonable efforts to (i) register or qualify the Units covered by such registration statement under such other Units or blue sky laws of such jurisdictions in the United States as any Member holding such Units reasonably (in light of such Member's intended plan of distribution) requests, (ii) cause such Units to be listed on any Units exchange or market or included for trading on any automated quotation system on which its Units are then listed or included for trading and (iii) cause such Units to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Member to consummate the disposition of the Units owned by such Member; provided, the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

The Company will immediately notify each Member holding such Units covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Units, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and promptly prepare and make available to each such Member and file with the SEC any such supplement or amendment.

Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, the Company will make available for inspection by any Member and any underwriter participating in any disposition pursuant to a registration statement being filed by the Company pursuant to this Section 3 and any attorney, accountant or other professional retained by any such Member or underwriter, financial and other records, pertinent corporate documents and properties of the Company as shall be reasonably requested by any such Person, and cause the Company's officers, Directors and employees to supply all information reasonably requested by any such attorney, accountant or other professional in connection with such registration statement.

The Company will furnish to each Selling Member and to each underwriter, if any, a signed counterpart, addressed to such underwriters and such Members, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as a majority of such Members or the managing underwriter therefore reasonably requests.

C-4

The Company will comply with all applicable rules and regulations of the SEC, and make available to the Members, as soon as substantially practicable, an earnings statement covering a period of 12 months, beginning within three months after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act.

The Company may require each Member to promptly furnish in writing to the Company information regarding the distribution of the Units as the Company may from time to time reasonably request and such other information as may be legally required in connection with such registration.

Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(e), such Member will forthwith discontinue disposition of Units pursuant to the registration statement covering such Units until such Member's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(e), and, if so directed by the Company, such Member will deliver to the Company all copies, other than any permanent file copies then in such Member's possession, of the most recent prospectus covering such Units at the time of receipt of such notice.  In the event that the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 3(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 3(e) to the date when the Company shall make available to such Member a prospectus supplemented or amended to conform with the requirements of Section 3(e).

The Company will provide a transfer agent and registrar for all such Units not later than the effective date of the first registration statement relating to Units.

<u>Indemnification by the Company</u>.  The Company shall indemnify, defend and hold harmless to the full extent permitted by law each Member holding Units covered by a registration statement, its managers, members, officers, Directors, employees, partners and agents, and each Person, if any, who controls such Member within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages, expenses (including reasonable cost of investigation and, subject to Section 7 of this <u>Exhibit C</u>, reasonable fees, disbursements and other charges of legal counsel) and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Units (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or any preliminary prospectus, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, expenses or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission so made in conformity with information furnished in writing to the Company by such Member or on such Member's behalf expressly for use therein.  The Company shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and directors and each person who controls such underwriter on substantially the same basis as that provided in this Section 4.

<u>Indemnification by Participating Investors</u>.  Each Member holding Units included in any registration statement shall, severally but not jointly, indemnify, defend and hold harmless the

CONFIDENTIAL

Company, its officers, Directors and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to such Member, but only with respect to information furnished in writing by such Member or on such Member's behalf expressly for use in any registration statement or prospectus relating to the Units, or any amendment or supplement thereto, or any preliminary prospectus. Each such Member shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and Directors and each person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 5. Notwithstanding the provisions of this Section 5, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to indemnify the Company or any underwriter pursuant to this Section 5, such Member shall not be required to pay any amount, including pursuant to Sections 6 or 7 of this Exhibit C, in excess of the net proceeds received by such Member in the offering to which such registration statement relates. As a condition to including Units in any registration statement filed in accordance with this Exhibit C, the Company may require that it shall have received an undertaking reasonably satisfactory to it from any underwriter to indemnify and hold it harmless to the extent customarily provided by underwriters with respect to similar Units.

Conduct of Indemnification Proceedings. In case any proceeding (including any governmental investigation) shall be instituted involving any Person in respect of which such Person is entitled to indemnity pursuant to this Exhibit C, such Person (an "***Indemnified Party***") shall promptly notify the Person against whom such indemnity may be sought (the "***Indemnifying Party***") in writing and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnified Party, and the Indemnifying Party shall assume the payment of all fees and expenses; provided, that the failure of any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that the Indemnifying Party is prejudiced by such failure to notify. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel (at the expense of the Indemnifying Party), or (b) in the reasonable judgment of such Indemnified Party representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties, and in the event the Indemnified Parties are not able to agree as to such firm, the Indemnified Party that has the largest potential risk of loss covered by the Indemnifying Party's indemnity hereunder shall select such firm, subject to the consent of the other Indemnified Parties, which consent shall not be unreasonably withheld, which selection shall then be binding for purposes of this Section 6. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any and all losses, claims, damages, liabilities and expenses or liability (to the extent stated above) by reason of such settlement or

C-6

judgment. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

Contribution. If the indemnification provided for in this Exhibit C is unavailable to an Indemnified Party in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Company and the Members holding Units covered by a registration statement and the underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities. The relative fault of the Company and such Members and the underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Members agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 7, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to make any contribution pursuant to this Section 7, such Member shall not be required to contribute any amount in excess of the net proceeds received by such Member in the offering to which such registration statement relates. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Participation in Underwritten Public Offering. No Person may participate in any Underwritten Public Offering unless such Person (a) agrees to sell such Person's Units on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, custody agreements, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and the provisions of this Exhibit C in respect of registration rights.

Rule 144. So long as the Company is subject to Section 13 or Section 15(d) of the Exchange Act, the Company covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act and that it will take such commercially reasonable further action as any Member may reasonably request to the extent required from time to time to enable such Member to sell Units without registration under the Securities Act within the limitations of the exemptions

CONFIDENTIAL

provided by Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.  Upon the request of any Member, the Company will deliver to such Member a written statement as to whether it has complied with such reporting requirements.  The registration rights set forth in this Exhibit C shall not be available to any Member if, in the opinion of counsel to the Company (delivered to the transfer agent), all of the Units then owned by such Member could be sold without restriction or limitation pursuant to Rule 144.

Other Registration Rights Agreements.  Without the approval of holders of a majority of the outstanding Units, the Company will neither enter into any new registration rights agreements that grant registration rights senior to those granted in this Exhibit C or otherwise conflict with the terms of this Exhibit C nor permit the exercise of any other registration rights in a manner that conflicts with the terms of the registration rights granted under this Exhibit C.  Notwithstanding the foregoing, the Company is authorized to grant piggyback registration rights with respect to incentive units or other equity-based awards, and such registration rights will be pari passu with the piggyback registration rights granted in this Exhibit C.

Transfer of Registration Rights.  The rights of the Lime Rock Investors (including the rights of any of their respective Permitted Transferees) under this Exhibit C may be assigned by any of them to any of their respective Permitted Transferees.

No Inconsistent Agreements.  The Company will not enter into any agreement with respect to its Units (excluding registration rights agreements described in Section 10 above) which is inconsistent with or violates the rights granted to the holders of Units in this Exhibit C.

C-8

                                                                                    LR_REV_00000150

## EXHIBIT D

## JOINDER AGREEMENT

This Joinder Agreement (this "***Joinder Agreement***") is executed as of _____ pursuant to the terms of the Limited Liability Agreement of Blackjewel Holdings L.L.C. dated as of July __, 2017, and the Schedules and Exhibits thereto, as amended or restated from time to time, a copy of which is attached hereto (the "***LLC Agreement***"), by the transferee ("***Transferee***") executing this Joinder Agreement.  By the execution of this Joinder Agreement, the Transferee agrees as follows:

1.      <u>Acknowledgment</u>.  Transferee acknowledges that Transferee is acquiring certain [_____] subject to the terms and conditions of the LLC Agreement.  Capitalized terms used herein without definition are defined in the LLC Agreement and are used herein with the same meanings set forth therein.

2.      <u>Agreement</u>.  Transferee (a) agrees that [_____] acquired by Transferee shall be bound by and subject to the terms of the LLC Agreement and (b) hereby joins in, and agrees to be bound by, the LLC Agreement (including the Exhibits) with the same force and effect as if the Transferee were originally a party thereto.

3.      <u>Representations</u>.  Transferee hereby makes each of the representations and warranties set forth in Section 3.1 of the LLC Agreement to the Company and each other Member with the same force and effect as if the Transferee were originally a party thereto.

4.      <u>Notice</u>.  Any notice required by the LLC Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

5.      <u>Joinder</u>.  The spouse of the undersigned Transferee, if applicable, executes this Joinder Agreement to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's community interest, if any, in the [_____] to the terms of the LLC Agreement.

D-1

TRANSFEREE:

By:_____

Information for Notices:

_____
_____
Telecopy:_____

SPOUSE:

By:_____

D-2

CONFIDENTIAL

*Execution*

## CONTRIBUTION, ADOPTION AND WAIVER AGREEMENT

## BLACKJEWEL HOLDINGS L.L.C.

THIS CONTRIBUTION, ADOPTION AND WAIVER AGREEMENT, dated as of August 15, 2017 (this "***Agreement***"), is by and among Blackjewel Holdings L.L.C. a Delaware limited liability company (the "***Company***"), Jeffery A. Hoops, Sr. ("***Contributor***"); LR-Revelation Holdings L.P ("***LRRH***") and Blackjewel Investment L.L.C. (together with LRRH, the "***Existing Members***").

## RECITALS

WHEREAS, the Company is offering 20,000 Senior Preferred Units to Contributor and Contributor desires to participate in such offering and purchase such 20,000 Senior Preferred Units in exchange for a cash capital contribution of $2,000,000 to the Company;

WHEREAS, Contributor desires to adopt the Limited Liability Company Agreement of the Company, dated as of July 14, 2017, set forth on Exhibit A hereto (the "***LLC Agreement***"). Capitalized terms used and not defined herein shall have the meanings ascribed in such terms in the LLC Agreement;

WHEREAS, Section 4.3 of the LLC Agreement sets forth (a) certain preemptive rights of Eligible Purchasers to receive notice of proposed issuances of, and purchase, Offered Units and (b) certain obligations of the Company to give written notices of such proposed issuances to Eligible Purchasers, which rights and obligations the parties hereto desire to waive; and

WHEREAS, Section 4.4 and Exhibit B of the LLC Agreement set forth certain restrictions on the Transfer of Units, which restrictions the parties hereto desire to waive in respect of any future Transfer of Senior Preferred Units purchased by John Reynolds on the date hereof, by John Reynolds to a Lime Rock Investor (a "***Reynolds-Lime Rock Transfer***").

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENTS

1.      Purchase of Senior Preferred Units. The Company agrees to issue, and hereby sells, to Contributor, and Contributor hereby purchases from the Company, Twenty Thousand (20,000) Senior Preferred Units, at $100 per such Senior Preferred Unit, for a total purchase price of Two Million Dollars ($2,000,000) and Contributor acknowledges and agrees that such Senior Preferred Units will be subject to, and governed by, the LLC Agreement.

2.      Contribution. On the terms and subject to the conditions set forth in this Agreement, in consideration for the Company's agreement to issue to Contributor, and the sale of, Twenty Thousand (20,000) Senior Preferred Units, Contributor agrees to make a capital contribution of Two Million Dollars ($2,000,000) to the Company. The capital contribution shall be payable to

LR_REV_00000007

the Company by Contributor in cash or wire transfer of immediately available funds on the date hereof.

3.    <u>Accession to LLC Agreement</u>. As required by <u>Section 4.2(c)</u> of the LLC Agreement, Contributor hereby agrees to each term of the LLC Agreement and agrees to be bound by, adopt and accede to the terms of the LLC Agreement, as a Member.

4.    <u>Representations and Warranties of Contributor</u>. In connection with the issuance of the Senior Preferred Units pursuant to this Agreement, Contributor represents and warrants to the Company and each Member as follows:

    a.    <u>Organization; Existence</u>. Such Person, if such Person is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

    b.    <u>Power; Qualification</u>. Such Person has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Person of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

    c.    <u>Authority; Enforceability</u>. This Agreement has been duly and validly executed and delivered by such Person and constitutes the binding obligation of such Person enforceable against such Person in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

    d.    <u>No Conflicts</u>. The execution, delivery, and performance by such Person of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Person is subject, (ii) violate any order, judgment, or decree applicable to such Person or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Person is a party. No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Person of this Agreement..

5.    <u>Representations and Warranties of the Company</u>. In connection with the issuance of the Senior Preferred Units pursuant to this Agreement, the Company represents and warrants to Contributor the representations and warranties set forth in <u>Section 4</u> hereof.

6.    <u>Waivers and Consents</u>.

    a.    <u>Waiver of Preemptive Rights by Existing Members</u>. Notwithstanding anything to the contrary contained in <u>Section 4.3</u> of the LLC Agreement, each Existing Member hereby consents to the Company offering 20,000 Senior Preferred Units

- 2 -

to Contributor and waives its rights to receive any First Notice and Supplemental Notice, and its opportunity to exercise its preemptive rights to subscribe for the Senior Preferred Units offered to, and purchased by, Contributor pursuant to this Agreement.

b. <u>Waiver of Transfer Restrictions for Reynolds-Lime Rock Transfer</u>. Notwithstanding anything to the contrary contained in Exhibit B of the LLC Agreement, each of the parties hereto agrees and acknowledges that any Reynolds-Lime Rock Transfer shall be deemed a Permitted Transfer for all purposes pursuant to, and under, the LLC Agreement.

7. <u>Amendment and Restatement of LLC Agreement</u>. The parties to this Agreement acknowledge that the Board, without any action by any Member or any other Person, is authorized to, and shall, amend and restate <u>Schedule 1</u> of the LLC Agreement to reflect the admission of Contributor as a Member.

8. <u>Further Assurances</u>. Each party agrees to execute any and all documents and instruments of transfer, assignment, assumption or novation and to perform such other acts as may be reasonably necessary or expedient to further the purposes of this Agreement and the transactions contemplated by this Agreement.

9. <u>Agreement</u>. This Agreement and the LLC Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, representations and warranties and agreement, both written and oral, with respect to such subject matter.

10. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11. <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

12. <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

13. <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

14. <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to

- 3 -

LR_REV_00000009

any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Kentucky in each case located in the city of Lexington and County of Fayette, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Remainder of Page Intentionally Left Blank]

- 4 -

LR_REV_00000010

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date set forth above.

<u>**COMPANY**</u>:

**BLACKJEWEL HOLDINGS, L.L.C.**

By: _____
Name: Jeffery A. Hoops, Sr.
Title:  President and Chief Executive Officer

[SIGNATURE PAGE TO BLACKJEWEL CONTRIBUTION AGREEMENT – HOOPS]

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date set forth above.

CONTRIBUTOR:

By: _____

Name: Jeffery A. Hoops, Sr.

[SIGNATURE PAGE TO BLACKJEWEL CONTRIBUTION AGREEMENT – HOOPS]

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date set forth above.

<u>**Solely for purposes of the waiver set forth in Section 6 above:**</u>

<u>**EXISTING MEMBERS:**</u>

**BLACKJEWEL INVESTMENT L.L.C.**

By: _____
    Jeffery A. Hoops, Sr.
Its: President and Chief Executive Officer

[SIGNATURE PAGE TO BLACKJEWEL CONTRIBUTION AGREEMENT – HOOPS]

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date set forth above.

<u>**Solely for purposes of the waiver set forth in Section 6 above:**</u>

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P., its
general partner

By: LRP GP V, Inc., its
general partner

By:_____
       Jeffery B. Scofield
Its: Authorized Person

[SIGNATURE PAGE TO BLACKJEWEL CONTRIBUTION AGREEMENT – HOOPS]

CONFIDENTIAL

EXHIBIT A

<u>LLC Agreement</u>

ACTIVE 224089388v.4

CONFIDENTIAL

Execution Version

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BLACKJEWEL HOLDINGS L.L.C.**

**A DELAWARE LIMITED LIABILITY COMPANY**

**JULY 14, 2017**

THE MEMBERSHIP INTERESTS (AS DEFINED HEREIN) GOVERNED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN AND IN THE OTHER INVESTMENT DOCUMENTS (AS DEFINED HEREIN).

CONFIDENTIAL

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**BLACKJEWEL HOLDINGS L.L.C.**
A Delaware Limited Liability Company

This Limited Liability Company Agreement of Blackjewel Holdings L.L.C., a Delaware limited liability company (the "***Company***"), dated as of July 14, 2017 (the "***Effective Date***") is adopted, executed and agreed to, for good and valuable consideration, by the Company and the Members (both as defined below).

### RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on March 30, 2017 (the "***Formation Date***"), of a Certificate of Formation under and pursuant to the Act (such Certificate of Formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "***Certificate***"); and

**WHEREAS**, the parties hereto desire to enter into this Agreement in order to set forth their rights and obligations as Members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Act.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

### AGREEMENTS

### ARTICLE 1

### DEFINITIONS AND CONSTRUCTION

**Section 1.1** ***Definitions***.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them in Exhibit A.  The Glossary of Defined Terms, which follows the Table of Contents, sets forth the location in this Agreement of the definition for each capitalized term used herein.

**Section 1.2** ***Construction***.  Unless the context requires otherwise:  (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America; (e) the word "including" means "including without limitation;" and (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto.

# ARTICLE 2

# ORGANIZATION

**Section 2.1** *Formation*. The Company was organized as a limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware, in accordance with and pursuant to the Act. All actions by any Member while making such filing are hereby ratified, adopted and approved. The rights and liabilities of the Members will be determined pursuant to the Act and this Agreement. To the extent that there is any conflict or inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement control and take precedence.

**Section 2.2** *Name*. The name of the Company is "Blackjewel Holdings L.L.C." and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select.

**Section 2.3** *Offices*. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law. The principal office of the Company in the United States shall be at 1051 Main Street, Milton, West Virginia 25541 or such other place as the Board may designate, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate.

**Section 2.4** *Purposes*. The purpose of the Company shall be the leasing, acquisition, exploration, mining and development of coal properties in the United States (the "***Business Line***") and any business activity reasonably related thereto, to the extent not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity. In furtherance of such purpose, the Company may (a) acquire (i) coal leasehold interests, mineral interests and royalty interests, (ii) mines, plants, railways, facilities, equipment and other assets relating to such activities or properties and (iii) contracts, easements, servitudes, permits, licenses and other rights relating to the foregoing; (b) explore for, mine, develop, produce, store, treat, process, gather, transport, purchase and market synfuel, coal and coal byproducts and related hydrocarbons and minerals; (c) farm out, sell, abandon and otherwise dispose of Company assets; effectuate commodity hedging transactions in order to minimize the risks associated with the fluctuation of prices to be received by the Company from the sale of synfuel, coal and coal byproducts and related hydrocarbons and minerals from Company properties; and (d) take all such other actions incidental or ancillary to any of the foregoing as the Board may determine to be necessary or desirable.

**Section 2.5** *Foreign Qualification*. Prior to the Company's conducting business in any jurisdiction other than Delaware, to the extent that the nature of the business conducted requires the Company to qualify as a foreign limited liability company under the Law of that jurisdiction, the Company shall satisfy all requirements necessary to so qualify. At the request of the Company, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue,

2

and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**Section 2.6**   *Term*.  The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 11.

**Section 2.7**   *No State Law Partnership*.  The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member shall be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and state income tax purposes, and this Agreement shall not be interpreted to provide otherwise.  The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

**Section 2.8**   *Title to Company Assets*.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be vested in the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.  Each of the Members hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any proceeding at or in equity seeking to have any one or all of the Company's assets partitioned.

## ARTICLE 3

### REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.1**   *Representations and Warranties of Each Member*.  Each Member (as to itself only) represents and warrants to the Company and the other Members (including other Members admitted after the date hereof) as follows:

(a)   Organization; Existence.  Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)   Power; Qualification.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)   Authority; Enforceability.  This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the other parties hereto, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally and by principles of equity.

3

LR_REV_00000019

(d)     No Conflicts.  The execution, delivery, and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment, or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)     Investment Matters.  Such Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities laws.  Such Member is an "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.  Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities." Such Member has knowledge of finance, securities and investments generally, experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company.

(f)     LLC Agreement.  Such Member understands that the Units acquired by it shall, upon issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement.

(g)     No Brokers.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company or any other Member; and such Member shall indemnify and hold harmless the Company and the other Members from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Members in connection with the Company or this Agreement.

(h)     Survival of Representations and Warranties.  All representations and warranties made by each of the Members in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

**Section 3.2     *Representations and Warranties of the Company*.**  The Company represents and warrants to the Members that:

(a)     It was formed in the State of Delaware on the Formation Date.

4

LR_REV_00000020

(b)     The Company is duly organized, validly existing and in good standing under the laws of Delaware and has all requisite power and authority to enter into this Agreement.

(c)     There are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the officers and managers of the Company, threatened against or affecting the Company.

(d)     Prior to the Effective Date, the Company has not conducted any business operations other than in connection (i) with its formation and capitalization and (ii) matters relating to the foregoing.

(e)     The Company has not owned any property or assets before the Effective Date.

<div align="center">

**ARTICLE 4**

**MEMBERS; UNITS**

</div>

**Section 4.1     *Members*.**

(a)     <u>Existing Members</u>.  Each of the Persons listed on <u>Schedule 1</u> hereto is hereby admitted as a Member as of the Effective Date.

(b)     <u>Additional Members</u>.  In addition to the Persons listed on <u>Schedule 1</u>, the following Persons shall be deemed to be Members and shall be admitted as Members without any further action by the Company, the Board or any Member:  (i) any Person to whom Units are Transferred by a Member so long as such Transfer is made in compliance with this Agreement, including <u>Exhibit B</u> and (ii) any Person to whom the Company issues Units after the Effective Date in compliance with this Agreement so long as the Board designates such Person as a "Member", which designation must be evidenced by an adoption of this Agreement and any other agreement reasonably specified by the Board.

(c)     <u>Cessation of Members</u>.  Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Section 9.2, which rights shall not cease), but such Person shall remain bound by Section 8.4.

**Section 4.2     *Units*.**

(a)     <u>Units; Class and Series</u>.  The Membership Interests of the Company shall be issued in unit increments (each, a "***Unit***").  The Company may also issue Membership Interests in fractional Unit increments.  From time to time, the Company may, subject to the terms of this Agreement, including Section 4.3, issue such Units as the Board reasonably determines to be in the best interests of the Company; provided, however, that, following the Effective Date, the Company may not issue any Units without the unanimous consent of the Board.  Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in Section 4.2(c) or otherwise as shall be fixed by the Board by resolution

<div align="center">5</div>

CONFIDENTIAL

thereof.  The Board, in so fixing the designations, rights and preferences of any class or series of Units, may, subject to the terms of this Agreement, designate such Units as "Preferred Units", "Common Units", or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units.  The Board may increase the number of authorized Units in any then existing class or series.  Upon due authorization of such issuances, the Board is hereby authorized, subject to this Agreement, to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations, preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units.  Each Member acknowledges and agrees that (i) any actions taken by the Company or the Board pursuant to this Section 4.2(a) (including the issuance of one or more classes or series of Units) shall not be deemed to materially adversely affect such Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director and (ii) any such amendment in connection with a duly authorized issuance of Units that is recommended by the Board may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution and tax allocation provisions of this Agreement to the extent approved by the Board.

(b)     Unit Certificates.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates.  As of the date hereof, Units are uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof.  In such event, the Board shall prescribe the forms of certificates to be issued by the Company including the forms of legends to be affixed thereto.  Any such certificate shall be delivered by the Company to the applicable record owner of the Units represented by such certificate.  Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code.  Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who shall certify the Units represented by such certificate.  Books and records reflecting the record ownership of the Units shall be kept by the Secretary.  In the event any Officer who shall have signed, or whose facsimile signature or signatures shall have been placed upon, any such certificate or certificates shall have ceased to be such Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such Officer at the date of issue.  The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed.  Each certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE**

6

SECURITIES ACT OR UNLESS AN EXEMPTION FROM
REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN
OPINION OF COUNSEL REASONABLY SATISFACTORY
TO THE COMPANY MAY BE REQUESTED BY THE
COMPANY TO THE EFFECT THAT SUCH OFFER OR
SALE IS NOT REQUIRED TO BE REGISTERED UNDER
THE SECURITIES ACT).

THIS SECURITY MAY BE SUBJECT TO CERTAIN
RESTRICTIONS ON TRANSFER AND OTHER TERMS
AND CONDITIONS SET FORTH IN THE LIMITED
LIABILITY COMPANY AGREEMENT OF THE COMPANY,
DATED AS OF JULY 14, 2017 (AS MAY BE AMENDED OR
RESTATED FROM TIME TO TIME), A COPY OF WHICH
MAY BE OBTAINED FROM THE COMPANY AT ITS
PRINCIPAL EXECUTIVE OFFICES.

(c)     Initial Unit Designations; Effective Date Issuances.

(i)     A class of Units designated as "*Senior Preferred Units*" is hereby
created and a class of Units designated as "*Series A Units*" is hereby created. The
Company is authorized to issue as many Senior Preferred Units and Series A Units as the
Board approves from time to time. Schedule 1 lists the Members and the number of Senior
Preferred Units and/or Series A Units issued to each of them as of the Effective Date. The
Board, without any action by any Member or any other Person, is authorized to amend and
restate Schedule 1 from time to time to reflect the admission of new Members, the cessation
of any Person as a Member and transfers and issuances of Units made, in each case, in
accordance with this Agreement.

(d)     Voting Rights.   Unless otherwise specified in this Agreement or the
resolution of the Board creating any class or series of Voting Units, all classes and series of Voting
Units shall vote together as a single class on all matters.

**Section 4.3     *Preemptive Rights*.**

(a)     Except for Exempted Units, prior to the Company issuing, after the date
hereof, any Units or any equity security having rights, preferences or priority as to distributions
senior to or on parity with any then existing Units, whether on a stand-alone basis or in tandem
with notes, warrants, loans or other financial accommodations (collectively, the "*Offered Units*")
to a proposed purchaser (the "*Proposed Purchaser*"), each Investor, so long as (i) in the case of
an Investor that is one of the Hoops Related Parties, the Hoops Related Parties continue to
collectively own of record at least 20% of the number of Series A Units owned of record by the
Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends
and recapitalizations) and (ii) such Hoops Related Party remains an Eligible Investor (each, an
"*Eligible Purchaser*"), shall have the right to purchase the number of Offered Units as provided
below in this Section 4.3. "*Eligible Investor*" means any Person that is an "accredited investor"
under Rule 501 of Regulation D of the Securities Act and who is not in default under this

7

CONFIDENTIAL

Agreement.  In order to confirm that a Person is an "Eligible Investor" for the foregoing purposes, the Company may require such Person to deliver customary investor eligibility certificates and documentation supporting the financial or other representations made therein.

(b)      The Company shall give each Eligible Purchaser written notice of any proposed issuance of Offered Units to which the preemptive rights provisions of Section 4.3(a) apply (the "***First Notice***") not less than 15 days prior to any such issuance (the "***Initial Notice Period***").  The First Notice shall include (i) the proposed number and class of the Offered Units and a description of the rights and preferences of such class if such class is other than Senior Preferred Units or Series A Units; (ii) the prospective sale price per Unit; and (iii) any other proposed terms and conditions of such issuance and shall offer to each Eligible Purchaser the opportunity to purchase its Percentage Interest (which Percentage Interest shall be calculated as of the date of such notice) of the Offered Units at the same price, on the same terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company.  If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company shall furnish a supplemental notice (a "***Supplemental Notice***") describing the revised terms; provided, the Supplemental Notice shall not restart the Initial Notice Period, but the Company shall give each Eligible Purchaser a reasonable period of time (no fewer than five Business Days after the Eligible Purchaser receives such Supplemental Notice, which shall, to the extent necessary, extend the Initial Notice Period) (such Initial Notice Period, as extended if applicable, being referred to as the "***Election Period***") to consider the revised terms.  If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering written notice thereof to the Company prior to the expiration of the Election Period or such later date determined by the Company because of material changes in the terms of the issuance or for any other reason.  Each Eligible Purchaser's notice shall state the dollar amount of Offered Units such Eligible Purchaser (each a "***Requesting Investor***") would like to purchase up to a maximum amount equal to such holder's Percentage Interest of the total offering amount plus the additional dollar amount of Offered Units such Requesting Investor would like to purchase in excess of its Percentage Interest (the "***Over-Allotment Amount***"), if any, if other Eligible Purchasers do not elect to purchase their full Percentage Interest of the Offered Units.  The rights of each Requesting Investor to purchase a dollar amount of Offered Units in excess of each such Requesting Investor's Percentage Interest of the Offered Units shall be based on the Requesting Investors' relative Percentage Interests of the excess Offered Units.

(c)      If all of the Offered Units are not fully subscribed by the Eligible Purchasers pursuant to the foregoing, the Company shall have the right to either (i) accept the partial subscriptions from the Eligible Purchasers and issue and sell the unsubscribed for portion of the Offered Units to the Proposed Purchaser (only on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable) at any time during the 90 days following the termination of the Election Period or (ii) cancel the entire offering (in which case any new offering will again be subject to the terms of this Section 4.3).  The Board may, acting unanimously, impose such other reasonable and customary terms and procedures such as setting a closing date (no fewer than five Business Days after the expiration of the Election Period), rounding the number of Units covered by this Section 4.3 to the nearest whole Unit and requiring customary closing deliveries such as accredited investor certificates, unit powers, representations of ownership and absence of encumbrances in connection with any preemptive rights offering.

8

LR_REV_00000024

Except in the case of an Eligible Purchaser which withdraws its election to exercise its preemptive rights in any offering due to a material change in the terms and conditions of the offering occurring after its election, if any Eligible Purchaser refuses to purchase Offered Units for which it subscribed pursuant to the exercise of preemptive rights granted thereto under this Section 4.3, in addition to any other rights the Company may be permitted to enforce at law or in equity, the Board may require such Member and any Permitted Transferee thereof, in connection with exercising any future pre-emptive rights granted under Section 4.3 in connection with a future offering, to deposit with the Company, along with written notice of its election to exercise its rights hereunder, such funds as may be necessary to purchase the Offered Units subscribed for by such Person (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all) (any such deposit to be fully refundable if the offering is cancelled or if the Member is permitted to withdraw its subscription due to a material change in the terms and conditions of the offering occurring after its election, or partially refundable to the extent that the amount deposited exceeds the ultimate purchase price of the Units such Eligible Person is permitted purchase under this Section 4.3 for the applicable offering).

(d)     The rights granted to the Lime Rock Investors under this Section 4.3 may be transferred to any private equity fund that is an Affiliate of Lime Rock.  The rights granted to each Hoops Related Party in this Section 4.3 are personal to it and cannot be transferred including by Involuntary Transfer; provided, however, to the extent that a Hoops Related Party makes a Permitted Transfer of its Units, such transferee may, if so permitted by such Hoops Related Party, exercise its rights hereunder.

**Section 4.4** *Transfers of Units*.  The Units shall be bound by, and the Members shall comply with, the terms set forth on Exhibit B hereto governing, among other matters, the Transfer of Units.

**Section 4.5** *Registration Rights*.  Each Member understands and agrees that the Units issued on or prior to the date hereof have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act.  The Company shall comply with, and the Members shall comply with and be entitled to the benefits of, the provisions set forth on Exhibit C governing and providing for, among other matters, registration rights with respect to the registrable securities.

**Section 4.6** *Additional Terms Relating to Members*.  No Member (a) has the right or power to Resign or (b) may be Expelled from the Company (other than in the event that such Member ceases to hold Units).

**Section 4.7** *Liability to Third Parties*.  No Member shall be liable for the debts, obligations or liabilities of the Company, nor shall any Member be obligated to guaranty any debt, obligation or liability of the Company.

9

CONFIDENTIAL                                                                                   LR_REV_00000025

## ARTICLE 5

## CAPITAL CONTRIBUTIONS

**Section 5.1**   *Capital Contributions*.

(a)   *Initial Contributions*.  As of the Effective Date, each Member has made Capital Contributions to the Company equal to the amount set forth opposite such Member's name on Schedule 1 hereto in the column entitled "Capital Contributions" in exchange for the number and type of Units set forth opposite such Member's name in Schedule 1.  No Member shall have any obligation to make any Capital Contribution after the Effective Date.

**Section 5.2**   *Return of Capital Contributions*.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest with respect to either its Capital Account or its Capital Contributions.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 5.3**   *Advances by Members*.  Any Member may, with the consent of the Board, advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company on such terms as the Board and such Member mutually agree.

**Section 5.4**   *Capital Accounts*.

(a)   A separate capital account (a "*Capital Account*") will be maintained for each Member.  Each Member's Capital Account will be increased by:  (i) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Profits and other items of income and gain pursuant to Section 6.3 and Section 6.4.  Each Member's Capital Account will be decreased by:  (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-l(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Losses and other items of deduction and loss pursuant to Section 6.3 and Section 6.4.

(b)   In the event of a permitted sale or exchange of an interest the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred interest in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)   The manner in which Capital Accounts are to be maintained pursuant to this Section 5.4 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.4 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.4,

10

LR_REV_00000026

the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

# ARTICLE 6

# DISTRIBUTIONS; ALLOCATIONS

**Section 6.1**    *Distributions*.

(a)    *Regular Distributions.*    Available Cash and other property shall be distributed to the Members solely at such times and in such amounts as the Board shall determine and approve.  Subject to the remaining provisions of this Article 6, at any such time, distributions shall be made according to the following methodology and the following order of priority:

(i)    First, 100% to the holders of Senior Preferred Units in respect of each Senior Preferred Unit held of record thereby until there has been distributed under this Section 6.1(a)(i) an amount equal to the sum of (A) $100 and (B) an amount sufficient to reduce such Senior Preferred Unit's Senior Preferred Return Amount to $0, in respect of each Senior Preferred Unit held of record by all holders of Senior Preferred Units; and

(ii)    Second, 100% to the holders of Series A Units (pro rata in accordance with the number of Series A Units held by each).

(b)    [RESERVED]

(c)    [RESERVED]

(d)    For the avoidance of doubt, no Member shall be required to return cash to the Company pursuant to this Section 6.1(b) with respect to any class of Units in excess of the total distributions made to such Member in respect of such class of Units reduced by the Maximum Tax Liability attributable to such Units.

(e)    [RESERVED]

(f)    Notwithstanding the foregoing, other than upon the occurrence of a Dissolution Event, Internal Restructure or Sale Transaction, distributions shall not be made pursuant to Section 6. l(a)(ii) and 6.1(a)(iii) to the extent such distributions would cause such holder's Capital Account (reduced by any tax distributions required to be made to such holder pursuant to Section 6.2) to be less than zero.

**Section 6.2**    *Tax Distributions*.  Notwithstanding anything to the contrary in Section 6.1, unless prohibited by applicable law or by any contract binding on the Company, prior to making any distribution under Section 6.1, the Company shall distribute cash to the Members at least five Business Days before estimated quarterly tax payments are due in respect of each of the quarters of each Fiscal Year on a pro rata basis based on the Board's good faith estimate of the projected Maximum Tax Liability of each Member, assuming a reasonable projection of the Company's annual Net Profit for the Fiscal Year.  The Company shall not have any liability to a Member for

11

LR_REV_00000027

penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments.  Any distributions made pursuant to this Section 6.2 shall be treated as an advance payment of, and shall reduce by a like amount, the amounts otherwise distributable to such Member pursuant to Section 6.1.

Section 6.3    *Allocations of Net Profits and Net Losses*.  After giving effect to the allocations under Section 6.4, except as otherwise provided herein, for purposes of maintaining the Capital Accounts, Net Profit and Net Loss for each Fiscal Year or other period shall be allocated among the Members in such a manner as shall cause the Capital Accounts of the Members (as adjusted to reflect all allocations under Section 6.4 and all distributions through the end of such period) to equal, as nearly as possible, (a) the amount such Members would receive if all assets of the Company on hand at the end of such period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of Nonrecourse Liabilities to the Book Value of the property securing such liabilities) and all remaining cash were distributed to the Members under Section 11.02(c) minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount any such Member is treated as obligated to contribute to the Company, computed immediately after the hypothetical sale of assets.

Section 6.4    *Regulatory Allocations*.

The following allocations shall be made in the following order:

(a)    Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Sharing Ratios.

(b)    Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4).  If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss.  This Section 6.4(b) is intended to comply with the provisions of Treasury Regulation Section 1.704- 2(i) and shall be interpreted consistently therewith.

(c)    Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(c)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)).  This Section 6.4(c) is intended to constitute a minimum gain chargeback under Treasury Regulation Section l.704-2(f) and shall be interpreted consistently therewith.

(d)    Notwithstanding any provision hereof to the contrary except Section 6.4(c) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum

12

CONFIDENTIAL                                                                                      LR_REV_00000028

Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year) and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.4(d), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).   This Section 6.4(d) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except Section 6.4(c) and Section 6.4(d) (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible.   This Section 6.4(e) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704- 1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)     In the event that any Member has a negative Capital Account at the end of any Fiscal Year, such Member shall be allocated items of Company gross income and gain in the amount of such deficit as quickly as possible; provided that an allocation pursuant to this Section 6.4(f) shall be made only if and to the extent that such Member would have a negative Capital Account after all other allocations provided for in this Section 6.4 have been tentatively made as if this Section 6.4(f) were not in this Agreement.

(g)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) or 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

Section 6.5     *Curative Allocations*.  The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.   The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Board is authorized to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero.  The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

CONFIDENTIAL                                                                LR_REV_00000029

**Section 6.6**      *Income Tax Allocations*.

(a)      All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as otherwise provided in this Section 6.6.

(b)      In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using the "traditional method" with no curative or remedial allocations.  In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Regulations thereunder.

(c)      Any (i) recapture of depreciation, depletion, "section 1254" costs or any other item of deduction shall be allocated, in accordance with Treasury Regulations Sections 1.1245-l(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of remedial allocations), and (ii) recapture of credits shall be allocated to the Members in accordance with applicable law.

(d)      Allocations pursuant to this Section 6.6 are solely for purposes of federal, state, and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**Section 6.7**      *Other Allocation Rules*.

(a)      All items of income, gain, loss, deduction and credit allocable to a Membership Interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as the owner of such Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Code Section 706 and the regulations thereunder.

(b)      The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be determined in accordance with their Sharing Ratios (relating solely to the Senior Preferred Units and Series A Units).

**Section 6.8**      *Limitation Upon Distributions*.  No distribution shall be declared and paid unless, after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities or if the declaration or payment would cause the Company or any of its Subsidiaries to breach any material agreement.

14

**Section 6.9**    *Withholding Authorized*.  The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign law. All amounts required to be withheld pursuant to federal, state, local or foreign tax laws shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

<div align="center">

**ARTICLE 7**

**MANAGEMENT**

</div>

**Section 7.1**    *Management by Directors*.  The Company shall be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7, except with respect to certain consent or approval requirements provided in this Agreement, no Member by virtue of having the status of a Member shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company.  The "managers" are referred to as "Directors" throughout this Agreement.  The business and affairs of the Company shall be managed by the Board of Directors of the Company (the "***Board***", in accordance with this Agreement.  Under the direction of the Board, to the extent that the Board designates Officers pursuant to Section 7.5, the day-to-day activities of the Company shall be conducted on the Company's behalf by the Officers, who shall be agents of the Company.  In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, the Board shall have full power and authority to do all things on such terms as they may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company.

**Section 7.2**    *Board of Directors*.  Each Member agrees that it will cast all votes ascribed to its Units, if any, or execute consents, as the case may be, and take all other necessary action (including causing the Company to call a special meeting of Members) in order to elect individuals, who have been nominated in accordance with the remaining provisions of this Section 7.2, to serve as Directors of the Board and otherwise to ensure that the composition of the Board is at all times consistent with the following:

(a)    Composition; Initial Directors; Observation Rights.

(i)    The Board shall consist of natural persons who need not be Members or residents of the State of Delaware.  Subject to the remaining provisions of this Section 7.2, the Board shall consist of three Directors, and the nominees to stand for election to serve as Directors shall be designated as follows:  (A) one individual nominated by Hoops (the "***Hoops Designee***"), so long as (x) Jeffrey A. Hoops, Sr., remains employed with the Company and (y) the Hoops Related Parties continue to collectively own of record at least 20% of the number of Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations); and (B) two individuals nominated by the Lime Rock Investors (each, a "Lime Rock Designee").  The initial Lime Rock Designees are John T.  Reynolds and Jeffrey B.  Scofield.  The Hoops Designee shall be Jeffrey A. Hoops, Sr., Patricia A.

<div align="center">15</div>

Hoops, or any of their descendants and shall initially be Jeffrey A. Hoops, Sr.  In the event that Hoops' right to nominate the Hoops Designee terminates as provided above, the Lime Rock Designees, acting jointly, shall have the right to require the Hoops Designee's resignation from the Board.  Thereafter, the Lime Rock Designees can either elect to fill the vacancy on the Board created by the removal or reduce the size of the Board to eliminate the vacancy on the Board created by such removal.  The Company shall allow up to two representatives designated by the Lime Rock Investors and, so long as the Hoops Related Parties continue to collectively own of record at least 20% of the Series A Units collectively owned of record by the Hoops Related Parties on the Effective Date (as such number may be adjusted by splits, dividends and recapitalizations), up to two representatives designated by Hoops to attend all meetings of the Board in a nonvoting capacity, and in connection therewith, the Company shall give such representative copies of all notices, minutes, consents and other materials, financial or otherwise, which the Company provides to the Board; provided, however, that such representative shall agree to hold in confidence and trust all such information pursuant to a confidentiality agreement satisfactory to the Company; provided further, however, that the Company reserves the right to exclude such representatives from access to any material or meeting or portion thereof if the Company believes that (i) such exclusion may be helpful or necessary to preserve the attorney- client privilege or (ii) the presence of such representative could materially impair due consideration of the Board with respect to certain competitively sensitive matters, proprietary information and other similar matters (and the Company shall not be obligated to provide the representative with any related materials provided to the Board).

(ii)      [RESERVED]

(iii)      Except as otherwise provided herein and for so long as such Person has the right to designate any Director, the Lime Rock Investors shall have the right to designate alternate or successor Directors (in lieu of the Lime Rock Designees), who may replace any absent or disqualified Director who was designated thereby; and Hoops shall have the right to designate alternate or successor Directors (in lieu of any Hoops Designee), who may replace any absent or disqualified Director who was designated thereby.

(iv)      Each individual elected to serve on the Board in accordance with this Section 7.2 shall serve until a successor is duly nominated and elected to serve in his stead, or until his removal in accordance with Section 7.2(c), voluntary resignation, death or disability, as applicable.

(v)      The chairperson of the Board, if any, shall be designated by the majority vote of all the Directors.

(b)      *Vacancies*.  Any vacancy created by the death, disability, retirement, resignation or proper removal (*i.e.*, removal in accordance with Section 7.2(c)) of any individual designated under Section 7.2(a) (a "***Former Director***") shall be filled by a nominee designated by the Person that designated the applicable Former Director under Section 7.2(a) unless such Person no longer has the right to designate a nominee to serve as a Director.

16

LR_REV_00000032

(c)     Removal.  Except as provided in Section 7.2(a)(i), a Director nominated in accordance with Section 7.2(a) may not be removed from the Board during his or her term of office except by the Person or Persons authorized to nominate such Director or for Cause (it being understood and agreed that such Person authorized to nominate a successor to the removed Director shall be permitted to designate a different natural person as successor to the removed Director).

(d)     Quorum; Required Vote for Board Action.  Each Director shall be entitled to cast one vote, in person or by proxy, with respect to each matter submitted for the vote or consent of the Board.  If only one Lime Rock Designee attends any meeting of the Board, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that is absent from such meeting.  If there is one or more vacancy on the Board because the Lime Rock Investors have yet to nominate both of the Lime Rock Designees, the Lime Rock Designee present at such meeting shall be entitled to cast the votes of the Lime Rock Designee that has yet to be nominated.  Directors then serving on the Board (*i.e.*, excluding any vacancies on the Board) that are entitled to cast a majority of the votes that may be cast by all of the Directors then serving on the Board must be present in order to constitute a quorum for the transaction of business of the Board.  The act of a majority of the Directors present, in person or by proxy, at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by the Act, the Certificate of Formation or by this Agreement (including Section 7.2 hereof).  A Director who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered into the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favor of such action.

(e)     Location; Order of Business.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)     Meetings of the Board; Notices.  The Board shall meet at least quarterly. Regular meetings of the Board shall be held at such places as shall be designated from time to time by resolution of the Board.  Special meetings of the Board may be called by any Investor on at least five days personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each Director, with such notice containing a statement of the purposes for such special meeting.  If a Hoops Designee is not able to attend a special meeting, such Director shall promptly send personal, written, telegraphic or wireless notice (*e.g.,* e-mail) to each other Director of such Director's inability to attend the special meeting and, unless otherwise agreed, the special meeting shall be rescheduled to a date not later than ten Business Days from the original date of such special meeting.

(g)     Reimbursement; Compensation.  All Directors shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including travel expenses in accordance with the Company's travel reimbursement policies.

17

LR_REV_00000033

**Section 7.3**    *Meetings of the Members*.

(a)    <u>Place of Meetings</u>.  All meetings of the Members shall be held at the principal office of the Company, or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice) thereof.

(b)    <u>Quorum; Required Vote for Member Action; Adjournment of Meetings</u>. Except as expressly provided otherwise by this Agreement, the holders of a majority of the Voting Units then outstanding, voting together as a single class, and entitled to vote at any meeting of Members, present in person or represented by proxy thereat, shall constitute a quorum at any such meeting for the transaction of business, and the affirmative vote of the holders of a majority of the Units so present or represented at such meeting, voting together as a single class, at which a quorum is present shall constitute the act of the Members.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c)    <u>Annual Meetings</u>.  An annual meeting of the Members for the election of Directors to succeed those Directors serving on the Board whose terms expire and for the transaction of such other business as may properly be considered at the meeting may be held at such place, within or without the State of Delaware, on such date, and at such time as the Board shall fix and set forth in the notice of the meeting; provided, until such time as a meeting of Members shall be called in accordance with this Section 7.3, the Directors shall continue to serve until their resignation or removal in accordance with Section 7.2.  In lieu of annual meetings, which are not a requirement for any purpose, the Members may elect Directors by written consent.

(d)    <u>Record Date</u>.

(i)    The Board shall give at least 10 days personal, written or wireless notice *(e.g.*, e-mail) of any meetings of the Members of the Company.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.

(ii)    If, in accordance with this Agreement, action without a meeting of Members is permitted to be taken, the Board may fix a record date for determining Members entitled to consent in writing to such action, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed

18

CONFIDENTIAL    LR_REV_00000034

by the Board, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or to an Officer of the Company having custody of the book in which proceedings of meetings of Members are recorded.

(iii)    A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

**Section 7.4    *Provisions Applicable to All Meetings*.**  In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions shall apply:

(a)    <u>Waiver of Notice Through Attendance</u>.  Attendance of a Person at such meeting (including attendance by telephone pursuant to Section 7.4(d)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)    <u>Proxies</u>.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a Members meeting may vote at a Members meeting by a written proxy executed by that Person and delivered to the Secretary.  A proxy shall be revocable unless it is stated to be irrevocable.

(c)    <u>Action by Written Consent</u>.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by all of the Directors or members of a committee of the Board or the Members, as applicable.

(d)    <u>Meetings by Telephone</u>.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment shall be given full effect.

**Section 7.5    *Officers*.**  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company (*"Officers"*), and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described by resolution of the Board or as is customary for each such position.  In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person." An employee or other agent of the

19

Company shall not be an authorized person unless specifically appointed as such by the Board. Duly elected and designated Officers shall have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board; provided, notwithstanding anything to the contrary herein, unless such acts have been approved by the Board, the Officers shall not have the power or authority to cause or permit the Company to do or perform any of the following:

(a)     Incur any indebtedness or make any loan other than trade payables incurred in the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(b)     Sell, assign, convey or otherwise dispose of assets or properties of the Company outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(c)     Make any capital expenditure outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board;

(d)     Approve or amend any capital or operating budget;

(e)     Mortgage, pledge, assign in trust or otherwise encumber or permit to be encumbered any of the Company assets outside of the ordinary course of the operations of the Company consistent with a budget approved by the Board; or

(f)     Enter into any transaction with a Member or an Officer or an Affiliate of a Member or an Officer.

**Section 7.6**     *Duties of Directors and Members.*

(a)     To the fullest extent permitted by the Act, a person, in performing his duties and obligations as a Director under this Agreement, shall be entitled to act or omit to act at the direction of the Members that designated such person to serve on the Board, considering only such factors, including the separate interests of the designating Members, as such Director or Members choose to consider, and any action of a Director or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Director or Members designating such Director, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Director or Members of the Company or any other Director or Member.

(b)     The Members (in their own names and in the name and on behalf of the Company) hereby:

(i)     agree that (A) the terms of this Section 7.6, to the extent that they modify or limit a duty or other obligation, if any, that a Director may have to the Company or any another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this Section 7.6 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have

20

to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

(ii)    waive to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.6.

(c)    The Members (in their own names and in the name and on behalf of the Company), acknowledge, affirm and agree that (i) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 7.6, and (ii) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

## ARTICLE 8

## ADDITIONAL COVENANTS

**Section 8.1    *Reports*.**  Except as expressly stated otherwise, the Company shall deliver the following reports and information to the Investors:

(a)    Annual Reports.

(i)    As soon as available and in any event within 90 days after the end of each Fiscal Year, a consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related consolidated and consolidating statements of operations, members' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified without qualification to the Board by an Accounting Firm as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

(ii)    As soon as available and in any event within 90 days after the end of each Fiscal Year, the Company shall deliver a reserve report prepared in accordance with applicable SEC guidelines by an independent engineer approved by the Board with respect to the coal reserves of the Company and the Subsidiaries.

(iii)    Prior to year-end, an annual capital and operating budget for the coming year, that shall be approved by the Board (as the same may be modified as approved by the Board on a month-to-month basis).

(b)    Monthly Reports.  As soon as practicable and in any event within 30 days after the end of each calendar month (including the last calendar month of the Company's Fiscal Year), a management report discussing the financial condition and operations of the Company and its Subsidiaries for the most recent period ended for which information is available, all in reasonable detail and certified by an officer of the Company as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance

CONFIDENTIAL                                                                                    LR_REV_00000037

with GAAP, as applied consistently with the Company's practices, and with the audited financial statements of the Company, excluding customary footnotes and year-end adjustments.

(c)     <u>Weekly Reports</u>.  Upon the request of the Lime Rock Investors, the Chief Executive Officer shall hold a weekly conference call during which management shall describe significant issues and events which have occurred during the previous week or which are expected to occur during the coming week (or such other reasonably relevant time frame as requested by the Lime Rock Investors).  The Lime Rock Investors shall be afforded the opportunity to ask questions regarding the information presented.  Notice of such conference call and the call-in number therefore shall be made available to the Lime Rock Investors and the Chief Executive Officer not less than 48 hours prior to the commencement of such conference call.

(d)     <u>Other Information</u>.

(i)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors notice of:  (A) any default in any material respect under any material agreement to which the Company or any Subsidiary is a party; (B) any material lawsuit or proceeding against the Company or any Subsidiary or executive officers, in their capacities as such executive officer; and (C) any other material change, event or circumstance affecting the Company, any Subsidiary or any executive officer, in their capacity as such executive officer, thereof.

(ii)     The Company shall promptly (but in any event within five Business Days) provide the Lime Rock Investors with copies of all material communications relating to any interest expressed by third-parties to engage in a Sale Transaction and all reasonable terms and other detail expressed in connection with such interest.

(iii)     Within five Business Days of the Company's receipt thereof, the Company shall provide the Lime Rock Investors with copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Company or any of its Subsidiaries to its Members, (B) all regular and periodic reports and all registration statements and prospectuses filed by the Company or any of its Subsidiaries with any securities exchange quotation system or service or with the SEC or any successor, (C) all press releases and other statements made available generally by the Company or any Subsidiaries concerning material developments in the business of the Company or its Subsidiaries and (D) all material communications with and from Federal, state or major municipal regulatory agencies or other governmental authorities, excluding any communications that are usual, customary, and in the ordinary course of the business of the Company and its Subsidiaries.

(iv)     The Company shall promptly (but in any event within five Business Days) provide to a Member any other information reasonably requested by such Member.

(v)     To each Member, as soon as available, but in no event more than 90 days after the end of each year, a copy of all tax information required to be provided to members, including but not limited to Schedules K-1.

22

**Section 8.2**   *Inspection Rights*.  Each Investor and its duly authorized representatives shall be permitted, during normal business hours and upon reasonable advance notice to the Company, to (a) inspect the books, records, contracts and agreements of the Company and the Subsidiaries for any proper purpose and make copies thereof and (b) obtain any information reasonably requested by such Member relating to the Company and the Subsidiaries.  All costs incurred in such inspection will be borne by the requesting Member; provided, that if it is determined that the Company or its Subsidiaries is in breach of this Agreement, then such costs will be borne by the Company.

**Section 8.3**   *Internal Restructure*.

(a)   The Company, upon the unanimous approval of the Board, may affect an Internal Restructure on such terms as the Board in good faith deems advisable; provided that each Member (and if applicable, the stockholders, members, partners, trustees or other equity owners of an entity or trust Member, as applicable) is treated equitably and incurs no personal liability with respect to such Internal Restructure.  Each Member agrees that it will consent to and raise no objections to such an Internal Restructure, in accordance with this Section 8.3, that has been unanimously approved by the Board.  Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this Section 8.3) to be executed by such Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement, including, without limitation, relative equity ownership percentages among the holders of a series or class of Units, relative pro rata distribution rights among the holders of a series or class of Units, pre-emptive rights (except in connection with a public offering of the Company), those provisions granting the Board authority to manage the affairs of the Company, and granting certain Persons the right to nominate and cause the election of Directors, governing Transfers of Units or other equity securities and indemnification.

(b)   The Members acknowledge that an Internal Restructure may be undertaken in connection with a public offering of the Company, an acquisition of another business or entity or the sale of equity in the surviving entity to other Persons.

(c)   Upon the consummation of an Internal Restructure, the surviving entity or entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company.  The governing instruments of the surviving entity shall incorporate the governance provisions of this Agreement as closely as practicable.  All Members shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Company in connection with consummating an Internal Restructure (in accordance with this Section 8.3) including voting for or consenting thereto.

(d)   Notwithstanding anything to the contrary in this Section 8.3, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a public offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby and such Member is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to

23

LR_REV_00000039

otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a Purchaser Representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.  No Member shall have any dissenters' or appraisal rights in connection with any Internal Restructure, and each Member hereby votes in favor of such Internal Restructure and agrees to execute such further instruments as the Company reasonably requests to further evidence the waiver of any such dissenters' or appraisal rights.

(e)     Each Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions of this Section 8.3.

**Section 8.4** *Confidentiality*.     The Members acknowledge that they may receive information from or regarding the Company, any of its Subsidiaries, the other Members, or Affiliates of any of the foregoing in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing.  Each Member shall hold in confidence and not disclose any confidential or proprietary information it receives regarding the Company, any of its Subsidiaries (including Persons with whom they may conduct business), the other Members, or Affiliates of any of the foregoing that is identified as confidential and may not disclose it to any Person other than another Member except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) to Affiliates, advisers or representatives of the Member (provided that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Affiliates, advisors and/or representatives to whom it discloses such information), (c) of information that the Member also has received from a source independent of the Company, any of its Subsidiaries, other Member, or Affiliates of any of the foregoing, as applicable, that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (d) to any Person to which such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and shall disclose only that portion of such information required to be disclosed), (f) permitted by the Company or Member affected by such disclosure, as applicable, (g) by any Member that is a private equity fund, hedge fund or institutional investor to its investors, partners or Affiliates (exclusive, however, of any portfolio company or any of their officers, directors, employees or owners, other than such Member); provided, that such Member remains liable for any breach of this provision by its investors, partners and Affiliates to whom it discloses

24

LR_REV_00000040

such information, or (h) by any private equity fund, hedge fund or institutional investor of confidential information to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Person reasonably deems necessary or appropriate in connection with such Person obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information and that the information permitted to be so disclosed shall in no event include the identity of any direct or indirect owner of any Member or any information regarding such Person's direct or indirect ownership in any Member.  The Members agree that breach of the provisions of this Section 8.4 may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this Section 8.4.  Accordingly, the Members agree that the provisions of this Section 8.4 may be enforced by specific performance.

**Section 8.5**     *Business Opportunities*.

(a)     Company Opportunities.  The Company and each Member recognize Lime Rock and its Affiliates are private equity funds, hedge funds and institutional investors and that they, their partners or investors (such persons, together with the operating companies described in this sentence, are collectively referred to as the "***Fund Group***" and individually as a "***Fund Group Member***") invest in, serve on the board of directors and other governing boards of, serve as officers of, provide services to and have minority and controlling ownership interests in existing and future operating companies.  Except for the confidentiality obligations contained in Section 8.4, nothing in this Agreement or the nature of the existing or any future relationship between any Fund Group Member, on the one hand, and the Company or any Member, on the other (whether such relationship is by reason of any Fund Group Member acting as a lender, owner of equity interests or warrants, landlord, service provider or otherwise), will prohibit any Fund Group Member from engaging in any activity or business opportunity whatsoever for its own account or will require any Fund Group Member to make any business opportunity available to the Company, in each case, even if such activity or business opportunity competes with the Business Line or any other business conducted by the Company.

(b)     Renunciation of Company Opportunities.  The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Fund Group Member participates in or desires to participate in including those that may involve any aspect related to the Business Line or any other business conducted by the Company (each such business opportunity is referred to as a "***Fund Renounced Business Opportunity***").  No Fund Group Member shall have any obligation to communicate or offer any Fund Renounced Business Opportunity to the Company, and any Fund Group Member may pursue any Fund Renounced Business Opportunity solely for its own account.

**Section 8.6**     *VCOC Related Rights*.  So long as any Lime Rock Investor is a Member or owns, directly or indirectly, any ownership interest in the Company, such Lime Rock Investor shall have the right under this Agreement to consult with and advise the management of the Company and any of its subsidiaries (including the right to meet with management personnel at least quarterly at the request of such Lime Rock Investor) on matters relating to the business and

25

financial affairs of the Company and any of its subsidiaries. The rights granted to each Lime Rock Investor under this Section 8.6 are intended to constitute "management rights" within the meaning of U.S. Department of Labor Regulation § 2510.3-101 (d)(3)(ii), and the Company and its subsidiaries will be operated consistent with the status of the Company as a "venture capital investment" of the Lime Rock Investors. The involvement of any Lime Rock Investor as contemplated in this Section 8.6 is for the purpose of informing such Lime Rock Investor with respect to various Company and subsidiary matters and receiving any ideas and suggestions that such Lime Rock Investor may have with respect to Company and subsidiary matters but is not otherwise intended to change the governance of the Company or any of its subsidiaries as more particularly set forth in this Agreement. Notwithstanding anything to the contrary contained in this Section 8.6, the Board shall have full and exclusive power and authority on behalf of the Company and its subsidiaries to acquire, manage, control, administer and operate the property, business and affairs of the Company and its subsidiaries in accordance with Article 7 and the other applicable provisions of this Agreement.

## ARTICLE 9

## EXCULPATION AND INDEMNIFICATION

**Section 9.1** *Exculpation*. No Director or Officer in his capacity as such and no Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for ( a) liability for acts that involve fraud, willful misconduct or gross negligence and (b) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (a) and (b) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator. Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Director, Affiliate or Officer thereof breached the standard of care set forth above in this Section 9.I. In addition, by resolution of the Board, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Director or Officer is exculpated under this Section 9.1.

**Section 9.2** *Indemnification*. Subject to the limitations set forth in this Article 9, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "***Proceeding***"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was an Officer or Director or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this Section 9.2, indemnified by the Company to the fullest extent permitted by the Act, as the

26

LR_REV_00000042

same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 9 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. Notwithstanding anything to the contrary in this Section 9.2, a person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such person seeks indemnification, such person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company or that such person's actions constituted fraud, willful misconduct or gross negligence.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 9.3    *Advance Payment*.  The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

Section 9.4    *Indemnification of Employees and Agents*.  The Company, by adoption of a resolution of the Board, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company who is not an Officer or Director to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Directors under this Article 9.

Section 9.5    *Appearance as a Witness*.  Notwithstanding any other provision of this Article 9, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by an Officer or Director or Member in connection with its appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

Section 9.6    *Nonexclusivity of Rights*.    The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right that an Officer or Director or other Person indemnified pursuant to this Article 9 may have or hereafter acquire by vote of the Board.  The Company hereby acknowledges that the Lime

CONFIDENTIAL                                                                        LR_REV_00000043

Rock Designees have certain rights to indemnification, advancement of expenses and/or insurance provided by Lime Rock and certain of its Affiliates (collective ly, the "**Fund Indemnitors**").  The Company hereby agrees (i) that it is the indemnitor of first resort with respect to the Lime Rock Designees (*i.e.*, its obligations to the Lime Rock Designees are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Lime Rock Designees are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Lime Rock D esignees and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights a Lime Rock Designee may have against the Fund Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Company further agrees that no advancement or payment by the Fu nd Indemnitors on behalf of a Lime Rock Designee with respect to any claim for which such Lime Rock Designee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Lime Rock Designee against the Company.  The Company and each of the Members acknowledges that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 9.6).

**Section 9.7**   *Insurance*.  Without limiting the Company's other obligations under this Article 9 and as soon as practicable, the Company shall procure and at all times maintain directors and officers liability insurance policies on customary terms, a nd all of the Officers and Directors, current and former, shall be included as insureds under such policies.  Without limiting the Company's other obligations under this Article 9, the Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as an authorized person, authorized signatory, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

## ARTICLE 10

## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

**Section 10.1**   *Tax Returns*.  The Company shall prepare and timely file all tax returns and reports required to be filed by the Company.  Unless otherwise agreed by the Directors, any income tax return of the Company shall be prepared by the Accounting Firm.  Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company shall deliver a Schedule K-1 to each of the Members as soon as practicable after the close of each taxable year, but in no event later than 90 days after the end of each year, together with such additional information as may be required by the Members in order for the Members to

28

file their individual returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filing of its tax returns and reports.

**Section 10.2    *Tax Partnership*.**  The Members acknowledge that, subject to Section 8.3 and the impact of an Internal Restructure, the Company shall be treated as a partnership for Federal income tax purposes and will not otherwise characterize the Company for purposes of any Federal tax returns, statements or reports filed by them or their Affiliates.

**Section 10.3    *Tax Elections*.**  The Company shall make the following elections on the appropriate tax returns:

(a)     to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Tax Matters Member designates;

(b)     to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method unless the cash method of accounting is available and the Tax Matters Member designates the cash method of accounting for use by the Company;

(c)     if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Tax Matters Member determines that the Code Section 754 election is in the best interests of the Company and the other Members, and so long as the Board consents to such election;

(d)     to elect to amortize the organizational expenses of the Company ratably over a period of 180 months as permitted by Code Section 709(b);

(e)     any election that would ensure that the Company will be treated as a partnership for Federal income tax purposes; and

(f)     any other election the Board may deem appropriate and m the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

**Section 10.4    *Tax Matters Member*.**

(a)     <u>Designation by the Board</u>.  The "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code shall be Lime Rock, or such other Member designated as such by the Board from time to time.  Any Member who is designated as the "tax matters partner" is referred to herein as the "***Tax Matters Member***."  The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.  The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its

29

capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

(b)     Duties and Obligations.  The Tax Matters Member shall take no action without the authorization of the Board, other than such action as may be required by Law.  Any cost or expense incurred by the Tax Matters Member in connection with its duties as such, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board.  The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the written consent of such Member.  Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 623 I (a)(3)) shall notify the other Members of such settlement agreement and its terms within 30 days from the date of the settlement.

(c)     Requests for Administrative Adjustments by Members.  No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members.  If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members.  If such consent is not obtained within 30 days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf.  Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding.  In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(d)     Notice of Inconsistent Treatment.  If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

(e)     For any taxable year for which the Bipartisan Budget Act is applicable, Lime Rock shall be the "Partnership Representative" as that term is defined in Section 6223(a) of the Amended Code and each Member shall take all actions necessary to cause Lime Rock to be so designated in accordance with any procedures prescribed therefor.  Unless determined otherwise by the Board and unless prohibited by applicable Law, the Company shall elect the alternative method of paying any imputed underpayment resulting from any Company adjustment as provided by Section 6226 of the Amended Code and each Member shall take any and all actions necessary to effect such election, including but not limited to the filing by each Member of amended returns and the payment of any tax, including any interest, penalties, or additions to such tax, resulting from the "imputed underpayment".  If such election is not made, the Company shall take commercially reasonable actions to minimize the financial burden of any imputed underpayment

30

to the Company and the Members through the procedures established pursuant to Section 6225 of the Amended Code, including, to the extent permissible under this Agreement, taking any commercially reasonable actions to allocate the financial burden of any imputed underpayment to the Member(s) to whom such amounts are specifically attributable (whether as a result of their tax status, actions, inactions, or otherwise), unless taking such actions would preclude judicial review of an adjustment arising out of such audit, as determined by the Partnership Representative. The Company shall not elect to apply the partnership audit rules, as added by the Bipartisan Budget Act, to taxable years of the Company earlier than is required (without such election). The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Treasury Regulations issued thereunder. The Partnership Representative shall have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The provisions contained in this Section 10.4(e) shall survive the termination of the Company and the withdrawal of any Member.

Section 10.5   *Bank Accounts*.  The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Board may determine.  The Company shall not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

Section 10.6   *Fiscal Year*.  The fiscal year of the Company (the "*Fiscal Year*") shall end on December 31 of each calendar year unless, for United States Federal income tax purposes, another fiscal year is required.  The Company shall have the same fiscal year for United States Federal income tax purposes and for accounting purposes.

## ARTICLE 11

## DISSOLUTION, WINDING-UP AND TERMINATION

Section 11.1   *Dissolution*.

(a)   General.  Subject to Section 11.l(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "*Dissolution Event*"), and no other event shall cause the Company's dissolution:

(i)   the approval of the Board; and

(ii)   the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)   Continuance of the Company.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

31

**Section 11.2   *Winding-Up and Termination*.**  On the occurrence of a Dissolution Event, the Board may, acting unanimously, select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind-up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)   Accounting.  As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)   Satisfaction of Obligations.  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 5.3); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)   Distribution of Assets.  All remaining assets of the Company shall be distributed to the Members as follows:

(i)   the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the provisions of Sections 6.3, 6.4, and 6.5;

(ii)   with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)   the property of the Company shall be distributed in accordance with Section 6.1 (with no part distributed under Section 6.2).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 11.2; provided, however, that no Member shall be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act;

32

LR_REV_00000048

provided, however, that no Member shall be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)     Final Capital Account Balances.  The Members intend that the allocations provided under Sections 6.3, 6.4, and 6.5 will produce final Capital Account balances for the Members that permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made in the order and priorities set forth in Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1).  If the allocations otherwise made under Sections 6.3, 6.4, and 6.5 would fail to produce such final Capital Account balances, the Board shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

**Section 11.3   *Deficit Capital Accounts*.**  No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**Section 11.4   *Certificate of Cancellation*.**  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company.  Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

# ARTICLE 12

# GENERAL PROVISIONS

**Section 12.1   *Books*.**  To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**Section 12.2   *Offset*.**  Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment, after written notice to the Member describing the nature of the offset and the amount to be offset.

**Section 12.3   *Notices*.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by telecopy shall be deemed to have been received (a) on the day on which the sender receives return confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business

CONFIDENTIAL                                                        LR_REV_00000049

Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the other Members.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

Section 12.4  *Entire Agreement; Supersedure*.   This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Members, and their respective Affiliates relating to the formation and operation of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

Section 12.5  *Effect of Waiver or Consent*.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 12.6  *Amendment or Restatement*.  Except as expressly set forth herein, this Agreement (including the Exhibits and Schedules) may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon unanimous Board approval); provided, (a) any amendment to this Agreement that would (i) obligate a Member to make a Capital Contribution to the Company (other than as provided by the terms of this Agreement in effect as of the Effective Date), (ii) cause a Member to have personal liability for Company obligations, (iii) materially adversely affect any Member's special voting rights, preemptive rights, tax distributions, indemnification rights, economic rights, rights governing Transfer of Units or right to designate a Director (other than any amendment related to an Internal Restructure in connection with an initial public offering) unless, with respect to each of the matters described in this clause (iii), such amendment (A) similarly affects all holders of a particular class of Units AND is approved by the holders of a majority of such class of Units or(B) similarly affects all holders of Senior Preferred Units and Series A Units AND is approved by the holders of a majority of all Senior Preferred Units and Series A Units voting as a single class, or (iv) adversely affect any Member's consent rights under this Section 12.7, shall be effective only with the consent of such Member, (b) to the extent that a provision of this Agreement requires a specified vote of the Members, or the vote of some or all of the holders of a specified class or series of Units, then any amendment of that provision will also require the consent of such specified vote of the Members or the vote of the requisite holders of such specified class or series of Units, as applicable, and (c) the Company (upon Board approval) may amend Schedule 1 without the consent of any Person to reflect new Members admitted in accordance with this Agreement, changes to the notice addresses and other similar relevant information.  The Certificate may be amended or restated only with the approval of the Company (upon Board approval), provided, however, that no such amendment or restatement of the Certificate may effect any change described in Section 12.7(a) or (b) above without the consent of the Member or Members whose consent would be required

34

under such clauses if such change were being effected through an amendment or restatement of this Agreement.

Section 12.7 *Binding Effect*.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

Section 12.8 *Governing Law; Venue*.  This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware.  The Members covenant and agree that the state courts located in Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in Delaware shall have exclusive jurisdiction of any action or proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

Section 12.9 *Severability*.  If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

Section 12.10 *Further Assurances*.   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 12.11 *Waiver of Certain Rights*.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

Section 12.12 *Directly or Indirectly*.  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

Section 12.13 *Counterparts*.  This Agreement may be executed in any number of counterparts, including facsimile counterparts, with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

**[SIGNATURES CONTAINED ON FOLLOWING PAGE]**

35

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

<u>**COMPANY**</u>:

**BLACKJEWEL HOLDINGS L.L.C.**

By:_____
Name: Jeffery A. Hoops, Sr.
Title: President and Chief Executive Officer

<u>**MEMBERS**</u>:

**LR-REVELATION HOLDINGS L.P.**

By:  LIME ROCK PARTNERS GP V, L.P.,
its general partner

By:  LRP GP V, Inc.,
its general partner

By:_____
Name: Jeffrey B. Scofield
Title: Managing Partner

<u>**BLACKJEWEL INVESTMENT L.L.C.**</u>

BLACKJEWEL INVESTMENT L.L.C.

By:_____
Name: Jeffrey A. Hoops, Sr.
Title: President and Chief Executive Officer

*[Signature page to Blackjewel Holdings LLC Agreement]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, the Company and the Members have executed this Agreement as of the Effective Date.

<u>**COMPANY:**</u>

**BLACKJEWEL HOLDINGS L.L.C.**

By:_____
Name: Jeffery A. Hoops, Sr.
Title: President and Chief Executive Officer

<u>**MEMBERS:**</u>

**LR-REVELATION HOLDINGS L.P.**

By:   LIME ROCK PARTNERS GP V, L.P.,
its general partner

By:   LRP GP V, Inc.,
its general partner

By:_____
Name: Jeffrey B. Scofield
Title: Managing Partner

<u>**BLACKJEWEL INVESTMENT L.L.C.**</u>

BLACKJEWEL INVESTMENT L.L.C.

By:_____
Name: Jeffrey A. Hoops, Sr.
Title: President and Chief Executive Officer

*[Signature page to Blackjewel Holdings LLC Agreement]*

CONFIDENTIAL

## SCHEDULE 1

## MEMBERS, UNITS AND INFORMATION RELATED THERETO

| Members | Number of Senior Preferred Units | Number of Series A Units | Capital Contributions as of the Effective Date |
|---|---|---|---|
| **LR-REVELATION HOLDINGS L.P.**<br>274 Riverside Ave., 3rd Floor<br>Westport, CT 06880<br>Attention: Jeffrey B. Scofield | **292,354** | **625** | **$29.24** |
| **BLACKJEWEL INVESTMENT L.L.C.**<br>1149 Newmans Branch Road<br>Milton, WV 25541 | **31,612** | **375** | **$3.16** |

Sch. 1-1

CONFIDENTIAL

**EXHIBIT A**

**DEFINED TERMS**

"*Accounting Firm*" means such accounting firm as the Board shall from time to time determine.  The initial Accounting Firm shall be Dixon Hughes Goodman PLLC.

"*Act*" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"*Adjusted Capital Account*" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections l. 704-1(b)(2)(ii)(c), l.704-2(g)(l) and l.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section l.704-l(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"*Affiliate*" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person.

"*Agreement*" means this Limited Liability Company Agreement of Blackjewel Holdings L.L.C., as amended and restated from time to time, including the Exhibits and Schedules hereto.

"*Amended Code*" means the Code (as amended by the Bipartisan Budget Act).

"*Available Cash*" means all cash, revenues and funds received by the Company from Company operations and proceeds from a Sale Transaction, less the sum of the following, to the extent paid or set aside by the Company:  (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the operation of the Company's business; and (c) such reserves as the Board deems reasonably necessary for the proper operation of the Company's business.

"*Bipartisan Budget Act*" means Title XI of the Bipartisan Budget Act of 2015 and any related provisions of law, court decisions, regulations, rules, and administrative guidance.

"*Book Liability Value*" means with respect to any liability of the Company described in Treasury Regulation Section I.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's- length transaction.  The Book Liability Value of each liability of the Company described in Treasury Regulation Section l.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values.

"*Book Value*" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

(a)     The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

A-1

CONFIDENTIAL

(b)     The Book Values of all properties shall be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by all Members in proportion to their respective Sharing Ratios) to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property (other than a distribution made to all Members in proportion to their respective Sharing Ratios) as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-l(b)(2)(ii)(g)(l) (other than pursuant to Section 708(b)(l)(B) of the Code); provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Book Value of property distributed to a Member shall be the fair market value of such property as of the date of such distribution as reasonably determined by the Board;

(d)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses; and

If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Section 6.4.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the States of New York or West Virginia are authorized by Law to close.

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

"*Capital Stock*" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"*Cause*" means, with respect to any Person, that such Person (a) has committed willful misconduct or gross negligence in a manner that materially impairs the Company's financial condition or prospects, (b) has continually refused or intentionally failed to perform his duties and

CONFIDENTIAL

obligations in some material respect after reasonable written notice (and reasonable time to cure) of any such refusal or failure to perform such duties or obligations or (c) has been convicted of a felony or crime involving moral turpitude.

"**Code**" means the United States Internal Revenue Code of 1986, as amended from time to time.  All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"**Co-Sale Percentage**" means, for each Electing Member, a fraction (expressed as a percentage), the numerator of which is the number of Senior Preferred Units held of record by such Electing Member and the denominator of which is the sum of the number of Senior Preferred Units held of record by all Electing Members and the Co-Sale Seller.

"**Control**," including the correlative terms "**Controlling**," "**Controlled by**" and "**Under Common Control with**" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.  For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

"**Curative Allocations**" means the allocations pursuant to Section 6.5 of this Agreement.

"**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"**Economic Risk of Loss**" has the meaning set forth in Treasury Regulation Section l.752-2(a).

"**Entity**" means any Person other than a natural person.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"**Exempted Units**" means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) any Units distributed or set aside ratably to all Members pro rata based on their respective Units, including any distribution issued for no

consideration to all Unit holders or any split of Units, (c) any Units issued, sold or otherwise transferred to sellers as consideration in connection with the Company's or any Subsidiary's acquisition of all or substantially all of another Person or another Person's line of business or division, or all or substantially all of a Person's assets, in any case, by merger, consolidation, stock purchase, asset purchase, recapitalization, or other reorganization, (d) [RESERVED], (e) any Units issued, sold or otherwise Transferred to any third-party unaffiliated investor if the Board determines that there are strategic reasons to exempt such issuance, sale or Transfer from the preemptive rights terms of Article 4, (f) any Units issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates) in connection with any loan or commitment to loan made by such lender to the Company or any Subsidiary thereof and (g) any Senior Preferred Units issued pursuant to Section 5.1(b).

"***Expel, Expelled or Expulsion***" means the expulsion or removal of a Member from the Company as a member.

"***GAAP***" means United States generally accepted accounting principles and policies as in effect from time to time.

"***Hoops***" means Blackjewel Investment L.L.C., a Delaware limited liability company.

"***Hoops Related Parties***" means, collectively, Hoops and its respective Permitted Transferees.

"***HSR Act***" means the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

"***Internal Restructure***" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Members or their Affiliates continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Members or their Affiliates in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to any Member.

"***Investors***" means Hoops, LR-Revelation Holdings, L.P., and their respective Permitted Transferees that hold all or any portion of the Units issued by the Company to such Person from time to time.

"***Involuntary Transfer***" means a Transfer resulting from the death of a Person or another involuntary Transfer occurring by operation of law.

"***Joinder Agreement***" means an agreement substantially in the form of <u>Exhibit D</u> hereto pursuant to which a Person agrees to be bound by the terms of this Agreement and agrees that any Units held thereby shall be bound by the terms of this Agreement or such other form as the Board reasonably required in connection with a Transfer.

"***Lime Rock***" means LR-Revelation Holdings, L.P., a Delaware limited partnership.

A-4

LR_REV_00000058

"*Lime Rock Investors*" means Lime Rock and its Affiliates and any direct or indirect transferee of all or any portion of the Units issued by the Company to Lime Rock or its Affiliates from time to time.

"*Maximum Tax Liability*" means, for any Member, the product of (a) an amount determined by the Company (on an actual or estimated basis) for each Member for a completed fiscal quarter, as the case may be, equal to the sum of the portion of the Company's Net Profit allocated or to be allocated and guaranteed payments made or to be made pursuant to Article 6 to such Member for federal, state or local income tax purposes for such fiscal quarter multiplied by (b) the highest combined marginal federal, state and local income tax rates that apply to an individual residing in New York County, New York taking into account rate differences that may apply to the character of the income so allocated. In determining cumulative Maximum Tax Liability for each Member, Net Losses allocated to a Member for a Fiscal Year that are allowed to be carried forward under applicable tax laws to a later Fiscal Year shall be deducted from Net Profit in that later year.

"*Member*" means any Person executing this Agreement as of the Effective Date, that executes a Restricted Unit Agreement and agrees to be bound by this Agreement or is hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

"*Member Nonrecourse Debt*" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"*Member Nonrecourse Debt Minimum Gain*" has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulation Section 1.704-2(i)(2).

"*Member Nonrecourse Deduction*" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(l).

"*Membership Interest*" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"*Minimum Gain*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

"*Net Loss*" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"*Net Profit*" means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

"*Nonrecourse Deduction*" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(l).

<center>A-5</center>

CONFIDENTIAL

"*__Nonrecourse Liabilities__*" means nonrecourse liabilities (or portions thereof) of the Company for which no Member bears the Economic Risk Of Loss.

"*__Percentage Interest__*" means, as to any Eligible Purchaser, a fraction (expressed as a percentage), the numerator of which equals the number of Voting Units held of record thereby and the denominator of which equals the number of Voting Units held of record by all of the Eligible Purchasers.

"*__Permitted Transfer__*" means any Involuntary Transfer or, with respect to any Member, any Transfer to (a) any parent, sibling, child or grandchild of such Member, (b) any trust, limited liability company, limited partnership or other Entity having as its sole beneficiaries or owners such Member, any Persons described in clause (a) above or any combination of the foregoing, (c) the shareholders, members, partners, beneficiaries or other equity owners of a Member that is an Entity, or (d) an Affiliate of a Member if such Member (or the sole shareholder(s)/member(s) of the Member) own(s) one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, (e) solely with respect to a Lime Rock Investor, any private equity fund that is an Affiliate of Lime Rock Management, L.P.  and any direct or indirect, wholly-owned (together with any general partner) subsidiary of any such fund, and (f) any Person designated by the Board as a "Permitted Transferee" for purposes of such Transfer.

"*__Person__*" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"*__Profits__*" or "*__Losses__*" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(l) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(c)     In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

A-6

CONFIDENTIAL

(d)     In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(e)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(g)     To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)     Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

"**Registration Expenses**" means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties and costs and expenses relating to analyst or investor presentations, if any, or any "road show" undertaken in connection with the registration and/or marketing of the Units other than as provided in any underwriting agreement entered into in connection with such offering), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters), (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Units of all participating Members, (h) fees and expenses in connection with any review of underwriting arrangements by the National Association of Securities Dealers, Inc. including fees and expenses of any "qualified independent underwriter", (i) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (j) fees and disbursements of underwriters

A-7

CONFIDENTIAL

customarily paid by issuers or sellers of Units, but shall not include any underwriting discounts attributable to the sale of secondary Units, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members or any fees and expenses of underwriter's counsel, and (k) the expenses and fees for listing the Units to be registered on each securities exchange on which similar securities issued by the Company are then listed or on the NASD automated quotation system.

"*Regulatory Allocations*" means the allocations pursuant to Section 6.4 of this Agreement.

"*Resign*, *Resigning or Resignation*" means the resignation, withdrawal or retirement of a Member from the Company.  Such terms shall not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

"*Sale Transaction*" means any transaction or series of related transactions (whether such transaction occurs by a sale of assets, sale of Units or other Company interests, merger, conversion, recapitalization or other business combination) that, after giving effect thereto, results in (a) all or substantially all of the assets of the Company being held by an entity that is less than 50% owned by the record holders of Units immediately prior to such transaction and their Affiliates or (b) the record holders of the Units prior to such transaction and their Affiliates having record ownership, directly or indirectly after the consummation of such transaction, of 50% or less (determined by the percentage of liquidating distributions the record holders of Units would receive upon a liquidation of the Company or other surviving entity immediately after consummation of such transaction) of the equity securities of the surviving company.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Senior Preferred Return Amount*" means, with respect to any Senior Preferred Unit and as of any date of determination, the hypothetical interest amount that would have accrued and that would remain unpaid as of such date of determination on a promissory note in the original principal amount of $100 that accrues interest at a rate of 15% per annum, compounded annually beginning on the date such Senior Preferred Unit was issued by the Company and treating distributions in respect of such Senior Preferred Unit under Section 6.1(a)(i) to first be repayments of the principal amount of such promissory note and then to be repayments of accrued interest.

"*Sharing Ratio*" means, with respect to any Member, the ratio which the number of Units (or Units of a specified class or specified classes) held by that Member bears to the total number of Units (or Units of the specified class or specified classes) held by all Members.

"*Subsidiary*" means (a) any corporation or other entity (including a limited liability company) a majority of the Capital Stock of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect Subsidiary of the Company or (b) a partnership in which the Company or any direct or indirect Subsidiary is a general partner.

A-8

CONFIDENTIAL

"***Transfer***," including the correlative terms "***Transferring***" or "***Transferred***", means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided, however, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

"***Treasury Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.  All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

"***Voting Interest***" means, with respect to each Member and any Person that acquires all or any portion of the Voting Units initially issued to and held by such Member, the percentage derived by dividing (a) the number of Voting Units (or Voting Units of a specific class) held by such Member by (b) the number of all Voting Units (or Voting Units of a specific class) held by all Members (and such percentage shall be allocated among such original Member and any such acquiring Person or Persons according to the transfer documentation pursuant to which all or any portion of such Voting Units are Transferred from time to time).

"***Voting Units***" means all Units other than any class or series of Units that is designated by the Board as non-voting.

A-9

LR_REV_00000063

## EXHIBIT B

### PROVISIONS RELATING TO TRANSFERS

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in the Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

1.    <u>General Rules</u>.

(a)    No Member may Transfer all or any portion of its Units other than in accordance with the terms of this <u>Exhibit B</u>, and any attempted Transfer that is not in accordance with this <u>Exhibit B</u> shall be, and is hereby declared, null and void ab initio.

(b)    [RESERVED]

(c)    No Member shall Transfer all or any of his or its Units (i) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (ii) if such Transfer would cause the Company to lose its status as a partnership for Federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704 or (iii) if the nature of the Transfer is reasonably likely to adversely affect the ability of the Company or any of its Subsidiaries to conduct its business in the manner conducted as of the time of a proposed Transfer.

(d)    The Members agree that a breach of the provisions of this <u>Exhibit B</u> may cause irreparable injury to the Company and the Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Person to comply with such provisions and (ii) the uniqueness of the Company's business and the relationship among the Members.  Accordingly, the Members agree that the provisions of this <u>Exhibit B</u> may be enforced by specific performance.

2.    <u>Permitted Transfers</u>.  A Member may make a Permitted Transfer of all or a portion of its Units subject to compliance with Section 6 of this <u>Exhibit B</u>.

3.    <u>Right of First Offer</u>.

(a)    The provisions of this Section 3 shall not apply to (i) a Permitted Transfer, (ii) a Transfer pursuant to the exercise of co-sale (tag-along) rights under Section 4 of this <u>Exhibit B</u>, (iii) a Transfer in connection with a Sale Transaction or (iv) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)    If an Investor (or its Affiliate) desires to Transfer all or a portion of its Units to any Person (including another Member), other than a Transfer described in Section 3(a) of this <u>Exhibit B</u>, such Investor (or its Affiliate) (the "***Disposing Member***") shall promptly give written notice (a "***Disposition Notice***") to the Company and the Lime Rock Investors (the "***ROFO Members***") that such Disposing Member desires to effect such a Transfer and setting forth the

B-1

LR_REV_00000064

portion (by reference to the Voting Interest percentage of the portion of the Units the Disposing Member desires to dispose of) of the Units proposed to be transferred by the Disposing Member (the "*Sale Units*"), the consideration that such Disposing Member proposes to be paid for such Sale Units (the "*Sale Price*") and any other material terms sought by the Disposing Member.

(c)     The giving of a Disposition Notice shall constitute an offer (the "*Disposition Offer*") by the Disposing Member to sell to the ROFO Members and the Company all of the Sale Units at the Sale Price.  The ROFO Members (and the Company, as hereafter set forth) shall have the option, but not the obligation, to acquire all, but not less than all, of the Sale Units on the terms set forth in the Disposition Notice, and such option shall be exercisable by the ROFO Members giving notice to the Disposing Member and the Company before the expiration of the 30-day period following the receipt by the ROFO Members of the Disposition Notice (the "*ROFO Member Election Period*").  If more than one of the ROFO Members exercise the option granted in this Section 3(c), the Sale Units will be allocated among them based on the relative Voting Interests of the Units held of record by them or on such other basis as the ROFO Members unanimously agree.  Any ROFO Member that fails to notify the Disposing Member prior to the expiration of the ROFO Member Election Period will be deemed to have rejected the Disposition Offer.  If the ROFO Members do not exercise the purchase option with respect to all the Sale Units, the Disposing Member shall immediately notify the Company thereof and the Company may, upon receipt of such notice, following the expiration of the ROFO Member Election Period, by giving notice to such Disposing Member and the ROFO Members within 10 days after the expiration of the ROFO Member Election Period (such 10-day period being referred to herein as the "*Company ROFO Election Period*"), exercise the right of first offer with respect to a portion of Sale Units that the ROFO Members declined pursuant to the Disposition Offer.  If the ROFO Members and the Company do not elect to purchase all of the Sale Units, the ROFO Members and the Company shall be deemed to have rejected the Disposition Offer.  The closing of the purchase and sale of the Sale Units to the ROFO Members or the Company, as applicable, shall be at 9:00 a.m. on the 20th Business Day following the end of the ROFO Member Election Period or the Company ROFO Election Period, as applicable, unless the ROFO Members and/or the Company, as applicable, and the Disposing Member otherwise agree.  At the closing, the ROFO Members or the Company, as applicable, shall deliver to the Disposing Member cash in the amount of the consideration applicable to the Sale Units to be purchased, and the Disposing Member shall represent and warrant to the ROFO Members and the Company, as applicable, that the Disposing Member owns such Sale Units free and clear of all liens, encumbrances and to the knowledge of such Disposing Member adverse claims, and shall deliver to the ROFO Members or the Company executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company.  The Disposing Member, the Company and the ROFO Members shall cooperate in good faith in obtaining all necessary governmental and other third Person approvals, waivers and consents required for the closing.  Notwithstanding the foregoing, any such closing shall be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the HSR Act.

(d)     The Disposing Member shall be free to sell the portion of the Sale Units not purchased by the ROFO Members or the Company pursuant to Section 3(c) of this Exhibit B to any Person during the 90-day period following the expiration of the Company ROFO Election Period; provided (i) any such sale shall be subject to Section 6 of this Exhibit B and (ii) the

CONFIDENTIAL                                                     LR_REV_00000065

consideration and other terms offered by the Disposing Member shall be no more favorable to the transferee than those offered to the ROFO Members in the Disposition Notice.  Any Sale Unit not sold during the 90-day period described in this Section 3(d) shall be subject again to right of first offer set forth in Section 3(b) of this Exhibit B.

4.      Co-Sale (Tag-Along) Rights.

(a)      The remaining provisions of this Section 4 shall not apply to (i) a Permitted Transfer, (ii) a Transfer in connection with a Sale Transaction, or (iii) a Transfer in connection with the exercise of the registration rights described in Exhibit C.

(b)      If any of the Investors (each, a "*Co-Sale Seller*") desires to Transfer, in a transaction or series of related transactions, Units then outstanding (a "*Proposed Co-Sale Transfer*"), then such Co-Sale Seller shall offer (the "*Co-Sale Offer*") to include in such Transfer a number of Units owned of record by the other Investors (and its Affiliates) according to the remaining terms of this Section 4.

(c)      The Co-Sale Seller shall notify the other Investors (the "*Co-Sale Notice*") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer.  The Co-Sale Notice shall specify the proposed Transferee (the "*Co-Sale Buyer*"), the number of Units proposed to be Transferred as part of the Proposed Co-Sale Transfer, the amount and type of consideration to be received therefor, the consideration offered to be paid for each Unit (the "*Per Unit Price*") and the place and date on which the Transfer is to be consummated.  If an Investor (and any Affiliate) wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer such Person must notify the Co-Sale Seller prior to 12:00 pm, New York time 10 calendar days following the date the Co-Sale Seller gave the Co-Sale Notice.   If an Investor (or any Affiliate) elects to participate in such Proposed Co-Sale Transfer (the "*Electing Member*"), then such Person shall have the right to include Units in such Transfer as follows:

(i)      Unless unanimously agreed to otherwise by the Electing Member and the Co-Sale Seller, the Electing Member may elect, by notice delivered to the Co-Sale Seller within 10 days after the Co-Sale Notice is given, to include up to a number of Units in the Proposed Co-Sale Transfer equal to its Co-Sale Percentage of the total number of Units proposed to be purchased by the Co-Sale Buyer pursuant to the Proposed Co-Sale Transfer.  The number of Units the Electing Member elects to sell in accordance with the foregoing is referred to as such Electing Member's "*Co-Sale Units.*" The Co-Sale Seller will reduce the number of Units to be included in the Proposed Co-Sale Transfer by the Electing Member's Co-Sale Units or, if the Co-Sale Buyer refuses to purchase Units from the Electing Member, the Co- Sale Seller shall purchase the Co- Sale Units from the Electing Member on the same terms as apply to the Proposed Co-Sale Transfer.

(ii)      All of the consideration payable to the Members in the Proposed Co-Sale Transfer shall be distributed to such Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement.  If the consideration in the Proposed Co-Sale Transfer involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an

B-3

accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Lime Rock Investor may require each Member, at the option of the Member, that is not an accredited investor (A) to receive solely cash in such transaction, or (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(iii)    The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(d)    In connection with a Proposed Co-Sale Transfer, the Electing Member shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms (other than non-compete and non-solicitation terms) as the Co-Sale Seller and (iv) be required to deliver customary transfer instruments.

5.    <u>Sale Transaction; Drag-Along Provisions</u>.

(a)    If (i) any Person that is not a Member or an Affiliate thereof (a "***Third-Party Buyer***") submits a bona fide written offer to any Lime Rock Investor to effect a Sale Transaction (a "***Sale of the Company Offer***") and (ii) such Lime Rock Investor desires to accept such offer (the "***Accepting Person***"), then the Lime Rock Investors shall have the right to require each other Member (each, a "***Drag-Along Person***") to Transfer to such Third-Party Buyer all of the Units held thereby (or if less than all of the Members' Units are to be Transferred to the Third Party Buyer in such Sale Transaction, each Member's pro rata share of the Units to be Transferred in such Sale Transaction).

(b)    In connection with such Transfer, each Drag-Along Person shall (i) only be required to severally and not jointly represent and warrant as to customary corporate matters about itself (such as due authorization, absence of conflicts and enforceability) and as to the unencumbered title to its Units, (ii) be required to bear its pro rata share of any post-closing indemnity obligations, (iii) be subject to the same post-closing purchase price adjustments, escrow terms, offset rights and holdback terms as the Lime Rock Investors, (iv) be required to deliver customary stock powers, letters of transmittal or other similar transfer documentation and (v) be obligated to pay no more than its pro rata share (based upon the amount of consideration received) of the costs of any Sale Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.

(c)    The Company shall give written notice to each Drag-Along Person of the Sale of the Company Offer approved by the Accepting Person (the "***Accepting Persons' Notice***")

B-4

LR_REV_00000067

at least 20 calendar days before the scheduled closing of the Sale Transaction.  The Accepting Persons' Notice shall specify the Third-Party Buyer, the amount and type of consideration to be received by the Members in connection with the Sale Transaction, the terms and conditions of payment of the consideration offered by the acquiring party and the place and date on which the Transfer is to be consummated.  Subject to Section 5(d) of this Exhibit B, if any holder of a particular class of Units is given an option as to the form and amount of consideration to be received, all holders of such class of Units shall be given the same option with respect to such consideration.  If the Accepting Persons elect to exercise their rights under this Section 5, the Drag-Along Persons shall take such other actions as may be reasonably required and otherwise cooperate in good faith with the Company and the Accepting Persons in connection with consummating the proposed Transfer.

(d)    All of the consideration payable to the Members in a Sale Transaction first shall be aggregated by the Company, as disbursing agent, before distributing any such consideration to any of the Members.  The Company, acting solely as the disbursing agent of the Members, shall then distribute the aggregate consideration to the Members in the same manner such consideration would have been distributed had such distribution been made under Section 6.1 of the LLC Agreement.  If the Sale Transaction involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then Lime Rock may require each Member that is not an accredited investor (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such transaction and/or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.

(e)    No Member shall have any dissenters' or appraisal rights in connection with a Sale Transaction, and each Member hereby releases, votes in favor of, consents to and will execute such further instruments as the Company reasonably requests (in accordance with this Section 5) to further evidence the waiver of, such rights and the approval of the Sale Transaction. No Member shall institute any action or proceeding with respect to the adequacy of the consideration given in a Sale Transaction.

(f)    Each Member hereby makes, constitutes and appoints the secretary or other officer of the Company, in its official Company capacity, as its true and lawful attorney-in- fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member in this Section 5 in the event that such Member is or becomes a Drag-Along Person pursuant to this Section 5.  Each Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as a Drag-Along Person pursuant to this Section 5 as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall

B-5

lawfully do or cause to be done by virtue of the power of attorney granted hereby.  The power of attorney granted pursuant to this Section 5(f) is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

6.      Conditions to Transfers; Continued Applicability of Agreement.

(a)      As a condition to any Transfer permitted under this Exhibit B (including Permitted Transfers), any transferee of Units shall be required to become a party to this Agreement, by executing (together with such Person's spouse, if applicable) a Joinder Agreement.  If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (whether such Transfer resulted by operation of law or otherwise), such Person and such Units shall be subject to this Agreement as if such Units were still held by the transferor.

(b)      No Units may be Transferred by a Person unless the transferee first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Company, with the approval of the Board, may waive any requirement to deliver a legal opinion under this Section 6.

B-6

CONFIDENTIAL                                                                    LR_REV_00000069

**EXHIBIT C**

**REGISTRATION RIGHTS**

Capitalized terms used in this Exhibit that are not defined in this Exhibit shall have the meanings given to them in Limited Liability Company Agreement to which this Exhibit is attached.  Unless the context requires otherwise, all references in this Exhibit to Sections refer to the Sections of this Exhibit.

Registration.

*Piggyback Registration Rights.*  If the Company (which term, for purposes of this Exhibit, includes any successor entity such as a Delaware corporation formed through an Internal Restructure or otherwise) proposes to register any of its Units (the term Units, as used in this Exhibit, shall be read broadly to include common stock if the issuer is a corporation rather than a limited liability company and if the Units have been, are to be, exchanged or converted into common stock in connection with a public offering) under the Securities Act (other than a registration (i) on Form S-8 or S-4 or any successor or similar forms, (ii) relating to Units issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company, (iii) in connection with a direct or indirect merger, acquisition or other similar transaction or (iv) on such other forms not permitting the registration of Units for resale by the Members), for its own account, it will at such time, subject to the provisions of Section 1(c), give notice to each Member at least 20 days prior to the filing of the registration statement relating to such registration with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1 and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 20 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the Company's registration must sell their Units to the underwriters selected by the Company on substantially the same terms and conditions as apply to the Company, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such Units or the transfer thereof, the Company shall give written notice to all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Company may (x) adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering or (y) exclude any Units from any offering to the extent the Board reasonably determines that the inclusion of such Units would be unduly burdensome on the Company and the Members.  The

C-1

CONFIDENTIAL

Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Requests for Registration Rights.*  Following an initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 for secondary sales.  At any time after an initial public offering, the Lime Rock Investors shall have the right to request registrations with respect to all or a part of the Units held by the Lime Rock Investors (such requests shall be in writing and shall state the number of Units to be disposed of and the intended method of disposition of shares by such holders); provided that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 1(b) (i) unless the Lime Rock Investors propose to dispose of securities having an aggregate price to the public of more than $15,000,000 (or $5,000,000 in the case of a registration on Form S-3) or (ii) within 180 days of the effective date of the most recent registration pursuant to this Section 1(b).  The Company shall give notice to each Member at least 15 days prior to the anticipated date the registration statement relating to such registration shall be filed with the Securities and Exchange Commission, which notice shall set forth such Members' rights under this Section 1(b) and shall offer all Members the opportunity to include in such registration statement such number of Units as each such Member is entitled to request pursuant to the remaining terms of this Section 1.  Upon the written request of any such Member made within 10 days after the receipt of notice from the Company (which request shall specify the number of Units intended to be included in such registration statement by such Member), the Company will use commercially reasonable efforts to effect the registration under the Securities Act of all Units that the Company has been so requested to register by such Members; provided, (A) if such registration involves an underwritten public offering, all such Members requesting to be included in the registration must sell their Units to the underwriters selected by the Lime Rock Investors on substantially the same terms and conditions as apply to the Lime Rock Investors, (B) if, at any time after giving written notice of its intention to register any Units or the transfer thereof pursuant to this Section 1(a) and prior to the effective date of the registration statement filed in connection with such registration, the Lime Rock Investors shall determine for any reason not to register such Units or the transfer thereof, the Lime Rock Investor shall give written notice to the Company and all Members that requested any Units to be included in such offering and, thereupon, the Company shall be relieved of its obligation to register any Units in connection with such registration and (C) notwithstanding the foregoing or the terms of Section 1(b), the Lime Rock Investors and the Company may adopt such procedures (including additional procedures relating to Unit allocations (such as disproportionate allocations to eliminate small holdings) and cutbacks and time periods in the event an underwritten offering is resized) as the Board reasonably determines are necessary or advisable in connection with such offering.  The Company will pay all Registration Expenses in connection with each registration of Units requested pursuant to this Section 1.

*Allocations.*  If a registration pursuant to this Section 1 involves an underwritten public offering and the managing underwriter advises the Company that, in its view, the number of Units that the Company and the Members exercising their rights under this Section 1 intend to include in such registration exceeds the maximum offering size, including the price at which such Units can be sold, the Company will include in such registration the following Units, in the following priority, up to the maximum offering size:

C-2

first, so much of the Units proposed to be registered for the account of the Company as would not cause the offering to exceed the maximum offering size;

second, all Units requested to be included in such registration by any Member pursuant to this Section 1 allocated, if necessary for the offering not to exceed the maximum offering size, pro rata among such Members on the basis of the relative number of Units owned by each requesting Member.

Standstill Agreements.  With respect to an initial public offering or any underwritten public offering, notwithstanding anything to the contrary in this Exhibit C, each Member agrees not to effect any public sale or distribution, including any sale pursuant to Rule 144, or any successor provision, under the Securities Act, of any Units, and not to effect any such public sale or distribution of any other security of the Company that is convertible into or exchangeable or exercisable for any Unit and that would be a Unit (in each case, other than as part of such underwritten public offering) during the 14 days prior to the anticipated effective date of the applicable registration statement or during the period after such effective date that the managing underwriter and the Company shall agree; provided, (a) such post-effective date standstill period shall not exceed 180 days or be less than 90 days and (b) notwithstanding clause (a) preceding, the Company may waive the 90-day minimum standstill period with respect to some or all of the Members if the managing underwriter does not require such Members to be bound by a standstill arrangement for any period of time and the Company determines that the absence of such standstill period for such Members will not adversely affect such offering.

Registration Procedures.  Whenever Members request that any Units be registered pursuant to Section 1, the Company will, subject to the provisions of such Sections, use commercially reasonable efforts to effect the registration and the sale of such Units in accordance with the intended method of disposition thereof and, in connection with any such request:

The Company will as soon as reasonably practicable prepare and file with the Securities and Exchange Commission a registration statement on any form selected by counsel for the Company and which form shall be available for the sale of the Units to be registered thereunder in accordance with the intended method of distribution thereof, and use all reasonable efforts to cause such filed registration statement to become and remain effective for a period of not less than 180 days (or such shorter period in which all of the Units of any Person included in such registration statement shall have actually been sold thereunder).

The Company will furnish to each Member and each underwriter, if any, of the Units covered by such registration statement copies of such registration statement as filed or proposed to be filed, and thereafter the Company will furnish to such Members and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto (and, if requested by such Members, all exhibits thereto and documents incorporated by reference therein), the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as such Members or underwriters may reasonably request in order to facilitate the disposition of the Units owned by such Members. Each such Member shall have the right to request that the Company modify any information contained in such registration statement, amendment and supplement thereto pertaining to such Member and the Company shall use commercially reasonable efforts to comply with such request; provided, the Company shall not

C-3

LR_REV_00000072

have any obligation to so modify any information if so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

After the filing of the registration statement, the Company will promptly notify each Member holding Units covered by such registration statement of any stop order issued or threatened by the SEC or any state Units commission under state blue sky laws and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered.

The Company will use commercially reasonable efforts to (i) register or qualify the Units covered by such registration statement under such other Units or blue sky laws of such jurisdictions in the United States as any Member holding such Units reasonably (in light of such Member's intended plan of distribution) requests, (ii) cause such Units to be listed on any Units exchange or market or included for trading on any automated quotation system on which its Units are then listed or included for trading and (iii) cause such Units to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Member to consummate the disposition of the Units owned by such Member; provided, the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

The Company will immediately notify each Member holding such Units covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Units, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and promptly prepare and make available to each such Member and file with the SEC any such supplement or amendment.

Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, the Company will make available for inspection by any Member and any underwriter participating in any disposition pursuant to a registration statement being filed by the Company pursuant to this Section 3 and any attorney, accountant or other professional retained by any such Member or underwriter, financial and other records, pertinent corporate documents and properties of the Company as shall be reasonably requested by any such Person, and cause the Company's officers, Directors and employees to supply all information reasonably requested by any such attorney, accountant or other professional in connection with such registration statement.

The Company will furnish to each Selling Member and to each underwriter, if any, a signed counterpart, addressed to such underwriters and such Members, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as a majority of such Members or the managing underwriter therefore reasonably requests.

C-4

The Company will comply with all applicable rules and regulations of the SEC, and make available to the Members, as soon as substantially practicable, an earnings statement covering a period of 12 months, beginning within three months after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act.

The Company may require each Member to promptly furnish in writing to the Company information regarding the distribution of the Units as the Company may from time to time reasonably request and such other information as may be legally required in connection with such registration.

Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(e), such Member will forthwith discontinue disposition of Units pursuant to the registration statement covering such Units until such Member's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(e), and, if so directed by the Company, such Member will deliver to the Company all copies, other than any permanent file copies then in such Member's possession, of the most recent prospectus covering such Units at the time of receipt of such notice. In the event that the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 3(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 3(e) to the date when the Company shall make available to such Member a prospectus supplemented or amended to conform with the requirements of Section 3(e).

The Company will provide a transfer agent and registrar for all such Units not later than the effective date of the first registration statement relating to Units.

<u>Indemnification by the Company</u>.  The Company shall indemnify, defend and hold harmless to the full extent permitted by law each Member holding Units covered by a registration statement, its managers, members, officers, Directors, employees, partners and agents, and each Person, if any, who controls such Member within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages, expenses (including reasonable cost of investigation and, subject to Section 7 of this <u>Exhibit C</u>, reasonable fees, disbursements and other charges of legal counsel) and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Units (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or any preliminary prospectus, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, expenses or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission so made in conformity with information furnished in writing to the Company by such Member or on such Member's behalf expressly for use therein. The Company shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and directors and each person who controls such underwriter on substantially the same basis as that provided in this Section 4.

<u>Indemnification by Participating Investors</u>.  Each Member holding Units included in any registration statement shall, severally but not jointly, indemnify, defend and hold harmless the

CONFIDENTIAL

LR_REV_00000074

Company, its officers, Directors and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to such Member, but only with respect to information furnished in writing by such Member or on such Member's behalf expressly for use in any registration statement or prospectus relating to the Units, or any amendment or supplement thereto, or any preliminary prospectus. Each such Member shall, if required by the underwriting agreement, indemnify and hold harmless the underwriters of the Units, their officers and Directors and each person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 5.  Notwithstanding the provisions of this Section 5, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to indemnify the Company or any underwriter pursuant to this Section 5, such Member shall not be required to pay any amount, including pursuant to Sections 6 or 7 of this <u>Exhibit C</u>, in excess of the net proceeds received by such Member in the offering to which such registration statement relates.  As a condition to including Units in any registration statement filed in accordance with this <u>Exhibit C</u>, the Company may require that it shall have received an undertaking reasonably satisfactory to it from any underwriter to indemnify and hold it harmless to the extent customarily provided by underwriters with respect to similar Units.

<u>Conduct of Indemnification Proceedings</u>.  In case any proceeding (including any governmental investigation) shall be instituted involving any Person in respect of which such Person is entitled to indemnity pursuant to this <u>Exhibit C</u>, such Person (an "***Indemnified Party***") shall promptly notify the Person against whom such indemnity may be sought (the "***Indemnifying Party***") in writing and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnified Party, and the Indemnifying Party shall assume the payment of all fees and expenses; provided, that the failure of any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that the Indemnifying Party is prejudiced by such failure to notify. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel (at the expense of the Indemnifying Party), or (b) in the reasonable judgment of such Indemnified Party representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  It is understood that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred.  In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties, and in the event the Indemnified Parties are not able to agree as to such firm, the Indemnified Party that has the largest potential risk of loss covered by the Indemnifying Party's indemnity hereunder shall select such firm, subject to the consent of the other Indemnified Parties, which consent shall not be unreasonably withheld, which selection shall then be binding for purposes of this Section 6.  The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any and all losses, claims, damages, liabilities and expenses or liability (to the extent stated above) by reason of such settlement or

C-6

LR_REV_00000075

judgment.  No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

Contribution.  If the indemnification provided for in this Exhibit C is unavailable to an Indemnified Party in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Company and the Members holding Units covered by a registration statement and the underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities.  The relative fault of the Company and such Members and the underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Members agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 7, in connection with any loss, claim, damages or liability resulting from statements or omissions in any registration statement for which a Member is required to make any contribution pursuant to this Section 7, such Member shall not be required to contribute any amount in excess of the net proceeds received by such Member in the offering to which such registration statement relates.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Participation in Underwritten Public Offering.  No Person may participate in any Underwritten Public Offering unless such Person (a) agrees to sell such Person's Units on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, custody agreements, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and the provisions of this Exhibit C in respect of registration rights.

Rule 144.  So long as the Company is subject to Section 13 or Section 15(d) of the Exchange Act, the Company covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act and that it will take such commercially reasonable further action as any Member may reasonably request to the extent required from time to time to enable such Member to sell Units without registration under the Securities Act within the limitations of the exemptions

C-7

LR_REV_00000076

provided by Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.  Upon the request of any Member, the Company will deliver to such Member a written statement as to whether it has complied with such reporting requirements.  The registration rights set forth in this <u>Exhibit C</u> shall not be available to any Member if, in the opinion of counsel to the Company (delivered to the transfer agent), all of the Units then owned by such Member could be sold without restriction or limitation pursuant to Rule 144.

<u>Other Registration Rights Agreements</u>.  Without the approval of holders of a majority of the outstanding Units, the Company will neither enter into any new registration rights agreements that grant registration rights senior to those granted in this <u>Exhibit C</u> or otherwise conflict with the terms of this <u>Exhibit C</u> nor permit the exercise of any other registration rights in a manner that conflicts with the terms of the registration rights granted under this <u>Exhibit C</u>.  Notwithstanding the foregoing, the Company is authorized to grant piggyback registration rights with respect to incentive units or other equity-based awards, and such registration rights will be pari passu with the piggyback registration rights granted in this <u>Exhibit C</u>.

<u>Transfer of Registration Rights</u>.  The rights of the Lime Rock Investors (including the rights of any of their respective Permitted Transferees) under this <u>Exhibit C</u> may be assigned by any of them to any of their respective Permitted Transferees.

<u>No Inconsistent Agreements</u>.  The Company will not enter into any agreement with respect to its Units (excluding registration rights agreements described in Section 10 above) which is inconsistent with or violates the rights granted to the holders of Units in this <u>Exhibit C</u>.

C-8

**EXHIBIT D**

**JOINDER AGREEMENT**

This Joinder Agreement (this "***Joinder Agreement***") is executed as of _____ pursuant to the terms of the Limited Liability Agreement of Blackjewel Holdings L.L.C. dated as of July __, 2017, and the Schedules and Exhibits thereto, as amended or restated from time to time, a copy of which is attached hereto (the "***LLC Agreement***"), by the transferee ("***Transferee***") executing this Joinder Agreement.  By the execution of this Joinder Agreement, the Transferee agrees as follows:

1.      <u>Acknowledgment</u>.  Transferee acknowledges that Transferee is acquiring certain [_____] subject to the terms and conditions of the LLC Agreement.  Capitalized terms used herein without definition are defined in the LLC Agreement and are used herein with the same meanings set forth therein.

2.      <u>Agreement</u>.  Transferee (a) agrees that [_____] acquired by Transferee shall be bound by and subject to the terms of the LLC Agreement and (b) hereby joins in, and agrees to be bound by, the LLC Agreement (including the Exhibits) with the same force and effect as if the Transferee were originally a party thereto.

3.      <u>Representations</u>.  Transferee hereby makes each of the representations and warranties set forth in Section 3.1 of the LLC Agreement to the Company and each other Member with the same force and effect as if the Transferee were originally a party thereto.

4.      <u>Notice</u>.  Any notice required by the LLC Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

5.      <u>Joinder</u>.  The spouse of the undersigned Transferee, if applicable, executes this Joinder Agreement to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's community interest, if any, in the [_____] to the terms of the LLC Agreement.

CONFIDENTIAL

TRANSFEREE:

By:_____

Information for Notices:

_____
_____
Telecopy:_____

SPOUSE:

By:_____

D-2

Message

| | |
|---|---|
| **From**: | Jeffrey Scofield |
| **Sent**: | 6/27/2017 8:57:21 PM |
| **To**: | James Wallis [ |
| **Subject**: | FW: Revelation IC Request |
| **Attachments**: | Blackjewel Model.pdf; Blackjewel LP.PDF |

Would you mind sending me a vote on this one?

From: Jeffrey Scofield
Sent: Monday, June 26, 2017 8:19 PM
To: Jonathan Farber <                        J McLane <                        Will Franklin <
Townes Pressler <                        Trevor Burgess <                        Greg Highberger
<                        James Wallis <
Cc: John Reynolds <                        Jeffrey Scofield <                        Blair Barlow
<                        Oliver Phillips <                        Brian Berger
<
Subject: Revelation IC Request

IC Members,

As we've discussed over the last several months, after a rebound in the coal markets starting late last year, Revelation management and the deal team have been working hard to bring external capital into the business to create a more permanent capital solution for the company. That process began in earnest with a Jefferies managed, $200mm syndicated 1st Lien Term Loan raise during May. Unfortunately, the syndicated term loan market cooled during the marketing process, causing us to audible to a directly placed, short-term loan with Riverstone Credit Partners ("RCP"), the direct lending arm of Riverstone. RCP had put in an order for the syndicated Revelation Term Loan, was familiar with the Revelation story and had met the management and deal team during the process. We agreed terms with RCP on June 16th, spent last week answering diligence questions and having their team down to West Virginia for a site visit, and are currently in the middle of deal documentation. The current timeline is for a paper closing on Friday, July 7th, with funding on Monday July 10th.

The RCP Term Loan is a $34mm, 18-month, NC-6, L+1400 bps (100 bps floor) facility. Use of proceeds includes working capital necessary to comfortably fund the 2017 plan, $8mm to acquire a property immediately adjacent to Revelation's highest quality/most profitable operating mine, and $5mm to repay Jeff Hoops, who has been funding liquidity shortfalls YTD. Hoops has covered nearly $9mm of liquidity shortfall so far this year, and will be rolling the balance (less the $5mm) into this new note. RCP has made its funding contingent on Lime Rock putting in a "like amount" into the Term Loan alongside them, which is currently contemplated to be $3mm. The attached PDF labeled Blackjewel Model.pdf illustrates the sources and uses of the RCP facility and the leverage metrics and forward model.

While the prospect of a near-term financing from RCP is obviously positive news, the company is in dire need of cash today. The request we are making in this email, is for Lime Rock to "pre-fund" $1.0mm of our $3.0mm contribution to the RCP loan before closing, providing enough capital for the company to survive until the RCP loan proceeds come in. This is high-risk capital, in that working capital at Revelation is razor thin. If the RCP deal fails to close (and a back-up Jefferies financing discussed later also fails) it would very likely result in Revelation not being able to fund its daily operations, with no further back-up plan. Hoops has been done an excellent job finding ways for the company to survive a downturn that lasted longer than we expected, but we believe he has now pulled all the levers he can and we are at a crucial point in our investment. We're encouraged by the company's performance year-to-date, but we are proposing making this investment knowing that further capital will almost certainly be needed, but which we can't stand for. We also believe Jeff Hoops doesn't have the capacity to risk more dollars in this investment (he's in for nearly $30mm of cash today).

We would not be proposing this investment if we did not think there is a very high chance the debt deal with RCP gets done or if we did not believe that by making this contribution we were protecting an investment that has been recovering material value over the last six months. Even risking the model/projections, we feel the company is back to generating enough cash to support this type of financing and to repair its strained balance sheet. The company generated ~$10mm of EBITDA through May. That is inclusive of a $3.2mm EBITDA loss in April, when Central Appalachia suffered flooding events not seen in several decades, which materially hampered operations (April production was 300K tons, compared to 376K tons in March and an average of 380K tons/month estimated for 2H17). Flooding impacts lingered through May and into June, but are now behind the company as the last mine restarted last week. May EBITDA was $3.1mm, a level that should be around what the company generates in June. After accounting for a more realistic production profile we believe Revelation will generate roughly $56 mm of recurring EBITDA in 2017 leaving the company 1.7x levered on an LTM basis at year end, with approximately $96 mm of debt and $40 mm cash (1.0x levered on a net basis). Assuming no growth and continued year-to-date performance (adjusting for April's one-time flooding losses), Revelation would generate approximately $47

mm of EBITDA and close the year with 2.0x leverage and a comfortable cash balance in the low $30 mm range (1.4x net leverage). These figures all assume that Revelation continues to pay down its extended supplier balance throughout the year. By year end, on management's model, the company should be generating roughly $75 mm of EBITDA on a 4Q17 annualized basis, likely providing support for a larger refinancing. Revelation has done very well to pick up lucrative assets during the downturn, its Black Mountain division on a standalone basis has generated nearly $21 mm of EBITDA through May and is on pace to generate $41 mm in 2017. In conjunction with the RCP transaction, Revelation will pick up an asset from Arch immediately adjacent to Black Mountain that Hoops and team feel is a smaller look-alike asset that should conservatively generate >$10 mm of annual EBITDA standalone, adding to this run-rate number. Given the changes in the broader coal market and Hoops' ability to pivot Revelation's asset base during a challenging market, we have a renewed faith in the underlying value of the business and its ability to generate attractive cash flow. Revelation's peers have nearly all been recapitalized via bankruptcy processes and subsequent re-listing IPO's. These companies are generally now much more open with the public markets they are not looking to finance organic growth, but we expect they will again be looking to the M&A markets to build scale without adding tons to the market, and expect that Revelation's revamped asset base and cash generation would be an attractive M&A target at some point in 2018 or 2019. Based on the public peers current trading levels (5.2x 2017E EBITDA, 4.3x 2018E) Revelation would be a $275 mm to $380 mm EV business (2017 and 2017/2018 average multiples), representing a 1.4x to 2.2x ROI net to Lime Rock based on the current waterfall.

As discussed, despite improved year-to-date and projected performance, cash remains tight at the company. Revelation has been digging out of a balance sheet hole created through the downturn, and negotiated payments settling legacy receivable claims, catch-up capex, equipment debt amortization payments and cash expenses for reclamation of shut properties we don't plan to mine in the future are real cash charges monthly. Generally speaking, the company has been generating enough cash YTD to service its operating needs and make these catch up payments. The timing of April's flooding was incredibly unlucky, and has been a material negative. The company could have weathered that incident alone. Unfortunately, Revelation's trading partner, the Noble Group, who sells and markets all of Revelations coal, detrimentally changed the way it makes weekly cash advances to the company under its marketing agreement in April. Effectively Noble is Revelation's AR/inventory lender in that it advances Revelation cash for coal each week and trues up what is owed monthly based on actual sales. The change was warranted under the terms of their agreement, but was different from the business deal under which the company had been operating since inception of the deal. Unfortunately, that change has led to Revelation receiving $1mm less in its weekly coal sales payments for the last 7 weeks (the final $1mm catch up payment will be made tomorrow). The $8mm swing has hamstrung liquidity and Hoops has effectively personally stood up to support the company through the shortfall - this is the largest portion of his personal loan referenced earlier. While the RCP financing is close at hand, and we're comfortable its moving on a pace to a close, Hoops seems to have hit his limit. We would like to advance a portion of the funds we're planning to invest in the RCP loan to the company over this week and next, to provide a cushion to see the company through closing, at which point there will be nearly $20mm of fresh working capital coming into the business, an amount we're comfortable provides plenty of cushion based on current operating performance.

As noted above, if RCP decided not to close, we would be again short on liquidity. As a back-up for that contingency, we have worked with Jefferies to provide the same loan we've negotiated with RCP, should they fail to close. Jefferies has gone to their internal committee, and has represented to us they will step-in to the RCP deal on short notice, and do not need any more diligence (since they did it for the larger debt deal already). They know the company well, and are incentivized by the fees of a future financing or M&A event however, so we do have some faith in their support, though it's not guaranteed.

The reality of coming out of a multi-year downcycle combined with two major, but one-off events (April floods and Noble payment change) has forced Revelation and the deal team to make difficult decisions. Ultimately, we view the RCP (or Jefferies) facility as a bridge to a more permanent capital or exit solution for Revelation, but cannot reach that solution without an immediate fix. We are increasingly comfortable that the coal markets have turned and that 2017 will likely be the best year in the company's history in terms of operating performance (production volume and EBITDA generation). The deal team is therefore requesting approval for a $3 mm investment into Revelation to get the RCP facility across the line. We plan fund $1 mm this week from unspent Fund V calls and the balance from Comerica once approved by the LPAC - this amount would be secured by future Fund V value. Executing the 2017 plan, or even continuing YTD performance should put the company in a much stronger position to finalize a longer-term solution for the balance sheet and an exit for Lime Rock - either through financing, secondary purchase or M&A event.

We have also attached the investor deck from the debt roadshow (Blackjewel LP.pdf), which has some good background and summary if you'd like to flip that. Please let us know if you have any questions, or would like the deal team to give you a call or swing by to discuss. In the meantime, please let us know your view on approval for the "pre-fund" investment proposal. Thanks, Jeff

Jeffrey B. Scofield
Lime Rock Partners
1111 Bagby Street, Suite 4600
Houston, TX 77002

CONFIDENTIAL

t    +1 713-292-9506
m   +1 832-878-3449
e    ███████████   mailto:███████████████

LR_REV_00005938

1              D. Flannery

2      A.    I led a team of people who did the

3   underwriting.  We asked questions, went

4   through financials, went through existing

5   debt documentation, you know, went through

6   the modeling with the company and the

7   sponsor, structured the deal.  So, yeah,

8   that's what we did.

9      Q.    You mentioned a sponsor.  Who would

10  that be in this case?

11     A.    Lime Rock.

12     Q.    And were -- you said you led a

13  team, if I am remembering what you said

14  correctly.  Would you kind of say you were

15  the point person as far as Riverstone's

16  investment?

17     A.    I was the most senior person on the

18  team, yes.

19     Q.    Okay.  And how big was that team

20  that was involved in doing the due diligence

21  for Riverstone?

22     A.    There was two of us.

23     Q.    Who were the -- who else was there?

24     A.    A gentleman named Steven Lowenthal,

25  who is not here anymore.

1                          D. Flannery

2       A.    I remember we went to -- I went to

3  Indiana, I want to say maybe June 24th or

4  25th, and in -- and during that transit,

5  there was e-mail traffic where we basically

6  found out that since January of '19, he had

7  been putting money in the business and taking

8  it out, so last dollars in, first dollars

9  out.

10           And so, that -- that's when the

11  whole discussion changed, and that's when we

12  took a different approach to how constructive

13  we were going to be on the maturity extension

14  and the amendment.

15      Q.    And that information was

16  information that was provided by whom?

17      A.    Drew Kesler.

18      Q.    CFO of Blackjewel?

19      A.    Correct.  With a bank account that

20  I believe was blocked out initially and that

21  we had to ask for whose bank account it was.

22      Q.    And then who provided you the

23  information on whose bank account it was?

24      A.    I think it was Drew.  Jeff may have

25  confirmed it, but I think Drew initially said

```
 1                     D. Flannery
 2    it was -- it was tied to Clearwater.
 3              (Exhibit 2, RCP000005-048 marked
 4         for identification, as of this date.)
 5         Q.    To jump around chronologically a
 6    little bit here, I will drop Exhibit 2 into
 7    the chat.  Can you try to download that.
 8              And while you're doing that, I
 9    probably forgot the most important rule,
10    which is that if you need a break, just let
11    me know.
12         A.    I'm good.  Yep.
13         Q.    Do you recognize Exhibit 2?
14         A.    Yes.
15         Q.    What is it?
16         A.    This is our investment committee
17    memo for the initial deal.
18         Q.    Would you have been involved in the
19    preparation of this document?
20         A.    I wrote it.
21         Q.    I'm sorry?
22         A.    Yes.  I wrote it.
23         Q.    Okay.  And I'm assuming statements
24    in here would have been true, at least to the
25    best of your knowledge at the time; right?
```

1                       D. Flannery

2    went to investment committee.

3         Q.    Okay.  And this was an e-mail that

4    was sent to you on June 13, 2017; is that

5    right?

6         A.    Yes.

7         Q.    Okay.  And Jeff Scofield is writing

8    to you that -- I'm going to read from the

9    second sentence of the top e-mail here:

10   "Should be consistent with discussions from

11   yesterday with one change to sources and

12   uses, in that we want to use $5 million of

13   the proceeds to pay down a note Hoops has

14   made to the company (he'll roll 3 million)."

15   Is that right?

16        A.    Yep.

17        Q.    And is that the structure that

18   eventually occurred?

19        A.    Correct.

20        Q.    So, Mr. Hoops is not in this e-mail

21   that we're looking at right now, at least the

22   top e-mail; is that right?

23        A.    That's correct.

24        Q.    Is it fair to say that the use of

25   that $5 million to pay down a note that

1                    D. Flannery

2      Q.    I'm dropping Exhibit 7 into the

3   chat.  Let me know when you are able to open

4   it, and my first question will be whether you

5   recognize the document.

6      A.    Yes.

7      Q.    What is it?

8      A.    This is a -- looks like a funds

9   flow, a closing funds flow for the deal.

10     Q.    Do you know who created this

11  document?

12     A.    This would have been created by our

13  team in conjunction with our lawyers, I

14  believe.

15     Q.    Do you recall who your lawyers were

16  with respect to this transaction?

17     A.    Simpson Thacher.

18     Q.    And do you see the -- on the right

19  side, it says "Uses"?

20     A.    Yep.

21     Q.    And then the first item is

22  "Repayment of Jeff Hoops note"; correct?

23     A.    Correct.

24     Q.    And that is consistent with what we

25  were discussing earlier about the use of the

Page 74

1                    D. Flannery

2    funds; right?

3        A.    Yeah.

4        Q.    And the number there is not exactly

5    5 million.  Do you see that?

6        A.    Yes.

7        Q.    Do you know where that number came

8    from, the 4,966,000 and change?

9        A.    Where it came from?  I don't --

10   that was a -- that was -- I think 5 million

11   was just a rounded number.  I think that was

12   the exact number.

13       Q.    Understood.

14             You can close Exhibit 7.

15             (Exhibit 8, RCP021180-184 marked

16        for identification, as of this date.)

17       Q.    I've dropped into the chat

18   Exhibit 8, sir.  My first question once

19   you're able to open it is, what is this

20   document?

21       A.    Sure.

22       Q.    If you need a second to flip

23   through it, that is of course fine.

24       A.    Sure.

25       Q.    This is an e-mail chain.  Let's

```
 1                    D. Flannery
 2      A.    Yeah, I'm doing okay.
 3            (Exhibit 11, RCP021428-430 marked
 4      for identification, as of this date.)
 5      Q.    Dropping in Exhibit 11.  Do you
 6  have it open, sir?
 7      A.    I do.
 8      Q.    The top e-mail here is from you to
 9  some of your Riverstone colleagues, dated
10  November 14, 2017; right?
11      A.    Yeah.
12      Q.    And if you need a moment to flip
13  through it here.
14            You wrote, "I agree."  What are you
15  agreeing to here?
16      A.    So, we -- we had come to a decision
17  with Lime Rock and Jeff on how to allow for
18  this liquidity rescue to come in, and it
19  wasn't perfect for us, but it wasn't perfect
20  for them, and it was also the second time
21  where we had this sudden evaporation of
22  liquidity that needed to be fixed
23  immediately.  And so, I was agreeing with my
24  partner Jamie that this was an acceptable
25  outcome.
```

Page 83

1              D. Flannery

2       Q.    And that included -- the e-mail --

3  the terms are basically set out, in a general

4  form at least, in Mr. Hoops' e-mail --

5       A.    Right.

6       Q.    -- of November 14th; right?

7       A.    That's right.

8       Q.    And one of the terms that Mr. Hoops

9  outlined in his e-mail is that -- it's that

10 first bullet point that I'm going to read

11 from -- "I will loan $5 million at no

12 interest to Blackjewel and when $10 million

13 comes in from any source other than ordinary

14 revenue, the 5 million will be returned to

15 me."  Right?

16      A.    That's right.

17      Q.    That was agreeable to Riverstone;

18 right?

19      A.    Yeah.  We documented it.  I think

20 it was called the Hoops note.

21      Q.    And your colleague Jamie Brodsky

22 wrote:  "I am good.  Given where we sit

23 today, this is the best outcome.  No more

24 dough from us, live to fight another day and

25 begin preparing to take the keys."

Page 159

1                          D. Flannery

2    Exhibit JJ that had to do with the SunCoke --

3    Mr. Hoops' e-mail to SunCoke.

4         A.    I do.

5         Q.    Were you aware that approximately

6    two weeks after that e-mail, Mr. Hoops and

7    John Reynolds each put $2 million of equity

8    into Blackjewel?

9         A.    I was.   That was what I was

10   referring to in earlier testimony, when they

11   did it without telling me, and then we

12   documented it afterwards.   I was briefed on

13   it late at night on vacation, and actually

14   had an in-person meeting with John Reynolds

15   on vacation, because we were at the same

16   place, about it.

17        Q.    I apologize for that divergence.

18   Let's go back to Exhibit QQQQ.   And, I'm

19   sorry, you do recall this e-mail exchange?

20        A.    I do.

21        Q.    And if you look at the first

22   e-mail, which starts on the second page, on

23   November 7th Mr. Hoops e-mails you.   He

24   addresses you as "Danny."   Do you see that?

25        A.    Yes.

Page 160

1                    D. Flannery

2      Q.    And I mean, I -- I am trying not

3   the read the whole thing.  To summarize it,

4   would you agree that he's basically saying

5   that Blackjewel is in a precarious cash flow

6   situation?

7      A.    Yeah.  I mean, Jeff sent these

8   e-mails out all the time, and -- yes.

9      Q.    Well, is this -- is this the first

10  time that Mr. Hoops had notified Riverstone

11  that it was going through significant

12  distress?

13     A.    Well, if you remember -- so, the

14  initial sign of distress was what happened

15  immediately after we closed, right, where

16  they had to put money in along with SunCoke.

17  And then it was touch and go from then until

18  October or November.

19           But that also coincided with the

20  Contura acquisition, which to us was kind of

21  like a kick save, because those assets were

22  generating cash.  And so, I don't remember if

23  this was the first e-mail, but yes, this

24  is -- this seems around the time when,

25  you know, it was made clear to us that things

1                       D. Flannery

2     making things seem really, really bad in

3     individual discussions to get things he

4     wanted.  And oftentimes -- not necessarily

5     here, but oftentimes Lime Rock was not

6     included on any of the e-mails.

7          Q.    And on this particular e-mail

8     exchange, Exhibit QQQQ, is this an instance

9     in your view in which Mr. Hoops is

10    exaggerating the distress of Blackjewel, or

11    is this real?

12         A.    Listen, I think the -- in this

13    circumstance, as far as we could diligence,

14    there was a roof fall, and the premiums went

15    up.  And so, there was an actual acute

16    liquidity need, and it was funded.  So, I

17    don't know if he was, he was exaggerating on

18    this particular circumstance, but there are

19    other circumstances where, you know, he made

20    the situation seem worse to try to benefit or

21    elongate the timeline.

22         Q.    If you can turn to the first page,

23    the second e-mail at the bottom, the one by

24    Mr. Hoops on November 9th.

25         A.    Yes.

| | |
|---|---|
| **From:** | Jeffrey Scofield |
| **Sent:** | Tuesday, June 13, 2017 10:43 PM CDT |
| **To:** | Flannery, Daniel |
| **CC:** | Brodsky, Jamie; Jeffrey Scofield |
| **Subject:** | RE: term sheet |
| **Attachments:** | Revelation Term Sheet 6.13.17.pptx |

Here is what we're thinking.  Should be familiar format as I crafted it off the term sheet you sent over on the $80mm deal.  Should be consistent with discussion from yesterday with one change to sources and uses, in that we want to use $5mm of the proceeds to pay down a note Hoops has made to the company (he'll roll $3mm).  He's got a lot in the deal (he still has $20mm + of hard cash in the deal pro-forma), but we want him to be laser focused on execution and delivering the 2017 plan and Arch deal, and think getting him some of the float he's put in the company in the last year back probably takes a bit of the pressure off on that side of the coin, which I'm sure you two can appreciate (I can…).  Anyway, I'm in Denver all day tomorrow, then east coast Thursday, would be good to find a time to discuss.  If we're close, would also be good to schedule trip down to get the real run-through next week.

Jeff

---

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Tuesday, June 13, 2017 7:58 PM
**To:** Jeffrey Scofield <js@lrpartners.com>
**Cc:** Brodsky, Jamie <jbrodsky@riverstonecredit.com>
**Subject:** Re: term sheet

Next couple days are a mess at our Riverstone offsite. We have no cell service where are, but have wifi and a land line. Can you send terms and I'll figure out how to call you?

Sent from my iPhone

On Jun 13, 2017, at 6:13 PM, Jeffrey Scofield <js@lrpartners.com> wrote:

> Been at a site visit in Colorado all day with no internet   Will have TS to you later tonight or first thing in the AM.  Can you guys discuss quickly tomorrow early morning CO time?

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

RCP017092

1  general counsel was present, and she's usually

2  typically very good at keeping notes and keeping

3  minutes so I -- I wouldn't be surprised if there were

4  minutes kept.  I just don't know.

5  BY MR. KANE:

6      Q      Who was that general counsel?  Was it

7  Helena Jackson?

8      A      It would have been Helena Jackson at the

9  time, yes.

10     Q      And when was Ms. Jackson general counsel

11  of the old Revelation entities?

12     A      I don't remember the exact dates.

13     Q      Was it up until the time of the renaming

14  transaction in 2017?

15     A      I don't recall.  She left one time and

16  came back, so I really don't -- I don't recall the

17  dates when she came, and I don't recall when she left,

18  and I don't recall when she came back so...

19     Q      Your view is you would trust

20  Ms. Jackson's recollection of events, though?

21             MS. SIEG:  Objection.  That misstates his

22  testimony.  Objection to the form.

23             THE WITNESS:  Ask that again, please.

24  BY MR. KANE:

25     Q      Well, did you say you thought she kept

1   Mr. Hoops.  I'm asking you for your knowledge, whatever

2   that knowledge is, if any.  And the question is, do you

3   have specific knowledge of any written approval by the

4   Board of Revelation Energy or Revelation Energy

5   Holdings to enter into Exhibit KK?

6              MS. SIEG:  Objection to form and asked

7   and answered.

8              THE WITNESS:  If the Board of Revelation

9   required a resolution for this transaction, then, yes,

10  one would have been done.

11  BY MR. KANE:

12       Q     Did it require a resolution?

13       A     I don't know.

14       Q     All right.  And so you're not

15  specifically aware of one?

16       A     I'm not aware of one one way or the

17  other.

18              (Whereupon, the Mortgage and

19              Security Agreement was marked as

20              Exhibit MM for identification.)

21  BY MR. KANE:

22       Q     The court reporter has handed you what

23  we've marked as Exhibit MM, Mr. Hoops.  Do you

24  recognize that document?

25       A     Yes, sir.

1        Q        What do you recognize it to be?

2        A        This is the original note that the

3    previous exhibits were referencing that was done in

4    December 2016.

5        Q        Is it the original note, or is it --

6        A        I'm sorry.

7        Q        -- the original mortgage and security

8    agreement?

9        A        The original mortgage and security

10   agreement, excuse me.

11       Q        All right.  And this document references

12   a note of even date herewith.  Do you see that?  In the

13   first whereas clause?

14       A        Yes.

15       Q        And you understand that to be the

16   December 1, 2016 original note that was referenced in

17   the prior exhibits?

18       A        I believe that's the case, yes.

19       Q        If you turn to Bates number -- the Bates

20   page ending in 361.

21       A        Yes, sir.

22       Q        You signed for Revelation Energy,

23   correct?

24       A        Yes, sir.

25       Q        As the mortgagor?

Page 153

1   into the bank, they cleared them until the account was

2   at zero, and then they would look, and there's eight

3   checks that didn't clear, so it was really at the

4   bank's discretion as to which ones cleared and which

5   ones didn't.  And they would call Drew and say these

6   checks didn't clear.  Do you want to transfer the

7   funds?  And he would say yes.  And could that have been

8   for payroll, could have been for fuel, could have been

9   for taxes.  It could have been for explosives.  It

10  could have been for roof bolts.  It could have been.

11       Q       All right.  I think you've answered my

12  question as to your -- whether you have any knowledge

13  on the payroll issue.  Sometimes -- were the funds ever

14  returned the same day --

15       A       Yes.

16               MS. SIEG:  Objection to form.

17       Q       -- to the line of credit?

18       A       Yes.

19       Q       How often?  Do you know?

20       A       Frequently.

21       Q       And then other times they were not

22  returned the same day, right?

23       A       That's possible, yes.

24       Q       Throughout 2019 there were periods where

25  there was a substantial amount that had not been

1    returned; is that correct?

2         A        That's correct.

3         Q        Was there any specific agreement as to

4    when funds would be returned?

5         A        The agreement between the parties is they

6    would be returned as -- as they came available.  So

7    when they received funds, they applied the Hoops line

8    of credit, and then they would have applied the United

9    line of credit.  And then when funds were needed, they

10   would pull from United, and then they would pull from

11   Hoops.  There was only -- there was $11 million --

12   there was $5 million available under the United line of

13   credit.  There was $11 million available under the

14   Hoops line of credit.

15            So repaying or not repaying didn't change

16   the fact there was 11 million is all there was.  And at

17   the end of the day, they got the entire 11 million.

18        Q        I'm asking you about along the way.  Was

19   there any specific term about when funds would be paid

20   back from Blackjewel to either the Hoops line of credit

21   or the Clearwater line of credit?

22        A        And what I'm -- my answer is from August

23   of 2017 when this was put in place the way it worked is

24   you start out with 5 million at United Bank, 11 million

25   of support being provided by Trish and I, and then

1   Clearwater, and the way it worked, when checks came in,

2   they would pull on the 5 million from United Bank

3   first.  If that wasn't enough to clear the checks, then

4   they would contact Drew, get his approval to pull on

5   our lines of credit and Clearwater's lines of credit,

6   to cover the remaining balance.  And then when funds

7   came in, it would work reverse.  They would pay down

8   our line, pay down the United line, and then any

9   leftover balance would go into Blackjewel's checking

10  account.  And that's the way it worked from the time it

11  was put in place in August of 2017 until the date of

12  filing.

13       Q       So based on what you just described, we

14  established earlier there were periods where all of the

15  funds were not returned to the Hoops line of credit or

16  the Clearwater line of credit, right?

17       A       That's correct.

18       Q       So based on what you just described, is

19  that because Blackjewel had no funds to return?

20               MS. SIEG:  Objection to the form.

21               THE WITNESS:  No, there were funds

22  flowing into Blackjewel, but you really -- it became --

23  in March of 2019, when the flooding occurred in

24  Wyoming, that impacted revenue and shipments by

25  approximately $10 million a month.  And so the mines

Page 157

1          MS. SIEG:  Objection to the form.

2          THE WITNESS:  I don't know how much more

3   detail or simpler I could make it.  I mean, it paid

4   down the 11 million, it paid down the five.  Anything

5   that left was left sitting in the Blackjewel account,

6   and Blackjewel was a zero balance account so it would

7   sweep to the lines of credit first.  So --

8   BY MR. KANE:

9      Q     That's what I'm asking you.  It was a

10  zero balance account?

11     A     Yes.

12     Q     And it zeroed out every day?

13     A     Yes.

14     Q     And it zeroed, and the priority of

15  zeroing was first to the Clearwater Hoops lines of

16  credit, and, second, to the United Bank revolver?  Is

17  that what I understood?

18          MS. SIEG:  Objection to the form.

19          THE WITNESS:  That's the mechanism.

20  That's the way it worked.  But it did not affect

21  Blackjewel's liquidity at all, because if it paid down

22  8-, it still had 8 million of liquidity and access to

23  that line -- line of credit.  So they were never harmed

24  in any way.  It didn't affect their availability.  If

25  they'd left the 8 million sitting in their checking

1   account, it wouldn't have been any different than if

2   they paid down the line of credit.  They still have

3   $8 million of liquidity.

4   BY MR. KANE:

5        Q      You knew you were going to put more money

6   back in even when you got a repayment?

7                MS. SIEG:  Objection to form.

8                THE WITNESS:  We were going to do exactly

9   what we've been doing since August of 2017.

10  BY MR. KANE:

11       Q      What if there wasn't enough zero balance

12  funds to pay it back on any given day?  Was there any

13  other fixed deadline or term by which it had to be paid

14  back otherwise?

15               THE WITNESS:  Not that I'm aware, no.

16  BY MR. KANE:

17       Q      There was no maturity date, for example,

18  separate than the zero balance procedure you were

19  describing, right?

20               MS. SIEG:  Objection to form.

21               THE WITNESS:  Well, certainly, the way

22  the mechanism worked, the money -- the money came in,

23  and the first thing it went to was the Hoops Clearwater

24  line of credit, which is the way it worked since August

25  of 2017.  So certainly the next -- on June 30th, the

1      Q      Was that disclosed to Lime Rock?

2      A      I don't know that they ever asked.  It

3  would have been, if they asked.

4      Q      But did you tell them it was 50,000 acres

5  that was appraised for 20 millionish dollars?

6      A      I can't speak to what they knew.  I

7  didn't hide anything from them.  If they had asked, I'd

8  have told them.  The other thing is the ranches were

9  never actually transferred.  The ranches were held as

10  collateral for the bonds for the mines, and so it's

11  kind of a moot issue, because the ranches never --

12  never transferred to me.  And I don't know who owns

13  them now, but I -- I never took ownership of them.

14      Q      Because of the bonds never got

15  transferred, which was a condition to transferring the

16  ranches, right?

17      A      Well, there were two things.  There was

18  -- there was the bonds and permits had to be

19  transferred, and then the other thing is Contura had

20  left -- I think it was about $30 million of collateral

21  up in Wyoming to secure the bonds, and that 30 million

22  had to be repaid.

23      Q      All right.

24      A      And that was never repaid.

25      Q      But my prior specific question about what

**From:**     Helena Jackson [hj@hrjacksonlaw.com]
**Sent:**     3/4/2022 10:23:44 AM
**To:**       Guadagnino, Frank J. [/o=MWBB/ou=Exchange Administrative Group
             (FYDIBOHF23SPDLT)/cn=Recipients/cn=Guadagnino, Frank J.3d4]
**Subject:**  FW: Mortgage, Security Agreement and Promissory Note


**EXTERNAL EMAIL; use caution with links and attachments**

-----Original Message-----
From: Helena Jackson <HJackson@revelenergy.com>
Sent: Thursday, June 29, 2017 5:27 PM
To: Anu Mehta <amehta@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow
<BBarlow@lrpartners.com>
Cc: Oliver Phillips <ophillips@lrpartners.com>
Subject: RE: Mortgage, Security Agreement and Promissory Note

I'll draft an Amended and Restated Promissory Note this evening for your review.  Thanks!



Sincerely,
Helena Racin Jackson, Esq.
General Counsel
1051 Main Street
Milton, WV 25541
M Mobile - (859) 533-4901
O Fax - (304) 390-5975



-----Original Message-----
From: Anu Mehta [mailto:amehta@lrpartners.com]
Sent: Thursday, June 29, 2017 4:46 PM
To: Helena Jackson; Jeffrey Scofield; Blair Barlow
Cc: Oliver Phillips
Subject: RE: Mortgage, Security Agreement and Promissory Note

Helena,

Once you find the executed promissory note can you send a copy to me?

The problem is right now the note is set up for monthly payments.  Since that hasn't been happening, the
note is technically in default and we'd want a waiver from Hoops on now and all future payment defaults.
I think it will be easier just to restate the original note for $9mm with language saying payments are
only due at maturity, which we'll set for Dec 31.

Anu Mehta
Deputy General Counsel
Lime Rock Management LP
t 713-345-2105
f 713-345-2155
e amehta@lrpartners.com
-----Original Message-----
From: Helena Jackson [mailto:HJackson@revelenergy.com]
Sent: Thursday, June 29, 2017 3:04 PM
To: Anu Mehta <amehta@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow
<BBarlow@lrpartners.com>
Cc: Oliver Phillips <ophillips@lrpartners.com>
Subject: RE: Mortgage, Security Agreement and Promissory Note

Not with me today - sorry!!



Sincerely,
Helena Racin Jackson, Esq.

Confidential

General Counsel
1051 Main Street
Milton, WV 25541
M Mobile - (859) 533-4901
O Fax - (304) 390-5975


-----Original Message-----
From: Anu Mehta [mailto:amehta@lrpartners.com]
Sent: Thursday, June 29, 2017 2:55 PM
To: Helena Jackson; Jeffrey Scofield; Blair Barlow
Cc: Oliver Phillips
Subject: RE: Mortgage, Security Agreement and Promissory Note

Helena,

Do you have a copy of the original executed note as well?

Thanks.


Anu Mehta
Deputy General Counsel
Lime Rock Management LP
t 713-345-2105
f 713-345-2155
e amehta@lrpartners.com
-----Original Message-----
From: Helena Jackson [mailto:HJackson@revelenergy.com]
Sent: Thursday, June 29, 2017 1:41 PM
To: Jeffrey Scofield <js@lrpartners.com>; Blair Barlow <BBarlow@lrpartners.com>
Cc: Oliver Phillips <ophillips@lrpartners.com>; Anu Mehta <amehta@lrpartners.com>
Subject: RE: Mortgage, Security Agreement and Promissory Note


No problem! I understand.

To explain, as I'm sure you all know, when the Hoops piece was originally drafted, we owed him approx..
$6.6mm.

But unfortunately, it is now up to $9mm., and so I prepared a First Amendment to Mortgage and Security
Agreement and will have him sign that when he returns to the office.    It is attached for your review.

The attached recorded instrument is the original Mortgage document with regard to the first piece.    The
original accompanying Promissory Note reads exactly the same as yours - but it is not a recordable
instrument, and so no one will see that document if they do a record check.  Last evening after our call
I also prepared an Amended Note for Jeff, attached.

Because his Mortgage was recorded first and is on the same assets, it will be a first priority lien if
push ever comes to shove.  Yours would be paid second, as there is currently no other secured party with
respect to these assets.


Sincerely,
Helena Racin Jackson, Esq.
General Counsel
1051 Main Street
Milton, WV 25541
M Mobile - (859) 533-4901
O Fax - (304) 390-5975


-----Original Message-----
From: Jeffrey Scofield [mailto:js@lrpartners.com]
Sent: Thursday, June 29, 2017 1:33 PM
To: Blair Barlow
Cc: Helena Jackson; Oliver Phillips; Anu Mehta
Subject: Re: Mortgage, Security Agreement and Promissory Note

Helena, our plan here is to just match our note to the same form Jeff H has (is this it?), and secure he
same collateral (parri with his note).  Happy to get on the phone if that's easier.


Sent from my iPhone

On Jun 29, 2017, at 1:22 PM, Blair Barlow <BBarlow@lrpartners.com<mailto:BBarlow@lrpartners.com>> wrote:

Helena,

Can you please send me all documentation related to Jeff Hoops's current note and his first lien?

Thanks,
Blair


From: Jeffrey Scofield
Sent: Thursday, June 29, 2017 11:25 AM
To: Blair Barlow <BBarlow@lrpartners.com<mailto:BBarlow@lrpartners.com>>; Oliver Phillips
<ophillips@lrpartners.com<mailto:ophillips@lrpartners.com>>; Brian Berger
<BBerger@lrpartners.com<mailto:BBerger@lrpartners.com>>
Cc: John Reynolds <jr@lrpartners.com<mailto:jr@lrpartners.com>>
Subject: FW: Mortgage, Security Agreement and Promissory Note


From: Helena Jackson [mailto:HJackson@revelenergy.com]
Sent: Thursday, June 29, 2017 10:10 AM
To: Jeffrey Scofield <js@lrpartners.com<mailto:js@lrpartners.com>>
Cc: Jeff Hoops <JHoops@revelenergy.com<mailto:JHoops@revelenergy.com>>
Subject: Mortgage, Security Agreement and Promissory Note

Jeff S. -
Pursuant to your request, attached are two documents. The first it the Promissory Note with Revelation
and Holdings for the 3mm plus 15% interest and the second is the Mortgage and Security Agreement securing
same.  I would also file a UCC in Kentucky and in Virginia to secure the asset security piece.
Please let me know if you have any comments.  Thanks!


<image001.jpg>
Sincerely,
Helena Racin Jackson, Esq.
General Counsel
1051 Main Street
Milton, WV 25541
. Mobile - (859) 533-4901
. Fax - (304) 390-5975

## AMENDED AND RESTATED MORTGAGE AND SECURITY AGREEMENT

**THIS AMENDED AND RESTATED MORTGAGE AND SECURITY AGREEMENT** (herein "Amended and Restated Mortgage") is made effective as of July 10, 2017, between Revelation Energy, LLC, a Kentucky limited liability company, whose address is 1051 Main Street, Milton, West Virginia 25541, Revelation Energy Holdings, LLC, a Delaware limited liability company, whose address is 1051 Main Street, Milton, West Virginia 25541 (hereinafter collectively referred to as "Mortgagor"); (ii) Jeffery A. Hoops, an individual with an address of 1149 Newman's Branch Road, Milton, West Virginia 25541 ("Mr. Hoops") and LR-Revelation Holdings, L.P. a Delaware limited partnership whose address is 274 Riverside Avenue, 3rd Floor, Westport, CT 06880 ("Lime Rock")  (Mr. Hoops and Lime Rock are collectively referred to herein as "Mortgagee").  (Mortgagor and Mortgagee are collectively referred to herein as the "Parties").

**WHEREAS**, Mortgagor and Mr. Hoops were Parties to that certain Promissory Note dated as of December 1, 2016 (the "Promissory Note") secured by that certain Mortgage and Security Agreement dated as of December 1, 2016 (the "Mortgage");

**WHEREAS**, the Promissory Note was amended and restated in its entirety by that certain Amended and Restated Promissory Note by and between Mortgagor and Mortgagee dated July 10, 2017 (the "Amended and Restated Promissory Note"). Among other things, the Amended and Restated Promissory Note increased the monies owed by Mortgagor to Mr. Hoops, added Lime Rock as a Holder, stated the amount owed to Lime Rock, and added a Maturity Date of December 31, 2017; and

**WHEREAS**, the Parties mutually agree to amend and restate the Mortgage to reflect the terms of the Amended and Restated Promissory Note, as more fully described herein.

**NOW, THEREFORE**, in consideration of the premises and the financial accommodations made or to be made by Mortgagee to Mortgagor, and of other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, Mortgagor and Mortgagee agree to amend and restate the terms and conditions of the Mortgage as follows:

1. <u>Restatement of Grant Language</u>:  **WHEREAS, TO SECURE** Mortgagee with the repayment of the indebtedness evidenced by the Amended and Restated Promissory Note, with the interest upon default as stated in the Amended and Restated Promissory Note, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Amended and Restated Mortgage, and the performance of the covenants and agreements of Mortgagor herein contained (the "Obligations"), Mortgagor does hereby mortgage, grant and convey to Mortgagee that real property and

Confidential                                     Clearwater AP Defendant 00002131

interest therein located in Harlan and Letcher Counties in the Commonwealth
of Kentucky and Wise, Buchanan, and Tazewell Counties in the
Commonwealth of Virginia, said property being more fully described on
Exhibit "A" which is attached hereto and incorporated herein by reference (the
"Property"); **TOGETHER** with any and all of the fixed assets of Revelation
(the "Fixed Assets") located in Letcher and Harlan Counties, Kentucky and in
Wise County, Buchanan, and Tazewell Counties, Virginia, whether currently
owned or hereinafter existing, created, acquired, or arising whether by
ownership, security interest or otherwise, and any and all related warranties
and General Intangibles; (ii) any and all replacements, repairs, repair parts,
spare parts, additions, attachments, accessories and Accessions to any of the
foregoing Fixed Assets; and (iii) Proceeds and products, whether tangible or
intangible, of any Fixed Assets, including, without limitation, Accounts,
Proceeds of Insurance, or any other property or equity resulting from sale, lease
or other disposition of the foregoing Fixed Assets, including, but not limited
to, proceeds of notes, checks, instruments, indemnity proceeds, or any
insurance on such and any refund or rebate of premiums on such (together with
the Fixed Assets, the "Collateral"), securing the indebtedness and Obligations
for the benefit of Mortgagee, and the Mortgagee is authorized to perfect the
same by electronic or other filing as may be allowed by law; and
**TOGETHER** with all permits, licenses, waivers, or consents now or hereafter
dealing with, affecting or concerning the Property.  To further secure to
Mortgagee the payment of the Obligations described hereinabove, and any and
all other indebtedness of Mortgagor to Mortgagee, whether now existing or
hereafter incurred, Mortgagor further grants to Mortgagee a security interest in
and to any of the Collateral that may be or become subject to Article 9 of the
Uniform Commercial Code applicable in either the Commonwealth of
Kentucky or the Commonwealth of Virginia (the "UCC").  (The "Property"
and the "Collateral" are hereinafter referred to collectively as the "Mortgaged
Estate.")  The maximum principal amount secured by this Amended and
Restated Mortgage, including (1) future obligations and advances (whether
made as an obligation, made at the option of a lender, made after a reduction to
a zero (0) or other balance, or made otherwise);and (2) future modifications,
extensions and renewals of any indebtedness or obligations, but *excluding*
interest, fees, obligations of indemnification and other costs and expenses,
costs incurred for the protection of the Mortgaged Property and other costs
that Mortgagee is authorized by this Mortgage to make on Mortgagor's behalf,
including, without limitation, unpaid impositions, insurance premiums or other
charges that Mortgagee elects to advance, defaults under Leases that
Mortgagee elects to cure, attorneys' fees or costs incurred while enforcing the

Clearwater AP Defendant 00002132

Amended and Restated Promissory Note and the Amended and Restated Mortgage and other expenses, shall not exceed Thirteen Million Dollars ($13,000,000.00).

2.  Intent.  It is the intention of the Parties hereto that this Amended and Restated Mortgage shall embrace and Mortgagor does hereby grant to Mortgagee a mortgage and security interest in all of the properties, rights, interests, claims, demands and privileges of every kind and character as are owned or leased by Mortgagor or in which Mortgagor has rights in or relating or appurtenant to any of the Property, whether fee, mineral, surface, leasehold, easement, right of way or otherwise, and whether or not specifically described above, together with all rents, royalties and other income arising from the operation of the Property or the interests therein.

3.  Covenants. Mortgagor covenants to Mortgagee that Mortgagor is well seized of the Mortgaged Estate, subject to the lien hereof, and has good right and full power to grant, bargain, sell, convey, mortgage, grant a security interest in and warrant the same as herein described.  Mortgagor covenants that the premises and properties constituting the Mortgaged Estate are and will be free from all liens and encumbrances whatsoever, excepting only such exceptions as may be contained in the deed by which Mortgagor derives title, the lien of general taxes not yet due and payable, easements and restrictions of record affecting the Property, and restrictions and zoning laws affecting the Property, none of which impair or will impair the value of the Mortgaged Estate as collateral for payment of the Amended and Restated Promissory Note.  Mortgagor warrants and will defend the said Mortgaged Estate, with the privileges and appurtenances thereunto belonging, to Mortgagee, its successors and assigns forever, against all claims and demands whatsoever adverse to the interest of Mortgagee, at Mortgagor's sole expense.

4.  Payment of Principal and Overdue Payment Interest.  Mortgagor shall promptly pay when due the principal of and interest on, the indebtedness evidenced by the Amended and Restated Promissory Note.

5.  Application of Payments.  Unless applicable law provides otherwise, all payments received by Mortgagee under the Amended and Restated Promissory Note and Paragraph 1 hereof shall be allocated between principal, interest and fees, if any, in the discretion of Mortgagee.

6.  Charges; Liens.  Mortgagor shall pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this First Amendment to Mortgage, and Mortgagor shall additionally promptly pay any leasehold

payments, ground rents and royalties due or which become due from Mortgagor, making payment, when due, directly to the payee thereof. Mortgagor shall further pay all taxes, assessments and other charges, fines and impositions attributable to the Mortgaged Estate which may attain a priority over this Amended and Restated Mortgage by Mortgagor making payment, when due, directly to the payee thereof. Mortgagor shall promptly discharge any lien which has priority over this Amended and Restated Mortgage; provided, that Mortgagor shall not be required to discharge any such lien so long as Mortgagor shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Mortgagee, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Mortgaged Estate or any part thereof.

7.      Preservation and Maintenance of Mortgaged Estate.  Mortgagor shall keep the Mortgaged Estate in good repair, cause the Mortgaged Estate to be utilized in conformance with all applicable laws, regulations and ordinances and shall not commit waste or permit impairment or deterioration of the Mortgaged Estate.

8.      Protection of Mortgagee's Security and Prohibition of Other Liens. Mortgagor shall not voluntarily create or otherwise permit to be created or filed against the Property, any mortgage lien, or any other lien or liens, charge or encumbrance of any nature (except as otherwise expressly authorized by this First Amended to Mortgage), whether inferior or superior to the lien of this Amended and Restated Mortgage, without the prior express written consent and approval of Mortgagee, which consent and approval will not be unreasonably withheld for mortgages that are second and inferior to the lien; provided, however, said mortgage states that said mortgage is second and inferior to the lien of Mortgagee. Mortgagor will keep and maintain the Property free from the claims of all persons supplying labor or materials which shall enter into the construction of any and all buildings and improvements now being created or which hereafter may be erected on the Property notwithstanding by whom such labor or materials may have been contracted.  On the failure of Mortgagor to perform any of the covenants contained in this Section, or any part thereof, thereupon (subject to any applicable requirement of notice and opportunity for cure) the un-paid portion of the principal of the Amended and Restated Promissory Note secured hereby and all arrears of interest thereon and all of the other Obligations shall, at the option of Mortgagee, become immediately due and payable. Notwithstanding the foregoing, Mortgagor shall have the right to contest any such lien or claim of any person supplying such labor or materials, provided (i) that such contest shall preclude enforcement of collection out of and from the sale of the Property  in satisfaction of such lien, (ii) Mortgagor shall furnish Mortgagee with a bond or other security satisfactory to Mortgagee, and (iii) such

contest shall not otherwise create a failure on the part of Mortgagor to comply with any other provisions or conditions hereof.

9.   <u>Damage.</u>  If Mortgagor fails to perform the covenants and agreements contained in this Amended and Restated Mortgage, or if any action or proceeding is commenced which materially affects Mortgagee's interest in the Mortgaged Estate, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Mortgagee at Mortgagee's option, upon notice to Mortgagor, may make such appearances, disburse such sums and take such action as is necessary to protect Mortgagee's interests, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property or other premises to make repairs to the Mortgaged Estate.

10.   <u>Indemnity</u>.  Mortgagor shall save Mortgagee harmless from all loss, reasonable cost and expense, including reasonable attorneys' fees, and the cost of a title search, continuation of abstract and preparation of survey, incurred by reason of any action, suit proceeding, hearing, motion or application before any court or administrative body in and to which Mortgagee may be or become a party by reason hereof, including but not limited to condemnation, bankruptcy, probate and administration proceedings, as well as any other of the foregoing wherein proof of claim is by law required to be filed or in which it becomes necessary to defend or uphold the terms of, or the lien created by, this Amended and Restated Mortgage, and all money paid or expended by Mortgagee in that regard, together with interest thereon from the date of such payment at the rate set forth in the Amended and Restated Promissory Note as applicable after the occurrence of a default thereunder, shall be so much additional indebtedness secured hereby and shall be immediately and without notice be due and payable by Mortgagor.  Mortgagor further shall protect, defend, indemnify and save Mortgagee harmless under this Amended and Restated Mortgage from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expense (including, without limitation, reasonable attorneys' fees and expenses imposed upon, incurred by, or asserted against, Mortgagee) on account of (i) any failure of the Mortgagor to comply with any of the covenants and conditions on the part of Mortgagor to be performed or representations of Mortgagor contained in this Amended and Restated Mortgage, or (ii) any loss or damage to the Property or any injury to, or death of, any person that may be occasioned by any cause whatsoever pertaining to the Property or the use thereof, provided that such indemnity shall be effective only to the extent of any loss that may be sustained by Mortgagee in excess of any net proceeds of the insurance received by it from any insurance (other than self-insurance) carried with respect to such loss and provided further that the benefits of this Section shall not inure to any person other than Mortgagee and its successors and assigns.  Nothing contained herein shall require the

Clearwater AP Defendant 00002135

Mortgagor to indemnify Mortgagee for any claim or liability resulting from the gross negligence or willful and wrongful acts of Mortgagee during the term of this Amended and Restated Mortgage.  The indemnities contained in this Section shall survive payment of the Obligations and the release of this Amended and Restated Mortgage, and shall extend to the officers, directors, employees and duly authorized agents of Mortgagee.

11.   Condemnation.  If all or any part of the Mortgaged Estate shall be damaged or taken through condemnation (which term when used herein shall include any damage or taking by any governmental authority or any other authority authorized by the laws of the Commonwealth where the Property is located or the United States of America to so damage or take, and any transfer by private sale in lieu thereof), either temporarily or permanently, Mortgagee, to the extent of the then current indebtedness of Mortgagor to Mortgagee under the Amended and Restated Promissory Note, shall be entitled to all compensation awards, damages, claims, rights of action and proceeds of, or on account of any damage or taking through condemnation and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or Mortgagor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith.  All such compensation awards, damages, claims, rights of action and proceeds, and any other payments or relief, and the right thereto, are hereby assigned by Mortgagor to Mortgagee, who, after deducting therefrom all its expenses, including attorney's fees, may release any monies so received by it without affecting the lien of this Amended and Restated Mortgage or may apply the same, in such manner as Mortgagee shall determine, to the reduction of the sums secured hereby.  Any balance of such monies then remaining shall be paid to Mortgagor.  Mortgagor agrees to execute such further assignments of any compensation, awards, damages, claims, rights of action and proceeds as Mortgagee may require.  If all or any part of the Mortgaged Estate is abandoned by Mortgagor, or if, after notice by Mortgagee to Mortgagor that the condemnor offers to make an award or settle a claim for damages, Mortgagor fails to respond to Mortgagee within thirty (30) days after the date such notice is mailed, Mortgagee is authorized to collect and apply the proceeds, at Mortgagee's option, either to restoration or repair of the Mortgaged Estate or to the sums secured by this Amended and Restated Mortgage.

12.   Mortgagor Not Released.  Neither extensions of the time for payment or modification of amortization of the sums secured by this Amended and Restated Mortgage granted by Mortgagee to Mortgagor, or to any successor in interest of Mortgagor, nor the release of other Parties or collateral, shall operate to release, in any manner, the liability of the original Mortgagor and Mortgagor's successors in interest.  Mortgagee shall not be required to commence proceedings against such successor or refuse to extend time

for payment or otherwise modify amortization of the sums secured by this Amended and Restated Mortgage by reason of any demand made by the original Mortgagor and Mortgagor's successors in interest.

13.    Forbearance by Mortgagee Not a Waiver.   Any forbearance by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver or preclude the exercise of any such right or remedy.  The procurement of insurance or the payment of taxes or other liens or charges by Mortgagee shall not be a waiver of Mortgagee's right to accelerate the maturity of the indebtedness secured by this Amended and Restated Mortgage.  No waiver of any event of default hereunder shall extend to or affect any subsequent or any other event of default then existing, or impair any rights, powers or remedies consequent thereon.  If Mortgagee (a) grants forbearance or an extension of time for the payment of any sums secured hereby; (b) takes other or additional security for the payment thereof; (c) waives or does not exercise any right granted in the Amended and Restated Promissory Note, this Amended and Restated Mortgage, any other instrument securing the Amended and Restated Promissory Note or any other document or agreement; (d) releases any part of the Mortgaged Estate from the lien of this Amended and Restated Mortgage or any other instrument securing the Amended and Restated Promissory Note; or, (e) makes or consents to any agreement changing the terms of this Amended and Restated Mortgage or subordinating the lien or any charge hereof, no such act or omission shall release, discharge, modify, change or affect the original liability under the Amended and Restated Promissory Note, this Amended and Restated Mortgage or otherwise of Mortgagor, or any subsequent purchaser of the Mortgaged Estate or any part thereof or any maker, cosigner, endorser, surety or guarantor.  No such act or omission shall preclude Mortgagee from exercising any right, power or privilege herein granted or intended to be granted in case of any event of default then existing or of any subsequent event of default nor, except as otherwise expressly provided in an instrument or instruments executed by Mortgagee, shall the lien of this Amended and Restated Mortgage be altered thereby.

14.    Remedies Cumulative.   All remedies provided in this Amended and Restated Mortgage are distinct and cumulative to any other right or remedy under this Amended and Restated Mortgage, any other agreement between Mortgagor and Mortgagee or afforded by law or equity, and may be exercised concurrently, independently or successively.

15.    Successors and Assigns Bound; Joint and Several Liability; Captions.  The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective heirs, successors and assigns of Mortgagee and Mortgagor.  The captions and

Confidential

headings of the paragraphs of this Amended and Restated Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

16.    Notice.  Any notice given to any party to this Amended and Restated Mortgage shall be given in writing and personally delivered or sent by registered or certified mail, postage prepaid, addressed to such party at the address first set forth for such party in this Amended and Restated Mortgage, or to such other address as such party shall have designated in a written notice given in accordance with this Section to the party sending such notice.

17.    Governing Law; Severability.  This Amended and Restated Mortgage shall be interpreted and construed under and governed by the laws of the Commonwealth of Kentucky, without regard to principles of conflicts of law.  In the event that any provision or clause of this Amended and Restated Mortgage or the Amended and Restated Promissory Note conflicts with applicable law, such conflict shall not affect other provisions of this Amended and Restated Mortgage or the Amended and Restated Promissory Note which can be given effect without the conflicting provision, and to this end the provisions of the Amended and Restated Mortgage and the Amended and Restated Promissory Note are declared to be severable.

18.    Security Agreement; Financing Statements.  Mortgagor acknowledges receipt of a conformed copy of the Amended and Restated Promissory Note and of this Amended and Restated Mortgage.  Mortgagor promptly upon request by Mortgagee shall execute, acknowledge and deliver to Mortgagor any financing statement, affidavit, continuation statement or certificate or other document that Mortgagor reasonably may request in order to perfect, preserve, maintain or continue the security interest in the Mortgaged Estate under this Amended and Restated Mortgage and the priority of such security interest, and upon any failure by Mortgagor to do so Mortgagee automatically shall be vested with power of attorney for Mortgagor, coupled with an interest, for such purposes.  Mortgagor further agrees to pay to Mortgagee on demand all costs and expenses incurred by Mortgagee in connection with the preparation, execution, recording, filing and refiling of any such documents.  In addition to being a mortgage this Amended and Restated Mortgage is intended to be a security agreement and a fixture filing pursuant to the UCC for the items specified above as part of the Property (including goods constituting part of the Collateral that are or are to become fixtures) which, under applicable law, may be subject to a security interest pursuant to the UCC, and Mortgagor hereby grants to Mortgagee a security interest in said items as security for the Obligations.  Without limitation of the foregoing, Mortgagor agrees that Mortgagee may file this Amended and Restated Mortgage in any personal property or real estate records or other appropriate index as a financing statement for all or any of

Confidential                                        Clearwater AP Defendant 00002138

the items specified above as part of the Property and/or Collateral. A carbon, photographic or other reproduction of this Amended and Restated Mortgage or of a financing statement shall be sufficient as a financing statement. Furthermore, the Mortgagor expressly authorizes the Mortgagee to file and to re-file or update on its behalf and on behalf of the Mortgagee by electronic means any information which may be necessary or deemed necessary by Mortgagee to record evidence of the security interests granted hereunder with the Kentucky Secretary of State or elsewhere as may be allowed by law.

19.    Transfer of the Mortgaged Estate. Mortgagor agrees not to sell all or any portion of the Mortgaged Estate, other than coal inventory sold in the ordinary course of Mortgagor's business, or any legal or equitable interest therein, without Mortgagee's prior written consent. If, notwithstanding the foregoing, all or any part of the Mortgaged Estate or any legal or equitable interest therein is sold or transferred by Mortgagor without Mortgagee's prior written consent, Mortgagee may, at Mortgagee's option, declare all the sums secured by this Mortgage to be immediately due and payable, and without further notice or demand on Mortgagor invoke any remedies permitted hereby.

20.    Acceleration; Remedies. Upon the occurrence of any "event of default," which, for purposes of this Amended and Restated Mortgage, means any repossession, sale or foreclosure instituted against the Mortgaged Estate or any part thereof by a junior or any other lienholder or other person, including foreclosure or other proceedings or action to enforce any security interest, lien or encumbrance of any kind upon the Mortgaged Estate or any portion thereof, any default in, or "event of default," or breach of any covenant, agreement, representation or warranty by Mortgagor under the provisions of the Amended and Restated Promissory Note and/or this Amended and Restated Mortgage, any document evidencing other indebtedness secured hereby, or any other agreement with respect to which Mortgagor and Mortgagee are Parties, which default has not been cured within any applicable grace period, Mortgagee shall, at Mortgagee's option, have the following rights and remedies, which, to the extent permitted by law, shall be cumulative:

(a)    to declare immediately due and payable and accelerate the entire unpaid balance due on the Amended and Restated Promissory Note and all other obligations of Mortgagor to Mortgagee,

(b)    to enforce the lien of this Amended and Restated Mortgage by judicial proceedings and have the Mortgaged Estate, or specific items thereof, sold and collect from Mortgagor all expenses of foreclosure, including, but not limited to, reasonable attorney's fees, court costs, costs of

Clearwater AP Defendant 00002139

taking, holding, preparing for sale and sale of the Mortgaged Estate or any part thereof, and costs of documentary evidence, abstracts and title reports,

(c)   to exercise the rights granted by this Amended and Restated Mortgage relative to collection of rents and all other rights provided by this Amended and Restated Mortgage, and

(d)   to exercise any and all other rights and remedies afforded to Mortgagee in and against the Mortgaged Estate or any part thereof or Mortgagor provided for or permitted by applicable law, including the UCC, or the provisions of any other agreement entered into by and between Mortgagor and Mortgagee.

21.   Remedies.  The remedies of Mortgagee upon the occurrence of an event of default shall, with respect to the Collateral, specifically include the following rights and powers, any of which may be exercised concurrently with or independent of those hereinabove described:

(a)   all rights and remedies of a secured party under the UCC or similar statutes, including, without limitation, the right to take possession of the Mortgaged Estate (or any part thereof) and to take such other measures as Mortgagee may deem necessary for the care, preservation or protection thereof, and for such purposes Mortgagee may enter upon the Property or upon any other premises on which the Collateral or Improvements may be situated and remove the same therefrom;

(b)   the right to require Mortgagor to assemble all of the Collateral and make it available to Mortgagee at a place to be designated by Mortgagee, or in the alternative Mortgagee may conduct any public or private sale at or upon the Property or other site where any Collateral may be located;

(c)   the right to transfer any of the Mortgaged Estate into Mortgagee's own name or that of its nominee and receive the income thereon and proceeds thereof and hold the same as security for the Amended and Restated Promissory Note and any other obligations secured hereby or apply it to principal or interest due on the Amended and Restated Promissory Note or other obligations secured hereby; and

(d)   the right and power of Mortgagee as attorney-in-fact for Mortgagor, with power of substitution, which right and power Mortgagor hereby irrevocably grants to Mortgagee to, in the name of Mortgagor or of Mortgagee, give, demand, collect, receipt for and give renewals, extensions, bills of sale, transfers of title, discharges and releases of any portion of the Mortgaged Estate; to institute and to prosecute legal and equitable proceedings;  to settle, compromise, compound or adjust claims in respect of any of the Mortgaged Estate or any legal proceedings brought in respect thereof; and generally to sell same in whole or in part for cash, credit or property to others at a

commercially reasonable public sale and to assign or make any agreement with respect to or otherwise deal with any of the Mortgaged Estate as fully and completely as though Mortgagee were the absolute owner thereof for all purposes.

22. Sale. For purposes of this Section, disposition of the Mortgaged Estate shall be deemed commercially reasonable if made pursuant to a public offering advertised at least twice in a newspaper of general circulation in the County where the Mortgaged Estate is located for a sum equal to or in excess of the liquidating value of the Mortgaged Estate as determined by Mortgagee. The Mortgagee may bid upon and acquire any portion of the Mortgaged Estate at such public sale. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Mortgaged Estate sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute reasonable notice to Mortgagor. In addition to all other sums secured hereby, Mortgagor shall promptly pay to Mortgagee all expenses, including legal expenses and attorney's fees, incurred by or paid by Mortgagee in protecting its interest in the Mortgaged Estate, assembling and holding same for sale or other disposition and in enforcing its rights hereunder with respect thereto.

23. Nature of this Agreement. This instrument constitutes both a real property mortgage and a "security agreement," within the meaning of the UCC, and the Mortgaged Estate includes both real and personal property and all other rights and interest, whether tangible or intangible in nature of Mortgagor in the Mortgaged Estate. Mortgagor by executing and delivering this instrument has granted to Mortgagee, as security for the indebtedness referred to herein, a security interest in the Collateral above described as a portion of the Mortgaged Estate. To the extent that any portion of the Mortgaged Estate may be defined herein as a part of the Property and as a part of the Collateral, Mortgagee, in its sole discretion, may designate how such portion of the Mortgaged Estate shall be classified and Mortgagee may change such classification at any time or from time to time.

24. Release. Upon payment of all sums secured by this Amended and Restated Mortgage, Mortgagee shall release this Amended and Restated Mortgage, without charge to Mortgagor, except Mortgagor shall pay all costs of recordation, if any.

25. Waiver of Homestead. Mortgagor hereby waives all right of homestead exemption in the Property.

26. Execution in Counterparts. This Amended and Restated Mortgage may be executed in any number of counterparts, all of which shall be construed together as a single instrument.

27.   <u>Kentucky Law.</u>  Mortgagor hereby irrevocably waives any and all rights under Section 382.385(4) of the Kentucky Revised Statutes to request the Mortgagee to amend this Mortgage to reduce the maximum amount of any such Amended and Restated Promissory Note under Section 382.520(2) of the Kentucky Revised Statutes to require the Mortgagee to release the lien of this Amended and Restated Mortgage as to any amount as provided.

28.   <u>Actions by Mortgagee.</u>  Mortgagee may not take any actions described hereunder, including the exercise of any remedies, without the affirmative consent of both Lime Rock and Mr. Hoops.

IN WITNESS WHEREOF, Mortgagor has caused this writing to be signed, sealed and delivered effective as of the date and year herein a first above written.

MORTGAGOR:

Revelation Energy, LLC, a Kentucky limited liability company

By: _____

Its: _____ PRESIDENT

MORTGAGOR:

Revelation Energy Holdings, LLC, a Delaware limited liability company

By: _____

Its: _____ PRESIDENT

Mortgagee executes this Mortgage for the purpose of acknowledging and agreeing to the terms set forth herein, including, but not limited to, execution of this Amended and Restated Mortgage as "Secured Party" for the purpose of creating a security interest in certain collateral described herein and serving as a fixture filing under the Uniform Commercial Code of Kentucky and the Uniform Commercial Code of Virginia.

Clearwater AP Defendant 00002142

MORTGAGEE:

Jeffrey Hoops

MORTGAGEE:

LR-Revelation Holdings, L.P.

By: _____
Name Jeff Scofield
Title: Authorized Person

Clearwater AP Defendant 00002143

STATE OF WEST VIRGINIA          )
                                            ) SS

COUNTY OF _____       )

        I hereby certify that the foregoing instrument was duly signed and acknowledged before me
by _____ as the duly authorized officer of _____, on the _____
day of _____, 2017.


                                      _____
                                      Notary Public


        My commission expires _____.

STATE OF WEST VIRGINIA          )
                                              ) SS

COUNTY OF _____       )

        I hereby certify that the foregoing instrument was duly signed and acknowledged before me
by _____ as the duly authorized officer of _____
on the _____ day of _____, 2017.


                                      _____
                                      Notary Public


        My commission expires _____.

STATE OF _____        )
                                                 ) SS
COUNTY OF _____        )

     I hereby certify that the foregoing instrument was duly signed and acknowledged before me by _____ , individual, as his free act and deed  on the _____ day of _____, 2017.


_____
Notary Public

     My commission expires _____.

STATE OF _____        )
                                                 ) SS
COUNTY OF _____        )

     I hereby certify that the foregoing instrument was duly signed and acknowledged before me by _____ as the duly authorized officer of _____, on the _____ day of _____, 2017.


_____
Notary Public

My commission expires _____.

Clearwater AP Defendant 00002145

EXHIBIT A

PROPERTY DESCRIPTION

The real property rights, estates and interests acquired by Revelation Energy, LLC, a Kentucky limited liability company, pursuant to the following:

1. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Resource Land Company LLC, North Fork Coal Corporation and Revelation Energy, LLC, as recorded in Mortgage Book 436, Page 242 in the Office of the Harlan County Clerk.

2. Special Warranty Deed made and entered into as of July 31, 2015 among Resource Development LLC, Resource Land Company LLC and Revelation Energy, LLC, as recorded in Deed Book 460, Page 539 in the Office of the Harlan County Clerk.

3. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Harlan Reclamation Services LLC and Revelation Energy, LLC, as recorded in Lease Book 66, Page 175 in the Office of the Letcher County Clerk.

4. Special Warranty Deed made and entered into as of July 31, 2015 between Pigeon Creek Processing Corporation and Revelation Energy, LLC, as recorded as Instrument Number 201600915 in the Office of the Commonwealth of Virginia, Wise County Clerk.

5. Special Warranty Deed made and entered into as of July 31, 2015 between Mill Branch Coal Corporation, Osaka Mining Corporation and Revelation Energy, LLC as recorded as Instrument Number 201600916 in the Office of the Commonwealth of Virginia, Wise County Clerk.

6. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Pigeon Creek Processing Corporation and North Fork Coal Corporation and Revelation Energy, LLC, unrecorded.

7. Purchase and Sale Agreement dated July 25, 2014, as amended, by and among Cumberland River Coal Company, Ark Land Company and Revelation Energy, LLC, unrecorded (leases at Schedule 2.1).

8. Amended, Consolidated and Restated Coal Mining Lease dated July 31, 2015 by and between ACIN LLC and Revelation Energy, LLC, unrecorded.

9. Quitclaim Deed dated April 7, 2016 by and between Jewell Smokeless Coal Corporation and Revelation Energy, LLC.

COMMONWEALTH OF KENTUCKY        )
                                                         ) SS
COUNTY OF _____        )

     I, _____, County Clerk of _____ County, do hereby certify that

the foregoing instrument was on the ____ day of _____, 20____, lodged in my

office for record and that it, the foregoing, and this my certificate have been duly recorded in my

said office in _____ Book ____, page ____.

     Witness my hand on this the ____ day of _____, 20____.

                    _____, CLERK

                    By:_____D.C.

This instrument prepared by:

_____
Helena Racin Jackson
225 Spring Gate Drive
London, Kentucky 40741

Clearwater AP Defendant 00002147

COMMONWEALTH OF VIRGINIA            )
                                    ) SS
COUNTY OF _____                )


      I, _____, County Clerk of _____ County, do hereby certify that

the foregoing instrument was on the ____ day of _____, 20____, lodged in my

office for record and that it, the foregoing, and this my certificate have been duly recorded in my

said office in _____ Book ____, page ____.

      Witness my hand on this the ____ day of _____, 20____.


                                  _____, CLERK


                            By:_____D.C.


This instrument prepared by:

_____
Helena Racin Jackson
225 Spring Gate Drive
London, Kentucky 40741

Confidential

**July 10, 2017**

Ladies and Gentlemen:

Reference is hereby made to (1) the Amended and Restated Promissory Note made by Revelation Energy, LLC and Revelation Energy Holdings, LLC, as Borrowers, for the benefit of Jeffery Hoops ("**Hoops**") in the principal amount of $9,000,000 and LR-Revelation Holdings, L.P. ("**Lime Rock**") in the principal amount of $3,000,000 (the "**Amended and Restated Promissory Note**") and (2) the Amended and Restated Mortgage and Security Agreement made by Borrowers for the benefit of Hoops and Lime Rock (the "**Amended and Restated Mortgage**", and together with the Amended and Restated Promissory Note, the "**Bridge Loan Documents**").

The parties hereto agree as follows:

A.  Hoops hereby agrees and represents that the Promissory Note between Borrowers and Hoops dated December 1, 2016, in the principal amount of $6,000,000 (the "**Original Note**") will be amended and restated by the Amended and Restated Promissory Note dated as of the date hereof, and Hoops hereby agrees and approves such amendment and restatement. Hoops represents that, prior to the date hereof, he has not exercised any remedies under the Original Note or its underlying mortgage. Hoops and Lime Rock acknowledge and agree that the Amended and Restated Promissory Note is an amendment and restatement of the Original Note, and no amounts advanced thereunder, nor the amendment and restatement thereof shall be deemed a novation of the indebtedness represented thereby.

B.  Hoops and Lime Rock hereby agree that they shall be treated *pari passu* and of equal priority with respect to each other as lenders under the Bridge Loan Documents.

C.  Hoops and Lime Rock agree that neither party shall not exercise any remedy under the Bridge Loan Documents without the consent of the other, and that any proceeds collected, received or setoff thereunder shall be divided between Hoops and Lime Rock pro rata according to their relative outstanding amounts under the Amended and Restated Promissory Note.

D.  All aspects of the relationship created by this letter agreement, any other agreements relating hereto and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of, or relate to this letter agreement shall be governed by and construed in accordance with the laws of the State of New York. In connection therewith, the parties hereto consent to the jurisdiction of the Supreme Court of the State of New York or the United States District Court for the Southern District of New York, in each case sitting in New York County and any appellate court from any thereof, and agrees to venue in such courts. This letter agreement constitutes the entire agreement between the parties and supersedes all prior agreements, both written and oral, with respect to the subject matter hereof. EACH OF THE PARTIES HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF OR

Clearwater AP Defendant 00002128

RELATING TO THIS LETTER AGREEMENT. This letter agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Signatures by facsimile shall bind the parties hereto.

All other binding terms and conditions of each of the Bridge Loan Documents shall remain in full force and effect.

[Remainder of page intentionally left blank.]

Accepted and agreed to as of the date first written above:


JEFFERY HOOPS


LR-REVELATION ENERGY HOLDINGS

By: _____

Name:   Jeff Scofield

Title:   Authorized Person

Confidential

**From:** Helena Jackson [hj@hrjacksonlaw.com]
**Sent:** 3/4/2022 10:28:00 AM
**To:** Guadagnino, Frank J. [/o=MWBB/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=Guadagnino, Frank J.3d4]
**Subject:** FW: BlackJewel

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

**From:** Helena Jackson <HJackson@revelenergy.com>
**Sent:** Wednesday, July 5, 2017 1:19 PM
**To:** Anu Mehta <amehta@lrpartners.com>
**Subject:** RE: BlackJewel

Thank you!

Jeff has stated many times that Lime Rock is contributing $3mm in connection with this transaction - Has that amount changed ?

Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

**From:** Anu Mehta [mailto:amehta@lrpartners.com]
**Sent:** Wednesday, July 05, 2017 11:59 AM
**To:** Helena Jackson
**Subject:** RE: BlackJewel

Helena,

Here are some revisions to the mortgage and the note.  I've also attached redlines to those documents.  The changes are some cleanup changes and also to reflect that the loan from Lime Rock was $1mm, not $3mm.

I've also drafted a letter agreement between the lenders that makes it clear no lender will exercise remedies for the note without the other.

Please let me know if you want to discuss.

Anu Mehta
Deputy General Counsel
Lime Rock Management LP
t 713-345-2105
f 713-345-2155
e amehta@lrpartners.com

**From:** Helena Jackson [mailto:HJackson@revelenergy.com]
**Sent:** Friday, June 30, 2017 3:39 PM
**To:** Jeffrey Scofield <js@lrpartners.com>; Blair Barlow <BBarlow@lrpartners.com>; Jeff Hoops <JHoops@revelenergy.com>; Anu Mehta <amehta@lrpartners.com>
**Cc:** Oliver Phillips <ophillips@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>
**Subject:** RE: BlackJewel

All –
Please see attached proposed amended note and mortgage instruments I prepared today for the purpose stated, below. Please let me know if you have any comments.
Thanks!
Sincerely,
Helena



*Sincerely,*
***Helena Racin Jackson, Esq.***
***General Counsel***
***1051 Main Street***
***Milton, WV 25541***
☎ ***Mobile - (859) 533-4901***
🖷 ***Fax - (304) 390-5975***

**From:** Jeffrey Scofield [mailto:js@lrpartners.com]
**Sent:** Friday, June 30, 2017 2:46 PM
**To:** Allison, Daniel; Blair Barlow; Helena Jackson; Dwyer, Andrew; Jeff Hoops; Hamner, Herschel; Chen, Andy
**Cc:** Oliver Phillips; Brian Berger
**Subject:** RE: BlackJewel

                                                Clearwater AP Defendant 00304312

Effectively instead of Funding $3mm at close into the loan (which I presume is how the current credit agreement is drafted), Lime Rock put $1mm into the company this week, and that will "roll" into the facility. We'll fund the additional $2mm at closing. The $1mm of roll, is similar to the $3mm Jeff H is rolling if that makes sense.

---

**From:** Allison, Daniel [mailto:dallison@sidley.com]
**Sent:** Friday, June 30, 2017 1:39 PM
**To:** Blair Barlow <BBarlow@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Helena Jackson <HJackson@revelenergy.com>; Dwyer, Andrew <andrew.dwyer@sidley.com>; Jeff Hoops <JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>
**Cc:** Oliver Phillips <ophillips@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>
**Subject:** RE: BlackJewel

So will that increase the face amount of the RCP loan by $1 million? Or will $1 million of the $34 million go to repay LR's additional loan?

**DANIEL ALLISON**
Associate

**SIDLEY AUSTIN LLP**
+1 713 495 4612
dallison@sidley.com

---

**From:** Blair Barlow [mailto:BBarlow@lrpartners.com]
**Sent:** Friday, June 30, 2017 1:21 PM
**To:** Jeffrey Scofield <js@lrpartners.com>; Allison, Daniel <dallison@sidley.com>; Helena Jackson <HJackson@revelenergy.com>; Dwyer, Andrew <andrew.dwyer@sidley.com>; Jeff Hoops <JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>
**Cc:** Oliver Phillips <ophillips@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>
**Subject:** RE: BlackJewel

One thing we did not cover on the call is the addition of the $1mm note from Lime Rock that will get refinanced alongside the Hoops Note as part of the deal. Let me know if you have any questions, but effectively we just need to mirror any language around the Hoops Note with matching language for a $1mm Lime Rock note.

Blair

---

**From:** Jeffrey Scofield
**Sent:** Friday, June 30, 2017 1:18 PM
**To:** Allison, Daniel <dallison@sidley.com>; Helena Jackson <HJackson@revelenergy.com>; Dwyer, Andrew <andrew.dwyer@sidley.com>; Jeff Hoops <JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>
**Cc:** Oliver Phillips <ophillips@lrpartners.com>; Blair Barlow <BBarlow@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>
**Subject:** RE: BlackJewel

We're on the phone with Riverstone now. They expect Daniels debt be excluded from definition of debt for covenants, etc. Let's make sure that's reflected in draft.

---

**From:** Allison, Daniel [mailto:dallison@sidley.com]
**Sent:** Friday, June 30, 2017 10:14 AM

**To:** Helena Jackson <HJackson@revelenergy.com>; Dwyer, Andrew <andrew.dwyer@sidley.com>; Jeff Hoops
<JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>
**Cc:** Jeffrey Scofield <js@lrpartners.com>; Oliver Phillips <ophillips@lrpartners.com>; Blair Barlow
<BBarlow@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>
**Subject:** RE: BlackJewel

Thanks Helena.  Do you guys have any insight/opinion on whether it would be acceptable to subordinate these
obligations to the new loan (i.e. if things go south, RCP could prevent Blackjewel from paying these)?  We probably
should share this with STB/RCP at some point, but I'm guessing they may ask to insert a subordination provision.


**DANIEL ALLISON**
Associate

**SIDLEY AUSTIN LLP**
+1 713 495 4612
dallison@sidley.com

---

**From:** Helena Jackson [mailto:HJackson@revelenergy.com]
**Sent:** Friday, June 30, 2017 8:30 AM
**To:** Dwyer, Andrew <andrew.dwyer@sidley.com>; Allison, Daniel <dallison@sidley.com>; Jeff Hoops
<JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>
**Cc:** Jeffrey Scofield <js@lrpartners.com>
**Subject:** RE: BlackJewel

Attached is the draft Transition Services Agreement.    Thanks!



*Sincerely,*
***Helena Racin Jackson, Esq.***
***General Counsel***
***1051 Main Street***
***Milton, WV 25541***
☎ ***Mobile - (859) 533-4901***
🖷 ***Fax - (304) 390-5975***

---

**From:** Helena Jackson
**Sent:** Thursday, June 29, 2017 4:15 PM
**To:** 'Dwyer, Andrew'; 'Allison, Daniel'; Jeff Hoops; 'Hamner, Herschel'; 'Chen, Andy'
**Cc:** 'Jeffrey Scofield'
**Subject:** RE: BlackJewel

Attached are two draft corporate formality documents – the Blackjewel Secretary's Certificate and the Resolutions approving the deal.

Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

---

**From:** Helena Jackson
**Sent:** Thursday, June 29, 2017 4:05 PM
**To:** 'Dwyer, Andrew'; 'Allison, Daniel'; Jeff Hoops; 'Hamner, Herschel'; 'Chen, Andy'
**Cc:** 'Jeffrey Scofield'
**Subject:** RE: BlackJewel

Attached is the draft Assignment and Assumption of Real Property Interests.  Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

Confidential

Clearwater AP Defendant 00304315

**From:** Helena Jackson
**Sent:** Thursday, June 29, 2017 3:56 PM
**To:** 'Dwyer, Andrew'; 'Allison, Daniel'; Jeff Hoops; 'Hamner, Herschel'; 'Chen, Andy'
**Cc:** 'Jeffrey Scofield'
**Subject:** RE: BlackJewel

Attached are the relevant documents for the transfers of ownership interests for Dominion, Vansant, Omega, and Harold Keene (who owns Energy Resources).   Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

---

**From:** Helena Jackson
**Sent:** Thursday, June 29, 2017 3:07 PM
**To:** 'Dwyer, Andrew'; Allison, Daniel; Jeff Hoops; Hamner, Herschel; Chen, Andy
**Cc:** Jeffrey Scofield
**Subject:** RE: BlackJewel

Great! Thanks!    I just finished the Kentucky and Virginia Deed forms, attached.
I'll move on to the Assignment of Ownership Interests.



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*

☎ *Mobile - (859) 533-4901*
▤ *Fax - (304) 390-5975*

---

**From:** Dwyer, Andrew [mailto:andrew.dwyer@sidley.com]
**Sent:** Thursday, June 29, 2017 2:51 PM
**To:** Allison, Daniel; Helena Jackson; Jeff Hoops; Hamner, Herschel; Chen, Andy
**Cc:** Jeffrey Scofield
**Subject:** RE: BlackJewel

Helena,

Thanks for sending across the fixes. We will have some comments for you to incorporate, mostly to streamline the document and remove the need for certain of the ancillary documents (for example there won't need to be a Section 2.5(j) agreement).

Thanks,
Andrew

**ANDREW DWYER**
Associate
Admitted in New York and New South Wales, Australia

**SIDLEY AUSTIN LLP**
+1 212 839 6784
andrew.dwyer@sidley.com

---

**From:** Allison, Daniel
**Sent:** Thursday, June 29, 2017 2:19 PM
**To:** Helena Jackson <HJackson@revelenergy.com>; Jeff Hoops <JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>; Dwyer, Andrew <andrew.dwyer@sidley.com>
**Cc:** Jeffrey Scofield <js@lrpartners.com>
**Subject:** RE: BlackJewel

Adding Andrew Dwyer.

**DANIEL ALLISON**
Associate

**SIDLEY AUSTIN LLP**
+1 713 495 4612
dallison@sidley.com

---

**From:** Helena Jackson [mailto:HJackson@revelenergy.com]
**Sent:** Thursday, June 29, 2017 1:04 PM
**To:** Jeff Hoops <JHoops@revelenergy.com>; Hamner, Herschel <hhamner@sidley.com>; Chen, Andy <andy.chen@sidley.com>; Allison, Daniel <dallison@sidley.com>
**Cc:** Jeffrey Scofield <js@lrpartners.com>
**Subject:** RE: BlackJewel

Good afternoon !

---

I fixed the formatting a bit and corrected a couple of numbers in the SPA/APA. Does anyone have any comments on this document that you would like to incorporate?

Today I'm working on the Assignment Contract, the Assignment of Transferred Ownership Interests for the companies, the Special Warranty Deeds, etc. and finalizing those ancillary documents for your review.

Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

---

**From:** Helena Jackson
**Sent:** Wednesday, June 28, 2017 6:39 PM
**To:** Jeff Hoops; 'Hamner, Herschel'; Chen, Andy (andy.chen@sidley.com); Allison, Daniel (dallison@sidley.com)
**Cc:** 'Jeffrey Scofield'
**Subject:** RE: BlackJewel

Revised. Please review this version. Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

                                          Clearwater AP Defendant 00304318

**From:** Helena Jackson
**Sent:** Wednesday, June 28, 2017 6:31 PM
**To:** Jeff Hoops; Hamner, Herschel; Chen, Andy (andy.chen@sidley.com); Allison, Daniel (dallison@sidley.com)
**Cc:** Jeffrey Scofield
**Subject:** RE: BlackJewel

Attached is the draft SPA/APA I prepared for the Blackjewel deal.

Thanks!



*Sincerely,*
*Helena Racin Jackson, Esq.*
*General Counsel*
*1051 Main Street*
*Milton, WV 25541*
☎ *Mobile - (859) 533-4901*
🖷 *Fax - (304) 390-5975*

**From:** Jeff Hoops
**Sent:** Monday, June 26, 2017 4:05 PM
**To:** Hamner, Herschel
**Cc:** Jeffrey Scofield; Helena Jackson
**Subject:** FW: BlackJewel

FYI - Jeff



*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

                                                                      Clearwater AP Defendant 00304319

**From:** Jeff Hoops
**Sent:** Monday, June 26, 2017 8:16 AM
**To:** 'Flannery, Daniel' <dflannery@riverstonecredit.com>; Jeffrey Scofield <js@lrpartners.com>; Jerrod Freund
(jerrod.freund@jefferies.com) <jerrod.freund@jefferies.com>; Helena Jackson <HJackson@revelenergy.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>;
Lowenthal, Steven <slowenthal@riverstonecredit.com>; Owsiany, Carmela <cowsiany@riverstonecredit.com>
**Subject:** RE: BlackJewel

Danny:

As you and your team are starting to get your hands around the assets that will be pledged as collateral for the loan, I
thought it would be good to take a moment to summarize them for you at a high level and put some values based on
what I am seeing in the market for underground equipment. As you will see this package includes 21 sections of
underground equipment, which is fairly liquid and would have an estimated value of $105mm, but the real value is Black
Mountain, which at 6X the 2017 run-rate EBITDA through May would be valued at more than $288mm.

1)   Collateral available to pledge:
a.   Black Mountain Division
            i.   Alpha Power Point attached that outlines the asset in great detail
           ii.   Assets include:
1.   314mm tons of reserves, more than 50% met
2.   (6) Sections of Underground Equipment and All Infrastructure ( + $30mm estimated liquidation value)
3.   (1) 1875 TPH Plant and Unit Train Loadout Facility on CSX ( +$50mm replacement cost)
4.   (1) 1275 TPH Plant and Unit Train Loadout Facility on NS ( +$50mm replacement cost)
b.   Virginia Division
           i.   Assets include:
1.   120mm, mid vol met
2.   (5) Sections of Underground Equipment and All Infrastructure ( +$25mm estimated liquidation value)
3.   (1) 625 TPH Plant ( $20mm replacement cost)
c.   Lone Mountain Acquisition
           i.   Assets include:
1.   +100mm tons of HVB and high quality steam reserves
2.   (6) Sections of Underground Equipment and All Infrastructure ( +$30mm estimated liquidation value)
3.   (1) 1350 TPH Plant and Unit Train Loadout Facility with NS/CSX ( +$50mm replacement cost)
4.   (1) 800 TPH Plant and Unit Train Loadout Facility with NS ( +$25mm replacement cost)
5.   (1) 600 TPH Plant and Unit Train Loadout Facility with NS (+$15mm replacement cost)
d.   BHL Division
           i.   2nd Lien Behind Noble, where Noble has no real risk, so essentially a first lien
1.   Assets Include:
a.   500 TPH Bell County Plant & Loadout ($20mm estimated replacement cost)
b.   1300 TPH Shamrock Plant ($25mm estimated replacement cost)
c.   Clover Unit Train Loadout Facility ($5mm estimated replacement cost)
d.   700TPH BL-1 Plant ( $15mm estimated replacement cost)
e.   +50mm tons of high quality steam and specialty coal reserves
f.   (4) Sections of Underground Equipment ( $20mm estimated liquidation value)
e.   We have the right to acquire MR Coal for $1 on 12/31/18
           i.   MR Coal is currently 100% owned by Noble Group
           ii.   Expected to generate over $25mm in revenue with net earnings of $20mm over next 5
years

Helena, now has all of the detail in the data room and I am sure over the coming days we will get all of the documentation aligned with the above collateral and be ready to fund by July 7th as targeted. Look forward to working with you and your team through this process in what I am confident will be the first of many opportunities…….Sincerely…..Jeff



*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Friday, June 23, 2017 8:43 AM
**To:** Jeffrey Scofield <js@lrpartners.com>; Jeff Hoops <JHoops@revelenergy.com>; Jerrod Freund (jerrod.freund@jefferies.com) <jerrod.freund@jefferies.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Lowenthal, Steven <slowenthal@riverstonecredit.com>; Owsiany, Carmela <cowsiany@riverstonecredit.com>
**Subject:** BlackJewel

Hey guys, I think getting a call set up with Noble's head of credit is important next week. Mel can help coordinate our schedules and I think Chris, Jamie, and myself need to be on it.

Equally important in my opinion is understanding how the model changes if you had to manage the business without MR coal or a simultaneous replacement credit provider. So what I'd like to see is a modified base case that assumes you have $26 million of liquidity day-1 and manage the growth within the means of the business so we can see what our refi risk is at 12 or 18 months. I think based on the math I've seen is that you can manage through it but would like your view so we can truly assess the nature of the risk. Let me know if this doesn't make sense.

Maybe we carve out 10-15 minutes after our all-hands call to discuss so everyone on same page going into weekend.

Thanks,

Danny

Daniel P. Flannery
Principal
Riverstone Credit Partners, L.P.
212-271-6259

                                                           Clearwater AP Defendant 00304321

dflannery@riverstonecredit.com

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

**********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

**********************************************************************************************

*Execution Version*

$34,000,000

**CREDIT AGREEMENT**

dated as of July 17, 2017

by and among

BLACKJEWEL L.L.C.,
as Borrower,

BLACKJEWEL HOLDINGS L.L.C.,
as Holdings,

the LENDERS from time to time party hereto,

and

RIVERSTONE CREDIT PARTNERS – DIRECT, L.P.,
as Agent,

JEFFERIES FINANCE LLC,
as Sole Lead Arranger and Sole Bookrunner

DEBTORSLCC_105703

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
### CERTAIN DEFINITIONS

Section 1.01   Certain Definitions .................................................................................. 1
Section 1.02   Interpretive Provisions ............................................................................ 32
Section 1.03   Accounting Principles; Changes in GAAP ............................................ 32

## ARTICLE 2
### THE LOANS

Section 2.01   The Loans ................................................................................................. 33
Section 2.02   Procedure for Borrowing Loans ............................................................ 33
Section 2.03   Agent Fees and OID ............................................................................... 33
Section 2.04   Conversions/Continuations .................................................................... 33
Section 2.05   Loan Conversions and Continuation; Obligations of Lenders Several; Repayment of Loans; Commitment Reductions ......................................................................... 34
Section 2.06   Defaulting Lenders ................................................................................. 34
Section 2.07   Extension of Stated Maturity Date ........................................................ 34

## ARTICLE 3
### RESERVED

## ARTICLE 4
### INTEREST RATES

Section 4.01   Interest Rate Options .............................................................................. 35
Section 4.02   Interest Periods ....................................................................................... 36
Section 4.03   Interest After Default ............................................................................. 36
Section 4.04   LIBOR Rate Unascertainable; Illegality; Increased Costs; Deposits Not Available ...... 36
Section 4.05   Selection of Interest Rate Options ........................................................ 37

## ARTICLE 5
### PAYMENTS

Section 5.01   Payments .................................................................................................. 37
Section 5.02   Pro Rata Treatment of Lenders .............................................................. 38
Section 5.03   Sharing of Payments by Lenders ........................................................... 38
Section 5.04   Presumptions by Agent .......................................................................... 39
Section 5.05   Interest Payment Dates .......................................................................... 39
Section 5.06   Prepayments ............................................................................................ 39
Section 5.07   Mitigation Obligations ........................................................................... 41
Section 5.08   Increased Costs ....................................................................................... 42
Section 5.09   Taxes ........................................................................................................ 43
Section 5.10   Indemnity ................................................................................................ 46
Section 5.11   Call Protection ........................................................................................ 47

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

Section 6.01   Organization and Qualification ............................................................. 47
Section 6.02   Ownership ............................................................................................... 47
Section 6.03   Power and Authority .............................................................................. 47
Section 6.04   Validity and Binding Effect ................................................................... 47

i

Section 6.05   No Conflict..................................................................................................47
Section 6.06   Litigation....................................................................................................48
Section 6.07   Financial Statements; No Material Adverse Change ....................................48
Section 6.08   Margin Stock...............................................................................................48
Section 6.09   Full Disclosure............................................................................................48
Section 6.10   Taxes..........................................................................................................49
Section 6.11   Consents and Approvals...............................................................................49
Section 6.12   No Event of Default; Compliance With Instruments and Certain Contracts ..................49
Section 6.13   Insurance.....................................................................................................49
Section 6.14   Compliance With Laws.................................................................................50
Section 6.15   Investment Companies..................................................................................50
Section 6.16   Plans and Benefit Arrangements....................................................................50
Section 6.17   Employment and Black Lung Liability Matters..............................................51
Section 6.18   Mining, Environmental Health and Safety Matters ........................................51
Section 6.19   [Reserved]...................................................................................................53
Section 6.20   Real Property Rights ....................................................................................53
Section 6.21   Patents, Trademarks, Copyrights, Licenses, Etc ...........................................53
Section 6.22   Security Interests.........................................................................................53
Section 6.23   Sanctions and Anti-Corruption Laws.............................................................54
Section 6.24   Status of Pledged Collateral .........................................................................54
Section 6.25   Mining Financial Assurances.......................................................................54
Section 6.26   Solvency......................................................................................................54
Section 6.27   Accounts in Existence...................................................................................54

ARTICLE 7
CONDITIONS PRECEDENT

Section 7.01   Conditions Precedent to Closing Date ...........................................................54

ARTICLE 8
COVENANTS

Section 8.01   Affirmative Covenants..................................................................................58
Section 8.02   Negative Covenants .....................................................................................65
Section 8.03   Reporting Requirements................................................................................73
Section 8.04   Financial Covenants.....................................................................................77
Section 8.05   Permitted Activities of Holdings...................................................................79

ARTICLE 9
DEFAULT

Section 9.01   Events of Default .........................................................................................79
Section 9.02   Consequences of Event of Default.................................................................82

ARTICLE 10
THE AGENT

Section 10.01   Appointment and Authority ........................................................................84
Section 10.02   Rights as a Lender.....................................................................................84
Section 10.03   Exculpatory Provisions..............................................................................84
Section 10.04   Reliance by the Agent ................................................................................86
Section 10.05   Delegation of Duties ..................................................................................87
Section 10.06   Resignation of the Agent.............................................................................87
Section 10.07   Non-Reliance on Agent and Other Lenders ..................................................88
Section 10.08   Notice of Default........................................................................................88
Section 10.09   No Other Duties, Etc ..................................................................................88

ii

DEBTORSLCC_105705

Section 10.10    The Agent May File Proofs of Claim......................................................................88
Section 10.11    Certain Obligations of the Agent .........................................................................89

ARTICLE 11
MISCELLANEOUS

Section 11.01    Modifications, Amendments or Waivers ...............................................................89
Section 11.02    No Implied Waivers; Cumulative Remedies.........................................................90
Section 11.03    Expenses; Indemnity; Damage Waiver ................................................................90
Section 11.04    Holidays ...............................................................................................................92
Section 11.05    Notices; Effectiveness; Electronic Communication.............................................93
Section 11.06    Severability ..........................................................................................................93
Section 11.07    Duration; Survival................................................................................................93
Section 11.08    Successors and Assigns.........................................................................................94
Section 11.09    Confidentiality .....................................................................................................97
Section 11.10    Counterparts; Integration .....................................................................................98
Section 11.11    CHOICE OF LAW; SUBMISSION TO JURISDICTION; WAIVER OF VENUE;
SERVICE OF PROCESS; WAIVER OF JURY TRIAL.................................................................99
Section 11.12    USA Patriot Act Notice......................................................................................100
Section 11.13    No Fiduciary Duty ..............................................................................................100
Section 11.14    The Platform .......................................................................................................101
Section 11.15    Authorization to Release Collateral and Guarantors...........................................101
Section 11.16    Right to Realize on Collateral and Enforce Guaranty ........................................101
Section 11.17    Release of Liens .................................................................................................101
Section 11.18    Acknowledgements and Consent to Bail-in of EEA Financial Institutions .............102
Section 11.19    Non-Pro Rata Acknowledgement ........................................................................102
Section 11.20    Existing Debt Consents: Authorization and Acknowledgement...............................102

DEBTORSLCC_105706

<u>Schedules and Exhibits</u>:

| | |
|---|---|
| Schedule 1.01(C) | Lenders; Commitments; Addresses For Notices |
| Schedule 1.01(E) | Excluded Leases |
| Schedule 1.01(E-2) | Existing Debt Documents |
| Schedule 1.01(L) | Lone Mountain Acquired Assets |
| Schedule 1.01(N) | NRP Leases |
| Schedule 1.01(P) | Existing Liens |
| Schedule 1.01(R) | Revelation Reclamation Obligations |
| Schedule 6.02 | Certain Information Regarding Capitalization of Borrower and its Subsidiaries |
| Schedule 6.06 | Litigation |
| Schedule 6.11 | Consents And Approvals |
| Schedule 6.12 | Amounts Due Under Existing Debt Documents |
| Schedule 6.13 | Insurance |
| Schedule 6.18 | Certain Disclosures Regarding Environmental Matters |
| Schedule 6.20(a) | Fee Owned Real Property |
| Schedule 6.20(b) | Leased Real Property |
| Schedule 6.22 | Permitted Prior Liens on Personal Property |
| Schedule 6.24 | Partnership Agreements; LLC Agreements |
| Schedule 6.25 | Mining Financial Assurances |
| Schedule 7.01(a)(x) | Outstanding Consents |
| Schedule 8.01(m) | Permitted Prior Liens on Real Property |
| Schedule 8.02(a) | Existing Debt |
| Schedule 8.02(e) | Certain Affiliate Transactions |
| Schedule 8.02(j) | Restrictions on Dividends and Distributions |
| Schedule 8.02(m) | Existing Investments |
| Schedule 8.02(r) | Aggregate Permitted Reclamation Obligations |
| | |
| Exhibit 1.01(A) | Form of Assignment and Assumption Agreement |
| Exhibit 1.01(E) | Form of Extension Request |
| Exhibit 1.01(G) | Form of Guaranty Agreement |
| Exhibit 1.01(M) | Form of Mortgage |
| Exhibit 1.01(N) | Form of Note |
| Exhibit 1.01(P) | Form of Perfection Certificate |
| Exhibit 1.01(S) | Form of Security Agreement |
| Exhibit 2.02 | Form of Funding Notice |
| Exhibit 2.04 | Form of Conversion/Continuation Notice |
| Exhibit 5.09 | Forms of U.S. Tax Compliance Certificates |
| Exhibit 7.01 | Form of Solvency Certificate |
| Exhibit 8.03(c) | Form of Compliance Certificate |
| Exhibit 8.03(d) | Form of Annual Operating Plan and Budget |

DEBTORSLCC_105707

## CREDIT AGREEMENT

This CREDIT AGREEMENT, dated as of July 17, 2017, is entered into by and among BLACKJEWEL, L.L.C., a Delaware limited liability company (the "Borrower"), BLACKJEWEL HOLDINGS, L.L.C., a Delaware limited liability company ("Holdings"), the LENDERS from time to time party hereto and RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., in its capacities as administrative agent for the Lenders and collateral agent for the Secured Parties (in such capacities, together with its successors and permitted assigns in such capacities, the "Agent").

## R E C I T A L S:

WHEREAS, on or prior to the date hereof, the Borrower has undertaken the Restructuring;

WHEREAS, the Borrower has requested, and the Lenders have agreed to make available to the Borrower, the term loan facility provided for herein upon the terms and subject to the conditions set forth in this Agreement to (a) pay all amounts currently due with respect to the Existing Debt Documents, the Hoops Note and the LR Note, (b) provide working capital, fund Permitted Capital Expenditures, fund cash on the Borrower's balance sheet and support other general corporate purposes of the Borrower, and (d) pay fees, expenses and other transaction costs incurred in connection with the Transactions;

WHEREAS, the Borrower desires to secure the Obligations by granting to the Agent, for the benefit of the Secured Parties, a first-priority security interest in and continuing Lien upon substantially all of its assets, subject to the Permitted Prior Liens on certain identified assets;

WHEREAS, Holdings directly owns all of the Equity Interests of the Borrower and has determined that it is in its best interests to guarantee the Obligations and to pledge and grant to the Agent, for the benefit of the Secured Parties, a first-priority security interest in and continuing Lien upon all of its rights, title and interest in the Equity Interests of the Borrower and substantially all of its other assets; and

WHEREAS, each Subsidiary of Holdings has determined that it is in its best interests to guarantee the Obligations (other than its own direct obligations) and to pledge and grant to the Agent, for the benefit of the Secured Parties, a first-priority security interest in and continuing Lien upon substantially all of its assets, subject to the Permitted Prior Liens on certain identified assets;

NOW THEREFORE, in consideration of their mutual agreements, provisions and covenants contained herein and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

Section 1.01    Certain Definitions.  In addition to words and terms defined elsewhere in this Agreement, the following words and terms shall have the following meanings, respectively, unless the context hereof clearly requires otherwise:

"Active Operating Property" shall mean any property which is the subject of an outstanding Environmental Health and Safety Permit issued to (or transferred by, or in the process of transfer by (and subject to a Temporary Permit Agreement), any predecessor in title to) any Loan Party or any Subsidiary of any Loan Party.

"Affiliate" as to any Person shall mean any other Person (a) which directly or indirectly controls, is controlled by, or is under common control with such Person, (b) which beneficially owns or holds 10%

or more of any class of the voting or other equity interests of such Person, or (c) 10% or more of any class of voting interests or other equity interests of which is beneficially owned or held, directly or indirectly by such Person. Control, as used in this definition, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case may be. For purposes of this Agreement and the other Loan Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"Affiliated Lender" shall mean any Lender, to the extent it owns or holds, directly or indirectly, or its Affiliate owns or holds, directly or indirectly, any Capital Stock of Holdings, the Borrower or any of their Subsidiaries.

"Agent" shall have the meaning specified in the introductory paragraph hereto.

"Agent Parties" shall have the meaning specified in Section 11.14.

"Agreement" shall mean this Credit Agreement (including all schedules and exhibits), as the same may be amended, amended and restated, refinanced, replaced, supplemented or otherwise modified from time to time.

"Annual Operating Plan and Budget" shall mean the applicable annual operating plan (including an annual operating budget and maintenance schedule), in form and substance reasonably satisfactory to the Required Lenders, prepared and delivered by the Borrower in accordance with Section 8.03(d).

"Annual Statements" shall have the meaning specified in Section 6.07(a).

"Applicable Margin" shall mean (a) the percentage spread to be added to the LIBOR Rate applicable to Loans under the LIBOR Rate Option, which shall be equal to 14.00% and (b) the percentage spread to be added to the Base Rate applicable to Loans under the Base Rate Option, which shall be equal to 13.00%.

"Approved Fund" shall mean any fund that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of business.

"Arranger" shall mean Jefferies LLC, in its capacity as sole lead arranger and sole bookrunner of the Loans.

"Assignment and Assumption Agreement" shall mean an assignment and assumption agreement entered into by a Lender and an assignee permitted under Section 11.08, in substantially the form of Exhibit 1.01(A).

"Authorized Officer" shall mean, with respect to any Loan Party, the Chief Executive Officer, President, Chief Financial Officer, Senior Vice President, Treasurer or Assistant Treasurer of such Loan Party or such other individuals with substantially equivalent responsibilities, designated by written notice to the Agent from the Borrower, authorized to execute notices, reports and other documents on behalf of the Loan Parties required hereunder. The Borrower may amend such list of individuals from time to time by giving written notice of such amendment to the Agent.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

DEBTORSLCC_105709

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Sections 101 et seq.

"Bankruptcy Proceeding" shall have the meaning specified in Section 11.08(f)(ii).

"Base Rate" shall mean for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate plus 1/2 of 1%, (b) the Prime Rate and (c) the LIBOR Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided that in no event shall the Base Rate for any Loans be less than 2.00%. Any change in the Base Rate (or any component thereof) shall take effect at the opening of business on the day such change occurs.

"Base Rate Option" shall mean the option of the Borrower to have Loans bear interest at the rate and under the terms set forth in Section 4.01(a).

"Benefit Arrangement" shall mean an "employee benefit plan," within the meaning of Section 3(3) of ERISA, which is neither a Plan nor a Multiemployer Plan and which is maintained, sponsored or contributed to by the Borrower.

"Black Lung Act" shall mean, collectively, the Black Lung Benefits Revenue Act of 1977, as amended and the Black Lung Benefits Reform Act of 1977, as amended.

"Borrower" shall have the meaning specified in the introductory paragraph hereto.

"Borrower Materials" shall have the meaning specified in Section 8.03(i).

"Borrowing Tranche" shall mean specified portions of Loans outstanding as follows: (a) any Loans to which a LIBOR Rate Option applies which become subject to the same Interest Rate Option under the same Funding Notice or Conversion/Continuation Notice, as applicable, by the Borrower and which have the same Interest Period shall constitute one Borrowing Tranche, and (b) all Loans to which a Base Rate Option applies shall constitute one Borrowing Tranche.

"Business Day" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required to be closed for business in New York City, New York or the Agent's Principal Office and if the applicable Business Day relates to any Loan to which the LIBOR Rate Option applies, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person that, in accordance with GAAP, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such Person (whether paid in cash or other consideration, financed by the incurrence of Debt or accrued as a liability).

"Capital Lease Obligation" shall mean, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP (without giving effect to any changes in GAAP occurring after

3

DEBTORSLCC_105710

the Closing Date, the effect of which would be to cause leases which would be treated as operating leases under GAAP as of the Closing Date to be treated as capital leases under GAAP), and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" shall mean:

(a)      in the case of a corporation, corporate stock;

(b)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Carried CapEx Amount" shall have the meaning specified in Section 8.04(b).

"CAT" shall mean Caterpillar Financial Services Corporation, a Delaware corporation.

"CAT Financing Documents" shall mean (a) that certain Amended and Restated Security Agreement and Promissory Note, dated as of February 28, 2017, by and between Revelation, as borrower, and CAT, as lender (as amended by that certain First Amendment to Amended and Restated Security Agreement and Promissory Note, dated as of March 3, 2017, that certain that certain Second Amendment to Amended and Restated Security Agreement and Promissory Note dated June 29, 2017 by and between Revelation and CAT and that certain Third Amendment to Amended and Restated Security Agreement and Promissory Note, dated as of July 17, 2017), (b) that certain Consent dated as of July 17, 2017 among the Borrower, CAT and Agent and (c) any other instruments, UCC filings or certificates delivered in connection with the transactions contemplated by the foregoing or executed in connection with the Restructuring, in the case of each of clauses (a) through (c), as in effect on the date hereof.

"Change in Law" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Official Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of Law) by any Official Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of Law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

"Change of Control" shall mean the occurrence of any of the following:

4

DEBTORSLCC_105711

(a)    (i) neither (x) the Permitted Holders - Hoops nor (y) the Permitted Holders – LR individually (A) own, directly or indirectly, more than 50% of the Equity Interests of Holdings or (B) have the power to vote, or direct the voting of, more than 50% of the Equity Interests of Holdings or (ii) any Person other than a Permitted Holder (A) owns, directly or indirectly, more of the Equity Interests of Holdings than Permitted Holders – Hoops or Permitted Holders – LR or (B) has the power to vote, or direct the voting of, more of the Equity Interests of Holdings than Permitted Holders – Hoops or Permitted Holders – LR;

(b)    Holdings at any time (i) ceases to own directly 100% of the Equity Interests of the Borrower or (ii) ceases to have the power to vote, or direct the voting of, 100% of the Equity Interests of the Borrower;

(c)    the Borrower at any time (i) ceases to own, directly or indirectly, 100% of the Equity Interests of each of its Subsidiaries or (ii) ceases to have, directly or indirectly, the power to vote, or direct the voting of, any such Equity Interests; or

(d)    a "Change of Control" (howsoever defined) under an Existing Debt Document shall have occurred.

"Claim" shall have the meaning specified in Section 11.08(f)(ii).

"Closing Date" shall mean the date on which the conditions precedent specified in Section 7.01 are satisfied (or waived in accordance with Section 11.01).

"Coal Act" shall mean the Coal Industry Retiree Health Benefits Act of 1992, as amended.

"Collateral" shall mean all of the "Collateral", "Mortgaged Property" and "Trust Property" as defined in any Collateral Document and all other assets that become subject to the Liens created by the Collateral Documents from time to time.

"Collateral Documents" shall mean, collectively, the Security Agreement, the Mortgages, the Patent, Trademark and Copyright Security Agreements, the Control Agreements and each other agreement or instrument providing for, evidencing or perfecting (or purporting to evidence or perfect) a security interest in or Lien on the Collateral in favor of the Agent for the benefit of the Secured Parties.

"Commitment" as to any Lender, shall mean the obligation of such Lender, if any, to make a Loan to the Borrower on the Closing Date in a principal amount not exceeding the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.01(C). As of the Closing Date, the aggregate amount of the Commitments is $34,000,000.

"Compliance Certificate" shall have the meaning specified in Section 8.03(c).

"Consolidated EBITDA" shall mean, with respect to the Borrower and its Subsidiaries for any period, Consolidated Net Income for such period:

(a)    increased by, to the extent deducted in computing Consolidated Net Income for such period (without duplication):

(i)    Interest Expense; *plus*

(ii)    provisions for taxes based on income, profits or capital; *plus*

5

DEBTORSLCC_105712

(iii)    total depreciation expense; *plus*

(iv)    total amortization expense; *plus*

(v)    transaction costs, fees and expenses incurred in connection with the Transactions not to exceed in the aggregate during the term of this Agreement, when combined with any amounts included in the calculation of Consolidated EBITDA pursuant to clause (vi) immediately below during the term of this Agreement, $1,500,000; *plus*

(vi)    non-recurring restructuring, reorganization and integration expenses (excluding severance expense) incurred in connection with the Restructuring not to exceed in the aggregate during the term of this Agreement, when combined with any amounts included in the calculation of Consolidated EBITDA pursuant to clause (v) immediately above during the term of this Agreement, $1,500,000; *plus*

(vii)    all other non-cash charges or expenses, including any write-offs and writedowns, reducing Consolidated Net Income for such period (excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period); and

(b)    decreased by, to the extent included in computing Consolidated Net Income for such period (without duplication), all non-cash gains increasing Consolidated Net Income for such period (excluding any such non-cash gains on items to the extent representing the reversal of an accrual or reserve for a potential cash charge in any prior period).

Notwithstanding the foregoing, for purposes of determining Total Leverage Ratio, (i) Consolidated EBITDA for the four-fiscal quarter period ending September 30, 2017 shall be deemed to be Consolidated EBITDA for the fiscal quarter ending September 30, 2017, multiplied by four, (ii) Consolidated EBITDA for the four fiscal quarter period ending December 31, 2017 shall be deemed to be Consolidated EBITDA for the two consecutive fiscal quarters ending December 31, 2017, multiplied by two, and (iii) Consolidated EBITDA for the four fiscal quarter period ending March 31, 2018 shall be deemed to be Consolidated EBITDA for the three consecutive fiscal quarters ended March 31, 2018, multiplied by 4/3, respectively.

For purposes of calculating Consolidated EBITDA for any period, if at any time during such period the Borrower or any Subsidiary shall have made any Material Disposition or Material Acquisition, Consolidated EBITDA for such period shall be calculated giving pro forma effect thereto as if such Material Disposition or Material Acquisition had occurred on the first day of such period (such pro forma effect to be determined without giving effect to any anticipated or proposed change in operations, revenues, expenses or other items included in the calculation of Consolidated EBITDA, except with the consent of the Agent), and such pro forma effect shall be determined in a manner otherwise acceptable to the Agent and with supporting documentation acceptable to the Agent. It is understood that, with respect to any Material Acquisition or Material Disposition occurring prior to March 31, 2018, the pro forma effect given to such Material Acquisition or Material Disposition shall be subject to the annualization mechanics set forth in the preceding paragraph.

"Consolidated Net Income" shall mean, with respect to the Borrower and its Subsidiaries for any period, the aggregate of the net income (loss) of the Borrower and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that the following shall be excluded from such net income (to the extent otherwise included therein): (a) all extraordinary, unusual or non-recurring gains, losses, charges or expenses, (b) the income (or deficit) of any Person (other than a

DEBTORSLCC_105713

Subsidiary) in which the Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation, including any Governing Document, or any Law applicable to such Subsidiary, (d) all gains or losses realized in connection with the early extinguishment of Debt, on an after tax basis, (e) any income or loss from disposed or discontinued operations and any net after tax gains or losses on disposed or discontinued operations and (f) non-cash gains and losses attributable to the mark-to-market valuation of Hedging Transactions permitted pursuant to Section 8.02(a) (including the application of FASB ASC Topic 815 relating thereto); provided, notwithstanding clauses (a) and (e), any gains from the Disposition of the Flint Ridge Assets shall be included in such net income.

"Contamination" shall mean the Release of Regulated Substances in, on, under or emanating to or from any real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party.

"Contractual Obligation" shall mean as to any Person, any provisions of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" shall mean, with respect to any deposit account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Agent and the Required Lenders, among the Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable Uniform Commercial Code) over such account (and all assets on deposit therein or credited thereto) to the Agent, for the benefit of the Secured Parties.

"Conversion/Continuation Notice" shall have the meaning assigned to that term in Section 2.04.

"Cure Notice" shall have the meaning specified in Section 8.04(d)(i).

"Daniels Debt" shall mean any Debt of the Borrower or any of its Subsidiaries incurred under the Daniels Financing Documents.

"Daniels Financing Documents" shall mean the definitive agreements entered into between the Borrower and the Daniels Company providing for the financing and construction of the Daniels Plant. Concurrently with the effectiveness of the Daniels Financing Documents in accordance with the terms thereof, the (a) Daniels Financing Documents shall constitute Existing Debt Documents, (b) Daniels Debt shall constitute Existing Debt except for purposes of Section 8.02(a) of this Agreement and (c) first-priority Liens on the Daniels Plant, including access to and from the Daniels Plant, and only the Daniels Plant securing the Daniels Debt shall constitute Permitted Prior Liens.

"Daniels Plant" shall mean that certain clean coal processing plant to be located in Whitewood, VA and built by the Daniels Company pursuant to the Daniels Financing Documents.

"Debt" shall mean for any Person as of any date of determination the sum, without duplication, of the following: (a) all indebtedness for borrowed money (including, without limitation, all subordinated indebtedness), (b) all obligations of such Person evidenced by notes, bonds, debentures, drafts or other similar instruments representing extensions of credit whether or not representing obligations for borrowed money and all amounts raised under any note purchase or acceptance credit facility, (c) all indebtedness

DEBTORSLCC_105714

in respect of any other transaction (including Mining Financial Assurances, production payments, installment purchase agreements, forward sale or purchase agreements, receivables financings and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements, including any earn-out obligation and other obligations owed for all or any part of the deferred purchase price of property or services (excluding (i) any earn-out obligations incurred in connection with acquisitions permitted hereunder until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (ii) trade accounts payable in the ordinary course of business that are not overdue by more than 120 days, unless being contested in good faith and for which adequate reserves have been taken in accordance with GAAP), (d) the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings (including any letter of credit in respect of Mining Financial Assurances), (e) all Capital Lease Obligations, (f) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction or other Hedging Transaction, whether entered into for hedging or speculative purposes or otherwise, (g) all indebtedness secured by any Lien on any property or asset owned or held by such Person regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of that Person (but limited to the lesser of (i) the face amount of such indebtedness and (ii) the greater of (A) the value of such property securing such indebtedness and (B) the maximum amount for which such Person can be liable under such indebtedness), (h) all obligations of such Person under take/ship or pay or similar contracts if any goods or services are not actually received or utilized by such Person; provided that any amounts in respect of the MR Coal Agreement as in effect on the date hereof shall be excluded from this clause (h), and (i) the amount of all indebtedness (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) in respect of all Guaranties by such Person (the "Guarantying Person") of Debt described in clauses (a) through (g) above of other Persons (each such other Person being a "Primary Obligor" and the obligations of a Primary Obligor which are subject to a Guaranty by a Guarantying Person being "Primary Obligations") (it being understood that if the Primary Obligations of the Primary Obligor do not constitute Debt, then the Guaranty by the Guarantying Person of the Primary Obligations of the Primary Obligor shall not constitute Debt).

"Debtor Relief Laws" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean any event or condition which with notice or passage of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to pay over to the Agent or any Lender any amount required to be paid by it hereunder, (b) has, or has a direct or indirect parent company that has, become the subject of a Bankruptcy Event or a Bail-In Action, or (c) has failed at any time to comply with the provisions of Section 5.03 with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its Ratable Share of such payments due and payable to all of the Lenders; provided that, for the avoidance of doubt, a Lender shall not be a Defaulting Lender solely by virtue of (i) the ownership or acquisition of any equity interest in such Lender by an Official Body or an instrumentality thereof, or (ii) in the case of a solvent Lender, the precautionary appointment of an administrator, guardian, custodian or other similar official by an Official Body or instrumentality thereof under or based on the law of the country where such Lender is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed, in any such case where such action does not result in or provide such Lender with immunity from the

8

jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Official Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

As used in this definition, the term "Bankruptcy Event" shall mean, with respect to any Person, such Person or such Person's direct or indirect parent company becomes the subject of a Bankruptcy Proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Agent (acting at the direction of the Required Lenders), has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by an Official Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Official Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Disposition" shall mean, with respect to assets of any Person, a sale, transfer, lease or other disposition of property or any casualty or condemnation event of such assets.

"Dollar, Dollars, U.S. Dollars and the symbol $" shall mean lawful money of the United States of America.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Health and Safety Claim" shall mean any administrative, regulatory or judicial action, suit, claim, written notice of non-compliance or violation, written notice of liability or potential liability, or proceeding pursuant to or otherwise relating in any way to any Environmental Health and Safety Laws, any Environmental Health and Safety Permit, any Regulated Substances, any Contamination, or the performance of any Remedial Action, including, without limitation, any written notice or complaint by any Person or Official Body setting forth allegations relating to or a cause of action arising under any Environmental Health and Safety Laws for personal injury or property damage, natural resource damage, contribution or indemnity for the costs associated with the performance of a Remedial Action, civil or administrative penalties, criminal fines or penalties, or declaratory or equitable relief arising under any Environmental Health and Safety Laws or any order, notice of violation, citation, subpoena, request for information or other written notice or demand of any type issued by an Official Body pursuant to any Environmental Health and Safety Laws.

DEBTORSLCC_105716

"Environmental Health and Safety Laws" shall mean, collectively, any federal, state, local or foreign statute, Law, code, consent decree, settlement agreement, legally binding directive or any legally binding judicial ruling, in each case regulating: (a) pollution or pollution control; (b) protection of human health from exposure to Regulated Substances; (c) protection of natural resources or the environment; (d) employee safety in the workplace with regard to Regulated Substances and the protection of employees from exposure to Regulated Substances in the workplace (but excluding workers compensation and wage and hour laws); (e) the use, management, generation, treatment, recycling, labeling, transport, storage, disposal Release or threatened Release of Regulated Substances; (f) Contamination or Remedial Actions; (g) the protection of endangered or threatened species; and/or (h) the protection of Environmentally Sensitive Areas. Environmental Health and Safety Laws include, but are not limited to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 to 136y, the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., the Atomic Energy Act, 42 U.S.C. § 2011 et seq., the National Historic Preservation Act, 16 U.S.C. § 470 et seq., the Endangered Species Act, 16 U.S.C. § 1531 et seq., the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1287, each as amended, or any equivalent state or local statute, and any amendments thereto.

"Environmental Health and Safety Orders" shall mean all decrees, orders, legally binding directives, judgments, opinions, rulings, writs, injunctions, settlement agreements or consent orders issued by or entered into with an Official Body relating or pertaining to Contamination, Environmental Health and Safety Laws, Environmental Health and Safety Permits, Regulated Substances or Remedial Actions.

"Environmental Health and Safety Permit" shall mean any applicable Permit required under any of the Environmental Health and Safety Laws.

"Environmentally Sensitive Area" shall mean (a) any wetland as defined by applicable Environmental Health and Safety Laws; (b) any area designated as a coastal zone pursuant to applicable Environmental Health and Safety Laws; (c) any area of historic or archeological significance or scenic area as defined or designated by applicable Environmental Health and Safety Laws; (d) habitats of endangered species or threatened species as designated by applicable Environmental Health and Safety Laws; (e) a floodplain or other flood hazard area as defined pursuant to any applicable Environmental Health and Safety Laws; (f) streams, rivers or other water bodies or springs classified, or designated or as otherwise protected by applicable Environmental Health and Safety Laws as a fishery, as having exceptional or high quality or value or as having recreational use; (g) any area classified, designated or protected by applicable Environmental Health and Safety Laws as unsuitable for mining; and (h) any man-made or naturally occurring surface feature classified, designated or protected by applicable Environmental Health and Safety Laws from disturbance, the effects of blasting, subsidence and mining operations.

"Equity Cure" shall have the meaning specified in Section 8.04(d).

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

10

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"ERISA Group" shall mean, at any time, the Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control or treated as a single employer with the Borrower or any of its Subsidiaries under Section 414(b) or (c) of the Internal Revenue Code (or Section 414(m) or (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Code) or Section 4001(a)(14) of ERISA.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall mean any of the events described in Article 9.

"Excluded Accounts" shall have the meaning specified in Section 8.01(n)(iii).

"Excluded Property" shall mean:

(a) assets with respect to which any pledge thereof or security interests therein would be prohibited by Law, except to the extent such prohibition is would be ineffective or rendered unenforceable under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable Law (including other provisions of the UCC, any Debtor Relief Law or principle of equity),

(b) any intent-to-use trademark applications prior to the filing, and acceptance by the United States Patent and Trademark Office, of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, if any, to the extent that, and solely during the period in which, the grant of a security interest therein prior to such filing and acceptance would impair the validity or enforceability of such intent-to-use trademark applications or the resulting trademark registrations under applicable federal law,

(c) each lease to which a Loan Party is a party set forth on Schedule 1.01(E), to the extent that, and only for so long as, the grant of a Lien upon such Loan Party's rights therein under any of the Collateral Documents constitutes a breach under such lease that would result in the termination of such lease; provided, however, that this clause (c) shall not apply to the extent any term or provision giving rise to such breach is or would be ineffective or rendered unenforceable under Sections 9-406, 9-407 or 9-409 of the UCC of any relevant jurisdiction or any other applicable Law (including other provisions of the UCC, any Debtor Relief Law or principle of equity); provided, further, that such lease will be Excluded Property only to the extent and for so long as the consequences specified above exist directly as a result of a grant of a Lien upon such Loan Party's rights therein under the Collateral Documents; provided, further, that (i) the Loan Parties shall have used, or shall be using, commercially reasonable efforts to obtain such consent or waiver as may be necessary to grant such a Lien and (ii) such lease will cease to be Excluded Property and will become subject to the Lien granted under the Loan Documents, immediately and automatically, at such time as such consent or waiver is obtained or such consequences will no longer result from the grant of a Lien upon the applicable Loan Party's rights therein;

(d) any equipment or other asset owned by a Loan Party that is subject to a Lien in existence on the date hereof created pursuant to the CAT Financing Documents, including any identifiable cash proceeds thereof; provided that any such equipment or other assets will cease to be Excluded Property and will become subject to the Lien granted under the Loan Documents, immediately and automatically, at

11

such time the Existing Debt secured by such CAT Financing Documents has been paid in full and such Liens have been released;

(e) for the period from the Closing Date to 25 calendar days after the Closing Date (and only such period), any asset owned by a Loan Party that is subject to a Lien in existence on the date hereof created pursuant to the United Financing Documents (or any instruments executed in connection therewith); provided that that any such assets will cease to be Excluded Property and will become subject to the Lien granted under the Loan Documents, immediately and automatically, upon the earliest of (i) for avoidance of doubt, 25 calendar days after the Closing Date and (ii) at such time the Existing Debt secured by such United Financing Documents has been paid in full and such Liens have been released;

(f) for the period from the Closing Date to 25 calendar days after the Closing Date (and only such period), any asset owned by a Loan Party that is subject to a Lien in existence on the date hereof created pursuant to the MR Security Agreements (or any instruments executed in connection therewith); provided that that any such assets will cease to be Excluded Property and will become subject to the Lien granted under the Loan Documents, immediately and automatically, upon the earlier of (i) for avoidance of doubt, 25 calendar days after the Closing Date and (ii) at such time the Existing Debt secured by the MR Security Agreements has been paid in full and such Liens have been released; and

(g) those assets as to which, in the reasonable discretion of the Agent, the taking of Liens thereupon is impractical, would exceed the value of such Liens or is otherwise commercially unreasonable;

provided that in no event shall "Excluded Property" include, or be deemed to include, any proceeds, products, substitutions or replacements of Excluded Property specified in clauses (a) through (g) of this definition unless such proceeds or substitutions would otherwise constitute Excluded Property.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 5.06(c)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 5.09(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Debt" shall mean all Debt and related payment obligations of the Borrower and its Subsidiaries outstanding under the Existing Debt Documents.

"Existing Debt Consents" shall mean those agreements listed on Schedule 6.11.

"Existing Debt Documents" shall mean the documents listed on Schedule 1.01(E-2).

12

"Extended Make-Whole Period" shall mean, in the event the Borrower elects to extend the initial Stated Maturity Date pursuant to Section 2.07, the period from the initial Stated Maturity Date to the extended Stated Maturity Date.

"Extension Fee" shall mean an extension fee equal to 300 basis points (3.00%) of the aggregate principal amount of Loans outstanding on the date the Extension Request is made by the Borrower.

"Extension Request" shall mean a written request by the Borrower substantially in the form attached hereto as Exhibit 1.01(E) to extend the initial Stated Maturity Date for an additional period of no greater than six (6) months.

"Extraordinary Receipts" shall mean the cash proceeds, net of any customary out-of-pocket cash costs, fees and expenses paid or required to be paid in connection therewith, of any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business consisting of (a) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (b) indemnity payments, (c) tax refunds, (d) any purchase price adjustment (other than a working capital adjustment) received in connection with any purchase agreement and (e) any other extraordinary receipt; provided that in connection with any sale, transfer, lease or other disposition of property or any casualty or condemnation event of Revelation and its Subsidiaries that results in Extraordinary Receipts to a Loan Party, such Extraordinary Receipts shall be net of (i) the customary out-of-pocket cash costs, fees and expenses paid or required to be paid in connection therewith (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) taxes paid or reasonably estimated by Revelation or its Subsidiaries to be payable as a result thereof and (iii) any amount required to be paid or prepaid on Existing Debt secured by Permitted Prior Liens (including, without limitation, the requirement to pay a percentage of excess cash flow under the CAT Financing Documents as in effect on the date hereof).  It is understood and agreed that any cash payments received by the Borrower under the Purchase and Sale Agreement or the Transition Services Agreement, in either case, representing the net cash proceeds received by Revelation as consideration for the disposition of the Flint Ridge Assets shall not constitute Extraordinary Receipts except to the extent that such cash payments exceed $7,000,000.

"FATCA" shall mean Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code as of the date of this Agreement (or any amended or successor version of such section that is described above), any intergovernmental agreement entered into in connection with any of the foregoing and any law, rule, regulation or other official written practice implementing such intergovernmental agreement.

"FCPA" shall have the meaning specified in Section 6.23.

"Federal Funds Effective Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged by three federal funds brokers of recognized standing selected by the Agent in consultation with the Borrower to major banks on such day on such transactions as determined by the Agent in a commercially reasonable manner.

13

"Flint Ridge Assets" shall mean the assets to be disposed of by Revelation and Revelation Flint Ridge, LLC pursuant to the Flint Ridge Purchase Agreement.

"Flint Ridge Purchase Agreement" shall mean that certain Stock and Asset Purchase Agreement by and between Appalachia Carbon Energy, L.L.C., as purchaser and Revelation, as seller.

"Flood Laws" shall mean (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Funding Notice" shall have the meaning specified in Section 2.02(a).

"GAAP" shall mean generally accepted accounting principles as are in effect from time to time, subject to the provisions of Section 1.03, and applied on a consistent basis both as to classification of items and amounts.

"General Cash Account" shall mean that certain deposit account located at United Bank, Inc. with the account number 87767953.

"Governing Document" shall mean any operating agreement, shareholders agreement, subscription agreement or similar agreement related to Holdings.

"Guarantor" shall mean at any time each of (a) Holdings and (b) each of the Subsidiaries of the Borrower that is party to the Guaranty Agreement on the Closing Date or, after the Closing Date, delivers a Guarantor Joinder in accordance with Section 8.01(j)(ii).

"Guarantor Joinder" shall mean a joinder by a Person as a Guarantor under the Loan Documents in the form attached to the Guaranty Agreement as Exhibit A thereto.

"Guaranty" of any Person shall mean any obligation of such Person guarantying or in effect guarantying any liability or obligation of any other Person in any manner, whether directly or indirectly, including any such liability arising by virtue of partnership agreements, including any agreement to indemnify or hold harmless any other Person, any performance bond or other suretyship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

"Guaranty Agreement" shall mean the continuing Guaranty Agreement in substantially the form of Exhibit 1.01(G) executed and delivered by each of the Guarantors for the benefit of the Agent and the other Secured Parties, as the same may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"Hedging Transaction" shall mean any of the following transactions by the Borrower or any of its Subsidiaries: any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, forward purchase or sale of a commodity, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency

DEBTORSLCC_105721

option or any other similar transaction, including, without limitation, any combination of the foregoing transactions.

"Historical Statements" shall have the meaning assigned to that term in Section 6.07(a).

"Holdings" shall have the meaning specified in the introductory paragraph hereto.

"Hoops Note" shall mean that certain Amended and Restated Secured Note, dated as of July 10, 2017, made by Revelation and assumed by the Borrower in favor of Jeffery Hoops in the maximum principal amount of $9,000,000.

"Income Tax Regulations" shall mean those regulations promulgated pursuant to the Internal Revenue Code.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning specified in Section 11.03(b).

"Information" shall mean all information received from the Loan Parties or any of their Subsidiaries relating to the Loan Parties or any of such Subsidiaries or any of their respective businesses, other than any such information that is available to the Agent or any Lender on a non-confidential basis other than by disclosure by the Loan Parties or any of their Subsidiaries.

"Initial Make-Whole Period" shall mean the period from the Closing Date to the date that is six (6) months after the Closing Date.

"Interest Expense" shall mean, with respect to any specified Person for any period, the sum, without duplication, of:

(a)     the consolidated interest expense of such Person and its Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of all payments associated with Capital Lease Obligations, and fees and charges incurred in respect of letter of credit or bankers' acceptance financings; *plus*

(b)     the consolidated interest expense of such Person and its Subsidiaries that was capitalized during such period.

"Interest Payment Date" shall mean, (a) with respect to interest on Loans to which the Base Rate Option applies, (i) the first Business Day of each calendar quarter after the date hereof and (ii) on the Termination Date and, (b) with respect to interest on Loans to which the LIBOR Rate Option applies, (i) the last day of each Interest Period for those Loans, and (ii) on the Termination Date.

"Interest Period" shall mean, in the case of Loans which bear interest under the LIBOR Rate Option, the period commencing on the date such LIBOR Rate Loan is disbursed or converted to or continued as a LIBOR Rate Loan and ending on the date one, two or three months thereafter, as selected by the Borrower in its Funding Notice or Conversion/Continuation Notice, as applicable; provided that (a) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a LIBOR Rate Loan, such Business Day falls in

15

DEBTORSLCC_105722

another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period, and (c) no Interest Period shall extend beyond the Stated Maturity Date.

"Interest Rate Option" shall mean any LIBOR Rate Option or Base Rate Option.

"Interim Statements" shall have the meaning specified in Section 6.07(a).

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Investments" shall mean, with respect to any Person, the following: (a) the purchase or other acquisition of Equity Interests or Debt or other securities of any other Person, including any partnership or joint venture interest in such other Person, and investments or contributions in or to the capital of such other Person, (b) loans, advances or capital contributions to any other Person, (c) any Guaranty directly or indirectly of the Debt or of the other obligations of any other Person, or any assumption of Debt of such other Person, and (d) the purchase or other acquisition (in one transaction or a series of transactions) of the property and assets (in an amount which is material to the Loan Parties taken as a whole) or business of another Person or assets constituting a business unit, line of business or division of such other Person. If the nature of an Investment is tangible property then the amount of such Investment shall be determined by valuing such property at fair market value.

"IRS" shall mean the Internal Revenue Service.

"Labor Contracts" shall mean all employment agreements, employment contracts, collective bargaining agreements and other agreements between or among any Loan Party or Subsidiary of a Loan Party and its employee(s).

"Law" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance that is legally binding, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Official Body, foreign or domestic.

"Lenders" shall mean the entities named on Schedule 1.01(C) (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Loans.

"Lending Office" shall mean, as to any Lender, the office or offices of such Lender described as such in such Lender's administrative questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Leverage Ratio Test" shall have the meaning specified in Section 8.04(d).

"LIBOR Rate" shall mean, with respect to Loans comprising any Borrowing Tranche to which the LIBOR Rate Option applies for any Interest Period, the rate per annum equal to (a) the Intercontinental Exchange Benchmark Administration Ltd. LIBOR Rate ("ICE LIBOR"), as published by Reuters (or such other commercially available source providing quotations of ICE LIBOR as may be designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business

16

Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (b) if such rate is not available at such time for any reason, the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered by a bank selected by the Agent in consultation with the Borrower to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; provided that in no event shall the LIBOR Rate for any Loans be less than 1.00%.

"LIBOR Rate Option" shall mean the option of the Borrower to have Loans bear interest at the rate and under the terms set forth in Section 4.01(b).

"Lien" shall mean any mortgage, deed of trust, deed to secure debt, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security, but, for the avoidance of doubt, the term "Lien" shall not include any operating lease.

"Lime Rock" shall mean LR-Revelation Holdings, L.P., a limited partnership organized under the laws of the state of Delaware.

"Liquidity" shall mean the sum of (a) the amount of Permitted Investments of the Borrower and its Subsidiaries to the extent that the use of such Permitted Investments for application to payment of the Obligations or other Debt is not prohibited by Law or any contract or other agreement, including Governing Documents, and such Permitted Investments are subject to a Control Agreement in favor of the Agent or held in an account of the Borrower or any of its Subsidiaries that is not required to be subject to a Control Agreement (provided that, prior to the expiration of the period set forth in Section 8.01(n)(iii) and any extensions consented to in accordance with the terms hereof, no Permitted Investments of the Borrower and its Subsidiaries shall be excluded in this clause (a) from counting toward the calculation of Liquidity by virtue of not being subject to a Control Agreement) and is otherwise free and clear of all other Liens (other than non-consensual Liens arising by operation of law and customary banker's liens and rights of setoff in favor of the applicable depositary institution) plus (b) any unused commitments that are available to be drawn by the Borrower pursuant to the terms of the United Revolving Facility.

"Loan Documents" shall mean this Agreement, the Notes, the Collateral Documents, the Guaranty Agreement, each Guarantor Joinder, the Consents and Agreements, the Perfection Certificate, and any other instruments, certificates or documents (including, without limitation, collateral access agreements, landlord waivers, bailee letters, collateral assignments, subordination agreements and intercreditor agreements) delivered or contemplated to be delivered hereunder or thereunder or in connection herewith or therewith, and each additional instrument, certificate, document, letter or agreement designated pursuant to its terms as a "Loan Document" (including any such instrument, certificate, document, letter or agreement entered into by any Affiliate of a Loan Party), in each case, as the same may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"Loan Parties" shall mean the Borrower and the Guarantors.

"Loans" shall have the meaning specified in Section 2.01.

17

"<u>Lone Mountain Acquisition</u>" shall mean that certain transaction evidenced by a Unit Purchase Agreement to be entered into after the date hereof (together with the schedules and exhibits thereto, the "<u>Lone Mountain Purchase Agreement</u>"), by and between Revelation, as purchaser, and Arch Coal, Inc., a Delaware corporation, as seller, Lone Mountain Processing LLC, a Delaware limited liability company, Powell Mountain Energy, LLC, a Delaware limited liability company, and Cumberland River Coal, LLC, a Delaware limited liability company, the Borrower will purchase 100% of the Equity Interests of Lone Mountain Processing LLC, Powell Mountain Energy, LLC and Cumberland River Coal, LLC, including all of the assets set forth on <u>Schedule 1.01(L)</u> and liabilities in an aggregate amount not to exceed $20,000,000.

"<u>Lone Mountain Closing Certificate</u>" has the meaning specified in <u>Section 8.02(m)(xiii)</u>.

"<u>Lone Mountain Closing Conditions</u>" has the meaning specified in <u>Section 8.02(m)(xiii)</u>.

"<u>Lone Mountain Closing Deadline</u>" has the meaning specified in <u>Section 8.02(m)(xiii)</u>.

"<u>Lone Mountain Documentation</u>" shall mean the Lone Mountain Purchase Agreement and related documents (including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof.

"<u>Lone Mountain Blocked Account</u>" shall mean that certain deposit account located at United Bank, Inc. with the account number 85733238.

"<u>Loan Mountain Blocked Amount</u>" shall mean $8,000,000.

"<u>Lone Mountain Loan Amount</u>" shall mean the Loan Mountain Blocked Amount <u>divided</u> by 0.975.

"<u>Lone Mountain Purchase Agreement</u>" has the meaning specified in the definition of Lone Mountain Acquisition.

"<u>Lone Mountain Signing Condition</u>" has the meaning specified in <u>Section 8.02(m)(xiii)</u>.

"<u>Lone Mountain Signing Deadline</u>" has the meaning specified in <u>Section 8.02(m)(xiii)</u>.

"<u>LR Note</u>" shall mean that certain Amended and Restated Secured Note, dated as of July 10, 2017, made by Revelation and assumed by the Borrower in connection with the Restructuring in favor of Lime Rock in the maximum principal amount of $3,000,000.

"<u>Make-Whole Premium</u>" with respect to any Loan on any date of prepayment, repayment, refinancing, replacement, purchase, or mandatory assignment shall mean the present value (computed at the date of prepayment, repayment, refinancing, replacement, purchase or mandatory assignment at a discount rate equal to the Treasury Rate plus 0.50%), as determined by the Lenders, of all required interest payments due on such Loan from the date of prepayment, repayment, refinancing, replacement, purchase or mandatory assignment through and including the Make-Whole Termination Date, assuming that all such interest accrues at the LIBOR Rate for a three-month Interest Period in effect as of the first Business Day prior to the date of such prepayment, repayment, refinancing, replacement, purchase or mandatory assignment plus the Applicable Margin.

18

"Make-Whole Period" shall mean the Initial Make-Whole Period and, in the event the Borrower elects to extend the initial Stated Maturity Date pursuant to Section 2.07, the Extended Make-Whole Period.  For the avoidance of doubt, the Make-Whole Period shall not include the period from the date that is six (6) months after the Closing Date to the initial Stated Maturity Date.

"Make-Whole Termination Date" shall mean (a) in the case of any prepayment, repayment, refinancing, replacement, purchase or mandatory assignment occurring during the Initial Make-Whole Period, the date that is six (6) months after the Closing Date and (b) in the case of any prepayment, repayment, refinancing, replacement, purchase or mandatory assignment occurring during the Extended Make-Whole Period, the extended Stated Maturity Date.

"Material Acquisition" means any acquisition of property or series of related acquisitions of property (including by way of merger or consolidation) that involves the payment by the Borrower or any Subsidiary of consideration in excess of $1,000,000.

"Material Adverse Change" shall mean any circumstance or event (or set of circumstances or events) which (a) has a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement or any other Loan Document, (b) results in a change that is materially adverse to the business, properties, assets or condition (financial or otherwise) of the Loan Parties, taken as a whole, (c) materially impairs the ability of the Loan Parties, taken as a whole, to perform their respective obligations under the Loan Documents or (d) impairs materially the ability of the Agent or any of the Lenders to exercise or enforce any of their rights or remedies under this Agreement or any other Loan Document.

"Material Disposition" means any sale, transfer or disposition of property or series of related sales, transfers, or dispositions of property that involves the receipt by the Borrower or any Subsidiary of consideration in excess of $1,000,000.

"Mining Claim" shall mean any administrative, regulatory or judicial action, suit, claim, written notice of non-compliance or violation, written notice of liability or potential liability, or proceeding pursuant to or otherwise relating in any way to any Mining Law, Reclamation Law, or Mining Permit, civil or administrative penalties, criminal fines or penalties, or declaratory or equitable relief arising under any Mining Laws or Reclamation Laws or any order, notice of violation, citation, subpoena, request for information or other written notice or demand of any type issued by an Official Body pursuant to any such Laws.

"Mining Financial Assurances" shall mean all performance bonds, surety bonds, reclamation bonds, payments or prepayments, guarantees, letters of credit, certificates of deposit, cash or other sums or assets required to be posted by any Official Body under any Mining Law or Reclamation Law in the amounts and forms required thereunder with respect to any mine or other Real Property owned by the Loan Parties and their respective Subsidiaries, or otherwise required to be maintained by the Loan Parties or any of their respective Subsidiaries under any Environmental Health and Safety Law or any Contractual Obligation.

"Mining Laws" shall mean any and all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to mining operations and activities, or oil, natural gas, minerals, and other hydrocarbons and their constituents production operations and activities. Mining Laws shall include but not be limited to, the Mineral Lands Leasing Act of 1920, the Federal Coal Leasing Amendments Act, the Surface Mining Control and Reclamation Act, all other land reclamation and use statutes and regulations relating to Coal

19

DEBTORSLCC_105726

mining, the Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, the Mine Safety and Health Act and the Occupational Safety and Health Act, each as amended, and their state and local counterparts or equivalents.

"Mining Operations" shall mean: (a) the removal of coal and other minerals from the natural deposits or from waste or stock piles by any surface or underground mining methods; (b) operations or activities conducted underground or on the surface associated with or incident to the preparation, development, operation, maintenance, opening and reopening of an underground or surface mine, storage or stockpiling of mined materials, backfilling, sealing and other closure procedures related to a mine or the movement, assembly, disassembly or staging of any mining equipment; (c) milling; (d) coal preparation, coal processing or testing; (e) coal refuse disposal, coal fines disposal or the operation and maintenance of impoundments; (f) the operation of any mine drainage system; (g) reclamation activities and operations; (h) the operation of coal terminals, river or rail load-outs or any other transportation facilities; and (i) activities related to (i) securing Permits to facilitate mining and/or (ii) complying with Mining Permits.

"Mining Orders" shall mean all decrees, orders, legally binding directives, guidance, judgments, rulings, writs, injunctions, settlement agreements or consent orders issued by or entered into with an Official Body relating or pertaining to Mining Laws, Reclamation Laws, or Mining Permits.

"Mining Permit" shall mean any applicable Permit required under any of the Mining Laws or Reclamation Laws.

"Mining Title" shall mean fee simple title to surface and/or coal or an undivided interest in fee simple title thereto or a leasehold interest in all or an undivided interest in surface and/or coal together with no less than those real property, easements, licenses, permits, privileges, rights and appurtenances as are necessary to mine, remove, process and transport coal in the manner presently operated.

"Month" with respect to an Interest Period under the LIBOR Rate Option, shall mean the interval between the days in consecutive calendar months numerically corresponding to the first day of such Interest Period. If any LIBOR Rate Interest Period begins on a day of a calendar month for which there is no numerically corresponding day in the month in which such Interest Period is to end, the final month of such Interest Period shall be deemed to end on the last Business Day of such final month.

"Moody's" shall mean Moody's Investors Service, Inc., and its successors.

"Mortgage" shall mean each of the fee and leasehold mortgages, deeds of trust, deeds to secure debt, assignments of leases and rents and other security documents, in substantially the form of Exhibit 1.01(M) or in such other form reasonably satisfactory to the Agent, the Required Lenders and the Borrower, delivered on or after the Closing Date with respect to Real Property to be encumbered pursuant to the Loan Documents, as each may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"MR Coal" shall mean MR Coal Marketing & Trading, LLC, a Delaware limited liability company.

"MR Coal Agreement" shall mean that certain (a) Amended and Restated Master Coal Purchase and Sale Agreement, dated as of April 18, 2015, between MR Coal and the Borrower and (b) any other related agreements between the Borrower and MR Coal and/or Noble Americas Corp. to the extent, reflecting, or necessary to effectuate, the rights of the Borrower in connection with the arrangements under such coal purchase and sale agreement.

20

"MR Security Agreements" shall mean that certain (a) Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 18, 2015 by Revelation Energy, LLC in favor of MR Coal and Noble Americas Corp., (b) Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 18, 2015, by Revelation Energy, LLC in favor of MR Coal and Noble Americas Corp. and (c) Security Agreement dated as of April 18, 2015, by Revelation Energy, LLC in favor of MR Coal and Noble Americas Corp.

"MR Intercreditor Agreement" shall mean an intercreditor agreement between Agent, as second lien creditor and representative for the Lenders, MR Coal, Noble Americas Corp., a Delaware corporation and Borrower, as first lien creditor, with respect to certain assets owned by a Loan Party that are subject to a Lien in existence on the date hereof created pursuant to the MR Security Agreements (or any instruments executed in connection therewith).

"Multiemployer Plan" shall mean any employee benefit plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and to which the Borrower or any other member of the ERISA Group is then making or accruing an obligation to make contributions or, within the preceding five plan years, has made or had an obligation to make such contributions and to which it continues to have unsatisfied liability.

"Multiple Employer Plan" shall mean an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) which has two or more contributing sponsors (including the Borrower or any other member of the ERISA Group) at least two of whom are not under common control, as such a plan is described in Sections 4063 and 4064 of ERISA.

"Net Cash Proceeds" shall mean proceeds received after the Closing Date in cash from (a) any sale, transfer, lease or other disposition of property or any casualty or condemnation event, net of (i) the customary out-of-pocket cash costs, fees and expenses paid or required to be paid in connection therewith (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof and (iii) any amount required to be paid or prepaid on Existing Debt secured by Permitted Prior Liens or (b) any sale or issuance of Equity Interests or incurrence, issuance, offering or placement of Debt, in each case net of brokers', advisors' and investment banking fees and other customary out-of-pocket underwriting discounts, commissions and other customary out-of-pocket cash costs, fees and expenses, in each case incurred in connection with such transaction; provided that amounts provided as a reserve, in accordance with GAAP, against any liability under any indemnification obligations or purchase price adjustment associated with any of the foregoing shall not constitute Net Cash Proceeds except to the extent and at the time any such amounts are released from such reserve.

"Notes" shall mean, collectively, the promissory notes in the form of Exhibit 1.01(N) evidencing the Loans.

"NRP Leases" shall mean those leases set forth on Schedule 1.01(N).

"Obligations" shall mean all Debt, liabilities and other obligations owing from time to time by the Loan Parties, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, under or in connection with the Loans, the Notes, this Agreement or any other Loan Document, including, without limitation, all interest (including post-default interest), fees, penalties, indemnifications, premiums (including any applicable Make-Whole Premium) and other amounts that accrue after the commencement of any case or proceeding under any Debtor Relief Laws relating to the Borrower, any other Loan Party or any of their respective Subsidiaries whether or not such interest, fees or other amounts are allowed or allowable as a claim in such case or proceeding,

DEBTORSLCC_105728

and in each case whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance) and all renewals, extensions and/or rearrangements of any of the above.

"Official Body" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.06(c)).

"Participant" shall have the meaning specified in Section 11.08(d).

"Participant Register" shall have the meaning specified in Section 11.08(d).

"Patent, Trademark and Copyright Security Agreements" shall mean each patent security agreement, trademark security agreement and copyright security agreement, in substantially the form attached as exhibits to the Security Agreement, each as executed and delivered by the applicable Loan Parties in favor of the Agent, for the benefit of the Secured Parties, as the same may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"Payment in Full" or "Paid in Full" shall mean the payment in full in cash of the Loans and other Obligations (other than contingent indemnity obligations not then owing or as to which no claim has been asserted).

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Perfection Certificate" shall mean a perfection certificate in substantially the form attached hereto as Exhibit 1.01(P).

"Permit" shall mean any and all permits, approvals, licenses, registrations, consents, identification numbers, bonds, waivers or exemptions and any other authorization, in each case, from an Official Body having jurisdiction over the applicable activity.

"Permitted Capital Expenditures" shall mean any Capital Expenditure by the Borrower or any of its Subsidiaries that is made solely in respect of an Active Operating Property on which the Borrower or any of its Subsidiaries is actively engaged in Mining Operations.

"Permitted Holders" shall mean (a) Permitted Holders - Hoops and (b) Permitted Holders - LR.

22

DEBTORSLCC_105729

"Permitted Holders - Hoops" shall mean (a) Jeffrey Hoops, (b) any spouse of Jeffrey Hoops, (c) the lineal descendants and spouses of the lineal descendants of Jeffrey Hoops, (d) the estates or legal representatives of the Persons named in clauses (a) and (b), (d) trusts established for the benefit of any Person named in clauses (a), (b) or (c), and (e) entities of which more than 50% of the total voting power of all classes of voting stock then outstanding is owned directly or indirectly by the Persons named in clauses (a) through (d).

"Permitted Holders - LR" shall mean Lime Rock and any of its Affiliates (other than any portfolio company of Lime Rock or any of its Affiliates).

"Permitted Investments" shall mean:

(a)      cash;

(b)      securities with maturities of 12 months or less from the date of acquisition issued or directly and fully guaranteed or insured by the United States Government or any agency thereof;

(c)      certificates of deposit and time deposits with maturities of six months or less from the date of acquisition and overnight bank deposits of any Lender or of any commercial bank having capital and surplus in excess of $500,000,000;

(d)      securities with maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state of the United States, by any political subdivision or taxing authority of any such state, the securities of which state, political subdivision or taxing authority (as the case may be) are rated at least AA- by Standard & Poor's or Aa3 by Moody's; and

(e)      shares of money market mutual or similar funds which invest principally in assets satisfying the requirements of clauses (a) through (d) of this definition.

"Permitted Liens" shall mean:

(a)      Liens for taxes, assessments, or similar charges, incurred in the ordinary course of business and which are not yet delinquent or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves have been established in accordance with GAAP;

(b)      (i) pledges or deposits made in the ordinary course of business (not relating to Debt for borrowed money) to secure payment of worker's compensation, or to participate in any fund in connection with worker's compensation, unemployment insurance, old-age pensions or other social security programs, and (ii) pledges or deposits (not relating to Debt for borrowed money) not to exceed at any time an amount equal to the sum of (A) $4,000,000 and (B) $0.25 for each incremental ton of coal mined by the Borrower and its Subsidiaries relative to the coal mined on the Closing Date by the Borrower and its Subsidiaries to secure Mining Financial Assurances permitted under Section 8.02(a)(ii); provided that, both immediately before and after giving effect to such pledges or deposits described in this clause (ii), no Event of Default shall have occurred and be continuing or would result from such pledges or deposits;

(c)      Liens of mechanics, materialmen, warehousemen, carriers, or other like Liens, securing obligations incurred in the ordinary course of business that are not yet due and payable;

23

(d)     good-faith pledges or deposits made in the ordinary course of business (and not in connection with Debt) to secure performance of bids (including bonus bids), tenders, contracts or leases, not in excess of the aggregate amount due thereunder or other amounts as may be customary;

(e)     encumbrances consisting of zoning restrictions, easements or other restrictions on the use of real property, and minor defects or irregularities in title, none of which materially impairs the use or operation of such property in the ordinary course of business of the Loan Parties or the value thereof, and none of which is violated in any material respect by existing or proposed structures or land use;

(f)     Liens created pursuant to the Loan Documents;

(g)     statutory and common law banker's Liens and rights of setoff on bank deposits;

(h)     Liens arising out of final judgments, awards, or orders not otherwise constituting an Event of Default hereunder;

(i)     option agreements and rights of first refusal granted with respect to assets that are permitted to be disposed of pursuant to the terms of Section 8.02(c) or Section 8.02(d) of this Agreement;

(j)     precautionary filings under the Uniform Commercial Code by a lessor with respect to personal property leased to such Person under an operating lease;

(k)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(l)     any Lien on any property or asset of any Loan Party existing on the date hereof and set forth in Schedule 1.01(P); provided that (i) such Lien shall not apply to any other property or assets of any Loan Party and (ii) such Lien shall secure only those obligations which it secured on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(m)     non-exclusive licenses of intellectual property granted in the ordinary course of business;

(n)     Liens given to a public utility or any Official Body when required by such utility or Official Body in connection with the operations of any Loan Party;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of good entered into by any Loan Party in the ordinary course of business;

(p)     (i) Liens reserved in or exercisable under any lease or sublease to which such Person is a lessee which secure the payment of rent or compliance with the terms of such lease or sublease and (ii) contractual Liens of suppliers (including sellers of goods) or customers to the extent limited to the property or assets relating to such contract, in the case of clauses (i) and (ii) on Property with a fair market value not to exceed $250,000 in the aggregate; and

(q)     Liens not otherwise permitted by hereby not to exceed $250,000 in the aggregate.

<center>24</center>

DEBTORSLCC_105731

For the avoidance of doubt, no intention to subordinate the Liens granted in favor of the Agent on behalf of the Secured Parties is to be hereby implied or expressed by the permitted existence of any Permitted Liens.

"Permitted Lone Mountain Blocked Account Withdrawals" shall have the meaning specified in Section 7.01(a)(xix).

"Permitted Prior Liens" shall mean the Liens set forth on Schedule 6.22 and Schedule 8.01(m).

"Person" shall mean any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, government or political subdivision or agency thereof, or any other entity.

"Plan" shall mean at any time an employee pension benefit plan (including a Multiple Employer Plan but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Internal Revenue Code and either (a) is maintained by any member of the ERISA Group for employees of any member of the ERISA Group or (b) has at any time within the preceding five years been maintained by any entity which was at such time a member of the ERISA Group for employees of any entity which was at such time a member of the ERISA Group.

"Platform" shall have the meaning specified in Section 8.03(i).

"Prime Rate" shall mean as of a particular date, the prime rate of interest as published on that date in The Wall Street Journal (Eastern Edition), or if The Wall Street Journal ceases to quote such rate, a similar rate quoted by a national publication chosen by the Agent in its reasonable discretion. If The Wall Street Journal (or similar publication) is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published on the nearest-preceding date.

"Principal Office" shall mean the Agent's address set forth on Schedule 1.01(C), or such other address or account as the Agent may from time to time notify to the Borrower and the Lenders.

"Prohibited Transaction" shall mean any prohibited transaction as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA for which neither an individual nor a class exemption has been issued by the United States Department of Labor and which is not exempt pursuant to a statutory exemption described in Section 4975 of the Internal Revenue Code or Section 408 of ERISA.

"Purchase and Sale Agreement" shall mean the Purchase and Sale Agreement, dated as of July 17, 2017, by and between Revelation, as seller, and Borrower, as buyer.

"Purchase Money Security Interest" shall mean Liens upon fixed or capital assets of any Loan Party or Subsidiary of a Loan Party securing Debt of any Loan Party or Subsidiary of a Loan Party incurred substantially concurrently with the purchase or acquisition of such assets and solely to finance the purchase or acquisition of such assets.

"Ratable Share" shall mean, as to any Lender, a fraction, the numerator of which is the principal amount of such Lender's Loans and the denominator of which is the aggregate principal amount of all Loans of all the Lenders at such time; provided that in the case of Section 2.06 when a Defaulting Lender shall exist, "Ratable Share" shall mean the percentage of the aggregate principal amount of all the Loans (disregarding any Defaulting Lender's Loans) represented by such Lender's Loans.

25

DEBTORSLCC_105732

"<u>Real Property</u>" shall mean the real property that is owned or leased by any Loan Party, including, but not limited to the surface, coal and other mineral rights, interests and coal leases associated with the properties described on <u>Schedule 6.20(a)</u> or <u>Schedule 6.20(b)</u> and all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"<u>Recipient</u>" shall mean the Agent or any Lender, as applicable.

"<u>Reclamation Laws</u>" shall mean all Laws relating to mining reclamation or reclamation liabilities, or restoration of land, water and any future, current, abandoned or former mines, and of any other environment affected by such mines, including the Surface Mining Control and Reclamation Act of 1977, as amended, and its state and local counterparts or equivalents.

"<u>Register</u>" shall have the meaning specified in <u>Section 11.08(c)</u>.

"<u>Regulated Substances</u>" shall mean any substance, material or waste, regardless of its form or nature, defined under Environmental Health and Safety Laws as a "hazardous substance", "pollutant", "pollution", "contaminant", "hazardous or toxic substance", "extremely hazardous substance", "toxic chemical", "toxic substance", "toxic waste", "hazardous waste", "special handling waste", "industrial waste", "residual waste", "solid waste", "municipal waste", "mixed waste", "infectious waste", "chemotherapeutic waste", "medical waste", or "regulated substance" or any other material, substance or waste, regardless of its form or nature, which is regulated by the Environmental Health and Safety Laws due to its radioactive, ignitable, corrosive, reactive, explosive, toxic, carcinogenic or infectious properties or nature, or which otherwise is regulated by any applicable Environmental Health and Safety Laws including, without limitation, petroleum and petroleum products (including crude oil and any fractions thereof), acid mine drainage, natural gas, coalbed methane, synthetic gas and any mixtures thereof, asbestos, urea formaldehyde, polychlorinated biphenyls, mercury and radioactive substances.

"<u>Regulation U</u>" shall mean Regulation U, T or X as promulgated by the Board of Governors of the Federal Reserve System, as amended from time to time.

"<u>Reinvestment Deferred Amount</u>" shall mean, with respect to any Net Cash Proceeds of any Disposition (including any casualty or condemnation event), the amount of such Net Cash Proceeds as to which the Borrower shall have elected, within five Business Days of such Disposition, to reinvest and apply to the purchase or repair by the Borrower or a Subsidiary of the Borrower, as the case may be, of assets useful in the business of the Borrower and its Subsidiaries, as certified by the chief financial officer or treasurer of the Borrower in a duly executed certificate delivered to the Agent, certifying as to (a) the amount of Net Cash Proceeds and (b) the fact that the Borrower or a Subsidiary of the Borrower, as the case may be, shall invest such Net Cash Proceeds to acquire or repair assets useful in the business of the Borrower and its Subsidiaries within 180 days after such Disposition (or, if the Borrower or any Subsidiary enters into a legally binding commitment to reinvest such Net Cash Proceeds within 180 days following such Disposition, within the later of (i) 180 days following such Disposition and (ii) 90 days of the date of such legally binding commitment).

"<u>Related Parties</u>" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

26

DEBTORSLCC_105733

"Release" shall mean any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Regulated Substance into or through the indoor or outdoor environment.

"Remedial Action" shall mean any investigation, identification, preliminary assessment, characterization, delineation, feasibility study, cleanup, corrective action, removal, remediation, risk assessment, fate and transport analysis, in-situ treatment, the treatment of discharges or seeps, containment, operation and maintenance or management in-place, control, abatement or other response actions to Regulated Substances and any closure or post-closure measures, or reclamation activities associated therewith.

"Replacement Contract" means any contract or agreement entered into after the Closing Date in replacement of an existing contract or agreement (a) (i) with economic terms (including pricing, payment provisions and term thereof) which, taken as a whole and in the Borrower's reasonable judgment, are substantially similar to or more favorable to the Borrower or the Subsidiary of the Borrower party thereto, as applicable, as the contract or agreement being replaced, and (ii) with a counterparty (or a guarantor of such counterparty's obligations) having substantially similar or better creditworthiness and experience as the counterparty to the contract or agreement being replaced or with a counterparty operationally capable of performing obligations substantially similar to those of the counterparty to the contract or agreement being replaced and otherwise acceptable to the Agent (such acceptance not to be unreasonably withheld or delayed) and (b) with respect to the MR Coal Agreement, that does not materially reduce the amount of coal required to be purchased thereunder.

"Reportable Event" shall mean a reportable event described in Section 4043 of ERISA and regulations thereunder with respect to a Plan (other than any such event as to which the 30-day notice period is waived).

"Required Lenders" shall mean Lenders (other than any Defaulting Lender) holding 66 2/3% or more of the sum of the aggregate principal amount of the Loans (excluding from such calculation Loans held by any Defaulting Lender).

"Resignation Effective Date" shall have the meaning specified in Section 10.06(a).

"Restricted Payment" shall mean (a) the payment of any dividend or making of any other payment or distribution (whether in cash, securities or other property) on account of any Loan Party's or any of its Subsidiaries' respective Equity Interests or to the direct or indirect holders of any Loan Party's or any of its Subsidiaries' respective Equity Interests in their capacity as such, (b) the purchase, redemption, acquisition, retirement for value, acquisition, cancellation or termination of any Loan Party's or any of its Subsidiaries' respective Equity Interests, (c) any payment or distribution (whether in cash, securities or other property) on account of any return of capital to any Loan Party's or any of its Subsidiaries' respective stockholders, partners or members (or the equivalent Person thereof), (d) any payment by any Loan Party's or any of its Subsidiaries' for any advisory, consulting, management or similar services provided by the Permitted Holders and their Affiliates or (e) any payment by, on one hand, any Loan Party's or any of its Subsidiaries' to, on the other hand, any other party except any other Loan Party, including Revelation and its Subsidiaries, for obligations of such other party under Reclamation Laws (or otherwise in respect of reclamation obligations).

"Restructuring" shall mean (a) the sale and transfer by Revelation, and purchase and acceptance by Borrower, of the issued and outstanding capital stock or membership interests, as applicable, in (i) Dominion Coal Corporation, a Virginia corporation, (ii) Harold Keene Coal Co., LLC, a Virginia limited liability company, (iii) Omega Mining LLC, a Virginia limited liability company, and (iv) Vansant Coal

DEBTORSLCC_105734

Corporation, a Virginia corporation; (b) the sale and transfer by Revelation, and purchase and acceptance by Borrower, of the Purchased Assets (as such term is defined in the Purchase and Sale Agreement); (c) the assignment by Revelation, and acceptance and assumption by Borrower, of the Assumed Liabilities (as such term is defined in the Purchase and Sale Agreement); (d) the payment, by Borrower to Revelation, of the Closing Date Payment (as such term is defined in the Purchase and Sale Agreement); (e) obtaining required consents and amendments from creditors with respect to the Permitted Prior Liens in connection with the actions described in this definition set forth on Schedule 6.11, and (f) the entry into ancillary documents, by Revelation and Borrower, as applicable, which such documents are required for Buyer to commence, on the date of this Agreement, the business of operating coal mines, including mining, processing, selling, trading, shipping, storing and delivering coal and such other activities related to the operations of a coal mining business (including such ancillary documents necessary in relation to Borrower obtaining consents, acquiring necessary permits, obtaining insurance and satisfying environmental obligations).

"Revelation" shall mean Revelation Energy, LLC, a Delaware limited liability company.

"Revelation Reclamation Obligations" shall mean, collectively, each obligation of the Borrower to make a monthly payment to Revelation pursuant to the Transition Services Agreement or the Purchase and Sale Agreement, in each case, in respect of the obligations of Revelation and its Subsidiaries under Reclamation Laws (or otherwise in respect of reclamation obligations) and other liabilities and expenses (for the avoidance of doubt, other than any payments in respect of employee services under the Transition Services Agreement) in respect of assets retained by Revelation in the amount set forth opposite the relevant month on Schedule 1.01(R).

"RRO Cap" shall mean, as of any date of determination, $13,500,000; provided that such amount shall be reduced, as of such date of determination, by the amount of obligations of Revelation and its Subsidiaries under Reclamation Laws (or otherwise in respect of reclamation obligations) or any other Revelation Reclamation Obligations for which Revelation is no longer liable and which have not been paid that are associated with any mining property sold or otherwise disposed of and which would otherwise be payable by Revelation or any of its Subsidiaries during the term of this Agreement.

"RRO Quarterly Limit" shall mean $3,375,000.

"Sanction(s)" shall mean any international trade or economic sanction administered or enforced by the United States (including but not limited to the U.S. Treasury Department's Office of Foreign Asset Control and the U.S. Department of State), the United Nations Security Council, the European Union and its member states, or Her Majesty's Treasury.

"SEC" shall mean the Securities and Exchange Commission or any governmental agencies substituted therefor.

"Secured Parties" shall mean, collectively, the Lenders and the Agent.

"Security Agreement" shall mean the Pledge and Security Agreement substantially in the form attached hereto as Exhibit 1.01(S), dated as of the Closing Date, by and among the Loan Parties and the Agent, for the benefit of the Secured Parties, as the same may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"Solvent" shall mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such

28

Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged. In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Assignee" shall mean Riverstone Credit Partners, L.P. and its Affiliates (other than its operating portfolio companies).

"Specified Lenders" shall mean, as of any date of determination, Jefferies Finance LLC, if it is a Lender as of such date of determination, and any other Lender as of such date of determination who has acquired Loans from Jefferies Finance LLC.

"Specified Loans" shall mean, as of any date of determination, any Loans held by a Specified Lender on such date of determination that were extended by Jefferies Finance LLC on the Closing Date.

"Standard & Poor's" shall mean Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc. and any successor thereto.

"Stated Maturity Date" shall mean July 17, 2018, subject to extension as set forth in Section 2.07 hereof.  As used herein, the term "initial Stated Maturity Date" shall mean July 17, 2018.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held by the parent or one or more subsidiaries of the parent, or (b) whose accounts are consolidated with the accounts of the parent or one or more subsidiaries of the parent in such parent's or subsidiary's SEC filings. Unless the context otherwise requires, Subsidiary shall mean a Subsidiary of the Borrower.

"Tax Distributions" shall have the meaning specified in Section 8.02(h)(i).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Official Body, including any interest, additions to tax or penalties applicable thereto.

"Temporary Permit Agreement" shall mean that certain Interim Operating and Permits Agreement dated as of the date hereof between Revelation and the Borrower with respect to certain Permits held by Revelation and in the process of being approved by the applicable Official Body to be transferred to Borrower.

"Termination Date" shall mean the earlier of (a) the Stated Maturity Date and (b) the date the Obligations are accelerated pursuant to Section 9.02.

29

"Test Period" shall mean, for any date of determination under this Agreement, the most recent period of four consecutive fiscal quarters of the Borrower for which financial statements have been delivered pursuant to Section 8.03(a) or (b), as applicable.

"Title Opinion" shall mean, with respect to any Real Property, a legal opinion from local counsel reasonably satisfactory to the Agent in the jurisdiction where such Real Property is located in form and substance reasonably satisfactory to the Agent that the mortgagor who is (or who is intended to be) named in any Mortgage relating to such Real Property holds legal and valid fee or leasehold title to the interests secured (or intended to be secured) by such Mortgage free and clear of all defects and encumbrances other than the defects and encumbrances listed in such opinion.

"Total Leverage Ratio" shall mean, as of any date, the ratio of:

(a)      an amount equal to the aggregate principal amount of Debt of the Borrower and its Subsidiaries outstanding on such date determined on a consolidated basis in accordance with GAAP (provided that, for this purpose, (1) letters of credit (including in respect of Mining Financial Assurances) will only be included to the extent of any unreimbursed drawings thereunder, (2) Debt of the types described in clauses (f) and (h) of the definition thereof shall be excluded and (3) Debt in respect of Mining Financial Assurances (other than such Debt described in clauses (a) and (b) of the definition thereof or arising under letters of credit, which, for the avoidance of doubt, is subject to clause (1) above) shall be excluded and (4) the Daniels Debt shall be excluded) *minus* the lesser of: (x) if Liquidity as of such date exceeds $5,000,000, (A) the aggregate amount of unrestricted Permitted Investments of the Loan Parties free and clear of Liens (other than Liens created pursuant to the Loan Documents, Liens permitted under clause (g) of the definition of Permitted Liens and non-consensual Liens arising by operation of Law) as of such date *minus* (B) $5,000,000; provided, for the avoidance of doubt, if Liquidity as of the last day of the most recently ended Test Period does not exceed $5,000,000, then this clause (x) shall be deemed to equal $0; and (y) $10,000,000, to:

(b)      Consolidated EBITDA for the Test Period most recently ended on or prior to such date.

In addition, for purposes of calculating the Total Leverage Ratio:

(i)      any Person that is a Subsidiary on the applicable calculation date will be deemed to have been a Subsidiary at all times during such Test Period; and

(ii)      any Person that is not a Subsidiary on the applicable calculation date will be deemed not to have been a Subsidiary at any time during such Test Period.

"Transactions" shall mean (a) the entering into the Loan Documents by the Loan Parties, the borrowing by the Borrower of the Loans on the Closing Date and the application of the proceeds thereof as contemplated hereby, (b) the repayment, redemption, discharge and satisfaction in full of the Hoops Note and the LR Note and the termination, release and discharge of all guarantees, Liens and security interests in respect thereof as contemplated hereby, (c) the consummation of the Restructuring and (d) the payment of fees, expenses and transaction costs in connection with the foregoing.

"Transition Services Agreement" means that certain Transition Services Agreement, dated as of July 17, 2017, by and between the Borrower, as buyer, and Revelation, as seller.

"Treasury Rate" as of any applicable date, shall mean the yield to maturity as of such date of the most recently issued United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly

DEBTORSLCC_105737

available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the Make-Whole Termination Date; provided that, if the period from such prepayment date to the Make-Whole Termination Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Unfunded Pension Liability" means the excess of a Plan's accrued benefit liabilities under Section 4001(a)(16) of ERISA over the current value of that Plan's assets, determined in accordance with the actuarial assumptions used for funding the Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Security Agreement.

"United Financing Documents" shall mean, collectively, (a) the United Revolving Facility, (b) that certain Business Loan Agreement, dated as of May 28, 2013, among Revelation, as borrower, Alpha Highwall Mining, LLC, as a guarantor, and United Bank, Inc., as secured party, as amended by that certain Change in Terms Agreement, dated as of December 17, 2013, among Revelation, Alpha Highwall Mining, LLC and United Bank, Inc., and as further amended by that certain Change in Terms Agreement, November 26, 2014 among Revelation, Alpha Highwall Mining, LLC and United Bank, Inc., (c) that certain Commercial Security Agreement, dated as of May 28, 2013, by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC and (d) any other instruments, UCC filings or certificates delivered in connection with the transactions contemplated by the foregoing or executed in connection with the Restructuring, in the case of each of clauses (a) through (d), as in effect on the date hereof.

"United Intercreditor Agreement" shall mean an intercreditor agreement between Agent, as second lien creditor and representative for the Lenders, and United Bank, Inc., as first lien creditor, with respect to certain assets owned by a Loan Party that are subject to a Lien in existence on the date hereof created pursuant to the United Revolving Facility (or any instruments executed in connection therewith).

"United Payment Account"  shall mean certain deposit account located at United Bank, Inc. with the account number 85663190.

"United Revolving Facility" shall mean that certain Second Amended and Restated Loan and Security Agreement, dated as of February 28, 2013, among Revelation, as borrower, United Bank, Inc., as secured party, Revelation Energy Holdings, LLC, a Delaware limited liability company and Alpha Highwall Mining, LLC, a Kentucky limited liability company.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, amended, amended and restated, replaced, supplemented or otherwise modified.

"U.S. Person" shall mean a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code, or any person treated as a United States person for purposes of the Internal Revenue Code.

"U.S. Tax Compliance Certificate" shall have the meaning assigned to that term in Section 5.09(f).

31

"Weighted Average Life to Maturity" shall mean, when applied to any Debt on any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Debt.

"Withdrawal Liability" shall have the meaning assigned to that term in Section 6.16(d).

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which writedown and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Interpretive Provisions.  Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the other Loan Documents: (a) references to the plural include the singular, the plural, the part and the whole and the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (b) the words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document as a whole; (c) article, section, subsection, clause, schedule and exhibit references are to this Agreement or other Loan Document, as the case may be, unless otherwise specified; (d) reference to any Person includes such Person's successors and assigns; (e) reference to any agreement, including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto, document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated; (f) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (h) section headings herein and in each other Loan Document are included for convenience and shall not affect the interpretation of this Agreement or such Loan Document, and (i) unless otherwise specified, all references herein to times of day shall be references to Eastern Time.

Section 1.03    Accounting Principles; Changes in GAAP.  Except as otherwise provided in this Agreement, all computations and determinations as to accounting or financial matters and all financial statements and certificates and reports as to financial matters required to be delivered pursuant to this Loan Documents shall be made and prepared in accordance with GAAP (including principles of consolidation where appropriate), and all accounting or financial terms shall have the meanings ascribed to such terms by GAAP, in each case applied on a basis consistent with those used in preparing the Historical Statements referred to in Section 6.07(a), except for changes in which the Borrower's independent certified public accountants concur and which are disclosed to the Agent on the next date on which financial statements are required to be delivered to the Agent pursuant to Section 8.03; provided that, unless such Borrower and the Required Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed and all such computations shall be conducted utilizing financial information presented consistently with prior periods.

32

**ARTICLE 2**
**THE LOANS**

Section 2.01    <u>The Loans</u>. Subject to the terms and conditions of this Agreement, each Lender severally and not jointly agrees to make a term loan (each a "<u>Loan</u>" and collectively, the "<u>Loans</u>") to the Borrower on the Closing Date in an amount equal to such Lender's Commitment. Each Lender's Commitment shall immediately terminate without further action upon the funding of such Lender's Loan pursuant to this <u>Section 2.01</u>. Any amounts borrowed hereunder and repaid or prepaid may not be reborrowed.

Section 2.02    <u>Procedure for Borrowing Loans</u>.

(a)    The Borrower shall give the Agent and each Lender irrevocable notice, substantially in the form of <u>Exhibit 2.02</u>, appropriately completed and signed by an Authorized Officer of the Borrower (each, a "<u>Funding Notice</u>"), which notice must be received by the Agent prior to 11:00 a.m., New York City time, no later than three Business Days prior to the Closing Date, requesting that the Lenders make the Loans on the Closing Date and specifying (i) whether such Loan is a Base Rate Loan or a LIBOR Rate Loan, (ii) the applicable Interest Period, and (iii) instructions for remittance of the Loans to be borrowed. Upon receipt of such notice the Agent shall promptly notify each Lender thereof. Not later than 1:00 p.m., New York City time, on the Closing Date, each such Lender shall make available to the Agent at the Principal Office an amount in immediately available funds equal to the Loans to be made by such Lender. Such borrowing will then be made available to the Borrower by the Agent crediting such account or by wire transfer as is designated in writing to the Agent by the Borrower, with the aggregate of the amounts made available to the Agent by the Lenders and in like funds as received by the Agent.

(b)    In respect of the last sentence of <u>Section 2.02(a)</u>, the Borrower hereby designates that (i) Loans in an amount equal to the Lone Mountain Blocked Amount funded by the Specified Lenders will be deposited in the Lone Mountain Blocked Account on the Closing Date and (ii) any other proceeds of the Loans funded to the Borrower and its Subsidiaries will be deposited in the General Cash Account.

Section 2.03    <u>Agent Fees and OID</u>.

(a)    The Borrower agrees to pay to the Agent an administrative agency fee of $75,000 on the Closing Date and, on the one-year anniversary thereof, the Borrower agrees to pay to the Agent an administrative agency fee of $37,500; provided, for the avoidance of doubt, if the Borrower has not submitted an Extension Request, no such administrative agency fee shall be due on the initial Stated Maturity Date. Such fee shall be earned when paid and shall not be refundable for any reason whatsoever.

(b)    On the Closing Date, the Borrower shall incur the Loans made by Jefferies Finance LLC net of a 2.50% original issue discount. For the avoidance of doubt, any Loans made on the Closing Date by any Lender other than Jefferies Finance LLC shall not be made with any original issue discount.

Section 2.04    <u>Conversions/Continuations</u>. Each conversion to or the renewal of the LIBOR Rate Option shall be made upon the Borrower's duly completed irrevocable request therefor substantially in the form of <u>Exhibit 2.04</u>, completed and signed by an Authorized Officer of the Borrower (each, a "<u>Conversion/Continuation Notice</u>"). Each Conversion/Continuation Notice must be received by the Agent not later than 2:00 p.m., New York City time, three Business Days prior to the requested date of any conversion to or renewal of LIBOR Rate Loans or of any conversion of LIBOR Rate Loans to Base Rate Loans. Each conversion to or renewal of LIBOR Rate Loans shall be in a principal amount of $1,000,000

33

or a whole multiple of $100,000 in excess thereof. Each conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each Conversion/Continuation Notice shall specify (i) whether the Borrower is requesting a conversion of Loans, or a renewal of LIBOR Rate Loans, (ii) the requested date of the conversion or renewal, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or renewed, (iv) whether the LIBOR Rate Option or Base Rate Option shall apply to such Loans to be converted to, and (v) if applicable, the duration of the Interest Period with respect thereto. During the existence of an Event of Default, no Loans may be converted to or renewed as LIBOR Rate Loans without the consent of the Required Lenders.

Section 2.05    Loan Conversions and Continuation; Obligations of Lenders Several; Repayment of Loans; Commitment Reductions.

(a)    Loan Conversions and Continuations.    Following receipt of a Conversion/Continuation Notice the Agent shall promptly notify each Lender of the amount of its Ratable Share of the applicable Loans, and if no timely notice of a conversion or renewal is provided by the Borrower, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 4.05.

(b)    Obligations of Lenders Several.  The obligations of the Lenders to fund Loans and to make payments pursuant to Section 11.03(c) are several and not joint. The failure of any Lender to make any payment under Section 11.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its payment under Section 11.03(c). It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, subject to the satisfaction of the conditions set forth in this Agreement, regardless of the failure of any other Lender to make its Loans hereunder.

(c)    Repayment of Loans.  The Borrower shall repay to the Agent, for the benefit of the Lenders, on the Termination Date, the aggregate principal amount of all Loans outstanding on such date, together in each case with accrued and unpaid interest on the principal amount to be so repaid.

(d)    Notes.  Any Lender may request that Loans made by it be evidenced by a Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender and its registered assigns in the form attached hereto as Exhibit 1.01(N).

Section 2.06    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, so long as such Lender is a Defaulting Lender, the outstanding Loans of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.01); provided that the restriction in this Section 2.06 shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of each Lender or each Lender directly affected thereby.

Section 2.07    Extension of Stated Maturity Date.

(a)    The Borrower shall have an option to extend the Stated Maturity Date for one additional term of six (6) months, subject to the satisfaction of the following conditions precedent:

34

DEBTORSLCC_105741

(i)      the Borrower shall have delivered an Extension Request with respect to the Stated Maturity Date to the Agent not less than thirty (30) days prior to the initial Stated Maturity Date (which shall be promptly forwarded by the Agent to each Lender);

(ii)     no Default or Event of Default shall have occurred and be continuing as of the initial Stated Maturity Date; and

(iii)    on the initial Stated Maturity Date, the Borrower shall have paid the Extension Fee to the Agent for the benefit of the Lenders, payable to each Lender on a pro rata basis based on their respective Ratable Shares.

(b)      The Extension Fee shall be earned by the Lenders on the date when the Extension Request is delivered and shall be payable to the Agent for the benefit of the Lenders on a pro rata basis based on their respective Ratable Shares on the earlier to occur of (i) Payment in Full and (ii) the initial Stated Maturity Date.

## ARTICLE 3
## RESERVED

## ARTICLE 4
## INTEREST RATES

Section 4.01    Interest Rate Options.    The Borrower shall pay interest in respect of the outstanding unpaid principal amount of the Loans at the Base Rate Option or LIBOR Rate Option applicable to the Loans, it being understood that, subject to the provisions of this Agreement, the Borrower may select different Interest Rate Options and different Interest Periods to apply simultaneously to the Loans comprising different Borrowing Tranches and may convert to or renew one or more Interest Rate Options with respect to all or any portion of the Loans comprising any Borrowing Tranche; provided that there shall not be at any one time outstanding more than three Borrowing Tranches in the aggregate among all of the Loans and provided, further that if an Event of Default exists and is continuing, the Borrower may not convert to, or renew the LIBOR Rate Option for any Loans. If at any time the designated rate applicable to any Loan made by any Lender exceeds such Lender's highest lawful rate, the rate of interest on such Lender's Loan shall be limited to such Lender's highest lawful rate.

The Borrower shall have the right to select from the following Interest Rate Options applicable to the Loans:

(a)      Base Rate Option:  With respect to any Loan that bears interest pursuant to the Base Rate Option, on a fluctuating rate per annum computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed equal to the Base Rate plus the Applicable Margin, such interest rate to change automatically from time to time effective as of the effective date of each change in the Base Rate; or

(b)      LIBOR Rate Option:  With respect to any Loan that bears interest pursuant to the LIBOR Rate Option, on a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the LIBOR Rate for the applicable Interest Period plus the Applicable Margin.

For the avoidance of doubt, all Applicable Margin shall be payable in cash in U.S. Dollars and in immediately available funds.

DEBTORSLCC_105742

Section 4.02    Interest Periods.  At any time when the Borrower shall select, convert to or renew a LIBOR Rate Option, the Borrower shall notify the Agent thereof at least three Business Days prior to the effective date of such LIBOR Rate Option by delivering a Funding Notice (it being understood that any Funding Notice may be delivered at any time acceptable to the Lenders prior to the Closing Date) or Conversion/Continuation Notice, as applicable. The notice shall specify an Interest Period during which such Interest Rate Option shall apply. Notwithstanding the preceding sentence, in the case of the renewal of a LIBOR Rate Option at the end of an Interest Period, the first day of the new Interest Period shall be the last day of the preceding Interest Period, without duplication in payment of interest for such day.

Section 4.03    Interest After Default.

(a)    Obligations.  At any time an Event of Default occurs and for so long as it shall be continuing, if requested by the Required Lenders, effective as of the date upon which such Event of Default first occurred or such later date approved by Required Lenders and ending on the date such Event of Default is no longer continuing (or, while such Event of Default is continuing, on the date such increase may thereafter be rescinded by Required Lenders, notwithstanding Section 11.01), (i) in the case of principal of any Loan, such amounts shall bear interest at a rate equal to 2.0% per annum plus the rate otherwise applicable to such Loan or (ii) in the case of any other amounts then due and owing, such amounts shall bear interest at a rate equal to the sum of the rate of interest applicable under the Base Rate Option plus an additional 2.0% per annum from the time such overdue Obligation becomes due and payable and until it is paid in full; provided, in each case, that upon the occurrence of an Event of Default under Section 9.01(a), Section 9.01(c) (solely with respect to a breach of Section 8.04), Section 9.01(k) or Section 9.01(l), the effects of such Event of Default described in this Section 4.03(a) shall occur automatically.

(b)    Acknowledgment.  The Borrower acknowledges that the increase in rates referred to in this Section 4.03 reflects, among other things, the fact that such Loans or other amounts have become a substantially greater risk given their default status and that the Lenders are entitled to additional compensation for such risk; and all such interest shall be payable by Borrower upon demand by the Required Lenders or by the Agent at the written direction of the Required Lenders.

Section 4.04    LIBOR Rate Unascertainable; Illegality; Increased Costs; Deposits Not Available.

(a)    Unascertainable.  If on any date on which a LIBOR Rate would otherwise be determined or if the Required Lenders determine that for any reason in connection with any request for a conversion to or continuation of a LIBOR Rate Loan that (i) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Rate Loan, (ii) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan or in connection with an existing or proposed Base Rate Loan, or (iii) the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the LIBOR Rate component of the Base Rate, the utilization of the LIBOR Rate component in determining the Base Rate shall be suspended, in each case until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a conversion to or continuation of LIBOR Rate Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans in the amount specified therein.

36

DEBTORSLCC_105743

(b)    Illegality; Increased Costs; Deposits Not Available.  If at any time any Lender shall have determined that:

(i)    the making, maintenance or funding of any Loan to which a LIBOR Rate Option applies has been made impracticable or unlawful by compliance by such Lender in good faith with any Law or any interpretation or application thereof by any Official Body or with any request or directive of any such Official Body (whether or not having the force of Law), or

(ii)    such LIBOR Rate Option will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any such Loan, or

(iii)    after making all reasonable efforts, deposits of the relevant amount in Dollars for the relevant Interest Period for a Loan, or to banks generally, to which a LIBOR Rate Option applies, respectively, are not available to such Lender with respect to such Loan, or to banks generally, in the interbank eurodollar market, then the Agent shall have the rights specified in Section 4.04(c).

(c)    Agent's and Lender's Rights. In the case of an event specified in Section 4.04(b) above, such Lender shall promptly so notify the Agent and endorse a certificate to such notice as to the specific circumstances of such notice, and the Agent shall promptly send copies of such notice and certificate to the other Lenders and the Borrower. Upon such date as shall be specified in such notice (which shall not be earlier than the date such notice is given), the obligation of such Lender to allow the Borrower to convert to or renew a LIBOR Rate Option shall be suspended until such Lender shall have later notified the Agent of such Lender's determination that the circumstances giving rise to such previous determination no longer exist. If any Lender notifies the Agent of a determination under Section 4.04(b), the Borrower shall, subject to the Borrower's indemnification Obligations under Section 5.10, as to any Loan of the Lender to which a LIBOR Rate Option applies, on the date specified in such notice either convert such Loan to the Base Rate Option otherwise available with respect to such Loan or prepay such Loan in accordance with Section 5.06(a). Absent due notice from the Borrower of conversion or prepayment, such Loan shall automatically be converted to the Base Rate Option otherwise available with respect to such Loan upon such specified date.

Section 4.05    Selection of Interest Rate Options.  If the Borrower fails to select a new Interest Period to apply to any Borrowing Tranche of Loans under the LIBOR Rate Option at the expiration of an existing Interest Period applicable to such Borrowing Tranche in accordance with the provisions of Section 4.02, the Borrower shall be deemed to have continued such Borrowing Tranche under the LIBOR Rate Option with a 3-month Interest Period commencing upon the last day of the existing Interest Period, provided that, if an Event of Default exists and is continuing, the Borrower shall be deemed to have converted such Borrowing Tranche to the Base Rate Option commencing upon the last day of the existing Interest Period.

**ARTICLE 5**
**PAYMENTS**

Section 5.01    Payments.  All payments and prepayments to be made in respect of principal, interest, fees or other amounts due from the Borrower hereunder shall be payable prior to 2:00 p.m., New York City time, on the date when due without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower, and without setoff, counterclaim, defense, recoupment or other deduction of any nature. Such payments shall be made to the Agent at its Principal Office for the ratable accounts of the Lenders (except as otherwise may be provided with respect to a Defaulting Lender and except as provided in Section 2.03, Section 5.08, Section 5.09 or Section 5.10) in U.S. Dollars and in immediately available funds, and the Agent shall forthwith (on the same Business

37

DEBTORSLCC_105744

Day) distribute such amounts to the Lenders in U.S. Dollars and in immediately available funds. The Agent's and each Lender's statement of account, ledger or other relevant record shall, in the absence of manifest error, be conclusive as the statement of the amount of principal of and interest on the Loans and other amounts owing under this Agreement and shall be deemed an "account stated." Any such payments not so distributed by the Agent within one Business Day of receipt thereof shall bear interest at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Agent in accordance with banking industry rules on interbank compensation. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder of (i) principal or interest in respect of any Loan or (ii) any other amount due hereunder or under any other Loan Document shall be made in Dollars. Any payment required to be made by the Agent hereunder shall be deemed to have been made by the time required if the Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Agent to make such payment.

Section 5.02    Pro Rata Treatment of Lenders.   All borrowings of Loans hereunder shall be funded by the Lenders in accordance with the terms and conditions of this Agreement on a pro rata basis based on their respective Ratable Shares of the Loans being requested, subject to Section 11.19. Each conversion to or renewal of any Interest Rate Option and each payment or prepayment by the Borrower with respect to principal or interest shall (except as otherwise may be provided with respect to a Defaulting Lender and except as provided in Section 5.08, 5.09 or 5.10) be payable ratably among the Lenders entitled to such payment in accordance with the amount of principal and interest as set forth in this Agreement.

Section 5.03    Sharing of Payments by Lenders.   Subject to Section 11.19, if any Lender shall, by exercising any right of setoff, counterclaim or banker's lien, by receipt of voluntary payment, by realization upon security, or by any other non-pro rata source, obtain payment in respect of any principal of or interest on any of its Loans or Commitments or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than the pro-rata share of the amount such Lender is entitled thereto, then the Lender receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, together with interest or other amounts, if any, required by Law (including court order) to be paid by the Lender or the holder making such purchase; and

(ii)      the provisions of this Section 5.03 shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of the Loan Documents or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section 5.03 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may

DEBTORSLCC_105745

exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

Section 5.04    Presumptions by Agent.  Unless the Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

Section 5.05    Interest Payment Dates.  Interest on Loans shall be due and payable in arrears on each Interest Payment Date. In the event of any prepayment of any Loan (other than any optional prepayment of any Loan that is subject to the Base Rate Option), accrued interest on the principal amount prepaid shall be due on the date such prepayment is due or made (it is understood that in the case of a prepayment made pursuant to Section 5.06(b)(vi) accrued interest on the Specified Loans only shall be due on the date of such prepayment is due or made and shall be payable only to the Specified Lenders). Interest accruing on any other monetary Obligation hereunder shall be due and payable on demand after such monetary Obligation becomes due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise).

Section 5.06    Prepayments.

(a)    Voluntary Prepayments.  The Borrower shall have the right at its option from time to time to prepay the Loans in whole or part without premium or penalty (except as provided in Sections 5.10 and 5.11). Whenever the Borrower desires to prepay any part of the Loans, it shall provide a prepayment notice to the Agent by 2:00 p.m., New York City time, at least three Business Days prior to the date of prepayment of the Loans that are subject to the LIBOR Rate Option and one Business Day prior to the date of prepayment of the Loans that are subject to the Base Rate Option:

(i)    the date, which shall be a Business Day, on which the proposed prepayment is to be made;

(ii)    a statement indicating the application of the prepayment between Loans to which the Base Rate Option applies and Loans to which the LIBOR Rate Option applies; and

(iii)    the total principal amount of such prepayment, which shall not be less than $1,000,000 (or, if less, the remaining balance of the Loans).

All prepayment notices shall be irrevocable; provided, however, that any such notice may state that such prepayment is conditioned upon the effectiveness of one or more other credit facilities, one or more Dispositions or other transactions specified therein, in which case such notice may be revoked by the Borrower (by notice to the Agent on or prior to the specified effective date) if such condition is not satisfied. The principal amount of the Loans for which a prepayment notice is given, together with interest on such principal amount (except with respect to Loans to which the Base Rate Option applies), shall be due and payable on the date specified in such prepayment notice as the date on which the proposed prepayment is to be made. Except as provided in Section 4.04(c), if the Borrower prepays a Loan but fails to specify the applicable Borrowing Tranche which the Borrower is prepaying, the prepayment shall be

DEBTORSLCC_105746

applied first to Loans to which the Base Rate Option applies, then to Loans to which the LIBOR Rate Option applies. Any prepayment hereunder shall be subject to the Borrower's Obligation to indemnify the Lenders under Section 5.10.

        (b)      Mandatory Prepayments.

        (i)      Sales of Assets; Casualty Events.  Within five Business Days of (A) any Disposition by Holdings or any of its Subsidiaries (including, without limitation, contracts and agreements, but excluding the Flint Ridge Assets) pursuant to Section 8.02(d)(iii) or (B) any casualty or condemnation experienced by Holdings or any of its Subsidiaries, in each case resulting in Net Cash Proceeds, the Borrower shall, subject to Section 5.06(b)(ii) below, immediately pay or cause to be paid an aggregate amount equal to 100% of such Net Cash Proceeds to the Agent for distribution to the Lenders in accordance with Section 5.06(b)(vii).

        (ii)      Reinvestment Proceeds.  In the event that any Disposition described in Section 5.06(b)(i) results in a Reinvestment Deferred Amount then, within the earlier of (A) the date occurring 180 days after such Disposition (or, if the Borrower or any Subsidiary enters into a legally binding commitment to reinvest such Reinvestment Deferred Amount within 180 days following such Disposition, within the later of (x) 180 days following such Disposition and (y) 90 days of the date of such legally binding commitment) and (B) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the business of the Borrower and its Subsidiaries with all or any portion of such Reinvestment Deferred Amount, the Borrower shall immediately pay or cause to be paid an aggregate amount equal to such Reinvestment Deferred Amount, minus any amount thereof expended when no Event of Default has occurred and was continuing to acquire or repair assets useful in the business of the Borrower and its Subsidiaries; provided that Net Cash Proceeds in excess of $1,500,000 in the aggregate from sales, transfers or other dispositions of assets under Section 8.02(d)(iii) or in excess of $1,500,000 in the aggregate from casualties or condemnations shall not be subject to the reinvestment right described in this clause (ii).

        (iii)      Debt Issuances; Equity Issuances.  Within five Business Days of any (A) issuance, incurrence, offering or placement of any Debt of any Loan Party or any Subsidiary of a Loan Party not permitted by Section 8.02(a), or (B) except as set forth in Section 5.06(b)(v) below, any sale or issuance by a Loan Party or any Subsidiary of a Loan Party of any Equity Interests (other than to another Loan Party), the Borrower shall immediately pay or cause to be paid an aggregate amount equal to 100% of the Net Cash Proceeds resulting therefrom to the Agent for distribution to the Lenders in accordance with Section 5.06(b)(vii).

        (iv)      Extraordinary Receipts.  Within five Business Days of receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall either (A) elect to retain the Extraordinary Receipts, as certified by the chief financial officer or treasurer of the Borrower in a duly executed certificate delivered to the Agent, certifying as to (1) the amount of Extraordinary Receipts and (2) the fact that the Borrower or a Subsidiary of the Borrower, as the case may be, shall retain such Extraordinary Receipts or (B) immediately pay or cause to be paid an aggregate amount equal to 100% of such Extraordinary Receipts in excess of $1,500,000 in the aggregate to the Agent for distribution to the Lenders in accordance with Section 5.06(b)(vii).

        (v)      Equity Cure Proceeds.  Within five Business Days of receipt by Holdings or the Borrower of any proceeds of any Equity Cure pursuant to Section 8.04(d), the Borrower shall immediately pay or cause to be paid an aggregate amount equal to 100% of such proceeds to the Agent for distribution to the Lenders in accordance with Section 5.06(b)(vii).

DEBTORSLCC_105747

(vi)    <u>Failure to Timely Consummate Lone Mountain Transaction</u>.  If (A) the Lone Mountain Signing Condition has not been satisfied prior to the Lone Mountain Signing Deadline or (B) the Lone Mountain Closing Conditions have not been satisfied prior to the Lone Mountain Closing Date, on the Lone Mountain Signing Deadline, in the case of <u>clause (A)</u>, and the Lone Mountain Closing Deadline, in the case of <u>clause (B)</u>, the Borrower shall immediately pay or cause to be paid an aggregate amount equal to the Lone Mountain Loan Amount to the Agent for distribution to the Specified Lenders in accordance with <u>Section 5.06(b)(vii)</u>.

(vii)    Each such prepayment pursuant to this <u>Section 5.06(b)</u> shall be applied to the Loans of Lenders on a pro rata basis, subject to <u>Section 11.19</u> (it being understood that, in the case of a prepayment pursuant to <u>Section 5.06(b)(vi)</u>, such prepayment shall be applied to the Specified Loans of the Specified Lenders on a pro rata basis).  Except as provided in <u>Section 4.04(c)</u>, if the Borrower prepays a Loan but fails to specify the applicable Borrowing Tranche which the Borrower is prepaying, the prepayment shall be applied first to Loans to which the Base Rate Option applies, then to Loans to which the LIBOR Rate Option applies.  Any prepayment hereunder shall be subject to the Borrower's Obligation to indemnify the Lenders under <u>Section 5.10</u>.

(c)    <u>Replacement of a Lender</u>.  In the event any Lender (i) gives notice under <u>Section 4.04(b)</u>, (ii) requests compensation under <u>Section 5.08</u>, or requires the Borrower to pay any additional amount to any Lender or any Official Body for the account of any Lender pursuant to <u>Section 5.09</u>, (iii) is a Defaulting Lender or (iv) becomes subject to the control of an Official Body (other than normal and customary supervision and other than as set forth in subsection (2) of the definition of "Defaulting Lender" contained herein), then in any such event the Borrower may, at its sole expense, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 11.08</u> (other than <u>Section 11.08(b)(i)</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(A)    the Borrower shall have paid to the Agent the assignment fee specified in <u>Section 11.08</u>;

(B)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 5.09</u> and <u>Section 5.10</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of any applicable Make-Whole Premium and all other amounts);

(C)    in the case of any such assignment resulting from a claim for compensation under <u>Section 5.08(a)</u> or payments required to be made pursuant to <u>Section 5.09</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(D)    such assignment does not conflict with applicable Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 5.07    <u>Mitigation Obligations</u>.    Each Lender agrees that upon receiving actual knowledge of the occurrence of any event giving rise to increased costs or other special payments under

41

Section 4.04(b), Section 5.08 or Section 5.09 with respect to such Lender, it will (a) promptly notify the Agent and the Borrower of the occurrence of such event and (b) if requested by the Borrower, use commercially reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event or appoint an agent or representative to deal with any relevant Official Body, provided that such designation or appointment does not cause such Lender and its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section shall affect or postpone any of the Obligations of the Borrower or any other Loan Party or the rights of the Agent or any Lender provided in this Agreement.

Section 5.08    Increased Costs.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Agent or any Lender (except any reserve requirement reflected in the LIBOR Rate);

(ii)    subject the Agent or any Lender to any Taxes with respect to this Agreement or any Loan under the LIBOR Rate Option made by it, or on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or change the basis of taxation of payments to such Lender in respect thereof (except, in each case, for Indemnified Taxes covered by Section 5.09 and Excluded Taxes); or

(iii)    impose on the Agent, any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or any Loan under the LIBOR Rate Option made by such Lender; and the result of any of the foregoing shall be to increase the cost to the Agent or Lender of continuing, converting into, or maintaining any Loan under the LIBOR Rate Option (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by the Agent or Lender hereunder (whether of principal, interest or any other amount)

then, upon request of the Agent or Lender, the Borrower will pay to the Agent or Lender, as the case may be, such additional amount or amounts as will compensate the Agent or Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital and Liquidity Requirements. If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital and liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Loans held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement; Repayment of Outstanding Loans. A certificate of the Agent or a Lender setting forth the amount or amounts necessary to compensate the Agent or such Lender or its holding company, as the case may be, as specified in Section 5.08(a) or 5.08(b) and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay the Agent or

42

DEBTORSLCC_105749

such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d) <u>Delay in Requests</u>.  Failure or delay on the part of the Agent or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Agent's or such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate the Agent or a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that the Agent or such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of the Agent's or such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 5.09    <u>Taxes</u>.

(a) <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Official Body in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) <u>Payment of Other Taxes</u>.  The Loan Parties shall timely pay to the relevant Official Body in accordance with applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c) <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Official Body. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d) <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.08(d)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Official Body. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby

43

authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (d).

(e)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to an Official Body pursuant to this Section 5.09, such Loan Party shall deliver to the Agent the original or a certified copy of a receipt issued by such Official Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent and the Required Lenders.

(f)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.09(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

44

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit 5.09-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 5.09-2 or Exhibit 5.09-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 5.09-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)      Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.09 (including by the payment of additional amounts pursuant to this Section 5.09), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than

45

any interest paid by the relevant Official Body with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Official Body) in the event that such indemnified party is required to repay such refund to such Official Body. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.  Each party's obligations under this Section 5.09 shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 5.10    Indemnity.  In addition to the compensation or payments required by Section 5.08 or Section 5.09, the Borrower shall indemnify each Lender against all liabilities, losses or expenses (including loss of anticipated profits, any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract), for the avoidance of doubt and duplication, excluding all Taxes for which compensation is payable by the Borrower under Section 5.08(a) and all Indemnified Taxes for which indemnification is available under Section 5.09, which such Lender sustains or incurs as a consequence of any:

(a)    payment, prepayment, conversion or renewal, or assignment pursuant to Section 5.06(c), of any Loan to which a LIBOR Rate Option applies on a day other than the last day of the corresponding Interest Period (whether or not such payment or prepayment is mandatory, voluntary or automatic and whether or not such payment or prepayment is then due),

(b)    attempt by the Borrower to revoke (expressly, by later inconsistent notices or otherwise) in whole or part any Funding Notice or Conversion/Notice under Section 2.02, Section 2.04 or Section 4.02 or notice relating to prepayments under Section 5.06, or

(c)    default by the Borrower in the performance or observance of any covenant or condition contained in this Agreement or any other Loan Document, including any failure of the Borrower to pay when due (by acceleration or otherwise) any principal, interest or any other amount due hereunder.

If any Lender sustains or incurs any such loss or expense, it shall from time to time notify the Borrower of the amount determined in good faith by such Lender for the period from the date of such event to the last day of the then current Interest Period therefor (or in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such LIBOR Rate Loan), which determination may include such assumptions, allocations of costs and expenses and averaging or attribution methods as such Lender shall deem reasonable, to be necessary to indemnify such Lender for such loss or expense. Such notice shall set forth in reasonable detail the basis for such determination. Such amount shall be due and payable by the Borrower to such Lender 10 Business Days after such notice is given.

DEBTORSLCC_105753

Section 5.11    Call Protection.  Any prepayment, repayment, refinancing, replacement, purchase or mandatory assignment of Loans during the Make-Whole Period for any reason (including by mandatory assignment pursuant to Section 5.06(c) (other than in the case of a Defaulting Lender or the circumstances described in Section 5.06(c)(iv)), by acceleration of the Loans, or pursuant to Section 5.06), shall be accompanied by a prepayment premium in an amount equal to the Make-Whole Premium. Without limiting the foregoing, the Borrower hereby acknowledges and agrees that the Make-Whole Premium shall be payable in connection with any acceleration of the Loans made at any time during the Make-Whole Period.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower represents and warrants to the Agent and each of the Lenders as follows:

Section 6.01    Organization and Qualification.  Each Loan Party and each Subsidiary of each Loan Party is a corporation, partnership or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Each Loan Party and each Subsidiary of each Loan Party has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct. Each Loan Party and each Subsidiary of each Loan Party is duly licensed or qualified and in good standing in each jurisdiction where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary.

Section 6.02    Ownership.  As of the Closing Date, Schedule 6.02 states the name of the Borrower and each of the Borrower's Subsidiaries and joint ventures, their respective jurisdictions of incorporation or formation, their authorized Capital Stock (if applicable), any issued and outstanding Equity Interests and the owners thereof. Holdings, the Borrower and each Subsidiary of the Borrower has good title to all of the Equity Interests it purports to own, free and clear in each case of any Lien, other than non-consensual Liens arising by operation of law. Except as set forth on Schedule 6.02, all Equity Interests of the Borrower and its Subsidiaries have been validly issued, and all such Equity Interests are fully paid and non-assessable. As of the Closing Date, there are no options, warrants or other rights outstanding to purchase any such Equity Interests except as indicated on Schedule 6.02.

Section 6.03    Power and Authority.  Each Loan Party has full power to enter into, execute, deliver and carry out this Agreement and the other Loan Documents to which it is a party, to incur the Debt contemplated by the Loan Documents and to perform its Obligations under the Loan Documents to which it is a party, and all such actions have been duly authorized by all necessary proceedings on its part.

Section 6.04    Validity and Binding Effect.  This Agreement has been duly and validly executed and delivered by each Loan Party, and each other Loan Document which any Loan Party is required to execute and deliver on or after the date hereof will have been duly executed and delivered by such Loan Party on the required date of delivery of such Loan Document. This Agreement and each other Loan Document constitutes, or will constitute, legal, valid and binding obligations of each Loan Party which is or will be a party thereto on and after its date of delivery thereof, enforceable against such Loan Party in accordance with its terms, except to the extent that enforceability of any of such Loan Document may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforceability of creditors' rights generally or limiting the right of specific performance.

Section 6.05    No Conflict.  Neither the execution and delivery of this Agreement or the other Loan Documents by any Loan Party, nor the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof by any of them will (a)

47

conflict with, constitute a default under or result in any breach of (i) the terms and conditions of the certificate or articles of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate or articles of formation, limited liability company agreement or other organizational documents of any Loan Party or any Subsidiary of any Loan Party, (ii) any material coal or Real Property lease, or other material Real Property document or agreement to which any Loan Party or any Subsidiary of any Loan Party is a party or by which or to which any Loan Party or any Subsidiary of any Loan Party is bound or subject, in each case in any material respect, (iii) any material Law or any material contract, agreement or instrument or any order, writ, judgment, injunction or decree to which any Loan Party or any Subsidiary of any Loan Party is a party or by which or to which any Loan Party or any Subsidiary of any Loan Party is bound or subject, in each case, in any material respect or (b) result in the creation or enforcement of any Lien, charge or encumbrance whatsoever upon any property (now or hereafter acquired) of any Loan Party or any Subsidiary of any Loan Party (other than the Liens granted under the Loan Documents).

Section 6.06     Litigation.   Except as set forth on Schedule 6.06, there are no actions, suits, proceedings or investigations pending or, to the knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary of any Loan Party at law or equity before any Official Body which individually or in the aggregate could reasonably be expected to result in liability exceeding $250,000. None of the Loan Parties nor any Subsidiary of any Loan Party is in violation of any order, writ, injunction or any decree of any Official Body which individually or in the aggregate could reasonably be expected to result in liability exceeding $250,000.

Section 6.07     Financial Statements; No Material Adverse Change

(a)     The Borrower has delivered to the Lenders or their Affiliates copies of (i) reviewed consolidated year-end financial statements for and as of the end of the fiscal year ended December 31, 2016 for Revelation (collectively, the "Annual Statements"), (ii) unaudited income statement and balance sheet for the fiscal year to date and as of the end of the fiscal quarters ended March 31, 2017, for Revelation (collectively, the "Interim Statements") and (iii) unaudited income statement for and as of the end of the fiscal months ended January 31, 2017, February 28, 2017 and March 31, 2017 for Revelation (collectively, the "Monthly Statements") (the Annual Statement, the Interim Statements and the Monthly Statements being collectively referred to as the "Historical Statements"). The Historical Statements were compiled from the books and records maintained by Revelation's management, are correct and complete in all material respects and fairly represent the consolidated financial condition of Revelation and its Subsidiaries, as of their dates and the results of operations for the fiscal periods then ended and have been prepared in accordance with GAAP consistently applied, subject (in the case of the Interim Statements) to normal year-end audit adjustments.

(b)     Since December 31, 2016, there has been no event or circumstance, individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Change.

Section 6.08     Margin Stock.   None of the Loan Parties nor any Subsidiary of any Loan Party engages or intends to engage principally, or as one of its important activities, in the business of extending credit for the purpose, immediately, incidentally or ultimately, of purchasing or carrying margin stock (within the meaning of Regulation U). No part of the Loans (or the proceeds thereof) will be used to purchase or carry any margin stock (within the meaning of Regulation U) or to extend credit for the purpose of purchasing or carrying any margin stock. Neither the making of any Loan nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation U.

Section 6.09     Full Disclosure.   Neither this Agreement nor any other Loan Document, nor any certificate, statement, agreement or other documents furnished in writing by or on behalf of a Loan Party

DEBTORSLCC_105755

or any Subsidiary thereof to the Agent or any Lender in connection herewith or the transactions contemplated hereby (in each case, as modified or supplemented by other information so furnished), when taken as a whole, contains with respect to the Loan Parties and their respective Subsidiaries any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading. The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  There is no fact known to any Loan Party that could reasonably be expected to have a Material Adverse Change that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

Section 6.10    Taxes.  All federal, state, local and other tax returns required to have been filed with respect to each Loan Party and each Subsidiary of each Loan Party have been filed, all such tax returns are complete and accurate, and payment or adequate provision has been made for the payment of all taxes, fees, assessments and other governmental charges which have or may become due pursuant to said tax returns or to assessments received, except to the extent that such taxes, fees, assessments and other charges are being contested in good faith by appropriate proceedings diligently conducted and for which such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made. There are no agreements or waivers extending the statutory period of limitations applicable to any income tax return of any Loan Party or Subsidiary of any Loan Party for any period.

Section 6.11    Consents and Approvals.    No consent, approval, exemption, order or authorization of, or a registration or filing with, any Official Body or any other Person is necessary to authorize or permit under any Law or any Contractual Obligation (including those evidencing Debt) in connection with the execution, delivery and carrying out of this Agreement and the other Loan Documents by any Loan Party, except as listed on Schedule 6.11, all of which shall have been entered, obtained or made on or prior to the Closing Date.

Section 6.12    No Event of Default; Compliance With Instruments and Certain Contracts.  No event has occurred and is continuing and no condition exists or will exist after giving effect to the borrowings of the Loans to be made on the Closing Date under or pursuant to the Loan Documents which constitutes a Default or Event of Default. None of the Loan Parties or any Subsidiary of any Loan Party is in violation of or default under (a) any term of its certificate or articles of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate or articles of formation, limited liability company agreement or other organizational documents, (b) any Governing Document or (c) any other Contractual Obligation or requirement of Law where, in the case of this clause (c) only, such violation, individually or in the aggregate, (A) could reasonably be expected to result in liability exceeding $250,000 or (B) concerns Debt in aggregate principal amount in excess of $250,000 (it is understood that (1) other than the amounts set forth on Schedule 6.12, there are no amounts due under any Existing Debt Documents and (2) all such amounts set forth on Schedule 6.12 will paid on the Closing Date with the proceeds of the Loans). The MR Coal Agreement as in existence as of the Closing Date (or Replacement Contract therefor) and each Governing Document is in full force and effect, and is valid, binding and enforceable upon such Loan Party or Subsidiary and, to the best knowledge of the Loan Parties upon each of the other parties thereto in accordance with their respective terms.

Section 6.13    Insurance.  As of the Closing Date, Schedule 6.13 lists all insurance policies to which any Loan Party or Subsidiary of any Loan Party is a party, all of which are valid and in full force

49

and effect as of the Closing Date. Such policies provide adequate coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each Loan Party and each Subsidiary of each Loan Party in accordance with prudent business practice in the industry of the Loan Parties and their Subsidiaries. Each Loan Party has taken all actions required under the Flood Laws or reasonably requested by any Lender to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including to the extent applicable, but not limited to, providing the Agent with the address, legal description and/or GPS coordinates of each structure located upon any Real Property, whether owned or leased, that will be subject to a Mortgage in favor of the Agent, for the benefit of the Secured Parties, and, to the extent required, obtaining and maintaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral, in such form and in such amount as each Lender may reasonably require and otherwise to ensure compliance with the Flood Laws. None of the Loan Parties nor any of their respective Subsidiaries (i) has received notice from any insurer or agent of such insurer that substantial capital improvements or other material expenditures will have to be made in order to continue such insurance or (ii) has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a comparable.

Section 6.14    Compliance With Laws.    The Loan Parties and their Subsidiaries are in compliance in all material respects with all applicable Laws (other than Environmental Health and Safety Laws, Mining Laws and Reclamation Laws which are specifically addressed in Section 6.18).

Section 6.15    Investment Companies.    None of the Loan Parties is an "investment company" registered or required to be registered under the Investment Company Act of 1940.

Section 6.16    Plans and Benefit Arrangements. Except as could not reasonably be expected, individually or in the aggregate, to result in liability to the Borrower exceeding $250,000:

(a)    The Borrower and each other member of the ERISA Group are in compliance, with respect to all Benefit Arrangements, Plans and Multiemployer Plans, with the terms thereof and any applicable provisions of ERISA and applicable Law. There has been no (i) Prohibited Transaction with respect to any Benefit Arrangement or any Plan or, to the knowledge of any Loan Party, with respect to any Multiemployer Plan which could result in any liability of the Borrower or (ii) Reportable Event with respect to a Plan. The Borrower and all other members of the ERISA Group have made when due any and all payments required to be made to a Multiemployer Plan or a Multiple Employer Plan. With respect to each Plan and Multiemployer Plan, the Borrower and each other member of the ERISA Group (i) have fulfilled their obligations under the minimum funding standards of ERISA and the Internal Revenue Code, and (ii) have not incurred any liability to the PBGC.

(b)    None of the Borrower, any other member of the ERISA Group, and the PBGC has instituted proceedings to terminate any Plan.

(c)    No event requiring notice by the Borrower or any member of the ERISA Group to the PBGC under Section 303(k)(4) of ERISA has occurred or is reasonably expected to occur with respect to any Plan.

(d)    Neither the Borrower nor any other member of the ERISA Group has (i) withdrawn from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA, and for which Borrower has any outstanding liability, (ii) any outstanding liability with respect to a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (iii) any outstanding liability with respect to a complete or partial withdrawal (within the meaning of Section 4203 or 4205 of ERISA) from any Multiemployer Plan

50

DEBTORSLCC_105757

("Withdrawal Liability") or (iv) received any notice regarding a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA). To the knowledge of any Loan Party, no Multiemployer Plan or Multiple Employer Plan has been or currently intends to be terminated within the meaning of Title IV of ERISA.

(e)      No Plan has any Unfunded Pension Liability.

Section 6.17     Employment and Black Lung Liability Matters.

(a)      Each of the Loan Parties and each of their respective Subsidiaries is in compliance with the Labor Contracts and all applicable federal, state and local labor and employment Laws including those related to equal employment opportunity and affirmative action, labor relations, minimum wage, overtime, child labor, medical insurance continuation, worker adjustment and relocation notices, immigration controls and worker and unemployment compensation, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in liability exceeding $250,000. There are no outstanding grievances, arbitration awards or appeals therefrom arising out of the Labor Contracts or current or threatened strikes, picketing, handbilling or other work stoppages or slowdowns at facilities of any of the Loan Parties or any of their Subsidiaries which in any case, individually or in the aggregate, could reasonably be expected to result in liability exceeding $250,000.

(b)      Each of the Loan Parties, each of their respective Subsidiaries and each of the "related persons" (as defined in the Coal Act) of each Loan Party and each Subsidiary of each Loan Party are in compliance in all material respects with the Coal Act. None of the Loan Parties, any Subsidiary of any Loan Party nor any related person of any Loan Party or its Subsidiaries has any liability under the Coal Act except with respect to premiums or other payments required thereunder which have been paid when due and except to the extent that the liability thereunder, individually or in the aggregate, could not reasonably be expected to result in liability exceeding $250,000. The Loan Parties and their respective Subsidiaries are in compliance in all material respects with the Black Lung Act. None of the Loan Parties nor any of their Subsidiaries has any liability under the Black Lung Act except with respect to premiums, contributions or other payments required thereunder which have been paid when due and except to the extent that the liability thereunder individually or in the aggregate, could not reasonably be expected to result in liability exceeding $250,000.

Section 6.18     Mining, Environmental Health and Safety Matters.   Except as set forth on Schedule 6.18 or as could not, individually or in the aggregate, reasonably be expected to result in liability exceeding $250,000:

(a)      the Loan Parties, their Subsidiaries and each of their owned real properties and operations on leased real properties are in compliance in all material respects with all applicable Environmental Health and Safety Laws, Mining Laws or Reclamation Laws, and none of the Loan Parties, their respective Subsidiaries nor any of their owned real properties or operations on leased real properties violate any Environmental Health and Safety Order or Mining Order in any material respect;

(b)      the Loan Parties and their Subsidiaries hold and are operating in compliance in all material respects with applicable Environmental Health and Safety Permits and Mining Permits, and none of the Loan Parties has received any written notice from an Official Body that such Official Body has or intends to suspend, revoke or adversely amend or alter, whether in whole or in part, any such Permit unless the possibility of any such action has been extinguished;

51

DEBTORSLCC_105758

(c)      there are no investigations for which any Loan Party has received written notice, actions, suits, or proceedings pending or, to the knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary of any Loan Party at law or equity before any Official Body challenging an application for, or the modification, amendment, renewal or issuance of, any Environmental Health and Safety Permit or any Mining Permit.  Applications for such Permits have been timely filed to the extent required for the Loan Parties' ongoing, modified, or planned Mining Operations and are reasonably expected to be granted prior to the time such Permits are required to be obtained consistent with financial model of the Borrower delivered to the Agent and Annual Operating Plan and Budget;

(d)      none of the Loan Parties, none of their respective Subsidiaries, and none of the officers, directors, or Persons who own more than 10% of any Loan Party's or Subsidiary's Equity Interests, has (i) been barred for a period of 30 or more consecutive days from receiving Permits pursuant to the permit blockage provisions of SMCRA, and the regulations promulgated thereunder, or pursuant to any other Environmental Health and Safety Laws, Mining Laws or Reclamation Laws, (ii) been notified by any Official Body of potential ineligibility to receive any Environmental Health and Safety Permit or any Mining Permit or (iii) been subject to any injunction or closure order pursuant to any Mining Law or pursuant to any Environmental Health and Safety Permit or any Mining Permit;

(e)      there are no pending or, to the knowledge of any Loan Party, threatened Environmental Health and Safety Claims or Mining Claims against any real property owned by any Loan Party or any Subsidiary of any Loan Party nor against any Loan Party or any Subsidiary of any Loan Party, nor to the knowledge of any Loan Party threatened against any real property leased by any Loan Party or any Subsidiary of any Loan Party;

(f)      none of the Loan Parties has received any written notice of violation, alleged violation, non-compliance, liability or potential liability regarding Environmental Health and Safety Laws, Mining Laws or Reclamation Laws which has not been resolved in a manner that extinguishes the possibility that liability in connection with such written notice will be imposed, or is subject to any outstanding Environmental Health and Safety Order or Mining Order, in either case including any with regard to their activities at any real property, whether owned or leased, of the Loan Parties or the business operated by the Loan Parties, or any prior business for which the Borrower has retained liability under any Environmental Health and Safety Law;

(g)      (i) no real property currently owned or, to the knowledge of any Loan Party, formerly owned or currently or formerly leased by any Loan Party or Subsidiary of a Loan Party, contains any Contamination, or has had a Release of any Regulated Substances on any such real property, or, to the knowledge of any Loan Party, any other location used by any Loan Party or Subsidiary of a Loan Party (including any location to which Regulated Substances have been sent for re-use or recycling or for treatment, storage, or disposal) for which any Loan Party or Subsidiary of a Loan Party has, or would reasonably be expected to have, liability under any Environmental Health and Safety Laws, Mining Laws or Reclamation Laws, (ii) there are no landfills or coal refuse disposal areas located at, on, in or under real properties currently, or to the knowledge of any Loan Party formerly, owned or leased by any Loan Party or Subsidiary of a Loan Party, except for coal refuse disposal facilities authorized under Environmental Health and Safety Permits or Mining Permits, if such authorization is required by Environmental Health and Safety Laws or Mining Laws; and (iii) to the knowledge of the Loan Parties, no such real property has any associated acid mine drainage, other than any such acid mine drainage which is currently receiving treatment to the extent required by Environmental Health and Safety Law or Mining Law and for which there are, and have been, no Environmental Health and Safety Claims or Mining Claims;

(h)      no Lien on the ownership, occupancy, use or transferability of real property authorized by Environmental Health and Safety Laws exists against any real property owned, or to the

DEBTORSLCC_105759

knowledge of any Loan Party leased, by any Loan Party or any Subsidiary, and none of the Loan Parties
has received written notice that any such Lien may be imposed, attached or be filed or recorded against
any real property, whether owned or leased, of any Loan Party or any Subsidiary;

    (i)  there have been no accidents, explosions, implosions, collapses or flooding at or
otherwise related to the Mining Operations of any of the Loan Parties or their Subsidiaries that have,
directly or indirectly, resulted in (i) any fatality, (ii) the trapping of any Person in any mine for more than
24 hours or (iii) any Environmental Health and Safety Claim or Mining Claim that remains unresolved.

    (j)  none of the Loan Parties and none of their respective Subsidiaries has assumed or
retained, by contract or operation of law, any liabilities or obligations of any other Person pursuant to any
Environmental Health and Safety Law, any Environmental Health and Safety Order, any Mining Law,
any Reclamation Law or any Mining Order, including any related to any Contamination or Remedial
Action, for which any of the Loan Parties or their respective Subsidiaries have received written notice that
they must fulfill an obligation that is currently unresolved or for which it would otherwise reasonably be
expected that any Loan Party or any of their respective subsidiaries will incur material liability; and

    (k)  each of the Loan Parties and their respective Subsidiaries have made adequate
provisions in their respective capital expenditure budgets and financial reserves to cover reasonably
anticipated costs of compliance with applicable Environmental Health and Safety Laws, Environmental
Health and Safety Orders, Mining Laws, Reclamation Laws and any Environmental Health and Safety
Claims or Mining Claims.

  Section 6.19  [Reserved].

  Section 6.20  Real Property Rights. Schedule 6.20(a) lists completely and correctly as of the
Closing Date all Real Property fee owned by each Loan Party and each Subsidiary of each Loan Party.
Schedule 6.20(b) lists, in all material respects, completely and correctly as of the Closing Date all Real
Property leased by each Loan Party and each Subsidiary of each Loan Party and the lessors thereof.

  Section 6.21  Patents, Trademarks, Copyrights, Licenses, Etc. Each Loan Party and each
Subsidiary of each Loan Party owns or possesses all the patents, trademarks, service marks, trade names,
copyrights, licenses, registrations, franchises, permits and rights, without conflict with the rights of others,
necessary for the Loan Parties to own and operate their properties and to carry on their businesses as
presently conducted and planned to be conducted by such Loan Parties and Subsidiaries, except where the
failure to so own would not reasonably be expected to result in a Material Adverse Change.

  Section 6.22  Security Interests. The Collateral Documents are effective to create in favor of
the Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest in the
Collateral described therein and proceeds thereof. Upon the filing of financing statements relating to said
security interests in each office and in each jurisdiction where required in order to perfect the security
interests described above, the Liens created by the Collateral Documents in favor of the Agent for the
benefit of the Secured Parties will constitute fully perfected first priority Liens (subject to Permitted Prior
Liens set forth on Schedule 6.22) on, and security interests in, all right, title and interest of the Loan
Parties in such Collateral to the extent perfection can be obtained by filing such financing statements. All
filing fees and other expenses in connection with each such action have been or will be paid by the
Borrower. The Liens granted to the Agent for the benefit of the Secured Parties pursuant to each of the
Mortgages constitute a valid first priority Lien under applicable law, subject only to Permitted Prior
Liens. The Liens granted to the Agent for the benefit of the Secured Parties pursuant to each of the
Control Agreements constitute a valid first priority Lien under applicable law.

DEBTORSLCC_105760

Section 6.23     Sanctions and Anti-Corruption Laws.  None of the Loan Parties nor any of their respective Subsidiaries, nor any director or officer of the Loan Parties or any of their respective Subsidiaries nor, to the knowledge the Loan Parties, any employee or agent of the Loan Parties or any of their respective Subsidiaries is: (a) the subject of any Sanctions, or (b) located, organized or resident in a country or territory that is the subject of Sanctions. The Loan Parties and their respective Subsidiaries, directors, officers, and employees, and to the knowledge of the Loan Parties, their respective agents that will act in any capacity in connection with or benefit from the credit facility established hereby, are in compliance in all material respects with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and all other applicable anti-corruption laws.

Section 6.24     Status of Pledged Collateral.  All the Equity Interests included in the Collateral to be pledged pursuant to the Security Agreement are or will be upon issuance validly issued and non-assessable and owned beneficially and of record by the pledgor thereof free and clear of any Lien or restriction on transfer, except as otherwise provided by the Security Agreement and except as the right of the Secured Parties to dispose of such Equity Interests may be limited by the Securities Act of 1933, as amended, and the regulations promulgated by the Securities and Exchange Commission thereunder and by applicable state securities laws. There are no shareholder, partnership, limited liability company or other agreements or understandings with respect to the Equity Interests included in the Collateral, except for the articles of incorporation, by-laws, partnership agreements, operating agreements and limited liability company agreements described on Schedule 6.24. The Loan Parties have delivered true and complete copies of such the articles of incorporation, by-laws, partnership agreements and limited liability company agreements to the Agent.

Section 6.25     Mining Financial Assurances.  Schedule 6.25 lists all Mining Financial Assurances of the Loan Parties in effect.  All such Mining Financial Assurances are in full force and effect except for any failure which individually or when taken together with all failures under all such Mining Financial Assurances, individually or in the aggregate, could not reasonably be expected to result in liability exceeding $250,000, and were not and will not be terminated, suspended, revoked or otherwise adversely affected by virtue of the consummation of the financing contemplated by this Agreement.

Section 6.26     Solvency.  As of the Closing Date, after giving effect to the Transactions (including the borrowing of Loans and the use of proceeds thereof), the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 6.27     Accounts in Existence.  Unless otherwise consented to by the Agent in writing after the Closing Date, the only deposit accounts, securities accounts and commodities accounts of the Borrower and its Subsidiaries are the (a) Lone Mountain Blocked Account, (b) General Cash Account and (c) United Payment Account.

## ARTICLE 7
## CONDITIONS PRECEDENT

Section 7.01     Conditions Precedent to Closing Date.  The occurrence of the Closing Date and the effectiveness of this Agreement, and the agreement of each Lender to make Loans available to the Borrower, are subject to the satisfaction (or waiver in accordance with Section 11.01) of each of the following conditions precedent:

(a)     The Agent shall have received each of the following in form and substance satisfactory to the Lenders:

54

(i)      executed counterparts of this Agreement from the Agent, the Lenders, Holdings and the Borrower;

(ii)      a certificate dated the Closing Date and signed by the Secretary or an Assistant Secretary or other Authorized Officer of each of the Loan Parties, certifying as appropriate as to: (A) all action taken by each Loan Party in connection with this Agreement and the other Loan Documents; (B) the names of the Authorized Officers authorized to sign the Loan Documents and their true signatures; and (C) copies of its organizational documents as in effect on the Closing Date certified by the appropriate state official where such documents are filed in a state office together with certificates from the appropriate state officials as to the continued existence and good standing of each Loan Party in each state where organized;

(iii)      (A) a written opinion of Sidley Austin LLP, counsel for the Loan Parties, and (B) a written opinion of Thomas L. Pruitt, local Virginia counsel for the Loan Parties formed in the state of Virginia, each dated the Closing Date, addressed to the Agent and each Lender and in form and substance satisfactory to the Lenders;

(iv)      a certificate from an Authorized Officer of the Borrower as to the matters set forth in clauses (b) through (f) of this Section 7.01;

(v)      the Historical Statements;

(vi)      to the extent requested by any Lender at least 1 Business Day prior to the Closing Date, Notes payable to the Lenders (and their registered assigns) to the extent requested by any Lender pursuant to Section 2.05(d);

(vii)      a solvency certificate substantially in the form attached hereto as Exhibit 7.01 certified by the chief financial officer or the treasurer of (A) Revelation as to the Solvency of the Revelation and its Subsidiaries on a consolidated basis after giving effect to the Restructuring and (B) the Borrower as to the Solvency of the Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions, including the borrowing of the Loans;

(viii)      fully executed counterparts of the Guaranty Agreement and the Security Agreement;

(ix)      a copy of the fully executed Temporary Permit Agreement;

(x)      (i) a copy of any leases in which the Borrower or any of its Subsidiaries holds the lessee's interest or other agreements relating to possessory interests in any Real Property, including each lease relating to the leased Real Property set forth on Schedule 6.20(b) and (ii) except as set forth on Schedule 7.01(a)(x), consents or waivers of each Person necessary to (A) permit the Loan Parties to grant to the Agent, for the benefit of the Secured Parties, security interests and Mortgages in such assets and leased Real Property and (B) permit the Agent to foreclose upon the Equity Interests of Borrower or such other Loan Party without affecting the legal validity of such lease, in either case as applicable, in the Real Property set forth on Schedule 6.20(a) and Schedule 6.20(b), in form and substance reasonably satisfactory to the Agent, duly executed and delivered by the applicable Person, including any landlord or lessor;

(xi)      in accordance with the provisions of Section 8.01(c), evidence that adequate insurance required to be maintained under this Agreement is in full force and effect, with additional insured, mortgagee and lender loss payable designations in form and substance reasonably

55

DEBTORSLCC_105762

satisfactory to the Required Lenders, naming the Agent as additional insured, mortgagee and lender loss payee;

(xii)    copies of all agreements relating to any net profits interests, working interests, overriding royalty interests or similar real property interests in any Real Property;

(xiii)    one or more Perfection Certificates, duly executed and delivered by each Loan Party;

(xiv)    proper financing statements (Form UCC-1 or the equivalent) for filing under the Uniform Commercial Code or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Agent desirable, to perfect the security interests purported to be created by the Security Agreement;

(xv)    certified copies of (A) requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any other Loan Party as debtor and that are filed in the jurisdictions of organization of each such Person and in such other jurisdictions in which Collateral is located on the Closing Date, together with copies of such other financing statements that name the Borrower or any other Loan Party as debtor, and such other searches that are required by the Perfection Certificate or that the Agent (at the direction of the Lenders) deems necessary or advisable (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing) and (B) tax lien, judgment and bankruptcy searches;

(xvi)    evidence that all other recordings and filings of, or with respect to, the Security Agreement, and all other actions, as may be necessary or, in the reasonable opinion of the Agent (at the direction of Lenders), desirable, to perfect the security interests intended to be created by the Security Agreement have been (or, substantially concurrently with the borrowing of the Loans on the Closing Date, will be) taken, and the Security Agreement shall be in full force and effect;

(xvii)    all (A) promissory notes required to be delivered pursuant to the Security Agreement, together with undated endorsements executed in blank and (B) Equity Interests constituting certificated Collateral together with undated stock or transfer powers executed in blank have been (or, substantially concurrently with the borrowing of the Loans on the Closing Date, will be) delivered to the Agent;

(xviii)    evidence that prior to or substantially concurrently with the Closing Date, the Restructuring has been consummated, together with executed copies of all agreements and instruments of transfer, including the agreements and instruments referenced in the definition of Restructuring, and all consents required hereunder and all documents prepared for filing and recording to be made in connection therewith on the Closing Date; and

(xix)    (A) the Lone Mountain Blocked Account shall have been established pursuant to documentation satisfactory to the Agent and (B) the Borrower and United Bank Inc. and the Agent (either as third party beneficiary or party thereto) shall have entered into documentation providing the Lone Mountain Blocked Account shall be subject to a Control Agreement so that the Agent may have a first-priority Lien on such account and the assets deposited therein and that funds deposited in the Lone Mountain Blocked Account shall not be transferred from the Lone Mountain Blocked Account other than (1) pursuant to instructions given by the Agent pursuant to the terms of such Control Agreement, (2) to fund the Lone Mountain Acquisition upon delivery to the Agent and United Bank Inc. of the Lone

56

Mountain Closing Certificate or (3) on the Lone Mountain Signing Deadline or the Lone Mountain Closing Deadline, to make the prepayments required by Section 5.06(b)(vi) (the "Permitted Lone Mountain Blocked Account Withdrawals").

(b)    All consents and approvals of, and filings and registrations with, and all other actions in respect of, all Official Bodies required in order to make or consummate the Transactions shall have been obtained, given, filed or taken or waived and shall be or will be in full force and effect (or effective judicial relief with respect thereto shall have been obtained), and all applicable waiting periods with respect thereto (if any) shall have or, prior to the time when required, will have, expired without, in all such cases, any action being taken by any competent authority which restrains, prevents, or imposes material adverse conditions upon the Transactions.

(c)    (i) There shall be no actions, suits or proceedings pending or threatened (A) with respect to the Transactions, this Agreement or any other Loan Document, or (B) which the Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Change, and (ii) no unstayed judgment, order or injunction shall be in effect prohibiting or imposing material adverse conditions upon the Transactions.

(d)    Substantially concurrently with the funding of the Loans, the Hoops Note and the LR Note shall have been repaid, redeemed, discharged and satisfied in full and all guarantees, Liens and security interests in respect thereof shall have been released, terminated and discharged and all UCCs-3 and other customary documentation necessary to release, terminate and discharge any such Liens and security interests shall have been filed or recorded, as applicable, in a manner reasonably satisfactory to the Agent or the Agent shall have been authorized by the holders of the Hoops Note or LR Note, as applicable, to file or record, as applicable, such UCCs-3 or other customary documentation in a manner reasonably satisfactory to the Agent.

(e)    Since December 31, 2016, no event or circumstance shall have occurred which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Change.

(f)    On the Closing Date, after giving effect to the borrowing of Loans on such date, (i) all representations and warranties of the Borrower and each other Loan Party contained in the Loan Documents shall be true and correct, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct as of such earlier date), and (ii) no Default or Event of Default shall have occurred and be continuing or would result from the transactions contemplated by this Agreement, including the funding of the Loans and the use of proceeds thereof.

(g)    The Agent shall have received a Funding Notice in accordance with Section 2.02(a).

(h)    The Borrower shall have paid all fees, costs and expenses (including, without limitation, legal fees and disbursements of counsel) payable on or before the Closing Date as required by this Agreement or any other Loan Document.

DEBTORSLCC_105764

## ARTICLE 8
## COVENANTS

Section 8.01    Affirmative Covenants.  Each of Holdings and the Borrower covenants and agrees that until Payment in Full, Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, comply at all times with the following:

(a)    Preservation of Existence, Etc.  Each of Holdings and the Borrower shall maintain its legal existence and good standing (if applicable) as a limited liability company.  The Borrower shall cause each of its Subsidiaries to maintain its legal existence and good standing (if applicable) as a corporation, limited partnership or limited liability company, as the case may be, except as otherwise expressly permitted in Section 8.02(c) or Section 8.02(d).  Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, maintain its license or qualification in each jurisdiction in which its ownership or lease of property or the nature of its business makes such license or qualification necessary.

(b)    Payment of Liabilities, Including Taxes, Etc.  Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, duly pay and discharge all federal and other material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid after becoming due, might become a lien or charge upon any properties of Holdings, the Borrower or any Subsidiary of the Borrower, provided that neither Holdings, the Borrower nor any Subsidiary of the Borrower shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings and with respect to which there are proper reserves as required by GAAP, but only to the extent that failure to discharge any such liabilities would not adversely affect the value of the Collateral in any material respect.

(c)    Maintenance of Insurance.  Each Loan Party shall, and shall cause each of its Subsidiaries to, insure its properties and assets against loss or damage by fire and such other insurable hazards as such assets are commonly insured (including fire, extended coverage, property damage, workers' compensation, comprehensive general liability, auto liability and, only with respect to the coal preparation and processing plants and load-out facilities used by the Loan Parties in connection Mining Operations, business interruption insurance) and against other risks in such amounts as similar properties and assets are insured by prudent companies in similar circumstances carrying on similar businesses, and with reputable and financially sound insurers, including self-insurance to the extent customary. The Loan Parties shall deliver to the Agent and the Required Lenders, (x) on the Closing Date and annually thereafter an original certificate of insurance of the Loan Parties' independent insurance broker describing and certifying as to the existence of the insurance on the Collateral required to be maintained by this Agreement and the other Loan Documents, together with a copy of the endorsement described in the next sentence attached to such certificate and, (y) at the request of the Agent (upon the direction of the Required Lenders), from time to time a summary schedule indicating all insurance then in force with respect to each of the Loan Parties. Such policies of insurance shall contain special endorsements, in form and substance reasonably acceptable to the Agent and the Required Lenders, which shall (i) specify the Agent as an additional insured, mortgagee and lender loss payee as its interests may appear, with the understanding that any obligation imposed upon the insured (including the liability to pay premiums) shall be the sole obligation of the applicable Loan Parties and not that of the insured, (ii) to the extent commercially available, provide that the interest of the Lenders shall be insured regardless of any breach or violation by the applicable Loan Parties of any warranties, declarations or conditions contained in such policies or any action or inaction of the applicable Loan Parties or others insured under such policies, (iii) provide that no cancellation of such policies for any reason (including non-payment of premium) shall be effective until at least 30 days (or, to the extent commercially available, 10 days for non-payment) after receipt by the

58

Agent of written notice of such cancellation, (iv) to the extent commercially available, be primary without right of contribution of any other insurance carried by or on behalf of any additional insureds with respect to their respective interests in the Collateral, and (v) provide to the extent commercially available that inasmuch as the policy covers more than one insured, all terms, conditions, insuring agreements and endorsements (except limits of liability) shall operate as if there were a separate policy covering each insured. The applicable Loan Parties shall notify the Agent promptly of any casualty or condemnation event causing a loss or decline in value of the Collateral in excess of $1,000,000 and the estimated (or actual, if available) amount of such loss or decline. Upon the occurrence of an Event of Default that has not been waived, monies constituting insurance proceeds or condemnation proceeds (pursuant to the Mortgages, if any) shall be paid to the Agent and applied in accordance with Section 9.02(e) and the Collateral Documents.

Each Loan Party shall take all actions reasonably requested by any Lender (or any potential Lender who has entered into a binding agreement to become a Lender) subject to the Flood Laws, to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, to the extent applicable, but not limited to, providing the Agent with the address, legal description and/or GPS coordinates of each structure on any Real Property, whether owned or leased, that will be subject to a Mortgage in favor of the Agent, for the benefit of the Secured Parties, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral, in such form and in such amount as each such Lender may reasonably require and otherwise to ensure compliance with the Flood Laws, and thereafter maintaining such flood insurance in full force and effect for so long as required by the Flood Laws.

(d)     Maintenance of Properties; Operation of Properties. Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, maintain and preserve all of its respective material properties and assets, necessary or useful in the proper conduct of the business of the Borrower or such Subsidiary, in good working order and condition in all material respects, ordinary wear and tear excepted (except as otherwise expressly permitted by this Agreement). Without limiting the generality of the foregoing, the Borrower shall, and shall cause each of its Subsidiaries to, maintain in full force and effect all material patents, trademarks, service marks, trade names, copyrights, licenses and franchises necessary for the ownership and operation of its properties and business. Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, operate and maintain its properties and assets (including its Mining Operations) (i) in accordance with prudent industry practice and (ii) in all material respects in accordance with all Permits and all applicable Laws.

(e)     Visitation Rights. Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, permit any of the officers or authorized employees or representatives of the Agent or any of the Lenders to visit and inspect, upon reasonable notice and during normal business hours, any of its properties and to examine and make excerpts from its books and records and discuss its business affairs, finances and accounts with its officers, all in such detail and at such times and as often as any of the Lenders may reasonably request, provided that unless an Event of Default shall have occurred and be continuing, only one such visit per fiscal year of the Borrower shall be at the expense of the Borrower. In the event any Lender desires to conduct an audit of the Borrower or any Subsidiary of the Borrower, such Lender shall conduct such audit contemporaneously with any audit to be performed by the Agent.

(f)     Keeping of Records and Books of Account; Quarterly Calls. Each of Holdings and the Borrower shall, and shall cause each Subsidiary of the Borrower to, maintain and keep proper books of record and account which enable the Borrower and its Subsidiaries to issue financial statements in accordance with GAAP and as otherwise required by applicable Laws of any Official Body having jurisdiction over the Borrower or any Subsidiary of the Borrower, and in which full, true and correct entries shall be made in all material respects of all its dealings and business and financial affairs. At the

DEBTORSLCC_105766

request of the Agent or the Required Lenders, the Borrower shall within 10 Business Days after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 8.03(a) and 8.03(b), hold a conference call or teleconference, at a time selected by the Borrower and reasonably acceptable to the Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Borrower, as the case may be, and the financial condition of the Borrower and its Subsidiaries and the budgets presented for the current fiscal year of the Borrower and its Subsidiaries.

(g)　　Use of Proceeds.  The Borrower shall, and shall cause each Subsidiary of the Borrower to, use all proceeds of the Loans to (i) pay all amounts currently due with respect to the Existing Debt Documents, the Hoops Note and the LR Note, (ii) finance the Restructuring, (iii) provide working capital, fund Permitted Capital Expenditures, fund cash on the Borrower's balance sheet and support other general corporate purposes of the Borrower and (iv) pay fees, expenses and other transaction costs incurred in connection with the Transactions.

(h)　　Compliance With Laws; Sanctions.  Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, comply in all material respects with all applicable Laws (other than Environmental, Health and Safety Laws, Environmental, Health and Safety Orders, Mining Laws, Reclamation Laws and Mining Orders, which are specifically addressed in Section 8.01(i)). Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, maintain in effect measures or policies and procedures reasonably designed to ensure compliance by Holdings, the Borrower, each of their respective Subsidiaries and the respective directors, officers, employees and agents of Holdings, the Borrower and such Subsidiaries with the FCPA and applicable anti-corruption laws and applicable Sanctions.

(i)　　Mining, Environmental, Health and Safety Matters.  Each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to (i) comply with applicable Environmental, Health and Safety Laws, Environmental, Health and Safety Orders, Mining Laws, Reclamation Laws and Mining Orders in all material respects, (ii) obtain, maintain in full force and effect and comply in all material respects with the terms and conditions of all Environmental, Health and Safety Permits and Mining Permits, (iii) take reasonable precautions against the imposition, attachment, filing or recording of any Lien (other than Permitted Liens) authorized by Environmental, Health and Safety Laws, Mining Laws, or Reclamation Laws to be imposed, attached or be filed or recorded against the real property owned or leased by any of them, (v) perform or pay for performance of any Remedial Actions necessary to (A) comply in any material respect with any Environmental, Health and Safety Law, any Environmental, Health and Safety Order, Mining Law, Reclamation Law or Mining Order, or (B) to manage material Contamination at, in, on, under, emanating to or from or otherwise affecting the real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party for which the Loan Party or any Subsidiary of the Loan Party has an obligation under any Environmental, Health and Safety Law, Environmental, Health and Safety Order, Mining Law, Reclamation Law or Mining Order to manage such Contamination, and (vi) maintain adequate reserves and make adequate provisions in their respective capital expenditure budgets and financial reserves to cover any known or reasonably anticipated material costs of compliance with applicable Environmental Health and Safety Laws, Environmental Health and Safety Orders, Mining Laws, Reclamation Laws and any Environmental Health and Safety Claims or Mining Claims.

(j)　　Collateral; Further Assurances.

(i)　　Collateral Documents and Liens.

60

(A)     To the extent not delivered on the Closing Date or pursuant to Section 8.01(n), each Loan Party shall, and shall cause each of its Subsidiaries to, upon the request of the Agent, execute and deliver to the Agent for the benefit of the Secured Parties, the Collateral Documents, including in the event any Loan Party develops or acquires any material intellectual property, Patent, Trademark and Copyright Security Agreements, necessary, or as the Agent or Required Lenders may deem necessary or appropriate, to grant first priority perfected liens and security interests (subject only to Permitted Prior Liens) in favor of the Agent for the benefit of the Secured Parties with respect to substantially all of the assets of the Loan Parties, other than Excluded Property.

(B)     The Loan Parties shall at all times work diligently with the Agent and Lenders to confirm that all documentation has been prepared, executed and recorded which is necessary to grant a Lien on all Real Property, as-extracted collateral and fixtures of the Loan Parties (other than Excluded Property) in favor of the Agent for the benefit of the Secured Parties, including opinions of local counsel in each applicable jurisdiction (including Title Opinions in respect of such Real Property), with such opinions to be reasonably satisfactory in form, scope and substance to the Agent and the Required Lenders in their respective reasonable discretion, in the case of Real Property acquired or leased after the Closing Date, not later than 30 days after such acquisition or entry into such lease, as applicable (or such longer period as may be extended by the Agent at the direction of the Required Lenders in their reasonable discretion).

(C)     The Borrower shall and shall cause each Loan Party, from time to time, at its expense, to preserve and protect the Agent's Lien on the Collateral as a continuing first priority perfected Lien, subject only to Permitted Prior Liens, and shall do such other acts and things as may be necessary or as the Agent or the Required Lenders may reasonably request from time to time, including execute and deliver any Collateral Documents covering any after-acquired property or assets (other than Excluded Property), in order to create, preserve, perfect and protect the Liens granted under the Loan Documents except to the extent otherwise permitted hereunder, including opinions of counsel in each applicable jurisdiction, with such opinions to be reasonably satisfactory in form, scope and substance to the Agent and the Required Lenders.

(ii)     Requirements for Subsidiaries.

(A)     Guarantees.  Within 30 days (or such longer period as may be extended by the Agent at the direction of the Required Lenders in their reasonable discretion) after any Subsidiary is formed or acquired after the Closing Date, the Borrower shall: (i) cause each such Subsidiary to execute a Guarantor Joinder pursuant to which it shall join as a Guarantor each of the documents to which the Guarantors are parties; (ii) execute and deliver to the Agent documents, modified as appropriate to relate to such Subsidiary, in the forms described in Sections 7.01(a)(ii), 7.01(a)(iii) and 7.01(a)(iv) and (iii) deliver to the Agent such other documents and agreements as the Agent or Required Lenders may reasonably request.

(B)     Collateral.  Within 30 days (or such longer period as may be extended by the Agent at the direction of the Required Lenders in their reasonable discretion) after any Subsidiary is formed or acquired after the Closing Date, the Borrower shall cause such Subsidiary to, unless the Required Lenders otherwise agree in writing, (i) execute and deliver to the Agent a Perfection Certificate, relating to such Subsidiary, (ii) pledge the Equity Interests it owns in any other Subsidiary to the Agent for the benefit of the Secured Parties on a first priority perfected basis pursuant to a security agreement in substantially the form of the Security Agreement, (iii) cause all of the issued and outstanding Equity Interests of such Subsidiary that are owned by another Loan Party to be pledged on a first priority perfected basis to the Agent for

61

the benefit of the Secured Parties pursuant to the Security Agreement, (iv) execute and deliver to the Agent for the benefit of the Secured Parties Collateral Documents in form and substance reasonably satisfactory to the Agent and the Required Lenders, including without limitation, a Security Agreement, Mortgages (subject to the below proviso) and, if such Subsidiary owns any material intellectual property, Patent, Trademark and Copyright Security Agreements, in each case, necessary or reasonably requested by the Agent or Required Lenders to grant first priority perfected liens and security interests (subject only to Permitted Prior Liens) in favor of the Agent for the benefit of the Secured Parties in substantially all of the assets of such Subsidiary, including proper financing statements under the Uniform Commercial Code of the applicable jurisdictions of organization covering the Collateral described in the relevant Collateral Documents and appropriate equity certificates and powers evidencing the Collateral pledged pursuant to the relevant Collateral Documents, (v) obtain Uniform Commercial Code, lien, tax, mortgage, leasehold mortgage, and judgment searches (including searches of the applicable real estate indexes), with the results, form scope and substance of such searches to be reasonably satisfactory to the Agent and the Required Lenders, (vi) deliver opinions of legal counsel with respect to such Subsidiary, including opinions of local counsel in each applicable jurisdiction, as such opinions may be reasonably requested by the Required Lenders and with such opinions to be reasonably satisfactory in form, scope and substance to the Agent and the Required Lenders in their respective reasonable discretion and (vii) upon the request by any Lender (or any potential Lender who has entered into a binding agreement to become a Lender) subject to the Flood Laws, provide the Agent with evidence that such Subsidiary has taken all actions required under the Flood Laws and/or reasonably requested by any such Lender, to assist in ensuring that each such Lender is in compliance with the Flood Laws applicable to the Collateral to the extent such Collateral includes any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Laws), including, but not limited to, providing the Agent with the address, legal description and/or GPS coordinates of each structure on any Real Property, whether owned or leased, that is or will be subject to a Mortgage in favor of the Agent, for the benefit of the Secured Parties, and, to the extent required, obtaining flood insurance in accordance with Section 8.01(c); provided, however, with respect to any Real Property, whether owned or leased (other than, for the avoidance of doubt, Excluded Property, only to the extent and for so long as such property or asset constitutes Excluded Property), of a Subsidiary that is formed or acquired after the Closing Date that is required to be subject to a Mortgage, and any as-extracted collateral or fixtures (as such terms are defined in the Uniform Commercial Code) which are required to be subject to a Mortgage or the Security Agreement, the requirements of this Section 8.01(j) shall be satisfied with respect to such Real Property, fixtures and as-extracted collateral if the Borrower and the applicable Subsidiary take all steps within 90 days following the date such Subsidiary is formed or acquired (or such longer period as may be extended by the Agent at the direction of the Required Lenders) necessary or reasonably requested by the Agent or the Required Lenders to grant first priority perfected liens (subject only to Permitted Prior Liens) in favor of the Agent for the benefit of the Secured Parties with respect to such Collateral.

(k)     Subordination of Intercompany Loans.   Each Loan Party agrees that any intercompany Debt, loans or advances owed by any Loan Party or any Subsidiary of a Loan Party to any other Loan Party shall be subordinated to the payment of the Obligations on terms and conditions satisfactory to the Required Lenders, evidenced by a global intercompany note in form and substance reasonably satisfactory to the Required Lenders and pledged (together with an allonge in respect thereof duly indorsed in blank) to the Agent, for the benefit of the Secured Parties, pursuant to the Collateral Agreement.

62

(l)    Role of Jeffrey Hoops. The Borrower and Holdings shall ensure that Jeffrey Hoops is employed as the full-time acting chief executive officer of Revelation and the Borrower.

(m)    Title to Real Properties. Each Loan Party and each Subsidiary of each Loan Party shall have (a) Mining Title to all Active Operating Properties that are necessary or appropriate for the Borrower and its Subsidiaries to conduct their respective operations, and (b) good and valid title (or, in the case of Real Property constituting coal reserves that are not Active Operating Properties, a valid leasehold interest in all or an undivided interest in surface and/or coal rights with regard to such Real Property) to all of their other respective material assets, in the case of both the foregoing items (a) and (b) of this sentence, free and clear of all Liens and encumbrances except Permitted Liens (and the Liens created by the Collateral Documents on such Real Property shall be first-priority Liens in favor of the Agent for the benefit of the Secured Parties except as set forth on Schedule 8.01(m)), and subject to the terms and conditions of the applicable leases. Each Loan Party's and each Subsidiary of each Loan Party's respective rights and interests under the leases, contracts, rights-of-way and easements necessary for the operation of any Active Operating Properties shall be in full force and effect. Each Loan Party or each Subsidiary of each Loan Party, as applicable, shall possess all material licenses, franchises and other Permits which are necessary to carry out its business as presently conducted at any Active Operating Property included or purported to be included in the Collateral.

(n)    Post-Closing Covenants.

(i)    No later than 30 days after the Closing Date (as such period may be extended by the Required Lenders in their sole discretion), each Loan Party shall, or shall cause the applicable Subsidiary to, ensure that its leasehold interests have been placed of record in the applicable county filing office(s) where the property that is the subject of the leasehold is located with respect to the NRP Leases, and shall deliver to the Agent and the Lenders consents or waivers of each Person necessary to (A) permit the Loan Parties to grant to the Agent, for the benefit of the Secured Parties, security interests and Mortgages in all assets and leased Real Property and (B) permit the Agent to foreclose upon the Equity Interests of Borrower or such other Loan Party without affecting the legal validity of such leases, in either case, with respect to the NRP Leases, duly executed and delivered by the applicable Person, including any landlord or lessor. No later than 90 days after the Closing Date (as such period may be extended by the Required Lenders in their sole discretion), each Loan Party shall, or shall cause the applicable Subsidiary to, ensure that its interest in any other leasehold interests is of record in the applicable county filing office(s) where the property that is the subject of the leasehold is located, and shall deliver to the Agent and the Lenders consents or waivers of each Person necessary to (A) permit the Loan Parties to grant to the Agent, for the benefit of the Secured Parties, security interests and Mortgages in all leased Real Property and (B) permit the Agent to foreclose upon the Equity Interests of Borrower or such other Loan Party without affecting the legal validity of such leases, in each case, with respect to the Real Property set forth on Schedule 6.20(b) (other than the NRP Leases), duly executed and delivered by the applicable Person, including any landlord or lessor, such that no additional consents or waivers are necessary to permit at least 85% of the aggregate fair market value of all Real Property set forth on Schedule 6.20(a) and Schedule 6.20(b) to be subject to Mortgages. Upon reasonable request of the Agent, the Borrower shall deliver a certificate of an Authorized Officer setting forth reasonably detailed calculations demonstrating compliance with the requirements of this Section 8.01(n)(i).

(ii)    No later than 5 Business Days (or such later date as the Agent may agree in its sole discretion) after the execution by any Loan Party or any of its Subsidiaries of any lease or sublease after the Closing Date, each Loan Party shall, or shall cause the applicable Subsidiary to, deliver to the Agent and the Lenders (A) a copy of such lease or sublease, including any amendments, modifications or supplements thereto and (B) either (1) ensure that such lease or sublease shall permit the Loan Parties to grant to the Agent, for the benefit of the Secured Parties, security interests and Mortgages

DEBTORSLCC_105770

in such lease or sublease and the rights of the applicable Loan Party or Subsidiary thereunder and permit the Agent to foreclose upon the Equity Interests of Borrower or such other Loan Party without affecting the legal validity of such lease or sublease or (2) such Loan Party or Subsidiary shall have obtained fully executed landlord or lessor consents relating thereto, in form and substance reasonably satisfactory to the Agent and the Required Lenders, duly executed and delivered by the applicable landlord or lessor.

(iii)     No later than 30 days (or such later date as the Agent may agree in its sole discretion) after the Closing Date with respect to any deposit account, securities account or commodity account existing as of the Closing Date (in each case other than (A) zero-balance accounts, (B) accounts used solely for payroll funding and other employee wage and benefit payments, tax payments or trust purposes and (C) deposit accounts, securities accounts and commodities accounts with a balance of less than $10,000 individually or $150,000 in the aggregate for all such deposit accounts, securities accounts and commodity accounts (such accounts set forth in clauses (A) through (C), collectively, the "Excluded Accounts")), each Loan Party shall, or shall cause the applicable Subsidiary to, deliver to the Agent and the Lenders a fully executed Control Agreement relating thereto, duly executed and delivered by the applicable Loan Party, the applicable financial institution, as the depositary bank, and the Agent, as the secured party.

(iv)     In the case of any fee owned Real Property or any leased Real Property, excluding leased Real Property set forth on Schedule 7.01(a)(x) (as updated pursuant to Section 8.01(n)(viii)) for which any consents or waivers required to pledge or foreclose on such lease have not been obtained, no later than 30 days after the Closing Date or, in the case of any leased Real Property for which a consent or waiver was obtained pursuant to the second sentence of Section 8.01(n)(i), within the earlier of (x) 20 Business Days after the request of Agent and (y) 90 days after the Closing Date (or, in each case, such later date as the Agent may agree in its sole discretion), the Loan Parties shall deliver to the Agent and the Lenders (A) fully executed counterparts of Mortgages and corresponding, duly completed UCC fixture filings and As-Extracted Collateral Filings, in form and substance satisfactory to the Agent and the Required Lenders, covering such Real Property (other than Excluded Property), together with evidence that counterparts of such Mortgages, UCC fixture filings and As-Extracted Collateral Filings have been delivered to the Agent or its designee for recording, and opinions of local counsel in form and substance satisfactory to the Lenders relating thereto; provided, that all such opinions of each single local counsel may be submitted at one time, such time no later than 90 days after the Closing Date, (B) evidence satisfactory to the Agent and the Required Lenders of the payment by the Borrower of all search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages, and (C) evidence that adequate insurance, including flood insurance, if applicable, required to be maintained under this Agreement is in full force and effect, with additional insured, mortgagee and lender loss payable special endorsements attached thereto in form and substance reasonably satisfactory to the Required Lenders, naming the Agent and each Secured Party as additional insured, mortgagee and lender loss payee, and if requested by any Lender (or any potential Lender who has entered into a binding agreement to become a Lender) subject to the Flood Laws, evidence that the Loan Parties have taken all action required under the Flood Laws and/or reasonably requested by the Agent or any Lender to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing the Agent with the address and/or GPS coordinates of each structure on any real property, whether owned or leased, that will be subject to a Mortgage in favor of the Agent, for the benefit of the Secured Parties, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral.

(v)     No later than 7 days (or such later date as the Agent may agree in its sole discretion) after the Closing Date, the Loan Parties shall take all necessary actions required by any applicable Official Body to initiate the transfer of all Permits subject to the Temporary Permit Agreement

DEBTORSLCC_105771

from Revelation and its Subsidiaries to the applicable Loan Party. Within 60 days after the Closing Date (or such later date as the Agent may agree in its sole discretion), the Loan Parties shall have completed the submission of a transfer application (to any applicable Official Body), including an approved-operator designation, insurance certificates, all bonding requirements, payment of all applicable fees and have taken all other steps necessary for the transfer of the Permits. The Loan Parties shall at all times use commercially reasonable efforts to cause all such Permits to be issued to the applicable Loan Party as soon as practicable after the Closing Date.

(vi)    No later than 15 Business Days (or such later date as the Agent may agree in its sole discretion) after the Closing Date, the Loan Parties shall have provided certified copies of all special endorsements in form and substance reasonably satisfactory to the Required Lenders, evidencing the endorsements required by Section 8.01(c).

(vii)    No later than 30 days (or such later date as the Agent may agree in its sole discretion) after the Closing Date, (A) Borrower, United Bank Inc. and Agent shall have entered into a United Intercreditor Agreement in form and substance reasonably satisfactory to Borrower and the Agent and (B) Borrower, MR Coal, Noble Americas Corp., a Delaware corporation, and Agent shall have entered into a MR Coal Intercreditor Agreement in form and substance reasonably satisfactory to Borrower and the Agent.

(viii)    No later than 10 Business Days (or such later date as the Agent may agree in its sole discretion) after the Closing Date, the Loan Parties shall deliver to the Agent any necessary revisions to Schedule 7.01(a)(x) so that it only identifies leased Real Property, excluding the NRP Leases, that requires a third-party consent or waiver necessary to (A) permit the Loan Parties to grant to the Agent, for the benefit of the Secured Parties, security interests and Mortgages in such assets and leased Real Property or (B) permit the Agent to foreclose upon the Equity Interests of Borrower or such other Loan Party without affecting the legal validity of such lease, in either case as applicable, in the Real Property set forth on Schedule 6.20(a) and Schedule 6.20(b) which the Borrower had not obtained as of the Closing Date.

Section 8.02    Negative Covenants. Each of Holdings and the Borrower covenants and agrees that until Payment in Full, each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to, comply with the following negative covenants:

(a)    Debt. Each of Holdings and the Borrower shall not, and shall not permit any of their respective Subsidiaries to, at any time create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents or in respect of any of the other Obligations;

(ii)    to the extent constituting Debt (other than Debt for borrowed money), of Holdings, the Borrower or any of their respective Subsidiaries, Mining Financial Assurances;

(iii)    unsecured Debt of any Loan Party payable to any other Loan Party, provided that such Debt shall be subordinated to the Obligations in a manner satisfactory to the Agent and Required Lenders;

(iv)    the Daniels Debt in an aggregate principal amount not to exceed $22,000,000 so long as (A) such debt does not mature prior to three years after the date of its incurrence, (B) the all-in-yield does not exceed 8%, (C) such Debt permits the Agent to have a second priority Lien on the Daniels Plant, (D) no other assets of the Borrower secure the Daniels Debt, (E) the proceeds of the

65

Daniels Debt are used solely to finance the Daniels Plant and (F) an Authorized Officer of the Borrower provides a certificate to the Agent on the date of the incurrence of such Debt certifying the foregoing and attaching the Daniels Financing Documents;

(v)    Debt in an aggregate principal amount not exceeding $5,000,000 incurred under the United Revolving Facility at any time outstanding;

(vi)    Guaranties in respect of Debt otherwise permitted hereunder;

(vii)    Debt relating to the financing of insurance policy premiums incurred in the ordinary course of business;

(viii)    Existing Debt existing on the date hereof and set forth in Schedule 8.02(a) (which, for avoidance of doubt, shall exclude the United Revolving Facility, which is permitted by clause (v) above and the Daniels Debt, which is permitted by clause (iv) above, in each case, to the extent permitted by such clauses);

(ix)    Debt in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments created or issued in the ordinary course of business in connection with workers' compensation claims, health, disability or other employee benefits or property, or casualty or liability insurance; provided that any reimbursement obligations in respect thereof are satisfied within 30 days following the incurrence thereof; and

(x)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred in the ordinary course of business; provided that such Debt is extinguished within 10 Business Days of its incurrence;

(xi)    to the extent constituting Debt of the Loan Parties, Debt in respect of accounts payable of Revelation, which obligation to pay to Revelation was assumed by the Borrower in connection with the Restructuring; and

(xii)    Debt not otherwise permitted hereunder in an aggregate amount not to exceed $250,000 at any time outstanding.

(b)    Liens; Guaranties.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, (i) at any time create, incur, assume or suffer to exist any Lien on any of its respective property or assets, tangible or intangible, now owned or hereafter acquired, except Permitted Liens, and (ii) at any time, directly or indirectly, enter into any agreement that prohibits or restricts Holdings', the Borrower's or its Subsidiaries' ability to grant a security interest or Lien on any of the Collateral to the Agent or the Secured Parties in connection with this Agreement or any other Loan Document.

Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, at any time, directly or indirectly, become or be liable in respect of any Guaranty, or assume, guaranty, become surety for, endorse or otherwise agree, become or remain directly or contingently liable upon or with respect to any obligation or liability of any other Person, except for (i) Guaranties of the Loan Parties or their Subsidiaries permitted hereunder, (ii) any Guaranty by any Loan Party of representations, warranties, performance covenants, or indemnities arising in connection with any sale or other disposition of assets of any Loan Party permitted by this Agreement, (iii) endorsements of negotiable or other instruments for deposit or collection in the ordinary course of business and (iv) the Revelation Reclamation Obligations.

66

DEBTORSLCC_105773

(c)    <u>Liquidations, Mergers, Consolidations, Acquisitions</u>.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, dissolve, liquidate or wind up its affairs, or consummate any merger or consolidation, or acquire by purchase, lease or otherwise all or substantially all of the assets or capital stock of any other Person, <u>provided</u> that:

(i)    (A) any Subsidiary of the Borrower may consolidate with or merge into the Borrower or into any Subsidiary of the Borrower that is a Loan Party so long as the security interest granted by the Borrower or such Loan Party, as the case may be, pursuant to the Collateral Documents shall remain in full force and effect, and (B) any transaction otherwise permitted by <u>Section 8.02(d)</u> and <u>Section 8.02(m)</u> shall be permitted under this <u>Section 8.02(c)</u>; and

(ii)    any Subsidiary of the Borrower that holds only de minimis assets and is not conducting any material business may dissolve or otherwise wind up its affairs.

(d)    <u>Dispositions of Assets or Subsidiaries</u>.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, sell, convey, assign, lease, abandon, securitize or enter into a securitization transaction, or otherwise transfer or dispose of, voluntarily or involuntarily, any of its properties or assets, tangible or intangible (including sale, assignment, discount or other disposition of accounts, contract rights, chattel paper, equipment, general intangibles with or without recourse or of Equity Interests of a Subsidiary of the Borrower), except:

(i)    (A) transactions involving the sale of inventory in the ordinary course of business, (B) any sale, transfer, lease, sublease or license of assets in the ordinary course of business which are no longer necessary or required in the conduct of any Loan Party's business or the grant in the ordinary course of business of any non-exclusive easements, permits, licenses, rights of way, surface leases or other surface rights or interests and (C) transfers of condemned property as a result of the exercise of "eminent domain" or other similar policies to the respective Official Body or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such property as part of an insurance settlement;

(ii)    any sale, transfer or lease of assets between or among Loan Parties (other than Holdings);

(iii)    any sale, transfer or lease of assets, other than those specifically excepted pursuant to clauses (i) and (ii) above or pursuant to clause (iv) below, <u>provided</u> that with respect to all such sales, transfers and leases of assets pursuant to this <u>Section 8.02(d)(iii)</u>: (A) at the time of any such disposition, no Event of Default shall exist or shall result from such disposition, (B) such sale, transfer or lease shall be for fair market value, (C) the consideration to be paid to the Borrower and its Subsidiaries as permitted by this clause (iii) shall consist of cash in an amount that is not less than 75% of such consideration, (D) if the consideration to be paid to the Borrower and its Subsidiaries pursuant to any such sale, transfer, lease or other disposition exceeds $1,500,000 in the aggregate, the Borrower shall have delivered to the Agent a certificate indicating compliance with the requirements of this <u>Section 8.02(d)(iii)</u> prior to consummating such sale, transfer or lease, (E) the Net Cash Proceeds for all such sales, transfers, leases or other dispositions are applied as a mandatory prepayment of the Loans in accordance with, and to the extent required under, the provisions of <u>Section 5.06(b)(i)</u>; <u>provided</u> that (1) no such mandatory prepayment shall be required with respect to Reinvestment Deferred Amounts except as required pursuant to <u>Section 5.06(b)(ii)</u> and (2) in the case of any such sale, transfer, lease or other disposition of assets, the Borrower shall have delivered to the Agent a certificate of the chief financial officer or the treasurer of the Borrower, certifying as to (x) the amount of Net Cash Proceeds and (y) the fact that a Loan Party shall invest such Net Cash Proceeds to acquire or repair assets useful in the

67

DEBTORSLCC_105774

business of the Borrower and its Subsidiaries within 180 days after such disposition (or, if the Borrower or any Subsidiary enters into a legally binding commitment to reinvest such Net Cash Proceeds within 180 days following such disposition, within the later of (i) 180 days following receipt thereof and (ii) 90 days of the date of such legally binding commitment) and (F) the aggregate Net Cash Proceeds received from any sales, transfers or leases (or series of related sales, transfers or leases) pursuant to this Section 8.02(d)(iii) shall not exceed $1,500,000 in the aggregate; provided that sales, transfers and leases (or series of related sales, transfers or leases) resulting in aggregate Net Cash Proceeds in excess of $1,500,000 in the aggregate shall be permitted under this Section 8.02(d)(iii) so long as (x) such excess Net Cash Proceeds are applied as a mandatory prepayment of the Loans in accordance with the provisions of Section 5.06(b)(i) (without giving effect to the reinvestment right described above or in Section 5.06(b)(ii)) and (y) the aggregate Net Cash Proceeds received from any sales, transfers or leases (or series of related sales, transfers or leases) pursuant to this Section 8.02(d)(iii) shall not exceed $7,500,000; and

(iv)     any sale, transfer, lease or other disposition of assets as part of a Restricted Payment which is permitted by Section 8.02(h), granting of any Permitted Lien or an Investment which is permitted by Section 8.02(m).

(e)     Affiliate Transactions.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, enter into or carry out any transaction (including purchasing property or services from or selling property or services to) with any Affiliate of any Loan Party unless (1) such transaction is not otherwise prohibited by this Agreement and (2) such transaction is entered into upon fair and reasonable arm's-length terms and conditions; provided, however that this Section 8.02(e) shall not prohibit (i) the consummation of the Transactions, (ii) any dividend or distribution which is not otherwise prohibited by this Agreement, (iii) any transaction described on Schedule 8.02(e) (including any modification, extension or renewal thereof on terms no less favorable to the Loan Parties than the terms of such transaction as described on such Schedule) which is not otherwise prohibited by this Agreement, (iv) transactions between or among the Loan Parties not involving any other Affiliate, (v) any Investment permitted by Sections 8.02(m)(ii) and transactions permitted by Section 8.02(n), (vi) any Debt permitted under Section 8.02(a)(iii), (vii) any Restricted Payment permitted by Section 8.02(h), (viii) loans or advances to employees permitted under Section 8.02(m)(viii), (ix) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are not employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business in an amount not to exceed $250,000 in any fiscal year of the Borrower, and (x) payments in respect of the Revelation Reclamation Obligations; provided further, that any transfer of Real Property including any royalty interests, overriding royalty interests, net profit interests, production payment interests or similar real property interests, to any Affiliate (other than the Borrower and its Subsidiaries) shall require the consent of the Required Lenders.

(f)     Subsidiaries, Partnerships and Joint Ventures; No Foreign Subsidiaries.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, own or create, directly or indirectly, any Subsidiaries or own or acquire, directly or indirectly, any Equity Interests in any other Person other than (i) its Subsidiaries owned as of the Closing Date and disclosed in writing to the Agent and the Lenders and (ii) Persons that become Subsidiaries pursuant to, and have otherwise complied with, the terms of this Agreement (including, without limitation, Section 8.01(k)). All Subsidiaries shall be wholly-owned Subsidiaries.   The jurisdiction of organization of each Loan Party and any of its Subsidiaries shall be a State of the United States.

(g)     Change in Business.  The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than the business of the Borrower and its Subsidiaries substantially as conducted and operated by the Borrower and its Subsidiaries, taken as a whole, as of the

DEBTORSLCC_105775

Closing Date or businesses that are reasonably related thereto, and the Loan Parties shall not permit any material change in the nature of such businesses.

(h)     Restricted Payments. Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, declare or pay, directly or indirectly, any Restricted Payment (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, or set aside any amount for any such purposes, except that:

(i)     for any fiscal year (or portion thereof) ending after the Closing Date for which the Borrower is treated as a partnership for U.S. federal income tax purposes, so long as (1) no Default or Event of Default arising under Section 9.01(a), Section 9.01(c) (in connection with a breach or default of any provision contained in Section 8.04), Section 9.01(k) or Section 9.01(l) shall have occurred and be continuing at the time of any such distributions or would result therefrom and (2) the Borrower would be in pro forma compliance with the covenant set forth in Section 8.04(c) as of the last day of the Test Period most recently completed prior to such distribution, the Borrower may make distributions ("Tax Distributions") in an aggregate amount with respect to any fiscal year not to exceed the greater of (x) 45.0% multiplied by the amount of the Borrower's net taxable income for the relevant fiscal year, reduced by any cumulative net taxable loss with respect to all fiscal years (or portion thereof) beginning after the Closing Date (determined as if all such periods were one period) to the extent such cumulative net taxable loss was not previously taken into account in calculating the amount of Tax Distributions and is of a character that would permit such loss to be deducted against the income of the fiscal year (or portions thereof) in question and (y) 33.0% multiplied by the amount of the Borrower's taxable income as determined for purposes of the alternative minimum tax for the relevant fiscal year, reduced by any cumulative net taxable loss with respect to all fiscal years (or portion thereof) beginning after the Closing Date (determined as if all such periods were one period) to the extent such cumulative net taxable loss was not previously taken into account in calculating the amount of Tax Distributions and is of a character that would permit such loss to be deducted against the income of the fiscal year (or portions thereof) in question; provided that (A) Tax Distributions in respect of any fiscal year may be paid on a quarterly basis to cover estimated tax payments with respect to the relevant fiscal quarter as reasonably determined by the Borrower and as set forth in a certificate of the chief financial officer or the treasurer of the Borrower delivered to the Agent and certifying as to the detailed calculation of such estimated tax payments; provided, further, that, to the extent the aggregate amount of estimated payments in respect of any fiscal year exceeds the actual amount of permitted Tax Distributions for such fiscal year, such excess shall reduce dollar for dollar the permitted Tax Distributions in respect of succeeding fiscal years (including, without duplication, any estimated payments) and (B) Tax Distributions allocable to the taxable income of any non-wholly owned Subsidiary or joint venture of the Borrower shall be permitted only to the extent of cash actually received from such non-wholly owned Subsidiary or joint venture with respect to such taxable income;

(ii)     any Subsidiary of the Borrower may declare and pay dividends or make any other distribution (by reduction of capital or otherwise) to, or repurchase its Equity Interests from, the Borrower or any wholly-owned Subsidiary of the Borrower;

(iii)     dividends or other distributions payable solely in Equity Interests;

(iv)     issuances of Equity Interests by Holdings or other payments, awards or grants in cash pursuant to, or the funding of, employment agreements, stock options and stock ownership plans, in each case, in the ordinary course of business and approved by Holdings' board of directors; provided that the aggregate amount of payments not paid in Equity Interests shall not have a fair market value exceeding $2,000,000 in any fiscal year of the Borrower; and

69

(v)     solely to the extent Revelation does not have sufficient funds to pay any Revelation Reclamation Obligation when due, the Borrower may make a Restricted Payment to satisfy such Revelation Reclamation Obligation; provided that, immediately after giving effect to the making of such Restricted Payment, (A) the aggregate amount of all Restricted Payments made in reliance on this Section 8.02(h)(v) since the Closing Date does not exceed the RRO Cap at such time, and (B) the aggregate amount of all Restricted Payments made in reliance on this Section 8.02(h)(v) during the then-current calendar quarter does not exceed the RRO Quarterly Limit for such quarter.  To the extent the aggregate amount of Restricted Payments made by the Borrower and its Subsidiaries in reliance on this Section 8.02(h)(v) during any calendar quarter is less than the RRO Quarterly Limit for such quarter, the difference between such amounts shall be deemed added to the RRO Quarterly Limit for the next succeeding calendar quarter (and any subsequent calendar quarters to the extent not utilized).

(i)     Payment of Other Debt.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, prepay, redeem, purchase, defease, convert into cash or otherwise satisfy prior to the scheduled maturity in any manner any Debt (other than Debt arising under the Loan Documents, the United Revolving Facility and mandatory prepayments or scheduled repayments under the Existing Debt Documents (including, without limitation, the requirement to pay a percentage of excess cash flow under the CAT Financing Documents as in effect on the date hereof)).

(j)     No Restriction in Agreements on Dividends or Certain Loans.  The Borrower shall not, and shall not permit any of its Subsidiaries to, enter into or be bound by any agreement (i) which prohibits or restricts, in any manner the payment of dividends by any of its Subsidiaries (whether in cash, securities, property or otherwise), or (ii) which prohibits or restricts in any manner the making of any loan to the Borrower by any of its Subsidiaries or payment of any Debt or other obligation owed to any Loan Party, other than, in each case, (A) restrictions imposed by any applicable law, rule or regulation (including applicable currency control laws and applicable state or provincial corporate statutes restricting the payment of dividends or any other distributions in certain circumstances) and (B) restrictions in effect under any Debt outstanding on the Closing Date and set forth in Schedule 8.02(j).

(k)     Amendment of Existing Debt Documents.  Each of the Loan Parties shall not, and shall not permit any Subsidiaries to, amend or modify, or grant any waiver or consent under any Existing Debt Document unless such amendment, modification, waiver or consent (i) does not materially increase (or have the direct or indirect effect of materially increasing) the obligations (contingent or otherwise) of any Loan Party thereunder (it being understood that increasing the yield on of any Debt under the any Existing Debt Document, other than due to the imposition of a default rate (as contemplated by the applicable Existing Debt Document on the date hereof) on such Debt, would materially increase such obligations), (ii) could not reasonably be expected to adversely affect the interests of the Lenders in any material respect (it being understood that making the maturity date of any Debt under the any Existing Debt Document earlier in time or reducing the weighted average life of such Debt would adversely affect the Lenders in a material respect) and (iii) does not impair and could not reasonably be expected to impair any Loan Party's ability to perform its obligations under any Loan Document to which it is a party.

(l)     Hedging Transactions.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, enter into any Hedging Transactions or create, incur, assume or suffer to exist any obligations in respect of any Hedging Transaction, other than any Hedging Transactions that are (i) unsecured and (ii) entered into in the ordinary course of business on a non-speculative basis.

(m)     Loans and Investments.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, make any Investment in or to any other Person, except:

70

(i)    trade credit extended on usual and customary terms in the ordinary course of business and stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Holdings or any Subsidiary in satisfaction of judgments;

(ii)    Investments by Holdings, the Borrower or any of its Subsidiaries in any Loan Party;

(iii)    (A) Permitted Investments and (B) any Investments arising in connection with any Hedging Transactions permitted hereunder;

(iv)    any transaction which is an Investment permitted by Section 8.02(c) or Section 8.02(d) (including, without limitation, Investments arising out of the receipt by Borrower or any Subsidiary of noncash consideration for the sale of assets permitted thereunder);

(v)    to the extent constituting an Investment, any Guaranty which is permitted under Section 8.02(b);

(vi)    to the extent permitted by Section 8.04(b), Capital Expenditures;

(vii)    Investments of the Loan Parties (other than Holdings) (A) in any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (B) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of such Loan Party;

(viii)    (A) payroll, travel and similar advances to employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business and (B) loans or advances to employees made in the ordinary course of business and consistent with past practice, provided that all such advances and loans pursuant to the foregoing clauses (A) and (B) shall in no event exceed an aggregate amount of $250,000 outstanding at any time;

(ix)    to the extent constituting Investments, purchases and acquisitions by the Loan Parties (other than Holdings) of inventory, equipment or supplies in the ordinary course of business;

(x)    Investments existing as of the Closing Date and set forth on Schedule 8.02(m), and extensions, renewals, modifications, restatements or replacements thereof; provided that no such extension, renewal, modification, restatement or replacement shall increase the amount of the original loan, advance or investment, except by an amount equal to any premium or other reasonable amount paid in respect of the underlying obligations and fees and expenses incurred in connection with such extension, renewal, modification, restatement or replacement;

(xi)    with the consent of the Required Lenders (who shall not unreasonably delay in providing or withholding their consent, as the case may be), the purchase or other acquisition (in one transaction or a series of transactions) of the property and assets or business of another Person;

(xii)    to the extent constituting an Investment, the repurchase, repayment, defeasance or retirement of any Debt of any Loan Party (other than Holdings) to the extent such repurchase, prepayment or retirement is expressly permitted hereunder; and

(xiii)    the Lone Mountain Acquisition so long as (A) the Lone Mountain Purchase Agreement and other Lone Mountain Documentation executed concurrently with the Loan

71

Mountain Purchase Agreement shall have been executed, delivered and effective on or before August 1, 2017 (such date, "Lone Mountain Signing Deadline" and such condition, the "Lone Mountain Signing Condition"), (B) the closing of the Lone Mountain Acquisition shall have occurred prior to October 1, 2017 (such date, "Lone Mountain Closing Deadline"), (C) the aggregate consideration paid by Blackjewel and Loan Parties does not exceed $8,000,000 and (D) Blackjewel and the other Loan Parties shall have acquired the assets set forth on Schedule 1.01(L) and liabilities in an aggregate amount not to exceed $20,000,000, (E) all consents and approvals of, and filings and registrations with, and all other actions in respect of, all Official Bodies required in order to make or consummate the Lone Mountain Acquisition shall have been obtained, given, filed or taken or waived and shall be or will be in full force and effect (or effective judicial relief with respect thereto shall have been obtained), and all applicable waiting periods with respect thereto (if any) shall have or, prior to the time when required, will have, expired without, in all such cases, any action being taken by any competent authority which restrains, prevents, or imposes material adverse conditions upon the Lone Mountain Acquisition and (F) the Agent shall have received a certificate from an Authorized Officer of Blackjewel certifying that the foregoing requirements have been met on or prior to the consummation of the Lone Mountain Acquisition (the "Lone Mountain Closing Certificate") (the requirements set forth in clauses (B) through (F), the "Lone Mountain Closing Conditions").

(n)     Private Air Transportation Expenses.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries or any of their respective directors, officers, employees, agents, controlling persons or representatives to, incur, or otherwise become liable in respect of, any private air transportation expenditures, except such as are incurred solely for business purposes in the ordinary course of business and at a market based rate; provided that all such private air transportation expenditures (including any advances or loans pursuant to Section 8.02(m)(viii) for such purpose) shall in no event exceed an aggregate amount of $400,000 per fiscal year of the Borrower.

(o)     Changes in Organizational Documents and Loan Party Information.

(i)     Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, amend in any respect its certificate or articles of incorporation (including any provisions or resolutions relating to capital stock), by-laws, certificate of limited partnership, partnership agreement, certificate or articles of formation, limited liability company agreement or other organizational documents, in each case without providing at least 10 days' prior written notice to the Agent (or such shorter notice as may be agreed by the Agent in its sole discretion) and, in the event such change could reasonably be expected to be materially adverse to the interests of the Lenders, without obtaining the prior written consent of the Required Lenders.

(ii)    Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries that are Loan Parties to, effect any change (A) in its legal name, (B) in the location of its chief executive office, (C) in its identity or organizational structure, (D) in its Federal Taxpayer Identification Number (or equivalent thereof) or organizational identification number, if any, (E) its entity classification for U.S. federal income tax purposes, or (F) in its jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), unless it shall have given the Agent 10 days' prior written notice thereof (or such shorter notice as may be agreed by the Agent in its sole discretion), clearly describing such change and providing such other information in connection therewith as the Agent or Required Lenders may reasonably request.

(iii)   The Borrower shall not permit any amendment or modification to the Transition Services Agreement, the Purchase and Sale Agreement or any other material agreements entered into in connection with the Restructuring, in each case, that would adversely affect the Borrower

72

in respect of any obligation of Revelation to transfer assets of Revelation or its Subsidiaries to the Loan Parties.

      (p)     <u>Accounting Practices</u>.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, make any change in accounting policies or reporting policies, except as required by GAAP, or change its fiscal year-end to a date other than December 31.

      (q)     <u>Mining Operations</u>.  Each of the Loan Parties shall not, and shall not permit any of its Subsidiaries to, (i) mine or commence mining operations on any Real Property unless and until the Borrower shall have, subject to <u>Section 8.01(n)(iv)</u> delivered a fully executed Mortgage and, subject to <u>Section 8.01(n)(i)</u> any related lease consents with respect to such Real Property or (ii) subject to <u>Section 8.01(n)</u>, enter into any lease or other contract or agreement, the grant of a security interest in which in favor of the Agent for the benefit of the Secured Parties requires the consent of the counterparty thereunder.

      (r)     <u>Reclamation Obligations</u>.  Each of Holdings and the Borrower shall not, and shall not permit any of its Subsidiaries to permit, (i) the aggregate principal amount of Mining Financial Assurances in respect of the Reclamation Laws affecting (or otherwise in respect of reclamation obligations of) Holdings and its Subsidiaries to exceed the amounts set forth on <u>Schedule 8.02(r)</u> or (ii) such Mining Financial Assurances not to be in full force and effect at any time, unless the aggregate principal amount of obligations owing by Holdings and its Subsidiaries in respect of the Reclamation Laws that are not subject to Mining Financial Assurances and that affect (or otherwise are in respect of reclamation obligations of) Holdings and its Subsidiaries in any year following the failure of such Mining Financial Assurances to be in full force and effect does not exceed $500,000.

      (s)     <u>Revelation Obligations</u>.  Each of Holdings and the Borrower shall not allow Revelation and its Subsidiaries to take any affirmative action that increases the aggregate amount of their Debt or other liabilities after the Closing Date.

      (t)     <u>Lone Mountain Blocked Account Withdrawals</u>.  The Borrower shall not, and shall not permit its Subsidiaries, to allow any Person to make any withdrawal from the Lone Mountain Blocked Account other than a withdrawal initiated by the Agent that constitutes a Permitted Lone Mountain Blocked Account Withdrawal (it being understood that the Agent shall not unreasonably delay in making a Permitted Lone Mountain Blocked Account Withdrawal and may conclusively rely on a Lone Mountain Closing Certificate to make a Permitted Lone Mountain Blocked Account Withdrawal).

      (u)     <u>Opening Accounts and Location of Loan Proceeds</u>.  The Borrower shall not, and shall not permit it Subsidiaries to, (i) open any deposit accounts, securities accounts and commodities accounts after the Closing Date without the written consent of the Agent, (ii) transfer any proceeds of the Loans on or after the Closing Date to any deposit accounts, securities accounts and commodities accounts of the Borrower and its Subsidiaries other than the Lone Mountain Blocked Account or the General Cash Account or (iii) permit any depositary bank to terminate a Control Agreement with respect to any such account unless it prior to, or concurrently with (or such longer period of the time to which the Agent may consent in its sole discretion), enters into a new Control Agreement.

    Section 8.03    <u>Reporting Requirements</u>.  Each of Holdings and the Borrower covenants and agrees that until Payment in Full, the Borrower will furnish or cause to be furnished to the Agent, for delivery to each of the Lenders:

      (a)     <u>Quarterly Financial Statements</u>.  Within 45 days after the end of each of the first three fiscal quarters in each fiscal year, financial statements of (i) the Borrower and its Subsidiaries and

DEBTORSLCC_105780

(ii) Revelation and its Subsidiaries, in each case, consisting of a consolidated balance sheet as of the end of such fiscal quarter, related consolidated statements of income and members' equity and related consolidated statement of cash flows for the fiscal quarter then ended and the fiscal year through that date, all in reasonable detail and certified (subject to normal year-end audit adjustments) by the Chief Executive Officer, President, Treasurer or Chief Financial Officer of the Borrower or Revelation, as applicable, as having been prepared in accordance with GAAP, consistently applied, and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.

(b)  Annual Financial Statements.  Within 90 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2017), financial statements of (i) the Borrower and its Subsidiaries and (ii) Revelation and its Subsidiaries, in each case, consisting of a consolidated balance sheet as of the end of such fiscal year, related consolidated statements of income and members' equity and related consolidated statement of cash flows for the fiscal year then ended, all in reasonable detail and setting forth in comparative form the financial statements as of the end of and for the preceding fiscal year, and certified, in the case of the consolidated financial statements, by independent certified public accountants of nationally recognized standing reasonably satisfactory to the Required Lenders (it being understood and agreed that Dixon Hughes Goodman LLP is reasonably satisfactory to the Required Lenders). The certificate or report of accountants shall be free of qualifications (other than any "going concern" or like qualifications as may be required as a result of a projected failure to comply with a financial covenant in this Agreement or an upcoming maturity date of the Loans that is scheduled to occur within one year of the time the report and opinion are delivered).

(c)  Certificate of the Borrower.  Concurrently with any delivery of financial statements under Section 8.03(a) and (b), a certificate of the Borrower signed by an Officer (a "Compliance Certificate"), substantially in the form of Exhibit 8.03(c): (A) confirming that no Default or Event of Default has occurred during the period covered by such financial statements or exists and is continuing on the date of such Compliance Certificate, except as set forth in an attachment to such Compliance Certificate, which describes in detail the nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event, (B) setting forth any changes or updates to Schedule 6.02, (C) confirming that each Subsidiary has joined the Loan Documents in accordance with the requirements of Section 8.01(k), (D) setting forth the information (including detailed calculations) required in order to establish whether the Borrower was in compliance with the covenants set forth in Sections 8.04(a), Section 8.04(b) and 8.04(c) during the fiscal quarter or fiscal year covered by the financial statements then being furnished and (E) setting forth each (1) payment made by the Borrower pursuant to Section 8.02(h)(iv) to satisfy Revelation Reclamation Obligations, including reasonably detailed information regarding how such payment was spent by Revelation and (2) Mining Financial Assurance that has been modified or terminated, in each case, since the date of the last Compliance Certificate delivered pursuant to this Section 8.03(c).

(d)  Annual Operating Plan and Budget.  No later than 30 days prior to the end of the fiscal year of the Borrower year ending December 31, 2017, an Annual Operating Plan and Budget for the ensuing fiscal year of the Borrower, in form and substance reasonably satisfactory to the Agent and the Required Lenders, which Annual Operating Plan and Budget shall (i) be in the form of Exhibit 8.03(d), (ii) present the Borrower's plan for the ensuing year's ongoing operations, including specific mine plans, production targets (quality and quantity), capital requirements, cost and revenue projections, ash disposal and sales projections, and permitting and bonding requirements (it being understood that a separate plan shall be submitted for each mining complex) and (iii) include such additional information as the Lenders may from time to time reasonably request.

74

(e)     Notices.  Prompt written notice to the Agent for distribution to the Lenders (but in no event later than the earlier of (x) five Business Days after obtaining knowledge thereof and (y) informing any creditor under any Existing Debt):

(i)     upon the occurrence of any Default or Event of Default;

(ii)     upon (A) the occurrence of any Reportable Event, which could reasonably be expected to result in the termination of any Plan or Multiemployer Plan by the PBGC; (B) the institution of any proceeding or the taking of other action to terminate any Plan or Multiemployer Plan, or the filing of a termination notice with respect to any Plan or Multiemployer Plan; (C) the appointment of a trustee to administer or liquidate any Plan or Multiemployer Plan; (D) the failure by the Borrower or any other member of the ERISA Group to make any contributions when due to a Plan or a Multiemployer Plan; or (E) the receipt by the Borrower or any other member of the ERISA Group of notice that it has incurred or will be assessed Withdrawal Liability with respect to any Multiemployer Plan in each case, only to the extent Borrower could reasonably be expected to incur liability in connection with the foregoing exceeding $250,000;

(iii)     upon the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Official Body against any Loan Party or any Subsidiary of a Loan Party that, individually or in the aggregate, could reasonably be expected to result in liability exceeding $250,000;

(iv)     upon the occurrence of any event or circumstance that has had or could reasonably be expected to result in a Material Adverse Change.

(f)     Certain Events.  Prompt written notice to the Agent for distribution to the Lenders (but in no event later than the earlier of (x) five Business Days after obtaining knowledge thereof and (y) informing any creditor under any Existing Debt):

(i)     of the occurrence of any event for which the Borrower is required to make a mandatory prepayment pursuant to Section 5.06(b);

(ii)     within the time limits set forth in Section 8.02(o), any material amendment to the organizational documents of any Loan Party (for purposes of the foregoing, it shall be deemed material for, among other things, any amendment to affect the name of the entity, its state of incorporation or formation or its outstanding Equity Interests or the transferability thereof) and also within such time limits of the other notices required by such Section;

(iii)     of any material change in accounting policies or financial reporting practices by any Loan Party other than as permitted by Section 8.02(p);

(iv)     of (A) any event or condition that constitutes a material default or event of default or a termination event under the MR Coal Agreement or any Existing Debt Document, and in each case a certificate of an Authorized Officer of the Borrower setting forth the details thereof and the action which the applicable Loan Party or the relevant Subsidiary has taken and proposes to take with respect thereto, (B) any material breach or default, or any notice of termination or notice of material default received or given, under, or in connection with, the MR Coal Agreement or any Existing Debt Document, or any other material notice under, or in connection with, the MR Coal Agreement or any Existing Debt Document (including, without limitation, borrowing base certificates), (C) any dispute between any Loan Party or any of its Subsidiaries and any Official Body involving the revocation, modification, failure to renew or the like of any material Permit or the imposition of additional material

DEBTORSLCC_105782

conditions with respect thereto, (D) any early cancellation or material change in the terms, coverage or amounts of any insurance required to be maintained pursuant to Section 8.01(c), (E) any termination or material amendment or modification of, or waiver or consent under, the MR Coal Agreement or any agreement, document or instrument governing, evidencing, securing or otherwise relating to any Existing Debt Document, and in each case, a copy of such termination, amendment, modification, waiver or consent, (F) any event of force majeure asserted under the MR Coal Agreement which exists for more than two Business Days and, to the extent reasonably available to the Loan Parties or any Subsidiary of the foregoing, copies of related invoices, statements, supporting documentation, schedules, data or affidavits delivered under the MR Coal Agreement or (G) any material shutdown, outage, strike, event of force majeure, casualty, condemnation, event of eminent domain or similar event impacting any of the Loan Parties, their respective Subsidiaries or the respective assets or businesses of any of the foregoing; and

(v)     (A) upon entry into the Lone Mountain Purchase Agreement, (1) certified complete and correct copies of the Lone Mountain Documentation, and (2) the expected closing date of the Loan Mountain Acquisition, (B) upon entry into any additional Lone Mountain Documentation or any amendment, consent, waiver or other modification to the Lone Mountain Documentation, certified complete and correct copies of the Lone Mountain Documentation and (C) prior notice of the consummation of the Lone Mountain Acquisition, and shall use commercially reasonable efforts to provide such notice in this clause (C) not less than 3 Business Days prior to the consummation of the Lone Mountain Acquisition.

(g)     Mining, Environmental, Health and Safety Matters.  Reasonably prompt written notice upon Holdings, the Borrower or applicable Subsidiary obtaining actual knowledge of any of the following (but in no event later than the earlier of (x) five Business Days after obtaining knowledge thereof and (y) informing any creditor under any Existing Debt): (A) the existence of material Contamination at any real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party which is in violation of Environmental, Health and Safety Laws or for which a Loan Party or a Subsidiary of a Loan Party is required, or would reasonably be expected, to take Remedial Action under such Laws, and for which in each case a Loan Party or a Subsidiary of a Loan Party would reasonably be expected to incur liability in excess of $250,000; (B) the receipt by Holdings, the Borrower or any of its Subsidiaries of a material Environmental, Health and Safety Claim or Mining Claim for which a Loan Party or a Subsidiary of a Loan Party would reasonably be expected to incur liability in excess of $250,000; (C) the imposition, attachment, filing or recording against the real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party of a Lien authorized under Environmental, Health and Safety Laws; (D) the inability to obtain or renew a material Environmental, Health and Safety Permit or Mining Permit, a notice from an Official Body that it has, will or intends to suspend, revoke or adversely amend or alter, in whole or in part, any material Environmental, Health and Safety Permit or Mining Permit or knowledge that a Person has filed a suit or claim or instituted a proceeding challenging the application for, or the modification, amendment or issuance of any material Environmental, Health and Safety Permit or Mining Permit; or (E) to the extent that the any of the following would reasonably be expected to result in liability of $250,000 or more to any Loan Party or any of their respective subsidiaries, any material violation of any Environmental, Health and Safety Law, Mining Law, Reclamation Law, Environmental Health and Safety Permit, Mining Permit, Environmental Health and Safety Order or Mining Order.

(h)     Other Reports and Information.

(i)     Any reports, notices or proxy statements generally distributed by the Borrower or any other Loan Party to its members or managers on a date no later than the date supplied to such members or managers, as applicable, and regular or periodic reports,

76

(ii)    Promptly upon their becoming available to Holdings, the Borrower or any other Loan Party, a copy of any material order in any material proceeding to which any Loan Party or any of its Subsidiaries is a party issued by any Official Body,

(iii)    Within 30 days of the end of each month, an operating report for the Borrower and its consolidated Subsidiaries, including balance sheet, cash flow and income statements and tons of coal sold by customer, in form and substance satisfactory to the Required Lenders,

(iv)    Promptly upon request, such other reports and information (including, without limitation with respect to (A) beneficial ownership of Holdings and its parent companies, (B) the status of consents and/or waivers relating leases then in effect or under negotiation and (C) any Disposition (or series of Dispositions) by Revelation or any of its Subsidiaries since the date of the last notification required to be delivered pursuant to this Section 8.03(h) that results in consideration paid to Revelation or any of its Subsidiaries in excess of $250,000 in the aggregate for such Disposition (or series of Dispositions)) as any of the Lenders may from time to time reasonably request; and

(v)    where applicable, promptly following receipt thereof, copies of any documents described in Section 101(k) or (l) of ERISA that any Loan Party or any of its Subsidiaries may request with respect to any Multiemployer Plan to which a Loan Party or any of its Subsidiaries is obligated to contribute; provided, that if the Loan Parties or any of their Subsidiaries have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Agent, the Loan Parties or their Subsidiaries shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Agent promptly after receipt thereof; provided, further, that the rights granted to the Agent in this Section 8.03(h)(v) shall be exercised not more than once during a 12-month period;

(vi)    Promptly upon the making thereof, all material information relating to any payment made by the Borrower pursuant to Section 8.02(h)(iv) to satisfy Revelation Reclamation Obligations, including, without limitation, the date on which such payment was made and the amount, recipient and purpose thereof; and

(vii)    Promptly upon the occurrence of any material modification to, or the termination of, any Mining Financial Assurance set forth on Schedule 6.25, all material information relating to such modification or termination thereof.

(i)    Platform.  The Borrower hereby acknowledges that the Agent may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform").

Section 8.04    Financial Covenants.

(a)    Maximum Total Leverage Ratio.  The Borrower will not permit the Total Leverage Ratio as of the last day of any Test Period (commencing with the Test Period ending on September 30, 2017) to be greater than 2.00:1.00.

To the extent compliance with this Section 8.04(a) is being calculated as of a date that is prior to the first test date under this Section 8.04(a) in order to determine the permissibility of an action by the Borrower or any of its Subsidiaries, such compliance shall be tested for such purpose as if such first test date had occurred.

DEBTORSLCC_105784

(b)    During each fiscal quarter of the Borrower ending on the date set forth below, the Borrower will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures, except Capital Expenditures of the Borrower and its Subsidiaries not exceeding the aggregate amount set forth below opposite such date:

| Fiscal Quarter Ending | Aggregate Capital Expenditures |
|---|---|
| September 30, 2017 | $17,000,000 |
| December 31, 2017 | $5,250,000 |
| March 31, 2018 | $16,500,000 |
| June 30, 2018 | $20,000,000 |
| September 30, 2018 and thereafter | $16,500,000 |

provided that, in addition to the amount of Capital Expenditures permitted above (as such amount may be increased pursuant to the terms of the immediately following paragraph), the Borrower may make any Capital Expenditures in respect of the Daniels Plant financed with the Daniels Debt.

To the extent the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries during any fiscal quarter is less than the maximum aggregate amount set forth above for such fiscal quarter, the difference between such amounts (such difference, the "Carried CapEx Amount") shall be deemed added to the maximum aggregate amount of Capital Expenditures that may be made by the Borrower and its Subsidiaries during the next succeeding fiscal quarter, but only the next succeeding fiscal quarter. Any Capital Expenditures made by the Borrower or its Subsidiaries during any fiscal quarter shall be only be deemed to utilize any Carried CapEx Amount available in such fiscal quarter after the maximum aggregate amount set forth above for such fiscal quarter has been exhausted.

The Borrower shall not commit to make any Capital Expenditures, except for commitments to make Capital Expenditures of the Borrower and its Subsidiaries which would not result in the aggregate amount of commitments for which the Loan Parties and its Subsidiaries are liable for any fiscal quarter of the Borrower exceeding the aggregate amounts set forth above for the relevant fiscal quarter.

(c)    The Borrower will not permit Liquidity as of the last day of any Test Period (commencing with the Test Period ending on September 30, 2017), calculated as an average of the Liquidity amounts as of the close of business on the last Tuesday of each month included in such Test Period, to be less than $5,000,000.

(d)    Equity Cure.  If the Borrower fails to comply with the requirements of the covenant in paragraph (a) above (the "Leverage Ratio Test"), then after the end of the relevant fiscal quarter or fiscal year until the 15th calendar day after delivery of the related certificate pursuant to Section 8.03(c), the Borrower shall have the right to receive contributions of cash equity in an aggregate amount equal to the amount that, if added to Consolidated EBITDA for the relevant Test Period, would have been sufficient to cause compliance with the Leverage Ratio Test for such Test Period (an "Equity Cure").

(i)    The Borrower shall give the Agent written notice (the "Cure Notice") of an Equity Cure on the day the Equity Cure is to be consummated. Upon the later of (x) delivery by the Borrower of a Cure Notice and (y) the Borrower's receipt of the proceeds of the relevant Equity Cure, no Default or Event of Default shall be deemed to exist pursuant to the Leverage Ratio Test.

(ii)    The cash amount received by the Borrower pursuant to exercise of the right to make an Equity Cure shall be added to Consolidated EBITDA for the last quarter of the immediately preceding Test Period solely for purposes of recalculating compliance with the Leverage

78

DEBTORSLCC_105785

Ratio Test for such Test Period and of calculating the Leverage Ratio Test as of the end of the next three following Test Periods. The proceeds of all Equity Cures will be applied to prepay the Loans pursuant to Section 5.06(b)(vii), provided that such Debt shall not be deemed to have been repaid for purposes of calculating the Leverage Ratio Test for any Test Period that includes the fiscal quarter in respect of which such Equity Cure is made. The Equity Cure shall not be taken into account for purposes of calculating any Total Leverage Ratio in order to determine compliance with such Total Leverage Ratio for purposes of the incurrence of any Debt, for determining compliance with any other covenant hereunder or under the Loan Documents and may not be used to make a Restricted Payment or for any other purpose. For the avoidance of doubt, an Equity Cure shall be deemed to be made on the last Business Day of the relevant Test Period even if such Equity Cure is made after such date.

Section 8.05    Permitted Activities of Holdings.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, Holdings shall not (a) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations or other activity or own any assets other than (i) its ownership of the Equity Interests of the Borrower and the Borrower's Subsidiaries and activities incidental thereto, (ii) activities incidental to the maintenance of its existence and compliance with applicable Laws, (iii) activities relating to the performance of its obligations under the Loan Documents and under its operating agreement or other Governing Documents, (iv) the making of Restricted Payments permitted to be made by Holdings pursuant to, and in accordance with, Section 8.02(h) and (v) the receipt of Restricted Payments permitted to be made to Holdings pursuant to, and in accordance with, Section 8.02(h), (b) incur, create, assume or suffer to exist any Debt or other liabilities or financial obligations, except (i) the Obligations, (ii) obligations with respect to its Equity Interests of the Borrower and the Borrower's Subsidiaries and (iii) non-consensual obligations imposed by operation of law, (c) create, assume, or suffer to exist any Lien upon, or grant any options or other rights with respect to, any of its revenues, property or other assets, whether now owned or hereafter acquired (other than under the Loan Documents and non-consensual Liens arising by operation of law), (d) wind-up, liquidate or dissolve itself (or suffer to exist any of the foregoing), consolidate or amalgamate with or merge into or with any other Person, or convey, sell, transfer, lease or otherwise dispose of all or any part of its assets or properties, (e) create, incur, assume or suffer to exist any Investment in any Person (other than its continuing ownership of all the Equity Interests of the Borrower) or (f) permit to be taken any action that would result in a Change in Control. Holdings shall not directly own any Equity Interests other than those of the Borrower.

## ARTICLE 9
## DEFAULT

Section 9.01    Events of Default.  An Event of Default shall mean the occurrence or existence of any one or more of the following events or conditions (whatever the reason therefor and whether voluntary, involuntary or effected by operation of Law):

(a)    Payments Under Loan Documents.  The Borrower shall fail to pay (i) any principal of any Loan (including scheduled installments, mandatory prepayments, or the payment due at maturity) when due hereunder or (ii) any interest on any Loan or any fee or other amount owing hereunder within three Business Days after such interest, fee or other amount becomes due in accordance with the terms hereof or thereof.

(b)    Breach of Warranty.  Any representation or warranty made at any time by the Borrower herein or by any of the Loan Parties in any other Loan Document, or in any certificate, other instrument or statement furnished pursuant to the provisions hereof or thereof, shall prove to have been false or incorrect in any material respect as of the time it was made or furnished.

79

(c)    Breach of Negative Covenants or Certain Other Covenants.  Any of the Loan Parties shall default in the observance or performance of any covenant contained in Section 8.01(a) (with respect to existence), Section 8.01(g), Section 8.01(j), Section 8.01(n), Section 8.02, Section 8.03(e)(i), Section 8.04 or Section 8.05. Any of the Loan Parties shall default in the observance or performance of any covenant contained in Section 8.03(a), Section 8.03(b), Section 8.03(c), Section 8.03(d), Section 8.03(f)(i), Section 8.03(f)(iv)(A), Section 8.03(f)(iv)(B), Section 8.03(f)(iv)(E), Section 8.03(h)(vi) or Section 8.03(h)(vii) and such default shall continue unremedied for a period of 5 days after the earlier of (x) any officer of any Loan Party becomes aware of the occurrence thereof and (y) the date upon which the Borrower has received written notice of such default from the Agent or any Lender.

(d)    Breach of Other Covenants.  Any of the Loan Parties (or any of their respective Affiliates) shall default in the observance or performance of any other covenant, condition or provision hereof or of any other Loan Document and such default shall continue unremedied for a period of 30 days after the earlier of (x) any officer of any Loan Party becomes aware of the occurrence thereof and (y) the date upon which the Borrower has received written notice of such default from the Agent or any Lender.

(e)    Defaults in Other Agreements or Debt; Bonding Matters.

(i)    A default or event of default shall occur at any time under the terms of any agreement involving borrowed money or the extension of credit or any Debt under which any Loan Party or Subsidiary of any Loan Party is obligated as a borrower, guarantor, counterparty or other party in an aggregate principal amount in excess of $1,000,000 and such default or event of default consists of the failure to pay (beyond any period of grace permitted with respect thereto) any such borrowed money, extension of credit or Debt when due (whether at stated maturity, by acceleration or otherwise) or such default or event of default otherwise permits, causes or results in (or with the giving of notice would permit, cause or result in) the acceleration of, or the requirement to repurchase or redeem, such borrowed money, extension of credit or Debt or the termination of any commitment to lend or otherwise extend credit under any such agreement or document.

(ii)    A default or event of default shall occur at any time under the terms of any agreement involving borrowed money or the extension of credit or any Debt under which Revelation of any of its Subsidiaries is obligated as a borrower, guarantor, counterparty or other party in an aggregate principal amount in excess of $1,000,000 and (A) such default or event of default consists of the failure to pay any such borrowed money, extension of credit or Debt when due (whether at stated maturity, by acceleration or otherwise), (B) such default or event of default permits (or with the giving of notice would permit) the acceleration of, or the requirement to repurchase or redeem, such borrowed money, extension of credit or Debt or the termination of any commitment to lend or otherwise extend credit under any such agreement or document and, in each, such default or event of default has continued uncured, unwaived and not otherwise remedied for a period of 30 consecutive days or (C) such default or event of default has caused or has resulted in the acceleration of, or the requirement to repurchase or redeem, such borrowed money, extension of credit or Debt.

(iii)    One or more surety, reclamation or similar bonds securing obligations of (A) any Loan Party or any Subsidiary of any Loan Party or (B) Revelation or any of its Subsidiaries (or any required guaranties thereof or required letters of credit with respect thereto) with an aggregate face amount of $1,000,000 or more shall be terminated, suspended or revoked prior to the full and complete satisfaction or discharge of such obligations by (x) such Loan Party or such Subsidiary or (y) Revelation or such Subsidiary and, in each case as applicable, not replaced within 45 days of such termination, suspension or revocation; provided that (x) the Loan Parties or (y) Revelation and its Subsidiaries shall be permitted to replace such surety bonds with self-bonding obligations to the extent permitted by any

80

Person to which satisfaction of the obligations secured by such bonds are owed prior to full satisfaction of the obligations secured by such bonds.

(f)      Judgments or Orders.   Any judgments or orders (including with respect to any Environmental Health and Safety Claims, Environmental Health and Safety Laws or Environmental Health and Safety Orders) (x) for the payment of money in excess of $1,000,000 in the aggregate shall be entered against any Loan Party or any Subsidiary of any Loan Party by a court having jurisdiction in the premises or (y) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Change shall be entered against any Loan Party or Subsidiary thereof, which judgment, in either case, is not discharged, vacated, bonded or stayed pending appeal for a period of 60 consecutive days after the date of entry; provided, however, that any such judgment or order under subclause (x) of this clause (f) shall not be an Event of Default under this Section 9.01(f) if and for so long as the amount of such judgment or order in excess of $1,000,000 is covered by a valid and binding policy of insurance between the defendant and the insurer covering payment thereof (and such insurer has been notified of the potential claim and has not objected to such claim).

(g)      Loan Document Unenforceable.   Any of the Loan Documents or any Governing Document shall cease to be legal, valid and binding agreements enforceable against any Loan Party (or any Affiliate thereof) executing the same or such party's successors and assigns (as permitted under the Loan Documents) in accordance with the respective terms thereof or shall in any way be terminated (except in accordance with its terms) or become or be declared ineffective or inoperative or shall in any way be challenged or contested or cease to give or provide the respective Liens, security interests, rights, titles, interests, remedies, powers or privileges intended to be created thereby.

(h)      Uninsured Losses; Proceedings Against Assets.   There shall occur any uninsured damage to or loss, theft or destruction of any of the Collateral in excess of $2,500,000 (it being understood that the amount of deductibles payable in connection with such claim shall not be included in such threshold) or the Collateral or any other of the Loan Parties' or any of their Subsidiaries' assets in excess of $2,500,000 in the aggregate are attached, seized, levied upon or subjected to a writ or distress warrant; or such come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within 30 days thereafter.

(i)      Events Relating to Plans and Multiemployer Plans.   Any of the following occurs, in each case, which individually or in the aggregate, has resulted or could reasonably be expected to result in liability to Borrower in excess of $1,000,000: (i) any Reportable Event, which could reasonably be expected to result in the termination of any Plan by the PBGC, shall have occurred and be continuing; (ii) proceedings shall have been instituted or other action taken to terminate any Plan or Multiemployer Plan, or a termination notice shall have been filed with respect to any Plan or Multiemployer Plan; (iii) a trustee shall have been appointed to administer or liquidate any Plan or Multiemployer Plan; (iv) Holdings, the Borrower or any other member of the ERISA Group shall have failed to make any contributions when due to a Plan or a Multiemployer Plan; or (v) the Borrower or any other member of the ERISA Group shall have received notice that it has incurred or will be assessed Withdrawal Liability with respect to any Multiemployer Plan.

(j)      Change of Control.   Any Change of Control shall have occurred.

(k)      Involuntary Proceedings.   A proceeding shall have been instituted in a court of competent jurisdiction seeking a decree or order for relief in respect of any Loan Party or any Subsidiary thereof in an involuntary case under any applicable Debtor Relief Law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or similar

DEBTORSLCC_105788

official) of such Loan Party or Subsidiary for any substantial part of its property, or for the winding-up or liquidation of its affairs, and such proceeding shall remain undismissed or unstayed and in effect for a period of 60 consecutive days or such court shall enter a decree or order granting any of the relief sought in such proceeding.

(l)     Voluntary Proceedings.   Any Loan Party or any Subsidiary thereof shall commence a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, shall consent to, or fail to file an answer or other pleading denying the material allegations of a petition seeking, the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or other similar official) of itself or for any substantial part of its property or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any action in furtherance of any of the foregoing.

(m)     MR Coal Agreement.   The MR Coal Agreement shall cease to be valid and binding and in full force and effect, unless terminated or expired in accordance with its terms and not as a result of any termination for convenience or any default or breach by any Loan Party or any of its Subsidiaries thereunder; provided, however, that so long as (i) such event has not resulted and is not likely to result in the inability of the Loan Parties to perform their respective obligations under the Loan Documents and (ii) the applicable Loan Party replaces the MR Coal Agreement with a Replacement Contract or other financial arrangement acceptable to the Agent and the Required Lenders within 90 days following such termination, no Event of Default shall occur under this Section 9.01(m).

Section 9.02     Consequences of Event of Default.

(a)     Events of Default Other than Bankruptcy, Insolvency or Reorganization Proceedings. If an Event of Default shall occur and be continuing, the Agent, at the written direction of the Required Lenders may, and upon the request of the Required Lenders, shall, by written notice to the Borrower, take one or more of the following actions: (i) declare the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Debt of the Borrower to the Lenders hereunder and thereunder to be forthwith due and payable, and the same shall thereupon become and be immediately due and payable to the Agent for the benefit of each Lender without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, or (ii) exercise rights and remedies in respect of the Collateral provided for or contemplated by the Security Agreement and/or any other Collateral Document.Bankruptcy, Insolvency or Reorganization Proceedings.  If an Event of Default specified under Section 9.01(k) or 9.01(l) shall occur, the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Debt of the Borrower to the Lenders under the Loan Documents shall be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived.

(c)     Set-off.   If an Event of Default shall have occurred and be continuing, each Lender and its Affiliates which has agreed in writing to be bound by the provisions of Section 5.03 is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of

DEBTORSLCC_105789

such Lender different from the branch or office holding such deposit or obligated on such Debt. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

(d)     Suits, Actions, Proceedings.  If an Event of Default shall occur and be continuing and if the Agent or the Required Lenders shall have accelerated the maturity of the Loans pursuant to any of the foregoing provisions of this Section 9.02, then the Agent or any Lender, if owed any amount with respect to such Loans, may, to the extent permitted by Law, proceed to protect and enforce its rights by suit in equity, action at law and/or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement or the other Loan Documents, including as permitted by applicable Law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Agent or the Lenders; and

(e)     Application of Proceeds.  From and after the date on which the Agent has taken any action pursuant to this Section 9.02 and until Payment in Full, any and all proceeds received by the Agent from the sale or other Disposition of the Collateral, or any part thereof, or the exercise of any remedy by the Agent or any Lender from the exercise of any remedy by the Agent or any Lender shall be applied as follows:

(i)     first, to reimburse the Agent for all costs, expenses, indemnities and disbursements, including reasonable attorneys' and paralegals' fees and legal expenses, incurred by the Agent in connection with realizing on the Collateral or collection of any Obligations of any of the Loan Parties under any of the Loan Documents, including reasonable expenses incurred to sell or otherwise realize on, or prepare for sale or other realization on, any of the Collateral;

(ii)     second, to ratably reimburse the Lenders for all costs, expenses, indemnities and disbursements, including reasonable attorneys' and paralegals' fees and legal expenses, incurred by the Lenders in connection with realizing on the Collateral or collection of any Obligations of any of the Loan Parties under any of the Loan Documents, including advances made by the Lenders or any one of them for the reasonable maintenance, preservation, protection or enforcement of, or realization upon, the Collateral, including advances for taxes, insurance, repairs and the like and reasonable expenses incurred to sell or otherwise realize on, or prepare for sale or other realization on, any of the Collateral;

(iii)     third, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agent) payable to the Agent in its capacity as such;

(iv)     fourth, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders), ratably among them in proportion to the respective amounts described in this clause fourth payable to them;

(v)     fifth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause fifth payable to them;

DEBTORSLCC_105790

(vi)    sixth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause sixth held by them; and

(vii)    seventh, the balance, if any, to the Borrower or as required by Law.

(f)    <u>Other Rights and Remedies</u>.  In addition to all of the rights and remedies contained in this Agreement or in any of the other Loan Documents (including the Mortgages), the Agent shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable Law, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by Law. Upon the request of the Required Lenders, the Agent may and shall exercise any post-default rights granted to the Agent and the Lenders under the Loan Documents or applicable Law.

(g)    <u>Notice of Sale</u>.  Any notice required to be given by the Agent of a sale, lease, or other disposition of the Collateral or any other intended action by the Agent, if given 10 days prior to such proposed action and otherwise in accordance with applicable Law, shall constitute commercially reasonable and fair notice thereof to the Borrower and each other Loan Party.

<div align="center">

**ARTICLE 10**
**THE AGENT**

</div>

Section 10.01    <u>Appointment and Authority</u>.  Each of the Lenders hereby irrevocably appoints the Agent to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent in such capacities to take such actions on its behalf and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. Concurrently herewith, each Lender directs and instructs the Agent, in each of its capacities, and the Agent, in each if its capacities, is authorized to enter into the Loan Documents and any other related agreements in the forms presented to the Agent. The provisions of this <u>Article 10</u> are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Loan Party or Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.02    <u>Rights as a Lender</u>.  If applicable, the Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03    <u>Exculpatory Provisions</u>.

(a)    The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Agent:

<div align="center">84</div>

DEBTORSLCC_105791

(i)      shall not be subject to any fiduciary or other implied duties, covenants, functions, obligations, responsibilities or liabilities, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, including in each case, without limitation, any expression of approval or satisfaction, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) and in the absence of such direction or consent may refrain from taking any such discretionary actions or exercising any such discretionary power, provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(b)      The Agent shall not be liable for any action taken or not taken by it (i) at the direction, with the consent or at the request of (or non-objection by) the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent in writing by the Borrower or a Lender.

(c)      The Agent and each of its officers, directors, employees, advisors, agents, attorneys-in-fact and affiliates shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered hereunder or thereunder or in connection herewith or therewith, the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, the value, validity, enforceability, effectiveness, sufficiency or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or for the failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder or (v) the satisfaction of any condition set forth in Article 7 or elsewhere, other than to confirm receipt of items expressly required to be delivered to the Agent or (vi) compliance by Lenders' Affiliates or Approved Funds with the terms hereof relating to Lenders' Affiliates and Approved Funds.

(d)      No provision of this Agreement or any related document shall require the Agent to expend or risk its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

85

(e)      In no event shall the Agent be responsible or liable for special, indirect, exemplary, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit).

(f)      The Agent shall not be liable for failing to comply with its obligations under this Agreement in so far as the performance of such obligations is dependent upon the timely receipt of instructions and/or other information from any other Person which are not received or not received by the time required.

(g)      The Agent shall not be required to take any action under this Agreement or any related document if taking such action (i) would subject the Agent to a tax in any jurisdiction where it is not then subject to a tax, or (ii) would require the Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(h)      The Agent shall not have any duty or responsibility in respect of (i) creating, monitoring or maintaining the perfection, continuation of perfection or the creating, sufficiency or validity of any security interest in or related to the Collateral, (ii) the acquisition or maintenance of any insurance or (iii) the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral. The Agent shall be authorized (but shall have no obligation) to file any financing or continuation statements or record any documents or instruments in any public office at any time or times or otherwise perfect or monitor or maintain any security interest in the Collateral.

(i)      For the avoidance of doubt, the Agent's rights, protections, indemnities and immunities provided herein shall apply to Agent for any actions taken or omitted to be taken under any Loan Document and any other related agreements in any of its capacities.

Section 10.04   Reliance by the Agent.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. Without limiting the generality of the foregoing, the Agent: (i) makes no warranty or representation to any Lender or any other Person and shall not be responsible to any Lender or any Person for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or the other Loan Documents; (ii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement, the other Loan Documents or any related documents on the part of the Borrower, the Loan Parties or any other Person or to inspect the property (including the books and records) of the Borrower and Loan Parties; and (iii) shall not be responsible to any Lender or any other Person for the due execution, legality, validity, enforceability, genuineness, sufficiency, ownership, transferability or value of any Collateral, this Agreement, the other Loan Documents, any related document or any other instrument or document furnished pursuant hereto or thereto. The Agent shall not have any liability to the Borrower, any Loan Party or any Lender or any other Person for the Borrower's, any Loan Party's or any Lender's, as the case may be, performance of, or failure to perform, any of their respective obligations

86

DEBTORSLCC_105793

and duties under this Agreement or any other Loan Document. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate and unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. Notwithstanding anything to the contrary herein or in any other Loan Document, phrases such as "satisfactory to the Agent," "approved by the Agent," "acceptable to the Agent," "as determined by the Agent," "in the Agent's discretion," "selected by the Agent," "elected by the Agent," "requested by the Agent," "waived by the Agent," "consented to by the Agent," "agreed by the Agent" and phrases of similar import (including, without limitation, any actions required of the Agent in connection with the collection, adjustment or settlement under an insurance policy pursuant to any Loan Document) that authorize and permit the Agent to approve, disapprove, determine, act or decline to act in its discretion shall, in each case, require the prior receipt by the Agent of a written direction or instruction, or written consent or approval, from the Required Lenders to take (or fail to take) such action or to exercise (or fail to exercise) such rights.

Section 10.05    Delegation of Duties.   The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more agents or attorneys-in-fact selected by the Agent (and approved by the Required Lenders). The Agent and any such agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of Section 8.03 shall apply to any such agent or attorney-in-fact and to the Related Parties of the Agent and any such sub agent. The Agent shall not be responsible for the negligence or misconduct or for the supervision of any agents or attorneys-in-fact selected by it, except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such agents or attorneys-in-fact.

Section 10.06    Resignation of the Agent.

(a)    The Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to) as directed by the Required Lenders appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice on the Resignation Effective Date and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed).

(b)    With effect from the Resignation Effective Date (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) except for any indemnity payments or other amounts then owed to the retiring Agent, all payments,

87

DEBTORSLCC_105794

communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other than as provided in Section 5.10 and other than any rights to indemnity payments or other amounts owed to the retiring Agent as of the Resignation Effective Date), and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article 10 and Section 11.03 shall continue in effect for the benefit of such retiring Agent, its agents, attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Section 10.07  Non-Reliance on Agent and Other Lenders.   Each Lender expressly acknowledges that neither the Agent nor any of its respective officers, directors, employees, agents, advisors, attorneys in fact or affiliates have made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Agent or any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates.

Section 10.08  Notice of Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless a Responsible Officer of the Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be directed by the Required Lenders (or, if so specified by this Agreement, all Lenders).

Section 10.09  No Other Duties, Etc.  Notwithstanding anything herein to the contrary, neither the Arranger nor the Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the administrative agent or the collateral agent or as Agent hereunder or thereunder.

Section 10.10  The Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

DEBTORSLCC_105795

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under Sections 2.03 and 11.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.03 and 11.03.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 10.11    Certain Obligations of the Agent.    Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, the Agent hereby agrees, for the benefit of each Lender, to (a) promptly, and in no event later than two Business Days after receiving any notice or other communication from or on behalf of any Loan Party required or permitted hereunder or under any other Loan Document, furnish a copy of such notice or other communication to each Lender (including by posting such notice or other communication to the Platform), (b) maintain a Platform for the benefit and use of the Lenders in connection with the Loan Documents and the transactions contemplated thereby, (c) in no event publish or provide a "quote" of any Loan or otherwise make any public determination of the price at which a buyer or seller may transact with respect to trading of any Loan (except to the Lenders upon the written required of the Required Lenders, which request may in turn be later revoked by the Required Lenders) and (d) act, or refrain from acting, under the Loan Documents as directed by Required Lenders.

# ARTICLE 11
## MISCELLANEOUS

Section 11.01    Modifications, Amendments or Waivers.    The Required Lenders and the Borrower, on behalf of the Loan Parties, may from time to time enter into written agreements amending or changing any provision of this Agreement or any other Loan Document or the rights of the Lenders or the Loan Parties hereunder or thereunder, or may grant written waivers or consents hereunder or thereunder. Any such agreement, waiver or consent made with such written consent shall be effective to bind all the Lenders and the Loan Parties; provided that, except as otherwise expressly contemplated by this Agreement, no such agreement, waiver or consent may be made which will:

(a)    Commitment Increases or Extensions.    Increase the amount or extend the expiration date of any Lender's Commitment, in each case, without the consent of such Lender;

(b)    Extension of Payment; Reduction of Principal Interest or Fees; Modification of Terms of Payment.    Without prejudice to Section 2.07, extend the Stated Maturity Date or the time for payment of principal or interest of any Loan, or any fee payable to any Lender, or reduce the principal

89

amount of, or the rate of interest borne by, any Loan or reduce any fee payable to any Lender, in each case, without the consent of each Lender directly affected thereby;

(c)     Release of Collateral or Guarantor; Borrower Assignment.   Release all or substantially all of the Collateral or all or substantially all of the Guarantors from their Obligations under the Guaranty Agreement, or consent to the assignment or transfer by the Borrower of any of its rights and obligations under the Loan Documents, in each case, without the consent of all Lenders (other than Defaulting Lenders); or

(d)     Miscellaneous.   Amend Section 5.02, 5.03, 9.02(e) or 11.03, this Section 11.01 or Section 11.08(a), or alter any provision regarding any waterfall or other application of proceeds provision or the pro rata treatment of the Lenders or requiring all Lenders to authorize the taking of any action or reduce any percentage specified in the definition of Required Lenders, in each case, without the consent of each Lender adversely affected thereby; provided that no agreement, waiver or consent which would modify the interests, rights or obligations of the Agent may be made without the written consent of the Agent.

If any amendment, amendment and restatement, supplement or other modification to any agreement, document or instrument governing, evidencing, securing or otherwise relating to any Existing Debt, (a) amends, amends and restates, supplements or otherwise modifies any financial covenant (or any other covenant or event of default (or any related definitions), in each case, in a manner that is more restrictive than the applicable provisions as of the Closing Date, or (b) adds a new covenant or event of default therein, the Loan Parties acknowledge and agree that this Agreement or the other Loan Documents, as the case may be, shall be deemed automatically amended, amended and restated, supplemented or modified to effect similar amendments, supplements or modifications with respect to this Agreement or such other Loan Documents, without the need for any further action or consent by any Loan Party or any other party. In furtherance of the foregoing, the Loan Parties hereby acknowledge and agree that the Agent and the Lenders shall be permitted to, at the discretion of the Required Lenders, document each such similar amendment, amendment and restatement, supplement or modification to this Agreement or such other Loan Document or insert a corresponding new covenant or event of default in this Agreement or such other Loan Documents without any need for any further action or consent by the Loan Parties.

Section 11.02   No Implied Waivers; Cumulative Remedies.   No course of dealing and no delay or failure of the Agent or any Lender in exercising any right, power, remedy or privilege under this Agreement or any other Loan Document shall affect any other or future exercise thereof or operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further exercise thereof or of any other right, power, remedy or privilege. The rights and remedies of the Agent and the Lenders under this Agreement and any other Loan Documents are cumulative and not exclusive of any rights or remedies which they would otherwise have.

Section 11.03   Expenses; Indemnity; Damage Waiver.

(a)     Costs and Expenses. The Borrower shall pay (i) all reasonable costs and expenses incurred by the Agent and its Affiliates, by the Arranger and its Affiliates or by any Lender and its Affiliates (but limited (A) in the case of legal fees and expenses, to reasonable and documented or invoiced legal fees and expenses of a single lead counsel to the Agent and the Lenders, taken as a whole, and of a single local counsel to such persons, taken as a whole, in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed) and (B) in the case of consultants' fees, to the extent any such consultant has been retained with the prior

DEBTORSLCC_105797

written consent of the Borrower (such consent not to be unreasonably withheld or delayed)), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents and the Existing Debt Consents or any amendments, supplements, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs and expenses incurred by the Agent and its Affiliates, by the Arranger and its Affiliates or by any Lender and its Affiliates in connection with the enforcement or protection of its rights (including, but not limited to, the fees and expenses of counsel and any rent or other amounts payable to third parties in connection therewith) (A) in connection with this Agreement and the other Loan Documents, including its rights under this <u>Section 11.03</u>, and the Existing Debt Consents or (B) in connection with the Loans or the use of proceeds thereof, including all such costs and expenses (including professional fees) incurred during any workout, restructuring or negotiations in respect of the Loans, and (iii) all reasonable costs and expenses of the Agent and the Agent's regular employees and agents engaged periodically to perform audits of the Loan Parties' books, records and business properties during the continuation of an Event of Default.

(b)     <u>Indemnification by the Borrower</u>.    The Borrower shall defend, indemnify, release, and protect the Agent (and any agent and attorney-in-fact thereof), the Arranger, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (including strict liabilities), obligations, fines, penalties and related assessments, costs and expenses (including reasonable and documented out-of-pocket fees, disbursements, settlement costs and other fees and expenses of all counsel to the Agent and counsel to any Lender) of any kind or nature whatsoever (excluding taxes, which shall be governed by <u>Section 5.09</u>) in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party or Subsidiary thereof arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby (including the Existing Debt Consents), the performance or nonperformance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) breach of representations, warranties or covenants of any Loan Party or any Subsidiary of a Loan Party under the Loan Documents, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, including any such items or losses relating to or arising under Environmental Health and Safety Laws or pertaining to environmental matters, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or Subsidiary thereof, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; and provided further that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses arise from a violation of Environmental Health and Safety Laws or Contamination first occurring on real property after a Loan Party or its Subsidiary is no longer in possession of such real property. Without limiting the foregoing, matters subject to this <u>Section 11.03(b)</u> include (A) Contamination at, on, in, under or affecting any real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party; (B) the presence, use, handling, management, Release, threat of Release, storage, treatment, production, generation, processing, refining, extraction, distribution, sale, collection, reclamation, recycling, disposal or manufacture of any Regulated Substances on, in, under or affecting any real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party or which may or have migrated to any surrounding areas from such real property or any Loan Party or any of its Subsidiaries arranging for disposal of or transportation to or from such real property of Regulated Substances; (C) the imposition,

DEBTORSLCC_105798

attachment, filing or recording of any Lien (other than a Permitted Lien) authorized by Environmental, Health and Safety Laws against the real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party and the removal of any such liens; (D) an Environmental, Health and Safety Claim or Environmental, Health and Safety Order relating or pertaining to any real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party, any Loan Party or any of its Subsidiaries; and (E) the failure to comply with or the violation of any Environmental, Health and Safety Law, Environmental, Health and Safety Permit or Environmental, Health and Safety Order with respect to the real property, whether owned or leased, of any Loan Party or any Subsidiary of a Loan Party or the operations of any Loan Party or any of its Subsidiaries; provided, further that no Loan Party shall have any obligation hereunder to any Indemnitee with respect to liabilities to the extent same arise from (1) such Indemnitee's gross negligence or willful misconduct, (2) the material breach in bad faith by such Indemnitee with respect to its obligations under the Loan Documents, or (3) any dispute solely between or among non-Affiliated Lender Indemnitees (not arising as a result of any act or omission by a Loan Party or any of its Subsidiaries), other than claims against Agent in its capacity as, or fulfilling its role as, the Agent, in the case of each of clauses (1), (2) and (3) as determined by a final non-appealable judgment rendered by a court of competent jurisdiction. This Section 11.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Reimbursement by Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under Sections 11.03(a) or 11.03(b) to be paid by it to the Agent (or any agent or attorney-in-fact thereof) or any Related Party of any of the foregoing, each applicable Lender severally agrees to pay to the Agent (or any such agent or attorney-in-fact) or such Related Party, as the case may be, such Lender's Ratable Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such agent or attorney-in-fact) in its capacity as such, or against any Related Party acting for the Agent (or any such agent or attorney-in-fact) in connection with such capacity.

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, no Loan Party shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in Section 11.03(b) shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages are found to be a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of such Indemnitee.

(e)     Payments.  All amounts due under this Section shall be payable not later than 30 days after demand therefor.

Section 11.04   Holidays.  Whenever payment of a Loan to be made or taken hereunder shall be due on a day which is not a Business Day such payment shall be due on the next Business Day (except as provided in Section 4.02) and such extension of time shall be included in computing interest and fees, except that the Loans shall be due on the Business Day preceding the Stated Maturity Date if the Stated Maturity Date is not a Business Day. Whenever any payment or action to be made or taken hereunder (other than payment of the Loans) shall be stated to be due on a day which is not a Business Day, such

DEBTORSLCC_105799

payment or action shall be made or taken on the next following Business Day, and such extension of time shall not be included in computing interest or fees, if any, in connection with such payment or action.

Section 11.05    Notices; Effectiveness; Electronic Communication.

(a)    Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 11.05(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier (i) if to a Lender, to it at its address set forth in its administrative questionnaire, or (ii) if to any other Person, to it at its address set forth on Schedule 1.01(C).

Notices sent by hand shall be deemed to have been given when received, notices sent by overnight courier service shall be deemed to have been given one Business Day after deposit with a reputable overnight courier service, notices mailed by certified or registered mail shall be deemed to have been given three Business Days after being deposited in the mail, postage prepaid; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in Section 11.05(b) shall be effective as provided in such Section.

(b)    Electronic Communications.    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent; provided that the foregoing shall not apply to notices to any Lender if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Change of Address, Etc.    Any party hereto may change its address, e-mail address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

Section 11.06    Severability.    The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

Section 11.07    Duration; Survival.    All representations and warranties of the Loan Parties contained herein or made in connection herewith shall survive the execution and delivery of this

DEBTORSLCC_105800

Agreement, the completion of the transactions hereunder and Payment In Full. All covenants and agreements of the Borrower contained herein relating to the payment of principal, interest, premiums, additional compensation or expenses and indemnification, including those set forth in the Notes, Article 5 and Section 11.03, shall survive Payment In Full.

Section 11.08    Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations under the Loan Documents without the prior written consent of each Lender (and any other attempted assignment or transfer by any Loan Party shall be null and void). Each Lender may assign or otherwise transfer its rights and obligations hereunder (i) to an assignee in accordance with the provisions of Section 11.08(b) or (ii) by way of participation in accordance with the provisions of Section 11.08(d). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.08(d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Loans and Commitments at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 11.08(b)(i)(B) below in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in Section 11.08(b)(i)(A) above, the Commitments and principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption Agreement, as of the Trade Date, shall not be less than $1,000,000 unless each of the Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by Section 11.08(b)(i)(B) and, in addition, the consent of (A) the Agent (such consent not to be unreasonably withheld or delayed) shall be required and (B) the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment, (2) such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or the Specified Assignee, or (3) such assignment is in connection with

94

the primary syndication of the Loans; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Agent within five Business Days after having received notice thereof.

(iv)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption Agreement (and the Agent shall countersign its acceptance of such Assignment and Assumption Agreement), together with a processing and recordation fee in the amount of $3,500, which the Agent may at any time waive (provided that (A) no such fee shall be payable in connection with assignments by a Lender to one or more of its Affiliates or to the Specified Assignee and (B) only one such fee shall be payable with respect to simultaneous assignments by or to one or more Approved Funds that are administered or maintained by the same Person or by Persons who are Affiliates of each other). The assignee, if it is not a Lender, shall deliver to the Agent an administrative questionnaire.

(v)    No Assignment to Certain Persons.    No such assignment shall be made to any Loan Party or any of the Loan Parties' respective Affiliates or Subsidiaries, to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B) or (C) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person).

(vi)    Certain Additional Payments.    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire its full pro rata share of all Loans in accordance with its Ratable Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to Section 11.08(c), from and after the effective date specified in each Assignment and Assumption Agreement, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 5.08, 5.09, 5.10, and 11.03 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.08(d) of this Section.

95

DEBTORSLCC_105802

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at its Principal Office a copy of each Assignment and Assumption Agreement delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders and principal amounts (and stated interest) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Agent, sell participations to any Person (other than a natural Person, a Defaulting Lender or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.03(b) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01 that directly affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 5.08, 5.09 and 5.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.08(b) (it being understood that the documentation required under Section 5.09 shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 5.03 and 5.07 as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 5.08 or 5.09, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 5.07 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.02(c) as though it were a Lender; provided that such Participant agrees to be subject to Section 5.03 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Income Tax Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the

96

Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Affiliated Lenders.

(i)     Notwithstanding anything to the contrary in this Agreement or any Loan Document, upon the occurrence and during the continuance of an Event of Default, no Affiliated Lender shall have any right to (A) attend (including by telephone) any meeting or discussions (or portion thereof) among the Agent or any Lenders to which representatives of Holdings and its Subsidiaries are not invited, (B) receive any information or material prepared by the Agent or any Lender or any communication by or among the Agent or any Lender, except to the extent such information or materials have been made available to Holdings or its Subsidiaries or their representatives or (C) receive advice of counsel or any financial or other advisors to the Agent or any other Lender or challenge their attorney client privilege.

(ii)     Notwithstanding anything to the contrary in this Agreement or any Loan Document, each Affiliated Lender, solely in its capacity as a Lender, hereby agrees that, if any of Holdings or its Subsidiaries shall be subject to any voluntary or involuntary bankruptcy, reorganization, insolvency, liquidation proceeding or any Event of Default under Section 9.01(k) and Section 9.01(l) (each, a "Bankruptcy Proceeding"), (A) such Affiliated Lender shall not take any step or action in such Bankruptcy Proceeding to object to, impede, or delay the exercise of any right or the taking of any action by the Agent or any Lender (or the taking of any action by a third party that is supported or consented to by the Agent and, if applicable, the Required Lenders, to which action such Affiliated Lender shall be deemed to consent, if applicable) in relation to such Affiliated Lender's claim with respect to its Loans ("Claim") (including objecting to any debtor in possession financing, use of cash collateral, grant of adequate protection, sale or disposition, compromise, or plan of reorganization) so long as such Affiliated Lender in its capacity as a Lender is treated in connection with such exercise or action on the same or better terms as the other Lenders and (B) with respect to any matter requiring the vote of Lenders (including voting on any plan of reorganization or plan of liquidation) during the pendency of a Bankruptcy Proceeding, such Affiliated Lender agrees that it shall not have the right to vote its Claim with respect to the Loans held by such Affiliated Lender so long as the treatment provided to such Affiliated Lender's Claim under any such plan is not disproportionately adverse to the treatment afforded to the non-Affiliated Lenders.  For the avoidance of doubt, the Lenders and each Affiliated Lenders agree and acknowledge that the provisions set forth in this Section 11.08(f)(ii) constitute a "subordination agreement" as such term is contemplated by, and utilized in, Section 510(a) of the Bankruptcy Code, and, as such, it is their intention that this Section 11.08(f) would be enforceable for all purposes in any case where Holdings or any of its Subsidiaries has filed for protection under any law relating to bankruptcy, insolvency or reorganization or relief of debtors applicable to Holdings or such Subsidiary, as applicable. Each Affiliated Lender hereby irrevocably appoints the Agent (such appointment being coupled with an interest) as such Affiliated Lender's attorney-in-fact, with full authority in the place and stead of such Affiliated Lender and in the name of such Affiliated Lender, from time to time in the Agent's discretion to take any action and to execute any instrument that the Agent and the Required Lenders may deem reasonably necessary to carry out the provisions of this Section 11.08(f)(ii).

Section 11.09   Confidentiality.

97

(a)    General.    Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or, Participant or in, or any prospective assignee of, or Participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (vii) with the consent of the Borrower or (viii) to the extent such Information (Y) becomes publicly available other than as a result of a breach of this Section or (Z) becomes available to the Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or the other Loan Parties. In addition, the Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to rating agencies, credit insurers, CUSIP Service Bureau, Inc., market data collectors, similar services providers to the lending industry, and service providers to the Agent and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Sharing Information With Affiliates of the Lenders.    Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to the Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each of the Loan Parties hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement to any such Subsidiary or Affiliate subject to the provisions of Section 11.09(a).

Section 11.10    Counterparts; Integration.

(a)    Counterparts; Integration.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof including any prior confidentiality agreements and commitments. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)    Electronic Execution of Assignments and Certain Other Documents.    The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption Agreement or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in

98

electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.11  CHOICE OF LAW; SUBMISSION TO JURISDICTION; WAIVER OF VENUE; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)  Governing Law.  This Agreement shall be deemed to be a contract under the Law of the State of New York.

(b)  SUBMISSION TO JURISDICTION.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF (OTHER THAN WITH RESPECT TO ACTIONS BY THE AGENT IN RESPECT OF RIGHTS UNDER ANY COLLATERAL DOCUMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO), IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)  WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 11.11. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT AND AGREES NOT ASSERT ANY SUCH DEFENSE.

(d)  SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.05. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

DEBTORSLCC_105806

(e)    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, THE AGENT OR THE ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 11.12    USA Patriot Act Notice.  The Agent and each Lender that is subject to the USA Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of Loan Parties and other information that will allow the Agent or such Lender, as applicable, to identify the Loan Parties in accordance with the USA Patriot Act.

Section 11.13    No Fiduciary Duty.  The Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender or the Agent, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other. The Loan Parties acknowledge and agree that (a) the arranging and other services regarding this Agreement and the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Agent and the Lenders, on the one hand, and the Loan Parties, on the other, and (b) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents, (y) the Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agent or any Lender has any obligation to disclose any of such interests to the Borrower and its Affiliate, and (z) each Lender is acting solely as principal and not as an advisor, the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate, that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto and is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

100

Section 11.14   <u>The Platform</u>.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Agent's transmission of Borrower Materials through the Internet.

Section 11.15   <u>Authorization to Release Collateral and Guarantors</u>.   The Required Lenders may authorize the Agent to (a) release any Collateral that becomes Excluded Property (or any assets no longer required to be Collateral pursuant to the terms hereof or of any other Loan Document) or any Collateral consisting of assets or equity interests sold or otherwise disposed of in a sale or other disposition or transfer permitted under <u>Section 8.02(c)</u> or <u>Section 8.02(d)</u>, and (b) release any Guarantor from its obligations under the Guaranty Agreement if such Guarantor ceases to be a Subsidiary pursuant to any sale, transfer, lease, disposition, merger or other transaction permitted by this Agreement, including, without limitation, in the event the ownership interests in such Guarantor are sold or otherwise disposed of or transferred to persons other than Loan Parties or Subsidiaries of the Loan Parties in a transaction permitted under <u>Section 8.02(c)</u> or <u>Section 8.02(d)</u>. Upon the written request of the Borrower (accompanied by such certificates and other documentation as the Agent or any Lender may reasonably request) the Agent at the direction of the Required Lenders, (i) shall release or consent to the release by the Agent of any Collateral or Guarantor in connection with any event contemplated above or Payment in Full, and (ii) notwithstanding <u>Section 11.01</u> or any other provision in any Loan Document to the contrary, shall amend, modify or supplement any of the Loan Documents from time to time or consent to such action by the Agent to (A) add Guarantors of the Obligations, (B) add property or other assets as Collateral or (C) approve of any correction or update to any Schedule hereto or to any other Loan Document to the extent such Schedule is being corrected in any manner that is not material or is being updated to reflect the consummation of any transaction or exercise of any rights of the Loan Parties permitted hereunder for which no consent is required or for which the required consent has been received.

Section 11.16   <u>Right to Realize on Collateral and Enforce Guaranty</u>.   Notwithstanding anything contained in any of the Loan Documents to the contrary, the Borrower, the Agent and each Lender hereby agree that no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agent at the direction of the Required Lenders in accordance with the terms hereof and all powers, rights and remedies under Collateral Documents may be exercised solely by the Agent on behalf of the Secured Parties (at the direction of the Required Lenders).

Section 11.17   <u>Release of Liens</u>.   In the event that any Loan Party disposes of any asset to any Person (other than a Loan Party) in a transaction expressly permitted by <u>Section 8.02(d)</u>, any Lien created by any Loan Document in respect of such assets shall be automatically released and the Agent (at the direction of the Required Lenders) shall promptly take such action and execute any such documents as may be reasonably requested by the Borrower (or on behalf of any other Loan Party) and at the Borrower's sole cost and expense to (i) evidence such release and (ii) if such disposition is a permitted sale of the Equity Interests in a Subsidiary, release such Subsidiary as a Guarantor under the Guaranty Agreement.

101

Section 11.18   <u>Acknowledgements and Consent to Bail-in of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 11.19   <u>Non-Pro Rata Acknowledgement</u>. Notwithstanding anything to the contrary in any Loan Document, each party hereto acknowledges and agrees to the terms of <u>Section 2.03(b)</u>, the second parenthetical of <u>Section 5.05</u>, <u>Section 5.06(b)(vi)</u> and the first parenthetical of <u>Section 5.06(b)(vii)</u>.

Section 11.20   <u>Existing Debt Consents: Authorization and Acknowledgement</u>. The Lenders authorize and direct the Agent to enter into the Existing Debt Consents and acknowledge that the Agent may exercise the right to repurchase Existing Debt under the Existing Debt Consents for its or its Affiliates own account.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

102

DEBTORSLCC_105809

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, have executed and delivered this Agreement as of the day and year first written above.

**BLACKJEWEL L.L.C.**, as the Borrower

By: _____
Name:  Jeffery A. Hoops, Sr.
Title:  President and Chief Executive Officer

**BLACKJEWEL HOLDINGS L.L.C.**, as Holdings

By: _____
Name:  Jeffery A. Hoops, Sr.
Title:  President and Chief Executive Officer

Signature Page
Credit Agreement

DEBTORSLCC_105810

**RIVERSTONE CREDIT PARTNERS – DIRECT, L.P.,**
as Agent

By: _____
Name: TOM WALKER
Title: CFO

Signature Page
Credit Agreement

DEBTORSLCC_105811

**JEFFERIES FINANCE LLC**, as a Lender

By: _____

Name: JOHN KOEHLER

Title: SENIOR VICE PRESIDENT

Signature Page
Credit Agreement

DEBTORSLCC_105812

**LR-REVELATION HOLDINGS, L.P.**, as a
Lender

By: LIME ROCK PARTNERS GP V, L.P.,
its general partner

By: LRP GP V, Inc.,
its general partner

By:
Name:   Jeffery B. Scofield
Title:    Managing Partner

Signature Page
Credit Agreement

DEBTORSLCC_105813

**JEFFERY HOOPS**, as a Lender

By:

Name:   Jeffery A. Hoops, Sr.

Signature Page
Credit Agreement

DEBTORSLCC_105814

## SCHEDULE 1.01(C)

### LENDERS; COMMITMENTS; ADDRESSES FOR NOTICES

| Lender | Commitment | Address |
|---|---|---|
| Jefferies Finance LLC | $28,000,000.00 | 520 Madison Avenue New York, NY 10022 |
| LR-Revelation Holdings, L.P. | $3,000,000.00 | 274 Riverside Avenue, 3rd Floor, Westport, CT 06880 |
| Jeffery Hoops | $3,000,000.00 | 1149 Newmans Branch Road Milton, West Virginia 25541 |

**Agent:**

Riverstone Credit Partners – Direct, L.P.
712 Fifth Avenue, 36th Floor
New York, NY 10019
Attention: Daniel Flannery
Telephone No. (212) 271-6259
Email: dflannery@riverstonecredit.com

Schedule 1.01(C)

**SCHEDULE 1.01(E)**

**EXCLUDED LEASES**

None.

DEBTORSLCC_105816

## SCHEDULE 1.01(E-2)

## EXISTING DEBT DOCUMENTS

### A. <u>J.A.D.</u>

1.   Overriding Royalty Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

2.   Real Estate Mortgage dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

3.   Security Agreement dated April 22, 2015 by and between Revelation Energy, LLC, a Kentucky limited liability company and J.A.D. Coal Company, Inc., a Virginia corporation.

4.   Throughput Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

5.   Special Warranty Deed dated April 22, 2015 between J.A.D. Coal Company, Inc., a Virginia corporation, as grantor and Revelation Energy, LLC, a Kentucky limited liability company, as grantee and recorded in the Clerk's Office of Harlan County, Kentucky in Deed Book 458, Page 503.

6.   Overriding Royalty Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company (the "Overriding Royalty Agreement").

7.   Memorandum of Overriding Royalty Agreement between J.A.D. Coal Company, Inc. and Revelation Energy, LLC dated April 22, 2015 and recorded in the Clerk's Office in Harlan County, Kentucky in Deed Book 458, Page 530.

8.   Assignment of the Overriding Royalty Agreement dated April 22, 2015 between J.A.D. Coal Company, Inc. and Julia L. McAfee and Carl E. McAfee (the "<u>McAfees</u>"); Dean McAfee Holdings, LLC ("<u>McAfee Holdings</u>"); Jeffery Paul Dean, Trustee of the Trust for Jeffery Paul Dean (GS Exempt), under Agreement dated August 29, 2008; Donna Mae Kolb, Trustee for the Trust for Donna Mae Kolb (GS Exempt), under Agreement dated August 29, 2008; and Aubra Brian Dean, Trustee for the Trust for Aubra Brian Dean (GS Exempt), under Agreement dated August 29, 2008 (collectively, the "<u>Deans</u>" or the "<u>Dean Heirs</u>"), as successors in interest to the Estate of Aubra Paul Dean [and along with McAfee Holdings, and the McAfees, collectively referred to herein as the "<u>Secured Parties</u>." Said Assignment of Overriding Royalty Agreement recorded in the Office of the Clerk for Harlan County, Kentucky in Deed Book 458, Page 537.

9.   Throughput Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability Company (the "Throughput Agreement").

10.   Memorandum of Throughput Agreement dated April 22, 2015 between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company, and recorded in the Clerk's Office in Harlan County, Kentucky in Misc. Book 41, Page 599.

DEBTORSLCC_105817

11.     Assignment of the Throughput Agreement between J.A.D. Coal Company, Inc. and the Secured Parties dated April 22, 2015 and recorded in the Office of the Clerk of Harlan County, Kentucky in Misc. book 41, Page 608.

12.     Real Estate Mortgage dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company, and recorded in the Clerk's Office in Harlan County, Kentucky in Mortgage Book 433, Page 450 (the "Real Estate Mortgage.").

13.     Assignment of the Real Estate Mortgage between J.A.D. Coal Company, Inc. and the Secured Parties dated April 22, 2015 and recorded in the Clerk's Office in Harlan, in Mtg. Book 433 Page 463.

14.     Security Agreement dated April 22, 2015 by and between Revelation Energy, LLC, a Kentucky limited liability company and J.A.D. Coal Company, Inc., a Virginia corporation (the "Security Agreement").

15.     Assignment of the Security Agreement between J.A.D. Coal Company, Inc. and the Secured Parties dated April 22, 2015.

16.     Assignment and Assumption of Leases dated April 22, 2015 between J.A.D. Coal Company, Inc. and Revelation Energy, LLC and recorded in the Clerk's Office of Harlan County, Kentucky in Lease Book __ Page 587.[1]

### B. MR Coal Marketing & Trading, LLC

1.     Bill of Sale, Assignment and Assumption Agreement dated February 28, 2013, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

2.     Put and Call Agreement dated as of April 17, 2015, by and between Parent and Revelation Energy, LLC.

3.     Guarantee of Revelation Energy Holdings, LLC dated as April 17, 2015.

4.     Guarantee of Parent Guarantor dated as of April 17, 2015.

5.     Amended and Restated Guaranty Reimbursement and Indemnification Agreement dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

6.     Throughput Agreement (Clover Loadout) dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

7.     Throughput Agreement (Beech Fork Prep Plant and Loadout) dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

8.     Throughput Agreement (Hignite Prep Plant and Loadout) dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

9.     Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 18, 2015 by Revelation Energy, LLC in favor of MR Coal Marketing & Trading, LLC and Noble Americas Corp.

---

[1] Documents part of the resolution of the JAD bankruptcy. The Secured Parties are the current holders of the obligations from Revelation and the security interests have been perfected in their names by the recording documents and filing of UCC Financing Statements. As such, they are the parties who need to grant the consent for assumption of the liabilities by Blackjewel.

Schedule 1.01(E-2)

DEBTORSLCC_105818

10. Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 18, 2015, by Revelation Energy, LLC in favor of MR Coal Marketing & Trading, LLC and Noble Americas Corp.

11. Security Agreement dated as of April 18, 2015, by Revelation Energy, LLC in favor of MR Coal Marketing & Trading, LLC and Noble Americas Corp.

12. Amended and Restated Logistics Services Agreement dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC.

## C. **United Bank, Inc.**

### C-1. **Loan and Security Agreement**

1. Second Amended and Restated Loan and Security Agreement dated February 28, 2013 by and among Revelation Energy, LLC, a Kentucky limited liability company; Revelation Energy Holdings, LLC, a Delaware limited liability company; Alpha Highwall Mining, LLC, a Kentucky limited liability company; and United Bank, Inc., a West Virginia banking corporation.

2. Amended and Restated Revolving Line of Credit Note dated February 28, 2013 by and between Revelation Energy, LLC, a Kentucky limited liability company; and United Bank, Inc., a West Virginia banking corporation.

3. Intercompany Debt Subordination Agreement dated July 18, 2012 by and among Revelation Energy, LLC, a Kentucky limited liability company; United Bank, Inc., a West Virginia banking corporation; Alpha Highwall Mining, LLC, a Kentucky limited liability company; Candle Ridge Mining, Inc., a Kentucky corporation; Revelation Management Corporation, a Delaware corporation; and Revelation Energy Holdings, LLC, a Delaware limited liability company.

4. Guaranty Agreement dated July 18, 2012 by and between Revelation Energy Holdings, LLC, a Delaware limited liability company, and United Bank, Inc., a West Virginia banking corporation.

5. Guaranty Agreement dated July 18, 2012 by and between Alpha Highwall Mining, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation.

6. Assignment of Life Insurance As Collateral dated July 13, 2012 by and among Northwestern Mutual Life Insurance Company and United Bank, Inc.

7. Insurance Proceeds Escrow Agreement dated July 18, 2012 by and between Revelation Energy, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation.

8. Secured Party Lockbox Agreement dated July 18, 2012 by and between United Bank, Inc., a West Virginia banking corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

9. Written Agreement In Lieu of Meeting of Board of Directors dated February 28, 2013 by Directors of Revelation Energy Holdings, LLC.

10. Written Action by Sole Member In Lieu of Meeting dated February 28, 2013 by Revelation Energy Holdings, LLC, the sole member of Revelation Energy, LLC.

11. Written Action by Sole Member In Lieu of Meeting dated February 28, 2013 by Revelation Energy, LLC, the sole member of Alpha Highwall Mining, LLC.

Schedule 1.01(E-2)

12. Intercreditor Agreement dated February 28, 2013 by and among United Bank, Inc., a West Virginia banking corporation; Revelation Energy, LLC, a Kentucky limited liability company; and MR Coal Marketing & Trading, LLC, a Delaware limited liability company.

13. Consent and Right of Entry dated February 28, 2013 by and among United Bank, Inc., a West Virginia banking corporation; Revelation Energy, LLC, a Kentucky limited liability company, and MR Coal Marketing & Trading, LLC, a Delaware limited liability company.

14. First Amendment to Second Amended and Restated Loan and Security Agreement dated March 28, 2014 and effective February 27, 2014, which amended the Loan Agreement and the Note to extend the Maturity Date until April 30, 2014;

15. Second Amendment to Second Amended and Restated Loan and Security Agreement dated April 30, 2014 and effective May 1, 2014, which amended the Loan Agreement and the Note to extend the Maturity Date until May 31, 2014;

16. Third Amendment to Second Amended and Restated Loan and Security Agreement dated June 2, 2014 and effective June I, 2014, which amended the Loan Agreement and the Note to extend the Maturity Date until June 30, 2014;

17. Fourth Amendment to Second Amended and Restated Loan and Security Agreement on July 29, 2014, which amended the Loan Agreement and the Note to extend the Maturity Date until September 30, 2014;

18. Fifth Amendment to Second Amended and Restated Loan and Security Agreement effective September 30, 2014 which amended the Loan Agreement and the Note to extend the Maturity Date until November 30, 2014;

19. Sixth Amendment to Second Amended and Restated Loan and Security Agreement effective December 1, 2014 (the "Sixth Amendment") which amended the Loan Agreement and the Note to extend the Maturity Date until December 31, 2014, and to amend and add such other terms and conditions of the Loan Agreement and the Note as described and set forth therein;

20. Seventh Amendment to Second Amended and Restated Loan and Security Agreement effective January 1, 2015, which amended the Loan Agreement and the Note to extend the Maturity Date until March 31, 2015, and to amend and add such other terms and conditions of the Loan Agreement and the Note as described and set forth therein;

21. Eighth Amendment to Second Amended and Restated Loan and Security Agreement effective April 1, 2015 which amended the Loan Agreement and the Note to extend the Maturity Date until May 31, 2015;

22. Ninth Amendment to Seconded Amended and Restated Loan and Security Agreement effective April 17, 2015 which amended certain definitions and terms and conditions of the Loan Agreement and the other Transaction Documents as described and set forth therein;

23. Tenth Amendment to Second Amended and Restated Loan and Security Agreement effective June 1, 2015 which amended the Loan Agreement and the Note to extend the Maturity Date until July 31, 2015;

24. Eleventh Amendment to Second Amended and Restated Loan and Security Agreement effective July 29, 2015 which amended the Loan Agreement and the Note to extend the Maturity Date until October 30, 2015;

Schedule 1.01(E-2)

DEBTORSLCC_105820

25. Twelfth Amendment to Second Amended and Restated Loan and Security Agreement effective October 30, 2015 which amended the Loan Agreement and the Note to extend the Maturity Date until January 30, 2016;

26. Thirteenth Amendment to Second Amended and Restated Loan and Security Agreement effective January 30, 2016 (the "Thirteenth Amendment") which amended the Loan Agreement and the Note to extend the Maturity date until July 31, 2016;

27. Fourteenth Amendment to Second Amended and Restated Loan and Security Agreement effective July 31, 2016 (the "Fourteenth Amendment") which amended the Loan Agreement and the Note to extend the Maturity Date until January 31, 2017;

28. Fifteenth Amendment to Second Amended and Restated Loan and Security Agreement effective January 30, 2017 (the "Fifteenth Amendment") which amended the Loan Agreement and the Note to extend the Maturity Date until July 31, 2017;

29. Error and Omissions Compliance Agreement dated May 28, 2013 by and among United Bank, Inc., Revelation Energy Holdings, LLC and Alpha Highwall Mining, LCC.

C-2. **Business Loan Agreement**

30. Business Loan Agreement dated May 28, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

31. Commercial Promissory Note dated May 28, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

32. Commercial Security Agreement dated May 28, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

33. Error and Omissions Compliance Agreement dated November 26, 2014 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

34. Change in Terms Agreement dated December 17, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

35. Error and Omissions Compliance Agreement dated November 28, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC.

36. Joinder Agreement, dated on or around the date hereof, made by Blackjewel L.L.C. and delivered to United Bank, Inc.

D. **Caterpillar Financial Services Corporation**

37. Amended and Restated Security Agreement and Promissory Note dated as of February 28, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation.

38. Amended and Restated Guaranty Agreement of Revelation Energy Holdings, LLC dated as of February 28, 2017.

39. First Amendment to Amended and Restated Security Agreement and Promissory Note dated as of March 3, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation.

40. Second Amendment to Amended and Restated Security Agreement and Promissory Note dated as of June 29, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation.

Schedule 1.01(E-2)

41. Third Amendment to Amended and Restated Security Agreement and Promissory Note of even date herewith, by and between Blackjewel, LLC, Delaware limited liability company, as assignee of Revelation Energy, LLC a Kentucky limited liability company, and Caterpillar Financial Services Corporation, a Delaware corporation.

42. Guaranty Agreement of Blackjewel Holdings, LLC of even date herewith.

Schedule 1.01(E-2)

DEBTORSLCC_105822

# SCHEDULE 1.01(L)

## LONE MOUNTAIN ACQUIRED ASSETS

| Company | Acquisition |
| --- | --- |
| Cumberland River Coal LLC | 100% equity interests |
| Lone Mountain Processing LLC | 100% equity interests |
| Powell Mountain Energy, LLC | 100% equity interests |

Schedule 1.01(L)

DEBTORSLCC_105823

| | Job/Rec # | ENTITY | Job Name | New PERMIT # | Previous PERMIT # | Type of Mining | MSHA ID # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | Supplemental Assurance | ARO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Kentucky/Virginia | Lone Mountain Division | | | | | | | | | | | |
| 1 | TBD | CRCC | Pending | Pending | 1102011 | | | | | | | $477,000 | | |
| 2 | TBD | CRCC | Pending | Pending | 1301430 | | | | | | | $179,800 | | $314,979.60 |
| 3 | TBD | CRCC | Pending | Pending | 1301533 | | | | | | | $1,248,300 | | $986,414.32 |
| 4 | TBD | CRCC | Pending | Pending | 1301561 | | | | | | | $1,503,800 | | $744,012.00 |
| 5 | TBD | CRCC | Pending | Pending | 1601486 | | | | | | | $1,499,800 | | $3,842,978.82 |
| 6 | TBD | CRCC | Pending | Pending | 867-0466 | | | Letcher | Eolia | 37-04-04 | 82-44-57 | $75,000 | | |
| 7 | TBD | CRCC | Pending | Pending | 867-5138 | | 15-05183 | Letcher | Eolia | 37-04-03 | 82-44-55 | $108,300 | | |
| 8 | TBD | CRCC | Pending | Pending | 867-5139 | | 15-19228 | Letcher | Eolia | 37-01-10 | 82-47-30 | $564,900 | | $1,680,475.93 |
| 9 | TBD | CRCC | Pending | Pending | 867-5291 | | | Letcher | | | | | | |
| 10 | TBD | CRCC | Pending | Pending | 867-5292 | | 15-19533 | Letcher | Franks Creek | 37-01-45 | 82-48-01 | $354,200 | | |
| 11 | TBD | Lone Mtn | Pending | Pending | 11-0188-95 | | | | | | | $5,000 | | |
| 12 | TBD | Lone Mtn | Pending | Pending | 1201390 | Haul road | | Lee | St. Charles | 36-50-30.2 | 83-01-49.7 | $399,000 | | $87,277.00 |
| 13 | TBD | Lone Mtn | Pending | Pending | 1201395 | Water monitoring & access road | | Lee | St. Charles | 36-50-22.3 | 83-02-36.6 | $78,000 | | $73,616.00 |
| 14 | TBD | Lone Mtn | Pending | Pending | 1201507 | Underground belt corridor | 44-06782 | Lee | St. Charles | 36-50-46.1 | 83-02-05.5 | $108,700 | | $156,922.00 |
| 15 | TBD | Lone Mtn | Pending | Pending | 1301411 | Prep Plant & Refuse | 1211-VA5-00174-81 | Lee | St. Charles | 36-50-12 | 83-02-14.2 | $8,444,100 | | $3,613,093.00 |
| 16 | TBD | Lone Mtn | Pending | Pending | 848-0158 | Haul Road & Surface | | Harlan | Holmes Mill | 36-52-10 | 83-00-26 | $75,000 | | $71,307.00 |
| 17 | TBD | Lone Mtn | Pending | Pending | 848-5282 | Underground | 15-17234, 15-18647 | Harlan | Holmes Mill | 36-52-10 | 82-57-50 | $112,500 | | $285,420.00 |
| 18 | TBD | Lone Mtn | Pending | Pending | 848-5297 | Underground | 15-02263, 15-18647 | Harlan | Holmes Mill | 36-52-02 | 82-59-37 | $10,000 | | $272.00 |
| 19 | TBD | Lone Mtn | Pending | Pending | 848-5324 | Underground | | Harlan | Holmes Mill | 36-51-34 | 83-01-200 | $710,500 | | $839,365.00 |
| 20 | TBD | Lone Mtn | Pending | Pending | 848-5353 | Underground | | Harlan | Holmes Mill | 36-52-37 | 82-58-47 | $150,000 | | $26,818.00 |
| 21 | TBD | Powell Mtn | Pending | Pending | 1202025 | Underground | 44-07060, 44-07207 | Lee | St. Charles | 36-49-05.5 | 83-05-42.5 | $509,300 | | $396,783.00 |
| 22 | TBD | Powell Mtn | Pending | Pending | 1202026 | Water monitoring | | Lee | St. Charles | 36-48-27.3 | 83-03-35.6 | $238,200 | | $1,685,211.00 |
| 23 | TBD | Powell Mtn | Pending | Pending | 1202027 | | | Lee | St. Charles | 36-50-07.3 | 83-04-56.6 | $314,200 | | $159,575.00 |
| 24 | TBD | Powell Mtn | Pending | Pending | 1402024 | Prep Plant & Refuse | 1211-VA5-0159-01 | Lee | St. Charles | 36-50-21.3 | 83-03-32.6 | $2,403,700 | | $1,673,553.00 |
| 25 | TBD | Powell Mtn | Pending | Pending | 848-5514 | Underground | 15-18734 | Harlan | Clover-Darby | 36-52-43 | 82-03-31 | $143,300 | | $300,927.00 |
| 26 | TBD | Powell Mtn | Pending | Pending | 848-5517 | Underground | | Harlan | Disney | 36-50-20 | 83-05-01 | $40,400 | | $4,750.00 |
| 27 | TBD | Powell Mtn | Pending | Pending | 848-5521 | Underground | | Harlan | Disney | 36-49-25 | 83-05-55 | $10,000 | | $1,500.00 |
| | | | | | | | | | | | Totals | $19,763,000 | $0 | $16,745,250 |

DEBTORSLCC_105824

POWELL MOUNTAIN
LEASED PROPERTY

| Ark File Number | Document Type | Estate Type | Execution/ Effective Date | Expiration Date | Grantee / Lessee | Recoupable Balance | Minimums | Guaranteed Minimums | Rentals | Production Royalty Rate | Wheelage |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MC-038 | SUBLEASE | SURFACE SUBLEASE AGREEMENT | 5/28/1982 | 5/28/2027 | ARK LAND LLC | NA | NA | NA | NA | NA | NA |
| PM-002 | LEASE | FEE | 5/27/2008 | 5/27/2023 | POWELL MOUNTAIN ENERGY, LLC | $9,362,160.11 | NA | Guaranteed_Minimum royalty to be $4,160.67 monthly through 5/2021 Guaranteed_Minimum royalty to be $50,000.00 monthly beginning 5/20/2021 | Rental royalty to be $180.00 monthly | For coal produced by surface method  Production royalty to be greater of 8% GSP or $4.00 per short ton  For coal produced by underground method  Production royalty to be greater of 6% GSP or $3.00 per short ton | NA |
| PM-003 | LEASE | SURFACE | 5/12/2002 | 8/11/2023 | POWELL MOUNTAIN ENERGY, LLC | $581,617.96 | Minimum royalty to be $5,000.00 yearly | NA | NA | For coal produced by any method  Production royalty to be $.25 per short ton | NA |
| PM-004 | LEASE | SURFACE | 5/28/2008 | | POWELL MOUNTAIN ENERGY, LLC | NA | NA | NA | Rental royalty to be $5,879.78 one-time  Rental royalty to be $6,129.62 yearly | NA | NA |

DEBTORSLCC_105825

Lone Mountain Processing LLC
Coal Lease Summary

| Ark File Number | Document Type | Estate Type | Effective Date | Expiration Date | Grantee / Lessee | Recoupable Balance | Minimums | Production Royalty Rate | Wheelage |
|---|---|---|---|---|---|---|---|---|---|
| KY-7072 | LEASE | COAL | 11/16/1988 | 11/15/2017 | ARK LAND LLC | $519,431.05 | Minimum royalty to be $30,000.00 yearly. | For coal produced by auger method: Production royalty to be greater of 6% GSP or $1.50 per short ton.  For coal produced by surface method: Production royalty to be greater of 6% GSP or $1.50 per short ton.  For coal produced by underground method: Production royalty to be greater of 6% GSP or $1.50 per short ton. | For coal produced by any method: Wheelage royalty to be $.15 per short ton |
| KY-7073 | LEASE | COAL | 11/21/1988 | 11/20/2018 | ARK LAND LLC | $0.00 | Minimum royalty to be $30,000.00 yearly. | For coal produced by auger method: Production royalty to be greater of 6% GSP or $1.50 per short ton.  For coal produced by surface method: Production royalty to be greater of 6% GSP or $1.50 per short ton.  For coal produced by underground method: Production royalty to be greater of 6% GSP or $1.50 per short ton. | |
| KY-7152 | LEASE | COAL | 4/27/1994 | 4/26/2018 | ARK LAND LLC | | | For coal produced by auger method: Production royalty to be 5% GSP.  For coal produced by surface method: Production royalty to be 5% GSP.  For coal produced by underground method: Production royalty to be 5% GSP. | |
| KY-7236-1 | LEASE | COAL | 4/29/1996 | 4/28/2017 | ARK LAND LLC | $1,400.00 | | | |
| KY-7236-2 | LEASE | COAL | 4/26/1996 | 4/25/2017 | ARK LAND LLC | $2,500.00 | | | |
| KY-7236-3 | LEASE | COAL | 4/29/1996 | 4/28/2017 | ARK LAND LLC | $2,500.00 | | | |
| KY-7236-4 | LEASE | COAL | 4/30/1996 | 4/29/2017 | ARK LAND LLC | $2,500.00 | | | |
| KY-7236-5 | LEASE | COAL | 11/21/1996 | 11/20/2021 | ARK LAND LLC | $2,500.00 | | | |
| KY-7236-6 | LEASE | COAL | 11/21/1996 | 11/20/2021 | ARK LAND LLC | $25,793.73 | | | |
| KY-7237 | LEASE | COAL | 5/28/1996 | 5/27/2021 | ARK LAND LLC | $11,397.60 | | | |
| KY-7238 | LEASE | COAL | 7/11/1996 | 7/10/2021 | ARK LAND LLC | $2,600.00 | | | |
| KY-7239 | LEASE | COAL | 7/18/1996 | 7/17/2021 | ARK LAND LLC | $3,000.00 | | | |
| KY-7267 | LEASE | COAL | 10/9/1997 | 10/8/2017 | ARK LAND LLC | $2,650.00 | | | |
| KY-7270 | LEASE | COAL | 6/26/1997 | 6/25/2017 | ARK LAND LLC | $2,100.00 | Minimum royalty to be $100.00 yearly. | | |
| KY-7271 | LEASE | COAL | 6/26/1997 | 6/25/2017 | ARK LAND LLC | $2,350.00 | Minimum royalty to be $100.00 yearly. | | |

DEBTORSLCC_105826

Lone Mountain Processing LLC
Coal Lease Summary

| Ark File Number | Document Type | Estate Type | Effective Date | Expiration Date | Grantee / Lessee | Recoupable Balance | Minimums | Production Royalty Rate | Wheelage |
|---|---|---|---|---|---|---|---|---|---|
| KY-7302-1; KY-7302-2; KY-7302-3 | LEASE | COAL | 10/1/2002 | 9/30/2017 | ARK LAND LLC | $0.00 | Minimum royalty to be $125,000.00 quarterly. Minimum royalty to be $25,000.00 quarterly. | For coal produced by any method: Production royalty to be greater of 6.5% GSP or $1.50 per short ton. | |
| KY-7307 | LEASE | COAL | 2/1/2003 | 1/31/2018 | ARK LAND LLC | | | For coal produced by underground method: Production royalty to be greater of 5% GSP or $1.00 per short ton. | For coal produced by any method: Wheelage royalty to be greater of .5% GSP or $.13 per short ton |
| KY-7307-1 | LEASE | COAL | 9/14/2008 | 1/31/2018 | ARK LAND LLC | | | For coal produced by any method: Production royalty to be greater of 6% GSP or $1.00 per short ton. | For coal produced by any method: Wheelage royalty to be greater of .5% GSP or $.13 per short ton |
| KY-7308 | LEASE | COAL | 11/11/2004 | 11/10/2018 | ARK LAND LLC | $0.00 | Minimum royalty to be $100.00 yearly. | For coal produced by any method: Production royalty to be 6% GSP | |
| KY-7309 | LEASE | COAL | 11/11/2004 | 11/10/2018 | ARK LAND LLC | $0.00 | Minimum royalty to be $100.00 yearly. | For coal produced by any method: Production royalty to be 6% GSP | |
| KY-7311 | LEASE | COAL | 3/1/2005 | 11/10/2017 | ARK LAND LLC | | | | |

2 of 2

DEBTORSLCC_105827

# 330 Cumberland River Coal Co.

**File Listing Report**

| Sys No | Co Asset Description | Model | Mfg Serial No | In Svc Date |
|---|---|---|---|---|
| 000242 | 05212500 PARDEE LOADOUT | | | 05/01/95 |
| 000385 | 05212600 PARDEE PREPARATION PL | | | 01/01/96 |
| 000392 | 08000800 BANDMILL SUBSTATION | | | 02/01/96 |
| 000436 | 05212600 PARDEE PREPARATION PL | | | 03/01/96 |
| 000449 | 05100500 PARDEE WAREHOUSE/OFI | | | 05/01/95 |
| 000514 | 08001000 TRANSFORMER & SWITCH | | | 07/01/97 |
| 000544 | 08001000 TRANSFORMER & SWITCH | | | 03/01/98 |
| 000549 | 08101000 MMD SERIES 500 MINERAL | | | 05/01/98 |
| 000553 | 00030400 MAIN VENTILATION FAN | | | 07/01/98 |
| 000563 | 00030600 FINE COAL CIRCUIT - A306 | | | 11/01/98 |
| 000564 | 00030900 MMD SIZER  SERIES 500 | | | 12/01/98 |
| 000584 | 00030400 MAIN VENTILATION FAN AD | | | 04/01/99 |
| 000720 | 01489900 JOY 72" FAN, 200 HP | | | 08/01/04 |
| 000727 | 20041000 MET SEGREGATION WALL | | | 10/01/04 |
| 000741 | 20050400 UPGRADE SPIRAL CIRCUIT | | | 04/01/05 |
| 000751 | 20050801 POWER DISTRIBUTION | | | 08/01/05 |
| 000753 | 01499300 72" 200 HP FAN | | 4095 | 08/01/05 |
| 000758 | 02220400 CATERPILLAR 345CL EXCA | | PJW00478 | 08/01/05 |
| 000779 | 01937100 2500 KVA SUBSTATION | | 74802 | 05/01/06 |
| 000790 | 01968600 CATERPILLAR 420D BACKI | | FDP26818 | 05/01/06 |
| 000818 | 20060904 TRUCK SCALE THURMAN | | | 09/01/06 |
| 000843 | 27100000 Coal Analyzer | Thermo | 801011 | 08/01/01 |
| 000849 | 20050804 2005 CHEVY TAHOE | | 1GNEK13T45R192318 | 08/01/05 |
| 000871 | 20070602 HEAVY EQUIPMENT SHOP | | | 06/01/07 |
| 000969 | 20080201 2008 WHITE CHEVROLET T | | 1GNFK13068R141241 | 02/01/08 |
| 000976 | 20080306 SECRUITY CAMERA | | | 03/01/08 |
| 000978 | 20080308 COMMUNICATIONS | | | 03/01/08 |
| 001033 | 20071101 CANOPIES | | | 11/01/07 |
| 001035 | 20071103 MINE FAN | | 4848 | 11/01/07 |
| 001046 | 03239500 CATERPILLAR 924G | | DDA02046 | 05/01/08 |
| 001067 | 20090402 SUPPLY BUILDING/GARAG | | | 04/01/09 |
| 001092 | 04620100 MINE TO PLANT | | | 05/01/96 |
| 001135 | 20080701 6' 200 HP FAN | | 2832 | 07/01/08 |
| 001137 | 00638200 IT28 WHEEL LOADER (FOR | | 8JB000976 | 04/01/96 |
| 001142 | 20100601 IP PBX PHONE SYSTEM | | | 06/01/10 |
| 001145 | 20100604 8520 DB TRUCK SCALES | | 8984 | 06/01/10 |
| 001154 | 02182200 MINE CHANGE TRAILER | | | 02/01/07 |
| 001163 | 02182100 OFFICE TRAILER | | 89835AB | 02/01/07 |
| 001169 | 20100904 STACKER | | | 09/01/10 |
| 001170 | 03759300 2500 KVA 34400 SUBSTATI | | 080828-10 | 09/01/10 |

DEBTORSLCC_105828

| | | | | |
|---|---|---|---|---|
| 001171 | 20100905 2500 KVA 34400 SUBSTATI | | | 09/01/10 |
| 001211 | 20110202 REBUILD OF 66" 150 HP FA | | | 02/01/11 |
| 001231 | 20110302 MODULAR OFFICE-ENGINE | | | 03/01/11 |
| 001239 | 20110401 36" PRIMARY CROSS- | | | 04/01/11 |
| 001257 | 20110701 SUBSTATION | | | 07/01/11 |
| 001263 | 03917000 OFFICE, SHOP, CHANGE | | DB14618-19 | 10/01/11 |
| 001264 | 20111001 METER | | | 10/01/11 |
| 001265 | 03949800 OFFICE/SHOP/CHANGE | | DB1146659A-E | 10/01/11 |
| 001297 | 20111106 TWO KIDNEY LOOP | | | 11/01/11 |
| 001303 | 20111203 FRANK'S CREEK POWER | | | 12/01/11 |
| 001321 | 04285800 BULK DUST SYSTEM | | 11E11269 | 02/01/12 |
| 001334 | 20120201 MINE WATER SYSTEM AND | | | 02/01/12 |
| 001336 | 20120203 CANOPIES | | | 02/01/12 |
| 001337 | 20120204 SLURRY PUMP AND CHEM | | | 02/01/12 |
| 001338 | 20120205 CLARIFIED BLOCK BUILDIN | | | 02/01/12 |
| 001339 | 20120206 MODULAR OFFICE | | | 02/01/12 |
| 001341 | 140912   PICKUP TRUCK - SUV | TAHOE | 1GNEK13T95R232912 | 06/14/11 |
| 001345 | 03221500 FAN AND INSTALLATION | | | 03/01/12 |
| 001346 | 20120303 150 GALLON WATER TANK | | | 03/01/12 |
| 001347 | 20120304 300 HP TURBINE PUMP | | | 03/01/12 |
| 001348 | 20120305 TANK AND PUMP INSTALL/ | | | 03/01/12 |
| 001352 | 04389100 BULK CONTAINMENT | | | 06/01/12 |
| 001353 | 03949600 STACKER AND INSTALLATI | | U48680 | 06/01/12 |
| 001377 | TRACE   SCALES TRANSFERRED | | | 12/01/12 |
| 001400 | 51000077 SUBSTATION | 5 MVA | 35065-76882-0406 | 06/14/11 |
| 001461 | 03708500 FAN REPLACEMENT | | 37085 | 05/01/13 |
| 001497 | 39212    JEFFREY 8HUA96 600HP | 8HUA96 600 | | 09/01/13 |
| 001510 | 11CRC54 STACKER & INSTALLATION | | | 12/01/13 |
| 001524 | 15-26042 POWER CENTER | 300 KVA | 26042-300-807 | 06/14/11 |
| 001531 | 02-81776 rgL69 MUSTANG SKID | 940 | 5481776 | 06/14/11 |

DEBTORSLCC_105829

Book =
FYE Month

| | | | | | | In Svc | Acquired | | | Net Book | Rem |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X00477 | 03390000 | REBUILD 14CM15 MINER | | JM5061-B | 2009 H | 08 | 10/01/16 | 149,900.00 | 87,441.66 | 62,458.34 | 00 05 |
| X00570 | 03710000 | 14CM15 MINER | | JM6253 | 2009 H | 08 | 10/01/16 | 171,300.00 | 49,962.50 | 121,337.50 | 01 05 |
| X00778 | 04380000 | 14CM15 MINER | 14CM15-11 | JM6901 | 2009 H | 08 | 10/01/16 | 192,700.00 | 56,204.16 | 136,495.84 | 01 05 |
| X00812 | 04459800 | CONTINUOUS 14CM15 MINER REBUILD | 14CM15-11 | JM6253A | 2009 H | 08 | 10/01/16 | 192,700.00 | 56,204.16 | 136,495.84 | 01 05 |
| X00604 | 03730000 | FEEDER | | 14250 | 2009 H | 08 | 10/01/16 | 22,600.00 | 6,650.00 | 16,150.00 | 01 05 |
| X00759 | 20120218 | FEEDER BREAKER | | 14466 | 2009 H | 09 | 10/01/16 | 20,900.00 | 5,095.83 | 14,804.17 | 01 05 |
| X00856 | 04344100 | JOY FEEDER BREAKER | | 14466 | 2009 H | 09 | 10/01/16 | 5,600.00 | 1,533.33 | 3,966.67 | 01 05 |
| X00802 | 04438600 | JOY BH18 RAM CAR #1 | JOY BH18 | 1685 | 2009 H | 10 | 10/01/16 | 55,800.00 | 10,850.00 | 44,950.00 | 02 05 |
| X00803 | 04438700 | JOY BH18 RAM CAR #2 | JOY BH18 | 1686 | 2009 H | 10 | 10/01/16 | 55,800.00 | 10,850.00 | 44,950.00 | 02 05 |
| X00804 | 04438900 | JOY BH18 RAM CAR #3 | JOY BH18 | 1687 | 2009 H | 10 | 10/01/16 | 55,800.00 | 10,850.00 | 44,950.00 | 02 05 |
| X00806 | 04438300 | USED BATTERY CHANGE VEHICHLE | JOY BH10H | 1183 | 2009 H | 10 | 10/01/16 | 18,900.00 | 5,512.50 | 13,387.50 | 01 05 |
| X01192 | 01947900 | BH-10 BATTERY CAR | | MV1379 | 2009 H | 10 | 10/01/16 | 45,800.00 | 13,368.33 | 32,441.67 | 01 05 |
| X00815 | 20121102 | MISC CABLE SCSR WATER ELEC | | | 2009 H | 11 | 10/01/16 | 2,500.00 | 2,500.00 | 0.00 | 00 00 |
| X00339 | 01693600 | WALK THROUGH ROOF BOLTER | | 2004131 | 2009 H | 12 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 00 |
| X00340 | 01708200 | WALK THROUGH ROOF BOLTER | | 2004130 | 2009 H | 12 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 00 |
| X00369 | 01885000 | WALK THRU ROOF BOLTER | | 2005017 | 2009 H | 12 | 10/01/16 | 4,100.00 | 2,391.66 | 1,708.34 | 00 05 |
| X00540 | 01693600 | REBUILD FLETCHER DDR-13 BOLTER | | 2004130 | 2009 H | 12 | 10/01/16 | 7,600.00 | 4,433.33 | 3,166.67 | 00 00 |
| X00565 | 01254600 | REBUILD FLETCHER DDR-13 BOLTER | | 2003014 | 2009 H | 12 | 10/01/16 | 5,500.00 | 3,208.33 | 2,291.67 | 00 05 |
| X00584 | 03737100 | WALK THRU BOLTER | | 2009055 | 2009 H | 12 | 10/01/16 | 28,700.00 | 6,370.83 | 20,329.17 | 01 05 |
| X00610 | 01469700 | NEW ROOF BOLTER | | 2004021 | 2009 H | 12 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 05 |
| X00648 | 01885000 | DDR-13 ROOF BOLTER CONVERT TO TRAM | | 2005017 | 2009 H | 12 | 10/01/16 | 10,300.00 | 6,008.33 | 4,291.67 | 00 05 |
| X00953 | 00814500 | FLETCHER RRII-13 ROOF BOLTER | RRII-13 | 2001013 | 2009 H | 12 | 10/01/16 | 3,000.00 | 3,000.00 | 0.00 | 00 00 |
| X00975 | 20141101 | REBUILT FLETCHER DDR-13 WALK-THRU ROOF BOLTER | DDR-13 WALK-TH | 2014313 | 2009 H | 12 | 10/01/16 | 39,400.00 | 7,661.10 | 31,738.90 | 02 05 |
| X00470 | 20060301 | SCSR'S/TRAINING FOR MINERS ACT | | | 2009 H | 12 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00825 | LT6540 | LO-TRAC | LO-TRAC LT 4834 | 10991850 | 2009 H | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00881 | 31-10180 | 2010 JBLCO ROCK DUSTER | MD4A | MD4-061510-180 | 2009 H | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00201 | 01805784 | BELT DRIVE A407 | | 35-5784 | 2009 H | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00202 | 01607101 | 200 HP BELT STARTER AFE #356 | | S337C071-01 | 2009 H | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00247 | 00010220 | BELT STORAGE UNIT | | | 2009 H | 20 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 |
| X00263 | 01054200 | DUAL BELT DRIVE 48 IN 300HP | 48 IN 4 LAP AC VE | | 2009 H | 20 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | 00 00 |
| X00264 | 01046500 | DUAL BELT DRIVE 48 IN 300HP | VFD | U43750 | 2009 H | 20 | 10/01/16 | 1,300.00 | 1,300.00 | 0.00 | 00 00 |
| X00297 | 01288400 | LO LO DRIVE & STORAGE UNIT | VFD | | 2009 H | 20 | 10/01/16 | 1,300.00 | 1,300.00 | 0.00 | 00 00 |
| X00300 | 01354000 | 48" DUAL 300 HP VFD DRIVE | | U43933 | 2009 H | 20 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | 00 00 |
| X00350 | 20051201 | DRIVES FOR 8A MAINS | | U44016 | 2009 H | 20 | 10/01/16 | 1,200.00 | 1,200.00 | 0.00 | 00 00 |
| X00351 | 20051202 | TAILPIECE/TAKEUP FOR 8 MAINS | | | 2009 H | 20 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X00352 | 01753500 | DUAL 300HP VFD CONTROLLER | | | 2009 H | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 |
| X00355 | 20051203 | TAILPIECE/TAKEUP | | | 2009 H | 20 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | 00 00 |
| X00363 | 20060202 | 48" BELT TAKE-UP UNITS | | | 2009 H | 20 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00364 | 20060203 | 48" TAILPIECE UNITS | | | 2009 H | 20 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 00 |
| X00365 | 20060204 | A-MAINS CONVEYOR EQUIPMENT | | | 2009 H | 20 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00394 | 20060901 | DUAL 300 VFD CONVEYOR BELST STARTER | | | 2009 H | 20 | 10/01/16 | 3,700.00 | 2,158.33 | 1,541.67 | 00 05 |
| X00407 | 02198600 | TERMINAL GROUP | | R3561 | 2009 H | 20 | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 00 |
| X00409 | 20061005 | CONVEYOR TAKEUP | | | 2009 H | 20 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 |
| X00424 | 20061202 | INFRASTRUCTURE FOR EAST MAIN | | | 2009 H | 20 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00511 | 01529600 | LO LO DRIVE | | U44121 | 2009 H | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00612 | 01650900 | 150 HP TERMINAL GROUP | | | 2009 H | 20 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 |
| X00613 | 01644600 | 150 HP TERMINAL GROUP | | | 2009 H | 20 | 10/01/16 | 900.00 | 900.00 | 0.00 | 00 00 |
| X00614 | 01842400 | 150 HP TERMINAL GROUP | | | 2009 H | 20 | 10/01/16 | 900.00 | 900.00 | 0.00 | 00 00 |
| X00622 | 20101002 | BELT TAKEUP AND TAIL PIECES | | | 2009 H | 20 | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 00 |
| X00715 | 20111116 | 6K FT OF CONVEYOR STRUCTURE | | | 2009 H | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00716 | 20111117 | 12K 48' OF CONVEYOR BELTING | | | 2009 H | 20 | 10/01/16 | 5,800.00 | 3,383.33 | 2,416.67 | 00 05 |
| X00717 | 20111118 | 6K FT 4" OF PVC WATER LINE | | | 2009 H | 20 | 10/01/16 | 11,600.00 | 6,766.66 | 4,833.34 | 00 05 |
| X00718 | 20111118 | 6K FT OF HIGH VOLTAGE CABLE | | | 2009 H | 20 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 |
| X00719 | 20111120 | 6K FT OF COMMUNICATION TRACKING | | | 2009 H | 20 | 10/01/16 | 2,500.00 | 1,516.66 | 1,083.34 | 00 05 |
| X00734 | 20111209 | BELT CONVEYOR TAILPIECE | | | 2009 H | 20 | 10/01/16 | 4,700.00 | 2,741.66 | 1,958.34 | 00 05 |
| X00782 | 20120701 | VFD BELT STACKER CONVERSION | MODEL SD300ACI | | 2009 H | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00809 | 20120902 | 3,000FT INFRASTRUCTURE | | | 2009 H | 20 | 10/01/16 | 2,500.00 | 1,458.33 | 1,041.67 | 00 05 |
| X00828 | 27-45102 | BELT TERMINAL GROUP | 48D150 | 45102 | 2009 H | 20 | 10/01/16 | 7,100.00 | 4,141.66 | 2,958.34 | 00 05 |
| X00906 | 27-47595 | 2010 JOY BELT TERMINAL GROUP | 48S100HP | 47595 | 2009 H | 20 | 10/01/16 | 1,300.00 | 1,300.00 | 0.00 | 00 00 |
| X00914 | 11FL1175-1 | BELT TERMINAL GROUP | CONTINENTAL | U01260 2 | 2009 H | 20 | 10/01/16 | 1,700.00 | 1,700.00 | 0.00 | 00 00 |
| X00930 | 20131211 | UPGRADE DUAL 300HP BELT STARTER TO VFD | 300HP VFD | | 2009 H | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00931 | 20131212 | UPGRADE DUAL 300 HP BELT STARTER TO VFD | 300HP VFD | | 2009 H | 20 | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | 00 05 |
| | | | | | 2009 H | 20 | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | 00 05 |

| ID | Acct No | Description | Model | Serial | Year | Code | Date | Cost | Depr | NBV | Codes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X01002 | 20110703 | 5,000 FT BELTING | | 48721 | 2009 | | | | | 0.00 | 00 05 |
| X00910 | 27-48721 | CONTINENTAL BELT TERMINAL GROUP | 495150HP | SA11P0276 | 2009 | 34 | 10/01/16 | 25,300.00 | 7,379.16 | 17,920.84 | 01 05 |
| X00360 | 01955000 | OUTSIDE LOADER/FORKLIFT | | SA11P0276 | 2009 | 34 | | 3,700.00 | 3,700.00 | 0.00 | 01 05 |
| X00640 | 00548300 | SCOOP TRACTOR-WAGNER SA11P0276  11 | | 70550264 | 2009 | 34 | 10/01/16 | 0.00 | | 0.00 | 00 05 |
| X00441 | 00548301 | REBUILD WAGNER SCOOP | | 70550294 | 2009 | 34 | 10/01/16 | 3,300.00 | 3,300.00 | 0.00 | 00 05 |
| X00156 | 00072264 | EIMCO 580 Battery Scoop - A707 | | 70550294 | 2009 | 34 | | 2,400.00 | 2,400.00 | 0.00 | 00 05 |
| X00261 | 01041100 | EIMCO SCOOP BATTERY POWERED | | SA11P0276 | 2009 | 34 | | 2,300.00 | 2,300.00 | 0.00 | 00 05 |
| X00262 | 00548302 | REBUILD WAGNER SCOOP LST-5S | 580-1 | 70550264 | 2009 | 34 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 05 |
| X00268 | 00548400 | REBUILD EIMCO BATTERY SCOOP | LST-5S | 40297 | 2009 | 34 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | 00 05 |
| X00318 | 01558500 | LO TRAC MACHINE | | 40925 | 2009 | 34 | | 1,000.00 | 1,000.00 | 0.00 | 00 05 |
| X00319 | 01559000 | LO TRAC MACHINE | | 580-3986 | 2009 | 34 | 10/01/16 | 3,400.00 | 1,983.33 | 1,416.67 | 00 05 |
| X00368 | 01945000 | BATTERY SCOOP | | 4380 | 2009 | 34 | | 8,000.00 | 2,333.33 | 5,666.67 | 01 05 |
| X00473 | 03301200 | DIESEL BATTERY POWERED SCOOP | | 4777 | 2009 | 34 | | 13,200.00 | 3,850.00 | 9,350.00 | 01 05 |
| X00532 | 03517500 | BATTERY POWERED SCOOP | | 488-4113 | 2009 | 34 | 10/01/16 | 19,500.00 | 5,687.50 | 13,812.50 | 01 05 |
| X00640 | 03840000 | DIESEL SCOOP | | 488-4073 | 2009 | 34 | 10/01/16 | 22,600.00 | 6,591.66 | 16,008.34 | 01 05 |
| X00644 | 03949700 | 488 BUCYRUS DIESEL SCOOP | | R40956 | 2009 | 34 | 10/01/16 | 0.00 | | 0.00 | 00 05 |
| X01194 | 32-84073 | 2010 BUCYRUS SCOOP | 488L | 3D7KS28D35 | 2009 | 36 | 10/01/16 | 2,100.00 | 2,100.00 | 0.00 | 00 05 |
| X00303 | 01475400 | REBUILT DIESEL RAM CAR | | 3B6MF36C82M228 | 2009 | 36 | 10/01/16 | 10,000.00 | 5,633.33 | 4,166.67 | 00 05 |
| X00306 | 01560900 | PICKUP TRUCK | | 3B6MF36C82M228 | 2009 | 36 | 10/01/16 | 10,800.00 | 6,300.00 | 4,500.00 | 00 05 |
| X01014 | 08-29382 | 2002 Dodge Ram Truck | Ram 3500 | 3RN04709 | 2008 | 39 | | 4,100.00 | 4,100.00 | 0.00 | 00 05 |
| X00847 | 2709 | FORKLIFT-TELEHANDLER | TH83 | 878 | 2009 | 39 | | 300.00 | 300.00 | 0.00 | 00 05 |
| X00167 | 00075658 | ALPHA DIESEL MANTRIP A4-9LP - A717 | | ET15048 | 2009 | 40 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 05 |
| X00219 | 00636600 | JOY 21SC SHUTTLE CAR USED | 21SC-A | JI157P | 2009 | 40 | | 300.00 | 300.00 | 0.00 | 00 05 |
| X00305 | 01533700 | PERMISSIBLE RIDE | | 6323 | 2009 | 40 | | 500.00 | 500.00 | 0.00 | 00 05 |
| X00441 | 03140000 | 4 MAN DIESEL MANTRIP | | 6324 | 2009 | 40 | | 500.00 | 500.00 | 0.00 | 00 05 |
| X00442 | 02200000 | 6 MAN DIESEL VEHICLE | | 60684 | 2009 | 40 | 10/01/16 | 1,600.00 | 933.33 | 666.67 | 01 05 |
| X00443 | 03120000 | LO TRAC UTILITY VEHICLE | | J1286P | 2009 | 40 | | 700.00 | 700.00 | 0.00 | 00 05 |
| X00461 | 03244600 | PERMISSABLE STINGER RIDE | | J1290NP | 2009 | 40 | | 800.00 | 800.00 | 0.00 | 00 05 |
| X00462 | 03279000 | PERMISSABLE STINGER RIDE | | 55093D | 2009 | H | 40 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X00495 | 03442400 | 14 MAN MANTRIP | | 8367 | 2009 | H | 40 | 1,200.00 | 1,200.00 | 0.00 | 00 00 |
| X00497 | 03422500 | 4 MAN MANTRIP | | 8425 | 2009 | H | 40 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00567 | 03710100 | 4 PERSON MANTRIP | | 9426 | 2009 | H | 40 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00568 | 03710200 | 4 PERSON MANTRIP | | 61262 | 2009 | H | 40 | 10/01/16 | 6,000.00 | 3,500.00 | 2,500.00 |
| X00524 | 03795500 | LO-TRAC | | 1154 | 2009 | H | 40 | 300.00 | 300.00 | 0.00 | 00 00 |
| X00625 | 00544000 | DIESEL MANTRIP 4 PASSENGER | | 770 | 2009 | H | 40 | 300.00 | 300.00 | 0.00 | 00 00 |
| X00626 | 00075062 | MANTRIP VEHICLE MODEL A2-9LP - A704 | | SS113D | 2009 | H | 40 | 10/01/16 | 3,400.00 | 1,983.33 | 1,416.67 |
| X00633 | 03671000 | 14 PERSON MANTRIP | | 452 | 2009 | H | 40 | 2,700.00 | 1,575.00 | 1,125.00 | 00 05 |
| X00639 | 03875500 | 4 PERSON MANTRIP | | SS120D | 2009 | H | 40 | 3,800.00 | 2,216.66 | 1,583.34 |
| X00675 | 03951500 | MANTRIP | | SS121D | 2009 | H | 40 | 3,800.00 | 2,216.66 | 1,583.34 |
| X00676 | 04257700 | 4 PERSON MANTRIP | | SS125KD | 2009 | H | 40 | 4,000.00 | 2,333.33 | 1,666.67 |
| X00731 | 04317600 | 10 MAN DIESEL MANTRIP | | 1511 | 2009 | H | 40 | 3,100.00 | 1,808.33 | 1,291.67 |
| X00736 | 04349000 | 4 PERSON MANTRIP LITTLE JAKE | | 1512 | 2009 | H | 40 | 3,200.00 | 1,866.66 | 1,333.34 |
| X00737 | 04355700 | 2 PERSON MANTRIP WITH FLATBED | | SS126KD | 2009 | H | 40 | 4,300.00 | 2,508.33 | 1,791.67 |
| X00793 | 04397900 | DIESEL PWR RUBBER TIRED MANTRIP | | SS127KD | 2009 | H | 40 | 4,300.00 | 2,508.33 | 1,791.67 |
| X00794 | 04409900 | DIESEL PWR RUBBER TIRED MANTRIP | | JI599P | 2009 | H | 40 | 2,300.00 | 1,341.66 | 958.34 |
| X00798 | 04406900 | PERMISSIBLE RIDE | | JI501P | 2009 | H | 40 | 2,300.00 | 1,341.66 | 958.34 |
| X00797 | 04413900 | PERMISSIBLE RIDE | | J1008 | 2009 | H | 40 | 10/01/16 | | | |
| X00873 | 07-21008 | 2 MAN PERSONNEL CARRIER | STINGER | SS128D | 2009 | H | 40 | 5,900.00 | 3,441.66 | 2,458.34 | 00 05 |
| X00981 | HCMT29028 | JOHNSON 4WHEEL SUPERSTEER 14 PERSON MANTRIP | JI728GSS128D | G8E9883 | 2009 | H | 42 | 3,000.00 | 1,750.00 | 1,250.00 | 00 05 |
| X00525 | 03475200 | 828 DIESEL POD TYPE ROCK DUSTER | | 43018 | 2009 | H | 42 | 10/01/16 | 500.00 | 500.00 | 0.00 |
| X00679 | 00138900 | ROCK DUSTER | | 39459 | 2009 | H | 42 | 700.00 | 700.00 | 0.00 |
| X00680 | 00141200 | ROCK DUSTER | | | 2009 | H | 42 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 |
| X00743 | 20120205 | TDT-88 FLINGER DUSTER | | 1497 | 2009 | H | 42 | 1,400.00 | 1,400.00 | 0.00 |
| X00744 | 04354700 | 520 GAL TDT-WET DUSTER | | E12069 | 2009 | H | 42 | 1,400.00 | 1,400.00 | 0.00 |
| X00895 | 20131106 | AL LEE MARK I 26" RAM ROCK DUSTER | MARK I 26' | E12067 | 2009 | H | 42 | 1,400.00 | 1,400.00 | 0.00 |
| X00896 | 20131106 | AL LEE MARK I 26" RAM ROCK DUSTER | MARK I 26' | | 2009 | H | 56 | 0.00 | | 0.00 | 00 00 |
| X00466 | 00071201 | DEWATERING HOLE AND PUMP | | | 2009 | H | 60 | 700.00 | 700.00 | 0.00 |
| X00065 | 00078203 | FAN HOUSE (HUFF CREEK) | | | 2009 | H | 60 | 0.00 | | 0.00 | 00 00 |
| X00066 | 00078203A | FAN HOUSE (HUFF CREEK) | | | 2009 | H | 60 | 800.00 | 800.00 | 0.00 |
| X00136 | 00078205 | VENTILATION FAN - BELTLINE RELATED | | | 2009 | H | 60 | 1,400.00 | 1,400.00 | 0.00 |
| X00141 | 00078205A | VENTILATION FAN - BELTLINE RELATED 1997 | | | 2009 | H | 60 | 23,100.00 | 6,737.50 | 16,362.50 | 01 05 |
| X00533 | 20090601 | VENTILATION FAN UPGRADE | | | 2009 | H | 66 | 0.00 | | 0.00 | 00 00 |
| X00151 | 00020416 | HUFF CREEK MINE OFFICE - A416 | | | 2009 | H | 66 | 0.00 | | 0.00 | 00 00 |
| X00158 | 00020416A | HUFF CREEK MINE OFFICE - A416 | | | 2009 | H | 68 | 0.00 | | 0.00 | 00 00 |
| X00511 | 20081104 | HC WAREHOUSE BAY ADDITION | | | 2009 | H | 68 | 400.00 | 400.00 | 0.00 |
| X00094 | 00082001 | EQUIPMENT RETRIEVER | | | 2009 | H | 68 | 2,300.00 | 2,300.00 | 0.00 |
| X00502 | 20081001 | ROCK DEFLECTOR SYSTEMS | | | 2009 | H | 68 | 4,200.00 | 4,200.00 | 0.00 |
| X00533 | 20080601 | LADDERS FOR 2 MINE SHAFTS | | | 2009 | H | 68 | 2,700.00 | 2,700.00 | 0.00 |
| X00733 | 20111208 | THREE SUPPLY TRAILERS | | | 2009 | H | 72 | 900.00 | 900.00 | 0.00 |
| X00063 | 00078202 | SUBSTATION (HUFF CREEK) | | | 2009 | H | 72 | 0.00 | | 0.00 | 00 00 |
| X00064 | 00078202A | SUBSTATION (HUFF CREEK) | | | 2009 | H | 72 | 600.00 | 600.00 | 0.00 |
| X00082 | 00079001 | VACUUM BKR SWITCHOUSE | | | | | | | | | |

DEBTORSLCC_105831

| | | Description | | | Year | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X0063 | 00079002 | VACUUM BKR SWITCHOUSE | | | | | | | | | | 00 00 |
| X0198 | 00777800 | 2250 KVA POWER CENTER | | A2776 | 2009 H | 72 | 10/01/16 | 600.00 | 600.00 | 0.00 | | 00 00 |
| X0189 | 00777900 | 2250 KVA POWER CENTER | | A557 | 2009 H | 72 | 10/01/16 | 600.00 | 600.00 | 0.00 | | 00 00 |
| X0401 | 20061001 | UPGRADE POWER TO 12KV | | | 2009 H | 72 | 10/01/16 | 600.00 | 600.00 | 0.00 | | 00 00 |
| X0404 | 01885100 | DIESEL GENERATOR | | D6-38310 | 2009 H | 72 | 10/01/16 | 14,300.00 | 8,341.66 | 5,958.34 | | 00 05 |
| X0444 | 20070301 | 3-150 HP POWER UNITS | | | 2009 H | 72 | 10/01/16 | 8,600.00 | 8,600.00 | 0.00 | | 00 00 |
| X0487 | 03422000 | 2250 KVA POWER CENTER | | R3840 | 2009 H | 72 | 10/01/16 | 21,300.00 | 6,212.50 | 15,087.50 | | 01 05 |
| X0480 | 20080701 | 12K' HIGH VOLTAGE CABLE | | | 2009 H | 72 | 10/01/16 | 5,900.00 | 3,441.66 | 2,458.34 | | 00 05 |
| X0534 | 03578600 | 750 KVA POWER CENTER | | R3965 | 2009 H | 72 | 10/01/16 | 27,900.00 | 16,275.00 | 11,625.00 | | 01 05 |
| X0556 | 03630500 | 750 KVA POWER CENTER | | R4017 | 2009 H | 72 | 10/01/16 | 2,600.00 | 2,600.00 | 0.00 | | 00 00 |
| X0631 | 03841900 | 750 KVA POWER CENTER | | R4203 | 2009 H | 72 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | | 00 00 |
| X0661 | 20110603 | UPGRADE TWO ELECTRICAL BOXES | | | 2009 H | 72 | 10/01/16 | 3,400.00 | 3,400.00 | 0.00 | | 00 00 |
| X0673 | 11LMP005 | 1050 KVA POWER CENTER | | | 2009 H | 72 | 10/01/16 | 3,600.00 | 3,600.00 | 0.00 | | 00 00 |
| X0807 | 04450600 | 2250 KVA SECTION POWER CENTER | | 203920-1-1 | 2009 H | 72 | 10/01/16 | 4,200.00 | 2,450.00 | 1,750.00 | | 00 05 |
| X0865 | 15-U3378 | BELT POWER CENTER | 300 KVA | U3378 | 2009 H | 72 | 10/01/16 | 8,600.00 | 2,508.33 | 6,091.67 | | 01 05 |
| X0866 | 15-U3372 | POWER CENTER | 300 KVA | U3372 | 2009 H | 72 | 10/01/16 | 400.00 | 400.00 | 0.00 | | 00 00 |
| X0887 | 15-7278 | POWER CENTER | 2500 KVA | 35097-77278-0506 | 2009 H | 72 | 10/01/16 | 400.00 | 400.00 | 0.00 | | 00 00 |
| X0887 | 13LMP010 | POWER CENTER FROM RAVEN | | 00014902 | 2009 H | 72 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | | 00 00 |
| X0912 | 15-3537 | Power Center | 750 KVA | R3537 | 2009 H | 72 | 10/01/16 | 2,300.00 | 2,300.00 | 0.00 | | 00 00 |
| X0913 | 27-3489 | POWER CENTER | 750 KVA | R3489 | 2009 H | 72 | 10/01/16 | 300.00 | 300.00 | 0.00 | | 00 00 |
| X1004 | 20111207 | 750 KVA  POWER CENTER | | | 2009 H | 72 | 10/01/16 | 200.00 | 200.00 | 0.00 | | 00 00 |
| X0250 | 01015300 | STAMLER FEEDER BREAKER BF-17A-8-74C | BF-17A-8-74C | | 2009 H | 72 | 10/01/16 | 3,100.00 | 3,100.00 | 0.00 | | 00 00 |
| X0433 | 20070201 | 5 SETS OF FIRE FIGHTING EQUIPMENT | | 13631 | 2009 H | 74 | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | | 00 05 |
| X0651 | 20110403 | OCEANCO 6.5 | | | 2009 H | 72 | 10/01/16 | 400.00 | 400.00 | 0.00 | | 00 00 |
| X0742 | 20120204 | REFUGE CHAMBER | | | 2009 H | 79 | 10/01/16 | 7,600.00 | 7,600.00 | 0.00 | | 00 00 |
| X0765 | 20120220 | MINERS ACTS COMMUNICATION | | | 2009 H | 79 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | | 00 00 |
| X0823 | 20121202 | FIRE SUPPORT SYS FOR BATTERY CHARGE STATION | | | 2009 H | 79 | 10/01/16 | 59,100.00 | 11,491.66 | 47,608.34 | | 02 05 |
| X0829 | 20121204 | PROXIMITY SYSTEM FOR MINER HAULAGE | | | 2009 H | 79 | 10/01/16 | 2,900.00 | 2,900.00 | 0.00 | | 00 00 |
| X0882 | 04692000 | UPDATE REFUGE CHAMBERS | | 454913-01 | 2009 H | 79 | 10/01/16 | 15,800.00 | 4,508.33 | 11,191.67 | | 01 05 |
| X0883 | 03434400 | UPDATE REFUGE CHAMBERS | | 452208-07 | 2009 H | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | | 00 00 |
| X0884 | 03334500 | UPDATE REFUGE CHAMBERS | | 452010-01 | 2009 H | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | | 00 00 |
| X0892 | 20131102 | STRATA PROXIMITY SYSTEM FOR 14CM15 MINER | STRATA PROX SY | JM6051 | 2009 H | 79 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | 00 00 |
| X0901 | 20131202 | UPDATE STRATA REFUGE CHAMBER REFIT M26FAB30-3.5 M26FAB30-3.5 | | 453797-01 | 2009 H | 79 | 10/01/16 | 7,100.00 | 2,070.83 | 5,029.17 | | 01 05 |
| X0902 | 20131202 | UPDATE STRATA REFUGE CHAMBER REFIT M26FAB30-3.5 M26FAB30-3.5 | | 452010-03 | 2009 H | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | | 00 00 |
| X0903 | 20131203 | UPDATE STRATA REFUGE CHAMBER REFIT M26FAB30-3.5 M26FAB30-3.5 | | 452010-03 | 2009 H | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | | 00 00 |
| X0904 | 20131204 | UPDATE STRATA REFUGE CHAMBER REFIT M26FAB30-3.5 M26FAB30-3.5 | | 452210-01 | 2009 H | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | | 00 00 |
| X0923 | 20120224 | FIBER CABLE AND MONITORING EQUIP | | 452315-01 | 2009 H | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | | 00 00 |
| X1029 | 29-0064R1 | ???? STAMLER FEEDER BREAKER - REBUILD | | 84R | 2009 H | 80 | 10/01/16 | 4,800.00 | 2,800.00 | 2,000.00 | | 00 05 |
| X0877 | 20130801 | IN SLOPE FROM DF(7N MAINS) TO HC(8MAINS) | | | 2009 H | 9 | 10/01/16 | 200.00 | 200.00 | 0.00 | | 00 05 |
| X0789 | 20120801 | IN MINE SLOPE AND SEALS | | | 2009 H | 95 | 10/01/16 | 0.00 | 0.00 | 0.00 | | 00 00 |
| X0653 | 20110701 | HAULAGE SYSTEM | | | 2009 H | 96 | 10/01/16 | 0.00 | 0.00 | 0.00 | | 00 00 |
| X0699 | 03800100 | HAULAGE SYSTEM | | CHS0500 | 2010 D | 01 | 10/01/16 | $ 0.00 | $ 0.00 | $ 0.00 | | 00 05 |
| X0777 | 20120301 | HAULAGE SYSTEM ADDITION | JOY BRIDGE SYST | CHS0501 | 2010 D | 01 | 10/01/16 | 0.00 | 0.00 | 0.00 | | 00 00 |
| X0251 | 01015700 | JOY CONTINUOUS MINER 14CM15-11BX | JOY BRIDGE SYST 14CM15-11BX | CHS0500 | 2010 D | 01 | 10/01/16 | | | | | 00 00 |
| X0266 | 01015600 | JOY CONTINUOUS MINER 14CM15-11BX | 14CM15-11BX | JM5402 | 2010 D | 08 | 10/01/16 | 85,700.00 | 49,991.66 | 35,708.34 | | 01 05 |
| X0296 | 01206200 | CONTINUOUS MINER | | JM5401 | 2010 D | 08 | 10/01/16 | 85,700.00 | 49,991.66 | 35,708.34 | | 00 05 |
| X0379 | 01606900 | REBUILD JOY 14CM15 CONTINUOUS MINER | | | 2010 D | 08 | 10/01/16 | 12,900.00 | 7,525.00 | 5,375.00 | | 00 05 |
| X0569 | 03715100 | JOY 14CM15 MINER | | JM5061A | 2010 D | 08 | 10/01/16 | 128,500.00 | 74,958.33 | 53,541.67 | | 01 05 |
| X0575 | 03740000 | 14CM15 MINER | | JM6252 | 2010 D | 08 | 10/01/16 | 171,300.00 | 49,962.50 | 121,337.50 | | 01 05 |
| X0687 | 04232000 | CONTINUOUS 13CM15 MINER | | JM6259 | 2010 D | 08 | 10/01/16 | 171,300.00 | 49,982.50 | 121,337.50 | | 01 05 |
| X0800 | 11FL1503 | STRATA PROXIMITY SYSTEM | | JM5423 | 2010 D | 08 | 10/01/16 | 137,500.00 | 40,104.15 | 97,395.84 | | 01 05 |
| X0946 | 20140601 | JOY 14CM15 CONT MINER - HIGH COAL CONVERSION/CM 14CM15 | | JM5907B | 2010 D | 08 | 10/01/16 | | | | | 00 00 |
| X0948 | 20140802 | REBUILD JOY 14CM15 CONT MINER W/PROX | 14CM15 | JM6259A | 2010 D | 08 | 10/01/16 | 214,100.00 | 62,445.83 | 151,654.17 | | 01 05 |
| X0758 | 20120217 | FEEDER BREAKER | | 14487 | 2010 D | 08 | 10/01/16 | 214,100.00 | 62,445.83 | 151,654.17 | | 01 05 |
| X0805 | 04441100 | STAMLER BF-17A FEEDER | | 14487 | 2010 D | 09 | 10/01/16 | 20,900.00 | 6,095.83 | 14,804.17 | | 01 05 |
| X0855 | 04367400 | JOY FEEDER BREAKERS | | 14490 | 2010 D | 09 | 10/01/16 | 34,900.00 | 10,179.16 | 24,720.84 | | 01 05 |
| X0542 | 00965100 | SHUTTLE CAR 21S/C-64AA MODEL | 21S/C-64AA | ET13194 | 2010 D | 09 | 10/01/16 | 5,600.00 | 1,633.33 | 3,966.67 | | 01 05 |
| X0601 | 03720800 | RAM CAR | | 1518 | 2010 D | 10 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | 00 00 |
| X0602 | 03720900 | RAM CAR | | 1519 | 2010 D | 10 | 10/01/16 | 31,800.00 | 8,183.33 | 25,616.67 | | 02 05 |
| X0603 | 03721000 | RAM CAR | | 1520 | 2010 D | 10 | 10/01/16 | 31,800.00 | 6,183.33 | 25,616.67 | | 02 05 |
| X0605 | 00855100 | SHUTTLE CAR 21S/C-64AA MODEL | 21S/C-64AA | ET12615 | 2010 D | 10 | 10/01/16 | 31,800.00 | 6,183.33 | 25,616.67 | | 02 05 |
| X0985 | 03389300 | MODEL CH810-C HAULER & BATTERIES | | 810-1351 | 2010 D | 10 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | 00 00 |
| X0986 | 03389400 | MODEL CH810-C HAULER & BATTERIES | | 810-1352 | 2010 D | 10 | 10/01/16 | 11,500.00 | 3,354.16 | 8,145.84 | | 01 05 |
| X0987 | 03389500 | MODEL CH810-C HAULER & BATTERIES | | 810-1352 | 2010 D | 10 | 10/01/16 | 11,200.00 | 3,266.66 | 7,933.34 | | 01 05 |
| X0990 | 03939900 | 8H10 BATTERY HAULERS-810C DC BUCYRUS RAM CAR | | 810-1353 | 2010 D | 10 | 10/01/16 | 11,500.00 | 3,354.15 | 8,145.84 | | 01 05 |
| X0991 | 03940000 | 8H10 BATTERY HAULERS-810C DC BUCYRUS RAM CAR | | 810-1366 | 2010 D | 10 | 10/01/16 | 32,000.00 | 6,222.22 | 25,777.78 | | 02 05 |
| X0992 | 03940100 | 8H10 BATTERY HAULERS-810C DC BUCYRUS RAM CAR | | 810-1367 | 2010 D | 10 | 10/01/16 | 32,000.00 | 6,222.22 | 25,777.78 | | 02 05 |
| X0999 | 02897000 | 818 BUCYRUS BATTERY HAULER | | 810-1368 | 2010 D | 10 | 10/01/16 | 32,000.00 | 6,222.22 | 25,777.78 | | 02 05 |
| X1191 | 01948000 | 8H-50 BATTERY CAR | | 1141 | 2010 D | 10 | 10/01/16 | 4,500.00 | 1,312.50 | 3,187.50 | | 01 05 |
| X0046 | 00072165 | FLETCHER DD0-13 ROOF BOLTER | | MV1380 | 2010 D | 12 | 10/01/16 | 45,800.00 | 13,358.33 | 32,441.67 | | 01 05 |
| X0277 | 00819700 | FLETCHER ROOF BOLTER | | 84302 | 2010 D | 12 | 10/01/16 | 2,400.00 | 1,400.00 | 1,000.00 | | 00 05 |
| X0276 | 01254600 | ROOF BOLTER | | 2001022 | 2010 D | 12 | 10/01/16 | 3,100.00 | 1,808.33 | 1,291.67 | | 00 05 |
| | | | | 2009014 | 2010 D | 12 | 10/01/16 | 3,900.00 | 2,275.00 | 1,825.00 | | 00 05 |

DEBTORSLCC_105832

| ID | No. | Description | Model | Ref | | | | Date | Amount 1 | Amount 2 | Amount 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I00322 | 01439900 | FLETCHER HDDR ROOF BOLTERS | | | | | | 2010 D | | | 0.00 | 00 | 00 |
| I00361 | 01782300 | MOBILE ROOF SUPPORT | | | 2005502 | 2010 D | 12 | 10/01/16 | 4,300.00 | 2,508.33 | 1,791.67 | 00 | 05 |
| I00382 | 01782400 | MOBILE ROOF SUPPORT | | | 2005502 | 2010 D | 12 | 10/01/16 | 4,300.00 | 2,508.33 | 1,791.67 | 00 | 05 |
| I00427 | 00819700 | ROOF BOLTER-REBUILD TO MASTER STYLE | | | 2001022 | 2010 D | 12 | 10/01/16 | 4,100.00 | 2,391.66 | 1,708.34 | 00 | 05 |
| I00428 | 00778500 | ROOF BOLTER-REBUILD TO MASTER STYLE | | | 2000019 | 2010 D | 12 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.57 | 00 | 05 |
| I00560 | 01057500 | REBUILD DDR-13 BOLTER | | | 2002015 | 2010 D | 12 | 10/01/16 | 6,400.00 | 3,733.33 | 2,666.67 | 00 | 05 |
| I00655 | 20110501 | ROOF BOLTER | | | 2006306 | 2010 D | 12 | 10/01/16 | 8,600.00 | 2,508.33 | 6,091.67 | 01 | 05 |
| I00656 | 20110601 | ROOF BOLTER | | | 2006307 | 2010 D | 12 | 10/01/16 | 8,600.00 | 2,508.33 | 6,091.67 | 01 | 05 |
| I00745 | 20120206 | EXPLORORATORY DRILL | | | | 2010 D | 12 | 10/01/16 | 6,300.00 | 1,837.50 | 4,462.50 | 01 | 05 |
| I00822 | 01057500 | REBUILD ROOF BOLTER | | | 200215 | 2010 D | 12 | 10/01/16 | 11,700.00 | 3,412.50 | 8,287.50 | 01 | 05 |
| I00938 | 01051700 | FLETCHER ROOF BOLTER RRII-13 WALK THRU | RRII-13 | | 2002014 | 2010 D | 12 | 10/01/16 | 3,800.00 | 2,216.66 | 1,583.34 | 01 | 05 |
| I00979 | 20141203 | FLETCHER DDR-13 WALK THRU ROOF BOLTER | DDR-13 WALK-TH | | 2014012 | 2010 D | 12 | 10/01/16 | 177,100.00 | 34,436.10 | 142,663.90 | 02 | 05 |
| I01008 | 03337900 | FLETCHER RRII 13 ROCK CONTROL DRILL | | | 2007007 | 2010 D | 12 | 10/01/16 | 8,900.00 | 2,595.83 | 6,304.17 | 01 | 05 |
| I01008 | 30-3300R | 2009 FLETCHER BOLTER - REBUILD | RRII-13 C-F | | 2009343 | 2010 D | 12 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I01093 | U0106 | RRII - 15 ROOF CONTROL DRILL | | | | 2010 D | 12 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00471 | 20060302 | SCSR'S/TRAINING FOR MINERS ACT | | | | 2010 D | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 05 |
| I05009 | 20081102 | MINERS ACT REQUIREMENT | | | | 2010 D | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00785 | 04395600 | FLETCHER LOW BEAM MRS | | | 2011914 | 2010 D | 17 | 10/01/16 | 36,600.00 | 7,116.66 | 29,483.34 | 02 | 05 |
| I00786 | 04395700 | FLETCHER LOW BEAM MRS | | | 2011915 | 2010 D | 17 | 10/01/16 | 36,600.00 | 7,116.66 | 29,483.34 | 02 | 05 |
| I00787 | 04396100 | FLETCHER LOW BEAM MRS | | | 2011912 | 2010 D | 17 | 10/01/16 | 36,600.00 | 7,097.22 | 29,402.78 | 02 | 05 |
| I00788 | 04396200 | FLETCHER LOW BEAM MRS | | | 2011913 | 2010 D | 17 | 10/01/16 | 36,700.00 | 7,136.10 | 29,563.90 | 02 | 05 |
| I00844 | 31-30669 | 2010 SPS TRICKLE TYPE ROCKDUSTER | CD-110S | | 10W03056-9 | 2010 D | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00845 | 31-30668 | 2010 SPS TRICKLE TYPE ROCKDUSTER | CD-110S | | 10W03056-8 | 2010 D | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00846 | 31-30667 | 2010 SPS TRICKLE TYPE ROCKDUSTER | CD-110S | | 10W03056-7 | 2010 D | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00003 | 00046103 | OUTSIDE STACKER (DARBY FORK) | | | | 2010 D | 20 | 10/01/16 | 600.00 | 600.00 | 0.00 | | |
| I00210 | 00901600 | LOW LOW STRUCTURE - BRIDGE SYSTEM | | | | 2010 D | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00243 | 00954100 | BELT DRIVE ASSEMBLY | | | | 2010 D | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00244 | 00954000 | BELT DRIVE ASSEMBLY | | | | 2010 D | 20 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | | |
| I00272 | 01191500 | 48" CONT. BELT STORAGE UNIT D.F. | | | | 2010 D | 20 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | | |
| I00338 | 01681400 | BELT STORAGE UNIT | | | | 2010 D | 20 | 10/01/16 | 300.00 | 300.00 | 0.00 | | |
| I00406 | 03079500 | TERMINAL GROUP | | | R3562 | 2010 D | 20 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | |
| I00467 | 20071202 | 6000' OF INFRASTRUCTURE FOR ADV AT 8 EAST MAIN | | | | 2010 D | 20 | 10/01/16 | 800.00 | 800.00 | 0.00 | | |
| I00505 | 03481000 | BELT TAILPIECES | | | | 2010 D | 20 | 10/01/16 | 7,800.00 | 4,550.00 | 3,250.00 | 00 | 05 |
| I00506 | 03481100 | BELT TAKEUP | | | | 2010 D | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | | |
| I00659 | 20110601 | TRIPLE 150 STARTER | | | | 2010 D | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00665 | 20110604 | 48" TAIL LOADING SECTION | | | | 2010 D | 20 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | |
| I00666 | 20110605 | 48" TAKE UP SECTION | | | | 2010 D | 20 | 10/01/16 | 600.00 | 600.00 | 0.00 | | |
| I00668 | 04287700 | 1050 KVA POWER CENTER | | | R4382 | 2010 D | 20 | 10/01/16 | 1,200.00 | 1,200.00 | 0.00 | | |
| I00689 | 04302000 | TRIPLE 150 BELT DRIVE | | | | 2010 D | 20 | 10/01/16 | 4,300.00 | 2,506.33 | 1,791.67 | 00 | 05 |
| I00701 | 20111108 | 3K FT OF CONVEYOR STRUCTURE | | | | 2010 D | 20 | 10/01/16 | 5,600.00 | 3,266.66 | 2,333.34 | 00 | 05 |
| I00702 | 20111107 | 6K FT OF CONVEYOR BELTING | | | | 2010 D | 20 | 10/01/16 | 2,900.00 | 2,900.00 | 0.00 | | |
| I00703 | 20111108 | 3K FT OF PVC WATER LINE | | | | 2010 D | 20 | 10/01/16 | 5,400.00 | 3,150.00 | 2,250.00 | 00 | 05 |
| I00704 | 20111109 | 3K FT OF HIGH VOLTAGE CABLE | | | | 2010 D | 20 | 10/01/16 | 300.00 | 300.00 | 0.00 | | |
| I00705 | 20111110 | 3K FT OF COMMUNICATION TRACKING | | | | 2010 D | 20 | 10/01/16 | 1,200.00 | 1,200.00 | 0.00 | | |
| I00821 | 20121201 | 5000 FT OF INFRASTRUCTURE | | | | 2010 D | 20 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | | |
| I00928 | 20131209 | POWER CENTER 2500 KVA | | | | 2010 D | 20 | 10/01/16 | 15,100.00 | 4,404.16 | 10,695.84 | 01 | 05 |
| I00248 | 0101444G | CAT 950G WHEEL LOADER | | | 35097-77278-0608 | 2010 D | 24 | 10/01/16 | 0.00 | 0.00 | 0.00 | | |
| I00937 | 02-23470 | 2006 CASE SKID STEER - MAXIMO | 850G | | 3JW00729 | 2010 D | 24 | 10/01/16 | 45,800.00 | 26,716.86 | 19,083.34 | 00 | 05 |
| I00240 | 00848600 | EIMCO DIESEL SCOOP 835-2NL | 410 | | N6M4423470 | 2010 D | 34 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00241 | 00849300 | EIMCO BATTERY SCOOP W/ BATTERY 550-2 | 935-2NL | | 70S60084 | 2010 D | 34 | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | | |
| I00256 | 01040000 | EIMCO SCOOP BATTERY POWERED W/ BATTERIES | 550-2 | | 70S50288 | 2010 D | 34 | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | | |
| I00301 | 01464700 | BATTERY SCOOP | 580-1 | | 0550293 | 2010 D | 34 | 10/01/16 | 2,100.00 | 2,100.00 | 0.00 | | |
| I00475 | 03386200 | DIESEL POWERED SCOOP | | | 4455 | 2010 D | 34 | 10/01/16 | 2,400.00 | 2,400.00 | 0.00 | | |
| I00482 | 03428300 | BATTERY POWERED SCOOP | | | 4593 | 2010 D | 34 | 10/01/16 | 8,600.00 | 2,625.00 | 6,375.00 | 01 | 05 |
| I00645 | 00384400 | BATTERY SCOOP 35CWH2 DUAL TRAM WORKHORSE | | | T400-145 | 2010 D | 34 | 10/01/16 | 10,300.00 | 3,004.16 | 7,295.84 | 01 | 05 |
| I00839 | 32-3724S | 2010 FAIRCHILD SCOOP | 35C-LS | | T337-245 | 2010 D | 34 | 10/01/16 | 26,500.00 | 7,729.16 | 18,770.84 | 01 | 05 |
| I00890 | 32-5104S | 2011 HYDRA POWER LO-TRAC SCOOP | | | 61408 | 2010 D | 34 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| I00994 | 04302100 | 488D BUCYRUS DIESEL SCOOP | LT-4834 | | 488-4114 | 2010 D | 34 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| I01193 | 32-84072 | 2010 BUCYRUS SCOOP | 488L | | 488-4072 | 2010 D | 34 | 10/01/16 | 21,700.00 | 6,329.16 | 15,370.84 | 01 | 05 |
| I00412 | 01948600 | LOW TRAC | | | 10037153 | 2010 D | 36 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| I00439 | 03110600 | LO TRAC UTILITY VEHICLE | | | 60812 | 2010 D | 36 | 10/01/16 | 700.00 | 700.00 | 0.00 | | |
| I00215 | 2000100021 | SURFACE UTILITY FORD TRUCK F356 2001 | F356 4X4 2001 FO | | | 2010 D | 36 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | | |
| I00853 | 02-SP94 | CAT FORKLIFT | IT18 | | 1FDWF371EY1EDK | 2010 D | 38 | 10/01/16 | 9,200.00 | 5,366.66 | 3,633.34 | 00 | 05 |
| I00214 | 00799100 | LO TRAC UTILITY VEHICLE | 5000#, 40HP | | 8NB01047 | 2010 D | 39 | 10/01/16 | 3,900.00 | 3,900.00 | 0.00 | | |
| I00267 | 01074700 | 14 PASSENGER MANTRIP DIESEL SUPER STEER | | | 40766 | 2010 D | 40 | 10/01/16 | 800.00 | 800.00 | 0.00 | | |
| I00270 | 01152600 | 4 PASSENGER MANTRIP DIESEL | | | SS0016 | 2010 D | 40 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00346 | 01731400 | DIESEL MANTRIPS | | | WA022 | 2010 D | 40 | 10/01/16 | 500.00 | 500.00 | 0.00 | | |
| I00347 | 01731500 | DIESEL MANTRIP | | | 5271 | 2010 D | 40 | 10/01/16 | 300.00 | 300.00 | 0.00 | | |
| I00348 | 01668800 | DIESEL LO-TRAC | | | 5270 | 2010 D | 40 | 10/01/16 | 300.00 | 300.00 | 0.00 | | |
| I00436 | 01989600 | 14 MAN MANTRIP | | | 40963 | 2010 D | 40 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | | |
| I00437 | 02152900 | 14 MAN MANTRIP | | | SS066D | 2010 D | 40 | 10/01/16 | 600.00 | 600.00 | 0.00 | | |
| I00438 | 02159600 | 14 MAN MANTRIP | | | SS067D | 2010 D | 40 | 10/01/16 | 600.00 | 600.00 | 0.00 | | |
| | | | | | SS068D | 2010 D | 40 | 10/01/16 | 600.00 | 600.00 | 0.00 | | |

| Item | Part No. | Description | Type | Model | Yr | Cl | Date | Cost | Accum | Net | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X00460 | 03260400 | PERMISSABLE STINGER RIDE | | | 2010 D | | | 800.00 | 800.00 | 0.00 | 00 00 |
| X00463 | 03307700 | PERMISSABLE STINGER RIDE | | JI291P | 2010 D | 15 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 |
| X00494 | 03422960 | 6 MAN MANTRIP | | | 2010 D | 40 | 10/01/16 | 1,200.00 | 1,200.00 | 0.00 | 00 00 |
| X00528 | 03499500 | LT6540 DIESEL LO TRAK | | 61103 | 2010 D | 40 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 05 |
| X00563 | 03597800 | 14 MAN MANTRIP | | SS107D | 2010 D | 40 | 10/01/16 | 2,400.00 | 1,400.00 | 1,000.00 | 00 05 |
| X00564 | 03679200 | 14 MAN MANTRIP | | SS106D | 2010 D | 40 | 10/01/16 | 2,400.00 | 1,400.00 | 1,000.00 | 00 05 |
| X00573 | 03724800 | 4 PERSON MANTRIP | | 9428 | 2010 D | 40 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 05 |
| X00823 | 03645600 | 14 PERSON MANTRIP | | SS11-2D | 2010 D | 40 | 10/01/16 | 3,100.00 | 1,808.33 | 1,291.67 | 00 05 |
| X00632 | 03867700 | 4 PERSON MANTRIP | | 0451 | 2010 D | 40 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 00 |
| X00635 | 03862600 | LO TRAC UTILITY VEHICLE | | 61328 | 2010 D | 40 | 10/01/16 | 5,700.00 | 3,325.00 | 2,375.00 | 00 05 |
| X00674 | 03939800 | 14 MAN MANTRIP | | SS118D | 2010 D | 40 | 10/01/16 | 4,000.00 | 4,000.00 | 0.00 | 00 00 |
| X00677 | 03951800 | LO TRAC UTILITY VEHICLE | | 61534 | 2010 D | 40 | 10/01/16 | 6,100.00 | 6,100.00 | 0.00 | 00 00 |
| X00725 | 04352600 | 4 MANTRIP | | 1506 | 2010 D | 40 | 10/01/16 | 3,200.00 | 3,200.00 | 0.00 | 00 00 |
| X00726 | 04341000 | 4 MANTRIP | | 1505 | 2010 D | 40 | 10/01/16 | 3,200.00 | 3,200.00 | 0.00 | 00 00 |
| X00730 | 04292000 | 10 MAN DIESEL MANTRIP | | SS124KD | 2010 D | 40 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 05 |
| X00735 | 04352500 | 4 PERSON MANTRIP LITTLE JAKE | | 1506 | 2010 D | 40 | 10/01/16 | 3,100.00 | 3,100.00 | 0.00 | 00 00 |
| X00740 | 04361400 | 4 PERSON BATTERY STINGER RIDE | | JI-587 | 2010 D | 40 | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | 00 00 |
| X00795 | 04405800 | PERMISSIBLE RIDE | | JI600P | 2010 D | 40 | 10/01/16 | 2,200.00 | 1,283.33 | 916.67 | 00 05 |
| X00843 | 07-1267 | JI PERSONNEL CARRIER | STINGER | JI267P | 2010 D | 40 | 10/01/16 | 2,300.00 | 1,341.66 | 958.34 | 00 05 |
| X00848 | 7635 | JOHNSON MANTRIP | | | 2010 D | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00849 | 38-021 | JOHNSON PERSONNEL CARRIER | SUPER STEER DIE | SS035 | 2010 D | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00978 | 20141202 | 14 PERSON SUPER STEER DIESEL SECTION MANTRIP | DIESEL | SS021 | 2010 D | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00302 | DFMT24206 | ALPHA A4-9-78DLJ 4-PERSON MANTRIP | SUPER STEER 14 / A4-9-78DLJ | SS129D | 2010 D | 40 | 10/01/16 | 6,100.00 | 3,558.33 | 2,541.67 | 00 05 |
| X00302 | 01474900 | DIESEL POD DUSTER | | 4587 | 2010 D | 42 | 10/01/16 | 5,000.00 | 5,000.00 | 0.00 | 00 00 |
| X00453 | 03215600 | ROCK DUSTER | | | 2010 D | 42 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 |
| X00454 | 03215500 | ROCK DUSTER | | | 2010 D | 42 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 |
| X00482 | 03417800 | TRICKLE ROCK DUSTER | | CS-1106 | 2010 D | 42 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00483 | 03417900 | TRICKLE ROCK DUSTER | | CS-1106 | 2010 D | 42 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00484 | 03418000 | TRICKLE ROCK DUSTER | | CS-1106 | 2010 D | 42 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00485 | 03418100 | TRICKLE ROCK DUSTER | | CS-1106 | 2010 D | 42 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00634 | 03388200 | 3 BUCKET TYPE ROCK DUSTERS | | 4455 | 2010 D | 42 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X00657 | 03945700 | ROCK DUSTER | | 1356 | 2010 D | 42 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00658 | 03945800 | ROCK DUSTER | | 1403 | 2010 D | 42 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00659 | 03945900 | ROCK DUSTER | | 1407 | 2010 D | 42 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00678 | 20110902 | PULL TYPE HYD SLINGER DUSTER | | 1485871 | 2010 D | 42 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00885 | 04696200 | SECTION ROCK DUSTER | | | 2010 D | 42 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 |
| X00887 | 04744600 | AL LEE MARK I 26" RAM ROCK DUSTER | MARK I 26" | E12065 | 2010 D | 42 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X00896 | 04744700 | AL LEE MARK I 26" RAM ROCK DUSTER | MARK I 26" | E12064 | 2010 D | 42 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X00071 | 00078231 | FAN HOUSE (DARBY FORK) | | | 2010 D | 80 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00139 | 00076206 | VENTILATION FAN - BELTLINE RELATED | | | 2010 D | 60 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00144 | 00078208A | VENTILATION FAN - BELTLINE RELATED | | | 2010 D | 60 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| X00376 | 01873800 | BLOWING FAN | | | 2010 D | 80 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 00 |
| X00562 | 00550700 | UPGRADE VENT FAN | | E76206 | 2010 D | 80 | 10/01/16 | 20,100.00 | 5,862.50 | 14,237.50 | 01 05 |
| X00152 | 00040416 | DARBY FORK MINE OFFICE - A416 | | | 2010 D | 86 | 10/01/16 | 16,900.00 | 4,929.16 | 11,970.84 | 01 05 |
| X00159 | 00040416A | DARBY FORK MINE OFFICE - A416 | | | 2010 D | 86 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00458 | 03232300 | CONVEYOR BELT MAGNET | | | 2010 D | 68 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00495 | 03454400 | HYDRAULIC RETRIEVER | | | 2010 D | 68 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 |
| X00503 | 20081002 | ROCK DEFLECTOR SYSTEMS | | 89040 | 2010 D | 68 | 10/01/16 | 2,800.00 | 2,800.00 | 0.00 | 00 00 |
| X01010 | KNOT0004 | ROOF BOLTER | RRII-13-B C-F | 2011308 | 2010 D | 68 | 10/01/16 | 3,000.00 | 3,000.00 | 0.00 | 00 00 |
| X00230 | 00857400 | 2250 KVA SECTION POWER CENTER | | | 2010 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00231 | 00977500 | SUBSTATION (DARBY FORK) | | | 2010 D | 72 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 |
| X00232 | 00977500A | SUBSTATION (HUFF CREEK) | | | 2010 D | 72 | 10/01/16 | 5,900.00 | 3,441.66 | 2,458.34 | 00 05 |
| X00236 | 00708100 | 1000 KVA SECTION POWER CENTER | | 8406 | 2010 D | 72 | 10/01/16 | 5,900.00 | 3,441.66 | 2,458.34 | 00 05 |
| X00245 | 00101430 | 750 KVA POWER CENTER | | R2969 | 2010 D | 72 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 |
| X00246 | 00101450 | 750 KVA POWER CENTER | | R2970 | 2010 D | 72 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 |
| X00402 | 20061002 | UPGRADE POWER TO 12KV | | | 2010 D | 72 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 |
| X00422 | 02177500 | POWER CENTER | | R3561 | 2010 D | 72 | 10/01/16 | 14,300.00 | 8,341.66 | 5,958.34 | 00 05 |
| X00423 | 02177600 | POWER CENTER | | R3562 | 2010 D | 72 | 10/01/16 | 1,600.00 | 1,600.00 | 0.00 | 00 00 |
| X00512 | 03500400 | 750 KVA POWER CENTER | | R3901 | 2010 D | 72 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X00523 | 03476700 | 2250 KVA SECTION POWER CENTER | | R3860 | 2010 D | 72 | 10/01/16 | 2,400.00 | 2,400.00 | 0.00 | 00 00 |
| X00527 | 03568700 | DUAL VACUUM DISCONNECT | | R3964 | 2010 D | 72 | 10/01/16 | 6,300.00 | 3,675.00 | 2,625.00 | 00 05 |
| X00537 | 03583200 | 2250 KVA SECTION POWER 8TH UNIT | | R3966 | 2010 D | 72 | 10/01/16 | 6,500.00 | 3,791.66 | 2,708.34 | 00 05 |
| X00599 | 03779400 | 150 HP 48" REMOTE BELT DRIVE | | | 2010 D | 72 | 10/01/16 | 6,400.00 | 3,733.33 | 2,666.67 | 00 05 |
| X00600 | 03779400A | 150 HP 48" BELT DRIVE -ADDL COST | | | 2010 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00616 | 20100901 | 150 HP BELT STARTER | | | 2010 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00847 | 15-6385 | FACE POWER CENTER | 2500 KVA | 34045-78385-0796 | 2010 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01003 | 03867400 | DUAL VACUUM CIRCUIT BREAKER | | 14359 | 2010 D | 72 | 10/01/16 | 5,600.00 | 3,266.66 | 2,333.34 | 00 05 |
| X01012 | 15-7278 | MCI Power Center | 750 KVA | 35117-77279-0508 | 2010 D | 72 | 10/01/16 | | | | |
| X00095 | D0085001 | POWER LINE (DARBY FORK) | | | 2010 D | 74 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X00234 | 20070202 | 5 SETS OF FIRE FIGHTING EQUIPMENT | | | 2010 D | 79 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 |
| X00652 | 20110404 | OCEANCO 6.5 | | | 2010 D | 79 | 10/01/16 | 3,300.00 | 3,300.00 | 0.00 | 00 00 |
| X00766 | 20120221 | MINERS ACTS COMMUNICATION | | | 2010 D | 79 | 10/01/16 | 66,000.00 | 12,833.33 | 53,166.67 | 02 05 |

DEBTORSLCC_105834

| ID | Code | Description | Model | Model 2 | Yr | Cl | Per | Date | Cost | Amt 2 | Amt 3 | Flags |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X00816 | 20121103 | FIRE SUPPLY SYSTEM FOR BATTERY HAULER | | | | | | | | | 0.00 | 00 00 |
| X00929 | 20131210 | UPDATED STRATA | M26FAB30-3.5 | 452209-02 | 2010 | D | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00933 | 20131213 | UPDATED STRATA | M26FAB30-3.5 | 452209-06 | 2010 | D | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00934 | 20131214 | UPDATED STRATA | M26FAB30-3.5 | 452209-01 | 2010 | D | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00935 | 20131215 | UPDATED STRATA | M26FAB30-3.5 | 452210-01 | 2010 | D | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X00936 | 20131217 | UPDATED STRATA | M26FAB30-3.5 | 452210-03 | 2010 | D | 79 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 00 |
| X01005 | 34-5876A | 2006 JOY CONTINUOUS MINER REBUILD | 14CM15-11CX | JM5876A | 2010 | D | 8 | 10/01/16 | 126,500.00 | 74,958.33 | 53,541.67 | 01 05 |
| X01032 | 34-5907R | 2005 JOY CONT MINER - REBUILT | 14CM15 | JM5907A | 2010 | D | 8 | 10/01/16 | 128,500.00 | 74,958.33 | 53,541.67 | 01 05 |
| X00770 | 20120225 | FIBER CABLE AND MONITORING EQUIP | | | 2010 | D | 80 | 10/01/16 | 4,600.00 | 2,583.33 | 1,916.67 | 01 05 |
| X00279 | 01254700 | POWER CENTER | | | 2022 | D | 07 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 |
| X00059 | 01046400 | JOY CONTINUOUS MINER 14CM15-11BX | 14CM15-11BX | JMS270 | 2022 | D | 08 | 10/01/16 | 85,700.00 | 49,991.55 | 35,708.34 | 00 05 |
| X00449 | 03079700 | 14-15 CONTINUOUS MINER REBUILD | | JM5401 | 2022 | D | 06 | 10/01/16 | 25,000.00 | 14,583.33 | 10,416.67 | 00 00 |
| X00452 | 03201200 | REBUILD JOY MINER 12CM12 | | 5611 | 2022 | D | 08 | 10/01/16 | 100,000.00 | 58,333.33 | 41,666.67 | 00 05 |
| X00543 | 01647400 | REBUILD CONTINUOUS MINER | | JM5270B | 2022 | D | 06 | 10/01/16 | 117,800.00 | 68,716.56 | 49,083.34 | 00 05 |
| X00620 | 03837200 | JOY 14CM15 MINER | | JM-5517-B | 2022 | D | 08 | 10/01/16 | 171,300.00 | 48,952.50 | 121,337.50 | 01 05 |
| X00627 | 03853500 | JOY 12CM12 MINER | | JM-5611B | 2022 | D | 06 | 10/01/16 | 130,900.00 | 37,916.66 | 92,983.34 | 01 05 |
| X00664 | 20110702 | CMR 12CM12 CONTINUOUS MINER | | | 2022 | D | 08 | 10/01/16 | 140,000.00 | 40,833.33 | 99,166.67 | 01 05 |
| X00852 | MLCM06 | Joy Continuous Miner (CM12CM12-11BX) | | JM6081 | 2022 | D | 08 | 10/01/16 | 110,000.00 | 32,083.33 | 77,916.67 | 01 05 |
| X00965 | 01683900A | MINER CORE | | JM5146A | 2022 | D | 08 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 |
| X00966 | 01683500 | JOY 14CM15 CONTINUOUS MINER | | JM5146A | 2022 | D | 08 | 10/01/16 | 117,800.00 | 68,718.66 | 49,083.34 | 00 05 |
| X00967 | 01683600 | REBUILD CONTINUOUS MINER | | JM5146 | 2022 | D | 08 | 10/01/16 | 192,700.00 | 56,204.16 | 136,495.84 | 01 05 |
| X00971 | 01742600 | STRATA PROXIMITY UNIT | STRATA PROXIMI | 8710 | 2022 | D | 08 | 10/01/16 | 75,000.00 | 21,875.00 | 53,125.00 | 01 05 |
| X00988 | MLCM1 | Joy Continuous Miner (CM14CM15-11BX) | CM14CM15-11BX | 5710 | 2022 | D | 08 | 10/01/16 | 117,800.00 | 68,716.66 | 49,083.34 | 00 05 |
| X00993 | 20111104 | REBUILD CONTINUOUS MINER | | JM5710A | 2022 | D | 06 | 10/01/16 | 76,400.00 | 22,283.33 | 54,116.67 | 01 05 |
| X00544 | 03383600 | STAMLER FEEDER BREAKER | | 14111 | 2022 | D | 09 | 10/01/16 | 10,400.00 | 3,033.33 | 7,366.67 | 01 05 |
| X00571 | 03727400 | BF-14 FEEDER BREAKER | | 14284 | 2022 | D | 09 | 10/01/16 | 22,500.00 | 6,562.50 | 15,937.50 | 01 05 |
| X00505 | 01605900 | REBUILD FREEDOM SCHUTTLE CAR | | PM0101 | 2022 | D | 09 | 10/01/16 | 10,700.00 | 3,120.83 | 7,579.17 | 01 05 |
| X00700 | 04264000 | BF-14 FEEDER | | 13975 | 2022 | D | 09 | 10/01/16 | 18,600.00 | 5,425.00 | 13,175.00 | 01 05 |
| X00819 | RAVN0007 | FEEDER BREAKER | | | 2022 | D | 09 | 10/01/16 | 24,900.00 | 7,262.50 | 17,637.50 | 01 05 |
| X00980 | 03850500 | STAMLER BF17 FEEDER | | 14403 | 2022 | D | 09 | 10/01/16 | 25,700.00 | 7,495.83 | 18,204.17 | 01 05 |
| X00292 | 00054052 | C-H 810 COAL HAULER | | 1186 | 2022 | D | 09 | 10/01/16 | 3,700.00 | 3,700.00 | 0.00 | 00 00 |
| X00545 | 00775500 | STAMLER BH10 BATTERY HAULER | | 1022 | 2022 | D | 10 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X00546 | 03407500 | 7TH UNIT RAMS CAR-BATTERY HAULER | | 1431 | 2022 | D | 10 | 10/01/16 | 17,200.00 | 5,016.66 | 12,183.34 | 01 05 |
| X00547 | 03412500 | 7TH UNIT-RAMS CAR-BATTERY HAULER | | 1432 | 2022 | D | 10 | 10/01/16 | 17,200.00 | 5,016.66 | 12,183.34 | 01 05 |
| X00548 | 03412600 | 7th Unit Rams Car-Battery Hauler | | 1433 | 2022 | D | 10 | 10/01/16 | 17,200.00 | 5,016.66 | 12,183.34 | 01 05 |
| X00549 | 03440000 | BATTERY POWERED CAR | | 1449 | 2022 | D | 10 | 10/01/16 | 20,000.00 | 5,833.33 | 14,166.67 | 01 05 |
| X00550 | 03443300 | BATTERY POWERED CAR | | 1450 | 2022 | D | 10 | 10/01/16 | 20,000.00 | 5,833.33 | 14,166.67 | 01 05 |
| X00558 | 01697800 | REBUILD PHILLIPS FREEDOM SHUTTLE CAR | | PM0061 | 2022 | D | 10 | 10/01/16 | 9,500.00 | 2,600.00 | 6,800.00 | 01 05 |
| X00568 | 0016585 | REBUILD FREEDOM SHUTTLE CAR | | PM00704 | 2022 | D | 10 | 10/01/16 | 10,500.00 | 3,062.50 | 7,437.50 | 01 05 |
| X00720 | 20111201 | CMR FREEDOM SHUTTLE CAR | | PM0075 | 2022 | D | 10 | 10/01/16 | 14,900.00 | 4,345.83 | 10,554.17 | 01 05 |
| X00721 | 20111202 | CMR FREEDOM SHUTTLE CAR | | PM0102 | 2022 | D | 10 | 10/01/16 | 14,600.00 | 4,258.33 | 10,341.67 | 01 05 |
| X00722 | 20111203 | CMR FREEDOM SHUTTLE CAR | | PM0103 | 2022 | D | 10 | 10/01/16 | 16,200.00 | 4,725.00 | 11,475.00 | 01 05 |
| X00772 | 33-10661 | 1979 JOY SHUTTLE CAR | 10SC22-48 AHE-1 | ET10661 | 2022 | D | 10 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00773 | 33-15885 | 1990 JOY SHUTTLE CAR | 10SC22-56 AHE-4 | ET15855 | 2022 | D | 10 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00774 | 33-15078 | 1990 JOY SHUTTLE CAR | 10SC22-56 AHE-4 | ET15078 | 2022 | D | 10 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00780 | 04184500 | JOY 10SC CAR | 10SC22-56 AHE-4 | ET15078 | 2022 | D | 10 | 10/01/16 | 13,900.00 | 4,054.16 | 9,845.84 | 01 05 |
| X00781 | 04183700 | JOY 10/SC CAR | 10SC22-48 AHE-1 | ET10661 | 2022 | D | 10 | 10/01/16 | 13,900.00 | 4,054.16 | 9,845.84 | 01 05 |
| X00954 | 33-0H210 | 2010 NARCO SHUTTLE CAR | 10SC32AA | M10H210 | 2022 | D | 10 | 10/01/16 | 28,000.00 | 16,333.33 | 11,666.67 | 01 05 |
| X00955 | 33-0H209 | 2010 NARCO REBUILT SHUTTLE CAR | 10SC32AA | M10H209 | 2022 | D | 10 | 10/01/16 | 28,000.00 | 16,333.33 | 11,666.67 | 01 05 |
| X00956 | 33-0H212 | 2010 NARCO SHUTTLE CAR - PURCH REBUILT | 10SC32AA | N10H212 | 2022 | D | 10 | 10/01/16 | 28,000.00 | 16,333.33 | 11,666.67 | 01 05 |
| X00213 | 00617200 | Fletcher RRII-13 Roof Bolter | RRII-13 | 2001014 | 2022 | C | 12 | 10/01/16 | 2,900.00 | 2,900.00 | 0.00 | 00 00 |
| X00293 | 00775600 | FLETCHER RRII-13 ROOF BOLTER | | 2000019 | 2022 | C | 12 | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | 00 05 |
| X00323 | 01578600 | MOBILE ROOF SUPPORTS | | | 2022 | C | 12 | 10/01/16 | 5,100.00 | 2,975.00 | 2,125.00 | 00 05 |
| X00324 | 01578700 | MOBILE ROOF SUPPORTS | | | 2022 | C | 12 | 10/01/16 | 5,100.00 | 2,975.00 | 2,125.00 | 00 05 |
| X00325 | 01578800 | MOBILE ROOF SUPPORTS | | | 2022 | C | 12 | 10/01/16 | 5,100.00 | 2,975.00 | 2,125.00 | 00 05 |
| X00326 | 01578900 | MOBILE ROOF SUPPORT | | | 2022 | C | 12 | 10/01/16 | 5,100.00 | 2,975.00 | 2,125.00 | 00 05 |
| X00554 | 02176400 | REPLACE ONE HIGH SEAM ROOF BOLTER | | | 2022 | C | 12 | 10/01/16 | 5,800.00 | 3,383.33 | 2,416.67 | 00 05 |
| X00607 | 00795000 | ROOF BOLTER-CONVERT TO MASTER STYLE | | 2000041 | 2022 | C | 12 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 05 |
| X00608 | 01786100 | FLETCHER ROOF BOLTER RRII-13 | RRII-13 | 2000041 | 2022 | C | 12 | 10/01/16 | 3,200.00 | 3,200.00 | 0.00 | 00 00 |
| X00609 | 01786200 | MOBILE ROOF SUPPORT | | 2005900 | 2022 | C | 12 | 10/01/16 | 4,300.00 | 2,508.33 | 1,791.67 | 00 05 |
| X00547 | 02176400 | FLETCHER HDDR-13 ROOF BOLTER | | 2005901 | 2022 | C | 12 | 10/01/16 | 4,300.00 | 2,508.33 | 1,791.67 | 00 05 |
| X00686 | 20110704 | PURCHASE AND REBUILD BOLTER | | 2006012 | 2022 | C | 12 | 10/01/16 | 10,800.00 | 6,300.00 | 4,500.00 | 00 05 |
| X00796 | 00795100 | CMR-FLETCHER DDR 13 BOLTER | | 2003303 | 2022 | C | 12 | 10/01/16 | 22,000.00 | 12,833.33 | 9,166.67 | 01 05 |
| X00601 | 04441800 | FLETCHER ROOF BOLTER | | 2000041 | 2022 | C | 12 | 10/01/16 | 12,100.00 | 3,529.16 | 8,570.84 | 01 05 |
| X00968 | 00815600 | FLETCHER ROOF BOLTER | | 2010048 | 2022 | C | 12 | 10/01/16 | 38,300.00 | 11,170.83 | 27,129.17 | 01 05 |
| X00970 | 04372500 | FLETCHER ROOF BOLTER | | 2001021 | 2022 | C | 12 | 10/01/16 | 3,100.00 | 1,808.33 | 1,291.67 | 00 05 |
| X00984 | 04394800 | WALK-THRU FLETCHER ROOF BOLTER | | 2010199 | 2022 | C | 12 | 10/01/16 | 33,800.00 | 9,858.33 | 23,941.67 | 01 05 |
| X00486 | 04356100 | FLETCHER ROOF BOLTER | | 2010161 | 2022 | C | 12 | 10/01/16 | 24,500.00 | 7,145.83 | 17,354.17 | 01 05 |
| X00472 | 20060303 | SCSR'S/TRAINING FOR MINERS ACT | | 2010186 | 2022 | C | 12 | 10/01/16 | 31,100.00 | 9,070.83 | 22,029.17 | 01 05 |
| X00510 | 20061103 | MINERS ACT REQUIREMENT | | | 2022 | C | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | | | | | 2022 | C | 17 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |

| Item | Code | Description | Model | Serial | Year | Col | Date | Amount 1 | Amount 2 | Amount 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X00558 | 20081101 | MINERS ACT REQUIREMENT | | | | | | | 0.00 | | 00 | 00 |
| X00958 | 04306900 | JH FLETCHER MOBILE ROOF SUPPORT | | 2011902 | 2022 C | 17 | 10/01/16 | 33,700.00 | 6,552.77 | 27,147.23 | 00 | 00 |
| X00959 | 04307000 | JH FLETCHER MOBILE ROOF BOLTER | | 2011900 | 2022 C | 17 | 10/01/16 | 33,700.00 | 9,829.15 | 23,870.84 | 01 | 05 |
| X00960 | 04306600 | JH FLETCHER MOBILE ROOF SUPPORT | | 2011900 | 2022 C | 17 | 10/01/16 | 33,400.00 | 6,494.44 | 26,905.56 | 01 | 05 |
| X00961 | 04306800 | JH FLETCHER MOBILE ROOF BOLTER | | 2011901 | 2022 C | 17 | 10/01/16 | 33,400.00 | 9,741.66 | 23,658.34 | 00 | 00 |
| X00649 | 20110401 | OVERCASTS | | | 2022 C | 18 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00969 | 03868100 | STAMLER BF17 FEEDER | | 14375 | 2022 C | 18 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00386 | 01668200 | DUAL 150 HP CONVEYOR TERMINAL GROUP | | | 2022 C | 20 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00390 | 01914300 | 150 HP TERM GROUP | | | 2022 C | 20 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 | 00 |
| X00421 | 02170700 | STAMLER FEEDER BREAKER | | | 2022 C | 20 | 10/01/16 | 900.00 | | 0.00 | 00 | 00 |
| X00425 | 20081203 | INFRASTRUCTURE FOR CLOVER FORK | | | 2022 C | 20 | 10/01/16 | 5,300.00 | 3,091.66 | 2,208.34 | 00 | 05 |
| X00531 | 03563400 | CONVEYOR TERMIANL GROUP | | U46241 | 2022 C | 20 | 10/01/16 | 1,600.00 | 1,600.00 | 0.00 | 00 | 05 |
| X00555 | 01668200 | DUAL 150HP DRIVE/STARTER | | U46244 | 2022 C | 20 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 | 00 |
| X00559 | 03565900 | TERMINAL GROUP | | | 2022 C | 20 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| X00592 | 03754800 | BELT CONVEYOR TAILPIECE | | WR1102 | 2022 C | 20 | 10/01/16 | 5,900.00 | 4,025.00 | 2,875.00 | 00 | 05 |
| X00643 | 20110202 | 2,000 FT OF INFRASTRUCTURE | | | 2022 C | 20 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 | 00 |
| X00706 | 20111111 | 5K-48" OF CONVEYOR STRUCTURE | | | 2022 C | 20 | 10/01/16 | 5,800.00 | 3,383.33 | 2,416.67 | 00 | 05 |
| X00707 | 20111112 | 8K-48" OF CONVEYOR BELTING | | | 2022 C | 20 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 | 05 |
| X00708 | 20111113 | 4K FT OF PVC WATER LINE | | | 2022 C | 20 | 10/01/16 | 7,200.00 | 4,200.00 | 3,000.00 | 00 | 05 |
| X00709 | 20111114 | 4K FT OF HIGH VOLTAGE CABLE | | | 2022 C | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 | 00 |
| X00710 | 20111115 | 4 K FT OF COMMUNICATION TRACKING | | | 2022 C | 20 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 | 00 |
| X00711 | 03879400 | CONVEYOR TERMINAL GROUP | | 26 | 2022 C | 20 | 10/01/16 | 5,100.00 | 1,487.50 | 3,612.50 | 01 | 05 |
| X00712 | 03103600 | CONVEYOR TERMINAL GROUP | | 27 | 2022 C | 20 | 10/01/16 | 4,600.00 | 2,683.33 | 1,916.67 | 00 | 05 |
| X00713 | 03878200 | CONVEYOR TERMINAL GROUP | | | 2022 C | 20 | 10/01/16 | 4,600.00 | 2,683.33 | 1,916.67 | 01 | 05 |
| X00714 | 03878300 | CONVEYOR TERMINAL GROUP | | | 2022 C | 20 | 10/01/16 | 8,400.00 | 1,866.66 | 4,533.34 | 01 | 05 |
| X00783 | 20120601 | 34K BELTING | | | 2022 C | 20 | 10/01/16 | 8,400.00 | 1,866.66 | 4,533.34 | 01 | 05 |
| X00808 | 20120901 | 2,000FT INFRASTRUCTURE | | | 2022 C | 20 | 10/01/16 | 4,500.00 | 1,312.50 | 3,187.50 | 01 | 05 |
| X00830 | 27-76762 | 2011 BELT TERMINAL GROUP | 48D150HP | U47676-2 | 2022 C | 20 | 10/01/16 | 1,700.00 | 1,700.00 | 0.00 | 00 | 00 |
| X00831 | 27-76761 | 2011 BELT TERMINAL GROUP | 48D150HP | U47676-1 | 2022 C | 20 | 10/01/16 | 4,600.00 | 2,683.33 | 1,916.67 | 00 | 05 |
| X00905 | 20131205 | 48" RICHWOOD BELT WIPE | 48" RICHWOOD BE | | 2022 C | 20 | 10/01/16 | 4,200.00 | 2,450.00 | 1,750.00 | 00 | 05 |
| X00915 | 11FL1175-2 | BELT TERMINAL GROUP | CONTINENTAL TE | U48598 | 2022 C | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 | 00 |
| X00925 | 20131206 | DUAL VCB BOX, MCI | | 35323-8309-0570 | 2022 C | 20 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00926 | 20131207 | 2500 KVA BOX MCI | | 35045-76335-0706 | 2022 C | 20 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00927 | 20131208 | DISTRIBUTION BOX MCI | | 35102-77283-0506 | 2022 C | 20 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00972 | 20120208 | BELT-3,000 FT | | | 2022 C | 20 | 10/01/16 | 2,800.00 | 2,800.00 | 0.00 | 00 | 00 |
| X00973 | RAVN0001 | MAINLINE BELT | | | 2022 C | 20 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 | 00 |
| X00989 | 02158300 | BELT DRIVE AND TAILPIECE | | U44815 | 2022 C | 20 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 | 00 |
| X00800 | 27-44708 | 46 INCH BELT TERMINAL GROUP | 48BWD200HP | 44708 | 2022 C | 23 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00333 | 01324900 | CAT 950 WHEEL LOADER | | 4BS321 | 2022 C | 24 | 10/01/16 | 48,000.00 | 28,000.00 | 20,000.00 | 00 | 05 |
| X00582 | 03748200 | CAT 908 LOADER | | OTARU1622 | 2022 C | 24 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00775 | 02-01030 | 2006 USED CAT TELEHANDLER | TH220B | SLA01030 | 2022 C | 24 | 10/01/16 | 80,800.00 | 23,566.66 | 57,233.34 | 01 | 05 |
| X00312 | 01506400 | EIMCO 935 DIESEL SCOOP | | | 2022 C | 34 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| X00432 | 03128200 | SCOOP ROCK DUSTER | | | 2022 C | 34 | 10/01/16 | 3,400.00 | 3,400.00 | 0.00 | 00 | 00 |
| X00499 | 03376500 | BATTERY POWERED SCOOP | | 4594 | 2022 C | 34 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 | 00 |
| X00524 | 03379400 | LS 190 DIESEL SCOOP | | 4589 | 2022 C | 34 | 10/01/16 | 10,200.00 | 2,975.00 | 7,225.00 | 01 | 05 |
| X00658 | 20110502 | BATTERY POWERED SCOOP | | | 2022 C | 34 | 10/01/16 | 17,400.00 | 5,075.00 | 12,325.00 | 01 | 05 |
| X00723 | 20111204 | REBUILD DIESEL POWER SCOOP | | | 2022 C | 34 | 10/01/16 | 23,800.00 | 6,941.66 | 16,858.34 | 01 | 05 |
| X00724 | 20111205 | BATTERY POWER SCOOP | | | 2022 C | 34 | 10/01/16 | 12,200.00 | 3,558.33 | 8,641.67 | 01 | 05 |
| X00638 | 32-37244 | 2010 FAIRCHILD SCOOP | 35C-LS | T337-244 | 2022 C | 34 | 10/01/16 | 27,500.00 | 8,020.83 | 19,479.17 | 01 | 05 |
| X00840 | 32-00152 | 2011 AC TRAM SCOOP | T400 | T400-152 | 2022 C | 34 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00841 | 4 | 35C DIESEL SCOOP | 35C-WHD | T600-107 | 2022 C | 34 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00356 | 01774500 | 1 TON F350 | | 1FDWF37P36E502 | 2022 C | 36 | 10/01/16 | 8,900.00 | 5,191.66 | 3,708.34 | 00 | 05 |
| X01021 | 14-95184 | 2003 Ford F150 Truck | | 50863 | 2022 C | 36 | 10/01/16 | 1,400.00 | 816.66 | 563.34 | 00 | 05 |
| X00732 | 20111207 | UTILITY TRAILER | F150 | 1FTRX18W33NB95 | 2022 C | 36 | 10/01/16 | 6,500.00 | 3,791.66 | 2,708.34 | 00 | 05 |
| X00747 | 04361600 | LO TRAC UTILITY TRACTOR ADD | | | 2022 C | 39 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 | 00 |
| X00207 | 06800761 | 12 PASS DIESEL MANTRIP #5MT | | 61406 | 2022 C | 39 | 10/01/16 | 5,800.00 | 3,966.66 | 2,833.34 | 00 | 05 |
| X00310 | 01456900 | PERMISSABLE STINGER BUGGY | | 761 | 2022 C | 40 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 | 00 |
| X00342 | 01668500 | REBUILD JOY SHUTTLE CAR 10SC | | PM0074 | 2022 C | 40 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 | 00 |
| X00343 | 01747500 | REBUILD JOY SHUTTLE CAR 10SC | | PM0075 | 2022 C | 40 | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | 00 | 00 |
| X00373 | 01829500 | REBUILD JOY SHUTTLE CAR | | PM0101 | 2022 C | 40 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 | 00 |
| X00374 | 01940200 | REBUILD JOY SHUTTLE CAR | | PM0102 | 2022 C | 40 | 10/01/16 | 2,500.00 | 2,500.00 | 0.00 | 00 | 00 |
| X00388 | 01925700 | JOY 10SC SHUTTLE CAR | | PM0103 | 2022 C | 40 | 10/01/16 | 2,000.00 | 2,000.00 | 0.00 | 00 | 00 |
| X00459 | 01945500 | REPLACE LO-TRAC | | 60797 | 2022 C | 40 | 10/01/16 | 3,700.00 | 3,700.00 | 0.00 | 00 | 00 |
| X00459 | 03239600 | FOUR-PERSON DIESEL RIDE | | | 2022 C | 40 | 10/01/16 | 1,000.00 | 1,000.00 | 0.00 | 00 | 00 |
| X00464 | 03227200 | PERMISSABLE STINGER RIDE | | J1289P | 2022 C | 40 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 | 00 |
| X00465 | 03248300 | PERMISSABLE STINGER RIDE | | J1288P | 2022 C | 40 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 | 00 |
| X00500 | 03454900 | 14 MAN MANTRIP | | SS0094D | 2022 C | 40 | 10/01/16 | 0.00 | | 0.00 | 00 | 00 |
| X00501 | 03470900 | 8 MAN LITTLE JACK MANTRIP | | 8761 | 2022 C | 40 | 10/01/16 | 1,600.00 | 1,600.00 | 0.00 | 00 | 00 |
| X00533 | 03562600 | STINGER PERM RIDE | | J1411P | 2022 C | 40 | 10/01/16 | 1,300.00 | 1,300.00 | 0.00 | 00 | 00 |
| X00557 | 03629100 | 14 MAN MANTRIP | | 104D | 2022 C | 40 | 10/01/16 | 2,400.00 | 1,400.00 | 1,000.00 | 00 | 05 |
| X00561 | 03672300 | 14 MAN MANTRIP | | SS105D | 2022 C | 40 | 10/01/16 | 2,500.00 | 2,500.00 | 0.00 | 00 | 00 |

| | | Description | Model | Serial | Year | Type | | Date | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00572 | 03719000 | 4 MAN LITTLE JAKE MANTRIP W/CANOPY | | | 2022 C | 40 | | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | 00 | 00 |
| 00574 | 03724900 | MAINTENANCE ON MANTRIP | X25 | | 2022 C | 40 | | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 | 00 |
| 00629 | 03844300 | 4 MAN MANTRIP LITTLE JAKE | 450 | | 2022 C | 40 | | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 | 00 |
| 00630 | 03848200 | 4 MAN MANTRIP LITTLE JAKE | 61345 | | 2022 C | 40 | | 10/01/16 | 6,300.00 | 3,675.00 | 2,625.00 | 00 | 05 |
| 00636 | 03863300 | LO TRAC UTILITY VEHICHLE | 61343 | | 2022 C | 40 | | 10/01/16 | 6,300.00 | 3,675.00 | 2,625.00 | 00 | 05 |
| 00637 | 03863200 | LO TRAC UTILITY VEHICLE | SS114D | | 2022 C | 40 | | 10/01/16 | 3,500.00 | 2,041.66 | 1,458.34 | 00 | 05 |
| 00638 | 03877900 | 14 PERSON MANTRIP | SS115D | | 2022 C | 40 | | 10/01/16 | 3,500.00 | 2,041.66 | 1,458.34 | 00 | 05 |
| 00641 | 03880200 | 14 MAN SUPERSTEER MANTRIP | SSD122D | | 2022 C | 40 | | 10/01/16 | 3,900.00 | 2,275.00 | 1,625.00 | 00 | 05 |
| 00670 | 04259900 | MANTRIP | SSD123D | | 2022 C | 40 | | 10/01/16 | 3,900.00 | 2,275.00 | 1,625.00 | 00 | 05 |
| 00671 | 04285900 | MANTRIP | FEK002 | | 2022 C | 40 | | 10/01/16 | 3,900.00 | 2,275.00 | 1,625.00 | 00 | 05 |
| 00727 | 04303400 | 4 MAN DIESEL WASP MANTRIP | 1509 | | 2022 C | 40 | | 10/01/16 | 3,300.00 | 1,925.00 | 1,375.00 | 00 | 05 |
| 00738 | 04342200 | 4 PERSON MANTRIP LITTLE JAKE | 1510 | | 2022 C | 40 | | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | 00 | 05 |
| 00739 | 04342400 | 4 PERSON MANTRIP LITTLE JAKE | 19862 | | 2022 C | 40 | | 10/01/16 | 3,200.00 | 1,866.66 | 1,333.34 | 00 | 05 |
| 00826 | 11FL1204 | KUBOTA UTILITY VEHICLE | KUBOTA | | 2022 C | 40 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 05 |
| 00907 | RAVN0010 | DIESEL MANTRIP | | | 2022 C | 40 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 05 |
| 00957 | 33-OH209. O | 2-Used Narco Shuttle Cars | | | 2022 C | 40 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 05 |
| 00977 | 20141201 | 14 PERSON SUPER STEER DIESEL SECTION MANTRIP | SUPER STEER 14 | N10H209 & N10H2... | 2022 C | 40 | | 10/01/16 | 31,300.00 | 18,256.33 | 13,041.67 | 00 | 05 |
| 00982 | CFMT49050 | ALPHA A4-9-78DLJ 4-PERSON MANTRIP | A4-9-78DLJ | SS130D | 2022 C | 40 | | 10/01/16 | 6,300.00 | 3,675.00 | 2,625.00 | 00 | 05 |
| 00311 | 01622000 | SR 500 SLURRY ROCK DUSTER | | 4588 | 2022 C | 40 | | 10/01/16 | 5,200.00 | 5,200.00 | 0.00 | 00 | 00 |
| 00334 | 01306500 | HIGH PRESSURE ROCKDUSTER | | | 2022 C | 42 | | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 | 00 |
| 00593 | 03784200 | SLURRY DUSTER | | | 2022 C | 42 | | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 | 00 |
| 00594 | 03786300 | FLINGER | | | 2022 C | 42 | | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | 00 | 00 |
| 00595 | 03786400 | FLINGER | | | 2022 C | 42 | | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 | 00 |
| 00596 | 03786500 | FLINGER | | | 2022 C | 42 | | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 | 00 |
| 00597 | 037866 | FLINGER | | | 2022 C | 42 | | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 | 00 |
| 00681 | 20110903 | ROCK DUSTER | | 1355 | 2022 C | 42 | | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 | 00 |
| 00682 | 03944700 | ROCK DUSTER | | 1410 | 2022 C | 42 | | 10/01/16 | 900.00 | 900.00 | 0.00 | 00 | 00 |
| 00683 | 03944600 | ROCK DUSTER | | 1411 | 2022 C | 42 | | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 | 00 |
| 00851 | 31-10179 | 2010 JBLCO ROCK DUSTER | MD4A | MD4-081510-179 | 2022 C | 42 | | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| 00858 | 31-8862 | ROCK DUST FLINGER | DD-1 | D6-E8862 | 2022 C | 42 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00888 | 04693500 | SECTION ROCK DUSTER | | E12068 | 2022 C | 42 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00899 | 04703100 | AL LEE MARK I 26" RAM ROCK DUSTER | MARK I 26" | E12017 | 2022 C | 42 | | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 | 00 |
| 00900 | 04744300 | AL LEE MARK I 26" RAM DUSTER | MARK I 26" | E12382 | 2022 C | 42 | | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 | 00 |
| 01030 | 31-04056 | 2010 CYCLONE TRICKLE DUSTER | CD-1106-LOW PRO | 10W04056 | 2022 C | 42 | | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 | 00 |
| 01031 | 31-40562 | 2010 CYCLONE TRICKLE DUSTER | CD-1106-LOW PRO | 10W04056-2 | 2022 C | 42 | | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 | 00 |
| 00842 | 07-17582 | MANTRIP | RTV1140 | 17582 | 2022 C | 42 | | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 | 00 |
| 00306 | 01306500 | SLURRY DUSTER | | | 2022 C | 44 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00406 | 20061004 | 40HP TAKEUP-PUMPING UNIT | | | 2022 C | 52 | | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 | 00 |
| 00335 | 01360700 | 64X125C25 BATTERY RETRAY | | | 2022 C | 56 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00336 | 01360800 | 64X125C25 BATTERY RETRAY | | | 2022 C | 56 | | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| 00393 | 01673600 | VENT FAN UPGRADE | | | 2022 C | 60 | | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| 00586 | 20100101 | BLEEDER FAN INSTALLATION | | 8HUA96 | 2022 C | 60 | | 10/01/16 | 13,400.00 | 3,908.33 | 9,491.67 | 01 | 05 |
| 00621 | 20101001 | AUXILARY VENT FAN TUBING | | | 2022 C | 60 | | 10/01/16 | 5,500.00 | 3,208.33 | 2,291.67 | 00 | 05 |
| 00341 | 200508 | SURFACE FACILITY | | | 2022 C | 60 | | 10/01/16 | 2,400.00 | 1,400.00 | 1,000.00 | 00 | 05 |
| 00369 | 20050801 | OIL STORAGE SHED | | | 2022 C | 66 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00498 | 20080901 | CONFERENCE ROOM & MINE OFFICE ADDITION | | | 2022 C | 66 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00583 | 20100401 | MANTRIP SHED | | | 2022 C | 66 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00372 | 01718700 | CO MONITORING SYSTEM | | | 2022 C | 68 | | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 | 00 |
| 00457 | 03209200 | CONVEYOR BELT MAGNET | | | 2022 C | 68 | | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| 00504 | 20081003 | ROCK DEFLECTOR SYSTEMS | | | 2022 C | 68 | | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 | 00 |
| 00186 | 00072661 | STAMLER FEEDER BREAKER BF17A-8-74C | | | 2022 C | 68 | | 10/01/16 | 1,600.00 | 1,600.00 | 0.00 | 00 | 00 |
| 00320 | 01821900 | MAGNETS | | | 2022 C | 72 | | 10/01/15 | 3,200.00 | 3,200.00 | 0.00 | 00 | 00 |
| 00321 | 01261700 | MAGNETS | | | 2022 C | 72 | | 10/01/15 | 2,300.00 | 2,300.00 | 0.00 | 00 | 00 |
| 00349 | 01647000 | 750 KVA POWER CENTER-B MAINS | | R3369 | 2022 C | 72 | | 10/01/16 | 2,300.00 | 2,300.00 | 0.00 | 00 | 00 |
| 00367 | 01709800 | POWER CENTER | | R3416 | 2022 C | 72 | | 10/01/16 | 3,900.00 | 3,900.00 | 0.00 | 00 | 00 |
| 00382 | 01747000 | REPLACE SECTION POWER CENTER | | U2951 | 2022 C | 72 | | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 | 00 |
| 00391 | 01991300 | 750 KVA POWER CENTER | | R3560 | 2022 C | 72 | | 10/01/16 | 3,500.00 | 3,500.00 | 0.00 | 00 | 00 |
| 00403 | 20061003 | UPGRADE POWER TO 12KV | | | 2022 C | 72 | | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 | 00 |
| 00410 | 01891200 | DOUBLE VAC DISCONNECT BOX | | R3571 | 2022 C | 72 | | 10/01/16 | 14,300.00 | 8,341.66 | 5,958.34 | 00 | 05 |
| 00411 | 01995300 | DOUBLE VAC DISCONNECT BOX | | R3570 | 2022 C | 72 | | 10/01/16 | 5,700.00 | 5,700.00 | 0.00 | 00 | 00 |
| 00414 | 02145800 | 750 KVA POWER CENTER | | | 2022 C | 72 | | 10/01/16 | 5,700.00 | 5,700.00 | 0.00 | 00 | 00 |
| 00415 | 01647200 | 750 KVA POWER CENTER-B MAINS | | R3370 | 2022 C | 72 | | 10/01/16 | 3,000.00 | 3,000.00 | 0.00 | 00 | 00 |
| 00418 | 01995800 | 750 KVA POWER CENTER | | | 2022 C | 72 | | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 | 00 |
| 00486 | 03416200 | 2250 KVA POWER CENTER | | | 2022 C | 72 | | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 | 00 |
| 00513 | 03500300 | DUALVACUUM CIRCUIT BREAKER | | R3635 | 2022 C | 72 | | 10/01/16 | 5,900.00 | 5,900.00 | 0.00 | 00 | 00 |
| 00514 | 03471500 | DUAL VACUUM CIRCUIT BREAKER | | R3903 | 2022 C | 72 | | 10/01/16 | 6,100.00 | 3,558.33 | 2,541.67 | 00 | 05 |
| 00538 | 03565900 | TERMINAL GROUP | | R3902 | 2022 C | 72 | | 10/01/16 | 6,100.00 | 3,558.33 | 2,541.67 | 00 | 05 |
| 00586 | 03753900 | 750 KVA POWER CENTER | | R4112 | 2022 C | 72 | | 10/01/16 | 81,900.00 | 18,054.16 | 43,845.84 | 01 | 05 |
| 00587 | 03753700 | POWER CENTER | | R4113 | 2022 C | 72 | | 10/01/16 | 4,000.00 | 4,000.00 | 0.00 | 00 | 00 |
| 00589 | 03746300 | 48" TERMINAL GROUP | | | 2022 C | 72 | | 10/01/16 | 3,000.00 | 3,000.00 | 0.00 | 00 | 00 |
| 00590 | 03753200 | 48" TERMINAL GROUP | | | 2022 C | 72 | | 10/01/16 | 26,000.00 | 7,583.33 | 18,416.67 | 01 | 05 |
| 00615 | 03746300 | 48" TERMINAL GROUP | | | 2022 C | 72 | | 10/01/16 | 26,000.00 | 7,583.33 | 18,416.67 | 01 | 05 |
| | | | | U47070 | 2022 C | 72 | | 10/01/16 | 51,200.00 | 14,933.33 | 36,266.67 | 01 | 05 |

DEBTORSLCC_105837

| Asset | Code | Description | Spec | Serial | Class | Col | Date | Amt1 | Amt2 | Amt3 | Flag | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00646 | 20110203 | 300 KVA MOVE BOX | | | | | | | | 0.00 | 00 00 | |
| 00832 | 15-5101 | MCI DISTRIBUTION BOX | 9 CIRCUIT | 35101-77261-0406 | 2022 C | 72 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 | |
| 00834 | 15-10507 | DUAL VACUUM BREAKER SWITCHHOUSE | 7200 VOLTS | 35117-1-77261-070 | 2022 C | 72 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 | |
| 00880 | 15-7281 | BELT POWER CENTER | 750 KVA | 35117-1-77261-070 | 2022 C | 72 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 00 | |
| 00906 | 15-U3499 | POWER CENTER | 300 KVA | U3499 | 2022 C | 72 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 | |
| 00909 | 15-3538 | Power Center | 750 KVA | R3538 | 2022 C | 72 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 00 | |
| 00911 | 15-00003 | 300 KVA POWER CENTER | 300 KVA | 14708 | 2022 C | 72 | 10/01/16 | 1,600.00 | 1,600.00 | 0.00 | 00 00 | |
| 01009 | 27-3488 | POWER CENTER | 750 KVA | R3488 | 2022 C | 72 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 | |
| 00435 | 20070203 | 5 SETS OF FIRE FIGHTING EQUIPMENT | | | 2022 C | 78 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 | |
| 00585 | 03754000 | REFUGE CHAMBER | | | 2022 C | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 | |
| 00653 | 20110405 | OCEANCO 6.5 | | 4532301-01 | 2022 C | 79 | 10/01/16 | 8,200.00 | 8,200.00 | 0.00 | 00 00 | |
| 00753 | 20120219 | SCBR'S | | | 2022 C | 79 | 10/01/16 | 8,500.00 | 8,500.00 | 0.00 | 00 00 | |
| 00767 | 20120222 | MINERS ACTS COMMUNICATION | | | 2022 C | 79 | 10/01/16 | | | | | |
| 00782 | U1001 | SCBR'S | | | 2022 C | 79 | 10/01/16 | 51,000.00 | 11,861.10 | 49,138.90 | 02 05 | |
| 00811 | 20120904 | PROXIMITY SYSTEM-12CM12 CONTINUOUS MINER | | | 2022 C | 79 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 | |
| 00811 | 20121203 | FIRE SUPPORT SYS FOR BATTERY CHARGE STATION | | | 2022 C | 79 | 10/01/16 | 6,400.00 | 1,866.66 | 4,533.34 | 01 05 | |
| 00863 | 03396700 | UPDATE FEFUGE | | 454913-01-13 | 2022 C | 79 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 00 | |
| 00864 | 03398800 | UPDATE REFUGE | | 452010-04-13 | 2022 C | 79 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 | |
| 00874 | 03396600 | UPDATE REFUGE CHAMBER | | 452010-02-13 | 2022 C | 79 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 | |
| 00875 | 04648500 | UPDATE REFUGE CHAMBER | | 4532427-01-13 | 2022 C | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 | |
| 00876 | 04648600 | UPDATE REFUGE CHAMBER | | 452209-04-13 | 2022 C | 79 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 | |
| 00878 | 033984 | UPDATE REFUGE CHAMBER @ MANF FACILITY | | 452136-04-13 | 2022 C | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 | |
| 00893 | 20131101 | STRATA PROXIMITY SYSTEM FOR 14CM15 MINER | STRATA PROX SY | JM6253 | 2022 C | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 | |
| 00893 | 20131103 | STRATA PROXIMITY SYSTEM FOR 14CM15 MINER | STRATA PROX SY | JM5517 | 2022 C | 79 | 10/01/16 | 8,400.00 | 2,450.00 | 5,950.00 | 01 05 | |
| 00894 | 20131104 | STRATA PROXIMITY SYSTEM FOR 14CM15 MINER | STRATA PROX SY | JM5450 | 2022 C | 79 | 10/01/16 | 5,800.00 | 1,691.66 | 4,108.34 | 01 05 | |
| 00771 | 20120226 | FIBER CABLE AND MONITORING EQUIP | | | 2022 G | 80 | 10/01/16 | 7,100.00 | 2,070.83 | 5,029.17 | 01 05 | |
| 01132 | 27-00020 | BELT TERMINAL GROUP | 48T150HP | N/A | 2051 D | 20 | 10/01/15 | 5,400.00 | 3,150.00 | 2,250.00 | 00 00 | LMP Darby Fork 2010 |
| 01133 | 27-00021 | BELT TERMINAL GROUP | 45D150HP | N/A | 2051 D | 20 | 10/01/15 | 0.00 | 0.00 | 0.00 | 00 00 | LMP Darby Fork 2010 |
| 00672 | 20110802 | DUAL 150 HP STARTER | | | 2051 D | 20 | 10/01/15 | 0.00 | 0.00 | 0.00 | 00 00 | LMP Darby Fork 2010 |
| 00684 | 04301800 | DUAL 150 HP DRIVE | | | 2051 D | 20 | 10/01/15 | 500.00 | 500.00 | 0.00 | 00 00 | LMP Darby Fork 2010 |
| 00690 | 20111101 | 48" HYD TAKEUP SECTION | | | 2051 D | 20 | 10/01/15 | 4,100.00 | 2,391.66 | 1,708.34 | 00 05 | LMP Darby Fork 2010 |
| 00693 | 20111104 | 8K-42" BELT STRUCTURE | | | 2051 D | 20 | 10/01/15 | 1,300.00 | 1,300.00 | 0.00 | 00 00 | LMP Darby Fork 2010 |
| 01131 | 27-00019 | Radial Stacker Conveyor | 48X120 | | 2051 D | 23 | 10/01/16 | 6,900.00 | 4,025.00 | 2,875.00 | 00 05 | No - Unknown |
| 01174 | 39-00004 | Ventilation Fan | | | 2051 D | 23 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01180 | 64000006 | STORAGE BUILDING | 6 FT | | 2051 D | 60 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| 00810 | 20120903 | CONSTRUCTION OF NEW OIL STORAGE SHED | | | 2051 D | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| 01115 | 15-00024 | Pemco 1800 KVA Enclosed Substation | | | 2051 D | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| 01117 | 15-04205 | BELT POWER CENTER | 750KVA | 1904-205 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01118 | 15-06563 | BELT POWER SYSTEM | 150KVA | C606-583 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01119 | 15-07998 | BELT POWER CENTER | 500KVA | 7898 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01120 | 15-12304 | SECTION POWER CENTER | 1000KVA | SEMM1012304 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01121 | 14-4557 | 2011 TREY K SECTION POWER CENTER | 1250 KVA | 14557 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 01122 | 15-19911 | BELT POWER CENTER | 500KVA | 19911 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 00667 | 27-48144 | 2011 JOY 48' BELT TERMIANL GROUP | | 48144-01 | 2051 D | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 00762 | 04322500 | TRACKING AND COMMUNICATION | | | 2051 D | 79 | 10/01/16 | 9,000.00 | 2,625.00 | 6,375.00 | 00 00 | LMP Darby Fork 2010 |
| 00764 | 04366600 | PYOTT-BOONE UHF TRACK/COMM SYSTEM | | | 2051 D | 79 | 10/01/16 | 18,300.00 | 4,754.16 | 11,545.84 | 01 05 | No - Unknown |
| 00766 | 04366600A | PYOTT-BOONE UHF TRACK/COMM SYSTEM | 003 | | 2051 D | 79 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 | No - Unknown |
| 01190 | 003 | MINE INFRASTRUCTURE | | | 2051 D | 90 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | No - Unknown |
| 00691 | 20111102 | 48" TAIL LOADING SYSTEM | | | 2053 M | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 | |
| 00592 | 20111103 | 2.250FT-42" BELT STRUCTURE | | | 2053 M | 20 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 | |
| 00664 | 20111105 | 3K HIGH VOLT CABLE | | | 2053 M | 20 | 10/01/16 | 2,100.00 | 2,100.00 | 0.00 | 00 00 | Yes |
| 01147 | 29-1118 | ???? STAMLER FEEDER BREAKER | 8F17B87C | 11118-R2 | 2053 M | 20 | 10/01/16 | 1,200.00 | 1,200.00 | 0.00 | 00 00 | No - Unknown |
| 01072 | 03389200 | BATTERY CHARGER ASSEMBLY | | 68-0755 | 3001 Id | 10 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 | No - Unknown |
| 01073 | 03389800 | BATTERY CHARGER ASSEMBLY | | 68-0756 | 3001 Id | 10 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 | |
| 01074 | 03393700 | BATTERY CHARGER ASSEMBLY | | 68-0757 | 3001 Id | 10 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 | |
| 01045 | 20071110 | DIRECTIONAL DRILLING | | | 3001 Id | 12 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 00 | |
| 01061 | 00815600 | REBUILD FLETCHER DDR DRILL | | FCRB8156 | 3001 Id | 12 | 10/01/16 | 19,300.00 | 5,629.16 | 13,670.84 | 01 05 | |
| 01068 | RAVN0016 | ROOF BOLTER REBUILD | FLETCHER RRII-1 | 00141/2011324 | 3001 Id | 12 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 01046 | 20110212 | OVERLAND CONVEYOR-STRUCTURE ELEC/INSTALL | | | 3001 Id | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 01047 | 20110301 | OVERLAND CONVEYOR 48" BELT | | | 3001 Id | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 01138 | 27-00026 | Stacker Conveyor | 42X120 | | 3001 Id | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 00200 | 01605000 | 48 200HP DRIVE W/TAIL SECTION | | | 3001 Id | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 00836 | RAVN0001 | MAINLINE BELT | | | 3001 Id | 20 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 | |
| 00836 | RAVN0005 | 48" MAINLINE BELT & STRUCTURE | | | 3001 Id | 20 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 | |
| 00837 | RAVN0013 | MAINLINE BELT AND STRUCTURE | | | 3001 Id | 20 | 10/01/16 | 3,300.00 | 3,300.00 | 0.00 | 00 00 | |
| 01022 | 27-00022 | BELT TERMINAL GROUP | 42D150HP | N/A | 3001 Id | 20 | 10/01/16 | 2,200.00 | 2,200.00 | 0.00 | 00 00 | |
| 01023 | 27-00023 | BELT TERMINAL GROUP | 48D150HP | N/A | 3001 Id | 20 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 | |
| 01024 | 27-00024 | BELT TERMINAL GROUP | 42D150HP | N/A | 3001 Id | 20 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 | |
| 01025 | 27-00025 | BELT TERMINAL GROUP | 42D150HP | N/A | 3001 Id | 20 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 | |
| 01026 | 27-00036 | BELT TERMINAL GROUP | 42S150HP | N/A | 3001 Id | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 01027 | 27-00037 | BELT TERMINAL GROUP | 42D150HP | N/A | 3001 Id | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| 01028 | 27-00046 | 26000 FT 48 IN BELT | | | 3001 Id | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |

| Asset | Number | Description | Model | Serial | Code | No | Date | Value 1 | Value 2 | Value 3 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X01033 | 64000010 | BELT & STRUCTURE | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01034 | 64000011 | BELT & STRUCTURE | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01035 | 64000012 | BELT & STRUCTURE | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01036 | 64000013 | BELT & STRUCTURE | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01037 | 64000014 | 4TH QTR 42 Inch BELT & STRUCTURE | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01064 | 04265100 | BELT STARTER | | | 3001 ld | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01065 | 03952800 | BELT POWER CENTER | | 14652 | 3001 ld | 20 | 10/01/16 | 900.00 | 900.00 | 0.00 | 00 00 |
| X01077 | 03710400 | 750 KVA POWER CENTER | | 14645 | 3001 ld | 20 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X01078 | 20100968 | 750 KVA POWER CENTER | | 13929 | 3001 ld | 20 | 10/01/16 | 2,500.00 | 2,500.00 | 0.00 | 00 00 |
| X01079 | 03835900 | POWER CENTER & DUAL 250 STARTER | | 13928 | 3001 ld | 20 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X01081 | 03952700 | BELT POWER CENTER | | 14171 | 3001 ld | 20 | 10/01/16 | 2,400.00 | 2,400.00 | 0.00 | 00 00 |
| X01082 | 03940800 | BELT DRIVE | | 14644 | 3001 ld | 20 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | 00 00 |
| X01052 | 27-44232 | CONTINENTAL BELT TERMINAL GROUP | | U48603 | 3001 ld | 20 | 10/01/16 | 5,400.00 | 3,150.00 | 2,250.00 | 00 05 |
| X01071 | 27-45196 | BELT TERMINAL GROUP | 48 Inch BW D200H | 44232 | 3001 ld | 23 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01075 | 01869300 | EIMCO 580 SCOOP | 48D150HP | 45196 | 3001 ld | 23 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01076 | 01869300 | EIMCO 580 SCOOP | | 3972 | 3001 ld | 34 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 |
| X01054 | 35305 | 4 WHEEL DRIVE VEHICHLE-CHEV TAHOE 1500 | | 3972 | 3001 ld | 34 | 10/01/16 | 2,700.00 | 787.50 | 1,912.50 | 01 05 |
| X01040 | 04354500 | MAC 2D DIESEL MANTRIP | | 1GNSKBE0XBR282 | 3001 ld | 36 | 10/01/16 | 24,500.00 | 14,291.66 | 10,208.34 | 00 05 |
| X01050 | 04353900 | MAC 3D DIESEL MANTRIP | | 131 | 3001 ld | 40 | 10/01/16 | 2,800.00 | 1,633.33 | 1,166.67 | 00 05 |
| X01053 | 7-0213 | JOHNSON INDUSTRIES MANTRIP | STINGER | 174 | 3001 ld | 40 | 10/01/16 | 2,900.00 | 1,691.66 | 1,208.34 | 00 05 |
| X01061 | 7-9288 | JOHNSON INDUSTRIES MANTRIP | SXSC | JI213P | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01062 | 03830800 | STINGER MANTRIP | | SXSC288 | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01066 | 07-GT488 | 2011 JI MANTRIP | | J1478P | 3001 ld | 40 | 10/01/16 | 1,600.00 | 933.33 | 666.67 | 00 05 |
| X01067 | 7-9311 | MANTRIP | SXSC48V | SXSC48VGT488 | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01069 | 7-9289 | JOHNSON INDUSTRIES MANTRIP | SXSC | SXSC311 | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01090 | 04332200 | MAC 2D DIESEL MANTRIP | SXSC | SXSC289 | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01056 | 31-10774 | 2010 A.L. LEE ROCKDUSTER | | 126 | 3001 ld | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01057 | 31-10772 | 2010 A.L. LEE TRICKLE-TYPE ROCK DUSTER | BELTMASTER | 10-E10774 | 3001 ld | 42 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01058 | 31-10773 | 2010 A.L. LEE TRICKLE-TYPE ROCK DUSTER | BELTMASTER II | 10-E10772 | 3001 ld | 42 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01175 | 39-47254 | Ventilation Fan | BELTMASTER II | 10-E10773 | 3001 ld | 42 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01177 | 54000002 | Office/Shop Building | Axivane 5 FT | SF47254 | 3001 ld | 60 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01178 | 64000003 | Mine Office Trailers | | | 3001 ld | 68 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00950 | 51000088 | OFFICE SHOP | | | 3001 ld | 68 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00951 | 51000091 | CHANGE HOUSE | | | 3001 ld | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01046 | 04365200 | VACUUM CIRCUIT BREAKER | | 14939 | 3001 ld | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01116 | 15-00025 | Main Substation | | | 3001 ld | 70 | 10/01/16 | 2,800.00 | 2,800.00 | 0.00 | 00 00 |
| X01118 | 15-86861 | BELT POWER SYSTEM | 150KVA | C386-881 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01127 | 15-91585 | Pamco 2500 KVA Enclosed Substation | 2500KVA | L181-595 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01128 | 15-R1418 | BELT POWER CENTER | 500KVA | R141B | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01130 | 15-R2245 | BELT POWER SYSTEM | 225KVA | R2245 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00288 | 00079203 | CHARGING STATION FOR CH810 UN-A-HAU | | 9503-2964-9 | 3001 ld | 72 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X00289 | 00079101 | CHARGING STATION FOR CH810 COAL HAU | | 8410-2871-6 | 3001 ld | 72 | 10/01/16 | 2,100.00 | 2,100.00 | 0.00 | 00 00 |
| X00290 | 00079102 | CHARGING STATION FOR CH810 COAL HAU | | 9411-2887-92 | 3001 ld | 72 | 10/01/16 | 1,300.00 | 1,300.00 | 0.00 | 00 00 |
| X00291 | 00079102A | CHARGING STATION FOR CH810 COAL HAU | | | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00944 | 15-U3374 | POWER CENTER | 300 KVA | U3374 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00945 | 15-U3375 | POWER CENTER | 300 KVA | U3375 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01070 | 15-26414 | BATTERY CHARGING POWER CENTER | 500 KVA | 26414500807 | 3001 ld | 72 | 10/01/16 | 500.00 | 500.00 | 0.00 | 00 00 |
| X01088 | 15-26037 | POWER CENTER | 300 KVA | 26037300607 | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01038 | 64000015 | OCENCO SELF RESCUERS | | | 3001 ld | 72 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01039 | 20061002 | REFUGE CHAMBER | | 452136-04 | 3001 ld | 79 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01042 | 20111211 | REFUGE CHAMBER 66" | | 453797-01 | 3001 ld | 79 | 10/01/16 | 1,500.00 | 1,500.00 | 0.00 | 00 00 |
| X01043 | 004538800 | MSHA UPDATES-LIFE CHAMBER | 13RF-M2630-3.5 | 453797-01-13 | 3001 ld | 79 | 10/01/16 | 2,800.00 | 2,800.00 | 0.00 | 00 00 |
| X01044 | 04286800 | MSHA UPDATES-LIFE CHAMBER | 13RF-M3630-3.5 | 452136-04-13 | 3001 ld | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 |
| X01059 | 03939300 | MINE MONITORING SYSTEM | | MC-4010-WM | 3001 ld | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 |
| X01090 | 20101003 | CO2 MINE MONITORING SYSTEM | | | 3001 ld | 79 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 |
| X01087 | 20110702 | SPOTTERS AND SAFELY EQUIPMENT | | | 3001 ld | 79 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 |
| X01051 | 29-13943 | 2007 STAMLER FEEDER BREAKER | BF-17A-54-105C | 13943 | 3001 ld | 9 | 10/01/16 | 1,400.00 | 1,400.00 | 0.00 | 00 00 |
| X00298 | 01382600 | 2004 Jeep Grand Cherokee | | 1J4GW48N44C318 | 4001 A | 36 | 10/01/16 | 3,900.00 | 3,900.00 | 0.00 | 00 00 |
| X00413 | 02173100 | 4WD VEHICLE | | 1GNFK13097R253 | 4001 A | 36 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00445 | 03150200 | 4 WHEEL DRIVE VEHICLE | | 1GFK13057R29166 | 4001 A | 36 | 10/01/16 | 17,500.00 | 10,266.66 | 7,333.34 | 00 05 |
| X00551 | 03788700 | 2010 CHEV SPORT UTILITY | | 1GNUKBE06AR236 | 4001 A | 36 | 10/01/16 | 13,500.00 | 7,875.00 | 5,625.00 | 00 05 |
| X00776 | 14-51096 | PICK-UP (SUV) | TAHOE | 1GNFK230X9R251 | 4001 A | 36 | 10/01/16 | 20,800.00 | 12,133.33 | 8,666.67 | 00 05 |
| X00253 | 00200400 | MINE RESCUE APPARATUS BG4 BREATHING | BG4 | | 4001 A | 36 | 10/01/16 | 15,700.00 | 9,158.33 | 6,541.67 | 00 05 |
| X00337 | 01667600 | PLOTTER | | | 4001 A | 44 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 |
| X00387 | 20050701 | TELEPHONE SYSTEM-ST. CHARLES OFFICE | | | 4001 A | 60 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00080 | 00078500 | NEW ADMIN OFFICE | | | 4001 A | 60 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00081 | 00078500A | NEW ADMIN OFFICE | | | 4001 A | 60 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00273 | 01191700 | STORAGE FACILITY | | | 4001 A | 58 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00274 | 01191800 | WAREHOUSE EXTENSION | | | 4001 A | 58 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X01179 | 64000005 | Office Building | | | 4001 A | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00162 | 00080200 | SURVEYING EQUIPMENT - A802 | | | 4001 A | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| X00974 | 08-98644 | KENWORTH ROLLBACK TRUCK | W900B | 2XKWDB0X5PM59 | 5001 C | 26 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 |

| ID | Asset No | Description | Model | Serial No | Acct | Loc | Date | Cost | Depr | Book Value | Code | Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X00661 | 20051202 | 2009 CHEVROLET TAHOE BLACK GM | | | 5001 C | | | 7,834.67 | | 00 05 | | |
| X01019 | 14-68585 | 2002 Ford F350 Truck | F350 | 1FTSW31F62E958 | 5001 C | | | 11,400.00 | 6,850.00 | 4,750.00 | 00 05 | |
| X01092 | 08810800 | CHEVROLET 4X4 BLASTING TRUCK | | 1FTSW31F62E958 | 5001 C | 36 | | 15,900.00 | 9,275.00 | 6,625.00 | 00 00 | |
| X00060 | 00078131 | THURMON 75T STEEL DECK TRUCK | | | 5001 C | | | | | | 00 00 | |
| X00855 | 07-00926 | MANTRIP | RTV900 | C0926 | 5001 C | 38 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 | |
| X00748 | 20120209 | CONTRUCT 2 RAW COAL TRUCK DUMPS | | | 5001 C | 44 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00749 | 20120210 | PAVING ROADWAYS | | | 5001 C | 58 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00750 | 20120211 | PAVING ROADWAY ST. CHARLES | | | 5001 C | 58 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00751 | 20120212 | CONSTRUCT ADDITIONAL OFFICES | | | 5001 C | 58 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00814 | 20121101 | CONSTRUCT ADDL OFFICE | | | 5001 C | 56 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00057 | 00078042 | WELDTECH 60 TON STEEL SCALE | | | 5001 C | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00446 | 20070302 | INFRARED ANALYSIS CAMERA | | | 5001 C | 68 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00447 | 20070303 | MAX THE MACHINE EQUIPMENT ANALYZER | | | 5001 C | 68 | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 00 | |
| X00588 | 20070304 | ALL-TEST VIBRATION EQUIPMENT | | | 5001 C | 68 | 10/01/16 | 300.00 | 300.00 | 0.00 | 00 00 | |
| X00588 | 20100505 | 60" MAP PLOTTER | | | 5001 C | 68 | 10/01/16 | 400.00 | 400.00 | 0.00 | 00 00 | |
| X00541 | 20090803 | REFUGE CHAMBER UNIT | | | 5001 C | 75 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00879 | 8899 | MINE RESCUE TRUCK | TC7C042 | | 5001 C | 79 | 10/01/16 | 1,100.00 | 1,100.00 | 0.00 | 00 00 | |
| X01000 | 20100602 | TWO FIRE FIGHTING BRIGADES | | 1GDK7C1C67F403 | 5001 C | 79 | 10/01/16 | 14,400.00 | 8,400.00 | 6,000.00 | 00 00 | |
| X01001 | 20120701 | HIGH VOLUME DRYER AND OXYGEN PUMP | | | 5001 C | 79 | 10/01/16 | 3,300.00 | 3,300.00 | 0.00 | 00 05 | |
| X01051 | LMPDM | (24) THERMO | 3700 | | 5001 C | 79 | 10/01/16 | 1,800.00 | 1,800.00 | 0.00 | 00 00 | |
| X00952 | 20080301 | TRIMBLE GPS SURVEY SYSTEM | | SS11A05329 | 5001 C | 8 | 10/01/16 | 34,300.00 | 10,004.16 | 24,295.84 | 01 05 | |
| X00754 | 20120215 | 1 MAGNETIC SEPARATOR & SPIRAL BANK | | | 5009 P | 8 | | 100.00 | 100.00 | 0.00 | 00 00 | |
| X00752 | 20120213 | AUTOMATE AND RELOCATE POWM TRUCK SCALE | | | 5009 P | 21 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| X00753 | 20120214 | UPGRADE HAUL ROAD FOR POWM MINES | | | 5009 P | 23 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| X00756 | 20120216 | 500 KVA TRANSFORMER STATION | | | 5009 P | 56 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | Yes |
| X00299 | 20040600 | REFUSE CONVEYOR | | | 5009 P | 72 | 10/01/16 | 18,900.00 | 5,512.50 | 13,387.50 | 01 05 | Yes |
| X00493 | 00584700 | REPLACE 36" CONVEYOR WITH 48" | | | 6012 P | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00665 | 20110705 | CLEAN COAL EXPANSION | | | 6012 P | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00779 | 04347400 | CLEAN COAL TRIPPER BELT | | | 6012 P | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00004 | 00046105 | OUTSIDE STACKER (HUFF CREEK) | | | 6012 P | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00175 | 00061400 | RAW COAL BYPASS SYSTEM | | | 6012 P | 20 | 10/01/16 | 500.00 | 0.00 | 500.00 | 00 00 | |
| X00181 | 00081400A | RAW COAL BYPASS SYSTEM | | | 6012 P | 20 | 10/01/16 | 5,500.00 | 0.00 | 5,500.00 | 00 00 | |
| X00451 | 20070501 | OVERLAND REFUSE CONVEYOR EXTENSION | | | 6012 P | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00866 | 51000102 | 48 IN MAINLINE BELT & STRUCTURE | | | 6012 P | 20 | 10/01/16 | 2,400.00 | 2,490.00 | 0.00 | 00 00 | |
| X00669 | 51000103 | 48IN MAINLINE BELT AND STRUCTURE | | | 6012 P | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00617 | 20100902 | MAGNETIC SEPARATOR | | | 6012 P | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00784 | 20120502 | COMPUTER PLC SYSTEM | | | 6012 P | 21 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00072 | 00078301 | PREPARATION PLANT | | | 6012 P | 21 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00073 | 00078301A | PREP PLANT & UPGRADE | | | 6012 P | 22 | 10/01/16 | 11,200.00 | 0.00 | 11,200.00 | 00 00 | |
| X00074 | 00078328 | UNIT TRAIN LOADOUT FACILITY - OFF | | | 6012 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00076 | 00078402 | LOADOUT BELT SCALE | | | 6012 P | 22 | 10/01/16 | 2,800.00 | 0.00 | 2,800.00 | 00 00 | |
| X00077 | 00078402A | LOADOUT BELT SCALE | | | 6012 P | 22 | 10/01/16 | 300.00 | 0.00 | 300.00 | 00 00 | |
| X00078 | 00078403 | LOADOUT NEW BELT | | | 6012 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00075 | 00078404 | JEFFERY LINE FEEDER | | | 6012 P | 22 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 | |
| X00109 | 00078302 | PREP PLANT UPGRADE | | | 6012 P | 22 | 10/01/16 | 100.00 | 0.00 | 100.00 | 00 00 | |
| X00146 | 00082000 | PREP PLANT ADDITION | | | 6012 P | 22 | 10/01/16 | 161,200.00 | 0.00 | 161,200.00 | 00 00 | |
| X00149 | 00078302A | PREP PLANT UPGRADE | | | 6012 P | 22 | 10/01/16 | 4,800.00 | 0.00 | 4,800.00 | 00 00 | |
| X00193 | 20001100 | SECONDARY COAL SAMPLER | Job #99-8-1360 | | 6012 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 | |
| X00194 | 20001200 | TRASH SCREEN | | | 6012 P | 22 | 10/01/16 | 500.00 | 0.00 | 500.00 | 00 00 | |
| X00269 | 20021400 | UPGRADE BYPASS COAL SCREENING SYSTEM | | F09N07848 | 6012 P | 22 | 10/01/16 | 500.00 | 0.00 | 500.00 | 00 00 | |
| X00357 | 00626700 | ELECTRONIC RAILROAD CAR SCANNER | | | 6012 P | 22 | 10/01/16 | 4,200.00 | 0.00 | 4,200.00 | 00 00 | |
| X00357 | 20050201 | FINE COAL CIRCUIT UPGRADE | | | 6012 P | 22 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 | |
| X00368 | 20060205 | INCREASE FEED RATE PLANT UPGRADE | | | 6012 P | 22 | 10/01/16 | 8,800.00 | 0.00 | 8,800.00 | 00 00 | |
| X00383 | 091190900 | PUMP SYSTEM | | | 6012 P | 22 | 10/01/16 | 600.00 | 0.00 | 600.00 | 00 00 | |
| X00384 | 01191000 | SMALL COAL DRYER CENTRIFUGE | | | 6012 P | 22 | 10/01/16 | 100.00 | 100.00 | 0.00 | 00 00 | |
| X00455 | 02199800 | LIWELL SCREEN | | B2509-938 | 6012 P | 22 | 10/01/16 | 700.00 | 700.00 | 0.00 | 00 00 | |
| X00521 | 01158900 | DEEP CONE THICKENER | | | 6012 P | 22 | 10/01/16 | 2,000.00 | 0.00 | 2,000.00 | 00 00 | |
| X00522 | 03216100 | NEW SKID LOADER | | | 6012 P | 24 | 10/01/16 | 23,400.00 | 0.00 | 23,400.00 | 00 00 | |
| X00315 | 01529000 | SKID STEER LOADER | | MST00781 | 6012 P | 24 | 10/01/16 | 3,300.00 | 1,825.00 | 1,375.00 | 00 00 | |
| X00507 | 03468100 | 1998 CAT WHEEL LOADER REBUILD | 980G | 2KR02704 | 6012 P | 24 | 10/01/16 | 45,700.00 | 26,658.33 | 19,041.67 | 00 00 | |
| X00318 | 22940R | 1995 CAT WHEEL LOADER - USED | 980G | 2KR03124 | 6012 P | 24 | 10/01/16 | 46,500.00 | 27,125.00 | 19,375.00 | 00 00 | |
| X00868 | 2124 | CATERPILLAR 980H LOADER | | JM5998 | 6012 P | 24 | 10/01/16 | | | | | |
| X00890 | 02181300 | 2010 CAT 960H LOADER | 980H HL | JM505717 | 6012 P | 24 | 10/01/16 | 171,000.00 | 49,875.00 | 121,125.00 | 01 05 | |
| X00920 | 02-05717 | 1995 CAT WHEEL LOADER - CERT REBUILD | 980F | 50W05826 | 6012 P | 24 | 10/01/16 | 80,600.00 | 23,506.33 | 57,091.67 | 01 05 | |
| X00921 | 02-75001 | 2008 USED CAT 420E BACKHOE | 420-E | 0HL508256 | 6012 P | 24 | 10/01/16 | 9,500.00 | 5,541.66 | 3,958.34 | 01 05 | |
| X00976 | 05-08256 | CAT 773B HAUL TRUCK 5/85 | CAT 773B | 63W01496 | 6012 P | 26 | 10/01/16 | 4,800.00 | 4,600.00 | 0.00 | 00 00 | |
| X00187 | 00534200 | REBUILD 773 TRUCK | | 63W04615 | 6012 P | 26 | 10/01/16 | 57,000.00 | 18,625.00 | 40,375.00 | 00 00 | |
| X00345 | 00534100 | CATERPILLAR ARTICULATED TRUCK | | AGF0131S | 6012 P | 26 | 10/01/16 | 9,900.00 | 2,887.50 | 7,012.50 | 01 05 | |
| X00469 | 03269400 | 1998 CAT HAUL TRUCK | 773D | 7ER00744 | 6012 P | 26 | 10/01/16 | 4,500.00 | 2,625.00 | 1,875.00 | 01 05 | |
| X00138 | 3774 | CAT 773B TRUCK | | 63W04615 | 6012 P | 28 | 10/01/16 | 81,300.00 | 35,758.33 | 25,541.67 | 00 00 | |
| X00136 | 02430700 | WATER TRUCK | | AFX00190 | 6012 P | 28 | 10/01/16 | 13,800.00 | 8,050.00 | 5,750.00 | 00 05 | |
| X00644 | 03873900 | | | | | | | 16,500.00 | 9,825.00 | 6,675.00 | 00 05 | |

| ID | Number | Description | Model |
|---|---|---|---|
| I00817 | 08-30952 | 2011 PETERBILT WATER TRUCK | |
| I00619 | 03819800 | CAT HAUL TRUCK | |
| I00918 | 01-85133 | 2002 KOMATSU EXCAVATOR | PC400LC |
| I00001 | 00020369 | 1993 CAT D9N DOZER | |
| I00221 | 00087750 | CATERPILLAR D10N DOZER | |
| I00222 | 00087750A | REBUILD CAT D10N (87750) | |
| I00223 | 00087580 | CATERPILLAR D10N DOZER | |
| I00308 | 01339400 | EXCAVATOR | |
| I00396 | 08778500 | REBUILD CAT D10 DOZER | |
| I00618 | 02100903 | REBUILT D10 DOZER | |
| I00668 | 00537600 | CAT D7 DOZER | |
| I00872 | 1641 | 2002 CAT DOZER | |
| I00888 | 02011500 | CATERPILLAR D10T DOZER | D9R |
| I00916 | 01-13707 | 2004 CAT DOZER | D6R |
| I00922 | 06-13960 | 1990 Cat Grader | 12G |
| I00827 | 06-8455X | 1998 CHAMPION GRADER | 720A |
| I00827 | 140474 | 2008 CHEV FLAT BED PICK-UP | S3500 |
| I00854 | 140355 | 2006 CHEV EXT CAB PICK-UP | 2500HD |
| I00943 | 140451 | 2006 CHEV EXT CAP PICK-UP | 2500 HD |
| I00996 | 01971700 | 2007 CHEVY TAHOE | |
| I01013 | 08-05876 | 1991 GMC TRUCK | Topkick |
| I01015 | 08-66829 | 2001 International Truck | 4700DT466E |
| I01016 | 08-94064 | 2001 International Truck | DT466E |
| I00486 | 03403600 | CERTIFIED CRANE | |
| I00871 | 8202 | MECHANIC'S TRUCK | |
| I00581 | 03729100 | BOOM LIFT | TC7C042 |
| I00225 | 00087491 | CATERPILLAR 16G GRADER | |
| I00271 | 01178800 | CAT BACKHOE LOADER 420D | 420D |
| I00163 | 00072100 | LOADOUT RAIL EXTENSION - A721 | |
| I00161 | 00071100 | SUPPLEMENTAL WATER SYSTEM - A711 | |
| I00070 | 00078225 | OFFICE/SHOP (PREP PLANT) | |
| I00164 | 00072200 | HEAVY EQUIPMENT SHOP - A722 | |
| I00862 | 53100041 | BATHHOUSE TRAILER | |
| I00536 | 20090902 | RELOCATION OF ELECTRICAL SUBSTATION | |
| I01187 | 64000016 | DOUBLE ROLL CRUSHER | |
| I01168 | 64000017 | MAGNETIC SEPARATORS (4) | 24x30 DBL ROLL |
| I01118 | 64000018 | CERAMIC SIEVE BOXES (6) | |
| I00813 | 04501700 | COAL ANALYZER | |
| I00528 | 00600000 | REBUILD D10 CAT DOZER | 840074 |
| I00529 | 00536200 | REBUILD D9 DOZER | |
| I00997 | 03696800 | 2010 F350 WAREHOUSE DELIVERY TRUCK | |
| I01020 | 14-96014 | 2001 Ford F350 Truck | F350 |
| I00946 | 20140201 | CTS-100 DUST | CTS-100 |
| I00746 | 20120208 | CONVERT DAYS CREEK INCLINE CONV 2 FABRIC | |
| I00137 | 00041600 | CONVEYOR SYSTEM | |
| I00145 | 00041600A | CONVEYOR SYSTEM | |
| I00150 | 00041600B | CONVEYOR SYSTEM-CONSTRUCTION INTEREST | |
| I00174 | 00018160 | DAYS CREEK MATERIAL SIZER | |
| I00317 | 01572100 | D9 DOZER | |
| I00757 | 04304500 | REBUILD CAT D9R DOZER POWM | |
| I00917 | 01-75001 | 1997 CAT DOZER - CERT RBUILD | D9R-CCR |
| I00760 | 04277400 | FAIRCHILD SCOOPS | |
| I00761 | 04295000 | FAIRCHILD SCOOPS | |
| I00307 | 01561000 | PICKUP TRUCK | |
| I00378 | 01972500 | PICKUP TRUCK | |
| I01018 | 14-34084 | 2004 Ford F250 Truck | F250 |
| I00468 | 03353100 | BATTERY POWERED 2 PERSON CARE RIDE-6C | |
| I00642 | 20110201 | 48 VT BATTERY SUPER CAR | |
| I00850 | 20110402 | NEW OFFICE BUILDING 6C | |
| I00113 | 00085002 | POWER LINE (BLACK MOUNTAIN) | |
| I00114 | 00085002A | SUBSTATION & POWERLINES | |
| I00768 | 20120223 | MINERS ACT COMMUNICATION | |

| Serial | Class | | Date | Cost | Depr | Net Book | Flags |
|---|---|---|---|---|---|---|---|
| | 6012 P | 30 | 10/01/16 | 136,700.00 | 39,870.63 | 96,829.17 | 01 05 |
| EED001156 | 6012 P | 30 | 10/01/16 | 800.00 | 800.00 | 0.00 | 00 05 |
| 1JD03654 | 6012 P | 30 | 10/01/16 | 67,500.00 | 39,375.00 | 28,125.00 | 00 05 |
| 2YD01250 | 6012 P | 30 | 10/01/16 | 61,900.00 | 36,108.33 | 25,791.67 | 00 05 |
| 2YD01250 | 6012 P | 30 | 10/01/16 | 12,500.00 | 7,291.66 | 5,208.34 | 00 05 |
| 2YD01058 | 6012 P | 30 | 10/01/16 | 64,300.00 | 37,508.33 | 26,791.67 | 00 05 |
| CR800761 | 6012 P | 30 | 10/01/16 | 40,000.00 | 11,666.66 | 28,333.34 | 01 05 |
| 2YD01250 | 6012 P | 30 | 10/01/16 | 12,000.00 | 7,000.00 | 5,000.00 | 00 05 |
| | 6012 P | 30 | 10/01/16 | 85,400.00 | 24,908.33 | 60,491.67 | 01 05 |
| 3DN60299 | 6012 P | 30 | 10/01/16 | 51,600.00 | 35,933.33 | 25,666.67 | 00 05 |
| ABK00541 | 6012 P | 30 | 10/01/16 | 155,000.00 | 45,208.33 | 109,791.67 | 01 05 |
| RJG00611 | 6012 P | 30 | 10/01/16 | 142,000.00 | 82,833.33 | 59,166.67 | 01 05 |
| 4ZF13707 | 6012 P | 30 | 10/01/16 | 6,500.00 | 3,791.66 | 2,708.34 | 00 05 |
| 61M13960 | 6012 P | 32 | 10/01/16 | 36,200.00 | 21,116.66 | 15,083.34 | 00 05 |
| X028455X | 6012 P | 32 | 10/01/16 | 33,800.00 | 19,715.66 | 14,083.34 | 00 05 |
| 1GBJK34U55E2724 | 6012 P | 36 | 10/01/16 | 7,300.00 | 4,258.33 | 3,041.67 | 00 05 |
| 1GCHK29U55E273 | 6012 P | 36 | 10/01/16 | 8,100.00 | 4,725.00 | 3,375.00 | 00 05 |
| 1GCHK29U05E272 | 6012 P | 36 | 10/01/16 | 8,100.00 | 4,725.00 | 3,375.00 | 00 05 |
| 10541 | 6012 P | 36 | 10/01/16 | 13,500.00 | 7,875.00 | 5,625.00 | 00 05 |
| 1GDL7H1JX4J505 | 6012 P | 36 | 10/01/16 | 2,500.00 | 1,458.33 | 1,041.67 | 00 05 |
| 1HTSCAAN21H366 | 6012 P | 36 | 10/01/16 | 4,800.00 | 2,800.00 | 2,000.00 | 00 05 |
| 1HTSCAAL31H394 | 6012 P | 36 | 10/01/16 | 4,800.00 | 2,800.00 | 2,000.00 | 00 05 |
| 12382 | 6012 P | 36 | 10/01/16 | 8,600.00 | 5,016.66 | 3,583.34 | 00 05 |
| 1GDM7C1C76F427 | 6012 P | 36 | 10/01/16 | 13,100.00 | 7,641.66 | 5,458.34 | 00 05 |
| 0300097320 | 6012 P | 39 | 10/01/16 | 6,400.00 | 3,733.33 | 2,666.67 | 00 05 |
| 93U02921 | 6012 P | 44 | 10/01/16 | 33,400.00 | 19,483.33 | 13,916.67 | 00 05 |
| 7BJ77954 | 6012 P | 44 | 10/01/16 | 1,900.00 | 1,900.00 | 0.00 | 00 00 |
| | 6012 P | 50 | 10/01/16 | 600.00 | 0.00 | 600.00 | 00 00 |
| | 6012 P | 56 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6012 P | 56 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6012 P | 65 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6012 P | 66 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6012 P | 72 | 10/01/16 | 18,600.00 | 5,425.00 | 13,175.00 | 01 05 |
| | 6013 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 Yes |
| | 6013 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 Yes |
| | 6013 P | 22 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 Yes |
| 840074 | 6526 L | 30 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| 2YD01058 | 6526 L | 30 | 10/01/16 | 37,500.00 | 21,933.33 | 15,666.67 | 00 05 |
| 1JD3654 | 6526 L | 30 | 10/01/16 | 60,000.00 | 35,000.00 | 25,000.00 | 00 05 |
| 1FTWF3BR5AEA22 | 6526 L | 36 | 10/01/16 | 17,100.00 | 9,975.00 | 7,125.00 | 00 05 |
| 1FTSF31F61EB6606 | 6526 L | 36 | 10/01/16 | 9,200.00 | 5,366.66 | 3,833.34 | 00 05 |
| | 6526 L | 42 | 10/01/16 | 2,700.00 | 2,700.00 | 0.00 | 00 00 |
| | 6802 B | 18 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6802 B | 20 | 10/01/16 | 63,400.00 | 0.00 | 63,400.00 | 00 00 |
| | 6802 B | 20 | 10/01/16 | 700.00 | 0.00 | 700.00 | 00 00 |
| | 6802 B | 20 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6802 B | 30 | 10/01/16 | 900.00 | 0.00 | 900.00 | 00 00 |
| 7XM04355 | 6802 B | 30 | 10/01/16 | 137,900.00 | 80,441.66 | 57,458.34 | 01 05 |
| 7XM75001 | 6802 B | 30 | 10/01/16 | 66,400.00 | 19,366.66 | 47,033.34 | 01 05 |
| 7XM022419/7XM750 | 6802 B | 30 | 10/01/16 | 84,400.00 | 24,616.66 | 59,783.34 | 01 05 |
| T337-254 | 6802 B | 34 | 10/01/16 | 17,200.00 | 5,016.66 | 12,183.34 | 01 05 |
| T337-267 | 6802 B | 34 | 10/01/16 | 17,200.00 | 5,016.66 | 12,183.34 | 01 05 |
| 3D7KS26D45G769 | 6802 B | 36 | 10/01/16 | 8,100.00 | 4,725.00 | 3,375.00 | 00 05 |
| 1FTNF31536EC9426 | 6802 B | 36 | 10/01/16 | 4,000.00 | 2,333.33 | 1,666.67 | 00 05 |
| 1FTNF21L04EA3406 | 6802 B | 36 | 10/01/16 | 6,100.00 | 3,558.33 | 2,541.67 | 00 05 |
| GT011 | 6802 B | 40 | 10/01/16 | 200.00 | 200.00 | 0.00 | 00 00 |
| | 6802 B | 40 | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 00 |
| | 6802 B | 40 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6802 B | 74 | 10/01/16 | 600.00 | 600.00 | 0.00 | 00 00 |
| | 6802 B | 74 | 10/01/16 | 0.00 | 0.00 | 0.00 | 00 00 |
| | 6802 B | 79 | 10/01/16 | 13,700.00 | 3,995.83 | 9,704.17 | 01 05 |

**Grand Total**

Count = 665

| | | | |
|---|---|---|---|
| Revised total LMP asset values | 10,104,300.00 | 4,111,212.76 | 5,993,087.24 |
| Original LMP asset values | $ 10,180,500.00 | $ 4,134,825.25 | $ 6,045,674.75 |
| Value of Powell Mountain Assets | 21,000.00 | 7,612.50 | 13,387.50 |

Report Name:

DEBTORSLCC_105841

## SCHEDULE 1.01(N)

### NRP LEASES

| NRP Lease | Original Lessee | Date | Recording/Mine Information |
|---|---|---|---|
| J.M. Huber Corporation (now WPP LLC) | Bell County Coal Corporation | 9/1/87 | Memorandum Recorded in Bell County at Lease Book 50, Page 626<br><br>WPP, LLC c/o NRP LLC, 5260 Irwin Rd. Huntington, WV 25705<br><br>Applicable to D1, D1A and D4 |
| J.M. Huber Corporation (now WPP, LLC – Tipple Lease) | Bell County Coal Corporation | 9/1/87 | WPP, LLC c/o NRP LLC, 5260 Irwin Rd. Huntington, WV 25705 |
| Amended, Consolidated and Restated Lease and Sublease with ACIN LLC | Revelation Energy, LLC | 7/31/15 | Unrecorded<br><br>Applicable to Black Mountain |
| WPP LLC | Revelation Energy, LLC | 10/1/16 | Unrecorded; WPP LLC c/o NRP (Operating) 5260 Irwin Rd Huntington WV 25705<br><br>Applies to D2 and S28 |
| ACIN LLC | Revelation Energy, LLC | 4/1/16 | Unrecorded.<br><br>Applicable to D15 and D19 |
| WPP LLC | Vansant Coal Corporation | 10/24/11; 4/1/16 | Unrecorded.<br><br>Applicable to D18 |

Schedule 1.01(N)

DEBTORSLCC_105842

## SCHEDULE 1.01(P)

## EXISTING LIENS

| Loan Party | Existing Lien |
|---|---|
| Blackjewel L.L.C. | Lien granted in favor of Caterpillar Financial Services Corporation, pursuant to the documents described in Section D of Schedule 1.01(E-2) as in effect on the date hereof, on collateral that includes equipment and assets. |
| Blackjewel L.L.C. | Lien granted in favor of MR Coal Marketing & Trading LLC and Noble Americas Corp., pursuant to the documents described in Section B of Schedule 1.01(E-2) as in effect on the date hereof, on collateral that includes real property located in Harlan, Bell and Leslie counties in Kentucky and personal property located thereon. |
| Blackjewel L.L.C. | Lien granted in favor of United Bank, Inc., pursuant to the Second Amended and Restated Loan and Security Agreement described in Section C-1 of Schedule 1.01(E-2) as in effect on the date hereof, on collateral that includes accounts, receivables, a first lien/mortgage on Borrower's facilities at Jackson, Kentucky, a key man life insurance policy and equipment.<br><br>Lien granted in favor of United Bank, Inc., pursuant to the Business Loan Agreement described in Section C-2 of Schedule 1.01(E-2), on collateral that includes certain equipment. |
| Blackjewel L.L.C. | Lien granted in favor of Julia L. McAfee and Carl E. McAfee; Dean McAfee Holdings, LLC; Jeffery Paul Dean, Trustee of the Trust for Jeffery Paul Dean (GS Exempt), under Agreement dated August 29, 2008; Donna Mae Kolb, Trustee for the Trust for Donna Mae Kolb (GS Exempt), under Agreement dated August 29, 2008; and Aubra Brian Dean, Trustee for the Trust for Aubra Brian Dean (GS Exempt), under Agreement dated August 29, 2008, as successors in interest to the Estate of Aubra Paul Dean, pursuant to the documentation described in Section A of Schedule 1.01(E-2) as in effect on the date hereof, on collateral that includes personal and real property located in Harlan County, Kentucky. |

Schedule 1.01(P)

DEBTORSLCC_105843

## SCHEDULE 1.01(R)

## REVELATION RECLAMATION OBLIGATIONS

| Month | Reclamation Obligation |
|---|---|
| July 2017 | $769,000 |
| August 2017 | $749,000 |
| September 2017 | $749,000 |
| October 2017 | $749,000 |
| November 2017 | $749,000 |
| December 2017 | $749,000 |
| January 2018 | $5,400,000 |
| February 2018 | $3,000,000 |
| March 2018 | $2,500,000 |
| April 2018 | $621,667 |
| May 2018 | $621,667 |
| June 2018 | $621,667 |
| July 2018 | $621,667 |
| August 2018 | $621,667 |
| September 2018 | $621,667 |
| October 2018 | $621,667 |
| November 2018 | $621,667 |
| December 2018 | $621,667 |
| January 2019 | $400,000 |
| February 2019 | $400,000 |
| March 2019 | $400,000 |

Schedule 1.01(R)

| | |
|---|---|
| April 2019 | $400,000 |
| May 2019 | $400,000 |
| June 2019 | $400,000 |
| July 2019 | $400,000 |

Schedule 1.01(R)

DEBTORSLCC_105845

## SCHEDULE 6.02

## CERTAIN INFORMATION REGARDING CAPITALIZATION OF BORROWER AND ITS SUBSIDIARIES

| Name | Jurisdiction of Incorporation or Formation | Equity Interests and Owners Thereof |
|---|---|---|
| Blackjewel Holdings L.L.C. | Delaware | Blackjewel Investment L.L.C. (37.5%); Lime Rock Partners (62.5%) |
| Blackjewel L.L.C. | Delaware | Wholly-owned by Blackjewel Holdings L.L.C. |
| Vansant Coal Corporation | Virginia | Wholly-owned by Blackjewel L.L.C. |
| Omega Mining LLC | Virginia | Wholly-owned by Blackjewel L.L.C. |
| Dominion Coal Corporation | Virginia | Wholly-owned by Blackjewel L.L.C. |
| Harold Keene Coal Co. LLC | Virginia | Wholly-owned by Blackjewel L.L.C. |
| Energy Resources, LLC | Virginia | Wholly-owned by Harold Keene Coal Co. LLC |

Schedule 6.02

DEBTORSLCC_105846

**SCHEDULE 6.06**

**LITIGATION**

None.

DEBTORSLCC_105847

## SCHEDULE 6.11

## CONSENTS AND APPROVALS

1. Consent made by Caterpillar Financial Services Corporation under each of the CAT Financing Documents (as defined therein) in favor of Revelation Energy, LLC and Blackjewel L.L.C. and Riverstone Credit Partners – Direct, L.P., in respect of, among other things, the Transactions (as defined in the Credit Agreement).

2. Consent made by Julia L. McAfee and Carl E. McAfee, Dean McAfee Holdings, LLC, Jeffery Paul Dean, Trustee of the Trust for Jeffery Paul Dean (GS Exempt), under Agreement dated August 29, 2008; Donna Mae Kolb, Trustee for the Trust for Donna Mae Kolb (GS Exempt), under Agreement dated August 29, 2008; and Aubra Brian Dean, Trustee for the Trust for Aubra Brian Dean (GS Exempt), under Agreement dated August 29, 2008 as successors in interest to the Estate of Aubra Paul Dean under each of the Senior Secured Party Agreements (as defined therein) in favor of Revelation Energy, LLC and Blackjewel, L.L.C. in respect of, among other things, the Transactions (as defined in the Credit Agreement).

3. Consent among MR Coal Marketing & Trading, LLC, Noble Americas Corp, Revelation Energy, LLC, Blackjewel L.L.C. and Riverstone Credit Partners – Direct, L.P., in respect of, among other things, the Transactions (as defined in the Credit Agreement).

4. Consent made by United Bank, Inc. under each of the United Bank Loan Agreements (as defined therein), in favor of Revelation Energy, LLC, Blackjewel L.L.C. and Riverstone Credit Partners – Direct, L.P., in respect of, among other things, the Transactions (as defined in the Credit Agreement).

Schedule 6.11

DEBTORSLCC_105848

**SCHEDULE 6.12**

AMOUNTS DUE UNDER EXSITING DEBT DOCUMENTS

| CAT Payment | $3,325,847.13 |
|---|---|
| United Bank Payment | $127,689.57 |

Schedule 6.12

DEBTORSLCC_105849

**SCHEDULE 6.13**

**INSURANCE**

[See attached]

Schedule 6.12

DEBTORSLCC_105850

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**07/11/2017**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Heather Hammond |
|---|---|
| Black Diamond Insurance Group, LLC<br>P.O. Box 99<br>Stanville, KY 41659 | PHONE (A/C, No, Ext): (606)478-2400  FAX (A/C, No): (606)478-2401<br>E-MAIL ADDRESS: heather@blackdiamondinsurancegroup.com |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| **INSURED** | Revelation Energy Holdings, LLC<br>1051 Main Street<br>Milton, WV 25541 | INSURER A : Great Midwest Insurance Company | 18694 |
| | | INSURER B : AIG (New Hampshire Insurance Company) | 23841 |
| | | INSURER C : Kentucky Employers' Mutual Insurance | 10320 |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:  00000000-4017769    REVISION NUMBER:  3

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE  X OCCUR | Y | | GL00097044-02 | 10/05/2016 | 10/05/2017 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>X POLICY  ☐ PROJECT  ☐ LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ OWNED AUTOS ONLY  X SCHEDULED AUTOS<br>X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | Y | | CA00084402-02 | 10/05/2016 | 10/05/2017 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR<br>☐ EXCESS LIAB  X CLAIMS-MADE | | | CX00097044-02 | 10/05/2016 | 10/05/2017 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | 33808868 | 10/05/2016 | 10/05/2017 | X PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | WC (KY Surface) | | | 394649 | 10/05/2016 | 10/05/2017 | | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
See Acord 101 for All Individual Named Insureds on Policies listed above.

Certificate Holder is listed as Additionally Insured with a 30 day notice of cancellation on a Primary and Noncontributory Basis.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Riverstone Credit Partners - Direct L.P.<br>Jefferies LLC<br>712 Fifth Avenue 19th Floor<br>New York, NY 10019 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>(HRH) |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

Printed by HRH on July 11, 2017 at 05:37PM

AGENCY CUSTOMER ID: __00000000__

LOC #: _____

**ACORD®**

## ADDITIONAL REMARKS SCHEDULE

Page __2__ of __2__

| AGENCY | NAMED INSURED |
|---|---|
| **Black Diamond Insurance Group, LLC** | **Revelation Energy Holdings, LLC** |

POLICY NUMBER
**N/A**

| CARRIER | NAIC CODE |
|---|---|
| **Multiple Carriers** | |

EFFECTIVE DATE:

ADDITIONAL REMARKS

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: __25__      FORM TITLE: __Certificate of Liability Insurance__

Policy covers more than one insured, all terms, conditions, insuring agreements, and endorsements (except limits of liability) shall operate as if there were a separate policy covering each insured.  All Named Insureds on listed insurance Policies are listed below:

Triple H Family Limited Partnership, ATIMA
Revelation Energy Holdings, LLC
Revelation Management Corp.
Revelation Energy, LLC
Candle Ridge Energies, LLC
Candle Ridge Mining, Inc.
Alpha Highwall Mining, LLC
Empire Coal Processing, LLC
Revelation Flint Ridge, LLC
Arch Flint Ridge, LLC
Dominion Coal Corporation
Harold Keene Coal Corp, Inc (changed name from LLC to Inc.)
Omega Mining LLC
Vansant Coal Corporation
Energy Resources, LLC
Blackjewel Holdings L.L.C.
Blackjewel L.L.C.



ACORD 101 (2008/01)                                         © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

Printed by HRH on July 11, 2017 at 05:37PM

# ACORD®

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
07/13/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Heather Hammond | | |
|---|---|---|---|
| Black Diamond Insurance Group, LLC<br>P.O. Box 99<br>Stanville, KY 41659 | PHONE (A/C, No, Ext): (606)478-2400 | | FAX (A/C, No): (606)478-2401 |
| | E-MAIL ADDRESS: heather@blackdiamondinsurancegroup.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: National Union Fire Insurance Co of Pittsburgh PA | | 19445 |
| INSURED | INSURER B: | | |
| Revelation Energy Holdings, LLC<br>1051 Main Street<br>Milton, WV 25541 | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

## COVERAGES       CERTIFICATE NUMBER: 00000000-4289255       REVISION NUMBER: 9

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N | | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | **Inland Marine** | | | 011134993 | 10/05/2016 | 10/05/2017 | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
See Acord 101 for All Individual Named Insureds on Policy listed above.

Also, see Attached Apendix A & Apendix B for Equipment & Building/Property Schedule.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Riverstone Credit Partners - Direct L.P.<br>Jefferies Finance LLC<br>712 Fifth Avenue 19th Floor<br>New York, NY 10019 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Heather Hammond* (HRH) |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)       The ACORD name and logo are registered marks of ACORD

Printed by HRH on July 13, 2017 at 09:18PM

AGENCY CUSTOMER ID: __00000000__

LOC #: _____

# ADDITIONAL REMARKS SCHEDULE

Page __2__ of __2__

| | |
|---|---|
| AGENCY<br>**Black Diamond Insurance Group, LLC** | NAMED INSURED<br>**Revelation Energy Holdings, LLC** |
| POLICY NUMBER<br>**011134993** | |
| CARRIER<br>**National Union Fire Insurance Co of Pittsburgh PA** | NAIC CODE<br>**19445** |

EFFECTIVE DATE: **10/05/2016**

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: __25__   FORM TITLE: __Certificate of Liability Insurance__

All Named Insureds on listed Insurance Policy is listed below:

Triple H Family Limited Partnership, ATIMA
Revelation Energy Holdings, LLC
Revelation Management Corp.
Revelation Energy, LLC
Candle Ridge Energies, LLC
Candle Ridge Mining, Inc.
Alpha Highwall Mining, LLC
Empire Coal Processing, LLC
Revelation Flint Ridge, LLC
Arch Flint Ridge, LLC
Dominion Coal Corporation
Harold Keene Coal Corp, Inc (changed name from LLC to Inc.)
Omega Mining LLC
Vansant Coal Corporation
Energy Resources, LLC
Blackjewel Holdings L.L.C.
Blackjewel L.L.C.

Attached Appendix A:
Certificate Holder is listed as Loss Payee on Buildings indicated with "Y".

Attached Appendix B:
Loss Payee Status is stated on each Insured piece of Equipment.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

Printed by HRH on July 13, 2017 at 09:18PM

DEBTORSLCC_105854

**SCHEDULE 6.18**

**CERTAIN DISCLOSURES REGARDING ENVIRONMENTAL MATTERS**

None.

Schedule 6.18

DEBTORSLCC_105855

## SCHEDULE 6.20(a)

## FEE OWNED REAL PROPERTY

### Bell County, Kentucky

All of the Real Property listed below Conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014 with Original Grantor James River Coal Co., *et al.*, and Original Grantee Revelation Energy, LLC , having the following reference: Misc. Book 23, pg. 261, pursuant to a Bankruptcy Order and APA with Schedules.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| Hignite Processing Company (J.M. Huber) | Bell County Coal Corporation | 324/257 | Stoney Fork, Related to Buckeye Springs Coal Seam Slurry Injection |
| Mike Ward | Bell County Coal Corporation | 223/641 | Stoney Fork |
| Henry Ralston | Bell County Coal Corporation | 237/782 | Sidetrack - .629 acres |
| Hignite Processing Company (J.M. Huber) | Bell County Coal Corporation | 324/257 | Rockhouse; Coppers Fk. Impoundment |
| Hignite Processing Company (Dallas Shackleford) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |
| Hignite Processing Company (George Givens) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |
| Hignite Processing Company (L. Crutchfield) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |
| Hignite Processing Company (Clydia Partin) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |
| Hignite Processing Company (Betty Vanover) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |

Schedule 6.18

DEBTORSLCC_105856

| Hignite Processing Company (James Leach) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |
|---|---|---|---|
| Edith Gibson | Bell County Coal Corporation | 223/627 | Hwy. 74 |
| Hignite Processing Company (Dallas Shackleford) | Bell County Coal Corporation | 324/257 | Coppers Fk. Impoundment |

## Harlan County, Kentucky

All of the Real Property listed below Conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014, with Original Grantor James River Coal Co., *et al.*, and Original Grantee Revelation Energy, LLC , having the following reference: Deed Book 458, Page 406, pursuant to a Special Warranty Deed executed pursuant to a Bankruptcy Order and APA with Schedules.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Velma Cochran Hall | Bledsoe Coal Corporation | 361/715<br>365/205 | Office Facility DTE |
| Gordon Cooper | Bledsoe Coal Corporation | 243/124<br>355/794 | See Tr. 6 of 355/794. |
| Will Caldwell | Bledsoe Coal Corporation | 244/483<br>355/794 | See Tr. 3 of 355/794. |
| Robert Hensley | Bledsoe Coal Corporation | 241/657<br>355/794 | See Tr. 4 of 355/794. |
| Minnie Brock | Bledsoe Coal | 291/642 | See Tr. 1 of 355/794. |

Schedule 6.18

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| | Corporation | 355/794 | |
| C.B. Hoskins | Bledsoe Coal Corporation | 270/240 355/794 | See Tr. 2 of 355/794. |
| Seaboard Systems Railroad | Bledsoe Coal Corporation | 340/247 355/794 | See Tr. 5 of 355/794. |
| Shamrock Coal Company, Incorporated (Glen & Vera Tolliver) | Bledsoe Coal Corporation | 292/167 359/041 | Hwy. 221 Straight Creek |
| Harold Nolan | Bledsoe Coal Leasing Company | 351/159 | Hwy 221 ROW Gabes Cr. |
| James Curry | Bledsoe Coal Leasing Company | 416/229 416/224 | Abner's Branch |

All of the Real Property listed below Conveyed to Revelation through that certain Special Warranty Deed dated April 22, 2015, with Original Grantor J.A.D. Coal Company, Inc., and Original Grantee Revelation Energy, LLC, having the following reference: Deed Book 458, Page 503, pursuant to that certain Bankruptcy Sale Order dated April 16, 2015.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| Aubra Paul Dean and Sue Dean | J.A.D. Coal Company, Inc. | Book 320, Page 578 | JAD Fee |
| Brenda Kay 0. Blanton | J.A.D. Coal Company, Inc. | Book 423, Page 509 | JAD Fee |
| H.K. Buttermore, et al. | J.A.D. Coal Company, Inc. | Book 229, Page 155 | JAD Fee |

Schedule 6.18

DEBTORSLCC_105858

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| Charles Robert Blanton, Four "B" Enterprises, a Kentucky corporation, and Brothers Construction, Inc., a Kentucky Corporation | J.A.D. Coal Company, Inc. | Book 402, Page 6 | JAD Fee |
| David Deron Blanton, II | J.A.D. Coal Company, Inc. | Book 423, Page 505 | JAD Fee |
| David D. Blanton and Wendolyn G. Blanton | J.A.D. Coal Company, Inc. | unrecorded | JAD Fee |
| Eunice Blanton, widow | J.A.D. Coal Company, Inc. | Book 388, Page 17 | JAD Fee |
| Harco. Fuels, Inc., | J.A.D. Coal Company, Inc. | Book 344, Page 711 | JAD Fee |
| Harlan Honey, Inc. | J.A.D. Coal Company, Inc. | Book 389, Page 22 | JAD Fee |
| Harlan Honey, Inc. | J.A.D. Coal Company, Inc. | Book 344, Page 699 | JAD Fee |
| Jimmy and Arlene Blanton | J.A.D. Coal Company, Inc. | Book 344, Page 717 | JAD Fee |
| Kentucky Harlan Coal Company, Inc. | J.A.D. Coal Company, Inc. | Book 383, Page 550 | JAD Fee |
| Marcus Ridner | J.A.D. Coal Company, Inc. | Book 394, Page 451 | JAD Fee |
| Charlsie Harris, et al | J.A.D. Coal Company, Inc. | Book 213, Page 455 | JAD Fee |
| Robert and Deborah Neal | J.A.D. Coal Company, Inc. | Deed Book 309, Page 1 | JAD Fee |
| Trinity Holdings, Inc | J.A.D. Coal Company, Inc. | Deed Book 393, Page 665 | JAD Fee |
| Charles Robert Blanton | J.A.D. Coal Company, Inc. | unrecorded | JAD Fee |

Schedule 6.18

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| Master Commissioner of the Harlan Circuit Court | J.A.D. Coal Company, Inc. | Deed Book 433, Page | Master Commissioner of the Harlan Circuit Court |

All of the Real Property listed below Conveyed to Revelation through that certain Special Warranty Deed dated July 31, 2015, with Original Grantor Resource Development LLC and Resource Land Company LLC, and Original Grantee Revelation Energy, LLC, having the following reference: Deed Book 460, Page 539.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| McCauley, Jeanette Gilliam | Resource Development LLC | DB 435, P 612 | Alpha Fee |
| Ark Land Company | Resource Development LLC | DB 368, P 272 | Alpha Fee |
| Morris, Aaron Otis and Loretta, et al | Resource Development LLC | DB 421, P 232 | Alpha Fee |
| Aguayo, Ronald and Juliana | Resource Development LLC | DB 422, P 78 | Alpha Fee |
| Watson, Brian and Diana | Resource Development LLC | DB 422, P 72 | Alpha Fee |
| Smith, David Carroll and Phyllis | Resource Development LLC | DB 422, P 437 | Alpha Fee |

Schedule 6.18

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED BK./PG. | REMARKS |
|---|---|---|---|
| Popp, Joy, et al | Resource Development LLC | DB 413, P 514 | Alpha Fee |
| Christianson, Kenneth and Karen Marie, et al | Resource Development LLC | DB 418, P 58 | Alpha Fee |
| Saylor, Oscar, et al | Resource Development LLC | DB 415, P 5 | Alpha Fee |
| Hall, Darrell McCoy and Jeanette, et al | Resource Development LLC | DB 414, P 19 | Alpha Fee |
| Kelly, Donald E., et al | Resource Development LLC | DB 421, P 346 | Alpha Fee |
| Pace, Doris Ball | Resource Development LLC | DB 413, P 79 | Alpha Fee |
| ACIN, LLC | Resource Land Company LLC | DB 443, P 623 | Alpha Fee |
| Ark Land Company | Resource Land Company LLC | DB 338, P 394 | Alpha Fee |

Schedule 6.18

DEBTORSLCC_105861

### Leslie County, Kentucky

All of the Real Property listed below Conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014, with Original Grantor James River Coal Company, *et al.*, and Original Grantee Revelation Energy, LLC, having the following reference: Deed Book 197, Page 004, pursuant to a Special Warranty Deed executed pursuant to a Bankruptcy Order, APA and Schedules.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Leeco, Inc. | Bledsoe Coal Corporation | 150/108 | Britton Branch 675.34 ac.+/- |
| Bledsoe Coal Leasing Company | Bledsoe Coal Corporation | 150/117 (Tr-2 & 3) | Britton Branch Part of LE-147-3.0 |
| Carrie Miniard | Bledsoe Coal Leasing Company | 150/582 | 1 ac. Hwy. 2000 Greasy Ck. |
| William Miniard | Bledsoe Coal Leasing Company | 145/707 | Dollar Branch |
| J.H. Miniard | Bledsoe Coal Leasing Company | 50/615 | 1 ac. John Miniard Branch |
| Harvey Herron | Bledsoe Coal Leasing Company | 156/457 | Dollar Branch |
| Eugene Hemmingway & Kendell Caudill | Bledsoe Coal Leasing Company | 157/51 157/37 | 18.47 ac. One Mile Branch of Beech Fork |

Schedule 6.20(a)

DEBTORSLCC_105862

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Geraldine Adams | Bledsoe Coal Leasing Company | 146/368 | 83.74 ac. LE-94-2.00 |
| William Walker | Bledsoe Coal Leasing Company | 157/541 | 1.4 ac. Persimmon Fork |
| Otis Cornett | Bledsoe Coal Leasing Company | 157/291 | 2.8 ac. Persimmon Fork |
| Edna Cornett | Bledsoe Coal Leasing Company | 157/297 | 2.14 ac. Persimmon Fork |
| Ernest Brown | Bledsoe Coal Leasing Company | 146/124 | 72.7 ac. Stone Coal Br. |
| Clifford Hoskins Jr. | Bledsoe Coal Leasing Company | 157/47 | 21.84 ac. One Mile Branch of Beech Fork |
| Clifford Hoskins Sr. | Bledsoe Coal Leasing Company | 157/43 | 0.30 ac. One Mile Branch of Beech Fork |
| Travis Hoskins | Bledsoe Coal Leasing Company | 157/33 | 0.92 ac. One Mile Branch of Beech Fork |
| Mary Mosley | Bledsoe Coal Leasing Company | 160/407 | 2.0 ac. One Mile Branch of Beech Fork |
| Kentucky River Properties | Bledsoe Coal Leasing Company | 186/52 | Lewis Creek |
| Roger Asher | Bledsoe Coal Leasing Company | 189/283 | Warbranch |

Schedule 6.20(a)

DEBTORSLCC_105863

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Gomer Nantz | Bledsoe Coal Leasing Company | 189/582 | Warbranch |
| Shamrock Coal Company/Clover Coal Company (Roscoe Miniard; John I. Miniard; Hershell Maggard; Disney Miniard; Headley Holbrook; Bill Miniard Heirs) | Bledsoe Coal Leasing Company/Bledsoe Coal Processing Company | 129/338 150/117 (TR-1) | Washer/shop/Office 135.21 ac BLF-008;009;010;011 |
| (Sampson Curry; John Curry; John D. Muncy) | Bledsoe Coal Leasing Company | 129/338 | Abner's Branch Impoundment 37.0 Acres |
| (Bill Miniard Heirs) | Bledsoe Coal Leasing Company | 129/338 | 17.0 ac. Abners Branch |
| (Leslie Curry / Jerry Turner, et al.) | Bledsoe Coal Leasing Company | 129/338 | 70 ac. Miniard Br. |
| (Disney Miniard) | Bledsoe Coal Leasing Company | 129/338 | 89.0 ac. Halfmile Br. |
| Eugene Hemmingway & Kendell Caudill | Bledsoe Coal Leasing Company | 157/51 157/37 | 18.47 ac. One Mile Branch of Beech Fork |
| (Headley Holbrook) | Bledsoe Coal Leasing Company | 129/338 | 74.0 ac Halfmile Br. |
| (I.D. Harris John Curry) | Bledsoe Coal Leasing Company | 129/338 | 538.00 ac. In Leslie & Harlan. Halfmile Refuse Fill LE-175-2.0 |
| Robert Nantz | Shamrock Coal Company, | 119/450 | Helton Ky. I ac. LE-1004 |

Schedule 6.20(a)

DEBTORSLCC_105864

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| | Incorporated | | |
| Robert Nantz | Shamrock Coal Company, Incorporated | 109/473 | Right Fork Oldhouse Branch<br><br>132.56<br><br>LF-94-9.0 |
| Oma & Stanley Wilson | Shamrock Coal Company, Incorporated | 114/106 | 65 ac. On Hwy 421 |
| Shamrock Coal Company, Incorporated (Farley Caldwell et. ux) | Shamrock Coal Company, Incorporated | 131/114 | Mile Branch |
| Kentucky River Coal Corporation (Georgia Pacific)<br><br>This document is affected by that certain Omnibus Agreement for Amendment to and Merger of Leases between Kentucky River Properties LLC, et al. & Bledsoe Coal Leasing Company entered into on April 30, 2007. Through this document, Kentucky River Properties has rights of first refusal to purchase the (a) Clover Loadout and appurtenant property necessary to operate such loadout, constituting | Bledsoe Coal Leasing Company | 01/15/95 | Memorandum recorded, Harlan in Lease Book 49, 137<br><br>Leslie in Lease Book 76, Page 770<br><br>Kentucky River Properties LLC, PO Box 269, Hazard, KY 41702 |

Schedule 6.20(a)

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| approximately 28.08 acres and (b) BL1 Greasy Creek Prep Facility and appurtenant property necessary to operate such preparation plant, constituting approximately 291.31 acres. Also executed an Amended Omnibus Agreement on February 22, 2010 and a Second Amendment to Omnibus Agreement on August 29, 2014. | | | |

**Fayette County, West Virginia**

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Lightning, Inc. | Revelation Energy, LLC | Instrument Book 2013011971 | Deed Dated June 28, 2013 conveying those certain 3 tracts of real property located in Fayette County, West Virginia |

Schedule 6.20(a)

DEBTORSLCC_105866

**McDowell County, West Virginia**

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| LBR Holdings, LLC | Revelation Energy, LLC | Instrument Number 0070 | Special Warranty Deed dated March 28, 2017 and recorded in McDowell County on July 12, 2017 conveying two parcels – one in Buchanan County, Virginia and one in McDowell County, West Virginia |

**Buchanan County, Virginia**

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Jewell Smokeless Coal Corporation | Revelation Energy, LLC | Instrument Book 170000021 | Quitclaim Deed Dated April 7, 2016 conveying those certain 64 tracts of real property located in Buchanan County, Virginia |

Schedule 6.20(a)

DEBTORSLCC_105867

| Jewell Smokeless Coal Corporation | Revelation Energy, LLC | Instrument Book 170000021 | Quitclaim Deed Dated April 7, 2016 conveying those certain 64 tracts of real property located in Buchanan County, Virginia |
|---|---|---|---|
| LBR Holdings, LLC | Revelation Energy, LLC | Instrument Book 17000005556 | Special Warranty Deed dated March 28, 2017 conveying two parcels – one in Buchanan County, Virginia and one in McDowell County, West Virginia |

### Wise County, Virginia

All of the Real Property listed below Conveyed to Revelation through that certain Special Warranty Deed dated July 31, 2015 from Mill Branch Coal Corporation and Osaka Mining Corporation and through that certain Special Warranty Deed dated July 31, 2015, with Original Grantor Pigeon Creek Processing Corporation, and Original Grantee Revelation Energy, LLC, having the following references: Instrument Book Number 201600916 and 201600915.

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Bond, Mary, et al. | Pigeon Creek Processing Corporation | INST# 201103278 | Alpha Fee |

Schedule 6.20(a)

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Meade, Willie G., Sr. | Pigeon Creek Processing Corporation | INST# 200804640 | Alpha Fee |
| Emerson G. Bossard 2002 Revocable Trust | Pigeon Creek Processing Corporation | INST# 200800640 | Alpha Fee |
| Griffin, Linus Morris | Pigeon Creek Processing Corporation | INST# 200602373 | Alpha Fee |
| Richardson, Susan Arlene | Pigeon Creek Processing Corporation | INST# 200601765 | Alpha Fee |
| Griffey, Donna, et al. | Pigeon Creek Processing Corporation | INST# 200602971 | Alpha Fee |
| Poole, James Sr., et al. | Pigeon Creek Processing Corporation | INST# 200603192 | Alpha Fee |
| Poole, Curtis | Pigeon Creek Processing Corporation | INST# 200603893 | Alpha Fee |
| Norris, James Henry, et al | Pigeon Creek Processing Corporation | INST# 200604837 | Alpha Fee |
| Broady, Patricia Norris | Pigeon Creek Processing Corporation | INST# 200700307 | Alpha Fee |
| Norris, Debra | Pigeon Creek Processing Corporation | NONE | Alpha Fee |

Schedule 6.20(a)

DEBTORSLCC_105869

| ORIGINAL GRANTOR(S) | ORIGINAL GRANTEE | REFERENCE DEED | REMARKS |
|---|---|---|---|
| Norris, Charles Lee | Pigeon Creek Processing Corporation | INST# 200701050 | Alpha Fee |
| Young, Forrest J. and Teresa A. | Pigeon Creek Processing Corporation | INST# 200504679 | Alpha Fee |

Schedule 6.20(a)

DEBTORSLCC_105870

### Fee Owned Property of the Subsidiaries

**McDowell County, West Virginia**

**The following Owned Property of Subsidiaries:**

1. Deed dated September 12, 1994, between Lena C. Day and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 428, Page 620.
2. Deed dated June 29, 1995, between Lacy Wright, Jr., and Ronald D. Hassan, as Grantors, and Vansant Coal Corporation, as Grantee, with respect to property in McDowell County, West Virginia; and recorded in Deed Book 434, Page 55.
3. Deed dated September 12, 1994, between Myrtle Scott and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 24.
4. Deed dated September 12, 1994, between George Scott and Pearl Lucille Scot and Dolly Louise Stanley and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 428, Page 626.
5. Deed dated February 9, 1995, between Elizabeth Webb and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 431, Page 29.
6. Deed dated December 28, 1994, between William D. Webb and Wilma L. Webb and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 430, Page 318.
7. Deed dated September 12, 1994, between Pearl Cole and J. W. Cole and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 47.
8. Deed dated September 12, 1994, between James C. Keen(e) and Geneva Chafin and Dewey Chafin and Charles Keene and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 16.
9. Deed dated September 12, 1994, between Mary Ann Price and Kenneth Price and Betty Cole and Ulise Cole and Irene Scruggs and Steve Scruggs and Helen Inez Day and Isom Day and Martine Keen(e) and Betty Keen(e) and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 38.
10. Deed dated September 12, 1994, between Lucille Justice and Joe Justice and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 60.

Schedule 6.20(a)

DEBTORSLCC_105871

11. Deed dated September 12, 1994, between Marvin William Keen(e) and Vansant Coal Corporation with respect to property in McDowell County, West Virginia; and recorded in Deed Book 429, Page 54.

12. Deed dated December 8, 2008, between Ona Marie Runyons, as Grantor, and Energy Resources, LLC, as Grantee.

13. Deed dated December 17, 2008, between Joyce Willett, as Grantor, and Energy Resources, LLC, as Grantee.

14. Deed dated December 8, 2008, between Eula Mae Jones, as Grantor, and Energy Resources, LLC, as Grantee.

15. Deed dated September 16, 2008, between Ernie Ray and Linda Wilson, as Grantors, and Energy Resources, LLC, as Grantee.

16. Deed dated December 15, 2008, between Carlos Rasnake and Edward Cummins, as Grantor, and Energy Resources, LLC, as Grantee.

17. Deed dated December 12, 2008, between Nancy Fisher, as Grantor, and Energy Resources, LLC, as Grantee.

## Buchanan County, Virginia

**The following Owned Property of Subsidiaries:**

1. Deed dated March 13, 2004, between Jerry Thurman Smith and Colene Smith and Energy Resources, LLC, with respect to property in Buchanan County, Virginia; and recorded in Deed Book 604, Page 282.

2. Quitclaim Deed dated February 5, 1988, between Jewell Ridge Coal Corporation and Vansant Coal Corporation with respect to Jewell coal seam in Buchanan County, Virginia.

3. Deed dated September 14, 1992, between Dominion Coal Corporation and Vansant Corporation with respect to approximately a 1/10th undivided interest in the Red Ash Seam of coal in Buchanan County, Virginia.

4. Deed dated August 28, 1993, between Herman Rife and Vansant Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 413, Page 125.

5. Deed dated August 28, 1993, between Dexter Lee Rife and Vansant Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 413, Page 127.

6. Deed dated March 11, 1992, between Jack Cole and Brenda Sharlene Cole and Paul Quincy Cole and Janet Marie Cole and George Kendrick Read and Helen Read and Robert J. Mullins and Delma Jean Mullins and Dominion Coal Corporation with respect to Red Ash coal seam in Buchanan County, Virginia.

Schedule 6.20(a)

7. Deed dated February 13, 1992, between Charles Cole and Zell Sue Cole and Dominion Coal Corporation with respect to Red Ash coal seam in Buchanan County, Virginia.

8. Deed dated March 5, 1992, between Nora May Cole and Harles Johnson Cole and Gaynelle Cole and Franklin Delano Cole and Lula Mae Cole and Virginia May Rosser and Dorothy Ann Hill and Dominion Coal Corporation with respect to Red Ash coal seam in Buchanan County, Virginia.

9. Deed dated June 27, 1991, between Molly Whitt and Donald Whitt and Dominion Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 376, Page 759.

10. Deed dated November 25, 1997, between Harold J. Mullins and Leah M. Mullins, as Grantors, and Dominion Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia; and recorded in Deed Book 471, Page 516.

11. Deed dated January 4, 1991, between Flora Jane Rife and Dominion Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 369, Page 247.

12. Deed dated June 27, 1991, between Molly Whitt and Donald Whitt and Dominion Coal Corporation and Burl Dennis Rife with respect to property in Buchanan County, Virginia; and recorded in Deed Book 376, Page 761.

13. Deed dated September 6, 1994, between Rebecca Rife and Roger Lee Rife and Dorothy Rife and Dominion Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 426, Page 254.

14. Deed dated October 23, 1992, between Harold Mullins and Dominion Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 400, Page 629.

15. Deed dated May 16, 1991, between Rickey Osborne and Dominion Coal Corporation with respect to property in Buchanan County, Virginia; and recorded in Deed Book 374, Page 769.

### Dickenson County, Virginia

**The following Owned Property of Subsidiary:**

1. Deed dated March 6, 1996, between Shamrock Coal Company, Incorporated, and Vansant Coal Corporation with respect to property in Dickenson County, Virginia; and recorded in Deed Book 316, Page 006.

### Russell County, Virginia

**The following Owned Property of Subsidiaries:**

1. Deed dated January 10, 2011, between Arbutus Keene and Arbutus Keene, Alma Jean Griffin and Harold Lynn Keene as Trustees of Harold Keene Trust, as Grantor, and

Schedule 6.20(a)

Harold Keene Coal Co., Inc., as Grantee with respect to 1.829 acre property in Russell County, Virginia; and recorded in Deed Book 729, Page 812.

2. Deed dated January 10, 2011, between Arbutus Keene as Grantor and Harold Keene Coal Co., Inc., as Grantee with respect to 48.42 and 17.64 acre tracts in Russell County, Virginia; and recorded in Deed Book 729, Page 806. [Group U(h)].

3. Deed dated January 10, 2011, between Arbutus Keene and Arbutus Keene, Alma Jean Griffin and Harold Lynn Keene as Trustees of Harold Keene Trust, as Grantor, and Harold Keene Coal Co., Inc., as Grantee, and recorded in Deed Book 729, Page 808.

4. Deed dated September 24, 2001, between Movie Star, Inc., as Grantor, and Energy Resources, LLC, as Grantee; and recorded in Deed Book 536, Page 222.

5. Deed dated March 1, 2008, between Eula Mae Jones and Benjamin F. Jones, Jr., and Teresa Jones Carter and Walter B. Jones and Sherri Jones, as Grantor, and Energy Resources, LLC, as Grantee, with respect to property in Russell County, Virginia; and recorded in Deed Book 686, Page 546.

6. Deed dated June 7, 2004, between Bobby Jack Ball, as Grantor, and Energy Resources, LLC, as Grantee, with respect to property in Russell County, Virginia; and recorded in Deed Book 612, Page 129.

7. Deed dated December 23, 2008, between West Raven Siding, Inc., and Harold Keene Coal Co., Inc. with respect to property in Russell and Tazewell Counties, Virginia; and recorded in Deed Book 1044, Page 683 (Tazewell) and Deed Book 700, Page 569 (Russell).

8. Deed dated December 3, 2008, between Dorothy Miller and Jerry Miller and Mattie Latham and James Walter Latham and Brant Latham and Judy Latham and Barbara Latham Whited and Tom Whited and Delzena Hubbard and Allen Hubbard and Annette Hubbard Dotson and Rita Hubbard Cox and Scottie Cox, as Grantor, and Energy Resources, LLC, as Grantee, with respect to property in Russell County, Virginia; and recorded in Deed Book 699, Page 978.

9. Deed dated September 3, 2008, between Debbie Rasnake, as Grantor, and Energy Resources, LLC, as Grantee, with respect to property in Russell County, Virginia; and recorded in Deed Book 696, Page 912.

10. Deed dated May 24, 2012, between Buckhorn Coal Company, LLLP, as Grantor, and Energy Resources, LLC, as Grantee, with respect to approximately 15.145 acres of property in Russell County, Virginia, and recorded in Deed Book 721, Page 439.

### Tazewell County, Virginia

1. Deed dated December 23, 2008, between West Raven Siding, Inc., and Harold Keene Coal Co., Inc. with respect to property in Russell and Tazewell Counties, Virginia; and recorded in Deed Book 1044, Page 683 (Tazewell) and Deed Book 700, Page 569 (Russell)

Schedule 6.20(a)

## SCHEDULE 6.20(b)

## LEASED REAL PROPERTY

### Surface or Mineral Leases

### Bell County, Kentucky

All of the Real Property listed below conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014, with Original Lessor James River Coal Company, *et al*., and Original Lessee Revelation Energy, LLC, having the following reference: Book 23, Page 261, pursuant to an Assignment and Assumption Agreement executed pursuant to a Bankruptcy Order,  APA with Schedules.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| J.M. Huber Corporation (now WPP LLC) | Bell County Coal Corporation | 9/1/87 | Memorandum Recorded in Bell County at Lease Book 50, Page 626 <br><br> WPP, LLC c/o NRP LLC, 5260 Irwin Rd. Huntington, WV 25705 |
| J.M. Huber Corporation (now WPP, LLC – Tipple Lease) | Bell County Coal Corporation | 9/1/87 | WPP, LLC c/o NRP LLC, 5260 Irwin Rd. Huntington, WV 25705 |

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Vanover, Dorothy, et al. | Bell County Coal Corporation | 4/14/99 | Unrecorded, Bell County, Dorothy Vanover, Route 1, Box 294, Middlesboro, KY 40965 |
| Vanover, Dorothy | Bell County Coal Corporation | 1/03/06 | Unrecorded, Bell County, Dorothy Vanover, Route 1, Box 294, Middlesboro, KY 40965 |
| John C. Slusher and Shirley Slusher | Bell County Coal Corporation | 5/28/14 | Recorded, Lease Book 52, Pages 69-79. P.O. Box 664, Pineville, Kentucky 40977 |
| Darris Wayne Lambdin | Bell County Coal Corporation | 5/21/14 | Recorded, Lease Book 52, Pages 80-89 514 Highway 535, Frakes, Kentucky 40940 |

**Harlan County, Kentucky**

All of the Real Property listed below conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014, with Original Lessor James River Coal Company, *et al.*, and Original Lessee Revelation Energy, LLC, having the following reference: Misc. Book 41, Page 267, pursuant to an Assignment and Assumption Agreement executed pursuant to a Bankruptcy Order and APA with Schedules.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Brown, Hargis and Quincy, et al. (Heirs of E.T. Creech) | Bledsoe Coal Leasing Company | 02/01/80 | Book 26, Page 167, Harlan County; Book 51, Page 122, Leslie County |
| Boggs, Jr., Ben, et al. (Heirs of Silas Boggs) | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 05/22/92 | Book 50, Page 397, Book 50, Page 409, Book 50, Page 421, Book 50, Page 777, Leslie County; Book 37, Page 530, Harlan County |
| Kentucky River Coal Corporation (Greasy Creek) | Bledsoe Coal Leasing Company | 01/11/95 | Book 76, Page 770, Leslie County; Lease Book 49, Page 137, Harlan County |

DEBTORSLCC_105877

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kentucky River Coal Corporation (Georgia Pacific)<br><br>This document is affected by that certain Omnibus Agreement for Amendment to and Merger of Leases between Kentucky River Properties LLC, et al. & Bledsoe Coal Leasing Company entered into on April 30, 2007. Through this document, Kentucky River Properties has rights of first refusal to purchase the (a) Clover Loadout and appurtenant property necessary to operate such loadout, constituting approximately 28.08 acres and (b) BL1 Greasy Creek Prep Facility and appurtenant property necessary to operate such preparation plant, constituting approximately 291.31 acres. Also executed an Amended Omnibus Agreement on February 22, 2010 and a Second Amendment to Omnibus Agreement on August 29, 2014. | Bledsoe Coal Leasing Company | 01/15/95 | Memorandum recorded, Harlan in Lease Book 49, 137<br><br>Leslie in Lease Book 76, Page 770<br><br>Kentucky River Properties LLC, PO Box 269, Hazard, KY 41702 |

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Arnold, Elizabeth and Jack | Bledsoe Coal Leasing Company (as assignee of Clover Coal Company, Inc. and Shamrock Coal Company, Inc.) | 01/27/79 | Book 24, Page 136, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Cornett, James Ralph | Bledsoe Coal Leasing Company | 09/17/01 | Book 42, Page 108, Harlan County |
| Engle, Melvin and Barbara | Bledsoe Coal Leasing Company | 09/18/01 | Book 42, Page 112, Harlan County |
| Ison, Mabel Carol and Bobby Kaywood | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/30/90 | Book 50, Page 278, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Meeks, James and Alafair | Bledsoe Coal Leasing Company | 01/27/79 | Book 24, Page 148, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Mildred Wilder | Bledsoe Coal Leasing Company | 7/17/2001 | Book 41 Page 760 Harlan County |

DEBTORSLCC_105879

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Hobart Miniard Heirs, being Dillard Miniard and Lucy Miniard, husband and wife; Carrie Miniard; Boby R. Miniard and Carmen Miniard, husband and wife; Donnie E. Miniard and Stephanie A. Miniard, husband and wife; Arlene D. Alsgaard and Harltey C. Alsgaard, wife and husband; Irene F. Wax and Don L. Wax, wife and husband; Ulene Lewis and William F. Lewis, wife and husband; Edward Day; Orlene Day; Lynette Broughton; Juanetta Threadgill and James Threadgill, wife and husband; Rufus Turner and Barbara Turner, husband and wife; Wanda Turner; Leslie Curry and Frank Curry, wife and husband Darla Brewer and William James Brewer, wife and husband; Nancy Cornett and Danny Cornett, wife and husband; Joe Turner and Ruby Turner, husband and wife; Hobart Ross Turner;  Charlie Turner, Jr.; Jerry D. Turner and Susan Turner; husband and wife; Eula F. Scearce and William Scearce, wife and husband | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/27/90 | Book 50, Page 202, Book 50, Page 240, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |

DEBTORSLCC_105880

| Name of Lessor | Original Lessee | Date | Lease Recorded/ lessor address |
|---|---|---|---|
| Scearce, William and Eula, et al. | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 11/01/94 | Book 50, Page 553, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Miniard, John I. and Mossie | Bledsoe Coal Leasing Company (assignee of Shamrock Coal Company, Incorporated) | 02/01/87 | Book 50, Page 301, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Penn VA | Bledsoe Coal Leasing Company | 6/18/08 | Book 48 Page 161 Harlan County Book 73 Page 784 Leslie County |
| Frances Parsons | Bledsoe Coal Leasing Company | 1/13/2010 | Book 49 Page 113 |

DEBTORSLCC_105881

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Mallie Begley Heirs | Bledsoe Coal Leasing Company | 2/24/11 | Memorandum Recorded Harlan County in Lease Book 50, Page 177;<br><br>Robert Begley and Norma Begley 2662 Newboune Rd.  Cox Mill, WV 26342; Lucille Begley Box 21 Stron, IN 46789;<br><br>Raymond Begley 416 E. 6th Street Peru, IN 46970; Paula Blowers 407 E. Wabash Street Wolcottville, IN 46795; Mary Dobson 213 S. Benton Street Millersburg, IN 46543 Anne Anderson 1705 S. 445 E LaGrange, IN 46761; Patricia Braun and Terrance Braun 9622 Harbour  Pointe Drive Bloomington, IN 47401 Connie Crouse 1011 Loyall, KY 40854 Michael Howard 7520 Solarset Cr. Anchorage, AK 99507 P.O. Box 1063 Cuyahoga Falls, OH 44223; Louise Huff 101 Virgil Smith Road Crossville, TN 38571 |
| Alice Turner Heirs | Bledsoe Coal Leasing Company | 10/11/10 | Memorandum recorded 11/4/10 in LB 49, Page 516; Clayton Turner and Jean Turner 2444 Kildare Avenue Dayton, OH 45414; Henry Miniard P.O. Box 274 Big Laurel, KY 40808; Opal Mullins and Robert P.O. Box 596 Lagrange, KY 40031; Lonnie Turner and Fran Turner 10 Erica Avenue Westridge Somerset West 7130 Cape Town, South Africa 7130 Coburn Turner and Phyllis Turner 6258 North HWY 421 Bledsoe KY 40810; Audrey Turner, 4204 Garden Ridge Road, Crestwood, KY 40014; and Eldon Turner and Faye Turner, 6699 Dana Drive, Macon, GA 31201 |

All of the Real Property listed below conveyed to Revelation through that certain Assignment and Assumption of Leases dated April 22, 2015, with Original Lessor J.A.D. Coal Company, Inc., and Original Lessee Revelation Energy, LLC, having the following reference: Lease Book 51, Page 587, pursuant to an Assignment and Assumption Agreement executed pursuant to a Bankruptcy Sale Order dated April 16, 2015.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Pocahontas Development Corporation | J.A.D. Coal Company, Inc. (with Lincoln Leasing Venture, Inc. as original lessee) | 9/1/98 | Assigned January 5, 2000; Renewed September 1, 2008 |
| Pocahontas Development Corporation | J.A.D. Coal Company, Inc. | 5/11/05 | Memorandum dated 5/11/05; renewed 5/11/10 |

All of the Real Property listed below Conveyed to Revelation through that certain Assignment and Assumption Agreement dated December 29, 2015, with Original Lessor James River Coal Company, *et al.*, and Original Lessee Revelation Energy, LLC, having the following reference: Recorded Mortgage Book 26, Page 596.

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| U.S. Dept. of the Interior | Bledsoe Coal Leasing Company | 8/1/10, assigned 7/1/12; modified 1/5/16 | Unrecorded; United States Department of the Interior, Bureau of Land Management, 7450 Boston Boulevard, Springfield, Virginia 22153. |

DEBTORSLCC_105883

All of the Real Property listed below conveyed to Revelation through that certain
Assignment of Real Property Agreements dated July 31, 2015, with Original Lessors
Resource Development, Resource Land Company LLC, and North Fork Coal Corporation,
and Original Lessee Revelation Energy, LLC, having the following reference: Mortgage
Book 436, Page 242.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Lewis, Burney, Jr., and Jacqueline L., et al | Resource Development LLC | 5/15/12 | LB 50, PG 474 |
| Hall, Robert E., et al | Resource Development LLC | 9/14/11 | LB 50, PG 262 (Hall Counterpart) & LB 50, PG 395 (Williams Counterpart) |
| McQueen, Tammy E. | Resource Development LLC | 8/19/05 | Unrecorded |
| Fields, Frances G. | Resource Development LLC | 9/3/05 | Unrecorded |
| Deal, Yvonne, et al | Resource Development LLC | 6/22/07 | LB 49, PG 484 |
| Deal, David Claude and Yvonne Boggs | Resource Development LLC | 6/17/11 | LB 50, PG 142 |
| Hall, Darlene | Resource Development LLC | 6/22/07 | LB 49, PG 480 |
| Shivel, Charles E. and Sandra K., et al | Resource Development LLC | 11/13/09 | LB 49, PG 359 |
| Henson, Charles L., et al | Resource Development LLC | 11/15/10 | LB 49, PG 554 & LB 50, PG 409 |
| Mitchell, Dart Keith and Melissa, et al | Resource Development LLC | 2/25/11 | LB 50, PG 45 |

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Heddon, Jonathan D., et al | Resource Development LLC | 9/14/11 | LB 50, PG 275 |
| Firchau, Richard and Sarah E., et al | Resource Development LLC | 11/13/09 | LB 49, PG 60 |
| Ison, Donald and Ora Jewel | Resource Development LLC | 11/13/09 | LB 50, PG 417 |
| White, Raymond A. and Mary E., et al | Resource Development LLC | 5/1/08 | LB 48, PG 59 |
| White, Mary Lou, et al | Resource Development LLC | 1/18/08 | LB 47, PG 749 |
| Arnette, Bobby J. Sr., et al | Resource Development LLC | 6/30/08 | LB 48, PG 330 |
| White, Michael J. and Lisa A., et al | Resource Development LLC | 7/31/08 | LB 48, PG 627 |
| Winters, Betty, J., et al | Resource Development LLC | 3/12/08 | LB 48, PG 54 |
| Penn Virginia Operating Co., LLC | Resource Development LLC | 5/20/96 | Unrecorded |
| Penn Virginia Operating Co., LLC | North Fork Coal Corporation | 2/12/97 | Unrecorded |
| Ark Land Company | Resource Development LLC | 3/1/05 | Unrecorded |
| Resource Development LLC | A & G Coal Corporation | 4/29/09 | Unrecorded |

DEBTORSLCC_105885

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Resource Land Company LLC | Windstream Kentucky East, LLC | 1/17/13 | Unrecorded |
| Old Virginia Services, LLC | Resource Land Company LLC and North Fork Coal Corporation | 1/1/14 | Unrecorded |
| Lewis, Burney, Jr., and Jacqueline L. | Resource Development LLC | 10/2/13 | Unrecorded |
| Ark Land Company | Resource Development LLC | 3/1/05 | Unrecorded |

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Amended, Consolidated and Restated Lease and Sublease with ACIN LLC | Revelation Energy, LLC | July 31, 2015 | Unrecorded |

DEBTORSLCC_105886

### Leslie County, Kentucky

All of the Real Property listed below conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014, with Original Lessor James River Coal Company, *et al*., and Original Lessee Revelation Energy, LLC, having the following reference: Misc. Book 41, Page 267, pursuant to an Assignment and Assumption Agreement executed pursuant to a Bankruptcy Order and APA with Schedules.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kentucky River Coal Corporation (Georgia Pacific)<br><br>This document is affected by that certain Omnibus Agreement for Amendment to and Merger of Leases between Kentucky River Properties LLC, et al. & Bledsoe Coal Leasing Company entered into on April 30, 2007. Through this document, Kentucky River Properties has rights of first refusal to purchase the (a) Clover Loadout and appurtenant property necessary to operate such loadout, constituting approximately 28.08 acres and (b) BL1 Greasy Creek Prep Facility and appurtenant property necessary to operate such preparation plant, constituting approximately 291.31 acres. Also executed an Amended Omnibus Agreement on February 22, 2010 and a Second Amendment to Omnibus Agreement on August 29, 2014. | Bledsoe Coal Leasing Company | 01/15/95 | Memorandum recorded, Harlan in Lease Book 49, 137<br><br>Leslie in Lease Book 76, Page 770<br><br>Kentucky River Properties LLC, PO Box 269, Hazard,  KY 41702 |

All of the Real Property listed below Conveyed to Revelation through that certain Assignment and Assumption Agreement dated December 29, 2015, with Original Lessor James River Coal Company, *et al.*, and Original Lessee Revelation Energy, LLC, having the following reference: Recorded Mortgage Book 26, Page 596.

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| WPP LLC | Revelation Energy, LLC | 10/1/16 | Unrecorded; WPP LLC c/o NRP (Operating) 5260 Irwin Rd Huntington WV 25705 |
| Alice Baker | Bledsoe Coal Leasing Company | 3/31/00 | Unrecorded; 1343 Big Rock Road, Yeaddiss, Kentucky 41777. |
| Kentucky River Coal Corporation (Greasy Creek) | Bledsoe Coal Leasing Company | 01/11/95 | Book 76, Page 770, Leslie County; Lease Book 49, Page 137, Harlan County |
| Kentucky River Coal Corporation | Shamrock Coal Company, Incorporated | 6/05/80 | Memorandum recorded in Harlan County Lease Book 49, Page 137; in Leslie County Lease Book 76, Page 770 Kentucky River Properties LLC, PO Box 269, Hazard, KY 41702 |

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| Ison, Mabel Carol and Bobby Kaywood | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/30/90 | Book 50, Page 278, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Puffer, Chloe (Heirs of Jackson) | Bledsoe Coal Leasing Company (assignee of Leeco, Inc.) | 01/12/90 | Book 43, Page 526, Book 46, Page 494, Book 51, Page 118, Leslie County |
| United States of America, through the Bureau of Land Management | Bledsoe Coal Leasing Company (assignee of Leeco, Inc.) | 11/1/93 | Unrecorded, Leslie County, Dept. of the Interior MMS, Payor Code MA475, Box 5810, Denver, CO 80217 |
| Hereford, George and Anna Mae | Shamrock Coal Company, Incorporated | 3/14/00 | Book 57, Page 251, Leslie County |
| Chloe Wilson | Shamrock Coal Company, Incorporated | 12/16/99 | Book 57, Page 354, Leslie County |
| Muncy, John D. and Sarah Jane, et al. (Heirs of F. G. Turner) | Bledsoe Coal Leasing Company (assignee of Shamrock Coal Company, Incorporated) | 05/03/90 | Book 50, Page 316, Book 51, Page 122, Leslie County |
| GW Taylor Heirs | Shamrock Coal Company, Incorporated | 03/17/10 | Book 77 Page 582 Leslie County |

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Shelby Mosley Heirs, being Frtiz Mosley; Laura Howard; Margaret Simpson; Al Carter and Donna Carter, husband and wife; Mark Carter and Jean Carter, husband and wife; Cindy Labonne and Timothy Labonne, wife and husband; Viola Mosley; Lonnie Mosley and Rachel Mosley, husband and wife; Chris Mosley; Duane Mosley; Roland Mosley; Hope Sharkey and Ronald Wayne Sharkey, wife and husband; Faith Fields and Dewey Fields, wife and husband; and Kentucky River Properties LLC, as the successor in interest to Dorothy Lewis | Shamrock Coal Company, Incorporated | 3/02/05 | Book 66 Page 163 Leslie County |

DEBTORSLCC_105891

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Herbert & Betty Nantz | Bledsoe Coal Leasing Company | 4/05/05 | Unrecorded Leslie County (Legal Description Attached as Exhibit C-35) Karen Crisp, 6023 Hwy 421 S, Helton, KY 40840; Kimberly Nantz, 6023 Hwy 421 S, Helton, KY 40840 |
| Helen Simpson | Bledsoe Coal Leasing Company | 5/24/05 | Book 67 Page 233 Leslie County |
| Joe Slusher | Shamrock Coal Company, Incorporated | 6/3/05 | Book 67 Page 233 Leslie County |
| R B Mosley | Shamrock Coal Company, Incorporated | 7/5/05 | Book 67 Page 233 Leslie County |
| Kenneth Howard | Bledsoe Coal Leasing Company | 7/6/05 | Book 66 Page 731 Leslie County |
| Irene Howard | Bledsoe Coal Leasing Company | 7/7/05 | Book 67 Page 739 Leslie County |
| U.S. Dept. of the Interior | Shamrock Coal Company, Incorporated | 10/1/05 | Book 68 Page 447 Leslie County |
| Russell Morgan | Bledsoe Coal Leasing Company | 4/28/07 | Book 74 Page 001 Leslie County |
| Mike Morgan | Bledsoe Coal Leasing Company | 5/14/07 | Book 71 Page 687 Leslie County |

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| Oscar Howard Heirs, being Ineda Howard; Wayne Howard and Carol Howard, husband and wife; Vickie Rhymer and Robert Rhymer, wife and husband; Leon Howard and Teresa Howard, husband and wife; Shafter Morgan and Anita Morgan; husband and wife; Margaret Pennington and Denver Pennington, wife and husband; Ted Stidham and Geneva Stidham, husband and wife | Bledsoe Coal Leasing Company | 5/24/07 | Book 71 Page 285 Leslie County |
| Elisha Morgan Heirs, being Joe Morgan, Jr. and Mary Morgan, husband and wife; Kathy Morgan, Debbie Mason and James Mason, wife and husband; Carrie Simmons and Marvin Simmons, wife and husband; Charlie Morgan and Shirley Morgan, husband and wife; Richard Morgan and Vera Morgan, husband and wife.<br><br>(see also Russell & Mike Morgan leases 2007) | Bledsoe Coal Leasing Company | 9/2/08 | Book 74 Page 112, Book 74 Page 120, Book 74 Page 128,<br><br>Book 71 Page 687,<br><br>Book 71 Page 285<br><br>Leslie County |
| Penn VA | Bledsoe Coal Leasing Company | 1/1/09 | Memorandum recorded 10/22/10 in Lease Book 77, Page 771 |
| Lela Hoskins | Bledsoe Coal Leasing Company | 1/1/76 | Leslie County Book 19 Page 8 |
| Arthur Estridge Heirs, being Red Carl Estridge, Barbara Alred and Nancy Bryant | Bledsoe Coal Leasing Company | 1/28/2010 | Memorandum recorded 8/10/11 in Lease Book 78, Page 554. |

DEBTORSLCC_105893

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Brock, Jane and Frank; Slusher, Wade and Christine | Shamrock Coal Company, Incorporated | 10/30/89 | Wade & Christine Slusher, 18 Ball Lane, Harlan, KY 40831; Jane or Frank Brock, PO Box 143, Bledsoe, KY 40810 |
| Brock, Frank and Jane | Shamrock Coal Company, Incorporated | 4/22/86 | Unrecorded, Leslie County<br><br>Bige Brock, 9000 E Laurel Road, London, KY 40741; Frank or Jane Brock, 464 Payne Trail, London, KY 40741 |
| Hoskins, Carl and Lela | Shamrock Coal Company, Incorporated | 8/17/92 | Book 57, Page<br><br>105,<br><br>Leslie County |
| Hall, Chester and Sarah | Shamrock Coal Company, Incorporated | 7/13/89 | Unrecorded, Leslie County<br><br>Chester & Sarah Hall, HC 77 Box 371, Mozelle, KY 40858 |

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kentucky River Properties | Shamrock Coal Company, Incorporated | 12/4/85 | Memorandum recorded Lease Book 77, Page 190 <br><br> Darrell Joseph, P.O. Box 574, Hyden, KY 41749; William Peyton Joseph, P.O. Box 39, Hyden, KY 41749; Marita Phillips, 2980 Admirl Street, Fort Pierce, FL 34982 |
| Mosley, Chester and Rebecca | Shamrock Coal Company, Incorporated | 9/11/89 | Unrecorded, Leslie County <br><br> Chester & Rebecca Mosley, Mozelle, KY 40858 |
| Howard, Otis and Stella | Shamrock Coal Company, Incorporated | 5/9/90 | Unrecorded, Leslie County <br><br> Otis & Stella Howard, PO Box 172, Mozelle, KY 40858 |
| Roark, Charles and Ruth | Shamrock Coal Company, Incorporated | 10/2/89 | Unrecorded, Leslie County <br><br> Charles & Ruth Roark, General Delivery, Mozelle, KY 40858 |

DEBTORSLCC_105895

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Taylor, Robert and Susie | Shamrock Coal Company, Incorporated | 3/16/89 | Unrecorded, Leslie County<br><br>(Legal Description Attached as Exhibit C-109)<br><br>Robert & Susie Taylor, PO Box 6, War Branch, KY 40878 |
| Stithem, James and Nancy | Shamrock Coal Company, Incorporated | 1/12/90 | Unrecorded, Leslie County<br><br>James & Nancy Stithem, 122 North Second St., Fairborn, OH 45324 |
| Wilson, Oscar and Sally | Shamrock Coal Company, Incorporated | 5/27/88 | Unrecorded, Leslie County<br><br>(Legal Description Attached as Exhibit C-110)<br><br>Wilson Enterprises, 145 Fredrick Dr., Eaton, OH 45320 |
| Bige Brock | Shamrock Coal Company, Incorporated | 4/22/86 | Unrecorded, Leslie County<br><br>Bige Brock, 9000 E Laurel Road, London, KY 40741; Frank or Jane Brock, 464 Payne Trail, London, KY 40741 |

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Denver Brock Heirs | Bledsoe Coal Leasing Company | 7/21/10 | Memorandum Recorded 8/30/10 in Lease Book 77, Page 572. Jerry Wayne Brock and Judy Brock, 5181 Hwy. 421, Helton, Kentucky 40840; Denver Ray Brock and Brenda Gail Brock, husband and wife, 4583 Hwy 421, Helton, Kentucky, 40840; Bessie Ruth Howard and Freddie Howard, wife and husband, 4568 HWY 421, Helton, Kentucky, 40840; Dorothy Ivey, single, 109 Elm Street,Berea, Kentucky, 40403 |

DEBTORSLCC_105897

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| Orville Burkhart, et al | Bledsoe Coal Leasing Company | 5/20/10 | Memorandum recorded in Leslie County in Lease Book 77, at Page 308; Orville Burkhart and Bernice Burkhart, husband and wife, P.O. Box 277, Livingston, Kentucky, 40445; Glen Burke and Opal Burke, husband and wife, 764 Kentucky 3245, Broadhead, Kentucky, 40409; William G. Burkhart and Nina Burkhart, husband and wife, P.O. Box 95, Broadhead, Kentucky, 40409; George Burkhart and Betty Burkhart, husband and wife, 8860 Highway 70 East,Eubank,Kentucky,42567; Clark W. Burkhart and Lorraine Burkhart, husband and wife, 535 Fox Lane, Savannah, Tennessee, 38372-6886; Mable Burkhart, widow, 615 West Gate Terrace, Streamwood, Illinois 60107 |
| Lela Hoskins | Bledsoe Coal Leasing Company | 3/14/00 | Unrecorded;  P.O. Box 234, Hoskinston, Kentucky 40844 |

Other Leslie County Leases:

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| C.W. Hoskins' Heirs | Revelation Energy, LLC | May 22, 2017 | Unrecorded |

**Letcher County, Kentucky**

All of the Real Property listed below Conveyed to Revelation through that certain Assignment of Real Property Agreements dated July 31, 2015, with Original Lessors Resource Development, Resource Land Company LLC and North Fork Coal Corporation, and Original Lessee Revelation Energy, LLC, having the following reference: Lease Book 66, Page 175.

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Maggard, Connie | Resource Development LLC | 7/13/00 | LB 49, PG 149 |
| Resource Development LLC | A & G Coal Corporation | 4/1/02 | Unrecorded |
| ACIN LLC, Resource Development and Harlan Reclamation Services LLC | Commonwealth of Kentucky, Transportation Cabinet | 11/19/12 | Unrecorded |
| Commonwealth of Kentucky, Transportation Cabinet | Harlan Reclamation Services LLC and Resource Development LLC | 12/13/12 | Unrecorded |
| Commonwealth of Kentucky, Transportation Cabinet | Harlan Reclamation Services LLC and Resource Development LLC | 12/13/12 | Unrecorded |
| Resource Development LLC, Harlan Reclamation Services LLC and North Fork Coal Corporation | East Kentucky Network, LLC | 7/15/2015 | Unrecorded |

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Eolia Resources, Inc. | Revelation Energy, LLC | November 1, 2014<br><br>Sublease document for the Collins' Heirs lease dated December 31, 1973 | Unrecorded. |
| Roda Coal Company, Inc. | Revelation Energy, LLC | December 29, 2016 | Unrecorded. |
| Penn Virginia Operating Co., LLC | Revelation Energy, LLC | December 13, 1984 | Partial Assignment and Assumption recorded in Lease Book 65, Page 611 |
| Amended, Consolidated and Restated Lease and Sublease with ACIN LLC | Revelation Energy, LLC | July 31, 2015 | Unrecorded |

### Fayette County, West Virginia

| Name of Lessor | Original Lessee | Date | Lease Recorded/ lessor address/Remarks |
|---|---|---|---|
| Master Sublease and Lease Agreement with Lightning, Inc. | Revelation Energy, LLC | July 12, 2011 | Unrecorded |

### Buchanan County, Virginia

All of the Real Property listed below Conveyed to Revelation through that certain Assignment and Assumption of Real Property Interests dated April 6, 2016, with Original Lessor Jewell Smokeless Coal Corporation, and Original Lessee Revelation Energy, LLC, having been recorded in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105901

1.  Lease and Agreement dated April 5, 1957, between Frank G. Carlson and Francis G. Carlson as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to Jawbone coal seam, Buchanan County, Virginia, as affected by Lease Modification Agreement dated June 10, 1957, between Frank G. Carlson and Francis G. Carlson as Lessors and Jewell Smokeless Coal Corporation, as Lessee; as affected by Agreement dated May 14, 1970, between Jewell Smokeless Coal Corporation and Francis G. Carlson and Stella McNeil Carlson.

2.  Agreement dated December 29, 1993, between Francis Carlson and Stella McNeil Carlson as Grantor and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia [electric transmission line easement].

3.  Indenture of Lease dated November 1, 1979, between Georgia-Pacific Corporation as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Amendment to Mining Lease with Consent to Sublease dated October 16, 1990, between Georgia-Pacific Corporation and Jewell Smokeless Coal Corporation.

4.  Agreement of Lease dated November 27, 1957, by and between W.M. Ritter Lumber Company, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, as affected by Supplemental Indenture of Lease dated March 15, 1962, between Georgia-Pacific Corporation and Jewell Smokeless Coal Corporation.

5.  Deed of Lease dated February 26, 1999, between Jack Stacy Adkins and Nancy Bowe Adkins and Allen Adkins as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam in Buchanan County, Virginia.

6.  Lease dated August 24, 1998, by and between PYXIS and Jewell Smokeless Coal Corporation, with respect to the Hagy coal seam in Buchanan County, Virginia, as affected by Lease Supplement and Amendment dated September 17, 2009, between ACIN LLC, successor to PYXIS, and Jewell Smokeless Coal Corporation; as affected by Agreement dated January 6, 2012, by and between Alpha Land and Reserves, LLC, and Jewell Smokeless Coal Corporation; as affected by Lease Supplement and Amendment dated January 9, 2012 between ACIN LLC, successor to PYXIS, and Jewell Smokeless Coal Corporation.  As amended by that certain Amended and Restated Lease effective as of April 6, 2016 by and between ACIN LLC and Revelation Energy, LLC.

7.  Agreement dated July 31, 1980, between Mamie B. Anderson and Vansant Coal Company and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

8.  Surface Lease dated February 6, 1980, between Gertie Arms, Josh V. Arms, Bill Arms, Juanita A Deel and Kelsey J. Earp, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

9.  Surface Lease Agreement dated August 1, 2004, between Wayne Baker and Stella M. Baker, as Lessors, and Jewell Smokeless Coal Corp., as Lessee, with respect to property near Squire Branch of Slate Creek in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105902

10. Agreement dated January 3, 1989, between Sarah Barton and Catherine Barton and Vansant Coal Corporation and Jewell Smokeless Coal Corporation with respect to property on the headwaters of the left fork of Hurricane Creek of Russell Fork River in Buchanan County, Virginia.

11. Lease dated November 19, 1970, between Earl E. Belcher, W.G. Combs, Lois McClanahan and Thomas Belcher, Florence Belcher, Clayton Edward Belcher and Mildred Belcher, Magdalene Belcher Smith, Eileen Belcher Glover, Hassell Belcher and Clemmie Belcher, Nell Belcher, Robinson Belcher and Martha Belcher, and Mary Ruth Combs and Lawrence Combs, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to coal property in Buchanan County, Virginia on the ridge between Slate Creek and Dismal on Little Prater Creek and Big Prater Creek.

12. Deed of Lease dated June 1, 1974, between C. L. Ritter Lumber Company as Lessor and H. A. Street and J. W. McGlothlin and W. W. McGlothlin and Burton Fletcher and Dennis Compton and Boyd Fowler as Lessees with respect to property situate on the waters of the Levisa River in Buchanan County, Virginia; as amended by Amendment dated July 6, 1981 by and between C.L. Ritter Lumber Company, Wellmore Coal Corporation, and H. A. Street and J. W. McGlothlin and W. W. McGlothlin and Burton Fletcher and Dennis Compton and Boyd Fowler; and affected by Consent to Sublease dated April 4, 2012 between C. L. Ritter Lumber Company, Incorporated and The Black Diamond Company and Jewell Smokeless Coal Corporation, and as affected by Sublease Agreement dated April 4, 2012 between The Black Diamond Company and Jewell Smokeless Coal Corporation.

13. Wheelage Easement Agreement dated December 28, 1976, between Walter F. Boyd and Carlie Boyd and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia, as affected by Addendum Wheelage Agreement dated September 11, 1984 between Walter F. Boyd and Carlie Boyd and Jewell Smokeless Coal Corporation.

14. Option Agreement dated October 31, 2007, between Samuel J. Breeding, Jr. and Betty Breeding and Inez Cox and Beverly Ruth Cox Tiller, as Owners, and Jewell Smokeless Coal Corporation, as Optionee, with respect to property in Buchanan County, Virginia.

15. Oil, Gas and Coalseam Gas Lease dated October 11, 1999 between Jewell Smokeless Coal Corporation and Buchanan Production Company with respect to property located on the waters of Levisa River in Buchanan County, Virginia.

16. Deed of Lease dated October 19, 1956, between Buchanan Reality Corporation, as Lessor, and H.J. Johnson and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as partially assigned by Assignment dated October 18, 1982, between Jewell Smokeless Coal Corporation, as Assignor, and W. Clyde Dennis, et. al., as Assignee, and Buchanan Reality Corporation, and as affected by Agreement dated November 5, 1982, between Buchanan Reality Corporation and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia, and

Schedule 6.20(b)

as affected by Supplemental Agreement dated September 8, 1987, between Buchanan Realty Corporation and Jewell Smokeless Coal Corporation.

17.     Sublease Agreement dated May 15, 1997, between Buchanan Energy Company and Jewell Smokeless Coal Corporation, with respect to Indenture of Lease dated August 7, 1978 between Georgia-Pacific Corporation and Buchanan Energy Company.

18.     Deed of Lease dated January 31, 1996, between Bull Creek Coal Company as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Widow Kennedy coal seam in Buchanan County, Virginia.

19.     Deed of Lease dated April 1, 1955, between Caroline Cole Gregory and W. D. Gregory as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

20.     Deed of Lease dated November 9, 1998, between Miles Charles, Jr., and Doris Charles Zang and Andra B. Evans and Rex Evans and Mellony Cates and Sammy Cates and Jimmy Lou Breeding as Lessors and Jewel Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

21.     Surface Lease dated February 28, 1979, between Arnold Childress and Beuna Childress as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property at the head of Pigeon Roost Branch and/or Mott Branch of Big Prater Creek, in Buchanan County, Virginia.

22.     Surface Lease dated March 15, 1979, between Everett Childress and Andy Granville Childress as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property at the head of Pigeon Roost Branch and/or Mott Branch of Big Prater Creek,in Buchanan County, Virginia.

23.     Partial Assignment dated March 28, 1994, between Wellmore Coal Corporation, as Assignor, and Jewell Smokeless Coal Corporation, as Assignee, with respect to rights under Deed of Lease dated January 1, 1977, between Ronald A. Clyborne and Kathryn S. C. Clyborne as Lessors and Wellmore Coal Corporation as Lessee.

24.     Agreement and Lease dated September 10, 1979, between Dewey Cole and Arizona M. Cole, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

25.     Surface Lease Agreement dated June 20, 2013, between Donald Lee and Maybelle Cole as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

26.     Lease Agreement dated October 31, 1979, between Fulton G. Cole and Madge J. Cole, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in on Dismal River of the Levisa River in Buchanan County, Virginia.

Schedule 6.20(b)

27.   Deed of Lease dated June 11, 1955, between Mrs. Katherine J. G. Cole, as Lessor, and
      Jewell Smokeless Coal Corporation, as Lessee, with respect to Jewell coal seam on the
      waters of Harry's Branch off Dismal River in Buchanan County, Virginia.

28.   Deed of Lease dated July 15, 1968, between Mrs. Katherine J. G. Cole, as Lessor, and
      Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam on the
      waters of Harry's Branch off Dismal River in Buchanan County, Virginia.

29.   Agreement dated July 11, 1980, between Auty Colman and Eva Coleman and Vansant
      Coal Company and Jewell Smokeless Coal Corporation with respect to property in
      Buchanan County, Virginia.

30.   Coal Lease dated February 26, 1979, between James E. Daniels and Belvie H. Daniels as
      Lessor and Jewell Smokeless Coal Company as Lessee with respect to property in
      Buchanan County, Virginia.

31.   Deed of Lease dated April 20, 1993, between William B. Dennis and Robert J. Dennis
      Katherine A. Dennis, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with
      respect to property located on Bill Keen Branch of Slate Creek in Buchanan County,
      Virginia.

32.   Sublease and Assignment dated January 6, 1988, between Eagle Investments, Inc., as
      Lessor and Jewell Smokeless Coal Corporation, as Lessee, and as affected by Settlement
      Agreement and Release dated January 6, 1988, between Emerald Mining, Inc., and Blue
      Diamond Energy, Inc., and Eagle Investments, Inc., and Carl R. Bolling, and Jewell
      Smokeless Coal Corporation.

33.   Easement Agreement dated September 5, 1978, between Garnie Boyd Elswick and
      Thurmond M. Elswick and Jewell Smokeless Coal Company with respect to property in
      Buchanan County, Virginia.

34.   Agreement dated January 16, 1985, between James W. Estep and Geneva B. Estep as
      Lessors and Wellmore Coal Corporation as Lessee with respect to property at Little
      Prater Creek in Buchanan County, Virginia, as affected by Assignment dated March 28,
      1994, between Wellmore Coal Corporation and James W. Estep and Jewell Smokeless
      Coal Corporation.

35.   Wheelage Agreement dated January 23, 1976, between James A Fletcher and Clara Mae
      and Young's Branch Coal Corporation and Jewell Coal and Coke Company with respect
      to property in Buchanan County, Virginia.

36.   Agreement dated December 17, 1981, between F. B. Fowler and Gaynell S. Fowler and
      Ira H. Blankenship and Lula Blankenship, as Lessor, and Jewell Smokeless Coal
      Company, as Lessee, with respect to Tiller coal seam and above in Buchanan County,
      Virginia.

Schedule 6.20(b)

DEBTORSLCC_105905

37.   Lease Agreement dated October 31, 1979, between Fulton G. Cole and Madge J. Cole as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

38.   Coal Lease dated October 6, 1987, by and between Garden Realty Corporation, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to the Tiller seam of coal and above in Buchanan County, Virginia.

39.   Coal Lease and Surface Rights Agreement dated July 8, 2004, between Georgia Matney and Donald Sandige and Ruby Belcher Sandige as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam and above in Buchanan County, Virginia.

40.   Agreement dated October 23, 1986, between George W. Gillespie Estate, Inc., and Mary Christian Elmore and Harry L. Elmore and Rachael L. Royall and J. Powell Royall, Jr., and Jane R. Phleger and Mosby Phleger and R. Bowen Royall and Doris Royall and William A. Royall and Theda D. Royall and Ellen R. Story and Walter F. Story and Sue S. Royall and Susan R. Whittaker and Sue Royall and Randall Whittaker and Edmund G. Royall and Martha S. Royall and John W. Gillespie and Virginia B. Gillespie and Robert G. Gillespie and Irma A. Gillespie and W. Jeff Gillespie, III, and Grace Barnes and George Barnes and R. R. St. Clair, Jr., and Grace St. Clair and Katherine C. St. Clair, as Lessors, and Jewell Smokeless Coal Corporation as Lessee with respect to Jawbone coal seam in Buchanan County, Virginia.

41.   Lease Agreement dated June 11, 1999, between Harrison-Wyatt, LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia.

42.   Deed of Lease dated January 2, 1974, between Otis Matney and May Matney and Dewey Matney and Julie B. Matney and Lution Matney and Lovis Matney and Helen Matney and Randy Matney and Kathy Matney and Ida C. Rife and Jerry Rife and Perry Matney and Maggie Matney and Vernon Matney and Tinie Matney and Elmer Matney and Josephine Matney and Gracie Daniels and Estil Daniels and Victoria Horwath and Edward Horwath and Edgar Looney and Roy T. Looney and Alice Suggs and Floyd Suggs and Neil Dills and Howard Dills as Lessors and Island Creek Coal Company as Lessee with respect to property in Buchanan County, Virginia, as affected by Coal Sublease Agreement dated August 18, 2010, between Island Creek Coal Company as Sublessor and Jewell Smokeless Coal Corporation as Sublessee.

43.   Agreement dated October 29, 2004, between Bucky Jean McConnell and Polly Ann Mallory and Ronnie Mallory and Nancy Lee Lowe and Wade Lowe and Artemus Bernard Jewell, Jr., and Frances Jewell, as Grantors, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property situate on the waters of Betts Branch, Mill Branch and Dry Branch of Dismal Creek in Buchanan County, Virginia.

44.   Lease dated October 26, 1970, between Lois Bowie and Dr. Roy Bowie and Florence E. Walker and James Walker and Irma R. Runals and John E. Runals and Robert Stinson

Schedule 6.20(b)

DEBTORSLCC_105906

Powers and Carol Powers and Amy Lee Powers, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

45.     Lease Agreement dated January 1, 1985, between Caroline Cole Keen and Claude V. Keene as Lessor and Jewell Smokeless Coal Corporation, Inc., as Lessee with respect to property in Buchanan County, Virginia.

46.     Deed of Lease dated May 21, 1955, between Mrs. Francis Gladys Cole Kennedy and Francis Kennedy as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property located between Loggy Bottom Branch and Harry's Branch in Buchanan County, Virginia.

47.     Deed of Lease dated May 11, 1971, between Mrs. Francis Gladys Cole Kennedy and Francis Kennedy, as Lessors, and Jewell Coal & Coke Company, as Lessee, with respect to property located between Loggy Bottom Branch and Harry's Branch in Buchanan County, Virginia.

48.     Lease dated November 7, 1973, between J. W. Lambert, Jr., and Jessie Pauley and Harry R. Pauley and Ava Spence and Hugh Spence and Helen L. James and Frank P. James, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia.

49.     Surface Lease dated March 6, 1979, between Claude Looney and Pearl Looney and Gurvis Looney and Ernest Looney and Clarence Looney, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

50.     Agreement and Lease dated October 19, 1978, between Ernest M. Looney and Faye Looney, as Lessors, and Jewell Smokeless Coal Company, as Lessee, with respect to property in Buchanan County, Virginia.

51.     Agreement dated July 31, 1980, Leland Looney and Margaret Ann Looney and Vansant Coal Company and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

52.     Coal Lease and Surface Rights Agreement dated July 8, 2004, between Georgia Matney and Donald Sandige and Ruby Belcher Sandige, as Lessor, and Jewell Smokeless Coal Corporation as Lessee.

53.     Agreement dated December 8, 1981, between Josie C. Maxwell and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

54.     Deed of Lease dated August 20, 1969, between George O. McGuire and Marjorie McGuire and Edward W. Baker and Robert L. Neeley and Jessie Maie Pobst and John W. Pobst and Billie S. Pobst and Nancy P. Ellis and Weldon T. Ellis, Jr., and W. Kent Pobst

Schedule 6.20(b)

DEBTORSLCC_105907

and Dorothy T. Pobst, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

55. Deed of Lease dated November 21, 1992, between Joseph F. McGuire and Marjorie Booker and James F. Booker and Helen Hahn and William F. Hahn and Rachel M. Colman and Harriette M. Doordan and Bernard P. Doordan, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

56. Lease dated November 16, 1970, between George B. Harris and Irene Harris and John G. Harris and Maybelle Harris and Humphrey W. Curtis, Jr., and Ann Curtis and Marjorie L. Lindsay and Winston S. Lindsay, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

57. Lease dated March 15, 1971, between Marjorie L. Lindsay and Winston S. Lindsay, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

58. Deed of Lease dated June 18, 1955, between George W. Keene and C. E. Keene, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as affected by First Supplemental Indenture of Lease dated April 16, 1985, between Modern Sales & Service, Inc., and John W. Ratliff and C. E. Ratliff and F. D. Robertson, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee.

59. Surface Rights Agreement dated December 28, 1994, between Carmel Deel and Phyllis Deel and Ernie Lee Deel and Katie Deel and Gregory V. Deel and Stephanie Deel, as Owner, and Motivation Coal Company, as Lessee, with respect to property in Buchanan County, Virginia; as affected by Assignment and Assumption Agreement dated October 20, 1995, between Jewell Smokeless Coal Corporation and Motivation Coal Company.

60. Deed of Lease dated May 25, 1998, between Robert S. Mullin and Catherine Q. Mullin and Marguerite M. Valdo and Alex R. Valdo, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

61. Lease Agreement dated June 17, 1967, between Basil Compton as Lessor and Jewel Smokeless Coal Corporation as Lessee with respect to Splashdam coal seam in Buchanan County, Virginia.

62. Deed of Lease dated August 24, 1995, between Evalena Mutter and Lyle Mutter and Ronald Compton and Jane Compton and Georgia Matney and Elmer Matney and Ethal Matney and Basil Matney and Marie Matney and Margaret Joyce Matney and Marie Keen and Elmer Keen and Arland Dennis Matney and Goldie Matney and Otis Matney

Schedule 6.20(b)

DEBTORSLCC_105908

and June Matney, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property on Hale Creek of the Dismal River in Buchanan County, Virginia.

63.   Coal Lease and Surface Rights Agreement undated in 2004, between Evalena Mutter and Lyle Mutter and Lonzo Rife and Alma Ruth Rife and J. B. Rife and Karen Rife and Cornelius Rife and Gusta Rife and Ellis Storia Rife and Ruby Rife as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

64.   Easement Agreement dated September 5, 1978, between Arthur Nuckles and Faye Nuckles and Jewell Smokeless Coal Company with respect to property on the waters of Back Hurricane Creek of Russell Fork River in Buchanan County, Virginia.

65.   Surface Lease Agreement dated December 1, 2003, between Jess O'Quin and Shelby O'Quinn, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

66.   Lease dated December 1, 1998, between Pocahontas Mining Company Limited Partnership, L.L.P., as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller, Jawbone, and Red Ash coal seams in Buchanan and Tazewell Counties, Virginia; and as affected by First Supplemental Agreement of Lease dated November 1, 2002; as affected by Second Supplemental Agreement of Lease dated November 1, 2003; as affected by Second Supplemental Agreement of Lease dated May 1, 2006; and as affected by Fourth Supplemental Agreement of Lease dated September 1, 2011; and as affected by Fifth Supplemental Agreement of Lease dated February 1, 2014, between Pocahontas Resources LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

The above Lease is affected by Agreement for Consent to Sublease and Lease Modification dated June 1, 2002, with respect to a sublease to Calico Coal, Inc.; and affected by First Amendment to Consent to Sublease and Lease Modification dated July 15, 2003; and affected by Second Amendment to Consent to Sublease and Lease Modification dated November 7, 2003; and affected by Third Amendment to Consent to Sublease and Lease Modification dated November 3, 2006.

67.   Deed of Lease dated September 17, 1957, between Clarence G. Ratliff and Orson P. Ratliff, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone and two top coal seams in Buchanan County, Virginia.

68.   Deed of Lease dated April 15, 1993, between Muriel Short and Sam D. Ray and Joe Roy Ray and Stephen Ray and Donna C. Ray and Virginia Ray Sanders and James E. Sanders and Inter Levisa Reality, LTD., as Lessors, Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

69.   Surface Lease Agreement dated May 11, 2004, between Freddie G. Rife and Mary W. Rife, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105909

70.     Wheelage Agreement dated July 11, 1966, between Aldon M. Rowe and Gladys Rowe and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

71.     Deed of Lease dated October 27, 1956, between Bascombe Rowe and Myrtle Rowe, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property known as Eligah Street farm in Buchanan County, Virginia.

72.     Deed of Lease dated January 15, 1973, between Pinkie S. Mullins and Stella S. Moore and John G. Moore and Virignia P. Shortridge and Kenneth E. Shortridge and Nell E. Shortridge and Cicero T. Shortridge and Donald L. Shortridge and Sidney B. Shortridge and Marie C. Shortridge and Hazel S. Kelly and Woddrow R. Kelly and Myrtle S. Ort and Frank Graham Ort and Kermit L. Shortridge and Jane Shortridge and Hassell A. Shortridge and Loueckel S. Shortridge and Birchie S. Goff and Ellis Goff and Murnice L. Shortridge and Virginia Carolyn S. Aliff and Jack Aliff, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Widow Kennedy coal seam in Buchanan County, Virginia.

73.     Surface Lease Agreement dated April 29, 2004, between Lula Crouse Sizemore as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

74.     Indenture of Lease dated April 3, 1961, between C. L. Ritter Lumber Company, Georgia-Pacific Corporation and Slocum Land Corporation, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property on the waters of Dismal Creek in Buchanan County, Virginia; as affected by First Supplemental Indenture of Lease dated March 1, 1962.

75.     Lease dated April 1, 1974, by and between Slocum Land Corporation, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to the Jawbone Seam on all the land situate on the left hand side of Long Branch of Dismal Creek near Patterson, Virginia.

76.     Coal Lease dated August 10, 1987, between Mary Miller Smith as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam and above in Buchanan County, Virginia.

77.     Coal Lease dated August 10, 1987, between Betty Miller Smith as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam and above in Buchanan County, Virginia.

78.     Surface Lease Agreement dated March 14, 2005, between Delmar U. Somoskey and Joyce M. Somoskey as Lessors and Jewell Smokeless Coal Corp., as Lessee with respect to Raven coal seam in Buchanan County, Virginia.

79.     Surface Lease Agreement dated March 14, 2005, between Emory C. Somoskey and Rebecca A. Somoskey as Lessors and Jewell Smokeless Coal Corp., as Lessee with respect to Raven coal seam in Buchanan County, Virginia.

Schedule 6.20(b)

80.    Deed of Lease dated August 1, 1990, between Huston St. Clair, Jr., and Janet T. Young and Sherwood D. Young and Robert H. Moore, Jr., and James R. Moore and Barbara W. Moore and George W. St. Clair Moore and Alice H. Moore and Margaret Moore Ripley and George W. St. Clair, II and Carol St. Clair and J. Douglas St. Clair and George W. St. Clair II and Sovran Bank, N.A., as Co-Trustees under Will of Kathryn B. St. Clair and Margaret Anne Evans Huhn and S. Peter Huhn and Debra Sue Evans, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia; and as affected by First Amendment to Lease dated July 8, 1992.

81.    Deed of Lease dated August 15, 1994, between Tazewell Coal and Iron Company, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Raven coal seam in Buchanan County, Virginia.

82.    Surface Lease Agreement (Patterson-West Project) dated June 1, 2004, between Connie Jean Teer and Vernon Teer, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

83.    Lease dated September 17, 1976, between Erma R. Runals and James S. Thompson and Patricia B. Thompson, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

84.    Surface Lease Agreement (Trivett/McGlothlin Properties) dated September 19, 2001, between W. H. Trivett and Dorothy Trivett and Mary McGlothlin, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

85.    Deed of Lease dated June 1, 1985, between Edward Ralph Van Dyke and Dorothy T. Van Dyke and William H. Van Dyke and Sue Davis Van Dyke and Claude H. Van Dyke and Bettye H. Van Dyke and Mary Elizabeth Van Dyke and Virginia V. Kinney and Harley P. Kinney and Rufus Oscar Van Dyke, Jr., and Bonnie Van Dyke and Marjorie T. Gillespie and Jean G. Walker and George F. Walker, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia.

86.    Lease Agreement dated September 1, 1992, between Vansant Coal Corporation, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property situate on the Middle Fork of Spruce Pine Creek in Buchanan County, Virginia.

87.    Easement Agreement dated November 8, 1983, between Julie L. Viers and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

88.    Deed of Easement and Maintenance Agreement dated April 21, 2003, between Julie Lester Viers, as Grantor, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105911

89.     Coal Lease (Hagy Seam on portion of 1,010 acres) dated June 1, 2011, between War Fork Coals, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Hagy coal seam in Buchanan County, Virginia.

90.     Surface Lease Agreement (Patterson-West Project) dated May 8, 2004, between Bernard D. Ward and Carol Ann Ward and Emily A. Brown and James S. Brown, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Glamorgan coal seam in Buchanan County, Virginia.

91.     Deed of Lease dated May 1, 1973, between Ona Rife and J. L. Weller and Hettie Weller, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to the Tiller coal seam in Buchanan County, Virginia.

92.     Coal Lease and Surface Rights Agreement (Patterson-West Project) dated June 17, 2004, between Joseph Weller, Jr., and Peggy Weller and Richard Weller and Phyllis Weller and Jay Rife and Janice Rife and Janet McGee and Francis McGee and Josephine Rife, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia.

93.     Lease dated November 19, 1970, between Earl E. Belcher and W. G. Combs and Lois McClanahan and Thomas Belcher and Florence Belcher and Clayton Edward Belcher and Mildred Belcher and Magdalene Belcher Smith and Eileen Belcher Glover and Hassell Belcher and Clemmie Belcher and Nell Belcher and Robinson Belcher and Martha Belcher and Mary Ruth Combs and Lawrence Combs, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

94.     Agreement of Sublease dated January 1, 1990 by and between United Coal Company, Wellmore Coal Corporation, as Sublessor, and Jewell Smokeless Coal Corporation, as Subleassee; as affected by partial release of Sublease Agreement dated June 1, 1995; as affected by First Amendment of Sublease Agreement dated June 1, 1995

95.     Sublease Agreement dated June 26, 1991, by and between Wellmore Coal Corporation, as Sublessor, and Jewell Smokeless Coal Corporation, as Sublessee.

96.     Assignment Agreement dated January 1, 1990 by and between Wellmore Coal Corporation, as Assignor, and Jewell Smokeless Coal Company, as Assignee.

97.     Coal Lease dated August 10, 1987, between Ruth Blanton Wilkie, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia.

98.     Deed of Lease dated August 14, 1972, between Garland D. Yates and Jennie C. Yates and Mary Elsie Clevinger and Russell S. Clevinger and Margie E. Belcher and Thomas A. Belcher and Flora E. Fuller and Bertha Horn and Lena C. Horn and Earl W. Yates and Violet Yates and Alta R. Yates and Vernon Yates, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller seam in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105912

99.    Lease Agreement dated February 17, 1989, between ETI Explosives Technologies International, Inc., and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia, as affected by Acknowledgement dated June 19, 1996, between Sandy Valley Explosives Co., Inc. and Jewell Smokeless Coal Corporation, and as affected by Amendment dated December 13, 1996, between ETI Explosives Technologies International, Inc., and Jewell Smokeless Coal Corporation, and as affected by Amendment dated February 17, 2009, between Dyno Nobel Inc. and Jewell Smokeless Coal Corporation.

100.    Deed of Lease dated September 12, 1955, between L. Maude Fugate, Marvin H. McGuire and Fan Ward McGuire, John McGuire, Wake H. Peery, James M. Peery and Clara B. Peery, Robert C. Peery and Stewart Buford Beery, Sadie M. Bane, Gertrude F. McGuire, Ruth M. Buck and W. M. Buck, and Elizabeth Reed Peery, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee; as affected by Agreement dated August 2, 1994, between James M. Peery, Charles E. Green, III, and H.G. Gillespie, Jr., Trustee of the Hurt-McGuire Land Trust, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

101.    Deed of Lease dated July 1, 1991, between James M. Peery, Charles E. Green, III and H.G. Gillespie, Jr., Trustees of the Hurt-McGuire Land Trust, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, and recorded in Deed Book 381, Page 300.

102.    Right of Way dated April 15, 1971, between Jack Ward in his own right and as agent for Jessie Ward, Leonard Ward, Sammy Ward and Ella Mullins and heirs of Marie Lester and Jewell Coal & Coke Company with respect to property in Buchanan County, Virginia. [power line easement]

103.    Limited Surface Easement dated June 25, 1993, between Mark Fletcher, as Grantor, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

Other Buchanan Leases:

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| Jewell Smokeless Coal Corporation | Revelation Energy, LLC | March 28, 2017 | Sublease Assignment and Agreement, as Amended for certain properties located in Buchanan County, Virginia, Tazewell County, Virginia and McDowell County, West Virginia.  Unrecorded. |
| Ramaco Resources Land Holdings, LLC | Revelation Energy, LLC | January 13, 2017 | Sublease (Southern Raven Seam Area) for such area located in certain properties held in Buchanan County, Virginia. |

Schedule 6.20(b)

DEBTORSLCC_105913

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| | | | Unrecorded. |
| Pocahontas Resources LLC | Revelation Energy, LLC | August 1, 2015 | Lease of Jones Fork No. 4 in Buchanan County, Virginia Unrecorded. |
| Pocahontas Resources LLC | Revelation Energy, LLC | January 1, 2010, as amended October 1, 2015 | Lease of 17,545 acres for surface mining in Buchanan and Tazewell Counties, Virginia. Unrecorded. |
| CNX Gas Company LLC | Revelation Energy, LLC | August 13, 2012 | Lease of surface in Buchanan County, Virginia.  Unrecorded. |

### Tazewell County, Virginia

The below lease Conveyed to Revelation through that certain Assignment and Assumption of Real Property Interests dated April 6, 2016, with Original Grantor Jewell Smokeless Coal Corporation, and Original Grantee Revelation Energy, LLC.  Memorandum to be recorded.

Lease dated December 1, 1998, between Pocahontas Mining Company Limited Partnership, L.L.P., as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller, Jawbone, and Red Ash coal seams in Buchanan and Tazewell Counties, Virginia; and as affected by First Supplemental Agreement of Lease dated November 1, 2002; as affected by Second Supplemental Agreement of Lease dated November 1, 2003; as affected by Second Supplemental Agreement of Lease dated May 1, 2006; and as affected by Fourth Supplemental Agreement of Lease dated September 1, 2011; and as affected by Fifth Supplemental Agreement of Lease dated February 1, 2014, between Pocahontas Resources LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

| Pocahontas Resources LLC | Revelation Energy, LLC | January 1, 2010, as amended October 1, 2015 | Lease of 17,545 acres for surface mining in Buchanan and Tazewell Counties, Virginia. Unrecorded. |
|---|---|---|---|

All of the Real Property listed below Conveyed to Revelation through that certain Assignment of Real Property Agreements dated July 31, 2015, with Original Lessors Resource Development, Resource Land Company LLC and North Fork Coal Corporation, and Original Lessee Revelation Energy, LLC, having the following reference: Instrument Number 201702982.

Schedule 6.20(b)

**Wise County, Virginia**

| Name of Lessor | Original Lessee | Date | Lease Recorded/ Lessor address/Remarks |
|---|---|---|---|
| Amended, Consolidated and Restated Lease and Sublease with ACIN LLC | Revelation Energy, LLC | July 31, 2015 | Unrecorded |
| Penn Virginia Operating Co., LLC | Pigeon Creek Processing Corporation | 2/5/00 | Unrecorded |
| Penn Virginia Operating Co., LLC | Resource Development LLC | 5/20/96 | Unrecorded |
| Penn Virginia Operating Co., LLC | Pigeon Creek Processing Corporation | 2/5/00 | Unrecorded |
| Penn Virginia Operating Co., LLC | North Fork Coal Corporation | 2/12/97 | Unrecorded |
| Resource Development LLC | A & G Coal Corporation | 4/29/09 | Unrecorded |
| Interstate Railroad Company | Pigeon Creek Processing Corporation | 8/29/01 | Unrecorded |
| Interstate Railroad Company | Pigeon Creek Processing Corporation | 9/30/07 | Unrecorded |
| Pigeon Creek Processing Corporation | Commonwealth of Virginia, Department of Mines, Minerals and Energy | 6/24/13 | Unrecorded |
| Resource Development LLC | Commonwealth of Virginia | 9/16/13 | Unrecorded |

Schedule 6.20(b)

DEBTORSLCC_105915

| Resource Development LLC | Virginia Department of Mines, Minerals and Energy, Division of Mined Land Reclamation | 1/24/13 | Unrecorded |
| --- | --- | --- | --- |
| Abba and Company | Resource Development LLC | 6/21/2012 | Unrecorded |

Schedule 6.20(b)

DEBTORSLCC_105916

## Leased Property of Subsidiaries

## McDowell County, West Virginia

1. Lease dated April 1, 2016 by and between WPP LLC and Vansant Coal Corporation Buchanan County and McDowell County, West Virginia

2. Coal Lease dated March 27, 2012, between Buck Jewell Resources, LLC, and OGI Properties I, LLC, as Lessor, and Vansant Coal Corporation, as Lessee, with respect to Jawbone coal seam in McDowell County, West Virginia.

3. Coal Sublease Agreement dated February 17, 1988, by and between Jewell Ridge Coal Corporation and Vansant Coal Corporation; as affected by First Amendment to Sublease Agreement dated June 23, 1988 [copy not provided]; as affected by Sublease Assignment Agreement dated October 3, 1988, between Vansant Coal Corporation, as Assignor, and Jewell Smokeless Coal Corporation, as Assignee; as affected by Supplemental Lease Agreement dated January 31, 1990, by and between Lon B. Rogers and Mary Evelyn Rogers, Jewell Ridge Coal Corporation and Jewell Smokeless Coal Corporation; as affected by Second Amendment to Sublease Agreement dated November 3, 1993; as affected by Settlement Agreement and Mutual Release dated December 30, 1996, by and among Fon Rogers, II, Trustee of the Lon B. Rogers Bradshaw Trust #2, Jewell Smokeless Coal Corporation, Vansant Coal Corporation, Jewell Resources Corporation, and Elk River Resources, Inc.; as affected by Agreement dated October 1, 2001.

4. Deed of Lease dated March 10, 2014, between LBR Holdings, LLC, as Lessor and Vansant Coal Corporation as Lessee with respect to Tiller coal seam in McDowell County, Virginia; as affected by Guaranty dated March 10, 2014, by SunCoke Energy, Inc.

5. Lease dated July 30, 2010, by and between Betty Taylor, Peggy Houseman, Glen Keith Nester and Michael D. Nester, as Lessor, and Energy Resources, LLC, as Lessee.

6. Easement Agreement (Powerline on Lopin Tract) dated March 30, 2110, by and between Ola Gay Jewell, David W. Clevinger, Everett Delaney, Buckeye Coal Company, Inc., CJ&L Mining, Inc., John D. Clevinger and Vansant Coal Corporation, and recorded in Deed Book 468, Page 754.

7. Right of Way License dated June 3, 2013, between Heartwood Forestland Fund IV, L.P., and Vansant Coal Corporation with respect to property in McDowell County, West Virginia.

8. Joint Road Use Agreement dated September 1, 2013, between GeoMet Operating Company, Inc., and Vansant Coal Corporation with respect to property in McDowell County, West Virginia.

9. Surface Lease Agreement dated June 10, 2014, by and between Gerald Combs, David Combs, Peggy Jean Mitchell, Patsy Rught Lockwood and Priscilla Ann McCall, as Lessors, and Harold Keene Coal Co., Inc., as Lessee.

Schedule 6.20(b)

10. Agreement of Release and Temporary Easement dated December 19, 2000, between James O. Riffe and Edna L. Riffe and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia.

11. Agreement of Release and Temporary Easement dated January 12, 2001, between Vernor R. Wimmer and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia, as affected by Agreement of Option for Release and Temporary Easement dated February 2, 2001 between Vernor R. Wimmer and Vansant Coal Corporation.

12. Agreement of Release and Temporary Easement dated January 12, 2001, between Herbert Sweet, Jr., and Dianne Sweet and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia, as affected by Agreement of Option for Release and Temporary Easement dated February 2, 2001, between Herbert Sweet, Jr., and Dianne Sweet and Vansant Coal Corporation.

**The following Leases to which a Subsidiary is a party:**

| WPP LLC | Vansant Coal Corporation | April 1, 2016 | Buchanan County, Virginia and McDowell County, West Virginia |
|---|---|---|---|

1. Surface Lease Agreement (Hillman Properties) dated September 7, 2012, between Randall Hillman and Michael Hillman, as Lessors, and Harold Keene Coal Co., Inc., as Lessee, with respect to property in Buchanan County, Virginia.

2. Sublease dated October 1, 2001, between Knox Creek Coal Corporation as Sublessor and Harold Keene Coal Co., Inc., as Sublessee and Keene Carpet of Bristol, Inc., as Guarantor with respect to Widow Kennedy coal seam in Russell County, Virginia; and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, between Buckhorn Coal Company as Lessor and Sandy Ridge Energy Corporation as Lessee with respect to property in Buchanan and Russell Counties, Virginia; as affected by Assignment Agreement dated March 12, 1987, between Sandy Ridge Energy Corporation and Knox Creek Coal Corporation, and as affected by Lease Amendment and Agreement dated September 1, 1998, between Buckhorn Coal Company as Lessor and Knox Creek Coal Corporation as Lessee.

3. Sublease dated September 29, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Widow Kennedy coal seam in Russell County, Virginia, as affected by Amendment No. 1 to Sublease dated February 26, 2013, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee; and as affected by

Schedule 6.20(b)

DEBTORSLCC_105918

Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, between Buckhorn Coal Company as Lessor and Sandy Ridge Energy Corporation as Lessee with respect to property in Buchanan and Russell Counties, Virginia; as affected by Assignment Agreement dated March 12, 1987, between Sandy Ridge Energy Corporation and Knox Creek Coal Corporation, and as affected by Lease Amendment and Agreement dated September 1, 1998, between Buckhorn Coal Company as Lessor and Knox Creek Coal Corporation as Lessee.

4. Sublease dated May 20, 2003, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Banner coal seam in Russell County, Virginia; as affected by Mutual Termination, Surrender and Release of Subleases dated March 24, 2010, between Harold Keene Coal Co., Inc., and Keene Carpet of Bristol, Inc., and Knox Creek Coal Corporation; and as affected by Reinstatement and Amendment of Subleases dated March 24, 2004, between Knox Creek Coal Corporation and Harold Keene Coal Co., Inc., and Jewell Resources Corporation as Guarantor.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page 516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated May 20, 2003, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

5. Sublease dated September 23, 2004, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Banner coal seam in Russell County, Virginia; as affected by Amendment to Sublease dated April 26, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, and as affected by Mutual Termination, Surrender and Release of Subleases dated March 24, 2010, between Harold Keene Coal Co., Inc., and Keene Carpet of Bristol, Inc., and Knox Creek Coal Corporation, and as affected by Reinstatement and Amendment of Subleases dated March 24, 2004, between Knox Creek Coal Corporation and Harold Keene Coal Co., Inc., and Jewell Resources Corporation as Guarantor, and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

Schedule 6.20(b)

DEBTORSLCC_105919

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page 516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated September 17, 2004, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

6. Coal Lease and Sublease dated April 26, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor with respect to Banner coal seam in Russell County, Virginia.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page 516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated March 20, 2007, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

7. Deed of Lease dated July 7, 2006, between Harrison-Wyatt LLC, as Lessor, and Energy Resources, LLC, as Lessee, with respect to property in Buchanan County, Virginia, as affected by Amendment to Deed of Lease dated August 31, 2010, between Harrison-Wyatt, LLC, as Lessor, and Energy Resources, LLC, as Lessee.

8. Lease dated December 13, 2010, by and between Emory & Henry College, as Lessor, and Harold Keene Coal Company, Inc., as Lessee, with respect to the Rufus Fletcher property in Buchanan County, Virginia.

9. Lease Agreement dated January 6, 2011, by and between Tazewell Coal and Iron Company, as Lessor, and Energy Resources, LLC, as Lessee, with respect to the Jawbone and above seams of cola in Buchanan County, Virginia.

10. Coal Mining Lease dated October 24, 2011, between WPP, LLC, as Lessor, and Vansant Coal Corporation, as Lessee, with respect to Douglas, Red Ash, Jawbone, and Tiller coal seams in Buchanan County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105920

11. Contract dated March 11, 1959 by and between R.L. Anderson and Maye Anderson, as Grantor, and Vansant Mining Corporation, as Grantee, with respect to property located on the waters of the right hand fork of Big Prater Creed in Buchanan County, Virginia.

12. Agreement dated June 26, 1965, between Elmer Church and Jonnie Church and Vansant Coal Corporation with respect to property in Buchanan County, Virginia.

13. Contract dated August 17, 1960, between Scott Cline and Lydia Cline and Vansant Mining Corporation with respect to property in Buchanan County, Virginia.

14. Lease dated January 1, 1972, between W. Clyde Dennis, in his own right, and as Trustee for the benefit of William B. Dennis and Robert J. Dennis, William B. Dennis, in his own right, and Robert J. Dennis, in his own right, as Lessors, and Vansant Coal Corporation, as Lessee, with respect to property located at the head of Dry Fork of Big Prater Creek, in Buchanan County, Virginia, as affected by First Supplemental Lease Agreement dated November 20, 1987, between William B. Dennis and Robert J. Dennis and Katherine A. Dennis as Lessor and Vansant Coal Corporation as Lessee.

15. Lease dated January 30, 1973, between C. M. Ellis, as Lessor, and Vansant Coal Corporation, as Lessee, with respect to property situate in Dry Fork of Big Prater in Buchanan County, Virginia.

16. Deed of Lease dated January 4, 1955, between M. B. Elswick and wife (deceased) and Vansant Coal Corporation with respect to property in Buchanan County, Virginia.

17. Deed of Lease dated November 26, 1958 between I.C. Boyd, as Lessor, and Vansant Mining Corporation, as Lessee.

18. Deed of Lease dated August 2, 1967 by and between Garden Realty Corporation, as Lessor, and Vansant Coal Corporation, as Lessee with respect to two parcels located on the right hand fork of Big Prater Creek in Buchanan County, Virginia; as affected by First Supplemental Lease Agreement dated November 20, 1987.

19. Deed of Lease dated February 26, 1972, by and between Garden Realty Corporation, as Lessor, and Vansant Coal Corporation, as Lessee with property lying on Baldwin Mountain and the head of Dry Fork of Big Prater Creek in Buchanan County, Virginia; as affected by Supplemental Agreement dated October 6, 1987.

20. Contract dated May 23, 1961, between Albert D. Hagy and Lorraine Hagy and Daniel B. Hagy and Lou Hagy and Vansant Mining Corporation with respect to property in Buchanan County, Virginia.

21. Deed of Lease dated July 25, 1952, between Levisa Coal Corporation, as Lessor, and Vansant Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as affected by Indenture of Lease dated November 16, 1956, between Levisa Coal Corporation as Lessor and Island Creek Coal Company as Lessee, and as affected by Assignment dated December 31, 1997, between Dominion Coal Corporation and Jewell Smokeless Coal Corporation and Vansant Coal Corporation; and as affected by Agreement dated July 25, 1998, between Levisa Coal Company and Motivation Coal Company and Vansant Coal Company; and as affected by Agreement and Compromise of Disputed Claims dated July 31, 1998, between

Schedule 6.20(b)

DEBTORSLCC_105921

Levisa Coal Company and Jewell Smokeless Coal Corporation and Dominion Coal Corporation and Vansant Coal Corporation; and as affected by Amendment and Supplement to Deed of Lease dated July 31, 1998, between Levisa Coal Company and Vansant Coal Corporation, and as affected by Release and Agreement dated May 30, 2006, between Levisa Coal Company and Vansant Coal Corporation, and as affected by Second Amendment and Supplement to Deed of Lease dated January 1, 2013, between Levisa Coal Company and Vansant Coal Corporation, and as affected by Settlement Agreement dated October 11, 2013, between Levisa Coal Company and Vansant Coal Corporation.

22. Agreement of Release and Temporary Easement dated December 19, 2000, between James O. Riffe and Edna L. Riffe and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia.

23. Agreement of Release and Temporary Easement dated January 12, 2001, between Vernor R. Wimmer and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia, as affected by Agreement of Option for Release and Temporary Easement dated February 2, 2001 between Vernor R. Wimmer and Vansant Coal Corporation.

24. Agreement of Release and Temporary Easement dated December 19, 2000, by and between James O. Riffe and Edna L. Riffee and Vansant Coal Corporation.

25. Agreement of Release and Temporary Easement dated January 12, 2001, between Herbert Sweet, Jr., and Dianne Sweet and Vansant Coal Corporation with respect to property in McDowell County, West Virginia and Buchanan County, Virginia, as affected by Agreement of Option for Release and Temporary Easement dated February 2, 2001, between Herbert Sweet, Jr., and Dianne Sweet and Vansant Coal Corporation.

26. Deed of Easement and Maintenance dated May 24, 2013, between Joseph and Billie Mullins, as Grantors, and Vansant Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

27. Deed of Easement and Maintenance dated May 24, 2013, between Luther Wimmer, as Grantor, and Vansant Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

28. Deed of Easement and Maintenance dated May 30, 2013, between Larry Allen, as Grantor, and Vansant Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

29. Deed of Easement and Maintenance dated June 18, 2013, between Tina Smith Phillips and Latisha Smith Bailey and Donathan Phillips and Summer Phillips and Christopher Bailey and Steven Luke Bailey, as Grantors, and Vansant Coal Corporation, as Grantee, with respect to property       in       Buchanan       County,       Virginia.

Schedule 6.20(b)

DEBTORSLCC_105922

## Dickenson County, Virginia

**The Following Leases to which a Subsidiary is a party:**

Lease Agreement dated October 12, 1973, between George W. Branham and Bertha Branham and Ross Branham and Nora Branham and Arville Branham and G. C. Branham and Clarence Branham and Harriet Self and T. D. Self, as Lessors, and Cumberland Collieries, Incorporated, as Lessee, with respect to property in Dickenson County, Virginia, as affected by Assignment of Lease dated September 26, 1990 between Cumberland Collieries, Inc., as Assignor, and Vansant Coal Corporation, as Assignee.

## Russell County, Virginia

### The Following Leases to which Subsidiaries are a party:

1. Lease Agreement dated August 12, 2004, between Buckhorn Coal Company, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to Banner and Big Fork coal seams in Russell County, Virginia.

2. Lease Agreement dated November 30, 2010, between Buckhorn Coal Company, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Jawbone coal seam in Russell County, Virginia, as affected by Modification and Supplemental Lease Agreement dated December 27, 2010.

3. Deed of Lease undated in June 2008, between Charles H. Gent, Jr., and Robert A. Gent, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to Widow Kennedy, Big Fork, and Banner coal seams in Russell County, Virginia.

4. Deed of Lease dated May 6, 2005, between Gent Royalty Partners, LLC, and Gent Enterprises, as Lessors, and Harold Keene Coal Co., Inc., as Lessee, with respect to Widow Kennedy, Big Fork, and Banner coal seams in Russell County, Virginia; as affected by Amendment dated August 31, 2012.

5. Surface Lease Agreement dated January 8, 2011, between Gent Enterprises LLC, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to Widow Kennedy, Big Fork, and Banner coal seams in Russell County, Virginia, as affected by Amendment and Supplement to Surface Lease Agreement dated May 6, 2014, between Gent Enterprises LLC and Harold Keene Coal Company, Inc.

6. Surface Lease Agreement dated January 8, 2011, between Gent Enterprises LLC, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to Widow Kennedy coal seam in Russell County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105923

7. Lease Agreement dated August 31, 2012, between Gent Royalty Partners, LLC and Gent Enterprises, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to property in Russell County, Virginia.

8. Sublease dated October 1, 2001, between Knox Creek Coal Corporation as Sublessor and Harold Keene Coal Co., Inc., as Sublessee and Keene Carpet of Bristol, Inc., as Guarantor with respect to Widow Kennedy coal seam in Russell County, Virginia; and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, between Buckhorn Coal Company as Lessor and Sandy Ridge Energy Corporation as Lessee with respect to property in Buchanan and Russell Counties, Virginia; as affected by Assignment Agreement dated March 12, 1987, between Sandy Ridge Energy Corporation and Knox Creek Coal Corporation, and as affected by Lease Amendment and Agreement dated September 1, 1998, between Buckhorn Coal Company as Lessor and Knox Creek Coal Corporation as Lessee.

9. Sublease dated September 29, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Widow Kennedy coal seam in Russell County, Virginia, as affected by Amendment No. 1 to Sublease dated February 26, 2013, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee; and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, between Buckhorn Coal Company as Lessor and Sandy Ridge Energy Corporation as Lessee with respect to property in Buchanan and Russell Counties, Virginia; as affected by Assignment Agreement dated March 12, 1987, between Sandy Ridge Energy Corporation and Knox Creek Coal Corporation, and as affected by Lease Amendment and Agreement dated September 1, 1998, between Buckhorn Coal Company as Lessor and Knox Creek Coal Corporation as Lessee.

10. Sublease dated May 20, 2003, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Banner coal seam in Russell County, Virginia; as affected by Mutual Termination, Surrender and Release of Subleases dated March 24, 2010, between Harold Keene Coal Co., Inc., and Keene Carpet of Bristol, Inc., and Knox Creek Coal Corporation; and as affected by Reinstatement and Amendment of Subleases dated March 24, 2004, between Knox Creek Coal Corporation and Harold Keene Coal Co., Inc., and Jewell Resources Corporation as Guarantor.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page

Schedule 6.20(b)

DEBTORSLCC_105924

516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated May 20, 2003, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

11. Sublease dated September 23, 2004, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to Banner coal seam in Russell County, Virginia; as affected by Amendment to Sublease dated April 26, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, and as affected by Mutual Termination, Surrender and Release of Subleases dated March 24, 2010, between Harold Keene Coal Co., Inc., and Keene Carpet of Bristol, Inc., and Knox Creek Coal Corporation, and as affected by Reinstatement and Amendment of Subleases dated March 24, 2004, between Knox Creek Coal Corporation and Harold Keene Coal Co., Inc., and Jewell Resources Corporation as Guarantor, and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page 516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated September 17, 2004, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

12. Coal Lease and Sublease dated April 26, 2007, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor with respect to Banner coal seam in Russell County, Virginia.

The above grants to Harold Keene Coal Co., Inc., a sublease with respect to Coal Lease dated March 12, 1987, by and between G.R. Brittain, et al., Trustees of the Coal Mountain Trust, et al., as Lessors, and Sandy Ridge Energy Corporation, as Lessee, of record by Memorandum in the Office of the Clerk of the Circuit Court of Russell County, Virginia, in Book 332, at page 516, and of record by Memorandum in the Office of the Clerk of the Circuit Court of Buchanan County, Virginia, in Book 331, at page 51; as assigned by Assignment from Sandy Ridge to Knox Creek Coal Corporation effective March 12, 1987, of record in the aforesaid Russell County Clerk's Office in Book 332, at page 508; as amended by unrecorded Lease Amendment

Schedule 6.20(b)

and Agreement dated September 1, 1998, by and between Lessors and Knox Creek; as affected by unrecorded Agreement dated August 23, 1999, by and between Buckhorn and Knox Creek; as affected by Consent to Sublease dated March 20, 2007, between Swords Creek Land Partnership as Lessor and Knox Creek Coal Corporation as Lessee.

13. Sublease dated March 30, 2010, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee, and Keene Carpet of Bristol, Inc., as Guarantor, with respect to portions of the Upper and Lower splits of the Banner coal seam in Russell County, Virginia, as affected by Amendment No. 1 to Sublease dated March 19, 2013, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee; and as affected by Guaranty Agreement dated January 13, 2011 between Jewell Resources Corporation as Guarantor and Knox Creek Coal Corporation as Beneficiary..

14. Sublease dated December 27, 2011, between Knox Creek Coal Corporation as Sublessor and Harold Keene Coal Co., Inc., as Sublessee with respect to the Lower split of the Banner coal seam (a/k/a Big Fork seam) in Russell County, Virginia; as affected by Extension Letter dated November 14, 2013, from Knox Creek Coal Corporation to Harold Keene Coal Co., Inc.; as affected by Amendment No. 1 to Sublease dated January 28, 2014, between Knox Creek Coal Corporation, as Sublessor, and Harold Keene Coal Co., Inc., as Sublessee.

15. Coal Lease Agreement dated July 7, 2006, between Wyatt Realty Corp., as Lessor, and Energy Resources, LLC, as Lessee, with respect to property in Russell County, Virginia, as affected by Amendment to Deed of Lease dated August 31, 2010, between Wyatt Realty Corp. as Lessor, and Energy Resources, LLC, as Lessee.

16. Coal Lease Agreement (Russell County, Virginia) dated January 8, 2013, between Harold Lynn Keene and Charlotte M. Keene, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to property in Russell County, Virginia.

17. Surface Lease Agreement (Russell County, Virginia) dated January 8, 2013, between Harold Lynn Keene and Charlotte M. Keene, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to property in Russell County, Virginia.

18. Coal Lease Agreement dated September 15, 2008, by and between Reserve Coal Properties Company and Harold Keene Coal Co., Inc.; as affected by Amendment to Coal Lease Agreement dated September 15, 2010; as affected by Second Amendment to Coal Lease Agreement dated August 13, 2012; and as affected by Third Amendment to Coal Lease Agreement dated August 13, 2012.

19. Lease dated February 15, 2008, between Anita Ray, as Lessor, and Energy Resources, LLC, as Lessee, with respect to the Lower Banner coal seam in Russell County, Virginia.

20. Lease dated April 17, 2008, between Bee Wells, as Lessor, and Energy Resources, LLC, as Lessee, with respect to the Lower Banner coal seam in Russell County, Virginia.

Schedule 6.20(b)

DEBTORSLCC_105926

21. Lease dated December 19, 2005, between Lisa Martin and Monica Martin, as Lessor, and Energy Resources, LLC, as Lessee, with respect to the Lower Banner coal seam in Russell County, Virginia.

22. Lease dated September 5, 2007, between Robert Eugene Hale, Mildred Hale and Robert Eugene Hale II, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia.

23. Lease dated February 18, 2008, between Leonard Mullins Living Trust, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia.

24. Lease dated January 10, 2003, between Charles Edwin Robinson and Steve Wayne Robinson and Mark Stilwell Robinson, as Lessor, and Energy Resources, LLC, as Lessee, with respect to property in Russell County, Virginia.

25. Surface Lease Agreement (64 3/4 acres on Lewis Creek, Russell County, Virginia) undated in June 2010, between Garden Realty Corporation, as Lessor, and Energy Resources, LLC, as Lessee, with respect to property in Russell County, Virginia.

26. Lease dated June 26, 2006, between Geraldine Childress Hubbard and Dallas Hubbard, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia.

27. Lease dated December 19, 2005, between Lisa Martin and Monica Martin, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia. dd. Lease dated January 17, 2006, between Ralph Eudell Bostic and Virginia Katherine Bostic, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia.

28. Property Lease Agreement dated January 2, 2006, between Arbutus Keene, as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to property located at Gardener, Virginia.

29. Lease dated December 19, 2005, between Edith Plaster, as Lessor, and Energy Resources, LLC, as Lessee, with respect to Lower Banner coal seam in Russell County, Virginia.

30. Coal Lease Agreement (Russell County, Virginia) dated January 8, 2013, between Virginia Resources, LLC ,as Lessor, and Harold Keene Coal Co., Inc., as Lessee, with respect to Jawbone coal seam in Russell County, Virginia.

31. Surface Lease (Russell County, Virginia) dated January 8, 2013, between Virginia Resources, LLC as Lessor and Harold Keene Coal Co., Inc., as Lessee with respect to property in Russell County, Virginia; as affected by Surface Rights Agreement dated March 21, 2013, between Virginia Resources, LLC, as Owner, Knox Creek Coal Corporation, as Lessee, and Harold Keene Coal Co., Inc. with respect to property in Russell County, Virginia.

Schedule 6.20(b)

32. Lease dated March 8, 2004, between Grace E. Deskins and Billy Joe Deskins, and James S. Osborne and Brenda Osborne, and Kyle S. Osborne and Gail Osborne, as Lessor, and Energy Resources, LLC, as Lessee.

33. Lease dated January 31, 2001, between Letha Vandyke, Mildred Jones, J.M. Jones, Bobbie Quinn, Marvin Quinn, William R. Vandyke, Ruth Vandyke, Mary Lynn Tharp, Randal Tharp, Geneva Crabtree and Donald Crabtree, as Lessor, and Harold Keene Coal Company, Inc., as Lessee; and recorded in Deed Book 522, page 688.

34. Lease dated January 11, 2011, between Claude Hart, as Lessor, and Harold Keene Coal Company, Inc., as Lessee.

35. Lease dated March 1, 2004, between Claude Fuller and Dorothy Fuller, Margaret Wyatt and Grat Wyatt, Lucile Salyers and Curtis Salyers, Carson Fuller and Nancy Fuller, Robert Fuller, Ruth Vance, Trula Wallace and Jack Wallace, Harless Fuller and Narsie Fuller, Roy Franklin Fuller, Maxie H. fuller, Dewey Lee Fuller and Linda Fuller and Georgia Thompson and Herbert Thompson as Lessor and Energy Resources, LLC as Lessee.

36. Lease dated May 31, 2011, between June Ellen Harris and Tolbert Harris as Lessor and Energy Resources, LLC as Lessee.

37. Lease dated June 1, 2007, between Helen M. Darocha, Hazel M. Jessee, Charlene F. Hause, Janet Martin, Andrew Martin, Catherine Martin, Sharon Wilmoth, Bill May, Gary May, Gerald May, Richard May, Randy May, Lynn Lear, Becky Francischetti, Randy Honaker and Sherie Iascone as lessor and Harold Keene Coal Co., Inc.

38. Lease dated July 20, 2010, between Betty Taylor, Peggy Houseman, Glen Keith Nester and Michael D. Nester as Lessor and Energy Resources, LLC.

39. Lease dated December 16, 2010, between Rosaline M. Black and Sydney L. Asbury and Harold Keene Coal Company, Inc.

Schedule 6.20(b)

DEBTORSLCC_105928

## SCHEDULE 6.22

## PERMITTED PRIOR LIENS ON PERSONAL PROPERTY

As in effect on the date hereof, all liens on equipment (substantially comprising all equipment acquired from Caterpillar), including all proceeds thereof, created pursuant to the Amended and Restated Security Agreement and Promissory Note, dated February 28, 2017, between Revelation Energy, LLC and Caterpillar Financial Services Corporation, as amended by that First Amendment to Amended and Restated Security Agreement and Promissory Note, dated March 3, 2017, the Second Amendment to Amended and Restated Security Agreement and Promissory Note dated as of June 29, 2017 and the Third Amendment to Amended and Restated Security Agreement, dated July 17, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation.  .

As in effect on the date hereof, all liens on equipment, property, insurance or other assets, including all proceeds thereof, created pursuant to the Business Loan Agreement, dated May 28, 2013, among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC, as amended by that certain Change In Terms Agreement, dated December 17, 2013, among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC, as further amended by that certain Change In Terms Agreement dated November 26, 2014, among Revelation Energy, LLC, Alpha Highwall Mining, LLC and United Bank, Inc. and the Commercial Security Agreement, dated May 28, 2013, between Alpha Highwall Mining, LLC and United Bank, Inc.

As in effect on the date hereof, all liens on equipment, property, insurance and other assets (substantially comprising accounts other than the Lone Mountain Blocked Account and the operating account subject to agent's lien, including all proceeds thereof, created pursuant to the Second Amended and Restated Loan and Security Agreement among Revelation Energy, LLC, Revelation Energy Holdings, LLC, Alpha highwall Mining, LLC and United Bank, Inc., dated February 28, 2013, as amended.

As in effect on the date hereof, all liens on certain assets including equipment and other assets located on various prep plant and coal loading facilities, and other property or other assets, including all proceeds thereof, created pursuant to Amended and Restated Logistics Services Agreement by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC, dated April 18, 2015, Amended and Restated Master Coal Purchase and Sale Agreement by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC, dated April 18, 2015, Put and Call Agreement, by and between Noble Americas Corp. and Revelation Energy, LLC, dated April 17, 2015 Security Agreement, made among Revelation Energy, LLC, MR Coal Marketing & Trading, LLC and Noble Americas Corp., dated April 18, 2015, Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, made by Revelation Energy, LLC in favor of MR Coal Marketing & Trading, LLC and Noble Americas Corp., dated April 18, 2015, Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, made by Revelation Energy, LLC in favor of MR Coal Marketing & Trading, LLC and Noble Americas Corp., dated April 18, 2015, Amended and Restated Intercreditor Agreement, among United Bank, Inc., Revelation Energy, LLC and MR Coal Marketing & Trading, LLC, dated April 17, 2015

Schedule 6.22

DEBTORSLCC_105929

As in effect on the date hereof, all liens on equipment, property, royalty interests, facilities or other assets (substantially comprising accounts), including all proceeds thereof, created pursuant to the Real Estate Mortgage between Revelation Energy, LLC, as Mortgagor and J. A. D. Coal Company, Inc., as Mortgagee, dated April 22, 2015, the Overriding Royalty Agreement between J.A.D. Coal Company, Inc. and Revelation Energy, LLC, dated April 22, 2015, the Throughput Agreement between J. A. D. Coal Company, Inc. and Revelation Energy, LLC, dated April 22, 2015 and the Security Agreement, between Revelation Energy, LLC and J. A. D. Coal Company, Inc., dated April 22, 2015.  Such collateral is subject to the assignments listed on Exhibit 1.01 (E-2).

Schedule 6.22

DEBTORSLCC_105930

## SCHEDULE 6.24

## PARTNERSHIP AGREEMENTS; LLC AGREEMENTS

**Blackjewel Holdings L.L.C.**

Limited Liability Company Agreement of Blackjewel Holdings LLC July 14, 2017

Certificate of Formation for Blackjewel Holdings L.L.C., dated March 24, 2017

**Blackjewel L.L.C.**

Limited Liability Company Agreement of Blackjewel L.L.C. dated March 24, 2017

Certificate of Formation for Blackjewel Holdings L.L.C., dated March 30, 2017

**Dominion Coal Corporation**

Articles of Incorporation of Dominion Coal Corporation dated March 17, 1972

Articles of Amendment to the Charter of Dominion Coal Corporation dated December 25, 1976

By-Laws of Dominion Coal Corporation dated April 18, 1972

**Energy Resources, LLC**

Operating Agreement of Energy Resources, LLC dated March 15, 2001

Amendment No. 1 to Operating Agreement of Energy Resources, LLC dated January 14, 2011

Articles of Organization for Energy Resources, LLC dated March 27, 2011

**Harold Keene Coal Co., LLC**

Articles of Incorporation of Harold Keene Coal Co., Inc., dated June 28, 2011

Certificate of Conversion for Harold Keene Coal Co. LLC, dated December 22, 2015

Limited Liability Company Agreement of Harold Keene Coal Co. LLC dated December 22, 2015

**Omega Mining LLC**

Articles of Incorporation for Omega Mining, Inc. dated June 24, 2004

Certificate of Conversion for Omega Mining LLC, dated December 22, 2015

Limited Liability Company Agreement of Omega Mining LLC dated December 22, 2015

Schedule 6.24

**Vansant Coal Corporation**

By-Laws of Vansant Coal Corporation, dated June 29, 1954

Articles of Incorporation for Vansant Coal Corporation dated June 23, 1954

Schedule 6.24

DEBTORSLCC_105932

## SCHEDULE 6.25

## MINING FINANCIAL ASSURANCES

### Bonds

| Permit Number | Current Bond |
|---|---|
| 1601656 | $733,000.00 |
| 1602115 | $5,075,600.00 |
| 1601876 | $459,700.00 |
| 1102111 | $426,000.00 |
| 1301769 | $852,000.00 |
| 1501773 | $426,000.00 |
| 1201805 | $40,200.00 |
| 1202108 | $16,000.00 |
| 1201890 | $72,000.00 |
| 1202113 | $512,400.00 |
| 1202131 | $40,000.00 |
| 1202112 | $225,000.00 |
| 1101990 | $1,563,500.00 |
| 1102014 | $2,856,700.00 |
| 1102022 | $219,000.00 |
| 1402126 | $55,400.00 |
| 1202109 | $16,000.00 |
| 1202107 | $16,000.00 |
| 1202120 | $258,900.00 |
| 1402116 | $10,000.00 |
| 1202110 | $87,000.00 |
| 1202106 | $73,200.00 |
| 1202117 | $16,800.00 |
| 1202114 | $69,000.00 |
| 848-0319 | $15,500.00 |
| 848-0320 | $618,800.00 |
| 848-0321 | $730,000.00 |
| 848-5522 | $631,240.00 |
| 848-5523 | $848,200.00 |
| 848-5524 | $278,000.00 |
| 848-5525 | $285,500.00 |
| 848-5526 | $235,200.00 |
| 848-5528 | $153,700.00 |
| 848-5529 | $89,400.00 |
| 848-5530 | $21,600.00 |
| 848-5531 | $217,100.00 |
| 867-5328 | $125,900.00 |
| 867-5327 | $160,000.00 |

Schedule 6.25

DEBTORSLCC_105933

| 867-5326 | $123,200.00 |
| 867-5325 | $97,800.00 |
| 867-5324 | $75,000.00 |
| 867-7032 | $75,000.00 |
| 867-7031 | $225,000.00 |
| 848-5527 | $712,800.00 |
| 848-9029 | $2,800,000.00 |
| 848-5500 | $160,500.00 |
| 848-5502 | $300,000.00 |
| 848-5543 | $130,900.00 |
| 848-5548 | $10,000.00 |
| 867-5332 | $10,000.00 |
| 867-5331 | $75,000.00 |

Schedule 6.25

## SCHEDULE 7.01(a)(x)

## OUTSTANDING CONSENTS

### Surface or Mineral Leases

### Bell County, Kentucky

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Vanover, Dorothy, et al. | Bell County Coal Corporation | 4/14/99 | Unrecorded, Bell County, Dorothy Vanover, Route 1, Box 294, Middlesboro, KY 40965 |
| Vanover, Dorothy | Bell County Coal Corporation | 1/03/06 | Unrecorded, Bell County, Dorothy Vanover, Route 1, Box 294, Middlesboro, KY 40965 |
| John C. Slusher and Shirley Slusher | Bell County Coal Corporation | 5/28/14 | Recorded, Lease Book 52, Pages 69-79. P.O. Box 664, Pineville, Kentucky 40977 |
| Darris Wayne Lambdin | Bell County Coal Corporation | 5/21/14 | Recorded, Lease Book 52, Pages 80-89 514 Highway 535, Frakes, Kentucky 40940 |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| J.M Huber Corporation (now WPP, LLC) | Bell County Coal Corporation | 9/1/87 | Instrument Number 83432 recorded at Lease Book 50, Page 626 |

**Harlan County, Kentucky**

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Brown, Hargis and Quincy, et al. (Heirs of E.T. Creech) | Bledsoe Coal Leasing Company | 02/01/80 | Book 26, Page 167, Harlan County; Book 51, Page 122, Leslie County |
| Boggs, Jr., Ben, et al. (Heirs of Silas Boggs) | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 05/22/92 | Book 50, Page 397, Book 50, Page 409, Book 50, Page 421, Book 50, Page 777, Leslie County; Book 37, Page 530, Harlan County |
| Kentucky River Coal Corporation (Greasy Creek) | Bledsoe Coal Leasing Company | 01/11/95 | Book 76, Page 770, Leslie County; Lease Book 49, Page 137, Harlan County |

Schedule 7.01(a)(x)

| Name of Lessor | Original Lessee | Date | Lease Recorded/ lessor address |
|---|---|---|---|
| Kentucky River Coal Corporation (Georgia Pacific)<br><br>This document is affected by that certain Omnibus Agreement for Amendment to and Merger of Leases between Kentucky River Properties LLC, et al. & Bledsoe Coal Leasing Company entered into on April 30, 2007. Through this document, Kentucky River Properties has rights of first refusal to purchase the (a) Clover Loadout and appurtenant property necessary to operate such loadout, constituting approximately 28.08 acres and (b) BL1 Greasy Creek Prep Facility and appurtenant property necessary to operate such preparation plant, constituting approximately 291.31 acres. Also executed an Amended Omnibus Agreement on February 22, 2010 and a Second Amendment to Omnibus Agreement on August 29, 2014. | Bledsoe Coal Leasing Company | 01/15/95 | Memorandum recorded, Harlan in Lease Book 49, 137<br><br>Leslie in Lease Book 76, Page 770<br><br>Kentucky River Properties LLC, PO Box 269, Hazard, KY 41702 |

Schedule 7.01(a)(x)

DEBTORSLCC_105937

| Name of Lessor | Original Lessee | Date | Lease Recorded/ lessor address |
|---|---|---|---|
| Arnold, Elizabeth and Jack | Bledsoe Coal Leasing Company (as assignee of Clover Coal Company, Inc. and Shamrock Coal Company, Inc.) | 01/27/79 | Book 24, Page 136, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Cornett, James Ralph | Bledsoe Coal Leasing Company | 09/17/01 | Book 42, Page 108, Harlan County |
| Engle, Melvin and Barbara | Bledsoe Coal Leasing Company | 09/18/01 | Book 42, Page 112, Harlan County |
| Ison, Mabel Carol and Bobby Kaywood | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/30/90 | Book 50, Page 278, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Meeks, James and Alafair | Bledsoe Coal Leasing Company | 01/27/79 | Book 24, Page 148, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Mildred Wilder | Bledsoe Coal Leasing Company | 7/17/2001 | Book 41 Page 760 Harlan County |

Schedule 7.01(a)(x)

DEBTORSLCC_105938

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Hobart Miniard Heirs, being Dillard Miniard and Lucy Miniard, husband and wife; Carrie Miniard; Boby R. Miniard and Carmen Miniard, husband and wife; Donnie E. Miniard and Stephanie A. Miniard, husband and wife; Arlene D. Alsgaard and Harltey C. Alsgaard, wife and husband; Irene F. Wax and Don L. Wax, wife and husband; Ulene Lewis and William F. Lewis, wife and husband; Edward Day; Orlene Day; Lynette Broughton; Juanetta Threadgill and James Threadgill, wife and husband; Rufus Turner and Barbara Turner, husband and wife; Wanda Turner; Leslie Curry and Frank Curry, wife and husband Darla Brewer and William James Brewer, wife and husband; Nancy Cornett and Danny Cornett, wife and husband; Joe Turner and Ruby Turner, husband and wife; Hobart Ross Turner;  Charlie Turner, Jr.; Jerry D. Turner and Susan Turner; husband and wife; Eula F. Scearce and William Scearce, wife and husband | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/27/90 | Book 50, Page 202, Book 50, Page 240, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |

Schedule 7.01(a)(x)

DEBTORSLCC_105939

| Name of Lessor | Original Lessee | Date | Lease Recorded/ lessor address |
|---|---|---|---|
| Scearce, William and Eula, et al. | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 11/01/94 | Book 50, Page 553, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Miniard, John I. and Mossie | Bledsoe Coal Leasing Company (assignee of Shamrock Coal Company, Incorporated) | 02/01/87 | Book 50, Page 301, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Penn VA | Bledsoe Coal Leasing Company | 6/18/08 | Book 48 Page 161 Harlan County Book 73 Page 784 Leslie County |
| Frances Parsons | Bledsoe Coal Leasing Company | 1/13/2010 | Book 49 Page 113 |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Mallie Begley Heirs | Bledsoe Coal Leasing Company | 2/24/11 | Memorandum Recorded Harlan County in Lease Book 50, Page 177;<br><br>Robert Begley and Norma Begley 2662 Newboune Rd.  Cox Mill, WV 26342; Lucille Begley Box 21 Stron, IN 46789;<br><br>Raymond Begley 416 E. 6th Street Peru, IN 46970; Paula Blowers 407 E. Wabash Street Wolcottville, IN 46795; Mary Dobson 213 S. Benton Street Millersburg, IN 46543 Anne Anderson 1705 S. 445 E LaGrange, IN 46761; Patricia Braun and Terrance Braun 9622 Harbour  Pointe Drive Bloomington, IN 47401 Connie Crouse 1011 Loyall, KY 40854 Michael Howard 7520 Solarset Cr. Anchorage, AK 99507 P.O. Box 1063  Cuyahoga  Falls,  OH  44223; Louise  Huff  101  Virgil  Smith  Road Crossville, TN 38571 |
| Alice Turner Heirs | Bledsoe Coal Leasing Company | 10/11/10 | Memorandum recorded 11/4/10 in LB 49, Page 516; Clayton Turner and Jean Turner<br>2444 Kildare Avenue Dayton, OH 45414; Henry Miniard P.O. Box 274 Big Laurel, KY 40808; Opal Mullins and Robert P.O. Box 596 Lagrange, KY 40031; Lonnie Turner and Fran Turner 10 Erica Avenue Westridge Somerset West 7130 Cape Town, South Africa 7130 Coburn Turner and Phyllis Turner 6258 North HWY 421 Bledsoe KY 40810; Audrey Turner, 4204 Garden Ridge Road, Crestwood, KY 40014; and Eldon Turner and Faye Turner, 6699 Dana Drive, Macon, GA 31201 |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| All of the above conveyed to Revelation through that certain Order Approving the Sales and Transfers of Certain Assets and Liabilities Free and Clear of Liabilities and Encumbrances, Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Granting Related Relief dated December 29, 2014 James River Coal Company, et al. | Revelation Energy, LLC | | Bankruptcy Order and APA with Schedules Deed Book 458, Page 406 |
| Pocahontas Development Corporation | J.A.D. Coal Company, Inc. (with Lincoln Leasing Venture, Inc. as original lessee) | 9/1/98 | Assigned January 5, 2000; Renewed September 1, 2008 |
| Pocahontas Development Corporation | J.A.D. Coal Company, Inc. | 5/11/05 | Memorandum dated 5/11/05; renewed 5/11/10 |
| All of the above Conveyed to Revelation through that certain Assignment and Assumption of Leases dated April 22, 2015 from J.A.D. Coal Company, Inc. | Revelation Energy, LLC | | Pursuant to Bankruptcy Sale Order dated April 16, 2015. Lease Book 51, Page 587 |
| Lewis, Burney, Jr., and Jacqueline L., et al | Resource Development LLC | 5/15/12 | LB 50, PG 474 |
| Hall, Robert E., et al | Resource Development LLC | 9/14/11 | LB 50, PG 262 (Hall Counterpart) & LB 50, PG 395 (Williams Counterpart) |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| McQueen, Tammy E. | Resource Development LLC | 8/19/05 | Unrecorded |
| Fields, Frances G. | Resource Development LLC | 9/3/05 | Unrecorded |
| Deal, Yvonne, et al | Resource Development LLC | 6/22/07 | LB 49, PG 484 |
| Deal, David Claude and Yvonne Boggs | Resource Development LLC | 6/17/11 | LB 50, PG 142 |
| Hall, Darlene | Resource Development LLC | 6/22/07 | LB 49, PG 480 |
| Shivel, Charles E. and Sandra K., et al | Resource Development LLC | 11/13/09 | LB 49, PG 359 |
| Henson, Charles L., et al | Resource Development LLC | 11/15/10 | LB 49, PG 554 & LB 50, PG 409 |
| Mitchell, Dart Keith and Melissa, et al | Resource Development LLC | 2/25/11 | LB 50, PG 45 |
| Heddon, Jonathan D., et al | Resource Development LLC | 9/14/11 | LB 50, PG 275 |
| Firchau, Richard and Sarah E., et al | Resource Development LLC | 11/13/09 | LB 49, PG 60 |
| Ison, Donald and Ora Jewel | Resource Development LLC | 11/13/09 | LB 50, PG 417 |
| White, Raymond A. and Mary E., et al | Resource Development LLC | 5/1/08 | LB 48, PG 59 |
| White, Mary Lou, et al | Resource Development LLC | 1/18/08 | LB 47, PG 749 |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Arnette, Bobby J. Sr., et al | Resource Development LLC | 6/30/08 | LB 48, PG 330 |
| White, Michael J. and Lisa A., et al | Resource Development LLC | 7/31/08 | LB 48, PG 627 |
| Winters, Betty, J., et al | Resource Development LLC | 3/12/08 | LB 48, PG 54 |
| Penn Virginia Operating Co., LLC | Resource Development LLC | 5/20/96 | Unrecorded |
| Penn Virginia Operating Co., LLC | North Fork Coal Corporation | 2/12/97 | Unrecorded |
| Ark Land Company | Resource Development LLC | 3/1/05 | Unrecorded |
| Resource Development LLC | A & G Coal Corporation | 4/29/09 | Unrecorded |
| Resource Land Company LLC | Windstream Kentucky East, LLC | 1/17/13 | Unrecorded |
| Old Virginia Services, LLC | Resource Land Company LLC and North Fork Coal Corporation | 1/1/14 | Unrecorded |
| Lewis, Burney, Jr., and Jacqueline L. | Resource Development LLC | 10/2/13 | Unrecorded |
| Ark Land Company | Resource Development LLC | 3/1/05 | Unrecorded |

Schedule 7.01(a)(x)

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| All of the above Conveyed to Revelation through that certain Assignment of Real Property Agreements dated July 31, 2015 from Resource Development, Resource Land Company LLC and North Fork Coal Corporation | Revelation Energy, LLC | Mortgage Book 436, Page 242 | Recorded |
| McCauley, Jeanette Gilliam | Resource Development LLC | DB 435, p 612 | |
| Ark Land Company | Resource Development LLC | DB 368, p 272 | |
| Morris, Aaron Otis and Loretta, et al. | Resource Development LLC | DB 421, p 232 | |
| Aguayo, Ronald and Juliana | Resource Development LLC | DB 422, p 78 | |
| Watson, Brian and Diana | Resource Development LLC | DB 422, p 72 | |
| Smith, David Carroll and Phyllis | Resource Development LLC | DB 422, p 437 | |
| Popp, Joy, et al. | Resource Development LLC | DB 413, p 514 | |
| Christianson, Kenneth and Karen Marie, et al. | Resource Development LLC | DB 418, p 58 | |
| Saylor, Oscar, et al. | Resource Development LLC | DB 415, p 5 | |
| Hall, Darrell McCoy and Jeanette, et al. | Resource Development LLC | DB 414, p 19 | |

Schedule 7.01(a)(x)

DEBTORSLCC_105945

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kelly, Donald E., et al. | Resource Development LLC | DB 421, p 346 | |
| Pace, Doris Ball | Resource Development LLC | DB 413, p 79 | |
| ACIN, LLC | Resource Land Company LLC | DB 443, p 623 | |
| Ark Land Company | Resource Land Company LLC | DB 338, p 394 | |
| All of the above conveyed to Revelation through that certain Special Warranty Deed dated July 31, 2015, from Resource Development LLC and Resource Land Company LLC | Revelation Energy LLC | 7/31/2015 | Deed Book 460, page 539 |
| Acin LLC, by NRP (Operating) LLC | Revelation Energy LLC | 7/31/2015 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105946

**Leslie County, Kentucky**

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kentucky River Coal Corporation (Georgia Pacific)<br><br>This document is affected by that certain Omnibus Agreement for Amendment to and Merger of Leases between Kentucky River Properties LLC, et al. & Bledsoe Coal Leasing Company entered into on April 30, 2007. Through this document, Kentucky River Properties has rights of first refusal to purchase the (a) Clover Loadout and appurtenant property necessary to operate such loadout, constituting approximately 28.08 acres and (b) BL1 Greasy Creek Prep Facility and appurtenant property necessary to operate such preparation plant, constituting approximately 291.31 acres. Also executed an Amended Omnibus Agreement on February 22, 2010 and a Second Amendment to Omnibus Agreement on August 29, 2014. | Bledsoe Coal Leasing Company | 01/15/95 | Memorandum recorded, Harlan in Lease Book 49, 137<br><br>Leslie in Lease Book 76, Page 770<br><br>Kentucky River Properties LLC, PO Box 269, Hazard, KY 41702 |
| WPP LLC | Revelation Energy, LLC | 10/1/2016 | Unrecorded |
| Alice Baker | Bledsoe Coal Leasing Company | 3/31/00 | Unrecorded; 1343 Big Rock Road, Yeaddiss, Kentucky 41777. |

Schedule 7.01(a)(x)

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Kentucky River Coal Corporation (Greasy Creek) | Bledsoe Coal Leasing Company | 01/11/95 | Book 76, Page 770, Leslie County; Lease Book 49, Page 137, Harlan County |
| Kentucky River Coal Corporation | Shamrock Coal Company, Incorporated | 6/05/80 | Memorandum recorded in Harlan County Lease Book 49, Page 137; in Leslie County Lease Book 76, Page 770  Kentucky River Properties LLC, PO Box 269, Hazard,  KY 41702 |
| Ison, Mabel Carol and Bobby Kaywood | Bledsoe Coal Leasing Company (as assignee of Shamrock Coal Company, Inc.) | 07/30/90 | Book 50, Page 278, Book 50, Page 577, Leslie County; Book 37, Page 530, Harlan County |
| Puffer, Chloe (Heirs of Jackson) | Bledsoe Coal Leasing Company (assignee of Leeco, Inc.) | 01/12/90 | Book 43, Page 526, Book 46, Page 494, Book 51, Page 118, Leslie County |
| United States of America, through the Bureau of Land Management | Bledsoe Coal Leasing Company (assignee of Leeco, Inc.) | 11/1/93 | Unrecorded, Leslie County, Dept. of the Interior MMS, Payor Code MA475, Box 5810, Denver, CO 80217 |
| Hereford, George and Anna Mae | Shamrock Coal Company, Incorporated | 3/14/00 | Book 57, Page 251, Leslie County |

Schedule 7.01(a)(x)

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Chloe Wilson | Shamrock Coal Company, Incorporated | 12/16/99 | Book 57, Page 354, Leslie County |
| Muncy, John D. and Sarah Jane, et al. (Heirs of F. G. Turner) | Bledsoe Coal Leasing Company (assignee of Shamrock Coal Company, Incorporated) | 05/03/90 | Book 50, Page 316, Book 51, Page 122, Leslie County |
| GW Taylor Heirs | Shamrock Coal Company, Incorporated | 03/17/10 | Book 77 Page 582 Leslie County |

Schedule 7.01(a)(x)

DEBTORSLCC_105949

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Shelby Mosley Heirs, being  Frtiz Mosley; Laura Howard; Margaret Simpson; Al Carter and Donna Carter, husband and wife; Mark Carter and Jean Carter, husband and wife; Cindy Labonne and Timothy Labonne, wife and husband; Viola Mosley; Lonnie Mosley and Rachel Mosley, husband and wife; Chris Mosley; Duane Mosley; Roland Mosley; Hope Sharkey and Ronald Wayne Sharkey, wife and husband; Faith Fields and Dewey Fields, wife and husband; and Kentucky River Properties LLC, as the successor in interest to Dorothy Lewis | Shamrock Coal Company, Incorporated | 3/02/05 | Book 66 Page 163 Leslie County |
| Herbert & Betty Nantz | Bledsoe Coal Leasing Company | 4/05/05 | Unrecorded Leslie County (Legal Description Attached as Exhibit C-35) Karen Crisp, 6023 Hwy 421 S, Helton, KY 40840; Kimberly Nantz, 6023 Hwy 421 S, Helton, KY 40840 |

<div align="center">Schedule 7.01(a)(x)</div>

DEBTORSLCC_105950

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Helen Simpson | Bledsoe Coal Leasing Company | 5/24/05 | Book 67 Page 233 Leslie County |
| Joe Slusher | Shamrock Coal Company, Incorporated | 6/3/05 | Book 67 Page 233 Leslie County |
| R B Mosley | Shamrock Coal Company, Incorporated | 7/5/05 | Book 67 Page 233 Leslie County |
| Kenneth Howard | Bledsoe Coal Leasing Company | 7/6/05 | Book 66 Page 731 Leslie County |
| Irene Howard | Bledsoe Coal Leasing Company | 7/7/05 | Book 67 Page 739 Leslie County |
| U S Dept. of the Interior | Shamrock Coal Company, Incorporated | 10/1/05 | Book 68 Page 447 Leslie County |
| US Dept. of the Interior | Bledsoe Coal Leasing Company | 8/1/10, assigned 7/1/12; modified 1/5/16 | Unrecorded; United States Department of the Interior, Bureau of Land Management, 7450 Boston Boulevard, Springfield, Virginia 22153. |
| Russell Morgan | Bledsoe Coal Leasing Company | 4/28/07 | Book 74 Page 001 Leslie County |
| Mike Morgan | Bledsoe Coal Leasing Company | 5/14/07 | Book 71 Page 687 Leslie County |
| Oscar Howard Heirs, being Ineda Howard; Wayne Howard and Carol Howard, husband and wife; Vickie Rhymer and Robert Rhymer, wife and husband; Leon Howard and Teresa Howard, husband and wife; Shafter Morgan and Anita Morgan; husband and wife; Margaret Pennington and Denver Pennington, wife and husband; Ted Stidham and Geneva Stidham, husband and wife | Bledsoe Coal Leasing Company | 5/24/07 | Book 71 Page 285 Leslie County |

Schedule 7.01(a)(x)

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| Elisha Morgan Heirs, being Joe Morgan, Jr. and Mary Morgan, husband and wife; Kathy Morgan, Debbie Mason and James Mason, wife and husband; Carrie Simmons and Marvin Simmons, wife and husband; Charlie Morgan and Shirley Morgan, husband and wife; Richard Morgan and Vera Morgan, husband and wife.<br><br>(see also Russell & Mike Morgan leases 2007) | Bledsoe Coal Leasing Company | 9/2/08 | Book 74 Page 112, Book 74 Page 120, Book 74 Page 128,<br><br>Book 71 Page 687,<br><br>Book 71 Page 285<br><br>Leslie County |
| Penn VA | Bledsoe Coal Leasing Company | 1/1/09 | Memorandum recorded 10/22/10 in Lease Book 77, Page 771 |
| Lela Hoskins | Bledsoe Coal Leasing Company | 1/1/76 | Leslie County Book 19 Page 8 |
| Arthur Estridge Heirs, being Red Carl Estridge, Barbara Alred and Nancy Bryant | Bledsoe Coal Leasing Company | 1/28/2010 | Memorandum recorded 8/10/11 in Lease Book 78, Page 554. |
| Brock, Jane and<br><br>Frank; Slusher,<br><br>Wade and Christine | Shamrock Coal Company, Incorporated | 10/30/89 | Wade & Christine Slusher, 18 Ball Lane, Harlan, KY 40831; Jane or Frank Brock, PO Box 143, Bledsoe, KY 40810 |

Schedule 7.01(a)(x)

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Brock, Frank and Jane | Shamrock Coal Company, Incorporated | 4/22/86 | Unrecorded, Leslie County Bige Brock, 9000 E Laurel Road, London, KY 40741; Frank or Jane Brock, 464 Payne Trail, London, KY 40741 |
| Hoskins, Carl and Lela | Shamrock Coal Company, Incorporated | 8/17/92 | Book 57, Page 105, Leslie County |
| Hall, Chester and Sarah | Shamrock Coal Company, Incorporated | 7/13/89 | Unrecorded, Leslie County Chester & Sarah Hall, HC 77 Box 371, Mozelle, KY 40858 |
| Kentucky River Properties | Shamrock Coal Company, Incorporated | 12/4/85 | Memorandum recorded Lease Book 77, Page 190 Darrell Joseph, P.O. Box 574, Hyden, KY 41749; William Peyton Joseph, P.O. Box 39, Hyden, KY 41749; Marita Phillips, 2980 Admirl Street, Fort Pierce, FL 34982 |
| Mosley, Chester and Rebecca | Shamrock Coal Company, Incorporated | 9/11/89 | Unrecorded, Leslie County Chester & Rebecca Mosley, Mozelle, KY 40858 |

Schedule 7.01(a)(x)

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| Howard, Otis and Stella | Shamrock Coal Company, Incorporated | 5/9/90 | Unrecorded, Leslie County<br><br>Otis & Stella Howard, PO Box 172, Mozelle, KY 40858 |
| Roark, Charles and Ruth | Shamrock Coal Company, Incorporated | 10/2/89 | Unrecorded, Leslie County<br><br>Charles & Ruth Roark, General Delivery, Mozelle, KY 40858 |
| Taylor, Robert and Susie | Shamrock Coal Company, Incorporated | 3/16/89 | Unrecorded, Leslie County<br><br>(Legal Description Attached as Exhibit C-109)<br><br>Robert & Susie Taylor, PO Box 6, War Branch, KY 40878 |
| Stithem, James and Nancy | Shamrock Coal Company, Incorporated | 1/12/90 | Unrecorded, Leslie County<br><br>James & Nancy Stithem, 122 North Second St., Fairborn, OH 45324 |
| Wilson, Oscar and Sally | Shamrock Coal Company, Incorporated | 5/27/88 | Unrecorded, Leslie County<br><br>(Legal Description Attached as Exhibit C-110)<br><br>Wilson Enterprises, 145 Fredrick Dr., Eaton, OH 45320 |

Schedule 7.01(a)(x)

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Bige Brock | Shamrock Coal Company, Incorporated | 4/22/86 | Unrecorded, Leslie County<br><br>Bige Brock, 9000 E Laurel Road, London, KY 40741; Frank or Jane Brock, 464 Payne Trail, London, KY 40741 |
| Denver Brock Heirs | Bledsoe Coal Leasing Company | 7/21/10 | Memorandum Recorded 8/30/10 in Lease Book 77, Page 572. Jerry Wayne Brock and Judy Brock, 5181 Hwy. 421, Helton, Kentucky 40840; Denver Ray Brock and Brenda Gail Brock, husband and wife, 4583 Hwy 421, Helton, Kentucky, 40840; Bessie Ruth Howard and Freddie Howard, wife and husband, 4568 HWY 421, Helton, Kentucky, 40840; Dorothy Ivey, single, 109 Elm Street,Berea, Kentucky, 40403 |

Schedule 7.01(a)(x)

DEBTORSLCC_105955

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor Address |
|---|---|---|---|
| Orville Burkhart, et al | Bledsoe Coal Leasing Company | 5/20/10 | Memorandum recorded in Leslie County in Lease Book 77, at Page 308; Orville Burkhart and Bernice Burkhart, husband and wife, P.O. Box 277, Livingston, Kentucky, 40445; Glen Burke and Opal Burke, husband and wife, 764 Kentucky 3245, Broadhead, Kentucky, 40409; William G. Burkhart and Nina Burkhart, husband and wife, P.O. Box 95, Broadhead, Kentucky, 40409; George Burkhart and Betty Burkhart, husband and wife, 8860 Highway 70 East,Eubank,Kentucky,42567; Clark W. Burkhart and Lorraine Burkhart, husband and wife, 535 Fox Lane, Savannah, Tennessee, 38372-6886; Mable Burkhart, widow, 615 West Gate Terrace, Streamwood, Illinois 60107 |
| Lela Hoskins | Bledsoe Coal Leasing Company | 3/14/00 | Unrecorded; P.O. Box 234, Hoskinston, Kentucky 40844 |
| All of the above Conveyed to Revelation through that certain Assignment and Assumption Agreement dated December 29, 2015 from James River Coal Company, et al. | Revelation Energy, LLC | | Recorded Mortgage Book 26, Page 596 |

Schedule 7.01(a)(x)

| Name of Lessor | Lessee | Date | Lease Recorded/ Lessor address |
|---|---|---|---|
| C.W. Hoskins' Heirs | Revelation Energy, LLC | May 22, 2017 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105957

**Lee County, Kentucky**

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Penn Virginia Operating Co., LLC | Resource Development LLC | 5/20/96 | Unrecorded |

**Letcher County, Kentucky**

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| Penn Virginia Operating Co., LLC | Resource Development LLC | 5/20/96 | Unrecorded |
| Maggard, Connie | Resource Development LLC | 7/13/00 | LB 49, PG 149 |
| Resource Development LLC | A & G Coal Corporation | 4/1/02 | Unrecorded |
| ACIN LLC, Resource Development and Harlan Reclamation Services LLC | Commonwealth of Kentucky, Transportation Cabinet | 11/19/12 | Unrecorded |
| Commonwealth of Kentucky, Transportation Cabinet | Harlan Reclamation Services LLC and Resource Development LLC | 12/13/12 | Unrecorded |
| Commonwealth of Kentucky, Transportation Cabinet | Harlan Reclamation Services LLC and Resource Development LLC | 12/13/12 | Unrecorded |
| Resource Development LLC, Harlan Reclamation Services LLC and North Fork Coal Corporation | East Kentucky Network, LLC | 7/15/2015 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105958

| NAME OF LESSOR | LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS |
|---|---|---|---|
| All of the above Conveyed to Revelation through that certain Assignment of Real Property Agreements dated July 31, 2015 from Resource Development, Resource Land Company LLC and North Fork Coal Corporation | Revelation Energy, LLC | Lease Book 66, Page 175 | Recorded |
| Eolia Resources, Inc. | Revelation Energy, LLC | November 1, 2014  Sublease document for the Collins' Heirs lease dated December 31, 1973 | Unrecorded. |
| Penn Virginia Operating Co., LLC | Revelation Energy, LLC | December 13, 1984 | Partial Assignment and Assumption recorded in Lease Book 65, Page 611 |
| Acin LLC, by NRP (Operating) LLC | Revelation Energy, LLC | 7/31/2015 | Unrecorded |
| Penn Virginia Coal Comany | Powell River Resources Corporation | 5/20/1996 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105959

**Wise County, Virginia**

| Name of Lessor | Lessee | Date | Lease Recorded/ lessor address |
|---|---|---|---|
| Penn Virginia Operating Co., LLC | Pigeon Creek Processing Corporation | 2/5/00 | Unrecorded |
| Penn Virginia Coal Company | Powell River Resources Corporation | 5/20/96 | Unrecorded |
| Penn Virginia Coal Company | Pigeon Creek Processing, LLC | 2/5/00 | Unrecorded |
| Penn Virginia Operating Co., LLC | North Fork Coal Corporation | 2/12/97 | Unrecorded |
| Resource Development LLC | A & G Coal Corporation | 4/29/09 | Unrecorded |
| Interstate Railroad Company | Pigeon Creek Processing Corporation | 8/29/01 | Unrecorded |
| Interstate Railroad Company | Pigeon Creek Processing Corporation | 9/30/07 | Unrecorded |
| Pigeon Creek Processing Corporation | Commonwealth of Virginia, Department of Mines, Minerals and Energy | 6/24/13 | Unrecorded |
| Resource Development LLC | Commonwealth of Virginia | 9/16/13 | Unrecorded |
| Resource Development LLC | Virginia Department of Mines, Minerals and Energy, Division of Mined Land Reclamation | 1/24/13 | Unrecorded |
| Abba and Company | Resource Development LLC | 6/21/2012 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105960

| | | | |
|---|---|---|---|
| All of the above Conveyed to Revelation through that certain Assignment of Real Property Agreements dated July 31, 2015 from Resource Development, Pigeon Creek Processing Corporation and North Fork Coal Corporation | Revelation Energy, LLC | | Recorded |

## Buchanan County, Virginia

1.  Lease and Agreement dated April 5, 1957, between Frank G. Carlson and Francis G. Carlson as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to Jawbone coal seam, Buchanan County, Virginia, as affected by Lease Modification Agreement dated June 10, 1957, between Frank G. Carlson and Francis G. Carlson as Lessors and Jewell Smokeless Coal Corporation, as Lessee; as affected by Agreement dated May 14, 1970, between Jewell Smokeless Coal Corporation and Francis G. Carlson and Stella McNeil Carlson.

2.  Indenture of Lease dated November 1, 1979, between Georgia-Pacific Corporation as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Amendment to Mining Lease with Consent to Sublease dated October 16, 1990, between Georgia-Pacific Corporation and Jewell Smokeless Coal Corporation.

3.  Agreement of Lease dated November 27, 1957, by and between W.M. Ritter Lumber Company, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, as affected by Supplemental Indenture of Lease dated March 15, 1962, between Georgia-Pacific Corporation and Jewell Smokeless Coal Corporation.

4.  Lease dated August 24, 1998, by and between PYXIS Resources Company and Jewell Smokeless Coal Corporation, with respect to the Hagy coal seam in Buchanan County, Virginia, as affected by Lease Supplement and Amendment dated September 17, 2009, between ACIN LLC, successor to PYXIS, and Jewell Smokeless Coal Corporation; as affected by Agreement dated January 6, 2012, by and between Alpha Land and Reserves, LLC, and Jewell Smokeless Coal Corporation; as affected by Lease Supplement and Amendment dated January 9, 2012 between ACIN LLC, successor to PYXIS, and Jewell Smokeless Coal Corporation. As amended by that certain Amended and Restated Lease effective as of April 1, 2016 by and between ACIN LLC and Revelation Energy, LLC.

5.  Surface Lease dated February 6, 1980, between Gertie Arms, Josh V. Arms, Bill Arms, Juanita A Deel and Kelsey J. Earp, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

Schedule 7.01(a)(x)

6.    Lease dated November 19, 1970, between Earl E. Belcher, W.G. Combs, Lois McClanahan and Thomas Belcher, Florence Belcher, Clayton Edward Belcher and Mildred Belcher, Magdalene Belcher Smith, Eileen Belcher Glover, Hassell Belcher and Clemmie Belcher, Nell Belcher, Robinson Belcher and Martha Belcher, and Mary Ruth Combs and Lawrence Combs, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to coal property in Buchanan County, Virginia on the ridge between Slate Creek and Dismal on Little Prater Creek and Big Prater Creek.

7.    Deed of Lease dated June 1, 1974, between C. L. Ritter Lumber Company as Lessor and H. A. Street and J. W. McGlothlin and W. W. McGlothlin and Burton Fletcher and Dennis Compton and Boyd Fowler as Lessees with respect to property situate on the waters of the Levisa River in Buchanan County, Virginia; as amended by Amendment dated July 6, 1981 by and between C.L. Ritter Lumber Company, Wellmore Coal Corporation, and H. A. Street and J. W. McGlothlin and W. W. McGlothlin and Burton Fletcher and Dennis Compton and Boyd Fowler; and affected by Consent to Sublease dated April 4, 2012 between C. L. Ritter Lumber Company, Incorporated and The Black Diamond Company and Jewell Smokeless Coal Corporation, and as affected by Sublease Agreement dated April 4, 2012 between The Black Diamond Company and Jewell Smokeless Coal Corporation.

8.    Oil, Gas and Coalseam Gas Lease dated October 11, 1999 between Jewell Smokeless Coal Corporation and Buchanan Production Company with respect to property located on the waters of Levisa River in Buchanan County, Virginia.

9.    Deed of Lease dated October 19, 1956, between Buchanan Reality Corporation, as Lessor, and H.J. Johnson and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as partially assigned by Assignment dated October 18, 1982, between Jewell Smokeless Coal Corporation, as Assignor, and W. Clyde Dennis, et. al., as Assignee, and Buchanan Reality Corporation, and as affected by Agreement dated November 5, 1982, between Buchanan Reality Corporation and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia, and as affected by Supplemental Agreement dated September 8, 1987, between Buchanan Realty Corporation and Jewell Smokeless Coal Corporation.

10.   Sublease Agreement dated May 15, 1997, between Buchanan Energy Company and Jewell Smokeless Coal Corporation, with respect to Indenture of Lease dated August 7, 1978 between Georgia-Pacific Corporation and Buchanan Energy Company.

11.   Deed of Lease dated January 31, 1996, between Bull Creek Coal Company as Lessor and Jewell Smokeless Coal Corporation as Lessee with respect to Widow Kennedy coal seam in Buchanan County, Virginia.

12.   Deed of Lease dated April 1, 1955, between Caroline Cole Gregory and W. D. Gregory as Lessors and Jewell Smokeless Coal Corporation as Lessee with respect to property in Buchanan County, Virginia.

Schedule 7.01(a)(x)

13. Sublease and Assignment dated January 6, 1988, between Eagle Investments, Inc., as Lessor and Jewell Smokeless Coal Corporation, as Lessee, and as affected by Settlement Agreement and Release dated January 6, 1988, between Emerald Mining, Inc., and Blue Diamond Energy, Inc., and Eagle Investments, Inc., and Carl R. Bolling, and Jewell Smokeless Coal Corporation.

14. Agreement dated October 23, 1986, between George W. Gillespie Estate, Inc., and Mary Christian Elmore and Harry L. Elmore and Rachael L. Royall and J. Powell Royall, Jr., and Jane R. Phleger and Mosby Phleger and R. Bowen Royall and Doris Royall and William A. Royall and Theda D. Royall and Ellen R. Story and Walter F. Story and Sue S. Royall and Susan R. Whittaker and Sue Royall and Randall Whittaker and Edmund G. Royall and Martha S. Royall and John W. Gillespie and Virginia B. Gillespie and Robert G. Gillespie and Irma A. Gillespie and W. Jeff Gillespie, III, and Grace Barnes and George Barnes and R. R. St. Clair, Jr., and Grace St. Clair and Katherine C. St. Clair, as Lessors, and Jewell Smokeless Coal Corporation as Lessee with respect to Jawbone coal seam in Buchanan County, Virginia.

15. Lease Agreement dated June 11, 1999, between Harrison-Wyatt, LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia.

16. Agreement dated October 29, 2004, between Bucky Jean McConnell and Polly Ann Mallory and Ronnie Mallory and Nancy Lee Lowe and Wade Lowe and Artemus Bernard Jewell, Jr., and Frances Jewell, as Grantors, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property situate on the waters of Betts Branch, Mill Branch and Dry Branch of Dismal Creek in Buchanan County, Virginia.

17. Lease dated October 26, 1970, between Lois Bowie and Dr. Roy Bowie and Florence E. Walker and James Walker and Irma R. Runals and John E. Runals and Robert Stinson Powers and Carol Powers and Amy Lee Powers, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

18. Lease dated November 7, 1973, between J. W. Lambert, Jr., and Jessie Pauley and Harry R. Pauley and Ava Spence and Hugh Spence and Helen L. James and Frank P. James, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia.

19. Lease dated November 16, 1970, between George B. Harris and Irene Harris and John G. Harris and Maybelle Harris and Humphrey W. Curtis, Jr., and Ann Curtis and Marjorie L. Lindsay and Winston S. Lindsay, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

Schedule 7.01(a)(x)

20.   Lease dated March 15, 1971, between Marjorie L. Lindsay and Winston S. Lindsay, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller coal seam in Buchanan County, Virginia, as affected by Sublease dated September 18, 2009, between Jewell Smokeless Coal Corporation, as Sublessor, and Alpha Land and Reserves, LLC, as Sublessee.

21.   Surface Rights Agreement dated December 28, 1994, between Carmel Deel and Phyllis Deel and Ernie Lee Deel and Katie Deel and Gregory V. Deel and Stephanie Deel, as Owner, and Motivation Coal Company, as Lessee, with respect to property in Buchanan County, Virginia; as affected by Assignment and Assumption Agreement dated October 20, 1995, between Jewell Smokeless Coal Corporation and Motivation Coal Company.

22.   Lease Agreement dated June 17, 1967, between Basil Compton as Lessor and Jewel Smokeless Coal Corporation as Lessee with respect to Splashdam coal seam in Buchanan County, Virginia.

23.   Lease dated December 1, 1998, between Pocahontas Mining Company Limited Partnership, L.L.P., as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller, Jawbone, and Red Ash coal seams in Buchanan and Tazewell Counties, Virginia; and as affected by First Supplemental Agreement of Lease dated November 1, 2002; as affected by Second Supplemental Agreement of Lease dated November 1, 2003; as affected by Second Supplemental Agreement of Lease dated May 1, 2006; and as affected by Fourth Supplemental Agreement of Lease dated September 1, 2011; and as affected by Fifth Supplemental Agreement of Lease dated February 1, 2014, between Pocahontas Resources LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

The above Lease is affected by Agreement for Consent to Sublease and Lease Modification dated June 1, 2002, with respect to a sublease to Calico Coal, Inc.; and affected by First Amendment to Consent to Sublease and Lease Modification dated July 15, 2003; and affected by Second Amendment to Consent to Sublease and Lease Modification dated November 7, 2003; and affected by Third Amendment to Consent to Sublease and Lease Modification dated November 3, 2006.

24.   Deed of Lease dated August 1, 1990, between Huston St. Clair, Jr., and Janet T. Young and Sherwood D. Young and Robert H. Moore, Jr., and James R. Moore and Barbara W. Moore and George W. St. Clair Moore and Alice H. Moore and Margaret Moore Ripley and George W. St. Clair, II and Carol St. Clair and J. Douglas St. Clair and George W. St. Clair II and Sovran Bank, N.A., as Co-Trustees under Will of Kathryn B. St. Clair and Margaret Anne Evans Huhn and S. Peter Huhn and Debra Sue Evans, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia; and as affected by First Amendment to Lease dated July 8, 1992.

25.   Deed of Lease dated August 15, 1994, between Tazewell Coal and Iron Company, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Raven coal seam in Buchanan County, Virginia.

Schedule 7.01(a)(x)

26.  Deed of Lease dated June 1, 1985, between Edward Ralph Van Dyke and Dorothy T. Van Dyke and William H. Van Dyke and Sue Davis Van Dyke and Claude H. Van Dyke and Bettye H. Van Dyke and Mary Elizabeth Van Dyke and Virginia V. Kinney and Harley P. Kinney and Rufus Oscar Van Dyke, Jr., and Bonnie Van Dyke and Marjorie T. Gillespie and Jean G. Walker and George F. Walker, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Jawbone coal seam in Buchanan County, Virginia.

27.  Easement Agreement dated November 8, 1983, between Julie L. Viers and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia.

28.  Deed of Easement and Maintenance Agreement dated April 21, 2003, between Julie Lester Viers, as Grantor, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

29.  Lease dated November 19, 1970, between Earl E. Belcher and W. G. Combs and Lois McClanahan and Thomas Belcher and Florence Belcher and Clayton Edward Belcher and Mildred Belcher and Magdalene Belcher Smith and Eileen Belcher Glover and Hassell Belcher and Clemmie Belcher and Nell Belcher and Robinson Belcher and Martha Belcher and Mary Ruth Combs and Lawrence Combs, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee, with respect to property in Buchanan County, Virginia.

30.  Agreement of Sublease dated January 1, 1990 by and between United Coal Company, Wellmore Coal Corporation, as Sublessor, and Jewell Smokeless Coal Corporation, as Subleassee; as affected by partial release of Sublease Agreement dated June 1, 1995; as affected by First Amendment of Sublease Agreement dated June 1, 1995

31.  Sublease Agreement dated June 26, 1991, by and between Wellmore Coal Corporation, as Sublessor, and Jewell Smokeless Coal Corporation, as Sublessee.

32.  Assignment Agreement dated January 1, 1990 by and between Wellmore Coal Corporation, as Assignor, and Jewell Smokeless Coal Company, as Assignee.

33.  Lease Agreement dated February 17, 1989, between ETI Explosives Technologies International, Inc., and Jewell Smokeless Coal Corporation with respect to property in Buchanan County, Virginia, as affected by Acknowledgement dated June 19, 1996, between Sandy Valley Explosives Co., Inc. and Jewell Smokeless Coal Corporation, and as affected by Amendment dated December 13, 1996, between ETI Explosives Technologies International, Inc., and Jewell Smokeless Coal Corporation, and as affected by Amendment dated February 17, 2009, between Dyno Nobel Inc. and Jewell Smokeless Coal Corporation.

34.  Deed of Lease dated September 12, 1955, between L. Maude Fugate, Marvin H. McGuire and Fan Ward McGuire, John McGuire, Wake H. Peery, James M. Peery and Clara B. Peery, Robert C. Peery and Stewart Buford Beery, Sadie M. Bane, Gertrude F. McGuire, Ruth M. Buck and W. M. Buck, and Elizabeth Reed Peery, as Lessors, and Jewell Smokeless Coal Corporation, as Lessee; as affected by Agreement dated August 2, 1994,

Schedule 7.01(a)(x)

between James M. Peery, Charles E. Green, III, and H.G. Gillespie, Jr., Trustee of the Hurt-McGuire Land Trust, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

35. Deed of Lease dated July 1, 1991, between James M. Peery, Charles E. Green, III and H.G. Gillespie, Jr., Trustees of the Hurt-McGuire Land Trust, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, and recorded in Deed Book 381, Page 300.

36. Limited Surface Easement dated June 25, 1993, between Mark Fletcher, as Grantor, and Jewell Smokeless Coal Corporation, as Grantee, with respect to property in Buchanan County, Virginia.

Note: All of the above Conveyed to Revelation through that certain Assignment and Assumption of Real Property Interests dated April 6, 2016 from Jewell Smokeless Coal Corporation.

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| Jewell Smokeless Coal Corporation | Revelation Energy, LLC | March 28, 2017 | Sublease Assignment and Agreement, as Amended for certain properties located in Buchanan County, Virginia, Tazewell County, Virginia and McDowell County, West Virginia.  Unrecorded. |
| Ramaco Resources Land Holdings, LLC | Revelation Energy, LLC | January 13, 2017 | Sublease (Southern Raven Seam Area) for such area located in certain properties held in Buchanan County, Virginia. Unrecorded. |
| Pocahontas Resources LLC | Revelation Energy, LLC | August 1, 2015 | Lease of Jones Fork No. 4 in Buchanan County, Virginia |
| Pocahontas Resources LLC | Revelation Energy, LLC | January 1, 2010, as amended October 1, 2015 | Lease of 17,545 acres for surface mining in Buchanan and Tazewell Counties, Virginia. Unrecorded. |
| CNX Gas Company LLC | Revelation Energy, LLC | August 13, 2012 | Lease of surface in Buchanan County, Tennessee.  Unrecorded. |

Schedule 7.01(a)(x)

DEBTORSLCC_105966

| M. M. Williams/Stinson | Jewell Smokeless Coal Corporation | November 16, 1970 | Unrecorded |
| R. S. Thompson | Jewell Smokeless Coal Corporation | September 17, 1976 | Deed Book 241, page 250 |
| Tazewell Coal & Iron | Jewell Smokeless Coal Corporation | February 1, 1995 | Deed Book 428, page 363 |
| Jewell Ridge Sublease (Brinks) LBR Holdings, LLC | Jewell Smokeless Coal Corporation | December 8, 1955 | Unrecorded |
| Harrison Wyatt | Energy Resources, LLC | July 7, 2006 | Unrecorded |
| Tazewell Coal & Iron Co. | Energy Resources, LLC | January 6, 2011 | Unrecorded |

### Tazewell County, Virginia

Lease dated December 1, 1998, between Pocahontas Mining Company Limited Partnership, L.L.P., as Lessor, and Jewell Smokeless Coal Corporation, as Lessee, with respect to Tiller, Jawbone, and Red Ash coal seams in Buchanan and Tazewell Counties, Virginia; and as affected by First Supplemental Agreement of Lease dated November 1, 2002; as affected by Second Supplemental Agreement of Lease dated November 1, 2003; as affected by Second Supplemental Agreement of Lease dated May 1, 2006; and as affected by Fourth Supplemental Agreement of Lease dated September 1, 2011; and as affected by Fifth Supplemental Agreement of Lease dated February 1, 2014, between Pocahontas Resources LLC, as Lessor, and Jewell Smokeless Coal Corporation, as Lessee.

Note: The above Conveyed to Revelation through that certain Assignment and Assumption of Real Property Interests dated April 6, 2016 from Jewell Smokeless Coal Corporation.

**Any and all leased property of:**

Dominion Coal Corporation; Omega Mining LLC; Vansant Coal Corporation; Energy Resources, LLC; or Harold Keene Coal Co., LLC in **Buchanan County, Virginia and/or Tazewell County, Virginia and/or McDowell County, West Virginia**.

Schedule 7.01(a)(x)

DEBTORSLCC_105967

**Russell County, Virginia**

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| Gent Royalty Partners LLC and Gent Enterprises | Harold Keene Coal Co., Inc. | 5/6/2005 | Unrecorded |
| FB Gent (Gent LLC) | Harold Keene Coal Co., Inc. | 6/25/2008 | Unrecorded |
| Knox Creek Coal Corp. | Harold Keene Coal Co., Inc. | 10/1/2001 | Unrecorded |
| Knox Creek Coal Corp. | Harold Keene Coal Co., Inc. | 9/29/2007 | Unrecorded |
| Knox Creek Coal Corp. | Harold Keene Coal Co., Inc. | 12/27/2011 | Unrecorded |
| Charles H. Gent Jr. and Robert A. Gent, collectively referred to as "Alice Thompson Tract" | Harold Keene Coal Co., Inc. | June 2008 | Unrecorded |
| Wyatt Realty Corp. | Energy Resources, LLC | 7/7/2006 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105968

### Fayette County, West Virginia

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| Master Sublease and Lease Agreement with Lightning, Inc. | Revelation Energy, LLC | July 12, 2011 | Unrecorded |

### Lee County, West Virginia

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| Penn Virginia Coal Company | Powell River Resources Corporation | 5/20/1996 | Unrecorded |

### McDowell County, West Virginia

| NAME OF LESSOR | ORIGINAL LESSEE | DATE | LEASE RECORDED/ LESSOR ADDRESS/REMARKS |
|---|---|---|---|
| LBR Holdings | Vansant Coal Corporation | March 10, 2014 | Unrecorded |
| WPP, LLC | Vansant Coal Corporation | October 24, 2011 | Unrecorded |

Schedule 7.01(a)(x)

DEBTORSLCC_105969

## SCHEDULE 8.01(m)

## PERMITTED PRIOR LIENS ON REAL PROPERTY

Real Estate Mortgage dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

Real Estate Mortgage dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company, and recorded in the Clerk's Office in Harlan County, Kentucky in Mortgage Book 433, Page 450 (the "Real Estate Mortgage.").

Assignment of the Real Estate Mortgage between J.A.D. Coal Company, Inc. and the Secured Parties dated April 22, 2015 and recorded in the Clerk's Office in Harlan, in Mtg. Book 433 Page 463.

Assignment and Assumption of Leases dated April 22, 2015 between J.A.D. Coal Company, Inc. and Revelation Energy, LLC and recorded in the Clerk's Office of Harlan County, Kentucky in Lease Book __ Page 587.

Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 28, 2015 in favor of MR Coal Marketing & Trading LLC and Noble Americas Corp.

Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 18, 2015 by Revelation Energy, LLC in favor of MR Coal Marketing & Trading LLC and Noble Americas Corp.

Overriding Royalty Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

Real Estate Mortgage dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

Security Agreement dated April 22, 2015 by and between Revelation Energy, LLC, a Kentucky limited liability company and J.A.D. Coal Company, Inc., a Virginia corporation.

Throughput Agreement dated April 22, 2015 by and between J.A.D. Coal Company, Inc., a Virginia corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

Special Warranty Deed dated April 22, 2015 between J.A.D. Coal Company, Inc., a Virginia corporation, as grantor and Revelation Energy, LLC, a Kentucky limited liability company, as grantee and recorded in the Clerk's Office of Harlan County, Kentucky in Deed Book 458, Page 503.

Schedule 8.01(m)

## SCHEDULE 8.02(a)

## EXISTING DEBT

| Creditor | Outstanding Debt | Documents |
|---|---|---|
| CATERPILLAR FINANCIAL SERVICES CORPORATION | $44,614,012.43 | (i) Amended and Restated Security Agreement and Promissory Note dated as of February 28, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation. <br><br> (ii) First Amendment to Amended and Restated Security Agreement and Promissory Note dated as of March 3, 2017, by and between Revelation Energy, LLC a Kentucky limited liability company and Caterpillar Financial Services Corporation, a Delaware corporation. <br><br> (iii) and the other documents described in Section D of Schedule 1.01(E-2) above. |
| MR COAL MARKETING & TRADING LLC | $5,244,000.47 | Amended and Restated Logistics Services Agreement dated as of April 18, 2015, by and between MR Coal Marketing & Trading, LLC and Revelation Energy, LLC., and the other documents described in Section B of Schedule 1.01(E-2) |
| UNITED BANK, INC. | $3,028,848.51 | Second Amended and Restated Loan and Security Agreement among Revelation Energy, LLC, Revelation Energy Holdings, LLC, Alpha highwall Mining, LLC and United Bank, |

Schedule 8.02(a)

| | | |
|---|---|---|
| | $3,308,536.03 | Inc., dated February 28, 2013, as amended. (Revolving)<br><br>Business Loan Agreement dated May 28, 2013 by and among United Bank, Inc., Revelation Energy, LLC and Alpha Highwall Mining, LLC, and the other documents described in Section C-2 of Schedule 1.01(E-2). |
| Julia L. McAfee and Carl E. McAfee (the "McAfees"); Dean McAfee Holdings, LLC ("McAfee Holdings"); Jeffery Paul Dean, Trustee of the Trust for Jeffery Paul Dean (GS Exempt), under Agreement dated August 29, 2008; Donna Mae Kolb, Trustee for the Trust for Donna Mae Kolb (GS Exempt), under Agreement dated August 29, 2008; and Aubra Brian Dean, Trustee for the Trust for Aubra Brian Dean (GS Exempt), under Agreement dated August 29, 2008 (collectively, the "Deans" or the "Dean Heirs"), as successors in interest to the Estate of Aubra Paul Dean [and along with McAfee Holdings | $5,761,718.00 | Security Agreement dated April 22, 2015 by and between Revelation Energy, LLC, a Kentucky limited liability company and J.A.D. Coal Company, Inc., a Virginia corporation (the "Security Agreement"), and the other documents described in Section A of Schedule 1.01(E-2) above. |

Schedule 8.02(a)

DEBTORSLCC_105972

**SCHEDULE 8.02(e)**

**CERTAIN AFFILIATE TRANSACTIONS**

None.

Schedule 8.01(m)

DEBTORSLCC_105973

# SCHEDULE 8.02(j)

## RESTRICTIONS ON DIVIDENDS AND DISTRIBUTIONS

None.

DEBTORSLCC_105974

**SCHEDULE 8.02(m)**

**EXISTING INVESTMENTS**

None.

Schedule 8.02(m)

DEBTORSLCC_105975

**SCHEDULE 8.02(r)**

**AGGREGATE PERMITTED RECLAMATION OBLIGATIONS**

| Mining Financial Assurance | Amount |
|---|---|
| Future Bonding Requirements on Active Permits | $10 mm |
| Future Bonding Requirements for Mid-terms, Revisions, Amendments, etc. | $5 mm |
| Future Bonding Requirements for Transfer of Future Mining Assets | $10 mm |

Schedule 8.02(r)

*Execution Version*

EXHIBIT 1.01(A)

### [FORM OF]
### ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement, the other Loan Documents and any other documents or instruments delivered pursuant thereto to the extent related to the amount[s] and percentage interest[s] identified below of all the outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Document, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

| | | |
|---|---|---|
| 1. | Assignor[s]: | [Assignor [is] [is not] a Defaulting Lender] |
| 2. | Assignee[s]: | [for each Assignee, indicate [Affiliate][Approved Fund] of [identify Lender]] |
| 3. | Borrower: | Blackjewel L.L.C. |
| 4. | Agent: | Riverstone Credit Partners – Direct, L.P. |

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

Exhibit 1.01(A) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_105977

5.   Credit Agreement:     Credit Agreement, dated as of July 17, 2017, by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company ("Holdings"), the Lenders from time to time party thereto, and Riverstone Credit Partners – Direct, L.P., in its capacities as administrative agent for the Lenders and collateral agent for the Secured Parties (in such capacities, together with its successors and permitted assigns in such capacities, the "Agent").

6.   Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Aggregate Amount of Term Loans for all Lenders[7] | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[8] | CUSIP Number |
|---|---|---|---|---|---|
| | | $ | $ | % | |
| | | | | | |
| | | $ | $ | % | |
| | | | | | |

[7.    Trade Date: _____][9]

Effective Date: , 20__  [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee and, if available, its market entity identifier, as appropriate.

[7] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[8] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

[9] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

Exhibit 1.01(A) - 2

DEBTORSLCC_105978

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR[S][10]**

**[NAME OF ASSIGNOR]**

By:    _____
Name:  _____
Title: _____

**[NAME OF ASSIGNOR]**

By:    _____
Name:  _____
Title: _____

**ASSIGNEE[S][11]**

**[NAME OF ASSIGNEE]**

By:    _____
Name:  _____
Title: _____

**[NAME OF ASSIGNEE]**

By:    _____
Name:  _____
Title: _____

---

[10] Add additional signature blocks as needed.
[11] Add additional signature blocks as needed.

001470-0043-16679-Active.21950790.6

Exhibit 1.01(A) - 3

DEBTORSLCC_105979

Accepted:

**RIVERSTONE CREDIT PARTNERS – DIRECT, L.P**, as Agent

By: _____
Name: _____
Title: _____

[Consented to:][12]

**BLACKJEWEL L.L.C.**, as Borrower

By: _____
Name: _____
Title: _____

---

[12] To be added only if the consent of the Borrower is required by the terms of Section 11.08(b) of the Credit Agreement.

Exhibit 1.01(A) - 4

001470-0043-16679-Active.21950790.6

DEBTORSLCC_105980

## ANNEX 1 TO ASSIGNMENT AND ASSUMPTION
## STANDARD TERMS AND CONDITIONS
## FOR ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor[s].  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any Lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any guarantee or collateral thereunder, (iii) the financial condition of Holdings, the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee[s].  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee (and become a Lender), under Section 11.08(b) of the Credit Agreement (subject to such consents, if any, as may be required under Section 11.08(b) of the Credit Agreement), (iii) it is not a Defaulting Lender or a natural person, (iv) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the other Loan Documents as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (v) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (vi) it has received a copy of the Credit Agreement and the other Loan Documents, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 7.01(a) or Section 8.03 thereof, as applicable, and such other documents and information as it has deemed or deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vii) it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (viii) if it is not already a Lender under the Credit Agreement, attached to this Assignment and Assumption is an administrative questionnaire as required by the Credit Agreement, duly completed and executed by [the][such] Assignee, (ix) the Administrative Agent has received a processing and recordation fee of $3,500 (unless waived or reduced by the Agent) as of the Effective Date and (x) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    Payments.  From and after the Effective Date, the Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other

Exhibit 1.01(A) - 5

001470-0043-16679-Active.21950790.6

DEBTORSLCC_105981

amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective
Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective
Date.

      3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure
to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and
Assumption may be executed in any number of counterparts, which together shall constitute one
instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption
by facsimile or other electronic means (including a PDF sent by e-mail) shall be effective as delivery of a
manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption,
and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance
with the laws of the State of New York.

Exhibit 1.01(A) - 6

DEBTORSLCC_105982

EXHIBIT 1.01(E)

**[FORM OF]**
**EXTENSION REQUEST**

To:    Riverstone Credit Partners – Direct, L.P.
       as Agent
       712 Fifth Avenue, 36th Floor
       New York, NY 10019
       Attention: Daniel Flannery
       Telephone No. (212) 271-6259
       Email: dflannery@riverstonecredit.com

_____, 20__ [13]

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 2.07(a) of the Credit Agreement, the Borrower hereby irrevocably requests that the Stated Maturity Date be extended for one additional term of six (6) months.

**BLACKJEWEL L.L.C.,** as Borrower

By:    _____
Name:  _____
Title:    _____

---

[13] Must be received by the Agent no later than thirty (30) days prior to the initial Stated Maturity Date.

Exhibit 1.01(E) - 1

DEBTORSLCC_105983

EXHIBIT 1.01(G)

**[FORM OF]**
**GUARANTY AGREEMENT**

[See Execution Version.]

Exhibit 1.01(G) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_105984

*Execution Version*

## GUARANTY AGREEMENT

This **GUARANTY AGREEMENT**, dated as of July 17, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is made and given by BLACKJEWEL HOLDINGS, L.L.C., a Delaware limited liability company ("Holdings"), and those certain direct or indirect Subsidiaries of BLACKJEWEL, L.L.C., a Delaware limited liability company (the "Borrower"), further identified as of the date hereof in Schedule 1 attached hereto and made a part hereof (together with any other Person that becomes a party hereto pursuant to Section 23 hereof, each a "Subsidiary Guarantor" and collectively, the "Subsidiary Guarantors" and, together with Holdings, each a "Guarantor" and collectively, the "Guarantors"), in favor of RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., in its capacities as administrative agent for the Lenders and as collateral agent for the Secured Parties (in such capacities, together with its successors and permitted assigns in such capacities, the "Agent"), and each other Secured Party.

## WITNESSETH:

WHEREAS, Holdings, the Borrower, the Lenders from time to time party thereto and the Agent have entered into that certain Credit Agreement, dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which, upon the terms and subject to the conditions set forth therein, the Lenders have agreed to make certain Loans to the Borrower, all as more fully set forth therein;

WHEREAS, it is a condition precedent to the effectiveness of the Credit Agreement and to the making of the Loans thereunder that this Agreement is made by each of the Guarantors existing on the Closing Date; and

WHEREAS, the respective businesses and investments of the Guarantors are interdependent and Loans made to the Borrower under the Credit Agreement are with the expectation that the profits and other opportunities from such investment will directly or indirectly inure to the benefit of each Guarantor and to all of them taken as an affiliated group.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound, each Guarantor hereby agrees as follows:

1.     Definitions.  Terms which are defined in the Credit Agreement and not otherwise defined herein are used herein as defined therein, and the rules of construction set forth in Section 1.02 of the Credit Agreement shall apply to this Agreement, mutatis mutandis, as if fully set forth herein.

2.     Guarantied Obligations.  Each Guarantor hereby jointly and severally unconditionally, and irrevocably, guaranties to the Agent for the ratable benefit of the Secured Parties the full and punctual payment and performance when due (whether on demand, at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise and including any amounts which would become due but for the operation of an automatic stay under any Debtor Relief Law) of all Obligations, including, without limiting the generality of the foregoing, all obligations, liabilities, and indebtedness from time to time of the Borrower or any Guarantor to the Agent or any other Secured Party under or in connection with the Credit Agreement or any other Loan Document, whether for principal, interest, fees, premiums (including any Make-Whole Premium), indemnities, expenses, or otherwise, and all renewals, extensions, amendments, refinancings or refundings thereof, whether such obligations, liabilities, or indebtedness are direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising (and including obligations, liabilities, and indebtedness arising or accruing after the commencement of any Bankruptcy Proceeding

001470-0043-16679-Active.21916887.7

DEBTORSLCC_105985

with respect to the Borrower or any Guarantor or which would have arisen or accrued but for the commencement of such Bankruptcy Proceeding, even if the claim for such obligation, liability, or indebtedness is not enforceable or allowable in such Bankruptcy Proceeding, and including all obligations, liabilities, and indebtedness arising from any extensions of credit under or in connection with any Loan Document from time to time, regardless of whether any such extensions of credit are in excess of the amount committed under or contemplated by the Loan Documents or are made in circumstances in which any condition to the extension of credit is not satisfied), all subject to the provisions set forth in Section 22 hereof (all of the foregoing obligations, liabilities and indebtedness are referred to herein collectively as the "Guarantied Obligations" and each as a "Guarantied Obligation"). Without limitation of the foregoing, any of the Guarantied Obligations shall be and remain Guarantied Obligations entitled to the benefit of this Agreement if the Agent or any of the other Secured Parties (or any one or more assignees or transferees thereof) from time to time assign or otherwise transfer all or any portion of their respective rights and obligations under the Loan Documents, or any other Guarantied Obligations, to any other Person.

     3.    <u>Guaranty</u>.  Each Guarantor hereby promises to pay and perform all such Guarantied Obligations immediately upon demand therefor by the Agent and the Secured Parties or any one or more of them. All payments made hereunder shall be made by each Guarantor in immediately available funds in U.S. Dollars and shall be made without setoff, counterclaim, withholding, or other deduction of any nature.

     4.    <u>Obligations Absolute</u>.  The obligations of the Guarantors hereunder are irrevocable, absolute, independent and unconditional and shall not be discharged or impaired or otherwise diminished or affected by the failure, default, omission, or delay, willful or otherwise, by the Agent, any other Secured Party, or the Borrower or any other guarantor or obligor in respect of any of the Guarantied Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or any circumstance, act or thing which constitutes, or would otherwise operate as, a discharge of any Guarantor as a matter of law or equity. Each of the Guarantors agrees that the Guarantied Obligations will be paid and performed strictly in accordance with the terms of the Loan Documents. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows: (i) this Agreement is a guaranty of payment when due and not of collectability; (ii) this Agreement is a primary obligation of each Guarantor and not merely a contract of surety; (iii) the Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of such Event of Default; (iv) the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions; (v) payment by any Guarantor of a portion, but not all, of the Guarantied Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guarantied Obligations which has not been paid (and without limiting the generality of the foregoing, if the Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guarantied Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guarantied Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guarantied Obligations); (vi) any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (a) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guarantied Obligations; (b) settle,

2

DEBTORSLCC_105986

compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (c) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (d) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (e) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent herewith or, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Guarantor or the Borrower or any security for the Guaranteed Obligations; and (f) exercise any other rights available to it under the Loan Documents;

5.      Without limiting the generality of the foregoing, each Guarantor hereby consents to, at any time and from time to time, and the joint and several obligations of each Guarantor hereunder shall be valid and enforceable and shall not be diminished, terminated, or otherwise similarly affected, or be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:

(a)      any lack of genuineness, legality, validity, enforceability or allowability (in a Bankruptcy Proceeding, or otherwise), or any avoidance or subordination, in whole or in part, of any Loan Document or any of the Guaranteed Obligations or any agreement or instrument relating to any of the foregoing, in each case, regardless of any Law, regulation or order now or hereafter in effect in any jurisdiction affecting any of the Guaranteed Obligations, any of the terms of the Loan Documents, or any rights of the Agent, any other Secured Party or any other Person with respect thereto;

(b)      any increase, decrease or change in the amount, nature, type or purpose of or any release, surrender, exchange, compromise or settlement of any of the Guaranteed Obligations (whether or not contemplated by the Loan Documents as presently constituted); any change in the time, manner, method or place of payment or performance of, or in any other term of, any of the Guaranteed Obligations; any execution or delivery of any additional Loan Documents; or any amendment, modification or supplement to, or renewals, extensions, refinancing or refunding of, any Loan Document or any of the Guaranteed Obligations;

(c)      any failure to assert any breach of or default under any Loan Document or any of the Guaranteed Obligations, or any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations;

(d)      any extensions of credit in excess of the amount committed under or contemplated by the Loan Documents, or in circumstances in which any condition to such extensions of credit has not been satisfied; any other exercise or non-exercise, or any other failure, omission, breach, default, delay or

3

DEBTORSLCC_105987

wrongful action in connection with any exercise or non-exercise, of any right or remedy against the Borrower or any other Person under or in connection with any Loan Document or any of the Guarantied Obligations; any refusal of payment or performance of any of the Guarantied Obligations, whether or not with any reservation of rights against any Guarantor; or any application of payments or collections (including but not limited to payments and collections resulting from realization upon any direct or indirect security for the Guarantied Obligations) to other obligations, if any, not entitled to the benefits of this Agreement, in preference to Guarantied Obligations entitled to the benefits of this Agreement, or if any collections are applied to Guarantied Obligations, any application to particular Guarantied Obligations;

(e)     any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or any agreement or instrument executed pursuant hereto or thereto, or of any other guaranty or security for the Guarantied Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or such other agreement or instrument or such other guaranty or security;

(f)     any taking, exchange, amendment, modification, waiver, supplement, termination, subordination, compromise, release, surrender, loss, or impairment of, or any failure to perfect or continue perfection of a security interest or Lien, or any failure to protect, perfect, or preserve the value of, or any enforcement of, realization upon, or exercise of rights, or remedies under or in connection with, or any failure, omission, breach, default, delay or wrongful action by the Agent and the Secured Parties, or any of them, or any other Person in connection with the enforcement of, realization upon, or exercise of rights or remedies under or in connection with, or, any other action or inaction by the Agent and the Secured Parties, or any of them, or any other Person in respect of, any direct or indirect security for any of the Guarantied Obligations. As used in this Agreement, "direct or indirect security" for the Guarantied Obligations, and similar phrases, includes any collateral security, guaranty, suretyship, letter of credit, capital maintenance agreement, put option, subordination agreement or other right or arrangement of any nature providing direct or indirect assurance of payment or performance of any of the Guarantied Obligations, made by or on behalf of any Person;

(g)     any merger, consolidation, reorganization, liquidation, dissolution, winding-up, charter revocation or forfeiture, or other change in, restructuring or termination of the corporate structure or existence of, Holdings, the Borrower or any other Person (and any Secured Party's consent to any of the foregoing and to any corresponding restructuring of the Guarantied Obligations); any Bankruptcy Proceeding with respect to the Borrower or any other Person; or any action taken or election made by the Agent and the Secured Parties, or any of them (including but not limited to any election under Section 1111(b)(2) of the Bankruptcy Code), the Borrower, or any other Person in connection with any such proceeding; or any liability if the Borrower makes a payment to the Agent and such payment is recovered from the Agent under any Debtor Relief Laws;

(h)     any defense, setoff, or counterclaim (excluding only the defense of full, strict and indefeasible payment and performance of all of the Guarantied Obligations), which may at any time be available to or be asserted by the Borrower or any other Person with respect to any Loan Document or any of the Guarantied Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; or any discharge by operation of Law or release of the Borrower or any other Person from the performance or observance of any Loan Document or any of the Guarantied Obligations; or

(i)     any other act, thing, omission, event or circumstance, or delay to do any other act or thing, whether similar or dissimilar to the foregoing, and whether known or unknown, which may or

DEBTORSLCC_105988

might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guarantied Obligations or otherwise constitute a defense available to, or limit the liability of, any Guarantor, a guarantor or a surety, excepting only full, strict and indefeasible payment and performance of all of the Guarantied Obligations.

6.    <u>Waivers, etc.</u>  Each Guarantor hereby waives, for the benefit of the Agent and each other Secured Party, any defense to or limitation on its obligations under this Agreement arising out of or based on any event or circumstance referred to in <u>Section 4</u> hereof. Without limiting the generality of the foregoing, each Guarantor waives, for the benefit of the Agent and each other Secured Party, each of the following:

(a)    all notices, presentments, protests, disclosures and demands, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, under any Loan Document or under any agreement or instrument related to any of the foregoing, notices of any renewal, extension or modification of any of the Guarantied Obligations or any Loan Document or any agreement or instrument related to any of the foregoing, notices of any extension of credit to the Borrower or the incurrence of any Guarantied Obligation, notices of any of the matters described in <u>Section 4</u> hereof and any right to consent to any and all of the foregoing, and any other notices, disclosures and demands of any nature which otherwise might be required from time to time to preserve intact any rights against any Guarantor, including, without limitation, the following: any notice required by any Law, regulation or order now or hereafter in effect in any jurisdiction; any notice of nonpayment, nonperformance, dishonor, or protest under any Loan Document or relating to any of the Guarantied Obligations; any notice of any default or any failure on the part of the Borrower or any other Person to comply with any Loan Document or any of the Guarantied Obligations or any direct or indirect security for any of the Guarantied Obligations; and any notice of any information pertaining to the business, operations, condition (financial or otherwise) or prospects of the Borrower or any other Person;

(b)    any right to any marshalling of assets, to the filing of any claim against the Borrower or any other Person in the event of any Bankruptcy Proceeding, or to the exercise against the Borrower or any other Person of any other right or remedy under or in connection with any Loan Document or any of the Guarantied Obligations or any direct or indirect security for any of the Guarantied Obligations; any requirement of promptness or diligence on the part of the Agent and the Secured Parties, or any of them, or any other Person; any requirement to exhaust any remedies under or in connection with, or to mitigate the damages resulting from default under, any Loan Document or any of the Guarantied Obligations or any direct or indirect security for any of the Guarantied Obligations; any benefit of any statute of limitations; and any requirement of acceptance of this Agreement and any requirement that any Guarantor receive notice of such acceptance;

(c)    any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guarantied Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever;

(d)    any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guarantied Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than the full, strict and indefeasible payment and performance of all of the Guarantied Obligations;

5

DEBTORSLCC_105989

(e)      any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal;

(f)      any defense based upon any Secured Party's errors or omissions in the administration of the Guarantied Obligations;

(g)      (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto;

(h)      any defense, benefit or other right derived from or afforded by or arising by reason of any Law now or hereafter in effect in any jurisdiction pertaining to election of remedies (including but not limited to anti-deficiency laws, "one action" laws or the like), or by reason of any election of remedies or other action or inaction by the Agent or the Secured Parties, or any of them, (including but not limited to commencement or completion of any judicial proceeding or nonjudicial sale or other action in respect of collateral security for any of the Guarantied Obligations), which results in denial or impairment of the right of the Agent and the Secured Parties, or any of them, to seek a deficiency against the Borrower or any other Person or which otherwise discharges or impairs any of the Guarantied Obligations, or any such defenses, benefits or other rights that limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof; and

(i)      any right to be subrogated to the rights of the Agent and the Secured Parties against the Borrower until all of the Guarantied Obligations are indefeasibly Paid in Full.

7.      Continuing Obligation.  This Agreement is a continuing obligation of the Guarantors and shall remain in full force and effect notwithstanding that no Guarantied Obligations may be outstanding from time to time and notwithstanding any other event or circumstance. Upon Payment in Full, this Agreement (other than obligations that survive termination hereof in accordance with their terms) shall terminate; provided, however, that this Agreement shall continue to be effective or be automatically reinstated, as the case may be, any time any payment of any of the Guarantied Obligations is rescinded, recouped, recovered, avoided, or must otherwise be returned or released by the Agent or any other Secured Party, whether upon or during a Bankruptcy Proceeding affecting the Borrower or any other Person or for any other reason whatsoever, all as though such payment had not been made and was due and owing.

8.      Subrogation.  Until indefeasible Payment in Full, each Guarantor waives, and agrees it will not exercise, any claim right or remedy, whether direct or indirect and whether arising in equity, under contract, by statute, under common law or otherwise, that it now has or may hereafter have or acquire against the Borrower or any other Guarantor or any of its assets or properties in connection with this Agreement or the performance by such Guarantor of its obligations hereunder or otherwise in connection with the Guarantied Obligations or any security therefor (including, without limitation, (a) any right of subrogation, reimbursement or indemnification, (b) any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guarantied Obligations, including any such right of contribution as contemplated by Section 28 hereof, (c) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower, and (d) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and

DEBTORSLCC_105990

contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any right of subrogation, reimbursement, indemnification, contribution or the like, such amount shall be deemed to have been paid to such Guarantor for the benefit of, and shall be held in trust for the benefit of, the Agent and the Secured Parties and shall forthwith be paid to the Agent to be credited and applied upon the Guarantied Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement.

9.    No Stay.  Without limitation of any other provision of this Agreement, if any declaration of default or acceleration or other exercise or condition to exercise of rights or remedies under or with respect to any Guarantied Obligation shall at any time be stayed, enjoined, or prevented for any reason (including but not limited to stay or injunction resulting from the pendency against the Borrower or any other Person of a bankruptcy, insolvency, reorganization or similar proceeding), each Guarantor agrees that, for the purposes of this Agreement and its obligations hereunder, the Guarantied Obligations shall be deemed to have been declared in default or accelerated, and such other exercise or conditions to exercise shall be deemed to have been taken or met.

10.    Taxes.    All payments and collections made by or from the Guarantor under this Agreement shall be deemed to be payments pursuant to Section 5.09 of the Credit Agreement and that such Section 5.09 shall apply in all instances.

11.    Notices.  Each Guarantor agrees that all notices, statements, requests, demands and other communications under this Agreement shall be given to the Borrower on behalf of such Guarantor at the address referred to in, and in the manner provided in, Section 11.05 of the Credit Agreement. The Agent and the other Secured Parties may rely on any notice (whether or not made in a manner contemplated by this Agreement) purportedly made by or on behalf of a Guarantor, and the Agent and the Secured Parties shall have no duty to verify the identity or authority of the Person giving such Notice.

12.    Counterparts; Electronic Signatures.  This Agreement may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by e-mail or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

13.    Setoff, Default Payments by Borrower.   Section 9.02(c) of the Credit Agreement is hereby incorporated by reference, and each Guarantor acknowledges and accepts the Lenders' and, to the extent their respective Affiliates have agreed in writing to be bound by the provisions of Section 5.03 of the Credit Agreement, their respective Affiliates' rights therein.

14.    Construction.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect interpretation of this Agreement in any respect. This Agreement has been fully negotiated between the applicable parties, each party having the benefit of legal counsel, and accordingly neither any doctrine of construction of guaranties in favor of the guarantor, nor any doctrine of construction of ambiguities in agreement or instruments against the party controlling the drafting thereof, shall apply to this Agreement.

001470-0043-16679-Active.21916887.7

DEBTORSLCC_105991

15.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon each of the parties hereto, their successors and assigns, and shall inure to the benefit of and be enforceable by each of the parties hereto, or any of them, and their successors and assigns permitted by the Credit Agreement; <u>provided</u>, <u>however</u>, that no Guarantor may assign or transfer any of its rights or obligations hereunder or any interest herein and any such purported assignment or transfer shall be null and void.

16.    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER THE LAWS OF THE STATE OF NEW YORK.

17.    <u>SUBMISSION TO JURISDICTION</u>.  EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, (OTHER THAN WITH RESPECT TO ACTIONS BY THE AGENT IN RESPECT OF RIGHTS UNDER ANY COLLATERAL DOCUMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO), IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH GUARANTOR HEREBY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE AGENT OR ANY OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AGAINST ANY GUARANTOR OR ITS PROPERTIES IN THE COURTS OF ANY OTHER JURISDICTION.

18.    <u>WAIVER OF VENUE</u>.  EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 17. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT AND AGREES NOT ASSERT ANY SUCH DEFENSE.

19.    <u>SERVICE OF PROCESS</u>.  EACH GUARANTOR HEREBY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.05 OF THE CREDIT AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE AGENT OR ANY OTHER SECURED PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

20.    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY

001470-0043-16679-Active.21916887.7

DEBTORSLCC_105992

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS
CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER
THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR
ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE,
THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO
ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG
OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 20.

21.     LIMITATION OF LIABILITY. EACH GUARANTOR AGREES TO BE BOUND BY
THE REQUIREMENTS OF SECTION 11.03(d) OF THE CREDIT AGREEMENT.

22.     Severability; Modification to Conform to Law.

(a)     It is the intention of the parties that this Agreement be enforceable to the fullest extent
permissible under applicable Law, but that the unenforceability (or modification to conform to such Law)
of any provision or provisions hereof shall not render unenforceable, or impair, the remainder hereof. If
any provision in this Agreement shall be held invalid or unenforceable in whole or in part in any
jurisdiction, this Agreement shall, as to such jurisdiction, be deemed amended to modify or delete, as
necessary, the offending provision or provisions and to alter the bounds thereof in order to render it or
them valid and enforceable to the maximum extent permitted by applicable Law, without in any manner
affecting the validity or enforceability of such provision or provisions in any other jurisdiction or the
remaining provisions hereof in any jurisdiction.

(b)     Without limitation of the preceding subsection (a), to the extent that applicable Law
(including applicable Laws pertaining to fraudulent conveyance or fraudulent or preferential transfer)
otherwise would render the full amount of any Guarantor's obligations hereunder invalid, voidable, or
unenforceable on account of the amount of such Guarantor's aggregate liability under this Agreement,
then, notwithstanding any other provision of this Agreement to the contrary, the aggregate amount of such
liability shall, without any further action by the Agent or any of the Secured Parties or such Guarantor or
any other Person, be automatically limited and reduced to the highest amount that would not render such
guarantee subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provisions
of applicable law.

(c)     Notwithstanding anything to the contrary in this Section 22 or elsewhere in this
Agreement, this Agreement shall be presumptively valid and enforceable to its full extent in accordance
with its terms, as if this Section 22 (and references elsewhere in this Agreement to enforceability to the
fullest extent permitted by Law) were not a part of this Agreement, and in any related litigation the
burden of proof shall be on the party asserting the invalidity or unenforceability of any provision hereof
or asserting any limitation on any Guarantor's obligations hereunder as to each element of such assertion.

23.     Additional Guarantors.   At any time and from time to time after the Closing Date,
additional Persons may become parties to this Agreement and thereby acquire the duties and obligations
of a Guarantor hereunder by executing and delivering to the Agent (with a copy to the Lenders) a Joinder
Agreement attached as Exhibit A hereto. No notice of the addition of any Guarantor shall be required to
be given to any pre-existing Guarantor, and each Guarantor hereby irrevocably consents thereto.

24.     Inducement from Waivers. Each Guarantor acknowledges and agrees that the waivers set
forth in this Agreement serve as a material inducement to the entry into the Credit Agreement by the
Agent and the Lenders, and that the Agent and the other Secured Parties are relying on each specific
waiver and all such waivers in entering into this Agreement.   The undertakings of each Guarantor

001470-0043-16679-Active.21916887.7

DEBTORSLCC_105993

hereunder secure the obligations of itself and the other Guarantors.  Each of the Agent and each other Secured Party hereby reserve all rights against each Guarantor.

      25.    <u>Representations and Warranties of the Guarantors</u>.

      (a)    Each Guarantor represents and warrants that:

      (i)    such Guarantor (A) is a corporation, partnership or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (B) has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct and (C) is duly licensed or qualified and in good standing in each jurisdiction where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary;

      (ii)    such Guarantor has duly executed and delivered this Agreement, and this Agreement constitutes its legal, valid and binding obligation, enforceable against such Guarantor in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforceability of creditors' rights generally or limiting the right of specific performance;

      (iii)    the execution, delivery and performance by such Guarantor of this Agreement do not (A) conflict with, constitute a default under or result in any breach of (1) the terms and conditions of the certificate of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company agreement or other organizational documents of such Guarantor or (2) any Law or any agreement or instrument or order, writ, judgment, injunction or decree to which such Guarantor is a party or by which such Guarantor is bound or subject to, in any material respect, or (B) result in the creation or enforcement of any Lien, charge or encumbrance whatsoever upon any property (now or hereafter acquired) of such Guarantor; and

      (b)    there are no actions, suits, proceedings or investigations pending or, to the knowledge of the Guarantors, threatened against any Guarantor at law or equity before any Official Body which individually or in the aggregate could reasonably be expected to result in liability exceeding $250,000. None of the Guarantors are in violation of any order, writ, injunction or any decree of any Official Body which individually or in the aggregate could reasonably be expected to result in liability exceeding $250,000. Each Guarantor hereby acknowledges, represents, and warrants that it receives direct and indirect benefits by virtue of its affiliation with the Borrower and the other Guarantors and that it will receive direct and indirect benefits from the financing arrangements contemplated by the Credit Agreement and that such benefits, together with the rights of contribution and subrogation that may arise in connection herewith are a reasonably equivalent exchange of value in return for providing this Agreement.

      26.    <u>Miscellaneous</u>.

      (a)    <u>Amendments; Waivers</u>.  No amendment to or waiver of any provision of this Agreement, and no consent to any departure by any Guarantor herefrom, shall in any event be effective unless in a writing manually signed by the Agent (with the consent of the Required Lenders or all of the Lenders, to the extent required by Section 11.01 of the Credit Agreement). Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No delay or failure of the Agent or the other Secured Parties, or any of them, in exercising any right or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The

DEBTORSLCC_105994

rights and remedies of the Agent and the other Secured Parties under this Agreement are cumulative and not exclusive of any other rights or remedies available hereunder, under any other agreement or instrument, by Law, or otherwise.

(b)     Notices.  The Guarantors agree that Section 11.05 of the Credit Agreement shall be incorporated herein *mutatis mutandis*; provided that the applicable address of any Guarantor that is not set forth on Schedule 1.01(C) of the Credit Agreement shall be set forth on Schedule 2 hereto on the Closing Date.

(c)     Expenses.  The Guarantors, jointly and severally, shall (i) pay all expenses incurred by the Agent or any other Secured Party incurred in collecting against any Guarantor under this Agreement or otherwise enforcing or preserving any rights under this Agreement or any other Loan Document to which any Guarantor is a party if, and to the same extent that, the Borrower is required to pay such expenses under Section 11.03(a) of the Credit Agreement and (ii) indemnify, defend and hold harmless each Indemnitee from, any and all liabilities with respect to, or in connection with any of the transactions contemplated by the Credit Agreement if, and to the same extent that, the Borrower is required to indemnify, defend and hold harmless such Indemnitee under Section 11.03(b) of the Credit Agreement. Without limiting the foregoing, the Guarantors, jointly and severally, agree to reimburse the Agent and the other Secured Parties for any costs and out-of-pocket expenses (including attorneys' fees) paid or incurred by the Agent or any other Secured Party in connection with the collection and enforcement of amounts due under the Loan Documents, including, without limitation this Guaranty.

(d)     Prior Understandings.  This Agreement and the other Loan Documents constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all other prior and contemporaneous understandings and agreements.

27.     Survival.  All representations and warranties of the Guarantors made in connection with this Agreement shall survive the execution and delivery of this Agreement, the completion of the transactions under the Loan Documents and Payment in Full. All covenants and agreements of the Guarantors contained herein relating to the payment of principal, interest, premiums, additional compensation or expenses and indemnification shall survive Payment in Full. All other covenants and agreements of the Guarantors shall continue in full force and effect from and after the date hereof and until Payment in Full.

28.     Contribution.  Each Guarantor hereby agrees that, to the extent a Guarantor shall have paid more than its proportionate share of any payment made hereunder or in respect of the Guarantied Obligations, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 28  shall (a) be subject at all times to the subordination provisions and other terms and conditions of Section 8 hereof and (b) in no respect limit the indebtedness, liabilities and obligations of any Guarantor to the Agent and the other Secured Parties, and each Guarantor shall remain liable to the Agent and the other Secured Parties for the full amount guaranteed by it hereunder.

29.     Subordination of Other Obligations.  Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guarantied Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Agent, for the benefit of the Secured Parties, and shall forthwith be paid over to the Agent for the benefit of the Secured Parties to be credited and applied against the Guarantied Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

11

DEBTORSLCC_105995

30.   <u>Authority of Guarantors or Borrower</u>.  It is not necessary for any Secured Party to inquire into the capacity or powers of any Guarantor or the Borrower or any affiliate of the foregoing, or the officers, employees, directors, representatives or agents of any of the foregoing acting or purporting to act on behalf of any of them.

31.   <u>Financial Condition of Borrower</u>.  Any Loan or other credit extension may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such funding or continuation. No Secured Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guarantied Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Secured Party.

32.   <u>Bankruptcy, Etc</u>. (a) So long as any Guarantied Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Agent, commence or join with any other Person in commencing any Bankruptcy Proceeding of or against the Borrower or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any Bankruptcy Proceeding of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such case or proceeding.

(b)   Each Guarantor acknowledges and agrees that any interest on any portion of the Guarantied Obligations which accrues after the commencement of any Bankruptcy Proceeding (or, if interest on any portion of the Guarantied Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guarantied Obligations if such case or proceeding had not been commenced) shall be included in the Guarantied Obligations because it is the intention of Guarantors and the Secured Parties that the Guarantied Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of Law or order which may relieve the Borrower of any portion of such Guarantied Obligations. The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay to the Agent, or allow the claim of the Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)   In the event that all or any portion of the Guarantied Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guarantied Obligations for all purposes hereunder.

33.   <u>Release</u>.  The obligations of any Guarantor under this Guaranty shall terminate automatically in accordance with, and subject to, Section 11.15(b) of the Credit Agreement .

[Signature Pages Follow]

12

DEBTORSLCC_105996

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first above written.

**GUARANTORS:**                                **BLACKJEWEL HOLDINGS, L.L.C.**

By: _____
Name:
Title:

**DOMINION COAL CORPORATION**

By: _____
Name:
Title:

**OMEGA MINING, LLC**

By: _____
Name:
Title:

**VANSANT COAL CORPORATION**

By: _____
Name:
Title:

**HAROLD KEENE COAL CO. LLC**

By: _____
Name:
Title:

**ENERGY RESOURCES, LLC**

By: _____
Name:
Title:

Signature Page
Guaranty Agreement

DEBTORSLCC_105997

ACKNOWLEDGED AND ACCEPTED:

**RIVERSTONE CREDIT PARTNERS –
DIRECT, L.P.**, as Agent


By: _____
Name:
Title:

**SCHEDULE 1**
**TO GUARANTY AGREEMENT**

| SUBSIDIARY | STATE OF INCORPORATION OR FORMATION |
|---|---|
| Dominion Coal Corporation | Virginia |
| Omega Mining, LLC | Virginia |
| Vansant Coal Corporation | Virginia |
| Harold Keene Coal Co. LLC | Virginia |
| Energy Resources, LLC | Virginia |

Schedule 1

DEBTORSLCC_105999

**SCHEDULE 2**
**TO GUARANTY AGREEMENT**

<u>Address for Notices</u>:

1051 Main St.
Milton, West Virginia 25541

Schedule 2

DEBTORSLCC_106000

# EXHIBIT A
## [FORM OF] JOINDER AGREEMENT

This **JOINDER AGREEMENT**, dated as of [＿＿＿＿＿＿] (this "Joinder Agreement"), is made by [＿＿＿＿＿＿＿＿], a [＿＿＿＿＿＿＿＿] (the "Additional Guarantor"), in favor of RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., in its capacities as administrative agent for the Lenders and as collateral agent for the Secured Parties (in such capacities, together with its successors and permitted assigns in such capacities, the "Agent"), and each other Secured Party. All capitalized terms not defined herein shall have the meaning ascribed to them in the Guaranty Agreement referred to below, whether included therein or by reference to another document.

A.    Reference is made to that certain Guaranty Agreement, dated as of July 17, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty Agreement"), in favor of the Agent for the benefit of the Secured Parties.

B.    The Guaranty Agreement provides that additional Subsidiaries of the Borrower may become Subsidiary Guarantors and Guarantors under the Guaranty Agreement by execution and delivery of an instrument in the form of this Joinder Agreement. The Additional Guarantor is executing and delivering this Joinder Agreement in accordance with the requirements of the Credit Agreement and the Guaranty Agreement to become a Guarantor under the Guaranty Agreement as consideration for extensions of credit previously made by the Lenders to the Borrower.

Accordingly, the Additional Guarantor agrees as follows:

1.    Guaranty Agreement.    By executing and delivering this Joinder Agreement, the Additional Guarantor, as provided in Section 23 of the Guaranty Agreement, hereby becomes a party to the Guaranty Agreement as a Subsidiary Guarantor and a Guarantor thereunder with the same force and effect as if originally named therein as a Subsidiary Guarantor and a Guarantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations, duties and liabilities of a Subsidiary Guarantor and a Guarantor thereunder. The Additional Guarantor hereby represents and warrants that each of the representations and warranties contained in Section 25 of the Guaranty Agreement is true and correct on and as the date hereof (after giving effect to this Joinder Agreement) as if made on and as of such date, and further confirms that it has executed and delivered to the Agent and the other Secured Parties all other documentation and information required in connection with the joinder of the Additional Guarantor contemplated hereby.

2.    Governing Law.    This Joinder Agreement, and the rights and obligations of the parties hereunder, shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

3.    Successors and Assigns.    This Joinder Agreement will be binding upon the Additional Guarantor and inure to the benefit of the Agent and the other Secured Parties and their respective successors and assigns, except that the Additional Guarantor may not assign, transfer or delegate any of its rights or obligations under this Joinder Agreement without the prior written consent of the Agent and any such assignment, transfer or delegation without such consent shall be null and void.

001470-0043-16679-Active.21916887.7

DEBTORSLCC_106001

IN WITNESS WHEREOF, the undersigned, for and on behalf of the Additional Guarantor, has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

**[INSERT ADDITIONAL GUARANTOR]**

By:     _____
Name:   _____
Title:  _____

Exhibit A - 2

DEBTORSLCC_106002

EXHIBIT 1.01(M)

**[FORM OF]**
**MORTGAGE**

[See Attached.]

Exhibit 1.01(G) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106003

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL
TO:


Simpson Thacher & Bartlett LLP
[                              ]

Attn:

Space above this line for recorder's use only

**FEE AND LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING**

This FEE AND LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING, dated as of _____, 2017 (as it may be amended, supplemented or otherwise modified from time to time, this "Mortgage"), by and from _____, a _____, with an address at _____ ("Mortgagor") to RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent") for the benefit of the Secured Parties, as mortgagee, assignee and secured party (in such capacities and, together with its successors and assigns in such capacities, "Mortgagee") with an address _____.

RECITALS:

WHEREAS, pursuant to the terms, conditions and provisions of the Credit Agreement, dated as of _____, 2017 (as amended, amended and restated, supplemented, refinanced, renewed, extended, replaced or otherwise modified from time to time, the "Credit Agreement"), by and among BLACKJEWEL L.L.C., a Delaware limited liability company (the "Borrower"), BLACKJEWEL HOLDINGS L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., in its capacities as administrative agent for the Lenders and collateral agent for the Secured Parties, the Lenders have agreed to make Loans to the Borrower on the Closing Date in accordance with the terms of the Credit Agreement; and

1

27    WHEREAS, the Borrower owns, directly or through its Subsidiaries, all of the issued and
28 outstanding shares of the Mortgagor; and

29    WHEREAS, the Mortgagor will receive substantial benefits from the execution, delivery, and
30 performance of the obligations under the Credit Agreement and other Credit Documents, including the
31 making of the Loans; and

32    WHEREAS, the execution and delivery of this Mortgage by Mortgagor is a condition to
33 the Lenders' obligations to make Loans to the Borrower under the Credit Agreement; and

34    WHEREAS, this Mortgage is given by Mortgagor to Mortgagee to secure the payment and
35 performance of all of the Secured Obligations; and

36    WHEREAS, Mortgagor is the owner and holder of the Mortgaged Property.

37    NOW, THEREFORE, to induce the Secured Parties to enter into the Credit Agreement
38 and the other Loan Documents and to make the extensions of credit contemplated thereby, and
39 for other good and valuable consideration, the receipt and sufficiency of which is hereby
40 acknowledged, the Mortgagor agrees, for the benefit of each Secured Party, as follows:

41    **SECTION 1.  DEFINITIONS**

42    **1.1    Definitions.** Capitalized terms used herein (including the recitals hereto) not
43 otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.  In
44 addition, as used herein, the following terms shall have the following meanings:

45    "**365(h) Election**" shall mean Mortgagor's election to treat the Mortgaged Leases as
46 terminated under Section 365(h) of the Bankruptcy Code or any similar Bankruptcy Law, or any
47 comparable right provided under any other Bankruptcy Law, together with all rights, remedies
48 and privileges related thereto.

49    "**Bankruptcy Law**" shall mean the Bankruptcy Code (as hereinafter defined) and any
50 other state or federal insolvency, reorganization, moratorium or similar law for the relief of
51 debtors.

52    "**Lessor**" shall mean, with respect to any Mortgaged Lease, the landlord named on
53 Exhibit A attached hereto and any successor thereto.

54    "**Mortgaged Leases**" means, (i) all of those leases, recorded and unrecorded, pursuant to
55 which the Mortgagor owns a leasehold interest, as a lessee or lesser, in all or a portion of the
56 Premises (as defined below) as more fully described on Exhibit A attached hereto; and (ii) all
57 other leases owned by Mortgagor and covering any real property interest located anywhere in
58 ____County _____, [insert applicable County and State] together with rights appurtenant thereto
59 and all assignments, modifications, extensions and renewals of the Mortgaged Leases and all
60 credits, deposits, options, privileges and rights of the Mortgagor as tenant under the Mortgaged
61 Leases, including, but not limited to, rights of first refusal, if any, and the right, if any, to renew
62 or extend the Mortgaged Leases for a succeeding term or terms and the option to purchase, if
63 any, all or any portion of the Premises demised under the Mortgaged Leases.

64       **"Mortgaged Property"** means, other than Excluded Property, the leasehold estates in
65 the lands described in <u>Exhibit A</u> attached hereto created by the Mortgaged Leases and all of
66 Mortgagor's rights, title, interest, and estate, if any, in (i) the fee simple real property described
67 in <u>Exhibit B</u>, together with any greater or additional estate therein as hereafter may be acquired
68 by Mortgagor (collectively, the land described on <u>Exhibit A</u> and <u>Exhibit B</u>, the "<u>Land</u>"); (ii) all
69 improvements now owned, leased or hereafter acquired by Mortgagor, now or at any time
70 situated, placed or constructed upon the Land, (the "<u>Improvements</u>"; the Land and Improvements
71 are collectively referred to as the "<u>Premises</u>"); (iii) all materials, supplies, equipment, preparation
72 plants, loadouts, refuse areas, apparatus and other items of personal property now owned or
73 hereafter acquired by Mortgagor and now or hereafter attached to, installed in or used in
74 connection with any of the Improvements or the Land, and water, gas, electrical, telephone,
75 storm and sanitary sewer facilities and all other utilities whether or not situated in easements (the
76 "<u>Fixtures</u>"); (iv) all right, title and interest of Mortgagor in and to all goods, accounts, general
77 intangibles, instruments, documents, chattel paper and all other personal property of any kind or
78 character, including such items of personal property as defined in the UCC (defined below), now
79 owned or hereafter acquired by Mortgagor and now or hereafter affixed to, placed upon, used in
80 connection with, arising from or otherwise related to the Premises (the "<u>Personalty</u>"); (v) all as-
81 extracted collateral produced from or allocated to the property, including, without limitation,
82 minerals, coal, oil, gas and other hydrocarbons and all products processed or obtained therefrom,
83 and the proceeds thereof (the "<u>As-Extracted Collateral</u>"); (vi) all leases, licenses, concessions,
84 occupancy agreements or other agreements (written or oral, now or at any time in effect) which
85 grant to any Person (other than Mortgagor) a possessory interest in, or the right to use, all or any
86 part of the Mortgaged Property, together with all related security and other deposits subject to
87 depositors rights and requirements of law (the "<u>Leases</u>"); (vii) all of the rents, revenues,
88 royalties, income, proceeds, profits, security and other types of deposits subject to depositors
89 rights and requirements of law, and other benefits paid or payable by parties to the Leases for
90 using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying
91 the Mortgaged Property (the "<u>Rents</u>"), (viii) to the extent mortgageable or assignable all other
92 agreements, such as construction contracts, architects' agreements, engineers' contracts, utility
93 contracts, maintenance agreements, management agreements, service contracts, listing
94 agreements, guaranties, warranties, permits (including all Permits, Mining Permits, Labor
95 Contracts, Environmental Health and Safety Permits); licenses, certificates and entitlements in
96 any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or
97 ownership of the Mortgaged Property (the "<u>Property Agreements</u>"); (ix) to the extent
98 mortgageable or assignable all rights, privileges, tenements, hereditaments, rights-of-way,
99 easements, wheelage agreements, contracts, surface damage waivers, releases, appendages and
100 appurtenances appertaining to the foregoing, or otherwise owned by Mortgagor, including by not
101 limited to those agreements set forth on <u>Exhibit C</u> attached hereto ("<u>Other Rights</u>") (as amended,
102 amended and restated, supplemented, renewed or otherwise modified from time to time in
103 accordance with the provisions of this Mortgage); (x) all property tax refunds payable to
104 Mortgagor (the "<u>Tax Refunds</u>"); (xi) all accessions, replacements and substitutions for any of the
105 foregoing and all proceeds thereof (the "<u>Proceeds</u>"); (xii) and all rights (including, without
106 limitation, alley, drainage, crop, mineral, mining, coal, water, sand, oil and gas rights, and any
107 other rights to produce or share in the production of anything from or attributable thereto), title
108 and interest of Mortgagor in and to the Mortgaged Property, and any and all privileges, royalties
109 and appurtenances to the Mortgaged Property, now or hereafter belonging or in any way

110  pertaining thereto; (xiii) subject to the terms of the Credit Agreement, all of Mortgagor's right,
111  title and interest in and to any awards, damages, remunerations, reimbursements, settlements or
112  compensation heretofore made or hereafter to be made by any governmental authority pertaining
113  to the Land, Improvements, Fixtures or Personality (the "<u>Condemnation Awards</u>"); (xiv) the
114  Mortgaged Leases and (xv) all leases, fee property and Other Rights hereafter acquired by
115  Mortgagor. As used in this Mortgage, the term "Mortgaged Property" shall mean all or, where
116  the context permits or requires, any portion of the above or any interest therein; provided,
117  however, that, notwithstanding any of the other provisions set forth in this Mortgage, and subject
118  to the terms of the Credit Agreement, this Mortgage shall not constitute a grant of a security
119  interest in any Excluded Property.

120      "**Secured Obligations**" has the meaning assigned to such term in the Security
121  Agreement.

122      "**UCC**" means the Uniform Commercial Code of _____ or, if the creation,
123  perfection and enforcement of any security interest herein granted is governed by the laws of a
124  state other than Illinois, then, as to the matter in question, the Uniform Commercial Code in
125  effect in that state.

126      **1.2      Interpretation.** References to "<u>Sections</u>" shall be to Sections of this Mortgage
127  unless otherwise specifically provided. Section headings in this Mortgage are included herein for
128  convenience of reference only and shall not constitute a part of this Mortgage for any other
129  purpose or be given any substantive effect. The rules of interpretation set forth in <u>Section 1.02</u> of
130  the Credit Agreement are hereby incorporated by reference, mutatis mutandis. If any conflict or
131  inconsistency exists between this Mortgage and the Credit Agreement, the Credit Agreement
132  shall govern.

133      **SECTION 2.   GRANT**

134      As collateral security for the prompt and complete payment and performance in full when
135  due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations,
136  Mortgagor hereby mortgages, pledges, transfers, assigns, grants and conveys to Mortgagee, for
137  the benefit of the Secured Parties, a continuing security interest in and Lien upon all of
138  Mortgagor's estate, right, title and interest in and to the Mortgaged Property.

139      TO HAVE AND TO HOLD the Mortgaged Property, together with all estate, right, title
140  and interest of the Mortgagor and anyone claiming by, through or under the Mortgagor in and to
141  the Mortgaged Property and all rights and appurtenances relating thereto, unto the Mortgagee, its
142  successors and assigns.

143      **SECTION 3.   WARRANTIES, REPRESENTATIONS AND COVENANTS**

144      Other than with respect to <u>Section 3.1</u> and <u>Section 3.2</u>, which are representations and
145  warranties, from and after the date of this Mortgage until Payment in Full:

146      **3.1      Due Authorization; Binding Effect**. Mortgagor represents and warrants to
147  Mortgagee and each other Secured Party that the execution, delivery and performance of this
148  Mortgage has been duly executed and delivered by the Mortgagor and duly authorized by all

149  necessary corporate or other organizational action by Mortgagor and that this Mortgage
150  constitutes a legal, valid and binding obligation of Mortgagor, enforceable against the Mortgagor
151  in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent
152  conveyance, reorganization, moratorium and other Laws relating to or affecting creditors' rights
153  generally, general principles of equity, regardless of whether considered in a proceeding in
154  equity or at law and an implied covenant of good faith and fair dealing.

155      **3.2    Title; Priority.** Mortgagee has agreed to accept this Mortgage as a quit claim
156  mortgage of the Mortgagor's rights, title, and interest, if any, in, to and under the Mortgaged
157  Property, without warranty of any kind except as expressly stated herein. Mortgagor has (a)
158  Mining Title to all of the Premises and As-Extracted Collateral that constitute Active Operating
159  Properties that are necessary or appropriate for Mortgagor to conduct its operations on such, and
160  (b) good and valid title (or, in the case of the Land including coal reserves that are not Active
161  Operating Properties, a valid leasehold interest in all or an undivided interest in surface and/or
162  coal rights with regard to such Premises) and good and valid recorded leasehold interests in the
163  Mortgaged Leases, in the case of both the foregoing items (a) and (b) of this sentence, free and
164  clear of all liens and encumbrances except Permitted Liens (but with respect to priority, only
165  Permitted Prior Liens). Mortgagor's interests under the Mortgaged Lease and any other leases,
166  contracts, rights-of-way and easements necessary for the operation of the Premises that constitute
167  Active Operating Properties are in full force and effect. Mortgagor possesses all material
168  licenses, franchises and other Permits which are necessary to carry out its business as presently
169  conducted at the Premises that constitute Active Operating Property. Mortgagor represents and
170  warrants that it has not granted any mortgage, lien or encumbrance on the Mortgaged Property
171  except pursuant to the terms of this Mortgage and the other Loan Documents and the Permitted
172  Liens (but with respect to priority, only Permitted Prior Liens).

173      **3.3    Maintenance of Perfected Security Interest**. To the extent of Mortgagor's
174  rights, title, interest, and estate in the Mortgaged Property on the execution date hereof, if any,
175  Mortgagor shall thereafter maintain the lien created by this Mortgage as a perfected lien having
176  at least the same priority existing on the execution date hereof and shall take all reasonable
177  actions to defend such security interest against the claims and demands of all Persons
178  whomsoever (subject to Permitted Prior Liens).

179      **3.4    Covenants Running with the Land.** All covenants and agreements contained in
180  this Mortgage are intended by Mortgagor and Mortgagee to be, and shall be construed as,
181  covenants running with the Mortgaged Property to the extent of Mortgagor's rights, title, interest,
182  and estate in the Mortgaged Property on the execution date hereof, if any. As used herein,
183  "Mortgagor" shall refer to the party named in the first paragraph of this Mortgage and to any
184  subsequent owner or holder of all or any portion of the Mortgaged Property. All Persons who
185  may have or acquire an interest in the Mortgaged Property shall be deemed to have notice of, and
186  be bound by, the terms of the Credit Agreement and the Loan Documents; however, no such
187  party shall be entitled to any rights thereunder without the prior written consent of Mortgagee. In
188  addition, all of the covenants of Mortgagor in any Loan Document to which it is a party thereto
189  are incorporated herein by reference and, together with covenants in this Section, shall be
190  covenants running with the land.

191    **3.5    Condemnation Awards and Insurance Proceeds.** Except as otherwise stated in
192  or required under the Credit Agreement, Mortgagor assigns all awards and compensation with
193  respect to the Mortgaged Property to which it is entitled for any condemnation or other taking, or
194  any purchase in lieu thereof, to Mortgagee, for the benefit of the Secured Parties, and upon the
195  occurrence and during the continuance of an Event of Default authorizes Mortgagee to collect
196  and receive such awards and compensation and to give proper receipts and acquittances therefor,
197  subject to the terms of the Credit Agreement. Mortgagor assigns to Mortgagee, for the benefit of
198  the Secured Parties, all proceeds of any insurance policies insuring against loss or damage to the
199  Mortgaged Property, subject to the terms of the Credit Agreement. Upon the occurrence and
200  during the continuance of an Event of Default, Mortgagor authorizes Mortgagee to collect and
201  receive such proceeds and authorizes and directs the issuer of each of such insurance policies to
202  make payment for all such losses directly to Mortgagee, for the benefit of the Secured Parties,
203  instead of to Mortgagor and Mortgagee jointly, subject to the terms of the Credit Agreement.

204    **3.6    Reduction Of Secured Amount.** In the event that the amount secured by this
205  Mortgage is less than the Secured Obligations, then the amount secured shall be reduced only by
206  the last and final sums that Borrower repays with respect to the Secured Obligations and shall not
207  be reduced by any intervening repayments of the Secured Obligations unless arising from the
208  Mortgaged Property. So long as the balance of the Secured Obligations exceeds the amount
209  secured by this Mortgage, any payments of the Secured Obligations shall not be deemed to be
210  applied against, or to reduce, the portion of the Secured Obligations secured by this Mortgage.
211  Such payments shall instead be deemed to reduce only such portions of the Secured Obligations
212  as are secured by other collateral located outside of the state in which the Land is located or as
213  are unsecured.

214    **3.7    Prohibited Transfers.** Except as permitted pursuant to the terms and conditions
215  of the Loan Documents, Mortgagor shall not, without the prior written approval of the
216  Mortgagee, dispose of any part of the Mortgaged Property.

217    **SECTION 4.    DEFAULT AND FORECLOSURE**

218    **4.1    Remedies.** If an Event of Default has occurred and is continuing, subject to the
219  terms and conditions of the Loan Documents and to the extent permitted by applicable law,
220  Mortgagee may, at Mortgagee's election, exercise any or all of the following rights, remedies
221  and recourses: (a) enter the Mortgaged Property and take exclusive possession thereof and of all
222  books, records and accounts relating thereto or located thereon. If Mortgagor remains in
223  possession of the Mortgaged Property after an Event of Default and without the Required
224  Lenders' prior written consent, if an Event of Default is continuing, Mortgagee may (b) invoke
225  any legal remedies to dispossess Mortgagor; (c) hold, lease, develop, manage, operate or
226  otherwise use the Mortgaged Property upon such terms and conditions as the Mortgagee may
227  deem reasonable under the circumstances (making such repairs, alterations, additions and
228  improvements and taking other actions, from time to time, as the Mortgagee deems necessary or
229  desirable), and apply all Rents and other amounts collected by Mortgagee in connection
230  therewith in accordance with the provisions hereof; (d) institute proceedings for the complete
231  foreclosure of this Mortgage by judicial action. With respect to any notices required or permitted
232  under the UCC, Mortgagor agrees that ten (10) days' prior written notice shall be deemed
233  commercially reasonable. At any such sale by virtue of any judicial proceedings or any other

234  legal right, remedy or recourse, the title to and right of possession of any such property shall pass
235  to the purchaser thereof, and to the fullest extent permitted by law, Mortgagor shall be
236  completely and irrevocably divested of all of its right, title, interest, claim, equity, equity of
237  redemption, and demand whatsoever, either at law or in equity, in and to the property sold and
238  such sale shall be a perpetual bar both at law and in equity against Mortgagor, and against all
239  other Persons claiming or to claim the property sold or any part thereof, by, through or under
240  Mortgagor. Mortgagee or any of the Lenders or other Secured Parties may be a purchaser at such
241  sale and if Mortgagee is the highest bidder, Mortgagee shall credit the portion of the purchase
242  price that would be distributed to Mortgagee against the Secured Obligations in lieu of paying
243  cash. In the event this Mortgage is foreclosed by judicial action, appraisement of the Mortgaged
244  Property is waived; (e) make application to a court of competent jurisdiction for, and obtain from
245  such court as a matter of strict right and without notice to Mortgagor or regard to the adequacy of
246  the Mortgaged Property for the repayment of the Secured Obligations, the appointment of a
247  receiver of the Mortgaged Property, and Mortgagor irrevocably consents to such appointment.
248  Any such receiver shall have all the usual powers and duties of receivers in similar cases and all
249  rights, powers, immunities, and duties and provisions available under applicable law and this
250  Mortgage, including the full power to rent, maintain and otherwise operate the Mortgaged
251  Property upon such terms as may be approved by the court, and shall apply such Rents in
252  accordance with the provisions hereof; and/or (f) exercise all other rights, remedies and recourses
253  granted under the Loan Documents or otherwise available at law or in equity. The Mortgagor
254  waives any requirement of presentment, demand, protest or notice of any kind concurrently with
255  such same rights being waived by the Borrower pursuant to the terms and conditions of the Loan
256  Documents.

257  **4.2    Separate Sales**. To the extent permitted by Law, the Mortgaged Property may be
258  sold in one or more parcels and in such manner and order as Mortgagee in its sole discretion may
259  elect; the right of sale arising out of any Event of Default shall not be exhausted by any one or
260  more sales.

261  **4.3    Cumulative Remedies**. No failure to exercise, nor any delay in exercising, on the
262  part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver
263  thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude
264  any other or further exercise thereof or the exercise of any other right, power or privilege. A
265  waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be
266  construed as a bar to any right or remedy which such Secured Party would otherwise have on any
267  future occasion. The rights and remedies herein provided are cumulative, may be exercised
268  singly or concurrently and are not exclusive of any other rights or remedies provided by law.

269  **4.4    Release of and Resort to Collateral.** Mortgagee may release, regardless of
270  consideration and without the necessity for any notice to or consent by the holder of any
271  subordinate lien on the Mortgaged Property, any part of the Mortgaged Property without, as to
272  the remainder, in any way impairing, affecting, subordinating or releasing the lien or security
273  interest created in or evidenced by the Loan Documents or the priority of the lien and security
274  interest in and to the Mortgaged Property. For payment of the Secured Obligations, Mortgagee
275  may resort to any other security in such order and manner as Mortgagee may elect.

**4.5    Waiver of Redemption, Notice and Marshalling of Assets**. If an Event of Default has occurred and is continuing, to the fullest extent permitted by law, Mortgagor hereby irrevocably and unconditionally waives and releases (a) all benefit that might accrue to Mortgagor by virtue of any present or future statute of limitations or law or judicial decision exempting the Mortgaged Property from attachment, levy or sale on execution or providing for any stay of execution, exemption from civil process, redemption or extension of time for payment; (b) except as otherwise required by the Loan Documents, all notices of any Event of Default or of Mortgagee's or any other Secured Party's election to exercise or the actual exercise of any right, remedy or recourse provided for under the Loan Documents; and (c) any right to a marshalling of assets or a sale in inverse order of alienation. Mortgagor waives the statutory right of redemption and equity of redemption.

**4.6    Discontinuance of Proceedings.** If Mortgagee or the Lenders shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Mortgagee or the Lenders shall have the unqualified right to do so and, in such an event, Mortgagor and Mortgagee or the Lenders shall be restored to their former positions with respect to the Secured Obligations, the Loan Documents, the Mortgaged Property and otherwise, and the rights, remedies, recourses and powers of Mortgagee or the Lenders shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Mortgagee or the Lenders thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default while continuing.

**4.7    Application of Proceeds.** The proceeds of any collection, sale or other realization of all or any part of the Mortgaged Property and the Rents and other amounts generated by the holding, leasing, management, operation or other use of the Mortgaged Property, shall be applied by Mortgagee (or the receiver, if one is appointed) in accordance with the Credit Agreement.

**4.8    Occupancy After Foreclosure.** Any sale of the Mortgaged Property or any part thereof will divest all right, title and interest of Mortgagor in and to the property sold. Subject to applicable law, any purchaser at a foreclosure sale will receive immediate possession of the property purchased. If Mortgagor retains possession of such property or any part thereof subsequent to such sale, Mortgagor will be considered a tenant at sufferance of the purchaser, and will, if Mortgagor remains in possession after demand to remove, be subject to eviction and removal, forcible or otherwise, with or without process of law.

**4.9    Additional Advances and Disbursements; Costs of Enforcement**. If any Event of Default exists, Mortgagee, for the benefit of the Secured Parties, shall have the right, but not the obligation, to cure such Event of Default in the name and on behalf of Mortgagor, subject to the terms and conditions of the Loan Documents. All documented sums advanced and expenses incurred at any time by Mortgagee or any other Secured Party under this Section, or otherwise under this Mortgage or any of the other Loan Documents or applicable law, shall bear interest from the date that such sum is advanced or expense incurred if not repaid within five (5) days after demand therefor, to and including the date of reimbursement, computed at the rate or rates at which interest is then computed in accordance with the provisions set forth in the applicable Loan Document, and all such sums, together with interest thereon, shall be secured by this Mortgage. Mortgagor agrees to pay or reimburse each Secured Party for all its reasonable and

DEBTORSLCC_106011

documented out-of-pocket costs and expenses incurred in collecting against Mortgagor under this Mortgage or otherwise enforcing or preserving any rights under this Mortgage and the other Loan Documents to which such Mortgagor is a party, including, without limitation, the reasonable and documented fees and disbursements of counsel to each Secured Party and of counsel to the Mortgagee to the extent the Borrower would be required to do so pursuant to the terms and conditions set forth in the Loan Documents including, without limitation, Section 11.03 of the Credit Agreement.

**4.10    No Mortgagee in Possession**. Neither the enforcement of any of the remedies under this Section, the assignment of the Rents and Leases under <u>Section 5,</u> the security interests or liens under <u>Section 6,</u> nor any other remedies afforded to Mortgagee or the Secured Parties under the Loan Documents, at law or in equity shall cause Mortgagee or any other Secured Party to be deemed or construed to be a mortgagee in possession of the Mortgaged Property, to obligate Mortgagee or any other Secured Party to lease the Mortgaged Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.


## SECTION 5.   ASSIGNMENT OF RENTS AND LEASES

**5.1    Assignment**. In furtherance of and in addition to the assignment made by Mortgagor herein, Mortgagor hereby absolutely and unconditionally assigns, sells, transfers and conveys to Mortgagee, for the benefit of the Secured Parties, all of its right, title and interest in and to all Leases, whether now existing or hereafter entered into, and all of its right, title and interest in and to all Rents. This assignment is an absolute assignment and not an assignment for additional security only. So long as no Event of Default shall have occurred and be continuing, Mortgagor shall have a revocable license from Mortgagee to exercise all rights extended to the landlord under the Leases, including the right to receive and collect all Rents and to hold the Rents in trust for use in the payment and performance of the Secured Obligations and to otherwise use the same. Upon the occurrence and during the continuance of an Event of Default and after written notice to the Mortgagor, whether or not legal proceedings have commenced, and without regard to waste, adequacy of security for the Secured Obligations or solvency of Mortgagor, the license herein granted shall automatically expire and terminate.

**5.2    Perfection Upon Recordation.** Mortgagor acknowledges and agrees that to the extent permitted under applicable law, upon recordation of this Mortgage Mortgagee's interest in the Rents shall be deemed to be fully perfected, "choate" and enforced as to Mortgagor and all third parties, including, without limitation, any subsequently appointed trustee in any case under the Bankruptcy Code, without the necessity of commencing a foreclosure action with respect to this Mortgage, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

**5.3    Bankruptcy Provisions.** Without limitation of the absolute nature of the assignment of the Rents hereunder, Mortgagor and Mortgagee agree that (a) this Mortgage shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Mortgage extends to property of Mortgagor acquired before the

DEBTORSLCC_106012

360  commencement of a case in bankruptcy and to all amounts paid as Rents, and (c) such security
361  interest shall extend to all Rents acquired by the estate after the commencement of any case in
362  bankruptcy.

363  **SECTION 6.   SECURITY AGREEMENT**

364       **6.1     Security Interest.** This Mortgage constitutes a "security agreement" on personal
365  property within the meaning of the UCC and other applicable law and with respect to the
366  Personalty, Fixtures, As-Extracted Collateral, Leases, Rents, Deposit Accounts, Property
367  Agreements, Tax Refunds, Proceeds, all insurance policies, unearned premiums therefor and
368  proceeds from such policies covering any of the Mortgaged Property now or hereafter acquired
369  by Mortgagor ("Insurance") and Condemnation Awards. To this end, Mortgagor grants to
370  Mortgagee, for the benefit of the Secured Parties, a security interest in the Personalty, Fixtures,
371  As-Extracted Collateral, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds,
372  Proceeds, Insurance, Condemnation Awards and all other Mortgaged Property which is personal
373  property to secure the payment in full of the Secured Obligations and performance in full of the
374  Secured Obligations, and agrees that Mortgagee, on behalf of the Secured Parties, shall have all
375  the rights and remedies of a secured party under the UCC with respect to such property. Any
376  notice of sale, disposition or other intended action by Mortgagee with respect to the Personalty,
377  Fixtures, As-Extracted Collateral, Leases, Rents, Deposit Accounts, Property Agreements, Tax
378  Refunds, Proceeds, Insurance and Condemnation Awards sent to Mortgagor at least ten (10) days
379  prior to any action under the UCC shall constitute reasonable notice to Mortgagor; provided,
380  however, that, notwithstanding any of the other provisions set forth in this Mortgage, this
381  Mortgage shall not constitute a grant of a security interest in any Excluded Property.

382       **6.2     Fixture Filing and As-Extracted Collateral Filing.** This Mortgage shall also
383  constitute a "fixture filing" for the purposes of the UCC against all of the Mortgaged Property
384  which is or is to become fixtures. To the extent permitted by Law, this Mortgage shall also be
385  effective as a financing statement covering as-extracted collateral (including minerals, coal, oil,
386  and gas) under the UCC, and is to be filed for record in the real estate records of each county
387  where any part of the Mortgaged Property is situated. Information concerning the security
388  interest herein granted may be obtained at the addresses of Debtor (Mortgagor) and Secured
389  Party (Mortgagee) as set forth in the first paragraph of this Mortgage, and the following
390  information is applicable for the purpose of such filing, to wit:

391

| **Name and Address of the debtor:** | **Name and Address of the Secured Party:** |
|---|---|
| The Mortgagor having the address described in the Preamble hereof. | The Mortgagee having the address described in the Preamble hereof, from which address information concerning the security interest may be obtained. |

**This Financing Statement covers the following collateral:** The Mortgaged Property.

This instrument covers goods or items of personal property which are or are to become

fixtures upon the property or is As-Extracted Collateral.

The description of the Land on which such collateral is or is to be located is attached as Exhibit A to this Mortgage.

The Mortgagor is the record owner of the Land other than the Land subject to the Mortgaged Leases and each the record owner listed on Exhibit B attached hereto is the record owner of the Land subject to the applicable Mortgaged Lease.

392
393        **SECTION 7.   ATTORNEY-IN-FACT**

394        (a) Without limiting any rights or powers granted by this Mortgage to Mortgagee,
395  Mortgagor hereby irrevocably constitutes and appoints Mortgagee and any officer or agent
396  thereof, with full power of substitution, as its true and lawful attorney-in-fact with full
397  irrevocable power and authority in the place and stead of Mortgagor and in the name of
398  Mortgagor or in its own name, at the Mortgagor's sole cost and expense, for the purpose of
399  carrying out the provisions of this Mortgage (a) to take any appropriate action and to execute any
400  document or instrument that may be necessary or desirable to accomplish the purposes of this
401  Mortgage (including taking actions under any consent delivered as required by the Loan
402  Documents), (b) to preserve the validity, perfection and priority of the Liens and security interest
403  granted by this Mortgage (c) to exercise its rights, remedies, powers and privileges under this
404  Mortgage (including taking actions under any consent delivered as required by the Loan
405  Documents), (d) to execute and/or record any notices of completion, cessation of labor or any
406  other notices that Mortgagee deems appropriate to protect Mortgagee's interest, if Mortgagor
407  shall fail to do so within ten (10) days after written request by Mortgagee, (e) upon the issuance
408  of a deed pursuant to the foreclosure of this Mortgage or the delivery of a deed in lieu of
409  foreclosure, to execute all instruments of assignment, conveyance or further assurance with
410  respect to the Leases, Rents, Deposit Accounts, Fixtures, Personality, Property Agreements, Tax
411  Refunds, Proceeds, Insurance and Condemnation Awards in favor of the grantee of any such
412  deed and as may be necessary or desirable for such purpose, (f) to prepare, execute and file or
413  record financing statements, continuation statements, applications for registration and like papers
414  necessary to create, perfect or preserve Mortgagee's security interests, liens and rights in or to
415  any of the Mortgaged Property, and (g) to perform any obligation of Mortgagor hereunder. This
416  appointment as attorney-in-fact is irrevocable and coupled with an interest.

417        (b) Mortgagor hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be
418  done by virtue hereof, in each case pursuant to the powers granted hereunder. Upon the
419  occurrence and during the continuation of an Event of Default Mortgagor hereby acknowledges
420  and agrees that Mortgagee shall have no fiduciary duties to Mortgagor in acting pursuant to this
421  power of attorney, and Mortgagor hereby waives any claims or rights of a beneficiary of a
422  fiduciary relationship hereunder.

423        **SECTION 8.   MORTGAGEE AS AGENT**

424        (a)    Mortgagor acknowledges that the rights and responsibilities of Mortgagee under
425  this Mortgage with respect to any action taken by Mortgagee or the exercise or non-exercise by

426   Mortgagee of any option, voting right, request, judgment or other right or remedy provided for
427   herein or resulting or arising out of this Mortgage shall, as between Mortgagee and the other
428   Secured Parties, be governed by the Credit Agreement and by such other agreements with
429   respect thereto as may exist from time to time among them, but, as between Mortgagee and the
430   Mortgagor, Mortgagee shall be conclusively presumed to be acting as agent for the Secured
431   Parties with full and valid authority so to act or refrain from acting, and the Mortgagor shall not
432   be under any obligation, or entitlement, to make any inquiry respecting such authority.

433         (b)      Mortgagee has been appointed to act as Mortgagee hereunder by the Secured
434   Parties pursuant to the Credit Agreement. Mortgagee shall be obligated, and shall have the right
435   hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights,
436   and to take or refrain from taking any action (including the release or substitution of Mortgaged
437   Property), solely in accordance with this Mortgage and the Credit Agreement.

438         (c)      In furtherance of the foregoing provisions of this Section, each Secured Party, by
439   its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon
440   any of the Mortgaged Property, it being understood and agreed by such Secured Party that all
441   rights and remedies hereunder may be exercised solely by Mortgagee for the benefit of the
442   Secured Parties in accordance with the terms of this Section.

443         (d)      For avoidance of doubt, Mortgagee shall benefit hereunder from all provisions set
444   forth in the Credit Agreement.

445   **SECTION 9.   TERMINATION AND RELEASE.**

446         (a)      For the avoidance of doubt, this Mortgage is subject to the terms and conditions
447   set forth in the Loan Documents, including, without limitation, Section 11.16 of the Credit
448   Agreement.

449         (b)      Upon the occurrence of the indefeasible Payment in Full of all of the Secured
450   Obligations, this Mortgage and the Liens and security interests created pursuant to this Mortgage
451   shall automatically be terminated and released and the remaining Mortgaged Property shall
452   automatically revert to Mortgagor with no further action on the part of any Person, and upon
453   written notice of such termination from Mortgagee, at the sole cost and expense of Mortgagor,
454   and without representation or warranty whatsoever by, and without recourse to, Mortgagee or
455   any other Secured Party, Mortgagee shall (a) return to Mortgagor the Mortgaged Property then in
456   the possession of Mortgagee as part of the collateral security for the Secured Obligations in
457   accordance with the provisions of this Mortgage, and (b) execute and deliver all such
458   documentation, and authorize the filing of UCC termination statements and mortgage
459   satisfactions, in each case, as are necessary or as Mortgagor may reasonably request in order to
460   release the Liens created pursuant to this Mortgage.

461         (c)      In the event that the Mortgagor disposes of any Mortgaged Property to any person
462   (other than a Loan Party) in a transaction expressly permitted by the terms of the Loan
463   Documents, any Lien created by this Mortgage shall be automatically released in accordance
464   with Section 11.17 of the Credit Agreement.

465   **SECTION 10.   LOCAL LAW PROVISIONS**

DEBTORSLCC_106015

466   (a)    In the event of any inconsistencies between the terms and conditions of this
467   Section 10 and the other terms and conditions of this Mortgage, the terms and conditions of this
468   Section 10 shall control and be binding.

469   **[LOCAL COUNSEL TO PROVIDE]**

470   **SECTION 11.  MULTI-SITE REAL ESTATE TRANSACTIONS.**

471   Mortgagor acknowledges that this Mortgage is one of a number of Mortgages and other
472   security documents ("Other Mortgages") that secure the Secured Obligations. Mortgagor agrees
473   that, subject to the terms of Section 9 hereof, the lien of this Mortgage shall be absolute and
474   unconditional and shall not in any manner be affected or impaired by any acts or omissions
475   whatsoever of Mortgagee or any other Secured Party, and without limiting the generality of the
476   foregoing, the lien hereof shall not be impaired by any acceptance by Mortgagee or any other
477   Secured Party of any security for or guarantees of the Secured Obligations, or by any failure,
478   neglect or omission on the part of Mortgagee or any other Secured Party to realize upon or
479   protect any Secured Obligation or any collateral security therefor including the Other Mortgages.
480   Subject to the terms of Section 9 hereof, the lien of this Mortgage shall not in any manner be
481   impaired or affected by any release (except as to the property released), sale, pledge, surrender,
482   compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or
483   disposition of any of the Secured Obligations or of any of the collateral security therefor,
484   including the Other Mortgages or any guarantee thereof, and, to the fullest extent permitted by
485   applicable law, Mortgagee (acting at the direction of the Required Lenders) may at its discretion
486   foreclose, or exercise any other remedy available to it under any or all of the Other Mortgages
487   without first exercising or enforcing any of its rights and remedies hereunder. Such exercise of
488   Mortgagee's rights and remedies under any or all of the Other Mortgages shall not in any manner
489   impair the indebtedness hereby secured or the lien of this Mortgage and any exercise of the rights
490   and remedies of Mortgagee hereunder shall not impair the lien of any of the Other Mortgages or
491   any of Mortgagee's rights and remedies thereunder. To the fullest extent permitted by applicable
492   law, Mortgagor specifically consents and agrees that Mortgagee (acting at the direction of the
493   Required Lenders) may exercise its rights and remedies hereunder and under the Other
494   Mortgages separately or concurrently and in any order that it may deem appropriate and waives
495   any right of subrogation.

496   **SECTION 12.  MISCELLANEOUS**

497   **12.1    Notices**. All notices, requests and demands to or upon Mortgagee or Mortgagor
498   hereunder shall be effected in the manner provided for, and (except as otherwise notified in
499   writing by one party to the other) to the addresses referred to, in Section 11.05 of the Credit
500   Agreement.

501   **12.2    Governing Law**. ALL OF THE PROVISIONS OF THIS MORTGAGE,
502   INCLUDING, WITHOUT LIMITATION, THE PROVISIONS RELATING TO THE
503   CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY
504   INTERESTS HEREIN GRANTED SHALL BE GOVERNED BY, AND CONSTRUED IN
505   ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE LAND IS LOCATED.

DEBTORSLCC_106016

**12.3    Severability**. In case any provision in or obligation under this Mortgage shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**12.4    Intentionally omitted**.

**12.5    Time of Essence.** Time is of the essence of this Mortgage.

**12.6    WAIVER OF JURY TRIAL.** THE TERMS OF SECTION 11.11(b)-(e) OF THE CREDIT AGREEMENT ARE INCORPORATED HEREIN BY REFERENCE MUTATIS MUTANDIS AND THE PARTIES HERETO AGREE TO SUCH TERMS.

**12.7    Credit Agreement**.

(a)    Notwithstanding anything herein to the contrary, the lien and security interest granted to Mortgagee, for the benefit of the Secured Parties, pursuant to this Mortgage and the exercise of any right or remedy by Mortgagee hereunder are subject to the provisions of the Credit Agreement. In the event of any conflict between the subject matter provisions of the Credit Agreement and this Mortgage, such provisions set forth in the Credit Agreement shall govern.

(b)    None of the terms or provisions of this Mortgage may be waived, amended, supplemented or otherwise modified except in accordance with Section 11.01 of the Credit Agreement.

**12.8    Successors and Assigns.** This Mortgage shall be binding upon the successors and assigns of Mortgagee and shall inure to the benefit of Mortgagee and the Secured Parties and their respective successors and assigns; provided that (a) Mortgagor may not assign, transfer or delegate any of its rights or obligations under this Mortgage without the prior written consent of Mortgagee, (b) Mortgagee shall only transfer or assign its rights under this Mortgage in connection with a resignation or removal of such Person from its capacity as "Collateral Agent" in accordance with the terms of this Mortgage and the Credit Agreement, and (c) Mortgagee may delegate certain of its responsibilities and powers under this Mortgage as contemplated by Section 12.15 hereof and Section 10.05 of the Credit Agreement.

**12.9    Subrogation.** To the extent proceeds of the Loan have been used to extinguish, extend or renew any indebtedness against the Mortgaged Property, then Mortgagee (for the benefit of the Secured Parties) shall be subrogated to all of the rights, liens and interests existing against the Mortgaged Property and held by the holder of such indebtedness and such former rights, liens and interests, if any, are not waived, but are continued in full force and effect in favor of Mortgagee, for the benefit of the Secured Parties.

DEBTORSLCC_106017

544    **12.10  Waiver of Stay, Moratorium and Similar Rights.** Mortgagor agrees, to the full
545    extent that it may lawfully do so, that it will not at any time insist upon or plead or in any way
546    take advantage of any appraisement, valuation, stay, marshalling of assets, extension, redemption
547    or moratorium law now or hereafter in force and effect so as to prevent or hinder the
548    enforcement of the provisions of this Mortgage, or any rights or remedies of Mortgagee or any
549    other Secured Party hereunder.

550    **12.11  Entire Agreement.** This Mortgage and the other Loan Documents embody the
551    entire agreement and understanding between Mortgagee and Mortgagor regarding the subject
552    matter hereof and thereof and supersede all prior agreements and understandings between such
553    parties relating to the subject matter hereof and thereof. Accordingly, the Loan Documents may
554    not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the
555    parties. There are no unwritten oral agreements between the parties.

556    **12.12  Counterparts.** This Mortgage is being executed in several counterparts, all of
557    which are identical. Each of such counterparts shall for all purposes be deemed to be an original
558    and all such counterparts shall together constitute but one and the same instrument.

559    **12.13  Maximum Secured Amount.** Notwithstanding anything contained herein to the
560    contrary, the maximum amount secured hereby shall not exceed $[34,000,000].

561    **12.14  Collateral Agent.** Notwithstanding anything herein to the contrary, the Collateral
562    Agent shall be afforded all of the rights, powers, immunities and indemnities of the Collateral
563    Agent set forth in the Loan Documents, as if such rights, powers, immunities and indemnities
564    were specifically set forth herein. Mortgagor hereby acknowledges the appointment of the
565    Collateral Agent pursuant to the Credit Agreement. The rights, privileges, protections and
566    benefits given to the Collateral Agent, including its right to be indemnified, are extended to, and
567    shall be enforceable by, the Collateral Agent in its capacity hereunder, and to each agent,
568    custodian and other Person employed by the Collateral Agent in accordance herewith to act
569    hereunder.**12.15.**    **Agents**Mortgagee may employ agents, experts and attorneys-in-fact in
570    connection herewith.**12.16. Deficiency.** If the proceeds of sale, collection or other realization of
571    or upon the Mortgaged Property by virtue of the exercise of remedies under Section 4.7 are
572    insufficient to cover the costs and expenses of such realization to the extent reimbursable under
573    the Credit Agreement and the payment in full of the Secured Obligations, Mortgagee and the
574    other Secured Parties shall retain all rights and remedies under the Loan Documents and
575    Mortgagor shall remain liable, with respect to any deficiency to the extent Mortgagor is
576    obligated under this Mortgage and the other Loan Documents.**12.18 Additional Covenants**.
577    Section 4.09, Section 4.10 and Section 4.18 of the Security Agreement are hereby incorporated
578    by reference, mutatis mutandis.

579    **SECTION 13.  <u>MORTGAGED LEASES</u>**

580    **13.1  <u>Representations, Warranties and Covenants</u>**.   Mortgagor represents and
581    warrants to Mortgagee that (a) the Mortgaged Leases are unmodified and in full force and effect,
582    (b) all rent and other charges therein have been paid to the extent they are payable to the date
583    hereof, (c) Mortgagor enjoys the quiet and peaceful possession of the property demised thereby,
584    (d) Mortgagor is not in default under any of the terms thereof and there are no circumstances

DEBTORSLCC_106018

585    which, with the passage of time or the giving of notice or both, would constitute an event of
586    default thereunder, and (e) each Lessor thereunder is not in default under any of the terms or
587    provisions thereof on the part of such Lessor to be observed or performed (but this statement is
588    made for the benefit of and may only be relied upon by Mortgagee and Secured Parties).
589    Mortgagor shall promptly pay, when due and payable, the rent and other charges payable
590    pursuant to the Mortgaged Leases, and will timely perform and observe all of the other terms,
591    covenants and conditions required to be performed and observed by Mortgagor as lessee under
592    the Mortgaged Leases. Mortgagor shall notify Mortgagee in writing of any default by Mortgagor
593    in the performance or observance of any terms, covenants or conditions on the part of Mortgagor
594    to be performed or observed under the Mortgaged Leases within ten (10) days after Mortgagor
595    knows of such default. Mortgagor shall, promptly following the receipt thereof, deliver a copy
596    of any notice of default given to Mortgagor by any Lessor pursuant to the applicable Mortgaged
597    Lease and promptly notify Mortgagee in writing of any default by such Lessor in the
598    performance or observance of any of the terms, covenants or conditions on the part of such
599    Lessor to be performed or observed thereunder. Unless required under the terms of a Mortgaged
600    Lease, except as set forth in the Credit Agreement, Mortgagor shall not, without the prior written
601    consent of Mortgagee (i) terminate, or surrender such Mortgaged Lease, or (ii) enter into any
602    modification of such Mortgaged Lease which materially impairs the practical realization of the
603    security interests granted by this Mortgage, and any such attempted termination, modification or
604    surrender without Mortgagee's written consent shall be void.

605        **13.2**   **No Merger; Acquisition; Power of Attorney**. So long as any of the Secured
606    Obligations remain unpaid or unperformed, the fee title to and the leasehold estate in the
607    Premises subject to the Mortgaged Leases shall not merge but shall always be kept separate and
608    distinct notwithstanding the union of such estates in any Lessor or Mortgagor, or in a third party,
609    by purchase or otherwise. If Mortgagor acquires the fee title or any other estate, title or interest
610    in the property demised by any Mortgaged Lease, or any part thereof, the Lien of this Mortgage
611    shall attach to, cover and be a Lien upon such acquired estate, title or interest and the same shall
612    thereupon be and become a part of the Mortgaged Property with the same force and effect as if
613    specifically encumbered herein. Mortgagor agrees to execute all instruments and documents that
614    Mortgagee may reasonably require to ratify, confirm and further evidence the Lien of this
615    Mortgage on the acquired estate, title or interest. Furthermore, Mortgagor hereby appoints
616    Mortgagee as its true and lawful attorney-in-fact to execute and deliver, following the occurrence
617    and during the continuance of an Event of Default, all such instruments and documents in the
618    name and on behalf of Mortgagor. This power, being coupled with an interest, shall be
619    irrevocable as long as any portion of the Secured Obligations remains unpaid.

620        **13.3**   **New Leases**. If any Mortgaged Lease shall be terminated prior to the natural
621    expiration of its term due to default by Mortgagor or any tenant thereunder, and if, pursuant to
622    the provisions of such Mortgaged Lease, Mortgagee or its designee shall acquire from the
623    applicable Lessor a new lease of the Premises subject to such Mortgaged Lease, Mortgagor shall
624    have no right, title or interest in or to such new lease or the leasehold estate created thereby, or
625    renewal privileges therein contained.

626        **13.4**   **No Assignment**. Notwithstanding anything to the contrary contained herein, this
627    Mortgage shall not constitute an assignment of any Mortgaged Lease within the meaning of any
628    provision thereof prohibiting its assignment and Mortgagee shall have no liability or obligation

DEBTORSLCC_106019

thereunder by reason of its acceptance of this Mortgage.  Mortgagee shall be liable for the
obligations of the tenant arising out of any Mortgaged Lease for only that period of time for
which Mortgagee is in possession of the Premises demised thereunder or has acquired, by
foreclosure or otherwise, and is holding all of Mortgagor's right, title and interest therein.

**13.5**    **Treatment of Mortgaged Lease In Bankruptcy.**

13.5.1 If any Lessor or grantor under any Mortgaged Lease rejects or disaffirms,
or seeks or purports to reject or disaffirm, such Mortgaged Lease pursuant
to any Bankruptcy Law, then Mortgagor shall not exercise the 365(h)
Election and, to the extent permitted by law, Mortgagor shall not suffer or
permit the termination of such Mortgaged Lease without Mortgagee's
consent.  Mortgagor acknowledges that because each Mortgaged Lease is
a primary element of Mortgagee's security for the Secured Obligations, it
is not anticipated that Mortgagee would consent to termination of any
Mortgaged Lease.  If Mortgagor makes any election under Section 365 of
the Bankruptcy Code in violation of this Mortgage, then such 365(h)
Election shall be void and of no force or effect.

13.5.2 Mortgagor hereby assigns to Mortgagee the 365(h) Election with respect
to each Mortgaged Lease until the Secured Obligations have been satisfied
in full.  Mortgagor acknowledges and agrees that the foregoing
assignment of the 365(h) Election and related rights is one of the rights
that Mortgagee may use at any time to protect and preserve Mortgagee's
other rights and interests under this Mortgage.  Mortgagor further
acknowledges that exercise of any election under Section 365 of the
Bankruptcy Code with the effect of terminating any Mortgaged Lease
would constitute waste prohibited by this Mortgage.

13.5.3 Mortgagor acknowledges that if the 365(h) Election is exercised in favor
of Mortgagor's remaining in possession under any Mortgaged Lease, then
Mortgagor's resulting occupancy rights, as adjusted by the effect of
Section 365 of the Bankruptcy Code, shall then be part of the Mortgaged
Property and shall be subject to the Lien of this Mortgage.

**13.6**    **Rejection of Mortgaged Lease by Landlord**.  If Lessor rejects or disaffirms any
Mortgaged Lease or purports or seeks to reject or disaffirm any Mortgaged Lease pursuant to any
Bankruptcy Law, then:

13.6.1 Mortgagor shall remain in possession of the Premises demised under such
Mortgaged Lease so rejected or disaffirmed and shall perform all acts
necessary for Mortgagor to remain in such possession for the unexpired
term of such Mortgaged Lease, whether the then existing terms and
provisions of such Mortgaged Lease require such acts or otherwise; and

13.6.2 All the terms and provisions of this Mortgage and the Lien created by this
Mortgage shall remain in full force and effect and shall extend

669          automatically to all of Mortgagor's rights and remedies arising at any time
670          under, or pursuant to, Section 365(h) of the Bankruptcy Code, including
671          all of Mortgagor's rights to remain in possession of the leased Premises.

672      **13.7**    **Assignment of Claims to Mortgagee**. Mortgagor, immediately upon learning
673 that any Lessor has failed to perform the terms and provisions under the applicable Mortgaged
674 Lease (including by reason of a rejection or disaffirmance or purported rejection or disaffirmance
675 of such Mortgaged Lease pursuant to any Bankruptcy Law), shall notify the Mortgagee of any
676 such failure to perform. Mortgagor unconditionally assigns, transfers, and sets over to
677 Mortgagee any and all damage claims thereunder. This assignment constitutes a present,
678 irrevocable, and unconditional assignment of all damage claims under each Mortgaged Lease,
679 and shall continue in effect until the Secured Obligations have been Paid in Full.
680 Notwithstanding the foregoing, Mortgagee grants to Mortgagor a revocable license to exercise
681 any such Mortgaged Lease damage claims which license may only be revoked by Mortgagee
682 upon the occurrence and during the continuance of any Event of Default.

683

684          [Remainder of page intentionally left blank]

685

686

687          IN WITNESS WHEREOF, Mortgagor has caused this Mortgage to be duly
688    executed and delivered under seal the day and year first above written.

689                               [                    ]

690                               By: _____
691                               Name:
692                               Title:

693          [local counsel to confirm signature requirements]

694                              ACKNOWLEDGMENT

695    State of _____    )
696                                 ) ss.:
697    County of _____     )

698                    [Local counsel to provide appropriate acknowledgment]

DEBTORSLCC_106023

Exhibit A-[Description of Mortgaged Lease and each corresponding Mortgage Lease Legal Description]


[attach]

DEBTORSLCC_106024

Exhibit B- Legal Description of Fee Estate

[attach]

3

DEBTORSLCC_106025

Exhibit C- Description of Easement and Wheelage Agreement Leases

[attach]

DEBTORSLCC_106026

EXHIBIT 1.01(N)

**[FORM OF]**
**PROMISSORY NOTE**

$[_____]

Dated as of [_____]
New York, New York

FOR VALUE RECEIVED, the undersigned, Blackjewel L.L.C., a Delaware limited liability (the "Borrower"), hereby promises to pay to [_____] or its registered assigns (the "Lender"), in Dollars in immediately available funds at the applicable Principal Office in accordance with the provisions of the Credit Agreement referred to below, the principal amount of the Loans from time to time made by the Lender to the Borrower under that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among the Borrower, Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. All capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

This is one of the Notes referred to in the Credit Agreement and is entitled to the benefits thereof and is subject to all terms, provisions and conditions thereof.

This Note is made in connection with and is secured by, among other instruments, the Mortgages, the Security Agreement and the other Collateral Documents, and supported by the Guaranty Agreement. Reference is hereby made to the Credit Agreement, the Guaranty Agreement, the Mortgages, the Security Agreement and the other Collateral Documents for the provisions, among others, with respect to the custody and application of the Collateral, the nature and extent of the security provided thereunder, the rights, duties and obligations of the Borrower and the other parties thereto, and the rights of the holder of this Note.

The principal amount hereof is payable in accordance with the Credit Agreement, and such principal amount may be prepaid solely in accordance with the Credit Agreement.

The Borrower authorizes the Lender to record on the schedule annexed to this Note, the date and amount of each Loan made by the Lender and each payment or prepayment of principal thereunder, and agrees that all such notations shall constitute prima facie evidence of the accuracy of the matters noted in the absence of manifest error. The Borrower further authorizes the Lender to attach to and make a part of this Note continuations of the schedule attached thereto as necessary. No failure to make any such notations, nor any errors in making any such notations, shall affect the validity of the Borrower's obligations to repay the full unpaid principal amount of the Loans advanced by the Lender, or the other obligations of the Borrower hereunder or under the Credit Agreement or the other Loan Documents.

The Borrower further agrees to pay, in Dollars in immediately available funds, interest on the unpaid principal amount of the Loans from the date of such Loans until such principal amount is paid in full, in Dollars in immediately available funds, at such interest rates and at such times as provided in the Credit Agreement, and the Borrower agrees to pay fees, costs and expenses as provided in the Credit Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

Exhibit 1.01(N) - 1

Upon the occurrence, and during the continuance of any one or more Events of Default, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable as provided in the Credit Agreement.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note, and any notice of any kind. No failure to exercise any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrower agrees to pay all costs and expenses, including without limitation attorneys' fees and disbursements, incurred in connection with the administration or enforcement of this Note, in accordance with the Credit Agreement.

Except as permitted by the Credit Agreement, this Note may not be assigned by the Lender to any other Person.

THIS NOTE, AND ANY CLAIM OR CONTROVERSY ARISING HEREUNDER OR RELATED HERETO, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Signature Page Follows]

Exhibit 1.01(N) - 2

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106028

**BLACKJEWEL L.L.C.**

By: _____

Name: _____

Title: _____

Exhibit 1.01(N) - 3

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106029

EXHIBIT 1.01(P)

**[FORM OF]**
**PERFECTION CERTIFICATE**

Dated as of [_____], 2017

In connection with that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among BLACKJEWEL L.L.C., a Delaware limited liability company, as borrower (the "Company"), BLACKJEWEL HOLDINGS L.L.C., a Delaware limited liability company, as holdings,  the lenders from time to time party thereto and RIVERSTONE CREDIT PARTNERS–DIRECT, L.P., as administrative agent and collateral agent (in such capacities, the "Agent"), the Company and each other grantor specified below (together with the Company, the "Grantors") hereby certifies as follows:

I.     CURRENT INFORMATION

A.     Legal Names, Organizations, Jurisdictions of Organization and     Organizational Identification Numbers.  The full and exact legal name (as it appears in each respective certificate or articles of incorporation, limited liability membership agreement or similar organizational documents, in each case as amended to date or, for natural persons, the name as set forth on their valid driver's license issued by their state of residence), the type of organization (or if a particular Grantor is a natural person, please indicate so), the jurisdiction of organization (or formation, as applicable), and the organizational identification number (not tax i.d. number) of each Grantor are as follows:

| Name of Grantor | Type of Organization (e.g. corporation, limited liability company, limited partnership | Jurisdiction of Organization/Formation | Organizational Identification Number |
|---|---|---|---|
| | | | |

B.     Chief Executive Offices and Mailing Addresses.  The chief executive office address (or the principal residence if a particular Grantor is a natural person) and the preferred mailing address (if different than chief executive office or residence) of each Grantor are as follows:

| Name of Grantor | Address of Chief Executive Office (or for natural persons, residence) | Mailing Address (if different than CEO or residence) |
|---|---|---|
| | | |

C.     Special Debtors and Former Article 9 Debtors.  Except as specifically identified below none of the Grantors is: (i) a transmitting utility (as defined in Section 9-102(a)(80)), (ii) primarily engaged in farming operations (as defined in Section 9-102(a)(35)), (iii) a trust, (iv) a foreign air carrier within the meaning of the federal aviation act of 1958, as amended, (v) a branch or agency of a bank which bank is not organized under the law of the United States or any state thereof or (vi) located (within the meaning of Section 9-307) in the Commonwealth of Puerto Rico.

| Name of Grantor | Type of Special Grantor |
|---|---|
| | |

D.     Trade Names/Assumed Names.

Current Trade Names.  Set forth below is each trade name or assumed name currently used by any Grantor or by which any Grantor is known or is transacting any business:

Grantor Trade/Assumed Name

Exhibit 1.01(P) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106030

E.    Changes in Names, Jurisdiction of Organization or Corporate Structure.  Except as set forth below, no Grantor has changed its name, jurisdiction of organization or its corporate structure in any way (e.g. by merger, consolidation, change in corporate form, change in jurisdiction of organization or otherwise) within the past five (5) years:

| Grantor | Date of Change | Description of Change |
|---------|----------------|------------------------|

F.    Prior Addresses.  Except as set forth below, no Grantor has changed its chief executive office, or principal residence if a particular Grantor is a natural person, within the past five (5) years:

| Grantor | Prior Address/City/State/Zip Code |
|---------|-----------------------------------|

G.    Acquisitions of Equity Interests or Assets.  Except as set forth below, no Grantor has acquired the equity interests of another entity or substantially all the assets of another entity within the past five (5) years:

| Grantor | Date of Acquisition | Description of Acquisition including full legal name of seller and seller's jurisdiction of organization and seller's chief executive office |
|---------|---------------------|------------------------------------------------------------------------------------------------------------------------------------------------|

H.    Corporate Ownership and Organizational Structure.  Attached as Exhibit A hereto is a true and correct chart showing the ownership relationship of each Grantor and all of its affiliates.

II.    INFORMATION REGARDING CERTAIN COLLATERAL

A.    Investment Related Property

1.    Equity Interests.  Set forth below is a list of all equity interests owned by each Grantor together with the type of organization which issued such equity interests (e.g. corporation, limited liability company, partnership or trust):

| Grantor | Issuer | Type of Organization | # of Shares Owned | Total Shares Outstanding | % of Interest Pledged | Certificate No. (if uncertificated, please indicate so) | Par Value |
|---------|--------|----------------------|-------------------|--------------------------|-----------------------|---------------------------------------------------------|-----------|

2.    Securities Accounts.  Set forth below is a list of all securities accounts in which any Grantor customarily maintains securities or other assets having an aggregate value in excess of $10,000:

| Grantor | Type of Account | Name & Address of Financial Institutions |
|---------|-----------------|-------------------------------------------|

3.    Deposit Accounts.  Set forth below is a list of all bank accounts (checking, savings, money market or the like) in which any Grantor customarily maintains in excess of $10,000:

| Grantor | Type of Account | Name & Address of Financial Institutions |
|---------|-----------------|-------------------------------------------|

4.    Debt Securities & Instruments.  Set forth below is a list of all debt securities and instruments owed to any Grantor in the principal amount of greater than $10,000:

| Grantor | Issuer of Instrument | Principal Amount of Instrument | Maturity Date |
|---------|----------------------|--------------------------------|---------------|

B.    Intellectual Property.  Set forth below is a list of all copyrights, patents, and trademark, all applications and licenses thereof and other intellectual property owned or used, or hereafter adopted, held or used, by each Grantor:

Exhibit 1.01(P) - 2

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106031

1.   Copyrights, Copyright Applications and Copyright Licenses

| Grantor | Title | Filing Date/Issued Date | Status | Application/Registration No. |
|---|---|---|---|---|

2.   Patents, Patent Applications and Patent Licenses

| Grantor | Title | Filing Date/Issued Date | Status | Application/Registration No. |
|---|---|---|---|---|

3.   Trademarks, Trademark Applications and Trademark Licenses

| Grantor | Title | Filing Date/Issued Date | Status | Application/Registration No. |
|---|---|---|---|---|

C.   Tangible Personal Property in Possession of Warehousemen, Bailees and Other Third Parties. Except as set forth below, no persons (including, without limitation, warehousemen and bailees) other than a Grantor have possession of any material amount (fair market value of $10,000 or more) of tangible personal property of any Grantor:

| Grantor | Address/City/State/Zip Code | County | Description of Assets and Value |
|---|---|---|---|

D.   Real Estate Related UCC Collateral

1.   Fixtures. Set forth below are all the locations where any Grantor owns or leases any real property:

| Grantor | Address/City/State/Zip Code | County | Owned or Leased |
|---|---|---|---|

2.   "As Extracted" Collateral. Set forth below are all the locations where any Grantor owns, leases or has an interest in any wellhead or minehead:

| Grantor | Address/City/State/Zip Code | County |
|---|---|---|

3.   Timber to be Cut. Set forth below are all locations where any Grantor owns goods that are timber to be cut:

| Grantor | Address/City/State/Zip Code | County |
|---|---|---|

III.   AUTHORITY TO FILE FINANCING STATEMENTS

Each undersigned Grantor hereby authorizes the Agent to file financing or continuation statements, and amendments thereto, in all jurisdictions and with all filing offices as the Agent may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted or to be granted to the Agent under the Collateral Documents (as defined in the Credit Agreement). Such financing statements may describe the collateral in the same manner as described in the applicable Collateral Document or may contain an indication or description of collateral that describes such property in any other manner as the Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the collateral granted to the Agent, including, without limitation, describing such property as "all assets" or "all personal property."

Exhibit 1.01(P) - 3

DEBTORSLCC_106032

IN WITNESS WHEREOF, each undersigned has caused this Perfection Certificate to be executed and delivered as of this ___ day of _____, 2017 by its officer thereunto duly authorized.

**[INSERT NAME OF EACH GRANTOR]**

By: _____
Name: _____
Title: _____

Exhibit 1.01(P) - 4

DEBTORSLCC_106033

**Exhibit A**

Corporate Ownership

Exhibit 1.01(P) - 5

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106034

EXHIBIT 1.01(S)

**[FORM OF]**
**SECURITY AGREEMENT**

[See Execution Version.]

Exhibit 1.01(S) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106035

*Execution Version*

**PLEDGE AND SECURITY AGREEMENT**

by and among

BLACKJEWEL HOLDINGS L.L.C.,
BLACKJEWEL L.L.C.
and
each of the SUBSIDIARIES of BLACKJEWEL L.L.C.
from TIME TO TIME PARTY HERETO,
each as a Grantor,

and

RIVERSTONE CREDIT PARTNERS – DIRECT, L.P.,
as Collateral Agent

Dated as of July 17, 2017

DEBTORSLCC_106036

# TABLE OF CONTENTS

<div align="right">Page</div>

## ARTICLE I
## DEFINITIONS

Section 1.01  Defined Terms.................................................................................................. 1
Section 1.02  Rules of Interpretation ...................................................................................... 6
Section 1.03  UCC Definitions ............................................................................................... 6

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.01  Inventory and Equipment.................................................................................. 6
Section 2.02  Grantor Information .......................................................................................... 6
Section 2.03  Certificated Securities and Instruments; Pledged Collateral ......................... 7
Section 2.04  Changes in Circumstances ............................................................................... 7
Section 2.05  Intellectual Property ......................................................................................... 8
Section 2.06  Commercial Tort Claims .................................................................................. 8
Section 2.07  Letters of Credit ............................................................................................... 8
Section 2.08  Rights in Collateral .......................................................................................... 8
Section 2.09  Financing Statements. ...................................................................................... 8
Section 2.10  Authorization .................................................................................................... 8
Section 2.11  Pledged Interests .............................................................................................. 9
Section 2.12  Best Interests. ................................................................................................... 9
Section 2.13  Deposit Accounts; Securities Accounts .......................................................... 9
Section 2.14  Electronic Chattel Paper; Transferable Records ............................................ 9
Section 2.15  Assets Subject to Certificates of Title ........................................................... 10

## ARTICLE III
## COLLATERAL

Section 3.01  Grant of Security Interests ............................................................................. 10
Section 3.02  Performance of Obligations; Grantors Remain Liable.................................. 11
Section 3.03  Delivery of Certificates and Instruments ...................................................... 12
Section 3.04  Security Interest Absolute, Etc....................................................................... 12
Section 3.05  Subrogation; Subordination ........................................................................... 13

## ARTICLE IV
## COVENANTS; CERTAIN ASSURANCES; REMEDIES

Section 4.01  Perfection; Etc................................................................................................ 14
Section 4.02  Intellectual Property ....................................................................................... 16
Section 4.03  Letter-of-Credit Rights................................................................................... 16
Section 4.04  Commercial Tort Claims ................................................................................ 16
Section 4.05  Electronic Chattel Paper and Transferable Records...................................... 16
Section 4.06  Other Financing Statements and Liens .......................................................... 17
Section 4.07  Receivables ..................................................................................................... 17
Section 4.08  Special Provisions Relating to Certain Collateral ......................................... 17
Section 4.09  Custody and Preservation................................................................................ 19
Section 4.10  Rights to Preserve and Protect ....................................................................... 20
Section 4.11  Remedies Generally ........................................................................................ 20
Section 4.12  Deficiency ....................................................................................................... 22
Section 4.13  Change of Name or Location .......................................................................... 22

<div align="center">i</div>

DEBTORSLCC_106037

Section 4.14    Private Sale ...................................................................................... 22
Section 4.15    Application of Proceeds .................................................................. 22
Section 4.16    Attorney-in-Fact ............................................................................. 23
Section 4.17    Financing Statement; Other Filings ............................................... 24
Section 4.18    Consents ......................................................................................... 25
Section 4.19    Partial Release of Liens .................................................................. 25

                                ARTICLE V
                             MISCELLANEOUS

Section 5.01    Collateral Agent's Right to Perform ............................................... 25
Section 5.02    Further Assurances .......................................................................... 25
Section 5.03    Set-Off ............................................................................................ 27
Section 5.04    No Waiver; Remedies Cumulative ................................................. 27
Section 5.05    Notices ............................................................................................ 27
Section 5.06    Amendments .................................................................................... 27
Section 5.07    Successors and Assigns .................................................................. 27
Section 5.08    Survival; Reliance ........................................................................... 27
Section 5.09    Effectiveness; Continuing Nature of Agreement ........................... 28
Section 5.10    Entire Agreement ............................................................................ 28
Section 5.11    Agents ............................................................................................. 28
Section 5.12    Severability ..................................................................................... 28
Section 5.13    Counterparts .................................................................................... 28
Section 5.14    Interpretation ................................................................................... 28
Section 5.15    GOVERNING LAW ........................................................................ 28
Section 5.16    Submission to Jurisdiction; Waivers .............................................. 28
Section 5.17    Acknowledgements ......................................................................... 29
Section 5.18    WAIVER OF JURY TRIAL ............................................................ 29
Section 5.19    Termination ..................................................................................... 30
Section 5.20    Reinstatement .................................................................................. 30
Section 5.21    Impairment ...................................................................................... 30
Section 5.22    Collateral Agent .............................................................................. 30
Section 5.23    Additional Grantors ........................................................................ 30

Exhibits and Schedules

Exhibit A        Supplement to Pledge and Security Agreement

Schedule 1       Instruments and Chattel Paper
Schedule 2       Pledged Interests
Schedule 3       Locations of Inventory and Equipment
Schedule 4       Grantor Information
Schedule 5       Commercial Tort Claims
Schedule 6       Letters of Credit
Schedule 7       Deposit Accounts, Securities Accounts and Commodity Accounts
Schedule 8       Certain Assets Subject to Certificates of Title

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106038

This **PLEDGE AND SECURITY AGREEMENT**, dated as of July 17, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is entered into by and among BLACKJEWEL HOLDINGS L.L.C., a Delaware limited liability company ("Holdings"), BLACKJEWEL L.L.C., a Delaware limited liability company (the "Borrower"), the other Persons listed on the signature pages hereof and the Additional Grantors (as hereinafter defined) (Holdings, the Borrower, the Persons so listed and the Additional Grantors being, the "Grantors", and each, a "Grantor") and RIVERSTONE CREDIT PARTNERS – DIRECT, L.P., as collateral agent for the Secured Parties (in such capacity, together with its successors and permitted assigns in such capacity, the "Collateral Agent"). Capitalized terms used in this Agreement are defined as set forth in Section 1.01.

## RECITALS:

WHEREAS, pursuant to the terms, conditions and provisions of the Credit Agreement, dated as of the date hereof (as amended, amended and restated, supplemented, refinanced, renewed, extended, replaced or otherwise modified from time to time, the "Credit Agreement"), by and among Holdings, the Borrower, the other Grantors from time to time party thereto, the Lenders from time to time party thereto, the Collateral Agent and Riverstone Credit Partners – Direct, L.P., as administrative agent, the Lenders have agreed to make Loans to the Borrower on the Closing Date in accordance with the terms of the Credit Agreement; and

WHEREAS, the execution and delivery of this Agreement by each Grantor is a condition precedent to the Lenders' obligations to make Loans to the Borrower under the Credit Agreement.

NOW, THEREFORE, to induce the Secured Parties to enter into the Credit Agreement and the other Loan Documents and to make the extensions of credit contemplated thereby, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree, for the benefit of each Secured Party, as follows:

## AGREEMENT:

## ARTICLE I
## DEFINITIONS

Section 1.01     Defined Terms.  Each capitalized term used and not otherwise defined herein (including the preamble, recitals and Schedules) has the meaning assigned to such term (whether directly or by reference to another agreement or document) in the UCC, as specified in Section 1.03, or the Credit Agreement. In addition to the terms defined in the Credit Agreement the following terms have the meanings specified below:

"Account Debtor" means any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account, Instrument, Receivable or any Supporting Obligation related thereto.

"Agreement" has the meaning given to such term in the preamble hereto.

"Borrower" has the meaning given to such term in the preamble hereto.

"Closing Date" has the meaning given to such term in the Credit Agreement, and shall be deemed to be the date of this Agreement.

"Collateral" has the meaning given to such term in Section 3.01(a).

DEBTORSLCC_106039

"Collateral Agent" has the meaning given to such term in the preamble hereto.

"Collateral Records" means books, records, writings, databases, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, information, computer printouts, tapes, disks and related data processing software and similar items and other property that at any time evidences or contains information relating to any of the Collateral, or otherwise relates to, is used or useful in connection with, evidencing, embodying, incorporating or referring to any of the Collateral, or is otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all property (real or personal) assigned, licensed, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Company Agreements" means the limited liability company agreement, operating agreement, partnership agreement, shareholders agreement, certificate of incorporation, by-laws or similar agreement of any Pledged Entity.

"Contracts" means all agreements, leases, grants and contracts to which a Grantor is or becomes a party (in each case, whether written or oral), including, without limitation, the MR Coal Agreement (including all exhibits, schedules and other attachments to any and all of the foregoing), as each such agreement, lease, grant and contract may be amended, amended and restated, supplemented, extended, renewed, replaced or modified from time to time, including, without limitation, (a) all rights of the Grantors to receive moneys due and to become due under or pursuant to the Contracts, (b) all rights of the Grantors to receive proceeds of any insurance, bond, indemnity, warranty, letter of credit or guaranty with respect to the Contracts, (c) all claims of the Grantors for damages arising out of or for breach of or default under the Contracts and (d) all rights of the Grantors to terminate, amend, amend and restate, supplement, modify or waive performance under the Contracts, to perform thereunder and to compel performance and otherwise to exercise all rights and remedies thereunder.

"Credit Agreement" has the meaning given to such term in the recitals hereto.

"Deposit Account" has the meaning as defined in the UCC of any applicable jurisdiction and, in any event, including any demand, time, savings, passbook or like account maintained with a depositary institution and shall include, without limitation, each of the accounts listed in Part A of Schedule 7 (as such Schedule may be amended or supplemented from time to time).

"Equipment" means: (a) all "equipment" as defined in Article 9 of the UCC, (b) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC) and (c) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any Fixtures.

"Financing Statements" means all financing statements, continuation statements, recordings, filings or other instruments of registration necessary or appropriate to perfect a Lien by filing in any appropriate filing or recording office in accordance with the UCC or any other relevant applicable law.

"General Intangibles" means all "general intangibles" and all "payment intangibles", each as defined in Article 9 of the UCC, and shall include all hedge agreements, interest rate, commodity or currency protection or other hedging arrangements, all tax refunds, all licenses, permits, concessions and

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106040

authorizations, all Intellectual Property and all Contracts (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" means all "goods" as defined in Article 9 of the UCC and includes all Inventory and Equipment (in each case, regardless of whether characterized as goods under the UCC).

"Goodwill" means, collectively, with respect to each Grantor, the goodwill connected with such Grantor's business, including but not limited to all goodwill connected with (a) the use of and symbolized by any trademark or trademark license in which such Grantor has any interest, (b) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (c) all product lines of such Grantor's business.

"Grantor" and "Grantors" have the respective meanings given to such terms in the preamble hereto.

"Holdings" has the meaning given to such term in the preamble hereto.

"Insurance" means (a) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent or any other Secured Party is a loss payee thereof) and (b) any key man life insurance policies in respect of which any Grantor is a beneficiary.

"Intellectual Property" means the collective reference to all rights, title, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation: (a) copyrights, whether registered or unregistered and whether published or unpublished, now or hereafter in force throughout the world, and all moral rights, reversionary interests, termination rights and all registrations, recordings and applications for any of the foregoing, whether pending or in preparation; (b) all patents, and all inventions and discoveries and similar industrial property rights (whether patentable or not), all registrations and recordings of any of the foregoing and all applications for any of the foregoing (including but not limited to registrations, recordings and pending applications in the U.S. Patent and Trademark Office or other applicable Governmental Authority), and all reissues, divisions, continuations, continuations-in-part, extensions, improvements, renewals and reexaminations of any of the foregoing items , and all inventions disclosed or claimed therein (including but not limited to the right to make, use and/or sell the inventions disclosed or claimed therein); (c) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, service marks, certification marks, collective marks, domain names, uniform resource locators, logos and other source or business identifiers, designs and general intangibles of a like nature, whether or not registered, and all registrations, recordings and applications for any of the foregoing and all goodwill of the business associated therewith, in each case whether now existing or hereafter adopted, created or acquired, whether currently in use or not, including but not limited to registrations, recordings and applications in the U.S. Patent and Trademark Office or in any office or agency of the United States of America, or any State thereof or any other country or political subdivision thereof or otherwise, and all common-law rights relating to the foregoing, and all reissues, extensions or renewals of the foregoing; (d) all copyright licenses, patent licenses and trademark licenses, and other agreements providing for the grant by or to such Grantor of any right in, to or under any of the items referred to in the foregoing clauses (a) through (c) above or otherwise providing for a covenant not to sue (whether a Grantor is licensee or licensor thereunder), and the rights of the Grantors under any such licenses and agreements; (e) all rights to sue or otherwise recover for any past, present and future infringement, misappropriation or other violation of any of the foregoing, and for breach or enforcement

3

DEBTORSLCC_106041

of any of the foregoing; (f) all extensions and renewals of any of the foregoing; (g) all rights of any kind accruing under any of the foregoing, or pertaining or corresponding to any of the foregoing, in each case throughout the world; (h) all Goodwill; and (i) all Proceeds of, and rights associated with, any of the foregoing, including but not limited to licenses, fees, royalties, income, payments, claims, damages and Proceeds of suits (including but not limited to damages and payments for past, present or future infringements, misappropriations or other violations thereof, and for breach or enforcement of any copyright license, patent license, trademark license or similar agreement relating to Intellectual Property).

"Inventory" means (a) all "inventory" as defined in Article 9 of the UCC and (b) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Grantor's business; all goods in which any Grantor has an interest in mass or a joint or other interest or right of any kind; and all goods which are returned to or repossessed by any Grantor, all computer programs embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"Investment Property" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC, (b) whether or not constituting "investment property" as so defined, Pledged Collateral, and (c) each security, whether certificated or uncertificated, and each Security Entitlement, Securities Account, Commodity Contract and Commodity Account.

"Material Intellectual Property" means any Intellectual Property that is material (a) to the use and operation of any other Collateral or any Real Property or (b) to the business, results of operations, prospects or condition, financial or otherwise, of any Grantor.

"Non-Delivered Instruments" has the meaning given to such term in Section 2.03.

"Pledged Collateral" means the Pledged Debt and the Pledged Interests, together with each of the following:

(a)     all of each Grantor's rights to acquire Equity Interests in a Pledged Entity in addition to or in exchange or substitution for its respective Pledged Interests in such Pledged Entity;

(b)     all of each Grantor's rights, privileges, authority and powers as a member of a Pledged Entity, whether under the applicable Company Agreements or otherwise, including (i) such Grantor's right to a share of the profits of the applicable Pledged Entity, (ii) the right to receive distributions from such Pledged Entity, (iii) such Grantor's right to vote and participate in the management of such Pledged Entity and (iv) such Grantor's capital account in such Pledged Entity;

(c)     all certificates or other documents representing any and all of the Collateral described in clauses (a) and (b) above;

(d)     other than as provided below, all dividends, distributions, cash, securities, instruments and other property or proceeds of any kind to which a Grantor may be entitled in its capacity as member of a Pledged Entity by way of distribution, return of capital or otherwise;

(e)     without affecting any obligations of any Grantor under any of the other Loan Documents, in the event of any consolidation or merger in which the applicable Pledged Entity is not the surviving Person, all ownership interests of any class or character in the successor Person formed by or resulting from such consolidation or merger;

4

DEBTORSLCC_106042

(f)      any other claim that any Grantor now has or may in the future acquire in its capacity as member of a Pledged Entity against such Pledged Entity and its property; and

(g)      all proceeds, products and accessions of and to any of the property described in the preceding clauses (a) through (f) above.

"Pledged Debt" means all Debt owned by, or otherwise owed to, any Grantor, the Instruments (if any) evidencing any and all such Debt, and all interest, cash, promissory notes, instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Debt.

"Pledged Entity" has the meaning given to such term in Section 2.11(a).

"Pledged Interests" means all Equity Interests at any time held or owned by any Grantor, including, without limitation, all Equity Interests described on Part A in Schedule 2 opposite the name of such Grantor (as such Schedule may be amended or supplemented from time to time), and the certificates, if any, representing any and all such Pledged Interests, any and all warrants, rights or options to purchase or other arrangements or rights to acquire any Pledged Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Interests.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property and any other Collateral, collections thereon or distributions or payments with respect thereto, and whatever is receivable or received when Collateral or proceeds are sold, leased, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Receivables" means all rights to payment, whether or not earned by performance or achievement of milestones and whether or not such right is evidenced by an Instrument or Chattel Paper, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Property, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"Receivables Records" means (a) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (b) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of a Grantor or any computer bureau or agent from time to time acting for any Grantor or otherwise, (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings, including lien search reports, from filing or other registration officers, (d) all credit information, reports and memoranda relating thereto and (e) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

"Secured Obligations" means (a) with respect to the Borrower, the Obligations and (b) with respect to the other Grantors, the Guarantied Obligations (as defined in the Guaranty Agreement).

5

DEBTORSLCC_106043

"Securities Act" means the Securities Act of 1933, as amended.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any financing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Agent pursuant to this Agreement or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement and any financing statement relating to such perfection or effect of perfection or non-perfection or the availability of such remedy, as the case may be.

Section 1.02    Rules of Interpretation.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the rules of interpretation set forth in Section 1.02 of the Credit Agreement are hereby incorporated by reference, mutatis mutandis, as if fully set forth herein.

Section 1.03    UCC Definitions.  All terms defined in the UCC have the respective meanings given to those terms in the UCC (and if defined in more than one article of the UCC, as defined in Article 9 thereof), except where the context otherwise requires, including the following terms: Accounts, As-Extracted Collateral, Certificated Security, Chattel Paper (including Electronic Chattel Paper and Tangible Chattel Paper), Commercial Tort Claims, Commodity Account, Commodity Contract, Documents, Fixtures, Instruments, Letter-of-Credit Rights, Money, Payment Intangibles, Records, Securities Account, Security Entitlement, Supporting Obligations and Uncertificated Securities. Letters of Credit has the meaning provided in Section 5-102 of the UCC.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Collateral Agent and each other Secured Party as follows, which representations and warranties shall survive the execution and delivery of this Agreement:

Section 2.01    Inventory and Equipment.  All Inventory and Equipment of such Grantor (other than (a) Inventory and Equipment in transit in the ordinary course of business or (b) Inventory and Equipment with an aggregate value for all Grantors not exceeding $5,000,000 that is in the possession or control of third parties (other than Persons controlled by or under common control with such Grantor) that have been notified of the security interest created in favor of the Secured Parties pursuant to this Agreement) is located at the addresses set forth in Schedule 3 (as such Schedule may be amended or supplemented from time to time as to matters permitted by the Loan Documents).

Section 2.02    Grantor Information.

(a)    The jurisdiction in which each Grantor is located for purposes of Sections 9-301 and 9-307 of the UCC is set forth in Part A of Schedule 4.

(b)    The place of business or, if there is more than one place of business, the chief executive office, of each Grantor is located at such Grantor's address for notices referred to in Section 11.05 of the Credit Agreement, and it does not have any books or records concerning or relating to the Collateral at any location other than at the addresses set forth in Part B on Schedule 4 (as such Schedule may be amended or supplemented from time to time as to matters permitted by the Loan Documents). Each Grantor is duly organized under the laws of its jurisdiction of formation and is not organized under the laws of any other jurisdiction.

6

DEBTORSLCC_106044

(c)     The names of the Grantors typed on the signature pages attached hereto are the true, correct and full legal names (as defined in the UCC) of each Grantor. The Grantors do not have any trade names or other names under which they currently conduct business other than those set forth in Part B of Schedule 4 hereto.

(d)     To each Grantor's knowledge, during the five years preceding the Closing Date, no Grantor has been known by any legal name different from the one set forth on the signature page hereto, nor has any Grantor been the subject of any merger or other corporate reorganization or otherwise become a "new debtor" as defined in Section 9-102(a)(56) of the UCC, except as set forth in Part C of Schedule 4 hereto.

(e)     Each Grantor's federal taxpayer identification number is (and, to the best of each Grantor's knowledge, during the four months preceding the Closing Date, no Grantor has had a federal taxpayer identification number different from that) set forth in Part D of Schedule 4 hereto.

(f)     As of the Closing Date, all information set forth in the Perfection Certificate and the schedules thereto is accurate and complete.

Section 2.03     Certificated Securities and Instruments; Pledged Collateral.

(a)     Each Grantor has delivered to the Collateral Agent, on or before the Closing Date, all (i) Collateral of such Grantor that is represented by Certificated Securities, together with duly executed undated blank stock powers or other equivalent instruments of transfer acceptable to the Collateral Agent and (ii) Collateral of such Grantor that consists of Instruments or Chattel Paper (other than Instruments and Chattel Paper deposited or to be deposited for collection and not exceeding $250,000 in the aggregate for all Grantors ("Non-Delivered Instruments")), including any Receivable that is evidenced by any Instrument or Chattel Paper. None of the obligors on any Receivables of any Grantor is an Official Body. As of the Closing Date, all Collateral consisting of Instruments or Chattel Paper (other than Non-Delivered Instruments) and owned by any Grantor is listed on Schedule 1.

(b)     As of the Closing Date, possession by the Collateral Agent of the notes, certificates or instruments representing Pledged Collateral and possession of the proceeds thereof are the only actions necessary to perfect or protect the Liens of the Collateral Agent (for the benefit of the Secured Parties) in the Pledged Collateral represented by such notes, certificates or instruments and the proceeds thereof under the UCC, and, upon delivery to the Collateral Agent of the certificate or certificates evidencing the Pledged Interests described in Part A of Schedule 2, together with an instrument of transfer duly endorsed in blank, the Lien granted to the Collateral Agent pursuant to this Agreement in and to such Pledged Collateral shall constitute a valid and enforceable perfected security interest therein superior and prior to the rights of all other Persons therein (except for Permitted Prior Liens) and, in each case, subject to no other Liens, sales, assignments, conveyances, settings over or transfers other than Permitted Liens.

(c)     To the best of each Grantor's knowledge, all of the Pledged Debt owed to any Grantor has been duly authorized, authenticated or issued and delivered and is the legal, valid and binding obligation of the issuers thereof and is not in default and constitutes all of the issued and outstanding Indebtedness owed to such Grantor.

Section 2.04     Changes in Circumstances.  As of the Closing Date and except as otherwise indicated in Part B of Schedule 4, since the date of its formation or incorporation, no Grantor has (a) changed its jurisdiction of formation or incorporation or (b) changed the jurisdiction of its chief executive office.

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106045

Section 2.05     Intellectual Property.  As of the Closing Date, no Grantor owns any Material Intellectual Property in its own name, and no Grantor licenses any right to or for any Material Intellectual Property.

Section 2.06     Commercial Tort Claims.  As of the Closing Date and except to the extent listed in Schedule 5, no Grantor has any rights, title or interest in, to or under any Commercial Tort Claim with potential value in excess of $250,000 individually or in the aggregate for all Grantors.

Section 2.07     Letters of Credit.  As of the Closing Date and except to the extent listed in Schedule 6, no Grantor is the beneficiary of any Letters of Credit in a face amount greater than $250,000 individually or in the aggregate for all Grantors. Each Grantor has obtained a legal, valid and enforceable consent of each issuer of any Letter of Credit in a face amount greater than $250,000 individually or in the aggregate for all Grantors to which such Grantor is the beneficiary to the assignment of the Proceeds of such Letter of Credit to the Collateral Agent, and no Grantor has consented to, and is otherwise unaware of, any Person (other than the Collateral Agent pursuant hereto) having control (within the meaning of Section 9-104 of the UCC) over, or any other interest in any of such Grantor's rights in respect thereof.

Section 2.08     Rights in Collateral.  Each Grantor owns the Collateral purported to be owned by it or otherwise has the right it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter arising, acquired, developed or created (including by way of lease or license), will continue to own or have such rights in each item of the Collateral, in each case free and clear of any and all Liens, rights or claims of all other Persons, including, without limitation, Liens arising as a result of such Grantor becoming bound (as a result of merger or otherwise) as debtor under a security agreement entered into by another Person other than Permitted Liens and, with respect to priority, only Permitted Prior Liens.

Section 2.09     Financing Statements.  Upon the filing of the Financing Statements naming each Grantor as "debtor" and the Collateral Agent as "secured party" and describing the Collateral in the filing office of such Grantor's jurisdiction of incorporation or formation, the security interest of the Collateral Agent, for the benefit of the Secured Parties, in all Collateral of such Grantor that can be perfected by the filing of a financing statement under the UCC will constitute a valid, perfected, first priority Lien subject to any Permitted Prior Liens. No effective Financing Statement or other filing or registration similar in effect covering all or any part of the Collateral is on file in any recording office in which a filing or registration may be made in order to properly perfect a security interest on any of the Collateral, except (a) those filed in favor of the Collateral Agent relating to this Agreement and (b) with respect to Permitted Liens.

Section 2.10     Authorization.  No authorization, consent, approval or other action by or of, and no notice to or filing, registration or declaration with, any Official Body or regulatory body or any other Person is necessary or desirable in connection with (a) the pledge or grant by any Grantor of the Liens purported to be created in favor of the Collateral Agent hereunder, (b) the creation, perfection or first priority status (subject only to Permitted Prior Liens) of the security interest of the Collateral Agent hereunder or (c) the exercise by the Collateral Agent or any other Secured Party of any rights or remedies in respect of any Collateral of such Grantor (whether specifically granted, created or provided for hereunder or under applicable law, or otherwise), except (i) for the filings contemplated by Section 2.09 and (ii) as may be required, in connection with the disposition of any Investment Property, by laws generally affecting the offering and sale of securities. There is no lease, contract, agreement, order, judgment or decree that would (A) impair or conflict with any Grantor's payment obligations under any Loan Document or (B) impair or conflict with, in any material respect, any other obligation of any

8

DEBTORSLCC_106046

Grantor hereunder or under any other Loan Document or with any right or remedy of the Collateral Agent or the Secured Parties hereunder or under any other Loan Document.

Section 2.11    Pledged Interests.

(a)    As of the Closing Date, the Pledged Interests in each entity identified in Part A of Schedule 2 under the heading "Pledged Entity" (as such Schedule may be amended or supplemented from time to time) (each such Person a "Pledged Entity" and collectively, the "Pledged Entities") comprise 100% of the authorized, issued and outstanding Equity Interests in such Pledged Entity. All Pledged Interests are duly authorized, validly existing, fully paid and non-assessable. No transfer of the Pledged Interests in the manner contemplated by this Agreement is subject to any contractual restriction or any restriction under any of the Company Agreements.

(b)    Except as identified in Part A of Schedule 2, no Pledged Interest constitutes a security (for purposes of Article 8 of the UCC) as of the date hereof.

Section 2.12    Best Interests. In the case of each Grantor other than the Borrower, it is in the best interests of such Grantor, in its reasonable business judgment exercised in good faith, to execute this Agreement inasmuch as such Grantor will derive substantial direct and indirect benefits from the Loans made to the Borrower by the Lenders pursuant to the Credit Agreement, and each Grantor agrees that the Secured Parties are relying on this representation and warranty in agreeing to make such Loans pursuant to the Credit Agreement to the Borrower.

Section 2.13    Deposit Accounts; Securities Accounts.

(a)    As of the Closing Date, no Grantor has any Deposit Accounts other than those listed in Part A of Schedule 7. Upon delivery to the Collateral Agent within the time period required by Section 8.01(n)(iii) of the Credit Agreement of a Control Agreement with respect to each such Deposit Account (other than Excluded Accounts), the Collateral Agent shall have a first priority security interest in each such Deposit Account (other than Excluded Accounts), which security interest is perfected by "control," as such term is defined in Section 9-104 of the UCC.

(b)    As of the Closing Date, no Grantor has any Securities Accounts or Commodity Accounts other than those listed in Part B of Schedule 7. Upon delivery to the Collateral Agent within the time period required by Section 8.01(n)(iii) of the Credit Agreement of a Control Agreement with respect to each such Securities Account or Commodities Account (other than Excluded Accounts), the Collateral Agent shall have a first priority security interest in each such Securities Account or Commodities Account (other than Excluded Accounts), which security interest is perfected by "control," within the meaning of Section 8-106 or Section 9-106 of the UCC, as applicable.

Section 2.14    Electronic Chattel Paper; Transferable Records.    As of the Closing Date, no amount under or in connection with any of the Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" or any "transferable record," as that term is defined in Section 201 of the U.S. Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the U.S. Uniform Electronic Transactions Act, as in effect in any relevant jurisdiction.

Section 2.15    Assets Subject to Certificates of Title.    As of the Closing Date, no Grantor owns or otherwise has any interest in any vehicle or other Equipment subject to a certificate of title Law of the United States or any state thereof with a fair market value in excess of $100,000 individually or $500,000 in the aggregate, other than those listed on Schedule 8.

9

DEBTORSLCC_106047

## ARTICLE III
## COLLATERAL

Section 3.01    <u>Grant of Security Interests</u>.

(a)    As collateral security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, each Grantor hereby pledges and grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien upon all of such Grantor's rights, title and interest in, to and under all assets and property of such Grantor, including but not limited to the following, in each case whether now or hereafter existing, owned, arising or acquired by such Grantor, or in which such Grantor now has or at any time may own or acquire any right, title or interest, and in each case, wherever located (collectively, the "<u>Collateral</u>"):

(i)    all Pledged Collateral;

(ii)    all Accounts;

(iii)    all Contracts;

(iv)    all Chattel Paper;

(v)    all Commercial Tort Claims listed on <u>Schedule 5</u> (as such Schedule may be amended or supplemented from time to time);

(vi)    all Deposit Accounts;

(vii)    all Documents;

(viii)    all General Intangibles;

(ix)    all As-Extracted Collateral, all Fixtures and all Goods, including, without limitation, all Inventory and all Equipment (including, without limitation, all gondolas, boxcars, tankers, locomotives and railcars of any type), all machinery, tools, motor vehicles, vessels, furniture and fixtures, and all parts thereof and all accessions thereto and all software related thereto, including, without limitation, software that is embedded in and is part of such Goods;

(x)    all Instruments;

(xi)    all Intellectual Property;

(xii)    all Insurance;

(xiii)    all Inventory;

(xiv)    all Investment Property (including all Pledged Collateral);

(xv)    all Letter-of-Credit Rights and all Letters of Credit;

(xvi)    all Money;

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106048

(xvii)   all Permits now or hereafter held in the name, or for the benefit of, any Grantor;

(xviii)   all Receivables and Receivables Records;

(xix)   all Securities Accounts;

(xx)   all Commodity Accounts;

(xxi)   all Collateral Records, Collateral Support and Supporting Obligations;

(xxii)   all rents, profits, income, royalties and revenues derived in any other manner by such Grantor as a result of its (direct or indirect) ownership of its assets or any part thereof and the operation thereof or any part thereof;

(xxiii)   all other property and rights of every kind and description and interests therein; and

(xxiv)   all Proceeds, accessions, rents, products and profits of or in respect of any of the foregoing;

provided that in no event shall the Collateral include any Excluded Property or any Excluded Account to the extent and for so long as the applicable property or asset constitutes Excluded Property or an Excluded Account.

(b)   This Agreement, and the Liens granted or purported to be granted herein upon the Collateral, secure the payment and the performance in full when due (whether at stated maturity, by required repayment or prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts) of all of the Secured Obligations, and including all amounts arising or accruing after the commencement of any Insolvency Proceeding or which would have arisen or accrued but for the commencement of such Insolvency Proceeding, even if the claim for such amounts is not enforceable or allowable in such Insolvency Proceeding.

Section 3.02   Performance of Obligations; Grantors Remain Liable.  Notwithstanding anything herein or in any other Loan Document to the contrary: (a) each Grantor shall remain liable for all obligations under and in respect of the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Collateral Agent or any other Secured Party; (b) each Grantor shall remain liable under each of the contracts and agreements included in the Collateral, including the Contracts and the Company Agreements, to perform all of its duties and obligations thereunder all in accordance with and pursuant to the terms and provisions thereof; (c) neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any of such contracts and agreements by reason of or arising out of this Agreement, any other Loan Document or any other document or agreement related hereto, nor shall the Collateral Agent or any other Secured Party have any obligation to perform any of the duties or obligations of any Grantor thereunder or to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any claim for payment or any rights under any contract or agreement included in the Collateral, including the Contracts and the Company Agreements; (d) the exercise by the Collateral Agent or any other Secured Party of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, including the Contracts and the Company Agreements; and (e) (i) each Grantor shall remain liable under each of the Loan Documents to which it is a party to the extent set forth therein to perform all of its duties and obligations thereunder to the same

11

DEBTORSLCC_106049

extent as if this Agreement had not been executed and (ii) the exercise by the Collateral Agent or the other Secured Parties (or any of their respective directors, officers, employees, affiliates, agents or sub-agents) of any of their rights, remedies or powers hereunder shall not release any Grantor from any of its duties or obligations under the Loan Documents to which it is a party.

Section 3.03    Delivery of Certificates and Instruments.    All certificates and instruments representing or evidencing any of the Pledged Collateral shall be delivered to and be held by or on behalf of the Collateral Agent in accordance with Section 4.01(a) and shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent. The Collateral Agent shall have the right, at any time following the occurrence and during the continuation of an Event of Default, without assent by, and without notice to, the applicable Grantor, to transfer to or to register in its name or in the name of any of its nominees any or all of the Pledged Collateral and to exchange certificates or instruments representing or evidencing any of the Pledged Interests for certificates or instruments of smaller or larger denominations. In the event of such a transfer, the Collateral Agent shall promptly thereafter give the applicable Grantor notice of such transfer or registration; provided, however, that (a) failure to give such notice shall have no effect on the rights of the Collateral Agent hereunder and (b) the Collateral Agent shall not be required to deliver any such notice if such Grantor is the subject of Insolvency Proceedings or the delivery of such notice is otherwise prohibited by applicable law.

Section 3.04    Security Interest Absolute, Etc.    This Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest and continuing Lien upon, and shall remain in full force and effect until Payment in Full (subject to Section 5.20). All rights and remedies of the Secured Parties and the security interests and Liens granted or purported to be granted to the Collateral Agent (for the benefit of the Secured Parties) hereunder, and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and irrevocable, and will remain in full force and effect and will not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (except (x) pursuant to Section 4.19 and (y) upon Payment in Full (subject to Section 5.20)), including but not limited to:

(a)    any lack of validity, legality or enforceability of, or any irregularity of, all or any portion of the Secured Obligations, the Credit Agreement, any other Loan Document or any other agreement, document or instrument relating to any of the foregoing or any security or credit support therefor;

(b)    any assertion, exercise or enforcement or failure of any Secured Party to assert, exercise or enforce any right, remedy, power, privilege, claim or demand under or in respect of any of the Secured Obligations, this Agreement, any other Loan Document or any other agreement, document or instrument relating to any of the foregoing;

(c)    the acceleration of the maturity of any of the Secured Obligations or any other change or modification in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of, consent to or departure from, extension, indulgence, compromise or renewal of any Secured Obligations;

(d)    any reduction, limitation, impairment or termination of any Secured Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and each Grantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, non-genuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations;

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106050

(e)       any amendment to, rescission, waiver, renewal, extension or other modification of, or any consent to or departure from, or any addition or supplement to or deletion from, any of the Loan Documents or any other agreement, document or instrument related thereto, or any assignment or transfer of any thereof;

(f)       any addition, exchange or release of any Collateral or other security for the Secured Obligations or of any Person that is (or will become) a Grantor (including the Grantors hereunder) of all or any portion of the Secured Obligations, or any substitution, sale, exchange, release, surrender, realization or non-perfection of any Collateral or other security for the Secured Obligations, or the failure to create, preserve, validate, perfect or protect any Lien granted or purported to be granted in favor of the Collateral Agent or any other Secured Party, or any amendment to or waiver or release or addition to, or consent to or departure from, any guaranty or other credit support held by any Secured Party securing any of the Secured Obligations;

(g)       any judicial or non-judicial foreclosure or sale of, or other election of remedies with respect to, any interest in real property or other collateral serving as security for all or any part of the Secured Obligations, even though such foreclosure, sale or election of remedies may impair the subrogation rights of the Grantors or may preclude the Grantors from obtaining reimbursement, contribution, indemnification or other recovery and even though the Grantors may or may not, as a result of such foreclosure, sale or election of remedies, be liable for any deficiency;

(h)       any act or omission of the Collateral Agent or any other Person (other than Payment in Full (subject to Section 5.20)) that directly or indirectly results in or aids the discharge or release of any Grantor or any part of the Secured Obligations or any security or guarantee (including any letter of credit) for all or any part of the Secured Obligations by operation of law or otherwise;

(i)       (i) the election by the Collateral Agent, in any bankruptcy proceeding of any Person, of the application or non-application of Section 1111(b)(2) of the U.S. Bankruptcy Code of the United States, (ii) any extension of credit or the grant of any Lien under Section 364 of the U.S. Bankruptcy Code, (iii) any use of cash collateral under Section 363 of the U.S. Bankruptcy Code, (iv) any agreement or stipulation with respect to the provision of adequate protection in any Insolvency Proceeding of any Person, (v) the avoidance of any Lien in favor of the Collateral Agent for any reason, and/or (vi) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any part of the Secured Obligations (or any interest on all or any part of the Secured Obligations) in or as a result of any such proceeding; and/or

(j)       any other event or circumstance whatsoever which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor, any surety or any guarantor or other obligor.

Section 3.05    Subrogation; Subordination.  Each Grantor agrees that it will not exercise any rights against another Grantor which it may acquire by way of rights of subrogation under any Loan Document to which it is a party, and notwithstanding anything in this Agreement or any other Loan Document to the contrary, all rights of the Grantors to indemnity, reimbursement, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the Secured Obligations until indefeasible Payment in Full. No failure on the part of any Grantor to make the payments required under applicable law or otherwise shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder. No Grantor shall seek or be entitled to seek any contribution, indemnity or reimbursement from any Grantor, in respect of any payment made under any Loan Document or otherwise, at any time on or prior to indefeasible Payment in Full. Any amount paid to such

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106051

Grantor on account of any such subrogation rights on or prior to indefeasible Payment in Full shall be held in trust for the benefit of the Secured Parties and shall promptly be paid and turned over to the Collateral Agent for the benefit of the Secured Parties in the exact form received by such Grantor (duly endorsed in favor of the Collateral Agent, if required), to be credited and applied against the Secured Obligations, whether matured or unmatured. In furtherance of the foregoing, at all times on and prior to indefeasible Payment in Full, each Grantor shall refrain from taking any action or commencing any proceeding against any other Grantor (or its successors or assigns, whether in connection with an Insolvency Proceeding or otherwise) to recover any amounts in respect of payments made under this Agreement to any Secured Party. Each Grantor hereby agrees that all Debt owed to it by any other Grantor is hereby subordinated in right of payment to the Secured Obligations, and any such Debt collected or received by any Grantor after an Event of Default has occurred and is continuing shall be held in trust for the Collateral Agent, for the benefit of the Secured Parties, and shall forthwith be paid over to the Collateral Agent for the benefit of the Secured Parties to be credited and applied against the Secured Obligations but without affecting, impairing or limiting in any manner the liability of any Grantor under any other provision of this Agreement or any other Loan Document.

## ARTICLE IV
## COVENANTS; CERTAIN ASSURANCES; REMEDIES

In furtherance of the grant of the Liens on the Collateral pursuant to Section 3.01, each Grantor agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

Section 4.01     Perfection; Etc.  Each Grantor shall:

(a)     promptly endorse, assign and deliver to the Collateral Agent any and all (i) Instruments and Chattel Paper (other than the Non-Delivered Instruments) and Certificated Securities of such Grantor (in each case, constituting Collateral), endorsed and/or accompanied by instruments of assignment and transfer in such form and substance as the Collateral Agent may reasonably request, and (ii) other certificates, stock powers, instruments or other documents representing or evidencing Pledged Collateral, with all necessary and appropriate instruments of transfer or assignment duly endorsed in blank, in each case, on or before the Closing Date (or within 30 days (or such longer period as may be extended by the Collateral Agent at the direction of the Required Lenders in their reasonable discretion) after acquisition or creation thereof) and, prior to any such delivery, all such Pledged Collateral shall be held by the applicable Grantor in trust for the Collateral Agent, for the benefit of the Secured Parties;

(b)     maintain the Liens created by this Agreement as a perfected and, subject only to Permitted Prior Liens, first priority security interest and, at the sole cost and expense of the Grantors, give, execute, deliver, file and/or record any Financing Statement (and continuations thereof) (i) to create, preserve, protect, perfect or validate and maintain the Liens granted or purported to be granted pursuant hereto and/or (ii) to enable the Collateral Agent to exercise and enforce its rights hereunder with respect to such Liens;

(c)     without limiting the generality of the foregoing, (i) not establish or maintain any Deposit Account, Securities Account or Commodity Account (other than any Excluded Account) unless (A) the applicable Grantor shall have given the Collateral Agent 5 days' prior written notice of its intention to establish such new Deposit Account, Securities Account or Commodities Account, as applicable (or such shorter time as the Collateral Agent may agree in its sole discretion), and (B) the applicable financial institution, securities intermediary or other institution, as the case may be, and the applicable Grantor shall have duly executed and delivered to the Collateral Agent, for the benefit of the Secured Parties, a Control Agreement with respect to such new Deposit Account, Securities Account or Commodity Account within the time period required by Section 8.01(n)(iii) of the Credit Agreement, (ii)

14

DEBTORSLCC_106052

in the case of Investment Property, Letter-of-Credit Rights and any other relevant Collateral, take any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the applicable provision of the UCC) with respect thereto no later than 30 days after the creation or acquisition by any Grantor of any rights, title or interest therein (or such longer time as the Collateral Agent may agree in its sole discretion), and (iii) except with respect to Excluded Accounts, not grant "control" of any Deposit Account, Securities Account, Commodity Account, Investment Property, Letter-of-Credit Rights or other relevant Collateral to any Person other than the Collateral Agent;

(d)    (reserved);

(e)    not permit any of the Pledged Interests to be (i) dealt in or traded on securities exchanges or in securities markets or (ii) placed in a Securities Account;

(f)    without the prior written consent of the Collateral Agent, such Grantor shall not vote to enable, consent to or take any other action to: (i) amend, terminate or waive any default under or breach of any terms of any Company Agreement in any way that adversely affects the validity, perfection or priority of the Collateral Agent's security interest hereunder or (ii) cause or permit any issuer of any Pledged Interests to elect to take any action that would cause or otherwise permit such Pledged Interests to be treated as securities for purposes of Article 8 of the UCC except to the extent such Grantor complies with Section 4.01(g) with respect to such Pledged Interests.

(g)    without limiting the covenants set forth above, with respect to any part of the Pledged Collateral of such Grantor that constitutes (i) an Uncertificated Security, cause the issuer thereof to register the Collateral Agent as the registered owner of such Uncertificated Security or, if a Grantor is not the issuer of such Uncertificated Security, to enter into an uncertificated securities control agreement in form and substance reasonably satisfactory to the Collateral Agent to establish the Collateral Agent's Control over such Uncertificated Security or (ii) a Certificated Security, deliver such Certificated Security to the Collateral Agent, together with duly executed undated blank stock powers or other equivalent instruments of transfer acceptable to the Collateral Agent; and

(h)    not shall enter into any lease, contract, agreement or undertaking, or take any other action, that would impair or conflict with any Grantor's obligations hereunder or the rights or remedies of the Collateral Agent hereunder.

Each Grantor hereby agrees that if such Grantor shall at any time be the issuer of a Pledged Interest constituting an Uncertificated Security for purposes of Article 8 of the UCC, (i) such Grantor shall comply with all instructions originated by the Collateral Agent with respect to such Pledged Interest without any further consent by the registered owner of such Pledged Interest. Each Grantor agrees In addition, each Grantor hereby (i) consents to the grant by each other Grantor of a security interest in and continuing Lien upon all Investment Property (to the extent constituting Collateral) to the Collateral Agent, for the benefit of the Secured Parties, and, without limiting the generality of the foregoing, hereby consents to the transfer of any Equity Interests to the Collateral Agent or its nominee following an Event of Default and to the substitution of the Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto, and (ii) consents to the creation, perfection and/or first priority status of the security interest of the Collateral Agent, for the benefit of the Secured Parties, in the Pledged Interests, and consents to the exercise by the Collateral Agent and the other Secured Parties of the voting or other rights provided for in this Agreement with respect to such Pledged Interests or the exercise of remedies in respect thereof.

Section 4.02    Intellectual Property.   Whenever any Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Material

15

DEBTORSLCC_106053

Intellectual Property, such Grantor shall promptly (and in no event later than 10 days after such filing) (a) notify the Collateral Agent in writing of such filing and provide a copy thereof and (b) execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as may be necessary or as the Collateral Agent may reasonably request to evidence the Collateral Agent's and the other Secured Parties' security interest in any such Intellectual Property, including the goodwill and general intangibles of the Grantors relating thereto or represented thereby. For the purpose of enabling the Collateral Agent to exercise rights and remedies hereunder and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, royalty-free, non-exclusive world-wide license to use, assign, license or sublicense any of the Intellectual Property now owned or hereafter acquired by such Grantor.

Section 4.03    Letter-of-Credit Rights.

(a)      Each Grantor, by granting a security interest in its Letters of Credit Letter-of-Credit Rights to the Collateral Agent, intends to (and hereby does) collaterally assign to the Collateral Agent its rights (including its contingent rights ) to the Proceeds of all Letters of Credit Letter-of-Credit Rights of which it is or hereafter becomes a beneficiary or assignee. If any Grantor is at any time a beneficiary under a Letter of Credit now or hereafter issued with a face amount greater than $250,000 individually or in the aggregate for all Grantors, such Grantor will promptly notify the Collateral Agent and the Lenders thereof in writing and, at the request of the Collateral Agent, cause the issuer of each Letter of Credit and each nominated person (if any) with respect thereto to consent to an assignment to the Collateral Agent, for the benefit of the Secured Parties, of the proceeds of any drawing under such Letter of Credit pursuant to a consent agreement in form and substance reasonably satisfactory to the Collateral Agent and deliver written evidence of such consent to the Collateral Agent (with a copy to the Lenders).

(b)      Upon the occurrence of an Event of Default, each Grantor will, promptly upon request by the Collateral Agent  (i) notify (and such Grantor hereby authorizes the Collateral Agent to notify) the issuer and each nominated person with respect to such Letters of Credit that the Proceeds thereof have been assigned to the Collateral Agent hereunder and any payments due or to become due in respect thereof are to be made directly to the Collateral Agent for the benefit of the Secured Parties and (ii) arrange for the Collateral Agent to become the transferee beneficiary of each such Letter of Credit.

Section 4.04    Commercial Tort Claims.   If any Grantor shall obtain an interest in any Commercial Tort Claim with a potential value in excess of $250,000 individually or in the aggregate for all Grantors, such Grantor shall promptly (and in any event within three Business Days of obtaining such interest) deliver to the Collateral Agent (with a copy to the Lenders) a supplement to this Agreement in form and substance reasonably satisfactory to Collateral Agent, together with all supplements to schedules hereto identifying and describing such Commercial Tort Claim.

Section 4.05    Electronic Chattel Paper and Transferable Records.   If any Grantor at any time holds or acquires an interest in any Electronic Chattel Paper or any "transferable record," as that term is defined in Section 201 of the U.S. Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the U.S. Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, with a value in excess of $250,000 individually or in the aggregate for all Grantors, such Grantor shall promptly notify the Collateral Agent and the Lenders in writing thereof and shall take such actions as the Collateral Agent  may reasonably request to vest in the Collateral Agent, for the benefit of the Secured Parties, control under Section 9-105 of the UCC of such Electronic Chattel Paper or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

16

DEBTORSLCC_106054

Section 4.06    Other Financing Statements and Liens. Except with respect to Excluded Property or Collateral encumbered by Permitted Prior Liens, without the prior written consent of the Collateral Agent, no Grantor shall file or authorize to be filed in any jurisdiction, any effective Financing Statement or like instrument with respect to the Collateral in which the Collateral Agent is not named as the sole secured party for the benefit of the Secured Parties.

Section 4.07    Receivables.

(a)    Each Grantor hereby covenants and agrees that, except as otherwise provided in this clause (a), it shall continue to collect, at its own expense and in the ordinary course of its business, as it determines to be prudent in its commercially reasonable judgment, all amounts due or to become due to such Grantor under its Receivables and any Supporting Obligation. Following the occurrence of and during the continuance of an Event of Default, the Collateral Agent shall have the right at any time, upon concurrent written notice to the applicable Grantor of its intention to do so (which notice shall not be required for an Event of Default under Sections 9.01(k) and (l) of the Credit Agreement), subject to the terms of the United Revolving Facility (as in existence on the date hereof) with respect to directing the proceeds of Receivables into the United Payment Account and the exercise of remedies in respect of any such Receivables, (i) to notify, or require such Grantor to notify, any Account Debtor of the Collateral Agent's security interest in the Receivables and any Supporting Obligation, (ii) to direct, or cause such Grantor to direct, such Account Debtors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent, for the benefit of the Secured Parties, and (iii) upon such concurrent notification and at the sole cost and expense of such Grantor, to enforce collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. Subject to the terms of the United Revolving Facility (as in existence on the date hereof) with respect to directing the proceeds of Receivables into the United Payment Account and the exercise of remedies in respect of any such Receivables, after receipt by the applicable Grantor of the written notice from the Collateral Agent referred to in the preceding sentence (but only to the extent such notice is required pursuant to the above provisions), any payments of Receivables received by such Grantor shall be forthwith (and in any event within three Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent, for the benefit of the Secured Parties, in an account maintained under the sole dominion and control of the Collateral Agent, for the benefit of the Secured Parties, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of the Collateral Agent on behalf of the Secured Parties and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon.

(b)    With respect to any Receivables hereafter arising in (i) that is evidenced by, or constitutes, Chattel Paper or Instruments (other than Non-Delivered Instruments), each Grantor shall cause each originally executed copy thereof to be delivered to the Collateral Agent (or its agent or designee) appropriately indorsed to the Collateral Agent or indorsed in blank, or (ii) which would constitute Electronic Chattel Paper, the Grantor shall take all steps necessary to give the Collateral Agent control over such Receivables (within the meaning of Section 9-105 of the UCC), in each case, within 30 days of such Grantor acquiring rights therein.

Section 4.08    Special Provisions Relating to Certain Collateral.

(a)    Adverse Claims. Each Grantor shall defend, all at its own cost and expense, such Grantor's title and the existence, perfection and priority of the Collateral Agent's (for the benefit of the

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106055

Secured Parties) security interests in the Collateral of such Grantor against all adverse claims (subject to any Permitted Liens).

      (b)    <u>Contracts</u>.

      (i)    At any time after the occurrence and the continuance of an Event of Default, upon the request of the Collateral Agent, each Grantor shall notify the parties to any Contract constituting Collateral that such Contract has been collaterally assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

      (ii)    In the event of a default by any Grantor in the performance of any of its obligations under any Contract constituting Collateral, or upon the occurrence or non-occurrence of any event or condition under any such Contract that would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable another party of such Contract to terminate or suspend its performance under such Contract, the Collateral Agent may (but shall not be obligated to), with prior written notice to such Grantor (it being acknowledged and agreed that the Collateral Agent shall not be required to deliver any such notice if such Grantor is the subject of Insolvency Proceedings or if the delivery of such notice is otherwise prohibited by applicable law), cure any such default or otherwise remedy such event or condition, and the fees, costs and expenses (including fees and expenses of outside counsel) of the Collateral Agent and/or the Lenders incurred in connection therewith shall be payable by or on behalf of such Grantor.

      (c)    <u>Pledged Interests</u>.

      (i)    (i)    Each Grantor hereby consents to the grant by each other Grantor of a security interest in all Pledged Interests and other Investment Property to the Collateral Agent, and to the creation, perfection and first priority status of such security interest of the Collateral Agent and, without limiting the foregoing, hereby consents to (A) the transfer of any Equity Interests to the Collateral Agent or its nominee during the continuance of an Event of Default and to the substitution of the Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto and (B) the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement with respect to such Equity Interests or the exercise of rights and remedies in respect thereof.

      (ii)    The Collateral Agent agrees that unless an Event of Default shall have occurred and be continuing, such Grantor will have the exclusive voting power and other rights with respect to the Pledged Interests, and the Collateral Agent will, upon the written request of such Grantor, promptly deliver such proxies and other documents, if any, as shall be reasonably requested by such Grantor which are necessary to allow such Grantor to exercise that voting power and other rights; <u>provided</u> that no vote shall be cast, or consent, waiver, or ratification given, or action taken by such Grantor that would be inconsistent with or violate any provision of any Loan Document.

      (iii)    Each Grantor agrees to, immediately upon the occurrence and during the continuation of an Event of Default, without any request by or notice from the Collateral Agent or any other Secured Party: (A) deliver to the Collateral Agent, for the benefit of the Secured Parties, all dividends, distributions, amounts and other property or assets (whether in cash, securities or otherwise) with respect to Investment Property, all interest, principal, other cash payments on Payment Intangibles, and all Proceeds of any of the Collateral, in each case thereafter received by such Grantor, all of which shall be held by the Collateral Agent, for the benefit of the Secured Parties, as additional Collateral; and (B) with respect to Collateral consisting of general partner interests or limited liability company interests,

<div align="center">18</div>

DEBTORSLCC_106056

promptly modify its organizational documents as may be necessary or advisable to permit the admittance of the Collateral Agent as a general partner or member, as applicable (it being understood such admittance shall not occur until notice from the Collateral Agent to the Borrower of its intention to be so admitted).

(iv)    Each Grantor agrees, immediately upon the occurrence and during continuance of an Event of Default: (A) that the Collateral Agent may exercise (to the exclusion of such Grantor) the voting power and all other incidental rights of ownership with respect to any Investment Property and such Grantor hereby grants the Collateral Agent an irrevocable proxy, exercisable under such circumstances, to vote such Investment Property; and (B) to promptly deliver to the Collateral Agent such additional proxies and other documents as may be necessary to allow the Collateral Agent to exercise such voting power.

(v)    All dividends, distributions, amounts and other property or assets, interest, principal, cash payments, Payment Intangibles and Proceeds that may at any time and from time to time be held by such Grantor, but which such Grantor is then obligated to deliver to the Collateral Agent, shall, until delivery to the Collateral Agent, be held by such Grantor separate and apart from its other property in trust for the Collateral Agent for the benefit of the Secured Parties.

(d)    Insurance.  In the event that the proceeds of any insurance claim are paid to any Grantor after the occurrence and during the continuance of an Event of Default, such proceeds shall be held in trust for the benefit of the Collateral Agent (for the benefit of the Secured Parties) and immediately after receipt thereof shall be paid to the Collateral Agent, for the benefit of the Secured Parties, for application in accordance with Section 4.13.

(e)    Vehicles, Etc. Each Grantor shall (i) promptly (and in any event no later than 10 days after acquiring an interest therein) notify the Collateral Agent and each Lender in writing if at any time it or any of its purchases or otherwise acquires any vehicle or other Equipment with a fair market value in excess of $100,000 individually or $500,000 in the aggregate that is subject to a certificate of title Law of the United States or any state thereof, (ii) within 90 days (or such longer period as the Collateral Agent may agree in its sole discretion) after the Closing Date or after the date of any purchase or other acquisition of any such vehicles or other Equipment with a fair market value in excess of $100,000 individually or $500,000 in the aggregate, deliver to the Collateral Agent or its designees the original certificate of title (if available in such state) in respect of such Equipment, together with any power of attorney or other documents necessary or appropriate for purposes of causing the Collateral Agent, for the benefit of the Secured Parties, to be named as lienholder on such certificate of title and (iii) promptly and from time to time, upon the request of the Collateral Agent or its designees, execute and deliver, and cause the recordation or registration of, any and all agreements, instruments, documents and papers as the Collateral Agent may request to notate the Secured Parties' security interest in and Lien upon such certificates of title and take such other actions reasonably requested by the Collateral Agent or its designees necessary or appropriate to enable the Collateral Agent, for the benefit of the Secured Parties, to be named as lienholder on any such certificate of title.

Section 4.09    Custody and Preservation.

(a)    Subject to applicable law, the Collateral Agent's obligation to use reasonable care in the custody and preservation of the Collateral shall be satisfied if it uses the same care as it uses in the custody and preservation of its own property. Except for the exercise of reasonable care in the custody thereof and the accounting for moneys actually received by it under the Loan Documents, the Collateral Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or

19

DEBTORSLCC_106057

any other rights pertaining thereto, and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.

(b)    The Collateral Agent shall not be responsible for (i) the existence, genuineness or value of any of the Collateral, (ii) the validity, perfection, priority or enforceability of the Liens on any of the Collateral, whether impaired by the operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes fraud, gross negligence or willful misconduct on the part of the Collateral Agent, (iii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iv) the validity of the title of any Grantor to the Collateral, (v) insuring the Collateral, (vi) the payment of taxes, charges, assessments or Liens upon the Collateral or (vii) any other maintenance of the Collateral.

Section 4.10    Rights to Preserve and Protect.  After the occurrence and during the continuation of an Event of Default, the Collateral Agent  may, but shall not be obligated to, pay or secure payment of any overdue tax or other claim that may be secured by or result in a Lien on any Collateral. After the occurrence and during the continuation of an Event of Default, the Collateral Agent may, but shall not be obligated to, do or cause to be done any other thing that is necessary or desirable to preserve, protect or maintain the Collateral. The Borrower shall promptly reimburse the Collateral Agent or any other Secured Party for any reasonable payment or expense (including reasonable fees and expenses of outside counsel) that the Collateral Agent or such other Secured Party may incur pursuant to this Section 4.10.

Section 4.11    Remedies Generally.

(a)    Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent shall have the right, but not the obligation, to exercise in respect of the Collateral, in addition to other rights, powers, privileges and remedies provided for herein or in any other Loan Document or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) or suit in equity and also shall have the right, but not the obligation, without notice to any Grantor (except as required by applicable law), to:

(i)    exercise any or all of any Grantor's rights in, to and under, or in any way connected to, the Collateral (including the performance of any Grantor's obligations, and the exercise of any Grantor's rights and remedies, under the Contracts), including the right, to the maximum extent permitted by applicable law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Collateral Agent were the sole and absolute owner thereof (and each Grantor agrees to take all such action as may be appropriate to give effect to such right);

(ii)    require each Grantor to, and each Grantor hereby agrees that it will, at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent and the other Secured Parties at a place to be designated by the Collateral Agent that is reasonably convenient to the Collateral Agent and such Grantor;

(iii)    make any reasonable compromise or settlement it deems desirable with respect to any of the Collateral and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms, of all or any part of the Collateral;

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106058

(iv)    in its name or in the name of the applicable Grantor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral;

(v)    enter onto the property where any Collateral is located, and take possession of any Collateral without demand and without legal process;

(vi)    sell, lease, license, assign or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at such place or places as the Collateral Agent may deem commercially reasonable, for cash, on credit or for future delivery (without thereby assuming any credit risk), and upon such other terms as the Collateral Agent may deem commercially reasonable, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required by applicable statute and cannot be waived). If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition. The Collateral Agent or any other Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the maximum extent permitted by applicable law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of any Grantor, any such demand, notice and right or equity being hereby expressly waived and released to the maximum extent permitted by applicable law. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned;

(vii)    appoint another Person (who may be an employee, officer or other representative of the Collateral Agent) to do any of the foregoing, or take any other action permitted hereunder, as agent for or representative of, and on behalf of, the Collateral Agent;

(viii)    to the full extent provided by law, have a court having jurisdiction appoint a receiver, which receiver shall take charge and possession of and protect, preserve and replace the Collateral or any part thereof, and manage and operate the same within the appropriate regulatory framework, and receive and collect all income, receipts, royalties, revenues, issues and profits therefrom (it being agreed that each Grantor irrevocably consents and shall be deemed to have hereby irrevocably consented to the appointment thereof, and upon such appointment, it shall immediately deliver possession of the Collateral to such receiver); and

(ix)    take any other action to the extent permitted under applicable law which the Collateral Agent deems necessary or desirable to protect or realize upon its security interest in and Lien upon the Collateral or any part thereof.

(b)    The proceeds of each collection, sale or other disposition under this Agreement shall be applied in accordance with Section 4.15.

(c)    Each Grantor recognizes that, if an Event of Default shall have occurred and be continuing and the Required Lenders have elected to accelerate the Secured Obligations, the Collateral Agent may elect to sell all or any part of the Collateral to one or more purchasers in privately negotiated transactions in which the purchasers will be obligated to agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale (including a public offering made pursuant to a registration

21

DEBTORSLCC_106059

statement under the Securities Act), and each Grantor and the Collateral Agent agree that such private sales shall be made in a commercially reasonable manner and that the Collateral Agent has no obligation to engage in public sales and no obligation to delay sale of any Collateral to permit the issuer thereof to register the Collateral for a form of public sale requiring registration under the Securities Act. If the Secured Parties exercise their right to sell any or all of the Collateral, upon written request, the Grantors shall, from time to time, furnish to the Collateral Agent all such information as is necessary in order to determine the Collateral and any other instruments included in the Collateral which may be sold by the Collateral Agent as exempt transactions under the Securities Act and rules of the United States Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d)    The Collateral Agent shall within a reasonable period of time thereafter give the Grantors notice of any action taken under this Section 4.11; provided, however, that (i) failure to give such notice shall have no effect on the rights of the Collateral Agent hereunder and (ii) the Collateral Agent shall not be required to deliver any such notice if any Grantor is the subject of Insolvency Proceedings or if the delivery of such notice is otherwise prohibited by applicable law.

Section 4.12    Deficiency.  If the proceeds of sale, collection or other realization of or upon the Collateral by virtue of the exercise of remedies under Section 4.11 are insufficient to cover the costs and expenses of such realization to the extent reimbursable under the Credit Agreement and Payment in Full, the Collateral Agent and the other Secured Parties shall retain all rights and remedies under the Loan Documents and each Grantor shall remain liable, with respect to any deficiency to the extent such Grantor is obligated under this Agreement and the other Loan Documents.

Section 4.13    Change of Name or Location.  No Grantor will change its name from the name or its jurisdiction of incorporation or formation or its federal taxpayer identification number, except in each case upon at least 10 days' prior written notice to the Collateral Agent (or such shorter time that is acceptable to the Collateral Agent) (with a copy to the Lenders); provided that no Grantor shall effect any such change until all necessary steps have been taken to maintain the perfection, validity and priority of the Liens granted or purported to be granted herein or in any other Security Document.

Section 4.14    Private Sale.  The Collateral Agent and the other Secured Parties shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 4.11 conducted in a commercially reasonable manner. Subject to without limiting the preceding sentence, each Grantor hereby waives, to the maximum extent permitted under applicable law, any claims against the Collateral Agent or any other Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale to an unrelated third party was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

Section 4.15    Application of Proceeds.

(a)    The Proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by the Collateral Agent under this Article IV with respect to the Collateral, shall be held by the Collateral Agent as Collateral hereunder for the benefit of the Secured Parties and shall be applied by the Collateral Agent to the payment of the Secured Obligations in the order specified in Section 9.02(e) of the Credit Agreement.

(b)    No sale or other disposition of all or any part of the Collateral pursuant to Section 4.11 shall be deemed to relieve any Grantor of its obligations under any Loan Document, except to the extent the cash proceeds thereof are actually applied to the indefeasible payment of such obligations.

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106060

(c)    The Collateral Agent or any other Secured Party may be a purchaser of the Collateral or any part thereof or any right or interest therein at any sale thereof, whether pursuant to foreclosure, power of sale or otherwise hereunder and the Collateral Agent may apply the purchase price to the payment of the applicable Secured Obligations. Any purchaser of all or any part of the Collateral shall, upon any such purchase, acquire good title to the Collateral so purchased, free of the Liens created by this Agreement.

Section 4.16    Attorney-in-Fact.

(a)    Without limiting any rights or powers granted by this Agreement to the Collateral Agent, each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, at the Grantors' sole cost and expense, for the purpose of carrying out the provisions of this Agreement upon the occurrence and during the continuation of an Event of Default, or otherwise as contemplated by Sections 4.08 and 5.01, to (a) take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of this Agreement (including taking actions under any consent delivered as required by the Loan Documents), (b) preserve the validity, perfection and priority of the Liens granted by this Agreement and (c) exercise its rights, remedies, powers and privileges under this Agreement (including taking actions under any consent delivered as required by the Loan Documents). This appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, upon the occurrence and during the continuation of an Event of Default (or as otherwise provided in Section 4.08 or 5.01) to:

(i)    ask, demand, collect, sue for, recover, receive and give receipt and discharge for amounts due and to become due under and in respect of all or any part of the Collateral;

(ii)    in the name of such Grantor or its own name or otherwise, take possession of, receive and indorse and collect any check, Account, Chattel Paper, draft, note, acceptance or other Instrument for the payment of moneys due under any Account or general intangible;

(iii)    file any claims or take any other action that the Collateral Agent may deem necessary or advisable for the collection of all or any part of the Collateral;

(iv)    execute, subject to any required regulatory approval, in connection with any sale or disposition of the Collateral under this Agreement, any endorsements, assignments, bills of sale or other instruments of conveyance or transfer with respect to all or any part of the Collateral;

(v)    pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral (other than Permitted Liens which are superior or pari passu with the Liens created under the Loan Documents, except for Permitted Prior Liens), effect any repair or pay or discharge any insurance called for by the terms of this Agreement or the other Loan Documents (including all or any part of the premiums therefor and the costs thereof);

(vi)    direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct;

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106061

(vii)    sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice or other document in connection with any Collateral;

(viii)    commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral;

(ix)    defend any suit, action or proceeding brought against any Grantor with respect to any Collateral;

(x)    settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate;

(xi)    cure any default by any Grantor under any Contract; and

(xii)    subject to any required regulatory approval, generally, sell, transfer, pledge, assign, license, sublicense, execute, deliver, record and make any agreement, instrument, document or paper with respect to or otherwise deal with any Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and the Grantors' expense, at any time, or from time to time, all acts and things that the Collateral Agent reasonably deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and the other Secured Parties' Liens thereon and to effect the intent of this Agreement, all as fully and effectively as the Grantors might do.

(b)    Each Grantor hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof, in each case pursuant to the powers granted hereunder. Upon the occurrence and during the continuation of an Event of Default (or as otherwise provided in Section 4.08 or 5.01), each Grantor hereby acknowledges and agrees that the Collateral Agent shall have no fiduciary duties to any Grantor in acting pursuant to this power of attorney, and each Grantor hereby waives any claims or rights of a beneficiary of a fiduciary relationship hereunder.

Section 4.17    Financing Statement; Other Filings.    Without relieving its obligations under Section 4.01 or elsewhere in this Agreement, each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file (but the Collateral Agent shall not be so obligated to file) such Financing Statements (including fixture filings, continuation statements and amendments thereto) in such offices as are or shall be necessary or appropriate to create, perfect and establish the priority of the Liens granted by this Agreement in any and all of the Collateral, to preserve the validity, perfection or priority of the Liens granted by this Agreement in any and all of the Collateral and/or to enable the Collateral Agent to exercise its remedies, rights, powers and privileges under this Agreement. Such Financing Statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes the Collateral in any other manner as the Collateral Agent may determine is necessary, advisable or prudent to ensure the perfection of the security interests in the Collateral granted to the Collateral Agent hereunder, including describing such property as "all of the Debtor's personal property or assets, whether now owned and existing or hereafter acquired or arising" or words to that effect, and, in the case of a Financing Statement filed as a fixture filing or covering Collateral constituting As-Extracted Collateral, including a sufficient description of the Real Property to which such Collateral relates. Each Grantor agrees to provide all such information to the Collateral Agent and the Lenders promptly upon request. Each Grantor hereby further authorizes the Collateral Agent to file (but the Collateral Agent shall not be so obligated to file) filings with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any

24

DEBTORSLCC_106062

similar office in any other country), including this Agreement, or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted or purported to be granted by such Grantor hereunder, without the signature of such Grantor, and naming such Grantor, as debtor, and the Collateral Agent, as secured party.

Section 4.18    Consents.  Upon the occurrence and during the continuance of an Event of Default, in the event that the Collateral Agent desires to exercise any remedies, any voting, consensual or other rights, or any attorney-in-fact powers set forth in this Agreement or otherwise available under applicable law and the Collateral Agent determine it necessary or advisable to obtain any approvals, authorization or consents of any Official Body, landlord, lessor, contract counterparty or any other Person therefor, then, upon the request of the Collateral Agent, such Grantor agrees to assist and aid the Collateral Agent and the Lenders to obtain as soon as practicable any such approvals, authorizations or consents.

Section 4.19    Partial Release of Liens.  If any of the Collateral shall be sold or disposed of to any Person in a transaction expressly permitted by, or otherwise consented to in writing by the Required Lenders pursuant to, the Loan Documents, such Collateral shall be automatically released from the Liens created hereunder subject to Section 11.17 of the Credit Agreement.

### ARTICLE V
### MISCELLANEOUS

Section 5.01    Collateral Agent's Right to Perform.  If any Grantor shall fail to observe or perform any of the terms, conditions, covenants and agreements to be observed or performed by it under this Agreement, the Collateral Agent may (but shall not be obligated to), upon reasonable notice to such Grantor, cause such terms, conditions, covenants and agreements to be done or performed or observed by experts, agents or attorneys, with reasonable care at the sole cost and expense of such Grantor, either in the Collateral Agent's name or in the name and on behalf of such Grantor, and each Grantor hereby authorizes the Collateral Agent so to do.

Section 5.02    Further Assurances.  Each Grantor agrees that, from time to time at the expense of such Grantor, it will promptly execute and deliver all further instruments and documents, and take all further action (including, without limitation, provide such information to the Collateral Agent in connection with any Financing Statements, amendments or continuations thereto, registrations and other filings), that may be necessary or desirable, or that the Collateral Agent may reasonably request, in order to create, perfect, protect, preserve, maintain or continue, and/or maintain the validity, perfection or priority of, any security interest granted or purported to be granted hereby or to enable the Collateral Agent or the other Secured Parties to exercise and enforce their rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor will:

(a)    from time to time upon the reasonable request of the Collateral Agent, promptly deliver to the Collateral Agent such stock powers, instruments, control agreements and similar documents, satisfactory in form and substance to the Collateral Agent, with respect to such Collateral as the Collateral Agent may request and will, from time to time upon the request of the Collateral Agent, after the occurrence and during the continuance of any Event of Default, promptly transfer any securities constituting Collateral into the name of any nominee designated by the Collateral Agent;

(b)    file (and hereby irrevocably authorizes the Collateral Agent or its designee for such purpose to at any time and from time to time file) such Financing Statements or continuation statements, or amendments thereto, and such other instruments or notices (including any assignment of claim form under or pursuant to the federal assignment of claims statute, 31 U.S.C. § 3726, any successor

25

DEBTORSLCC_106063

or amended version thereof or any regulation promulgated under or pursuant to any version thereof), record security interests in Intellectual Property and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or desirable, or as the Collateral Agent may reasonably request, in order to effect, reflect, perfect and preserve the security interests and other rights granted or purported to be granted hereby;

(c)    deliver to the Collateral Agent (for the benefit of the Secured Parties), at the request of the Collateral Agent (acting at the direction of the Secured Parties), all Investment Property, including all dividends, distributions, cash, securities, instruments and other property or proceeds of any kind relating thereto (but only in the case of the occurrence and continuation of an Event of Default), and all interest and principal with respect to promissory notes and other Instruments (but only in the case of the occurrence and continuation of an Event of Default), and all Proceeds and rights from time to time received by or distributable to such Grantor in respect of any of the foregoing Collateral;

(d)    take all actions necessary and reasonably requested by the Collateral Agent to ensure the recordation of appropriate evidence of the Liens and security interests granted or purported to be granted hereunder in any Material Intellectual Property with any intellectual property registry in which said Intellectual Property is registered or issued or in which an application for registration or issuance is pending, including the United States Patent and Trademark Office the United States Copyright Office, the various Secretaries of State, and the foreign counterparts on any of the foregoing;

(e)    at any reasonable time after the occurrence and during the continuance of an Event of Default, upon request by the Collateral Agent, assemble the Collateral and allow inspection of the Collateral by the Collateral Agent or any other Secured Party, or persons designated by the Collateral Agent or any such other Secured Party;

(f)    upon the occurrence and during the continuation of any Event of Default, promptly notify (and each Grantor hereby authorizes and irrevocably instructs the Collateral Agent to so notify) each Account Debtor that the applicable Collateral has been assigned to the Collateral Agent, for the benefit of the Secured Parties, hereunder, and that any payments due or to become due in respect of such Collateral are to be made directly to the Collateral Agent, for the benefit of the Secured Parties, with a copy of such notice to the applicable Grantor;

(g)    upon the reasonable request of the Collateral Agent, furnish to the Collateral Agent (with a copy to the Lenders) from time to time statements and schedules further identifying and describing the assets and properties of such Grantor and such other reports in connection therewith that the Collateral Agent may reasonably request, all in reasonable detail;

(h)    not take or omit to take any action the taking or the omission of which would result in any impairment or alteration of any obligation of the maker of any Payment Intangible or other Instrument;

(i)    not create any Tangible Chattel Paper without placing a legend on such Tangible Chattel Paper reasonably acceptable to the Collateral Agent indicating that the Collateral Agent, for the benefit of the Secured Parties, has a security interest in such Tangible Chattel Paper;

(j)    at the Collateral Agent's request, appear in and defend any action or proceeding that may affect any Grantor's title to or the Collateral Agent's security interest in all or any part of the Collateral;

26

DEBTORSLCC_106064

(k)    do all things reasonably requested by the Collateral Agent in order to enable the Collateral Agent to have and maintain control over the Collateral consisting of Investment Property, Deposit Accounts, Securities Accounts, Letter-of-Credit-Rights and Electronic Chattel Paper; and

(l)    furnish the Collateral Agent with such information regarding the Collateral, including the location thereof, as the Collateral Agent may reasonably request from time to time.

Section 5.03    Set-Off.  In addition to any rights and remedies of the Secured Parties provided by law, each Secured Party shall have the right, without notice to any Grantor, any such notice being expressly waived by the Grantors to the fullest extent permitted by applicable law, upon any Secured Obligations becoming due and payable by such Grantor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Secured Obligations, by set-off or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Party, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of such Grantor. Each Secured Party agrees promptly to notify such Grantor and the Collateral Agent after any such application made by such Secured Party, provided that the failure to give such notice shall not affect the validity of such application.

Section 5.04    No Waiver; Remedies Cumulative.

(a)    No failure or delay of the Collateral Agent or any other Secured Party in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce any such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

(b)    The rights and remedies of the Collateral Agent and the other Secured Parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.

Section 5.05    Notices.  All notices, requests and demands to or upon the Collateral Agent or each Grantor hereunder shall be effected in the manner provided for, and (except as otherwise notified in writing by one party to the other) to the addresses referred to, in Section 11.05 of the Credit Agreement.

Section 5.06    Amendments.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 11.01 of the Credit Agreement.

Section 5.07    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each of the Grantors and shall inure to the benefit of the Collateral Agent and the Secured Parties and their respective successors and assigns; provided that (a) no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Collateral Agent, (b) the Collateral Agent shall only transfer or assign its rights under this Agreement in connection with a resignation or removal of such Person from its capacity as "Collateral Agent" in accordance with the terms of this Agreement and the Credit Agreement, and (c) the Collateral Agent may delegate certain of its responsibilities and powers under this Agreement as contemplated by Section 5.11 hereof and Section 10.05 of the Credit Agreement.

Section 5.08    Survival; Reliance.  The representations and warranties of the Grantors set out in this Agreement or contained in any documents delivered to the Collateral Agent or any other Secured Party pursuant to this Agreement shall be considered to have been relied upon by the Secured Parties in

27

DEBTORSLCC_106065

entering into the Loan Documents and extending the credit or otherwise performing the transactions thereunder, notwithstanding any investigation on their respective parts.

Section 5.09    Effectiveness; Continuing Nature of Agreement.  This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and any Secured Party may continue, at any time and without notice to any other Person, to extend credit and other financial accommodations and lend monies to or for the benefit of the Grantors constituting Secured Obligations in reliance hereof. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceedings. All references to the Grantors shall include each Grantor as debtor and debtor-in-possession and any receiver or trustee for each Grantor (as the case may be) in any Insolvency Proceedings.

Section 5.10    Entire Agreement.  This Agreement, together with other agreements attached hereto or referred to herein and the other Loan Documents, constitute the entire contract between the parties relative to the subject matter hereof. Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.

Section 5.11    Agents.  The Collateral Agent may employ agents, experts and attorneys-in-fact in connection herewith.

Section 5.12    Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 5.13    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective when executed and delivered by each Person intended to be a party hereto. Delivery of an executed counterpart to this Agreement by facsimile transmission or ".pdf" electronic format shall be as effective as delivery of a manually signed original.

Section 5.14    Interpretation.  The section headings in this Agreement are for the convenience of reference only and shall not affect the meaning or construction of any provision hereof.

Section 5.15    GOVERNING LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT THE PERFECTION, EFFECT OF PERFECTION OR NON-PERFECTION, AND PRIORITY OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 5.16    Submission to Jurisdiction; Waivers.

(a)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any

28

DEBTORSLCC_106066

judgment, and each of the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in such New York state court or, to the extent permitted by law, in such federal court. Each party hereto further irrevocably consents to the service of process in any action or proceeding in such courts in any manner permitted by applicable Law. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or federal court. Each party hereto hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party hereto hereby agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address referred to in Section 11.05 of the Credit Agreement or at such other address of which the Collateral Agent shall have been notified pursuant hereto.

(d)     Each party hereto hereby agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Law or shall limit the right to sue in any other jurisdiction.

(e)     Each Grantor hereby irrevocably and unconditionally waives, to the maximum extent not prohibited by Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

Section 5.17     Acknowledgements.  Each Grantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     no Secured Party has any fiduciary relationship with or fiduciary duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Secured Parties, on the one hand, and the Grantors, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

Section 5.18     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND

29

DEBTORSLCC_106067

THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 5.18</u>.

Section 5.19   <u>Termination</u>. Upon Payment in Full, and subject to <u>Section 5.20</u>, this Agreement and the Liens created pursuant to this Agreement shall automatically be terminated and released and the remaining Collateral shall automatically revert to the Grantors with no further action on the part of any Person, and upon written notice of such termination from the Collateral Agent, at the sole cost and expense of the Grantors, and without representation or warranty whatsoever by, and without recourse to, the Collateral Agent or any other Secured Party, the Collateral Agent shall (a) return to each Grantor the Pledged Interests and any other possessory Collateral then in the possession of the Collateral Agent as part of the collateral security for the Secured Obligations in accordance with the provisions of this Agreement, and (b) execute and deliver all such documentation, and authorize the filing of UCC termination statements, in each case, as are necessary or as the Grantors may reasonably request in order to release the Liens created pursuant to this Agreement.

Section 5.20   <u>Reinstatement</u>.   This Agreement and the Liens created hereunder shall automatically be reinstated if and to the extent that for any reason any payment by or on behalf of any Grantor in respect of the Secured Obligations is rescinded or revoked or must otherwise be returned or restored by any Secured Party, whether as a result of any Insolvency Proceedings or reorganization or otherwise, and each Grantor shall indemnify the Collateral Agent, each other Secured Party and their respective employees, directors, officers, representatives and agents on demand for all fees, costs and expenses (including fees, costs and expenses of counsel) incurred by the Collateral Agent, such other Secured Party or their respective employees, directors, officers, representatives or agents in connection with such reinstatement, rescission, revocation, return or restoration. The provisions of this <u>Section 5.20</u> shall survive the termination of this Agreement and Payment in Full.

Section 5.21   <u>Impairment</u>. Nothing in this Agreement shall impair, as between the Borrower and the Collateral Agent and the other Secured Parties, the obligations of the Borrower to pay principal, interest, fees and other amounts as provided in the Loan Documents or as between the Grantors (other than the Borrower) and the Collateral Agent and the other Secured Parties, the obligations of such Grantors to pay amounts payable pursuant to the Guaranty Agreement.

Section 5.22   <u>Collateral Agent</u>. Notwithstanding anything herein to the contrary, the Collateral Agent shall be afforded all of the rights, powers, immunities and indemnities of the Collateral Agent set forth in the Loan Documents, as if such rights, powers, immunities and indemnities were specifically set forth herein. The Grantors hereby acknowledge the appointment of the Collateral Agent pursuant to the Credit Agreement. The rights, privileges, protections and benefits given to the Collateral Agent, including its right to be indemnified, are extended to, and shall be enforceable by, the Collateral Agent in its capacity hereunder, and to each agent, custodian and other Person employed by the Collateral Agent in accordance herewith to act hereunder.

Section 5.23   <u>Additional Grantors</u>. Upon the execution and delivery to the Collateral Agent by any other Person of a supplement in the form of <u>Exhibit A</u>, such Person shall become a "Grantor" hereunder with the same force and effect as if it were originally a party to this Agreement and named as a "Grantor" hereunder. The execution and delivery of such supplement shall not require the consent of any other Grantor hereunder, and the rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

[Signature Pages Follow]

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106068

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective duly authorized representatives as of the day and year first above written.

**BLACKJEWEL L.L.C.**, as a Grantor

By: _____
Name: _____
Title: _____

**BLACKJEWEL HOLDINGS L.L.C.**, as a Grantor

By: _____
Name: _____
Title: _____

**DOMINION COAL CORPORATION**, as a Grantor

By: _____
Name: _____
Title: _____

**OMEGA MINING, LLC**, as a Grantor

By: _____
Name: _____
Title: _____

**VANSANT COAL CORPORATION**, as a Grantor

By: _____
Name: _____
Title: _____

**HAROLD KEENE COAL CO. LLC**, as a Grantor

By: _____
Name: _____
Title: _____

Signature Page
Pledge and Security Agreement

DEBTORSLCC_106069

**ENERGY RESOURCES, LLC**, as a Grantor

By: _____

Name: _____

Title: _____

Signature Page
Pledge and Security Agreement

001470-0043-16679-Active.21916891.8

**RIVERSTONE CREDIT PARTNERS –
DIRECT, L.P.**, as  Collateral Agent

By:     _____
Name:   _____
Title:  _____

Signature Page
Pledge and Security Agreement

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106071

EXHIBIT A
to Pledge and Security Agreement

## SUPPLEMENT TO
## PLEDGE AND SECURITY AGREEMENT

This **SUPPLEMENT**, dated as of _____ ___, _____ (this "Supplement"), is to the Pledge and Security Agreement, dated as of July 17, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among the Grantors (such term, and other terms used in this Supplement, to have the meanings set forth in Article I of the Security Agreement) from time to time party thereto, in favor of RIVERSTONE CREDIT PARTNERS - DIRECT, L.P., as the Collateral Agent under the Security Agreement (in such capacity, together with its successors and permitted assigns from time to time acting as Collateral Agent under such Security Agreement, the "Collateral Agent").

## WITNESSETH:

WHEREAS, pursuant to the terms, conditions and provisions of the Credit Agreement, dated as of July 17, 2017 (as amended, amended and restated, supplemented, refinanced, replaced or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, Holdings, the financial institutions from time to time party thereto as Lenders (as such terms are defined in the Credit Agreement), the Collateral Agent and the other agents party thereto, the Lenders have agreed to make Loans to the Borrower;

WHEREAS, pursuant to the provisions of Section 8.01(j) of the Credit Agreement and Section 5.23 of the Security Agreement, each of the undersigned is becoming a Grantor under the Security Agreement;

WHEREAS, each of the undersigned desires to become a "Grantor" under the Security Agreement in order to induce the Lenders to continue to extend Loans under the Credit Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the undersigned agrees, for the benefit of each Secured Party, as follows.

SECTION 1. Party to Security Agreement, etc.  In accordance with the terms of the Security Agreement, by its signature below each of the undersigned hereby irrevocably agrees to become a Grantor under the Security Agreement with the same force and effect as if it were an original signatory thereto and each of the undersigned hereby (a) agrees to be bound by and comply with all of the terms and provisions of the Security Agreement applicable to it as a Grantor and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct in all material respects as of the date hereof, as if made on the date hereof. In furtherance of the foregoing, each reference to a "Grantor" and/or "Grantors" in the Security Agreement shall be deemed to include each of the undersigned.

SECTION 2. Grant of Security Interest.  Each Grantor hereby grants to Riverstone Credit Partners – Direct, L.P., as Collateral Agent, for its benefit and the benefit of each other Secured Party, a continuing security interest in and Lien upon all of such Grantor's rights, title and interest in and to the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties.

SECTION 3. Representations.  Each of the undersigned Grantor hereby represents and warrants that this Supplement has been duly authorized, executed and delivered by it and that this Supplement and

Exhibit A - 1

DEBTORSLCC_106072

the Security Agreement constitute the legal, valid and binding obligation of each of the undersigned, enforceable against it in accordance with its terms.

SECTION 4.  Full Force of Security Agreement.  Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect in accordance with its terms.

SECTION 5.  Severability.  Wherever possible each provision of this Supplement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Supplement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Supplement or the Security Agreement.

SECTION 6.  Governing Law, Entire Agreement, etc.  This Supplement and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto. The provisions of Sections 5.15, 5.16, 5.17 and 5.18 of the Security Agreement are hereby incorporated by this reference, mutatis mutandis, and shall apply to this Supplement as if fully set forth herein.

SECTION 7.  Counterparts.  This Supplement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

* * * * *

DEBTORSLCC_106073

IN WITNESS WHEREOF, the parties have caused this Supplement to be duly executed by their respective duly authorized representatives as of the day and year first above written.

**BLACKJEWEL L.L.C.**, as a Grantor

By: _____
Name: _____
Title: _____

**BLACKJEWEL HOLDINGS L.L.C.**, as a Grantor

By: _____
Name: _____
Title: _____

**DOMINION COAL CORPORATION**, as a Grantor

By: _____
Name: _____
Title: _____

**OMEGA MINING LLC**, as a Grantor

By: _____
Name: _____
Title: _____

**VANSANT COAL CORPORATION**, as a Grantor

By: _____
Name: _____
Title: _____

**HAROLD KEENE COAL CO. LLC**, as a Grantor

By: _____
Name: _____
Title: _____

Exhibit A - 3

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106074

**ENERGY RESOURCES, LLC**, as a Grantor

By:     _____

Name:   _____

Title:  _____

Exhibit A - 4

DEBTORSLCC_106075

**RIVERSTONE CREDIT PARTNERS –
DIRECT, L.P.**, as Collateral Agent

By: _____
Name: _____
Title: _____

Exhibit A - 5

DEBTORSLCC_106076

**Schedule 1**
**Instruments and Chattel Paper**

None.

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106077

**Schedule 2**
**Pledged Interests**

Part A:

| Grantor | Pledged Entity | Type of Interest | % of Interests Owned & Pledged | Certificate Number |
|---------|----------------|------------------|-------------------------------|--------------------|
| BlackJewel Holdings L.L.C. | BlackJewel L.L.C. | Membership Interest | 100% | Uncertificated |
| BlackJewel L.L.C. | Dominion Coal Corporation | Capital Stock | 100% | Uncertificated |
| BlackJewel L.L.C. | Omega Mining LLC | Membership Interest | 100% | Uncertificated |
| BlackJewel L.L.C. | Vansant Coal Corporation | Capital Stock | 100% | Uncertificated |
| BlackJewel L.L.C. | Harold Keen Coal Co. LLC | Membership Interest | 100% | Uncertificated |
| Harold Keen Coal Co. LLC | Energy Resources, LLC | Membership Interest | 100% | Uncertificated |

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106078

**Schedule 3**
**Locations of Inventory and Equipment**

BL-1: 16974 Greasy Creek Road, Big Laurel KY 40808

Hignite: 6340 West Cumberland Ave., Middlesboro, KY 40965

Shamrock: 4901 Hwy 421 South, Helton, KY 40840

Clover: 2527 W. Hwy 221, Bledsoe, KY 40810

DEBTORSLCC_106079

**Schedule 4**
**Grantor Information**

Part A.    <u>Location of each Grantor.</u>

| Name of Grantor: | Location for purposes of UCC: |
|---|---|
| BlackJewel Holdings L.L.C. | Delaware |
| BlackJewel L.L.C. | Delaware |
| Dominion Coal Corporation | Virginia |
| Omega Mining LLC | Virginia |
| Vansant Coal Corporation | Virginia |
| Harold Keene Coal Co. LLC | Virginia |
| Energy Resources, LLC | Virginia |

Part B.    <u>Trade Names; Locations of Books/Records</u>

None.

Locations:

1051 Main St., Milton, West Virginia 25541

Part C.    <u>Legal Names; Merger or other corporate reorganization.</u>

| Grantor | Date of Change | Description of Change |
|---|---|---|
| Omega Mining LLC | December 22, 2015 | Converted from corporation formerly known as Omega Mining, Inc. |
| Harold Keene Coal Co., LLC | December 22, 2015 | Converted from corporation formerly known as Harold Keene Coal Co., Inc. |

Part D.    <u>Taxpayer ID numbers.</u>

| Name of Grantor: | Taxpayer ID numbers: |
|---|---|
| Blackjewel Holdings, L.L.C. | 26-3810823 |
| Blackjewel, L.L.C. | 30-0544745 |
| Dominion Coal Corporation | 54-0572957 |
| Omega Mining LLC | 84-1648872 |
| Vansant Coal Corporation | 54-0572785 |
| Harold Keene Coal Co. LLC | 54-1296749 |
| Energy Resources, LLC | 61-1264415 |

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106080

**Schedule 5**
**Commercial Tort Claims**

None.

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106081

**Schedule 6**
**Letters of Credit**

None.

DEBTORSLCC_106082

**Schedule 7**
**Deposit Accounts, Securities Accounts and Commodity Accounts**

Part A.    Deposit Accounts

| Grantor | Name of Depositary Bank | Account Number | Account Name |
|---|---|---|---|
| Blackjewel L.L.C. | United Bank | 85663190 | MR Lock Box Account |
| Blackjewel L.L.C. | United Bank | 85733238 | RCP Blocked Account |
| Blackjewel L.L.C. | United Bank | 87767953 | Blackjewel Operating Account |

Part B.    Securities Accounts and Commodity Accounts

Securities Accounts:    None

| Grantor | Name of Securities Intermediary | Account Number | Account Name |
|---|---|---|---|
| None | | | |

Commodity Accounts:    None

| Grantor | Name of Commodity Intermediary | Account Number | Account Name |
|---|---|---|---|
| None | | | |

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106083

## Schedule 8
## Certain Assets Subject to Certificates of Title

| | | | |
|---|---|---|---|
| M8 | 2007 KENWORTH T300 | 2NKMHD7X37M166044 | Title |
| M14 | 2005 FREIGHTLINER GREASE TRUCK | 1FVACXDCX5HU71806 | Title |
| ST4 | SWEEPER TRUCK | 1HTSCABN4XH613610 | Title |
| WT6 | GMC 7500 Water Truck | 1G0L7H1C5XJ514149 | Title |
| M5 | MACK GU713 | 1M2AX04C2AM008370 | Title |
| M7 | 2005 KENWORTH T300 | 2NKMHD7X95M097759 | Title |
| M9 | GREASE TRUCK | 1M2AX04C2AM008367 | Title |
| M11 | MACK GU713 | 1M2AXO4COAM008142 | Title |
| ST5 | 2001 FREIGHTLINER SWEEPER TRUCK | 1FVABTBV01HH57967 | Title |
| HS2 | PETERBILT HYDROSEED TRUCK | 1XP9DB9X7EN163339 | Title |
| M13 | 1999 RD888 LUBE TRUCK | 1M2P278C6XM002141 | Title |
| M24 | MACK GU713 LUBE TRUCK | 1M2AX07C9CM010650 | Title |
| M27 | PETERBILT MECHANIC TRUCK | 2NPLHD7X37M681406 | Title |
| M28 | MACK RD888 LUBE TRUCK | 1M237C12M002347 | Title |
| WT15 | 1988 MACK RD888 WATER TRUCK | 1M2P190C6JW001089 | Title |
| M12 | 2011 MACK GRANITE GREASE TRUCK | 1M2AX07C7CM010680 | Title |
| M16 | 2009 PETERBILT MECHANIC TRUCK (JR TAYLOR) | 2NPLHN7X89M777492 | Title |
| M48 | INTERNATIONAL 4900 | 1HTSOAAN01H340056 | Title |
| TK3 | MACK RD688S | 1M2P270Y3NM011576 | Title |
| M49 | GMC C7500 | 1GDM7H1C9YJ504911 | Title |
| TK4 | MACK RD688SX | 1M2P271C3MM009716 | Title |
| M50 | FREIGHTLINER FL70 | 1FV6HLBAOTL716608 | Title |
| TK5 | MACK RD888SX | 1M2P282C5PM001657 | Title |
| M51 | INTERNATIONAL 4900 | 1HTSDAANOWH515364 | Title |
| TK6 | AUTOCAR ACL64B | 4V25CBBE9MV508872 | Title |
| M52 | INTERNATIONAL 4900 | 1HTSDAAN71H373068 | Title |
| TR1 | BENSON COAL TRAILER | 1NUDT38N4YMAS0632 | Title |
| M53 | INTERNATIONAL 4900 | 1HTSDZ4PXMH333406 | Title |
| TK8 | MACK DM886SX | 1M2B128C5EA010116 | Title |
| TR4 | FRUEHAUF FLATBED | TNCVE001102129RS | Title |
| M4 | MACK FUEL/LUBE TRUCK | 1M2AX07C2AM008168 | Title |
| M22 | 2007 FREIGHTLINER GREASE TRUCK | 1FVACXDC07HX41533 | Title |

001470-0043-16679-Active.21916891.8

DEBTORSLCC_106084

| M1 | MACK GREASE TRUCK (EDDIE DOWNEY) | 1M2AX07COAM008167 | Title |
|---|---|---|---|
| M6 | T300 KENWORTH 2004 32,000# | 2NKMHD7X94M050732 | Title |
| M29 | 2006 GMC MECHANIC TRUCK | 1GDM7C1C27F402211 | Title |
| M2 | F800 FORD MECHANIC TRUCK | 1FDXK84A8LVA44292 | Title |
| ST7 | 99 C6500 | 1GDK7H1CXXJ510335 | Title |
| M25 | INTERNATIONAL MECHANIC TRUCK | 1HTMKAANOBH356628 | Title |
| M26 | PETERBILT MECHANIC TRUCK | 2NPLHD7X17M681405 | Title |
| ST1 | SWEEPER TRUCK | 1HTSCABN51H314859 | Title |
| ST2 | 1993 INTERNATIONAL SWEEPER TRUCK | 1HTSCPLLOPH499394 (T04039D391431) | Title |
| M19 | 2004 F550 MECHANIC TRUCK | 1FDAF56P84EC79271 | Title |
| ST3 | SWEEPER TRUCK | J8DB4W16487400244 | Title |
| M44 | 1988 MACK | 1M2N187Y9JW025123 | Title |
| ST8 | 99 C6500 | 1GDK7H1C4XJ510914 | Title |
| WT14 | 1997 MACK WATER TRUCK | 1M2P225C9VM001103 | Title |
| M30 | 2000 FORD MECH TRUCK | 3FDWF65HIYMA09269 | Title |
| M31 | 1995 FORD MECH TRUCK | 1FDNF80C55VA37981 | Title |
| M32 | 1996 MACK SERVICE TRUCK | 1M1P267Y4TMO28274 | Title |
| M33 | STERLING BOOM TRUCK | 2FZHATAK73AL06206 | Title |
| M34 | Kenworth Welding Truck | 2NKMH27X45MO73303 | Title |
| M35 | 98 Freightliner Electrical truck | 1FV6HJAA6WH948045 | Title |
| WT17 | 97 Water Truck | IM2P225C6VMOO1103 | Title |
| WT18 | Orange Water Truck | 1M2C114C6OAOO1156 | Title |
| WT19 | Red Water Truck | 1M2C114C6CAOO1071 | Title |
| M57 | CHEVROLET 3500 | 1GBJK34K37R592703 | Title |
| TK15 | 2009 MACK GU713 DUMP TRUCK | 1M2AX07C59M004529 | Title |
| M46 | LUBE TRUCK | 3FRXF7FL8BV091457 | Title |
| M47 | 2000 FORD F650 | FDWF65A8YMA27528 | Title |
| ST10 | 2008 INTERNATIONAL ELGIN SWEEPER TRUCL | 1HTMMAAN88H579096 | Title |
| WT21 | 2000 GALLON WATER TRUCK | 3FRNF7FA9CV165816 | Title |
| WT23 | 2007 PETERBILT 335 WATER TRUCK | 2NPLLDOX27M694902 | Title |
| M3 | 1998 F800 FORD MECHANIC TRUCK | 1FDWF80C4WVA23936 | Title |
| M45 | INTERNATIONAL MECHANIC TRUCK | 1HTMKAAN3CH600757 | Title |
| ST9 | NISSAN SWEEPER TRUCK | JNAPC81LOAAF80025 | Title |
| TK16 | 800 MACK COAL TRUCK | 1M2P156C6EA001032 | Title |

Schedule 8 - 2

DEBTORSLCC_106085

| M58 | GMC LUBE TRUCK | 4GDT9C4W9JV701623 | Title |
| C6 | Carrier - 53 | 53-1163 | |
| M40 | 1 TON TRUCK | 1GBJK34R9YF406932 | Title |
| M36 | BUCKET TRUCK | 1FDPF80C7SVA69517 | Title |
| M37 | 4900 4X2 (POLE TRUCK) | 1HTSDAAN4WH500804 | Title |
| M38 | T300 (WELDING TRUCK) | 2NKMHZ7X65M073304 | Title |
| M41 | R690ST (MACK) | 1M2N277YOJWOO3284 | Title |
| M42 | FORD FLAT BED | 1FDAF57Y69EA77866 | Title |
| M43 | FORD F150 | 1FTRX14W24NC18263 | Title |
| WT5 | 2000 GMC 7500 WATERTRUCK | 1GDL7H1C1YJ517129 | Title |
| WT16 | 1981 MACK RD688 WATER TRUCK | 1M2P143CXBA001562 | Title |

Schedule 8 - 3

DEBTORSLCC_106086

EXHIBIT 2.02

**[FORM OF]
FUNDING NOTICE**

To:     Riverstone Credit Partners – Direct, L.P.
        as Agent
        712 Fifth Avenue, 36th Floor
        New York, NY 10019
        Attention: Daniel Flannery
        Telephone No. (212) 271-6259
        Email: dflannery@riverstonecredit.com

With a copy to each Lender

_____, 20__ [14]

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 2.02(a) of the Credit Agreement, the Borrower hereby irrevocably requests Loans to be made by the Lenders on the terms set forth below, and subject to the terms and conditions of the Credit Agreement:

(A)     Aggregate principal amount of the proposed
        borrowing:                                          _____

(B)     Date of the proposed borrowing:                    _____
                                                            (which is a Business Day)

(C)     Type of Loan comprising the proposed
        borrowing: [15]                                     _____

(D)     If the proposed borrowing is a LIBOR Rate
        Loan, the length of the initial Interest Period
        therefor: [16]                                      _____

[The Borrower hereby requests that the proceeds of the Loans described in this Funding Notice be applied as set forth in the funds flow memorandum attached hereto as Exhibit 1.]

The Borrower hereby certifies that as of the Closing Date, after giving effect to the borrowing of Loans on such date:

---

[14] Must be received by the Agent prior to 11:00 a.m., New York City time, three Business Days prior to the Closing Date.
[15] Must specify whether such Loan is a Base Rate Loan or a LIBOR Rate Loan.
[16] Select one, two or three month Interest Period.

Exhibit 2.02 - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106087

(a)     all representations and warranties of the Borrower and each other Loan Party contained in the Loan Documents are true and correct, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties are true and correct as of such earlier date);

(b)     no Default or Event of Default has occurred and is continuing or would result from the transactions contemplated in the Credit Agreement, including the funding of the Loans and the use of proceeds thereof; and

(c)     since December 31, 2016, no event or circumstance shall have occurred which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Change.

[Signature Page Follows]

Exhibit 2.02 - 2

DEBTORSLCC_106088

**BLACKJEWEL L.L.C.**

By: _____

Name: _____

Title: _____

Exhibit 2.02 - 3

DEBTORSLCC_106089

EXHIBIT 2.04

**[FORM OF]**
**CONVERSION/CONTINUATION NOTICE**

To:    Riverstone Credit Partners – Direct, L.P.
       as Agent
       712 Fifth Avenue, 36th Floor
       New York, NY 10019
       Attention: Daniel Flannery
       Telephone No. (212) 271-6259
       Email: dflannery@riverstonecredit.com

With a copy to each Lender

_____, 20__ [17]

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 2.04 of the Credit Agreement, the Borrower hereby irrevocably requests the [conversion] [continuation] of [IDENTIFY BORROWING OF LOANS] as described below, and Borrower hereby confirms to the Agent and each Lender as follows:[18]

(A)    Principal amount of Loans being [converted] [continued]: $_____

(B)    Effective date (which shall be a Business Day): _____

(C)    Type of resulting Loans (Base Rate or LIBOR Rate):[19] _____

(D)    Interest Period for resulting Loans:[20] _____

No conversion or continuation of any Loans shall result in more than three Borrowing Tranches outstanding at any one time.

---

[17] Must be received by the Agent not later than 2:00 p.m., New York City time, three Business Days prior to the requested date of any conversion to or renewal of LIBOR Rate Loans or of any conversion of LIBOR Rate Loans to Base Rate Loans.

[18] Each conversion to or renewal of LIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof.

[19] For conversions only.

[20] For conversions and continuations of LIBOR Rate Loans. If the Borrower requests the LIBOR Rate Option but does not specify an Interest Period, then the Interest Period shall be deemed to be of three month's duration.

Exhibit 2.04 - 1

DEBTORSLCC_106090

[The Borrower hereby certifies to the Agent that, as of the date hereof and as of the proposed date of the [conversion][continuation], no Default or Event of Default has occurred and is continuing.][21]

[Signature Page Follows]

---

[21] Add this certification only if Base Rate Loans are converted to LIBOR Loans or if LIBOR Loans are being continued. Certification not required if Required Lenders consent to such conversion or renewal.

Exhibit 2.05 - 2

001470-0043-16679-Active.21950790.6

**BLACKJEWEL L.L.C.**

By:     _____

Name:   _____

Title:  _____

DEBTORSLCC_106092

EXHIBIT 5.09-1

**[FORM OF]**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 5.09(f)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) it is not a 10-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a United States trade or business.

The undersigned has furnished the Agent and the Borrower with a certificate of its non-U.S. person status on Internal Revenue Service Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which payment is to be made to the undersigned, or in either of the two calendar years preceding such payment.

**[NAME OF LENDER]**

By: _____
Name: _____
Title: _____

Date: _____

Exhibit 5.09-1 - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106093

EXHIBIT 5.09-2

**[FORM OF]**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 5.09(f)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) it is not a 10-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a United States trade or business.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____
Name: _____
Title: _____

Date: _____

Exhibit 5.09-2 - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106094

EXHIBIT 5.09-3

**[FORM OF]**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 5.09(f)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) neither the undersigned nor any of its direct or indirect partners/members is a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iv) none of its direct or indirect partners/members is a 10-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B)  of the Code, (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or its direct or indirect partners/members' conduct of a United States trade or business.

The undersigned has furnished its participating Lender with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its direct or indirect partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W- 8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**


By:      _____
Name:  _____
Title:   _____

Date:   _____

Exhibit 5.09-3 - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106095

EXHIBIT 5.09-4

**[FORM OF]**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 5.09(f)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any note(s) evidencing such Loan(s)), (iii) neither the undersigned nor any of its direct or indirect partners/members is a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iv) none of its direct or indirect partners/members is a 10-percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or its direct or indirect partners'/members' conduct of a United States trade or business.

The undersigned has furnished the Agent and the Borrower with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its direct or indirect partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By:      _____
Name:    _____
Title:   _____

Date:    _____

Exhibit 5.09-4 - 1

DEBTORSLCC_106096

EXHIBIT 7.01

**[FORM OF]
SOLVENCY CERTIFICATE**

Dated as of July 17, 2017 (the "<u>Closing Date</u>")

This Solvency Certificate (this "<u>Solvency Certificate</u>") is delivered pursuant to Section [7.01(a)(vii)(A)][7.01(a)(vii)(B)] of that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "<u>Borrower</u>"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

I, [_____], the [Chief Financial Officer][Treasurer] of [Revelation Energy, LLC, a Kentucky limited liability company ("<u>Revelation</u>")][the Borrower], DO HEREBY CERTIFY in such capacity as an Authorized Officer of [Revelation][the Borrower] and not in an individual capacity as follows:

1.        I am the [Chief Financial Officer][Treasurer] of [Revelation][the Borrower], and I am familiar with the financial performance and prospects of [Revelation][the Borrower] and its Subsidiaries and have the primary responsibility for the management of the financial affairs and accounting practices of [Revelation][the Borrower] and its Subsidiaries and have acted on behalf of [Revelation][the Borrower] and its Subsidiaries connection with the financing arrangements provided for under, and the other transactions contemplated by, the Credit Agreement and the other Loan Documents.

2.        For purposes of this Solvency Certificate, I have, prior to the Closing Date (a) to the extent I deemed necessary or prudent to enable me to express an informed opinion as to the matters referred to in this Solvency Certificate, made inquiries of certain other duly Authorized Officers of [Revelation][the Borrower] in connection with the execution and delivery of this Solvency Certificate; (b) read and reviewed the Credit Agreement; (c) reviewed the Historical Statements; (d) reviewed the terms of the Restructuring and read the terms of the documentation effectuating the Restructuring; and (e) made such other examinations, investigations and inquiries as I deemed necessary or prudent in connection with the matters referred to in this Solvency Certificate.

3.        Based upon the foregoing, as of the Closing Date, after giving effect to the [Restructuring][22] [Transactions (including the borrowing of Loans and the Restructuring)][23]:

(a)        the fair value of the property of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis;

(b)        the present fair saleable value of the assets of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, is not less than the amount that will be required to pay the probable liabilities of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, on their debts as they become absolute and matured;

---

[22] Revelation certifies as to the Solvency of Revelation and its Subsidiaries on a consolidated basis after giving effect to the Restructuring.
[23] Borrower certifies as to the Solvency of Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions.

Exhibit 7.01 - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106097

   (c)  [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, are able to realize upon the assets of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, and pay the debts and other liabilities (including contingent liabilities) of the [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, as they mature in the normal course of business;

   (d)  [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, do not intend to, and do not believe that they will, incur debts or other liabilities beyond their ability to pay such debts and liabilities as they mature;

   (e)  [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which the property of [Revelation][the Borrower] and its Subsidiaries, on a consolidated basis, would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which [Revelation][the Borrower] and its Subsidiaries are engaged.

For purposes of this Certificate, the amount of contingent liabilities has been computed at the amount which, in light of all of the facts and circumstances existing as of the date hereof, represents the amount that can reasonably be expected to become an actual or matured liability.

   This Solvency Certificate is a Loan Document executed pursuant to the Credit Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof (including Article 11 thereof).

<div align="center">[Signature Page Follows]</div>

<div align="center">Exhibit 7.01 - 2</div>

DEBTORSLCC_106098

IN WITNESS WHEREOF, the undersigned Authorized Officer has executed and delivered this Solvency Certificate on behalf of [Revelation][the Borrower], and has made the certifications and statements contained herein, as of the date first above written.

**[REVELATION ENERGY, LLC]**
**[BLACKJEWEL L.L.C.]**

By: _____

Name: _____

Title: _____

Exhibit 7.01 - 3

DEBTORSLCC_106099

EXHIBIT 8.03(c)

**[FORM OF]
COMPLIANCE CERTIFICATE**

_____, 20___

To:     Riverstone Credit Partners – Direct, L.P.
        as Agent
        712 Fifth Avenue, 36th Floor
        New York, NY 10019
        Attention: Daniel Flannery
        Telephone No. (212) 271-6259
        Email: dflannery@riverstonecredit.com

With a copy to each Lender

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement, dated as of July 17, 2017 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Blackjewel L.L.C., a Delaware limited liability company (the "Borrower"), Blackjewel Holdings L.L.C., a Delaware limited liability company, the Lenders from time to time party thereto and Riverstone Credit Partners – Direct, L.P., as Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned, in his capacity as an Authorized Officer of the Borrower, hereby certifies on behalf of the Borrower and not in an individual capacity as follows:

1.      General.  The undersigned Authorized Officer has reviewed and is familiar with the contents of this certificate (this "Compliance Certificate"), and the undersigned Authorized Officer has reviewed the terms, and is familiar with the contents of, the Credit Agreement. The undersigned Authorized Officer has made a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the period covered by the financial statements attached as Annex 1 hereto.

2.      Default or Event of Default.  No Default or Event of Default existed or arose at any time during the period covered by the attached financial statements, and no Default or Event of Default exists and is continuing as of the date of this Compliance Certificate[, except as set forth in Annex 6 hereto, which describes in detail the nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event].

3.      Financial Statements.

_[Use following paragraph for Fiscal **Year-end** financial statements]_

The financial statements delivered in connection herewith pursuant to Section 8.03(b) of the Credit Agreement for the fiscal year ending [ _____ ] are certified by independent certified public accountants of nationally recognized standing.

Exhibit 8.03(c) - 1

DEBTORSLCC_106100

*[Use following paragraph for Fiscal **Quarter-end** financial statements]*

The financial statements delivered in connection herewith pursuant to Section 8.03(a) of the Credit Agreement for the fiscal quarter ending [_____] have been prepared in accordance with GAAP, consistently applied, and set forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.

5.    <u>New Subsidiaries</u>.  Each Subsidiary formed or acquired more than 30 days (or a longer period as may be extended by the Agent at the direction of the Required Lenders in their reasonable discretion) prior to the date hereof has joined the Loan Documents in accordance with the requirements of Section 8.01(j)(ii) of the Credit Agreement.

6.    <u>Revelation Reclamation Obligations</u>.  <u>Annex 5</u> attached hereto sets forth each payment made by the Borrower pursuant to <u>Section 8.02(h)(v)</u> to satisfy Revelation Reclamation Obligations, together with reasonably detailed information regarding how such payment was spent by Revelation.

7.    <u>Mining Financial Assurances</u>.   No Mining Financial Assurance has been modified or terminated, in each case, since the date of the last Compliance Certificate delivered pursuant to <u>Section 8.03(c)</u> of the Credit Agreement, other than those Mining Financial Assurances set forth on <u>Annex 5</u> attached hereto. <u>Annex 5</u> sets forth detailed information regarding each such modification or termination.

6.    Consolidated EBITDA for the Test Period ending on or about the last day of the [fiscal quarter][ fiscal year] to which such financial statements relate (the "<u>Relevant Date</u>") is $[_____]. Attached hereto as <u>Annex 2</u> is the calculation of such Consolidated EBITDA.

7.    The Total Leverage Ratio as of the last day of the Test Period ending on the Relevant Date is [__] to 1.00. Attached hereto as <u>Annex 3</u> is the calculation of such Total Leverage Ratio.

8.    The aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries during the most recent fiscal quarter ending on the Relevant Date is $[_____]. The Carried CapEx Amount to be carried over to the fiscal quarter immediately following the most recent fiscal quarter ending on the Relevant Date is $[_____]. During the most recent fiscal quarter ending on the Relevant Date, the Borrower and its Subsidiaries committed to make Capital Expenditures in an aggregate amount of $[_____], which Capital Expenditures will be made [describe when committed Capital Expenditures during such fiscal quarter will be made and the amount of each such expenditure].  The committed amounts of capital expenditures for any future fiscal quarters do not exceed the aggregate capital expenditures permitted for any such fiscal quarter under <u>Section 8.04(b).</u>

9.    The Liquidity as of the last day of the Test Period ending on the Relevant Date, calculated as an average of the Liquidity amounts as of the close of business on the last Tuesday of each month included in the Test Period, is $[_____].

10.    [Schedule Updates. Attached as <u>Annex 4</u> is an update to Schedule 6.02 of the Credit Agreement and updates to the Schedules to the Security Agreement, if any.]

It is understood that the calculations laid out in Annex 2 and Annex 3 are meant to represent the calculations required pursuant to the terms of the Credit Agreement; however, in the event of a conflict, the terms of the Credit Agreement shall control.

[SIGNATURE PAGE FOLLOWS]

Exhibit 8.03(c) - 2

DEBTORSLCC_106101

IN WITNESS WHEREOF, the undersigned Authorized Officer has executed and delivered this Compliance Certificate on behalf of the Borrower, and has made the certifications and statements contained herein, as of the date first above written.

**BLACKJEWEL L.L.C.**

By: _____
Name: _____
Title:   Chief Financial Officer

Exhibit 8.03(c) - 3

DEBTORSLCC_106102

Annex 1 to EXHIBIT 8.03(c)
Financial Statements

[See Attached.]

Exhibit 8.03(c) - 4

DEBTORSLCC_106103

Annex 2 to EXHIBIT 8.03(c)
Consolidated EBITDA

The information described herein pertains to the fiscal [quarter][year] ended _____, 20__.

Consolidated EBITDA:[12](a) + (b) - (c) =                                       $[___,____,____]

(a)    Consolidated Net Income: (i) - (ii) =                                    $[___,____,____]

    (i)    the aggregate of the net income (loss) of Borrower and its
        Subsidiaries for such period, on a consolidated basis[3]      $[___,____,____]

    (ii)   (a) + (b) + (c) + (d) + (e) + (f) + (g) =                     $[___,____,____]

        a.    all extraordinary, unusual or non-recurring gains, losses,
            charges or expenses                                        $[___,____,____]

        b.    the income (or deficit) of any Person (other than a
            Subsidiary) in which the Borrower or any of its Subsidiaries
            has an ownership interest, except to the extent that any such
            income is actually received by the Borrower or such
            Subsidiary in the form of dividends or similar distributions    $[___,____,____]

        c.    the undistributed earnings of any Subsidiary to the extent
            that the declaration or payment of dividends or similar
            distributions by such Subsidiary is not at the time permitted
            by the terms of any contractual obligation, including any
            Governing Document, or any Law applicable to such
            Subsidiary                                                 $[___,____,____]

        d.    all gains or losses realized in connection with the early
            extinguishment of Debt, on an after tax basis              $[___,____,____]

---

[1] For purposes of determining Total Leverage Ratio, (i) Consolidated EBITDA for the four-fiscal quarter period ending September 30, 2017 shall be deemed to be Consolidated EBITDA for the fiscal quarter ending September 30, 2017, multiplied by four, (ii) Consolidated EBITDA for the four fiscal quarter period ending December 31, 2017 shall be deemed to be Consolidated EBITDA for the two consecutive fiscal quarters ending December 31, 2017, multiplied by two, and (iii) Consolidated EBITDA for the four fiscal quarter period ending March 31, 2018 shall be deemed to be Consolidated EBITDA for the three consecutive fiscal quarters ended March 31, 2018, multiplied by 4/3, respectively.

[2] For purposes of calculating Consolidated EBITDA for any period, if at any time during such period the Borrower or any Subsidiary shall have made any Material Disposition or Material Acquisition, Consolidated EBITDA for such period shall be calculated giving pro forma effect thereto as if such Material Disposition or Material Acquisition had occurred on the first day of such period (such pro forma effect to be determined without giving effect to any anticipated or proposed change in operations, revenues, expenses or other items included in the calculation of Consolidated EBITDA, except with the consent of the Agent), and such pro forma effect shall be determined in a manner otherwise acceptable to the Agent and with supporting documentation acceptable to the Agent. It is understood that, with respect to any Material Acquisition or Material Disposition occurring prior to March 31, 2018, the pro forma effect given to such Material Acquisition or Material Disposition shall be subject to the annualization mechanics set forth in footnote 1.

[3] Determined in accordance with GAAP

Exhibit 8.03(c) - 5

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106104

    e.    any income or loss from disposed or discontinued operations and any net after tax gains or losses on disposed or discontinued operations      $[___,____,____]

    f.    non-cash gains and losses attributable to the mark-to-market valuation of Hedging Transactions permitted pursuant to Section 8.02(a) (including the application of FASB ASC Topic 815 relating thereto)[4]      $[___,____,____]

(b)    (i) + (ii) + (iii) + (iv) + (v) + (vi) + (vii)[5] =      $[___,____,____]

    i.    Interest Expense      $[___,____,____]

    ii.    provisions for taxes based on income, profits or capital      $[___,____,____]

    iii.    total depreciation expense      $[___,____,____]

    iv.    total amortization expense      $[___,____,____]

    v.    transaction costs, fees and expenses incurred in connection with the Transactions[6]      $[___,____,____]

    vi.    non-recurring restructuring, reorganization and integration expenses (excluding severance expense) incurred in connection with the Restructuring[7]      $[___,____,____]

    vii.    all other non-cash charges or expenses, including any write-offs and write-downs, reducing Consolidated Net Income for such period[8]      $[___,____,____]

(c)    Non-cash gains increasing Consolidated Net Income for such period[9][10]      $[___,____,____]

---

[4] Notwithstanding clauses (a) and (e), any gains from the disposition of the Flint Ridge Assets shall be included in net income.

[5] For each of clauses (i), (ii), (iii), (iv), (v), (vi) and (vii), to the extent deducted in computing Consolidated Net Income for such period (without duplication)

[6] Not to exceed in the aggregate, when combined with any amounts included in the calculation of Consolidated EBITDA pursuant to clause (vi) immediately below, $1,500,000.

[7] Not to exceed in the aggregate, when combined with any amounts included in the calculation of Consolidated EBITDA pursuant to clause (v) immediately above, $1,500,000.

[8] Excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period.

[9] To the extent included in computing Consolidated Net Income for such period (without duplication)

[10] Excluding any such non-cash gains on items to the extent representing the reversal of an accrual or reserve for a potential cash charge in any prior period.

Exhibit 8.03(c) - 6

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106105

Annex 3 to EXHIBIT 8.03(c)
Total Leverage Ratio

The information described herein is as of _____, 20___, and pertains to the period from _____, 20___ to _____, 20___.

1.  (i) – (ii)                                                                                            $[___,____,____]

   (i)     the aggregate principal amount of Debt of the Borrower and
          its Subsidiaries outstanding on such date determined on a
          consolidated basis in accordance with GAAP[11]                        $[___,____,____]

   (ii)    the lesser of $10,000,000 and (x)                                    $[___,____,____]

       (x)    if Liquidity as of such date exceeds $5,000,000, (A)
           the aggregate amount of unrestricted Permitted
           Investments of the Loan Parties free and clear of
           Liens[12] as of such date minus (B) $5,000,000.[13]          $[___,____,____]

2.  Consolidated EBITDA[14]                                                                $[___,____,____]

Total Leverage Ratio[15] (1. / 2.)                                                    [_____]:1.00

---

[11] For this purpose, (1) letters of credit (including in respect of Mining Financial Assurances) will only be included to the extent of any unreimbursed drawings thereunder, (2) Debt of the types described in clauses (f) and (h) of the definition thereof shall be excluded and (3) Debt in respect of Mining Financial Assurances (other than such Debt described in clauses (a) and (b) of the definition thereof or arising under letters of credit, which, for the avoidance of doubt, is subject to clause (1) above) shall be excluded and (4) the Daniels Debt shall be excluded).

[12] Other than Liens created pursuant to the Loan Documents, Liens permitted under clause (g) of the definition of Permitted Liens and non-consensual Liens arising by operation of Law.

[13] For the avoidance of doubt, if Liquidity on the last day of the most recently ended Test Period does not exceed $5,000,000, then this clause (x) shall be deemed to equal $0.

[14] See Annex 2.

[15] For purposes of calculating the Total Leverage Ratio: (i) any Person that is a Subsidiary on the applicable calculation date will be deemed to have been a Subsidiary at all times during such Test Period; and (ii) any Person that is not a Subsidiary on the applicable calculation date will be deemed not to have been a Subsidiary at any time during such Test Period.

Exhibit 8.03(c) - 7

DEBTORSLCC_106106

Annex 4 to EXHIBIT 8.03(c)
update to Schedule 6.02 of the Credit Agreement
and updates to Schedules to the Security Agreement

Exhibit 8.03(c) - 8

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106107

Annex 5 to EXHIBIT 8.03(c)
Revelation Reclamation Obligations and Mining Financial Assurances

Exhibit 8.03(c) - 9

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106108

Exhibit 8.03(c) - 10

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106109

EXHIBIT 8.03(d)

**[FORM OF]**
**ANNUAL OPERATING PLAN AND BUDGET**

[Provided to Agent under separate cover.]

Exhibit 8.03(d) - 1

001470-0043-16679-Active.21950790.6

DEBTORSLCC_106110

| Sources & Uses Of Funds | | | | |
|---|---|---|---|---|
| **Sources** | **Amount** | | **Uses** | **Amount** |
| Term Loan Proceeds (RCP) | $27,300,000.0 | | Repayment of Jeff Hoops Note | $ 4,956,798.9 |
| | | | Escrow Account for Lone Mtn Purchase | 8,000,000.0 |
| | | | Transaction Fees & Expenses | 635,523.4 |
| | | | Agent Fee | 75,000.0 |
| | | | CAT Payment | 3,325,847.1 |
| | | | United Payment | 112,878.6 |
| | | | Cash to Balance Sheet | 10,193,951.9 |
| **Total Sources** | **$27,300,000.0** | | **Total Uses** | **$27,300,000.0** |

Notes
(1) Uses exclude Sidley Austin LLP as well as title/mortgage advisors/expenses.
(2) Sources exclude $3 million Jeff Hoops' note which has already been invested.
(3) Sources exclude $1 million of Lime Rock funding invested the week of July 3rd. Remaining $2 million invested 7/10/17.
(4) Sources exclude $2 million of Lime Rock funding rolled from Revelation
(5) Cash balance includes $168,750 to be paid to JAD via paper checks from BlackJewel (inclusive of July payment).

Clearwater AP Defendant 00001637

Confidential

*Black/jewel*

*Funds Flow Memorandum - Arranger Funds Flow for First Lien Term Loan*

*July 17, 2017*

## Sources and Uses of Funds

| Item | | Amount | | Note |
|---|---|---|---|---|
| **Issue** | | | | |
| **Sources** | | | | |
| First Lien Term Loan | $ | 34,000,000.00 | | |
| Jefferies Placement | $ | 28,000,000.00 | | |
| (Original Issue Discount) / Premium | | (700,000.00) | | *Issued at 97.500%* |
| First Lien Term Loan - Cash Proceeds | $ | 27,300,000.00 | A | |
| | | | | |
| **Arranger's Witholdings** | | | | |
| **Term Loan Fees and Expenses:** | | | | |
| Arrangment Fee | $ | 250,000.00 | | *Flat fee* |
| Other transaction-related expenses | | 5,000.00 | | *Riverstone Credit* |
| Agent fee | | 75,000.00 | | *Riverstone Credit* |
| Arranger legal counsel fees and expenses | | 50,000.00 | | *White & Case* |
| Other legal counsel fees and expenses | | 330,523.40 | | *Simpson Thacher & Bartlett* |
| Total Arranger's Witholdings | $ | 710,523.40 | B | |
| | | | | |
| Reaymeent of InterCo Note | | 4,956,798.93 | C | *Jeff Hoops* |
| CAT Payment | | 3,325,847.13 | D | *CAT* |
| United Bank Payment | | 112,828.60 | E | *United* |
| Net Cash Proceeds from First Lien Term Loan | $ | 18,193,951.94 | =A-B-C-D-E | |

**Blackjewel**

Funds Flow Memorandum - Wires
July 17, 2017

## Wire Instructions

| Payee | Amount | Account Information |
|---|---|---|
| **Jefferies to Wire:** | | |
| **Blackjewel, LLC** | $ 10,193,651.940 | Bank Name: United Bank |
| _Net Proceeds to Company_ | | Account Name: Blackjewel, LLC |
| | | Account No. |
| | | ABA No. |
| | | Ref: Drew Kesler / Jeff Hoops |
| **Blackjewel, LLC** | $ 8,000,000.000 | Bank Name: United Bank |
| _Escrow Account: Arch - Lone Mountain Transaction_ | | Account Name: BlackJewel Escrow Account |
| | | Beneficiary Receiver Bank: UNITED BK PRKSBRG |
| | | Account No. |
| | | ABA No. |
| | | Ref: BlackJewel Escrow Account |
| **Jeff Hoops** | $ 4,956,798.930 | Bank Name: United Bank, Inc. (Charleston, WV) |
| _Repayment of InterCo Note_ | | Account Name: Jeffery A. Hoops Sr |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: Jeffery A. Hoops Sr |
| **White & Case** | $ 50,000.000 | Bank Name: JPMorgan Chase |
| _Arranger Counsel Fee_ | | SWIFT/BIC: CHASUS33 |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: Invoice No. 1100-17-03052 |
| **Simpson Thacher & Bartlett** | $ 330,523.400 | Bank Name: JPMorgan Chase |
| _Other Counsel Fee_ | | SWIFT/BIC: CHASUS33 |
| | | ABA Number: |
| | | Account Number: |
| | | Account Name: Simpson Thacher & Bartlett LLP |
| | | Reference: Tax# 13-5395280; A/R Dept. |
| **Riverstone Credit** | $ 5,000.000 | Bank Name: JP Morgan Chase Bank, N.A. |
| _Other Transaction-Related Expenses_ | | Account Name: Riverstone Equity Partners, LP |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: Steven Lowenthal |
| **Riverstone Credit** | $ 75,000.000 | Bank Name: BMO Harris Bank N.A. |
| _Agent Fee_ | | Account Name: Riverstone Credit Partners, LP Agency |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: Steven Lowenthal |
| **Caterpillar Financial Services Corporation** | $ 3,326,847.130 | Bank Name: JPMorgan Chase |
| _Debt Payment_ | | Account Name: Caterpillar Financial Services Corporation |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: N/A |
| **United Bank** | $ 112,878.600 | Bank Name: United Bank, Inc. |
| _Debt Payment_ | | Account Name: Revelation Energy LLC |
| | | ABA Number: |
| | | Account Number: |
| | | Reference: N/A |

Confidential

Clearwater AP Defendant 00001639

*Execution*

July 17, 2017

Blackjewel L.L.C.
c/o Blackjewel Holdings L.L.C.
1051 Main St.
Milton, WV 25541
Attn: Jeff Hoops

       Re:     Mortgage Termination

Ladies and Gentlemen:

Reference is made to (1) the Mortgage and Security Agreement dated as of December 1, 2016 (as heretofore amended, supplemented or otherwise modified from time to time, the "Mortgage") by and among Revelation Energy, LLC, a Kentucky limited liability company ("Revelation"), Revelation Energy Holdings, LLC, a Delaware limited liability company ("Revelation Holdings") (Revelation and Revelation Holdings are hereinafter collectively referred to as the "Makers"), Jeffrey A. Hoops, an individual ("Mr. Hoops"), and LR-Revelation Holdings, L.P., a Delaware limited partnership ("Lime Rock") (Mr. Hoops and Lime Rock are collectively referred to herein as "Holders"), and (2) the Promissory Note dated as of December 1, 2016 made by Makers for the benefit of Mr. Hoops and Lime Rock (the "Promissory Note", and together with the Mortgage, the "Bridge Loan Documents"). Unless otherwise defined in this letter, each capitalized term used in this letter agreement (this "Agreement") that is defined in the Mortgage has the meaning assigned to such term in the Mortgage.

The Makers desire to repay the total unpaid balance of all amounts, including all outstanding principal, interest, fees, expenses and penalties, owed by the Makers to the Holders under the Mortgage and the other Bridge Loan Documents. In connection with and immediately prior to such payment, Holders hereby consent to the assignment and assumption of the Bridge Loan Documents and their corresponding debt to Blackjewel L.L.C., a Delaware limited liability company.

As of July 17, 2017 (the "Proposed Payment Date"), the aggregate amount of the Obligations due and owing by the Makers under the Mortgage and the other Bridge Loan Documents is the amount set forth on Schedule 1 (the "Payoff Amount"). If the Holders do not receive such amount by 4:00 p.m. Central Time on the Proposed Payment Date, interest will continue to accrue and the per diem amount set forth on Schedule 1 (the "Per Diem Amount") will be added to, and shall constitute a part of, the required Payoff Amount due hereunder for each day following the Proposed Payment Date until the Payoff Amount (including any Per Diem Amount added thereto) is paid in full (it being understood that the Per Diem Amount shall accrue and be added to the Payoff Amount each day up to but excluding the day on which payment is received).

ACTIVE 223086591v.3

CONFIDENTIAL

RCP000084

Blackjewel L.L.C.
July 17, 2017
Page 2 of 8

Payment of the Payoff Amount should be made by wire transfer to:

### MR. HOOPS

Bank Name:         United Bank, Inc.
ABA Routing No.:   ▮▮▮▮▮▮▮
Account No.:       ▮▮▮▮▮▮▮
Account Name:      Jeffery A. Hoops Sr
Reference:         Jeffery A. Hoops Sr

### LIME ROCK

Bank Name:         Comerica Bank
ABA Routing No.:   ▮▮▮▮▮▮▮
Account No.:       ▮▮▮▮▮▮▮
Account Name:      LR-Revelation Holdings, L.P.
Reference:         N/A

The Holders hereby acknowledge and agree that once the Payoff Amount is received in full in cash then, (1) all obligations of the Holders to the Makers are fully and finally terminated, and (2) all obligations of the Makers to the Holders are fully and finally terminated.  Holders hereby (i) acknowledge and agree that payment to Holders of the Payoff Amount will constitute payment in full and complete satisfaction of all of the Obligations and all amounts owing under the Bridge Loan Documents and any and all promissory notes shall be thereby paid in full, released and discharged, all without any further action being required to effectuate the foregoing, (ii) agrees that, effective upon receipt by Holders of the Payoff Amount, all security interests, mortgages and other liens that Makers may have granted to Holders, or which Holders may otherwise possess with respect to any assets or properties of the Makers, shall automatically be deemed to be forever and irrevocably discharged, released and terminated, (iii) the guaranty provided by each Guarantor shall be automatically fully released and terminated and (iv) the Bridge Loan Documents shall terminate and be of no further force or effect.

Upon payment in full of the Payoff Amount, Holders hereby (i) authorize the Makers or any of their respective counsel, agents or designees, to file Uniform Commercial Code financing statement amendments evidencing the release and termination of the liens held by Holders in all assets and properties of the Credit Parties, (ii) agree to promptly deliver to the Credit Parties, such release of liens, mortgages and filings evidencing the release and termination of liens on real property, including, without limitation, the Deed of Release attached hereto as Exhibit A, (iii) agree to promptly execute and deliver, such Uniform Commercial Code financing statement amendments, terminations, releases or other agreements and documents, as the Credit Parties may reasonably request to evidence the release and termination of the Holders' liens in any assets or properties of the Credit Parties (provided, any such financing statement amendments, terminations, releases or other agreements and documents shall be prepared, delivered and recorded at Borrower's expense), and (iv) agree to promptly deliver any Collateral in its possession to Borrower or such other party as any

CONFIDENTIAL

Blackjewel L.L.C.
July 17, 2017
Page 3 of 8
Credit Party may direct in writing, including, without limitation, originals of all stock certificates
and transfer powers of the Credit Parties held by Holders, including without limitation the share
certificate of the Makers and the membership interest transfer power in respect thereof (provided,
any such deliveries shall be made at Borrower's expense).

This letter agreement shall be governed by, and construed and enforced in accordance with, the laws
of the State of New York applicable to contracts made and performed in such State, without regard
to conflict of laws principles thereof.

This Agreement may be executed in any number of counterparts, all of which taken together shall be
deemed to constitute one and the same instrument.  Delivery of an executed counterpart of this
Agreement by telecopier or .pdf shall be effective to the same extent as delivery of a manually
executed counterpart of this Agreement.

*[signature pages follow]*

CONFIDENTIAL

Very truly yours,

JEFFREY A. HOOPS,
an individual

By: _____
Name: Jeffery A. Hoops, Sr.

LR-REVELATION HOLDINGS, L.P.,
a Delaware limited partnership

By : LIME ROCK PARTNRES GP V, L.P.,
its general partner

By:   LRP GP V, Inc.,
its general partner

By: _____
Name:   Jeffrey B. Scofield
Its:       Managing Partner

Signature Page to Payoff Letter – Blackjewel L.L.C.

CONFIDENTIAL

Very truly yours,

JEFFREY A. HOOPS,
an individual

By: _____
Name:  Jeffery A. Hoops, Sr..



LR-REVELATION HOLDINGS, L.P.,
a Delaware limited partnership

By : LIME ROCK PARTNRES GP V, L.P.,
its general partner

By:  LRP GP V, Inc.,
its general partner

By: _____
Name:  Jeffrey B. Scofield
Its:      Managing Partner·

Signature Page to Payoff Letter – Blackjewel L.L.C.

CONFIDENTIAL

ACCEPTED AND AGREED TO
This 14th day of July, 2017.


BLACKJEWEL L.L.C.,
a Delaware limited liability company


By: _____
Name: Jeffery A. Hoops, Sr.
Its:    President and Chief Executive Officer


Signature Page to Payoff Letter – Blackjewel L.L.C.

CONFIDENTIAL                                                                    RCP000089

Blackjewel L.L.C.
July 17, 2017
Page 6 of 8

*Schedule 1*

### PAYOFF AMOUNT FOR MR. HOOPS
### As of July 17, 2017

| TOTAL: | $4,956,798.93 |
|--------|---------------|
|        |               |

### PAYOFF AMOUNT FOR LIME ROCK
### As of July 17, 2017

| TOTAL: | $3,000,000.00 |
|--------|---------------|
|        |               |

Schedule 1 to Payoff Letter – Blackjewel L.L.C.

RCP000090

### Exhibit A:  Deed of Releases

[Attached]

Exhibit A

CONFIDENTIAL

## DEED OF RELEASE

That for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, **Jeffery A. Hoops** (the "Mortgagee"), does hereby FULLY RELEASE AND DISCHARGE that certain Mortgage and Security Agreement dated as of December 1, 2016 from REVELATION ENERGY, LLC, A KENTUCKY LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 1051 MAIN STREET, MILTON, WEST VIRGINIA 25541 (the "Mortgagor"), to Mortgagee, which Mortgage secures an obligation in the maximum face principal amount of $6,565,000.00 with interest thereon from the date hereof at the rate of Fifteen Percent (15%) per annum, of record in Mortgage Book 328, Page 846 in the Letcher County Court Clerk's Office (the "Mortgage").

It is expressly agreed that the Property defined by the Mortgage and described on **Exhibit A** is the Property being released by the undersigned pursuant to this Deed of Release.

IN TESTIMONY WHEREOF, witness the signature of the Mortgagee this __14__ day of _July_, 2017.

**JEFFERY A. HOOPS**

By: _____

("Mortgagee")

STATE OF West Virginia )
                                    ) SS:
COUNTY OF Cabell      )

The foregoing Deed of Release was subscribed, sworn to and acknowledged before me, _Annette Haley_, a Notary Public in and for said County and State, this __14__ day of _July_, 2017 by _Jeffery A Hoops_ , an individual, as his free act and deed, the Mortgagee.

My commission expires: _March 5, 2019_.

[SEAL]

Official Seal
Notary Public, State of West Virginia
Annette Haley
101 Rolling Meadows
Scott Depot, WV 25560
My commission expires March 5, 2019

NOTARY PUBLIC _____

THIS INSTRUMENT PREPARED BY:

_____

Helena R. Jackson, Attorney at Law
1051 Main Street
Milton, West Virginia 25541
859/533-4901

CONFIDENTIAL

RCP000093

<u>EXHIBIT A</u>

PROPERTY DESCRIPTION

The real property rights, estates and interests acquired by Revelation Energy, LLC, a Kentucky limited liability company, pursuant to the following:

1. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Resource Land Company LLC, North Fork Coal Corporation and Revelation Energy, LLC, as recorded in Mortgage Book 436, Page 242 in the Office of the Harlan County Clerk.
2. Special Warranty Deed made and entered into as of July 31, 2015 among Resource Development LLC, Resource Land Company LLC and Revelation Energy, LLC, as recorded in Deed Book 460, Page 539 in the Office of the Harlan County Clerk.
3. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Harlan Reclamation Services LLC and Revelation Energy, LLC, as recorded in Lease Book 66, Page 175 in the Office of the Letcher County Clerk.
4. Special Warranty Deed made and entered into as of July 31, 2015 between Pigeon Creek Processing Corporation and Revelation Energy, LLC, as recorded as Instrument Number 201600915 in the Office of the Commonwealth of Virginia, Wise County Clerk.
5. Special Warranty Deed made and entered into as of July 31, 2015 between Mill Branch Coal Corporation, Osaka Mining Corporation and Revelation Energy, LLC as recorded as Instrument Number 201600916 in the Office of the Commonwealth of Virginia, Wise County Clerk.
6. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Pigeon Creek Processing Corporation and North Fork Coal Corporation and Revelation Energy, LLC, unrecorded.
7. Purchase and Sale Agreement dated July 25, 2014, as amended, by and among Cumberland River Coal Company, Ark Land Company and Revelation Energy, LLC, unrecorded (leases at Schedule 2.1).
8. Amended, Consolidated and Restated Coal Mining Lease dated July 31, 2015 by and between ACIN LLC and Revelation Energy, LLC, unrecorded.
9. Quitclaim Deed dated April 7, 2016 by and between Jewell Smokeless Coal Corporation and Revelation Energy, LLC.

CONFIDENTIAL

RCP000094

## DEED OF RELEASE

That for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, **Jeffery A. Hoops** (the "Mortgagee"), does hereby FULLY RELEASE AND DISCHARGE that certain Mortgage and Security Agreement dated as of December 1, 2016 from **REVELATION ENERGY, LLC, A KENTUCKY LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 1051 MAIN STREET, MILTON, WEST VIRGINIA 25541** (the "Mortgagor"), to Mortgagee, which Mortgage secures an obligation in the maximum face principal amount of $6,565,000.00 with interest thereon from the date hereof at the rate of Fifteen Percent (15%) per annum, of record in Mortgage Book 447, Page 412 in the Harlan County Court Clerk's Office (the "Mortgage").

It is expressly agreed that the Property defined by the Mortgage and described on **Exhibit A** is the Property being released by the undersigned pursuant to this Deed of Release.

IN TESTIMONY WHEREOF, witness the signature of the Mortgagee this ⏟14⏟ day of ⏟July⏟, 2017.


**JEFFERY A. HOOPS**


By: _____

("Mortgagee")


STATE OF ⏟West Virginia⏟ )
                                                    ) SS:
COUNTY OF ⏟Cabell⏟ )

The foregoing Deed of Release was subscribed, sworn to and acknowledged before me, __ ⏟Annette Haley⏟, a Notary Public in and for said County and State, this ⏟14⏟ day of ⏟July⏟, 2017 by ⏟Jeffery A Hoops⏟, an individual, as his free act and deed, the Mortgagee.

My commission expires: ⏟March 5. 2019⏟.

[SEAL]

Official Seal
Notary Public, State of West Virginia
Annette Haley
101 Rolling Meadows
Scott Depot, WV 25560
My commission expires March 5, 2019

_____
NOTARY PUBLIC

THIS INSTRUMENT PREPARED BY:

_____

Helena R. Jackson, Attorney at Law
1051 Main Street
Milton, West Virginia 25541
859/533-4901

CONFIDENTIAL

RCP000096

EXHIBIT A

PROPERTY DESCRIPTION

The real property rights, estates and interests acquired by Revelation Energy, LLC,
a Kentucky limited liability company, pursuant to the following:

1.  Assignment of Real Property Agreements effective as of July 31, 2015 between
    Resource Development LLC, Resource Land Company LLC, North Fork Coal
    Corporation and Revelation Energy, LLC, as recorded in Mortgage Book 436, Page
    242 in the Office of the Harlan County Clerk.
2.  Special Warranty Deed made and entered into as of July 31, 2015 among Resource
    Development LLC, Resource Land Company LLC and Revelation Energy, LLC, as
    recorded in Deed Book 460, Page 539 in the Office of the Harlan County Clerk.
3.  Assignment of Real Property Agreements effective as of July 31, 2015 between
    Resource Development LLC, Harlan Reclamation Services LLC and Revelation
    Energy, LLC, as recorded in Lease Book 66, Page 175 in the Office of the Letcher
    County Clerk.
4.  Special Warranty Deed made and entered into as of July 31, 2015 between Pigeon
    Creek Processing Corporation and Revelation Energy, LLC, as recorded as
    Instrument Number 201600915 in the Office of the Commonwealth of Virginia,
    Wise County Clerk.
5.  Special Warranty Deed made and entered into as of July 31, 2015 between Mill
    Branch Coal Corporation, Osaka Mining Corporation and Revelation Energy, LLC
    as recorded as Instrument Number 201600916 in the Office of the Commonwealth
    of Virginia, Wise County Clerk.
6.  Assignment of Real Property Agreements effective as of July 31, 2015 between
    Resource Development LLC, Pigeon Creek Processing Corporation and North Fork
    Coal Corporation and Revelation Energy, LLC, unrecorded.
7.  Purchase and Sale Agreement dated July 25, 2014, as amended, by and among
    Cumberland River Coal Company, Ark Land Company and Revelation Energy,
    LLC, unrecorded (leases at Schedule 2.1).
8.  Amended, Consolidated and Restated Coal Mining Lease dated July 31, 2015 by
    and between ACIN LLC and Revelation Energy, LLC, unrecorded.
9.  Quitclaim Deed dated April 7, 2016 by and between Jewell Smokeless Coal
    Corporation and Revelation Energy, LLC.

CONFIDENTIAL

Message

| | |
|---|---|
| **From:** | Jeff Hoops [JHoops@revelenergy.com] |
| **Sent:** | 11/9/2017 6:05:54 PM |
| **To:** | Gleason, Mike [Mike.Gleason@austinpowder.com] |
| **Subject:** | FW: URGENT MESSAGE |
| **Attachments:** | BLACKJEWEL MOD OCT17.xlsx |

Recent update on cash situation I sent to Riverstone.......Jeff

# BLACKJEWEL

*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

**From:** Jeff Hoops
**Sent:** Tuesday, November 7, 2017 10:42 PM
**To:** 'Flannery, Daniel' <dflannery@riverstonecredit.com>
**Cc:** 'Jeffrey Scofield' <js@lrpartners.com>; John Reynolds <jr@lrpartners.com>; Blair Barlow <BBarlow@lrpartners.com>; 'Oliver Phillips' <ophillips@lrpartners.com>; Drew Kesler <DKesler@revelenergy.com>
**Subject:** URGENT MESSAGE

Danny:

I was out of pocket most of the day and started picking up emails around 5pm and learned that Noble took the true up before the numbers were finalized and as a result we received $2.3mm less this week than anticipated. While the adjustment is in line with what we were expecting for October, we were not expecting it until next week. Also, in addition to this we had a major roof fall at Lone Mountain yesterday and based on the assessment provided today we are going to lose 60% of our production for the next 7 to 10 days, which will impact cash flow by another $4mm or so next week. As you know cash has always been tight from day one of our transaction and the impact of these events has created the perfect storm that we may not be able to manage our way through as we look at the obstacles and alternatives moving forward:

-        Attached is our updated model with actual numbers through September that reflect the change in law in Kentucky that took our underground Workers Comp rate from 24% to 48% effective October 25. This resulted in an increase of $24mm per year in Workers Comp that is reflected in the attached model.
o        AIG gave us a 4 month extension to allow us time to work on a new program that will hopefully reduce this rate.
o        Kentucky used to participate in Black Lung claims, now it all falls on the insurance companies.
o        Workers Comp is required to operate and we had to agree to $2mm payment upfront, then $718,000 per week to keep insurance in effect.
o        Must have Workers Comp to continue to operate as State will shut mines down immediately and we would not want to run anyway.
-        NRP leases, which are critical have almost instantaneous default provisions for failure to make timely lease payments.
o        We have a $1mm payment due and are at risk of termination. They want to have a call tomorrow to discuss as clearly they do not want us to shutdown.
-        The roof fall that occurred yesterday is going to impact next Tuesday's funds by approximately $4mm and will most likely impact the next week as well as we are looking at 7-10 days to clean it up.

Given this turn of events and with cash always being tight, last week was a payroll week, so we had to cover payroll and with the $2.3mm shortfall from Noble's true up, we just do not have the funds to cover AIG and NRP at this time. I reached out immediately to Matt Schicke at this evening to let him know what the true up adjustment done to our cash expectations and needs this week and he is reaching out to the Singapore office tonight to see if they can forward the remaining funds, but he was not optimistic.

Wish I could tell you what is going to happen, but here is my best guess:

1)      Noble needs to keep us going until the end of November so we can take them out as Encina has agreed to providing working capital. Matt understands what is at stake, but again not optimistic they can or will step up as they do need this as part of the sale of their North American Oil & Gas book.
2)      Assuming they do not advance additional money, then AIG will most likely issue termination notice tomorrow and mines could be shut down by the close of business tomorrow in Kentucky.
3)      If Noble comes through that buys us a week, but given the production impact from the fall we probably buy ourselves a week, but will be in the same shape next Tuesday.

We understand given your position, you are essentially in control of the company and the moment we learned of the impact of all of these factors we wanted to make you aware of it. Normally, I could recommend some options or solutions to solve almost any problem we have encountered in this business, but unfortunately, I just do not see a path forward. Our working capital situation has been way too tight for the past 3 years and we have never really fixed the issue, so when a series of events such as the ones laid out above occur we are just not in a position to withstand multiple events such as the ones described.

Unfortunately, my schedule tomorrow is beyond my control. I have some time tonight until 11:30, in the morning until 8:30am, then mid-day from 12:30 – 1:30, then after 7pm tomorrow night. Thought it best to lay this out in an email as I just finished up a call with Jeff Scofield making him fully aware of the situation after Drew and myself scrubbed all of the cash numbers this evening to fully understand our situation.

Just so you are aware, discussions with Contura continue as it appears there is a deal to be done here in PRB, then Jefferies is confident they can get refinancing done to put $30mm on the Balance Sheet. Seems we are so close to getting our Balance Sheet where it needs to be with the operating capital necessary, but just do not see a way to get there as Lime Rock has no ability to do anything at this time and I have put much more at risk than I ever intended……Sincerely……Jeff

# BLACKJEWEL

*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

Message

| | |
|---|---|
| **From**: | Jeff Hoops [JHoops@revelenergy.com] |
| **Sent**: | 11/13/2017 4:57:23 PM |
| **To**: | Jeffrey Scofield [js@lrpartners.com] |
| **Subject**: | Possible Solution |

Jeff:

I am not having any luck finding an investor on short notice, but here is what I am willing to do and it is a lot less than we are offering River Stone:

1)      $5mm should get us through until Contura and/or Uniper deal happen
2)      $5mm would be repaid as soon as funds are available
3)      In return the cost would be:
a.      Contura is including 2 ranches in Wyoming that are not near the mines and are just raw land, not working, but could have some value. I would like those conveyed to Triple H Real Estate
b.      Senior Unit concept would go away and all equity would be the same at 62.5% - 37.5%
c.      MR Coal is going to be acquired by Uniper and Agency Fee will be reduced back to 1%.
i.      I am trying to negotiate an equity position for Blackjewel in this entity and if I am successful I would like for that equity to roll to me.

This is much less costly to both of us compared the alternative, only real cost to you from where we are now is the Sr. Units come out first at about 90% to Lime Rock 10% to me, now all dollars would come out at 62.5% - 37.5%. Just looking for solutions as the last thing I want is to be diluted down even more.....Thanks....Jeff

# BLACKJEWEL

*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

Message
| | |
|---|---|
| **From:** | Flannery, Daniel [dflannery@riverstonecredit.com] |
| **Sent:** | 11/14/2017 10:08:04 AM |
| **To:** | Oliver Phillips [ophillips@lrpartners.com] |
| **CC:** | Jeffrey Scofield [js@lrpartners.com]; Blair Barlow [BBarlow@lrpartners.com]; Jeff Hoops [JHoops@revelenergy.com]; Lowenthal, Steven [slowenthal@riverstonecredit.com] |
| **Subject:** | RE: Black Jewel Proposal |

Can we talk at 10:30 et?

**From:** Oliver Phillips [mailto:ophillips@lrpartners.com]
**Sent:** Monday, November 13, 2017 7:57 PM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Cc:** Jeffrey Scofield <js@lrpartners.com>; Blair Barlow <BBarlow@lrpartners.com>
**Subject:** Black Jewel Proposal

Danny,

Per your discussion with Jeff below is the bullet point summary of the proposal back from Jeff Hoops.

1)      Jeff Hoops to invest $5mm into the existing loan structure, pari-passu with existing creditors
2)      That $5mm would be repaid when funds are available at closing of either Uniper or Contura providing they bring in the liquidity as currently contemplated – essentially last in, first out
3)      In return the cost would be:
a.      Contura is including 2 ranches in Wyoming that are not near the mines and are just raw surface land, not working, but could have some value. Jeff would like those conveyed to his Triple H Real Estate vehicle
b.      Senior Unit concept (except last $4mm invested in August) would go away and all other equity in the waterfall would be collapsed to the same at 62.5% - 37.5% (LRP – Hoops)
c.      MR Coal is going to be acquired by Uniper and the agency fee will be reduced to 1% from the current 2.25%.
i.      As part of that acquisition Jeff is negotiate an equity position for Blackjewel in this new entity, if successful that equity to roll to Lime Rock / Hoops (50/50)
d.      The existing covenant waiver (draft sent to Simpson a few minutes ago) would be extended until March 31st at which point the fee would then be payable – essentially pushing back the test 2 quarters vs. the one quarter in the current draft
4)      We'd push forward with the Lexington/Revelation clean up transaction ASAP, terms unchanged versus recent discussions

Jeff and I are around if you would like to clarify any of the above.

OP

Oliver Phillips
Lime Rock Partners
t +1 713 345 2140
m +1 713 824 1973
e ophillips@lrpartners.com

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this

transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

DEBTORSHOOPS_000062

Message
| | |
|---|---|
| **From:** | Oliver Phillips [ophillips@lrpartners.com] |
| **Sent:** | 11/14/2017 6:33:03 PM |
| **To:** | Flannery, Daniel [dflannery@riverstonecredit.com]; Jeff Hoops [JHoops@revelenergy.com]; Jeffrey Scofield [js@lrpartners.com] |
| **CC:** | Abbate, Christopher [cabbate@riverstonecredit.com]; Brodsky, Jamie [jbrodsky@riverstonecredit.com]; Lowenthal, Steven [slowenthal@riverstonecredit.com]; Blair Barlow [BBarlow@lrpartners.com]; Brian Berger [BBerger@lrpartners.com]; John Reynolds [jr@lrpartners.com] |
| **Subject:** | RE: Updated BlackJewel Proposal |

All,

Jeff Scofield will be in the air at 8p et, but the rest of us can be available.   I will brief Sidley on the below now and confirm their availability as well.

OP

Oliver Phillips
Lime Rock Partners
t +1 713 345 2140
m +1 713 824 1973
e ophillips@lrpartners.com

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Tuesday, November 14, 2017 5:25 PM
**To:** Jeff Hoops <JHoops@revelenergy.com>; Jeffrey Scofield <js@lrpartners.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Lowenthal, Steven <slowenthal@riverstonecredit.com>; Blair Barlow <BBarlow@lrpartners.com>; Oliver Phillips <ophillips@lrpartners.com>; Brian Berger <BBerger@lrpartners.com>; John Reynolds <jr@lrpartners.com>
**Subject:** RE: Updated BlackJewel Proposal

We are good to go on this.

Here's what I suggest regarding a path forward. Would ask Jeff Hoops, Jeff Scofield, and rest of Limerock team to brief Sidley. We then need to get on the phone tonight as a group with Lawyers to discuss next steps to document all this appropriately as we have a decent amount of wood to chop in a short period of time. I would propose 8 pm et.

Let's wrap this up.

**From:** Jeff Hoops [mailto:JHoops@revelenergy.com]
**Sent:** Tuesday, November 14, 2017 5:24 PM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>; Jeffrey Scofield <js@lrpartners.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Lowenthal, Steven <slowenthal@riverstonecredit.com>
**Subject:** RE: Updated BlackJewel Proposal

Danny:

I really appreciate the consideration as this is a substantial investment for me on top of what I have already made to date. I just cannot take the risk of these funds being tied up long term and so my offer is this simple:

-        I will loan $5mm @ no interest to Blackjewel and when $10mm comes in from any source other than ordinary revenue, the $5mm will be returned to me.

I understand fully where you and the River Stone are on this issue and for all of the reasons you laid out for us earlier today I have no hard feelings if you find this unacceptable. The alternative that you proposed with me putting in $3mm beside you and leaving it in is not acceptable to me as again, my issue is tying up my limited personal liquidity for a long period of time.

I understand what this means and again I will work with you in any manner you want for a smooth transition and have no issue signing my interest over right away. I am not interested in getting into any kind of dispute as we made a deal, you hold my equity as collateral and I will live up to that end of the deal and you will not have to make any effort to enforce it with me. Also, I will be happy to assist in the transition on a consulting basis or however you prefer that work or not at all.

I have worked countless hours the last 4 years building what I believe to be a very valuable company, but unfortunately the best business in the world must have adequate working capital to thrive and that has been my challenge for way too long now. I appreciate all you have done and am committed to helping you make this work out for River Stone as I owe it to you and all of the great people that work here to make this a seamless transition........Sincerely........Jeff

# BLACKJEWEL

*Jeff Hoops*
*1051 Main Street*
*Milton, WV 25541*
*(D)304-390-5920*
*(M)304-541-2059*

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Tuesday, November 14, 2017 5:10 PM
**To:** Jeffrey Scofield <js@lrpartners.com>; Jeff Hoops <JHoops@revelenergy.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Lowenthal, Steven <slowenthal@riverstonecredit.com>
**Subject:** FW: Updated BlackJewel Proposal

Jeff Hoops and Jeff Scofield, per our most recent discussions I wanted to lay out the revised details in an email

- Jeff Hoops can invest $5mm in the term loan pari passu
- Jeff Hoops has the ability to get the $5mm out from our deal subject to successful closing of the Contura deal and receipt of the $15-20mm of cash proceeds, no event of default, and compliance with our min liquidity test
- Extension option/fee unchanged
- 75 bps waiver fee to push out the leverage test from 9/30/17 to 12/31/17, payable upon earlier of 3/31/18 and refi

Please let us know if you'd like to discuss.

**From:** Flannery, Daniel
**Sent:** Tuesday, November 14, 2017 2:08 PM
**To:** Jeffrey Scofield <js@lrpartners.com>; Jeff Hoops (JHoops@revelenergy.com) <JHoops@revelenergy.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Lowenthal, Steven <slowenthal@riverstonecredit.com>; Owsiany, Carmela <cowsiany@riverstonecredit.com>
**Subject:** Updated BlackJewel Proposal

Guys, here is where we are coming out. Let us know if you'd like to get on the phone to discuss specifics.

- $5mm of new preferred equity from Jeff Hoops
- Pricing is PIK with a maturity outside our loan, economics to be agreed between LRP and Hoops
- Priority cash sweep available to repay Jeff Hoops subject to: closing of either Uniper or Contura with cash to be distributed at the end of the next fiscal quarter subject to compliance the existing min liquidity compliance (so if deals close 12/1, money can come out 12/31 to repay Jeff subject to min liquidity)
- RCP and Company/LRP to use commercially reasonable efforts to agree on financial covenant levels for 12/31/17 and 3/31/18
- Removal of the extension option and fee
- 75 bps waiver fee to push out 1st leverage test from 9/30/17 to 12/31/17, payable upon earlier of 3/31/18 and refi

Available at your convenience to talk.

Danny

Daniel P. Flannery
Principal
Riverstone Credit Partners, L.P.
212-271-6259
dflannery@riverstonecredit.com

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

## DEMAND PROMISSORY NOTE

November 10, 2017                                                    $5,000,000.00

FOR VALUE RECEIVED, the undersigned, BLACKJEWEL L.L.C., a Delaware limited liability company (*"Borrower"*), hereby promises to pay to the order of JEFFERY A. HOOPS (*"Lender"*) the principal sum of Five Million Dollars ($5,000,000.00), or so much thereof as may be advanced from time to time hereunder, without interest.

1.   This Note is unsecured.

2.   Advances of principal hereunder shall be at the discretion of Lender. At the option of Lender, all obligations shall become immediately due and payable upon demand.

3.   Borrower shall have the right to prepay the obligation evidenced by this Note, in whole or in part, at any time without penalty.

4.   At the option of Lender, all obligations shall become immediately due and payable without notice or demand upon the occurrence of any of the following events of default: (a) failure of the Borrower to make payment when due after ten (10) days written notice; and (b) failure of Borrower to comply with any of the terms and conditions of this Note.

5.   No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

6.   Borrower hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

7.   This Note shall be governed by and construed in accordance with laws of the State of West Virginia in all respects.

8.   Borrower will pay on demand all costs of collection and reasonable attorney fees incurred or paid by Lender in enforcing this Note when the same has become due, whether by acceleration or otherwise.

9.   Lender may assign or otherwise transfer any or all of Lender's rights under this Note, in whole or in part, to one or more other persons or entities at any time without obtaining the prior written consent of Borrower. Upon any assignment, such assignee shall have all of the rights and privileges granted Lender hereunder.

1

12023122v1

10.    The invalidity or unenforceability of any provision of this Note in general or in any particular circumstance shall not affect the validity or enforceability of any one or more of the other provisions of this Note or the validity of such provision as applied to any other circumstance.  Borrower agrees that this Note and all provisions hereof shall be interpreted so as to give effect and validity to all the provisions hereof to the fullest extent permitted by law.

**BORROWER:**

BLACKJEWEL L.L.C.

By:    _____
       Jeffery A. Hoops
Its:    President & CEO

The undersigned Lender acknowledges that the principal balance due under this Note has been PAID IN-FULL.  Accordingly, this Note is hereby CANCELLED and all of Borrower's obligations under this Note are hereby terminated.

Effective as of December 11, 2017.

**LENDER:**

_____
JEFFERY A. HOOPS

12023122v1                                           2

Message

| | |
|---|---|
| **From**: | Oliver Phillips [ophillips@lrpartners.com] |
| **Sent**: | 12/29/2017 10:14:32 AM |
| **To**: | Flannery, Daniel [dflannery@riverstonecredit.com] |
| **CC**: | Jeff Hoops [JHoops@revelenergy.com]; Jeffrey Scofield [js@lrpartners.com] |
| **Subject**: | Hoops Demand Note - Final Repayment Documentation |
| **Attachments**: | Black Jewel Secretary Letter Hoops Note vFinal .pdf; Exhibit A - Hoops Demand Note.pdf |

Danny,

Please see attached Secretary's letter covering the draws and repayment of Jeff's note as well as a copy of the Note itself.  This should take care of the required paperwork to close out that process.

Thanks,
OP

---------------------------------------------

Oliver Phillips
Lime Rock Partners
t +1 713 345 2140
m +1 713 824 1973
e ophillips@lrpartners.com

DEBTORSUB_129236

## SECRETARY'S CERTIFICATE

December 29, 2017

I, the undersigned, being the duly-elected and currently serving Secretary of BLACKJEWEL L.L.C., a Delaware limited liability company (the "Company), do hereby certify solely on behalf of the Company and not in my individual capacity, that:

1. Attached hereto as Exhibit A is a true, correct  and complete copy of the Demand Promissory Note dated November 10, 2017 between Company and Jeffery A. Hoops (the "Note"), together with all amendments thereto, as in full force and effect as of the date hereof.

2. Below is a summary of the balance drawn and repaid under the Note as of the date hereof:

| Date | Repayment Amount | Draw Amount | TOTAL |
|---|---|---|---|
| November 16, 2017 | | $ 830,000.00 | $ 830,000.00 |
| November 20, 2017 | | 1,800,000.00 | 2,630,000.00 |
| November 22, 2017 | | 280,000.00 | 2,910,000.00 |
| November 24, 2017 | | 300,000.00 | 3,210,000.00 |
| November 27, 2017 | | 328,000.00 | 3,538,000.00 |
| December 1, 2017 | | 688,000.00 | 4,226,000.00 |
| December 7, 2017 | | 774,000.00 | 5,000,000.00 |
| December 7, 2017 | $5,000,000.00 | | 0.00 |

This Secretary's Certificate may be signed in multiple counterparts (including by means of manual telecopy of .PDF signature pages), each of which when taken together shall constitute one document and shall be considered valid, binding and effective for all purposes.

**[Signature Page follows]**

12171584v1

IN WITNESS WHEREOF, the undersigned has duly executed this Secretary's Certificate as of the date first written above.

By: _____

Name: Drew Kessler

Title:  Secretary


I, Jeffery A. Hoops, the Chief Executive Officer, hereby certify that Drew Kessler is the Secretary of the Company and that the signature appearing above is the genuine signature of the Secretary.

IN WITNESS WHEREOF, I have hereunto set my hand as of the date first written above.

By: _____

Name: Jeffery A. Hoops

Title:  Chief Executive Officer


**[Signature Page to Secretary's Certificate]**

12171584v1

DEBTORSUB_129238

**Exhibit A**
**Demand Promissory Note**

Page 24

1                        D. Kesler

2   that capacity until March of 2021, I believe.

3        Q.   So you served as the CFO of Blackjewel

4   up through the bankruptcy filing, correct?

5        A.   Yeah, I'm not certain when -- when

6   Blackjewel was disbanded and the new holding

7   company was formed, but I was only the CFO of

8   Blackjewel.

9        Q.   Okay.  And I understand you don't know

10  the exact dates, but at some point you did work

11  for the -- what came after Blackjewel, correct?

12       A.   On a contractual basis, yes.

13       Q.   Can you describe that contract to me?

14  Were you a full-time employee, for example?  Were

15  you a part-time employee?  Can you elaborate on

16  that?

17       A.   My agreement, it was an hourly agreement

18  to provide services and report as needed.

19       Q.   And do you recall when that contract

20  became effective, when you stopped being a

21  full-time employee and when you started becoming a

22  contract employee?

23       A.   I believe it was March 31st, 2021.

24       Q.   Okay.  So after March 2021, you served

25  on a contractual basis; but before March 2021, you

Page 25

1                    D. Kesler

2  were full-time still?

3       A.   Correct, yes.

4       Q.   I want to ask you about the time period

5  before March 2021 and after the bankruptcy filing,

6  when you continued to serve as CFO, right?

7       A.   Yes.

8       Q.   Who did you report to during that time

9  period?

10      A.   I reported to FTI Consulting.

11      Q.   Who specifically at FTI did you report

12  to?

13      A.   The majority of my interactions were

14  with Dan Brosious.  I think he ultimately rolled

15  out to David Beckman.

16      Q.   And they are out of Denver, correct?

17      A.   That is correct.

18      Q.   Did the terms of your compensation

19  change after the bankruptcy or did they remain the

20  same?

21      A.   Well, I was salaried -- after the

22  bankruptcy in 2019?  Is that your question?

23      Q.   Yes.

24      A.   They remained the same until March 31st

25  of 2021.

1                     D. Kesler

2        Q.   And we'll get into this a little bit

3    more later, but there's no mention in this audit

4    of any accordion feature with respect to the

5    company's loan at United Bank, correct?

6        A.   What do you mean by "accordion feature"?

7        Q.   Have you ever in your role as CFO of

8    Blackjewel heard any reference to any accordion

9    feature on the line of credit with United Bank?

10       A.   I'm unfamiliar with the term.  I don't

11   recall hearing it as being an accordion feature,

12   no.

13       Q.   You never recall calling it an accordion

14   feature, correct?

15       A.   Correct.

16       Q.   And you never told anybody at Lime Rock

17   that there was an accordion feature on United's

18   line of credit, right?

19       A.   Still unfamiliar with the term.  I can't

20   imagine I would have shared that, no.

21       Q.   Would you please turn here in Exhibit 5

22   to page 15 of the document, 19 of the PDF.

23       A.   Okay.  I'm there.

24       Q.   Before we read -- I'm going to read from

25   this in a moment, but before I get there, as CFO

1                         D. Kesler

2    would you have any responsibilities to track

3    members' equity in the company?  If, for example,

4    equity was put into the company or equity was

5    taken out of the company, would that be something

6    you'd help facilitate?

7         A.   It's a function of financial reporting;

8    so I would have been aware of members' equity,

9    yes.

10        Q.   And for the entities that we're talking

11   about here, like Blackjewel and its parent

12   company, how would infusions of equity need to be

13   documented, if at all?

14        A.   Infusions of equity would have been

15   booked to members' equity.  There was an account

16   specific to members' equity on the financials.

17        Q.   And is it your understanding that there

18   would need to be an amendment of the LLC agreement

19   in order to change members' equity?

20        A.   What do you mean by "LLC agreement"?

21        Q.   Is it -- Blackjewel was an LLC, correct?

22        A.   Correct.

23        Q.   And so is its parent company, correct?

24        A.   Correct.

25        Q.   Do you know whether those LLCs were

Page 42

1          D. Kesler

2  governed by LLC agreements?

3       A.   I'm unfamiliar with any LLC agreements.

4       Q.   Let's take a look at paragraph 10.  I'm

5  going to read from the last sentence in that

6  paragraph that starts, "As of and for the year

7  ended December 31st."

8            Do you see that?

9       A.   Yes.

10      Q.   "As of and for the year ended December

11 31st, 2018, there was no contributions,

12 distributions, or transfers among the unit

13 holders, and the company had 323,966 Preferred

14 Units and 1,000 Series A units outstanding."

15           Did I read that correctly?

16      A.   Yes.

17      Q.   So is this basically saying that in the

18 year 2018 there were no changes to the members'

19 equity?

20      A.   I believe that to be the case, yes.

21      Q.   And that was, in fact, true for 2018,

22 correct?

23      A.   I have no reason to believe that this is

24 inaccurate.  Yes.

25      Q.   And is the same thing true, to the best

Page 43

1                         D. Kesler

2   of your knowledge, for 2019?

3        A.   Yeah, there was a small members'

4   contribution one of the years.  I believe it was

5   prior to 2018.  I don't recall there being any

6   members' equity contributions in 2019.

7        Q.   So no changes to members' equity from an

8   accounting and financial perspective for 2018 and

9   2019, correct?

10            MS. DOLLARD-SMITH:  Objection.

11            THE WITNESS:  I do not believe so.

12            MR. McGAVRAN:  One thing I forgot to

13       mention during instructions,

14       Ms. Dollard-Smith might object sometimes, but

15       unless she instructs you not to answer, it's

16       okay to answer, which I think you did.  I

17       just want to make sure I understood your

18       answer right.

19   BY MR. McGAVRAN:

20        Q.   So as far as you know as the CFO, former

21   CFO of Blackjewel, there were no changes to

22   members' equity in 2018 or 2019, correct?

23        A.   Correct.

24        Q.   Now, this might be something you've

25   talked about in the other AP adversary

Page 44

1                        D. Kesler

2    depositions, but I apologize, I have to go over it

3    in this, if that's the case.

4              Some of the allegations in one of the

5    lawsuits that we're here on today relate to loans

6    that Mr. Hoops made to Revelation and Blackjewel

7    and loans that Clearwater Investment made to the

8    same entities.

9              Do you understand that, that to be the

10   case?

11        A.    I have a very basic understanding of the

12   allegations.  I did not review the complaint prior

13   to the deposition today.

14        Q.    As the CFO of Revelation and Blackjewel,

15   were you aware that Mr. Hoops was extending credit

16   and Clearwater was extending credit to Blackjewel?

17        A.    Yes.

18        Q.    Why were those loans extended to the

19   company?

20        A.    Working capital contributions, I would

21   characterize it as; operating capital.

22        Q.    Can you elaborate that a little bit for

23   me?  When you say working capital and operating --

24   I think you said capital or operating expenses,

25   what does that mean from a laymen's perspective?

Page 45

1              D. Kesler

2   Why were these loans --

3        A.   To fund the day-to-day operations of the

4   business in the absence of ordinary course revenue

5   or capital.

6        Q.   What sources of credit did Blackjewel

7   have available to it in 2017, 2018, and 2019?

8        A.   United Bank had a line of credit.  I

9   believe it was $5 million over that entire period

10  of time.  There were various -- there were various

11  coal agreements that provided working capital,

12  first with MR Coal -- unsure of what the period

13  was for MR Coal -- and then ultimately Blackjewel

14  Marketing and Sales.  It's a $50 million line,

15  $50 million line protected by receivables

16  inventory.

17       Q.   So there was a $5 million United loan

18  that was available, there was the Blackjewel -- is

19  that referred to as BJMS?

20       A.   Blackjewel Marketing and Sales was often

21  referred to as BJMS, yes.

22       Q.   Okay.  So there was an agreement with

23  them.  And then what was the second one that you

24  had mentioned?

25       A.   MR Coal was the original group.

Page 46

1                    D. Kesler

2  Blackjewel Marketing and Sales essentially took

3  over the position of MR Coal.  I'm unsure when the

4  MR Coal transition occurred.  It's possible that

5  was in place in 2017.

6        Q.   So if I'm following right, there were

7  sort of three sources of credit that Blackjewel

8  had.  There was the United loan, there was an MR

9  Coal/BJMS option sometimes available, and then

10 there was any loans that Mr. Hoops and/or

11 Clearwater would provide, correct?

12       A.   Correct.

13       Q.   Any other credit sources that you're

14 aware of?

15       A.   Not to my recollection, no.

16       Q.   And just since you talked about it a

17 little while ago I'll ask:  When any of those

18 entities provided credit to Blackjewel, was it

19 ever put down as equity in the -- in your books

20 and records?

21       A.   For which period?

22       Q.   Any time between 2017 and 2019.

23       A.   I believe, as we discussed, I don't

24 recall any equity contributions in 2018 and 2019.

25            There was an equity contribution by both

Page 47

1          D. Kesler

2  Mr. Hoops and Lime Rock that was recorded as such.

3  I don't -- I'm uncertain which period that was,

4  2016 or possibly 2017.

5          Q.   Okay.  Asides from that, that Lime Rock

6  and Mr. Hoops' change in equity, were there any

7  other changes in equity that you're aware of?

8          A.   I don't believe so, no.

9          Q.   But just to be totally clear, if United

10 Bank made a loan to Blackjewel to help fund

11 operations, that was not marked down as an equity

12 contribution, correct?

13         A.   That is correct.

14         Q.   And if Mr. Hoops made a loan to the

15 bank -- excuse me, to Blackjewel, to help with

16 payroll, for example, that was not marked down as

17 an equity contribution, correct?

18         A.   Correct.

19              MS. DOLLARD-SMITH:  Objection.

20 BY MR. McGAVRAN:

21         Q.   And if Clearwater made a loan to

22 Blackjewel, that was, likewise, not marked down as

23 an equity contribution, correct?

24         A.   Correct.

25         Q.   I'd like to focus in on the loans that

Page 48

1                    D. Kesler

2   Jeff Hoops, Clearwater made.

3         Could you give me a little description

4   about what sort of shortfalls or purposes that

5   money would go to cover?

6         A.   Operating expenses of the business,

7   ordinary course operating expenses: payroll,

8   royalties, taxes.  Various things in the normal

9   course of operating the business.

10        Q.   So that money could go to pay employees,

11  correct?

12        A.   Could, yes.

13        Q.   It could have gone to pay taxes?

14        A.   Correct.

15        Q.   Could have gone to pay third-party

16  vendors?

17        A.   Fair.

18        Q.   It could go to pay royalties?

19        A.   Sure.

20        Q.   Any other sort of major categories we've

21  left out as far as where that money could have

22  been used by Blackjewel?

23        A.   I think that about covers it.

24        Q.   And how would the need for a loan arise?

25  How would you -- how would the company know that

Page 49

1                           D. Kesler

2   it needed to use that available credit?

3        A.    Cash reports were prepared by myself and

4   provided to Mr. Hoops that showed the cash

5   position of the business, absolutely on a weekly

6   basis, often more frequently than that.  It was

7   typically apparent from those reports whether any

8   cash infusion was needed or not.

9        Q.    Who was tasked with creating those cash

10  reports, and were they done at a certain time

11  every week or did that just depend?

12       A.    They were updated daily.  When were they

13  provided to Mr. Hoops?  At the end, they were

14  provided typically Thursday or Friday; also as

15  requested.  Could be any time.

16       Q.    And then what did -- can you tell me

17  what a cash report is?  What kind of information

18  is on a cash report?

19       A.    It took various forms over the period in

20  time.  If you could be more specific to a period,

21  I'm happy to tell you what I recall.

22       Q.    So is it the case that what was in a

23  cash report changed between 2017 and 2019?

24       A.    The information and the format it was

25  presented changed.

Page 56

1                           D. Kesler

2          Q.    Is the same thing true with respect to

3    Clearwater?

4          A.    Yes.

5          Q.    In -- I want to take this by year.   And

6    if you need to get more granular than that, just

7    let me know.   But how often was Mr. Hoops needing

8    to provide credit support in 2017?

9          A.    I have no idea.   If I had the reports I

10   could tell you.   But from memory, I have no idea.

11         Q.    Same thing true for 2018 and 2019, you

12   don't really --

13         A.    I am unsure.   It was not uncommon.

14         Q.    Every week?

15         A.    I couldn't say with any certainty

16   sitting here today.

17         Q.    And the loans that Mr. Hoops and/or

18   Clearwater provided were documented with e-mails

19   authorizing those loans, correct?

20         A.    E-mails from Mr. Hoops?

21         Q.    I'm asking you, I mean, was the fact

22   that these loans were being extended documented in

23   e-mails at all?

24         A.    Yeah, there's a fair number of e-mails

25   directing or instructing this information, sure.

1                    D. Kesler

2            But no, your daily sweeps, ins and outs

3    on the line of credit, were not needed, nor was

4    approval typically given to United Bank.

5        Q.   Thank you for that clarification.

6            What about if Mr. Hoops' or Clearwater's

7    line of credit was needed, what authorizations, if

8    any, did United Bank require in order to access

9    those?

10       A.   I believe that changed over the period.

11   Can you be specific?  I couldn't tell you which

12   period.  Towards the -- towards the end, I believe

13   United Bank had the ability to draw directly from

14   Mr. Hoops' or Clearwater.  I am uncertain if that

15   is the case.

16           Earlier in the process -- I'm uncertain

17   of the period, but earlier in the process, either

18   Mr. Hoops or myself, with Mr. Hoops' approval,

19   authorized the withdrawal on the Hoops line of

20   credit.

21       Q.   So there was a time period when you

22   or -- you, with Mr. Hoops' approval, or Mr. Hoops

23   would authorize the tapping of those lines of

24   credit, correct?

25       A.   Correct.

1                        D. Kesler

2        Q.   And then you think there might have been

3   a time period where it was automatic, if I

4   understand that correctly?

5        A.   There came a time period when United

6   Bank continued the process of requesting approval

7   or seeking approval for transfers, but they put a

8   hard stop on any overdrafts in their account.  I

9   believe the hard stop was 10 o'clock; it had to be

10  funded by 10 o'clock or the funds were returned.

11            I believe at that point United Bank had

12  the ability to draw on the Hoops and/or Clearwater

13  line of credit.  I'm unsure if Mr. Hoops had an

14  agreement with United Bank or if United Bank took

15  those liberties, but my recollection is that

16  United Bank drew on the account at various periods

17  later in the process on their own accord.

18       Q.   Okay.  Another rule that I should have

19  mentioned at the beginning is that if you ever

20  need to take a break, that's totally fine, just

21  let me know.  Are you good to keep going for now?

22       A.   I'm good.

23       Q.   Okay.  Do you know who the board members

24  for Blackjewel or its holding company were?

25       A.   Not specifically.  I believe the board

1              D. Kesler

2         Some of the guys under Jeff Scofield and

3    John Reynolds -- Blair Barlow, Brian Berger,

4    possibly some others -- occasionally they would

5    ask for a report or an undate on something

6    specific and it would be provided.  I can't tell

7    you sitting here today what those were, but I had

8    interactions with Lime Rock over a period of time.

9         Q.   And those financial documents that you

10   said you put together regularly for Lime Rock,

11   would those reflect the amount of debt that the

12   company had to, for example, United Bank?

13        A.   Yes.

14        Q.   Would they reflect the amount of debt

15   that the company had to Jeff Hoops or Clearwater?

16        A.   Yes.  I mean, they saw the monthly

17   financials.  The amounts to Hoops were recorded on

18   the monthly financials.  And the balance, as

19   discussed earlier, particularly later in the

20   process, on the last iteration of the cash

21   schedule, the balance due to Hoops was on the

22   schedule.

23        Q.   As CFO of Blackjewel, prior to that

24   Revelation, did you ever refuse to provide any

25   information requested by Lime Rock?

## ASSIGNMENT

FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the undersigned, JEFFERY A. HOOPS and PATRICIA A. HOOPS (together, "*Assignors*") hereby assign, transfer and deliver unto CLEARWATER INVESTMENT HOLDINGS, LLC, a Delaware limited liability company, all of Assignors' right, title and interest in and to the outstanding principal balance and all accrued and unpaid interest thereon payable to Assignors pursuant to the revolving line of credit extended by Assignors to Blackjewel L.L.C., a Delaware limited liability company ("*Blackjewel*").

As of the effective date hereof, the outstanding balance due and payable to Assignors by Blackjewel under the revolving line of credit is as follows:

| Principal | $4,775,505.18 |
| Accrued interest | $67,826.69 |
| | $4,843,331.87 |

This Assignment is made effective as of April 24, 2019.

JEFFERY A. HOOPS

PATRICIA A. HOOPS

Clearwater AP Defendant 00000137

162

1    Q.  I think this is in your interrogatory
2  responses and we may have even covered it when I
3  took your deposition before.  But when you refer to
4  yourself as CFO of Clearwater, you're referring to
5  your functional duties; is that right?
6    A.  Yes, sir.
7    Q.  There's nothing in the Clearwater
8  operating agreement that designates the CFO position
9  or that you're aware of; is that right?
10    A.  That's correct.
11    Q.  And you're not aware of any formal
12  resolution of Clearwater establishing an office
13  position -- or an officer position, correct?
14    A.  Right.  That's correct.
15    Q.  You're referring in substance to the
16  nature of the duties that you do for Clearwater; is
17  that right?
18    A.  Yes, sir.
19    Q.  How are you compensated for those duties?
20    A.  Paid a salary.
21    Q.  You're aware that some of the claims in
22  this litigation relate to line of credit activity as
23  between Clearwater and Blackjewel.  I'm not saying
24  those are all.  I'm taking it piece by piece.  Is
25  that your general understanding?

163

1    A.  Yes.
2    Q.  As well as some claims relating to line of
3  credit activity as between a Hoops personal line of
4  credit and Blackjewel; is that correct?
5    MS. SIEG:  Objection to form.
6    A.  I'm aware of that, yes.
7  BY MR. KANE:
8    Q.  The Hoops personal line of credit, was
9  that a joint line of credit with Jeff and Patricia?
10    A.  The personal line of credit between Jeff
11  and the debtors or Revelation Energy -- Revelation
12  and Blackjewel?
13    Q.  Yes.
14    A.  To my understanding, it was just between
15  him personally and Revelation and Blackjewel, but I
16  could be mistaken on that.  It might have been a
17  joint.  I would refer to the document itself.
18    Q.  I'm going to call that line of credit just
19  the Hoops line of credit and we'll leave that issue
20  open.  But if I say the Hoops line of credit, the
21  line of credit we were just talking about, and
22  you'll understand that, right?
23    A.  Yes, sir.
24    Q.  And that Hoops line the credit was with
25  United Bank, correct?

164

1    MS. SIEG:  Objection to form.
2  BY MR. KANE:
3    Q.  The line of credit was provided by United
4  Bank to Hoops?
5    A.  That is my understanding, that he had a
6  line of credit set up at United Bank and with the
7  purpose of providing some credit to Revelation and
8  Blackjewel, yes.
9    Q.  And back to what a moment ago I referred
10  to as the Clearwater line of credit.  That was a
11  line of credit at United Bank provided by United
12  Bank to Clearwater; is that correct?
13    A.  Yes, sir.
14    Q.  And if I just call that one the Clearwater
15  line of credit, you'll know what I'm referring to,
16  correct?
17    A.  Yes, sir.
18    Q.  Is it your understanding that in 2019 from
19  January through the petition date let's say there
20  were various advances and repayments on the
21  Clearwater line of credit?
22    A.  Yes.
23    Q.  Advances from the Clearwater line of
24  credit to a Blackjewel account, correct?
25    A.  Yes.

165

1    Q.  And then -- I'm saying -- I'm choosing my
2  words carefully, and we can call them -- we can
3  define them because there's a -- part of the
4  disagreement between the parties is how to
5  characterize them, so I'm saying as neutrally as
6  possible advances and repayments.
7    So then in addition to the advances from
8  the Clearwater line of credit to Blackjewel there
9  were then repayments from Blackjewel to the
10  Clearwater line of credit.
11    Is that your understanding?
12    A.  Yes, sir.
13    Q.  And similarly, for what we're calling from
14  the Hoops line of credit, there were advances from
15  the Hoops line of credit to Blackjewel for that same
16  period throughout 2019 up to the petition date,
17  correct?
18    MS. SIEG:  Objection to form.
19    A.  Well, the relationship between the Hoops
20  line of credit and Blackjewel, from my understanding
21  -- and there may have been some transactions, but
22  Clearwater acquired the balance from the Hoops line
23  of credit.
24    And once that started, my understanding is
25  that there were no other transactions between the

166

1  Hoops personal line of credit and the debtors.  So
2  Clearwater was providing -- I think that was around
3  April of 2019 -- Clearwater became kind of the --
4  was -- sorry.
5      Prior to April it was Hoops personal line
6  of credit and Blackjewel and Revelation.  April
7  2019, it was Clearwater line of credit and
8  Blackjewel Revelation through the petition date.
9  BY MR. KANE:
10     Q.  Is it your understanding -- and I'm going
11  to ask you about that period and that assignment in
12  some detail.  But you're indicating that your and
13  Clearwater's understanding is that all of the line
14  of credit advances and repayments after that April
15  2019 assignment took place only under the Clearwater
16  line of credit?
17     MS. SIEG:  Objection to form.
18     A.  That is my understanding as from
19  Clearwater's perspective and as the CFO of
20  Clearwater.  I didn't have access to their personal
21  records, so if there were some transactions that
22  lingered out beyond that, I can't recall, sitting
23  here, if that's the case.
24  BY MR. KANE:
25     Q.  Okay.

167

1      A.  But my understanding is that once we were
2  assigned that personal line of credit, then
3  Clearwater was the -- stop loss was the -- you know,
4  our revolving line of credit was provided to
5  Blackjewel and Revelation from that point until the
6  petition date.
7      Q.  You don't remember, for example, doing a
8  reconciliation where you indicated to someone that
9  there was a substantial line of credit transaction
10  that Drew said -- Drew Kesler said came from
11  Clearwater and it really came from the Hoops line of
12  credit?
13     A.  It's possible that I did a reconciliation
14  and would just refer back to my previous
15  deposition or the documents.
16     Q.  And sitting here right now, your and
17  Clearwater's recollection is that there were no
18  advances and repayments under the Hoops line of
19  credit in June of 2019?
20     MS. SIEG:  Objection.  That misstates his
21  prior answer.
22     A.  I would refer back to a previous
23  deposition and any documents that are out there.
24  It's certainly possible that I did a reconciliation,
25  and I do recall a transaction right there at the end

168

1  of June that was questionable.  If I recall, though,
2  it was a transaction that occurred that Friday over
3  into the weekend and it was a Clearwater
4  transaction.
5      I've spent a lot of time reviewing
6  documents and in preparing for this.  This detail is
7  kind of slipping my mind, so I would just say I'd
8  like to refer to those previous documents or
9  depositions if there is a transaction that happened
10  on the Hoops line of credit that was prior to -- or
11  after April 2019.
12  BY MR. KANE:
13     Q.  Understanding that, and I'm not trying to
14  be argumentative, but part of my job is to exhaust
15  your recollection the one and only time I'm going to
16  get to take your deposition.
17     So, sitting here right now, do you not
18  know if there were advances and repayments under the
19  Hoops line of credit after that April 2019
20  assignment.  Is that a fair statement?
21     A.  The Clearwater line of credit did get
22  maxed out, so I do recall at some point Jeff
23  stepping in to help, but my memory is kind of foggy
24  on that transaction.
25     Q.  What was the maximum amount of the

169

1  Clearwater line of credit?  Was it $11 million in
2  2019?
3      A.  Yes, sir.
4      Q.  When did the Clearwater line of credit get
5  established at United Bank?
6      A.  We, I believe, originally was (sic)
7  looking to establish it either early 2019 or late
8  2018, and I believe we went through those documents
9  at the previous deposition.  But it didn't start --
10  the first activity wasn't until, I think, April 19 -
11  - April 24th or something, in that ballpark.
12     Q.  Of 2019?
13     A.  Of 2019, yes, sir.
14     Q.  And because it wasn't established until
15  then, any prior line of credit activities and
16  advances and repayments would have been under the
17  Hoops line of credit, right?
18     A.  That's correct.
19     Q.  Has Clearwater ever done a reconciliation
20  of the advances and repayments under the Clearwater
21  line of credit?
22     A.  Yes.
23     Q.  When was that reconciliation performed?
24     A.  I reconciled every transaction that went
25  through that revolving line of credit with Drew, DJ,



Brent Walls    March 16, 2022    NDT Assgn # 56151    Page 54

210

1     A.  Yes, sir.
2     Q.  How did you -- how did Clearwater prepare
3 that information?
4     A.  Through the reconciliations, as I
5 discussed earlier, between United Bank's records and
6 my accounting records.
7     Q.  And what's reflected in Interrogatory No.
8 2 is -- just represents the Clearwater line of
9 credit and not the Hoops line of credit, correct?
10     A.  That is correct.
11     Q.  And Clearwater received all of the
12 repayments indicated in the response to
13 Interrogatory No. 2 in the amounts and on the dates
14 indicated there, correct?
15     MS. SIEG:  Objection to form.
16     A.  These payments were received against --
17 directly against the line of credit at United Bank,
18 yes.
19 BY MR. KANE:
20     Q.  Nothing about this as you look at it now
21 is inaccurate with respect to the Clearwater line of
22 credit transactions, right, to the best of your
23 knowledge?
24     A.  Correct.
25     Q.  And as ta ked about earlier and as

211

1 indicated here, these payments were made directly to
2 the Clearwater line of credit from the Blackjewel
3 account, correct?
4     A.  Yes.
5     MR. KANE:  Exhibit No. 21, please.
6     (Exhibit Number 21 was marked for
7 identification and was attached to the deposition.)
8 BY MR. KANE:
9     Q.  Mr. Walls, you've been handed what's been
10 marked as Exhibit 21 to your deposition.
11     A.  Yes.
12     Q.  Is that Clearwater's proof of claim in the
13 Blackjewel, LLC bankruptcy case?
14     A.  Yes.
15     Q.  There is an amount reflected in the proof
16 of claim for a little bit more than $7.28 million.
17     Do you see that?
18     A.  Yes, sir.
19     Q.  Under Section 8 basis of claim, it states
20 money loaned.
21     Do you see that?
22     A.  Yes, sir.
23     Q.  What is Clearwater's proof of claim in
24 that amount for?
25     A.  It is the remaining balance on that

212

1 revolving line of credit with United Bank that was
2 allocated directly to Blackjewel through
3 reconciliation of all the monies that were loaned to
4 and loaned from that line of credit to Blackjewel's
5 operating account in which I believe a
6 reconciliation of that amount has been provided to
7 you during the discovery.
8     Q.  So adding up all of the flows in and out
9 on the Clearwater line of credit, that is the amount
10 -- and I will tell you there's a page here that
11 details it -- of what Clearwater says is owed for
12 advances under that line of credit, correct?
13     A.  In short summary, it lists principal plus
14 accrued interest, yes.
15     Q.  How was accrued interest calculated?
16     A.  It was the interest that was calculated
17 the same rate that United Bank was charging on the
18 revolving line of credit, so it was a pass-through
19 cost.
20     Q.  The amount of accrued interest that's
21 reflected in the proof of claim, do you know what
22 period that relates to?
23     A.  I would have to look back through my
24 documents, but, as we sit here, I can't because I
25 know we also invoiced an interest amount.  And I'm

213

1 not sure looking back at this and in my memory right
2 now if that invoice -- if the invoice accrued
3 interest -- if it's included in the principal or if
4 it's lumped together with this accrued interest
5 amount.
6     So I don't know that particular breakdown,
7 so I'm not sure if this 109 is for the entire
8 period. I would have to go back through my documents
9 to see how we came up with that number.  There's
10 various different ways to calculate interest.
11     Q.  Did you participate in the preparation of
12 this proof of claim?
13     A.  I did.  I certainly helped with the
14 preparation of this with Dinsmore.
15     Q.  Interest wasn't paid under the Hoops line
16 of credit, was it?
17     MS. SIEG:  Objection to form.
18     A.  I don't think so, but I wasn't prepared to
19 answer that question, but I don't think it was.  I
20 recall seeing some other communication about that.
21 BY MR. KANE:
22     Q.  Did interest start getting charged on the
23 Clearwater line of credit when you became
24 responsible for it?
25     MS. SIEG:  Objection to form.

214

1    A.  Well, I saw the Clearwater revolving line
2  of credit.  We had interest, so there was a cost
3  there, and my responsibility as CFO of Clearwater is
4  to ensure that Clearwater is made whole or made as
5  whole as possible.  So yeah, I would have invoiced
6  that interest.
7  BY MR. KANE:
8    Q.  Did you have any communications with Mr.
9  Hoops about invoicing that interest amount?
10    A.  I'm sure there's communication there.
11    Q.  What ones are you sure of?
12    A.  I mean, I wouldn't have invoiced
13  Blackjewel without also copying him on the invoice
14  when I sent it to Drew for the interest amount, so
15  that was calculated and invoiced and documentation
16  sent to Drew and his team and Jeff.
17    Q.  But before you sent an invoice, did you
18  have any communications with Mr. Hoops about
19  applying interest to the Clearwater line of credit
20  balance?
21    A.  I do believe so.  I don't recall when or
22  the nature of that conversation, but I do remember
23  having a conversation and that we needed to make
24  sure -- Clearwater needed to make sure it invoiced
25  the interest.

215

1        And, again, it was a pass-through -- it
2  was a pass-through cost from Clearwater because the
3  interest on that Clearwater revolving line of credit
4  -- it was due to United on a monthly basis and it
5  wasn't -- you know, they drew that right out of
6  Clearwater's operating account.
7        So Clearwater paid the interest on that
8  revolving line of credit.  Then we turned around and
9  invoiced that interest to Blackjewel.
10    Q.  So the conversation you remember about
11  interest on the Clearwater line of credit, who do
12  you remember that conversation being with?
13    MS. SIEG:  Objection to form.
14    A.  It would have been with Jeff.  I'm sure I
15  spoke to the family about it.  That's not something
16  that I -- you know, although I may not have, I would
17  have seen that just as an ordinary course of
18  business and just handled it as the CFO of
19  Clearwater.
20  BY MR. KANE:
21    Q.  When you say you would have, my specific
22  question is:  Was there such conversation or was
23  there not, to the best of your recollection?
24    MS. SIEG:  Objection.  Asked and answered.
25    A.  I do recall an email.  I just cannot point

216

1  you to a day or time.  I believe you have all my
2  emails and you can probably find that, but I do
3  recall email correspondence.
4  BY MR. KANE:
5    Q.  Email correspondence about whether
6  interest should be charged on the Clearwater line of
7  credit.  That's what you recall?
8    A.  Yes.
9    Q.  And you don't remember the date of the
10  email?
11    A.  I don't.
12    Q.  You don't remember who the email is with?
13    MS. SIEG:  Objection to form.
14    A.  It would have been to Jeff and Drew at a
15  minimum.
16  BY MR. KANE:
17    Q.  Why was interest charged on the Clearwater
18  line of credit when it wasn't charged on the Hoops
19  line of credit?
20    MS. SIEG:  Objection to form.  Asked and
21  answered.
22    A.  Well, from Clearwater's perspective, we
23  weren't going to pay to loan money or to -- we
24  weren't going to pay to loan money to Clearwater --
25  or sorry -- to Blackjewel and Revelation.  That was

217

1  an expense.
2        So we negotiated a fair rate with United
3  Bank and we passed that cost right to Blackjewel
4  based on the amount that was being borrowed.
5  BY MR. KANE:
6    Q.  Was there any negotiation of a rate
7  between Clearwater and Blackjewel?
8    MS. SIEG:  Objection.  Asked and answered.
9    A.  It was understood that they were going to
10  pay the interest that we were paying to United for
11  the revolving line of credit.
12  BY MR. KANE:
13    Q.  Understood by whom?
14    A.  Jeff, Drew, Scoffield.  Reynolds probably
15  knew about it.  You know, my -- as the Clearwater
16  representative, once we had Jeff and Drew's
17  understanding of it, if they discussed it with their
18  board, I feel that was on them.
19    Q.  What's the basis for your statement that
20  Scoffield and Reynolds knew about the interest?
21    A.  Well, they knew about the agreement.  They
22  knew about the overall transaction and the loans
23  going back and forth.
24    Q.  But specifically you said they knew about
25  the interest.  What's the basis for your

226

1  contend establish the terms of the agreement to the
2  line of credit arrangement?
3        MS. SIEG: Objection to form.
4        A.  I would just continue referring to the
5  emails and previous discussions and depositions.
6  BY MR. KANE:
7        Q.  Was there a maturity date for the line of
8  credit advances by Hoops or Clearwater?
9        A.  Not to my knowledge.
10       Q.  Was there a schedule of repayment?
11       A.  What do you mean by that?
12       Q.  Promissory notes that call for monthly
13  payments, annual payments, other terms.
14       A.  Got you.  So, again, with any normal
15  working capital revolving line of credit, it was
16  understood that advances would be made as needed and
17  repayments would be made as -- as the funds became
18  available in their operating account.
19       In terms of, you know, regularly scheduled
20  payments, I would refer to the interest.  As United
21  Bank billed and charged Clearwater for that
22  interest, we would turn around and bill that to
23  Blackjewel.  So from that regard, I think you could
24  consider it an interest-only revolving line of
25  credit with day-to-day activity.

227

1        And this is pretty common practice, I
2  think, amongst the business.  I see it all the time
3  where you have a revolving line of credit tied to an
4  operating account and it's used almost daily.
5        Q.  Where is it common that you've seen it
6  before?
7        A.  I remind you that I own a CPA firm with
8  thousands of clients and almost every single one of
9  my business clients have a revolving line of credit.
10       Q.  Do any of them have a revolving line of
11  credit where tens of millions of dollars were
12  advanced and repaid and there's no loan agreement or
13  other instrument that governs it?
14       MS. SIEG: Objection to the form of the
15  question.  Calls for speculation and confidential
16  information of other clients not relevant to this
17  litigation.
18       A.  Not every client have I looked at their
19  documentation.
20  BY MR. KANE:
21       Q.  You mentioned the interest again.  Is
22  there any document -- written document that you're
23  aware of that talks about what the interest rate is
24  or how it's to be calculated?
25       MS. SIEG: Objection.  Asked and answered.

228

1        A.  We have the document from United Bank for
2  the revolving line of credit itself and we use that
3  same interest as a pass-through interest to
4  Blackjewel, so I would refer back to that or the
5  email correspondence.  But in terms of a promissory
6  note, there is no promissory note.
7  BY MR. KANE:
8        Q.  And I know you said we use the United Bank
9  line of credit.  I'm talking about as not between
10  United Bank and Clearwater.  I'm talking about as
11  between Clearwater and Blackjewel.
12       Is there any document that establishes how
13  interest is to be calculated or paid?
14       MS. SIEG: Objection.  Asked and answered.
15       A.  Well, again, it was meant to be a pass-
16  through interest.  So we weren't making money off
17  the interest.  We weren't going to lose money off
18  the interest either.
19       So if the balance for that month was 100
20  percent for Blackjewel and we were charged interest,
21  then 100 percent of that interest was invoiced to
22  Blackjewel based on United Bank's calculation of the
23  interest owed on the revolving line of credit at the
24  end of each month.
25  BY MR. KANE:

229

1        Q.  But my question, Mr. Walls, is:  Is there
2  any document that establishes the agreement to do it
3  the way you just said?
4        MS. SIEG: Objection.  Asked and answered.
5        A.  Email correspondence.
6  BY MR. KANE:
7        Q.  And that's the email correspondence you're
8  referring to about the interest before?
9        A.  Yes, sir.
10       Q.  And you believe that email correspondence
11  says, hey, this is how we're going to calculate and
12  pay interest?
13       A.  Something along those terms or that we
14  were passing the interest along to Blackjewel.
15       Q.  What was the source of repayment of the
16  advances by Blackjewel?
17       MS. SIEG: Objection to form.
18       A.  Elaborate.
19  BY MR. KANE:
20       Q.  What was Blackjewel going to use to repay
21  the line of credit advances?
22       A.  I think it would be speculation, but it
23  would be whatever was deposited into their account
24  for coal sales or scrap sales or whatever it was
25  that they were depositing into their checking

502217



# MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (herein "Mortgage") is made effective as of December 1, 2016, between Revelation Energy, LLC, a Kentucky limited liability company, whose address is 1051 Main Street, Milton, West Virginia 25541 (hereinafter "Mortgagor"); and (ii) Jeffery A. Hoops, individual with an address of 1149 Newmans Branch Road, Milton, West Virginia 25541 ("Mortgagee").

WHEREAS, Mortgagor and Mortgagee executed that certain Promissory Note dated as of even date herewith (the "Promissory Note") through which Mortgagor is indebted to Mortgagee in the principal sum of Six Million Five Hundred Sixty Five Thousand Dollars ($6,565,000.00) with interest thereon from the date hereof at the rate of Fifteen Percent (15.0%) per annum from date until paid;

WHEREAS, TO SECURE Mortgagee with the repayment of the indebtedness evidenced by the Promissory Note, with the interest upon default as stated in the Promissory Note, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Mortgagor herein contained (the "Obligations"), Mortgagor does hereby mortgage, grant and convey to Mortgagee that real property and interest therein located in Harlan and Letcher Counties in the Commonwealth of Kentucky and Wise, Buchanan, and Tazewell Counties in the Commonwealth of Virginia, said property being more fully described on Exhibit "A" which is attached hereto and incorporated herein by reference (the "Property");

TOGETHER with any and all of the fixed assets of Revelation (the "Fixed Assets") located in Letcher and Harlan Counties, Kentucky and in Wise County, Buchanan, and Tazewell Counties, Virginia, whether currently owned or hereinafter existing, created, acquired, or arising whether by ownership, security interest or otherwise, and any and all related warranties and General Intangibles; (ii) any and all replacements, repairs, repair parts, spare parts, additions, attachments, accessories and Accessions to any of the foregoing Fixed Assets; and (iii) Proceeds and products, whether tangible or intangible, of any Fixed Assets, including, without limitation, Accounts, Proceeds of Insurance, or any other property or equity resulting from sale, lease or other disposition of the foregoing Fixed Assets, including, but not limited to, proceeds of notes, checks, instruments, indemnity proceeds, or any insurance on such and any refund or rebate of premiums on such (together with the Fixed Assets, the "Collateral"), securing the indebtedness and Obligations for the benefit of Mortgagee, and the Mortgagee is authorized to perfect the same by electronic or other filing as may be allowed by law; and

TOGETHER with all permits, licenses, waivers, or consents now or hereafter dealing with, affecting or concerning the Property.

To further secure to Mortgagee the payment of the Obligations described hereinabove, and any and all other indebtedness of Mortgagor to Mortgagee, whether now existing or hereafter incurred, Mortgagor further grants to Mortgagee a security interest in and to any of the Collateral that may be or become subject to Article 9 of the Uniform Commercial Code applicable in either the Commonwealth of Kentucky or the Commonwealth of Virginia (the "UCC").

(The "Property" and the "Collateral" are hereinafter referred to collectively as the "Mortgaged Estate.")

It is the intention of the parties hereto that this Mortgage shall embrace and Mortgagor does hereby grant to Mortgagee a mortgage and security interest in all of the properties, rights, interests, claims, demands and privileges of every kind and character as are owned or leased by Mortgagor or in which Mortgagor has rights in or relating or appurtenant to any of the Property, whether fee, mineral, surface, leasehold, easement, right of way or otherwise,  and whether or not specifically described above, together with all rents, royalties and other income arising from the operation of the Property or the interests therein.

Mortgagor covenants to Mortgagee that Mortgagor is well seized of the Mortgaged Estate, subject to the lien hereof, and has good right and full power to grant, bargain, sell, convey, mortgage, grant a security interest in and warrant the same as herein described.  Mortgagor covenants that the premises and properties constituting the Mortgaged Estate are and will be free from all liens and encumbrances whatsoever, excepting only such exceptions as may be contained in the deed by which Mortgagor derives title, the  lien of general taxes not yet due and payable, easements and restrictions of record affecting the Property, and restrictions and zoning laws affecting the Property, none of which impair or will impair the value of the Mortgaged Estate as collateral for payment of the Promissory Note.  Mortgagor warrants and will defend the said Mortgaged Estate, with the privileges and appurtenances thereunto belonging, to Mortgagee, its successors and assigns forever, against all claims and demands whatsoever adverse to the interest of Mortgagee, at Mortgagor's sole expense.

Mortgagor and Mortgagee covenant and agree as follows:

1.    <u>Payment of Principal and Overdue Payment Interest</u>.  Mortgagor shall promptly pay when due the principal of and interest on, the indebtedness evidenced by the Promissory Note.

2.    <u>Application of Payments</u>.  Unless applicable law provides otherwise, all payments received by Mortgagee under the Promissory Note and Paragraph 1 hereof shall be allocated between principal, interest and fees, if any, in the discretion of Mortgagee.

3.    <u>Charges; Liens</u>.  Mortgagor shall pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and Mortgagor shall additionally promptly pay any leasehold payments, ground rents and royalties due or

Confidential
Clearwater AP Defendant 00304439

which become due from Mortgagor, making payment, when due, directly to the payee thereof. Mortgagor shall further pay all taxes, assessments and other charges, fines and impositions attributable to the Mortgaged Estate which may attain a priority over this Mortgage by Mortgagor making payment, when due, directly to the payee thereof.  Mortgagor shall promptly discharge any lien which has priority over this Mortgage; provided, that Mortgagor shall not be required to discharge any such lien so long as Mortgagor shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Mortgagee, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Mortgaged Estate or any part thereof.

4.    <u>Preservation and Maintenance of Mortgaged Estate</u>.  Mortgagor shall keep the Mortgaged Estate in good repair, cause the Mortgaged Estate to be utilized in conformance with all applicable laws, regulations and ordinances and shall not commit waste or permit impairment or deterioration of the Mortgaged Estate.

5.    <u>Protection of Mortgagee's Security and Prohibition of Other Liens</u>.  Mortgagor shall not voluntarily create or otherwise permit to be created or filed against the Property, any mortgage lien, or any other lien or liens, charge or encumbrance of any nature (except as otherwise expressly authorized by this Mortgage), whether inferior or superior to the lien of this Mortgage, without the prior express written consent and approval of Mortgagee, which consent and approval will not be unreasonably withheld on mortgages which are second and inferior to the lien of this Mortgage if the proceeds of which are used to make improvements to the Property, and provided (i) said inferior or subordinate mortgage states that the proceeds secured by such mortgage are to be used only for improvements to the Property; and (ii) said mortgage states said mortgage is second and inferior to the lien of this Mortgage.  Mortgagor will keep and maintain the Property free from the claims of all persons supplying labor or materials which shall enter into the construction of any and all buildings and improvements now being created or which hereafter may be erected on the Property notwithstanding by whom such labor or materials may have been contracted.  On the failure of Mortgagor to perform any of the covenants contained in this Section, or any part thereof, thereupon (subject to any applicable requirement of notice and opportunity for cure) the un-paid portion of the principal of the Promissory Note secured hereby and all arrears of interest thereon and all of the other Obligations shall, at the option of Mortgagee, become immediately due and payable. Notwithstanding the foregoing, Mortgagor shall have the right to contest any such lien or claim of any person supplying such labor or materials, provided (i) that such contest shall preclude enforcement of collection out of and from the sale of the Property  in satisfaction of such lien, (ii) Mortgagor shall furnish Mortgagee with a bond or other security satisfactory to Mortgagee, and (iii) such contest shall not otherwise create a failure on the part of Mortgagor to comply with any other provisions or conditions hereof.

If Mortgagor fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Mortgagee's interest in the

Confidential

Clearwater AP Defendant 00304440

Mortgaged Estate, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Mortgagee at Mortgagee's option, upon notice to Mortgagor, may make such appearances, disburse such sums and take such action as is necessary to protect Mortgagee's interests, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property or other premises to make repairs to the Mortgaged Estate.

Mortgagor shall save Mortgagee harmless from all loss, reasonable cost and expense, including reasonable attorneys' fees, and the cost of a title search, continuation of abstract and preparation of survey, incurred by reason of any action, suit proceeding, hearing, motion or application before any court or administrative body in and to which Mortgagee may be or become a party by reason hereof, including but not limited to condemnation, bankruptcy, probate and administration proceedings, as well as any other of the foregoing wherein proof of claim is by law required to be filed or in which it becomes necessary to defend or uphold the terms of, or the lien created by, this Mortgage, and all money paid or expended by Mortgagee in that regard, together with interest thereon from the date of such payment at the rate set forth in the Promissory Note as applicable after the occurrence of a default thereunder, shall be so much additional indebtedness secured hereby and shall be immediately and without notice be due and payable by Mortgagor.

Mortgagor further shall protect, defend, indemnify and save Mortgagee harmless under this Mortgage from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expense (including, without limitation, reasonable attorneys' fees and expenses imposed upon, incurred by, or asserted against, Mortgagee) on account of (i) any failure of the Mortgagor to comply with any of the covenants and conditions on the part of Mortgagor to be performed or representations of Mortgagor contained in this Mortgage, or (ii) any loss or damage to the Property or any injury to, or death of, any person that may be occasioned by any cause whatsoever pertaining to the Property or the use thereof, provided that such indemnity shall be effective only to the extent of any loss that may be sustained by Mortgagee in excess of any net proceeds of the insurance received by it from any insurance (other than self-insurance) carried with respect to such loss and provided further that the benefits of this Section shall not inure to any person other than Mortgagee and its successors and assigns. Nothing contained herein shall require the Mortgagor to indemnify Mortgagee for any claim or liability resulting from the gross negligence or willful and wrongful acts of Mortgagee during the term of this Mortgage. The indemnities contained in this Section shall survive payment of the Obligations and the release of this Mortgage, and shall extend to the officers, directors, employees and duly authorized agents of Mortgagee.

6.    Condemnation. If all or any part of the Mortgaged Estate shall be damaged or taken through condemnation (which term when used herein shall include any damage or taking by any governmental authority or any other authority authorized by the laws of the commonwealth where the Property is located or the United States of America to so damage or take, and any transfer by private sale in lieu thereof), either temporarily or permanently, Mortgagee, to the extent of the then

Clearwater AP Defendant 00304441

current indebtedness of Mortgagor to Mortgagee under the Promissory Note, shall be entitled to all compensation awards, damages, claims, rights of action and proceeds of, or on account of any damage or taking through condemnation and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or Mortgagor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation awards, damages, claims, rights of action and proceeds, and any other payments or relief, and the right thereto, are hereby assigned by Mortgagor to Mortgagee, who, after deducting therefrom all its expenses, including attorney's fees, may release any monies so received by it without affecting the lien of this Mortgage or may apply the same, in such manner as Mortgagee shall determine, to the reduction of the sums secured hereby. Any balance of such monies then remaining shall be paid to Mortgagor. Mortgagor agrees to execute such further assignments of any compensation, awards, damages, claims, rights of action and proceeds as Mortgagee may require.

If all or any part of the Mortgaged Estate is abandoned by Mortgagor, or if, after notice by Mortgagee to Mortgagor that the condemnor offers to make an award or settle a claim for damages, Mortgagor fails to respond to Mortgagee within thirty (30) days after the date such notice is mailed, Mortgagee is authorized to collect and apply the proceeds, at Mortgagee's option, either to restoration or repair of the Mortgaged Estate or to the sums secured by this Mortgage.

Unless Mortgagee and Mortgagor otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of any payments referred to in Paragraph 1 hereof or change the amount of such payment.

7.    Mortgagor Not Released. Neither extensions of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Mortgagee to Mortgagor, or to any successor in interest of Mortgagor, nor the release of other parties or collateral, shall operate to release, in any manner, the liability of the original Mortgagor and Mortgagor's successors in interest. Mortgagee shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Mortgagor and Mortgagor's successors in interest.

8.    Forbearance by Mortgagee Not a Waiver. Any forbearance by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Mortgagee shall not be a waiver of Mortgagee's right to accelerate the maturity of the indebtedness secured by this Mortgage. No waiver of any event of default hereunder shall extend to or affect any subsequent or any other event of default then existing, or impair any rights, powers or remedies consequent thereon. If Mortgagee (a) grants forbearance or an extension of time for the payment of any sums secured hereby; (b) takes other or additional security for the payment thereof; (c) waives or does not exercise any right granted in the Promissory Note, this Mortgage, any other instrument securing the Promissory Note or any other document or

Confidential

agreement; (d) releases any part of the Mortgaged Estate from the lien of this Mortgage or any other instrument securing the Promissory Note; or, (e) makes or consents to any agreement changing the terms of this Mortgage or subordinating the lien or any charge hereof, no such act or omission shall release, discharge, modify, change or affect the original liability under the Promissory Note, this Mortgage or otherwise of Mortgagor, or any subsequent purchaser of the Mortgaged Estate or any part thereof or any maker, cosigner, endorser, surety or guarantor.  No such act or omission shall preclude Mortgagee from exercising any right, power or privilege herein granted or intended to be granted in case of any event of default then existing or of any subsequent event of default nor, except as otherwise expressly provided in an instrument or instruments executed by Mortgagee, shall the lien of this Mortgage be altered thereby.

     9.    <u>Remedies Cumulative</u>.  All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage, any other agreement between Mortgagor and Mortgagee or afforded by law or equity, and may be exercised concurrently, independently or successively.

     10.    <u>Successors and Assigns Bound; Joint and Several Liability; Captions</u>.  The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective heirs, successors and assigns of Mortgagee and Mortgagor.  The captions and headings of the paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

     11.    <u>Notice</u>.  Any notice given to any party to this Mortgage shall be given in writing and personally delivered or sent by registered or certified mail, postage prepaid, addressed to such party at the address first set forth for such party in this Mortgage, or to such other address as such party shall have designated in a written notice given in accordance with this Section to the party sending such notice.

     12.    <u>Governing Law; Severability</u>.  This Mortgage shall be interpreted and construed under and governed by the laws of the Commonwealth of Kentucky, without regard to principles of conflicts of law.  In the event that any provision or clause of this Mortgage or the Promissory Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Promissory Note which can be given effect without the conflicting provision, and to this end the provisions of the Mortgage and the Promissory Note are declared to be severable.

     13.    <u>Security Agreement; Financing Statements</u>.  Mortgagor acknowledges receipt of a conformed copy of the Promissory Note and of this Mortgage.  Mortgagor promptly upon request by Mortgagee shall execute, acknowledge and deliver to Mortgagor any financing statement, affidavit, continuation statement or certificate or other document that Mortgagor reasonably may request in order to perfect, preserve, maintain or continue the security interest in the Mortgaged Estate under this Mortgage and the priority of such security interest, and upon any failure by Mortgagor to do so

Confidential

Mortgagee automatically shall be vested with power of attorney for Mortgagor, coupled with an interest, for such purposes. Mortgagor further agrees to pay to Mortgagee on demand all costs and expenses incurred by Mortgagee in connection with the preparation, execution, recording, filing and refiling of any such documents. In addition to being a mortgage this Mortgage is intended to be a security agreement and a fixture filing pursuant to the UCC for the items specified above as part of the Property (including goods constituting part of the Collateral that are or are to become fixtures) which, under applicable law, may be subject to a security interest pursuant to the UCC, and Mortgagor hereby grants to Mortgagee a security interest in said items as security for the Obligations. Without limitation of the foregoing, Mortgagor agrees that Mortgagee may file this Mortgage in any personal property or real estate records or other appropriate index as a financing statement for all or any of the items specified above as part of the Property and/or Collateral. A carbon, photographic or other reproduction of this Mortgage or of a financing statement shall be sufficient as a financing statement. Furthermore, the Mortgagor expressly authorizes the Mortgagee to file and to re-file or update on its behalf and on behalf of the Mortgagee by electronic means any information which may be necessary or deemed necessary by Mortgagee to record evidence of the security interests granted hereunder with the Kentucky Secretary of State or elsewhere as may be allowed by law.

14.    Transfer of the Mortgaged Estate. Mortgagor agrees not to sell all or any portion of the Mortgaged Estate, other than coal inventory sold in the ordinary course of Mortgagor's business, or any legal or equitable interest therein, without Mortgagee's prior written consent. If, notwithstanding the foregoing, all or any part of the Mortgaged Estate or any legal or equitable interest therein is sold or transferred by Mortgagor without Mortgagee's prior written consent, Mortgagee may, at Mortgagee's option, declare all the sums secured by this Mortgage to be immediately due and payable, and without further notice or demand on Mortgagor invoke any remedies permitted by Paragraph 15 hereof.

15.    Acceleration; Remedies. Upon the occurrence of any "event of default," which, for purposes of this Mortgage, means any repossession, sale or foreclosure instituted against the Mortgaged Estate or any part thereof by a junior or any other lienholder or other person, including foreclosure or other proceedings or action to enforce any security interest, lien or encumbrance of any kind upon the Mortgaged Estate or any portion thereof, any default in, or "event of default," or breach of any covenant, agreement, representation or warranty by Mortgagor under the provisions of the Promissory Note and/or this Mortgage, any document evidencing other indebtedness secured hereby, or any other agreement with respect to which Mortgagor and Mortgagee are parties, which default has not been cured within any applicable grace period, Mortgagee shall, at Mortgagee's option, have the following rights and remedies, which, to the extent permitted by law, shall be cumulative:

(a)    to declare immediately due and payable and accelerate the entire unpaid balance due on the Promissory Note and all other obligations of Mortgagor to Mortgagee,

Confidential                                                    Clearwater AP Defendant 00304444

(b)      to enforce the lien of this Mortgage by judicial proceedings and have the Mortgaged Estate, or specific items thereof, sold and collect from Mortgagor all expenses of foreclosure, including, but not limited to, reasonable attorney's fees, court costs, costs of taking, holding, preparing for sale and sale of the Mortgaged Estate or any part thereof, and costs of documentary evidence, abstracts and title reports,

(c)      to exercise the rights granted by this Mortgage relative to collection of rents and all other rights provided by this Mortgage, and

(d)      to exercise any and all other rights and remedies afforded to Mortgagee in and against the Mortgaged Estate or any part thereof or Mortgagor provided for or permitted by applicable law, including the UCC, or the provisions of any other agreement entered into by and between Mortgagor and Mortgagee.

The remedies of Mortgagee upon the occurrence of an event of default shall, with respect to the Collateral, specifically include the following rights and powers, any of which may be exercised concurrently with or independent of those hereinabove described:

(a)      all rights and remedies of a secured party under the UCC or similar statutes, including, without limitation, the right to take possession of the Mortgaged Estate (or any part thereof) and to take such other measures as Mortgagee may deem necessary for the care, preservation or protection thereof, and for such purposes Mortgagee may enter upon the Property or upon any other premises on which the Collateral or Improvements may be situated and remove the same therefrom;

(b)      the right to require Mortgagor to assemble all of the Collateral and make it available to Mortgagee at a place to be designated by Mortgagee, or in the alternative Mortgagee may conduct any public or private sale at or upon the Property or other site where any Collateral may be located;

(c)      the right to transfer any of the Mortgaged Estate into Mortgagee's own name or that of its nominee and receive the income thereon and proceeds thereof and hold the same as security for the Promissory Note and any other obligations secured hereby or apply it to principal or interest due on the Promissory Note or other obligations secured hereby; and

(d)      the right and power of Mortgagee as attorney-in-fact for Mortgagor, with power of substitution, which right and power Mortgagor hereby irrevocably grants to Mortgagee to, in the name of Mortgagor or of Mortgagee, give, demand, collect, receipt for and give renewals, extensions, bills of sale, transfers of title, discharges and releases of any portion of the Mortgaged Estate; to institute and to prosecute legal and equitable proceedings;  to settle, compromise, compound or adjust claims in respect of any of the Mortgaged Estate or any legal proceedings brought in respect thereof; and generally to sell same in whole or in part for cash, credit or property to others at a

Confidential

Clearwater AP Defendant 00304445

commercially reasonable public sale and to assign or make any agreement with respect to or otherwise deal with any of the Mortgaged Estate as fully and completely as though Mortgagee were the absolute owner thereof for all purposes.

For purposes of this Section, disposition of the Mortgaged Estate shall be deemed commercially reasonable if made pursuant to a public offering advertised at least twice in a newspaper of general circulation in the County where the Mortgaged Estate is located for a sum equal to or in excess of the liquidating value of the Mortgaged Estate as determined by Mortgagee. The Mortgagee may bid upon and acquire any portion of the Mortgaged Estate at such public sale. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Mortgaged Estate sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute reasonable notice to Mortgagor. In addition to all other sums secured hereby, Mortgagor shall promptly pay to Mortgagee all expenses, including legal expenses and attorney's fees, incurred by or paid by Mortgagee in protecting its interest in the Mortgaged Estate, assembling and holding same for sale or other disposition and in enforcing its rights hereunder with respect thereto.

16.    Nature of this Agreement. This instrument constitutes both a real property mortgage and a "security agreement," within the meaning of the UCC, and the Mortgaged Estate includes both real and personal property and all other rights and interest, whether tangible or intangible in nature of Mortgagor in the Mortgaged Estate. Mortgagor by executing and delivering this instrument has granted to Mortgagee, as security for the indebtedness referred to herein, a security interest in the Collateral above described as a portion of the Mortgaged Estate. To the extent that any portion of the Mortgaged Estate may be defined herein as a part of the Property and as a part of the Collateral, Mortgagee, in its sole discretion, may designate how such portion of the Mortgaged Estate shall be classified and Mortgagee may change such classification at any time or from time to time.

17.    Release. Upon payment of all sums secured by this Mortgage, Mortgagee shall release this Mortgage, without charge to Mortgagor, except Mortgagor shall pay all costs of recordation, if any.

18.    Waiver of Homestead. Mortgagor hereby waives all right of homestead exemption in the Property.

19.    Execution in Counterparts. This Mortgage may be executed in any number of counterparts, all of which shall be construed together as a single instrument.

IN WITNESS WHEREOF, Mortgagor has caused this writing to be signed, sealed and delivered effective as of the date and year herein a first above written.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK SIGNATURES FOLLOW**

Confidential

Clearwater AP Defendant 00304446

MORTGAGOR:

Revelation Energy, LLC

By: _____
Its: _____

    Mortgagee executes this Mortgage for the purpose of acknowledging and agreeing to the terms set forth herein, including, but not limited to, execution of this Mortgage as "Secured Party" for the purpose of creating a security interest in certain collateral described herein and serving as a fixture filing under the Uniform Commercial Code of Kentucky and the Uniform Commercial Code of Virginia.

MORTGAGEE:

Jeffery A. Hoops

By: _____
Its: _____

STATE OF WEST VIRGINIA   )
              ) SS
COUNTY OF _Cabell_     )

   I hereby certify that the foregoing instrument was duly signed and acknowledged before me
by _Jeffrey Adkins_     as the duly authorized officer of _Revolution_, on the _15_.
day of _February_, 2017.       _Ennegg_

               _Annette Haley_
               Notary Public

    My commission expires _March 5, 2019_

Official Seal
Notary Public, State of West Virginia
Annette Haley
101 Rolling Meadows
Scott Depot, WV  25560
My commission expires March 5, 2019

STATE OF WEST VIRGINIA   )
              ) SS
COUNTY OF _Cabell_     )

   I hereby certify that the foregoing instrument was duly signed and acknowledged before me
by _Jeffrey Adkins_ as the duly authorized officer of _Individual_
on the _15_ day of _February_, 2017.

               _Annette Haley_
               Notary Public

My commission expires _March 5 2019_

Official Seal
Notary Public, State of West Virginia
Annette Haley
101 Rolling Meadows
Scott Depot, WV  25560
My commission expires March 5, 2019

EXHIBIT A

PROPERTY DESCRIPTION

The real property rights, estates and interests acquired by Revelation Energy, LLC, a Kentucky limited liability company, pursuant to the following:

1. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Resource Land Company LLC, North Fork Coal Corporation and Revelation Energy, LLC, as recorded in Mortgage Book 436, Page 242 in the Office of the Harlan County Clerk.

2. Special Warranty Deed made and entered into as of July 31, 2015 among Resource Development LLC, Resource Land Company LLC and Revelation Energy, LLC, as recorded in Deed Book 460, Page 539 in the Office of the Harlan County Clerk.

3. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Harlan Reclamation Services LLC and Revelation Energy, LLC, as recorded in Lease Book 66, Page 175 in the Office of the Letcher County Clerk.

4. Special Warranty Deed made and entered into as of July 31, 2015 between Pigeon Creek Processing Corporation and Revelation Energy, LLC, as recorded as Instrument Number 201600915 in the Office of the Commonwealth of Virginia, Wise County Clerk.

5. Special Warranty Deed made and entered into as of July 31, 2015 between Mill Branch Coal Corporation, Osaka Mining Corporation and Revelation Energy, LLC as recorded as Instrument Number 201600916 in the Office of the Commonwealth of Virginia, Wise County Clerk.

6. Assignment of Real Property Agreements effective as of July 31, 2015 between Resource Development LLC, Pigeon Creek Processing Corporation and North Fork Coal Corporation and Revelation Energy, LLC, unrecorded.

7. Purchase and Sale Agreement dated July 25, 2014, as amended, by and among Cumberland River Coal Company, Ark Land Company and Revelation Energy, LLC, unrecorded (leases at Schedule 2.1).

8. Amended, Consolidated and Restated Coal Mining Lease dated July 31, 2015 by and between ACIN LLC and Revelation Energy, LLC, unrecorded.

9. Quitclaim Deed dated April 7, 2016 by and between Jewell Smokeless Coal Corporation and Revelation Energy, LLC.

Clearwater AP Defendant 00304449

COMMONWEALTH OF KENTUCKY )
                              ) SS
COUNTY OF Harlan )

     I, Donna G Hoskins , County Clerk of Harlan County, do hereby certify that

the foregoing instrument was on the 7th day of March , 20 17 , lodged in my

office for record and that it, the foregoing, and this my certificate have been duly recorded in my

said office in _____ Mtg _____ Book 449 page 42 at 2.07 pm

     Witness my hand on this the 7th day of March , 20 17 .

                             Donna G Hoskins , CLERK

                 By: April Lewis D.C.


This instrument prepared by:

Helena Racin Jackson Attorney
225 Spring Gate Drive
London, Kentucky 40741

                           Filed: 03/07/2017 02:07:52 PM
                       Donna Hoskins, County Clerk
                          Harlan County, KY


                             APRIL LEWIS

Clearwater AP Defendant 00304450

# OPERATING AGREEMENT

## OF

## CLEARWATER INVESTMENT HOLDINGS, LLC
### (A Delaware Limited Liability Company)

March 30 , 2017

11189252v1

DEBTORSUB_104992

OPERATING AGREEMENT

OF

CLEARWATER INVESTMENT HOLDINGS, LLC

THIS OPERATING AGREEMENT is made and entered into on __March 30__, 2017 (the *"Effective Date"*) between and among CLEARWATER INVESTMENT HOLDINGS, LLC, a Delaware limited liability company (the *"Company"*), and each other party who may execute this Agreement as a Member (collectively, the *"Members"*).

## RECITALS

WHEREAS, the Company was organized as a limited liability company under the laws of the State of Delaware, effective as of March 30, 2017.

WHEREAS, the Company and the Members desire to enter into this Agreement to set forth the terms and conditions on which the management, business and financial affairs of the Company shall be conducted.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, covenants and conditions contained herein, the Company and the Members hereby covenant and agree as follows:

## ARTICLE I - DEFINITIONS

1.1   **Definitions**.  For purposes of this Agreement, unless the language or context clearly indicates that a different meaning is intended, the words, terms and phrases defined in this Section have the following meanings:

a.   *"Act"* means the Delaware Limited Liability Company Act in effect at the time of this Agreement, as amended.

b.   *"Agreement"* means this Operating Agreement, as amended from time to time.

c.   *"Applicable Federal Rate"* has the meaning set forth in § 10.5.

d.   *"Approval of the Members"* means the written approval of those Members who, at the time the Company action is being considered for approval, have, collectively, more than 50% of all Voting Membership Interests.

11189252v1

1

DEBTORSUB_104993

e.   *"Buy-Sell Event"* has the meaning set forth in § 10.1.

f.   *"Buy-Sell Notice"* has the meaning set forth in §10.2.

g.   *"Closing"* has the meaning set forth in § 10.5.

h.   *"Code"* means the Internal Revenue Code of 1986, as amended, and any successor to that Code.

i.   *"Company"* means Clearwater Investment Holdings, LLC, a Delaware Limited Liability Company, organized under the Act.

j.   *"Fair Market Value"* means the fair market value of Company as determined by a mutually acceptable independent appraiser or, if the parties cannot agree on an appraiser, an independent appraiser shall be chosen by the Manager.  Discounts, including (but not limited to) discounts for lack of control, lack of marketability, etc., may be applied.

k.   *"Family"* means Jeffery A. Hoops, Patricia A. Hoops and their descendants.

l.   *"Manager"* shall mean a Manager of the Company, whose rights, powers and duties are specified herein.

m.   *"Member"* means any person named as a Member in this Agreement (whether Voting or Non-Voting) and any person who becomes a Member pursuant to this Agreement.

n.   *"Membership Interest"* (whether Voting or Non-Voting) means the ownership interest of a Member in the Company, which may be expressed in either units (*"Units"*) or as a percentage equal to such Member's capital account divided by the aggregate capital accounts of all Members.  The initial Membership Interests are reflected on Schedule A attached to this Agreement and may be amended from time to time.

o.   *"Net Book Value"* means the net book value of the Company as determined by a mutually acceptable independent appraiser or, if the parties cannot agree on an appraiser, an independent appraiser shall be chosen by the Manager.  Discounts (such as discounts for lack of marketability, lack of control, loss of key man, etc.) may be applied in determining Net Book Value.

p.   *"Non-Voting Membership Interest"* means any Non-Voting Membership Interest reflected on Schedule A, as amended.

q.   *"Person"* includes a natural person, domestic or foreign limited liability company, corporation, company, limited partnership, joint venture, association, business trust, estate, trust, enterprise, and any other legal or commercial entity.

r.   *"Purchase Option"* has the meaning set forth in § 10.3(a).

11189252v1

2

s.      *"Purchasing Members"* has the meaning set forth in § 10.3(b).

t.      *"Transfer"* includes an assignment, conveyance, lease, mortgage, security interest, deed, encumbrance, gift, bequest, inheritance, sale, etc.

u.      *"Voting Membership Interest"* means any Voting Membership Interest reflected on Schedule A, as amended.

v.      *"Withdrawing Member"* has the meaning set forth in § 10.2.

## ARTICLE II – GENERAL PROVISIONS

**2.1    Formation**. The Company was formed upon the issuance of a Certificate of Formation by the Delaware Secretary of State.

**2.2    Name**. The name of the Company is Clearwater Investment Holdings, LLC. The Members may change the name of the Company from time to time, as they deem advisable, provided appropriate amendments to this Agreement and the Certificate of Formation and necessary filings under the Act are first obtained.

**2.3    Registered Office and Statutory Agent**. The Company's statutory office within the State of Delaware and its registered agent at such address shall be as the Members may from time to time deem necessary or advisable.

**2.4    Principal Place of Business**. The principal place of business of the Company shall be at such place or places as the Members shall from time to time deem necessary or advisable.

**2.5    Purpose**. The Company shall not be deemed to exist for a specific purpose; rather, the purpose of the Company is to conduct any business which lawfully may be conducted in limited Company form in Delaware under the Act. Some of the more particular purposes of the Company are to:

a.      manage investments in other businesses without regard to the form in which the business is organized and without limitation as to the nature of the investment; and to hold, buy, sell, lease, pledge, mortgage and otherwise deal in or dispose of those investments;

b.      acquire interests in other companies, partnerships and limited liability companies; to enter into partnership agreements as a general partner or limited partner, and to become a member of a joint venture or to participate in any other form of syndication for the purpose of conducting business as described in this Agreement;

c.      purchase, sell, invest or otherwise deal in stocks, bonds and other securities and similar interests of any kind, including stocks, bonds, notes, debentures, commercial paper, bills of exchange and evidences of indebtedness of any domestic or foreign person; to purchase, sell,

11189252v1

3

DEBTORSUB_104995

invest or otherwise deal in bonds, notes, bills and other evidences of indebtedness and currencies of any domestic or foreign government, state, municipality, school district or any political subdivision thereof; to purchase, sell, invest or otherwise deal in derivatives of any kind related to any kind of underlying asset, including both options and futures; to purchase, sell, invest or otherwise deal in gold, silver, grain, livestock, cotton, petrochemicals and other commodities and provisions traded on exchanges or in the over-the-counter-market; and to form corporations, partnerships and other business enterprises as may be desirable in making any such investments, and to do any and all things necessary or incident to such ventures;

     d.    engage generally in the real estate business; to acquire, hold, develop and operate real estate properties, whether full or fractional interests and whether improved or unimproved, either as operator, managing agent, principal, agent, partner, stockholder, associate, joint venturer, participant or otherwise; to invest funds and to raise funds to be invested in such ventures; to purchase, perform services, construct, acquire, own, develop, operate, lease, mortgage, pledge, sell or otherwise dispose of any such real estate properties, buildings, and other properties and any interest therein; and to form corporations, partnerships and other business enterprises as may be desirable in making any such investments, and to do any and all things necessary or incident to such ventures; and

     e.    acquire, own, buy, sell, invest in, trade, manage, develop, finance, refinance, exchange, or otherwise dispose of or deal with real and personal property, or any interests therein, of whatever kind or description, and any type of business, as the Managers or Members may from time to time deem to be in the best interests of the Company.

     f.    consolidate the management and control of certain properties, which consolidation would improve the efficiency of the management of those properties by holding them in a single, flexible entity;

     g.    avoid the fractionalization of the ownership of certain properties in order to receive a higher price in the event of a sale of any of the properties;

     h.    reduce the costs and expenses associated with investment of certain properties, including (but not limited to) the amount of fees charged by brokers and investment firms, by having the properties held in a single entity rather than by multiple owners;

     i.    preserve the ownership of certain properties, whether direct, indirect, legal or beneficial ownership, within the Family and, to the extent possible, provide an opportunity for the Company and the Family to purchase any interest in the Company prior to certain Transfers becoming effective;

     j.    protect, to the extent allowed by law, properties which are contributed to the Company from any unknown future creditors of the Members;

     k.    provide flexibility in the management of certain properties not available through the use of other entities;

11189252v1

4

DEBTORSUB_104996

l.      avoid the potential expense and publicity of litigation related to certain properties of the Family by requiring Members and transferees to submit to arbitration for the resolution of disputes and by requiring the losers of a dispute to bear the costs associated with the dispute;

m.      establish an investment policy related to certain properties of the Family which is focused on growth as measured by total return rather than attempting to achieve a certain level of either income or appreciation for any particular time period, while providing a policy with respect to the distribution of cash to the Members which promotes growth in the value of the assets of the Company; and

n.      promote the education of, and communication among, certain members of the Family with respect to financial matters.

**2.6**    **Term**.  The Company shall continue from the date of its formation until its date of termination as set forth in the Certificate of Formation, as may be amended from time to time, unless the Company is earlier dissolved and its affairs wound up in accordance with the provisions of this Agreement or the Act.

**2.7**    **Interest Subject to Agreement**.   It is expressly stipulated and agreed that this Agreement is intended to and shall cover all of the interests in the Company now owned or hereafter acquired by a Member or a transferee of a Member, for so long as this Agreement is in effect.

## ARTICLE III - MANAGEMENT OF THE COMPANY

**3.1**    **Election of Managers**.  The Company will be managed by a Manager.  A Manager must be a member of the Family.  Subject to Section 3.2, the Voting Members shall elect one Person as Manager at each annual meeting of the Company to serve until the next annual meeting of the Company and until his or her successor is duly elected and qualified.  In addition, if any Person resigns or otherwise vacates the office of Manager, the Voting Members shall elect a replacement Manager to serve the remaining term of such office.

**3.2**    **Appointment of Initial Manager**.  The Voting Members hereby unanimously elect PATRICIA A. HOOPS as the Manager of the Company, and she shall serve until her death or resignation.

**3.6**    **Authority of the Manager**.   The Manager has sole authority to manage the Company.

**3.7**    **Compensation and Expenses**.  The Manager may receive reasonable compensation from the Company for managing the Company, with any such compensation paid to a Manager who is also a Member being in the form of a guaranteed payment.  The Company may reimburse the Managers for expenses incurred in connection with their service to the Company.

11189252v1

5

DEBTORSUB_104997

3.8    **Indemnification**. The Company shall indemnify the Manager to the fullest extent permitted or required by the Act or by law against claims, causes of action, suits, fees or costs brought against, or incurred by, the Manager as a result of the performance of his or her duties.

3.9    **Other Business Ventures and Activities**. A Manager may engage, invest or possess an interest in other business ventures, investments or transactions of any kind, nature or description, independently or with others, which are directly or indirectly competitive with the Company.

## ARTICLE IV - RIGHTS AND OBLIGATIONS OF MEMBERS

4.1    **In General**. The Members shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Members' right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation or this Operating Agreement vest in the Members the right to so vote or otherwise participate.

4.2    **Names, Addresses and Interests of Members**. The names, addresses, ownership and Membership Interests of the Members are set forth in Schedule A attached hereto and made a part hereof, as may be amended from time to time.

4.3    **No Authority of Members**. No Member is an agent of the Company or has the authority to make any contracts, enter into any transactions or make any commitments on behalf of the Company.

4.4    **Limited Liability**. The Members shall not be required to make any contribution to the capital of the Company except as otherwise provided in this Agreement, nor shall the Members, in their capacity as Members, be bound by, or liable for, any expense, liability or obligation of the Company except to the extent of: (i) their capital contribution, (ii) their proportionate share of the undistributed profits of the Company, and (iii) the amount of certain distributions received from the Company as provided by the Act. Notwithstanding anything in this Agreement to the contrary, the Members shall be under no obligation to restore a deficit capital account upon the dissolution of the Company or the liquidation of any of their ownership interest in the Company.

4.5    **Bankruptcy or Incapacity of a Member**. A Member shall cease to have any power as a Member or any voting rights or rights of approval hereunder upon the Member's death, resignation, bankruptcy, insolvency, dissolution, assignment for the benefit of creditors or legal incompetency and the Member, his or her personal representative or successor upon the occurrence of any such event shall have only the rights, powers and privileges associated with a transferee of a Membership Interest and shall be liable for all obligations of the Member under this Agreement. In no event, however, shall a personal representative or successor become a substitute Member except in accordance with Article IX of this Agreement.

4.6    **Other Business Ventures and Activities**. Any Member may engage, invest or possess an interest in other business ventures, investments or transactions of any kind, nature or description, independently or with others, which are directly or indirectly competitive with the

11189252v1

6

Company.

## ARTICLE V - MEETINGS AND VOTING OF THE MEMBERS

**5.1**   **Meetings**. The Members owning the Voting Membership Interests shall meet, no less frequently than annually, for the purpose of the transaction of such business as may be properly brought before the meeting.

**5.2**   **Place of Meetings**. Meetings of the Members owning the Voting Membership Interests shall be held at such place as shall be designated in the notice of the meeting.

**5.3**   **Special Meetings**. Special meetings of the Members owning the Voting Membership Interests shall be called at any time by one or more Members holding not less than one-tenth of all Voting Membership Interests upon such Members execution and delivery to the Company one or more written demands for the meeting, in each case describing the purpose or purposes for which it is to be held.

**5.4**   **Notice of Meetings**. At least (ten) 10 and no more than fifty (50) days prior to any annual or special meeting of Members, the Company shall notify the Members owning the Voting Membership Interests of the date, time and place of the meeting and, in the case of a special meeting, shall briefly describe the purpose or purposes of the meeting. Only business within the purpose or purposes described in the notice may be conducted at a special meeting. The Members may waive the requirements of this Section in writing.

**5.5**   **Quorum**. Members owning a majority of the Voting Membership Interests and represented in person or by proxy at a meeting of Members shall constitute a quorum. Once the Membership Interests of a Member are represented for any purpose at a meeting, such Membership Interests are deemed present for quorum purposes for the remainder of the meeting and any adjournment thereof, unless a new record date is or must be set for the adjournment. In the absence of a quorum at the opening of any meeting of Members, such meeting may be adjourned from time to time by a vote of Members holding a majority of the Voting Membership Interests represented at the meeting to adjourn.

**5.6**   **Voting**.  Unless otherwise provided elsewhere in this Agreement or the Act, any action taken or to be taken by the Company or the Members shall be made with the Approval of the Members. Each Member shall be entitled to one vote for each Voting Membership Unit owned by such Member. Votes of Members holding fractional Voting Membership Units shall be rounded to the nearest one-tenth.

**5.7**   **Action Without Meeting**. Any action which the Members could take at a meeting may be taken without a meeting if one or more written consents, setting forth the action taken, shall be signed, before or after such action, by Members holding in the aggregate Voting Membership Interests at least equal to the vote required to approve the action and who would be entitled to vote upon the action at a meeting. The consent shall be delivered to the Company for inclusion in the minutes for filing with the Company's records. Any action approved by written consent shall be

11189252v1

7

DEBTORSUB_104999

deemed effective following the issuance of written notice to the Members of the Company who or which have not signed the consent.

## ARTICLE VI - CAPITAL ACCOUNTS

6.1     **Capital Accounts**. A separate capital account shall be established and maintained for each Member. Each Member's capital account shall at all times be determined and maintained pursuant to the principles of Section 704(b) of the Code and the Treasury Regulations of that Section.

6.2     **Interest on Capital Accounts**. No interest shall be paid on any capital account.

6.3     **Additional Funds, Additional Capital Contributions**. In the event the Managers determine at any time (or from time to time) that additional funds are required by the Company for or in respect of its business or to pay any of its obligations, expenses, costs, liabilities or expenditures (including without limitation any operating deficits), then the Managers may (i) borrow all or part of such additional funds on behalf of the Company, with interest payable at then prevailing rates, from one or more of the Members or from other commercial banks, savings and loan associations or other commercial lending institutions; or (ii) sell additional Units at their then "fair market value" as reasonably determined by the Managers. The Members shall have no preemptive rights to purchase Units or other interests in the Company.

6.4     **Further Capital Contributions**. If the Managers elect for further capital contributions to be made to the Company for the purpose of providing all or a portion of the additional funds required for the purposes set forth in Section 6.3 above, the Members shall make the necessary additional capital contributions to the Company in proportion to their respective Membership Interests. Notwithstanding the foregoing, no Member shall be required under any circumstances to make additional capital contributions to the Company under Section 6.3, and the failure of a Member to make any further capital contribution pursuant to this Section shall result only in the dilution of the non-contributing Member's Membership Interest.

## ARTICLE VII - ALLOCATIONS AND ELECTIONS

7.1     **Profits and Losses**. Profits and losses of the Company and all items of tax credit and tax preference shall be allocated among the Members in accordance with their respective Membership Interest in the Company; provided, however, if any Member has contributed property other than money to the Company, the allocations shall be governed by Section 704(c) of the Code and the Treasury Regulations of that Section. If the Membership Interests vary during any fiscal year, profits and losses and all items of tax credit and tax preference for such fiscal year shall be allocated among the Members on a daily basis in accordance with their varying Membership Interests during the fiscal year.

7.2     **Tax Elections**. The Manager may, without the prior Approval of the Members, make elections, tax allocations and adjustments, including amendments to this Agreement, as the Manager deems necessary or appropriate.

11189252v1

8

DEBTORSUB_105000

## ARTICLE VIII - DISTRIBUTIONS

**8.1    Distributions**. The Manager may make distributions proportionately among the Members in accordance with their respective Membership Interest in such amounts and at such times as determined by the Manager.

**8.2    Distributions in Liquidation**. Upon liquidation of the Company, all of the Company's property may be sold or distributed in-kind, as provided herein, and profits and losses allocated accordingly. Proceeds from a liquidation of the Company shall be distributed in accordance with the provisions of this Agreement.

**8.3    Limitation Upon Distributions**. No distribution shall be declared and paid if payment of such distribution would cause the Company to violate any limitation on distributions provided in the Act.

## ARTICLE IX - TRANSFER OF INTERESTS AND ADMISSION OF MEMBERS

**9.1    Restrictions on Transfer**. Except as otherwise provided herein:

a.    Except as provided in Section 9.1(b), no Member may voluntarily or involuntarily Transfer or encumber all or any part of such Member's Membership Interest in the Company without the prior unanimous written consent of the other Members and the prior written consent of the Manager, the granting or denial of which shall be in the sole and absolute discretion of the non-transferring Members and the Manager, and such consent may be arbitrarily withheld.

b.    Notwithstanding the provisions of Section 9.1(a), a Member may, at any time and from time to time, Transfer all or any portion of his Membership Interest to one or more members of the Family, a trust for the sole and exclusive benefit of one or more members of the Family (but only if and only so long as all trustees are members of the Family); provided however, any such transferee must agree, in writing, to assume all of the obligations and undertakings of the transferor under the terms of this Agreement, and also satisfy the conditions of Section 9.2.

c.    No Person may be admitted to the Company as a Member except in accordance with Section 9.2 below.

**9.2    Substituted Members**. No transferee of an interest in the Company shall be admitted as a substituted Member of the Company unless, in addition to compliance with the conditions set forth in Section 9.1, the transferee shall have executed and delivered to the Manager all documents deemed appropriate by the Manager to reflect the transferee's admission to the Company and its agreement to be bound by this Agreement.

**9.3    Rights of Transferee**. Unless admitted to the Company as a Member, the transferee shall not be entitled to any of the rights, powers or privileges of his predecessor in interest, except that he shall be entitled to receive and be credited or debited with his or her proportionate share of

11189252v1

9

DEBTORSUB_105001

profits, losses, gains from capital transactions, cash flow, and distributions in liquidation.

## ARTICLE X - BUY-SELL

**10.1**    **Buy-Sell**. Each of the following events shall constitute a *"Buy-Sell Event"* under this Agreement:

a.    Any filing of a petition or suit under the bankruptcy laws by or against a Member that is not dismissed within sixty (60) days;

b.    Any purported voluntary or involuntary Transfer of all or any part of a Member's Membership Interest, except as otherwise permitted by this Agreement;

c.    Any material breach of this Agreement by a Member which is not cured within ten (10) days after written notice of such breach is given to the Member by the Company;

d.    Any withdrawal by a Member from the Company other than as may be expressly permitted by this Agreement; and

e.    Upon a determination by the Company that state or federal regulations or laws, or any legal developments thereunder, as applied to the Membership Interest of any Member, would adversely affect (or potentially adversely affect), in a manner deemed substantial by the Company, the operations of the Company or the affected Member.

**10.2**    **Buy-Sell Notice**. Upon the occurrence of a Buy-Sell Event, the Member to whom such event has occurred (the *"Withdrawing Member"*) or his or her legal representative shall give written notice of the Buy-Sell Event (the *"Buy-Sell Notice"*) to the Manager, the Company and the other Members within ten (10) days after its occurrence. If the Withdrawing Member fails to give the Buy-Sell Notice, the Manager or any other Member may give written notice to the Company and the other Members at any time thereafter and by so doing commence the Buy-Sell procedure provided for in this Article X.

**10.3**    **Purchase Options and Right of First Refusal**.

a.    Immediately following the occurrence of a Buy-Sell Event, the Company shall have an option to purchase (the *"Purchase Option"*) the Withdrawing Member's Membership Interest on the terms and conditions as set forth in Sections 10.4 and 10.5. The Company must give notice of its election to exercise its Purchase Option to the Withdrawing Member within sixty (60) days after its receipt of written notice of an occurrence of a Buy-Sell Event. The Withdrawing Member shall not be entitled to vote on whether the Company will exercise its Purchase Option.

b.    In the event the Company does not elect to exercise its Purchase Option, then each of the remaining Members, except the Withdrawing Member, shall have an option to purchase the Membership Interests held by the Withdrawing Member at Closing on the terms

11189252v1

10

DEBTORSUB_105002

and conditions as set forth in Sections 10.4 and 10.5. This right will be allocated among the Members who elect to purchase the Withdrawing Member's Membership Interest (the *"Purchasing Members"*) in the proportion they mutually agree upon, or, in the absence of agreement, in the ratio that each Purchasing Member's Membership Interest bears to the aggregate Membership Interest of all Purchasing Members. To exercise their Purchase Option, the Purchasing Members must give written notice of their election to the Withdrawing Member and the Company within the thirty (30) day period following expiration of the Company's option set forth in Section 10.3(a).

      c.   In the event the Company does not exercise its Purchase Option and the remaining Members do not exercise their Purchase Option with respect to the Withdrawing Member's entire Membership Interest, then the Withdrawing Member shall have no right to Transfer any remaining Membership Interest to any Person and any such purported Transfer shall be rendered null and void and of absolutely no force or effect and the Withdrawing Member shall continue to be bound by the terms of this Agreement.

    **10.4**   <u>Agreement on Valuation</u>. The purchase price shall be such amount as agreed to between the respective parties, or if no such agreement exists, the lesser of (i) the amount of the third party offer, if any, (ii) an amount equal to the Withdrawing Member's Membership Interest multiplied by the Net Book Value of the Company as of the date of the Buy-Sell Event, or (iii) an amount equal to the Withdrawing Member's Membership Interest multiplied by the Fair Market Value of the Company as of the date of the Buy-Sell Event.

    **10.5**   <u>Closing</u>. The closing (the *"Closing"*) of the purchase of any Membership Interest pursuant to this Article shall take place on the date agreed upon by the Company or the Purchasing Member(s), as the case may be, and the Withdrawing Member, but not later than thirty (30) days after the last exercise of the option to purchase, unless otherwise agreed to by the parties to the Closing. The purchase price for each Membership Interest being purchased shall be paid, at the option of the Company or Purchasing Member, either in cash at the time of Closing or by delivery on the Closing date of a promissory note to the Withdrawing Member bearing interest at the "Applicable Federal Rate" of interest under Section 1274(d) of the Code, or any comparable section in effect, and payable in ten (10) equal annual installments of principal and interest until paid, commencing on a date that is one month following the Closing. Upon payment of the purchase price, the Withdrawing Member shall execute and deliver such assignments and other instruments as may be reasonably necessary to evidence and carry out the transfer of such Membership Interest to the Company or Purchasing Member(s), as the case may be. In connection with the sale of any Membership Interest under this Article, unless otherwise agreed by the Company or Purchasing Member(s) and the Withdrawing Member, the Company or Purchasing Member(s) will assume the Withdrawing Member's allocable portion of Company obligations to the extent related to the transferred interest as well as the seller's individual obligations to the extent related to the transferred interest, other than income tax liabilities of the Withdrawing Member.

    **10.6**   <u>Effect on Withdrawing Member's Interest</u>. From the date of the occurrence of the Buy-Sell Event to the date of Closing of the transfer of the Withdrawing Member's Membership Interest under this Article, the Withdrawing Member's Membership Interest will be excluded from

11189252v1

DEBTORSUB_105003

any calculation of aggregate Membership Interests for purposes of any approval required of Members under this Agreement. Without limiting the generality of any other provision of this Agreement, upon the exercise of the Purchase Option, the Withdrawing Member, without further action, will have no rights in the Company against the Company or any Member other than the right to receive payment for its Membership Interest in accordance with this Article.

10.7    **Failure to Exercise Purchase Option or Right of First Refusal.** If neither the Company nor the other Members exercise their Purchase Options or right of first refusal with respect to the Withdrawing Member's entire Membership Interest, then the Withdrawing Member shall have the right to sell any remaining Membership Interest to any Person who is not in violation of the terms of this Agreement in the offer if the Buy-Sell Event involved a third party offer, or, in all other cases, at any negotiated price; *provided, however*, that any Transferee of such Membership Interest: (i) shall not be admitted as a substitute Member without full compliance with Section 9.2; (ii) shall, if not admitted as a substitute Member, have only have those rights as specified in Section 9.3; and (iii) shall be subject to the Buy-Sell restrictions imposed under this Article. If such Transfer is not completed within thirty (30) days after expiration of the Member's right of first refusal, any attempted Transfer thereafter will be deemed pursuant to a new offer and Section 10.3 shall again apply.

## ARTICLE XI - DISSOLUTION AND LIQUIDATION OF THE COMPANY

11.1    **Events Causing Dissolution**. The Company will be dissolved upon the happening of any of the following events:

a.    The natural expiration of the term of the Company as set forth in the Certificate of Formation, as may be amended from time to time;

b.    All or substantially all of the assets of the Company are sold, exchanged or otherwise transferred (unless the Members have elected to continue the business of the Company, in which event the Company will continue until the Members elect to dissolve the Company);

c.    With the prior Approval of the Members, a document is signed to dissolve the Company;

d.    The entry of a final judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be bankrupt and the expiration without appeal of the period, if any, allowed by applicable law in which to appeal;

e.    By Approval of the Members, upon a determination that state or federal regulations or laws, or any legal developments thereunder, as applied to the Company or to the interests of the Members, would adversely affect (or potentially adversely affect), in a manner deemed substantial, the operations of the Company or the Members; or

f.    The entry of a decree of judicial dissolution or the issuance of a certificate for administrative dissolution under the Act.

11189252v1

12

DEBTORSUB_105004

**11.2   Winding up and Liquidation**. Upon the happening of any of the events specified above, the Manager will commence as promptly as practicable to wind up the Company's affairs. Assets of the Company may be liquidated or distributed in kind, as the Manager determines to be appropriate. The Members will continue to share cash flow, profits and losses during the period of liquidation in the manner set forth in the Act. The proceeds from liquidation of the Company, including, repayment of any debts of Members to the Company and any Company assets that are not sold in connection with the liquidation will be applied and distributed to the Members and to the creditors of the Company as required by the Act.

**11.3   Articles of Dissolution**. Upon the dissolution and commencement of the winding up of the Company, the Members shall cause all necessary documents and filings to be executed on behalf of the Company and filed with the Secretary of State of Delaware or any other governmental authority. After all debts, liabilities, and obligations have been paid and discharged (or adequate provision made therefor) and all of the assets have been distributed to the Members, Articles of Termination shall be executed on behalf of the Company and filed with the Secretary of State of Delaware. The Members shall execute, acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution of the Company.

## ARTICLE XII - MISCELLANEOUS

**12.1   Records**. The records of the Company will be maintained at the Company's principal place of business or at any other place the Members select, provided the Company keeps at its principal place of business the records required by the Act to be maintained there. Appropriate records in reasonable detail will be maintained to reflect income tax information for the Members. Each Member, at his expense, may inspect and make copies of the records maintained by the Company. The Company may, but is not required to, prepare and deliver to each Member compiled financial statements that include a balance sheet and an income statement.

**12.2   Amendments**. No amendment to the Certificate of Formation or this Agreement will be valid or binding upon the Members or the Company nor will any waiver of any term of the Certificate of Formation or this Agreement be effective without the prior unanimous written consent of the other Members and the prior written consent of the Manager, the granting or denial of which shall be in the sole and absolute discretion of the Members and the Manager, and such consent may be arbitrarily withheld.

**12.3   Additional Documents**. Each party hereto agrees to execute and acknowledge all documents and writings which the Company may deem necessary or expedient in the creation of the Company and the achievement of its purposes, including but not limited to, the Certificate of Formation and any amendments or cancellation thereof.

**12.4   Survival of Rights**. Except as provided herein to the contrary, this Agreement shall be binding upon and shall inure to the benefit of the parties their heirs, distributees, executors, administrators, successors and assigns.

11189252v1

13

DEBTORSUB_105005

**12.5** **Interpretation and Governing Law**. When the context in which words are used in this Agreement indicates that such is the intent, words in the singular number shall include the plural and vice versa. The masculine gender shall include the feminine and neuter. The Article and Section headings or titles shall not define, limit, extend or interpret the scope of this Agreement or any particular Article or Section. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to the conflicts of laws provisions thereof.

**12.6** **Relationship of This Agreement to the Default Rules Provided by the Act**. Regardless of whether this Agreement specifically refers to particular default rules of the Act:

a.     If any provision of this Agreement conflicts with a default rule, the provision of this Agreement controls and the default rule is modified or negated accordingly, and

b.     If it is necessary to construe a default rule as modified or negated in order to effectuate any provision of this Agreement, the default rule is modified or negated accordingly.

**12.7** **Severability**. If any provision, sentence, phrase or word in this Agreement, or the application thereof to any person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision, sentence, phrase or word to persons or circumstances, other than those as to which it is held invalid, shall not be affected thereby.

**12.8** **Agreement in Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature pages and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages, all of such signature pages shall be read as though one, and they shall have the same force and effect as though all the signers had signed a single signature page.

**12.9** **Notices**. Any notice or other communication required by this Agreement must be in writing. Notices and other communications will be deemed to have been given when delivered by hand or dispatched by means of electronic facsimile transmission with receipt electronically acknowledged or nationally recognized air courier with notice of receipt obtained, or on the third business day after being deposited in the United States mail, postage prepaid. In each case, notice hereunder shall be addressed to the Member to whom the notice is intended to be given at its address set forth on Exhibit A to this Agreement or, in the case of the Company, to its principal place of business. A Member may change its notice address by notice in writing to the Company.

**12.10** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

**12.11** **Mandatory Arbitration of All Disputes**. Any dispute between or among the Company, any of the Members or any transferees which cannot be resolved by agreement shall be resolved by arbitration, and the resolution of the dispute shall be final as between the parties to the dispute and may be enforced or preserved upon application to any court of competent jurisdiction.

11189252v1

14

DEBTORSUB_105006

     a.     General Rules.  Except as this Section provides to the contrary, all proceedings required by this Section shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**") as then in effect; provided that such rules shall be applied in accordance with Delaware law and that any questions which are not resolved by such rules shall be determined by Delaware law. All parties to an arbitration proceeding under this Section shall make all reasonable efforts to perform their obligations under this Section promptly, recognizing that time is of the essence.

     b.     English Rule - Loser Pays.  The parties prevailing in an arbitration proceeding under this Section or in a legal proceeding brought in a court of competent jurisdiction to enforce or preserve the rights awarded pursuant to an arbitration proceeding under this Section, including all appeals, shall be entitled to recover from the other parties all costs and expenses incurred by the prevailing parties with respect to all of the proceedings, including reasonable attorneys' fees.

     c.     Arbitration Procedures.

     (i)     Written Notice of Arbitration.  Any party wishing to submit any dispute to arbitration ("**Petitioner**") shall provide written notice of the arbitration containing the information required below to the other parties to the dispute ("**Respondents**") and simultaneously shall file copies of the written notice of arbitration with the regional office of the AAA for Huntington, West Virginia, together with the appropriate fee as provided in the AAA's administrative fee schedule. All communications with the AAA regarding the arbitration proceedings shall be directed to the regional office for Huntington, West Virginia, unless the AAA directs otherwise. The written notice of arbitration shall provide a brief description of the nature of the dispute and the resolution sought by Petitioner.

     (ii)     Written Response.  Within twenty days after receiving the notice of arbitration, each of the Respondents shall provide the Petitioner and the AAA with a written response describing the Respondent's opinion of the nature of the dispute and the resolution desired by the Respondent.

     (iii)     List of Arbitrators.  As soon as reasonably possible after receiving each response notice, the AAA shall compile a list of arbitrators which are available and are qualified to arbitrate the dispute, which list shall contain the names of a number of arbitrators equal to one plus the number of parties to the dispute (Petitioner plus each Respondent) in rank order, and shall provide that list to Petitioner and each of the Respondents, together with a return date which is seven days after the date on which the AAA sends the list to the Petitioner and each of the Respondents, excluding Saturday, Sunday, and holidays.

     (iv)     Deletions from the List of Arbitrators.  Unless otherwise agreed, Petitioner and each of the Respondents shall meet on the return date specified by the AAA at the offices of Dinsmore & Shohl LLP, Huntington, West Virginia, at 10:00 A.M. local time, at which time each of them shall strike one name from the list of arbitrators provided by the AAA, and if any of them fails to attend the meeting, the AAA shall strike one name from the list on behalf of each

11189252v1

15

missing one of them. The highest ranking arbitrator whose name remains on the list after an arbitrator has been stricken by or on behalf of Petitioner and each of the Respondents shall be the arbitrator of the dispute. If the arbitrator selected in this manner for any reason fails to perform as required by this Section, the procedures provided in this paragraph shall be repeated until an arbitrator is selected which performs as required.

(v)    Arbitration of the Dispute. The arbitration shall be held in Huntington, West Virginia, at a location determined by the AAA. The decision of the arbitrator shall be final as between Petitioner and Respondents and may be enforced or preserved upon application to any court of competent jurisdiction.

*[Remainder of page left intentionally blank; signatures follow on separate pages]*

11189252v1

16

DEBTORSUB_105008

IN WITNESS WHEREOF, the undersigned have executed or caused this Agreement to be executed effective as of the Effective Date.

**THE COMPANY:**

CLEARWATER INVESTMENT HOLDINGS, LLC

By: _Patricia A. Hoops_
      Patricia A. Hoops
Its:    Manager

**THE MEMBERS:**

_Patricia A. Hoops_
PATRICIA A. HOOPS

CLEARWATER TRUST, U/A DTD _March 30, 2017_

By: _Jeffery A. Hoops, II_
      Jeffery A. Hoops, II
Its:    Co-Trustee

By: _Jeremy A. Hoops_
      Jeremy A. Hoops
Its:    Co-Trustee

11189252v1

## SCHEDULE A

**VOTING MEMBERSHIP INTERESTS:**

| NAME AND ADDRESS | VOTING MEMBERSHIP INTEREST |
|---|---|
| Patricia A. Hoops<br>1540 South Gulf Blvd.<br>Penthouse #2<br>Clearwater, FL 33767 | 1 UNIT<br>(or 1% of total Membership Interests) |

**NON-VOTING MEMBERSHIP INTERESTS:**

| NAME AND ADDRESS | NON-VOTING MEMBERSHIP INTEREST |
|---|---|
| Clearwater Trust<br>U/A DTD MARCH 30, 2017<br>Jeffery A. Hoops, II and Jeremy A. Hoops, Trustees<br>1051 Main Street<br>Milton, WV 25541 | 99 UNITS<br>(or 99% of total Membership Interests) |

11189252v1

```
 1              MS. SIEG:  Objection to form.

 2              THE DEPONENT:  I'm not sure.

 3   BY MS. DOLLARD-SMITH:

 4        Q.   Do you know why Clearwater Investment

 5   Holdings, LLC was created?

 6        A.   We wanted to set up a Trust for the boys,

 7   and -- and just be able to use that as a whole,

 8   instead of all these little things.

 9        Q.   Okay.  And when you say you wanted to set

10   up a Trust for the boys, is that what ultimately

11   became the Clearwater Trust?

12        A.   Yes.

13        Q.   And then the Clearwater Trust owned 100

14   percent of Clearwater Investment Holdings, LLC;

15   right?

16        A.   I think so.

17        Q.   Okay.  And were you the Trustee of the

18   Clearwater Trust?

19        A.   The boys were the trustees.  They were 99

20   percent, and I was one percent.  I think that's

21   correct.

22        Q.   And were the boys the beneficiaries of the

23   Clearwater Trust?

24        A.   Yes, I'm sure.

25        Q.   Okay.  And then Clearwater Investment
```

1  you.  And then Blackjewel would use Clearwater's

2  line of credit going forward when it was having a

3  hard time with cash.  Did I kind of summarize that

4  properly?

5      A.   That's pretty close.

6      Q.   Okay.  And what was the purpose of the

7  Assignment from you and your husband personally to

8  Clearwater Investment Holdings, that we're looking

9  at here?

10     A.   It was a hold off me personally, but I

11  just wanted, you know, wanted to help.  But still it

12  would have been better, since we were changing

13  things over, to go ahead and use it with Clearwater

14  and then I wouldn't have to do it personally.  The

15  main thing was, it was like I said, you know, to

16  others, that's my -- the mining business is and was

17  my husband's passion.  He loved it and if he came to

18  me needing a little something that would help out,

19  that's what we did, that's what I tried to do.

20     Q.   That makes sense.  When the debtors, when

21  Blackjewel filed for bankruptcy in July 2019, did

22  they still owe any money on your and your husband's

23  personal line of credit?

24     A.   I'm not sure.  I'm not sure.  Taking my

25  glasses off.

## COMMERCIAL PROMISSORY NOTE
United Bank Loan No.: ▮▮▮▮▮▮▮

---

**BORROWER:**                                    **LENDER:**

**CLEARWATER INVESTMENT**                 **UNITED BANK**
**HOLDINGS, LLC**                              500 Virginia Street East
1051 Main Street                                Charleston, WV 25301
Milton, WV 25541

**Principal Amount:    $11,000,000.00**          **Effective Date:**         **April 1, 2019**

---

**PROMISE TO PAY.  CLEARWATER INVESTMENT HOLDINGS, LLC,** a Delaware limited liability company ("Borrower"), promises to pay to the order of **UNITED BANK** ("Lender"), in lawful money of the United States of America, the original principal amount of **Eleven Million and 00/00 Dollars ($11,000,000.00),** or so much as may be outstanding (the "Loan").

**ADVANCES.**  This Note evidences a revolving line of credit loan.  The proceeds of the loan evidenced hereby may be advanced in partial amounts.  Advances may be requested by the undersigned official of Borrower or such other duly authorized representative(s) of Borrower as shall be designated in writing to Lender.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.  Lender will have no obligation to advance funds under this Note if: (a) Borrower or any Guarantor (as defined in the Commercial Loan Agreement (the "Loan Agreement") and Commercial Guaranty of even date herewith) is in default under the terms of this Note or any agreement that Borrower or any Guarantor has with Lender, including any agreement made in connection with the signing of this Note or otherwise; (b) Borrower ceases doing business or is insolvent, or upon the death of any Guarantor; provided that, within thirty (30) days of Guarantor's death, the Lender is provided with satisfactory information demonstrating that the Guarantor's estate will remain in the same financial condition as before Guarantor's death, Lender shall permit the Guarantor's estate, successor, or assigns, to assume unconditionally the obligations arising under any Guaranty in a manner satisfactory to Lender, and, in so doing, cure the Event of Default; (c) any Guarantor claims or otherwise attempts to limit, modify or revoke such Guarantor's guarantee of this Note, the performance of Borrower of any term of the Loan Agreement or other Loan Document (as defined in the Loan Agreement) or any other loan with Lender; or (d) Borrower has applied or utilized funds provided pursuant to this Note for purposes other than those authorized by Lender.

**PAYMENT.**

A.      Commencing on May 1, 2019, and continuing on the same day of each month thereafter, Borrower shall make twenty-three (23) consecutive monthly installment payments of accrued interest only, in arrears.  A final payment of the total outstanding balance of principal, accrued interest, late charges, and any other fees and costs shall mature and be due and payable, in

Confidential                                    Clearwater AP Defendant 00001278

full, on April 1, 2021 (the "Maturity Date").

B.   Interest on this Note is computed on the actual period that a balance is outstanding; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

C.   Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing to Borrower.  Unless otherwise agreed or required by applicable law, payments will be applied first to unpaid collection costs, including, without limitation, those costs identified in this Agreement or costs incurred by Lender in accordance with the Note, second to accrued interest, and third to principal.

**INTEREST RATE.**  The interest rate of this Note shall be subject to change monthly based on changes in an independent index which is the highest 30 day LIBOR (the "Index") plus 1.50% per annum.  Notwithstanding the foregoing, the interest rate of this Note shall never be less than one and one-half percent (1.50%) per annum.

As used herein, LIBOR shall mean the rate obtained by dividing: (1) the actual per annum rate of interest for deposits in U.S. dollars for the related LIBOR Interest Period (as hereinafter defined) based upon information which appears on page LIBOR01, captioned British Bankers Assoc. Interest Settlement Rates, of the Reuters America Network, a service of Reuters America Inc. (or such other page that may replace that page on that service for the purpose of displaying London interbank offered rates; or, if such service ceases to be available or ceases to be used by Lender, such other reasonably comparable money rate service as Lender may select) or upon information obtained from any other reasonable procedure, as of two Banking Days (as hereinafter defined) prior to the first day of a LIBOR Interest Period; by (2) an amount equal to one minus the stated maximum rate (expressed as a decimal), if any, of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves) that is specified on the first day of each LIBOR Interest Period by the Board of Governors of the Federal Reserve System (the "System") or any successor agency thereto for determining the maximum reserve requirement with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of such Board) maintained by a member bank of such System, or any other regulations of any governmental authority having jurisdiction with respect thereto as conclusively determined by Lender.  Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby shall change automatically without notice to the Borrower on the first day of each LIBOR Interest Period.  Lender shall obtain the Index from the "Money Rates" section of the Wall Street Journal.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower; provided that in such event, the Margin (as defined below) shall be adjusted in order to make the interest rate comparable to the interest rate under the prior Index.  Lender will tell Borrower the current Index rate upon Borrower's request.  Borrower understands that Lender may make loans based on other rates as well.

**DETERMINATION OF INDEX.**  This Note may express an initial interest rate and an initial index value to five (5) places to the right of the decimal point.  This expression is done solely for

Confidential                                                          Clearwater AP Defendant 00001279

convenience. The reference sources for the index used by Lender, as stated in this Note, may actually quote the index on any given day to as many as five (5) places to the right of the decimal point. Therefore, the actual index value used to calculate the interest rate on and the amount of interest due under this Note will be to five (5) places to the right of the decimal point.

**ADDITIONAL LIBOR PROVISIONS.** As used herein, LIBOR Interest Period shall mean one month provided that: (1) if any LIBOR Interest Period would otherwise expire on a day which is not a Banking Day, the LIBOR Interest Period shall be extended to the next succeeding Banking Day (provided, however, that if such next succeeding Banking Day occurs in the following calendar month, then the LIBOR Interest Period shall expire on the immediately preceding Banking Day).

In the event that the Lender reasonably determines that by reason of (1) any change arising after the date of this Note affecting the interbank eurocurrency market or affecting the position of the Lender with respect to such market, adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the LIBOR then being determined is to be fixed, (2) any change arising after the date of this Note in any applicable law or governmental rule, regulation or order (or any interpretation thereof, including the introduction of any new law or governmental rule, regulation or order), or (3) any other circumstance affecting the Lender or the interbank market (such as, but not limited to, official reserve requirements required by Regulation D of the Board of Governors of the Federal Reserve System) the LIBOR plus the applicable spread shall not represent the effective pricing to the Lender of accruing interest hereunder based on the LIBOR, then, and in any such event, the accruing of interest hereunder based upon the LIBOR shall be suspended until the Lender shall notify Borrower that the circumstances causing such suspension no longer exist. In such case, beginning on the date of such suspension, interest shall accrue hereunder at a variable interest rate per annum, which shall change in the manner set forth below equal to **one** percentage point less than the Prime Commercial Rate (as hereinafter defined).

In the event that on any date the Lender shall have reasonably determined that accruing interest hereunder based upon the LIBOR has become unlawful by compliance by the Lender in good faith with any law, governmental rule, regulation or order, then, and in any such event, the Lender shall promptly give notice thereof to the Borrower. In such case, accruing interest hereunder based on the LIBOR shall be terminated and the Borrower shall, at the earlier of the end of each LIBOR Interest Period then in effect or when required by law, repay the advances based upon the LIBOR, together with interest accrued thereon. In such case, when required by law, interest shall accrue hereunder at a variable rate of interest per annum, which shall change in the manner set forth below, equal to one percentage point less than the Prime Commercial Rate.

As used herein, Prime Commercial Rate shall mean the rate established by the Lender from time to time based on its consideration of economic, money market, business and competitive factors, and is not necessarily the Lender's most favored rate. Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby based upon the Prime Commercial Rate shall change automatically without notice to the Borrower immediately with each change in the Prime Commercial Rate. If during any period of time while interest is accruing hereunder based upon the Prime Commercial Rate, the obligation evidenced by this Note is not paid at maturity, whether maturity occurs by lapse of time, demand acceleration or otherwise, the unpaid principal balance and any unpaid interest thereon shall,

Confidential                                                    Clearwater AP Defendant 00001280

thereafter until paid, bear interest at a rate equal to **two** percentage points in excess of the rate indicated in the immediately preceding two paragraphs.

If, due to (1) the introduction of or any change in or in the interpretation of any law or regulation, (2) the compliance with any guideline or request from any central bank or other public authority (whether or not having the force of law), or (3) the failure of the Borrower to repay any advance when required by the terms of this Note, there shall be any loss or increase in the cost to the Lender of accruing interest hereunder based upon the LIBOR, then the Borrower agrees that the Borrower shall, from time to time, upon demand by the Lender, pay to the Lender additional amounts sufficient to compensate the Lender for such loss or increased cost. A certificate as to the amount of such loss or increased cost, submitted to Borrower by Lender, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

Notwithstanding that the section below entitled "Prepayment," during any period of time while interest is accruing hereunder based upon the LIBOR, Borrower may not prepay any portion of the outstanding principal balance prior to the expiration of the then current LIBOR Interest Period.

**NOTICE:** Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. The rate is not necessarily the lowest rate charged by Lender on its loans.

**PAYMENT DATES.** All scheduled payments of this Note shall be due and payable on the first (1st) day of the month. If the due date of any payment under this Note shall be a day that is not a day when banking business is conducted by Lender (a "Banking Day"), the due date shall be extended to the next succeeding Banking Day; *provided, however*, that if such next succeeding Banking Day occurs in the following calendar month, then the due date shall be the immediately preceding Banking Day.

**LATE CHARGE.** If a payment, excluding any balloon payment, is ten (10) or more days late, Borrower will be charged Five Percent (5.00%) of the regularly scheduled payment with a minimum charge of Twenty-Five and 00/100 Dollars ($25.00) which shall be considered costs of collection for the purposes of this Note.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of Twenty-Five and 00/100 Dollars ($25.00) if Borrower makes a payment on this Note by a check or preauthorized charge which is later dishonored.

**PREPAYMENT.** There shall be no prepayment fee for the early repayment or payoff of this Note.

**DEFAULT INTEREST.** Upon a default under (i) this Note, (ii) the Loan Agreement, or (iii) any of the Loan Documents (as that term is defined in the Loan Agreement), for which the Lender does not accelerate this Note, the applicable interest rate to this Note shall accrue at the rate of interest in effect at that time, as described hereinabove, plus five percent (5.00%) per annum. Such default interest rate shall apply to the outstanding principal balance of this Note. Upon the curing of the default, the interest rate on this Note shall revert to the initially agreed-upon interest rate effective on

SJ83729921                                       4

Confidential                                                          Clearwater AP Defendant 00001281

the date that the default is cured.

**LENDER'S RIGHTS.**  Upon an Event of Default (as defined in the Loan Agreement or any of the Loan Documents), Lender may, upon demand, declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount. Lender may hire or pay someone else to help collect this Note if Borrower does not pay.  Borrower also will pay Lender reasonable costs of collection.  This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Unless prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.  This Note has been delivered to Lender and accepted by Lender in the State of West Virginia. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Circuit Court of Kanawha County, West Virginia. This Note shall be governed by and construed in accordance with the laws of the State of West Virginia without regard to the choice of law principles adhered to therein. It also shall constitute an Event of Default under this Note if Borrower fails to comply with or to perform any term, obligation, covenant or condition contained in any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement between Borrower and Lender.

**JURY WAIVER.  LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER LENDER OR BORROWER AGAINST THE OTHER.**

**COLLATERAL.**  This Note is secured by a security interest through a Control Agreement and the unconditional, irrevocable, joint and several guarantees of the Guarantors, all in favor of Lender, and the terms and conditions of which are hereby incorporated and made a part of this Note.

**GENERAL PROVISIONS.**  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this Note, or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other lawful action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the Borrower.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.  BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETE COPY OF THE NOTE.**

SJ8372992.1                                        5

                                                  Clearwater AP Defendant 00001282

BORROWER:

**CLEARWATER INVESTMENT HOLDINGS,
LLC**, a Delaware limited liability company

By: _[signature]_

Patricia A. Hoops, Manager

Confidential

Testing Notes: Month provided the APA between
Revelation, Blackjewel and Lexington Coal (related party).
Key aspects of this agreement have been noted and carried
to transaction adjustment support (9309.1). Noted permits
are identified starting on page #25 of the PDF. / DCM

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is made effective as of November 30, 2017 (the "*Effective Date*") between and among REVELATION ENERGY, LLC, a Kentucky limited liability company ("*Revelation*"), BLACKJEWEL L.L.C., a Delaware limited liability company ("*Blackjewel*" and, together with Revelation, whether individually or collectively, "*Seller*"), and LEXINGTON COAL COMPANY, LLC, a Delaware limited liability company ("*Buyer*"). Seller and Buyer are sometimes referred to collectively herein as the "*Parties*" and individually as a "*Party*."

WHEREAS, this Agreement contemplates a transaction in which Seller will sell certain assets and pay certain amounts to Buyer and Buyer will assume certain liabilities from Seller upon closing of the transactions contemplated herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

1.1    Definitions.    Unless otherwise provided to the contrary in this Agreement, capitalized terms in this Agreement shall have the following meanings:

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, Taxes, liens, losses, expenses, and fees, including court costs and attorneys' fees and expenses.

"*Encumbrance*" means any mortgage, pledge, lien, encumbrance or security interest on any of the Purchased Assets.

"*Governmental Authority*" means the United States and any state, county, city or other political subdivision, agency, court or instrumentality.

"*Insurance Policies*" means all material policies of insurance of Seller.

"*Law*" or "*Laws*" means any statute, code, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any applicable Governmental Authority.

"*Obligations*" means duties, liabilities and obligations, whether vested, absolute or contingent, known or unknown, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether contractual, statutory or otherwise.

"*Permitted Encumbrances*" means, with respect to the Purchased Assets, any of the following: (i) any liens for Taxes and assessments not yet due and payable or, if due and payable,



EXHIBIT  5
WIT: Poe
DATE: 3/11/22
Tanya Page, CCR

DEBTORSLCC_001124

that are being contested in good faith in the ordinary course of business; (ii) liens reserved for Seller's performance under leases, subleases, licenses and similar instruments; (iii) any Encumbrances listed on Schedule 1.1 which is attached hereto and made a part hereof; (iv) easements, rights-of-way, restrictions and other similar encumbrances; and (v) any mortgage, deed of trust, pledge, lien or security interest which may be a matter of record.

"*Person*" means an individual or entity, including, without limitation, any corporation, association, joint stock company, trust, joint venture, limited liability company, unincorporated organization, or governmental entity (or any department, agency or political subdivision thereof).

"*Tax*" or "*Taxes*" means any Federal, state or local income, sales, use, ad valorem, real property or personal property tax, including Transfer Taxes, and interest, penalties or additions thereto, whether disputed or not.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Transaction Documents*" means this Agreement and all other agreements, instruments and documents required to be delivered at the Closing.

1.2     Interpretations.  Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions:

(a)     Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

(b)     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(c)     A reference to a person, corporation, trust, estate, partnership, or other entity includes any of them.

(d)     The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(e)     All references in this Agreement to articles, sections or subdivisions thereof shall refer to the corresponding article, section or subdivision thereof of this Agreement unless specific reference is made to such articles, sections, or subdivisions of another document or instrument.

(f)     A reference to any agreement or document (including, without limitation, a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document.

DEBTORSLCC_001125

(g)     No waiver by either Party of any default by the other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement herein, nor shall such waiver be deemed to be a waiver of, or in any manner a release of, the other Party from future performance of the same provision, condition or requirement.  Any delay or omission of either Party to exercise any right hereunder shall not impair the exercise of any such right, or any like right, accruing to it thereafter.  The failure of either Party to perform its obligations hereunder shall not release the other Party from the performance of such obligations.

(h)     A reference to any Party to this Agreement or another agreement or document includes the Party's successors and assigns.

(i)     A reference to legislation or to a provision of legislation includes a modification or reenactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.

(j)     A reference to a writing includes a facsimile transmission of it and any means of reproducing of its words in a tangible and permanently visible form.

(k)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(l)     The word "including" shall mean including without limitation.

(m)     The Exhibits identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

(n)     The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE II
### PURCHASE AND SALE OF ASSETS

2.1     Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller agrees to sell and assign to Buyer and Buyer agrees to purchase and assume from Seller all of Seller's rights, title and interests in and to the following (all of which are collectively referred to as the "**Purchased Assets**"), free and clear of all Encumbrances, except Permitted Encumbrances:

11803700v1

3

DEBTORSLCC_001126

(a)     The real property listed on Schedule 2.1(a) attached hereto and made a part hereof (collectively, the *"Owned Real Property"*).

(b)     The leases and other real property interests listed on Schedule 2.1(b) attached hereto and made a part hereof (collectively, the *"Leased Real Property"* or *"Lease"*).

(c)     The permits listed on Schedule 2.1(c) attached hereto and made a part hereof (collectively, the *"Permits"*).

(d)     All equipment listed on Schedule 2.1(d) attached hereto and made a part hereof (collectively, the *"Equipment"*).

(e)     All agreements listed on Schedule 2.1(e) attached hereto and made a part hereof (collectively, the *"Contracts"*).

(f)     All other assets listed on Schedule 2.1(f) and all other assets which are directly related to the assets described in Schedule 2.1 (a)-(f) and which provide a benefit to such accounts attached hereto and made a part hereof (collectively, the *"Other Purchased Assets"*).

(g)     All records in the possession of Seller pertaining to the assets described above in subsections (a) through (f), including, without limitation, all maps, files, reserve information and other similar materials pertaining (collectively, the *"Records"*).

2.2     Assumed Obligations.   At Closing, Buyer will assume only the following Obligations of Seller (collectively, the *"Assumed Obligations"*):

(a)     All asset retirement liabilities and all other reclamation Obligations relating to the Purchased Assets whether arising before, on or after the Closing Date, but not including any asset retirement liabilities or other reclamation Obligations that are related to the Retained Obligations (as defined below) or any fines, penalties or similar charges arising before the Closing Date.

(b)     All Obligations relating to the Purchased Assets arising from or related to Seller's purported ownership, possession, use or operation of the Purchased Assets after the Closing Date.

(c)     The post-Closing Obligations of Seller under the Purchased Assets that, by their terms, arise after the Closing Date, and are to be observed, paid, performed or discharged, as the case may be, at any time after the Closing Date.

(d)     All Obligations arising under any Environmental Law relating to the Purchased Assets arising at any time after the Closing Date.

2.3     Retained Obligations.   Except for the Assumed Obligations, Buyer shall not assume, and Seller shall remain solely responsible for and shall retain, pay, perform and discharge any and all other Obligations of Seller (collectively, the *"Retained Obligations"*).

DEBTORSLCC_001127

Consideration amount has been tied back to
9309.1. This cash represents a net position which
was subsequently supported by mgmt. / DCM

2.4     Additional Consideration. As further consideration for Buyer's assumption of the
Assumed Obligations, Blackjewel shall pay Buyer the sum of One Million Eighty-Six Thousand
Dollars ($1,086,000.00) in cash at Closing (the "*Cash Payment*").

2.5.    The Closing. Subject to the terms and conditions of this Agreement, the
consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take
place at the offices of Dinsmore & Shohl LLP, 611 Third Avenue, Huntington, West Virginia, at
10:00 am, local time, on the date mutually agreed upon by the Parties, or at such other time, date
or place as Seller and Buyer may mutually agree upon in writing but in no event later than March
31, 2018. The date on which the Closing is to occur is herein referred to as the "*Closing Date*".

2.6     Deliveries at Closing.

(a)     At Closing, Seller shall:

(i)     Deliver to Buyer the Cash Payment.

(ii)    Execute and deliver to Buyer deeds conveying the Owned Real
Property to Buyer in form and substance reasonably acceptable to the Parties.

(iii)   Execute and deliver to Buyer an assignment of the Leases in
substantially the form attached as Exhibit A.

(iv)    Execute and deliver to Buyer an assignment of the Permits in
substantially the form attached as Exhibit B.

(v)     Execute and deliver to Buyer a bill of sale for the Equipment and
Other Purchased Assets in substantially the form attached as Exhibit C.

(vi)    Execute and deliver to Buyer an assignment of the Contracts in
substantially the form attached hereto as Exhibit D.

(vii)   Execute and deliver to Buyer the Equipment Lease Agreement in
substantially the form attached hereto as Exhibit E.

(viii)  Deliver to Buyer such other documents as Buyer may reasonably
request that are necessary for the consummation of this Agreement.

(b)     At Closing, Buyer shall:

(i)     Execute and deliver to Buyer the Transaction Documents.

(ii)    Deliver to Seller such documents as Seller may reasonably request
that are necessary for the consummation of this Agreement.

11803700v1                                    5

DEBTORSLCC_001128

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

3.1    <u>Representations as to Seller and the Transaction</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Organization of Seller</u>.   Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the state of its organization.

(b)    <u>Authorization of Transaction</u>.  Seller has all requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. This Agreement constitutes the valid and legally binding obligation of Seller enforceable in accordance with its terms and conditions.

(c)    <u>Brokers' Fees</u>.  Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

3.2    <u>Representations and Warranties Concerning the Purchased Assets</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Encumbrances</u>.   The Purchased Assets are free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)    <u>No Adverse Claims</u>.  There are no adverse claims to any of the Purchased Assets except for (i) Permitted Encumbrances and (ii) those claims which would not have a material adverse effect.

(c)    <u>Tax Matters</u>.  Except as would not have a material adverse effect, there are no disputes or claims concerning any Tax liability with respect to the Purchased Assets claimed or raised by any authority.

(d)    <u>Litigation</u>. Except as may be set forth in <u>Schedule 3.2(d)</u>, none of the Purchased Assets (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is the subject of any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction, or is the subject of any pending or threatened claim, demand, or notice of violation or liability from any Person, except where any of the foregoing would not have a material adverse effect.

(e)    <u>Environmental Matters</u>.

(i)    With respect to the Purchased Assets, Seller is in material compliance with all Environmental Laws, except for such instances of noncompliance that do not have a material adverse effect.

DEBTORSLCC_001129

(ii)    Seller has obtained all licenses, permits, franchises, authorities, consents, and approvals, and has made all filings and maintained all material information, documentation, and records, as necessary under applicable Laws including Environmental Laws for owning or operating the Purchased Assets and any related business as it is presently conducted, or contemplated to be conducted, and all such permits, licenses, franchises, authorities, consents, approvals, and filings remain in full force and effect, except for such matters that do not have a material adverse effect.

(iii)    Except as set forth on Schedule 3.2(e), (A) there are no pending or threatened claims, demands, actions, administrative proceedings or lawsuits against Seller or it predecessors in title with respect to the Purchased Assets under any Environmental Laws and (B) none of the Purchased Assets are subject to any outstanding injunction, judgment, order, decree or ruling, under any Environmental Laws.

(f)    Title.  Seller has good, marketable and indefeasible title to all the Purchased Assets, free and clear of any Encumbrances of any kind or nature whatsoever, other than for Permitted Encumbrances.

(g)    Real Property.  Seller has good and marketable fee simple title in and to the Real Property, free and clear of all Encumbrances, except for Permitted Encumbrances. Seller has not leased or otherwise granted to any Person the right to use or occupy the Real Property or any portion thereof.  There are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase the Real Property or any portion thereof or interest therein.

(h)    Contracts.  All contracts to be assigned Buyer are freely assignable to Buyer and will be enforceable by Buyer in accordance with their respective terms (individually a "*Contract*" and jointly the "*Contracts*").  There is not under any Contract any existing default by any party thereto or event which, after notice or lapse of time, or both, would constitute such a default or result in the imposition of any late charges, liquidated damages or other penalties except for such defaults that would not have a material adverse effect.  Seller is not aware of any intention by any party to any Contract (i) to terminate or amend the terms thereof, or (ii) to renew the same upon expiration only on terms and conditions which are more onerous and burdensome than those pertaining to the existing Contract.

(i)    Leases.  The Leases are in full force and effect and Seller has performed all Obligations required to be performed by it under the Leases, except when such default would not have a material adverse effect.  Seller is not in default under any Obligation under the Leases, except when such default would not have a material adverse effect.

(j)    Permits.  The Permits are in full force and effect. Seller is not in default under or in violation of the Permits. Except as set forth on Schedule 3.2(j), there are no outstanding penalties, notices of noncompliance, agreements, judgments, consent decrees, agreed orders, or administrative actions or proceedings affecting the Permits.

DEBTORSLCC_001130

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

4.1    Representations as to Buyer and the Transaction.  Buyer hereby represents and warrants to Seller as follows:

(a)    Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

(b)    Authorization of Transaction.  Buyer has all requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.

4.2    No Other Representations Beyond Those Expressed Herein. Buyer makes no other representation to any other Party to this Agreement as to any matter except as otherwise expressly provided herein.

## ARTICLE V
## POST-CLOSING COVENANTS

5.1    General.  If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefore under Article VI).

5.2    Delivery of Records.  As soon as practicable after the Closing Date, Seller will deliver or cause to be delivered the Records to Buyer at its principal office location or such other mutually agreeable location.  Seller (and its successors and assigns) may retain a copy of the Records to the extent that they relate to the operation of its business.

5.3    Permits.

(a)    The Parties shall use their commercially reasonable efforts to diligently and in good faith pursue the transfer of each Permit to Buyer and the approval of each such transfer by each relevant Governmental Authority.  After the Closing Date, Buyer shall submit and file with the applicable Governmental Authority a complete and correct successor operator permit application and any other application or document necessary to cause or allow the transfer of each Permit to Buyer and the release of any and all of Seller's bonds related thereto. Simultaneously with the submission of the successor operator permit application, Buyer shall file and post with such Governmental Authority new bonds with adequate surety to allow transfer of each Permit and cause a full and complete release of Seller's bonds upon final transfer of each Permit.  Seller agrees to cooperate fully with Buyer in the preparation and execution of all additional applications and other documents or submittals necessary to accomplish the transfer and assignment of each Permit to Buyer.

DEBTORSLCC_001131

(b)      After the Closing Date, Seller shall designate Buyer as "operator" with the appropriate Governmental Authority under each Permit where such designation is necessary for Buyer's operations until all consents to the transfer of the Permit are received. During this period, Buyer shall comply, in all material respects, with all Laws applicable to the Permit and shall give Buyer prompt written notice of any incidents or occurrences of non-compliance with such Laws, which Buyer shall have the right (but not the obligation) to cure, including any necessary right of entry to the property that is the subject of any of the Purchased Assets. Buyer agrees to, and does hereby, indemnify and hold Seller harmless in respect of any claim, loss, cost, expense (including without limitation, fees, expenses, disbursements and other charges of attorneys, accountants, consultants, experts and other professionals), liability, fine, penalty, interest, payment and/or damage incurred or suffered by Seller resulting from, arising out of, caused proximately by, incurred or suffered in connection with or incident to any liability or obligation relating to the Permit or Buyer's operations thereunder arising after the Closing Date.

(c)      If a Permit cannot be transferred to Buyer for any reason beyond the control of Buyer, Buyer shall be entitled to continue to utilize the Permit either as a designated operator or under some other mutually satisfactory arrangement.

(d)      Seller agrees that from the Closing Date through the transfer of a Permit to Buyer or so long as Buyer shall continue to utilize the Permit either as a designated operator or under some other mutually satisfactory arrangement, Seller shall not sell, transfer or otherwise dispose of the Permit or any portion thereof.

(e)      Until such time as each bond is released, Buyer shall reimburse Seller for all continuing costs and to keep each such bond in full force and effect.

5.4      Contract Mining Agreement. If any sublease, assignment or transfer of a Contract or Lease would operate to void or nullify any such Contract or Lease, the Parties shall enter into a contract mining agreement or other agreement so as not to terminate the Contract or Lease under usual and customary terms for the Parties and with financial terms no less burdensome to the Parties than those provided herein.

### ARTICLE VI
### REMEDIES FOR BREACHES OF AGREEMENT

6.1      Survival of Representations, Warranties and Certain Covenants. The representations and warranties of Seller contained in Section 3.1 shall survive the Closing under this Agreement indefinitely and those contained in Section 3.2 for a period of three (3) years after the Closing Date, except those for which Seller has applicable insurance coverage and for those relating to Taxes, both of which shall survive for the maximum applicable statute of limitations. The representations and warranties of Buyer contained in Article IV shall survive the Closing indefinitely. The covenants contained in this Agreement to be performed after the Closing shall survive the Closing indefinitely.

DEBTORSLCC_001132

6.2    Indemnification Provisions for Benefit of Buyer.

(a)    Seller shall indemnify and hold Buyer harmless from and against any and all Adverse Consequences whatsoever arising out of or resulting from:

(i)    Any breach of warranty or misrepresentation by Seller or the nonperformance of any covenant or obligation to be performed by Seller to the extent that and only to the extent that (A) there is an applicable survival period pursuant to this Article; and that (B) Buyer makes a written claim for indemnification against Seller pursuant to Article VI within such survival period;

(ii)    Any liability or claim arising out of the ownership, conduct or operation of the Purchased Assets prior to the Closing Date;

(iii)    Any claim which may be asserted against Buyer or any of the Purchased Assets by any of Seller's employees, independent contractors, their employees, or agents with respect to liabilities incurred by or on Seller's behalf prior to the Closing Date, whether covered by a collective bargaining agreement or not, including labor costs, severance pay, pension benefits, employee benefits, workers' compensation, vacation and holiday benefits, sick pay, multiemployer withdrawal liability, any and all employee benefits, and any other costs associated therewith; and/or

6.3    Indemnification Provisions for Benefit of Seller.

(a)    Buyer shall indemnify and hold Seller harmless from and against all Adverse Consequences whatsoever arising out of or resulting from:

(i)    Any breach of warranty or misrepresentation by Buyer contained herein, or the non-performance of any covenant or obligation to be performed by Buyer.

(b)    Limitations of Indemnification. Seller acknowledges and agrees that the indemnification provisions in this Article shall be the exclusive remedies of Seller, Seller Indemnitees and their affiliates with respect to the transactions contemplated by this Agreement.

6.4    Matters Involving Third Parties.

(a)    If any third party shall notify any Party (the "*Indemnified Party*") with respect to any matter (a "*Third Party Claim*") that may give rise to a right to claim for indemnification against any other Party (the "*Indemnifying Party*") under this Article, then the Indemnified Party shall promptly (and in any event within 5 business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing.

(b)    The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without

DEBTORSLCC_001133

the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c)     Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in subsection 6.4(b), the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)     In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party which consent shall not be withheld unreasonably.

## ARTICLE VII
## TAX MATTERS

7.1     Proration of Taxes. As of the Closing Date, there shall be prorated between Seller and Buyer accrued or prepaid items (other than any prepaid, advance, recoupable royalty or payment balances) relating to the Purchased Assets that relate to the period beginning before the Closing Date and ending after the Closing Date such that (a) Seller shall be liable for (and shall reimburse Buyer to the extent that Buyer shall pay) that portion of such Taxes and other expense items relating to, or arising in respect of, periods through the Closing Date, and (b) Buyer shall be liable for (and shall reimburse Seller to the extent Seller shall have paid) that portion of such Taxes and other expense items related to, or arising in respect of, periods after the Closing Date, including ad valorem and similar taxes with respect to the Purchased Assets. To the extent the amounts of any such proratable items are not finally known at the Closing, appropriate settlement will be made within thirty (30) days after the amount of any such item is finally known.

7.2     Cooperation on Tax Matters. Each Party shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other administrative or judicial proceeding relating to liability for Taxes. Each Party shall retain all books and records that are in its possession with respect to Tax matters pertinent to the Purchased Assets relating to any taxable period beginning before the Closing Date until the expiration of the applicable statute of limitations.

7.3     Transfer Taxes. Seller and Buyer shall cooperate in the preparation, execution, and filing of all returns, questionnaires, applications or other documents regarding any transfer, recording, documentary, sales, use, stamp, registration and other similar taxes and fees ("*Transfer Taxes*") that become payable in connection with the transaction contemplated by this Agreement, and Seller and Buyer shall use their commercially reasonable efforts to obtain any certificate, document or take other action to reduce or eliminate any such Transfer Tax. Buyer will file all necessary tax returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Seller will join in the execution of any such tax returns and other documentation. Notwithstanding anything set forth in this Agreement to the contrary, Buyer will be obligated to bear and shall pay at Closing, any Transfer Taxes incurred in connection with the transactions contemplated by this Agreement. Buyer agrees to indemnify, defend and hold Seller harmless for all such Transfer Taxes.

DEBTORSLCC_001134

## ARTICLE VIII
## MISCELLANEOUS

8.1    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

8.2    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party.

8.3    Counterparts.  This Agreement may be executed in one or more counterparts (including by means of facsimile or electronic signature page) and all such counterparts taken together shall constitute one and the same Agreement.

8.4    Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given two (2) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient at the party's last known address.  Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.

8.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of West Virginia without giving effect to any choice or conflict of law provision or rule (whether of the State of West Virginia or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of West Virginia.

8.6    Entire Agreement.  This Agreement (including the documents referred to in this Agreement) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they have related in any way to the subject matter of this Agreement.  Neither this Agreement nor any amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

8.7    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

DEBTORSLCC_001135

8.8     Transaction Expenses. Each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

8.9     Right of Setoff. Either Party may setoff any amounts to which it may be entitled from the other Party under this Agreement or the Transaction Documents against amounts otherwise payable to the other Party under this Agreement or the Transaction Documents.

8.10     Rule of Construction.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement, and the Parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.


[REMAINDER OF PAGE LEFT BLANK; SIGNATURE PAGE FOLLOWS]

DEBTORSLCC_001136

IN WITNESS WHEREOF, the parties have entered into this Assignment as of the Effective Date.

REVELATION ENERGY, LLC

By: _____

Its: _____

BLACKJEWEL L.L.C.

By: _____

Its: _____

LEXINGTON COAL COMPANY, LLC

By: _____

Its: _____

STATE OF WEST VIRGINIA

COUNTY OF CABELL:

The foregoing instrument was acknowledged before me this _16_ day of _December_, 2017, by _Jeffrey A. Hoops_, as _President_ of Revelation Energy, LLC, a Kentucky limited liability company, on behalf of said company.

My commission expires: _March 5, 2019_

_____
Notary Public

[Notarial Seal]

Official Seal
Notary Public, State of West Virginia
Anetma Maloy
101 Rolling Meadows
Scott Depot, WV 25560
My commission expires March 5, 2019

11803601v1

3

## Schedule 1.1

### List of Encumbrances

NONE

DEBTORSLCC_001138

## Schedule 2.1(a)

### Owned Real Property

NONE

DEBTORSLCC_001139

Schedule 2.1(b)

Leased Property

**[SEE ATTACHED]**

DEBTORSLCC_001140

## Lease Summary

|  | Execution Date |
|---|---|
| **R235 - Slate Branch** | |
| Alberta & Elmer Stafford | 12/18/1974 |
| Bonzo Heirs Tract III (C5) | 7/9/1991 |
| Cuzzie Gooslin | 10/23/1998 |
| Cylde & Phyliss Daughtery | 3/2/1994 |
| Doug Gooslin | 10/23/1998 |
| Douglas & Evelyn Gooslin | 3/21/2005 |
| George & Della Griffey | 1/1/2006 |
| Glen & Nellie Blankenship | 8/27/1993 |
| James & Bonnie Yound | 9/12/2005 |
| Joseph McCoy | 2/13/1991 |
| Joseph McCoy, et al. | 11/1/2011 |
| Myrtle Dotson | 9/28/1992 |
| Robert & Mary Isom | 6/15/2004 |
| Terry Fields | 10/17/1997 |
| Virgie Fields | 9/9/2001 |
| | |
| **A23 - Big Branch** | |
| Majestic Colleries | 2/1/2010 |
| | |
| Poplar Creek | 2/18/2014 |
| | |
| **A30 - Point Rock** | |
| Empire Coal Holdings, LLC | 8/22/2013 |
| | |
| **R234 - Gooseneck** | |
| Arthur & Bunia Ratliff | 9/22/2003 |
| Bonzo Heirs Tract V (C6) | 7/9/1991 |
| Bonzo Heirs Tract IV (C4) | 7/9/1991 |
| Clyde Daughtery | 3/2/1994 |
| Eddie & Mary Dotson | 8/8/2001 |
| Eloise Thacker Alley | 8/25/1981 |
| Ernst Calhoun | 11/10/1997 |
| Hubert Compton | 6/1/1993 |
| Jessica & Thomas Curry | 9/4/2003 |
| JS Cline | 2/5/1981 |
| JW Kinzer (Kinzer Business Realty) (Harold Norma | 12/31/1974 |
| Kermit Ratliff | 9/22/2003 |
| Nora Gooslin Heirs | 7/2/1999 |
| Roy & Janice Browning | 9/1/1980 |
| Teddy Gooslin | 5/2/2006 |
| WE Deaton Heirs | 5/7/1999 |

## Lease Summary

|  | Execution Date |
| --- | --- |
| **P2 - Pontiki Prep Plant** | |
| Hardin Heirs | 5/20/1975 |
| Oliver & Marcheta Blackburn | 9/2/1985 |
| Larry & Barbara Mullins | 4/11/2011 |
| Pocahontas/Pontiki Coal | 9/30/2009 |
| Ruth McCoy | 4/5/1979 |
| Mary Haney et al | 6/28/2011 |
| Mary Haney et al | 4/15/2008 |
| Clyde Scalf et al | 9/27/1988 |
| Earnest & Pearl Cline | 8/13/1973 |
| Ollie & Raymond Gibson (c/o Ramona Williamson | 5/14/1976 |
| Denzil Lowe | 1/17/2012 |
| Denzil Lowe | 12/1/1993 |
| Norfolk Southern | 2/17/1987 |
| Norfolk Southern | |
| | |
| **S1-Hunt's Branch** | |
| Paul & Helen Norman | 2/27/2004 |
| WS Charles | 4/5/1996 |
| Sandra Bentley | 5/1/1999 |
| Larry & Angela Mounts | 8/10/2004 |
| Donald & Beulah Norman | 6/28/2004 |
| George Norman | 6/28/2004 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Audy & Sharon Asbury | 9/17/2004 |
| Eddie & Barbara Hurley | 6/20/2006 |
| Gary & Shirley McClanahan | 6/10/2004 |
| Georgia Chapman | 9/17/2004 |
| Glen & Pauline Stump | 8/19/2004 |
| Homer Thompson | 3/4/2005 |
| James & Ellen Charles | 11/21/1990 |
| Kennie Wolford | 7/25/2008 |
| Larry & Angela Mounts | 8/10/2004 |
| Larry & Brenda Wolford | 8/24/2004 |
| Marrow Mounts Heirs | 5/10/2012 |
| Paul & Helen Norman | 2/27/2004 |
| Ronnie Chapman | August 2012 |
| Roy, Jr. & Jewel Dotson | 3/27/2006 |
| Victoria Hicks (Leesha Mullins) | 2/23/2009 |
| William & Sylvia Coleman | 10/10/2001 |

## Lease Summary

| | Execution Date |
|---|---|
| **S1-Pompey West** | |
| Frank Robinette | 1/1/2014 |
| Hassell Prater | 1/1/2014 |
| Eddie Dean Ferrell | 6/18/2014 |
| Geroge Robinette Heirs, John & Melanie Robinett | 3/19/2014 |
| Lura Robinette Gannon | 3/17/2014 |
| Hulita & Diane Blankenship | 6/22/2015 |
| | |
| **S4 - Netley Branch** | |
| David Akers | 9/2/1998 |
| Ricky & Lana Blankenship | 10/24/2001 |
| Clair & Florence Breeding | 7/24/1997 |
| Lilly Crawley | 4/15/2004 |
| Paul Farley | 9/30/2008 |
| Hall / Whitt | 9/2/1998 |
| Gary Hatfield | 3/15/1999 |
| John Loudermelt | 7/24/1997 |
| Kathy Maynard | 9/22/1998 |
| Pocahontas Development | 6/22/2003 |
| Martha Roberts | 10/1/2008 |
| Patsy Salmons | 4/16/2004 |
| Landon Smith | 9/6/1997 |
| Colonial Energy LLC | 5/1/2010 |
| Raynie Hatfield | 3/26/2008 |
| | |
| **S4A - Calloway North** | |
| GW Dotson Heirs Change | 8/4/2010 |
| JL Dotson Heirs | 10/25/1988 |
| Johnny & Henrietta Dotson | 12/9/1993 |
| Kentucky Berwind-Amende 8/15/11 | 1/1/1992 |
| Peter Creek Development | 3/17/1993 |
| Pocahontas Devlopment | 4/15/2009 |
| Pocahontas Devlopment (Colonial Land) | 4/1/1993 |
| Sarah Dotson | 10/23/1990 |
| | |
| **S9 - Findlay Branch** | |
| Almond & Martha McCoy | 5/24/2010 |
| Larry & Barbara Mullins | 5/23/2008 |
| Martin County Coal Corp | 8/12/2008 |

## Lease Summary

| | Execution Date |
|---|---|
| Jackie & Laura Scott | 5/25/2010 |
| Pontiki Coal, LLC | 1/1/2011 |

### S15 - Flag Knob

| | |
|---|---|
| Roy Alexander (Land Rental Celia Fish) | 3/26/2009 |
| Cecil & Bethel Setser | 1/17/2011 |
| Dorothy Maynard | 6/14/2011 |
| Douglas & Rosalee Taylor | 1/16/1995 |
| The Elk Horn Coal Company | 12/1/2009 |
| Goldie & Wanda Taylor | 1/16/1995 |
| Harry & Roberta Jones | 10/24/2008 |
| Pauline Nichols | 3/1/2000 |
| Roy Alexander | 3/26/2009 |

### S18 - Serig Branch

| | |
|---|---|
| James & Addie Farley | 6/4/2009 |
| James & Addie Farley, Virginia Karen & Terry Keat | 5/21/2009 |
| Randy Sluss et al | 3/19/2009 |
| John & Lutie Williams | 4/8/2009 |
| Sarah & Harold Hall | 7/28/2009 |
| Shelby Jarrell | 10/20/2009 |
| James & Dorothy Wooley | 11/2/2011 |
| Ronald Maynard et al | 3/24/2010 |
| Calvary Episcopal Church | 5/19/2010 |
| Kings Daughters & Sons | 6/15/2010 |
| Susan & Dane Moore | 11/19/2010 |
| William Kazee | 11/16/2010 |
| Franklin & Betty Booth | 3/11/2011 |
| Marcie & Earnest Hale | 3/29/2011 |
| Norman Vogeler | 8/26/2011 |
| Ronald & Judith Maynard | 8/26/2011 |
| John & Lutie Williams | 8/26/2011 |
| James Harmon | 9/27/2011 |
| Rodney & Grace Jordan | 11/1/2011 |
| Lowell Jordan | 11/1/2011 |
| Connel & Ruby Ware | 12/16/2011 |
| Pack, Reed, Potter, Stepp, Webb & Barrett | 12/17/1998 |
| Lummie & Dorothy Wilson (Larry Whitt-POA) | 2/27/2001 |
| Burgett, Cox, Booth, Vanoy, Foster & Palmer | 3/1/2001 |
| Carl & Nancy Justice | 2/5/2011 |

## Lease Summary

|  | Execution Date |
| --- | --- |
| Lauren Land Company-Override | 12/13/2013 |
| Norfolk & Western Railway Company | 5/7/1982 |
| Russell Stanley | 1/4/1982 |
| Jim & Sadie Jude | 4/18/1983 |
| Andrew & Jean Webb | 1/19/1984 |
| Armel Staton | 11/4/1996 |
| Helen Bush | 11/4/1996 |
| Ray & Linda Jude and Thomas & Elizabeth Muncy | 1/1/2002 |
| Lauren Land Company | 12/13/2013 |
| Pocahontas Development Corporation | 12/11/2013 |
| Triple H Real Estate, LLC-Override | 12/13/2013 |

| $20 - Bevins Branch | |
| --- | --- |
| CAM Mining | 5/21/2015 |
| Alma Land | 12/9/2004 |
| Beaually Land | 12/9/2004 |
| Chestern & Judith Blackburn et al. (French Blackb | 6/12/2013 |
| E.J. (Elbert) & Justine Blackburn et al | 8/5/2007 |
| John Burchett | 12/21/2007 |
| Woodrow & Lora Burchett | 11/11/2005 |
| Ruth & Chester Butcher et al (Tom Fraley Heirs) | 4/21/2007 |
| Bill, Frank & Linda Caldwell | 8/14/2006 |
| Nella Clay | 12/10/2012 |
| DFM, Inc. | 4/12/2004 |
| The Elk Horn Coal Co. | 9/1/2005 |
| Delcie Endicott | 4/22/2009 |
| Barbara Fraely et al (Milford Fraley Heirs) | 6/25/2007 |
| Charles & Nancy Fraley et al (Haskey Fraley Heirs) | 4/25/2007 |
| John & Barbara Fraley et al (Milford Fraley Heirs) | 9/6/2007 |
| Maybeth Fraley et al (Jerry Fraley Heirs) | 4/30/2007 |
| Kalman Franko et al (Maude Gladys Franko Fraley | 5/15/2007 |
| Anna Jean & Ernest Goble et al | 4/11/2007 |
| Connie Hand et al (Samuel Henderson Fraley Heir | 4/22/2007 |
| Billy & Lucille James | 5/6/2008 |
| Helen Spears (Willie C. Thompson as successor) | 1/16/2009 |
| Wanda & Ballard Tussey | 3/25/2008 |
| Emogene Ward et al | 12/11/2006 |
| Sheila & Carl Wenger et al (Dorothy Mae Fraley C | 6/25/2007 |
| DFM, Inc. - Subleases: | |
| M&M Enterprise | 9/1/1998 |
| Cero Blackburn et al | 6/4/1996 |
| Cliff Blackurn et al | 12/30/1999 |

## Lease Summary

|  | Execution Date |
|---|---|
| Denzil Allen et al | 7/26/1999 |
| Denzil Allen | 9/1/2005 |
| Denzil Allen/Jack Hall | 8/23/1999 |
| | |
| **T2 - Sunny Ridge Loadout** | |
| Pinson Lease - Robert Pinson | 3/1/1972 |
| NS Agreement 260032 | 4/14/1998 |
| NS Agreement 260009 | 7/11/1995 |
| | |
| **Johns Creek & Peter Creek** | |
| Berkeley Energy Corporation | 10/8/2014 |

Schedule 2.1(c)

Permits

[SEE ATTACHED]

DEBTORSLCC_001147

| | Mine ID # | Site Name | New PERMIT # | Previous PERMIT # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | [illegible] | [illegible] | [illegible] Assumption | [illegible] | [illegible] | [illegible] | Previous Outlet (Yes) | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major Reclamation Permits - Will be Mined to Reclaim** | | | | | | | | | | | | | | | | | | | |
| 1 | [illegible] | [illegible] | 498-0869 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $1,400,000 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Mine to Reclaim |
| 2 | [illegible] | [illegible] | 898-0933 | --- | Pike | [illegible] | [illegible] | [illegible] | $3,125,400 | $971,200 | [illegible] | $450,000 | | 273.00 | 0.00 | 7900.00 | [illegible] | 80.00 | Mine to Reclaim |
| 3 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $1,450,000 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Mine to Reclaim |
| 4 | [illegible] | [illegible] | 880-0294 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $1,240,000 | $0 | $1,240,000 | $750,000 | | [illegible] | 4.40 | 9750.00 | 545.346 | [illegible] | Mine to Reclaim |
| 5 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 6 | [illegible] | [illegible] | 898-0442 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $2,529,300 | $ | $2,529,300 | $450,000 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Mine to Reclaim |
| **Major Reclamation with No Mining** | | | | | | | | | | | | | | | | | | | |
| 7 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Facilities** | | | | | | | | | | | | | | | | | | | |
| 8 | [illegible] | [illegible] | 880-3021 | [illegible] | Martin | War Creek | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | [illegible] | 0.00 | [illegible] | [illegible] | [illegible] |
| 9 | [illegible] | [illegible] | 880-8023 | [illegible] | Martin | War Creek | [illegible] | [illegible] | $1,699,300 | $0 | $1,699,300 | $0 | | 130.00 | 0.00 | 0.00 | 0.00 | 50.00 | [illegible] |
| 10 | [illegible] | [illegible] | 898-8120 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $448,500 | $0 | $448,500 | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | [illegible] |
| **Deep Mine Permits with Reserves (O2)** | | | | | | | | | | | | | | | | | | | |
| 11 | [illegible] | [illegible] | 898-0890 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Deep Mine w/ Surface Reserves Pending |
| 12 | [illegible] | [illegible] | 898-9911 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | 72.00 | 0.00 | 0.00 | [illegible] | [illegible] | Deep Mine w/ Surface Reserves Pending |
| 13 | [illegible] | [illegible] | 898-4479 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $78,800 | $0 | $78,800 | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | [illegible] |
| 14 | [illegible] | [illegible] | 898-9991 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | [illegible] | [illegible] | 0.00 | [illegible] | [illegible] | Deep Mine w/ Surface Reserves Pending |
| 15 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 16 | [illegible] | [illegible] | 898-1515 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | [illegible] | [illegible] | [illegible] | 0.00 | [illegible] | [illegible] | Deep Mine w/ Surface Reserves Pending |
| 17 | [illegible] | [illegible] | 880-5194 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Deep Mine w/ Surface Reserves Pending |
| 18 | [illegible] | [illegible] | 880-8130 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | $10,000 | $0 | $10,000 | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 19 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 20 | [illegible] | [illegible] | 898-4482 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | [illegible] |
| **Haul Road Permits** | | | | | | | | | | | | | | | | | | | |
| 21 | [illegible] | [illegible] | 898-7025 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 22 | [illegible] | [illegible] | 898-7036 | --- | Pike | [illegible] | [illegible] | [illegible] | $90,000 | $77,000 | $17,000 | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Haul Road |
| 23 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 24 | [illegible] | [illegible] | 898-7127 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $9,500 | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | [illegible] |
| 25 | [illegible] | [illegible] | 880-7034 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Haul Road |
| 26 | [illegible] | [illegible] | 880-7037 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | $603,500 | $0 | $603,500 | $0 | | 200.00 | 0.00 | 0.00 | 0.00 | 200.00 | Haul Road |
| 27 | [illegible] | [illegible] | 880-7031 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Haul Road |
| 28 | [illegible] | [illegible] | 880-7038 | [illegible] | Martin | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | 170.00 | 0.00 | 0.00 | 0.00 | 170.00 | Haul Road |
| 29 | [illegible] | [illegible] | [illegible] | [illegible] | Martin | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 30 | [illegible] | [illegible] | 898-7092 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $79,000 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | [illegible] | [illegible] | Haul Road |
| **Maintenance Only** | | | | | | | | | | | | | | | | | | | |
| 31 | [illegible] | [illegible] | 898-0031 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 32 | [illegible] | [illegible] | 898-0030 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $1,000,000 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | 100.00 | [illegible] |
| 33 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 34 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 35 | [illegible] | [illegible] | 898-0087 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $3,609,200 | $0 | $3,609,200 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 36 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

DEBTORSLCC_001149

### Schedule 2.1(d)

### Equipment

All improvements, furniture, fixtures, equipment, machinery, tools, vehicles, and office equipment located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility).

DEBTORSLCC_001150

## Schedule 2.1(e)

### Contracts

NONE

DEBTORSLCC_001151

## Schedule 2.1(f)

### Other Purchased Assets

All inventory, supplies and any other tangible personal property located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility).

Schedule 3.2(d)

Litigation

NONE

**Schedule 3.2(e)**

**Environmental Actions**

NONE

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "*Assignment*") is entered into and effective as of November 30, 2017 (the "*Effective Date*"), REVELATION ENERGY, LLC, a Kentucky limited liability company ("*Revelation*"), BLACKJEWEL L.L.C., a Delaware limited liability company ("*Blackjewel*" and, together with Revelation, whether individually or collectively, "*Assignor*"), and LEXINGTON COAL COMPANY, LLC, a Delaware limited liability company ("*Assignee*"). Assignor and Assignee are sometimes referred to collectively herein as the "*Parties*" and individually as a "*Party*."

WHEREAS, Assignor is a party to certain lease agreements and related agreements, as described more particularly on Exhibit A attached hereto and incorporated herein by reference (collectively, "*Leases*").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement of even date herewith ("*Asset Purchase Agreement*").

WHEREAS, Assignor now desires to assign to Assignee all of Assignor's right, title, interest and estate in and to the Leases, and Assignee desires to accept such assignment and assume the Leases from Assignor, pursuant to the terms of the Asset Purchase Agreement and this Assignment.

WHEREAS, this Assignment is executed and delivered by the parties to effect, and in conjunction with, the closing of the transactions contemplated by the Asset Purchase Agreement.

NOW, THEREFORE, for and in consideration of the foregoing Recitals, the covenants and agreements set forth herein and in the Asset Purchase Agreement, and the payments made pursuant to the terms of the Asset Purchase Agreement, the receipt and sufficiency of all of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignor hereby absolutely and unconditionally grants, conveys, assigns, transfers, delivers and sets over to Assignee, its successors and assigns, all of Assignor's right, title, interest and estate in, under and to the Leases, together with all rights of Assignor to recoup any advance or minimum royalties paid under the Leases, and all issues, profits, payments and other amounts with respect thereto, all of Assignor's improvements, if any, on and to its leaseholds under the Leases, all revenue and income accruing thereunder, and all rights, titles, options and privileges conferred thereby.

2.     Assignee hereby absolutely and unconditionally accepts the foregoing assignment by Assignor of all of its right, title, interest and estate in, under and to the Leases and expressly assumes and agrees to become responsible for all the terms, covenants, conditions and obligations (collectively, "*Obligations*") under the Leases which accrue from and after the Effective Date (exclusive of any Obligations arising under the Leases as a result of any breach, default or failure of the Assignor to perform any Obligations required to be performed by Assignor with respect to the operation of Assignor's business prior to the Effective Date).

3.     The indemnification provisions set forth in the Asset Purchase Agreement are incorporated herein by reference.

11803601v1

DEBTORSLCC_001155

4.      Notwithstanding any presumption of law or anything herein to the contrary, Assignor makes no representations or warranties regarding the lessors' title to the real property interests acquired by Assignor under the Leases.  Assignor hereby assigns to Assignee any representation or warranty which any lessor has made to Assignor under a Lease with respect to such lessor's title, to the extent that such representation or warranty is assignable by Assignor.

5.      Capitalized words used but not otherwise defined in this Assignment shall have the meanings assigned to them in the Asset Purchase Agreement.  This Assignment shall be binding upon the parties hereto and shall inure to the benefit of such parties and their respective successors and permitted assigns.  This Assignment may be executed in any number of counterparts, each of which shall be deemed an original but all of which taken together will constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto.

6.      In the event of any inconsistency between this Assignment and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

[REMAINDER OF PAGE LEFT BLANK; SIGNATURE PAGE FOLLOWS]

DEBTORSLCC_001156

IN WITNESS WHEREOF, the parties have entered into this Assignment as of the Effective Date.

REVELATION ENERGY, LLC

By: _____

Its: _____

BLACKJEWEL L.L.C.

By: _____

Its: _____

LEXINGTON COAL COMPANY, LLC

By: _____

Its: _____

STATE OF WEST VIRGINIA

COUNTY OF CABELL:

The foregoing instrument was acknowledged before me this _16_ day of _December_____, 2017, by _Jeffrey A Hoops_, as _President_ of Revelation Energy, LLC, a Kentucky limited liability company, on behalf of said company.

My commission expires: _March 5, 2019_.

_____
Notary Public

[Notarial Seal]

Official Seal
Notary Public, State of West Virginia
Aneissa Maloy
101 Rolling Meadows
Scott Depot WV 25560
My commission expires March 5, 2019

11803601v1

3

STATE OF WEST VIRGINIA

COUNTY OF CABELL:

The foregoing instrument was acknowledged before me this ___6___ day of

_Wscunder___ . 2017, by _Jeffey A Hospo_ . as _President_ . of

Blackjewel L.L.C., a Delaware limited liability company, on behalf of said company.

My commission expires: _March 5, 2019._

> Official Seal
> Notary Public, State of West Virginia
> Annette Haley
> 101 Rising Meadows
> Scott Depot, WV 25560
> My commission expires March 5, 2019

Seal

_Annette Haley_
Notary Public

STATE OF WEST VIRGINIA

COUNTY OF CABELL:

The foregoing instrument was acknowledged before me this ___6___ day of

_____, 2017, by _____, as _____ of

Lexington Coal Company, LLC, a Delaware limited liability company, on behalf of said

company.

My commission expires: _____

_____
Notary Public

[Notarial Seal]

This instrument prepared by:

_____
M. Edward Cunningham, II, Esquire
Dinsmore & Shohl LLP
611 Third Avenue
Huntington, WV 25701
(304) 529-6181

DEBTORSLCC_001158

## Lease Summary

|  | Execution Date |
| --- | --- |
| **R235 - Slate Branch** |  |
| Alberta & Elmer Stafford | 12/18/1974 |
| Bonzo Heirs Tract III (C5) | 7/9/1991 |
| Cuzzie Gooslin | 10/23/1998 |
| Cylde & Phyliss Daughtery | 3/2/1994 |
| Doug Gooslin | 10/23/1998 |
| Douglas & Evelyn Gooslin | 3/21/2005 |
| George & Della Griffey | 1/1/2006 |
| Glen & Nellie Blankenship | 8/27/1993 |
| James & Bonnie Yound | 9/12/2005 |
| Joseph McCoy | 2/13/1991 |
| Joseph McCoy, et al. | 11/1/2011 |
| Myrtle Dotson | 9/28/1992 |
| Robert & Mary Isom | 6/15/2004 |
| Terry Fields | 10/17/1997 |
| Virgie Fields | 9/9/2001 |
|  |  |
| **A23 - Big Branch** |  |
| Majestic Colleries | 2/1/2010 |
|  |  |
| Poplar Creek | 2/18/2014 |
|  |  |
| **A30 - Point Rock** |  |
| Empire Coal Holdings, LLC | 8/22/2013 |
|  |  |
| **R234 - Gooseneck** |  |
| Arthur & Bunia Ratliff | 9/22/2003 |
| Bonzo Heirs Tract V (C6) | 7/9/1991 |
| Bonzo Heirs Tract IV (C4) | 7/9/1991 |
| Clyde Daughtery | 3/2/1994 |
| Eddie & Mary Dotson | 8/8/2001 |
| Eloise Thacker Alley | 8/25/1981 |
| Ernst Calhoun | 11/10/1997 |
| Hubert Compton | 6/1/1993 |
| Jessica & Thomas Curry | 9/4/2003 |
| JS Cline | 2/5/1981 |
| JW Kinzer (Kinzer Business Realty) (Harold Norma | 12/31/1974 |
| Kermit Ratliff | 9/22/2003 |
| Nora Gooslin Heirs | 7/2/1999 |
| Roy & Janice Browning | 9/1/1980 |
| Teddy Gooslin | 5/2/2006 |
| WE Deaton Heirs | 5/7/1999 |

## Lease Summary

|  | Execution Date |
|---|---|
| **P2 - Pontiki Prep Plant** | |
| Hardin Heirs | 5/20/1975 |
| Oliver & Marcheta Blackburn | 9/2/1985 |
| Larry & Barbara Mullins | 4/11/2011 |
| Pocahontas/Pontiki Coal | 9/30/2009 |
| Ruth McCoy | 4/5/1979 |
| Mary Haney et al | 6/28/2011 |
| Mary Haney et al | 4/15/2008 |
| Clyde Scalf et al | 9/27/1988 |
| Earnest & Pearl Cline | 8/13/1973 |
| Ollie & Raymond Gibson (c/o Ramona Williamsor | 5/14/1976 |
| Denzil Lowe | 1/17/2012 |
| Denzil Lowe | 12/1/1993 |
| Norfolk Southern | 2/17/1987 |
| Norfolk Southern | |
| | |
| **S1-Hunt's Branch** | |
| Paul & Helen Norman | 2/27/2004 |
| WS Charles | 4/5/1996 |
| Sandra Bentley | 5/1/1999 |
| Larry & Angela Mounts | 8/10/2004 |
| Donald & Beulah Norman | 6/28/2004 |
| George Norman | 6/28/2004 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Audy & Sharon Asbury | 9/17/2004 |
| Eddie & Barbara Hurley | 6/20/2006 |
| Gary & Shirley McClanahan | 6/10/2004 |
| Georgia Chapman | 9/17/2004 |
| Glen & Pauline Stump | 8/19/2004 |
| Homer Thompson | 3/4/2005 |
| James & Ellen Charles | 11/21/1990 |
| Kennie Wolford | 7/25/2008 |
| Larry & Angela Mounts | 8/10/2004 |
| Larry & Brenda Wolford | 8/24/2004 |
| Marrow Mounts Heirs | 5/10/2012 |
| Paul & Helen Norman | 2/27/2004 |
| Ronnie Chapman | August 2012 |
| Roy, Jr. & Jewel Dotson | 3/27/2006 |
| Victoria Hicks (Leesha Mullins) | 2/23/2009 |
| William & Sylvia Coleman | 10/10/2001 |

## Lease Summary

|  | Execution Date |
|---|---|
| **S1-Pompey West** | |
| Frank Robinette | 1/1/2014 |
| Hassell Prater | 1/1/2014 |
| Eddie Dean Ferrell | 6/18/2014 |
| Geroge Robinette Heirs, John & Melanie Robinett | 3/19/2014 |
| Lura Robinette Gannon | 3/17/2014 |
| Hulita & Diane Blankenship | 6/22/2015 |
| | |
| **S4 - Netley Branch** | |
| David Akers | 9/2/1998 |
| Ricky & Lana Blankenship | 10/24/2001 |
| Clair & Florence Breeding | 7/24/1997 |
| Lilly Crawley | 4/15/2004 |
| Paul Farley | 9/30/2008 |
| Hall / Whitt | 9/2/1998 |
| Gary Hatfield | 3/15/1999 |
| John Loudermelt | 7/24/1997 |
| Kathy Maynard | 9/22/1998 |
| Pocahontas Development | 6/22/2003 |
| Martha Roberts | 10/1/2008 |
| Patsy Salmons | 4/16/2004 |
| Landon Smith | 9/6/1997 |
| Colonial Energy LLC | 5/1/2010 |
| Raynie Hatfield | 3/26/2008 |
| | |
| **S4A - Calloway North** | |
| GW Dotson Heirs Change | 8/4/2010 |
| JL Dotson Heirs | 10/25/1988 |
| Johnny & Henrietta Dotson | 12/9/1993 |
| Kentucky Berwind-Amende 8/15/11 | 1/1/1992 |
| Peter Creek Development | 3/17/1993 |
| Pocahontas Devlopment | 4/15/2009 |
| Pocahontas Devlopment (Colonial Land) | 4/1/1993 |
| Sarah Dotson | 10/23/1990 |
| | |
| **S9 - Findlay Branch** | |
| Almond & Martha McCoy | 5/24/2010 |
| Larry & Barbara Mullins | 5/23/2008 |
| Martin County Coal Corp | 8/12/2008 |

## Lease Summary

|  | Execution Date |
| --- | --- |
| Jackie & Laura Scott | 5/25/2010 |
| Pontiki Coal, LLC | 1/1/2011 |

### S15 - Flag Knob

|  |  |
| --- | --- |
| Roy Alexander (Land Rental Celia Fish) | 3/26/2009 |
| Cecil & Bethel Setser | 1/17/2011 |
| Dorothy Maynard | 6/14/2011 |
| Douglas & Rosalee Taylor | 1/16/1995 |
| The Elk Horn Coal Company | 12/1/2009 |
| Goldie & Wanda Taylor | 1/16/1995 |
| Harry & Roberta Jones | 10/24/2008 |
| Pauline Nichols | 3/1/2000 |
| Roy Alexander | 3/26/2009 |

### S18 - Serig Branch

|  |  |
| --- | --- |
| James & Addie Farley | 6/4/2009 |
| James & Addie Farley, Virginia Karen & Terry Keal | 5/21/2009 |
| Randy Sluss et al | 3/19/2009 |
| John & Lutie Williams | 4/8/2009 |
| Sarah & Harold Hall | 7/28/2009 |
| Shelby Jarrell | 10/20/2009 |
| James & Dorothy Wooley | 11/2/2011 |
| Ronald Maynard et al | 3/24/2010 |
| Calvary Episcopal Church | 5/19/2010 |
| Kings Daughters & Sons | 6/15/2010 |
| Susan & Dane Moore | 11/19/2010 |
| William Kazee | 11/16/2010 |
| Franklin & Betty Booth | 3/11/2011 |
| Marcie & Earnest Hale | 3/29/2011 |
| Norman Vogeler | 8/26/2011 |
| Ronald & Judith Maynard | 8/26/2011 |
| John & Lutie Williams | 8/26/2011 |
| James Harmon | 9/27/2011 |
| Rodney & Grace Jordan | 11/1/2011 |
| Lowell Jordan | 11/1/2011 |
| Connel & Ruby Ware | 12/16/2011 |
| Pack, Reed, Potter, Stepp, Webb & Barrett | 12/17/2011 |
| Lummie & Dorothy Wilson (Larry Whitt-POA) | 2/27/2001 |
| Burgett, Cox, Booth, Vanoy, Foster & Palmer | 3/1/2001 |
| Carl & Nancy Justice | 2/5/2011 |

## Lease Summary

|  | Execution Date |
|---|---|
| Lauren Land Company-Override | 12/13/2013 |
| Norfolk & Western Railway Company | 5/7/1982 |
| Russell Stanley | 1/4/1982 |
| Jim & Sadie Jude | 4/18/1983 |
| Andrew & Jean Webb | 1/19/1984 |
| Armel Staton | 11/4/1996 |
| Helen Bush | 11/4/1996 |
| Ray & Linda Jude and Thomas & Elizabeth Muncy | 1/1/2002 |
| Lauren Land Company | 12/13/2013 |
| Pocahontas Development Corporation | 12/11/2013 |
| Triple H Real Estate, LLC-Override | 12/13/2013 |

| $20 - Bevins Branch | |
|---|---|
| CAM Mining | 5/21/2015 |
| Alma Land | 12/9/2004 |
| Beaually Land | 12/9/2004 |
| Chestern & Judith Blackburn et al. (French Blackb | 6/12/2013 |
| E.J. (Elbert) & Justine Blackburn et al | 8/5/2007 |
| John Burchett | 12/21/2007 |
| Woodrow & Lora Burchett | 11/11/2005 |
| Ruth & Chester Butcher et al (Tom Fraley Heirs) | 4/21/2007 |
| Bill, Frank & Linda Caldwell | 8/14/2006 |
| Nella Clay | 12/10/2012 |
| DFM, Inc. | 4/12/2004 |
| The Elk Horn Coal Co. | 9/1/2005 |
| Delcie Endicott | 4/22/2009 |
| Barbara Fraely et al (Milford Fraley Heirs) | 6/25/2007 |
| Charles & Nancy Fraley et al (Haskey Fraley Heirs) | 4/25/2007 |
| John & Barbara Fraley et al (Milford Fraley Heirs) | 9/6/2007 |
| Maybeth Fraley et al (Jerry Fraley Heirs) | 4/30/2007 |
| Kalman Franko et al (Maude Gladys Franko Fraley | 5/15/2007 |
| Anna Jean & Ernest Goble et al | 4/11/2007 |
| Connie Hand et al (Samuel Henderson Fraley Heir | 4/22/2007 |
| Billy & Lucille James | 5/6/2008 |
| Helen Spears (Willie C. Thompson as successor) | 1/16/2009 |
| Wanda & Ballard Tussey | 3/25/2008 |
| Emogene Ward et al | 12/11/2006 |
| Sheila & Carl Wenger et al (Dorothy Mae Fraley C | 6/25/2007 |
| DFM, Inc. - Subleases: | |
| M&M Enterprise | 9/1/1998 |
| Cero Blackburn et al | 6/4/1996 |
| Cliff Blackurn et al | 12/30/1999 |

## Lease Summary

| | Execution Date |
|---|---|
| Denzil Allen et al | 7/26/1999 |
| Denzil Allen | 9/1/2005 |
| Denzil Allen/Jack Hall | 8/23/1999 |
| **T2 - Sunny Ridge Loadout** | |
| Pinson Lease - Robert Pinson | 3/1/1972 |
| NS Agreement 260032 | 4/14/1998 |
| NS Agreement 260009 | 7/11/1995 |
| **Johns Creek & Peter Creek** | |
| Berkeley Energy Corporation | 10/8/2014 |

DEBTORSLCC_001164

## BILL OF SALE

**THIS BILL OF SALE** (this *"Bill of Sale"*) is made effective as of November 30, 2017 REVELATION ENERGY, LLC, a Kentucky limited liability company (*"Revelation"*), BLACKJEWEL L.L.C., a Delaware limited liability company (*"Blackjewel"* and, together with Revelation, whether individually or collectively, *"Seller"*), and LEXINGTON COAL COMPANY, LLC, a Delaware limited liability company (*"Buyer"*).  Seller and Buyer are sometimes referred to collectively herein as the *"Parties"* and individually as a *"Party."*

**WHEREAS**, this Bill of Sale is being executed in conjunction with the transactions contemplated by the Asset Purchase Agreement of even date herewith (as the same may be hereafter amended or supplemented, the *"Asset Purchase Agreement"*) between the Parties. Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the Asset Purchase Agreement.

**WHEREAS**, to facilitate the transactions contemplated by the Asset Purchase Agreement, Seller desires to sell, and Buyer desires to purchase, all those certain assets defined in the Asset Purchase Agreement as the Equipment and Other Purchased Assets listed on Exhibit A attached hereto and made a part hereof (the *"Assets"*).

**NOW, THEREFORE,** in consideration of One Dollar ($1.00), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Seller does hereby bargain, sell, grant, assign, transfer, convey and deliver unto Buyer, and its successors and assigns, all of Seller's right, title and interest in and to the Assets AS-IS, WHERE IS and WITH ALL FAULTS.

2.      Seller hereby specifically assigns and transfers to Buyer all of the right, title and interest of Seller in, to and under all warranties or other agreements covering any of the Assets and any other guarantee of any manufacturer, distributor, or supplier with respect to the Assets, if such assignment or transfer is permitted under the warranties or other agreements.

3.      At and after the date of this Bill of Sale, Seller shall from time to time, at the request of Buyer and without further cost or expense to Seller, execute and deliver such other instruments of assignment, transfer and conveyance and shall take such other action as Buyer may reasonably request, and to place Buyer in possession and control of the Assets or to enable it to exercise and enjoy all rights and benefits of the Seller with respect thereto.

4.      This Bill of Sale shall inure to the benefit of and be binding upon Buyer, and its successors and assigns.

5.      This Bill of Sale shall be governed by the laws of the State of West Virginia, without regard to its principles of conflict of laws.

6.      This Bill of Sale may be executed in one or more counterparts (including by means of facsimile or electronic signature page) and all such counterparts taken together shall constitute one and the same Bill of Sale.

11785730v1

DEBTORSLCC_001165

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be made effective as of the Effective Date.

REVELATION ENERGY, LLC

By: _____

Its: _____

BLACKJEWEL L.L.C.

By: _____

Its: _____

LEXINGTON COAL COMPANY, LLC

By: _____

Its: _____

11785730v1

DEBTORSLCC_001166

## EXHIBIT A

(a) All inventory, supplies and any other tangible personal property located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility); and

(b) All improvements, furniture, fixtures, equipment, machinery, tools, vehicles, and office equipment located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility).

DEBTORSLCC_001167

## PERMIT TRANSFER AGREEMENT

**THIS PERMIT TRANSFER AGREEMENT** (this "*Agreement*") is made effective as of November 30, 2017 REVELATION ENERGY, LLC, a Kentucky limited liability company ("*Revelation*"), BLACKJEWEL L.L.C., a Delaware limited liability company ("*Blackjewel*" and, together with Revelation, whether individually or collectively, "*Seller*"),, and LEXINGTON COAL COMPANY, LLC, a Delaware limited liability company ("*Buyer*"). Seller and Buyer are sometimes referred to collectively herein as the "*Parties*" and individually as a "*Party*."

**WHEREAS**, this Agreement is being entered into to effect the transactions contemplated by the Asset Purchase Agreement of even date herewith (as the same may be hereafter amended or supplemented, the "*Asset Purchase Agreement*") between the Parties. Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the Asset Purchase Agreement.

**WHEREAS**, Seller has agreed to assign to Buyer all of its rights, title, interest and obligations in, under and to the permits referred to in the Asset Purchase Agreement as the Permits, which Permits are identified in Exhibit A attached hereto and made a part hereof.

**WHEREAS**, Seller desires to transfer and assign to Buyer, and Buyer desires to receive and assume from Seller, all of Seller's rights, title, interest and obligations in, under and to the Permits in accordance with the terms of this Agreement and the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Transfer of the Permits. Seller hereby sells, assigns, transfers and conveys unto Buyer all of its rights, title and interests in and to the Permits.

2.    Assumption of Liabilities. Buyer shall assume and become liable for any and all liabilities arising out of the use or ownership of the Permits, but not including any fines, penalties or similar charges arising before the Closing Date.

3.    Costs. Buyer shall have full responsibility for and shall pay all costs and expenses associated with the transfers of the Permits; *provided, however*, that except as otherwise expressly set forth herein, each Party shall be responsible for the costs of its own lawyers and other advisors.

4.    Existing Bonds. Buyer acknowledges that Seller, in connection with the Permits, has posted various bonds securing reclamation and other Obligations under the Permits. Buyer shall cause the replacement of each such bond and shall deliver to Seller such documents as are reasonably requested by Seller in order to permit Seller to effect the full release and discharge of such bonds. If the Closing does not occur or unless otherwise agreed in writing by the Parties, Seller shall work with Buyer to substitute cash, letters of credit or other surety bonds for the replacement bonds using commercially reasonable efforts.

1

11803599v1

DEBTORSLCC_001168

5.    Commencement of Operations. Buyer is attempting to achieve the status of "successor in interest permittee" and may be desirous of commencing operations upon the property encompassed by the Permits before the transfer to Buyer of "permittee liability" under the Permits. In recognition thereof, Seller agrees that on the date hereof, Buyer shall have the right to commence mining and reclamation operations upon the property encompassed by the Permits and Seller hereby agrees to execute all documents necessary to have Buyer designated an "operator" under the Permits until such time as the Permits have been transferred to Buyer. Buyer agrees to comply with all conditions and requirements of, or pertaining to, the Permits. Buyer shall defend, indemnify and hold harmless Seller from any and all liabilities, costs, damages, expenses, claims or other losses (including attorneys' fees) incurred by Seller arising out of the foregoing arrangement. Seller agrees that from the Closing Date through the transfer of the Permit to Buyer or so long as Buyer shall continue to utilize the Permits either as a designated operator or under some other mutually satisfactory arrangement, Seller shall not sell, transfer or otherwise dispose of the Permits or any portion thereof.

6.    Non-Compliance. If any notice of violation, non-compliance or similar occurrence is issued with respect to Buyer's operations under the Permits after the Closing Date but prior to the transfer of such Permit, Buyer shall have the duty to defend such violation, non-compliance or similar occurrence and, if applicable, to pay all fines associated therewith, to correct such violation, non-compliance or similar occurrence, and to perform all abative measures required by any Governmental Authority. If Seller receives notice of any such violation, non-compliance or similar occurrence with respect to the Permits, it shall give notice of the violation, non-compliance or similar occurrence to Buyer within five (5) Business Days of receipt of such notice. If Buyer fails to defend a violation, noncompliance or similar occurrence with respect to Buyer's operations under the Permits after the Closing Date and prior to the transfer of such Permits or does not promptly and in good faith take all action reasonably necessary to correct or abate such violation, non-compliance or similar occurrence, Seller shall have the right (but not the obligation) to defend, correct and/or abate such violation, noncompliance or similar occurrence, and if Buyer is required to defend, correct and/or abate the same pursuant to the first sentence of this Section, Buyer shall reimburse Seller for all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees.

7.    Covenants of the Parties.

(a)    The Parties shall promptly apply for and diligently pursue all applications for and shall use commercially reasonable efforts to promptly obtain such consents, authorizations and approvals from such governmental authorities and third parties as shall be necessary or appropriate to permit the consummation of the transactions contemplated by this Agreement and shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions necessary to effect the consummation of the transactions contemplated by this Agreement, even if such actions must occur after the Closing Date.

(b)    Seller agrees that it will use commercially reasonable efforts to obtain, and shall diligently and in good faith pursue, any and all revisions, amendments or other modifications to the Permit until the transfer or issuance to Buyer of the Permit has been approved by the applicable government authorities.

2

DEBTORSLCC_001169

(c)     Until the Permit is transferred to Buyer, the Parties shall promptly provide the other Party with a copy of all notices of non-compliance, cessation orders, if any, or other notices relating to the Permits received by a Party.

(d)     Until the Permit is transferred to Buyer, Buyer shall maintain and keep in force and effect, at its sole cost and expense, general liability insurance coverage with a good and reputable insurance company or companies naming Seller as an additional insured under such coverage.

8.     Amendment, Waivers, Etc. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

9.     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

10.     Conflict. This Agreement is subject to all the terms and conditions of the Asset Purchase Agreement. No provision of this Agreement shall be deemed to alter or amend the terms or provisions of the Asset Purchase Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall control.

11.     Governing Law. This Agreement shall be governed by and construed according to the laws of the State of West Virginia, without regard to or application of its conflict of laws rules.

12.     Counterparts. This Agreement may be executed in one or more counterparts (including by means of facsimile signature page) and all such counterparts taken together shall constitute one and the same Agreement.

13.     Severability. If any provision of this Agreement or its application is invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired. If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

14.     Entire Agreement. All prior negotiations and agreements by and among the Parties with respect to the subject matter hereof are superseded by this Agreement, the Asset Purchase Agreement and the other related agreements made a part thereof, and there are no representations, warranties, understandings or agreements with respect to the subject matter

3

DEBTORSLCC_001170

hereof other than those expressly set forth in this Agreement the Asset Purchase Agreement, and the other related agreements made a part thereof.

15.    Headings. Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any provision in it.

16.    Assignment. Buyer may assign or otherwise transfer this Agreement, in whole or in part, at any time without first obtaining the prior written consent of Seller.

17.    Representations and Warranties. The representations and warranties set forth in the Asset Purchase Agreement are incorporated herein by reference.

18.    Indemnity.   The indemnification provisions set forth in the Asset Purchase Agreement are incorporated herein by reference.

19.    Right of Setoff. Either Party may setoff any amounts to which it may be entitled from the other Party under this Agreement, the Asset Purchase Agreement or any other Transaction Documents against amounts otherwise payable to the other Party under this Agreement, the Asset Purchase Agreement or any other Transaction Documents.

20.    Rule of Construction.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement, and the Parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

21.    Further Acts.  Each of the Parties shall do, execute, acknowledge and deliver and cause to be done, executed, acknowledged and delivered all such further acts, instruments, transfers and assurances as shall be required in order to carry out this Agreement and consummate the transactions contemplated hereby.

[REMAINDER OF PAGE LEFT BLANK; SIGNATURE PAGE FOLLOWS]

11803599v1

DEBTORSLCC_001171

IN WITNESS WHEREOF, the parties have entered into this Assignment as of the Effective Date.

REVELATION ENERGY, LLC

By: _____

Its: _____

BLACKJEWEL L.L.C.

By: _____

Its: _____

LEXINGTON COAL COMPANY, LLC

By: _____

Its: _____


STATE OF WEST VIRGINIA

COUNTY OF CABELL:

The foregoing instrument was acknowledged before me this _l6_ day of _December_____, 2017, by _Jeffrey A. Hoops_, as _President_ of Revelation Energy, LLC, a Kentucky limited liability company, on behalf of said company.

My commission expires: _March 5, 2019_

_____
Notary Public

[Notarial Seal]

Official Seal
Notary Public, State of West Virginia
Anetta Maloy
101 Rolling Meadows
Scott Depot, WV 25560
My commission expires March 5, 2019

11803601v1                          3

EXHIBIT A

6

11803599v1

DEBTORSLCC_001173

**Major Reclamation Permits - Will be Mined to Reclaim**

**Major Reclamation with No Mining**

**Facilities**

**Deep Mine Permits with Reserves (002)**

**Haul Road Permits**

**Maintenance Only**

| | [illegible] | [illegible] | NEW PERMIT # | Previous PERMIT # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | [illegible] | [illegible] | Supplemental Assurance | [illegible] | [illegible] | [illegible] | Previous Open Wall | [illegible] | [illegible] | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | [illegible] | [illegible] | 895-4516 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $151,500 | $0 | $150,500 | $0 | | 54.00 | 0.00 | 0.00 | 0.00 | 0.00 | [illegible] |
| 38 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | $0 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 39 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | Ready for Phase I |
| 40 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $134,800 | $0 | $134,800 | $0 | | 53.00 | 0.00 | 0.00 | 0.00 | 53.00 | Ready for Phase I |
| 41 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | 409.00 | 0.00 | 0.00 | 0.00 | 409.00 | [illegible] |
| 42 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 43 | [illegible] | [illegible] | 880-0255 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $479,900 | $0 | $476,900 | $0 | | 250.00 | 0.00 | 400.00 | 0.00 | [illegible] | [illegible] |
| 44 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 45 | [illegible] | [illegible] | 880-0200 | [illegible] | [illegible] | [illegible] | | | $102,800 | $0 | $102,800 | | | 56.00 | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 46 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | $779,400 | $0 | $779,400 | | | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 | [illegible] |
| 47 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | $ | [illegible] | | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 48 | [illegible] | [illegible] | 880-0264 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | $250,700 | $0 | | 109.00 | 0.00 | 0.00 | 0.00 | 109.00 | [illegible] |
| 49 | [illegible] | [illegible] | 880-5192 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 50 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | $0 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 51 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 52 | [illegible] | [illegible] | 880-0290 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $279,350 | $279,350 | $0 | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 53 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 54 | [illegible] | [illegible] | 880-0240 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | [illegible] | $0 | | 109.40 | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 55 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 56 | [illegible] | [illegible] | 895-0929 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 57 | [illegible] | [illegible] | 895-0930 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | $467,400 | $0 | | 275.00 | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |
| 58 | [illegible] | [illegible] | 895-0931 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | Ready for Phase I |
| 59 | [illegible] | [illegible] | 895-0934 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $347,500 | $0 | $317,500 | $0 | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | [illegible] |

New Permits (Undisturbed)

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ | [illegible] | $0 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 61 | [illegible] | [illegible] | [illegible] | - | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $0 | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| Total Bond Amount | [illegible] | [illegible] | Supplemental Assurance | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | | | |

DEBTORSLCC_001175

| # | JobRef # | Job Name | New PERMIT # | Previous PERMIT # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | KRG? Amount | Surety Amount | Supplemental Assurance | LTT Bonds | Disturbed Acres | Sloped | Previous Open Wall | Open Wall | Reclaimed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major Reclamation Permits - Will be Mined to Reclaim** | | | | | | | | | | | | | | | | | | | |
| 1 | S1 | Hoard's Branch | 898-0900 | 898-0687 | Pike | Freeborn | 37-33-14 | 82-49-31 | $7,412,000 | $6,628,000 | $784,000 | $1,200,000 | | 1229.10 | 584.08 | 3500.00 | 936.02 | 662.49 | Mine to Reclaim |
| 2 | S3 | Pompey West | 898-0903 | --- | Pike | Phelps | 37-36-27 | 82-46-59 | $6,123,400 | $5971.70 | $1,151,700 | $460,000 | | 275.00 | 0.00 | 7800.00 | 3121.00 | 60.00 | Mine to Reclaim |
| 3 | S4A | Calloway Branch | 898-0902 | 898-0695 | Pike | Phelps | 37-30-11 | 82-13-34 | $3,991,000 | $3,326,000 | $418,500 | $1,150,000 | | 406.11 | 100.40 | 8150.00 | 10702.00 | 180.20 | Mine to Reclaim |
| 4 | S1B | White Oak | 800-0254 | 880-0295 | Martin | Pigeon Roost | 37-45-43 | 82-26-19 | $1,246,600 | 50 | $1,246,600 | $150,000 | | 153.00 | 4.49 | 5750.00 | 3436.96 | 250.00 | Mine to Reclaim |
| 5 | S20 | 523 Review Branch | 898-0905 | 898-0779 | Pike | McCombs | 37-39-59 | 82-35-44 | $3,979,900 | 50 | $3,979,900 | $1,200,000 | | 1503.00 | 0.00 | 5950.00 | 9950.00 | 500.00 | Mine to Reclaim |
| 6 | S20 | 527 Review Branch | 898-0442 | 856-0355 | Floyd | Endicott | 37-39-22 | 82-37-28 | $2,609,360 | 50 | $2,609,360 | $460,000 | | 200.00 | 0.00 | 0.00 | 0.00 | 20.00 | Mine to Reclaim |
| **Major Reclamation with No Mining** | | | | | | | | | | | | | | | | | | | |
| 7 | P3 | Pompey | 898-0936 | 898-0765 | Pike | Stopover | 37-29-16 | 82-07-57 | $2,677,902 | 50 | $2,672,902 | $565,600 | | 389.00 | 205.92 | 1320.00 | 0.00 | 95.00 | Grading/Seeding - Approximately 150 acres |
| **Facilities** | | | | | | | | | | | | | | | | | | | |
| 8 | P2 | Peerilli Prep Plant | 800-0021 | 880-8005 | Martin | Wolf Creek | 37-43-55 | 82-31-01 | $629,500 | 50 | $629,300 | | | 16.00 | 0.00 | 0.00 | 0.00 | 1.00 | Loadout Facility |
| 9 | P3 | Patoki Refuse | 800-0022 | 880-8006 | Martin | Wolf Creek | 37-43-55 | 82-31-01 | $1,699,700 | 50 | $1,699,700 | | | 100.00 | 0.00 | 0.00 | 0.00 | 36.00 | Loadout Facility |
| 10 | P2 | Philo's Loadout | 898-8160 | 898-8152 | Pike | Calloway | 37-29-32 | 82-11-06 | $423,500 | 50 | $423,500 | | | 45.20 | 0.00 | 0.00 | 0.00 | 0.00 | Plant/Loadout |
| **Deep Mine Permits with Reserves (O2)** | | | | | | | | | | | | | | | | | | | |
| 11 | R233 | Dougherty Br | 898-0890 | 898-0684 | Pike | Freeborn | 37-34-12 | 82-49-39 | $170,689 | 50 | $170,689 | 50 | | 135.35 | 0.00 | 0.00 | 450.00 | 116.83 | Deep Mine w/ Substantial Reserves Remaining |
| 12 | A23 | Calloway South | 898-4448 | 898-5005 | Pike | Phelps | 37-29-11 | 82-12-38 | $186,200 | $160,700 | $25,500 | 50 | | 42.00 | 0.00 | 0.00 | 1768.00 | 41.00 | Deep Mine w/ Substantial Reserves Remaining |
| 13 | R86 | Cedar Grove Deep | 898-4479 | 898-4843 | Pike | Argo | 37-27-54 | 82-46-57 | $75,800 | 50 | $75,800 | 50 | | 3.00 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 14 | R87 | Wildcat Guyan Deep | 898-4481 | 898-5205 | Pike | Jamboree | 37-30-09 | 82-07-02 | $38,600 | $36,400 | $38,600 | 50 | | 4.13 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 15 | R88 | Majestic Deep | 898-4480 | 898-5940 | Pike | Jamboree | 37-30-09 | 82-07-02 | $75,000 | 50 | $75,000 | 50 | | 3.48 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 16 | R89 | Beakley Deep | 898-4515 | 898-4515 | Pike | Kincaer | 37-27-28 | 82-31-01 | $35,600 | 50 | $35,600 | 50 | $127,500 | 6.67 | 0.00 | 0.00 | 300.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 17 | R77 | Excel Mine #1 | 800-5104 | 880-5156 | Martin | Pilgrim | 37-43-57 | 82-31-01 | $364,000 | 50 | $364,000 | 50 | | 52.00 | 0.00 | 0.00 | 0.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 18 | R28 | Viedore Mine | 800-5135 | 880-5172 | Martin | Meron | 37-42-15 | 82-30-28 | $58,000 | 50 | $58,000 | 50 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 19 | R29 | Excel Mine #2A | 898-0951 | 898-0569 | Pike | Pike | 37-30-43 | 82-28-03 | $82,000 | 50 | $82,000 | 50 | | 13.00 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| 20 | R80 | Excel Mine #1A | 898-4492 | 898-4687 | Pike | Guthrie | 37-40-30 | 82-32-29 | $97,000 | 50 | $97,000 | 50 | | 15.80 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaining |
| **Haul Road Permits** | | | | | | | | | | | | | | | | | | | |
| 21 | A23 | Pt. Rock 2 / Rounding 920 Haul Road | 898-7005 | 898-7064 | Pike | Phelps | 37-34-21 | 82-49-44 | $132,500 | $106,000 | $26,500 | 50 | | 52.37 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 22 | S4 | Pt. Rock Haul Road | 898-7006 | --- | Pike | Phelps | 37-35-55 | 82-49-43 | $94,000 | $77,000 | $17,000 | 50 | | 19.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 23 | S10 | Pompey J Haul Road | 898-7104 | 898-7046 | Pike | Stopover | 37-29-18 | 82-08-00 | $174,300 | $135,300 | $39,000 | 50 | | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 24 | S10 | Pompey J Haul Road | 898-7103 | 898-7037 | Pike | Stopover | 37-30-16 | 82-07-01 | $75,000 | $68,500 | $6,501 | 50 | | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 25 | R69 | Smithside Road | 800-7006 | 480-7001 | Martin | Inez | 37-44-12 | 82-31-53 | $303,500 | 50 | $303,500 | 50 | | 50.00 | 0.00 | 0.00 | 0.00 | 2.00 | Haul Road |
| 26 | S1B | 17 West Main Haul Road | 898-7037 | 880-7019 | Martin | Pilgrim | 37-45-08 | 82-28-28 | $602,500 | 50 | $602,500 | 50 | | 200.00 | 0.00 | 0.00 | 0.00 | 200.00 | Haul Road |
| 27 | R75 | Pigeon Roost Haul Road | 800-7038 | 880-7020 | Martin | Pilgrim | 37-44-17 | 82-29-21 | $282,500 | 50 | $282,500 | 50 | | 128.00 | 0.00 | 0.00 | 0.00 | 108.00 | Haul Road |
| 28 | R76 | Estep Fork Headrout | 800-7039 | 880-7021 | Martin | Meron | 37-44-10 | 82-28-54 | $385,500 | 50 | $385,500 | 50 | | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 | Haul Road |
| 29 | S9 | Eldey Br Hill | 898-7000 | 880-7033 | Martin | Meron | 37-44-13 | 82-31-36 | $127,500 | $102,000 | $25,500 | 50 | | 34.00 | 0.00 | 0.00 | 0.00 | 34.00 | Haul Road |
| 30 | R81 | Scott Br Haul Road | 898-7007 | 898-7100 | Pike | Meta | 37-34-15 | 82-25-33 | $472,500 | $79,660 | $392,900 | 50 | | 91.00 | 0.00 | 0.00 | 0.00 | 2.00 | Haul Road |
| **Maintenance Only** | | | | | | | | | | | | | | | | | | | |
| 31 | R234 | Guntsmith Strip | 898-0891 | 898-0686 | Pike | Freeborn | 37-34-21 | 82-49-44 | $689,800 | 50 | $689,800 | 50 | | 973.62 | 0.00 | 0.00 | 0.00 | 973.62 | phase I |
| 32 | R235 | Slate Branch | 898-0893 | 898-0763 | Pike | Ransom | 37-34-09 | 82-11-01 | $1,441,200 | $1,206,600 | $234,600 | 50 | | 125.00 | 0.00 | 0.00 | 0.00 | 100.00 | 1.8 min from Reserve/Reclaimed |
| 33 | S4 | Halley Br (M-23) | 898-0863 | 898-0788 | Pike | Ransom | 37-32-08 | 82-11-41 | $4,849,600 | $4,955,100 | $389,500 | 50 | | 409.44 | 0.00 | 0.00 | 0.00 | 929.44 | Partial phase I 3 lifts to be Certified |
| 34 | R84 | Pompey East | 898-0935 | 898-0704 | Pike | Stopover | 37-31-12 | 82-05-00 | $105,000 | 50 | $105,000 | 50 | | 77.48 | 0.00 | 0.00 | 0.00 | 77.48 | phase I |
| 35 | S10 | Pompey | 898-0937 | 898-0706 | Pike | Jamboree | 37-29-14 | 82-07-21 | $2,669,200 | 50 | $2,669,200 | 50 | | 309.00 | 0.00 | 0.00 | 0.00 | 252.00 | Ready for Phase I Reserves to be Permitted |
| 36 | R85 | Pompey South | 898-0938 | 898-0711 | Pike | Argo | 37-29-17 | 82-08-65 | $1,534,700 | 50 | $1,534,700 | 50 | | 785.00 | 0.00 | 0.00 | 0.00 | 775.00 | Yonkos Phase I |

DEBTORSLCC_001174

REVELATION TO UCC PERMITS

| JobPlot # | Job Name | New PERMIT # | Previous PERMIT # | Country | Nearest Community | Latitude | Longitude | Total Bond Amount | KRGF Amount | Slurry Amount | Supplemental Assurance | LTT Bonds | Disturbed Acres | Sloped | Previous Open Wall | Open Wall | Reclaimed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | RN0 | Eclipse Deep | 898-4516 | 898-4526 | Pike | Kincaer | 37-30-14 | 82-31-31 | $569,500 | $0 | $569,500 | $0 | | 24.99 | 0.0 | 0.0 | 0.0 | 0.00 | Ready for Phase I - Remove Buildings? |
| 38 | RN1 | Berkley surface | 898-9172 | 898-9172 | Pike | Kincaer | 37-29-07 | 82-21-14 | $463,500 | $0 | $461,500 | $0 | $390,000 | 21.00 | 0.0 | 0.00 | 0.00 | 4.00 | Ready for Pump I? |
| 39 | RN0 | Cow Fork | 880-0250 | 880-0266 | Martin | Thomas | 37-41-27 | 82-33-49 | $1,004,100 | $0 | $1,004,100 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Ready for Phase I |
| 40 | RN1 | McIver Branch | 880-0251 | 880-0216 | Martin | Meow | 37-44-14 | 82-31-36 | $184,800 | $0 | $184,800 | $0 | | 55.00 | 0.00 | 0.00 | 0.00 | 55.00 | Ready for Phase I |
| 41 | RN2 | Peter Cave Lake | 880-0252 | 880-0187 | Martin | Pilgrim | 37-44-37 | 82-29-32 | $2,814,600 | $0 | $2,814,600 | $0 | | 902.00 | 0.00 | 0.00 | 0.00 | 902.00 | Phase I |
| 42 | S18 | Seng Branch | 880-0253 | 880-0188 | Martin | Pilgrim | 37-44-27 | 82-24-23 | $719,700 | $0 | $719,700 | $300,000 | | 145.40 | 8.40 | 1020.00 | 0.00 | 137.00 | Ready for Phase - Permit Actice |
| 43 | S18 | LCC Treater | 880-0255 | 880-0219 | Martin | Pilgrim | 37-44-20 | 82-26-25 | $473,300 | $0 | $473,300 | $0 | | 260.00 | 0.00 | 400.00 | 0.00 | 260.00 | Phase I&Phase II |
| 44 | S18 | Meade Branch | 880-0257 | 880-0189 | Martin | Pilgrim | 37-44-27 | 82-24-23 | $165,100 | $0 | $165,100 | $0 | | 131.80 | 0.00 | 0.00 | 0.00 | 131.80 | Phase I |
| 45 | R155 | Muffins Fork | 880-0260 | 480-0073 | Martin | Pilgrim | | | $102,800 | $0 | $102,800 | $0 | | 50.00 | 0.00 | 0.00 | 0.00 | 50.00 | Phase I |
| 46 | R156 | Maywood Fork | 880-0262 | 880-0041 | Martin | Pilgrim | | | $779,400 | $0 | $779,400 | $0 | | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 | Phase I |
| 47 | R157 | 17 West | 880-0263 | 880-0217 | Martin | Pilgrim | | | $869,700 | $0 | $869,700 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Phase I |
| 48 | R147 | Laurel Fork | 880-0264 | 880-0197 | Martin | Milo | 37-54-56 | 82-35-09 | $226,700 | $0 | $226,700 | $0 | | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 | Phase I |
| 49 | R73 | Aldridge Branch | 880-5152 | 880-5044 | Martin | Meow | 37-42-57 | 82-30-21 | $461,100 | $0 | $461,100 | $0 | | 292.74 | 0.00 | 0.00 | 0.00 | 292.74 | Phase I |
| 50 | R74 | White Oak's N Pigeons | 880-5153 | 880-5071 | Martin | Meow | 37-43-52 | 82-31-48 | $841,400 | $0 | $841,400 | $0 | | 60.00 | 0.00 | 0.00 | 0.00 | 33.00 | To be Reclaimed with Aldridge Branch |
| 51 | R2 | Ship Br Env 2 | 836-0475 | 836-0173 | Floyd | Seanville | 37-35-05 | 82-36-04 | $300,640 | $0 | $300,640 | $0 | | 573.50 | 0.00 | 0.00 | 0.00 | 573.50 | Phase I |
| 52 | S9 | Fraley Br | 880-0230 | 880-0246 | Martin | McCone | 37-42-02 | 82-31-12 | $479,350 | $479,350 | $0 | $0 | | 311.28 | 0.00 | 0.00 | 0.00 | 311.28 | Phase I |
| 53 | R7 | Slurry Impound | 880-0239 | 880-0165 | Martin | Pilgrim | 37-44-35 | 82-28-39 | $215,800 | $0 | $215,800 | $0 | | 157.40 | 0.00 | 0.00 | 0.00 | 157.40 | Phase I |
| 54 | R8 | Rt Peter Cave | 880-0240 | 880-0166 | Martin | Pilgrim | 37-45-05 | 82-28-13 | $51,000 | $0 | $51,000 | $0 | | 192.40 | 0.00 | 0.00 | 0.00 | 192.40 | Phase I |
| 55 | R32 | Flag Rock | 898-0900 | 898-0921 | Pike | Pate | 37-37-55 | 82-28-52 | $1,057,800 | $747,100 | $290,700 | $0 | | 520.00 | 0.00 | 0.00 | 0.00 | 520.00 | Portion Phase I |
| 56 | R24 | Scott Branch | 898-0929 | 898-0763 | Pike | Pate | 37-35-57 | 82-29-08 | $170,900 | $0 | $170,900 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Phase I |
| 57 | R25 | Alley Branch | 898-0930 | 898-0764 | Pike | Meta | 37-35-49 | 82-28-40 | $462,400 | $0 | $462,400 | $0 | | 235.00 | 0.00 | 0.00 | 0.00 | 270.00 | Phase I |
| 58 | R26 | Turtleneck | 898-0931 | 898-0844 | Pike | Thomas | 37-40-44 | 82-32-01 | $34,800 | $0 | $34,800 | $0 | | 25.15 | 0.00 | 0.00 | 0.00 | 25.15 | Ready for Phase I |
| 59 | S20 | 823 Review Branch | 898-0966 | 898-0776 | Pike | McCombs | 37-39-59 | 82-35-48 | $247,500 | $0 | $247,500 | $0 | | 200.75 | 0.00 | 0.00 | 0.00 | 200.75 | Phase I |

### New Permits (Undisturbed)

| JobPlot # | Job Name | New PERMIT # | Previous PERMIT # | Country | Nearest Community | Latitude | Longitude | Total Bond Amount | KRGF Amount | Slurry Amount | Supplemental Assurance | LTT Bonds | Disturbed Acres | Sloped | Previous Open Wall | Open Wall | Reclaimed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | A23 | Big Branch P-Fant | 898-4894 | 898-6792 | Pike | Stopover | 37-31-09 | 82-05-43 | $75,000 | $0 | $75,000 | $0 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Not Disturbed |
| 61 | A36 | Rockhouse Fk | 898-4876 | --- | Pike | Mouthhouse | 37-33-04 | 82-18-29 | $53,500 | $244,002 | $97,500 | $0 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Not Disturbed |
| | | | | | | | | Total Bond Amount $4,482,139.00 / 2,446,150.00 | KRGF Amount | Slurry Amount 33,036,389.00 | Supplemental 5,550,200.00 | LTT Bonds $17,500.000 | 13,706.16 | 875.29 | 34,120.00 | 28,721.96 | 11,074.08 | |

64

DEBTORS_ _001175

1                          S. POE

2        Q      You mentioned an engineering degree.

3   What year did you get that and from what institution?

4        A      I grade waited from West Virginia

5   University Institute of technology.  I have a

6   two-year degree in mechanical engineering technology,

7   an Associate of Science.  I have a four-year degree

8   Bachelor of Science in mechanical engineering

9   technology, and I finished that in 2000, I think.

10  And then I acquired my Master's in Business

11  Administration from the University of Charleston in

12  2008.

13       Q      Thank you.  During a break, my guess is

14  the court reporter will ask you for the spellings on

15  some of those other companies, but we'll take care of

16  it then and not bog down now.

17              You mentioned a transaction between Alpha

18  and Lexington Coal.  When did that take place?

19       A      That closed on October 27th of 2017.  I

20  think the closing and my official start day was the

21  same day, to the best of my memory, or thereabouts

22  approximate, in those dates, when those assets closed

23  to move to Lexington Coal Company.

24       Q      And at a high level, what was that

25  transaction about?  What was the subject of the

1                          S. POE

2    location, Coal River Energy.

3         Q     And did anyone -- all those 130 people,

4    were many of them out at the field -- out in the

5    field?

6         A     Oh, we had field offices, correct.  The

7    office was at coal River Energy housed, you know,

8    probably -- or served as an office for probably ten

9    employees, engineers and managers, including myself.

10        Q     And Mr. Hoops primarily worked at the

11   office in Milton, West Virginia; is that right?

12        A     Correct.

13        Q     Did anyone from Blackjewel or Revelation

14   work at the Coal River Energy office?

15        A     No, not that I recall.  Not during my

16   time there.

17              And let me go on the record and say that,

18   I can only attest to and talk to the time frame that

19   I worked there.  We talked about my start date, but

20   keep in mind I resigned from Lexington Coal in

21   January of 2019.  So anything that may have -- there

22   may have been people that worked there after I left.

23   I'm not sure.

24        Q     I understand, your testimony is regarding

25   when you were there.

1               S. POE

2   on how they identified or cataloged their specific

3   operations.  If it was underground, it may start with

4   a U and there would be a certain number.  Surface

5   mine, S, a certain number.

6          And then obviously it comes from that --

7   out from that text and identifies the mining

8   operation with the permit numbers associated with

9   that mining operation.

10      Q    Okay.  So then you responded to

11  Mr. Tackett's e-mail to Mr. Hoops only, as we talked

12  about, and then on the page that ends in Bates 426,

13  there's Mr. Hoops' response to you on October 26th,

14  2017 at 9:47 a.m.

15          Do you see that?

16      A    Yes.

17      Q    He starts out by saying:  You have been

18  copied on several e-mails as this is a Contour/HWM

19  operation in Martin County.

20          Do you see that?

21      A    Yes.

22      Q    Were you copied on e-mails prior to this

23  one about the Contour/HWM operation in Martin County?

24      A    I don't recall.

25      Q    HWM refers to highwall miners, right?

1                           S. POE

2    He's looking after the best interest of Revelation

3    and Blackjewel.  Of course, he wants us to take them.

4    That was my perception.

5              So I would challenge him on that, and,

6    again, that's when he would come back with his

7    convincing ways of, no, this is a good deal for both.

8        Q    And what you just described is that based

9    on your reading of this Exhibit 4 now, or do you

10   remember other discussions?

11       A    Again, it's -- obviously I'm recalling

12   other discussions, after reading things like this.

13   And, again, it's been three and a half years ago.  So

14   I've -- as I read through stuff like this, I can

15   recollect feelings, emotions, understand where

16   Revelation was so strained at that time with -- as I

17   read things like the -- that's outlining how the --

18   the condition of these permits with the state of

19   Kentucky's regulatory authorities.

20             They were a Failure to the HCO, which

21   means you've went a long way.  You're now in dire

22   straights, if you will, in compliance with that

23   permit and risking losing that permit.  These permits

24   were obviously strained so much that they could have

25   been taken away from Revelation if actions weren't

1                            S. POE

2    taken properly.

3              So the other thing with these permits,

4    what I recollect -- and again, after reading through

5    this list -- is you asked about bonding.  And when

6    you started this question about transferring permits,

7    I recall these permits being associated in part with

8    a pool bond that was in existence with the State of

9    Kentucky at that time.

10             And the State of Kentucky was applying

11   pressure to Revelation Energy that they were going to

12   eliminate coal bonds and they wanted those bonds --

13   they wanted those permits bonded with conventional

14   bonds, conventional surety bonds, which took

15   collateral, typically, to get done, depending on the

16   bonding companies.  Which at that time was pretty

17   tough, again, after going through bankruptcy.

18             So you had -- these companies had to be

19   very smart, methodical.  So did Alpha.  So did ours.

20   So did Peabody.  All these companies had to be -- the

21   bonding game changed after going through these

22   bankruptcies.  So to secure bonding, there was

23   collateral that may be required or different things

24   required to get a conventional bond.

25             In this particular case, it was even more

1                        S. POE

2    permits being in the pool bond.  They could not be

3    replaced and brought out of that pool bond until they

4    had conventional bonds.

5              So in the interim period, Lexington would

6    have had to have been put on the permits initially

7    just as an operator, but at least that was probably

8    his plan to help satisfy the agencies to get

9    equipment moved in and start some work on these

10   failure to abate cessation order type things, where

11   some physical work had to be done.

12             So the way I understood it at that time,

13   he needed to move on this fast because he truly did

14   not have any equipment that could go do the work.

15   Their equipment was all basically ran into the

16   ground.  The equipment they had and the assets they

17   had couldn't even physically do work.  And you

18   couldn't repair that without money and he was on COD.

19   And quite honestly and frankly and candidly, vendors

20   just would not do business with him.

21             So we had -- Lexington did have assets.

22   We did have operators.  We did have equipment that

23   could function and do the work.  So that's why he was

24   initially wanting to put Lexington on these permits

25   as an operator initially.  And then he's saying that,

1              S. POE

2   gentleman that -- in the grocery store.  It's not

3   even somebody I even knew or I definitely wouldn't

4   say I trusted.

5              But, you know, one or two of the comments

6   made about him was definitely from people I trusted

7   and then some was just -- I just deemed comments in

8   passing.  But again, I took it to Jeff personally

9   myself and tried my best to draw my own conclusion.

10             (Poe Deposition Exhibit No. 5 was

11        marked for the record.)

12  BY MR. KANE:

13     Q     Mr. Poe, I'm going to hand you what we've

14  marked as Exhibit 5 to your deposition.  Tell me if

15  you recognize that document.

16     A     Yes.

17     Q     What do you recognize it to be?

18     A     The asset purchase agreement between the

19  parties of Revelation Energy, Blackjewel, LLC and

20  Lexington Coal Company, LLC.

21     Q     Is this the asset purchase agreement that

22  reflected the transaction that was being discussed in

23  the e-mails in Exhibit 4, to your understanding?

24     A     Give me one second.  I think so.  It's on

25  Exhibit -- yes, I see the exhibit here now regarding

1                           S. POE

2        A     Yes.

3        Q     And Hoops for Revelation and Blackjewel,

4   LLC again, right?

5        A     Yes.

6        Q     And the notary pages say that Hoops

7   signed on December 6th, 2017, right?

8        A     Yes.

9        Q     There's a blank notary page that's not

10  complete, but there's no notarization of your

11  signature, right?

12       A     Correct.

13       Q     All right.  If you could turn a few more

14  pages in, in the page that ends in Bates number 168.

15  Okay?

16       A     Okay.

17       Q     There's a Permit Transfer Agreement.

18             Do you see that?

19       A     Yes.

20       Q     It says it's also made effective as of

21  November 30, 2017, right?

22       A     Yes.

23       Q     If we turn to the signature pages for

24  that one on the Bates page that ends in 172.

25       A     Yes.

1                         S. POE

2        Q     That's your signature for Lexington Coal

3   again, right?

4        A     Yes.

5        Q     And Hoops signs again for Revelation and

6   Blackjewel, right?

7        A     Yes.

8        Q     There's a notarization of his signature

9   for December 6th, 2017, right?

10       A     Yes.

11       Q     And no notarization for you?

12       A     Correct.

13       Q     In the Exhibit A to this permit transfer

14  agreement, and I think it was in some of the others,

15  there's a list of permits.

16             Do you see that?

17       A     Yes.

18       Q     It appears to me to be 61 different items

19  in the Exhibit A that's titled Revelation LCC

20  Permits, right?

21       A     It's not legible on the copy I have, but

22  I assume the one you have is correct.

23       Q     All right.  Maybe I'll -- let me see if

24  it's more legible on --

25             MR. GUADAGNINO:  This copy is not

1                          S. POE

2          legible.  I think the letters -- the

3          exhibit is clearer.

4     BY MR. KANE:

5          Q     Well, what's the Bates number at the

6     bottom of that page that you're looking at, 174?

7          A     Correct, 174 and 175.

8          Q     It looks like it may be -- it looks like

9     that may have been printed like portrait style

10    instead of landscape style.  So I'm going to hand you

11    a page with the same Bates number.

12               MR. KANE:  Do you want to look at

13          it first, Frank?

14               MR. GUADAGNINO:  Yes, sure.  Yeah.

15    BY MR. KANE:

16         Q     I think, Mr. Poe, this is the same page

17    that's printed in the correct format and it's more

18    legible.

19         A     Okay.

20         Q     Does that look like the same thing that's

21    there with the same Bates number but you can read

22    that one?

23         A     Yes.

24         Q     And according to that page you're looking

25    at, there's 61 permits that are transferring; is that

1                           S. POE

2    right?

3         A      Yes.

4         Q      All right.  Is that consistent with your

5    recollection or do you have a recollection of what

6    was transferring?

7         A      I would think that would be consistent

8    with my recollection.  Again, we would have had a

9    team that would have looked over all this that would

10   have been more involved in the details than myself.

11              Prior to executing, I would have advised

12   or asked the team to probably look this over to make

13   sure it was correct.

14        Q      Who would have been on that team that you

15   would have asked to check it?

16        A      Knowing that these were all Kentucky

17   permits, John Cline, Chris Slone and Keith Runyon.

18        Q      Was it your understanding that all of

19   those permits, the 61 that are listed there, were all

20   Kentucky permits?

21        A      I think so, yes.

22        Q      Okay.  I'm going to ask you to set this

23   down so we can both look at the legible copy at the

24   same time.

25              MR. GUADAGNINO:  And, Frank, if you

1                              S. POE

2       A      That's what it says here.  New Permits

3    Undisturbed is the category, so the assumption there

4    would be -- again, it says here it doesn't have any

5    open wall or any disturbed acres, so.

6               MR. KANE:  All right.  So I will

7          note for the record that we're going to

8          put this page with Exhibit 5 that has one

9          piece of highlighting on it, which is

10         from me.  We'll attach this just because

11         we had you look at that page for

12         legibility.

13              THE WITNESS:  Okay.

14              MR. KANE:  I'm going to propose we

15         take a five-minute break because we've

16         been going for a while.

17                   (Brief pause.)

18              (Poe Deposition Exhibit No. 6 was

19         marked for the record.)

20   BY MR. KANE:

21      Q      Mr. Poe, I'm handing you what we've

22   marked as Exhibit 6 to your deposition.  There is an

23   e-mail from you to a few people, including Mr. Hoops,

24   Mr. Slone, Mr. Tackett, and it references some

25   slides.

1                      S. POE

2                 That we were not only in there just with

3      a pie in the sky plan, so to speak.  That we actually

4      had some things with validity.  There was some -- it

5      wasn't all bad.  There was a feature to it that was

6      good and there was a feature to it we thought we

7      could do something with because of those synergies I

8      mentioned before.  And anyway, with all that, they

9      seemed to be really warm to the idea.

10                 I think we had another follow-up meeting

11     or two that occurred even after this, I'm sure.

12     I'm -- I know we did because I had to personally go

13     back once or twice just to -- when they released the

14     $14 million of funding, for Lexington.  I had to

15     attend in-person and receive that.  So I know I went

16     back as I worked through the process.

17                 And then, again, once that was done is

18     when I would deem -- kind of like the Alpha APA with

19     Lexington.  The APA was done, the purchase was

20     complete, but the permit process -- I think that's

21     the case in any acquisition, period, with coal

22     companies.  A purchase will take place, transactions

23     will take place, but permit transfers will always

24     lag, because they cannot be done in one day.  They

25     take months to get done.

1                              S. POE

2         A     Yes.

3         Q     Looking at this, would you -- do you know

4    if the reference to the 61 transfer applications are

5    a reference to the 61 permits that were the subject

6    of the November 30th, 2017 transaction?

7         A     I would say yes.

8         Q     Okay.  And it goes on to say:  The

9    submittal fee checks were mailed to Frankfort Friday

10   morning.

11              What would that have been in reference

12   to?

13        A     Probably just the application fees that

14   went along with the permit transfers.

15        Q     Was there a fee required for each permit?

16        A     Yes.

17        Q     It says those were mailed to Frankfort

18   Friday morning, correct?

19        A     Yes.

20        Q     And it just says:  I just wanted to give

21   you a chance to notify Frankfort that they will be

22   submitted around 9:00 a.m. this morning.

23              Did I read that correctly?

24        A     Yes.

25        Q     So do you think, looking at this e-mail,

Page 221

1                           S. POE

2    that the permit transfer applications may have been

3    submitted on or around April 23rd, 2018?

4         A     Yes.  And again, the bonding -- kind of

5    going back to what I said earlier.  The process, they

6    would have submitted these, but then there would have

7    been, again, a process that has to take place where a

8    bond for each permit and then that permit approval.

9    It's not like they all got done in a block of 61, in

10   other words.

11              Even though the applications might have

12   been filed all 61 at one time, there was still a

13   process that went on as the agency would review one,

14   two or three of them, ask John Cline for the bond for

15   one, two or three of them, and then complete the

16   process for that one, two or three of them.  Then

17   they would move on to the next one, two or three, and

18   so on and so forth until they eventually completed

19   all 61.

20              But that's common.  That's common with

21   any coal acquisition, to follow that process.

22        Q     Did Lexington Coal ultimately provide the

23   bonding for all 61 permits?

24        A     To the best of my knowledge, yes.

25        Q     What other requirements did the State

1                              S. POE

2   its entirety and then approved and these permits,

3   some of which transferred.  I can't testify that all

4   of them were complete during my time there.

5         Q     Are you aware of anything that Lexington

6   Coal could have done that it didn't do in order to

7   effectuate the transfer of any of these permits?

8         A     No, I'm not aware of anything.

9         Q     Could Lexington Coal have reasonably done

10  anything more to effectuate the transfer of the

11  permits?

12              MR. KANE:  Object to the form of

13        the question.  Lack of foundation.

14              THE WITNESS:  I mean, I -- I think

15        we did everything that we were required

16        to do and we did it as timely as we

17        could, even with my push to complete the

18        process.

19  BY MR. GAUDAGNINO:

20        Q     And approval of the transfer of the

21  permits was ultimately a decision of the State of

22  Kentucky; is that right?

23        A     Absolutely.  Nothing could be done, no

24  matter who wanted it done, without their approval.

25        Q     Was there any reason why particular

1                           S. POE

2          that one document said maybe 10 million,

3          but if that was required to go to the

4          surety company, it would have been paid

5          directly to them.  There would have been

6          no reason for it to not.

7               Now, was it handled differently?  I

8          don't know.  I can't talk to that.  But I

9          would assume it would have went straight

10         to the third party.

11    BY MR. GAUDAGNINO:

12         Q    All right.  Did anyone at Blackjewel or

13    Revelation ever suggest to you that Lexington was in

14    breach of its obligations under the APA or the permit

15    transfer agreement?

16         A    That Lexington was in breach?  Not to my

17    knowledge.

18         Q    Would you agree with the characterization

19    that Lexington breached it obligations under those

20    agreements?

21              MR. KANE:  Object to the form of

22         the question.

23              THE WITNESS:  Would I -- would I

24         agree that Lexington was in breach of the

25         APA?  Is that what you're asking?

1                           S. POE

2     BY MR. GAUDAGNINO:

3          Q     Yes.

4          A     No one ever told me that we was in breach

5     of it.  To the best of my knowledge, we never

6     breached it under my management there.

7          Q     In your view, was Lexington Coal

8     performing all of its obligations under the APA or

9     the permit transfer agreement?

10         A     To the best of my knowledge, yes, during

11    the time I was there.

12         Q     Let's switch gears a little bit and talk

13    about the highwall miners again.

14         A     Okay.

15         Q     You mentioned that you heard some things

16    about the value of the highwall miners from Keith

17    Runyon; is that right?

18         A     Yeah, Keith would.  Again, it was mostly

19    general.  He was maybe expressing his frustrations

20    that the more he would dig and learn, the more he

21    felt that we were going to have to -- he just felt

22    like -- Jeff's an optimistic person.  Okay?  He

23    operates on optimism.

24               So anytime -- nearly everything he would

25    tell us, oh, this is great and shiny and it's got all

**United States Bankruptcy Court, Southern District of West Virginia**

| Fill in this information to identify the case (Select only one Debtor per claim form): | | |
|---|---|---|
| ☑ Blackjewel, L.L.C. (Case No. 19-30289) | ☐ Revelation Management Corp. (Case No. 19-30293) | ☐ Lone Mountain Processing, LLC (Case No. 19-30326) |
| ☐ Blackjewel Holdings, L.L.C. (Case No. 19-30290) | ☐ Dominion Coal Corporation (Case No. 19-30323) | ☐ Powell Mountain Energy, LLC (Case No. 19-30327) |
| ☐ Revelation Energy Holdings, LLC (Case No. 19-30291) | ☐ Harold Keene Coal Co. LLC (Case No. 19-30324) | ☐ Cumberland River Coal LLC (Case No. 19-30328) |
| ☐ Revelation Energy, LLC (Case No. 19-30292) | ☐ Vansant Coal Corporation (Case No. 19-30325) | |

Modified Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Clearwater Investment Holdings, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Dinsmore & Shohl LLP
611 Third Avenue
Huntington, WV  25701

Contact phone  304-529-6181
Contact email  janet.holbrook@dinsmore.com

Where should payments to the creditor be sent? (if different)

Clearwater Investment Holdings, LLC
1051 Main Street
Milton, WV 25541

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known)_____
Filed on ___ / ___ / ___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

**Claim Number: 1271**

Proof of Claim

page 1

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

---

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____ ____ ____ ____

---

**7.  How much is the claim?**

$ 7,280,577.99

**Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $ _____

**Amount of the claim that is secured:**  $ _____

**Amount of the claim that is unsecured:**  $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $ _____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

| | | Amount entitled to priority |
|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**  $_____

---

### Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** */s/ Patricia A. Hoops*
/s/ Patricia A. Hoops (Oct 31, 2019)

**Email:** janet.holbrook@dinsmore.com

Signature

**Name of the person who is completing and signing this claim:**

| Name | Patricia A. Hoops | | |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Manager |
|---|---|

| Company | Clearwater Investment Holdings, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1051 Main Street | | |
|---|---|---|---|
| | Number      Street | | |
| | Milton | WV | 25540 |
| | City | State | ZIP Code |

| Contact phone | | Email | |
|---|---|---|---|

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **I have supporting documentation.**
   (attach below)

☐ **I do not have supporting documentation.**

 Attachment

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/blackjewel.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Blackjewel, L.L.C. Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

---

**Do not file these instructions with your form**

| | |
|---|---|
| **Principal** | $7,171,017.74 |
| **Accrued interest** | $   109,560.25 |
| **Total** | $7,280,577.99 |

# Electronic Proof of Claim

Final Audit Report                                           2019-10-31

| | |
|---|---|
| Created: | 2019-10-31 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAeSJleq2AUpEvBpkA8xs9NBsPWyeuoxVS |

## "Electronic Proof of Claim" History

🗎 Web Form created by Prime Clerk (epoc@primeclerk.com)
   2019-10-31 - 3:32:10 PM GMT

📎 /s/ Patricia A. Hoops (janet.holbrook@dinsmore.com) uploaded the following supporting documents:
   📎 Attachment
   2019-10-31 - 3:39:14 PM GMT

🗎 Web Form filled in by /s/ Patricia A. Hoops (janet.holbrook@dinsmore.com)
   2019-10-31 - 3:39:14 PM GMT- IP address: 66.192.64.34

✒ (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
   AppleWebKit/537.36 (KHTML, like Gecko) Chrome/78.0.3904.70 Safari/537.36)
   2019-10-31 - 3:39:16 PM GMT- IP address: 66.192.64.34

✅ Signed document emailed to Prime Clerk (epoc@primeclerk.com) and /s/ Patricia A. Hoops
   (janet.holbrook@dinsmore.com)
   2019-10-31 - 3:39:16 PM GMT

**United States Bankruptcy Court, Southern District of West Virginia**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|

| | | |
|---|---|---|
| ☑ Blackjewel, L.L.C. (Case No. 19-30289) | ☐ Revelation Management Corp. (Case No. 19-30293) | ☐ Lone Mountain Processing, LLC (Case No. 19-30326) |
| ☐ Blackjewel Holdings, L.L.C. (Case No. 19-30290) | ☐ Dominion Coal Corporation (Case No. 19-30323) | ☐ Powell Mountain Energy, LLC (Case No. 19-30327) |
| ☐ Revelation Energy Holdings, LLC (Case No. 19-30291) | ☐ Harold Keene Coal Co. LLC (Case No. 19-30324) | ☐ Cumberland River Coal LLC (Case No. 19-30328) |
| ☐ Revelation Energy, LLC (Case No. 19-30292) | ☐ Vansant Coal Corporation (Case No. 19-30325) | |

## Modified Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | Who is the current creditor? | Jeffery A. Hoops |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| | | |
|---|---|---|
| 2. | Has this claim been acquired from someone else? | ☑ No ☐ Yes. From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Dinsmore & Shohl LLP 611 Third Avenue Huntington, WV 25701 | Clearwater Investment Holdings, LLC 1051 Main Street Milton, WV 25541 |
| | | Contact phone 304-529-6181 | Contact phone _____ |
| | | Contact email janet.holbrook@dinsmore.com | Contact email _____ |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | ☑ No ☐ Yes. Claim number on court claims registry (if known)_____   Filed on ___/___/_____ MM / DD / YYYY |

| | | |
|---|---|---|
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No ☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7.  How much is the claim? | $ 3,604,267.71 |

**Does this amount include interest or other charges?**
☐ No
☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Money Loaned |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                   $ _____<br><br>**Amount of the claim that is secured:**     $ _____<br><br>**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**     $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.     $ _____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**     $_____

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

**If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** */s/ Jeffery A. Hoops*
/s/ Jeffery A. Hoops (Oct 31, 2019)

**Email:** janet.holbrook@dinsmore.com

_____
Signature

**Name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Jeffery A. Hoops |
| | First name    Middle name    Last name |
| Title | |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1051 Main Street |
| | Number    Street |
| | Milton                                                    WV        25541 |
| | City                                                      State     ZIP Code |
| Contact phone | _____    Email _____ |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **I have supporting documentation.**
   **(attach below)**          ☐ **I do _not_ have supporting documentation.**

 Attachment

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> A person who files a fraudulent claim could be fined up
> to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/blackjewel.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Blackjewel, L.L.C. Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

---

**Do not file these instructions with your form**

| | |
|---|---|
| **Principal** | $3,591,605.67 |
| **Accrued interest** | $    12,662.04 |
| **Total** | $3,604,267.71 |

# Electronic Proof of Claim

Final Audit Report                                                        2019-10-31

| | |
|---|---|
| Created: | 2019-10-31 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAApJlbqkSuXFSnBUXOziBxTU2-5vBhmmLL |

## "Electronic Proof of Claim" History

📄 Web Form created by Prime Clerk (epoc@primeclerk.com)
2019-10-31 - 3:43:39 PM GMT

📎 /s/ Jeffery A. Hoops (janet.holbrook@dinsmore.com) uploaded the following supporting documents:
  📎 Attachment
2019-10-31 - 3:52:59 PM GMT

📄 Web Form filled in by /s/ Jeffery A. Hoops (janet.holbrook@dinsmore.com)
2019-10-31 - 3:52:59 PM GMT- IP address: 66.192.64.34

✍ (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/78.0.3904.70 Safari/537.36)
2019-10-31 - 3:53:02 PM GMT- IP address: 66.192.64.34

✅ Signed document emailed to Prime Clerk (epoc@primeclerk.com) and /s/ Jeffery A. Hoops
(janet.holbrook@dinsmore.com)
2019-10-31 - 3:53:02 PM GMT

Prime Clerk 🔾 | POWERED BY
Adobe Sign

Message
_____

| | |
|---|---|
| **From:** | Beckman, David [Dave.Beckman@FTIConsulting.com] |
| **Sent:** | 7/18/2019 11:55:50 AM |
| **To:** | Lerner, Stephen D. [stephen.lerner@squirepb.com] |
| **Subject:** | [EXT] RE: [EXTERNAL] Hoops proposal |

# Redacted – Privilege

```
-----Original Message-----
From: Lerner, Stephen D. <stephen.lerner@squirepb.com>
Sent: Thursday, July 18, 2019 9:53 AM
To: Beckman, David <Dave.Beckman@FTIConsulting.com>
Subject: RE: [EXTERNAL] Hoops proposal
```

## Redacted – Privilege

```
-----Original Message-----
From: Beckman, David <Dave.Beckman@FTIConsulting.com>
Sent: Thursday, July 18, 2019 11:51 AM
To: Lerner, Stephen D. <stephen.lerner@squirepb.com>
Subject: [EXT] FW: [EXTERNAL] Hoops proposal
```

### Redacted – Privilege

```
-----Original Message-----
From: Beckman, David
Sent: Thursday, July 18, 2019 9:50 AM
To: Lerner, Stephen D. <stephen.lerner@squirepb.com>; Jerrod Freund <jerrod.freund@jefferies.com>
Cc: Robert White <rwhite@jefferies.com>; Brosious, Dan <dbrosio@FTIConsulting.com>
Subject: RE: [EXTERNAL] Hoops proposal
```

I agree Steve.  A couple additional thoughts.

One thing was that I think taxes were just taxes and then he was splitting the 'after tax free cash flow'
1/3-1/3-1/3.   The issue on the payments to UCC is probably undoable w/o RS agreement but maybe we can
bifurcate the RS obligation between the east and west and have 2/3 go to RS until paid off and afterwards
to the GUCs.  The GUCs also have the chance to benefit from ongoing operations which RS will not.

On Hoops being involved, the trade in the east will be ok, it will be the west that is concerned.
Therefore the issue will be the discomfort that Team Contura feels about Hoops.  We need to think about
what all protections can be put in place (also see comment re proof of funds. .

On the prepetition transaction we can say that the debtor has looked at the ins/outs and Hoops
contributed a net $11M and under a strict preference we believe that and  debtor does owe the $11M.  I
think we can get the UCC to support that analysis and conclusion.  If that were the case we wouldn't be
looking for a decision on the characterization of the $45M but on the net $11M.

One thing that clearly distinguished this is that it is a DIP without a rollup that will get the cash
available to cover the workers comp and allow us to go forward.  Very good aspect.  It also allows for a
sales hearing where, ostensibly, other potential bidders could show up (even if it just gave bidders a
few weeks).

Need to also think through how best to get United and Cat on board.

Available for a call.

And... did I mention ...  WE NEED PROOF OF FUNDS.  We can't have a repeat of that debacle.

```
-----Original Message-----
From: Lerner, Stephen D. <stephen.lerner@squirepb.com>
Sent: Thursday, July 18, 2019 9:22 AM
To: Beckman, David <Dave.Beckman@FTIConsulting.com>; Jerrod Freund <jerrod.freund@jefferies.com>
Cc: Robert White <rwhite@jefferies.com>
```

Subject: RE: [EXTERNAL] Hoops proposal

Also, I am not saying we don't pursue this, but there are several likely insurmountable issues.  First, the request for a binding judicial determination on the character of the pre-petition advances as loans vs equity contributions.  Second, the use of 25% of cash flow to pay unsecured creditors is the subject for a plan of reorganization and is not something that courts can approve as part of a financing.  And, the mere fact, of Hoops as lender will draw substantial opposition.

-----Original Message-----
From: Beckman, David <Dave.Beckman@FTIConsulting.com>
Sent: Thursday, July 18, 2019 11:18 AM
To: Jerrod Freund <jerrod.freund@jefferies.com>
Cc: Lerner, Stephen D. <stephen.lerner@squirepb.com>; Robert White <rwhite@jefferies.com>
Subject: [EXT] Re: [EXTERNAL] Hoops proposal

Jerrod,

Need proof of funds.  Sorry to be obvious.

Sent from my iPhone

> On Jul 18, 2019, at 9:09 AM, Jerrod Freund <jerrod.freund@jefferies.com> wrote:
>
> We will be receiving a proposal from Hoops for the east this afternoon.  High level summary:
>
> Hoops to provide 10-15MM into the east priming Riverstone
>
> He will bring back on line 11 sections (out of 17 i believe - i assume the other 6 will be shut down and liquidated) which are all met coal and he believes they will cash flow almost immediately
>
> He will propose to pay half of the 3MM Riverstone put in for the dip (assume the other 1.5MM comes from the west)
>
> He will agree to cash flow allocation as follows:
> 25% goes to taxes
> 25% goes to pay down Riverstone
> 25% to unsecured
> 25% stays in the business
> No distributions to hoops (other than his claims - see below) for equity
>
> He wants the court to acknowledge that his 45MM put into the business was an unsecured revolver and not equity
>
> United and Cat to both take back equipment and liquidate
>
> Dave did i miss anything
>
> Jerrod Freund
> Managing Director
> Jefferies LLC
> O 212.336.7203
> M 917.304.2471
> jerrod.freund@jefferies.com
>
> Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: Vintners Place, 68 Upper Thames Street, London EC4V 3BJ. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.
>


Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

DEBTORSUB_205709

-------------------------------------------------------------------
47 Offices in 20 Countries

This message is confidential and may be legally privileged or otherwise protected from disclosure.  If
you are not the intended recipient, please telephone or email the sender and delete this message and any
attachment from your system; you must not copy or disclose the contents of this message or any attachment
to any other person.

For information about how Squire Patton Boggs processes EU personal data that is subject to the
requirements of the EU General Data Protection Regulation, please see our Privacy Notice regarding the
processing of EU personal data about clients and other business contacts pursuant to the GDPR at
www.squirepattonboggs.com.

Squire Patton Boggs (US) LLP is part of the international legal practice Squire Patton Boggs, which
operates worldwide through a number of separate legal entities. Please visit www.squirepattonboggs.com
for more information.

#US
-------------------------------------------------------------------

DEBTORSUB_205710

1                         D. BECKMAN

2   broader?

3    Q     Let's start with what you're testifying

4   on.

5    A      No, the 2019 advances, and I think I

6   already testified to this, the 2019 recovery of

7   the 2019 disbursements to Clearwater and Hoops

8   is not based on a breach of fiduciary duty.

9    Q     Now let's step aside from the topics

10  that you're designated to testify on as a

11  corporate representative.  I'm asking you

12  personally, Mr. Beckman, are you aware of any

13  alleged fiduciary duty breaches on Mr. Hoops'

14  behalf that led to any allegation in the

15  Clearwater complaint?

16   A     Yes, I believe that is -- a claim has

17  been made based on breach of fiduciary duty,

18  yes.

19   Q     And what is your understanding of the

20  basis for those claims?

21   A     I think it's largely on lack of full

22  disclosure relative to various transactions.  I

23  think it has to do with self-dealing related to

24  various transactions.  I apologize if I'm

25  mixing legal concepts, but that's my

```
1                        D. BECKMAN

2        audit.

3          Q     Just switch gears a little bit.  Just

4        talk about the Clearwater complaints some more.

5          A     Okay.

6                (Exhibit 27:  7/18/19 E-mail)

7     BY MR. MCGAVRAN:

8          Q     I'm going to drop into the chat Exhibit

9        27.

10         A     Yes, sir.

11         Q     Exhibit 27 is another e-mail chain, and

12       the top e-mail is from yourself dated

13       July 18th, 2019 to someone at Jefferies with

14       other individuals copied; is that correct?

15         A     That's what it said.

16         Q     Can you scroll down to the bottom third

17       of the first page, and it appears that on

18       July 18th, 2019 at 11:50 a.m. you wrote an

19       e-mail, correct?

20         A     Yes.  At the very bottom of the first

21       page?

22         Q     Yes, sir.

23         A     Yeah.

24         Q     And I'm going to go down to the second

25       page here.  And could you read what you wrote
```

1        D. BECKMAN

2    in the second paragraph starting "On the

3    pre-petition transaction."

4     A      "On the pre-petition transaction, we can

5    say that the debtor had looked at the ins and

6    outs and Hoops contributed a net 11 million and

7    under a strict preference we believe that, and

8    the debtor does owe the $11 million.  I think

9    we can get the UCC to support that analysis and

10   conclusion.  If that were the case, we wouldn't

11   be looking for a decision in the

12   characterization of the 45 million but on the

13   11 million."

14    Q      And UCC is the unsecured creditors

15   committee; is that right?

16    A      Yes.

17    Q      And this is an e-mail discussing a

18   potential approach where the pre-petition loans

19   or advances would be repaid to Mr. Hoops,

20   correct?

21    A      I'd have to read it, but it has to do

22   with, I believe, a kind of a comprehensive

23   offer that Mr. Hoops was crafting relative to

24   buying the assets of the estate.

25    Q      Did it have to do with a potential

| | |
|---|---|
| **From:** | Drew Kesler </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=01B2A675AFEE416D87C1230552E3DD01-DREW KESLER> |
| **To:** | Flannery, Daniel; Banks, Zachary; Jeff Hoops |
| **CC:** | Abbate, Christopher; Brodsky, Jamie; Maleh, Jack; John Reynolds; Jeffrey Scofield; Blair Barlow (BBarlow@lrpartners.com); Einbinder, Matthew P |
| **Sent:** | 24-Jun-19 10:06:25 PM |
| **Subject:** | RE: Response |
| **Attachments:** | Hoops & Clearwater Summary w Bank Download.xlsx |

Danny – Attached is #4. Rolling the cash model now.


Thanks,

   Drew


Drew Kesler, CFO
Blackjewel LLC
1051 Main Street
Milton, WV 25541
( Office - (304) 390-5959
( Direct - (304) 390-5915
2 Fax - (304) 390-5975


**From:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Sent:** Monday, June 24, 2019 3:48 PM
**To:** Banks, Zachary <Zachary.Banks@stblaw.com>; Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie
<jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds
<jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com)
<BBarlow@lrpartners.com>; Einbinder, Matthew P <MEinbinder@stblaw.com>; Drew Kesler
<Drew.Kesler@blackjewel.us>
**Subject:** RE: Response

Drew, please send the united documentation (#4) and the updated cash forecast today if you can.

Team STB, can you send a planner for 3 et this coming Thursday for the legal call?

Thanks.

**From:** Flannery, Daniel
**Sent:** Sunday, June 23, 2019 6:27 PM
**To:** Banks, Zachary <Zachary.Banks@stblaw.com>; Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie
<jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds
<jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com)
<BBarlow@lrpartners.com>; Einbinder, Matthew P <MEinbinder@stblaw.com>; Drew Kesler
<Drew.Kesler@blackjewel.us>
**Subject:** RE: Response

All, checking in re our proposal for a call tomorrow at 9 et.

If that time doesn't work, please propose other options for tomorrow or Tuesday. Would like everyone on the call.

Quick agenda below.

   1. Status of consents from JVLN/Uniper and United for 2L – CAT was constructive

2. Status of Uniper maturity request

3. Status of company counsel engagement – we need to know who is helping the company on the amendment/perfection and potential restructuring efforts

4. Documentation of how much has been funded by Jeff Hoops (amounts, dates of the advances) through United to date

5. CRO candidates

6. Jefferies EL

7. Scheduling of a bring-down legal dd call with lawyers for later this week focused on the following:

   a. Status of the Fifth Third fraudulent transfer and loan repayment

   b. Update on the BJW permits and bonding

   c. Update on the Pocahontas Royalties

   d. PRB Tax Settlement specifics and documentation

   e. BlackJewel arrangements with Lexington Coal re production shortfalls in BJE

Lastly, Jack and I would like to come to BlackJewel HQ this Wednesday to go through the latest cash flow forecast and accounting controls in granularity. Apologies for the short notice but we need to understand what is going on and what to expect regarding liquidity. If Wednesday doesn't work, please suggest other days this week and next week.

Thanks.

Danny

**From:** Banks, Zachary <Zachary.Banks@stblaw.com>
**Sent:** Friday, June 21, 2019 7:17 PM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>; Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>; Einbinder, Matthew P <MEinbinder@stblaw.com>
**Subject:** RE: Response

All,

As a follow-up to the below, please find attached the updated amendment terms grid.

Thanks,

Zach

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Friday, June 21, 2019 11:28 AM
**To:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>; Einbinder, Matthew P <MEinbinder@stblaw.com>; Banks, Zachary <Zachary.Banks@stblaw.com>
**Subject:** RE: Response

*** External Email ***

Jeff, per our discussion earlier RCP is OK with $10mm of term loan and $10mm of revolver. Pricing is L+150. Seems like we are agreed on everything else. STB is working on updating the grid to reflect the business deal so no confusion.

We would suggest that Limerock and the Company reach out to United, Cat, and Uniper regarding the consents. We can be available as needed to assist with those conversations. STB, will begin drafting

I think we should have an all-hands call (company, LRP, and RCP) on Monday to talk work streams and to get organized.

Does 9 am et work?

Thanks all.

Danny

**From:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Sent:** Thursday, June 20, 2019 6:02 PM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>
**Subject:** RE: Response

Danny:

I agree with the proposal as per my responses below with the exception I would agree to the first $10mm being a term loan and the 2nd $10mm being a revolver with both commitments being for the term of your loan. If this works for you and the Riverstone, team that is great, if not, then I completely understand and we will work together to make this as painless as possible for everyone........Thanks.....Jeff

# BLACKJEWEL

*Jeff Hoops*
Blackjewel L.L.C.
1051 Main Street
Milton, WV 25541

Email:  jeff.hoops@blackjewel.us
Office:  304-390-5920
Fax:  304-290-5975
Cell:  304-541-2059



The information contained in this e-mail is intended only for the use of the individual above.  If you receive this message in error, please do not read it, notify the sender and then delete.

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Thursday, June 20, 2019 5:50 PM
**To:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>
**Subject:** RE: Response

Thanks, Jeff.

We just convened. Feedback is that if you agree with the rest of the proposal, we will allow the L+150 interest rate. Let us know how you would like to proceed.

Danny

CONFIDENTIAL

**From:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Sent:** Thursday, June 20, 2019 3:43 PM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>
**Subject:** RE: Response

Danny:

Also, you guys should keep in mind my salary of $400k per year is about 10% of what comparable CEO's make at much smaller companies. My goal is not to make money from the additional capital, but again I cannot put $20mm at risk, then pay $800k per year in interest on top of that just to keep everyone else whole. I fully support whatever you decide as some critical decisions will need to be made in the next 24 hours as I am cutting off the tie to my LOC until this matter is resolved........Thanks.....Jeff

# BLACKJEWEL

*Jeff Hoops*
Blackjewel L.L.C.
1051 Main Street
Milton, WV 25541

Email: jeff.hoops@blackjewel.us
Office: 304-390-5920
Fax: 304-290-5975
Cell: 304-541-2059



The information contained in this e-mail is intended only for the use of the individual above. If you receive this message in error, please do not read it, notify the sender and then delete.

**From:** Flannery, Daniel [mailto:dflannery@riverstonecredit.com]
**Sent:** Thursday, June 20, 2019 3:29 PM
**To:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Cc:** Abbate, Christopher <cabbate@riverstonecredit.com>; Brodsky, Jamie <jbrodsky@riverstonecredit.com>; Maleh, Jack <jmaleh@riverstonecredit.com>; John Reynolds <jr@lrpartners.com>; Jeffrey Scofield <js@lrpartners.com>; Blair Barlow (BBarlow@lrpartners.com) <BBarlow@lrpartners.com>
**Subject:** RE: Response

Jeff –

Thanks for your thoughts. Copying the broader team including my partners and LRP.

I'm sure you made your partners aware of your response this am but wanted to make sure everyone remains included on all communication so there is no confusion.

As we mentioned in our email last night and have said to you consistently throughout our discussions, the revolver ask does not work and the company should not pay any interest on the new 2L debt.

For the avoidance of doubt, the fundamental terms of the 2L are to be exactly as we drafted in the grid. That is what RCP is prepared to allow.

Regarding the CRO proposal, we will come back with thoughts and suggestions.

Seems like we have agreed on all the other points which is good.

CONFIDENTIAL

DEBTORSCL_006318

Please let us know how the shareholders would like to proceed.

Thanks,

Danny

**From:** Jeff Hoops <Jeff.Hoops@blackjewel.us>
**Sent:** Thursday, June 20, 2019 9:09 AM
**To:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Subject:** FW: Response

Danny:

Below are my thoughts......Jeff

All,

Please see attached our response to your grid.

No question the company is in a very tough spot right now. We recognize that new money coming into the system is important for everyone to achieve their respective objectives and we are supportive of such injection.

To be crystal clear so there is no confusion about where things are today with RCP, here are our objectives:

1. We want our money back. Our deal has run its course and it is time for you all to explore all refinancing possibilities including a sale.We have and will continue to explore all options.

2. We want to honor the key elements of the existing amendment executed earlier this year, most importantly the extension option giving the company runway until January 2020 which the company doesn't have access to right now because of the ongoing EoD.Agreed.

3. The capital injection is something that we are highly supportive of but it must be structured in a way that works for RCP. We promised LRP and Jeff Hoops that we would deliver on allowing a 2L to accommodate the new money protection and we fully intend to do that. However, it needs to be on terms and conditions that we think are fair given the circumstances.Agree.

The summary changes in the grid are as follows:

1. The existing $11.4mm that has been funded through United will be reclassified as a 2L term loan with no coupon and a maturity outside of our debt. We need to see documentation that the $11.4mm has been invested and remains in the company.  Blackjewel will be the borrower and Jeff Hoops (or related entities) will be the lender. Would agree to $5mm term and $15mm revolver. The cost will be LIBOR + 1.50%, which is my exact cost.

2. The additional $8.6mm of available funding will be structured as a 2L delayed-draw term loan on the same terms as the reclassified $11.4mm. Use of proceeds is for working capital and can be used as needed.$5mm & $15mm will agree.

3. For the avoidance of doubt, there is no ability to get the money out unless we are 100% repaid. A revolving line is not going to work. No other structure works for me.

4. We are removing the fixed amortization. We want the fresh capital to have the maximum effect for the shareholders. This could potentially reduce the capital needs going forward. We believe this give, along with the infusion of capital should prevent any unnecessary liquidity squeezes through the life of our loan.Agree

5. We cannot extend our maturity. The deal is invested out of a fund that is past its investment life and having already extended this once, with a further extension, we will not receive any support for a further extension. Once the amendment is executed, the extension option is available, we believe this should be ample time to effect a refinancing / sale / restructuring.Agree

6. We need Uniper to agree that their facility will remain outstanding until at least the maturity of our debt.I believe they will agree to a 1/17/2020

7. The Company needs to hire a CRO acceptable to RCP to help the Company and its capital structure constituents prepare for all potential possibilities, including a bankruptcy filing. This is the 3rd emergency liquidity injection since we closed our initial deal in July 2017. It would be irresponsible to not be organized at this stage given the coming maturities and the multiple layers of creditors. Liquidity is incredibly tight, we need to see detailed weekly cash accounting, and we all need to get organized. The CRO will report to the Company's board of directors and the lenders will have information sharing

DEBTORSCL_006319

rights.Spoke with David Stetson and he seems willing to

8. The Company needs to sign an engagement letter with Jefferies focused on a transaction (sale or refinancing) that pays RCP off in full.Agree

Let us know when you are available to discuss.

Thanks,

Danny

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it

DEBTORSCL_006320

be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

| Hoops/Clearwater LOC Activity | | | |
|---|---|---|---|
| Date | Bank Advance | Paid | Balance |
| 1/10/2019 | 1,205,000.00 | | 1,205,000.00 |
| 1/11/2019 | | 1,205,000.00 | - |
| 1/11/2019 | 2,500,000.00 | | 2,500,000.00 |
| 1/11/2019 | 237,329.44 | | 2,737,329.44 |
| 3/14/2019 | 650,000.00 | | 3,387,329.44 |
| 3/15/2019 | | 650,000.00 | 2,737,329.44 |
| 4/16/2019 | 605,500.00 | | 3,342,829.44 |
| 4/17/2019 | | 605,500.00 | 2,737,329.44 |
| 4/18/2019 | 230,000.00 | | 2,967,329.44 |
| 4/18/2019 | | 230,000.00 | 2,737,329.44 |
| 4/23/2019 | 3,300,000.00 | | 6,037,329.44 |
| 4/23/2019 | | 3,300,000.00 | 2,737,329.44 |
| 4/24/2019 | 2,155,000.00 | | 4,892,329.44 |
| 4/25/2019 | 1,360,000.00 | | 6,252,329.44 |
| 4/26/2019 | 525,000.00 | | 6,777,329.44 |
| 4/26/2019 | | 4,083,526.18 | 2,693,803.26 |
| 4/29/2019 | 3,025,000.00 | | 5,718,803.26 |
| 4/29/2019 | 100,000.00 | | 5,818,803.26 |
| 5/1/2019 | | 100,000.00 | 5,718,803.26 |
| 5/2/2019 | 350,000.00 | | 6,068,803.26 |
| 5/3/2019 | | 3,375,000.00 | 2,693,803.26 |
| 5/6/2019 | 1,071,000.00 | | 3,764,803.26 |
| 5/7/2019 | | 1,071,000.00 | 2,693,803.26 |
| 5/8/2019 | 2,500,000.00 | | 5,193,803.26 |
| 5/9/2019 | 2,741,012.56 | | 7,934,815.82 |
| 5/10/2019 | | 5,241,012.56 | 2,693,803.26 |
| 5/13/2019 | 1,650,000.00 | | 4,343,803.26 |
| 5/14/2019 | | 1,650,000.00 | 2,693,803.26 |
| 5/15/2019 | 1,750,000.00 | | 4,443,803.26 |
| 5/17/2019 | | 1,722,058.97 | 2,721,744.29 |
| 5/19/2019 | 710,500.00 | | 3,432,244.29 |
| 5/20/2019 | 3,812,071.53 | | 7,244,315.82 |
| 5/21/2019 | | 1,992,745.72 | 5,251,570.10 |
| 5/22/2019 | 1,260,141.21 | | 6,511,711.31 |
| 5/23/2019 | 324,106.91 | | 6,835,818.22 |
| 5/24/2019 | | 1,360,702.77 | 5,475,115.45 |
| 5/28/2019 | | 2,767,900.53 | 2,707,214.92 |
| 5/30/2019 | 2,548,644.68 | | 5,255,859.60 |
| 5/30/2019 | 1,988,456.22 | | 7,244,315.82 |
| 5/31/2019 | | 1,587,157.38 | 5,657,158.44 |
| 6/3/2019 | 1,587,157.38 | | 7,244,315.82 |
| 6/5/2019 | 1,361,130.38 | | 8,605,446.20 |
| 6/6/2019 | 863,000.00 | | 9,468,446.20 |
| 6/6/2019 | 126,000.00 | | 9,594,446.20 |
| 6/7/2019 | 800,000.00 | | 10,394,446.20 |

| Date | | | |
|---|---|---|---|
| 6/7/2019 | 210,000.00 | | 10,604,446.20 |
| 6/10/2019 | | 1,296,764.00 | 9,307,682.20 |
| 6/11/2019 | | 968,241.90 | 8,339,440.30 |
| 6/12/2019 | 1,818,212.33 | | 10,157,652.63 |
| 6/13/2019 | 146,232.90 | | 10,303,885.53 |
| 6/14/2019 | 149,594.86 | | 10,453,480.39 |
| 6/14/2019 | 1,466,089.34 | | 11,919,569.73 |
| 6/14/2019 | | 1,466,089.34 | 10,453,480.39 |
| | 45,126,179.74 | 34,672,699.35 | 10,453,480.39 |

| Date | Debit | Credit | Description | | | |
|---|---|---|---|---|---|---|
| 1/10/2019 | | 1,205,000.00 | MISC. CREDIT | | | |
| 1/11/2019 | | 237,329.44 | MISC. CREDIT | | | |
| 1/11/2019 | | 2,500,000.00 | MISC. CREDIT | | | |
| 1/11/2019 | 1,205,000.00 | | MISC. DEBIT | | | |
| 3/14/2019 | | 650,000.00 | MISC. CREDIT | | | |
| 3/15/2019 | 650,000.00 | | MISC. DEBIT | | | |
| 4/16/2019 | | 605,500.00 | MISC. CREDIT | | | |
| 4/17/2019 | 605,500.00 | | MISC. DEBIT | | | |
| 4/18/2019 | | 230,000.00 | MISC. CREDIT | | | |
| 4/18/2019 | 230,000.00 | | MISC. DEBIT | | | |
| 4/23/2019 | | 3,300,000.00 | MISC. CREDIT | | | |
| 4/23/2019 | 3,300,000.00 | | MISC. DEBIT | | | |
| 4/24/2019 | | 2,155,000.00 | MISC. CREDIT | | | |
| 4/25/2019 | | 1,360,000.00 | MISC. CREDIT | | | |
| 4/26/2019 | | 525,000.00 | MISC. CREDIT | | | |
| 4/26/2019 | 4,083,526.18 | | MISC. DEBIT | | | |
| 4/29/2019 | | 3,025,000.00 | MISC. CREDIT | | | |
| 4/29/2019 | | 100,000.00 | MISC. CREDIT | | | |
| 5/1/2019 | 100,000.00 | | MISC. DEBIT | | | |
| 5/2/2019 | | 350,000.00 | MISC. CREDIT | | | |
| 5/3/2019 | 3,375,000.00 | | MISC. DEBIT | | | |
| 5/6/2019 | | 1,071,000.00 | MISC. CREDIT | | | |
| 5/7/2019 | 1,071,000.00 | | MISC. DEBIT | | | |
| 5/8/2019 | | 2,500,000.00 | MISC. CREDIT | | | |
| 5/9/2019 | | 2,741,012.56 | MISC. CREDIT | | | |
| 5/10/2019 | 5,241,012.56 | | MISC. DEBIT | | | |
| 5/13/2019 | | 1,650,000.00 | MISC. CREDIT | | | |
| 5/14/2019 | 1,650,000.00 | | MISC. DEBIT | | | |
| 5/15/2019 | | 1,750,000.00 | MISC. CREDIT | | | |
| 5/16/2019 | | 710,500.00 | MISC. CREDIT | | | |
| 5/17/2019 TO ▮ | 1,722,058.97 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 5/20/2019 TRANSFER FROM LO | | 3,812,071.53 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 5/21/2019 TO ▮ | 1,992,745.72 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 5/22/2019 TRANSFER FROM LO | | 1,260,141 21 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 5/23/2019 TRANSFER FROM LO | | 324,106 91 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 5/24/2019 TO ▮ | 1,360,702.77 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 5/28/2019 TO ▮ | 2,767,900.53 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 5/29/2019 TRANSFER FROM LO | | 2,548,644.68 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 5/30/2019 TRANSFER FROM LO | | 1,988,456 22 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 5/31/2019 TO ▮ | 1,587,157.38 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 6/3/2019 TRANSFER FROM LO | | 1,587,157 38 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 6/5/2019 | | 1,361,130 38 | MISC. CREDIT | | | |
| 6/6/2019 | | 126,000.00 | MISC. CREDIT | | | |
| 6/6/2019 | | 863,000.00 | MISC. CREDIT | | | |
| 6/7/2019 | | 210,000.00 | MISC. CREDIT | | | |
| 6/7/2019 | | 800,000.00 | MISC. CREDIT | | | |
| 6/10/2019 TO ▮ | 1,296,764.00 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 6/11/2019 TO ▮ | 968,241.90 | | LOAN PAYMENT | TRANSFER TO | LOAN SYSTEM | ACCOUNT |
| 6/12/2019 TRANSFER FROM LO | | 1,818,212.33 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |
| 6/13/2019 TRANSFER FROM LO | | 146,232.90 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT |

796,041,619,106,828

| 6/14/2019 | TRANSFER FROM | LO | | 149,594 86 | AUTO TRANSFER CREDIT | TRANSFER FROM | LOAN SYSTEM | ACCOUNT | | |
| 6/14/2019 | | | | 1,466,089 34 | MISC. CREDIT | | | | | |
| 6/14/2019 | Blackjewel LLC | SE | 1,466,089.34 | | PREAUTHORIZED ACH DEBIT | Blackjewel LLC | SETTLEMENT | | PF SETT | Blackjewel LLC |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re:<br>Blackjewel, L.L.C., *et al.*,<br>Debtors,[1] | :<br>:<br>:<br>: | Chapter 11<br>Case No. 19-30289<br>(Jointly Administered) |
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>CLEARWATER INVESTMENT<br>HOLDINGS, LLC, et al.,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03008<br>(Consolidated) |
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>LEXINGTON COAL COMPANY,<br>LLC, et al.,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03012<br>(Consolidated) |
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>TRIPLE H REAL ESTATE, LLC, et al.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03015<br>(Consolidated) |

[1] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

1

## DECLARATION OF PATRICIA HOOPS

I, Patricia Hoops, state and declare as follows:

1.      My name is Patricia Hoops.  I am over 18 years old and am a resident of Piniellas County, Florida.  I make this Declaration based on my personal knowledge, and I am competent to testify to the matters stated herein.  All statements contained herein are true and accurate to the best of my current knowledge and belief.

2.      I am now and have at other relevant times been the manager of Clearwater Investment Holdings, LLC.  In this role, I would, at times, sign documents on behalf of Clearwater Investment Holdings, LLC.  I have reviewed certain documents, discussed below, contained in the Appendix to Defendants' Motion for Partial Summary Judgment in the above-captioned adversary proceeding.

3.      Appendix No. 29 (DEBTORSUB_104992-105010) is a true and accurate copy of the Operating Agreement of Clearwater Investment Holdings, LLC.  As indicated therein, Clearwater Investment Holdings, LLC is 99% owned by an entity named the Clearwater Trust and 1% owned by myself.

4.      Appendix No. 31 is a true and accurate copy of the Commercial Promissory Note in the amount of $11,000,000 and with an effective date of April 1, 2019 involving United Bank, as lender, and Clearwater Investment Holdings, LLC, as borrower.

5.      Appendix No. 34 is a true and accurate copy of the Proof of Claim filed by Clearwater Investment Holdings, LLC in the total amount of $7,280,577.99.

6.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2

Executed on April 18, 2022.

_____
Patricia Hoops

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re:<br>Blackjewel, L.L.C., *et al.*,<br>Debtors,[1] | :<br>:<br>:<br>: | Chapter 11<br>Case No. 19-30289<br>(Jointly Administered) |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>CLEARWATER INVESTMENT<br>HOLDINGS, LLC, et al.,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03008<br>(Consolidated) |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>LEXINGTON COAL COMPANY,<br>LLC, et al.,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03012<br>(Consolidated) |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al.<br><br>        Plaintiffs,<br>v.<br><br>TRIPLE H REAL ESTATE, LLC, et al.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Adv. Proc. No. 3:20-ap-03015<br>(Consolidated) |

---

[1] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

1

## DECLARATION OF JEFFERY A, HOOPS, SR.

I, Jeffery A. Hoops, Sr. state and declare as follows:

1.      My name is Jeffery A. Hoops, Sr.  I am over 18 years old and am a resident of Piniellas County, Florida.  I make this Declaration based on my personal knowledge, and I am competent to testify to the matters stated herein.  All statements contained herein are true and accurate to the best of my current knowledge and belief.

2.      At the times relevant to this declaration, I was President and CEO of Debtors Blackjewel, L.L.C. Blackjewel Holdings L.L.C., Revelation Energy Holdings, LLC, Revelation Management Corporation, and Revelation Energy, LLC.  As a result of my work with these entities, I am familiar with their operations, business affairs, and books and records. I have reviewed certain documents, discussed below, contained in the Appendix to Defendants' Motion for Partial Summary Judgment in the above-captioned adversary proceeding.

3.      Appendix No. 2 is a true and accurate copy of the Limited Liability Company Agreement of Revelation Energy Holdings, LLC dated as of March 26, 2009.

4.      Appendix No. 4 is a true and accurate copy of the Limited Liability Company Blackjewel, L.L.C. dated as of March 24, 2017

5.      Appendix No. 5 is a true and accurate copy of the Limited Liability Company Blackjewel Holdings, L.L.C. dated as of July 14, 2017.

6.      Appendix No. 13 is a true and accurate copy of the Amended and Restated Mortgage and Security Agreement effective as of July 10, 2017 between Revelation Energy, LLC, Revelation Energy Holdings, LLC, LR-Revelation Holdings, L.P., and myself.

7.      Appendix No. 14 is a true and accurate copy of a Letter Agreement dated as of July 10, 2017, between Revelation Energy, LLC, Revelation Energy Holdings, LLC, LR-Revelation Holdings, L.P., and myself.

8.      Appendix No. 19 is a true and accurate copy of an email chain dated from November 7, 2017 to November 9, 2017 involving, among others, Daniel Flannery, Jeff Scofield, Drew Kesler, John Reynolds, and myself including, among others, an email I sent on November 7, 2017.   As indicated in my email dated November 7, 2017, Debtors' underground workers' compensation insurance rate increased from 24% to 48% effective October 25, 2017 as a result of a change in Kentucky state law, resulting in a cost increase to the Debtors of $24 million per year and, on or around November 6, 2017, a roof collapsed at Blackjewel's Lone Mountain facility which temporarily reduced production at Lone Mountain by a significant degree.

9.      Appendix No. 20 is a true and accurate copy of an email dated November 13, 2017, that I sent to Jeff Scofield.

10.     Appendix No. 23 is a true and accurate copy of a Demand Promissory Note dated as of November 10, 2017 between Blackjewel, L.L.C., as borrower, and myself, as lender, in the principal sum of $5,000,000.

11.     Appendix No. 24 is a true and accurate copy of an email dated December 29, 2017 involving Daniel Flannery, Jeff Scofield, Oliver Phillips, and myself.

12.     Appendix No. 26 is a true and accurate copy of an Assignment made effective as of April 24, 2019 between Patricia Hoops and myself, as assignors, and Clearwater Investment Holdings, LLC, as assignee.

3

13.     Appendix No. 28 is a true and accurate copy of a Mortgage and Security Agreement made effective as of December 1, 2016 between Revelation Energy, LLC, as mortgagor, and myself, as mortgagee.

14.     Appendix No. 35 is a true and accurate copy of the Proof of Claim I filed in the total amount of $3,604,267.71.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 18, 2022.

Jeffery A. Hoops, Sr.

4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Blackjewel, L.L.C., *et al.*, | : | Case No. 19-30289 |
| Debtors,[1] | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03008 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| CLEARWATER INVESTMENT | : | |
| HOLDINGS, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03012 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| LEXINGTON COAL COMPANY, | : | |
| LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| BLACKJEWEL, L.L.C., et al. | : | Adv. Proc. No. 3:20-ap-03015 |
| | : | (Consolidated) |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| TRIPLE H REAL ESTATE, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

[1] Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number were as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The Blackjewel Liquidation Trust (the "Trust") is the successor-in-interest to the Debtors as Plaintiffs for purposes of this action.

## DECLARATION OF HELENA JACKSON

I, Helena Jackson, state and declare as follows:

1.      My name is Helena Jackson.  I am over 18 years old and am a resident of Pike
County, Kentucky.  I make this Declaration based on my personal knowledge, and I am competent
to testify to the matters stated herein.  All statements contained herein are true and accurate to the
best of my current knowledge and belief.

2.      During the summer of 2017, I served as General Counsel to the Debtors.  In
furtherance of this role, I would send and receive communications related to various of the
Debtors' transactions.  I was familiar with certain of the Debtors' operations, business affairs,
books and records.  I have reviewed certain documents, discussed below, contained in the
Appendix to Defendants' Motion for Partial Summary Judgment in the above-captioned adversary
proceeding.

3.      Appendix No. 12 (Clearwater AP Defendant 0304537-39) is a true and accurate
copy of an email chain including emails from June 29, 2017 involving, among others, Jeff Scofield,
Blair Barlow, Lime Rock's deputy general counsel Anu Mehta, and myself regarding certain
transactions involving Jeffery A. Hoops, Sr. and Lime Rock.

4.      Appendix No. 15 (Clearwater AP Defendant 00304311-22) is a true and accurate
copy of an email chain including emails from June 26, 2017 to July 5, 2017 involving, among
others, Jeff Scofield, Blair Barlow, Lime Rock's Deputy General Counsel Anu Mehta, and myself
regarding certain transactions involving Jeffery A. Hoops, Sr. and Lime Rock.  As reflected in
Appendix No. 15, on July 5, 2017, Anu Mehta sent me a draft letter agreement.

5.      I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

2

Executed on April 18, 2022.


*/s/ Helena Jackson*
Helena Jackson